1  JOHN H. HEMANN (SBN: 165823)
2  JOSEPH E. FLOREN (SBN: 168292)
   THOMAS R. GREEN (SBN: 203480)
   MATTHEW S. WEILER (SBN 236052)
3  MORGAN, LEWIS & BOCKIUS LLP
   One Market, Spear Street Tower
4  San Francisco, CA  94105-1126
   Tel: 415.442.1000
5  Fax: 415.442.1001
   E-mail: jhemann@morganlewis.com
6           jfloren@morganlewis.com
            tgreen@morganlewis.com
7           mweiler@morganlewis.com

8
   Attorneys for KLA-Tencor Corporation
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12  CHRIS CRIMI, on Behalf of Himself and All    Case No.
    Others Similarly Situated,
13                                               **CLASS ACTION**
                        Plaintiff,
14                                               **NOTICE OF REMOVAL OF
         vs.                                     ACTION TO THE UNITED STATES**
15                                               **DISTRICT COURT FOR THE
    EDWARD W. BARNHOLT, H. RAYMOND               NORTHERN DISTRICT OF**
16  BINGHAM, ROBERT T. BOND, RICHARD J.          **CALIFORNIA**
    ELKUS, JR., STEPHEN P. KAUFMAN,
17  KENNETH LEVY, MICHAEL E. MARKS,              [28 U.S.C. §1441(a); 15 U.S.C. §
    DEAN O. MORTON, KENNETH L.                   78bb(f)(2)]
18  SCHROEDER, JON D. TOMPKINS,
    RICHARD P. WALLACE, KLA-TENCOR
19  CORPORATION, and DOES 1 through 25,

20                      Defendants.

21

22

23

24

25

26

27

28

1    **TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE**

2    **NORTHERN DISTRICT OF CALIFORNIA, AND TO PLAINTIFF AND HIS**

3    **ATTORNEYS:**

4        PLEASE TAKE NOTICE that Defendant KLA-Tencor Corporation ("KLA") hereby

5    removes to this Court the action filed in state court described below pursuant to 15 U.S.C. §

6    78bb(f) *et seq.* and 28 U.S.C. §§ 1331, 1441(a), (b), and 1446.

7        1.    On April 1, 2008, Plaintiff Chris Crimi filed his First Amended Complaint against

8    Defendants in the Superior Court of the State of California in and for the County of Santa Clara

9    entitled *Crimi v. Barnholt, et. al.,* Case No. 1-07-CV-093465 (the "State Court Action"), a true

10   and correct copy of which is attached hereto as Exhibit A.

11       2.    Plaintiff originally filed a complaint asserting causes of action for breach of

12   fiduciary duty and "rescission," on September 4, 2007.  KLA demurred on the grounds that the

13   complaint failed to state a cause of action.  The Superior Court sustained KLA's demurrer on

14   February 29, 2008.  Plaintiff's First Amended Complaint, asserting causes of action for breach of

15   fiduciary duty and a provision of the California Corporate Code, was filed on April 1, 2008.  The

16   state court pleadings for this matter are attached hereto as Exhibit B.

17       3.    The First Amended Complaint is styled as a class action.  It asserts claims arising

18   from allegedly false and misleading proxy materials and financial statements within Form 10K

19   filings for the years 1998 through 2005.  FAC ¶¶ 33-46, 66-68.  Among other things, Plaintiff

20   alleges that issuance of a number of false and misleading statements was "material to KLA-

21   Tencor Corporation shareholders' consideration of ... holding their shares of KLA-Tencor stock

22   during times relevant herein." FAC ¶ 77.

23       4.    KLA-Tencor's stock is a covered security within the meaning of the Securities

24   Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f) ("SLUSA") because it is listed on the

25   National Market System of the Nasdaq Stock Market.  The Complaint thus constitutes a "covered

26   class action" involving a "covered security" within the meaning of SLUSA, and is expressly

27   removable to this Court by KLA under 15 U.S.C. §§ 78bb(f)(2).

28       5.    This action may be removed to this Court by KLA pursuant to SLUSA, which

1    provides that "[n]o covered class action based upon the statutory or common law of any State or

2    subdivision thereof may be maintained in any State or Federal court by any private party alleging

3    (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a

4    covered security; or (B) that the defendant used or employed any manipulative or deceptive

5    device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. §

6    78bb(f)(1); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, (2006) (holding

7    "covered class action" applies to holders of securities as well as to buyers and sellers for purposes

8    of SLUSA). As this action purports to be a class-action on behalf of 50 or more KLA

9    shareholders, it is a "covered class action, and "[a]ny covered class action brought in any State

10   court involving a covered security, as set forth in [15 U.S.C. § 78bb(f)(1)] shall be removable to

11   the Federal district court for the district in which the action is pending." 15 U.S.C. § 78bb(f)(2).

12        6.      This court has jurisdiction pursuant to 15 U.S.C. §§ 77p and 77bb(f), as well as 28

13   U.S.C. § 1331, without regard to the amount in controversy or citizenship of the parties.

14        7.      Fewer than thirty (30) days have elapsed since the State Court Action first became

15   removable to this Court. Plaintiff filed his First Amended Complaint on April 1, 2008, asserting

16   a cause of action for violation of California Corporations Code § 1507. FAC ¶¶ 74-79. This

17   cause of action was not asserted in Plaintiff's original complaint.

18        8.      KLA is the only defendant that has been served with Plaintiff's First Amended

19   Complaint. Accordingly, KLA is not required to obtain consent of the other Defendants.

20   *Salveson v. W. States Bankcard Ass'n*, 731 F2d 1423, 1429 (9th Cir. 1984). Nevertheless, KLA

21   has informed the other Defendants of its intent to remove this matter, and none of them has

22   objected.

23        9.      Pursuant to this Court's Civil Local Rule 3.2(c), this action is a styled as a putative

24   class action and can be assigned to the San Francisco Division of the Northern District of

25   California. Furthermore, pursuant to this Court's Civil Local Rule 3-12, this action should be

26   assigned to the San Francisco Division of the Northern District of California on the additional

27   ground that a consolidated class action entitled *In re KLA-Tencor Corporation Securities*

28   *Litigation* (Case No. C 06-4065 CRB) is currently pending before United States District Court

1    Judge Charles R. Breyer.  As this present action is styled as class actions, and asserts claims

2    under the same set of underlying factual allegations as the consolidated federal class action, KLA

3    has submitted a notice of related case herewith.

4         10.    Venue in this Court is appropriate under 28 U.S.C. § 1441(a), because this district

5    embraces the place in which the State Court Action was filed.

6         11.    All pleadings, process, and orders served upon KLA from the State Court Action

7    are attached to this Notice of Removal as required by 28 U.S.C. §1446(a) as <u>Exhibit A</u> (the

8    Complaint) and <u>Exhibit B</u> (all other Pleadings).

9         12.    A true and correct copy of this Notice of Removal shall be promptly filed with the

10   Clerk of the Santa Clara County Superior Court, as required by 28 U.S.C. §1446(d).

11        13.    Written notice of the filing of this Notice of Removal shall be given to Plaintiff as

12   required by law.

13        14.    A completed Federal Civil Cover Sheet accompanies this Notice of Removal.

14        15.    A notice of interested parties accompanies this Notice of Removal.

15
16                              **<u>CONCLUSION</u>**

17        For the foregoing reasons, KLA respectfully requests that further proceedings in the State

18   Court Action be discontinued, and that this suit be removed to the United States District Court for

19   the Northern District of California, San Francisco Division.

20

21   Dated: April 30, 2008              MORGAN, LEWIS & BOCKIUS LLP

22

23                              By _____

24                                   Matthew S. Weiler
                                     Attorneys for Defendant KLA-Tencor
25                                   Corporation

26

27

28

1  Patrice L. Bishop (182256)
   service@ssbla.com
2  STULL, STULL & BRODY
   10940 Wilshire Boulevard
3  Suite 2300
   Los Angeles, CA 90024
4  Tel:   (310) 209-2468
   Fax:   (310) 209-2087
5
   [Additional Counsel Appear
6  on Signature Page]
7  Counsel for Plaintiff
8
9
10

<div align="right">

# E-FILED

Apr 1, 2008 5:00 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7883
By A. Ilas, Deputy

</div>

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on Behalf of Himself and All Others Similarly Situated,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>EDWARD W. BARNHOLT,<br>H. RAYMOND BINGHAM,<br>ROBERT T. BOND,<br>RICHARD J. ELKUS, JR.,<br>STEPHEN P. KAUFMAN,<br>KENNETH LEVY,<br>MICHAEL E. MARKS,<br>DEAN O. MORTON,<br>KENNETH L. SCHROEDER,<br>JON D. TOMPKINS,<br>RICHARD P. WALLACE,<br>KLA-TENCOR CORPORATION, and<br>DOES 1 through 25,<br><br>　　　　　　Defendants. | CASE NO. 1:07cv093465<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**<br><br>**JURY TRIAL DEMANDED**<br><br>Assigned To:  Honorable Jack Komar<br>Department:    17C |

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1    Plaintiff, through his attorneys, brings this Amended Complaint against defendant KLA-

2 Tencor Corporation ("KLA-Tencor" or the "Company") and certain directors of the Company,

3 alleges on personal knowledge as to his self and his activities, and on information and belief as to

4 all other matters, based on investigation and discovery conducted by counsel:

5                                          **SUMMARY**

6    1.    This is a shareholders' action on behalf of all individuals who owned KLA-Tencor

7 common stock between September 20, 2002 and September 27, 2006, except those who are part of

8 the class of settling shareholders who purchased KLA-Tencor stock between February 13, 2003 and

9 May 22, 2006, (the "Class"). Plaintiff, on behalf of himself and those similarly situated, alleges that

10 certain current and former officers and members of its Board of Directors (the "Board") breached

11 their fiduciary duties when they failed to inform plaintiff and the Class that they had issued

12 backdated KLA-Tencor stock options to certain senior executives. Indeed, defendants, as outlined

13 *infra,* have admitted that they issued backdated stock options to all employees who received grants

14 between from July 1, 1997 and June 30, 2002.

15    2.    KLA-Tencor, a publicly traded company whose common stock is traded on Nasdaq

16 under the ticker symbol "KLAC," was formed in May 1997 pursuant to merger of KLA Instruments

17 and Tencor Instruments. The Company supplies management solutions for the semiconductor and

18 related microelectronics industries.

19                                        **JURISDICTION**

20    3.    This Court has jurisdiction over the subject matter of this action pursuant to the

21 California Constitution Article VI, Section 10, because the case is an action not given by statute to

22 other trial courts.

23    4.    Venue is proper in this County under Section 395(a) of the California code of Civil

24 Procedure in that some or all of the Individual Defendants reside in this County.

25                                          **PARTIES**

26    5.    Plaintiff Chris Crimi owned shares of KLA-Tencor common stock between

27 September 20, 2002 and September 27, 2006.

28

2

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

6.    Edward W. Barnholt ("Barnholt") has served as a member of the Board of Directors since 1995 and its Compensation Committee and Nominating and Governance Committee since 2000. Defendant Barnholt was the Chairman of the Nominating and Governance Committee for the 2004, 2005 and 2006 fiscal years, and was named as Chairman of the Board in October of 2006, and became its Chairman in October 2006. Upon information and belief, Barnholt resides in California.

7.    H. Raymond Bingham ("Bingham") has served as a member of the Board of Directors since October 1999, its Audit Committee since 2000, and its Nominating and Governance Committee since 2006. Defendant Bingham became Chairman of the Audit Committee in 2003. and as Chairman. Upon information and belief, Bingham resides in California.

8.    Robert T. Bond ("Bond") has served as a member of the Board of Directors and its Compensation Committee since August 2000 and Audit Committee since 2002. He became Chairman of the Compensation Committee in 2004. Upon information and belief, Bond resides in California.

9.    Richard J. Elkus, Jr. ("Elkus") was a member of the Board of Directors during times relevant herein, and a member of its Audit Committee from 1999 until November 4, 2005 and its Nominating and Governance Committee from fiscal 2003 to November 4, 2005. Upon information and belief, Elkus resides in California.

10.    Stephen P. Kaufman ("Kaufman") has served as a member of the Board of Directors since November 2002 and its since November 2002 and its Nominating and Governance Committee since fiscal year 2005. Upon information and belief, Kaufman resides in California.

11.    Kenneth Levy ("Levy") was a member of Board of Directors during times relevant herein, holding the position of Chairman of the Board from July 1999 through October 2006. Levy was also a member of the Board's Nominating and Governance Committee and served as the Company's CEO from July 1998 to June 1999. Upon information and belief, Levy resides in California.

12.    Michael E. Marks ("Marks") was a member of the Board of Directors during times relevant herein, and a member of its Compensation Committee from November 2003 until May 2006. Upon information and believe, Marks resides in California.

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed: Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1    13.    Dean O. Morton ("Morton") was a member of the Board of Directors during times

2    relevant herein, and a member of its Audit Committee and the Nominating and

3    Governance Committee during fiscal year 2001.  Upon information and belief, Morton resides in

4    California.

5    14.    Defendant Kenneth L. Schroeder ("Schroeder") was a member of the Board of

6    Directors during times relevant herein and served on its Nominating and Governance Committee

7    during the 2001 and 2002 fiscal years.  Schroeder also served on the Company's Stock Option

8    Committee from 1994 until December 31, 2005.  Defendant Schroeder was a Senior Advisor to the

9    Company from January 1, 2006 through October 16, 2006, its CEO from July 1999 until January 1,

10   2006, President from November 1991 to July 2002 and from May 2004 to July 2005, and COO

11   from November 1991 until June 1999.  Upon information and belief, defendant Schroeder resides in

12   California.

13   15.    Jon D. Tompkins ("Tompkins"), one of the founders of the Company,  was a

14   member of the Board during times relevant herein, having served as Chairman of the Board from

15   July 1998 to June 1999 and CEO from May 1997 to July 1998.  Tompkins also served as a member

16   of the Stock Option Committee from 1997 until 1999.  Upon information and belief, Tompkins

17   resides in California.

18   16.    Defendant Richard P. Wallace ("Wallace") has been a member of the Company's

19   Board of Directors since January 2006.  Defendant Wallace also serves as the Company's Chief

20   Executive Officer ("CEO"), a position he has held since January 1, 2006.  He also served as

21   President and Chief Operating Officer ("COO") from July 2005 through December 2005, Executive

22   Vice President of the Customer Group from May 2004 to July 2005, and Executive Vice President

23   of the Wafer Inspection, Review & Analysis Group from July 2000 to May 2004.  Upon

24   information and belief, defendant Wallace resides in California.

25   17.    Defendant KLA-Tencor is a Delaware corporation with its executive offices and

26   principal place of business located at 160 Rio Robles, San Jose, California 95134.

27

28

4

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1       18.    Defendants Barnholt, Bingham, Bond, Elkus, Kaufman, Levy, Marks, Morton,

2  Schroeder, Tompkins, and Wallace are collectively referred to herein as the "Individual

3  Defendants."

4       19.    The true names and capacities of defendants sued herein under California Code of

5  Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiff, who

6  therefore sue these defendants by such fictitious names. Plaintiff will seek to amend this Complaint

7  and include these Doe defendants' true names and capacities when they are ascertained. Each of the

8  fictitiously named defendants is responsible in some manner for the conduct alleged herein and for

9  the injuries suffered by the Company.

10             **DUTIES OF THE INDIVIDUAL DEFENDANTS**

11       20.    Each Individual Defendant owed KLA-Tencor and its public shareholders the duty to

12  exercise due care, loyalty and good faith in the management and administration of the affairs of the

13  Company, as well as in the use and preservation of its property and assets. The conduct of the

14  Individual Defendants complained of herein involves a knowing, reckless or grossly negligent and

15  culpable violation of their obligations as directors and/or officers of KLA-Tencor, the absence of

16  good faith on their part and a reckless disregard for their duties to the Company and its

17  shareholders, all of which the Individual Defendants were aware or should have been aware,

18  presented a risk of, and in fact did cause, serious injury to the Company.

19       21.    By reason of their positions as officers, directors, and fiduciaries of KLA-Tencor and

20  its shareholders and because of their ability to control the business and corporate affairs of KLA-

21  Tencor, the Individual Defendants owed KLA-Tencor and its shareholders fiduciary obligations of

22  trust, good faith, loyalty, and due care, and were and are required to use their utmost ability to

23  control and manage KLA-Tencor in a fair, just, honest, and equitable manner. The Individual

24  Defendants were and are required to act in furtherance of the best interests of KLA-Tencor and its

25  shareholders so as to benefit all shareholders equally and not in furtherance of their personal

26  interests or benefit.

27

28

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1     22.    The Individual Defendants, because of their positions of control and authority as

2   directors and/or officers of KLA-Tencor, were able to and did, directly and/or indirectly, exercise

3   control over the wrongful acts complained of herein.

4     23.    At all times relevant hereto, each of the Individual Defendants was the agent of each

5   of the other Individual Defendants and of KLA-Tencor, and was at all times acting within the

6   course and scope of such agency.

7     24.    To discharge the aforesaid duties, the Individual Defendants were required to

8   exercise reasonable and prudent supervision over the management, policies, practices, controls, and

9   financial affairs of KLA-Tencor. The Individual Defendants were required, among other things, to:

10  in good faith manage, conduct, supervise and direct the business and affairs of KLA-Tencor

11  carefully and prudently and in accordance with all applicable laws, rules and regulations; neither

12  violate nor knowingly permit any officer, director, employee or agent of KLA-Tencor to violate

13  applicable federal and state laws, rules and regulations or any rule or regulation of KLA-Tencor;

14  exercise reasonable control and supervision over the officers and employees and agents of KLA-

15  Tencor; remain informed as to the status of KLA-Tencor's operations, and upon receipt of notice or

16  information of imprudent or unsound practices, to make a reasonable inquiry in connection

17  therewith, and to take steps to correct such conditions or practices and make such disclosures as are

18  necessary to comply with federal and state securities laws, supervise the preparation, filing and/or

19  dissemination of any SEC filings, press releases, audits, reports or other information required by

20  law, and examine and evaluate any reports or examinations, audits, or other financial information

21  concerning the financial condition of KLA-Tencor; maintain and implement an adequate system of

22  internal financial, accounting and management information systems and controls; and ensure that

23  KLA-Tencor's financial statements were prepared in accordance with Generally Accepted

24  Accounting Principles ("GAAP").

25    25.    Because of their Board membership and/or executive and managerial positions with

26  KLA-Tencor and their access to internal corporate documents (including the Company's operating

27  plans, budgets and forecasts and reports of actual operations compared thereto), conversations and

28  connections with other corporate officers and employees, attendance at management and Board of

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed: Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1  Directors meetings and committees thereof, and their receipt of reports and other information

2  provided to them in connection therewith, each of the Individual Defendants had access to

3  undisclosed information about KLA-Tencor's business prospects, financial condition, performance,

4  accounting and revenue recognition practices, as alleged herein.

5                    **CLASS ACTION ALLEGATIONS**

6        26.    Plaintiff brings this action pursuant to §382 of the California Code of Civil

7  Procedure on his own behalf and as a class action on behalf of all holders of KLA-Tencor common

8  stock, who are being and will be harmed by defendants' actions described below (the "Class").

9  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other

10  entity related to or affiliated with any defendants.

11        27.    This action is properly maintainable as a class action because:

12             a.    The class is so numerous that joinder of all members is impracticable.  There

13                   are millions of KLA-Tencor stock issued and outstanding.  The shares trade

14                   on the Nasdaq National Market under the ticker symbol "KLAC", and

15                   thousands of KLA-Tencor stockholders of record are located throughout the

16                   United States;

17             b.    There are questions of law and fact which are common to the Class, including

18                   whether the defendants have engaged or are continuing to act in a manner

19                   calculated to benefit themselves at the expense of KLA-Tencor's minority

20                   stockholders and whether plaintiff and other members of the Class would be

21                   irreparably damaged if the defendants are not enjoined in the manner

22                   described below;

23             c.    The defendants have acted or refused to act on grounds generally applicable

24                   to the Class thereby making appropriate final injunctive relief with respect to

25                   the Class as a whole;

26             d.    Plaintiff is committed to prosecuting this action and has retained competent

27                   counsel experienced in litigation of this nature.  The claims of plaintiff are

28                   typical of the claims of the other members of the class and plaintiff has the

7

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1     same interest as the other members of the Class.  Accordingly, plaintiff is an

2     adequate representative of the Class and will fairly and adequately protect the

3     interests of the Class; and

4     e.     Plaintiff anticipates that there will be no difficulty in the management of this

5     litigation as a class action.

6     28.     For the reasons stated herein, a class action is superior to other available methods for

7     the fair and efficient adjudication of this controversy.

8     <div align="center">**SUBSTANTIVE ALLEGATIONS**</div>

9     **Background**

10     29.     Stock options give employees of a publicly traded company the right to purchase

11     company stock at a fixed price in the future.  The general policy behind a grant of stock options is

12     to link employees' compensation to the value of the company's shares and, therefore, to the wealth

13     of the company's shareholders.  Typically, the options' fixed price is aligned with the price of the

14     stock on the day of the grant.  If the stock price rises from the fixed grant price the employee profits

15     by exercising the options and selling the shares.  In contrast, backdated stock options allow the

16     employees of a publicly traded company, such as KLA-Tencor, to maximize their wealth at the

17     expense of its shareholders.

18     30.     According to the Definitive Proxy filed with the Securities and Exchange

19     Commission on October 6, 1997 (the "1997 Proxy"), options were granted to eligible employees

20     through the 1982 Stock Option Plan and to directors through the Director Plan.  According to the

21     1997 Proxy, the "exercise price of the options is the fair market value of Common Stock as of the

22     date of grant."

23     31.     The 1982 Stock Option Plan was initially adopted by KLA Instruments Corporation

24     in 1981, restated on November 18, 1996 (the date of the annual meeting pursuant to the 1996

25     Definitive Proxy filed with the SEC on October 11, 1996), and operative through October 18, 2004.

26     Pursuant to the terms of the 1982 Stock Option Plan, as restated, the "Plan shall be administered by

27     the Board, including any duly appointed Committee of the Board."  In its power as administrator of

28     the plan, "the Board shall have the full and final power and authority, in its sole discretion . . . to

<div align="center">8</div>

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1   determine the persons to whom, and the time or times at which, Options shall be granted and the

2   number of shares of Stock to be subject to each Option . . . [and] . . . to determine the Fair Market

3   Value of shares of Stock or other property". Moreover, the "exercise price for each Option shall be

4   established in the sole discretion of the Board; provided, however, that [] no Option shall have an

5   exercise price per share less than the Fair Market Value of a share of Stock on the effective date of

6   grant of the Option."

7         32.     The 1982 Stock Option Plan also had an "evergreen" automatic annual share

8   replenishment feature which provided for, on the first day of the next fiscal year, the addition to the

9   Plan an amount of shares equal to 3% of KLA-Tencor's outstanding shares of common stock on the

10   last day of each fiscal year (the "Evergreen Provision").

11         33.     According to the Definitive Proxy filed with the SEC on September 28, 1998 (the

12   1998 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and

13   to directors through the Director Plan. According to the 1998 Proxy, the "exercise price of the

14   options is the fair market value of Common Stock as of the date of grant."

15         34.     The 1998 Proxy also requested shareholders approve the 1998 Outside Director

16   Option Plan (the "1998 Director Plan") and to reserve for issuance 1,000,000 shares of the KLA-

17   Tencor common stock for distribution to the directors under that plan.

18         35.     According to the Definitive Proxy filed with the SEC on October 15, 1999 (the

19   "1999 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and

20   to directors through the 1998 Director Plan. According to the 1999 Proxy, the "exercise price of the

21   options is the fair market value of Common Stock as of the date of grant."

22         36.     According to the Definitive Proxy filed with the SEC on October 6, 2000 (the "2000

23   Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and to

24   directors through the 1998 Director Plan. According to the 2000 Proxy, the "exercise price of the

25   options is the fair market value of Common Stock as of the date of grant."

26         37.     On November 10, 2000, the Board approved the 2000 Nonstatutory Stock Option

27   Plan which provides for the issuance of stock options to employees and consultants, other than

28   officers and directors, of the Company or any parent or subsidiary corporation .

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1    38.    According to the Definitive Proxy filed with the SEC on September 28, 2001 (the

2    2001 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and

3    to directors through the 1998 Director Plan.  According to the 2001 Proxy, the "exercise price of the

4    options is the fair market value of Common Stock as of the date of grant."

5    39.    According to the Definitive Proxy filed with the SEC on September 20, 2002 the

6    "2002 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and

7    to directors through the 1998 Director Plan.  According to the 2002 Proxy, all "Options were

8    granted at an exercise price equal to the fair market value of the Company's Common Stock on" the

9    date of the grant.

10    40.    On November 6, 2002, the Board amended the Nonstatutory Stock Option Plan.

11    41.    According to the Definitive Proxy filed with the SEC on September 23, 2003 (the

12    2003 Proxy"),options were granted to eligible employees through the 1982 Stock Option Plan and

13    to directors through the 1998 Director Plan.  According to the 2003 Proxy, all "Options were

14    granted at an exercise price equal to the fair market value of the Company's Common Stock."

15    42.    Pursuant to Evergreen Provision, on July 1, 2004, 5,903,603 shares of KLA-Tencor

16    stock were added into the 1982 Stock Option Plan.

17    43.    According to the Definitive Proxy filed with the SEC on September 9, 2004 (the

18    "2004 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan to

19    and to directors through the 1998 Director Plan.  According to the 2004 Proxy, all "Options were

20    granted at an exercise price equal to the fair market value of the Company's Common Stock."

21    44.    The 2004 Proxy requested shareholders vote in favor of the director approved 2004

22    Equity Incentive Plan.  The "2004 Equity Incentive Plan [was] developed to replace [the] 1982

23    Stock Option Plan and 2000 Nonstatutory Stock Option Plan and to supplement [the] 1998 Outside

24    Director Option Plan."   Under the terms of the 2004 Equity Incentive Plan, shareholders were

25    requested to reserve 11,000,000 shares of KLA-Tencor common stock for issuance under the terms

26    of the 2004 Equity Incentive Plan.  In addition, pursuant to the terms of the 2004 Equity Incentive

27    Plan, up to an additional 1,500,000 shares remaining for grant under the 1982 Stock Option Plan

28    and 2000 Nonstatutory Stock Option Plan would be transferred into the 2004 Equity Incentive Plan.

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1   45.    The 2004 Equity Incentive Plan was to "be administered by our Board of Directors

2   or a committee, which our Board of Directors may appoint from among its members (the

3   'Administrator')."  The "Administrator has the authority to . . . select the persons to whom awards

4   are to be granted."  Options granted under the Plan "may not be granted with an exercise price

5   lower than 100% of the fair market value of the underlying shares."

6   46.    According to the Definitive Proxy filed with the SEC on October 13, 2005 (the

7   "2005 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan to

8   and to directors through the 1998 Director Plan.  According to the 2005 Proxy, all "Options were

9   granted at an exercise price equal to the fair market value of the Company's Common Stock." .

10  **Defendants Begin to Reveal the Truth**

11  47.    On May 22, 2006, *The Wall Street Journal* published an article entitled "Five More

12  Companies Show Questionable Options Patterns."  The first company addressed by the article was

13  KLA-Tencor and, in fact, this was the first time the public had any idea that KLA-Tencor was

14  allegedly backdating stock options to top executives. The article stated, in relevant part:

> In 2001, KLA-Tencor Corp., a leading semiconductor-equipment
> maker, granted its top executives, including Chairman Ken Levy, two
> batches of stock options. They arrived on unusually fortunate days for
> the executives: The first dated at the share price's first-half low; the
> second at its second-half low. .
>
> In all, Mr. Levy received 10 grants from KLA-Tencor and its
> predecessor company between 1994 and 2001 -- all preceding quick
> runups in the share price; an analysis by The Wall Street Journal
> found the probability that that pattern occurred merely by chance is
> tiny -- around one in 20 million.
>
> Mr. Levy and company executives didn't return repeated phone and
> email messages.
>
> * * *
>
> KLA-Tencor was formed from the merger of two major suppliers of
> semiconductor equipment. It is a powerhouse in the specialized and
> expensive gear used by the world's largest chipmakers to test the
> quality of their complex production systems. It has a market value of
> about $9 billion. Based in San Jose, Calif., KLA-Tencor has
> generated a fortune for Mr. Levy, the founder of one of its
> predecessors.
>
> The company has assured shareholders -- whose holdings in the
> company get diluted each time an option is exercised -- that its option

11

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1
2
3
4

grants serve an important incentive purpose. "Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price," KLA-Tencor's compensation committee members wrote in a report filed with the company's 2002 proxy statement.

5
6
7

KLA-Tencor's 2001 stock chart looks a bit like a "W," with sharp drops in April and October. Mr. Levy and other top executives were granted options dated at the very bottom of each dip. One grant carried an exercise price of $29.31; the other, $32.75. KLA-Tencor shares now trade around $45, which means the options could be yielding millions in gains.

8
9

But had either 2001 grant come a bit more than a month later, it would have carried an exercise price closer to $50, yielding zero potential profit today.

10
11
12

It wasn't the only time that KLA executives, including Mr. Levy, former CEO Kenneth Schroeder and current chief Rick Wallace, received propitious grants. Grants to Messrs. Levy and Schroeder in 1998 and 2000 also were dated at that year's lowest closing price.

13
14
15

The 1998 grant proved lucrative for the executives. Mr. Levy has reaped at least $6 million from cashing out options issued then, while Mr. Schroeder has pocketed at least $10 million. Mr. Levy didn't return phone or email messages. Neither the company's chief financial officer nor a company spokeswoman returned several messages seeking comment. Mr. Schroeder couldn't be reached to comment.

16    48.    On May 24, 2006, the Company filed an 8-K with the SEC which stated:

17
18
19
20
21
22
23
24

KLA-Tencor Corporation announced today that its Board of Directors has appointed a Special Committee of independent directors to conduct an internal investigation relating to past stock option grants, the timing of such grants and related accounting and documentation. The Special Committee will be assisted by outside legal counsel and accounting experts. KLA-Tencor also said that it has received subpoenas from the U.S. Attorney's Offices for the Eastern District of New York and Northern District of California requesting information relating to its past stock option grants. KLA-Tencor said that it will cooperate fully with any government or regulatory investigation into these matters. KLA-Tencor further disclosed that on May 22, 2006, it was served with a complaint relating to a lawsuit filed in the United States District Court for the Northern District of California filed by the Theodore R. Kornreich Revocable Trust, derivatively on behalf of KLA-Tencor.

25    49.    On May 20, 2006, KLA-Tencor filed another 8-K which stated that "KLA-Tencor

26  Corporation announced today that it received notice from the Securities and Exchange Commission

27  of an informal inquiry relating to past stock option grants. KLA-Tencor will cooperate fully with

28  this investigation."

<div align="center">12</div>

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1    50.    On June 30, 2006, the Company filed a 8-K attaching a press release issued that

2  same day entitled "KLA-Tencor Provides Update on Special Committee Investigation." The press

3  release announcing:

4          [T]hat a Special Committee of the Company's Board of Directors has
          reached a preliminary conclusion that the actual measurement dates
5          for financial accounting purposes of certain stock option grants issued
          in prior years likely differ from the recorded grant dates of such
6          awards. The Special Committee has not completed its investigation
          and is continuing its review of these matters. The Special Committee
7          has not yet determined whether any resulting compensation charges
          are material or whether the Company ultimately will restate
8          previously issued financial statements.

9          The Company previously announced that its Board of Directors has
          appointed a Special Committee of independent directors to conduct an
10          internal investigation relating to stock options granted to members of
          senior management and the employees of the Company. The Special
11          Committee, assisted by independent legal counsel and accounting
          experts, is investigating the timing of such grants, as well as their
12          related accounting treatment.

13          Based on the Special Committee's investigation to date, the Company
          now anticipates that it may record additional non-cash charges for
14          stock-based compensation expense. The Company has not yet
          determined the amount of such charges or the resulting tax impact of
15          these actions. In the event that the Company determines that these
          items are material, KLA-Tencor may be required to restate its
16          financial statements for the relevant prior fiscal periods.

17    51.    On July 26, 2006, the Company filed another 8-K attaching a press release issued on

18  July 21, 2006, which stated, in relevant part:

19          As previously announced, the Company's Board of Directors has
          appointed a Special Committee of independent directors to conduct an
20          internal investigation relating to stock options granted to the
          employees of the Company. As disclosed on June 30, the Special
21          Committee has reached a preliminary conclusion that the actual
          measurement dates for financial accounting purposes of certain stock
22          option grants issued in prior years likely differ from the recorded
          grant dates of such awards. The Special Committee has not yet
23          determined whether any resulting compensation charges or tax
          implications are material or whether the Company ultimately will
24          restate previously issued financial statements.

25          As a result of the on-going investigation and the potential for
          restatement, the Company is unable to provide detailed GAAP or
26          non-GAAP financials for items other than revenue and bookings for
          the quarter or year ended June 30, 2006. In addition, the Company
27          will not file its annual report on form 10-K until after the completion
          of the investigation. The Company does not expect the investigation

28

13

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1     to be completed until after the date the Form 10-K is required to be
      filed.

2

3     52.    On September 14, 2006, the Company acknowledged that it could not meet its

4     financial obligations when it filed a Form 12b-25, Notice of Inability to Timely File 10-Q, with the

5     SEC.  The Form stated, in relevant part that:

6           [A] Special Committee of independent directors, appointed by the
            Board of Directors of KLA-Tencor Corporation (the "Company"), is
7           conducting an internal investigation relating to stock options granted
            to the employees of the Company, the timing of such grants and their
8           related accounting and tax treatment.

9           On June 30, 2006, the Company disclosed that the Special Committee
            reached a preliminary conclusion that the actual measurement dates
10          for financial accounting purposes of certain stock option grants issued
            in prior years likely differ from the recorded grant dates of such
11          awards. Neither the Special Committee nor the Board of Directors of
            the Company has yet determined whether any resulting compensation
12          or tax charges are material or whether the Company ultimately will
            restate previously issued financial statements.

13

14          As a result of the ongoing investigation, the Company was unable to
            file its annual report on Form 10-K for the year ended June 30, 2006
15          by the required filing date of September 13, 2006 without
            unreasonable effort or expense. The Company does not anticipate that
16          it will be able to file its Form 10-K on or before the fifteenth calendar
            day following the prescribed due date, in accordance with Rule 12b-
17          25.

18          The Company is focused on resolving these issues as quickly as
            possible and plans to file its Form 10-K as soon as practicable
19          following the completion of the Special Committee's investigation.

20    53.    On September 15, 2006, the Company filed an 8-K with the SEC attaching a

21    September 14, 2006 press release which announced that:

22          [T]he Special Committee appointed by the Board of Directors of the
            Company is continuing its internal investigation relating to stock
23          options granted to employees of the Company. As anticipated in the
            Company's news release dated July 24, 2006, the Company will not
24          file its Annual Report on Form 10-K until the internal investigation is
            complete. Thus, the Company did not file its Form 10-K on
25          September 13, 2006 as required, and has filed Form 12b-25
            (Notification of Late Filing) also as required.

26

27          As a result of the delayed filing of the Company's Form 10-K, the
            Company today received a NASDAQ Staff Determination notice
28          indicating that the Company is not in compliance with the filing
            requirements for continued listing as set forth in NASDAQ

                                        14

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1    Marketplace Rule 4310(c)(14) and that its common stock is subject to
     delisting from the NASDAQ Global Select Market. The notice, which
2    the Company expected, was issued in accordance with standard
     NASDAQ procedures. The Company will appeal this determination
3    and request a hearing before the NASDAQ Listing Qualifications
     Panel. The Company's appeal and hearing request will automatically
4    stay the delisting of the Company's common stock. Pending the
     Panel's decision, the Company's shares will continue to be listed on
5    the NASDAQ Global Select Market.

6    As previously announced, the Special Committee reached a
     preliminary conclusion that the actual measurement dates for financial
7    accounting purposes of certain stock option grants issued in prior
     years likely differ from the recorded grant dates of such awards.
8    Neither the Special Committee nor the Board of Directors of the
     Company has yet determined whether any resulting compensation or
9    tax charges are material or whether the Company ultimately will
     restate previously issued financial statements. The Company is
10   focused on resolving these issues as quickly as possible and plans to
     file its Form 10-K as soon as practicable following completion of the
11   Special Committee's investigation.

12   54.    On September 27, 2007, the Company filed an 8-K with the SEC admitting that

13   stock options had been granted to KLA-Tencor executives at backdated prices.  The press release

14   announced, in relevant part, that:

15   A Special Committee of the Board of Directors of KLA-Tencor
     Corporation (the "Company") has delivered a report to the Board of
16   Directors, which concluded that incorrect measurement dates were
     used for certain stock option grants made principally during the
17   period from July 1, 1997 through July 30, 2002. The Board of
     Directors of the Company has not concluded its evaluation of the
18   factors that led to the use of incorrect measurement dates of stock
     options. The Board of Directors has concluded that the Company will
19   need to restate certain of its historical financial statements to record
     non-cash charges for compensation expenses relating to past stock
20   option grants. The Company has not determined the amount of such
     charges, the resulting tax and accounting impacts, the impact on
21   internal control over financial reporting, or which specific periods
     may require restatement. However, the effects on previously reported
22   financial statements are expected to be material. The Special
     Committee and the Board of Directors will continue to be actively
23   involved in reviewing information and determining the appropriate
     actions to be taken by the Company with respect to this matter.
24
     Accordingly, on September 27, 2006, the Board of Directors
25   concluded that financial statements and all earnings and press releases
     and similar communications issued by the Company relating to
26   periods beginning on or after July 1, 1997, should no longer be relied
     upon, including the Company's financial statements for fiscal years
27   1998 through 2005, the interim periods contained therein, and the
     fiscal quarters ended September 30, 2005, December 31, 2005 and
28   March 31, 2006. The Company's management and the Special

                                          15

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1    Committee have discussed this matter with PricewaterhouseCoopers
2    LLP, the Company's independent registered public accounting firm.

3                                          * * *

4    On September 27, 2006, KLA-Tencor Corporation (the "Company")
     determined that its historical financial statements for one or more
     prior fiscal years will have to be restated as a result of improper
5    accounting for option grants made to officers and employees. The
     specific fiscal years which will need to be restated has yet been
6    determined. However, the Company has decided to suspend
     temporarily employee participation in several equity incentive
7    programs because the S-8 registration statements covering the shares
     of common stock issuable under those programs incorporate one or
8    more financial statements that will likely have to be restated. As part
     of such suspension, participants in the Company's 401(k) Plan (the
9    "401(k) Plan") will be subject to a blackout period during which they
     will be precluded from acquiring shares of the Company's common
10   stock under that plan. . . .

11   **Ongoing Aftermath**

12          55.    On October 3, 2007, KLA-Tencor filed an 8-K announcing that the Company would

13   need restate its financials for dates between July 1, 1997 through March 31, 2006.  The 8-K more

14   specifically stated, in relevant part, that:

15   A Special Committee of the Board of Directors of KLA-Tencor
     Corporation (the "Company") has delivered a report to the Board of
16   Directors, which concluded that incorrect measurement dates were
     used for certain stock option grants made principally during the
17   period from July 1, 1997 through July 30, 2002. The Board of
     Directors of the Company has not concluded its evaluation of the
18   factors that led to the use of incorrect measurement dates of stock
     options. The Board of Directors has concluded that the Company will
19   need to restate certain of its historical financial statements to record
     non-cash charges for compensation expenses relating to past stock
20   option grants. The Company has not determined the amount of such
     charges, the resulting tax and accounting impacts, the impact on
21   internal control over financial reporting, or which specific periods
     may require restatement. However, the effects on previously reported
22   financial statements are expected to be material. The Special
     Committee and the Board of Directors will continue to be actively
23   involved in reviewing information and determining the appropriate
     actions to be taken by the Company with respect to this matter.
24
     Accordingly, on September 27, 2006, the Board of Directors
25   concluded that financial statements and all earnings and press releases
     and similar communications issued by the Company relating to
26   periods beginning on or after July 1, 1997, should no longer be relied
     upon, including the Company's financial statements for fiscal years
27   1998 through 2005, the interim periods contained therein, and the
     fiscal quarters ended September 30, 2005, December 31, 2005 and
28   March 31, 2006. The Company's management and the Special

                                          16

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1      Committee have discussed this matter with PricewaterhouseCoopers
2      LLP, the Company's independent registered public accounting firm.

3      56.    On October 16, 2006, the Company announced, in an 8-K filed with the SEC, in
4      relevant part, that:

> [A]s a result of the Special Committee investigation [] of the historical stock option practices of KLA-Tencor Corporation [] , the Company terminated, effective immediately, all aspects of its employment relationship with Kenneth L. Schroeder and any and all employment and/or service agreements between Mr. Schroeder and the Company. The Company intends to cancel all outstanding stock options held by Mr. Schroeder that were retroactively priced or otherwise improperly granted. Mr. Schroeder was President and Chief Operating Officer of the Company from 1991 to 1999 and Chief Executive Officer and a member of the Board of Directors of the Company from 1999 to 2005.

> Also on October 16, 2006, the Company's General Counsel, Stuart J. Nichols, resigned, effective immediately. Mr. Nichols had been Vice President and General Counsel of the Company since 2000. The Company intends to re-price all outstanding retroactively priced stock options held by Mr. Nichols; the exercise price of each re-priced option will be increased to the fair market value on the corrected measurement date.

<div align="center">* * *</div>

> Later on October 16, 2006, Kenneth Levy, Founder and Chairman of the Board of Directors of the Company, retired as a Director and employee, effective immediately, and was named Chairman Emeritus by the Board of Directors. As of that date, by mutual agreement, Mr. Levy's employment with the Company immediately ceased, and any and all employment or service contracts between Mr. Levy and the Company immediately terminated, with each party having no further monetary or other obligations thereunder. The Company intends to re-price all outstanding retroactively priced stock options held by Mr. Levy; the exercise price of each re-priced option will be increased to the fair market value on the corrected measurement date. Mr. Levy was a member of the Board of Directors of the Company since 1975, Chairman of the Board since 1999, and Chief Executive Officer from 1975 to 1997 and from mid 1998 to mid 1999.

> Edward W. Barnholt was appointed to succeed Mr. Levy as Chairman of the Board of Directors of the Company and will serve in a non-executive capacity. Mr. Barnholt is the former President and Chief Executive Officer of Agilent Technologies, and joined the Company's Board of Directors in 1995.

<div align="center">17</div>

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1    57.    A press release issued by the Company on October 16, 2007 also announced, in

2    relevant part, that:

> [T]he Company's Board of Directors concluded that incorrect
> measurement dates for certain stock option grants were used for
> financial accounting purposes, principally during the period July 1,
> 1997 through June 30, 2002, and as a result, the Company will restate
> its financial statements to correct the accounting for retroactively
> priced stock options. The Company now anticipates that the total
> additional non-cash charges for stock-based compensation expenses
> will not exceed $400 million.

8    58.    On November 15, 2006, the Company filed with the SEC another Form 12b-25,

9    Notice of Inability to Timely File 10-Q.

10    59.    On November 15, 2006, the Company also filed an 8-K with the SEC announcing

11    that it continued to face delisting as the result of its inability to meet its financial reporting

12    requirements.

13    60.    On December 27, 2006, the Company filed an 8-K announcing that defendant

14    Tompkins had resigned from the KLA-Tencor Board of Directors on December 21, 2006.

15    61.    On January 5, 2007, the Company filed and 8-K attaching its "Stock Option

16    Amendment and Special Bonus Agreement." The text of the 8-K stated, *inter alia*, the amendment

17    would increase the price of defendant Wallace's outstanding stock options by $368,618.36.

18    62.    On January 29, 2007, the KLA-Tencor filed its fiscal 2006 Form 10-K and restated

19    previously filed financial results for fiscal years 2005, 2004, 2003 and 2002. In its filing, the

20    Company, admitted, *inter alia*, that:

> This Annual Report on Form 10-K for our fiscal year ended June 30,
> 2006 includes restatements of the following previously filed financial
> statements and data (and related disclosures): (1) our consolidated
> financial statements as of and for our fiscal years ended June 30, 2005
> and 2004; (2) our selected consolidated financial data as of and for
> our fiscal years ended June 30, 2005, 2004, 2003 and 2002, and (3)
> our unaudited quarterly financial data for the first three quarters in our
> fiscal year ended June 30, 2006 and for all quarters in our fiscal year
> ended June 30, 2005. See Note 2, "Restatement of Consolidated
> Financial Statements," to Consolidated Financial Statements and
> Exhibit 99.1 for a detailed discussion of the effect of the restatements.

> As a result of an investigation of our historical stock option practices
> by a Special Committee of our Board of Directors (see Item 3—Legal
> Proceedings), **we discovered that certain of our stock options,**

18

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

primarily those granted from July 1, 1997 to June 30, 2002, had been retroactively priced for <u>all</u> employees who received these grants (less than 15% of these options were granted to executive officers). This means that the option exercise price was not the market price of the option shares on the actual grant date of the option, but instead was a lower market price on an earlier date. The actual grant date—when the essential actions necessary to grant the option were completed, including the final determination of the number of shares to be granted to each employee and the exercise price—is the correct measurement date to determine the market price of the option shares under the accounting rules in effect at the time. More than 95% of the total in-the-money value (market price on the actual grant date minus exercise price) of all of our retroactively priced options was attributable to those granted from July 1, 1997 to June 30, 2002.

\* \* \*

. . . To correct our past accounting for stock options, we recorded additional pre-tax, non-cash, stock-based compensation expense of (a) $348 million for the periods July 1, 1994 to June 30, 2005 under APB Opinion No. 25 and (b) $22 million for the year ended June 30, 2006 under SFAS No. 123®. We expect to amortize an additional $6 million of such pre-tax charges under SFAS No. 123® in future periods to properly account for past retroactively priced option grants.

By October 16, 2006, the Special Committee had substantially completed its investigation. The Special Committee concluded that (1) there was retroactive pricing of stock options granted to all employees who received options, primarily during the periods from July 1, 1997 to June 30, 2002 (less than 15% of these options were granted to executive officers), (2) **the retroactively priced options were not accounted for correctly in our previously issued financial statements**, (3) the <u>retroactive pricing of options was</u> <u>intentional</u>, **not inadvertent or through administrative error,** (4) **the retroactive pricing of options involved the selection of fortuitously low exercise prices by certain former executive officers, and other former executives may have been aware of this conduct,** (5) the <u>retroactive pricing of options involved the</u> <u>falsification of Company records</u>, **resulting in erroneous statements being made in financial and other reports previously filed with the SEC, as well as in information previously provided to our independent registered public accounting firm,** and (6) in most instances, **the retroactive pricing of options violated the terms of our stock option plans.** Because virtually all holders of retroactively priced options issued by the Company were not involved in or aware of the retroactive pricing, the Board of Directors decided that we should continue to honor the options that violated the terms of our stock option plans, except in certain individual cases as described below.

[emphasis added.]

63.    According to an 8-K filed by KLA-Tencor on July 25, 2007, the Company reached a

settlement with the United States Securities and Exchange Commission ("SEC") "by consenting to

19

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1    the entry of a permanent injunction against future violations of the reporting, books and records,

2    and internal controls provisions of the federal securities laws."

3        64.    On that same day the SEC announced that it had filed charges against defendant

4    Schroeder concerning Schroeder's backdating of stock options during his employment with KLA-

5    Tencor.

6        65.    The Defendants disseminated false and misleading financial statements in, *inter alia,*

7    the following "Form 10-K" filings:

8             a.    Form 10-K for fiscal year ended June 30, 1998, and filed with the SEC on

9                  September 28, 1998;

10            b.    Form 10-K/A for fiscal year ended June 30, 1998, and filed with the SEC on
                  September 29, 1998;

11            c.    Form 10-K for fiscal year ended June 30, 1999, and filed with the SEC on

12                   September 28, 1999;

13            d.    Form 10-K for fiscal year ended June 30, 2000, and filed with the SEC on
                  September 28, 2000;

14            e.    Form 10-K for fiscal year ended June 30, 2001, and filed with the SEC on

15                   September 21, 2001;

16            f.    Form 10-K for fiscal year ended June 30, 2002, and filed with the SEC on
                  September 20, 2002;

17            g.    Form 10-K for fiscal year ended June 30, 2003, and filed with the SEC on

18                   September 16, 2003;

19            h.    Form 10-K/A for fiscal year ended June 30, 2003, and filed with the SEC on
                  September 29, 2003;

20            i.    Form 10-K for fiscal year ended June 30, 2004, and filed with the SEC on

21                   August 30, 2004; and

22            j.    Form 10-K for fiscal year ended June 30, 2005, and filed with the SEC on
                  September 2, 2005.

23        66.    The Company's 1998, 1999, 2000, 2001, 2002, 2003, 2004 and 2005 Form 10-Ks

24    were issued in violation of GAAP, and in particular Accounting Principles Board ("APB") Opinion

25    No. 25 ("APB 25"), "Accounting for Stock Issued to Employees." Pursuant to APB 25, if the

26    market price on the date of grant exceeds the exercise price of the options, the company must

27    recognize the difference as an expense. Defendants' backdating practice resulted in understated

28

<div align="center">20</div>

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1   expenses on each Form 10-K because the difference between the market price and option exercise

2   price was not expensed by the Company.

3     67. The Individual Defendants also caused and/or participated in issuing, filing and

4   disseminating the false and misleading information regarding Company issued options on the

5   Form(s) DEF 14A (the "Definitive Proxies") filed with the SEC on:

6       a. October 6, 1997;

7       b. September 28, 1998;

8       c. October 15, 1999;

9       d. October 6, 2000;

10      e. September 28, 2001;

11      f. September 20, 2002;

12      g. September 23, 2003;

13      h. September 9, 2004;

14      i. October 13, 2005; and

15      j. February 27, 2007.

16    68. The Definitive Proxies were each false and misleading because they failed to correct

17  prior information regarding the issuance of backdated stock options and caused the Class to approve

18  the Individual Defendants' request to be appointed as directors of the Company based on that false

19  and misleading information.

20    69. Defendants' backdating of options grants also violated provisions of the Internal

21  Revenue Code relating to deduction of option payments and thereby rendered the Company's

22  financial statements in Form 10-K filings for the years 1998, 1999, 2000 and 2001, as well as

23  interim Form 10-Qs, materially false and misleading.

24        **TOLLING OF THE STATUTE OF LIMITATIONS**

25    70. The Defendants concealed their violations of law until at least June 30, 2006, the

26  date the Company issued its press release entitled "KLA-Tencor Provides Update on Special

27  Committee Investigation." Further, it was not until September 14, 2006, that the investing public

28  was informed that the Defendants would be unable to meet their financial reporting requirements as

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed: Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1    a result of backdating schemes. Indeed, while the Defendants partially admitted to their violations

2    of law in their September 27, 2006, 8-K filing with the SEC, outlined *infra*, when they admitted that

3    they would be required to restate the earnings for certain accounting periods relevant to plaintiff's

4    allegations herein, the full extent of their violations is not yet known. It was not until October 16,

5    2007, that KLA-Tencor shareholders and the investing public were advised that the Company

6    anticipated that "the total additional non-cash charges for stock-based compensation expenses will

7    not exceed $400 million."

8         71.    As a result, the Individual Defendants have systematically and wrongfully concealed

9    their manipulation of Company stock option plans, falsely asserting that the grants were being

10    administered by a committee of independent directors, while in fact, as outlined herein, the

11    Compensation Committee Defendants were colluding with other Individual Defendants to violate

12    GAAP and Section 162(m). Moreover, the Compensation Committee Defendants were colluding

13    with the other Individual Defendants to make, *inter alia*, false and misleading filings with the SEC.

14         72.    Similarly, the Audit Committee Defendants were systematically and wrongfully

15    concealing wrongdoings of each of the Individual Defendants by disseminating to KLA-Tencor

16    shareholders and the market false financial statements that improperly recorded and accounted for

17    backdated options grants in violation of GAAP and Section 162(m).

18         73.    At no time prior to June 30, 2006, did KLA-Tencor shareholders or any other

19    member of the investing public have reason to know of Defendants' breaches of their fiduciary

20    duties and violations of the Corporations Code. Therefore, the Individual Defendants cannot rely

21    on a statute of limitations defense as they have withheld from KLA-Tencor shareholders and the

22    investing public the facts that give rise to the claims asserted herein.

23                                     **COUNT I**

24                         (Against All Defendants)

               Class Claim for Violation of §1507 of the California Corporations Code

25

26         74.    Plaintiff hereby realleges and incorporates by reference the allegations in the

27    preceding paragraphs as if fully set forth herein.

28

<div align="center">22</div>

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1    75.    Plaintiff brings this claim as a direct claim, on behalf of himself and the Class,

2    against defendants for violations of California Corporations Code §1507.

3    76.    Defendants made or knowingly participated, *inter alia*, in the making and issuance of

4    the Company's false 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, and 2005 Definitive Proxies,

5    which claimed that option grants were made with strike prices no less than the fair market value on

6    the date of the grant.  Defendants also made or knowingly participated, *inter alia*, in the making and

7    issuance of the Company's false Form(s) 10-K for the years 1997, 1998, 1999, 2000, 2001, 2002,

8    2003, 2004, 2005, and 2006 and respective Form 10-Qs, which materially overstated KLA-Tencor's

9    net income and retained earnings. As a result of the Defendants' backdating scheme, the Company'

10   filings of its Form 10-Qs for the quarters ending June 30, 2006 and September 30, 2006, and Form

11   10-K for the fiscal year ending December 31, 2006, were delayed.

12   77.    The foregoing misleading statements were material to KLA-Tencor shareholders'

13   consideration of: (i) holding their shares of KLA-Tencor stock during times relevant herein; (ii)

14   allowing the Evergreen Provision to go forward, adding to the restated 1982 Stock Option Plan, on

15   July 1, 2003 and July 1, 2004, an amount of shares equal to 3% of KLA-Tencor's shares of common

16   stock outstanding on June 30, 2002 and June 30, 2001, respectively; (iii) the adoption of 2004

17   Equity Incentive Plan.  Indeed, if shareholders had known the truth regarding the Individual

18   Defendants' false and misleading statements, they would not have continued to hold their shares of

19   KLA-Tencor, allowed the Evergreen Provision to continue to add the amount of common stock

20   available for dissemination under the 1982 Stock Option Plan and/or approved the adoption of the

21   2004 Equity Incentive Plan, each of which added hundreds of thousands to millions of shares to the

22   amount available under the terms of the original 1982 Stock Option Plan..

23   78.    The Class relied on such materially false statements and were damaged thereby.

24   79.    Defendants are jointly and severally liable for such damage.

25   //

26   //

27   //

28   //

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

## COUNT II

(Against All Defendants)
Claim for Breach of Fiduciary Duty of Due Care and Loyalty

80.    Plaintiff hereby realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

81.    Defendants have violated fiduciary duties owed to the shareholders of KLA-Tencor under Delaware and California law as they have acted unreasonably and/or put their personal interests ahead of the interests of plaintiff and other members of the Class.

82.    Rather than make proper disclosures concerning the true financial condition of KLA-Tencor, defendants either breached their duties, and/or aided and abetted such breach, to take the following actions:

a.    to act in the interests of all KLA-Tencor equity owners, including at the time of agreeing to a settlement;

b.    to maximize shareholder value;

c.    to act in accordance with their fundamental duties of due care and loyalty and not to place their individual interests or other shareholders interests over the interests of plaintiff and the Class, nor to aid and abet such abject dereliction of duties.

83.    By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, failed to disclose KLA-Tencor's true financial condition or prospects to plaintiff or the Class and unfairly deprived plaintiff and other members of the Class of the ability to make an informed decision concerning whether they should: (i) continue holding their shares of KLA-Tencor stock during times relevant herein; (ii) allow the Evergreen Provision to go forward, adding to the restated 1982 Stock Option Plan, on July 1, 2003 and July 1, 2004, an amount of shares equal to 3% of KLA-Tencor's shares of common stock outstanding on June 30, 2002 and June 30, 2001, respectively; (iii) adopt of 2004 Equity Incentive Plan.

24

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1    84.    By reason of the foregoing acts, practices and course of conduct, the defendants

2  failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward

3  plaintiff and the other Class members.

4    85.    As a result of the actions of defendants, plaintiff and the Class were damaged.

5                                        **COUNT III**

6                                    (Against All Defendants)
                        Claim for Breach of Duty of Candor and Full Disclosure

7

8    86.    Plaintiff repeats and realleges each allegation set forth herein.

9    87.    As fiduciaries of the KLA-Tencor shareholders, defendants owed all KLA-Tencor

10  shareholders the highest duty known to the law, a duty of complete candor, requiring them to fully

11  disclose all material facts concerning the grant of stock options and related transactions which were

12  voted upon by plaintiff and the Class shareholders.

13    88.    Defendants breached their duty of candor and full disclosure by failing to disclose

14  material facts and misrepresenting matters as set forth above.  As a result of these

15  misrepresentations and failures to disclose, plaintiff and the Class were deprived of the opportunity

16  to cast their vote in an informed manner.

17    89.    As a result of defendants' breach of the duty of candor and full disclosure, KLA-

18  Tencor's shareholders were damaged.

19    90.    By reason of the foregoing, plaintiff and each member of the Class is suffering

20  irreparable injury and damages.

21    91.    By reason of the foregoing, the Individual Defendants have violated the fiduciary

22  duties which each of them owes to plaintiff and the class.

23    92.    Plaintiff and other members of the class have no adequate remedy at law.

24    93.    Each of the defendants has colluded in and rendered substantial assistance in the

25  accomplishment of the wrongdoing complained of herein.  In taking the actions, as particularized

26  herein, to aid and abet and substantially assist the wrongs complained of, all defendants acted with

27  an awareness of the primary wrongdoing and realized that their conduct would substantially assist

28

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1   the accomplishment of that wrongdoing and were aware of their overall contribution to the

2   conspiracy, common scheme and course of wrongful conduct.

3       94.     Unless enjoined by this Court, defendants will continue to breach their fiduciary

4   duties owed to plaintiff and the Class.

5       95.     Plaintiff and the other Class members are immediately threatened by the acts and

6   transactions complained of herein, and lack an adequate remedy at law.

7                           **PRAYER FOR RELIEF**

8       WHEREFORE, plaintiff prays for judgment and relief as follows:

9       1.      Ordering that this action may be maintained as a class action and certifying plaintiff

10              as the Class representative;

11      2.      Declaring that defendants have breached and/or are aiding and abetting breaches of

12              fiduciary and other duties to plaintiff and the other members of the Class;

13      3.      Awarding compensatory damages against defendants, jointly and severally, in an

14              amount to be determined at trial, together with pre-judgment interest at the

15              maximum rate allowable by law;

16      4.      Rescinding: (i) all stock added to the 1982 Stock Option Plan on July 1, 2003 and

17              July 1, 2004, pursuant to the Evergreen Provision, and (ii) the 2004 Equity Incentive

18              Plan, and cancelling the millions of shares added to the stock option plans.

19      5.      Preliminarily and permanently enjoining the defendants from granting any stock

20              options and from allowing the exercise of any of the currently outstanding options

21              granted under the stock option plans during the Class Period outlined herein;

22      6.      Awarding costs and disbursements, including plaintiff's counsel's fees and experts'

23              fees; and

24      7.      Granting such other and further relief as the Court may deem just and proper.

25   //

26   //

27   //

28   //

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

E-Filed Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1

## JURY DEMAND

2          Plaintiff demands a trial by jury.

3

4   Dated: April 1, 2008                              Patrice L. Bishop
                                                      STULL, STULL & BRODY
5

6
                                       By:     _____/s/_____
7                                              Patrice L. Bishop
                                               10940 Wilshire Boulevard
8                                              Suite 2300
                                               Los Angeles, CA  90024
9                                              Tel:    (310) 209-2468
                                               Fax:    (310) 209-2087
10

11                                             Jules Brody
                                               Aaron L. Brody
                                               STULL, STULL & BRODY
12                                             6 East 45th Street
                                               New York, NY 10017
13                                             Tel:    (212) 687-7230
                                               Fax:    (212) 490-2022
14

15                                             Joseph H. Weiss
                                               WEISS & LURIE
16                                             551 Fifth Avenue
                                               Suite 1600
                                               New York, NY 10176
17                                             Tel:    (212) 682-3025
                                               Fax:    (212) 682-3010
18

19                                             Counsel for Plaintiff

20

21

22

23

24

25

26

27

28

**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
Z:\STULL\KLA2\PLD\DirectComplaint.002.wpd

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG

1  c/o Glotrans
   2915 McClure Street
   Oakland, CA 94609
2  TEL: (510) 208-4775
   FAX: (510) 465-7348
   EMAIL: Info@Glotrans.com



E-FILED

Apr 1, 2008 5:00 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7883
By A. Ilas, Deputy

3

4

5

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

6

7

8

9

10

11

12

13

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | |
| vs. | Lead Case No.1-07-CV-093465 |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT | Hon. Jack Komar |
| T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. | |
| MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, | |
| RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and | |
| DOES 1 through 25, Defendants. | |
| Defendant. | |
| AND RELATED ACTIONS | PROOF OF SERVICE<br>Electronic Proof of Service |

I am employed in the County of Alameda, State of California.

14     I am over the age of 18 and not a party to the within action; my business address is 2915 McClure

15  Street, Oakland, CA 94609.

       The documents described on page 2 of this Electronic Proof of Service were submitted via the

16  worldwide web on Tue. April 1, 2008 at 4:58 PM PDT and served by electronic mail notification.

       I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and

17  am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described

18  document's electronic service in the following manner:

       The document was electronically filed on the Court's website, http://www.scefiling.org, on Tue. April 1,

19  2008 at 4:58 PM PDT

       Upon approval of the document by the Court, an electronic mail message was transmitted to all parties

20  on the electronic service list maintained for this case. The message identified the document and provided

21  instructions for accessing the document on the worldwide web.

       I declare under penalty of perjury under the laws of the State of California that the foregoing is true and

22  correct. Executed on April 1, 2008 at Oakland, California.

23     Dated: April 1, 2008                                    For WWW.SCEFILING.ORG

E-Filed: Apr 1, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

Andy Jamieson

E-Filed: Apr 1, 2008 5:00 PM; Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7883

1 | THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG

2 | **Electronic Proof of Service**
**Page 2**

3 | **Document(s) submitted by Patrice Bishop of STULL, STULL & BRODY on Tue. April 1, 2008 at 4:58 PM PDT**

1. 1st Amended Complaint: AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY

The Superior Court of California
County of Santa Clara
Hon. Jack Komar, Department 17
191 N. First Street, San Jose, CA 95113

www.scefiling.org
info@glotrans.com
(510) 208-4775

## ELECTRONIC SERVICE NOTICE #215-22

Service date: 04/01/2008 5:13 PM

<u>Crimi v. Barnholt, et al. (KLA-Tencor Corporation)</u>
Case No: 1-07-CV-093465

Document #FD19262:

Title: **AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY** *(Click here to view document information)*
Type: 1st Amended Complaint
Author: Patrice Bishop of Stull, Stull & Brody
Parties: Crimi, Chris

Service list:

| Party name | Representative | Email address |
|---|---|---|
| Barnholt, Edward W. | | |
| Bingham, H. Raymond | | |
| Bond, Robert T. | | |
| Crimi, Chris | Bishop, Patrice – Stull, Stull & Brody | service@ssbla.com |
| Elkus, Jr., Richard J. | | |
| KLA-Tencor Corporation | Floren, Joseph – Morgan, Lewis & Bockius LLP | jfloren@morganlewis.com |
| | Weiler, Matthew – Morgan Lewis & Bockius LLP | mweiler@morganlewis.com |
| Kaufman, Stephen P. | | |
| Levy, Kenneth | | |
| Marks, Michael E. | | |
| Morton, Dean O. | | |
| Santa Clara County Superior Court | Walker, Rowena – Santa Clara County Superior Court | rwalker@scscourt.org |
| Schroeder, Kenneth L. | | |
| Tompkins, Jon D. | | |
| Wallace, Richard P. | | |

## Additional recipients of Electronic Service

| Service recipient | Email address |
|---|---|
| Floren, Joseph [Assoc.] | mhaut@morganlewis.com *[bad address]* |
| Floren, Joseph [Assoc.] | rluke@morganlewis.com |
| Floren, Joseph [Assoc.] | eeberline@morganlewis.com |
| Weiler, Matthew [Assoc.] | eeberline@morganlewis.com |

SUM-100

**SUMMONS**
*(CITACION JUDICIAL)*

UCS

FILED
FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

2007 SEP -4 PM 2:31

KIRI TORRE
EXEC. OFFICER/CLERK
CHIEF ___ T OF CA
MA ___ RA

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
EDWARD W. BARNHOLT
(Additional Parties Attachment form is attached)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

CHRIS CRIMI, on Behalf of Himself and All Others Similarly Situated    . Rosales

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* | CASE NUMBER:<br>*(Número del Caso):*<br>**107CV093465** |

Superior Court of the State of California for the County of Santa Clara
191 North First Street
San Jose, CA 95113

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Patrice L. Bishop, Esq. (SBN 182256)    Tel: (310) 209-2468
STULL, STULL & BRODY, 10940 Wilshire Boulevard, Suite 2300, Los Angeles, CA 90024

KIRI TORRE
Chief Executive Officer/Clerk

| | | | |
|---|---|---|---|
| DATE:<br>*(Fecha)* **SEP 0 4 2007** | Clerk, by<br>*(Secretario)* **M. Rosales** | *MR* | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:

   under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
          ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

| | |
|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. January 1, 2004] | **SUMMONS** | Code of Civil Procedure §§ 417.20, 465<br>*American LegalNet, Inc.*<br>www.USCourtForms.com |

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| CRIMI v. BARNHOLT, et al. | |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

☐ Plaintiff    ☑ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

H. RAYMOND BINGHAM,
ROBERT T. BOND,
RICHARD J. ELKUS, JR.,
STEPHEN P. KAUFMAN,
KENNETH LEVY,
MICHAEL E. MARKS,
DEAN O. MORTON,
KENNETH L. SCHROEDER,
JON D. TOMPKINS,
RICHARD P. WALLACE,
KLA-TENCOR CORPORATION, and
DOES 1 through 25,

Page ___ of ___

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

ADDITIONAL PARTIES ATTACHMENT
Attachment to Summons

American LegalNet, Inc.
www.FormsWorkflow.com

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

1

2

3

4

# THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

5

## IN AND FOR THE COUNTY OF SANTA CLARA

6

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | Lead Case No.1-07-CV-093465 |
| vs. | |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | Judge Jack Komar |
| Defendant. | |
| AND RELATED ACTIONS | PROOF OF SERVICE<br>Electronic Proof of Service |

7

8

9

10

11

12

13

I am employed in the County of Alameda, State of California.

14

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

15

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Fri. September 7, 2007 at 3:53 PM PDT and served by electronic mail notification.

16

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

17

18

The document was electronically filed on the Court's website, http://www.scefiling.org, on Fri. September 7, 2007 at 3:53 PM PDT

19

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

20

21

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on September 7, 2007 at Oakland, California.

22

Dated: September 7, 2007                    For WWW.SCEFILING.ORG

23

Andy Jamieson

1 | **THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG**

2 | **Electronic Proof of Service**
**Page 2**

3 | **Document(s) submitted by Rowena Walker of Santa Clara County Superior Court on Fri. September 7, 2007 at 3:53 PM PDT**

4 | 1. Summons Filed: Summons (Manually filed September 4, 2007)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

SEP. 4. 2007  12:53PM    LEGAL SERVICE 6506974640                    NO. 0354    P. 3

UCS

1   Patrice L. Bishop (182256)
    STULL, STULL & BRODY
2   10940 Wilshire Boulevard
    Suite 2300
3   Los Angeles, CA  90024
    Tel:    (310) 209-2468
4   Fax:    (310) 209-2087

5   [Additional Counsel Appear
    on Signature Page]
6
    Counsel for Plaintiff
7

FILED  Santa Clara Co
U9/U4/U/  2:54PM
Kiri lorre
Chief Executive Uffic
By: mrosales U15CIVU1
R#2UU/UUU8/43/
CK                $8/U.UU
IL                $8/U.UU
Case: 1-U/-CV-U93465

L. Rosales

10                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                        FOR THE COUNTY OF SANTA CLARA

12                                                      107CV093465

13  CHRIS CRIMI, on Behalf of Himself and        CASE NO.
    All Others Similarly Situated,
14                                               CLASS ACTION
                    Plaintiff,
15                                               COMPLAINT FOR BREACHES OF
            v.                                   FIDUCIARY DUTY
16
    EDWARD W. BARNHOLT,                           JURY TRIAL DEMANDED
17  H. RAYMOND BINGHAM,
    ROBERT T. BOND,
18  RICHARD J. ELKUS, JR.
    STEPHEN P. KAUFMAN,
19  KENNETH LEVY,
    MICHAEL E. MARKS,
20  DEAN O. MORTON,
    KENNETH L. SCHROEDER,
21  JON D. TOMPKINS,
    RICHARD P. WALLACE,
22  KLA-TENCOR CORPORATION, and
    DOES 1 through 25,
23
                    Defendants.
24

25

26

27

28

FILE VIA FAX

1      Plaintiff, through his attorneys, brings this Complaint against defendant KLA-Tencor

2  Corporation ("KLA-Tencor" or the "Company") and certain directors of the Company, alleges on

3  personal knowledge as to his self and his activities, and on information and belief as to all other

4  matters, based on investigation and discovery conducted by counsel:

5                                          **SUMMARY**

6      1.      This is a shareholders' action on behalf of all individuals who owned KLA-Tencor

7  common stock between September 20, 2002 and September 27, 2006, alleging that certain current

8  and former officers and members of its Board of Directors (the "Board") breached their fiduciary

9  duties when they failed to inform shareholders that they had issued backdated KLA-Tencor stock

10  options to certain senior executives.  Indeed, defendants, as outlined *infra*, have admitted that they

11  issued backdated stock options to all employees who received grants between from July 1, 1997 and

12  June 30, 2002.

13      2.      KLA-Tencor, a publicly traded company whose common stock is traded on Nasdaq

14  under the ticker symbol "KLAC," was formed in May 1997 pursuant to merger of KLA Instruments

15  and Tencor Instruments.  The Company supplies management solutions for the semiconductor and

16  related microelectronics industries.

17                                        **JURISDICTION**

18      3.      This Court has jurisdiction over the subject matter of this action pursuant to the

19  California Constitution Article VI, Section 10, because the case is an action not given by statute to

20  other trial courts.

21      4.      Venue is proper in this County under Section 395(a) of the California code of Civil

22  Procedure in that some or all of the Individual Defendants reside in this County.

23                                          **PARTIES**

24      5.      Plaintiff Chris Crimi owned shares of KLA-Tencor common stock between

25  September 20, 2002 and September 27, 2006.

26      6.      Edward W. Barnholt ("Barnholt") has served as a member of the Board of Directors

27  since 1995 and  its Compensation Committee and Nominating and Governance Committee since

28  2000.  Defendant Barnholt was the Chairman of the Nominating and Governance Committee for the

                                               2

1  2004, 2005 and 2006 fiscal years, and was named as Chairman of the Board in October of 2006, and

2  became its Chairman in October 2006.  Upon information and belief, Barnholt resides in California.

3          7.    H. Raymond Bingham ("Bingham") has served as a member of the Board of

4  Directors since October 1999, its Audit Committee since 2000, and its Nominating and Governance

5  Committee since 2006.  Defendant Bingham became Chairman of the Audit Committee in 2003

6  and as Chairman.  Upon information and belief, Bingham resides in California.

7          8.    Robert T. Bond ("Bond") has served as a member of the Board of Directors and its

8  Compensation Committee since August 2000 and Audit Committee since 2002.  He became

9  Chairman of the Compensation Committee in 2004.  Upon information and belief, Bond resides in

10  California.

11          9.    Richard J. Elkus, Jr. ("Elkus") was a member of the Board of Directors during times

12  relevant herein, and a member of its Audit Committee from 1999 until November 4, 2005 and its

13  Nominating and Governance Committee from fiscal 2003 to November 4, 2005.  Upon information

14  and belief, Elkus resides in California.

15          10.    Stephen P. Kaufman ("Kaufman") has served as a member of the Board of Directors

16  since November 2002 and its since November 2002 and its Nominating and Governance Committee

17  since fiscal year 2005.  Upon information and belief, Kaufman resides in California.

18          11.    Kenneth Levy ("Levy") was a member of Board of Directors during times relevant

19  herein, holding the position of Chairman of the Board from July 1999 through October 2006.  Levy

20  was also a member of the Board's Nominating and Governance Committee and served as the

21  Company's CEO from July 1998 to June 1999.  Upon information and belief, Levy resides in

22  California.

23          12.    Michael E. Marks ("Marks") was a member of the Board of Directors during times

24  relevant herein, and a member of its Compensation Committee from November 2003 until May

25  2006.  Upon information and believe, Marks resides in California.

26          13.    Dean O. Morton ("Morton") was a member of the Board of Directors during times

27  relevant herein, and a member of its Audit Committee and the Nominating and

28

3

1    Governance Committee during fiscal year 2001.  Upon information and belief, Morton resides in

2    California.

3        14.    Defendant Kenneth L. Schroeder ("Schroeder") was a member of the Board of

4    Directors during times relevant herein and served on its Nominating and Governance Committee

5    during the 2001 and 2002 fiscal years.  Schroeder also served on the Company's Stock Option

6    Committee from 1994 until December 31, 2005.  Defendant Schroeder was a Senior Advisor to the

7    Company from January 1, 2006 through October 16, 2006, its CEO from July 1999 until January 1,

8    2006, President from November 1991 to July 2002 and from May 2004 to July 2005, and COO from

9    November 1991 until June 1999.  Upon information and belief, defendant Schroeder resides in

10   California.

11       15.    Jon D. Tompkins ("Tompkins"), one of the founders of the Company,  was a member

12   of the Board during times relevant herein, having served as Chairman of the Board from July 1998

13   to June 1999 and CEO from May 1997 to July 1998.  Tompkins also served as a member of the

14   Stock Option Committee from 1997 until 1999.  Upon information and belief, Tompkins resides in

15   California.

16       16.    Defendant Richard P. Wallace ("Wallace") has been a member of the Company's

17   Board of Directors since January 2006.  Defendant Wallace also serves as the Company's Chief

18   Executive Officer ("CEO"), a position he has held since January 1, 2006.  He also served as

19   President and Chief Operating Officer ("COO") from July 2005 through December 2005, Executive

20   Vice President of the Customer Group from May 2004 to July 2005, and Executive Vice President

21   of the Wafer Inspection, Review & Analysis Group from July 2000 to May 2004.  Upon information

22   and belief, defendant Wallace resides in California.

23       17.    Defendant KLA-Tencor is a Delaware corporation with its executive offices and

24   principal place of business located at 160 Rio Robles, San Jose, California 95134.

25       18.    Defendants Barnholt, Bingham, Bond, Elkus, Kaufman, Levy, Marks, Morton,

26   Schroeder, Tompkins, and Wallace are collectively referred to herein as the "Individual

27   Defendants."

28

<div align="center">4</div>

1    19.    The true names and capacities of defendants sued herein under California Code of

2    Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiff, who

3    therefore sue these defendants by such fictitious names.  Plaintiff will seek to amend this Complaint

4    and include these Doe defendants' true names and capacities when they are ascertained.  Each of the

5    fictitiously named defendants is responsible in some manner for the conduct alleged herein and for

6    the injuries suffered by the Company.

7                **DUTIES OF THE INDIVIDUAL DEFENDANTS**

8    20.    Each Individual Defendant owed KLA-Tencor and its public shareholders the duty to

9    exercise due care, loyalty and good faith in the management and administration of the affairs of the

10   Company, as well as in the use and preservation of its property and assets.  The conduct of the

11   Individual Defendants complained of herein involve a knowing, reckless or grossly negligent and

12   culpable violation of their obligations as directors and/or officers of KLA-Tencor, the absence of

13   good faith on their part and a reckless disregard for their duties to the Company and its shareholders,

14   all of which the Individual Defendants were aware or should have been aware, presented a risk of,

15   and in fact did cause, serious injury to the Company.

16   21.    By reason of their positions as officers, directors, and fiduciaries of KLA-Tencor and

17   its shareholders and because of their ability to control the business and corporate affairs of KLA-

18   Tencor, the Individual Defendants owed KLA-Tencor and its shareholders fiduciary obligations of

19   trust, good faith, loyalty, and due care, and were and are required to use their utmost ability to

20   control and manage KLA-Tencor in a fair, just, honest, and equitable manner.  The Individual

21   Defendants were and are required to act in furtherance of the best interests of KLA-Tencor and its

22   shareholders so as to benefit all shareholders equally and not in furtherance of their personal

23   interests or benefit.

24   22.    The Individual Defendants, because of their positions of control and authority as

25   directors and/or officers of KLA-Tencor, were able to and did, directly and/or indirectly, exercise

26   control over the wrongful acts complained of herein.

27

28

5

23.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of KLA-Tencor, and was at all times acting within the course and scope of such agency.

24.    To discharge the aforesaid duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial affairs of KLA-Tencor. The Individual Defendants were required, among other things, to: in good faith manage, conduct, supervise and direct the business and affairs of KLA-Tencor carefully and prudently and in accordance with all applicable laws, rules and regulations; neither violate nor knowingly permit any officer, director, employee or agent of KLA-Tencor to violate applicable federal and state laws, rules and regulations or any rule or regulation of KLA-Tencor; exercise reasonable control and supervision over the officers and employees and agents of KLA-Tencor; remain informed as to the status of KLA-Tencor's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with federal and state securities laws, supervise the preparation, filing and/or dissemination of any SEC filings, press releases, audits, reports or other information required by law, and examine and evaluate any reports or examinations, audits, or other financial information concerning the financial condition of KLA-Tencor; maintain and implement an adequate system of internal financial, accounting and management information systems and controls; and ensure that KLA-Tencor's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP").

25.    Because of their Board membership and/or executive and managerial positions with KLA-Tencor and their access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and their receipt of reports and other information provided to them in connection therewith, each of the Individual Defendants had access to

6

1     undisclosed information about KLA-Tencor's business prospects, financial condition, performance,

2     accounting and revenue recognition practices, as alleged herein.

3                          **CLASS ACTION ALLEGATIONS**

4        26.     Plaintiff brings this action pursuant to §382 of the California Code of Civil

5     Procedure on his own behalf and as a class action on behalf of all holders of KLA-Tencor common

6     stock, who are being and will be harmed by defendants' actions described below (the "Class").

7     Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other

8     entity related to or affiliated with any defendants.

9        27.     This action is properly maintainable as a class action because:

10           a.     The class is so numerous that joinder of all members is impracticable. There

11               are millions of KLA-Tencor stock issued and outstanding. The shares trade

12               on the Nasdaq National Market under the ticker symbol "KLAC", and

13               thousands of KLA-Tencor stockholders of record are located throughout the

14               United States;

15           b.     There are questions of law and fact which are common to the Class, including

16               whether the defendants have engaged or are continuing to act in a manner

17               calculated to benefit themselves at the expense of KLA-Tencor's minority

18               stockholders and whether plaintiff and other members of the Class would be

19               irreparably damaged if the defendants are not enjoined in the manner

20               described below;

21           c.     The defendants have acted or refused to act on grounds generally applicable

22               to the Class thereby making appropriate final injunctive relief with respect to

23               the Class as a whole;

24           d.     Plaintiff is committed to prosecuting this action and has retained competent

25               counsel experienced in litigation of this nature. The claims of plaintiff are

26               typical of the claims of the other members of the class and plaintiff has the

27               same interest as the other members of the Class. Accordingly, plaintiff is an

28

1  adequate representative of the Class and will fairly and adequately protect the
2  interests of the Class; and

3      e.    Plaintiff anticipates that there will be no difficulty in the management of this
4  litigation as a class action.

5      28.    For the reasons stated herein, a class action is superior to other available methods for
6  the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

8  ### Background

9      29.    Stock options give employees of a publically traded company the right to purchase
10  company stock at a fixed price in the future.  The general policy behind a grant of stock options is to
11  link employees' compensation to the value of the company's shares and, therefore, to the wealth of
12  the company's shareholders.  Typically, the options' fixed price is aligned with the price of the stock
13  on the day of the grant.  If the stock price rises from the fixed grant price the employee profits by
14  exercising the options and selling the shares.  In contrast, backdated stock options allow the
15  employees of a publically traded company, such as KLA-Tencor, to maximize their wealth at the
16  expense of its shareholders.

17      30.    According to the Definitive Proxy filed with the Securities and Exchange
18  Commission on October 6, 1997 (the "1997 Proxy"), options were granted to eligible employees
19  through the 1982 Stock Option Plan and to directors through the Director Plan.  According to the
20  1997 Proxy, the "exercise price of the options is the fair market value of Common Stock as of the
21  date of grant."

22      31.    The 1982 Stock Option Plan was initially adopted by KLA Instruments Corporation
23  in 1981, restated on November 18, 1996 (the date of the annual meeting pursuant to the 1996
24  Definitive Proxy filed with the SEC on October 11, 1996), and operative through October 18, 2004.
25  Pursuant to the terms of the 1982 Stock Option Plan, as restated, the "Plan shall be administered by
26  the Board, including any duly appointed Committee of the Board."  In its power as administrator of
27  the plan, "the Board shall have the full and final power and authority, in its sole discretion . . . to
28  determine the persons to whom, and the time or times at which, Options shall be granted and the

8

SEP. 4. 2007  12:54PM   A   LEGAL SERVICE 6506974640                NO. 0354   P. 11

1   number of shares of Stock to be subject to each Option . . . [and] . . . to determine the Fair Market

2   Value of shares of Stock or other property". Moreover, the "exercise price for each Option shall be

3   established in the sole discretion of the Board provided, however, that [] no Option shall have an

4   exercise price per share less than the Fair Market Value of a share of Stock on the effective date of

5   grant of the Option."

6       32.    The 1982 Stock Option Plan also had an "evergreen" automatic annual share

7   replenishment feature which provided for, on the first day of the next fiscal year, the addition to the

8   Plan an amount of shares equal to 3% of KLA-Tencor's outstanding shares of common stock on the

9   last day of each fiscal year (the "Evergreen Provision").

10      33.    According to the Definitive Proxy filed with the SEC on September 28, 1998 (the

11  "1998 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and

12  to directors through the Director Plan. According to the 1998 Proxy, the "exercise price of the

13  options is the fair market value of Common Stock as of the date of grant."

14      34.    The 1998 Proxy also requested shareholders approve the 1998 Outside Director

15  Option Plan (the "1998 Director Plan") and to reserve for issuance 1,000,000 shares of the KLA-

16  Tencor common stock for distribution to the directors under that plan.

17      35.    According to the Definitive Proxy filed with the SEC on October 15, 1999 (the

18  "1999 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and

19  to directors through the 1998 Director Plan. According to the 1999 Proxy, the "exercise price of the

20  options is the fair market value of Common Stock as of the date of grant."

21      36.    According to the Definitive Proxy filed with the SEC on October 6, 2000 (the "2000

22  Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and to

23  directors through the 1998 Director Plan. According to the 2000 Proxy, the "exercise price of the

24  options is the fair market value of Common Stock as of the date of grant."

25      37.    On November 10, 2000, the Board approved the 2000 Nonstatutory Stock Option

26  Plan which provides for the issuance of stock options to employees and consultants, other than

27  officers and directors, of the Company or any parent or subsidiary corporation.

28

-9-

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY

1    38.    According to the Definitive Proxy filed with the SEC on September 28, 2001 (the

2    "2001 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and

3    to directors through the 1998 Director Plan.  According to the 2001 Proxy, the "exercise price of the

4    options is the fair market value of Common Stock as of the date of grant."

5    39.    According to the Definitive Proxy filed with the SEC on September 20, 2002 the

6    "2002 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and

7    to directors through the 1998 Director Plan.  According to the 2002 Proxy, all "Options were

8    granted at an exercise price equal to the fair market value of the Company's Common Stock on" the

9    date of the grant.

10    40.    On November 6, 2002, the Board amended the Nonstatutory Stock Option Plan.

11    41.    According to the Definitive Proxy filed with the SEC on September 23, 2003 (the

12    "2003 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and to

13    directors through the 1998 Director Plan.  According to the 2003 Proxy, all "Options were granted

14    at an exercise price equal to the fair market value of the Company's Common Stock."

15    42.    Pursuant to Evergreen Provision, on July 1, 2004, 5,903,603 shares of KLA-Tencor

16    stock were added into the 1982 Stock Option Plan.

17    43.    According to the Definitive Proxy filed with the SEC on September 9, 2004 (the

18    "2004 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan to

19    and to directors through the 1998 Director Plan.  According to the 2004 Proxy, all "Options were

20    granted at an exercise price equal to the fair market value of the Company's Common Stock."

21    44.    The 2004 Proxy requested shareholders vote in favor of the director approved 2004

22    Equity Incentive Plan.  The "2004 Equity Incentive Plan [was] developed to replace [the] 1982

23    Stock Option Plan and 2000 Nonstatutory Stock Option Plan and to supplement [the] 1998 Outside

24    Director Option Plan."  Under the terms of the 2004 Equity Incentive Plan, shareholders were

25    requested to reserve 11,000,000 shares of KLA-Tencor common stock for issuance under the terms

26    of the 2004 Equity Incentive Plan.  In addition, pursuant to the terms of the 2004 Equity Incentive

27    Plan, up to an additional 1,500,000 shares remaining for grant under the 1982 Stock Option Plan

28    and 2000 Nonstatutory Stock Option Plan would be transferred into the 2004 Equity Incentive Plan.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY
W:\STULL\KLA2\PLD\DirecComplaint.001.wpd

1    45.    The 2004 Equity Incentive Plan was to "be administered by our Board of Directors or

2    a committee, which our Board of Directors may appoint from among its members (the

3    'Administrator')." The "Administrator has the authority to . . . select the persons to whom awards

4    are to be granted." Options granted under the Plan "may not be granted with an exercise price lower

5    than 100% of the fair market value of the underlying shares."

6    46.    According to the Definitive Proxy filed with the SEC on October 13, 2005 (the

7    "2005 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan to

8    and to directors through the 1998 Director Plan. According to the 2005 Proxy, all "Options were

9    granted at an exercise price equal to the fair market value of the Company's Common Stock."

10   **Defendants Begin to Reveal the Truth**

11   47.    On May 22, 2006, *The Wall Street Journal* published an article entitled "Five More

12   Companies Show Questionable Options Patterns." The first company addressed by the article was

13   KLA-Tencor and, in fact, this was the first time the public had any idea that KLA-Tencor was

14   allegedly backdating stock options to top executives. The article stated, in relevant part:

15           In 2001, KLA-Tencor Corp., a leading semiconductor-equipment
16           maker, granted its top executives, including Chairman Ken Levy, two
             batches of stock options. They arrived on unusually fortunate days for
17           the executives. The first dated at the share price's first-half low, the
             second at its second-half low.

18           In all, Mr. Levy received 10 grants from KLA-Tencor and its
19           predecessor company between 1994 and 2001 — all preceding quick
             runups in the share price; an analysis by The Wall Street Journal
20           found the probability that that pattern occurred merely by chance is
             tiny — around one in 20 million.

21           Mr. Levy and company executives didn't return repeated phone and
22           email messages.

23                                          * * * * *

24           KLA-Tencor was formed from the merger of two major suppliers of
             semiconductor equipment. It is a powerhouse in the specialized and
25           expensive gear used by the world's largest chipmakers to test the
             quality of their complex production systems. It has a market value of
26           about $9 billion. Based in San Jose, Calif., KLA-Tencor has generated
             a fortune for Mr. Levy, the founder of one of its predecessors.

27           The company has assured shareholders — whose holdings in the
             company get diluted each time an option is exercised — that its option
28           grants serve an important incentive purpose. "Stock options are

                                          -11-

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY
W:\STULL\KLA2\PLD\DirectComplaint.001.wpd

granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price," KLA-Tencor's compensation committee members wrote in a report filed with the company's 2002 proxy statement.

KLA-Tencor's 2001 stock chart looks a bit like a "W," with sharp drops in April and October. Mr. Levy and other top executives were granted options dated at the very bottom of each dip. One grant carried an exercise price of $29.31; the other, $32.75. KLA-Tencor shares now trade around $45, which means the options could be yielding millions in gains.

But had either 2001 grant come a bit more than a month later, it would have carried an exercise price closer to $50, yielding zero potential profit today.

It wasn't the only time that KLA executives, including Mr. Levy, former CEO Kenneth Schroeder and current chief Rick Wallace, received propitious grants. Grants to Messrs. Levy and Schroeder in 1998 and 2000 also were dated at that year's lowest closing price.

The 1998 grant proved lucrative for the executives. Mr. Levy has reaped at least $6 million from cashing out options issued then, while Mr. Schroeder has pocketed at least $10 million. Mr. Levy didn't return phone or email messages. Neither the company's chief financial officer nor a company spokeswoman returned several messages seeking comment. Mr. Schroeder couldn't be reached to comment.

48.   On May 24, 2006, the Company filed an 8-K with the SEC which stated:

KLA-Tencor Corporation announced today that its Board of Directors has appointed a Special Committee of independent directors to conduct an internal investigation relating to past stock option grants, the timing of such grants and related accounting and documentation. The Special Committee will be assisted by outside legal counsel and accounting experts. KLA-Tencor also said that it has received subpoenas from the U.S. Attorney's Offices for the Eastern District of New York and Northern District of California requesting information relating to its past stock option grants. KLA-Tencor said that it will cooperate fully with any government or regulatory investigation into these matters. KLA-Tencor further disclosed that on May 22, 2006, it was served with a complaint relating to a lawsuit filed in the United States District Court for the Northern District of California filed by the Theodore R. Kornreich Revocable Trust, derivatively on behalf of KLA-Tencor.

49.   On May 20, 2006, KLA-Tencor filed another 8-K which stated that "KLA-Tencor Corporation announced today that it received notice from the Securities and Exchange Commission of an informal inquiry relating to past stock option grants. KLA-Tencor will cooperate fully with this investigation."

**COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
W:\STULL\KLA2\PLD\DirecComplaint.001.wpd

1   50.   On June 30, 2006, the Company filed a 8-K attaching a press release issued that same

2   day entitled "KLA-Tencor Provides Update on Special Committee Investigation." The press release

3   announcing:

> [T]hat a Special Committee of the Company's Board of Directors has
> reached a preliminary conclusion that the actual measurement dates
> for financial accounting purposes of certain stock option grants issued
> in prior years likely differ from the recorded grant dates of such
> awards. The Special Committee has not completed its investigation
> and is continuing its review of these matters. The Special Committee
> has not yet determined whether any resulting compensation charges
> are material or whether the Company ultimately will restate
> previously issued financial statements.

> The Company previously announced that its Board of Directors has
> appointed a Special Committee of independent directors to conduct an
> internal investigation relating to stock options granted to members of
> senior management and the employees of the Company. The Special
> Committee, assisted by independent legal counsel and accounting
> experts, is investigating the timing of such grants, as well as their
> related accounting treatment.

> Based on the Special Committee's investigation to date, the Company
> now anticipates that it may record additional non-cash charges for
> stock-based compensation expense. The Company has not yet
> determined the amount of such charges or the resulting tax impact of
> these actions. In the event that the Company determines that these
> items are material, KLA-Tencor may be required to restate its
> financial statements for the relevant prior fiscal periods.

17   51.   On July 26, 2006, the Company filed another 8-K attaching a press release issued on

18   July 21, 2006, which stated, in relevant part:

> As previously announced, the Company's Board of Directors has
> appointed a Special Committee of independent directors to conduct an
> internal investigation relating to stock options granted to the
> employees of the Company. As disclosed on June 30, the Special
> Committee has reached a preliminary conclusion that the actual
> measurement dates for financial accounting purposes of certain stock
> option grants issued in prior years likely differ from the recorded grant
> dates of such awards. The Special Committee has not yet determined
> whether any resulting compensation charges or tax implications are
> material or whether the Company ultimately will restate previously
> issued financial statements.

> As a result of the on-going investigation and the potential for
> restatement, the Company is unable to provide detailed GAAP or non-
> GAAP financials for items other than revenue and bookings for the
> quarter or year ended June 30, 2006. In addition, the Company will
> not file its annual report on form 10-K until after the completion of
> the investigation. The Company does not expect the investigation to
> be completed until after the date the Form 10-K is required to be filed.

---

**COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
W:\STULL\KLA2\PLD\DirectComplaint.001.wpd

52.    On September 14, 2006, the Company acknowledged that it could not meet its

financial obligations when it filed a Form 12b-25, Notice of Inability to Timely File 10-Q, with the

SEC.  The Form stated, in relevant part that:

> [A] Special Committee of independent directors, appointed by the
> Board of Directors of KLA-Tencor Corporation (the "Company"), is
> conducting an internal investigation relating to stock options granted
> to the employees of the Company, the timing of such grants and their
> related accounting and tax treatment.
>
> On June 30, 2006, the Company disclosed that the Special Committee
> reached a preliminary conclusion that the actual measurement dates
> for financial accounting purposes of certain stock option grants issued
> in prior years likely differ from the recorded grant dates of such
> awards. Neither the Special Committee nor the Board of Directors of
> the Company has yet determined whether any resulting compensation
> or tax charges are material or whether the Company ultimately will
> restate previously issued financial statements.
>
> As a result of the ongoing investigation, the Company was unable to
> file its annual report on Form 10-K for the year ended June 30, 2006
> by the required filing date of September 13, 2006 without
> unreasonable effort or expense. The Company does not anticipate that
> it will be able to file its Form 10-K on or before the fifteenth calendar
> day following the prescribed due date, in accordance with Rule 12b-
> 25.
>
> The Company is focused on resolving these issues as quickly as
> possible and plans to file its Form 10-K as soon as practicable
> following the completion of the Special Committee's investigation.

53.    On September 15, 2006, the Company filed an 8-K with the SEC attaching a

September 14, 2006 press release which announced that:

> [T]he Special Committee appointed by the Board of Directors of the
> Company is continuing its internal investigation relating to stock
> options granted to employees of the Company. As anticipated in the
> Company's news release dated July 24, 2006, the Company will not
> file its Annual Report on Form 10-K until the internal investigation is
> complete. Thus, the Company did not file its Form 10-K on
> September 13, 2006 as required, and has filed Form 12b-25
> (Notification of Late Filing) also as required.
>
> As a result of the delayed filing of the Company's Form 10-K, the
> Company today received a NASDAQ Staff Determination notice
> indicating that the Company is not in compliance with the filing
> requirements for continued listing as set forth in NASDAQ
> Marketplace Rule 4310(c)(14) and that its common stock is subject to
> delisting from the NASDAQ Global Select Market. The notice, which
> the Company expected, was issued in accordance with standard
> NASDAQ procedures. The Company will appeal this determination

14

1    and request a hearing before the NASDAQ Listing Qualifications
2    Panel. The Company's appeal and hearing request will automatically
     stay the delisting of the Company's common stock. Pending the
3    Panel's decision, the Company's shares will continue to be listed on
     the NASDAQ Global Select Market.

4    As previously announced, the Special Committee reached a
5    preliminary conclusion that the actual measurement dates for financial
     accounting purposes of certain stock option grants issued in prior
6    years likely differ from the recorded grant dates of such awards.
     Neither the Special Committee nor the Board of Directors of the
7    Company has yet determined whether any resulting compensation or
     tax charges are material or whether the Company ultimately will
8    restate previously issued financial statements. The Company is
     focused on resolving these issues as quickly as possible and plans to
9    file its Form 10-K as soon as practicable following completion of the
     Special Committee's investigation.

10        54.    On September 27, 2007, the Company filed an 8-K with the SEC admitting that

11   stock options had been granted to KLA-Tencor executives at backdated prices. The press release

12   announced, in relevant part, that:

13   A Special Committee of the Board of Directors of KLA-Tencor
     Corporation (the "Company") has delivered a report to the Board of
14   Directors, which concluded that incorrect measurement dates were
     used for certain stock option grants made principally during the period
15   from July 1, 1997 through July 30, 2002. The Board of Directors of
     the Company has not concluded its evaluation of the factors that led to
16   the use of incorrect measurement dates of stock options. The Board of
     Directors has concluded that the Company will need to restate certain
17   of its historical financial statements to record non-cash charges for
     compensation expenses relating to past stock option grants. The
18   Company has not determined the amount of such charges, the
     resulting tax and accounting impacts, the impact on internal control
19   over financial reporting, or which specific periods may require
     restatement. However, the effects on previously reported financial
20   statements are expected to be material. The Special Committee and
     the Board of Directors will continue to be actively involved in
21   reviewing information and determining the appropriate actions to be
     taken by the Company with respect to this matter.
22
     Accordingly, on September 27, 2006, the Board of Directors
23   concluded that financial statements and all earnings and press releases
     and similar communications issued by the Company relating to
24   periods beginning on or after July 1, 1997, should no longer be relied
     upon, including the Company's financial statements for fiscal years
25   1998 through 2005, the interim periods contained therein, and the
     fiscal quarters ended September 30, 2005, December 31, 2005 and
26   March 31, 2006. The Company's management and the Special
     Committee have discussed this matter with PricewaterhouseCoopers
27   LLP, the Company's independent registered public accounting firm.

28                                   * * *

                                      15

1    On September 27, 2006, KLA-Tencor Corporation (the "Company")
2    determined that its historical financial statements for one or more
     prior fiscal years have to be restated as a result of improper
3    accounting for option grants made to officers and employees. The
     specific fiscal years which will need to be restated has yet been
4    determined. However, the Company has decided to suspend
     temporarily employee participation in several equity incentive
5    programs because the S-8 registration statements covering the shares
     of common stock issuable under those programs incorporate one or
6    more financial statements that will likely have to be restated. As part
     of such suspension, participants in the Company's 401(K) Plan (the
7    "401(k) Plan") will be subject to a blackout period during which they
     will be precluded from acquiring shares of the Company's common
8    stock under that plan. . .

9    **Ongoing Aftermath**

10        55.    On October 3, 2007, KLA-Tencor filed an 8-K announcing that the Company would

11   need restate its financials for dates between July 1, 1997 through March 31, 2006. The 8-K more

12   specifically stated, in relevant part, that:

13        A Special Committee of the Board of Directors of KLA-Tencor
          Corporation (the "Company") has delivered a report to the Board of
14        Directors, which concluded that incorrect measurement dates were
          used for certain stock option grants made principally during the period
15        from July 1, 1997 through July 30, 2002. The Board of Directors of
          the Company has not concluded its evaluation of the factors that led to
16        the use of incorrect measurement dates of stock options. The Board of
          Directors has concluded that the Company will need to restate certain
17        of its historical financial statements to record non-cash charges for
          compensation expenses relating to past stock option grants. The
18        Company has not determined the amount of such charges, the
          resulting tax and accounting impacts, the impact on internal control
19        over financial reporting, or which specific periods may require
          restatement. However, the effects on previously reported financial
20        statements are expected to be material. The Special Committee and
          the Board of Directors will continue to be actively involved in
21        reviewing information and determining the appropriate actions to be
          taken by the Company with respect to this matter.
22
          Accordingly, on September 27, 2006, the Board of Directors
23        concluded that financial statements and all earnings and press releases
          and similar communications issued by the Company relating to
24        periods beginning on or after July 1, 1997, should no longer be relied
          upon, including the Company's financial statements for fiscal years
25        1998 through 2005, the interim periods contained therein, and the
          fiscal quarters ended September 30, 2005, December 31, 2005 and
26        March 31, 2006. The Company's management and the Special
          Committee have discussed this matter with PricewaterhouseCoopers
27        LLP, the Company's independent registered public accounting firm.

28

-16-

1  56. On October 16, 2006, the Company announced, in an 8-K filed with the SEC, in

2 relevant part, that:

3   [A]s a result of the Special Committee investigation [] of the

4   historical stock option practices of KLA-Tencor Corporation [], the
   Company terminated, effective immediately, all aspects of its

5   employment relationship with Kenneth L. Schroeder and any and all
   employment and/or service agreements between Mr. Schroeder and

6   the Company. The Company intends to cancel all outstanding stock
   options held by Mr. Schroeder that were retroactively priced or

7   otherwise improperly granted. Mr. Schroeder was President and Chief
   Operating Officer of the Company from 1991 to 1999 and Chief

8   Executive Officer and a member of the Board of Directors of the
   Company from 1999 to 2005.

9   Also on October 16, 2006, the Company's General Counsel, Stuart J.

10   Nichols, resigned, effective immediately. Mr. Nichols had been Vice
   President and General Counsel of the Company since 2000. The

11   Company intends to re-price all outstanding retroactively priced stock
   options held by Mr. Nichols; the exercise price of each re-priced

12   option will be increased to the fair market value on the corrected
   measurement date.

13      * * *

14   Later on October 16, 2006, Kenneth Levy, Founder and Chairman of

15   the Board of Directors of the Company, retired as a Director and
   employee, effective immediately, and was named Chairman Emeritus

16   by the Board of Directors. As of that date, by mutual agreement, Mr.
   Levy's employment with the Company immediately ceased, and any

17   and all employment or service contracts between Mr. Levy and the
   Company immediately terminated, with each party having no further

18   monetary or other obligations thereunder. The Company intends to re-
   price all outstanding retroactively priced stock options held by Mr.

19   Levy; the exercise price of each re-priced option will be increased to
   the fair market value on the corrected measurement date. Mr. Levy

20   was a member of the Board of Directors of the Company since 1975,
   Chairman of the Board since 1999, and Chief Executive Officer from

21   1975 to 1997 and from mid 1998 to mid 1999.

22   Edward W. Barnholt was appointed to succeed Mr. Levy as Chairman
   of the Board of Directors of the Company and will serve in a non-

23   executive capacity. Mr. Barnholt is the former President and Chief
   Executive Officer of Agilent Technologies, and joined the Company's

24   Board of Directors in 1995.

25  57. A press release issued by the Company on October 16, 2007 also announced, in

26 relevant part, that:

27   [T]he Company's Board of Directors concluded that incorrect

28   measurement dates for certain stock option grants were used for
   financial accounting purposes, principally during the period July 1,

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY
W:\STULL\KLA2\PLD\DirectComplaint.t001.wpd

1997 through June 30, 2002, and as a result, the Company will restate
its financial statements to correct the accounting for retroactively
priced stock options. The Company now anticipates that the total
additional non-cash charges for stock-based compensation expenses
will not exceed $400 million.

58.    On November 15, 2006, the Company filed with the SEC another Form 12b-25,
Notice of Inability to Timely File 10-Q.

59.    On November 15, 2006, the Company also filed an 8-K with the SEC announcing
that it continued to face delisting as the result of its inability to meet its financial reporting
requirements.

60.    On December 27, 2006, the Company filed an 8-K announcing that defendant
Tompkins had resigned from the KLA-Tencor Board of Directors on December 21, 2006.

61.    On January 5, 2007, the Company filed and 8-K attaching its "Stock Option
Amendment and Special Bonus Agreement." The text of the 8-K stated, *inter alia*, the amendment
would increase the price of defendant Wallace's outstanding stock options by $368,618.36.

62.    On January 29, 2007, the KLA-Tencor filed its fiscal 2006 Form 10-K and restated
previously filed financial results for fiscal years 2005, 2004, 2003 and 2002. In its filing, the
Company, admitted, *inter alia*, that:

This Annual Report on Form 10-K for our fiscal year ended June 30,
2006 includes restatements of the following previously filed financial
statements and data (and related disclosures): (1) our consolidated
financial statements as of and for our fiscal years ended June 30, 2005
and 2004; (2) our selected consolidated financial data as of and for
our fiscal years ended June 30, 2005, 2004, 2003 and 2002, and (3)
our unaudited quarterly financial data for the first three quarters in our
fiscal year ended June 30, 2006 and for all quarters in our fiscal year
ended June 30, 2005. See Note 2, "Restatement of Consolidated
Financial Statements," to Consolidated Financial Statements and
Exhibit 99.1 for a detailed discussion of the effect of the restatements.

As a result of an investigation of our historical stock option practices
by a Special Committee of our Board of Directors (see Item 3 — Legal
Proceedings), we discovered that certain of our stock options,
primarily those granted from July 1, 1997 to June 30, 2002, had
been retroactively priced for all employees who received these
grants (less than 15% of these options were granted to executive
officers). This means that the option exercise price was not the market
price of the option shares on the actual grant date of the option, but
instead was a lower market price on an earlier date. The actual grant
date—when the essential actions necessary to grant the option were
completed, including the final determination of the number of shares

1   to be granted to each employee and the exercise price— is the correct
2   measurement date to determine the market price of the option shares
    under the accounting rules in effect at the time. More than 95% of the
3   total in-the-money value (market price on the actual grant date minus
    exercise price) of all of our retroactively priced options was
4   attributable to those granted from July 1, 1997 to June 30, 2002.

5                                    * * *

6       . . . To correct our past accounting for stock options, we recorded
    additional pre-tax, non-cash, stock-based compensation expense of (a)
7   $348 million for the periods July 1, 1994 to June 30, 2005 under APB
    Opinion No. 25 and (b) $22 million for the year ended June 30, 2006
8   under SFAS No. 123®. We expect to amortize an additional $6
    million of such pre-tax charges under SFAS No. 123® in future
9   periods to properly account for past retroactively priced option grants.

10      By October 16, 2006, the Special Committee had substantially
    completed its investigation. The Special Committee concluded that
11  (1) there was retroactive pricing of stock options granted to all
    employees who received options, primarily during the periods from
12  July 1, 1997 to June 30, 2002 (less than 15% of these options were
    granted to executive officers), (2) the retroactively priced options
13  were not accounted for correctly in our previously issued
    financial statements, (3) the retroactive pricing of options was
14  intentional, not inadvertent or through administrative error, (4)
    the retroactive pricing of options involved the selection of
15  fortuitously low exercise prices by certain former executive
    officers, and other former executives may have been aware of this
16  conduct, (5) the retroactive pricing of options involved the
    falsification of Company records, resulting in erroneous
17  statements being made in financial and other reports previously
    filed with the SEC, as well as in information previously provided
18  to our independent registered public accounting firm, and (6) in
    most instances, the retroactive pricing of options violated the
19  terms of our stock option plans. Because virtually all holders of
    retroactively priced options issued by the Company were not involved
20  in or aware of the retroactive pricing, the Board of Directors decided
    that we should continue to honor the options that violated the terms of
21  our stock option plans, except in certain individual cases as described
    below.

22  [emphasis added.]

23      63.    According to an 8-K filed by KLA-Tencor on July 25, 2007, the Company reached a

24  settlement with the United States Securities and Exchange Commission ("SEC") "by consenting to

25  the entry of a permanent injunction against future violations of the reporting, books and records, and

26  internal controls provisions of the federal securities laws."

27

28

                                     19

1    64.    On that same day the SEC announced that it had filed charges against defendant

2  Schroeder concerning Schroeder's backdating of stock options during his employment with KLA-

3  Tencor.

4    65.    The Defendants disseminated false and misleading financial statements in, *inter alia*,

5  the following "Form 10-K" filings:

6         a.    Form 10-K for fiscal year ended June 30, 1998, and filed with the SEC on
7               September 28, 1998;

8         b.    Form 10-K/A for fiscal year ended June 30, 1998, and filed with the SEC on
               September 29, 1998;

9         c.    Form 10-K for fiscal year ended June 30, 1999, and filed with the SEC on
10              September 28, 1999;

11        d.    Form 10-K for fiscal year ended June 30, 2000, and filed with the SEC on
               September 28, 2000;

12        e.    Form 10-K for fiscal year ended June 30, 2001, and filed with the SEC on
13              September 21, 2001;

14        f.    Form 10-K for fiscal year ended June 30, 2002, and filed with the SEC on
               September 20, 2002;

15        g.    Form 10-K for fiscal year ended June 30, 2003, and filed with the SEC on
16              September 16, 2003;

17        h.    Form 10-K/A for fiscal year ended June 30, 2003, and filed with the SEC on
               September 29, 2003;

18        i.    Form 10-K for fiscal year ended June 30, 2004, and filed with the SEC on
19              August 30, 2004; and

20        j.    Form 10-K for fiscal year ended June 30, 2005, and filed with the SEC on
               September 2, 2005.

21    66.    The Company's 1998, 1999, 2000, 2001, 2002, 2003, 2004 and 2005 Form 10-Ks

22  were issued in violation of GAAP, and in particular Accounting Principles Board ("APB") Opinion

23  No. 25 ("APB 25"), "Accounting for Stock Issued to Employees." Pursuant to APB 25, if the

24  market price on the date of grant exceeds the exercise price of the options, the company must

25  recognize the difference as an expense. Defendants' backdating practice resulted in understated

26  expenses on each Form 10-K because the difference between the market price and option exercise

27  price was not expensed by the Company.

28

-20-

1       67.    The Individual Defendants also caused and/or participated in issuing, filing and

2  disseminating the false and misleading information regarding Company issued options on the

3  Form(s) DEF 14A (the "Definitive Proxies") filed with the SEC on:

4          a.     October 6, 1997;

5          b.     September 28, 1998;

6          c.     October 15, 1999;

7          d.     October 6, 2000;

8          e.     September 28, 2001;

9          f.     September 20, 2002;

10         g.     September 23, 2003;

11         h.     September 9, 2004;

12         i.     October 13, 2005; and

13         j.     February 27, 2007.

14       68.    The Definitive Proxies were each false and misleading because they failed to correct

15  prior information regarding the issuance of backdated stock options and caused the Class to approve

16  the Individual Defendants' request to be appointed as directors of the Company based on that false

17  and misleading information.

18       69.    Defendants' backdating of options grants also violated provisions of the Internal

19  Revenue Code relating to deduction of option payments and thereby rendered the Company's

20  financial statements in Form 10-K filings for the years 1998, 1999, 2000 and 2001, as well as

21  interim Form 10-Qs, materially false and misleading.

22               **TOLLING OF THE STATUTE OF LIMITATIONS**

23       70.    The Defendants concealed their violations of law until at least June 30, 2006, the

24  date the Company issued its press release entitled "KLA-Tencor Provides Update on Special

25  Committee Investigation." Further, it was not until September 14, 2006, that the investing public

26  was informed that the Defendants would be unable to meet their financial reporting requirements as

27  a result of backdating schemes. Indeed, while the Defendants partially admitted to their violations

28  of law in their September 27, 2006, 8-K filing with the SEC, outlined *infra*, when they admitted that

**COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
W:\STULL\KLA\ZIPLD\DirectComplaint.001.wpd

1   they would be required to restate the earnings for certain accounting periods relevant to plaintiff's

2   allegations herein, the full extent of their violations is not yet known. It was not until October 16,

3   2007, that KLA-Tencor shareholders and the investing public were advised that the Company

4   anticipated that "the total additional non-cash charges for stock-based compensation expenses will

5   not exceed $400 million."

6          71.    As a result, the Individual Defendants have systematically and wrongfully concealed

7   their manipulation of Company stock option plans, falsely asserting that the grants were being

8   administered by a committee of independent directors, while in fact, as outlined herein, the

9   Compensation Committee Defendants were colluding with other Individual Defendants to violate

10  GAAP and Section 162(m). Moreover, the Compensation Committee Defendants were colluding

11  with the other Individual Defendants to make, *inter alia*, false and misleading filings with the SEC.

12         72.    Similarly, the Audit Committee Defendants were systematically and wrongfully

13  concealing wrongdoings of each of the Individual Defendants by disseminating to KLA-Tencor

14  shareholders and the market false financial statements that improperly recorded and accounted for

15  backdated options grants in violation of GAAP and Section 162(m).

16         73.    At no time prior to June 30, 2006, did KLA-Tencor shareholders or any other

17  member of the investing public have reason to know of Defendants' breaches of their fiduciary

18  duties and violations of the Corporations Code. Therefore, the Individual Defendants cannot rely on

19  a statute of limitations defense as they have withheld from KLA-Tencor shareholders and the

20  investing public the facts that give rise to the claims asserted herein.

21                                        COUNT I

22                        (Against All Defendants Except KLA-Tencor)
                          Class Claim for Breach of the Duty of Disclosure
23

24         74.    Plaintiff hereby realleges and incorporates by reference the allegations in the

25  preceding paragraphs as if fully set forth herein.

26         75.    Plaintiff brings this claim as a direct claim, on behalf of himself and the Class,

27  against defendants for breach of their fiduciary duty of disclosure.

28

                                            22

1    76.    Defendants caused the Company to publish and/or disseminate its 1997, 1998, 1999,

2    2000, 2001, 2002, 2003, 2004, and 2005 Definitive Proxies with the false representation that option

3    grants were made with strike prices no less than the fair market value on the date of the grant.

4    Defendants failed to disclose that they knew and/or recklessly disregarded a pervasive options

5    backdating scheme from 1997 to 2006 causing the options to be issued during much of that time to

6    carry a much lower price than the strike price.

7    77.    As a result of the Individual Defendants' backdating scheme, the 1997, 1998, 1999,

8    2000, 2001, 2002, 2003, 2004, and 2005 Definitive Proxies and the Form 10-K for the years 1997,

9    1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, and 2006 and respective Form 10-Qs, materially

10   overstated KLA-Tencor's net income and retained earnings. Moreover, as a result of the Individual

11   Defendants' backdating scheme, the Company has been unable to file its Form 10-Qs for the

12   quarters ending June 30, 2006 and September 30, 2006, and Form 10-K for the fiscal year ending

13   December 31, 2006. Further, as a result of the materially overstatements, the Company faces

14   delisting from the Nasdaq National Market.

15   78.    The foregoing misleading statements were material to KLA-Tencor shareholders'

16   consideration of: (i) allowing the Evergreen Provision to go forward, adding to the restated 1982

17   Stock Option Plan, on July 1, 2003 and July 1, 2004, an amount of shares equal to 3% of KLA-

18   Tencor's shares of common stock outstanding on June 30, 2002 and June 30, 2001, respectively; (ii)

19   the adoption of 2004 Equity Incentive Plan. Indeed, if shareholders had known the truth regarding

20   the Individual Defendants' false and misleading statements, they would have not allowed the

21   Evergreen Provision to continue to add the amount of common stock available for dissemination

22   under the 1982 Stock Option Plan and/or approved the adoption of the 2004 Equity Incentive Plan,

23   each of which added hundreds of thousands to millions of shares to the amount available under the

24   terms of the original 1982 Stock Option Plan.

25   79.    The Class was harmed as a result of the dilution of its voting power and

26   proportionate share of the Company due to the dedication of over millions of KLA-Tencor shares as

27   a result of the addition of stock pursuant to Evergreen Provision and adoption of the 2004 Equity

28   Incentive Plan.

23

## COUNT II

(Against All Defendants)
### Claim for Rescission

80.    Plaintiff hereby realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

81.    Plaintiff brings this claim as a direct claim, on behalf of himself and the Class, against defendants for: (A) recession of: (i) all stock added to the 1982 Stock Option Plan pursuant to the terms of the Evergreen Provision; (ii) the 2004 Equity Incentive Plan; and (B) cancellation of the millions of shares added through the administration of the Evergreen Provision and adoption of the 2004 Equity Incentive Plan.

82.    In the Definitive Proxies, defendants made the false representation that option grants were made with strike prices no less than the fair market value on the date of the grant. Defendants failed to disclose that in fact they either knew and/or recklessly disregarded a pervasive backdating scheme from 1997 to 2006 under which options granted were backdated and/or spring-loaded.

83.    The Definitive Proxies and relevant Form 10-Ks each materially misrepresented KLA-Tencor's net income and retained earnings. Indeed, if the Defendants, and each of them, had not disseminated the materially false and misleading information, plaintiff and the Class would not have (i) allowed the Evergreen Provision to go forward, adding to the restated 1982 Stock Option Plan, on July 1, 2003 and July 1, 2004, an amount of shares equal to 3% of KLA-Tencor's shares of common stock outstanding on June 30, 2002 and June 30, 2001, respectively; and (ii) the adopted the 2004 Equity Incentive Plan.

84.    The Class was harmed as a result of the foregoing as they were deprived of the opportunity to cast a fully informed vote with regards to: (i) allowing the Evergreen Provision to go forward, adding to the restated 1982 Stock Option Plan, on July 1, 2003 and July 1, 2004, an amount of shares equal to 3% of KLA-Tencor's shares of common stock outstanding on June 30, 2002 and June 30, 2001, respectively; and (ii) the adopting the 2004 Equity Incentive Plan.

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY
WASTULL\KLA2\PLDI\DirectComplaint.001.wpd.

85.    The Class was also harmed as a result of the dilution of its voting power and proportionate share of the Company due to the dedication of millions KLA-Tencor shares as a result of the amendments to 1982 Stock Option Plan and adoption of the 2004 Equity Incentive Plan.

86.    Defendants secured adoption of the amendments to the 1982 Stock Option Plan and adoption of the 2004 Equity Incentive Plan through false and misleading statements.  Accordingly the amendments to the 1982 Stock Option Plan and entire 2004 Equity Incentive Plan must be rescinded and the million of shares added to the 1982 Stock Option Plan must be cancelled.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment and relief as follows:

1.    Ordering that this action may be maintained as a class action and certifying plaintiff as the Class representative;

2.    Declaring that defendants have breached and/or are aiding and abetting breaches of fiduciary and other duties to plaintiff and the other members of the Class;

3.    Rescinding: (i) all stock added to the 1982 Stock Option Plan on July 1, 2003 and July 1, 2004, pursuant to the Evergreen Provision, and (ii) the 2004 Equity Incentive Plan, and canceling the millions of shares added to the stock option plans;

4.    Preliminarily and permanently enjoining the defendants from granting any stock options and from allowing the exercise of any of the currently outstanding options granted under the stock option plans during the Class Period outlined herein;

5.    Awarding compensatory damages against defendants, individually and severally, as the facts may justify, in an amount to be determined at trial, together with pre-judgment interest thereon at the maximum rate allowed by law, from date of judicial demand until paid;

6.    Awarding costs and disbursements, including plaintiff's counsel's fees and experts' fees; and

7.    Granting such other and further relief as the Court may deem just and proper.

///

///



**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: September 4, 2007

Patrice L. Bishop
STULL, STULL & BRODY

By: Patrice Bishop

Patrice L. Bishop
10940 Wilshire Boulevard
Suite 2300
Los Angeles, CA 90024
Tel:    (310) 209-2468
Fax:    (310) 209-2087

Jules Brody
Aaron L. Brody
STULL, STULL & BRODY
6 East 45th Street
New York, NY 10017
Tel:    (212) 687-7230
Fax:    (212) 490-2022

Joseph H. Weiss
WEISS & LURIE
551 Fifth Avenue
Suite 1600
New York, NY 10176
Tel:    (212) 682-3025
Fax:    (212) 682-3010

Counsel for Plaintiff

26

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY
W:\STULL\KLA2\PLD\Direl Complaint.001.wpd

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
1   c/o Glotrans
    2915 McClure Street
    Oakland, CA 94609
2   TEL: (510) 208-4775
    FAX: (510) 465-7348
    EMAIL: Info@Glotrans.com
3

4

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

5               ## IN AND FOR THE COUNTY OF SANTA CLARA

6   CHRIS CRIMI, on behalf of himself and all others          )    Crimi v. Barnholt, et al. (KLA-Tencor
    similarly situated, Plaintiff,                            )    Corporation)
7                                                             )
                            Plaintiff,                        )    Lead Case No.1-07-CV-093465
    vs.                                                       )
8                                                             )    Judge Jack Komar
    EDWARD W. BARNHOLT, H. RAYMOND BINGHAM,                   )
    ROBERT                                                    )
9   T. BOND, RICHARD J. ELKUS, JR. STEPHEN P.                 )
    KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS,                  )
    DEAN O.                                                   )
10  MORTON, KENNETH L. SCHROEDER, JON D.                      )
    TOMPKINS,                                                 )
    RICHARD P. WALLACE, KLA-TENCOR CORPORATION,               )
11  and                                                       )
    DOES 1 through 25, Defendants.                            )
                                                              )
12                     Defendant.                             )
                                                              )    PROOF OF SERVICE
    _____             )    Electronic Proof of Service
13  AND RELATED ACTIONS                                       )
    _____             )

        I am employed in the County of Alameda, State of California.

14      I am over the age of 18 and not a party to the within action; my business address is 2915 McClure

15  Street, Oakland, CA 94609.

        The documents described on page 2 of this Electronic Proof of Service were submitted via the

16  worldwide web on Fri. September 7, 2007 at 3:53 PM PDT and served by electronic mail notification.

        I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and

17  am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described

18  document's electronic service in the following manner:

        The document was electronically filed on the Court's website, http://www.scefiling.org, on Fri. September

19  7, 2007 at 3:53 PM PDT

        Upon approval of the document by the Court, an electronic mail message was transmitted to all parties

20  on the electronic service list maintained for this case. The message identified the document and provided

21  instructions for accessing the document on the worldwide web.

        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and

22  correct. Executed on September 7, 2007 at Oakland, California.

23      Dated: September 7, 2007                          For WWW.SCEFILING.ORG

Andy Jamieson

1

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG

2

**Electronic Proof of Service**
**Page 2**

3

**Document(s) submitted by Rowena Walker of Santa Clara County Superior Court on Fri. September 7, 2007 at 3:53 PM PDT**

4

1. Complex Complaint: Complaint (Manually filed September 4, 2007)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

Patrice L. Bishop, Esq. (SBN 182256)
STULL, STULL & BRODY
10940 Wilshire Boulevard, Suite 2300
Los Angeles, CA 90024
TELEPHONE NO.: (310) 209-2468   FAX NO.: (310) 209-2087
ATTORNEY FOR (Name): Plaintiff Chris Crimi

**F I L E D**  UCS

SEP - 7 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY M. Alonta ——— DEPUTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
STREET ADDRESS: 191 North First Street
MAILING ADDRESS: same
CITY AND ZIP CODE: San Jose, CA, 95113
BRANCH NAME: Downtown Superior

CASE NAME:
CHRIS CRIMI, etc. v. EDWARD W. BARNHOLT, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | 1 : 07CV093465 |
| | | | | JUDGE: Kevin McKenney |
| | | | | DEPT: 16 |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)
- ☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☐ Business tort/unfair business practice (07)
- ☐ Civil rights (08)
- ☐ Defamation (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☐ Breach of contract/warranty (06)
- ☐ Rule 3.740 collections (09)
- ☐ Other collections (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/Inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)
- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Mass tort (40)
- ☑ Securities litigation (28)
- ☐ Environmental/Toxic tort (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☐ Other petition (not specified above) (43)

2. This case ☑ is ☐ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties   d. ☑ Large number of witnesses
   b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. ☑ Substantial amount of documentary evidence   f. ☑ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☑ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action (specify):
5. This case ☑ is ☐ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: September 4, 2007

Patrice L. Bishop, Esq.
(TYPE OR PRINT NAME)   (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10 www.courtinfo.ca.gov |
|---|---|---|

American LegalNet, Inc.
www.FormsWorkflow.com

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | Lead Case No.1-07-CV-093465 |
| vs. | Judge Jack Komar |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | |
| Defendant. | PROOF OF SERVICE Electronic Proof of Service |
| AND RELATED ACTIONS | |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Tue. September 18, 2007 at 11:03 AM PDT and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Tue. September 18, 2007 at 11:03 AM PDT

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on September 18, 2007 at Oakland, California.

Dated: September 18, 2007                    For WWW.SCEFILING.ORG

Andy Jamieson

1  THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
   ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG

2  **Electronic Proof of Service**
   **Page 2**

3  **Document(s) submitted by Rowena Walker of Santa Clara County Superior Court on Tue. September 18, 2007 at
   11:03 AM PDT**

4  1. Civil Case Cover Sheet: Civil Case Cover Sheet (Manually Filed September 7, 2007)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23



FBG
JEF
MJL
BPS

**E-FILED**
Sep 10, 2007 9:36 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-4929
By R. Walker, Deputy

1

2

3

4

5

6

7

8                    SUPERIOR COURT OF CALIFORNIA

9                      COUNTY OF SANTA CLARA

10

11   CHRIS CRIMI, on behalf of himself and all          Case No.: 1-07-CV-093465
     others similarly situated,
12

13              Plaintiff,

14        vs.

15   EDWARD W. BARNHOLT,                          **ORDER DEEMING CASE**
                                                  **COMPLEX**
16   H. RAYMOND BINGHAM,
     ROBERT T. BOND,
17   RICHARD J. ELKUS, JR.
     STEPHEN P. KAUFMAN,
18   KENNETH LEVY,
19   MICHAEL E. MARKS,
     DEAN O. MORTON,
20   KENNETH L. SCHROEDER,
     JON D. TOMPKINS,
21   RICHARD P. WALLACE,
22   KLA-TENCOR CORPORATION, and
     DOES 1 through 25,
23
24              Defendants.

25

26        WHEREAS, the Complaint was filed by Plaintiff Chris Crimi ("Plaintiff") in the Santa

27   Clara County Superior Court on September 4, 2007 and the matter was assigned to Department

28   16, the Hon. Kevin McKenney presiding;

---

*Crimi v. Barnholt, et al. (KLA-Tencor Corporation)*
*Santa Clara County Superior Court, Case No. 1-07-CV-093465*
*Order Deeming Case Complex*

RECEIVED
NOV 14 '0

E-Filed: Sep 10, 2007 9:36 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-4929

1    WHEREAS, Plaintiff Chris Crimi filed a Civil Case Cover Sheet deeming the matter

2    provisionally complex on September 4, 2007 and the matter was thereafter referred to

3    Department 17C (Complex Civil Litigation), the Hon. Jack Komar presiding, pending a ruling

4    on the complexity issue;

5    IT IS HEREBY ORDERED that:

6    The Court determines that the above-referenced case is **COMPLEX** within the meaning

7    of California Rules of Court 3.400.    The matter is reassigned, for all purposes, including

8    discovery and trial, to Department 17C (Complex Civil Litigation), the Hon. Jack Komar

9    presiding.

10    The Case Management Conference is rescheduled from January 29, 2008 at 2:15 p.m. in

11    Department 16 to **February 1, 2008 at 10:00 a.m. in Department 17C**.

12    The parties are directed to the Electronic Filing and Service Standing Order and to the

13    Guidelines for the Complex Civil Litigation Department, copies of which may be downloaded

14    from www.scefiling.org.

15    Pursuant to California Rules of Court, Rule 3.254, the creation and maintenance of the

16    Master Service List shall be under the auspices of (1) Plaintiff Chris Crimi, as the first-named

17    party in the Complaint, and (2) the first-named party in each Cross-Complaint, if any.

18    The Complex Case Fee is due from all parties immediately [Government Code Sections

19    70616(a), 70616(b)].

20    Plaintiff shall serve a copy of this Order on all the parties in this matter forthwith.

21    SO ORDERED.

22

23    Dated: September 10, 2007                    /s/ Jack Komar
                                                              Judge of the Superior Court
24

25

26

27

28

*Crimi v. Barnholt, et al. (KLA-Tencor Corporation)*
*Santa Clara County Superior Court, Case No. 1-07-CV-093465*
*Order Deeming Case Complex*

2

1

**PROOF OF SERVICE**

2

STATE OF CALIFORNIA                )

3

)ss.:

COUNTY OF LOS ANGELES        )

4

5

     I am employed in the county of Los Angeles, State of California, I am over the age of 18 an

not a party to the within action; my business address is 10940 Wilshire Boulevard, Suite 2300, Lo

6

Angeles, CA 90024.

7

     On November 12, 2007, I served the document(s) described as **ORDER DEEMING CAS**

8

**COMPLEX** by placing a true copy(ies) thereof enclosed in a sealed envelope(s) addressed as follow

9

**SEE ATTACHED SERVICE LIST**

10

I served the above document(s) as follows:

11

__xx__    BY MAIL. I am familiar with the firm's practice of collection and processing correspondenc

12

    for mailing. Under that practice it would be deposited with U.S. postal service on that same da

    with postage thereon fully prepaid at Los Angeles, California in the ordinary course of busines

13

    I am aware that on motion of the party served, service is presumed invalid if postal cancellatio

14

    date or postage meter date is more than one day after date of deposit for mailing in an affidav

15

    I declare under penalty of perjury under the laws of the State of California that the above is tr

and correct.

16

17

    Executed on November 12, 2007, at Los Angeles, California 90024.

18

19

MELANIE JACOBS

20

    Type or Print Name                Signature

21

22

23

24

25

26

27

28

1

<u>**SERVICE LIST**</u>

2   Jules Brody                     Franklin B. Gowdy
    Aaron L. Brody               Michael J. Lawson

3   STULL, STULL & BRODY      Joseph E. Floren
    6 East 45th Street           Benjamin P. Smith

4   New York, NY 10017       MORGAN, LEWIS & BOCKIUS LLP
    Tel:   (212) 687-7230     One Market Street, Spear Street Tower

5   Fax:   (212) 490-2022     San Francisco, CA 94105
                               Tel:   (415) 442-1000

6   Joseph H. Weiss           Fax:   (415) 442-1001
    WEISS & LURIE

7   551 Fifth Avenue          **Counsel for Defendant KLA-Tencor**
    Suite 1600                 **Corporation**

8   New York, NY 10176
    Tel:   (212) 682-3025

9   Fax:   (212) 682-3010

10   **Counsel for Plaintiff**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Patrice L. Bishop (182256)
    STULL, STULL & BRODY
2   10940 Wilshire Boulevard
    Suite 2300
3   Los Angeles, CA 90024
    Tel:   (310) 209-2468
4   Fax:   (310) 209-2087

5   Counsel for Plaintiff

6

7

8

9

**E-FILED**

Oct 15, 2007 2:48 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-5487
By L. Quach-Marcellana, Deputy

10          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11              **FOR THE COUNTY OF SANTA CLARA**

12

13  CHRIS CRIMI, on Behalf of Himself and          CASE NO. 1:07-cv-093465
    All Others Similarly Situated,
14                                                 **CLASS ACTION**
                        Plaintiff,
15                                                 **PROOF OF SERVICE OF SUMMONS**
         v.                                        **AND COMPLAINT ON DEFENDANT**
16  EDWARD W. BARNHOLT,                            **KLA-TENCOR CORPORATION**
    H. RAYMOND BINGHAM,
17  ROBERT T. BOND,
    RICHARD J. ELKUS, JR.,
18  STEPHEN P. KAUFMAN,
    KENNETH LEVY,
19  MICHAEL E. MARKS,
    DEAN O. MORTON,
20  KENNETH L. SCHROEDER,
    JON D. TOMPKINS,
21  RICHARD P. WALLACE,
    KLA-TENCOR CORPORATION, and
22  DOES 1 through 25,

23                      Defendants.

24

25

26

27

28

**PROOF OF SERVICE OF SUMMONS AND COMPLAINT ON DEFENDANT KLA-TENCOR CORPORATION**
W:\STULL\KLA2\PLD\Caption.wpd

E-Filed Oct 15, 2007 2:48 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-5487

| | |
|---|---|
| *Attorney or Party without Attorney:*<br>STULL, STULL & BRODY<br>10940 WILSHIRE BLVD., 23RD FL<br>LOS ANGELES, CA 90024<br>*Telephone No:* 310-209-2468    *FAX No:* 310-209-2087 | *For Court Use Only* |
| *Attorney for:* Plaintiff | *Ref. No. or File No.:*<br>CRIMI V. BARNHOLT |

*Insert name of Court, and Judicial District and Branch Court:*
SANTA CLARA COUNTY SUPERIOR COURT

*Plaintiff:* CHRIS CRIMI; ET AL

*Defendant:* EDWARD W. BARNHOLT; ET AL

| PROOF OF SERVICE<br>SUMMONS | *Hearing Date:*<br>Tue, Jan. 29, 2008 | *Time:*<br>2:15PM. | *Dept/Div:*<br>16 | *Case Number:*<br>107CV093465 |
|---|---|---|---|---|

*1. At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS AND COMPLAINT; CIVIL CASE COVER SHEET; CIVIL LAWSUIT NOTICE; SANTA CLARA SUPERIOR ADR INFORMATION SHEET

3. a. *Party served:*                 KLA-TENCOR CORPORATION
   b. *Person served:*             KERRY BIRD, AUTHORIZED TO ACCEPT

4. *Address where the party was served:*     ONE TECHNOLOGY DRIVE, BLDG. ONE
                                              MILPITAS, CA 95035

5. *I served the party:*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on: Wed., Sep. 12, 2007 (2) at: 2:55PM

6. *The "Notice to the Person Served" (on the Summons) was completed as follows:*
   *on behalf of:* KLA-TENCOR CORPORATION
   Under CCP 416.10 (corporation)

7. *Person Who Served Papers:*                            Recoverable Cost Per CCP 1033.5(a)(4)(B)
   a. MELISSA MAJOR                         d.   **The Fee for Service was:**



A & A LEGAL SERVICE

1541 Bayshore Hwy.          GENERAL@AALEGALSERVICE.COM
Burlingame, CA 94010-1602    Fax (650) 697-4640
**(650) 697-9431**

                                          e.   I am: (3) registered California process server
                                               *(i)*    Independent Contractor
                                               *(ii)*   *Registration No.:*      390
                                               *(iii)*  *County:*              San Mateo

*8. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

Date:Mon, Sep. 17, 2007

Judicial Council Form POS-010          PROOF OF SERVICE          *(MELISSA MAJOR)*
Rule 982.9.(a)&(b) Rev January 1, 2007      SUMMONS                            *1092468.40869*

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

# E-FILED

Oct 15, 2007 2:48 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-5487
By L. Quach-Marcellana, Deputy

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff,  )<br><br>                      Plaintiff,  )<br>vs.  )<br><br>EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT  )<br>T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O.  )<br>MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS,  )<br>RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and  )<br>DOES 1 through 25, Defendants.  )<br><br>                      Defendant.  ) | Crimi v. Barnholt, et al. (KLA-Tencor Corporation)<br><br>Lead Case No.1-07-CV-093465<br><br>Judge Jack Komar |
| AND RELATED ACTIONS  ) | **PROOF OF SERVICE**<br>Electronic Proof of Service |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Mon. October 15, 2007 at 2:28 PM PDT and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Mon. October 15, 2007 at 2:28 PM PDT

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on October 15, 2007 at Oakland, California.

Dated: October 15, 2007                    For WWW.SCEFILING.ORG

E-Filed: Oct 15, 2007 2:48 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-5487

Andy Jamieson

E-Filed: Oct 15, 2007 2:48 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-5487

1

**THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG**

2

**Electronic Proof of Service**
**Page 2**

3

**Document(s) submitted by Patrice Bishop of STULL, STULL & BRODY on Mon. October 15, 2007 at 2:28 PM PDT**

4

1. Proof of Svc Compl/Pet/Summons: for Defendant KLA-Tencor Corporation

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The Superior Court of California
County of Santa Clara
Hon. Jack Komar, Department 17
191 N. First Street, San Jose, CA 95113

www.scefiling.org
info@glotrans.com
(510) 208-4775

## ELECTRONIC SERVICE NOTICE #215-2

Service date: 10/15/2007 2:43 PM

### Crimi v. Barnholt, et al. (KLA-Tencor Corporation)
Case No: 1-07-CV-093465

Document #FD14963:

| | |
|---|---|
| Title: | **for Defendant KLA-Tencor Corporation** *(Click here to view document information)* |
| Type: | Proof of Service Complaint/ Petition/ Summons |
| Author: | Patrice Bishop of Stull, Stull & Brody |
| Parties: | Crimi, Chris |

### Service list:

| Party name | Representative | Email address |
|---|---|---|
| Barnholt, Edward W. | | |
| Bingham, H. Raymond | | |
| Bond, Robert T. | | |
| Crimi, Chris | Bishop, Patrice – Stull, Stull & Brody | service@ssbla.com |
| Elkus, Jr., Richard J. | | |
| KLA-Tencor Corporation | | |
| Kaufman, Stephen P. | | |
| Levy, Kenneth | | |
| Marks, Michael E. | | |
| Morton, Dean O. | | |
| Santa Clara County Superior Court | Walker, Rowena – Santa Clara County Superior Court | rwalker@scscourt.org |
| Schroeder, Kenneth L. | | |
| Tompkins, Jon D. | | |
| Wallace, Richard P. | | |

1  JOHN H. HEMANN (SBN 165823)
   JOSEPH E. FLOREN (SBN 168292)
2  TERA M. HEINTZ (SBN 241414)
   MATTHEW WEILER (SBN 236052)
3  MORGAN, LEWIS & BOCKIUS LLP
   One Market, Spear Street Tower
4  San Francisco, CA  94105-1126
   Tel:  415.442.1000
5  Fax:  415.442.1001

6  Attorneys for Defendant
   KLA-Tencor Corporation

7

# E-FILED

Nov 14, 2007 8:00 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6052
By A. Ilas, Deputy

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    COUNTY OF SANTA CLARA

10

11  CHRIS CRIMI, on Behalf of Himself and        Case No. 107CV093465
    All Others Similarly Situated,
12                                               **NOTICE OF MOTION AND MOTION BY**
                     Plaintiff,                  **DEFENDANT KLA-TENCOR CORP. TO**
13                                               **STAY ACTION PURSUANT TO C.C.P.**
            vs.                                  **§ 418.10(A)(2) AND § 410.30;**
14                                               **MEMORANDUM OF POINTS AND**
    EDWARD W. BARNHOLT, H.                        **AUTHORITIES IN SUPPORT OF**
15  RAYMOND BINGHAM, ROBERT T.                   **MOTION TO STAY**
    BOND, RICHARD J. ELKUS, JR.,
16  STEPHEN P. KAUFMAN, KENNETH                  [ACCOMPANYING PAPERS:  REQUEST
    LEVY, MICHAEL E. MARKS, DEAN O.              FOR JUDICIAL NOTICE AND
17  MORTON, KENNETH L. SCHROEDER,                DECLARATION OF JOSEPH E. FLOREN;
    JON D. TOMPKINS, RICHARD P.                  [PROPOSED] ORDER]
18  WALLACE, KLA-TENCOR
    CORPORATION, and DOES 1 through 25,          Time: January 18, 2008, at 9:00 a.m.
19                                               Department:  17
                     Defendants.                 Judge:  Hon. Jack Komar
20
                                                 Date Filed:  September 4, 2007
21                                               Trial Date:  None Set

22

23

24

25

26

27

28

1-SF/7619926.2                          1

NOTICE OF MOTION AND MOTION TO STAY

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

**NOTICE OF MOTION AND MOTION TO STAY**

TO THE HONORABLE COURT AND ALL COUNSEL OF RECORD:

Please take notice that on January 18, 2008 at 9:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Jack Komar of the Superior Court of the State of California for the County of Santa Clara, defendant KLA-Tencor Corporation ("KLA") will, and hereby does, move this Court for a stay pursuant to California Code of Civil Procedure §§ 418.10 and 410.30 and the Court's inherent power to control its own docket.

This Motion is based on the fact that a parallel action, *Benjamin Langford v. Edward W. Barnholt, et al.*, Case No. 2295-N, asserting the same causes of action under Delaware law and naming many of the same parties named in this case, was filed in the Delaware Court of Chancery on July 21, 2006, and is currently pending in that court, and further parallel shareholder derivative actions are pending in the U.S. District Court for the Northern District of California and in this Court, with the same plaintiff's counsel. A stay under Section 410.30 in favor of these earlier-filed actions is appropriate here to avoid duplicative litigation and an unseemly conflict with the Delaware court, particularly given Delaware's strong interest in adjudicating claims governing the internal affairs of Delaware corporations and the more advanced status of the other litigation.

This Motion to Stay is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the supporting Declaration of Joseph E. Floren, all pleadings currently on file in this matter and matters of which judicial notice may be taken, and all arguments to be presented to this Court at oral argument.

DATED:  November 13, 2007

Respectfully submitted,

MORGAN LEWIS & BOCKIUS, LLP

By:_____/s/_____
JOSEPH E. FLOREN
*Attorneys for Defendant KLA-Tencor Corporation*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7619926.2

2

NOTICE OF MOTION AND MOTION TO STAY

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ..................................................................................................1

II.     FACTUAL AND PROCEDURAL HISTORY ......................................................2

        A.      Plaintiff's Complaint ..................................................................................2

        B.      The Langford Action ..................................................................................3

        C.      Other Actions Against KLA ........................................................................3

III.    ARGUMENT .......................................................................................................4

        A.      A STAY IS APPROPRIATE PURSUANT TO C.C.P. § 410.30 .........................5

                1.      A Stay Should be Granted to Avoid Duplicative Litigation and to
                        Avoid Conflicts with Delaware Courts Regarding Relatively Novel
                        Issues of Delaware Law ....................................................................5

                2.      Private Interests Favor a Stay ............................................................8

        B.      STAY IS APPROPRIATE ON THE GROUNDS OF COMITY AND
                EFFICIENCY ............................................................................................9

IV.     CONCLUSION ..................................................................................................10

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

i

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

# TABLE OF AUTHORITIES

Page

CASES

*Berg v. MTC Electronics Techs.,*
    61 Cal. App. 4th 349 (1998) ...........................................................5, 6

*Celotex Corp. v. Am. Ins. Co.,*
    199 Cal. App. 3d 678 (1987) ....................................................5, 6, 7, 10

*Century Indemnity Co. v. Bank of America,*
    58 Cal. App. 4th 408 (Cal. App. 1998) .........................................5, 7, 8

*CTS Corp. v. Dynamics Corporation of America,*
    481 U.S. 69,
    107 S. Ct. 1637,
    95 L. Ed. 2d 67 (1987) ................................................................6

*Desaigoudar v. Meyercord,*
    108 Cal. App. 4th 173 (2003) ...........................................................4

*Dodge v. Superior Court,*
    139 Cal. App. 178 (1939) ..............................................................9

*Hart v. General Motors Corp.,*
    517 N.Y.S.2d 490 (1987) ............................................................7, 8

*In re Oracle Corp. Derivative Litig.,*
    808 A.2d 1206 (Del. Ch. 2002) .........................................................4

*In re Topps Co. S'holders Litig.,*
    924 A.2d 951 (Del. Ch. 2007) ....................................................6, 7, 8, 9

*Johnson v. Hui,*
    811 F. Supp. 479 (N.D. Cal. 1991) .....................................................4

*Langfelder v. Universal Labs.,*
    293 N.Y. 200 (1944) .................................................................7

*Morrow v. Superior Court,*
    9 Cal. App. 2d 16 (1935) ............................................................10

*Oakland Raiders v. National Football League,*
    93 Cal. App. 4th 572 (2001) ...........................................................4

*Simmons v. Superior Court,*
    96 Cal. App. 2d 119 (1950) ............................................................9

*Stangvik v. Shiley Inc.,*
    54 Cal. 3d 744 (1991) ..............................................................5, 8

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

ii

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-8052

### *TABLE OF AUTHORITIES*
### (continued)

*Page*

**CODES**

Cal. Civ. Proc. Code § 410.30(a) ................................................................................5

Cal. Civ. Proc. Code § 418.10 ................................................................................2, 1

Cal. Civ. Proc. Code § 410.30 ................................................................................2, 1, 4, 5

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This case is the latest in a series of actions that were filed against KLA-Tencor Corporation ("KLA") and its present and former officers and directors in the wake of a *Wall Street Journal* article on May 22, 2006 suggesting that KLA, as well as numerous other companies, had "backdated" stock options between 1994 and 2001.[1]  Compl. ¶ 47.  Plaintiff, who admittedly was not a KLA shareholder at the time of any alleged stock option backdating, does not assert claims concerning backdating itself.  Compl. ¶¶ 5, 62.  Rather, recognizing that many other plaintiffs had beaten him to the punch by more than a year in bringing derivative and class action claims based on the same events, Plaintiff seeks to assert the same type of claim in a slightly different form – seeking a different kind of relief arising from exactly the same subject matter and the same underlying transactions and events – all based on KLA's purported failure to disclose information regarding its historical stock option practices.  Compl. ¶¶ 62; 79.  Specifically, Plaintiff claims, defendants' purported failure to disclose information about prior backdating justifies an award of damages for "dilution" based on the issuance of additional, non-backdated stock options in more recent years, and even justifies the rescission of those option grants to those innocent KLA officers and employees.  This claim is patently spurious as a class action – such claims based on dilution are derivative in nature and may be asserted only by the corporation, not by a class of shareholders.  Even this strained legal theory, however, is substantively identical to the claim of another plaintiff that has been pending for over a year in an action currently before Vice Chancellor Lamb in the Delaware Chancery Court for the County of New Castle.

There is no reason for this follow-on litigation to proceed.  This Court should stay this

---

[1]  "Backdating," also termed "retroactive pricing," generally refers to the selection of exercise prices for stock options based not on the market price for the underlying stock on the date the option grant was completed or finally approved, but on a lower market price for the stock on an earlier date.  The actual grant date, or "measurement date" for accounting purposes, is deemed to be the date that all essential actions necessary to complete the granting of the option are concluded, including identification of all grantees and final determination of the number of shares granted to each and the exercise price of the option.  Options are said to be "backdated" or "retroactively priced" if the exercise price is set as of a date before the measurement date.

1  action under California Code of Civil Procedure sections 410.30 and 418.10 because Delaware

2  (and the other courts, including this one, where other derivative litigation is proceeding) is the

3  more appropriate and convenient forum for adjudicating this case.  Staying this action would

4  promote California's interest in avoiding expensive and duplicative litigation in a matter of

5  shareholder dilution that has at best an attenuated connection to California.  Plaintiffs' claims

6  relate solely to the internal affairs of KLA, a Delaware Corporation.  Delaware courts have a

7  powerful interest in adjudicating cases regarding the internal affairs of Delaware corporations.

8  This is interest is particularly strong here, where the plaintiff seeks to make a relatively novel

9  claim under Delaware law (and in fact, one that is prohibited under Delaware law).  Additionally,

10  Plaintiffs cannot allege a significant countervailing private interest in maintaining this case in

11  California given that he does not claim to be a California resident.   The balance of private and

12  public interests thus weigh strongly in favor of staying this case in deference to the first-filed

13  Delaware and other actions.

14  **II.    FACTUAL AND PROCEDURAL HISTORY**

15      **A.    Plaintiff's Complaint**

16          Plaintiff filed the Complaint in this case on September 4, 2007, asserting two causes of

17  action for breach of fiduciary duty and rescission.[2]  Plaintiff alleges that the individual defendants

18  – eleven former and current officers and directors of KLA – breached their fiduciary duties to

19  Plaintiff by failing to disclose that KLA had purportedly granted backdated options between 1997

20  and June 30, 2002.  Compl. ¶ 1.  Given that Plaintiff admittedly did not even own KLA stock

21  during the period of alleged backdating, he does not allege any injury arising out of the

22  backdating itself or based on the purported misstated financial statements that resulted.  Compl.

23  ¶ 5.  Rather, Plaintiff claims that *if* he had known about the backdating in the years after the

24  purported backdating had ceased, he would not have approved KLA's adoption of its 2004 Equity

25  Compensation Plan in 2004, and somehow would have disallowed additional options to be issued

26

27  _____

    [2]   KLA admits none of Plaintiff's allegations, and hereby reserves the right to challenge the
    sufficiency of the pleadings, including whether Plaintiff has alleged any valid cause of action

28  against KLA, at the appropriate time.

1-SF/7619926.2                                    2

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

1 under the "Evergreen Provision" of the prior plan (the 1982 Stock Option Plan) in 2003 and 2004.

2 Compl. ¶¶ 78-79. The "Evergreen Provision" under the 1982 Stock Option Plan automatically

3 authorized the issuance each year of stock options covering an amount of shares equal to 3% of

4 KLA-Tencor's outstanding shares of common stock as of the end of the prior fiscal year. Compl.

5 ¶ 32.

6      Notwithstanding that Plaintiff alleges *no* factual connection between any wrongdoing in

7 the form of purported backdating at KLA and the 2004 Equity Compensation Plan or the issuance

8 of shares under the Evergreen provision, Plaintiff alleges that he and the putative class were

9 injured "as a result of the dilution of its voting power and proportionate share of the Company

10 due to the dedication of over millions of KLA-Tencor shares as a result of the addition of stock

11 pursuant to the Evergreen Provision and adoption of the 2004 Equity Incentive Plan." Compl.

12 ¶ 79. Plaintiff seeks to rescind "all stock added to the 1982 Stock Option Plan pursuant to the

13 terms of the Evergreen Provision" and the 2004 Equity Incentive Plan. *Id.* ¶ 81. Additionally,

14 Plaintiff seeks cancellation of the shares of stock added pursuant the Evergreen Provision and

15 Equity Incentive Plan. [3] *Id.*

16     **B.**     **The Langford Action**

17     Over one year before Plaintiff filed this action, a putative class action case asserting the

18 same causes of action was filed in the Court of Chancery for the State of Delaware. *See* Request

19 for Judicial Notice ("RJN"), Ex. 1. *Benjamin Langford v. Edward W. Barnholt, et al.*, filed on

20 July 21, 2006, asserts both a derivative action and a class action on behalf of KLA shareholders

21 against Edward W. Barnholt, H. Raymond Bingham, Robert T. Bond, Richard J. Elkus, Jr.,

22 Stephen P. Kaufman, Kenneth Levy, Michael E. Marks, Kenneth L. Schroeder, Jon D. Tompkins,

23 and the KLA-Tencor Corporation, *all* of whom are defendants in the instant action, as well as

24 other current and former directors and officers of KLA. Like the instant case here, the *Langford*

---

25   [3]   Although not material to the outcome of this motion, it is worth noting that Plaintiff's claims

26 make even no sense on their own terms. The authorization of the additional shares under the
Evergreen provision could not have been accomplished by means of misstatements, because
as Plaintiffs allege, it was "automatic." Compl. ¶ 32. Moreover, Plaintiff cannot obtain

27 "rescission" of a transaction to which he was not a party, viz., the issuance of stock options by
KLA to its employees and directors. Indeed, Plaintiff's "rescission" claim betrays the

28 inherently derivative nature of his claims.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7619926.2

3

NOTICE OF MOTION AND MOTION TO STAY

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

1   plaintiff alleges that, as a result of the exercise of options at below-market price, "KLA was

2   caused … to state improperly its financial results, and never disclosed to shareholders that the

3   options had been improperly priced and back dated." *Langford* Compl. ¶ 31. The *Langford*

4   complaint similarly alleges an injury not based on the backdating itself, but rather, on equity

5   dilution caused by the granting of purportedly illegitimate stock options. *Langford* Compl. ¶ 40,

6   RJN Ex. 1. Also similar to this case, the *Langford* plaintiff seeks damages in the form of

7   disgorgement of the allegedly back dated options and other equitable relief.[4] *Id.*

8      **C.**    **Other Related Actions Against KLA**

9      Between May 22, 2006 and July 3, 2006 five shareholder derivative suits were filed in the

10  United States District Court for the Northern District of California, San Jose Division, each of

11  which asserted claims against nominal defendant KLA and current and former officers and

12  directors of KLA, including all of the defendants in the instant case. Four of the cases were

13  consolidated under the caption *In re KLA-Tencor Corporation Shareholder Derivative Litigation*,

14  Case. No. 06-03445 JW (N.D. Cal.).[5] RJN, Ex. 3. One of the derivative actions is pending in *this*

---

16  [4]  Due to extensive settlement discussions that are ongoing with the active assistance and
17  involvement of nationally recognized mediator Jonathan Marks of MarksADR, LLC, the other
     derivative actions pending in California are presently stayed until December 3, 2007. KLA
18  has filed a motion to dismiss the putative class claims in *Langford* and to stay the derivative
     claims therein in light of the earlier-filed and more heavily litigated California derivative
19  actions and anticipated action to be taken by the Special Litigation Committee of KLA. The
     parties in *Langford* stipulated to a stay in lieu of substantive briefing on these issues.

20  [5]  A Special Litigation Committee ("SLC") of KLA has conducted an investigation and is in the
21  final stages of determining the disposition of the derivative actions. As the findings and
     recommendations of the SLC will be binding on the derivative actions, KLA anticipates
22  dismissal, settlement, or other resolution of these actions in the near future. *See In re Oracle
     Corp. Derivative Litig.*, 808 A.2d 1206, 1210 (Del. Ch. 2002); *see also Johnson v. Hui*, 811 F.
23  Supp. 479, 482 (N.D. Cal. 1991) ("Delaware law endows [a corporation] with the power to
     form a special litigation committee (SLC) of the board of directors, and to either terminate or
24  assume prosecution of the suit based upon the SLC's review and recommendation.").
     California law also recognizes that the results of the SLC investigation are binding in
25  derivative litigation. *Desaigoudar v. Meyercord*, 108 Cal. App. 4th 173, 185 (2003) (the
     decision of a Special Litigation Committee to not prosecute a lawsuit is a defense to an action
26  in California); *Oakland Raiders v. National Football League*, 93 Cal. App. 4th 572, 589
     (2001) ("Delaware law allows corporations to respond to a derivative suit by appointing
27  independent directors to a special litigation committee, which will then investigate the merits
     of the suit and thereafter recommend pursuing the case as a plaintiff or seeking dismissal of
28  the case.").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7619926.2                4

NOTICE OF MOTION AND MOTION TO STAY

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

1    court, with *the same plaintiff's counsel* as the instant case, under the caption *Rabin v. Edward*

2    *Barnholt et al.*, No. 1-06-CV-064841. RJN, Ex. 2. Yet another class action, asserting federal

3    securities causes of action, is pending in the United States District Court for the Northern District

4    of California under the caption *In re KLA-Tencor Corporation Securities Litigation*, No. C 06-

5    4065 MJJ. RJN, Ex. 4.[6]

6    **III.    ARGUMENT**

7            This Court should grant KLA's Motion to Stay to avoid expensive and duplicative

8    litigation that is controlled by Delaware law. There is substantial overlap between the previously

9    filed litigation, and in particular the *Langford* action, and the instant action: (1) both the *Crimi*

10   and *Langford* actions are putative class actions comprised of KLA shareholders; (2) both concern

11   identical underlying allegations, *i.e.* the issuance of stock options with an exercise price below the

12   fair market value and the failure to disclose this practice; (3) both allege voter and ownership

13   dilution as the principal injury; and (4) the *Langford* action involves ten of the twelve defendants

14   named here. As the instant action is duplicative of the earlier-filed *Langford* action and the other

15   derivative actions pending in California federal court and in this court, a stay is appropriate under

16   both the principle of *forum non conveniens* codified in C.C.P. § 410.30 and the Court's inherent

17   power to grant a stay based on comity and efficiency.

18   **A.    A STAY IS APPROPRIATE PURSUANT TO C.C.P. § 410.30**

19           California courts have considerable discretion to stay an action "that in the interest of

20   substantial justice . . . should be heard in a forum outside this state." C.C.P. § 410.30(a)

21   (codifying the common law doctrine of *forum non-conveniens*). Courts conduct a two-step

22   inquiry in determining whether a stay is appropriate under Section 410.30(a). First, the court

23   considers whether the alternative forum is suitable for trial. Second, courts apply a multi-factor

24   "private and public interest" balancing test to determine whether a chosen forum is convenient.

---

25   
26           [6] Three separate class action complaints in the Northern District of California were
     consolidated into this action: *Garber v. KLA-Tencor Corp., et al.*, 06-CV-4065 MJJ, filed
27   June 29, 2006, and amended complaint filed July 13, 2006; *Police & Fire Retirement System
     of the City of Detroit ("PFRS") and the Louisiana Municipal Police Employees' Retirement
28   System ("MPERS") v. KLA-Tencor Corp. et al.*, 06-CV-4709, filed August 3, 2006; and
     *Spilman v. KLA-Tencor Corp., et al.*, 06-CV-5225, filed August 24, 2006.

Morgan, Lewis &
Bockius LLP
Attorneys At Law San
Francisco

1-SF/7619926.2                                          5

NOTICE OF MOTION AND MOTION TO STAY

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

1   *Stangvik v. Shiley Inc.*, 54 Cal. 3d 744, 751 (1991).

2       Here, because KLA is a Delaware corporation, and a lawsuit covering the same subject

3 matter is already pending there, it is beyond dispute that Delaware is a suitable jurisdiction.

4 *Celotex. Corp. v. Am. Ins. Co.*, 199 Cal. App. 3d 678, 683 (1987) (an alternative forum is suitable

5 when there is already an action pending there). Thus, the focus of this Motion relates solely to

6 whether the balance of public and private interests weighs in favor of a stay.

7         **1.**     **A Stay Should be Granted to Avoid Duplicative Litigation and to**
              **Avoid Conflicts with Delaware Courts Regarding Relatively Novel**
8               **Issues of Delaware Law.**

9

10       Two primary "public" factors weigh strongly in favor of staying the present action. First,

11 California has a strong interest in "discouraging multiple litigation designed solely to harass an

12 adverse party." *Century Indemnity Co. v. Bank of America*, 58 Cal. App. 4th 408, 413 (1998);

13 *Berg v. MTC Electronics Techs.*, 61 Cal. App. 4th 349, 362-63 (1998) (courts should consider the

14 "burdens and inefficiencies that could be imposed by the conduct of parallel litigations in

15 different fora"). In *Berg*, the trial court granted defendant's motion to stay in favor of a similar

16 class action pending against the defendant in the United States District Court for the Eastern

17 District of New York. The Court of Appeal upheld the grant of a stay, despite appellants'

18 arguments that plaintiff was a California resident, it was burdensome to litigate in New York, and

19 defendant had submitted to jurisdiction in California in a stock sale prospectus, because of the

20 public's overriding interest in avoiding duplicative litigation. *Id.* at 363.

21       The same result should obtain here, where a class action covering the same subject matter

22 is pending in Delaware. As discussed above, the *Langford* action asserts the same substantive

23 claims as those asserted by Plaintiff in this case; it is based on the same underlying factual

24 allegations regarding purported backdating and inaccurate financial disclosures; and it asserts

25 precisely the same alleged injury of ownership dilution on behalf of shareholder plaintiffs.

26 Further, *Langford* and the other federal and state court cases were filed over one year ago, a fact

27 well known to Plaintiff given that this case is being prosecuted by the same law firm that is

28 litigating the *Rabin* derivative action in this Court. (Oddly enough, that firm purports to assert

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7619926.2                           6

NOTICE OF MOTION AND MOTION TO STAY

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

1   claims *on behalf of* KLA derivatively in the *Rabin* action, while simultaneously seeking damages

2   and other relief *against* KLA in the instant action). As Plaintiff is also aware, the parties to the

3   previously filed actions have been intensely involved in mediation efforts over the past five

4   months. The timing and wholly duplicative nature of this action thus strongly suggests that

5   Plaintiff's interest in filing this complaint is *not* in adjudicating these tenuous claims in

6   California, but rather, to manufacture leverage in ongoing settlement discussions. This Court has

7   a particularly compelling interest in avoiding the expenditure of California tax dollars for such

8   purposes.

9   Second, a stay of the instant action would avoid an "unseemly conflict" with the Delaware

10  Chancery Court, particularly in a case raising relatively novel legal issues under Delaware law.

11  *Id.* at 356. Delaware's interest in resolving the internal affairs of a company incorporated under

12  its laws is paramount and firmly rooted in United States Supreme Court precedent:

13          No principle of corporation law . . . is more firmly established than a state's
            authority to regulate domestic corporations. . . . The beneficial free market system
14          depends at its core upon the fact that a corporation-except in the rarest of
            situations-is organized under, and governed by, the law of a single jurisdiction,
15          traditionally the State of its incorporation . . . . A state has an interest in
            promoting stable relationships among parties involved in the corporations it
16          charters.

17  *CTS Corp. v. Dynamics Corporation of America*, 481 U.S. 69, 89, 107 S.Ct. 1637, 95 L.Ed.2d 67

18  (1987). The Delaware Court of Chancery recently reiterated its desire to determine questions of

19  Delaware law in Delaware courts: "[w]hen new issues arise, the state of incorporation has a

20  particularly strong interest in addressing them, and providing guidance." *In re Topps Co.*

21  *S'holders Litig.*, 924 A.2d 951, 953-54 (Del. Ch. 2007); *see also Ryan v. Gifford*, 918 A.2d 341

22  (Del. Ch. 2007) (declining to dismiss or stay Delaware case in deference to earlier-filed

23  California derivative litigation involving alleged stock option backdating at Maxim Integrated

24  Products, Inc. in light of importance of novel issues of Delaware law involved).

25  In deciding *forum non conveniens* motions, California courts grant significant weight to

26  the public interest of another state in applying its own laws to a matter. For example, in *Celotex*

27  *Corp.*, the Court of Appeal affirmed the trial court's stay of a California action where similar

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7619926.2                                7

NOTICE OF MOTION AND MOTION TO STAY

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

1  claims were pending in Ohio state court. 199 Cal. App. 3d at 683-84. The court held that it was

2  an "efficient use of juridical resources" to have an agreement that was to be governed by Ohio

3  law to be litigated in Ohio courts. *Id.* Similarly, in *Century Indemnity*, the Court of Appeal

4  upheld a stay of a California action in deference to a previously-filed Hawaii action, stating that

5  Hawaii had a "significant state interest in interpreting insurance contracts issued in that state." 58

6  Cal. App. 4th at 413.

7      Cases from other jurisdictions also recognize Delaware's paramount interest in resolving

8  questions of internal affairs of Delaware corporations in Delaware courts. *See Hart v. General*

9  *Motors Corp.*, 517 N.Y.S.2d 490, 494 (1987) ("Given Delaware's paramount interest in

10  determining whether a Delaware corporation properly purchased securities from a group of its

11  shareholders, including one of its directors, the pendency of virtually identical actions in that

12  jurisdiction and the need for uniformity in the application of pertinent law to this controversy, the

13  court erred in denying the motion to dismiss on the ground of *forum non conveniens*."). Another

14  New York decision, *Langfelder v. Universal Labs.*, 293 N.Y. 200, 204 (1944), recognizes that a

15  foreign court should decline jurisdiction over matters that require application of Delaware law

16  under the "internal affairs doctrine." Discussing the *Langfelder* holding, the Delaware Court of

17  Chancery observed that this rationale "is grounded in the long-understood notion that when a

18  corporation forms under the laws of a particular state, the rights of its stockholders are determined

19  by that state's law and that the chartering state has a powerful interest in ensuring the uniform

20  interpretation and enforcement of its corporation law, so as to facilitate economic growth and

21  efficiency." *In re Topps Co. S'holders Litig.*, 924 A.2d at 953.

22      Here, Delaware's interest in adjudicating this action is particularly strong because Plaintiff

23  asserts a relatively new theory of relief for dilution of voting and ownership rights resulting from

24  purportedly improper grants of stock options. In adjudicating this case, this Court would be

25  required to apply very recent Delaware law regarding whether a Plaintiff may assert a direct claim

26  for dilution where Plaintiffs do not claim that there was an extraction of ownership or voting

27  rights from a minority shareholder to a majority shareholder. While this Court could no doubt

28  competently and correctly decide these issues, Delaware has a strong interest in first determining

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7619926.2

8

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

1  these issues in Delaware courts. Given that California has no countervailing interest in

2  adjudicating this case, the public interest weighs strongly in favor of deferring to the first filed

3  action in Delaware.

### 2.    Private Interests Favor a Stay

5  Private interests also favor a stay in deference to the Delaware action. California courts

6  do not mechanically apply the private interest factors, but must consider the broader nature of the

7  action in balancing the respective interests. *Century Indemnity Co.*, 58 Cal. App. 4th at 413

8  (holding that proximity of witnesses favored neither forum where presenting the case would be "a

9  documentary case"). While KLA has its principal place of business in California, and many of its

10  former officers and directors named in the lawsuit are residents of California, the nature of

11  Plaintiff's allegations makes Delaware a more appropriate forum for KLA.

12  First, moving defendants have an interest in avoiding unnecessary legal fees, and risking

13  inconsistent results by litigating the same dispute in both Delaware and California. *See Hart*, 517

14  N.Y.S..2d at 495 (finding that litigating in parallel jurisdictions burdened defendants because the

15  action "subject[ed] GM and its twenty individual directors to the expense of litigating the same

16  claims in separate forums, as well as exposing them to the possibility of inconsistent judgments"

17  as to the ownership of GM stock). This interest is particularly strong in a shareholder

18  representative action where a corporation's by-laws require the Company to advance the legal

19  fees of all the individual defendants.

20  Second, all parties have an interest in litigating this matter in Delaware, whose courts

21  specialize in the application of Delaware law of corporate governance. Specifically, litigating

22  corporate governance issues in Delaware "provide[s] litigants the timely opportunity to seek

23  review from the state's highest court, the Delaware Supreme Court, by way of requesting an

24  expedited and direct interlocutory appeal." *In re Topps Co. S'holders Litig.*, 924 A.2d at 954.

25  Further, this "opportunity for prompt definitive guidance is obviously unavailable in the courts of

26  another state." *Id.*

27  Moreover, Plaintiff cannot assert a countervailing interest in adjudicating this case in

28  California, rather than Delaware. Notably, Plaintiff does not allege that he is a resident of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7619926.2                                        9

NOTICE OF MOTION AND MOTION TO STAY

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

1    California, which substantially diminishes the level of deference that is traditionally accorded a

2    plaintiff's choice of forum.  *Stangvik v. Shiley Inc.*, 54 Cal.3d 744 at 753.  Moreover, as

3    recognized by the Delaware Chancery Court, "representative plaintiffs seeking to wield the

4    cudgel for all stockholders of a Delaware corporation have no legitimate interest in obtaining a

5    ruling from a non-Delaware court."  *In re Topps*, 924 A. 2d at 961.  Thus, the balance of private

6    equities also strongly favors issuing a stay in this action.

7    **B.     STAY IS APPROPRIATE ON THE GROUNDS OF COMITY AND
            EFFICIENCY**

8

9         Alternatively, the court should stay this action because the principles of efficiency and

10   comity require a stay in the present circumstances.  California courts recognize that "the principle

11   of comity between the states calls for the refusal on the part of the courts of this state to proceed

12   to a decision before the termination of the prior action."  *Dodge v. Superior Court*, 139 Cal. App.

13   178, 181 (1939).  California courts have discretion to stay a matter in deference to a matter

14   pending in a foreign jurisdiction "to prevent vexation, oppression and harassment, to prevent

15   unnecessary litigation, to prevent multiplicity of suits – in short, to prevent two actions between

16   the same parties involving the same subject matter from proceeding independently of each other."

17   *Simmons v. Superior Court*, 96 Cal. App. 2d 119, 124-25 (1950).  The rationale for a stay on this

18   ground is rooted in the principle that two actions involving the same subject matter and same

19   parties should not proceed in California courts at the same time:

20          We think there is no distinction in reason or difference is principle
            between a case where a later action between the same parties
21          involving the same subject matter is commenced in the same state
            and a case where a later action between he same parties involving
22          the same subject matter is commenced in another state.  If
            proceedings should be stayed in the first case mentioned, it is in
23          order to avoid a multiplicity of suits and prevent vexatious
            litigation, conflicting judgments, confusion and unseemly
24          controversy between litigants and courts.  Any and all of this may
            occur where the later action is commenced in another state, as well
25          as where it is commenced in the same state.

26   *Id.* at 125.

27        As in *Simmons* and in *Dodge*, a stay is appropriate here because there are several actions

28   pending in California courts covering the exact same subject matter, parties, and underlying

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7619926.2                                    10

NOTICE OF MOTION AND MOTION TO STAY

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

1  transactions and events.  The consolidated federal securities class action, the consolidated federal

2  derivative class action, and the *Rabin* action all concern substantially the same allegations against

3  the same defendants arising out of the same events.  The consolidated federal securities class

4  action has progressed substantially in the past year.  A motion to dismiss pursuant to Rule

5  12(b)(6) has been fully briefed and is set for argument.  Additionally, the parties have participated

6  in several mediation sessions.  Moreover, the *Rabin* action is pending before this Court and

7  covers allegations of the same underlying wrongdoing – there in an openly derivative context,

8  whereas here the same claims are asserted in the guise of a class action.  Thus, this Court should

9  grant the federal actions comity and stay this action.  *Morrow v. Superior Court*, 9 Cal. App.2d

10 16, 22 (1935) (granting a stay on the grounds that comity was owed a California federal court);

11 *Celotex*, 199 Cal. App. 3d at 685 (granting a stay on the grounds of forum non conveniens where,

12 as here, parallel actions were pending in federal court).

13 **IV.    CONCLUSION**

14     For the foregoing reasons, KLA asks for a stay of the instant action.

15

16 DATED:  November 13, 2007

17

18

Respectfully submitted,

MORGAN LEWIS & BOCKIUS, LLP


By:_____/s/_____

JOSEPH E. FLOREN

*Attorneys for Defendant KLA-Tencor Corporation*

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7619926.2                                11

NOTICE OF MOTION AND MOTION TO STAY

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG

1  c/o Glotrans
   2915 McClure Street
   Oakland, CA94609
2  TEL: (510) 208-4775
   FAX: (510) 465-7348
   EMAIL: Info@Glotrans.com
3

# E-FILED

Nov 14, 2007 8:00 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6052
By A. Ilas, Deputy

4

5

### THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
### IN AND FOR THE COUNTY OF SANTA CLARA

6  CHRIS CRIMI, on behalf of himself and all others              )    Crimi v. Barnholt, et al. (KLA-Tencor
   similarly situated, Plaintiff,                                )    Corporation)
7                                                                )
                              Plaintiff,                         )    Lead Case No.1-07-CV-093465
   vs.                                                           )
8  EDWARD W. BARNHOLT, H. RAYMOND BINGHAM,                       )    Judge Jack Komar
   ROBERT                                                        )
9  T. BOND, RICHARD J. ELKUS, JR. STEPHEN P.                     )
   KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS,                      )
   DEAN O.                                                       )
10 MORTON, KENNETH L. SCHROEDER, JON D.                          )
   TOMPKINS,                                                     )
11 RICHARD P. WALLACE, KLA-TENCOR CORPORATION,                  )
   and                                                           )
   DOES 1 through 25, Defendants.                                )
12                                                               )
                              Defendant.                         )
   _____                    )    PROOF OF SERVICE
13 AND RELATED ACTIONS                                           )    Electronic Proof of Service
   _____                    )

        I am employed in the County of Alameda, State of California.

14      I am over the age of 18 and not a party to the within action; my business address is 2915 McClure

15 Street, Oakland, CA 94609.

        The documents described on page 2 of this Electronic Proof of Service were submitted via the

16 worldwide web on Tue. November 13, 2007 at 5:03 PM PST and served by electronic mail notification.

        I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and

17 am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described

18 document's electronic service in the following manner:

        The document was electronically filed on the Court's website, http://www.scefiling.org, on Tue.

19 November 13, 2007 at 5:03 PM PST

        Upon approval of the document by the Court, an electronic mail message was transmitted to all parties

20

21 on the electronic service list maintained for this case. The message identified the document and provided

instructions for accessing the document on the worldwide web.

        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and

22

correct. Executed on November 13, 2007 at Oakland, California.

23      Dated: November 13, 2007                          For WWW.SCEFILING.ORG

E-Filed: Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

Andy Jamieson

E-Filed: Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

1 THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
  ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG

2 Electronic Proof of Service
  Page 2

3 Document(s) submitted by Joseph Floren of Morgan, Lewis & Bockius LLP on Tue. November 13, 2007 at 5:03 PM
  PST

4 1. Mtn to Stay: Notice of Motion and Motion By Defendant KLA-Tencor Corp. to Stay Action Pursuant to C.C.P. 418.10(A)(2)
  and 410.30; Memorandum of Points and Authorities In Support of Motion to Stay

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1   MORGAN, LEWIS & BOCKIUS LLP
    JOHN H. HEMANN (SBN 165823)
2   JOSEPH E. FLOREN (SBN 168292)
    TERA M. HEINTZ (SBN 241414)
3   MATTHEW S. WEILER (SBN 236052)
    One Market, Spear Street Tower
4   San Francisco, CA  94105-1126
    Tel:  415.442.1000
5   Fax:  415.442.1001

6   Attorneys for Defendant KLA-Tencor Corporation

7

**E-FILED**

Nov 14, 2007 8:00 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6052
By A. Ilas, Deputy

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   COUNTY OF SANTA CLARA

10

11  CHRIS CRIMI, on Behalf of Himself and          Case No. 107CV093465
    All Others Similarly Situated,
12                                                 **REQUEST FOR JUDICIAL NOTICE IN**
                      Plaintiff,                   **SUPPORT OF DEFENDANT KLA-**
13                                                 **TENCOR'S MOTION TO STAY;**
                vs.                                **DECLARATION OF JOSEPH E. FLOREN**
14
    EDWARD W. BARNHOLT, H.
15  RAYMOND BINGHAM, ROBERT T.                     Date: January 18, 2008
    BOND, RICHARD J. ELKUS, JR.,                   Time: 9:00 a.m.
16  STEPHEN P. KAUFMAN, KENNETH                    Department:  17C
    LEVY, MICHAEL E. MARKS, DEAN O.                Judge:  Hon. Jack Komar
17  MORTON, KENNETH L. SCHROEDER,
    JON D. TOMPKINS, RICHARD P.                    Complaint Filed: September 4, 2007
18  WALLACE, KLA-TENCOR
    CORPORATION, and DOES 1 through 25,
19
                      Defendants.
20

21

22

23

24

25

26

27

28

---

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

1

**REQUEST FOR JUDICIAL NOTICE**

2    Pursuant to Rule 323(c) of the California Rules of Court and California Evidence Code

3    Sections 452(d) and 453, Defendant KLA-Tencor Corporation ("KLA") respectfully requests that

4    the Court take judicial notice of complaints filed in the following actions, which are attached as

5    exhibits to the accompanying Declaration of Joseph E. Floren: a complaint filed in the matter

6    <u>Benjamin Langford v. Edward W. Barnholt, et al.</u> (Del. Ch.); <u>In re KLA-Tencor Corporation</u>

7    <u>Shareholder Derivative Litigation</u>, No. C-06-03445-JW (N.D. Cal.); <u>Jeffrey A. Rabin v. Edward</u>

8    <u>W. Barnholt, et al.</u>. No. 106CV064841 (Cal. Super.); <u>In re KLA-Tencor Corporation Securities</u>

9    <u>Litigation,</u> No. 06-CV-04065 MJJ (N.D. Cal.).

10    This court may take judicial notice of complaints filed in California state and federal

11    courts, and in other courts in the United States.  *See* Cal. Evid. Code § 452(d) (stating that judicial

12    notice may be taken of records of "any court of record of the United States[.]"); *People v.*

13    *$25,000 United States Currency*, 131 Cal. App. 4th 127, 131 n.2 (2005) (noting that it had taken

14    judicial notice of federal court records pertaining to the matter before it upon appellant's request).

15    Accordingly, KLA requests that this Court take judicial notice of the attached complaints.

16

17

18    DATED:  November 13, 2007          MORGAN LEWIS & BOCKIUS, LLP

19

20                                          By:_____/s/_____

21                                                        Joseph E. Floren

22                                          *Attorneys for Defendant KLA-Tencor Corporation*

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7560868.1

REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF JOSEPH E. FLOREN

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

## DECLARATION OF JOSEPH E. FLOREN

I, Jospeh E. Floren, declare as follows:

1.      I am an attorney at law, licensed to practice before the courts of the State of California and before this Court.  I am a partner of the law firm Morgan, Lewis & Bockius LLP, attorneys of record for defendant KLA-Tencor Corporation.  I am making this declaration in support of Defendant KLA-Tencor Corporation's Motion to Stay.  The facts set forth in this declaration are true of my own personal knowledge, and if called I could and would testify competently thereto.

2.      On July 21, 2006, a complaint entitled <u>Benjamin Langford v. Edward W. Barnholt, et al.</u> was filed in the Delaware Court of Chancery, New Castle County.  A true and correct copy of an amended complaint in this action, filed on or about March 5, 2007, is attached hereto as Exhibit 1.

3.      On June 2, 2006, a verified shareholder derivative complaint entitled <u>Jeffrey A. Rabin v. Edward W. Barnholt, et al.</u>. No. 106CV064841, was filed in the Superior Court of California for the County of Santa Clara.  A true and correct copy of this complaint is attached hereto as Exhibit 2.

4.      On May 22, 2006, the first of four shareholder derivative actions was filed in the United States District Court for the Northern District of California.  These actions were later consolidated under the caption <u>In re KLA-Tencor Corporation Shareholder Derivative Litigation,</u> No. C-06-03445-JW.  A true and correct copy of the operative consolidated complaint, filed on February 20, 2007, is attached hereto as Exhibit 3.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FR●NCISCO

1-SF/7560868.1

REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF JOSEPH E. FLOREN

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

1    5.    On June 29, 2006, <u>Garber v. KLA-Tencor Corp., et al.</u>, 06-CV-4065 MJJ, was

2  filed in the United States District Court for the Northern District of California; it was the first of

3  three class action complaints to be filed concerning alleged stock option backdating.    On March

4  6, 2007, a consolidated class action complaint encompassing it entitled <u>In re KLA-Tencor</u>

5  <u>Corporation Securities Litigation</u>, No. 06-CV-04065 MJJ, was filed in the United States District

6  Court for the Northern District of California.    A true and correct copy of this complaint is

7  attached hereto as Exhibit 4.

8    I declare under penalty of perjury under the laws of the State of California that the

9  foregoing is true and correct and based on my personal knowledge, and that this declaration was

10  executed on November 13, 2007 at San Francisco, California.

11

12    By _____/s/_____

13    Joseph E. Floren

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FRANCISCO

1-SF/7560868.1

REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF JOSEPH E. FLOREN

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465.Filing #G-6052

1

# PROOF OF SERVICE BY ELECTRONIC TRANSMISSION

2

*Chris Crimi, et al. v. Edward W. Barnholt, et al.*
**Santa Clara County Superior Court Case No. 107CV093465**

3

4        I, the undersigned, declare:  that I am, and was at the time of service of the documents

5  herein referred to, over the age of 18 years, and not a party to the action; and I am employed in
the County of San Francisco, California.  My business address is One Market, Spear Street

6  Tower, San Francisco, California 94105.

7        On the date executed below, I electronically served the document(s) via the Santa Clara

8  Superior Court's electronic filing system described as:

9  **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT KLA-
TENCOR'S MOTION TO STAY; DECLARATION OF JOSEPH E. FLOREN**

10

11  on the recipients designated on the Transaction Receipt located on the Santa Clara County
Superior Court's electronic filing website.  I declare under penalty of perjury pursuant to the laws

12  of the State of California that the foregoing is true and correct and was executed on November 13,
2007.

13

14                                        /s/

15                              Erika R. Eberline

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FRANCISCO

1-SF/7560868.1

REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF JOSEPH E. FLOREN

IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| BENJAMIN LANGFORD, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| - against - | ) Case Number: 2295-N |
| | ) |
| EDWARD W. BARNHOLT, H. RAYMOND | ) |
| BINGHAM, ROBERT J. BOEHLKE, ROBERT | ) |
| T. BOND, GARY E. DICKERSON, RICHARD J | ) |
| ELKUS, JR., DENNIS J. FORTINO, STEPHEN | ) |
| P. KAUFMAN, JOHN H. KISPERT, KENNETH | ) |
| LEVY, MICHAEL E. MARKS, ARTHUR P. | ) |
| SCHNITZER, KENNETH L. SCHROEDER, | ) |
| JON D. TOMPKINS, LIDA URBANEK, and | ) |
| KLA-TENCOR CORPORATION | ) |
| | ) |
| Defendants. | ) |

AMENDED COMPLAINT[1]

Plaintiff brings this action as a derivative action on behalf of KLA-TENCOR

CORPORATION ("KLA" or the "Company") and as a class action on behalf of the

shareholders of KLA because their stockholding interests were diluted and affected

as a result of the issuance of void stock options and their subsequent exercise.

Plaintiff alleges, upon information and belief, the following, except upon personal

knowledge as to his ownership of KLA stock.

I.    PRELIMINARY ALLEGATIONS

---

[1] Pursuant to Chancery Court Rule 15(aa) matter added to the original complaint is shown in underline and deleted matter is shown in cross-out.

1.      Plaintiff is a shareholder of KLA as a result of its merger with Tencor Instruments in 1997. He continues to own these shares since its acquisition.

2.      KLA is a corporation organized and existing under the laws of the State of Delaware. It is a supplier of process control and yield management solutions for the semi conductor and related microelectronics industries.

3.      Defendant Kenneth L. Schroeder ("Schroeder") has served as a director of KLA and as Chief Executive Officer of the Company since July 1999. Schroeder served as President of the Company from November 1991 to July 2002 and again from May 2004 to July 2005.

4.      Defendant Kenneth Levy ("Levy"), a founder of KLA, has served as a director of KLA since 1975 and as Chairman of the Board of Directors ("Board") since July 1999. Levy served as Chief Executive Officer of the Company from July 1998 to June 1999.

5.      Defendant Jon D. Tompkins ("Tompkins") has served as a director of KLA since April 1997. Tompkins served as Chairman of the Board from July 1998 to June 1999 and as Chief Executive Officer of the Company from May 1997 to July 1998.

6.      Defendant Robert J. Boehlke ("Boehlke") served as Executive Vice President and Chief Financial Officer of the Company from 1992 to 2000.

7.      Defendant Stephen P. Kaufman ("Kaufman") has been a director since November 2002.

8.    Defendant Michael E. Marks ("Marks") has been a director since November 2003.

9.    Defendant Gary E. Dickerson ("Dickerson") served as Executive Vice President of the Company from 1995 to 1999 and as President and Chief Operating Officer of the Company from 1999 to 2004.

10.    Defendant Arthur P. Schnitzer ("Schnitzer") served as Executive Vice President of the Company at all times relevant hereto. Schnitzer is a citizen of the State of California.

11.    Defendant John H. Kispert ("Kispert") has served as Executive Vice President and Chief Financial Officer of the Company since 2000.

12.    Defendant Dennis J. Fortino ("Fortino") has served as Executive Vice President of the Company since 1999.

13.    Collectively, defendants Schroeder, Levy, Tompkins, Boehlke, Dickerson, Schnitzer, Kispert, and Fortino are referred to herein as the "Officer Defendants".

14.    Defendant Lida Urbanek ("Urbanek") has served as a director of KLA and as a member of the Compensation Committee of the Board (the "Compensation Committee") since 1997.

15.    Defendant Edward W. Barnholt ("Barnholt") has served as a director of KLA since 1995 and as a member of the Compensation Committee since 2000.

3

16.     Defendant Robert T. Bond ("Bond") has served as a director of KLA and as a member of the Compensation Committee since 2000. Bond has also served as a member of the Audit Committee of the Board (the "Audit Committee") since 2002.

17.     Collectively, defendants Urbanek, Barnholt, and Bond are referred to herein as the "Compensation Committee Defendants".

18.     Defendant Richard J. Elkus, Jr. ("Elkus") has served as a director of KLA since 1997 and as a member of the Audit Committee since 1999.

19.     Defendant H. Raymond Bingham ("Bingham") has served as a director of KLA since 1999 and as a member of the Audit Committee since 2000.

20.     Collectively, defendants Bond, Elkus, and Bingham are referred to herein as the "Audit Committee Defendants".

21.     KLA had adopted stock option plans which were shareholder approved. Under such plans, the exercise price of the stock options granted cannot be less than the closing price of KLA stock on the date of grant.

22.     The Compensation Committee, determined, among other things, the stock option awards, for executive officers of KLA and administered the Company stock option plans.

23.     From 1997 to 2001 the Compensation Committee granted stock options to various defendants (adjusted for KLA's two-for-one stock splint effective January 19, 2000) as follows:

| Officer | Purported Date Of Grant | Exercise Price | No. Of Options |
|---|---|---|---|
| Schroeder | 7-31-97 | $30.2813 | 125,000 |
| | 8-31-98 | 10.625 | 204,272 |
| | 10-23-98 | 16.9688 | 220,728 |
| | 10-27-99 | 16.875 | 300,000 |
| | 8-13-00 | 44.6875 | 75,800 |
| | 11-10-00 | 26.25 | 37,900 |
| | 4-4-01 | 32.75 | 37,900 |
| | 10-2-01 | 29.31 | 341,100 |
| Levy | 7-31-97 | $30.2813 | 125,000 |
| | 8-31-98 | 10.625 | 204,272 |
| | 10-23-98 | 16.9688 | 220,728 |
| | 10-27-99 | 16.875 | 180,000 |
| | 8-13-00 | 44.6875 | 37,901 |
| | 11-10-00 | 26.25 | 18,951 |
| | 4-4-01 | 32.75 | 18,951 |
| | 10-2-01 | 29.31 | 28,425 |
| Dickerson | 7-31-97 | $30.2813 | 85,000 |
| | 8-31-98 | 10.625 | 125,764 |
| | 10-23-98 | 16.9688 | 139,236 |
| | 10-27-99 | 16.875 | 200,000 |
| | 8-13-00 | 44.6875 | 65,800 |
| | 11-10-00 | 26.25 | 32,500 |
| | 4-4-01 | 32.75 | 32,500 |
| | 10-2-01 | 29.31 | 105,000 |
| Tompkins | 8-31-98 | $10.625 | 101,618 |
| | 10-23-98 | 16.9688 | 148,382 |
| | 10-27-99 | 16.875 | 20,000 |
| | 11-10-00 | 26.25 | 10,000 |
| Boehlke | 7-31-97 | $10.625 | 667,000 |
| | 8-31-98 | 16.9688 | 108,870 |
| | 10-23-98 | 33.9375 | 99,300 |
| | 10-27-99 | 16.875 | 120,000 |

5

| Schnitzer | 8-31-98 | $10.625 | 108,870 |
| | 10-23-98 | 16.9688 | 99,300 |
| | 10-27-99 | 33.75 | 100,000 |
| Kispert | 10-2-01 | $29.31 | 60,000 |
| Fortino | 10-2-01 | $29.31 | 45,000 |

24.     Despite the express requirements of the stock option plans and in violation thereof, each and every one of the stock option grants was back dated, at the date of grant, after a sharp drop in the stock price, and just before a substantial rise in KLA's stock price, to enable the recipients to be able to cash in on substantial profits.

25.     On October 31, 1998, KLA announced that certain executive officers were granted the opportunity to surrender options and receive a reduced number of options having an exercise price of $33.94 the market price on that date, pre-split.  However, October 31, 1998 fell on a Saturday, and the closing pre-split price on Friday, October 30, 1998, was $36.87.

26.     Certain KLA executives took advantage of the opportunity and surrendered their options and received the following pre-split:

| Kenneth Levy | 110,364 |
| Kenneth L. Schroeder | 110,364 |
| Gary E. Dickerson | 69,618 |
| Jon D. Tompkins | 74,191 |
| Robert J. Boehlke | 49,065 |
| Arthur P. Schnitzer | 49,065 |
| Edward C. Grady | 26,745 |
| Samuel A. Harrell | 57,338 |
| Neil Richardson | 46,184 |

6

KLA reported that the date of grant in each instance for the above was October 23, 1998, and that the option exercise price was $33.94. All of the above transactions were not adjusted for the split.

27.    Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

28.    Pursuant to § 162(m) of the Tax Code, 26 U.S.C. §162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors; (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation; and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

29.    Various of the defendants exercised their options as follows:

(a)    Defendant Schroeder exercised options received between July 1997 and October 2001. He obtained 550,000 shares upon such exercise;

7

     (b)     Defendant Levy exercised options received between July 1997 and October 2001. He obtained 275,000 shares upon such exercise;

     (c)     Defendant Tompkins exercised options received between 1998 and 2000. He obtained 280,000 shares upon such exercise;

     (d)     Defendant Dickerson exercised options received between 1997 and 2001. He obtained 327,535 shares upon such exercise;

     (e)     Defendant Kispert exercised options received in 2001. He obtained 46,000 shares upon such exercise;

     (f)     Defendant Fortino exercised options granted to him in October 2001. He obtained 20,250 shares upon such exercise.

30.     Other defendants and officers and directors similarly received options that were void because they were not priced on the grant date and exercised, and continue to exercise those options and receive stock therefor. The names and amounts are still unknown and will be ascertained upon complete discovery.

31.     To conceal the issuance of the improperly priced and thus void options, and the violation of the stock option plans, KLA was caused to claim deductions under the aforesaid tax code, to state improperly its financial results, and never disclosed to shareholders that the options had been improperly priced and back dated. Indeed, KLA falsely reported the option grant dates in their annual reports and disseminated the false

information to the shareholders and in the SEC filings. Shareholders never learned the truth until now.

32.    Thereafter, as a result of publicity regarding a number of public companies having "back dated" options, KLA examined the circumstance and conceded in press releases that it had improperly priced its options. This publicity was the first time and first indication that such "back dating" had occurred, in violation of the stock option plans.

33.    After the conclusion of the investigation, KLA determined that particular options had indeed, fair market prices below those on the date they were granted.

34.    During December 26, 2006 to December 28, 2006, KLA entered into Agreements with Richard Wallace, Neil Richardson and defendant Dennis Fortino whereby the exercise price of their respective options were raised as follows:

| Name | Prior Exercise Price | Increased Exercise Price |
|------|----------------------|--------------------------|
| Richard Wallace | $26.26 | $32.88 |
| Neil Richardson | $32.75 | $50.82 |
| Dennis Fortino | $29.31 | $45.25 |

35.    As part of their agreement, each of the foregoing recipients will receive a special cash bonus from KLA equal to the amount of the aggregate increase in the exercise price.  Thus, Mr. Wallace would receive or has received a cash payment of $21,275.67. Mr. Richardson would receive or has received a cash payment of $84,332.69 and defendant Fortino would receive or has received a cash payment of $263,010.00.

9

3336.  KLA and its shareholders have been damaged as a direct result of the foregoing misconduct. There will be substantial tax liabilities and possible damages to be paid to potential class action suits already commenced and to be commenced. In addition to the said cash payments, there will be the loss of funds to be paid upon the exercise of the options and damage to KLA's good name and good will.  The cash payment alleged above were improper and designed to enable the recipients to offset the increased option prices.

### AS AND FOR A FIRST CAUSE OF ACTION
### (Derivative)

3437.  Plaintiff brings this suit as a derivative action in the right and for the benefit of KLA to address the injuries suffered and to be suffered by KLA as a result of the breached of fiduciary duty and commission of waste by the individual defendants.

3538.  As a result of the facts set forth above, plaintiff has not made any demand on KLA's board of directors to institute this action against the individual defendants for the following reasons:

(a)     Schroeder, Levy and Tompkins, are directly interested in the improperly backdated stock option grants complained of herein;

(b)     Urbanek, Barholt and Bond, members of the Compensation Committee, directly participated in and approved the improper backdating of stock options, as alleged herein. Moreover, by colluding with the Officer Defendants and others, as

10

alleged herein, Urbanek, Barnholt, and Bond have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

      (c)    Bond, Elkus, and Bingham, members of the Audit Committee directly participated in and approved the Company's violations of GAAP and the Tax Code as alleged herein. Moreover, by colluding with the Officer Defendants and others, as alleged herein, Bond, Elkus, and Bingham have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

      (d)    Urbanek, Barnholt, Bond, Elkus, and Bingham, directors of the Company directly participated in and approved the Company's filing of false financial statements and other SEC filings, as alleged herein. Moreover, by colluding with the Officer Defendant and others, as alleged herein, Bond, Elkus, and Bingham have demonstrated that they are unable or unwilling to act independently of the Officer Defendants.

      (e)    The acts complained of herein resulted from failure to follow the stockholder approved option plans and the resulting exercise of those options and the issuance of the stock thereunder constituted acts of *ultra vires*, for which demand is excused;

      (f)    The Board of directors currently consists of ten directors, of which eight were involved, either in receiving the options as set forth above, or being aware of the granting, and overlooking the back dating of said options;

<center>11</center>

(g)    The acts complained of herein constitute waste, if nothing else and are thus incapable of being considered the exercise of business judgment;

(h)    The Board is incapable of exercising an independent and disinterested decision to institute and prosecute this action and the complained of acts could not be, and were not the result of any exercise of good faith business judgment.

(i)    Moreover, the Board will itself become defendants in any pending action or other litigations to be instituted for the aforesaid misconduct.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Class)

36~~39~~.    This claim is asserted as an individual and class claim on behalf of all KLA shareholders.

37~~40~~.    Defendants caused the shareholders' equity and holdings to be diluted and wasted by allowing void options to be granted on a date other than the grant date and at an exercise price lower than the grant date exercise price, in violation of the stockholder approved option plans and upon the exercise of said options, causing KLA to receive less than the required consideration. Thus, the equity of all KLA shareholders were improperly diluted.

38~~41~~.    Plaintiff will fairly and adequately represent the shareholders in this litigation.

WHEREFORE, plaintiff demands judgment as follows:

12

A.    Against all of the individual defendants and in favor of KLA for the damages sustained by KLA and/or its shareholders as a result of the actions complained of herein;

B.    Ordering the recipients to disgorge to KLA all of the back dated options they received, including the proceeds of any such options that have been exercised, sold, pleged or otherwise monetized;

C.    Granting such other and appropriate equitable relief to remedy the wrongs complained of herein;

D.    Awarding to plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs and disbursements; and

E.    Such other and further relief as the Court deems just and proper.

Dated: ~~7/21/2006~~ March 5, 2007

BIGGS AND BATAGLIA

By: /s/ Robert Goldberg
Robert Goldberg (I.D. No. 631)
Biggs and Bataglia
921 North Orange Street
P.O. Box 1489
Wilmington, DE 19899
(302) 655-9677
Attorney for Plaintiff

Of Counsel:

13

Of Counsel:

Irving Bizar, Esq.
Ballon Stoll Bader & Nadler, P.C.
1450 Broadway, 14th floor
New York, NY 10018
T: (212) 575-7900
F: (212) 764-5060

## CERTIFICATE OF SERVICE

I, Robert D. Goldberg, undersigned counsel of record, hereby certify that on

March 5, 2007, I caused a copy of the Amended Complaint of Benjamin Langford to be

served on the following in the manner indicated:

**VIA ELECTRONIC FILING**
Michael D. Goldman (ID #268)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899-0951


                                        /s/ Robert D. Goldberg
                                    Robert D. Goldberg (I.D. #631)

JGAK    A & A LEGAL SERVICE 6506974640                    NO. 8658    P. 1

1   WEISS & LURIE
    Jordan L. Lurie (130013)                          ORIGINAL
2   Leigh A. Parker (170565)
    Zev B. Zysman (176805)
3   10940 Wilshire Boulevard, 23rd Floor
    Los Angeles, CA 90024
4   Telephone:    310/208-2800
    Facsimile:    310/209-2348
5   jlurie@weisslurie.com

6   Counsel for Plaintiff                    FILED  Santa Clara Co
                                             06/02/06   2:10pm
7                                            Kiri Torre
                                             Chief Executive Offic
8                                            By: shannonc dtsclerk
                                             R#200600054570
        SUPERIOR COURT OF THE STATE OF CALIFORNIA   $870.00
9                                                   TL       $870.00
        FOR THE COUNTY OF SANTA CLARA   Case: 1-06-CV-064841
10

11  JEFFREY A. RABIN, Derivatively on Behalf of )  Case No.  106CV064841
    Nominal Defendant KLA-TENCOR             )
12  CORPORATION,                            )  CLASS ACTION    FILE VIA FAX
                                             )
13             Plaintiff,                    )  VERIFIED SHAREHOLDER
                                             )  DERIVATIVE COMPLAINT
14       v.                                  )
                                             )
15  EDWARD W. BARNHOLT, H. RAYMOND           )
    BINGHAM, ROBERT J. BOEHLKE, ROBERT       )
16  T. BOND, GARY E. DICKERSON, RICHARD      )
    J. ELKUS, JR., DENNIS J. FORTINO, JOHN   )
17  H. KISPERT, KENNETH LEVY, ARTHUR P.      )
    SCHNITZER, KENNETH L. SCHROEDER,         )
18  JON D. TOMPKINS, and LIDA URBANEK,       )
                                             )
19             Defendants,                   )
                                             )
20       and                                 )
                                             )
21  KLA-TENCOR CORPORATION,                  )
                                             )
22             Nominal Defendant.            )

23

24

25

26

27

28

DERIVATIVE COMPLAINT

1  Plaintiff, by his attorneys, submits this Derivative Complaint (the "Complaint") against
2  the defendants named herein.

3  ### NATURE AND SUMMARY OF THE ACTION

4  1.    This is a shareholder's derivative action brought for the benefit of nominal
5  defendant KLA-Tencor Corporation ("KLA" or the "Company") against certain members of its
6  Board of Directors (the "Board"), including members of the Company's Compensation
7  Committee and the Company's Audit Committee, and certain of the Company's executive
8  officers.

9  2.    When stock options are awarded, the strike price of the options ordinarily is set
10  equal to or below the share price on the day of the award.  In this way, the executives of a
11  company are supposed to have their interests aligned with the shareholders, whose holdings are
12  diluted each time an option is exercised.

13  3.    As further alleged below, Defendants improperly backdated stock option grants to
14  make it appear as though the grants were made on dates when the market price of KLA stock was
15  lower than the market price on the actual grant dates. This improper backdating resulted in option
16  grants with lower exercise prices and thereby improperly increased the value of the options to the
17  Officer Defendants, improperly reduced the amounts the Officer Defendants had to pay the
18  Company upon exercise of the options, and unfairly transferred shareholder equity to Defendants.
19  Defendants' conduct also violated the Company's shareholder-approved stock option plans, the
20  Company's corporate governance guidelines, the Company's standards of business conduct and
21  the Company's conflicts of interest policy.

22  4.    Defendants' backdating scheme also rendered the Company's proxy materials
23  false and misleading, as the proxy materials falsely reported the dates of the stock option grants
24  and falsely represented that options were granted at fair market value; if the option grant is
25  backdated, the options value is not fair from the vantage point of the Company and its
26  shareholders.  Further, Defendants' backdating of options grants violated provisions of the
27  Internal Revenue Code relating to deduction of option payments and thereby rendered the

28

DERIVATIVE COMPLAINT                    -1-

1  Company's financial statements in Form 10-K filings for the years 1998, 1999, 2000, 2001, and
2  2002 false and misleading.

3      5.      In addition, KLA and its shareholders were further injured in that Defendants'
4  illegal conduct caused KLA to overpay to acquire ADE Corporation, a maker of silicon wafer
5  inspection equipment, as further described below.

6      6.      On May 24, 2006, KLA announced the formation of a Special Committee to
7  investigate the Company's stock option practices from 1995 to 2001.  The Company also
8  announced that it received subpoenas from the U.S. Attorney's Office for the Eastern District of
9  New York and the Northern District of California requesting information relating to the
10  Company's past stock option grants.

11      7.      As a result of Defendants' conduct, the Company's stock price has declined and
12  the Company has sustained millions of dollars in damages, including additional compensation
13  expenses and tax liabilities and loss of funds paid to the Company upon exercise of options, and
14  the recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

15                      **JURISDICTION AND VENUE**

16      8.      This Court has jurisdiction over all causes of action asserted herein because this
17  case is a cause not given by statute to other trial courts.

18      9.      The jurisdiction of this Court arises under §410.10 of the Code of Civil Procedure.
19  This Court has jurisdiction over each of the Defendants in this action because they conduct
20  business in, reside in or are citizens of this State.  The conduct alleged herein took place in and/or
21  was directed at residents of this State.

22      10.      The amounts in controversy exceed the jurisdictional minimum of this Court.

23      11.      Venue is proper in this Court because a substantial portion of the transactions and
24  wrongs complained of herein, including the Defendants' primary participation in the wrongful
25  acts detailed herein, occurred in this district, because Defendants have received substantial
26  compensation in this district by engaging in numerous activities and conducting business here,
27  which had an effect in this district, and because KLA maintains its principal place of business in
28

1   this County. Defendant KLA maintains its principal place of business at 160 Rio Robles, San

2   Jose, California 95134.

3                                       **PARTIES**

4       12.     Plaintiff Jeffrey A. Rabin, a citizen of the State of California, is, and was at all

5   relevant times, a shareholder of KLA.

6       13.    Nominal defendant KLA is a Delaware corporation with its principal executive

7   offices located at 160 Rio Robles, San Jose, California 95134. According to its public filings,

8   KLA is a supplier of process control and yield management solutions for the semiconductor

9   manufacturing and related microelectronics industries. KLA's stock is publicly traded on the

10   Nasdaq under the ticker symbol KLAC.

11      14.    Defendant Kenneth L. Schroeder ("Schroeder") has served as a director of KLA

12   and as Chief Executive Officer of the Company since July 1999. Schroeder served as President

13   of the Company from November 1991 to July 2002 and again from May 2004 to July 2005.

14      15.    Defendant Kenneth Levy ("Levy"), a founder of KLA, has served as a director of

15   KLA since 1975 and as Chairman of the Board since July 1999. Levy served as Chief Executive

16   Officer of the Company from July 1998 to June 1999.

17      16.    Defendant Jon D. Tompkins ("Tompkins") has served as a director of KLA since

18   April 7, 1997. Tompkins served as Chairman of the Board from July 1998 to June 1999 and as

19   Chief Executive Officer of the Company from May 1997 to July 1998.

20      17.    Defendant Robert J. Boehlke ("Boehlke") served as Executive Vice President and

21   Chief Financial Officer of the Company from 1992 to 2000.

22      18.    Defendant Gary B. Dickerson ("Dickerson") served as Executive Vice President of

23   the Company from 1995 to 1999 and as President and Chief Operating Officer of the Company

24   from 1999 to 2004.

25      19.    Defendant Arthur P. Schnitzer ("Schnitzer") served as Executive Vice President of

26   the Company at all times relevant hereto.

27      20.    Defendant John H. Kispert ("Kispert") has served as Executive Vice President and

28   Chief Financial Officer of the Company since 2000.

1   21.   Defendant  Dennis J. Fortino ("Fortino") has served as Executive Vice President

2   of the Company since 1999.

3   22.   Collectively, defendants Schroeder, Levy, Tompkins, Boehlke, Dickerson,

4   Schnitzer, Kispert, and Fortino are referred thereon as the "Officer Defendants."

5   23.   Defendant Lida Urbanek ("Urbanek") has served as a director of KLA and as a

6   member of the Compensation Committee of the Board (the "Compensation Committee") since

7   1997.

8   24.   Defendant Edward W. Barnholt ("Barnholt") has served as a director of KLA

9   since 1995 and as a member of the Compensation Committee since 2000.

10   25.   Defendant Robert T. Bond ("Bond") has served as a director of KLA and as a

11   member of the Compensation Committee since 2000. Bond has also served as a member of the

12   Audit Committee of the Board (the "Audit Committee") since 2002.

13   26.   Collectively, defendants Urbanek, Barnholt, and Bond are referred to herein as the

14   "Compensation Committee Defendants."  At all times relevant hereto, the Compensation

15   Committee determined the salaries, incentive compensation, and stock option awards for

16   executive officers of KLA and administered the Company's stock option plans.

17   27.   Defendant Richard J. Elkus, Jr. ("Elkus") has served as a director of KLA since

18   1997 and as a member of the Audit Committee since 1999.

19   28.   Defendant H. Raymond Bingham ("Bingham") has served as a director of KLA

20   since 1999 and as a member of the Audit Committee since 2000.

21   29.   Collectively, defendants Bond, Elkus, and Bingham are referred to herein as the

22   "Audit Committee Defendants."  At all times relevant hereto, the Audit Committee supervised

23   the preparation, filing and/or dissemination of the Company's financial statements, including the

24   treatment of stock option awards for executive officers of KLA.

25   30.   At all relevant times, defendants Barnholt and Elkus also served on the

26   Company's Nominating and Governance Committee which is charged with reviewing the

27   Company's corporate governance policies and procedures.

28

31.     Collectively, the Officer Defendants, Compensation Committee Defendants, and Audit Committee Defendants are referred to herein as the "Individual Defendants" or as "Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     Each Individual Defendant owed and owes KLA and its shareholders fiduciary obligations and were and are required by law to: (1) use their ability to control and manage KLA in a fair, just and equitable manner; (2) act in furtherance of the best interests of KLA and its shareholders; (3) act to maximize shareholder value in connection with any transaction; (4) govern KLA in such a manner as to heed the expressed views of its public shareholders; (5) refrain from abusing their positions of control; and (6) not favor their own interests or the interests of any Individual Defendants at the expense of KLA and its public shareholders.

33.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein and did control and influence and cause KLA to engage in the practices complained of herein.

35.     Each defendant herein is sued individually as a conspirator and aider and abettor, as well as in his capacity as a director of KLA, and the liability of each arises from the fact that

each engaged in and/or aided and abetted all or part of the unlawful acts, plans or transactions complained of herein.

36.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of the Company were required to, among other things:

    a.   exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.   exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

    c.   exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

    d.   exercise good faith in ensuring that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

    e.   refrain from unduly benefitting themselves and other Company insiders at the expense of the Company.

37.    The Individual Defendants also were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on adequate accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

    (1)   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

    (2)   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that --

        (a)   transactions are executed in accordance with management's general or specific authorization;

      (b)     transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

38.    Further, KLA's Audit Committee Charter provides that the Audit Committee shall be responsible for, among other things:

    a.    Reviewing on a continuing basis the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the a Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure; and

    b.    Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited Financial Statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition" and "Results of Operations" to be included in the Company's Annual Report on Form 10K (or the Annual Report to Shareholders if distributed prior to the filing of Form 10K) and Quarterly Reports on Form10-Q, respectively, prior to their filing with the SEC.

## SUBSTANTIVE ALLEGATIONS

39.    From 1997 to 2001, the Compensation Committee granted certain KLA stock options to the Officer Defendants as set forth in Exhibit A hereto.  All of the grants were dated just after a sharp drop in the Company's stock price and just before a substantial rise in the Company's stock price.  An analysis conducted by the *Wall Street Journal* and initially reported on March 18, 2006 found the probability that such a pattern occurred merely by chance to be around one in 20 million.

40.    The reason for the extraordinary pattern of stock option grants as alleged herein is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.  Rather, at the behest of the Officer Defendants and /or other Individual Defendants, the Compensation Committee Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of KLA stock was lower than the market price on the actual grant dates.

41. This improper backdating violated the terms of the Company's shareholder-approved stock option plans. Pursuant to the terms of the Company's shareholder-approved stock option plans, the exercise price of options must be no less than the closing price of KLA stock on the date of grant. In this way, the executives of a company are supposed to have their interests aligned with the shareholders, whose holdings are diluted each time an option is exercised. Backdating improperly increased the value of the options to the Officer Defendants and gave them an immediate paper profit which undermined the incentive purpose of such options, improperly reduced the amounts the Officer Defendants had to pay the Company upon exercise of the options, and unfairly transferred shareholder equity to Defendants.

42. Defendants' conduct also violated the terms of the Company's own corporate governance guidelines, the Company's standards of business conduct and the Company's conflicts of interest policy. For example, the Company's Corporate Governance Standards provides that "each director owes a duty of loyalty to the Company and is expected to act in the best interests of the Company and its stockholders as a whole." Similarly, the Company's Standards of Business Conduct states, in part, that "KLA-Tencor insists that all records maintained by employees are an accurate, honest and forthright presentation of the facts." KLA's conflict of interest policy, as set forth in the Company's proxy statement states that "KLA-Tencor expects its Directors, executives and employees to conduct themselves with the highest degree of integrity, ethics and honesty."

43. Defendants' backdating scheme also rendered the Company's proxy materials from 1997 to 2005 false and misleading, as the proxy materials falsely reported the dates of the stock option grants and falsely represented that the options were granted at fair market value; if the option grant is backdated, the options value is not fair from the vantage point of the Company and its shareholders. For example, a report of the Compensation Committee contained in KLA's 2002 proxy statement falsely stated that "Stock options are granted at market prices on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price." Defendants also filed with the SEC Form 4 filings that falsely reported the dates of stock option grants to the Officer Defendants.

44.    Defendants' backdating scheme also rendered the Company's financial statements in Form 10-K filings for the years 1998, 1999, 2000, 2001, and 2002 false and misleading.

45.    Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense, reducing the company's net income.

46.    In addition, as set forth in the Company's proxy statement, the Company has adopted the IRS§162(m) (Section 162(m) of the Tax Code, 26 U.S.C. §162) Performance Bonus Plan which permits the Company to deduct for federal income taxes purposes compensation paid under the Bonus Plan.   Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

47.    As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted; violated §162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and produced and disseminated to KLA shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants, rendering the Company's financial statements false and misleading.

48.     As a result of all of the foregoing, KLA has been damaged. KLA's stock price has declined over 20% or over $10 per share since news of the scandal first surfaced, and it will likely cost the Company millions of dollars to resolve the multiple stock option investigations and lawsuits.

49.     In addition, the Company and its shareholders were further injured in that Defendants' illegal conduct caused KLA to alter the terms of its offer to buy ADE, a maker of silicon wafer inspection equipment and to overpay for the acquisition.

50.     On February 23, 2006, KLA announced it was buying ADE in a stock-for- stock transaction. As KLA shares wilted over the investigation of improprieties concerning KLA's stock option grants, KLA was forced to change its purchase agreement from all stock to an all cash offer as announced on May 26, 2006 . As one commentator has noted, "I have to wonder whether the latest decline [in KLA's stock price] caused by that [Wall Street Journal] column finally pushed ADE's board to ask for a better deal. . . [KLA's offer] may be a higher price than it had to be."

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

51.     The Officer Defendants breached their fiduciary duties by, *inter alia*:

    a.    colluding with the Compensation Committee Defendants to improperly backdate dozens of grants of KLA stock options to KLA Chief Executive Officer Kenneth L. Schroeder and several other KLA executives, in violation of the Company's shareholder-approved stock option plans;

    b.    colluding with the Audit Committee Defendants to improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles and improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Tax Code;

    c.    colluding with the other Individual Defendants to produce and disseminate to KLA shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.    colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

52.    The Officer Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

53.    The Compensation Committee Defendants breached their fiduciary duties by, *inter alia*:

    a.    colluding with the Officer Defendants to backdate stock option grants;

    b.    colluding with the Officer Defendants and Audit Committee Defendants to violate GAAP and Section 162(m);

    c.    colluding with the other Individual Defendants to produce and disseminate to KLA shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.    colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

54.    The Compensation Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

55.    The Audit Committee Defendants breached their fiduciary duties by, *inter alia*:

    a.    colluding with the Officer Defendants to violate GAAP and Section 162(m);

    b.    colluding with the other Individual Defendants to produce and disseminate to KLA shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    c.    colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

56.    The Audit Committee Defendants' foregoing misconduct was not and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

57.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not

limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

58.　Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress Defendants' breaches of fiduciary duties and unjust enrichment.

59.　Plaintiff is an owner of KLA common stock and was an owner of KLA common stock at all times relevant hereto.

60.　Plaintiff will adequately and fairly represent the interests of the Company and its shareholders enforcing and prosecuting its rights.

61.　As a result of the facts set forth herein, plaintiff has not made any demand on the KLA Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

62.　The Board currently consists of 10 directors: defendants Schroeder, Levy, Tompkins, Barnholt, Bingham, Bond, Elkus, and Urbanek, and directors Michael E. Marks and Stephen P. Kaufman. The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

　　a.　Schroeder, Levy, and Tompkins, because they are directly interested in the improperly backdated stock option grants complained of herein;

　　b.　Urbanek, Barnholt, and Bond, because as members of the Compensation Committee they directly participated in and approved the improper backdating of stock options, as alleged herein, and face substantial likelihood of liability for their conduct. Moreover, by colluding with the Officer Defendants and others, as alleged herein, Urbanek, Barnholt, and Bond have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

　　c.　Bond, Elkus, and Bingham, because as members of the Audit Committee they directly participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein. Moreover, by colluding with the Officer Defendants and others, as alleged herein, Bond, Elkus, and Bingham have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

　　d.　Urbanek, Barnholt, Bond, Elkus, and Bingham, because as directors of the Company they directly participated in and approved the Company's filing of false financial statements and other SEC filings, as alleged herein.

Moreover, by colluding with the Officer Defendants and others, as alleged herein, Bond, Elkus, and Bingham have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

e.    If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which may underlie allegations against them in class action complaints for violations of the securities law, which admissions would impair their defense of any class actions filed and greatly increase any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defense they will likely assert in any securities class actions. This they will not do. Thus, demand is futile.

63.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.

64.    A true and correct copy of this complaint was delivered to KLA before being filed with this Court.

## FIRST CAUSE OF ACTION
### (Against All Individual Defendants for Breach of Fiduciary Duty)

65.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

66.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to refrain from unduly benefitting themselves and other Company insiders at the expense of the Company.

67.    As alleged in detail herein, the Officer Defendants, Compensation Committee Defendants, and the Audit Committee Defendants breached their fiduciary duties by:

a.    colluding to backdate stock option grants;

b.    colluding to violate GAAP and Section 162(m);

c.    colluding to produce and disseminate to KLA shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options;

d.    colluding to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options; and

e.    violating the provisions of the Company's own internal corporate governance guidelines, the Company's standards of business conduct and the Company's conflicts of interest policy.

DERIVATIVE COMPLAINT                    -13-

68.     Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

69.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

## SECOND CAUSE OF ACTION
### (Against All Individual Defendants)
### For Negligent Breaches of Fiduciary Duty

70.     Except to the extent plaintiff alleges intentional or reckless misconduct by any Defendant, plaintiff incorporates by reference all preceding and subsequent paragraphs if set forth fully herein.

71.     The Individual Defendants engaged in the aforesaid conduct without exercising the reasonable and ordinary care owed to the Company by directors, officers, managing agents and employees of a company.

72.     The Company and its shareholders have been injured by reason of the Individual Defendants' negligent breaches of their fiduciary duty.

## THIRD CAUSE OF ACTION
### (Against the Officer Defendants for Unjust Enrichment)

73.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

74.     The Officer Defendants were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

75.     To remedy the Officer Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

**FOURTH CAUSE OF ACTION**
(Against All Individual Defendants for Abuse of Control)

76.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

77.    Defendants' conduct constituted an abuse of their ability to control and influence KLA for which they are legally responsible.

78.    By reason of the foregoing, KLA has been damaged.

**FIFTH CAUSE OF ACTION**
(Against All Individual Defendants for Constructive Fraud)

79.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

80.    As a result of the conduct described above, Defendants have committed, or aided and abetted the commission of numerous representations to and concealed material facts from KLA despite Defendants' fiduciary duties to, *inter alia*, disclose the true facts regarding their stewardship of and their true intentions, and thus have committed and/or aided and abetted constructive fraud.

81.    For the purpose of maintaining and further entrenching themselves in their positions of power and control at KLA and to attempt to conceal their wrongdoing and continue to receive the substantial benefits and salaries associated with their positions, and with the intent to injure KLA, Defendants employed the above-detailed scheme and conspiracy to defraud. As a part of this scheme and conspiracy, Defendants actively made or concealed and/or participated in the making of or aided and abetted the making or perpetration of the concealment, numerous omissions and misrepresentations of facts to KLA. Said representations and statements were untrue and Defendants did not believe them to be true when made, or knowingly, willfully, and/or intentionally made them without regard to their truthfulness or aided and abetted the making of said misrepresentations. Said acts by these Defendants were fraudulent, oppressive, despicable and malicious.

82.    By reason of the foregoing, KLA has sustained, and will continue to sustain, irreparable injury for which it has no adequate remedy at law, and is also entitled to an award of punitive damages against Defendants.

83.    By reason of the foregoing, KLA has been damaged.

<div align="center">

**SIXTH CAUSE OF ACTION**
**(Against All Defendants for Gross Mismanagement)**

</div>

84.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

85.    As detailed more fully herein, Defendants had a duty to KLA to prudently supervise, manage and control KLA's operations.

86.    Defendants by their actions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing the assets of KLA in a manner consistent with the operations of a publicly-held corporation.

87.    By acting as alleged herein, Defendants breached their duties of due care and diligence in the management and administration of KLA's affairs and in the use and preservation of KLA's assets.

88.    As a proximate result thereof, KLA has been damaged.

**WHEREFORE,** Plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and statutory violations;

B.    Ordering the Officer Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized;

C.    Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

D.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury as to all issues so triable.

Dated: June 1, 2006

WEISS & LURIE

Jordan L. Lurie
Leigh A. Parker
Zev B. Zysman

By:     _____
        Jordan L. Lurie
        10940 Wilshire Boulevard, 23rd Floor
        Los Angeles, CA 90024
        Telephone: 310/208-2800
        Facsimile:  310/209-2348

*Attorneys for Plaintiff*

# EXHIBIT A

| KLA-Tencor Stock Options (1997 thru 2001) | | | |
|---|---|---|---|
| | Purported Grant Date | Number of Options[1] | Exercise Price |
| SCHROEDER | 07/31/97 | 62,500 | $60.5625 |
| | 08/31/98 | 102,136 | $21.2500 |
| | 10/23/98 | 110,364 | $33.9375 |
| | 10/27/99 | 150,000 | $33.7500 |
| | 08/13/00 | 75,800 | $44.6875 |
| | 11/10/00 | 37,900 | $26.2500 |
| | 04/04/01 | 37,900 | $32.7500 |
| | 10/02/01 | 341,100 | $29.3100 |
| LEVY | 07/31/97 | 62,500 | $60.5625 |
| | 08/31/98 | 102,136 | $21.2500 |
| | 10/23/98 | 110,364 | $33.9375 |
| | 10/27/99 | 90,000 | $33.7500 |
| | 08/13/00 | 37,901 | $44.6875 |
| | 11/10/00 | 18,951 | $26.2500 |
| | 04/04/01 | 18,951 | $32.7500 |
| | 10/02/01 | 28,425 | $29.3100 |
| TOMPKINS | 08/31/98 | 50,809 | $21.2500 |
| | 10/23/98 | 74,191 | $33.9375 |
| | 10/27/99 | 10,000 | $33.7500 |
| | 11/10/00 | 10,000 | $26.2500 |
| BOEHLKE | 07/31/97 | 33,500 | $60.5625 |
| | 08/31/98 | 54,435 | $21.2500 |

[1] Exercise prices and numbers of options are __not__ adjusted for the Company's 2-for-1 stock split effective January 19, 2000.

| KLA-Tencor Stock Options (1997 thru 2001) | | | |
|---|---|---:|---:|
| | 10/23/98 | 49,065 | $33.9375 |
| | 10/27/99 | 60,000 | $33.7500 |
| | | | |
| DICKERSON | 07/31/97 | 42,500 | $60.5625 |
| | 08/31/98 | 62,882 | $21.2500 |
| | 10/23/98 | 69,618 | $33.9375 |
| | 10/27/99 | 100,000 | $33.7500 |
| | 08/13/00 | 65,000 | $44.6875 |
| | 11/10/00 | 32,500 | $26.2500 |
| | 04/04/01 | 32,500 | $32.7500 |
| | 10/02/01 | 105,000 | $29.3100 |
| | | | |
| SCHNITZER | 08/31/98 | 54,435 | $21.2500 |
| | 10/23/98 | 49,065 | $33.9375 |
| | 10/27/99 | 50,000 | $33.7500 |
| | | | |
| KISPERT | 10/02/01 | 60,000 | $29.3100 |
| | | | |
| FORTINO | 10/02/01 | 45,000 | $29.3100 |

A & A LEGAL SERVICE 6506974640                    NO. 8658   P. 2

1
2                              **VERIFICATION**
3          I, JEFFREY A. RABIN, hereby verify that I have reviewed the Complaint and authorized
4   its filing and that the foregoing is true and correct to the best of my knowledge, information and
5   belief.
6
7   Dated: June ____, 2006
8                                                          JEFFREY A. RABIN
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT

1    LERACH COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2    SHAWN A. WILLIAMS (213113)
     MONIQUE C. WINKLER (213031)
3    AELISH M. BAIG (201279)
     100 Pine Street, Suite 2600
4    San Francisco, CA 94111
     Telephone: 415/288-4545
5    415/288-4534 (fax)
     swilliams@lerachlaw.com
6    mwinkler@lerachlaw.com
     abaig@lerachlaw.com
7
     Lead Counsel for Plaintiffs
8
     [Additional counsel appear on signature page.]
9
                        UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF CALIFORNIA
10                            SAN JOSE DIVISION

11   In re KLA-TENCOR CORP. SHAREHOLDER  )  No. C-06-03445-JW
     DERIVATIVE LITIGATION               )
12   _____     )  AMENDED CONSOLIDATED VERIFIED
                                         )  SHAREHOLDER DERIVATIVE
13   This Document Relates To:           )  COMPLAINT FOR VIOLATION OF THE
                                         )  FEDERAL SECURITIES LAWS AND
14        ALL ACTIONS.                   )  STATE LAW CLAIMS FOR BREACH OF
                                         )  FIDUCIARY DUTY, ABUSE OF
15   _____     )  CONTROL, CONSTRUCTIVE FRAUD,
     ALASKA ELECTRICAL PENSION FUND,     )  CORPORATE WASTE, UNJUST
16   Derivatively on Behalf of KLA-TENCOR )  ENRICHMENT, GROSS
     CORPORATION,                        )  MISMANAGEMENT, ACTION FOR
17                                       )  ACCOUNTING AND VIOLATION OF
                          Plaintiff,     )  CALIFORNIA CORPORATIONS CODE
18        vs.                            )
     KENNETH LEVY, KENNETH L.            )
19   SCHROEDER, RICHARD P. WALLACE,      )
     JOHN H. KISPERT, JEFFREY L. HALL, JON )
20   D. TOMPKINS, LIDA URBANEK, H.       )
     RAYMOND BINGHAM, ROBERT J.          )
21   BOEHLKE, ROBERT T. BOND, EDWARD     )
     W. BARNHOLT, STEPHEN P. KAUFMAN,    )
22   RICHARD J. ELKUS, JR., ARTHUR       )
     SCHNITZER, GARY DICKERSON, STUART   )
23   NICHOLS and LEO CHAMBERLAIN,        )
                                         )
24                        Defendants,    )
                                         )
25        – and –                        )
                                         )
26   KLA-TENCOR CORPORATION, a Delaware  )
     corporation,                        )
27                                       )
                          Nominal Defendant. )  DEMAND FOR JURY TRIAL
28   _____     )

**NATURE OF THE ACTION**

1.     This is a shareholder derivative action brought by Alaska Electrical Pension Fund, a shareholder of KLA-Tencor Corporation ("KLA-Tencor" or the "Company"), on behalf of the Company against its Board of Directors ("Board") and certain of its current and former senior executives (collectively, "Defendants").[1] This action seeks to remedy Defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement, arising out of a scheme and wrongful course of business whereby Defendants allowed senior KLA-Tencor insiders to divert hundreds of millions of dollars of corporate assets to themselves via the manipulation of grant dates associated with hundreds of thousands of stock options granted to KLA-Tencor insiders. During the period between 1995 and the present (the "Relevant Period"), each of the Defendants also participated in the concealment of the option backdating scheme complained of herein and/or refused to take advantage of the Company's legal rights to require these senior insiders to disgorge the hundreds of millions of dollars in illicitly obtained incentive compensation and proceeds diverted to them since 1995.

2.     During the Relevant Period, Defendants also caused KLA-Tencor to issue and file false and misleading statements with the Securities and Exchange Commission ("SEC"), including Proxy Statements filed with the SEC.

3.     The action seeks to remedy Defendants' violations of federal and California state law, including the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated therein and §14(a) of the Exchange Act, Cal. Corp. Code §§25402 and 25502.5, as well as breaches of fiduciary duties, abuse of control,

---

[1]     The "Individual Defendants" are Kenneth Levy ("Levy"), Kenneth L. Schroeder ("Schroeder"), Richard P. Wallace ("Wallace"), John H. Kispert ("Kispert"), Jeffrey L. Hall ("Hall"), Jon D. Tompkins ("Tompkins"), Lida Urbanek ("Urbanek"), H. Raymond Bingham ("Bingham"), Robert J. Boehlke ("Boehlke"), Robert T. Bond ("Bond"), Edward W. Barnholt ("Barnholt"), Stephen P. Kaufman ("Kaufman"), Richard J. Elkus, Jr. ("Elkus"), Arthur Schnitzer ("Schnitzer"), Gary Dickerson ("Dickerson"), Stuart Nichols ("Nichols") and Leo Chamberlain ("Chamberlain").

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 1 -

1   gross mismanagement, constructive fraud, waste of corporate assets, and unjust enrichment between

2   1995 and the present.

3       4.    Plaintiffs demand an accounting of all stock option grants made to Defendants during

4   times relevant hereto, the rescission of all contracts which provide for stock option grants between

5   any of the Defendants and KLA-Tencor, which were entered into during times relevant hereto, and a

6   declaration that the illicit stock options, and all proceeds derived from exercise thereof, are and have

7   been held in constructive trust for the Company's benefit.

8       5.    During the Relevant Period, the Company's executives and its non-employee

9   directors were compensated in large part through the issuance of stock options. A stock option

10  granted to an employee and/or director of a corporation allows the employee and/or director to

11  purchase company stock at a specified price – referred to as the "exercise price," typically the fair

12  market value of the stock on the date the option is granted.  When properly issued, stock options

13  serve as a valuable part of employee and/or director compensation packages as a means to create

14  incentives to boost profitability and stock value.  When the employee and/or director exercises the

15  option, he or she purchases the stock from the company at the exercise price, regardless of the

16  stock's price at the time the option is exercised.

17      6.    Dating back to at least 1996, the Defendants engaged in a scheme and course of

18  conduct designed to manipulate KLA-Tencor stock option grant dates so as to secretly maximize

19  profits to themselves and other Company executives at the expense of the Company and its

20  shareholders.  Specifically, the Defendants, the Board and senior officers at the Company approved

21  the granting of backdated/misdated stock options in abdication of their fiduciary duties.

22      7.    "Backdating"[2] is a practice by which a stock option is reported as having been

23  granted on one date, but is actually backdated weeks or months to a date where the stock price was

24  trading at a lower price.  Such backdating allows company executives and stock option grantees to

25

26  _____

    [2]    Plaintiffs' use of the terms "backdating," "misdating," "backdated" and "misdated"
27  throughout this Complaint may also refer to other forms of related stock option manipulation
    perpetrated by Defendants alleged in this action.

28

1    realize immediate unearned and undisclosed financial gains at the expense of the company's

2    shareholders. Backdating of stock option grants has been compared to picking lottery numbers on

3    the day after the winning numbers are announced, or betting on a horse after the race has finished.

4    Arthur Levitt, a former chairman of the SEC was quoted as stating that stock option backdating

5    "represents the ultimate in greed." Further, Levitt stated, "It is stealing, in effect. It is ripping off

6    shareholders in an unconscionable way." On May 5, 2006, President George W. Bush stated in an

7    interview on the Kudlow & Company show airing on CNBC that "overcompensating or trying to

8    backdate things is bad for America, and there ought to be consequences when people don't tell the

9    truth and are not transparent."

10       8.    In addition, former SEC Chairman Harvey Pitt recently opined that the backdating of

11    stock options often involves the falsification of documents for personal gain:

12       Many discussions of backdating options start with the observation that backdating is
         not, per se, illegal. That is wrong. *Options backdating frequently involves*
13       *falsification of records used to gain access to corporate assets. That conduct*
         *violates the Foreign Corrupt Practices Act and its internal controls requirements.*
14       *If corporate directors were complicit in these efforts, state law fiduciary obligations*
         *are violated.* Backdating is not only illegal and unethical, it points to a lack of
15       integrity in a company's internal controls.

16       9.    Furthermore, backdating stock options creates an instant paper gain to grantees who

17    receive them because the options were priced below the stock's fair market value when they were

18    actually awarded. Under Generally Accepted Accounting Principles ("GAAP"), this instant paper

19    gain is equivalent to paying extra compensation and thus is a cost to KLA-Tencor. Accordingly,

20    KLA-Tencor was required to record an expense to its financial statements for any options granted

21    below the fair market value on the grant date of the option, or "in the money" options. However, the

22    Defendants did not properly record these known costs on KLA-Tencor's financial statements,

23    causing KLA-Tencor's financial statements throughout the Relevant Period to be issued in violation

24    of GAAP. Specifically, these financial statements overstated reported earnings and understated

25    reported expenses.

26       10.   In addition to Defendants' clear breach of fiduciary duty and violation of accounting

27    rules, Defendants' backdating of stock options may have extremely serious tax consequences for the

28    Company. While stock options generally qualify for favorable tax treatment, options issued at a

1    discount to the market price do not qualify for that treatment. Accordingly, backdated stock options

2    are automatically disqualified from that favorable tax relief, and KLA-Tencor has now

3    acknowledged that it may owe millions of dollars in unpaid taxes.

4        11.    Defendants' conduct has already had severe consequences on the Company's

5    available assets and the credibility of its Board and executive leadership. The disruption to the

6    Company's business is and will continue to be immeasurable until the ongoing regulatory

7    investigations are complete, and the Company restates its many false and misleading financial

8    statements. Further, the Company is now the target of investigations by the SEC and the Department

9    of Justice ("DOJ") and is exposed to severe civil and criminal liability, including Internal Revenue

10   Service ("IRS") fines and back taxes.

11       12.    Apart from the knowing issuance of false and misleading representations in financial

12   reports, Defendants misrepresented facts presented in Form 14-A Proxy Statements soliciting action

13   by Company shareholders, and in press releases and documents filed with the SEC, specifically

14   quarterly and year-end reports.

15       13.    For example, throughout the Relevant Period, the Company described the purpose

16   and philosophy of the stock option and incentive program as necessary to align the long term

17   interests of executives with the that of the stockholders:

18           The goals of the Company's compensation policy are to attract, retain and reward
             executive officers who contribute to the overall success of the Company by offering
19           compensation that is competitive in the industry, to motivate executives to achieve
             the Company's business objectives and to align the interests of officers with the long
20           term interests of stockholders. The Company currently uses salary, a management
             incentive plan, and stock options to meet these goals.
21
22       14.    The Company also repeatedly and falsely represented that because stock options were

23   granted at market price on the date of the grant or fair market value on the date of the stock option

24   grants, the options only became valuable as the share price increased from the price on the date of

25   the grant:

26

27

28

1    *Stock options are granted at market price on the date of grant and will provide*
     *value to the executive officers only when the price of the Company's Common*
2    *Stock increases over the exercise price.*[3]

3        15.    During the Relevant Period, Defendants also caused the Company to falsely state that

4    it properly accounted for stock option issuance in accordance with Accounting Principles Board

5    ("APB") Opinion No. 25 as follows:

6        Stock-Based Compensation Plans

7        *The Company accounts for its stock option plans and employee stock purchase*
         *plan in accordance with provisions of the Accounting Principles Board's Opinion*
8        *No. 25 (APB OPINION NO. 25), "Accounting for Stock Issued to Employees."*
         *The Company's policy is to grant options at the fair market value on the date of*
9        *grant. Accordingly no compensation expense has been recorded.*

10       16.    Defendants also assured shareholders that the issuance of stock options and their

11   exercise would be in compliance with all applicable federal, state and foreign law with respect to the

12   securities at issue:

13       COMPLIANCE WITH SECURITIES LAW. The grant of Options and the issuance
         of shares of Stock upon exercise of Options shall be subject to compliance with all
14       applicable requirements of federal, state or foreign law with respect to such
         securities.
15

16       17.    At the same time that Defendants knowingly caused the Company to make these false

17   and misleading statements, Defendants knew but failed to disclose that the practices employed by the

18   Board allowed the stock option grants to be manipulated or *backdated* to dates when the Company's

19   shares were trading at or near the lowest price for that Relevant Period. By May 2006, Defendants'

20   backdating scheme had yielded stock option grants to the Company's executive officers worth

21   millions of dollars.

22       18.    In order to conceal the falsity of the Company's financial statements, representations

23   of the adequacy of its internal controls, and the fraudulent issuance and manipulation of the

24   Company's stock option grants, Defendants, through key executives and the Board's Compensation

25   ———————————————————

26   [3]     During the Relevant Period the Company issued stock options under several different stock
     option plans, including the 1982 Stock Option Plan, the 1990 Stock Option Plan, the 1993 Employee
27   Incentive Stock Option Plan, the 1998 Outside Director Stock Option Plan, the 2004 Equity
     Incentive Plan and the 2000 Non-Statutory Plan (hereinafter "Stock Option Plans").

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW        - 5 -

1    and Audit Committees, falsely assured shareholders that financial statements and associated

2    representations were accurate.  Indeed, during the Relevant Period, Defendants Schroeder and

3    Kispert each claimed that they had investigated and reviewed the Company's financial statements

4    and internal control processes and authorized their inclusion in the Company's public filings.

5    Between 2002 and 2005, both Schroeder and Kispert signed false certifications pursuant to

6    Sarbanes-Oxley §§302 and 906.  For example, Schroeder's Sarbanes-Oxley certification filed with

7    the Company's 2004 Form 10-K affirms:

8        I, Kenneth L. Schroeder certify that:

9        1.    I have reviewed this annual report on Form 10-K of KLA-Tencor
        Corporation;
10

11        2.    Based on my knowledge, *this report does not contain any untrue statement
        of a material fact or omit to state a material fact necessary to make the statements
        made, in light of the circumstances under which such statements were made, not
12        misleading with respect to the period covered by this report;*

13        3.    *Based on my knowledge, the financial statements*, and other financial
        information included in this report, *fairly present in all material respects the
14        financial condition, results of operations* and cash flows of the registrant as of, and
        for, the periods presented in this report;
15

16        4.    *The registrant's other certifying officer and I are responsible for
        establishing and maintaining disclosure controls and procedures (as defined in
        Exchange Act Rules* 13a-15(e) and 15d-15(e)) for the registrant *and have:*
17

18            a.    *designed such disclosure controls and procedures, or caused
            such disclosure controls and procedures to be designed under our
            supervision, to ensure that material information relating to the
19            registrant, including its consolidated* subsidiaries, is made known to
            us by others within those entities, particularly during the period in
20            which this report is being prepared;

21            b.    evaluated the effectiveness of the registrant's disclosure
            controls and procedures and presented in this report our conclusions
22            about the effectiveness of the disclosure controls and procedures, as
            of the end of the period covered by this report based on such
23            evaluation; and

24            c.    disclosed in this report any change in the registrant's internal
            control over financial reporting that occurred during the registrant's
25            most recent fiscal quarter (the registrant's fourth fiscal quarter in the
            case of an annual report) that has materially affected, or is reasonably
26            likely to materially affect, the registrant's internal control over the
            financial reporting; and
27

28        5.    *The registrant's other certifying officer and I have disclosed, based on our
        most recent evaluation of internal control over financial reporting, to the*

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW        - 6 -

1     *registrant's auditors and the audit committee* of the registrant's board of directors
    (or persons performing the equivalent functions):

2

3         a.    all significant deficiencies and material weaknesses in the
        design or operation of internal control over financial reporting which
        are reasonably likely to adversely affect the registrant's ability to

4         record, process, summarize and report financial information; and

5         b.    any fraud, whether or not material, that involves management
        or other employees who have a significant role in the registrant's

6         internal control over financial reporting.

7     19.    In fact, however, Defendants knew and failed to disclose that for years, the Company,

8 its senior executives and members of the Board, had been engaging in a continuing scheme and

9 course of conduct of backdating or misdating stock option grants to themselves and other executives

10 in a manner designed to create immediate and risk free profits in direct contravention of the

11 Company's stated and shareholder approved stock option plans and Proxy Statements.

12     20.    Furthermore, Defendants knew that because the Company had not taken a

13 compensation expense for backdated options required by APB Opinion No. 25, KLA-Tencor

14 reported earnings and expenses were false and misleading and not in compliance with GAAP. Thus,

15 by falsifying the date on which options were granted, Defendants materially understated KLA-

16 Tencor expenses, overstated its income and falsely represented that it had not incurred any expenses

17 for option grants.

18     21.    Defendants' misrepresentations and wrongful course of conduct violated the

19 Exchange Act, as well as California and Delaware law. By authorizing and/or acquiescing in the

20 stock option backdating scheme, Defendants: (a) caused KLA-Tencor to issue false statements; (b)

21 diverted hundreds of millions of dollars of corporate assets to themselves and KLA-Tencor

22 executives; and (c) subjected KLA-Tencor to liability from regulators including the SEC, the IRS

23 and federal prosecutors.

24     22.    Throughout the Relevant Period, however, Defendants knew but failed to disclose

25 that stock option grants had been manipulated in order to create secret and risk-free profits to grant

26 recipients, and that as a result, the Company repeatedly and materially overstated its net income and

27 understated its expenses.

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 7 -

Case 5:06-cv-03445-JW    Document 88    Filed 02/20/2007    Page 9 of 89

23.    Further, throughout the Relevant Period, Defendants knowingly and falsely assured shareholders that in addition to the certified internal controls, the Board had Compensation, Audit, and Nominating and Governance Committees in place to oversee the Company's compensation practices including stock option issuances, accounting practices and overall corporate governance policies.

## Compensation Committee

24.    During the Relevant Period, the Company made the following representations regarding the responsibilities of the Compensation Committee of the Board:

Compensation Committee

The Committee is comprised of three of the ***independent***, non-employee members of the Board of Directors, none of whom have interlocking relationships as defined by the Securities and Exchange Commission. The Committee is responsible for setting and administering the policies governing annual compensation of executive officers, considers their performance and ***makes recommendations regarding their cash compensation and stock options to the full Board of Directors***. The Committee periodically reviews its approach to executive compensation and makes changes as appropriate.

## Audit Committee

25.    During the Relevant Period, Defendants gave assurances with regard to the Audit Committee's practices in evaluating the Company's financial statements and that its outside auditors did a comprehensive review of the Company's audit practices before authorizing them to be included in public financial statements. For example, set forth below is the Company's September 25, 2002 Audit Committee Report:

*During fiscal year 2002, the Audit Committee met with the senior members of the Company's financial management team, the Company's independent auditors and the Company's General Counsel when appropriate. The Audit Committee also met separately with the Company's independent auditors and separately with the Company's Chief Financial Officer. The parties candidly discussed financial management, accounting and internal controls.*

\*    \*    \*

*The Audit Committee reviewed and discussed the audited financial statements included in the Company's Annual Report with the Companies management including, without limitation, a discussion of the quality and not just the acceptability of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements as well as in Management's Discussion and Analysis of Results of Operations and Financial Condition. . . .*

1                                    *      *      *

2      Based on the reviews and discussions referred to above, the Audit Committee
       recommended to the Board of Directors, and the Board of Directors approved, the
3      audited financial statements included in the Company's Annual Report for the fiscal
       year ended June 30, 2002, filed with the Securities and Exchange Commission on
4      September 20, 2002.

5      26.    The following chart illustrates the Board committee memberships between 1998-

6   2005:

7                    **Members of the Committees of the Board of Directors**

| Year | Compensation | Audit | Nominating and Governance |
|------|--------------|-------|---------------------------|
| 1998 | James Bagley<br>Leo Chamberlain<br>Lida Urbanek | Dean Morton<br>Dag Tellefsen<br>Samuel Rubinovitz | Edward Barnholt<br>Kenneth Levy<br>Jon Tompkins |
| 1999 | James Bagley<br>Leo Chamberlain<br>Lida Urbanek | Richard Elkus, Jr.<br>Samuel Rubinovitz<br>Dag Tellefsen | Edward Barnholt<br>Kenneth Levy<br>Dean Morton |
| 2000 | Edward Barnholt<br>Robert Bond<br>Lida Urbanek | Dean Morton<br>Richard Elkus, Jr.<br>Leo Chamberlain | Dean Morton<br>Kenneth Levy<br>Kenneth Schroeder<br>Edward Barnholt |
| 2001 | Edward Barnholt<br>Robert Bond<br>Lida Urbanek | Raymond Bingham<br>Richard Elkus, Jr.<br>Dean Morton | Dean Morton<br>Kenneth Levy<br>Kenneth Schroeder<br>Edward Barnholt |
| 2002 | Edward Barnholt<br>Robert Bond<br>Lida Urbanek | Raymond Bingham<br>Richard Elkus, Jr.<br>Dean Morton | Edward Barnholt<br>Kenneth Levy<br>Kenneth Schroeder |
| 2003 | Edward Barnholt<br>Robert Bond<br>Lida Urbanek | Raymond Bingham<br>Robert Bond<br>Richard Elkus, Jr.<br>Stephen Kaufman | Edward Barnholt<br>Richard Elkus |
| 2004 | Edward Barnholt<br>Robert Bond<br>Michael Marks<br>Lida Urbanek | Raymond Bingham<br>Robert Bond<br>Richard Elkus, Jr.<br>Stephen Kaufman | Edward Barnholt<br>Kenneth Levy<br>Kenneth Schroeder |
| 2005 | Edward Barnholt<br>Robert Bond<br>Michael Marks<br>Lida Urbanek | Raymond Bingham<br>Robert Bond<br>Richard Elkus, Jr.<br>Stephen Kaufman | Edward Barnholt<br>Richard Elkus<br>Stephen Kaufman |

24     27.    Finally, at the same time that Defendants were secretly issuing themselves and other

25   KLA-Tencor executives backdated stock options and falsifying the Company's financial statements,

26

27

28

the Insider Selling Defendants unloaded millions of shares of KLA-Tencor stock for a total of more than *$246 million* in insider trading proceeds:[4]

| DEFENDANT | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
|---|---|---|---|
| BARNHOLT | 12/10/04 – 11/18/05 | 29,000 | $1,432,675 |
| BINGHAM | 11/22/05 | 5,000 | $263,100 |
| BOEHLKE | 8/1/97-3/3/00 | 352,400 | $14,136,330 |
| BOND | 09/13/05 | 5,000 | $253,050 |
| CHAMBERLAIN | 12/14/95 – 1/18/00 | 81,764 | $4,839,107 |
| ELKUS | 8/6/99 – 11/29/05 | 155,416 | $7,022,474 |
| HALL | 12/03/04 – 11/18/05 | 12,300 | $607,060 |
| KISPERT | 01/18/00 – 09/15/05 | 341,500 | $20,156,845 |
| LEVY | 04/30/96 – 02/27/06 | 2,285,651 | $111,476,225 |
| NICHOLS | 4//24/01 – 4/30/02 | 21,614 | $1,155,276 |
| SCHROEDER | 05/08/97 – 02/08/06 | 1,249,800 | $64,336,289 |
| SCHNITZER | 5/28/97-3/10/00 | 471,644 | $26,807,656 |
| TOMPKINS | 07/31/97 – 08/29/05 | 670,049 | $31,565,583 |
| URBANEK | 12/14/01 – 02/27/06 | 9,149 | $448,324 |
| WALLACE | 08/05/99 – 12/03/03 | 292,499 | $15,547,430 |
| TOTAL | | 5,003,326 | $259,103,438 |

**Illegal Backdating Forces KLA-Tencor to Restate Years of Financial Statements**

28.    On May 16, 2006, the Center for Financial Research and Analysis issued a report: "Options Backdating – Which Companies Are at Risk?" The report also identified the risks for companies that have taken part in options backdating:

• SEC investigation risk – The SEC has begun informal investigations at many companies in recent months and has also begun to call for improved disclosure around all areas of executive compensation.

• Accounting restatement risk – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

• Tax/Cash implications – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

• Management credibility risk – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholders, the reputation of management (and the related stock premium for superior management) could take a hit.

---

[4]    The "Insider Selling Defendants" are Barnholt, Bingham, Boehlke, Bond, Chamberlain, Elkus, Hall, Kispert, Levy, Nichols, Schroeder, Schnitzer, Tompkins, Urbanek, and Wallace.

1    29.    On May 22, 2006, *The Wall Street Journal* reported that KLA-Tencor had shown

2  questionable patterns surrounding the timing of option grants to its executives.  Later the same day,

3  it was disclosed that U.S. federal prosecutors were investigating executive stock option grants at

4  KLA-Tencor.  These disclosures caused KLA-Tencor's stock to close down $4.70 per share on

5  extremely high volume at $40.54 on May 22, 2006 – a one day decline of 10.4%.

6    30.    On May 24, 2006, the Company announced that it had received subpoenas from the

7  United States Attorneys' Offices in New York and California.  In addition, the Company had formed

8  a Special Committee of "independent" directors to investigate the timing of stock option grants

9  between 1995-2001:

10    **KLA-Tencor Announces Formation of Special Committee to Investigate Stock**
       **Option Practices**

11

12    SAN JOSE, Calif., May 24, 2006 – KLA/Tencor Corporation (NASDAQ: KLAC)
       today announced that its Board of Directors has appointed a special committee of
       independent directors to conduct an internal investigation relating to past stock

13    options granted to employees during the 1995 to 2001 timeframe.  The special
       committee is investigating the timing of such grants and related accounting and

14    documentation and will be assisted by outside legal counsel and accounting experts.

15    KLA-Tencor also said that it has received subpoenas from the U.S. Attorney's
       Offices for the Eastern District of New York and Northern District of California

16    requesting information related to its past stock option grants. . . .

17    31.    As a result of the sharp decline in KLA-Tencor's stock price due to its involvement in

18  the ongoing option granting scandal, KLA-Tencor was forced to renegotiate its deal to acquire ADE

19  Corporation ("ADE").  On May 26, 2006, the Company announced that it had amended a merger

20  agreement it had previously entered into with ADE to acquire ADE in a stock-for-stock transaction

21  valued at approximately $488 million.  Under the agreement, KLA-Tencor would issue 0.64 share of

22  KLA-Tencor per one share of ADE.  This calculation was based upon the closing price of KLA-

23  Tencor stock for February 22, 2006 of $51.73.  Due to the sharp decline in the value of KLA-

24  Tencor's stock, KLA-Tencor was forced to change the terms of its agreement with ADE into an all-

25  cash transaction instead of a stock-for-stock transaction. On May 26, 2006, KLA-Tencor announced

26  that it had amended its agreement with ADE from a stock-for-stock transaction to an all-cash

27  transaction and that it had agreed to pay $32.50 *in cash* per share of ADE stock.  KLA-Tencor's

28  stock closed at $40.62 per share on May 26, 2006 – a 21.5% decline from February 22, 2006.

1      32.    On May 30, 2006, KLA-Tencor announced that it received notice from the SEC of an

2  informal inquiry relating to past stock option grants.

3      33.    On June 30, 2006, KLA-Tencor issued a press release to report the preliminary

4  conclusion of its Special Committee with respect to its ongoing internal investigation relating to past

5  stock option grants, the timing of such grants and related accounting and documentation. The

6  preliminary report found that the measurement date for certain option grants indeed likely differed

7  from the recorded date of the grants. The Company further indicated that it would likely have to

8  restate its financials to correct improperly reported compensation expenses.

9      [A] *Special Committee of the Company's Board of Directors has reached a*

10  *preliminary conclusion that the actual measurement dates for financial accounting*
   *purposes of certain stock option grants issued in prior years likely differ* from the
   recorded grant dates of such awards. The Special Committee has not completed its

11  investigation and is continuing its review of these matters. The Special Committee
   has not yet determined whether any resulting compensation charges are material or

12  whether the Company ultimately will restate previously issued financial statements.

13  The Company previously announced that its Board of Directors has appointed a
   Special Committee of independent directors to conduct an internal investigation

14  relating to stock options granted to members of senior management and the
   employees of the Company. The Special Committee, assisted by independent legal

15  counsel and accounting experts, is investigating the timing of such grants, as well as
   their related accounting treatment.

16

17  *Based on the Special Committees investigation to date, the Company now*
   *anticipates that it may record additional non-cash charges for stock-based*

18  *compensation expense.* The Company has not yet determined the amount of such
   charges or the resulting tax impact of these actions. *In the event that the Company*
   *determines that these items are material, KLA-Tencor may be required to restate its*

19  *financial statements for the relevant prior fiscal periods.*

20      34.    On July 27, 2006, KLA-Tencor issued a press release announcing that as a result of

21  the on-going internal investigation relating to stock option grants previously disclosed on May 24,

22  2006, the Company would be unable to provide detailed GAAP financials for items other than

23  revenue and bookings for the quarter or year ended June 30, 2006. The Company also disclosed that

24  it would not file its annual report on Form 10-K.

25      35.    On September 14, 2006, the Company announced that it received a NASDAQ Staff

26  Determination notice indicating that the Company is not in compliance with the filing requirements

27  for continued listing as set forth in NASDAQ Marketplace Rule 4310(c)(14) and that its common

28  stock is subject to delisting from the NASDAQ Global Select Market:

| | |
|---|---|
| 1 | **KLA-Tencor Delays Filing Form 10-K and Receives Notice from Nasdaq** |
| 2 | \*      \*      \* |
| 3 | As a result of the delayed filing of the Company's Form 10-K, the Company today |
| 4 | received a NASDAQ Staff Determination notice indicating that the Company is not in compliance with the filing requirements for continued listing as set forth in NASDAQ Marketplace Rule 4310(c)(14) and that its common stock is subject to |
| 5 | delisting from the NASDAQ Global Select Market. . . . |

36.     On September 28, 2006, the Company issued a press release stating that it would restate publicly reported financial statements due to the backdating/misdating of stock options and that all of its financial statements issued since July 1997 should no longer be relied upon. Moreover, the Company stated that its restatement could reduce previously reported net income and increase previously reported losses during the Relevant Period:

**KLA-Tencor Will Restate Financial Statements Related to Stock Options**

*SAN JOSE, Calif., September 28, 2006 -- KLA-Tencor Corporation (NASDAQ: KLAC) today announced that it will restate* previously issued financial statements to correct the Company's past accounting for stock options. Based on a report received from a Special Committee of the Board of Directors, *the Board concluded that incorrect measurement dates for certain stock option grants were used for financial accounting purposes, principally during the periods July 1, 1997 through June 30, 2002. As a result, the Company will be required to record non-cash charges for compensation expenses relating to those past stock option grants.*

The Company has not determined the exact amount of such charges, the resulting tax and accounting impact, or which specific reporting periods may require restatement. *Accordingly, the Company is filing a Form 8-K today stating that the financial statements and all earnings and press releases and similar communications issued by the Company relating to periods beginning on or after July 1, 1997, should no longer be relied upon. KLA-Tencor intends to file its restated financial results and Annual Report on Form 10-K as quickly as practicable.*

KLA-Tencor does not anticipate that the restatement will have any impact on the Company's historical revenues. *Any stock-based compensation charges incurred as a result of the restatement would have the effect of decreasing reported income or increasing reported loss from operations, and decreasing reported net income or increasing reported net loss, and decreasing reported retained earnings amounts contained in the Company's historical financial statements for the affected periods.*

37.     On October 3, 2006, the Company filed a Form 8-K with the SEC further detailing the findings of the Special Committee and specifically stating that the measurement dates and the grant dates for stock options issued during the Relevant Period materially differed and the Company would indeed restate seven years of financial statements:

A Special Committee of the Board of Directors of KLA-Tencor Corporation (the "Company") has delivered a report to the Board of Directors, which concluded that incorrect measurement dates were used for certain stock option grants made principally during the period from July 1, 1997 through July 30, 2002. The Board of Directors of the Company has not concluded its evaluation of the factors that led to the use of incorrect measurement dates of stock options. The Board of Directors has concluded that the Company will need to restate certain of its historical financial statements to record non-cash charges for compensation expenses relating to past stock option grants. *The Company has not determined the amount of such charges, the resulting tax and accounting impacts, the impact on internal control over financial reporting, or which specific periods may require restatement. However, the effects on previously reported financial statements are expected to be material.* The Special Committee and the Board of Directors will continue to be actively involved in reviewing information and determining the appropriate actions to be taken by the Company with respect to this matter.

*Accordingly, on September 27, 2006, the Board of Directors concluded that financial statements and all earnings and press releases and similar communications issued by the Company relating to periods beginning on or after July 1, 1997, should no longer be relied upon, including the Company's financial statements for fiscal years 1998 through 2005, the interim periods contained therein, and the fiscal quarters ended* September 30, 2005, December 31, 2005 and March 31, 2006. The Company's management and the Special Committee have discussed this matter with PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm.

38.    The same Form 8-K stated that the Company had taken steps to restrict or freeze the exercise and sale of any stock options during the period that the investigation was ongoing and imposing a "blackout" period on the acquisition of any shares under the stock option plans.

On September 27, 2006, KLA-Tencor Corporation (the "Company") determined that its historical financial statements for one or more prior fiscal years will have to be restated as a result of improper accounting for option grants made to officers and employees. *The specific fiscal years which will need to be restated has yet been determined. However, the Company has decided to suspend temporarily employee participation in several equity incentive programs because the S-8 registration statements covering the shares of common stock issuable under those programs incorporate one or more financial statements that will likely have to be restated.* As part of such suspension, participants in the Company's 401(k) Plan (the "401(k) Plan") will be subject to a blackout period during which they will be precluded from acquiring shares of the Company's common stock under that plan.

39.    On October 16, 2006, the Company announced that the Special Committee's investigation had concluded that the Company would have to restate a *whopping $400 million in compensation expense.* Moreover, the Company specifically implicated defendant Schroeder in the scheme, terminating all relationships with Schroeder immediately.    Schroeder had been the Company's President and Chief Operating Officer ("COO"), Chief Executive Officer ("CEO") and a member of the Board between 1995-2005. The Company also fired its General Counsel, defendant

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 14 -

1  Nichols. In addition, the Company canceled all backdated stock options held by defendant

2  Schroeder and repriced options held by Nichols:

3  **KLA-Tencor Announces Results of Special Committee Investigation of Historical Stock Option Practices**

4

5  Stock-Based Compensation Expenses Not Expected to Exceed $400 Million

6  SAN JOSE, California, October 16, 2006 KLA -- Tencor Corporation (NASDAQ: KLAC) today announced that the Special Committee investigation of the Company's historical stock option practices has been substantially completed. As previously

7  announced, the Company's Board of Directors concluded that incorrect measurement dates for certain stock option grants were used for financial accounting purposes,

8  principally during the period July 1, 1997 through June 30, 2002, and as a result, the Company will restate its financial statements to correct the accounting for

9  retroactively priced stock options. *The Company now anticipates that the total additional non-cash charges for stock-based compensation expenses will not*

10  *exceed $400 million.*

11  *As a result of the investigation, the Company has terminated all aspects of its employment relationship with Kenneth L. Schroeder, effective immediately.*

12  *Mr. Schroeder was President and Chief Operating Officer of the Company from 1991 to 1999 and Chief Executive Officer and a member of the Board of Directors*

13  *from 1999 through 2005.*

14  *The Company also announced that its General Counsel, Stuart J. Nichols, has resigned, effective immediately. Mr. Nichols had been Vice President and General*

15  *Counsel of the Company since 2000. . . .*

16  *The Company further announced its intention to cancel all outstanding retroactively priced stock options held by Mr. Schroeder and to re-price all*

17  *outstanding retroactively priced stock options held by Mr. Nichols. The exercise price of each re-priced option will be increased to the fair market value on the*

18  *corrected measurement date.*

19    40.    The Company also indicated that it had found no wrongdoing by current members of

20  management (though Levy simultaneously "retired"), but repriced options held by Kispert because

21  he was the Chief Financial Officer ("CFO") during the Relevant Period and likely received

22  backdated stock options.

23  Based on the Special Committee's investigation, the Board of Directors concluded that there was no involvement in the improper stock option practices by any current

24  members of Company management, including Richard P. Wallace, John H. Kispert and Jeffrey L. Hall, who became Chief Executive Officer, Chief Operating Officer

25  and Chief Financial Officer, respectively, in early 2006. *Although the Board of Directors concluded that Mr. Kispert was not involved in the improper stock option*

26  *practices, based on the Special Committee's recommendation, his outstanding retroactively priced options will be re-priced* (in the manner described above)

27  because he served as Chief Financial Officer during part of the period in question. While the Company is evaluating whether the factors that led to the restatement

28  constituted a material weakness as of June 30, 2006, *the Company believes that it*

1  *has in place the necessary internal controls to ensure proper accounting for stock*
2  *options going forward.*

3  The Special Committee will now concentrate its efforts on assisting the Company's management with the restatement of the Company's affected financial statements. The restatement process is well underway, and the Company will continue to work
4  diligently to determine the exact amount of additional non-cash charges for stock-based compensation expenses, the resulting accounting and tax impact, and the
5  specific prior periods requiring restatement, and to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2006, as well as other required reports, as
6  soon as practicable.

7  41.    On October 17, 2006, the Company announced additional executive departures due to

8  the options backdating scandal, specifically, the Company's long-time Chairman of the Board and

9  founder, defendant Levy.  The Company further admitted that defendant Levy also received

10  backdated stock options and that the Company would reprice stock options that he received as part

11  of the scheme:

12  **KLA-Tencor Announces Retirement of Board Chairman Kenneth Levy**

13              *       *       *

14  SAN JOSE, California, October 17, 2006 -- KLA-Tencor Corporation (NASDAQ: KLAC) today announced that Kenneth Levy, Founder and Chairman of the Board,
15  has informed the Company that he is retiring as a Director and employee, effective immediately.  Mr. Levy was a member of the Board of Directors of the Company
16  since 1975, Chairman of the Board since 1999, and Chief Executive Officer from 1975 to 1997 and from mid 1998 to mid 1999.
17

18              *       *       *

19  *The Company separately announced results of the investigation by the Special Committee of the Board of Directors of the Company's historical stock option practices.  Based upon that investigation, the Company intends to re-price all*
20  *outstanding retroactively priced options by Mr. Levy and certain other former and current executives of the Company.  The exercise price of each re-priced option*
21  *will be increased to the fair market value on the corrected measurement date.*

22  42.    On November 15, 2006, the Company announced that it was still unable to file its

23  financial statements and had received yet another notice from NASDAQ of its non-compliance.

24  43.    On January 29, 2007, the Company filed its form 10-K for the fiscal year ending

25  June 30, 2006 with the SEC. The form 10-K included restated financials statement covering 1994-

26  2006. In addition, the Company admitted that the during the Special Committee's investigation they

27  indeed discovered that stock options had been retroactively priced for all employees who received

28  grants:

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 16 -

Case 5:06-cv-03445-JW    Document 88    Filed 02/20/2007    Page 18 of 89

1    As a result of an investigation of our historical stock option practices by a Special
2    Committee of our Board of Directors . . . we discovered that certain of our stock
     options, primarily those granted from July 1, 1997 to June 30, 2002, had been
3    retroactively priced for all employees who received these grants (less than 15% of
     these options were granted to executive officers). This means that the option
4    exercise price was not the market price of the option shares on the actual grant
     date of the option, but instead was a lower market price on an earlier date.

5    The actual grant date—when the essential actions necessary to grant the option
     were completed, including the final determination of the number of shares to be
6    granted to each employee and the exercise price—is the correct measurement date
     to determine the market price of the option shares under the accounting rules in
7    effect at the time. More than 95% of the total in-the-money value (market price on
     the actual grant date minus exercise price) of all of our retroactively priced options
8    was attributable to those granted from July 1, 1997 to June 30, 2002.

9        44.    In addition to admitting that option grants had been backdated during the Relevant

10   Period, the Company, in its January 29, 2007 form 10-K, admitted that the Company had failed to

11   properly apply APB Opinion No. 25 which requires that a compensation expense be taken for

12   options whose exercise price is lower that the market price on the date of the grant, thus requiring

13   restatement of $348 million for the period of 1994-2005 compensation expense:

14   Because each of our retroactively priced options had an exercise price below the
     market price on the actual grant date, there should have been a charge for each of
15   these options under APB Opinion No. 25 equal to the number of option shares,
     multiplied by the difference between the exercise price and the market price on the
16   actual grant date. That expense should have been amortized over the vesting period
     of the option. Starting in our fiscal year ended June 30, 2006, we adopted SFAS
17   No. 123(R), "Share-Based Payment." As a result, for fiscal year 2006, the
     additional stock-based compensation expense required to be recorded for each
18   retroactively priced option was equal to the incremental fair value of these options
     on the actual grant date over the remaining vesting period of the option. We did
19   not record these stock-based compensation expenses under APB Opinion No. 25 or
     SFAS No. 123(R) related to our retroactively priced options in our previously
20   issued financial statements, and that is why we are restating them in this filing.

21   To correct our past accounting for stock options, we recorded additional pre-tax,
     non-cash, stock-based compensation expense of (a) $348 million for the periods
22   July 1, 1994 to June 30, 2005 under APB Opinion No. 25 and (b) $22 million for
     the year ended June 30, 2006 under SFAS No. 123(R). We expect to amortize an
23   additional $6 million of such pre-tax charges under SFAS No. 123(R) in future
     periods to properly account for past retroactively priced option grants.
24

25       45.    The Company further detailed the Special Committee's findings, including its

26   findings that the retroactive price of stock options was intentional and involved the falsification of

     Company records, and the 10-K revealed that "Management reviewed the findings of the Special
27

28   Committee and conducted its own internal review of our past stock option grants and other aspects

     AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
     VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 17 -

1    of our historical financial statements. Management agrees with the Special Committee . . . ." The

2    10K detailed their findings as follows:

3        *By October 16, 2006, the Special Committee had substantially completed its*
         *investigation. The Special Committee concluded that*

4

5            *(1) there was retroactive pricing of stock options granted to all employees*
         *who received options, primarily during the periods from July 1, 1997 to June 30,*
         *2002 (less than 15% of these options were granted to executive officers),*

6

7            *(2) the retroactively priced options were not accounted for correctly in our*
         *previously issued financial statements,*

8            *(3) the retroactive pricing of options was intentional, not inadvertent or*
         *through administrative error,*

9

10           *(4) the retroactive pricing of options involved the selection of fortuitously*
         *low exercise prices by certain former executive officers, and other former*
         *executives may have been aware of this conduct,*

11

12           *(5) the retroactive pricing of options involved the falsification of Company*
         *records, resulting in erroneous statements being made in financial and other*
         *reports previously filed with the SEC, as well as in information previously provided*

13       *to our independent registered public accounting firm, and*

14           *(6) in most instances, the retroactive pricing of options violated the terms of*
         *our stock option plans. Because virtually all holders of retroactively priced options*

15       *issued by the Company were not involved in or aware of the retroactive pricing, the*
         *Board of Directors decided that we should continue to honor the options that*

16       *violated the terms of our stock option plans, except in certain individual cases as*
         *described below.*

17

18       *The Special Committee concluded that, with a few immaterial exceptions, the*
         *retroactive pricing of stock options stopped after June 30, 2002. After that time,*
         *there were procedures in place designed to provide reasonable assurance that stock*

19       *options were priced on the grant date. The Special Committee also concluded that*
         *none of our independent Directors was involved in or aware of the retroactive*

20       *pricing of stock options. Based on the Special Committee's report, our Board of*
         *Directors concluded that no current members of management were involved in the*

21       *retroactive pricing of stock options. During its investigation of our historical stock*
         *option practices, the Special Committee did not find evidence of any other financial*

22       *reporting or accounting issues.*

23       46.    With respect to certain individuals alleged herein to have either participated in the

24   issuance of or received backdated stock options, the Company made the following disclosures with

25   respect to Defendants Levy, Schroeder, Nichols, Kispert, Tomkins and Wallace. More specifically,

26   the Company cancelled all outstanding stock options to held by Schroeder and repriced stock options

27   that were issued to defendants Levy, Nichols, Tomkins, Wallace and Kispert:

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW        - 18 -

1

2    <u>Schroeder</u>

3    *As a result of the Special Committee investigation, on October 16, 2006, we terminated our employment relationship and agreement with Kenneth L. Schroeder, and we announced our intent to cancel all outstanding stock options held by Mr. Schroeder that were retroactively priced or otherwise improperly granted. Those options [596, 740] were canceled in December 2006. . . .*

4

5    . . . Accordingly, in the second quarter of fiscal 2007 we will reverse approximately $20 million of the non-cash, stock-based compensation charge recorded in prior periods. In December 2006, we canceled 596,740 vested option shares held by Mr. Schroeder as of the time of termination, representing those shares that had been retroactively priced or otherwise improperly granted.

6

7

8    <u>Nichols</u>

9    Also on October 16, 2006, Stuart J. Nichols, Vice President and General Counsel, resigned. Mr. Nichols and we entered into a Separation Agreement and General Release under which *Mr. Nichols' outstanding retroactively priced stock options have been re-priced by increasing the exercise price to the market price of the option shares on the actual grant date.*

10

11

12    <u>Levy</u>

13    On October 16, 2006, Kenneth Levy, Founder and Chairman of the Board of Directors of the Company, retired as a director and employee, and was named Chairman Emeritus by our Board of Directors. *Mr. Levy and we entered into a Separation Agreement and General Release under which Mr. Levy's outstanding retroactively priced stock options have been re-priced by increasing the exercise price to the market price of the option shares on the actual grant date.*

14

15

16

17    <u>Tompkins</u>

18    On December 21, 2006, Jon D. Tompkins resigned as a director of the Company, and we agreed to modify the outstanding options held by Mr. Tompkins (all of which were fully vested) to extend the post-termination exercisability period to December 31, 2007, which is the last day of the calendar year in which those options would have terminated in the absence of such extension. . . .

19

20

21    <u>Kispert</u>

22    Although the Board of Directors concluded that John H. Kispert, our President and Chief Operating Officer, was not involved in and was not aware of the improper stock option practices, *based on the Special Committee's recommendation, his outstanding retroactively priced stock options have been re-priced because he served as Chief Financial Officer during part of the period in question. This re-pricing involved increasing the exercise price to the market price of the option shares on the actual grant date.*

23

24

25

26    47.    Finally, with respect to the some of the tax implications caused by the backdated

27    stock options and the Company's failure to properly account for them, the Company stated that it

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW        - 19 -

1    will pay bonuses to defendant Wallace and to non officers to address adverse consequences of

2    backdated stock options:

> Three of the Company's option holders were subject to the December 31, 2006 deadline described above. Accordingly, in December 2006, the Company offered to amend the 409A Affected Options held by Mr. Wallace, the Company's Chief Executive Officer, and two former executive officers to increase the exercise price so that these options will not subject the option holder to a penalty tax under IRC Section 409A. All three individuals accepted the Company's offer. In addition, the Company agreed to pay each of the three individuals a cash bonus in January 2008 equal to the aggregate increase in the exercise prices for his amended options. For Mr. Wallace, the amount of this bonus is $0.4 million. The Company plans to take similar actions with respect to the outstanding 409A Affected Options granted to non-officers as soon as possible after the filing of this Report. The Company estimates that the total cash payments needed to deal with the adverse tax consequences of retroactively priced options granted to non-officers will be approximately $30 million.

> With respect to the individuals whose options were canceled or re-priced by the Company following the Special Committee investigation, no bonuses of the type described above will be paid.

48.    Defendants' gross mismanagement and malfeasance over the past decade has exposed KLA-Tencor and its senior executives to criminal and civil liability for issuing false and misleading financial statements. Specifically, Defendants caused or allowed KLA-Tencor to issue statements that failed to disclose or misstated the following: (a) that the Company had material weaknesses its internal controls that prevented it from issuing accurate financial reports and projections; (b) that because of improperly recorded stock-based compensation expenses, the Company's financial results violated GAAP; and (c) that the Company's public disclosures presented an inflated view of KLA-Tencor's earnings and earnings per share ("EPS").

49.    Defendants' malfeasance and mismanagement during the Relevant Period has wreaked millions of dollars of damages on KLA-Tencor. The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds. Defendants' breach of fiduciary duties in the administration of the Company's stock option plans so polluted the plans with grant date manipulations as to void all grants made pursuant to the plans. Meanwhile, certain of the Defendants, who received under-priced stock options and/or knew material non-public information regarding KLA-Tencor's internal control problems, abused their fiduciary relationship

1   with the Company by selling over $259 million worth of their personally held shares at artificially

2   inflated prices during the Relevant Period. This action seeks recovery for KLA-Tencor against these

3   faithless fiduciaries, as KLA-Tencor's Board, as currently composed, is simply unable or unwilling

4   to do so as more fully set in the Derivative Demand Futility Allegations, *infra*, ¶¶165-169.

5       50.    At the time the first derivative action was commenced, the KLA-Tencor Board

6   consisted of nine directors: Levy, Barnholt, Wallace, Kaufman, Urbanek, Bond, Tompkins, David

7   Wang ("Wang") and Bingham. Eight of these directors are incapable of independently and

8   disinterestedly considering a demand to commence and vigorously prosecute the derivative actions:

9           (a)    Defendants Levy, Tompkins and Wallace are incapable because they received

10  backdated stock options, and they are directly interested in the improperly backdated stock option

11  grants complained of herein, as recipients thereof. These defendants also sold hundreds of thousands

12  of shares of KLA-Tencor stock for millions of dollars in insider trading proceeds (*see supra*, ¶27);

13          (b)    Bond, Barnholt and Urbanek are incapable because, as members of the

14  Compensation Committee, each directly participated in and approved the improper backdating of

15  stock options, as alleged herein, or misrepresented and falsely assured the Company shareholders

16  that KLA-Tencor stock options were issued at fair market value on the date of the grant. They

17  indeed were the Board members who purported but failed to *"review[] . . . the Company's executive*

18  *compensation policy and administer[] the Company's . . . equity benefit plan"* under which stock

19  options were granted. Moreover, by colluding with Defendants and others, as alleged herein, Bond,

20  Barnholt and Urbanek have demonstrated that they are unable and unwilling to act independently of

21  Defendants; and

22          (c)    All of the members of the Audit Committee, including Bingham, Bond and

23  Kaufman, are incapable because as veteran members of the Audit Committee, they directly

24  participated in and approved the Company's knowing violations of GAAP and IRS Code §162(m),

25  as alleged herein. Defendant Bingham was represented to shareholders as being a "financial expert,"

26  and has been Chairman of the Audit Committee for the last five years. Moreover, by colluding with

27  Defendants and others, as alleged herein, Bingham, Bond and Kaufman have demonstrated that they

28  are unable and unwilling to act independently of Defendants.

**INTRADISTRICT ASSIGNMENT**

51.    A substantial part of the events or omissions which give rise to the claims in this action occurred in the county of Santa Clara, and as such this action is properly assigned to the San Jose division of this Court.

**JURISDICTION AND VENUE**

52.    The claims asserted herein arise under §§10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78n(a) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, and under California and Delaware law for violations of breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

53.    This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §§1331 and 1337. This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

54.    This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

55.    Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. KLA-Tencor is located in and conducts its business in this District. Further, Defendants conduct business in this District, and are citizens of California and reside in this District.

**PARTIES**

56.    Plaintiff Alaska Electrical Pension Fund is, and at times relevant hereto was, a shareholder of nominal party KLA-Tencor. During the Relevant Period, the Company had more than 500 shareholders of record.

57.    Nominal party KLA-Tencor is a supplier of process control and yield management solutions for the semiconductor and related microelectronics industries. The Company's portfolio of

1    products, software, analysis, services and expertise is designed to help integrated circuit

2    manufacturers manage yield throughout the entire fabrication process, from research and

3    development to final mass-production yield analysis. The Company was founded in July 1975 as

4    KLA Instruments Corporation. In May 1997, KLA Instruments merged with Tencor Instruments –

5    another longtime leader in semiconductor industry – and changed its name to KLA-Tencor.

6        58.    Defendant Levy has been Chairman of the Board of KLA-Tencor since July 1999.

7    Levy is the founder of KLA Instruments and at all times has served as a director of the Company.

8    Levy served as the CEO of KLA Instruments from its inception until its merger with Tencor

9    Instruments in May 1997. From July 1998 to June 1999, Levy served as CEO of KLA-Tencor. At

10   all relevant times, Levy actively participated in the management of KLA-Tencor's daily business

11   affairs and finances. He also actively participated in the preparation, review and approval of KLA-

12   Tencor's publicly reported financial results and financial statements for Fiscal Years ("FY")[5] 1995-

13   2005, as well as the corresponding reports on SEC Form 10-K and press releases. By reason of his

14   executive positions with the Company, Board membership and ownership of KLA-Tencor stock,

15   Levy was a controlling person of KLA-Tencor and had the power and influence, and exercised the

16   same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein. Based on his

17   knowledge of material non-public information regarding the Company, defendant Levy violated Cal.

18   Corp. Code §§25402 and 25502.5 by selling 2.28 million KLA-Tencor shares for insider trading

19   proceeds of more than $111 million.

20       59.    Defendant Schroeder was from 1991 to 1999 President and COO of the Company.

21   He was a CEO of the Company. During the Relevant Period, Schroeder was also a director of KLA-

22   Tencor from July 1, 1999, until he retired from the Company effective January 1, 2006. Schroeder

23   initially joined KLA Instruments in 1979 and left in 1987. Schroeder returned to KLA Instruments

24   in 1991. From November 1991 to July 2002 Schroeder held the position of President of the

25   Company. He again held the position of President from May 2004 to July 2005. At all relevant

26   _____

27   [5]    KLA-Tencor's fiscal year ends June 30. Accordingly, the Company's FY 1995 started
     July 1, 1994 and ended June 30, 1995.

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 23 -

1  times, Schroeder actively participated in the management of KLA-Tencor's daily business affairs

2  and finances. He also actively participated in the preparation, review and approval of KLA-Tencor's

3  publicly reported financial results and financial statements for FY 1995-2005, as well as the

4  corresponding reports on SEC Form 10-K and press releases. By reason of his executive positions

5  with the Company, Board membership and ownership of KLA-Tencor stock, Schroeder was a

6  controlling person of KLA-Tencor and had the power and influence, and exercised the same, to

7  cause KLA-Tencor to engage in the conduct detailed with particularity herein. Based on his

8  knowledge of material non-public information regarding the Company, defendant Schroeder violated

9  Cal. Corp. Code §§25402 and 25502.5 by selling 1.25 million KLA-Tencor shares for insider trading

10  proceeds of more than $64 million.

11      60.    Defendant Wallace is the current CEO and a director of KLA-Tencor. Defendant

12  Wallace, during the Relevant Period and since 2000, was Executive Vice President ("EVP") of the

13  Company. He was appointed to his current position effective January 1, 2006. Wallace joined

14  KLA-Tencor in 1988 serving in a variety of senior management positions – most recently serving as

15  President and COO from July 2005 to January 2006. Wallace also actively participated in the

16  preparation, review and approval of KLA-Tencor's publicly reported financial results and financial

17  statements for FY 1995-2005, as well as the corresponding reports on SEC Form 10-K and press

18  releases. By reason of his executive positions with KLA-Tencor, Board membership and ownership

19  of KLA-Tencor stock, Wallace was a controlling person of KLA-Tencor and had the power and

20  influence, and exercised the same, to cause KLA-Tencor to engage in the conduct detailed with

21  particularity herein. Based on his knowledge of material non-public information regarding the

22  Company, defendant Wallace violated Cal. Corp. Code §§25402 and 25502.5 by selling 292,499

23  KLA-Tencor shares for insider trading proceeds of more than $15.5 million during the Relevant

24  Period.

25      61.    Defendant Kispert is the current President and COO of KLA-Tencor. He was

26  appointed to his current position effective January 1, 2006. Previously, Kispert served as CFO of

27  KLA-Tencor from July 2000 until his promotion to President and COO. Kispert joined KLA-Tencor

28  in 1995 serving in a variety of senior management positions. Kispert actively participated in the

1  preparation, review and approval of KLA-Tencor's publicly reported financial results and financial

2  statements for FY 1995-2005, as well as the corresponding reports on SEC Form 10-K and press

3  releases. By reason of his executive positions at the Company and ownership of KLA-Tencor stock,

4  Kispert was a controlling person of KLA-Tencor and had the power and influence, and exercised the

5  same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein. Based on his

6  knowledge of material non-public information regarding the Company, defendant Kispert violated

7  Cal. Corp. Code §§25402 and 25502.5 by selling 341,500 KLA-Tencor shares for insider trading

8  proceeds of more than $20.1 million during the Relevant Period.

9      62.    Defendant Hall is the CFO of KLA-Tencor. He was appointed to his current position

10  effective January 1, 2006. Hall joined the Company in 2000 acting as the Vice President ("VP") of

11  Finance, Mergers and Acquisitions. During the Relevant Period, Hall actively participated in the

12  preparation, review and approval of KLA-Tencor's publicly reported financial results and financial

13  statements for FY 2000-2005, as well as the corresponding reports on SEC Form 10-K and press

14  releases. By reason of his executive positions at the Company and ownership of KLA-Tencor stock,

15  Hall was a controlling person of KLA-Tencor and had the power and influence, and exercised the

16  same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein. Based on his

17  knowledge of material non-public information regarding the Company, defendant Hall violated Cal.

18  Corp. Code §§25402 and 25502.5 by selling 12,300 KLA-Tencor shares for insider trading proceeds

19  of $607,060 during the Relevant Period.

20      63.    Defendant Boehlke was, from April 1997 to 2000, EVP and CFO. Defendant

21  Boehlke joined KLA-Tencor in April 1983 as VP and General Manager of the RAPID Division.

22  During the next seven years he became Senior VP and then EVP in charge of several operating

23  divisions, including RAPID, WISARD and ATS. He was COO from August 1989 until July 1990,

24  when he became CFO. Because of Boehlke's position and history with the Company, he knew

25  adverse non-public information about the business of KLA-Tencor, as well as its finances, markets

26  and present and future business prospects, via access to internal corporate documents, conversations

27  and connections with other corporate officers and employees, attendance at management meetings,

28  and via reports and other information provided to him in connection therewith. Boehlke actively

1   participated in the preparation, review and approval of KLA-Tencor's publicly reported financial

2   results and financial statements as well as the corresponding reports on SEC Form 10-K and press

3   releases. During the Relevant Period, Boehlke received backdated stock options. In addition, during

4   the Relevant Period between August 1, 1997 and March 3, 2000, Boehlke sold 352,400 shares of

5   KLA-Tencor stock for insider trading proceeds of $14,136,130.

6          64.     Defendant Tompkins has been a director of the Company since April 1997.

7   Previously, Tompkins served as CEO from May 1997 until July 1998 and as Chairman of the Board

8   from July 1998 to June 1999. Tompkins was President, CEO and Chairman of the Board of Tencor

9   Instruments. During the Relevant Period, Tompkins actively participated in the preparation, review

10  and approval of KLA-Tencor's publicly reported financial results and financial statements for FY

11  1997-2005, as well as the corresponding reports on SEC Form 10-K and press releases. By reason of

12  his Board membership and ownership of KLA-Tencor stock, Tompkins was a controlling person of

13  KLA-Tencor and had the power and influence, and exercised the same, to cause KLA-Tencor to

14  engage in the conduct detailed with particularity herein. Based on his knowledge of material non-

15  public information regarding the Company, defendant Tompkins violated Cal. Corp. Code §§25402

16  and 25502.5 by selling 670,049 KLA-Tencor shares for insider trading proceeds of $31.5 million

17  during the Relevant Period.

18         65.     Defendant Urbanek has been a director of the Company since April 1997. From

19  August 1991 until April 1997, Urbanek was a director of Tencor Instruments prior to its merger with

20  KLA Instruments. During the Relevant Period, Urbanek actively participated in the preparation,

21  review and approval of KLA-Tencor's publicly reported financial results and financial statements for

22  FY 1997-2005, as well as the corresponding reports on SEC Form 10-K and press releases. By

23  reason of her Board membership and ownership of KLA-Tencor stock, Urbanek was a controlling

24  person of KLA-Tencor and had the power and influence, and exercised the same, to cause KLA-

25  Tencor to engage in the conduct detailed with particularity herein. Based on her knowledge of

26  material non-public information regarding the Company, defendant Urbanek violated Cal. Corp.

27  Code §§25402 and 25502.5 by selling 9,149 KLA-Tencor shares for insider trading proceeds of

28  $448,324 during the Relevant Period.

66.    Defendant Bingham has been a director of the Company since October 1999. During the Relevant Period, Bingham actively participated in the preparation, review and approval of KLA-Tencor's publicly reported financial results and financial statements for FY 2000-2005, as well as the corresponding reports on SEC Form 10-K and press releases. By reason of his Board membership and ownership of KLA-Tencor stock, Bingham was a controlling person of KLA-Tencor and had the power and influence, and exercised the same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein. Based on his knowledge of material non-public information regarding the Company, defendant Bingham violated Cal. Corp. Code §§25402 and 25502.5 by selling 5,000 KLA-Tencor shares for insider trading proceeds of $263,100 during the Relevant Period.

67.    Defendant Bond has been a director of the Company since August 2000. During the Relevant Period, Bond actively participated in the preparation, review and approval of KLA-Tencor's publicly reported financial results and financial statements for FY 2000-2005, as well as the corresponding reports on SEC Form 10-K and press releases. By reason of his Board membership and ownership of KLA-Tencor stock, Bond was a controlling person of KLA-Tencor and had the power and influence, and exercised the same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein. Based on his knowledge of material non-public information regarding the Company, defendant Bond violated Cal. Corp. Code §§25402 and 25502.5 by selling 5,000 KLA-Tencor shares for insider trading proceeds of $253,050 during the Relevant Period.

68.    Defendant Barnholt has been a director of the Company since 1995. During the Relevant Period, Barnholt actively participated in the preparation, review and approval of KLA-Tencor's publicly reported financial results and financial statements for FY 1995-2005, as well as the corresponding reports on SEC Form 10-K and press releases. By reason of his Board membership and ownership of KLA-Tencor stock, Barnholt was a controlling person of KLA-Tencor and had the power and influence, and exercised the same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein. Based on his knowledge of material non-public information regarding the Company, defendant Barnholt violated Cal. Corp. Code §§25402 and

1    25502.5 by selling 29,000 KLA-Tencor shares for insider trading proceeds of $1.4 million during the

2    Relevant Period.

3        69.      Defendant Kaufman has been a director of the Company since November 2002.

4    During the Relevant Period, Kaufman actively participated in the preparation, review and approval

5    of KLA-Tencor's publicly reported financial results and financial statements for FY 2003-2005, as

6    well as the corresponding reports on SEC Form 10-K and press releases. By reason of his Board

7    membership and ownership of KLA-Tencor stock, Kaufman was a controlling person of KLA-

8    Tencor and had the power and influence, and exercised the same, to cause KLA-Tencor to engage in

9    the conduct detailed with particularity herein.

10       70.      Defendant Elkus, during the Relevant Period and since April 1997, was a director of

11    the Company and during the Relevant Period sat on the Company's Audit Committee which was

12    responsible for overseeing the accounting and financial reporting processes. Elkus actively

13    participated in the preparation, review and approval of KLA-Tencor's publicly reported financial

14    results and financial statements for FY 1999-2005, as well as the corresponding reports on SEC

15    Form 10-K and press releases. Elkus also sat on the Company's Nominating and Governance

16    Committee in 2003. By reason of his Board membership and ownership of KLA-Tencor stock,

17    Elkus was a controlling person of KLA-Tencor and had the power and influence, and exercised the

18    same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein. During the

19    Relevant Period, Elkus violated Cal. Corp. Code §§25402 and 25502.5 by selling 155,416 shares of

20    KLA stock for proceeds of more than $7 million.

21       71.      Defendant Nichols was, during the Relevant Period, VP and General Counsel for the

22    Company. Because of Nichols' position with KLA-Tencor, he knew adverse non-public information

23    about the business of KLA-Tencor, as well as its finances, markets and present and future business

24    prospects, via access to internal corporate documents, conversations and connections with other

25    corporate officers and employees, attendance at management meetings, and via reports and other

26    information provided to him in connection therewith. Defendant Nichols actively participated in the

27    preparation, review and approval of KLA-Tencor's publicly reported financial results and financial

28    statements, as well as the corresponding reports on SEC Form 10-K and press releases.

1       72.    Defendant Chamberlain was, during the Relevant Period, a director of the Company

2  and had been a director since 1982. Chamberlain sat on the Company Compensation Committee

3  from 1995-1999, and was a member of the Company's Audit Committee in 2000. During the

4  Relevant Period, defendant Chamberlain violated Cal. Corp. Code §§25402 and 25502.5 by selling

5  81,764 shares for proceeds of $4,839,107. Because of defendant Chamberlain's position with KLA-

6  Tencor, he knew adverse non-public information about the business of KLA-Tencor, as well as its

7  finances, markets and present and future business prospects, via access to internal corporate

8  documents, conversations and connections with other corporate officers and employees, attendance

9  at management meetings, and via reports and other information provided to him in connection

10  therewith. Defendant Chamberlain actively participated in the preparation, review and approval of

11  KLA-Tencor's publicly reported financial results and financial statements during the Relevant

12  Period, as well as the corresponding reports on SEC Form 10-K and press releases.

13       73.    Defendant Schnitzer was, during the Relevant Period, EVP of the Company. From

14  June 1997 to October 1998 he was EVP, Human Resources. From July 1993 to June 1997 he was

15  Group VP responsible for RAPID, SEMSpec, Prism and manufacturing for WISARD and RAPID.

16  From 1989 to July 1993 he was VP and General Manager of the WISARD Division. Defendant

17  Schnitzer joined KLA-Tencor in July 1978 and held a series of other management positions.

18  Because of Schnitzer's position with KLA-Tencor, he knew adverse non-public information about

19  the business of KLA-Tencor, as well as its finances, markets and present and future business

20  prospects, via access to internal corporate documents, conversations and connections with other

21  corporate officers and employees, attendance at management meetings, and via reports and other

22  information provided to him in connection therewith. During the Relevant Period, defendant

23  Chamberlain violated Cal. Corp. Code §§25402 and 25502.5 by selling 471,664 shares of KLA-

24  Tencor stock for insider trading proceeds of $26,807,656.

25       74.    Defendant Dickerson, during the Relevant Period and since 1999, served as COO of

26  the Company, and President of the Company since 2002. Dickerson has held management or

27  executive management positions at the Company since 1994, including EVP of the Customer Group

28  and Group VP of the Wafer Inspection Division. Because of Dickerson's position with KLA-

1   Tencor, he knew adverse non-public information about the business of KLA-Tencor, as well as its

2   finances, markets and present and future business prospects, via access to internal corporate

3   documents, conversations and connections with other corporate officers and employees, attendance

4   at management meetings, and via reports and other information provided to him in connection

5   therewith.  Defendant Dickerson actively participated in the preparation, review and approval of

6   KLA-Tencor's publicly reported financial results and financial statements, as well as the

7   corresponding reports on SEC Form 10-K and press releases.  During the Relevant Period,

8   Dickerson violated Cal. Corp. Code §§25402 and 25502.5 by selling 574,000 KLA-Tencor shares

9   for more than $27 million in insider trading proceeds.

10   **DEFENDANTS' DUTIES**

11      75.    Each officer and director of KLA-Tencor named herein owed the Company and

12   KLA-Tencor shareholders the duty to exercise a high degree of care, loyalty and diligence in the

13   management and administration of the affairs of the Company, as well as in the use and preservation

14   of its property and assets.  The conduct of KLA-Tencor's directors and officers complained of herein

15   involves knowing, intentional and culpable violations of their obligations as officers and directors of

16   KLA-Tencor.  Further, the misconduct of KLA-Tencor's officers has been ratified by KLA-Tencor's

17   Board, which has failed to take any legal action on behalf of the Company against them.

18      76.    By reason of their positions as officers, directors and fiduciaries of KLA-Tencor and

19   because of their ability to control the business and corporate affairs of the Company, the Defendants

20   owed KLA-Tencor and its shareholders fiduciary obligations of candor, trust, loyalty and care, and

21   were required to use their ability to control and manage KLA-Tencor in a fair, just, honest and

22   equitable manner, and to act in furtherance of the best interests of KLA-Tencor and its shareholders

23   so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  In

24   addition, as officers and/or directors of a publicly held company, the Defendants had a duty to

25   refrain from utilizing their control over KLA-Tencor to divert assets to themselves via improper

26   and/or unlawful practices.  Defendants also had a duty to promptly disseminate accurate and truthful

27   information with respect to the Company's operations, earnings and compensation practices.

28

1    77.    Because of their positions of control and authority as directors or officers of KLA-

2  Tencor, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts

3  complained of herein.   As to the Defendants who served as directors, these acts include: (a)

4  agreement to and/or acquiescence in Defendants' option backdating scheme; and (b) willingness to

5  cause KLA-Tencor to disseminate false Proxy Statements for FY 1995-2005, which Proxy

6  Statements failed to disclose Defendants' option backdating scheme and omitted the fact that

7  executive officers were allowed to backdate their stock option grants in order to manipulate the

8  strike price of the stock options they received. Because of their positions with KLA-Tencor, each of

9  the Defendants was aware of these wrongful acts, had access to adverse non-public information and

10  was required to disclose these facts promptly and accurately to KLA-Tencor shareholders and the

11  financial markets but failed to do so.

12    78.    Between FY 1995 and 2005, Defendants repeated in each Proxy Statement that the

13  stock option grants made during that period carried an exercise price that was *not less than* the fair

14  market value of KLA-Tencor stock on the date granted, as calculated by the public trading price of

15  the stock at the market's close on that date.   However, Defendants concealed until 2006 that the

16  stock option grants were repeatedly and consciously *backdated* to ensure that the strike price

17  associated with the option grants was at or near the lowest trading price for that fiscal period. Due to

18  Defendants' breach of their fiduciary duty in the administration of the stock option plans, plaintiffs

19  seek to have the directors' and officers' plans voided and gains from those plans returned to the

20  Company.   In the alternative, plaintiffs seek to have all of the unexercised options granted to

21  Defendants between 1994 and 2002 cancelled, the financial gains obtained via the exercise of such

22  options returned to the Company and to have Defendants revise the Company's financial statements

23  to reflect the truth concerning these option grants.

24    79.    To discharge their duties, the directors of KLA-Tencor were required to exercise

25  reasonable and prudent supervision over the management, policies, practices and controls of the

26  business and financial affairs of KLA-Tencor. By virtue of such duties, the officers and directors of

27  KLA-Tencor were required, among other things, to:

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 31 -

1       (a)    Manage, conduct, supervise and direct the business affairs of KLA-Tencor in

2 accordance with all applicable law (including federal and state laws, government rules and

3 regulations and the charter and bylaws of KLA-Tencor);

4       (b)    Neither engage in self-dealing nor knowingly permit any officer, director or

5 employee of KLA-Tencor to engage in self-dealing;

6       (c)    Neither violate nor knowingly permit any officer, director or employee of

7 KLA-Tencor to violate applicable laws, rules and regulations;

8       (d)    Remain informed as to the status of KLA-Tencor's operations, including its

9 practices in relation to the cost of allowing the pervasive backdating and improperly accounting for

10 such, and upon receipt of notice or information of imprudent or unsound practices, to make a

11 reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices

12 and make such disclosures as are necessary to comply with federal securities laws and their duty of

13 candor to the Company's shareholders;

14       (e)    Prudently protect the Company's assets, including taking all necessary steps

15 to recover corporate assets (cash, stock options) improperly paid to Company executives and

16 directors together with the related costs (professional fees) proximately caused by the illegal conduct

17 described herein;

18       (f)    Establish and maintain systematic and accurate records and reports of the

19 business and affairs of KLA-Tencor and procedures for the reporting of the business and affairs to

20 the Board and to periodically investigate, or cause independent investigation to be made of, said

21 reports and records;

22       (g)    Maintain and implement an adequate, functioning system of internal legal,

23 financial and accounting controls, such that KLA-Tencor's financial statements – including its

24 expenses, accounting for stock option grants and other financial information – would be accurate and

25 the actions of its directors would be in accordance with all applicable laws;

26       (h)    Exercise control and supervision over the public statements to the securities

27 markets and trading in KLA-Tencor stock by the officers and employees of KLA-Tencor; and

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 32 -

1            (i)      Supervise the preparation and filing of any financial reports or other

2 information required by law from KLA-Tencor and to examine and evaluate any reports of

3 examinations, audits or other financial information concerning the financial affairs of KLA-Tencor

4 and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the

5 subjects and duties set forth above.

6      80.     Each Defendant, by virtue of his or her position as a director and/or officer, owed to

7 the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of

8 due care and diligence in the management and administration of the affairs of the Company, as well

9 as in the use and preservation of its property and assets. The conduct of the Defendants complained

10 of herein involves a knowing and culpable violation of their obligations as directors and/or officers

11 of KLA-Tencor, the absence of good faith on their part, and a reckless disregard for their duties to

12 the Company and its shareholders, which Defendants were aware or should have been aware posed a

13 risk of serious injury to the Company. The conduct of the Defendants who were also officers and/or

14 directors of the Company during the Relevant Period has been ratified by the Defendants who served

15 as directors who comprised KLA-Tencor's entire Board during the Relevant Period.

16      81.     Defendants breached their duties of loyalty and good faith by allowing or by

17 themselves causing the Company to misrepresent its financial results and prospects, as detailed

18 herein *infra*, and by failing to prevent the Defendants from taking such illegal actions. In addition,

19 as a result of Defendants' illegal actions and course of conduct during the Relevant Period, the

20 Company is now the subject of an SEC investigation. As a result, KLA-Tencor has expended and

21 will continue to expend significant sums of money. Such expenditures include, but are not limited

22 to:

23            (a)      Improvidently paid executive compensation;

24            (b)      Increased capital costs as a result of the loss of market capitalization and the

25 Company's damaged reputation in the investment community;

26            (c)      Professional costs associated with the SEC's inquiry and the U.S. Attorney's

27 investigation;

28

1           (d)     Costs incurred to carry out internal investigations, including legal fees paid to

2  outside counsel; and

3           (e)     Incurring possible IRS penalties for improperly reporting compensation.

4      82.    These actions have irreparably damaged KLA-Tencor's corporate image and

5  goodwill. For at least the foreseeable future, KLA-Tencor will suffer from what is known as the

6  "liar's discount," a term applied to the stocks of companies who have been implicated in illegal

7  behavior and have misled the investing public, such that KLA-Tencor's ability to raise equity capital

8  or debt on favorable terms in the future is now impaired.

9                  **AIDING AND ABETTING AND CONCERTED ACTION**

10      83.    In committing the wrongful acts alleged herein, Defendants have pursued or joined in

11  the pursuit of a common course of conduct, and have acted in concert with one another in

12  furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as

13  giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in

14  breach of their respective duties.

15      84.    At relevant times, Defendants collectively and individually initiated a course of

16  conduct which was designed to and did: (a) conceal the fact that the Company was over-paying its

17  directors, officers and employees and improperly misrepresenting its financial results, in order to

18  allow Defendants to artificially inflate the price of the Company's shares; (b) maintain Defendants'

19  executive and directorial positions at KLA-Tencor and the profits, power and prestige which

20  Defendants enjoyed as a result of these positions; (c) deceive the investing public, including

21  shareholders of KLA-Tencor, regarding Defendants' management of KLA-Tencor's operations, the

22  Company's financial health and stability, and future business prospects, which had been

23  misrepresented by Defendants throughout the Relevant Period; and (d) allow several of the

24  Company's officers and directors to sell millions of dollars worth of Company stock at inflated

25  prices. In furtherance of this course of conduct, Defendants collectively and individually took the

26  actions set forth herein.

27      85.    Defendants engaged in a common course of conduct commencing by at least 1995

28  and continuing thereafter. During this time, Defendants caused the Company to conceal the true fact

1 that KLA-Tencor was over-compensating its directors, officers and employees and misrepresenting

2 its financial results. In addition, Defendants also made other specific, false statements about KLA-

3 Tencor's financial performance and future business prospects, as alleged herein.

4   86. The purpose and effect of Defendants' common enterprise and/or common course of

5 conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary

6 duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to

7 conceal adverse information concerning the Company's operations, financial condition, and future

8 business prospects; and to artificially inflate the price of KLA-Tencor common stock so they could:

9 (a) dispose of millions of dollars of their own stock, and (b) protect and enhance their executive and

10 directorial positions and the substantial compensation and prestige they obtained as a result thereof.

11   87. Defendants accomplished their common enterprise and/or common course of conduct

12 by causing the Company to purposefully, recklessly or negligently grant under-priced stock options

13 and to misrepresent its financial results. Because the actions described herein occurred under the

14 authority of the Board, each of the Defendants was a direct, necessary, and substantial participant in

15 the common enterprise and/or common course of conduct complained of herein.

16   88. Each of the Defendants aided and abetted and rendered substantial assistance in the

17 wrongs complained of herein. In taking such actions to substantially assist the commission of the

18 wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary

19 wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or

20 her overall contribution to and furtherance of the wrongdoing.

21         **FACTUAL ALLEGATIONS**

22   89. KLA-Tencor is a supplier of process control and yield management solutions for the

23 semiconductor and related microelectronics industries. The Company's portfolio of products,

24 software, analysis, services and expertise is designed to help integrated circuit manufacturers

25 manage yield throughout the entire fabrication process, from research and development to final

26 mass-production yield analysis. The Company provides inline wafer defect monitoring; reticule and

27 photomask defect inspection; critical dimension metrology; wafer overlay; film and surface

28 measurement; and overall yield and fab-wide data analysis.

90.    By law, Defendants owed KLA-Tencor a duty to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  To adequately carry out these duties, it is necessary for Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements.. This material non-public information included the problems KLA-Tencor faced because of its deficient internal controls.  Furthermore, Defendants Bingham, Bond, Elkus and Kaufman, as members of the Audit Committee of KLA-Tencor's Board, had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with management, the Company's policies generally with respect to the Company's earnings press releases and with respect to financial information and earnings guidance provided to Defendants as KLA-Tencor's directors and officers.  In addition, Defendants Barnholt, Urbanek, and Bond, as members of the Compensation Committee had a special duty to know and execute its oversight and execution of the Company's stock option issuance policies.

91.    Moreover, Defendants had ample opportunity to discuss this material information with management and fellow directors at any of the scores of Board meetings that occurred during the Relevant Period as well as at committee meetings of the Board. Despite these duties, Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or conscious inactions, the misleading statements to be disseminated by KLA-Tencor to the Company's shareholders.

92.    Specifically, the reported dates KLA-Tencor stock options were granted differed from the dates on which the options were actually granted.  The practice applied to stock option grants made between 1995 and 2002, which allowed directors, officers and employees to make more money on their options because it set a lower "strike price" at which the options could be exercised, allowing employees to pocket larger profits.

93.    By manipulating the grant dates, KLA-Tencor was able to provide executives and employees with the lowest possible exercise price.  The lower the exercise price, the worse off KLA-Tencor was because it would receive less cash for the option purchased.  However, such

1  manipulation would allow the director, officer or other employee to increase the amount he or she

2  would pocket by a commensurate amount.  So, as insiders, Defendants were motivated to "cherry

3  pick" the dates on which the prices would be set.  Certain of KLA-Tencor's grants are described

4  below (adjusted for stock splits).

5  **1995 False Proxy Statement**

6  94.  On October 17, 1995, the Company filed it Form 14-A Proxy Statement with the

7  SEC.  In the Proxy Statement the Company described its Stock Option Plan and administration of

8  the plan by the Board or a committee of the Board, and that generally, stock options are issued at the

9  market price on the date of the grant:

10  Grants of stock options to executive officers are based upon each officer's relative
   position, responsibilities, historical and expected contributions to the Company, and

11  the officer's existing stock ownership and previous option grants, with primary
   weight given to the executive officer's relative rank and responsibilities.  Initial stock

12  option grants designed to recruit an executive officer to join the Company may be
   based on negotiations with the officer and with reference to historical option grants

13  to existing officers. *Stock options are granted at market price on the date of grant
   and will provide value to the executive officers only when the price of the*

14  *Company's Common Stock increases over the exercise price.*

15  **1996 False Proxy Statement**

16  95.  On October 11, 1996, the Company filed its Form 14-A Proxy Statement with the

17  SEC.  The Proxy Statement made the following false and misleading statements regarding the

18  administration of the Stock Option Plan while at the same time soliciting shareholder votes for

19  amendments thereto:

20  Terms and Conditions of Options.  Each option granted under the Option Plan is
   evidenced by a written agreement between the Company and the optionee specifying

21  the number of shares subject to the option and the other terms and conditions of the
   option, consistent with the requirements of the plan. *The exercise price of each*

22  *option granted under the Option Plan must equal at least the fair market value of a
   share of the Company's Common Stock on the date of grant.*

23
24  **1997 False Proxy Statement**

   96.  On October 6, 1997, the Company filed its Form 14-A Proxy Statement with the SEC
25
   and distributed the same to the Company shareholders.  The Proxy Statement made the following
26
   false and misleading statements regarding the administration of the Company's Stock Option Plans
27
   and grants to executive officers:
28

1    Grants of stock options to executive officers are based upon each executive officer's
     relative position, responsibilities, historical and expected contributions to the
2    Company, and the executive officer's previous option grants, with primary weight
     given to the executive officer's relative rank and responsibilities. *Stock options are*
3    *granted at market price on the date of grant and will provide value to the executive*
     *officers only when the price of the Company's Common Stock increases over the*
4    *exercise price.*

5                **September 28, 1998 Proxy and 1998 Option Grants**

6        97.    On September 28, 1998, the Company filed a Form 14-A Proxy Statement with the

7    SEC.  The Proxy Statement made the following false and misleading statements regarding the

8    Company Stock Option Plans:

9    COMPENSATION OF DIRECTORS

10   . . . . The Company's Outside Directors Stock Option Plan (the "Director Plan") as
     adopted by the Board of Directors and approved by the stockholders, provides for the
11   grant of an option to purchase 2,500 shares of Common Stock of the Company to
     each of the Company's non-employee directors on the date on which such person is
12   elected a director. . . . *The Director Plan provides that the exercise price shall be*
     *equal to the fair market value of the Common Stock on the date of grant of the*
13   *option. . . .*

14        . . . *The 1998 Director Plan provides that the exercise price shall be equal to*
     *the fair market value of the Common Stock on the date of grant of the option.*
15   *Options granted under the 1998 Director Plan shall become exercisable*
     *immediately upon the date of grant.*
16
                        *        *        *
17

18   *Grants of stock options to executive officers* are based upon each executive officer's
     relative position, responsibilities, historical and expected contributions to the
19   Company, and the executive officer's existing stock ownership and previous option
     grants, with primary weight given to the executive officer's relative rank and
20   responsibilities. *Stock options are granted at market price on the date of grant and*
     *will provide value to the executive officers only when the price of the Company's*
21   *Common Stock increases over the exercise price.*

22        98.    Defendants dated many of KLA-Tencor's 1998 option grants as of August 31, 1998,

23   at $10.625 per share – *not only the low for the month but also for the year.*  The stock traded

24   between $10.625 and $16.1563 per share during August 1998.  The stock traded between $10.625

25   and $24.00 per share during 1998. Defendants Levy and Schroeder each received 204,272 options at

26   $10.625 per share.  Also, on August 31, 1998, defendant Tompkins received 50,809 options,

27   defendant Boehlke received 54,436 options, defendant Schnitzer received 54,436 options and

28   defendant Dickerson received 62,882 options.

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 38 -



KLA-Tencor
July 31, 1998 - September 30, 1998

**October 15, 1999 Proxy and 1999 Option Grants**

99.    On October 15, 1999, the Company filed its Form 14-A Proxy Statement. The Proxy Statement reiterated the material terms of stock option grants, including the statement that the "exercise price of the options is the fair market value of the common stock on the date of grant." Grants of stock options to executive officers are based upon each executive officer's responsibilities, historical and expected contributions to the Company, and the executive officer's existing stock ownership and previous option grants, with primary weight given to the executive officer's relative rank and responsibilities.

> Stock options are granted at market price on the date of grant and provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price.

100.    Defendants dated KLA-Tencor's 1999 option grants as of October 27, 1999, at $33.75 per share – nearly the lowest price at which the stock traded that month, when the stock traded between $33.125 and $39.5938 per share. Defendants Levy and Schroeder received 90,000 and 150,000 options, respectively, at this price. In addition, on October 27, 1999, defendants Tompkins

1  received 10,000 options, Boehlke received 60,000 options, Dickerson received 100,000 options and

2  Schnitzer received 50,000 options.



**October 6, 2000 Proxy Statement and 2000 Option Grants**

101.   The October 6, 2000 Proxy Statement made the following false and misleading

statements regarding the administration and issuance of stock option grants to executive officers:

> Grants of stock options to executive officers are based upon each executive officer's
> relative position, . . . ***Stock options are granted at market price on the date of grant
> and will provide value to the executive officers only when the price of the
> Company's Common Stock increases over the exercise price.***

102.   Defendants dated KLA-Tencor's 2000 option grants on several dates, including one

which was the lowest price for the year.  Defendants Levy and Schroeder received 37,901 and

75,800 options, respectively, at $44.69 per share on August 11, 2000, nearly the lowest price at

which the stock traded that month, when the stock traded between $42.375 and $65.625 per share.

Defendants Levy and Schroeder received 18,951 and 37,900 options, respectively, at $26.25 per

share on November 10, 2000; defendant Tompkins (10,000) and defendant Dickerson (32,500) also

received grants on November 10, 2000 – *not only the low for the month but also the low for the*

*year*.  The stock traded as high as $33.50 during the month and as high as $97.4375 during the year:





**September 28, 2001 Proxy Statement and 2001 Option Grants**

103.    On September 28, 2001, the Company filed its Form 14-A Proxy Statement with the SEC.  The Proxy Statement made the following false and misleading statement regarding the issuance of stock options to executive officers:

> Grants of stock options to executive officers are based upon each executive officers' relative position, responsibilities, historical and expected contributions to the

1      Company, and the executive officer's existing stock ownership and previous option
grants, with primary weight given to the executive officer's relative rank and
2      responsibilities. ***Stock options are granted at market price on the date of grant and
will provide value to the executive officers only when the price of the Company's
3      Common Stock increases over the exercise price.***

4      104.    On the same September 28, 2001 Proxy Statement, the Company's Audit Committee

5 issued a report providing substantial assurances that it had comprehensively reviewed and discussed

6 the Company's financial statements and internal controls prior to approving the financial statements.

7      During each of its five meetings during fiscal year 2001, the Audit Committee met
with the senior members of the Company's financial management team, the
8      independent auditors and the Company's General Counsel when appropriate. The
Audit Committee's chairman was responsible for preparing an agenda for each
9      meeting. ***During the Committee's private sessions, the Audit Committee met with
the Company's independent auditors and separately with the Company's Chief***
10      ***Financial Officer. The parties candidly discussed financial management,
accounting and internal controls.***

11

12      105.    Further, Defendants dated KLA-Tencor's 2001 option grants on several dates,

13 including two which were at the lowest price of the month in which the options were granted.

14 Defendants Levy, Schroeder and Dickerson received 18,951, 37,900 and 32,500 options,

15 respectively, at $32.75 per share on April 4, 2001 – ***the low of the month***. The stock traded as high

16 as $54.96 per share in April 2001. Defendants Levy, Schroeder, Kispert and Dickerson received

17 28,425, 341,100, 60,000 and 105,000 options, respectively, at $29.31 per share dated October 2,

18 2001 – ***again the low for the month***. The stock traded as high as $45.25 per share in October 2001:

19

20

21

22

23

24

25

26

27

28





106.     On September 25, 2002, the Company filed its Form 14-A Proxy Statement with the

SEC.  The Proxy Statement made the following false and misleading statements regarding issuance

of stock options to executive officers:

1    Grants of stock options to executive officers . . . *Stock options are granted at
     *market price on the date of grant and will provide value to the executive officers*
2    *only when the price of the Company's Common Stock increases over the exercise*
     *price.*

3    107.    Defendants dated KLA-Tencor's 2002 option grants as of November 8, 2002, at

4    $37.05 per share – nearly the lowest price at which the stock traded that month, when the stock

5    traded between $34.97 and $45.80 per share. Defendants Schroeder, Kispert and Wallace received

6    31,450, 12,500 and 12,500 options, respectively, at this price:

7

8

9

10

11

12                                    

13

14

15

16

17

18

19

20

21

22

23

24        THE STOCK OPTION BACKDATING SCHEME AND ITS IMPACT
              ON KLA-TENCOR'S FINANCIAL STATEMENTS

25

26    108.    Since FY 1995, Defendants caused KLA-Tencor to report false and misleading

27    financial results which materially understated its compensation expenses and thus overstated its

28    earnings as follows:

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 44 -

| Fiscal Year | Reported Earnings (in millions) | Reported Diluted EPS |
|---|---|---|
| 1995 | $105 | $1.34 |
| 1996 | $197 | $1.17 |
| 1997 | $105 | $0.62 |
| 1998 | $134 | $0.76 |
| 1999 | $39 | $0.22 |
| 2000 | $253 | $1.32 |
| 2001 | $67 | $0.34 |
| 2002 | $216 | $1.10 |
| 2003 | $137 | $0.70 |
| 2004 | $244 | $1.21 |
| 2005 | $467 | $2.32 |
| 1Q-3Q 2006 | $251 | $1.23 |

109.    In effect, between 1995 and 2006, Defendants caused KLA-Tencor shares to trade at artificially inflated levels by issuing a series of materially false and misleading statements regarding the Company's financial results. These financial results misrepresented and omitted to disclose that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and that because of improperly recorded stock-based compensation expenses the Company's publicly reported financial statements and results presented an inflated view of KLA-Tencor's earnings and EPS.

### The FY 1995 Form 10-K

110.    On September 27, 1995, the Company filed its FY 1995 Form 10-K with the SEC signed by William Turner ("Turner"), Levy, Schroeder, Boehlke, Barnholt, Chamberlain, Samuel Rubinovitz ("Rubinovitz") and Yoshio Nishi ("Nishi").    The FY 1995 Form 10-K was simultaneously distributed to shareholders and the public. The FY 1995 Form 10-K included KLA-Tencor's FY 1995 financial statement which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, KLA-Tencor's compensation expense was understated and its net earnings were overstated.

111.    The September 27, 1995 Form 10-K falsely stated that the Company issued stock options in compliance with the Company's 1982 Stock Option Plan and that options issued under said plan were issued by the Board Of Directors at "not less than fair market value on the date of the grant" as follows:

> Under the 1982 Stock Option Plan, as amended, 6,350,000 shares have been reserved for issuance to eligible employees and directors as either Incentive Stock Options

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 45 -

1  (ISO's) or nonqualified options. *Options under this plan are granted at prices*
2  *determined by the Board of Directors, but not less than the fair market value on*
   *the date of grant . . . .*

3  ### The FY 1996 Form 10-K

4       112.    On September 27, 1996, the Company filed its FY 1996 Form 10-K with the SEC

5  signed by Turner, Levy, Schroeder, Boehlke, Barnholt, Chamberlain, Robert Lorenzini, Nishi,

6  Rubinovitz and Dag Tellefsen ("Tellefsen"). The FY 1996 Form 10-K was simultaneously

7  distributed to shareholders and the public. The FY 1996 Form 10-K included KLA-Tencor's FY

8  1996 financial statements which were materially false and misleading and presented in violation of

9  GAAP, due to improper accounting for the backdated stock options. As a result, KLA-Tencor's

10  compensation expense was understated and its net earnings were overstated.

11       113.    The September 27, 1996 Form 10-K made the following false and misleading

12  statement regarding the issuance of stock options under the Company's 1982 Stock Option Plan and

13  specifically and falsely stated that options were issued at not less than fair market value on the date

14  of the grant:

15       Under the 1982 Stock Option Plan, as amended, 14,900,000 shares have been
         reserved for issuance to eligible employees and directors as either Incentive Stock
16       Options (ISO's) or nonqualified options. *Options under this plan are granted at*
         *prices determined by the Board of Directors, but not less than the fair market value*
17       *on the date of grant, and expire ten years after the date of grant.*

18  ### The FY 1997 Form 10-K

19       114.    On September 29, 1997, the Company filed its FY 1997 Form 10-K with the SEC

20  signed by Levy, Tompkins, Schroeder, Boehlke, James Bagley ("Bagley"), Barnholt, Chamberlain,

21  Elkus, Dean Morton ("Morton"), Nishi, Rubinovitz, Urbanek and Tellefsen. The FY 1997 Form 10-

22  K was simultaneously distributed to shareholders and the public. The FY 1997 Form 10-K included

23  KLA-Tencor's FY 1997 financial statements which were materially false and misleading and

24  presented in violation of GAAP, due to improper accounting for the backdated stock options. As a

25  result, KLA-Tencor's compensation expense was understated and its net earnings were overstated.

26       115.    The September 29, 1997 Form 10-K made the following false and misleading

27  statement regarding the Company's issuance of employee stock options in compliance with the

28  applicable Stock Option Plan stating that stock options were granted at fair market value on the grant

1   date, and that the Company properly accounted for stock options under APB Opinion No. 25 as

2   follows:

3       Stock-Based Compensation Plans

4       *The Company accounts for its stock option plans and employee stock purchase*
        *plan in accordance with provisions of the Accounting Principles Board's Opinion*
5       *No. 25 (APB OPINION NO. 25), "Accounting for Stock Issued to Employees."*
        *The Company's policy is to grant options at the fair market value on the date of*
6       *grant. Accordingly no compensation expense has been recorded.*

7                       **The FY 1998 Form 10-K**

8       116.    On September 29, 1998, the Company filed its FY 1998 Form 10-K with the SEC.

9   The FY 1998 Form 10-K was simultaneously distributed to shareholders and the public.  The

10  September 29, 1998 Form 10-K was signed by Levy, Tompkins, Schroeder, Boehlke, Bagley,

11  Barnholt, Chamberlain, Elkus, Morton, Nishi, Rubinovitz and Urbanek.  The FY 1998 Form 10-K

12  included KLA-Tencor's FY 1998 financial statements which were materially false and misleading

13  and presented in violation of GAAP, due to improper accounting for the backdated stock options.

14  As a result, KLA-Tencor's compensation expense was understated and its net earnings were

15  overstated.   The Form 10-K also falsely stated that the Company properly accounted for stock

16  options under APB Opinion No. 25:

17      STOCK-BASED COMPENSATION PLANS

18      *The Company accounts for its employee stock option plans and employee stock*
        *purchase plan in accordance with provisions of the Accounting Principles Board's*
19      *Opinion No. 25 (APB OPINION NO. 25), "Accounting for Stock Issued to*
        *Employees."*
20

21                      **The FY 1999 Form 10-K**

22      117.    On September 28, 1999, the Company filed its FY 1999 Form 10-K with the SEC.

23  The FY 1999 Form 10-K was simultaneously distributed to shareholders and the public signed by

24  Levy, Schroeder, Boehlke, Bagley, Barnholt, Chamberlain, Elkus, Morton, Rubinovitz and

25  Tompkins.  The FY 1999 Form 10-K included KLA-Tencor's FY 1999 financial statements which

26  were materially false and misleading and presented in violation of GAAP, due to improper

27  accounting for the backdated stock options. As a result, KLA-Tencor's compensation expense was

28  understated and its net earnings were overstated.

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 47 -

1    118.    The Form 10-K also made the specific false and misleading statement that the

2    Company properly accounted for stock options in accordance with APB Opinion No. 25:

3    STOCK-BASED COMPENSATION PLANS

4    *The Company accounts for its employee stock option plans and employee stock
purchase plan in accordance with provisions of the Accounting Principles Board's*

5    *Opinion No. 25*, "Accounting for Stock Issued to Employees." The Company
provides additional proforma disclosure required by Financial Accounting Standard

6    (SFAS) No. 123, "Accounting for Stock-Based Compensation" (*see* Note 6).

7    **The FY 2000 Form 10-K**

8    119.    On September 28, 2000, the Company filed its FY 2000 Form 10-K with the SEC

9    signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Morton, Tompkins and

10    Urbanek. The FY 2000 Form 10-K was simultaneously distributed to shareholders and the public.

11    The FY 2000 Form 10-K included KLA-Tencor's FY 2000 financial statements which were

12    materially false and misleading and presented in violation of GAAP, due to improper accounting for

13    the backdated stock options. As a result, KLA-Tencor's compensation expense was understated and

14    its net earnings were overstated.

15    120.    The 2000 Form 10-K falsely represented that the Company issued stock options at

16    prices not less than fair market value of the Company's common stock on the grant date:

17    STOCK OPTION AND INCENTIVE PLANS

18    The Company has authorized various stock option and management incentive plans
for selected employees, officers, directors, and consultants. . . .

19

20    *Under the Company's stock option plans, options generally have vesting periods of
four years, are exercisable for a period not to exceed ten years from the date of
issuance and are granted at prices not less than the fair market value of the*

21    *Company's common stock at the grant date.*

22    **The FY 2001 Form 10-K**

23    121.    On September 21, 2001, the Company filed its FY 2001 Form 10-K with the SEC

24    signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Morton, Tompkins and

25    Urbanek. The FY 2001 Form 10-K was simultaneously distributed to shareholders and the public.

26    The FY 2001 Form 10-K included KLA-Tencor's FY 2001 financial statements which were

27    materially false and misleading and presented in violation of GAAP, due to its improper accounting

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 48 -

1   for the backdated stock options. As a result, KLA-Tencor's compensation expense was understated

2   and its net earnings were overstated.

3       122.   The September 21, 2001 Form 10-K falsely represented that stock options issued

4   under the Company Incentive Stock Option Plan were issued at the fair market value of the stock on

5   the date of the grant:

6       Under KLA-Tencor's stock option plans, options generally have vesting periods of
        four or five years, are exercisable for a period not to exceed ten years from *the date*
7       *of issuance and are granted at prices not less than the fair market value of KLA-*
        *Tencor's common stock at the grant date.*

8                                    **The FY 2002 Form 10-K**

9       123.   On September 20, 2002, the Company filed its FY 2002 Form 10-K with the SEC

10  signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Tompkins and Urbanek. The

11  FY 2002 Form 10-K was simultaneously distributed to shareholders and the public. The 2002 Form

12  10-K also included the false Sarbanes-Oxley certifications of Kispert and Schroeder. The FY 2002

13  Form 10-K included KLA-Tencor's FY 2002 financial statements which were materially false and

14  misleading and presented in violation of GAAP, due to its improper accounting for the backdated

15  stock options. As a result, KLA-Tencor's compensation expense was understated and its net

16  earnings were overstated.

17      124.   The September 20, 2002 Form 10-K falsely represented that option grants under its

18  Incentive Stock Option Plan were issued at no less than fair market value on the date of the grant:

19      Stock Option and Incentive Plans KLA-Tencor's stock option program is a broad-
        based, long-term retention program that is intended to attract and retain qualified
20      management and technical employees ("knowledge employees"), and align
        stockholder and employee interests. . . : *Under KLA-Tencor's stock option plans,*
21      *options generally have vesting periods of four or five years, are exercisable for a*
        *period not to exceed ten years from the date of issuance and are granted at prices*
22      *not less than the fair market value of KLA-Tencor's common stock at the grant*
        *date.*

23

24      125.   The same Form 10-K reported that in 2002 the Company granted an additional

25  227,000 options to defendant Schroeder to incentivize him as a future leader of the Company:

26      Options granted to the top five officers as a percentage of the total options granted to
        all employees vary from year to year. In 2002, they were a higher percentage of the
27      total grants than in the other years shown as they included Board of Director
        approved additional grants to *Mr. Schroeder in recognition of his future potential to*

28

1   *lead the corporation. The additional grants to Mr. Schroeder total 227,400 options*
    *with vesting on said grants . . . .*

2

3                    **The FY 2003 Form 10-K Amended September 29, 2003**

4          126.    On or about September 16, 2003 (amended September 29, 2003), the Company filed

5   its FY 2003 Form 10-K with the SEC. The Form 10-K was signed by Kispert and included false

6   Sarbanes-Oxley certifications of Schroeder and Kispert. The FY 2003 Form 10-K was

7   simultaneously distributed to shareholders and the public. The FY 2003 Form 10-K included KLA-

8   Tencor's FY 2003 financial statements which were materially false and misleading and presented in

9   violation of GAAP, due to improper accounting for the backdated stock options. As a result, KLA-

10  Tencor's compensation expense was understated and its net earnings were overstated. The Form 10-

11  K also falsely represented that it properly accounted for stock options under APB Opinion No. 25

12  and that all stock options granted under the Plan were equal in value to the common stock on the

13  grant date:

14          **Accounting for Stock-Based Compensation Plans** *KLA-Tencor accounts for its*
            *employee stock option and employee stock purchase plans under the recognition*
15          *and measurement principles of APB Opinion No. 25, Accounting for Stock Issued*
            *to Employees, and related Interpretations. No stock-based employee compensation*
16          *is reflected in net income, as all options granted under those plans had an exercise*
            *price equal to the market value of the underlying common stock on the date of*
17          *grant. . . . Since KLA-Tencor continues to account for stock-based compensation*
            *according to APB OPINION NO. 25, its adoption of SFAS No. 148 required the*
18          *Company to provide prominent disclosures about the effects of SFAS 123 on*
            *reported income and required the Company to disclose these affects in the*
            *financial statements as well.*

19

20          127.    The September 16, 2003 Form 10-K also falsely represented that the Company's

21  stock options were issued at prices "not less than the fair market value . . . on the date of the grant."

22          Stock Option and Incentive Plans KLA-Tencor's stock option program is a
            broad-based, long-term retention program that is intended to attract and retain
23          qualified management and technical employees ("knowledge employees"), and align
            stockholder and employee interests. *Under KLA-Tencor's stock option plans,*
24          *options generally have a vesting period of five years, are exercisable for a period*
            *not to exceed ten years from the date of issuance and are granted at prices not less*
25          *than the fair market value of KLA-Tencor's common stock at the grant date.*

26                           **The FY 2004 Form 10-K**

27          128.    On August 30, 2004, the Company filed its FY 2004 Form 10-K with the SEC signed

28  by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Kaufman, Michael Marks, Tompkins

1   and Urbanek. The Form 10-K also attached the Sarbanes-Oxley certifications of Schroeder and

2   Kispert. The FY 2004 Form 10-K was simultaneously distributed to shareholders and the public.

3   The FY 2004 Form 10-K included KLA-Tencor's FY 2004 financial statements which were

4   materially false and misleading and presented in violation of GAAP, due to improper accounting for

5   the backdated stock options. As a result, KLA-Tencor's compensation expense was understated and

6   its net earnings were overstated.

7           129.    Further, the August 30, 2004 Form 10-K made the following false representations

8   regarding the way in which options were granted and accounted for:

9           **Accounting for Stock-Based Compensation Plans** *KLA-Tencor accounts for its*
            *employee stock option and employee stock purchase plans under the recognition*

10          *and measurement principles of APB Opinion No. 25,* Accounting for Stock Issued
            to Employees, and related Interpretations. *No stock-based employee compensation*

11          *is reflected in net income, as all options granted under those plans had an exercise*
            *price equal to the market value of the underlying common stock on the date of*

12          *grant.*

13                                  *       *       *

14          **Stock Option and Incentive Plans** KLA-Tencor's stock option program is a broad-
            based, long-term retention program that is intended to attract and retain qualified

15          management and technical employees ("knowledge employees"), and align
            stockholder and employee interests. Under KLA-Tencor's stock option plans, options

16          generally have a vesting period of five years, are exercisable for a period not to
            exceed ten years from the date of *issuance and are granted at prices not less than*

17          *the fair market value of KLA-Tencor's common stock at the grant date.* . . .

18                                  *       *       *

19          *All stock option grants to officers are approved by the Compensation Committee of*
            *the Board of Directors. All members of the Compensation Committee are*

20          *independent directors, as defined in the applicable rules for issuers traded on the*
            *NASDAQ Stock Market.*

21
                                    **The FY 2005 Form 10-K**
22

23          130.    On September 2, 2005, the Company filed its FY 2005 Form 10-K with the SEC.

24   The FY 2005 Form 10-K was simultaneously distributed to shareholders and the public. The FY

25   2005 Form 10-K included KLA-Tencor's FY 2005 financial statements which were materially false

26   and misleading and presented in violation of GAAP, due to its improper accounting for the

27   backdated stock options. As a result, KLA-Tencor's compensation expense was understated and its

28   net earnings were overstated.

1    131.    The September 2, 2005 Form 10-K also attached false Sarbanes-Oxley certifications

2    of defendants Schroeder and Kispert, falsely assuring shareholders, and made the following

3    representations:

> Our equity incentive program is a broad-based, long-term retention program that is
> intended to attract and retain qualified management and technical employees
> ("Knowledge Employees"), and align stockholder and employee interests. The
> equity incentive program consists of two plans: one under which non-employee
> directors may be granted options to purchase shares of our stock, and another in
> which non-employee directors, officers, key employees, consultants and all other
> employees may be granted options to purchase shares of our stock, restricted stock
> units and other types of equity awards. *Under our equity incentive program, stock
> options generally have a vesting period of five years, are exercisable for a period
> not to exceed ten years from the date of issuance and are generally granted at
> prices not less than the fair market value of our common stock at the grant
> date. . . .*
>
> On October 18, 2004, the Company's stockholders approved the 2004 Equity
> Incentive Plan (the "Omnibus Plan") which provides for the grant of options to
> purchase shares of the Company's Common Stock, stock appreciation rights,
> restricted stock, performance shares, performance units and deferred stock units to
> our employees, consultants and members of our Board of Directors. This new Plan
> replaces future grants under the 1982 Stock Option Plan and 2000 Nonstatutory
> Stock Option Plan and supplements the 1998 Outside Director Option Plan. The
> shareholder approval included the creation of a reserve establishment of 11,000,000
> shares of common stock for use under the plan and the ability to transfer up to an
> additional 1,500,000 shares of forfeited or expired stock under the 1982 Stock Option
> Plan and the 2000 Nonstatutory Plan.
>
> During the fiscal year ended June 30, 2005, the following actions were taken with
> regard to the New Equity Incentive Plan: a) a reserve of 11,000,000 shares was
> established, b) 1,465,853 shares were added to the reserve from the 1982 Stock
> Option Plan and the 2000 Nonstatutory Plan due to forfeitures or expiration, c) the
> 1982 Stock Option Plan was terminated; as a result, 12,358,625 shares expired, d) the
> 2000 Nonstatutory Plan was terminated; and, as a result, 3,447,748 shares expired, e)
> the 1993 Stock Option Plan was terminated, as a result, 3,500 shares expired and f)
> The Metrology Stock Option Plan was terminated, as a result 4,238 shares expired.

21    132.    The materially false and misleading FY 1995-2005 Form 10-Ks described above were

22    reviewed, prepared and/or endorsed by the Defendants. The following chart illustrates the Form 10-

23    Ks signed by the Defendants:[6]

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Boehlke* | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | |
| Chamberlain | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | |

[6]    Unless otherwise noted, these Defendants served as directors of the Company.

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tompkins | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Elkus | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Urbanek | | | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Kispert* | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Bingham | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Bond | | | | | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Kaufman | | | | | | | | | ✓ | ✓ | ✓ |
| Barnholt | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Schroeder** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Levy** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

**      = Directors and Officers
*       = Officers

The Form 10-Ks also incorporated by reference Form S-8 of December 4, 1998, the 1998 Outside Director Option Plan, Restated 1982 Stock Option Plan (filed March 1997), and the March 11, 1997 Form S-4.

## KLA-TENCOR'S FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP

133.    As a result of Defendants' improper backdating of stock options, Defendants caused KLA-Tencor to violate GAAP, SEC regulations and IRS rules and regulations.

134.    KLA-Tencor financial results for 1996-2006 were included in reports filed with the SEC and in other shareholder reports.  In these reports, Defendants represented that KLA-Tencor financial results were presented in a fair manner and in accordance with GAAP.

135.    Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

136.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time.  Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17

1    C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared

2    in compliance with GAAP, are presumed to be misleading and inaccurate.

3                                    **Violations of GAAP**

4           137.    During the Relevant Period, Defendants caused the Company to understate its

5    compensation expense by not properly accounting for its stock options under GAAP and thus

6    overstated the Company's net earnings.

7           138.    Under well-settled accounting principles in effect throughout the Relevant Period,

8    KLA-Tencor did not need to record an expense for options granted to employees at the then-current

9    market price ("at the money").   The Company was, however, required to record an expense in its

10   financial statements for any options granted below the then-current market price ("in the money").

11   In order to provide KLA-Tencor executives and employees with far more lucrative "in the money"

12   options, while avoiding having to inform shareholders about millions of dollars incurred by the

13   Company in compensation expenses (and without paying the IRS millions of dollars in employment

14   taxes), Defendants systematically falsified Company records to create the false appearance that

15   options had been granted at the market price on an earlier date.

16          139.    Throughout the Relevant Period, KLA-Tencor accounted for stock options using the

17   intrinsic method described in APB Opinion No. 25, Accounting for Stock Issued to Employees.

18   Under APB Opinion No. 25, employers were required to record as an expense on their financial

19   statements the "intrinsic value" of a fixed stock option on its "measurement date." An option that is

20   "in the money" on the measurement date has intrinsic value, and the difference between its exercise

21   price and the quoted market price must be recorded as compensation expense to be recognized over

22   the vesting period of the option.   Options that are "at the money" or "out of the money" on the

23   measurement date need not be expensed.   Excluding non-employee directors, APB Opinion No. 25

24   required employers to record compensation expenses on options granted to non-employees

25   irrespective of whether they were "in the money" or not on the date of grant.

26

27

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 54 -

**KLA-Tencor's Forthcoming Restatement Is an Admission of Falsity**

140.    As detailed above, the fact that KLA-Tencor will need to revise and restate downward its net income is an admission that the financial statements originally issued were false when they were reported and that the misstatements were material.

141.    Pursuant to GAAP, as set forth in APB Opinion No. 20, the type of restatements and revisions announced by KLA-Tencor were to correct for material errors in previously issued financial statements. APB Opinion No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when the restatement occurs. *Id.;* ¶14. Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used, or to correct an error in previously issued financial statements. KLA-Tencor's restatements and revisions were not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements. Thus, the restatements and revisions were an admission by KLA-Tencor that its previously issued financial results and its public statements regarding those results were false and misleading.

**KLA-Tencor's GAAP Violations Were Material**

142.    KLA-Tencor's false and misleading Relevant Period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality. SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality. Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important." It also stresses that materiality requires qualitative, as well as quantitative, considerations. For example, if a known misstatement would cause a significant market reaction that reaction should be taken into account in determining the materiality of the misstatement.

143.    SAB Topic 1M further states:

1   Among the considerations that may well render material a quantitatively small
2   misstatement of a financial statement item are –

                    *         *         *

3   • whether the misstatement masks a change in earnings or other trends

4   • whether the misstatement hides a failure to meet analysts' consensus
5   expectations for the enterprise

                    *         *         *

7   • whether the misstatement concerns a segment or other portion of the
8   registrant's business that has been identified as playing a significant role in the
    registrant's operations or profitability.

9       144.   SAB Topic 1M also says that an intentional misstatement of even immaterial items

10  may be illegal and constitute fraudulent financial reporting.

11      145.   KLA-Tencor's misstatements, by its own admissions, satisfy these criteria and thus

12  were material from both a quantitative and qualitative perspective.

13  **KLA-Tencor's Financial Statements Violated Fundamental Concepts of GAAP**

14      146.   Due to these accounting improprieties, the Company presented its financial results

15  and statements in a manner that violated GAAP, which are described by the following statements:

16          (a)    The principle that interim financial reporting should be based upon the same

17  accounting principles and practices used to prepare annual financial statements (APB Opinion No.

18  28, 10);

19          (b)    The principle that financial reporting should provide information that is useful

20  to existing and potential investors and creditors and other users in making rational investment, credit

21  and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No.

22  1, 34);

23          (c)    The principle that financial reporting should provide information about the

24  economic resources of an enterprise, the claims to those resources, and the effects of transactions,

25  events and circumstances that change resources and claims to those resources (FASB Statement of

26  Concepts No. 1, 40);

27          (d)    The principle that financial reporting should provide information about how

28  management of an enterprise has discharged its stewardship responsibility to stockholders for the use

1  of enterprise resources entrusted to it.  To the extent that management offers securities of the

2  enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective

3  investors and to the public in general (FASB Statement of Concepts No. 1, 50);

4         (e)    The principle that financial reporting should be reliable in that it represents

5  what it purports to represent (FASB Statement of Concepts No. 2, 58-59);

6         (f)    The principle of completeness, which means that nothing material is left out of

7  the information that may be necessary to insure that it validly represents underlying events and

8  conditions (FASB Statement of Concepts No. 2, 79); and

9         (g)    The principle that conservatism be used as a prudent reaction to uncertainty to

10  try to ensure that uncertainties and risks inherent in business situations are adequately considered

11  (FASB Statement of Concepts No. 2, 95, 97).

12         147.    Further, the undisclosed adverse information concealed by Defendants during the

13  Relevant Period is the type of information which, because of SEC regulations, regulations of the

14  national stock exchanges and customary business practice, is expected by investors and securities

15  analysts to be disclosed, and is known by corporate officials and their legal and financial advisors to

16  be the type of information which is expected to be and must be disclosed.

17                       **Violations of the SEC Regulations**

18         148.    During the Relevant Period, Defendants caused KLA-Tencor to violate SEC

19  regulations by failing to disclose that the Company's senior executives had been granted backdated

20  stock options.

21         149.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer

22  must furnish information required by Item 402 of Regulation S-K (17 C.F.R. §229.402).  Item

23  402(b) and (c) require a company to provide both a summary compensation table and an option/SAR

24  ("stock appreciation right") grants table identifying the compensation of the named executive

25  officers – the Company's CEO and its next four most highly paid executives.  Item 402 requires

26  particularized disclosures involving a company's stock option grants in the last fiscal year.  In the

27  summary compensation table, the issuer must identify in a column "other annual compensation"

28  received by the named executives that is not properly categorized as salary or bonus, including any

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 57 -

1   "[a]bove-market or preferential earnings on restricted stock, options, SARs or deferred

2   compensation" paid to the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option grants

3   table, the issuer must identify in a column "[t]he per-share exercise or base price of the options . . . .

4   If such exercise or base price is less than the market price of the underlying security on the date of

5   grant, a separate, adjoining column shall be added showing market price on the date of grant." Item

6   402(c)(2)(iv).

7        150.   Defendants caused KLA-Tencor to violate SEC Regulations by failing to disclose that

8   the Company's named executive officers had been granted options with exercise prices below the

9   market value on the date the Board or Compensation Committee approved the grant.

10           **Violations of IRS Rules and Regulations**

11        151.   During the Relevant Period, Defendants further caused KLA-Tencor to violate IRS

12   rules and regulations due to its improper accounting for the backdated stock options. As a result, the

13   Company's tax liabilities were understated exposing KLA-Tencor to potential amounts owed for

14   back taxes, penalties and interest to the IRS for improperly reporting compensation.

15        152.   Defendants caused the Company to violate IRS Code §162(m) which generally limits

16   a publicly traded company's tax deductions for compensation paid to each of its named executive

17   officers to $1 million unless the pay is determined to be "performance-based." In order for

18   compensation to be performance-based, the Compensation Committee must have set pre-established

19   and objective performance goals. The goals must then be approved by the shareholders.

20   Section 162(m) defines stock options as performance-based, provided they are issued at an exercise

21   price that is no less than the fair market value of the stock on the date of the grant. Accordingly,

22   properly issued stock options do not have to be taken into account in calculating whether an

23   executive's compensation has exceeded the $1 million compensation cap.

24        153.   Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top

25   executives' soaring pay packages more closely to a company's performance. This change in the tax

26   law turned compensation practices for a company's top executives away from straight salary-based

27   compensation to performance-based compensation, including stock options. According to former

28

1    SEC Chairman Harvey Pitt: "What [§162(m)] did was create incentives to find other forms of

2    compensation so people could get over the $1 million threshold without running afoul of the code."

3        154.    Defendants caused KLA-Tencor to violate IRS Code §162(m) by providing

4    backdated options to the Company's named executive officers, which were granted with exercise

5    prices that were less than the fair market value of the stock on the date of the grant. As a result, all

6    of the income resulting from the exercise of the options must be included for purposes of calculating

7    whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

8        155.    Defendants further caused the Company to violate IRS rules and regulations in order

9    to avoid having to withhold income and FICA ("Federal Insurance Contributions Act") tax from its

10   executives and employees upon the exercise of KLA-Tencor's stock options by improperly

11   accounting for its Non-Qualified Stock Options ("NQSOs") as Incentive Stock Options ("ISOs").

12       156.    ISOs are a form of equity compensation that may be provided to a company's

13   employees. ISOs are required to be granted at an exercise price that is no less than the fair market

14   value of the stock on the date of the grant, and are entitled to preferential tax treatment as they are

15   not subject to income tax upon exercise of the options but only upon sale of the stock (except for the

16   possible imposition of alternative minimum tax on the option spread at the time of exercise). Stock

17   options that do not qualify as ISOs are considered to be NQSOs. NQSOs are not entitled to

18   preferential treatment as they are subject to income tax and FICA withholding upon exercise. As a

19   result, a company that fails to withhold income tax and/or FICA upon the exercise of NQSOs by its

20   employees would be liable for the amount of the income tax and FICA that the company failed to

21   withhold upon exercise of the options, in addition to interest and penalties.

22       157.    By improperly treating its backdated options as ISOs, Defendants failed to provide

23   proper income tax and FICA withholdings upon the exercise of its options by its executives and

24   employees in violation of IRS rules and regulations.

25                 **THE COMPANY REVELATIONS AND ADMISSIONS OF**
                      **STOCK OPTION BACKDATING**

26

27       158.    The FY 1995-2005 Proxy Statements concealed Defendants' option backdating

28   scheme. Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when

1    voting on proxy proposals between 1994 and 2005. In fact, it was not until *The Wall Street Journal*

2    article that shareholders learned that the Proxy Statements which they had relied upon for nearly a

3    decade were false and misleading.

4    159.    On May 22, 2006, KLA-Tencor's stock dropped when it was mentioned in *The Wall*

5    *Street Journal* article on companies at risk for being involved in the backdating scandal.

6    160.    On May 24, 2006, the Company confirmed that it was a target of DOJ investigations

7    and announced that it had received subpoenas from the U.S. Attorneys' Offices in New York and

8    California.    That same day the Company announced the formation of a Special Committee to

9    investigate stock option practices.  The Form 8-K provided:

> KLA-Tencor Corporation announced today that its Board of Directors has appointed
> a Special Committee of independent directors to conduct an internal investigation
> relating to past stock option grants, the timing of such grants and related accounting
> and documentation. The Special Committee will be assisted by outside legal counsel
> and accounting experts. KLA-Tencor also said that it has received subpoenas from
> the U.S. Attorney's Offices for the Eastern District of New York and Northern
> District of California requesting information relating to its past stock option grants.
> KLA-Tencor said that it will cooperate fully with any government or regulatory
> investigation into these matters.  KLA-Tencor further disclosed that on May 22,
> 2006, it was served with a complaint relating to a lawsuit filed in the United States
> District Court for the Northern District of California filed by the Theodore R.
> Kornreich Revocable Trust, derivatively on behalf of KLA-Tencor.

161.    Additionally, as a result of the sharp decline in KLA-Tencor's stock due to its

involvement in the ongoing option granting scandal, KLA-Tencor has been forced to renegotiate its

deal to acquire ADE. Initially, on February 23, 2006, KLA-Tencor announced that it had entered

into an agreement with ADE to acquire ADE in a stock-for-stock transaction valued at

approximately $488 million. Under the agreement, KLA-Tencor would issue 0.64 share of KLA-

Tencor per one share of ADE. This calculation was based upon the closing price of KLA-Tencor

stock for February 22, 2006 of $51.73. Due to the recent sharp decline of the value of KLA-

Tencor's stock, KLA-Tencor was forced to change the terms of its agreement with ADE into an all-

cash transaction instead of a stock-for-stock transaction. On May 26, 2006, KLA-Tencor announced

that it had amended its agreement with ADE from a stock-for-stock transaction to an all-cash

transaction and that it had agreed to pay $32.50 in cash per share of ADE stock in a transaction

1   valued at approximately $478 million. KLA-Tencor's stock closed at $40.62 per share on May 26,

2   2006 – a 21.5% decline from February 22, 2006.

3       162.    On September 28, 2006, the Company announced an impending restatement of

4   publicly reported financial statements due to the backdating/misdating of stock options:

5   **KLA-Tencor Will Restate Financial Statements Related to Stock Options**

6   *SAN JOSE, Calif., September 28, 2006 – KLA-Tencor Corporation (NASDAQ:*
    *KLAC) today announced that it will restate previously issued financial statements*
7   *to correct the Company's past accounting for stock options.* Based on a report
    received from a Special Committee of the Board of Directors, *the Board concluded*
8   *that incorrect measurement dates for certain stock option grants were used for*
    *financial accounting purposes, principally during the periods July 1, 1997 through*
9   *June 30, 2002. As a result, the Company will be required to record non-cash*
    *charges for compensation expenses relating to those past stock option grants.*

10
    The Company has not determined the exact amount of such charges, the resulting tax
11  and accounting impact, or which specific reporting periods may require restatement.
    *Accordingly, the Company is filing a Form 8-K today stating that the financial*
12  *statements and all earnings and press releases and similar communications issued*
    *by the Company relating to periods beginning on or after July 1, 1997, should no*
13  *longer be relied upon. KLA-Tencor intends to file its restated financial results and*
    *Annual Report on Form 10-K as quickly as practicable.*
14
    KLA-Tencor does not anticipate that the restatement will have any impact on the
15  Company's historical revenues. *Any stock-based compensation charges incurred as*
    *a result of the restatement would have the effect of decreasing reported income or*
16  *increasing reported loss from operations, and decreasing reported net income or*
    *increasing reported net loss, and decreasing reported retained earnings amounts*
17  *contained in the Company's historical financial statements for the affected*
    *periods.*
18
        163.    Thereafter, on October 16, 2006, the Company announced that it was immediately
19
    terminating all relationships with Schroeder and that it fired its General Counsel, defendant Nichols.
20
    On October 17, 2006, the Company announced the retirement of defendant Levy along with the fact
21
    that Levy received backdated options and that his options would be repriced.
22
        164.    Finally, as discussed above in ¶¶43-47, on January 29, 2007, the Company filed its
23
    Form 10-K for the period ending June 30, 2006 detailing restated financials between 1994-2006 and
24
    the specific findings of the Special Committee.
25
                      **DERIVATIVE DEMAND FUTILITY ALLEGATIONS**
26
        165.    At the time the first derivative action was commenced, the KLA-Tencor Board
27
    consisted of nine directors: Levy, Barnholt, Wallace, Kaufman, Urbanek, Bond, Tompkins, Wang
28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 61 -

1    and Bingham.    Eight of these directors are incapable of independently and disinterestedly

2    considering a demand to commence and vigorously prosecute the derivative actions:

3              (a)    Defendants Levy, Tompkins and Wallace are incapable because they received

4    backdated stock options, and they are directly interested in the improperly backdated stock option

5    grants complained of herein, as recipients thereof. These defendants also sold hundreds of thousands

6    of shares of KLA-Tencor stock for millions of dollars in insider trading proceeds (see supra, ¶27);

7              (b)    Bond, Barnholt and Urbanek are incapable because as members of the

8    Compensation Committee, each directly participated in and approved the improper backdating of

9    stock options, as alleged herein or misrepresented and falsely assured the Company shareholders that

10   KLA-Tencor stock options were issued at fair market value on the date of the grant. They indeed

11   were the Board members who purported but failed to "review[]. . . the Company's executive

12   compensation policy and administer[] the Company's . . . equity benefit plan" under which stock

13   options were granted. Moreover, by colluding with Defendants and others, as alleged herein, Bond,

14   Barnholt and Urbanek have demonstrated that they are unable and unwilling to act independently of

15   Defendants; and

16             (c)    All of the members of the Audit Committee, including Bingham, Bond and

17   Kaufman are incapable because as veteran members of the Audit Committee, they directly

18   participated in and approved the Company's knowing violations of GAAP and IRS Code §162(m),

19   as alleged herein. Defendant Bingham was represented to shareholders as being a "financial expert,"

20   and has been Chairman of the Audit Committee for the last five years. Moreover, by colluding with

21   Defendants and others, as alleged herein, Bingham, Bond and Kaufman have demonstrated that they

22   are unable and unwilling to act independently of Defendants.

23        166.    The instant Complaint includes federal securities claims brought under the Exchange

24   Act for violations of §10(b) and Rule 10b-5 promulgated thereunder, and for violations of proxy

25   disclosure requirements under §14(a) of the Exchange Act and Cal. Corp. Code §25402. Under both

26   federal and Delaware law, proxy disclosure claims are not subject to the pre-suit demand

27   requirement because imposing such a requirement would enable a Board to override federal and

28

1    Delaware policy requiring full disclosure in all Proxy Statements. Indeed, the business judgment

2    rule does not apply to proxy disclosure claims.

3         167.    In relation to plaintiffs' other claims, prior demand upon a Board of Directors is

4    excused if plaintiffs allege facts that, if accepted as true, raise a reasonable doubt that: (a) the

5    challenged transaction was the product of a valid business judgment; or (b) a majority of the

6    directors are disinterested and independent. If either prong of this test is satisfied, demand is

7    excused.

8         168.    By reason of their corporate positions and their ability to control the business and

9    corporate affairs of KLA-Tencor at all relevant times, the directors of KLA-Tencor owed KLA-

10    Tencor and its stockholders fiduciary duties of candor, fidelity, trust, and loyalty, and are and were

11    required to use their ability to control KLA-Tencor in a fair, just and equitable manner, as well as to

12    act in furtherance of the best interests of KLA-Tencor and its stockholders. In addition, the directors

13    owed KLA-Tencor the fiduciary duty to exercise due care and diligence in the management and

14    administration of the affairs of KLA-Tencor and in the use and prevention of its property and assets.

15    In violation of their fiduciary duties, Defendants approved of and/or caused KLA-Tencor to issue

16    illegally backdated stock options to many of its employees for a period beginning in at least 1995

17    and continuing through 2005.

18       **A Majority of KLA-Tencor's Directors Are Not Independent and Disinterested**

19         169.    A majority of KLA-Tencor's Board are interested and/or incapable of independently

20    evaluating the claims in this lawsuit. Of the nine members of the Board at the time this action was

21    filed, a majority of them have significant conflicts which would make a demand on the Board futile

22    and useless. In particular:

23         (a)      Defendant Levy founded KLA Instruments in 1976 and was both Chairman of

24    the Board and CEO of the Company. Because of these dual roles, Levy is incapable of exercising

25    independent judgment regarding this action. Levy was Chair of KLA-Tencor's Nominating and

26    Governance Committee from 1997 and continued to serve on the Committee until October 17, 2006.

27    As the Chairman and/or member of the Nominating and Governance Committee, Levy had a

28    responsibility to oversee the Company's nomination of directors and developing and leading

1   corporate governance policies and principles at the Company.  As former Chairman and CEO of

2   KLA-Tencor, Levy stands to earn millions of dollars in retirement and severance compensation, all

3   of which must be approved by the current members of the Compensation Committee.  Though the

4   Company has repriced Levy's backdated options, it has not indicated that it will recover bonuses and

5   insider trading proceeds obtained in part by falsifying the Company's financial statements.  Indeed,

6   through the falsification of the Company's financial statements and, based upon his knowledge of

7   material non-public information regarding the Company, Levy has made over *$111 million* through

8   his sales of Company stock.  In addition, Levy is a director and a named defendant in *In re Juniper*

9   *Derivative Actions*, No. 5:06-cv-03396-JW, wherein he is alleged to have backdated stock options.

10  Juniper admitted on December 21, 2006 that it will restate *$900 million* in compensation expenses

11  due to improperly backdated stock options between 1997 and 2003.  Levy grossly abandoned his

12  fiduciary duties and betrayed KLA-Tencor and its shareholders by knowingly approving and/or

13  directing that Company directors and officers manipulate the grant date of stock options.

14  Accordingly, Levy is incapable of independently and disinterestedly considering a demand to

15  commence and vigorously prosecute the above-captioned action against Defendants;

16          (b)      Defendant Levy himself received backdated/misdated option grants.  Further,

17  Levy faces a significant likelihood of criminal and/or civil prosecution from his participation in, and

18  direction of, this fraudulent and illegal scheme.  There can be no doubt that these conflicts make

19  Levy interested in these transactions, and completely incapable of exercising independent judgment

20  regarding this lawsuit;

21          (c)      Defendant Bond has served as a director of the Company since 1997.

22  Between 2000 and 2005, Bond was a member of the Compensation Committee responsible for

23  reviewing and making recommendations to the Board concerning stock option issuances for certain

24  executive officers and certain employees.  During the Relevant Period, Bond represented that the

25  Compensation Committee reviewed and recommended individual options grants to the Board, taking

26  into account the officer's scope of responsibility and specific assignments, strategic and operational

27  goals applicable to the officer, anticipated performance requirements and contributions of the officer,

28  and the number of options previously granted to the officer.  Moreover, Bond falsely confirmed in

1    Compensation Committee reports that stock option grants were made at the fair market value on the

2    date of the grant.  These statements and assertions were knowingly false because Bond either: (i)

3    knew that KLA-Tencor granted options inconsistent with publicly disclosed policies or without any

4    approval or review by the Compensation Committee or the Board; or (ii) knew that KLA-Tencor's

5    Compensation Committee had illegally backdated option grants to increase their value to the

6    grantees contrary to the requirements of KLA-Tencor's Stock Option Plans.  Accordingly, Bond

7    ignored his fiduciary duties to KLA-Tencor, and deliberately or recklessly materially misrepresented

8    the level of review and oversight that the Compensation Committee provided.  Further, Bond also

9    has served on KLA-Tencor's Audit Committee from at least 2003 to 2005 and represented that the

10   Audit Committee provided oversight regarding the integrity of the Company's financial statements,

11   the Company's compliance with legal and regulatory requirements, and the Company's internal

12   accounting and financial controls.  As a member of the Audit Committee, Bond had a special duty to

13   know and understand the material information regarding the stock option grants as it affected the

14   Company's financial statements as provided for in the Audit Committee's charter.  Accordingly,

15   Bond knew or should have known that KLA-Tencor's financial statements were inaccurate and that

16   certain stock option grants were improperly accounted for.  Nonetheless, Bond permitted and/or

17   condoned the unlawful practices described herein, including preparing false reports in the

18   Company's Proxy Statements and annual reports and interim financial reports which did not disclose

19   this egregious practice.  Bond knew or deliberately disregarded that the Company had failed to

20   disclose material weaknesses in its financial statements and internal controls and specifically

21   misrepresented the Company's compliance with GAAP and APB Opinion No. 25.  Because Bond

22   either knew that KLA-Tencor had (a) backdated options without reporting the cost of such options in

23   KLA-Tencor's Proxy Statements or financial filings; or (b) allowed the backdating of options to

24   occur unchecked by failing to exercise adequate oversight over KLA-Tencor's financial reporting,

25   Bond ignored his fiduciary duties to KLA-Tencor, and deliberately misrepresented the level of

26   review and oversight that the Audit Committee provided.

27              (d)      Because of Bond's lack of due care with respect to his duties on the Audit

28   Committee, KLA-Tencor has suffered tremendous damages from this scandal.  Bond either knew

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW      - 65 -

1   that backdating was occurring on a systematic basis, or allowed for the waste of millions of dollars

2   of corporate assets by failing to provide the necessary oversight that could have prevented the

3   widespread manipulation of KLA-Tencor's Stock Option Plans. As a result, Bond could not

4   objectively consider a demand in this matter.

5            (e)       Defendant Kaufman has been a director of KLA-Tencor since 2002. Kaufman

6   has served on KLA-Tencor's Audit Committee since 2003. During the Relevant Period, Kaufman

7   represented that the Audit Committee provided oversight regarding the integrity of the Company's

8   financial statements, the Company's compliance with legal and regulatory requirements, and the

9   Company's internal accounting and financial controls. As a member of the Audit Committee,

10  Kaufman had a special duty to know and understand the material information regarding the stock

11  option grants as it affected the Company's financial statements as provided for in the Audit

12  Committee's charter. Accordingly, Kaufman knew or should have known that KLA-Tencor's

13  financial statements were inaccurate and that certain stock option grants were improper.

14  Nonetheless, Kaufman permitted and/or condoned the unlawful practices described herein, including

15  preparing false reports in the Company's Proxy Statements and annual reports and interim financial

16  reports which did not disclose this egregious practice. Accordingly, Kaufman knew or should have

17  known that KLA-Tencor's financial statements were false and certain stock options granted were

18  improperly accounted for. Kaufman knew or deliberately disregarded that the Company had failed

19  to disclose material weaknesses in its financial statements and internal controls and specifically

20  misrepresented the Company's compliance with APB Opinion No. 25 and that KLA-Tencor had

21  backdated options without reporting the cost of such options in KLA-Tencor's Proxy Statements or

22  financial filings. Alternatively, Kaufman allowed the backdating of options to occur unchecked by

23  failing to exercise adequate oversight over KLA-Tencor's financial reporting. In either respect,

24  Kaufman ignored his fiduciary duties to KLA-Tencor, and deliberately misrepresented the level of

25  review and oversight that the Audit Committee provided.

26           (f)       Because of Kaufman's lack of due care with respect to his duties on the Audit

27  Committee, KLA-Tencor has suffered tremendous damages from this scandal. Kaufman either knew

28  that backdating was occurring on a systematic basis, or allowed for the waste of millions of dollars

1  of corporate assets by failing to provide the necessary oversight that could have prevented the blatant

2  and widespread manipulation of KLA-Tencor's Stock Option Plans. As a result Kaufman could not

3  objectively consider a demand in this matter;

4          (g)      Defendant Barnholt has been a director of KLA-Tencor since 2001. Barnholt

5  has served on KLA-Tencor's Compensation Committee since 2003. During the Relevant Period,

6  Barnholt represented that the Compensation Committee reviewed option grants to KLA-Tencor

7  officers, and that the Compensation Committee approved and made recommendations to the Board

8  concerning incentive compensation for executive officers and employees. These statements and

9  assertions were false because Barnholt either knew that KLA-Tencor had granted options

10  inconsistent with the Stock Option Plans and/or knew that the KLA-Tencor Compensation

11  Committee or the Board was illegally backdating option grants to increase their value to the grantees

12  contrary to the requirements of KLA-Tencor's Stock Option Plans. In either respect, Barnholt

13  ignored fiduciary duties to KLA-Tencor and deliberately misrepresented the level of review and

14  oversight that the Compensation Committee provided. Barnholt cannot be independent and

15  disinterested in litigation that so directly implicates his abdication of his fiduciary duties. Because of

16  Barnholt's lack of due care with respect to his duties on the Compensation Committee, KLA-Tencor

17  has suffered tremendous damages from this scandal. Barnholt either knew that backdating was

18  occurring on a systematic basis, or allowed for the waste of millions of dollars of corporate assets by

19  failing to provide the necessary oversight that could have prevented the blatant and widespread

20  manipulation of KLA-Tencor's Stock Option Plans;

21          (h)      Defendant Bingham has been a director since 1999 and has served on KLA-

22  Tencor's Audit Committee from at least 2001 through 2005. During the Relevant Period, Bingham

23  represented that the Audit Committee provided oversight as provided in the Audit Committee

24  Charter regarding the integrity of the Company's financial statements, the Company's compliance

25  with legal and regulatory requirements, and the Company's internal accounting and financial

26  controls. As a member of the Audit Committee, Bingham had a special duty to know and understand

27  the material information regarding the stock option grants as it affected the Company's financial

28  statements as provided for in the Audit Committee's charter. Accordingly, Bingham knew or should

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 67 -

1    have known that KLA-Tencor's financial statements were inaccurate and that certain stock option

2    grants were improperly accounted for.    Nonetheless, Bingham permitted and/or condoned the

3    unlawful practices described herein, including preparing false reports in the Company's Proxy

4    Statements and annual reports and interim financial reports which did not disclose this egregious

5    practice.  These statements and assertions were false because Bingham either: (i) knew that KLA –

6    Tencor had in fact awarded backdated options without reporting the cost of such options in KLA-

7    Tencor's Proxy Statements or financial filings; or (ii) allowed the backdating of options to occur

8    unchecked by failing to exercise adequate oversight over KLA-Tencor's financial reporting.  In

9    either respect, Bingham ignored his fiduciary duties to KLA-Tencor, and deliberately misrepresented

10   the level of review and oversight that the Audit Committee provided;

11            (i)    •  Defendant Wallace has been a director of KLA-Tencor since November 16,

12   2005.  Defendant Wallace served as the Company's President and COO in 2005 and 2006.  Further,

13   during the Relevant Period, apart from receiving backdated stock options, Wallace sold 292,449

14   shares of KLA-Tencor stock for insider trading proceeds of $15.5 million.

15            (j)    Defendant Urbanek has been a director of KLA-Tencor since 1997 and has

16   served on KLA-Tencor's Compensation Committee since 1997.  During the Relevant Period

17   Urbanek represented that the Compensation Committee reviewed option grants to KLA-Tencor

18   officers, and made recommendations to the Board concerning incentive compensation for executive

19   officers and employees.  These statements and assertions were false because Urbanek either: (i)

20   knew that KLA-Tencor had issued stock options inconsistent with the Stock Option Plans which

21   provided that stock options were granted at fair market value on the grant date; or (ii) knew that the

22   Company's Board was backdating option grants to increase their value to the grantees contrary to the

23   requirements of KLA-Tencor's Stock Option Plans.  In either respect, she ignored her fiduciary

24   duties to KLA-Tencor, and deliberately or recklessly misrepresented the level of review and

25   oversight that the Compensation Committee provided.    Urbanek cannot be independent and

26   disinterested in litigation that so directly implicates her abdication of her fiduciary duties.  Because

27   of Urbanek's lack of due care with respect to her duties on the Compensation Committee, KLA-

28   Tencor has suffered tremendous damages from this scandal.  Urbanek either knew that backdating

1   was occurring on a systematic basis, or allowed for the waste of millions of dollars of corporate

2   assets by failing to provide the necessary oversight that could have prevented the blatant and

3   widespread manipulation of KLA-Tencor's Stock Option Plans.

4          (k)     Defendant Tompkins has served as a director since 1997 and served as

5   Chairman of the Board from July 1997 to June 1999. He also served as CEO of the Company from

6   May 1997 to July 1998.  He was a member of KLA-Tencor's Nominating and Governance

7   Committee in 1998, and as a member, he had a duty to oversee the Company's nomination of

8   directors, and a duty to develop corporate governance polices and lead with respect to those policies.

9   Because of Tompkins' positions, he knew the adverse non-public information about the business of

10  the Company, as well as its finances, markets and present and future business prospects, via access

11  to internal corporate documents, conversations and connections with other corporate officers and

12  employees, attendance at Board meetings and committees thereof and via reports and other

13  information provided to him in connection therewith.  Tompkins received backdated/misdated

14  options and based on his knowledge of material non-public information regarding the Company,

15  Tompkins violated Cal. Corp. Code §§25402 and 25502.5 by selling shares of KLA-Tencor stock for

16  proceeds of $31.5 million during the Relevant Period.

17  **Options Backdating Is Not the Product of Business Judgment Because It Is *Ultra Vires*,
    Illegal, and Contrary to the Stated Purpose of the Stock Option Plans**

18

19  170.    The practice of granting illegal and backdated stock options is not protected by the

20  business judgment rule because it is *ultra vires*.  The various stock option plans under which these

    options were purportedly given, and the Proxy Statements disclosing grants to senior executives and

21
    directors during this time period, all represented and required that the stock grants in question be
22
    priced on the fair market value of KLA-Tencor stock on the day of the grant.
23
24  171.    However, contrary to this limited authority given to the Board by KLA-Tencor's

25  Stock Option Plans, and contrary to KLA-Tencor's representations in the proxy filings, by KLA-

    Tencor's own admission, *most* of KLA-Tencor's option grants between 1997 and 2002 were priced
26
    at a date earlier than the actual date on which they were granted. Further, such conduct caused the
27
    Company's financial statements for nearly a decade to be false and misleading.  Because granting
28

1    options using manipulated grant dates to lower the strike price of the options is not permitted by the

2    Stock Option Plans, this conduct is *ultra vires* and void on its face. *Ultra vires* acts are not protected

3    by the business judgment rule, and thus demand is excused.

4         172.    Additionally, Defendants' conduct caused KLA-Tencor to issue materially false

5    financial reports and Proxy Statements for the entirety of the period in question, in violation of

6    numerous provisions of the federal securities laws. Each Defendant violated §10(b) and Rule 10b-5

7    of the Exchange Act by participating in this fraudulent scheme. Each director violated §14(a) of the

8    Exchange Act by issuing false and misleading Proxy Statements from 1995 to 2005. And each

9    director violated §20(a) of the Exchange Act by being controlling persons of KLA-Tencor and

10   engaging in the purchase and/or sale of KLA-Tencor stock while in the possession of material non-

11   public information regarding KLA-Tencor's backdating scheme. Demand is excused because these

12   are illegal acts that are not protected by the business judgment rule.

13        173.    Even if stock option backdating was not illegal, *ultra vires*, and void, there would be

14   no plausible argument that backdating stock options was a valid exercise of business judgment. As

15   represented in KLA-Tencor's Proxy Statements, the stated purpose of KLA-Tencor's Stock Option

16   Plans is to encourage the productivity of KLA-Tencor employees by providing compensation that is

17   proportional to gains in KLA-Tencor's stock price. However, by granting options with backdated

18   strike prices, Defendants undermined the purpose of the Stock Option Plans which was to incentivize

19   grant recipients to commit to the advancement of the Company's stock price thereby aligning the

20   interest of the employees with that of the Company. In effect, this practice was nothing more than

21   secret handouts to executives and employees at the expense of unsuspecting shareholders and the

22   market at large.

23        174.    Defendants could have achieved the stated purpose of attracting and retaining

24   qualified employees by granting those employees additional options under their incentive plans, or

25   by granting options at a price less than the fair market value on the day of the grant and simply

26   disclosing and expensing these grants. Instead, Defendants intentionally concealed these known

27   grants and illegally reported these grants in their financial disclosures to improve their bottom line.

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 70 -

175. Further, the practice of backdating stock options could not have been a valid exercise of business judgment because it has subjected KLA-Tencor to potentially massive liability. KLA-Tencor has disclosed that it will have to restate financial statements for several past periods. The Company's practices are being investigated by the SEC and DOJ. The Company will likely suffer tax liabilities for the additional compensation they will have to expense, and they have tarnished their reputation in the investment community through this deliberate and calculated conduct. In addition, the Company has already had to pay millions of dollars to keep their creditors at bay until they are able to file their most recent Form 10-Q.

176. In particular, demand would be a futile and useless act for the following reasons:

(a)     A majority of the current KLA-Tencor Board participated in or approved many of the acts and omissions or were on notice of and/or recklessly disregarded the wrongs complained of herein;

(b)     KLA-Tencor's Board ultimately had to approve all option grants. Some of the directors themselves received options by virtue of their employment at KLA-Tencor that were likely backdated;

(c)     Regardless of whether any individual director received a backdated grant, all of KLA-Tencor's directors benefited from the option backdating because it allowed KLA-Tencor to overstate its profits and understate its compensation expenses for the years in question. Thus, every time the directors exercised KLA-Tencor stock options – backdated or not – they were doing so with knowledge that KLA-Tencor's stock price was illegally overstated because of their approval of, or acquiescence to, these fraudulent practices. They have thus benefited from the wrongdoing herein alleged, and are incapable of exercising independent objective judgment in deciding whether to bring this action;

(d)     The acts complained of herein constitute violations of law and breaches of the fiduciary duties owed by KLA-Tencor's Board, and these acts are incapable of ratification;

(e)     In order to bring this action for breaching their fiduciary duties, the members of the KLA-Tencor Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW      - 71 -

1  entangling financial alliances, interests and dependencies, which they would not do. Therefore,
2  Defendants would not be able to vigorously prosecute any such action;

3         (f)     The composition of KLA-Tencor's Board is designed to (and does) make
4  them dependent on and deferential to the top officers of the Company and Chairman of the Board
5  who, as a practical matter, control and dominate the process by which directors are selected for
6  nomination or renomination to the Board;

7         (g)     If KLA-Tencor's current and past officers and directors are protected against
8  personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this
9  Complaint by directors' and officers' liability insurance, they caused the Company to purchase that
10  insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of
11  KLA-Tencor. However, due to certain changes in the language of directors' and officers' liability
12  insurance policies in the past several years, the directors' and officers' liability insurance policies
13  covering Defendants in this case contain provisions which eliminate coverage for any action brought
14  directly by KLA-Tencor against these Defendants, known as, *inter alia*, the "insured versus insured
15  exclusion." As a result, if these directors were to sue themselves or certain of the officers of KLA-
16  Tencor, there would be no directors' and officers' insurance protection and thus, this is a further
17  reason why they would not bring such a suit. On the other hand, if the suit is brought derivatively, as
18  this action is brought, such insurance coverage exists and will provide a basis for the Company to
19  effectuate a recovery. If there is no directors' and officers' liability insurance at all, then Defendants
20  will not cause KLA-Tencor to sue them, since they will face a large uninsured liability.

21      177.    Because plaintiffs can show a reasonable doubt that a majority of KLA-Tencor's
22  directors at the time of suit were disinterested and independent at the time of suit, and because the
23  challenged transaction was clearly not the product of a valid business judgment, a demand upon
24  KLA-Tencor's Board would be futile and is excused.

25      178.    Plaintiffs have not made any demand on shareholders of KLA-Tencor to institute this
26  action since such demand would be a futile and useless act for the following reasons:

27         (a)     KLA-Tencor is a publicly traded Company with approximately 199 million
28  shares outstanding, and thousands of shareholders;

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW   - 72 -

1    (b)  Making a demand on such a number of shareholders would be impossible for

2 plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders;

3 and

4    (c)  Making a demand on all shareholders would force plaintiffs to incur huge

5 expenses, assuming all shareholders could be individually identified.

6         **TOLLING OF THE STATUTE OF LIMITATIONS**

7    179.  The Counts alleged herein are timely. As an initial matter, Defendants wrongfully

8 concealed their manipulation of the stock option plans, through strategic timing and fraudulent

9 backdating, by issuing false and misleading Proxy Statements, by falsely reassuring KLA-Tencor's

10 public investors that KLA-Tencor's option grants were being administered by a committee of

11 independent directors, and by failing to disclose that backdated options were, in fact, actually issued

12 on dates other than those disclosed, and that strategically timed option grants were issued based on

13 the manipulation of insider information that ensured that the true fair market value of the Company's

14 stock was, in fact, higher than the publicly traded price on the date of the option grant.

15    180.  KLA-Tencor's public investors had no reason to know of the Defendants' breach of

16 their fiduciary duties until May 2006, when *The Wall Street Journal* published its article detailing

17 the option practices of KLA-Tencor and other companies.

18    181.  Finally, as fiduciaries of KLA-Tencor and its public shareholders, the Defendants

19 cannot rely on any limitations defense where they withheld from KLA-Tencor's public shareholders

20 the facts that give rise to the claims asserted herein, *i.e.,* that the KLA-Tencor Board had abdicated

21 its fiduciary responsibilities to oversee the Company's executive compensation practices, and that

22 the option grant dates had been manipulated to maximize the profit for the grant recipients and,

23 accordingly, to maximize the costs for the Company.

24             **COUNT I**

25    **Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**
            **Against All Defendants**
26

27    182.  Plaintiffs incorporate by reference and reallege each and every allegation set forth

above, as though fully set forth herein.
28

1      183.    Throughout the Relevant Period, Defendants individually and in concert, directly and

2   indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails,

3   engaged and participated in a continuous course of conduct designed to divert hundreds of millions

4   of dollars to Defendants via improper option grants.

5      184.    Defendants employed devices, schemes and artifices to defraud while in possession of

6   material, adverse non-public information and engaged in acts, practices and a course of conduct that

7   included the making of, or participation in the making of, untrue and/or misleading statements of

8   material facts and/or omitting to state material facts necessary in order to make the statements made

9   about KLA-Tencor not misleading.

10     185.    Defendants, as top executive officers and directors of the Company, are liable as

11  direct participants in the wrongs complained of herein.  Through their positions of control and

12  authority as officers of the Company, each of the Defendants was able to and did control the conduct

13  complained of herein and the content of the public statements disseminated by KLA-Tencor.

14     186.    Defendants acted with scienter throughout the Relevant Period, in that they either had

15  actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or

16  acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true

17  facts, even though such facts were available to them.  Defendants were among the senior

18  management of the Company, and were therefore directly responsible for the false and misleading

19  statements and/or omissions disseminated to the public through press releases, news reports and

20  filings with the SEC.

21     187.    Each of the Defendants participated in a scheme to defraud with the purpose and

22  effect of defrauding KLA-Tencor.

23     188.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act, and

24  Rule 10b-5 promulgated thereunder.

25

26

27

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 74 -

**COUNT II**

**Violations of Section 14(a) of the Exchange Act Against
All Defendants**

189.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

190.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no Proxy Statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

191.    The FY 1995-2005 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were causing KLA-Tencor to engage in an options backdating scheme, a fact which Defendants were aware of and participated in from at least 1994.

192.    In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

193.    The misrepresentations and omissions in the Proxy Statements were material to plaintiffs in voting on each Proxy Statement. The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

194.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

<center>COUNT III</center>

<center>**Violations of Section 20(a) of the Exchange Act Against
Defendants Levy, Schroeder, Wallace, Kispert, Hall, Tompkins,
Urbanek, Bingham, Bond, Barnholt and Kaufman**</center>

195.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

196.   Plaintiffs bring this claim against defendants Levy, Schroeder, Wallace, Kispert, Hall, Tompkins, Urbanek, Bingham, Bond, Barnholt and Kaufman.

197.   Defendants named in this Count, by virtue of their positions with KLA-Tencor and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of KLA-Tencor within the meaning of §20(a) of the Exchange Act. They had the power and influence and exercised the same to cause KLA-Tencor to engage in the illegal conduct and practices complained of herein.

<center>COUNT IV</center>

<center>**Accounting**</center>

198.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

199.   At all relevant times, Defendants, as directors and/or officers of KLA-Tencor, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

200.   In breach of their fiduciary duties owed to KLA-Tencor and its shareholders, the Defendants caused KLA-Tencor, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of KLA-Tencor. By this wrongdoing, Defendants breached their fiduciary duties owed to KLA-Tencor and its shareholders.

201.   Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to Defendants.

202.   As a result of Defendants' misconduct, KLA-Tencor has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

1    203.    Plaintiffs demand an accounting be made of all stock options grants made to

2 Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the

3 value of the grants, the recipients of the grants, the exercise date of stock options granted to

4 Defendants, as well as the disposition of any proceeds received by Defendants via sale or other

5 exercise of backdated stock option grants received by Defendants.

6 <div align="center">**COUNT V**</div>

7 <div align="center">**Breach of Fiduciary Duty and/or Aiding and Abetting Against All Defendants**</div>

8    204.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

9 above, as though fully set forth herein.

10    205.    Each of Defendants agreed to and did participate with the other Defendants and/or

11 aided and abetted one another in a deliberate course of action designed to divert corporate assets in

12 breach of the fiduciary duties Defendants owed to the Company.

13    206.    Defendants have violated fiduciary duties of care, loyalty, candor and independence

14 owed to KLA-Tencor and its public shareholders, have engaged in unlawful self-dealing and have

15 acted to put their personal interests and/or their colleagues' interests ahead of the interests of KLA-

16 Tencor and its shareholders.

17    207.    As demonstrated by the allegations above, Defendants failed to exercise the care

18 required, and breached their duties of loyalty, good faith, candor and independence owed to KLA-

19 Tencor and its public shareholders, and they failed to disclose material information and/or made

20 material misrepresentations to shareholders regarding Defendants' options backdating scheme.

21    208.    By reason of the foregoing acts, practices and course of conduct, Defendants have

22 failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward

23 KLA-Tencor and its public shareholders.

24    209.    As a proximate result of Defendants' conduct, KLA-Tencor has been injured and is

25 entitled to damages.

26

27

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW   - 77 -

1                              **COUNT VI**

2              **Abuse of Control Against All Defendants**

3        210.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

4    above, as though fully set forth herein.

5        211.    Defendants employed the alleged scheme for the purpose of maintaining and

6    entrenching themselves in their positions of power, prestige and profit at, and control over, KLA-

7    Tencor, and to continue to receive the substantial benefits, salaries and emoluments associated with

8    their positions at KLA-Tencor.  As a part of this scheme, Defendants actively made and/or

9    participated in the making of or aided and abetted the making of, misrepresentations regarding KLA-

10   Tencor.

11       212.    Defendants' conduct constituted an abuse of their ability to control and influence

12   KLA-Tencor.

13       213.    By reason of the foregoing, KLA-Tencor has been damaged.

14                             **COUNT VII**

15             **Gross Mismanagement Against All Defendants**

16       214.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

17   above, as though fully set forth herein.

18       215.    Defendants had a duty to KLA-Tencor and its shareholders to prudently supervise,

19   manage and control the operations, business and internal financial accounting and disclosure controls

20   of KLA-Tencor.

21       216.    Defendants, by their actions and by engaging in the wrongdoing described herein,

22   abandoned and abdicated their responsibilities and duties with regard to prudently managing the

23   businesses of KLA-Tencor in a manner consistent with the duties imposed upon them by law.  By

24   committing the misconduct alleged herein, Defendants breached their duties of due care, diligence

25   and candor in the management and administration of KLA-Tencor's affairs and in the use and

26   preservation of KLA-Tencor's assets.

27       217.    During the course of the discharge of their duties, Defendants knew or recklessly

28   disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW      - 78 -

1    caused KLA-Tencor to engage in the scheme complained of herein which they knew had an

2    unreasonable risk of damage to KLA-Tencor, thus breaching their duties to the Company. As a

3    result, Defendants grossly mismanaged KLA-Tencor.

4         218.    By reason of the foregoing, KLA-Tencor has been damaged.

5                          **COUNT VIII**

6                 **Constructive Fraud Against All Defendants**

7         219.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

8    above, as though fully set forth herein.

9         220.    As corporate fiduciaries, Defendants owed to KLA-Tencor and its shareholders a duty

10   of candor and full accurate disclosure regarding the true state of KLA-Tencor's business and assets

11   and their conduct with regard thereto.

12        221.    As a result of the conduct complained of, Defendants made, or aided and abetted the

13   making of, numerous misrepresentations to and/or concealed material facts from KLA-Tencor's

14   shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of

15   KLA-Tencor. Thus they have committed constructive fraud and violated their duty of candor.

16        222.    By reason of the foregoing, KLA-Tencor has been damaged.

17                          **COUNT IX**

18                 **Corporate Waste Against All Defendants**

19        223.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

20   above, as though fully set forth herein.

21        224.    By failing to properly consider the interests of the Company and its public

22   shareholders, by failing to conduct proper supervision, by giving away millions of dollars to

23   Defendants via the options backdating scheme, Defendants have caused KLA-Tencor to waste

24   valuable corporate assets.

25        225.    As a result of Defendants' corporate waste, they are liable to the Company.

26

27

28

<center>**COUNT X**</center>

<center>**Unjust Enrichment Against All Defendants**</center>

226.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

227.    As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of KLA-Tencor, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

228.    Certain Defendants also obtained severance benefits that were not earned or justified but were instead paid as part of a scheme to cover up Defendants' complicity in the scheme.

229.    All the payments and benefits provided to Defendants were at the expense of KLA-Tencor. The Company received no benefit from these payments. KLA-Tencor was damaged by such payments.

230.    Certain of the Defendants sold KLA-Tencor stock for a profit during the period of deception, misusing confidential non-public corporate information. These Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of KLA-Tencor. A constructive trust for the benefit of the Company should be imposed thereon.

<center>**COUNT XI**</center>

<center>**Against the Officer Defendants for Rescission**</center>

231.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

232.    As a result of the acts alleged herein, the stock option contracts between the Officer Defendants and KLA-Tencor entered into during the Relevant Period were obtained through Defendants' fraud, deceit, and abuse of control. Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding the Officer Defendants' employment agreements and the Company's Stock Option Plan which was also approved by KLA-Tencor shareholders and filed with the SEC.

233.    All contracts which provide for stock option grants between the Officer Defendants and KLA-Tencor and were entered into during the Relevant Period should, therefore, be rescinded,

1    with all sums paid under such contracts returned to the Company, and all such executory contracts

2    cancelled and declared void.

3                                   **COUNT XII**

4                   **Against the Insider Selling Defendants for Violation of**
                       **California Corporations Code Section 25402**

5

6    234.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

     above, as though fully set forth herein.

7

8    235.    At the time that the Insider Selling Defendants sold their KLA-Tencor common stock

9    as set forth herein at ¶27, by reason of their high executive and/or directorial positions with KLA-

     Tencor, the Insider Selling Defendants had access to highly material information regarding the

10

11   Company, including the information set forth herein regarding the true adverse facts of KLA-

     Tencor's improper accounting.

12

13   236.    At the time of such sales, that information was not generally available to the public or

14   the securities markets. Had such information been generally available, it would have significantly

     reduced the market price of KLA-Tencor shares at that time.

15

16   237.    The Insider Selling Defendants, and each of them, had actual knowledge of material,

17   adverse non-public information and thus sold their KLA-Tencor common stock in California in

     violation of Cal. Corp. Code §25402.

18

19   238.    Pursuant to California Corporations Code §25502.5, the Insider Selling Defendants,

20   and each of them, are liable to KLA-Tencor for damages in an amount up to three times the

     difference between the price at which KLA-Tencor common stock was sold by these Defendants,

21

22   and each of them, and the market value which KLA-Tencor common stock would have had at the

     time of the sale if the information known to these Defendants, and each of them, had been publicly

23

24   disseminated prior to that time and a reasonable time had elapsed for the market to absorb the

     information.

25

26

27

28

1

**COUNT XIII**

2

**Against the Insider Selling Defendants for Breach of Fiduciary
Duties for Insider Selling and Misappropriation of Information**

3

239.     Plaintiffs incorporate by reference and reallege each and every allegation set forth

4

above, as though fully set forth herein.

5

240.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the

6

information described above, and sold KLA-Tencor common stock on the basis of such information.

7

241.     The information described above was proprietary non-public information concerning

8

the Company's financial condition and future business prospects.  It was a proprietary asset

9

belonging to the Company, which the Insider Selling Defendants used for their own benefit when

10

they sold KLA-Tencor common stock.

11

242.     At the time of their stock sales, the Insider Selling Defendants knew that the

12

Company's revenues were materially overstated.  The Insider Selling Defendants' sales of KLA-

13

Tencor common stock while in possession and control of this material adverse non-public

14

information was a breach of their fiduciary duties of loyalty and good faith.

15

243.     Since the use of the Company's proprietary information for their own gain constitutes

16

a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the

17

imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

18

**PRAYER FOR RELIEF**

19

WHEREFORE, plaintiffs demand judgment as follows:

20

A.     Awarding money damages against all Defendants, jointly and severally, for all losses

21

and damages suffered as a result of the acts and transactions complained of herein, together with pre-

22

judgment interest, to ensure Defendants do not participate therein or benefit thereby;

23

B.     Directing all Defendants to account for all damages caused by them and all profits

24

and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct,

25

including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and

26

imposing a constructive trust thereon;

27

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW     - 82 -

1        C.      Directing KLA-Tencor to take all necessary actions to reform and improve its

2  corporate governance and internal control procedures to comply with applicable law, including, but

3  not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's

4  By-Laws or Articles of Incorporation and taking such other action as may be necessary to place

5  before shareholders for a vote adoption of the following Corporate Governance Policies:

6        (i)     a proposal requiring that the office of CEO of KLA-Tencor and

7  Chairman of the KLA-Tencor Board be permanently held by separate individuals and that the

8  Chairman of the KLA-Tencor Board meets rigorous "independent" standards;

9        (ii)    a proposal to strengthen the KLA-Tencor Board's supervision of

10  operations and develop and implement procedures for greater shareholder input into the policies and

11  guidelines of the Board;

12        (iii)   appropriately test and then strengthen the internal audit and control

13  functions;

14        (iv)   rotate independent auditing firms every five years;

15        (v)    control and limit insider stock selling and the terms and timing of

16  stock option grants; and

17        (vi)   reform executive compensation.

18    D.      Ordering the imposition of a constructive trust over Defendants' stock options and

19  any proceeds derived therefrom;

20    E.      Awarding punitive damages;

21    F.      Awarding costs and disbursements of this action, including reasonable attorneys',

22  accountants', and experts' fees; and

23    G.     Granting such other and further relief as this Court may deem just and proper.

24

25

26

27

28

1                              **JURY DEMAND**

2          Plaintiffs demand a trial by jury.

3    DATED: February 20, 2007                    LERACH COUGHLIN STOIA GELLER
                                                    RUDMAN & ROBBINS LLP
4                                               SHAWN A. WILLIAMS
                                                MONIQUE C. WINKLER
5                                               AELISH M. BAIG

6

7                                                   _____/s/Shawn A. Williams_____
                                                        SHAWN A. WILLIAMS
8
                                                100 Pine Street, Suite 2600
9                                               San Francisco, CA 94111
                                                Telephone: 415/288-4545
10                                              415/288-4534 (fax)

11                                              LERACH COUGHLIN STOIA GELLER
                                                    RUDMAN & ROBBINS LLP
12                                              TRAVIS E. DOWNS III
                                                BENNY C. GOODMAN III
13                                              655 West Broadway, Suite 1900
                                                San Diego, CA 92101-3301
14                                              Telephone: 619/231-1058
                                                619/231-7423 (fax)
15
                                                LERACH COUGHLIN STOIA GELLER
16                                                  RUDMAN & ROBBINS LLP
                                                THOMAS WILHELM
17                                              9601 Wilshire Blvd., Suite 510
                                                Los Angeles, CA 90210
18                                              Telephone: 310/859-3100
                                                310/278-2148 (fax)
19
                                                Lead Counsel for Plaintiffs
20
     T:\CasesSF\KLA-Tencor Derivative\CPT00039317.doc
21

22

23

24

25

26

27

28

1

<u>VERIFICATION</u>

2        I, SHAWN A. WILLIAMS, hereby declare as follows:

3        2.    I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins,

4 LLP, counsel for plaintiff in the above-entitled action. I have read the foregoing Complaint and

5 know the contents thereof. I am informed and believe the matters therein are true and on that ground

6 allege that the matters stated therein are true.

7        3.    I make this Verification because plaintiff is absent from the County of San Francisco

8 where I maintain my office.

9        Executed this 20th day of February 2007 at San Francisco, California.

10

11                    /s/Shawn A. Williams

                             SHAWN A. WILLIAMS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2          I hereby certify that on February 20, 2007 I electronically filed the foregoing with the Clerk

3  of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4  addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5  mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6  participants indicated on the attached Manual Notice List.

7

8

9                                         /s/Shawn A. Williams
                                   SHAWN A. WILLIAMS

10                                 LERACH COUGHLIN STOIA GELLER
                                      RUDMAN & ROBBINS LLP
11                                 100 Pine Street, Suite 2600
                                   San Francisco, CA  94111
12                                 Telephone:  415/288-4545
                                   415/288-4534 (fax)
13                                 E-mail:ShawnW@lerachlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 3:08-cv-02249-CRB    Document 1-6    Filed 04/30/2008    Page 88 of 89
CAND-ECF                                                                Page 1 of 2
Case 5:06-cv-03445-JW    Document 88    Filed 02/20/2007    Page 88 of 89

# Mailing Information for a Case 5:06-cv-03445-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Christopher J. Banks**
  cbanks@morganlewis.com

- **Paul F. Bennett**
  pfb@gbcslaw.com cgw@gbcslaw.com

- **Miles F. Ehrlich**
  miles@ramsey-ehrlich.com milesmf@yahoo.com

- **Joseph Edward Floren**
  jfloren@morganlewis.com rluke@morganlewis.com

- **Geoffrey M. Johnson**
  gjohnson@scott-scott.com aslaughter@scott-scott.com

- **Craig D Martin**
  cmartin@mofo.com

- **Leigh A. Parker**
  info@wllawca.com lparker@wllawca.com

- **Warrington S. Parker, III**
  wparker@hewm.com
  tchurch@hewm.com;kim.sydorak@hellerehrman.com

- **David Priebe**
  david.priebe@dlapiper.com stacy.murray@dlapiper.com

- **Patrick David Robbins**
  probbins@shearman.com

- **David R. Scott**

CAND-ECF
Case 3:08-cv-02249-CRB    Document 1-6    Filed 04/30/2008    Page 89 of 89
Page 2 of 2
Case 5:06-cv-00445-JW    Document 88    Filed 02/20/2007    Page 89 of 89

drscott@scott-scott.com

- **Arthur L. Shingler, III**
  ashingler@scott-scott.com ssawyer@scott-scott.com

- **Benjamin P. Smith**
  bpsmith@morganlewis.com ewoodward@morganlewis.com

- **Robert P. Varian**
  rvarian@orrick.com

- **Shirli Fabbri Weiss**
  shirli.weiss@dlapiper.com

- **Shawn A. Williams**
  shawnw@lerachlaw.com
  e_file_sd@lerachlaw.com;e_file_sf@lerachlaw.com;aelishb@lerachlaw.c

- **Denise V. Zamore**
  dzamore@scott-scott.com cmcgowan@scott-scott.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

1   Joseph J. Tabacco, Jr. (SBN 75484)
    Email: jtabacco@bermanesq.com
2   Christopher T. Heffelfinger (SBN 118058)
    Email: cheffelfinger@bermanesq.com
3   Nicole Lavallee (SBN 165755)
    Email: nlavallee@bermanesq.com
4   Lesley Ann Hale (SBN 237726)
    Email: lhale@bermanesq.com
5   **BERMAN DeVALERIO PEASE TABACCO**
    **BURT & PUCILLO**
6   425 California Street, Suite 2100
    San Francisco, CA  94104
7   Telephone: (415) 433-3200
    Facsimile:  (415) 433-6382
8
    Member of Plaintiffs' Executive Committee and Liaison Counsel
9
10  [Additional counsel appear on signature page]

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13

| | |
|---|---|
| 14  IN RE KLA-TENCOR CORP. SECURITIES LITIGATION | Master File No. 06-cv-04065-MJJ |
| 15 | **CLASS ACTION** |
| 16 | **CONSOLIDATED FEDERAL** |
| 17  THIS DOCUMENT RELATES TO: ALL ACTIONS | **SECURITIES CLASS ACTION COMPLAINT** |
| 18 | **JURY TRIAL DEMANDED** |
| 19 | |

20

21

22

23

24

25

26

27

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

1

## TABLE OF CONTENTS

2    I.    NATURE OF THE ACTION ......................................................................... 1

3    II.    JURISDICTION AND VENUE ................................................................... 7

4    III.    THE PARTIES........................................................................................... 7

5        A.    THE LEAD PLAINTIFFS ............................................................... 7

6        B.    THE DEFENDANTS ...................................................................... 8

7            (i)    The Company..................................................................... 8

8            (ii)    The Officer Defendants: Wallace, Schroeder, Dickerson, Kispert,
                Hall, Boehlke and Nichols ............................................... 8
9

10            (iii)    The Compensation Committee Defendants: Urbanek, Marks,
                Barnholt and Bond ........................................................ 13

11            (iv)    The Audit Committee Defendants: Bingham, Elkus, Morton
                Kaufman And Bond ...................................................... 15
12

13            (v)    The Nominating and Governance Committee Defendants: Levy,
                Morton, Barnholt, Schroeder, Elkus, Bingham and Kaufman ...................... 18

14            (vi)    The Additional Outside Director Defendant: Tompkins ................................. 21

15    IV.    CLASS ACTION ALLEGATIONS ........................................................... 23

16    V.    BACKGROUND ....................................................................................... 26

17        A.    CONFIDENTIAL WITNESSES ................................................... 26

18        B.    KLA'S STOCK OPTION PLANS ................................................ 27

19            1.    The Restated 1982 Stock Option Plan ........................... 28

20            2.    The 1998 Outside Director Option Plan ........................ 29

21            3.    The 2004 Equity Incentive Plan .................................... 30

22    VI.    SUBSTANTIVE ALLEGATIONS............................................................ 31

23        A.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ......................... 31

24            1.    False and Misleading Financial Statements..................... 32

25                (a)    The Misleading Financials....................................... 32

26                (b)    The Reasons Why The Financial Statements Were False
                    And Misleading.................................................... 60

27                    (i)    Improper Accounting For Stock Options........................ 61
28

|   |   | (ii) | Improper Tax Reporting For Stock Options .................................. 64 |
|   |   | (iii) | The Misleading Statements In The Management Discussion And Analysis Section Of The Financial Statements ... 66 |
|   | 2. | The False and Misleading Statements Regarding the Option Grants .............. 69 |
|   |   | (a) | The Misleading Statements ................................................................. 69 |
|   |   | (b) | The Reasons Why The Statements Were False And Misleading .......... 81 |
|   | 3. | The False and Misleading Statements Regarding Internal Controls .............. 82 |
|   |   | (a) | The Misleading Statements ................................................................. 82 |
|   |   | (b) | The Reasons Why These Statements Were False and Misleading ......... 88 |
| B. | DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD ............................... 90 |
|   | 1. | Defendants' Manipulation of Option Grants and KLA's Stock Purchase Plan ................................................................................... 91 |
|   | 2. | Defendants' Manipulative And Deceptive Exercise Of Backdated Options ... 94 |
|   | 3. | Defendants' Manipulative And Deceptive Understating of Expenses, Improper Tax Treatment of Options And Misrepresentation Of The Company's Financial Results ............................................................ 94 |
|   | 4. | Defendants' Participation In The Understating And Misrepresentation Of Officer And Director Compensation .................................................. 96 |
|   | 5. | Defendants' Manipulative And Deceptive Acts Regarding The Company's Tax Withholding Obligations ..................................................... 96 |
|   | 6. | Defendants' Failure To Establish Sound Internal Controls And Allow Deficiencies And Material Weaknesses ............................................... 99 |
| C. | THE TRUTH BEGINS TO EMERGE ................................................................. 100 |
| D. | ADDITIONAL *SCIENTER* ALLEGATIONS ....................................................... 113 |
|   | 1. | The Company's Own Admissions And Recent Actions Establish Defendants' *Scienter* ............................................................................. 114 |
|   | 2. | Defendants' Specific Participation In The Backdating Establish Their *Scienter* ...................................................................................... 115 |
|   | 3. | Defendants' Efforts To Recruit And Retain Executives And Employees Supports A Strong Inference Of *Scienter* ....................................... 116 |
|   | 4. | Defendants' Personal Enrichment Through Lucrative Stock Option Grants And Insider Trading Further Supports A Finding Of *Scienter* ......... 118 |
|   | 5. | The Pervasiveness Of The Fraudulent Conduct And The Nature |

Of The Accounting Rules At Issue Further Support A Strong
Inference Of *Scienter* ................................................................................ 160

E.    LOSS CAUSATION................................................................................ 164

F.    PRESUMPTION OF RELIANCE ........................................................... 166

G.    NO SAFE HARBOR ............................................................................... 166

CLAIMS FOR RELIEF .................................................................................................... 167

COUNT I ........................................................................................................................... 167

COUNT II .......................................................................................................................... 170

COUNT III ......................................................................................................................... 171

COUNT IV ......................................................................................................................... 173

COUNT V ........................................................................................................................... 175

PRAYER FOR RELIEF .................................................................................................... 176

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

1    Lead Plaintiffs Police and Fire Retirement System of the City of Detroit ("PFRS"),

2    Louisiana Municipal Police Employees' Retirement System ("MPERS") and the City of

3    Philadelphia Board of Pensions and Retirement ("CPBPR"), by their attorneys, on behalf of

4    themselves and all others similarly situated, allege the following based upon the investigation of

5    Lead Plaintiffs' counsel, except as to the allegations specifically pertaining to Lead Plaintiffs,

6    which are based upon personal knowledge. The investigation of counsel included, among other

7    things, a review of KLA-Tencor Corporation's ("KLA" or the "Company") public filings with

8    the United States Securities and Exchange Commission ("SEC"), press releases issued by the

9    Company, media and news reports about the Company, publicly available trading data for

10   KLA's securities and interviews with former employees of the Company ("Confidential

11   Witnesses").

12   **I.    NATURE OF THE ACTION**

13       1.    This is a class action brought on behalf of a class consisting of all persons who

14   purchased publicly traded securities of KLA between June 30, 2001 and May 21, 2006,

15   inclusive ("Class Period"). The following are named as defendants in this action: KLA,

16   Richard P. Wallace, Kenneth L. Schroeder, Kenneth Levy, Jon D. Tompkins, Stephen P.

17   Kaufman, Gary E. Dickerson, Jeffrey L. Hall, John H. Kispert, Lida Urbanek, Michael E.

18   Marks, Edward W. Barnholt, Robert T. Bond, Richard J. Elkus, Jr., H. Raymond Bingham,

19   Dean O. Morton, Stuart J. Nichols and Robert J. Boehlke.

20       2.    This action involves an ***admitted intentionally*** fraudulent scheme that spanned

21   nearly a decade. At the crux of the fraudulent scheme was a practice whereby defendants

22   intentionally manipulated stock option grants to the Company's officers, directors and

23   employees in order to provide the recipients with a more profitable exercise price. The

24   Company has ***admitted*** that some of its executives had engaged in this scheme knowingly. As a

25   result of this scheme, ***the Company has been forced to restate its previously filed financial***

26   ***statements*** for fiscal years ended June 30, 2005 and 2004 and selected consolidated financial

27   data for fiscal years ended June 30, 2005, 2004, 2003 and 2002 ***by over $375 million.*** This

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    1

1    restatement represents *one of the largest restatements (or projected restatement) of any*
2    *company that has admitted to options backdating*.  According to the scorecard kept by *The*
3    *Wall Street Journal*, approximately 62 companies have announced restatements and KLA is in
4    the top five in terms of dollar value of the projected or announced restatements.

5         3.    Publicly traded companies routinely award stock options to their officers,
6    directors and employees.  Stock options are granted as part of compensation packages to create
7    incentives to boost profitability and stock value.   Such stock options allow the officer, director
8    or employee to purchase company stock at a specified price ("exercise price" or "strike price")
9    for a specific period of time.  When an officer, director or employee exercises the option, he or
10   she purchases the stock from the company at the exercise price, regardless of the stock's price at
11   the time the option is exercised.   The lower the exercise price, the more profit the officer,
12   director or employee can potentially make and the less money the company gets when the stock
13   option is exercised.  When the exercise price of an option grant is set at the market price on the
14   date of the grant, *i.e.*, "at-the-money," the option holder will profit only if the stock price goes
15   up over time.  Thus, one of the benefits of such stock options is that they align the interests of
16   the officers, directors and employees with the interests of the company's shareholders because
17   the value of the options only increases if the company's stock price increases.  When, however,
18   the option is set below the market price on the date of the grant, *i.e.*, "in-the-money," the option
19   holder receives options that immediately have value.

20        4.    In early 2006, it came to light that a number of publicly traded companies had
21   been manipulating the exercise price of option grants to officers, directors and employees in
22   improper ways and for improper purposes.  The main type of price manipulation is referred to
23   as "backdating."  Backdating is the process of retroactively cherry picking an earlier date –
24   when the underlying stock price was lower – as the grant date in order to assign a lower
25   exercise price to the option.

26        5.    Here, defendants manipulated the stock option grants to officers, directors and
27   employees from the late 1990s through the entire Class Period in a number of ways.  Most
28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    2

1   notably, *the Company has admitted that "certain of our stock options primarily those granted*
2   *from July 1, 1997 to June 30, 2002, had been retroactively priced for all employees who*
3   *received these grants.... This means that the option exercise price was not the market price*
4   *of the option shares on the actual grant date of the option, but instead was a lower market*
5   *price on an earlier date. The actual grant date – when the essential actions necessary to*
6   *grant the option were completed, including the final determination of the number of shares to*
7   *be granted to each employee and the exercise price – is the correct measurement date to*
8   *determine the market price of the option shares under the accounting rules in effect at the*
9   *time."* (Emphasis added.)

10      6.      Stock option manipulation and, in particular, the practice of granting an option
11   with an exercise price tied to a date prior to the actual grant date is fraudulent where, for
12   example, (a) the backdating of grant dates violates the terms of the company's stock option
13   plan; (b) the company misrepresents how the options are priced; or (c) the company fails to
14   properly record expenses associated with these option grants under Generally Accepted
15   Accounting Principles ("GAAP"). All three of these circumstances existed here.

16      7.      Defendants' manipulation of – and, in particular, the backdating of – stock
17   option grants was not a legitimate exercise of their discretion to grant options. Rather, it was
18   the linchpin of a broader fraudulent scheme to profit from increases in the Company's stock
19   price with the benefit of hindsight and to misrepresent and withhold truthful material
20   information from the public about this scheme. In furtherance of this fraudulent scheme,
21   defendants engaged in the following misconduct:

22          (a)      Defendants failed to report expenses associated with the backdated
23   options and thereby materially understated KLA's expenses and materially overstated its net
24   income and earnings per share in direct contravention of the most basic GAAP principles. If the
25   options are priced below a stock's fair market value when they are awarded, there is an instant
26   paper gain. Pursuant to Accounting Principles Board ("APB") Opinion No. 25 "Accounting for
27   Stock Issued to Employees" ("APB No. 25"), which was in effect through June 2005, the
28

1    Company was obligated to recognize this gain as compensation expense over the vesting period

2    of the option. After June 2005, Statement of Financial Accounting Standards ("SFAS") 123,

3    "Accounting For Stock-Based Compensation" ("SFAS 123"), required that the Company

4    recognize the entire value of the options on the grant date over the vesting period of the option.

5    However, as the Company just recently admitted, *"the retroactively priced options were not*

6    *accounted for correctly in our previously issued financial statements" under either of these*

7    *two GAAP principles. Accordingly, the Company was forced to restate its prior financial*

8    *results by recording additional pre-tax, non-cash, stock-based compensation expense of (i)*

9    *$348 million for the periods July 1, 1994 to June 30, 2005 under APB Opinion No. 25"; and*

10   *(ii) "$28 million for the period from July 1, 2005 through December 31, 2006 under SFAS*

11   *No. 123(R)" in order "[to] correct our past accounting for stock options." ("Restatement")*

12   (Emphasis added.). A further restatement for the third quarter of fiscal year 2006 ("Q3FY06")

13   is still pending.

14         (b)    By retroactively pricing the options, defendants also caused the Company

15   to issue options with terms that violated the express requirements of the Company's stock

16   option plans, which rendered the Company's public representations that options were issued in

17   compliance with the Company's stock option plans false and misleading. Specifically, three of

18   the Company's stock option plans – the Restated 1982 Stock Option Plan, the 1998 Outside

19   Director Option Plan and the 2004 Equity Incentive Plan – expressly state that the exercise

20   price of the options shall not be less than 100% of the fair market value of the stock on the date

21   of the grant. However, where, as here, options are backdated, the exercise price of the stock

22   options is lower than the fair market value on the true date of the grant.

23         (c)    Defendants also repeatedly misled investors by affirmatively representing

24   in Company filings that, since it was the Company's philosophy to "motivate executive officers

25   to achieve the Company's business objectives and to align the interests of executive officers

26   with the long term interests of stockholders," "the exercise price of the options shall not be less

27   than 100% of the fair market value of the stock on the date of the grant."

28

1        (d)    Defendants also expressly misrepresented the value of officer and

2  director compensation in various Company filings, particularly the proxy statements

3  disseminated to investors in connection with the annual shareholder meetings. Specifically, in

4  identifying specific options granted to the officers and directors, defendants falsely stated that

5  such options were granted with an exercise price equal to the fair market value of the stock on

6  the grant date when, in fact, the options granted were backdated and thus "in-the-money" when

7  granted.

8        8.    By issuing its Restatement, KLA *conceded that its prior financial statements*

9  *about its financial results were materially false and misleading when made* because such

10  statements omitted material facts regarding the fact and financial effect of the backdated option

11  grants. Moreover, *the Company has expressly admitted* in its annual report on Form 10-K for

12  the period ended June 30, 2006 ("2006 Form 10-K") *that the fraud has had a material impact*

13  *on the Company and its shareholders* in a number of ways:

- "The discovery that *we had retroactively priced stock options* (primarily from July 1, 1997 to June 30, 2002) *and had not accounted for them correctly* has had, and may continue to have, a material adverse effect on our financial results." (Emphasis added.)

- "The ongoing government inquiries relating to our historical stock option practices are time consuming and expensive and *could result in injunctions, fines and penalties that may have a material adverse effect on our financial condition and results of operations*." (Emphasis added.)

- "The Special Committee investigation and restatement activities have required us to expend significant management time and incur significant accounting, legal, and other expenses. *The resulting restatements have had a material adverse effect on our results of operations.*" (Emphasis added.)

21        9.    There is no doubt that the backdating of the option grants and corresponding

22  public misrepresentations were the result of intentional and opportunistic acts. Indeed, the

23  Company has made the following additional key admissions in its 2006 Form 10-K:

- "*There was retroactive pricing of stock options granted* to *all employees* who received options, primarily during the periods from July 1, 1997 to June 30, 2002." (Emphasis added.)

- "*[T]he retroactive pricing of options involved the falsification of Company records, resulting in erroneous statements* being made in financial and other reports previously filed with the SEC, as well as in information previously provided to our independent registered public accounting firm." (Emphasis added.)

- *"[T]he retroactive pricing of options was intentional, not inadvertent or through administrative error."* (Emphasis added.)

- *"[T]he retroactive pricing of options involved the selection of fortuitously low exercise prices by certain former executive officers, and other former executives may have been aware of this conduct."* (Emphasis added.)

- *"The individual who served as the Company's Chief Executive Officer during part of that time period and continuing until midway through the last fiscal year, was involved in the past retroactive pricing of stock options."* (Emphasis added.) Based on public filings, the individual who held these positions was *Schroeder*.

- Under the "Findings and Remedial Actions" section of the 2006 Form 10-K, the Company stated that, "[a]s result of the Special Committee investigation, on October 16, 2006, *we terminated our employment relationship and agreement with Kenneth L. Schroeder*, and *we announced our intent to cancel all outstanding stock options held by Mr. Schroeder that were retroactively priced or otherwise improperly granted*. Those options were canceled in December 2006…. Accordingly, in the second quarter of fiscal 2007 the Company will reverse approximately $20 million of the non-cash, stock-based compensation recorded in prior periods…." (Emphasis added.)

- Under the "Findings and Remedial Actions" section of the 2006 Form 10-K, the Company also stated that *Nichols and Levy had resigned* in fall 2006 and that the Company had entered into agreements with both Nichols and Levy whereby the Company *re-priced their outstanding retroactively priced stock options by increasing the exercise price to the market price of the option shares on the actual grant date*. While the Company attempted to shield others whose backdated options were re-priced by including a caveat regarding their alleged lack of involvement in the scheme, it provided no such caveat for Nichols and Levy, thereby acknowledging their involvement.

10.    There is no doubt that this extensive fraud injured Lead Plaintiffs and members of the Class. From the very first published announcement of potential backdating at KLA on May 22, 2006, the market has reacted to the news and the stock price has fallen as the prior artificial inflation was removed from the value of KLA's securities. Specifically, after *The Wall Street Journal* issued the first article raising the strong possibility of backdating at KLA and the Company revealed that the Department of Justice ("DOJ") was investigating possible backdating, the price of KLA common stock plummeted from a closing price of $45.24 per share on May 19, 2006 to a closing price of $40.54 on May 22, 2006, *on heavy volume of 13,615,220 shares traded – which was three times the average trading volume for the prior three months*. This one-day drop alone amounted to a *market capitalization loss of approximately $935 million*.

11.     Moreover, by issuing false and misleading statements regarding officer and director compensation as well as the terms of a new option plan in the proxy statements, defendants deprived Lead Plaintiffs and other Class members of their basic corporate suffrage rights in connection with their voting rights at the annual shareholder meetings.

**II.     JURISDICTION AND VENUE**

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78aa, and 28 U.S.C. §1331.  The claims asserted herein arise under Sections 10(b), 14(a), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78n(a), 78t(a) and 78t-1, and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC, 17 C.F.R. §§240.10b-5 and 240.14a-9.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  KLA's principal executive offices are located in this District, defendants transacted business in this District and many of the acts and transactions constituting the violations of law alleged herein, including the preparation, issuance and dissemination of materially false and misleading statements to the investing public, occurred in this District.

14.     In connection with the acts, conduct and other wrongs alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and national securities markets.

**III.     THE PARTIES**

**A.     THE LEAD PLAINTIFFS**

15.     Plaintiff PFRS purchased KLA securities during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the wrongful acts of defendants alleged herein.  Moreover, PFRS had standing to vote in connection with each of the proxy statements alleged herein, as it held shares on the requisite dates.

16.     Plaintiff MPERS purchased KLA securities during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the

1  wrongful acts of defendants alleged herein.  Moreover, MPERS had standing to vote in

2  connection with each of the proxy statements alleged herein, as it held shares on the requisite

3  dates.

4      17.    Plaintiff CPBPR purchased KLA securities during the Class Period, as set forth

5  in the certification previously filed with the Court, and suffered damages as a result of the

6  wrongful acts of defendants alleged herein.  Moreover, CPBPR had standing to vote in

7  connection with each of the proxy statements alleged herein, as it held shares on the requisite

8  dates.

9      18.    By Order dated October 13, 2006, PFRS, MPERS and CPBPR were appointed

10 Lead Plaintiffs in this action.

11     **B.    THE DEFENDANTS**

12          **(i)    The Company**

13     19.    KLA maintains its principal executive offices at 160 Rio Robles, San Jose,

14 California 95134.  The Company purports to be the world's leading supplier of process control

15 and yield management solutions for the semiconductor and related microelectronics industries.

16 KLA's portfolio of products, software, analysis and services is designed to help integrated

17 circuit ("IC") manufacturers manage yield throughout the entire fabrication process – from

18 research and development to final mass-production yield analysis.  According to the Company,

19 virtually every major wafer, IC and photomask manufacturer in the world uses KLA's products

20 and services.  These customers use KLA's products and services for (a) inline wafer defect

21 monitoring; (b) reticle and photomask defect inspection; (c) critical dimension metrology; (d)

22 wafer overlay; (e) film and surface measurement; and (f) overall yield and fab-wide data

23 analysis.  The Company acts by and through its officers and directors, including defendants.

24          **(ii)    The Officer Defendants: Wallace, Schroeder,**
                    **Dickerson, Kispert, Hall, Boehlke and Nichols**

25

26     20.    Richard P. Wallace ("Wallace") is the current Chief Executive Officer ("CEO")

27 and is a director of the Company.  He was appointed CEO of the Company on January 1, 2006

28

1    and has served as a director since January 2006. Wallace was President and Chief Operating

2    Officer ("COO") from July 2005 through December 2005. He was Executive Vice President of

3    the Customer Group from May 2004 to July 2005 and Executive Vice President of the Wafer

4    Inspection, Review & Analysis Group from July 2000 to May 2004. Wallace signed false and

5    misleading KLA filings during the Class Period, including the Company's quarterly reports on

6    Form 10-Q for the period ended December 31, 2005 ("Q2FY06") and for Q3FY06. Wallace

7    also certified the Form 10-Qs filed for Q2FY06 and Q3FY06. Wallace is a citizen of the State

8    of California.

9        21.    Kenneth L. Schroeder ("Schroeder") served as a director and CEO of the

10    Company from July 1999 until January 1, 2006. Schroeder also served as President of the

11    Company from November 1991 to July 2002 and again from May 2004 to July 2005. He was

12    COO of the Company from November 1991 until June 1999. Schroeder served on the

13    Nominating and Governance Committee of the Board of Directors during fiscal years 2001 and

14    2002. According to the Company's 2006 Form 10-K, Schroeder was a member of the

15    Company's Stock Option Committee from 1994 until December 31, 2005 and was employed as

16    a Senior Advisor to the Company from January 1, 2006 through October 16, 2006. Schroeder

17    signed false and misleading KLA filings during the Class Period, including the Company's

18    quarterly reports on Form 10-Q for the periods ended September 30, 2002 ("Q1FY03"),

19    December 31, 2002 ("Q2FY03"), March 31, 2003 ("Q3FY03"), September 30, 2003

20    ("Q1FY04"), December 31, 2003 ("Q2FY04"), March 31, 2004 ("Q3FY04"), September 30,

21    2004 ("Q1FY05"), December 31, 2004 ("Q2FY05"), March 31, 2005 ("Q3FY05") and

22    September 30, 2005 ("Q1FY06") and the Form 10-Ks filed for fiscal years ended June 30, 2001

23    ("2001 Form 10-K"), June 30, 2002 ("2002 Form 10-K"), June 30, 2003 ("2003 Form 10-K"),

24    June 30, 2004 ("2004 Form 10-K") and June 30, 2005 ("2005 Form 10-K"). Schroeder also

25    certified the Form 10-Qs filed for Q1FY03, Q2FY03, Q3FY03, Q1FY04, Q2FY04, Q3FY04,

26    Q1FY05, Q2FY05, Q3FY05 and Q1FY06 and the 2001, 2002, 2003, 2004 and 2005 Form 10-

27    Ks. Schroeder is a citizen of the State of California.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

1      22.    Gary E. Dickerson ("Dickerson") served as President of the Company from July

2    2002 to April 2004 and as COO of the Company from July 1999 to April 2004. He served as

3    Executive Vice President of the Customer Group from July 1997 to June 30, 1999. He was also

4    named Senior Vice President, New Business Operations in May 2004. According to a

5    Confidential Witness, Dickerson was also a member of KLA's Stock Option Committee.

6    Dickerson is a citizen of the State of California.

7      23.    Jeffrey L. Hall ("Hall") is the current Chief Financial Officer ("CFO") of the

8    Company. He was appointed Senior Vice President and CFO in January 2006. From July 2004

9    until his appointment as CFO on January 1, 2006, Hall was Vice President of Finance, Tax and

10    Treasury. From July 2003 though July 2004, Hall served as Vice President, Finance and

11    Accounting and, from April 2001 to July 2003, he was Vice President, Mergers and

12    Acquisitions and Corporate Planning. As CFO and VP of Finance during the Class Period,

13    defendant Hall was responsible for the preparation of the Company's financial statements and

14    for ensuring that the periodic reports filed with the SEC containing such financial statements

15    complied fully with the disclosure requirements of the federal securities laws. According to a

16    Confidential Witness, Hall was also a member of KLA's Stock Option Committee. Hall signed

17    false and misleading KLA filings during the Class Period, including the Company's quarterly

18    reports on Form 10-Q for the periods ended Q2FY06 and Q3FY06. Hall also certified the Form

19    10-Qs filed for Q2FY06 and Q3FY06. Hall earned his bachelor's degree in finance from

20    Indiana University and his master's degree in business administration from the University of

21    Dayton. Hall is a citizen of the State of California.

22      24.    John H. Kispert ("Kispert") is the current President and COO of the Company.

23    He was appointed President and COO on January 1, 2006. From July 2000 until his

24    appointment as President and COO, he served as Executive Vice President and CFO of the

25    Company. As CFO during the Class Period, Kispert was responsible for the preparation of the

26    Company's financial statements and for ensuring that the periodic reports filed with the SEC

27    containing such financial statements complied fully with the disclosure requirements of the

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

1  federal securities laws. According to a Confidential Witness, Kispert was a member of the

2  KLA's Stock Option Committee. Kispert signed false and misleading KLA filings during the

3  Class Period, including the Company's quarterly reports on Form 10-Q for the periods ended

4  March 31, 2001 ("Q3FY01"), September 30, 2001 ("Q1FY02"), December 31, 2001

5  ("Q2FY02"), March 31, 2002 ("Q3FY02"), Q1FY03, Q2FY03, Q3FY03, Q1FY04, Q2FY04,

6  Q3FY04, Q1FY05, Q2FY05, Q3FY05 and Q1FY06 and the 2001, 2002, 2003, 2004 and 2005

7  Form 10-Ks. Kispert also certified the Form 10-Qs filed for Q1FY03, Q2FY03, Q3FY03,

8  Q1FY04, Q2FY04, Q3FY04, Q1FY05, Q2FY05, Q3FY05 and Q1FY06 and the 2001, 2002,

9  2003, 2004 and 2005 Form 10-Ks. Kispert obtained his master's degree in business

10  administration from the University of California, Los Angeles. Kispert is a citizen of the State

11  of California.

12      25.    Robert J. Boehlke ("Boehlke") served as Executive Vice President and CFO of

13  the Company from 1990 until his retirement in 2000. Between 1983 and 1990, he held various

14  management positions at KLA. As CFO, Boehlke was responsible for the preparation of the

15  Company's financial statements and for ensuring that the periodic reports filed with the SEC

16  containing such statements complied fully with the disclosure requirements of the

17  federal securities laws. Boehlke received his master's degree in business administration from

18  Harvard University. Boehlke is a citizen of the State of California.

19      26.    Stuart J. Nichols ("Nichols") was Vice President and General Counsel of KLA

20  from 2000 until his resignation on October 16, 2006. According to a Confidential Witness,

21  Nichols was a member of KLA's Stock Option Committee. Nichols signed false and

22  misleading KLA filings during the Class Period, specifically the Notice of Annual Meeting of

23  Stockholders for the 2002, 2003, 2004 and 2005 Schedule 14A Proxy Statements. Nichols is a

24  citizen of the state of California.

25      27.    Wallace, Schroeder, Dickerson, Kispert, Hall Boehlke and Nichols are

26  collectively referred to hereinafter as the "Officer Defendants." By virtue of their high-level

27  positions with the Company, each of the Officer Defendants directly participated in the

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT             11

1    management of the Company, was directly involved in the day-to-day operations of the

2    Company at the highest levels and was privy to confidential proprietary information concerning

3    the Company and its business, operations, growth, financial statements and financial condition.

4        28.    As officers of the Company, defendants Wallace, Schroeder, Dickerson, Hall,

5    Kispert and Nichols had extensive duties to ensure the accuracy of information disseminated to

6    investors:

7        (a)    As noted in American Institute of Certified Public Accountants

8    ("AICPA") auditing standard, Section 110.03, a public company's management is responsible

9    for preparing financial statements in accordance with GAAP:

10       The financial statements are management's responsibility.... Management is
11       responsible for adopting sound accounting policies and for establishing and
         maintaining internal controls that will, among other things, initiate, record,
12       process, and report transactions (as well as events and conditions) consistent with
         management's assertions embodied in the financial statements. The entity's
13       transactions and the related assets, liabilities, and equity are within the direct
         knowledge and control of management. The auditor's knowledge of these matters
14       and internal controls is limited to that acquired through the audit. Thus, the fair
         presentation of financial statements in conformity with generally accepted
15       accounting principles is an implicit and integral part of management's
         responsibility.

16       (b)    In Accounting Series Release 173 (July 2, 1975), the SEC reiterated the

17   duty of management to present a true representation of a company's operations:

18       [I]t is important that the overall impression created by the financial statements be
19       consistent with the business realities of the company's financial position and
         operations.

20       (c)    Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and SEC rules

21   promulgated thereunder, the CEO and CFO of reporting corporations are required to certify as

22   to the accuracy and completeness of the company's financial statements.    In addition,

23   companies are required to make extensive disclosures in their Proxy Statements and annual

24   reports regarding officer and director compensation, including stock holdings and exercised and

25   unexercised stock options.

26       29.    As the Company's own filings also state, "KLA-Tencor's management is

27   responsible for establishing and maintaining a system for internal controls and the financial

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    12

1    reporting process."

2            (iii)    **The Compensation Committee Defendants: Urbanek, Marks,**
3                     **Barnholt and Bond**

4         30.    Lida Urbanek ("Urbanek") has served as a director of KLA and as a member of

5    the Compensation Committee of the Board of Directors ("Compensation Committee") since

6    April 1997.    Urbanek signed false and misleading KLA filings during the Class Period,

7    including the 2001, 2002, 2003, 2004 and 2005 Form 10-Ks. Urbanek is a citizen of the State

8    of California.

9         31.    Michael E. Marks ("Marks") was a director of KLA and a member of the

10    Compensation Committee from November 2003 until May 2006. Marks signed false and

11    misleading KLA filings during the Class Period, including the 2004 and 2005 Form 10-Ks.

12    Marks is a citizen of the State of California.

13         32.    Edward W. Barnholt ("Barnholt") has served as a director of KLA since 1995

14    and was named Chairman of the Board of Directors of KLA in October 2006. He has served as

15    a member of the Compensation Committee since 2000 and of the Nominating and Governance

16    Committee since fiscal 2000.    Barnholt signed false and misleading KLA filings during the

17    Class Period, including the 2001, 2002, 2003, 2004 and 2005 Form 10-Ks. Barnholt is a citizen

18    of the State of California.

19         33.    Robert T. Bond ("Bond") has served as a director of KLA since August 2000.

20    He has served as a member of the Compensation Committee since 2000 and as Chair of this

21    Committee since 2004. He also has served as a member of the Audit Committee since 2002.

22    Bond signed false and misleading KLA filings during the Class Period, including the 2001,

23    2002, 2003, 2004 and 2005 Form 10-Ks. Bond is a citizen of the State of California.

24         34.    Defendants Urbanek, Marks, Barnholt and Bond are collectively referred

25    hereinafter as the "Compensation Committee Defendants." As members of the Compensation

26    Committee, the Compensation Committee Defendants were responsible for the Company's

27    public representations regarding options. KLA's proxy statements generally provide that "the

28

1    Compensation Committee reviews and approves, subject to ratification by the Board of

2    Directors, the Company's executive compensation policy and administers the Company's

3    employee equity award plans."  According to KLA's Compensation Committee Charter, the

4    Compensation Committee Defendants participated in decisions regarding the options grants

5    including the setting of option grant dates and exercise prices.  More specifically, the

6    Company's Charter for the Compensation Committee states that the purpose of the

7    Compensation Committee is to, *inter alia*, "review and make recommendations to the Board of

8    Directors regarding all forms of compensation to be provided to the executive officers and

9    directors…including…stock compensation to all employees" of the Company.  The charter

10   further describes the Compensation Committee's responsibilities as follows:

11           (a)     "Two weeks prior to the Compensation Committee meeting, each

12   member of the committee will receive information regarding compensation, option grants,

13   bonuses…."

14           (b)     The "Compensation Committee will make a recommendation to the

15   Board on the range of option grants for each level of employee; the compensation, option grants

16   and bonus goals for each officer of at least Vice President…."

17           (c)     The Compensation Committee "review[s] and mak[es] recommendations

18   to the Board of Directors regarding the compensation policy for executive officers of and

19   directors of the Company, and such other officers of the Company as directed by the Board."

20           (d)     The Compensation Committee "review[s] and mak[es ] recommendations

21   to the Board of Directors regarding all forms of compensation (including all 'plan'

22   compensation, as such term is defined in Item 402(a)(7) of Regulation S-K promulgated by the

23   Securities and Exchange Commission, and all non-plan compensation) to be provided to the

24   executive officers of the Company."

25           (e)     Members act as administrators for the Company's Option Plans by,

26   among other things, granting stock options or stock purchase rights to eligible individuals.

27           (f)     Members prepare a report for inclusion in the Company's proxy

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                14

1    statements, "which describes (a) the criteria on which compensation paid to the Chief Executive

2    Officer for the last completed fiscal year is based; (b) the relationship of such compensation to

3    the Company's performance; and (c) the Compensation Committee's executive compensation

4    policies applicable to executive officers."

5             (g)    Members review and make recommendations to the Board regarding

6    compensation of the independent board members, including option grants.

7             (h)    Members    prepare    written    reports    to    the    Board    regarding

8    recommendations of the Compensation Committee submitted to the Board for action and

9    provide the Board with copies of written minutes of its meetings.

10        35.    During fiscal years 2001, 2002, 2003, 2004, 2005 and 2006, the Compensation

11   Committee met four, two, two, three, four and six times, respectively.  The Compensation

12   Committee was required to provide to the Board of Directors its schedule of meetings.

13        36.    The Company has expressly represented that, during the Class Period, "all stock

14   option grants to officers are made with a review by, and with the approval of the Compensation

15   Committee of the Board of Directors." *See* 2002 Form 10-K, Q1FY03 Form 10-Q, 2QFY03

16   Form 10-Q, 3QFY03 Form 10-Q. *See also* 2003 Form 10-K and 2004 Form 10-K stating that

17   "[a]ll stock option grants to officers are approved by the Compensation Committee of the Board

18   of Directors."

19        37.    During the Class Period, the Compensation Committee also prepared reports on

20   executive compensation, which were included in the proxy statements disseminated to

21   shareholders in connection with the annual shareholder meetings.

22             (iv)    **The Audit Committee Defendants: Bingham, Elkus, Morton**

23                    **Kaufman And Bond**

24        38.    H. Raymond Bingham ("Bingham") has served as a director of KLA since

25   October 1999.  He has served as a member of the Audit Committee since 2000 and as Chairman

26   of the Audit Committee since 2003.  According to KLA's 2004 and 2005 Proxy Statements, the

27   Board determined that Bingham was an "'audit committee financial expert' within the meaning

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                  15

1    of the rules promulgated by the [SEC]." Bingham has also been a member of the Nominating

2    and Governance Committee since fiscal year 2006. Bingham signed false and misleading KLA

3    filings during the Class Period, including the 2001, 2002, 2003, 2004 and 2005 Form 10-Ks.

4    Bingham is a citizen of the State of California.

5        39.    Richard J. Elkus, Jr. ("Elkus") has served as a director of KLA from April 1997

6    until November 4, 2005 (fiscal 2006) and was a member of the Audit Committee from 1999

7    until November 4, 2005. He also served on the Nominating and Governance Committee from

8    fiscal 2003 to November 4, 2005. Elkus signed false and misleading KLA filings during the

9    Class Period including the 2001, 2002, 2003, 2004 and 2005 Form 10-Ks. Elkus is a citizen of

10    the State of California.

11        40.    Dean O. Morton ("Morton") served as a director of KLA from April 1997 until

12    July 31, 2002. Morton was a member of the Audit Committee and the Nominating and

13    Governance Committee during fiscal year 2001. Morton received an M.B.A. from Harvard

14    Business School. Morton signed false and misleading KLA filings during the Class Period -

15    specifically, the 2001 Form 10-K. Morton is a citizen of the State of California.

16        41.    Stephen P. Kaufman ("Kaufman") has served as a director of KLA since

17    November 2002. He has been a member of the Audit Committee since November 2002 (fiscal

18    2003). Kaufman has also served as a member of the Nominating and Governance Committee

19    since fiscal year 2005. Kaufman signed false and misleading KLA filings during the Class

20    Period, including the 2003, 2004 and 2005 Form 10-Ks. Kaufman is a citizen of the State of

21    California.

22        42.    Bond has also served as a member of the Audit Committee since fiscal year

23    2002.

24        43.    Defendants Bingham, Elkus, Morton, Kaufman and Bond are collectively

25    referred to hereinafter as the "Audit Committee Defendants." KLA's own reports state that the

26    "Audit Committee is responsible for overseeing KLA-Tencor's auditing, accounting and

27    financial reporting processes, its system of internal controls, and legal and ethical compliance."

28

1    According to KLA's Audit Committee Charter, the purpose of the Audit Committee is to, *inter*

2    *alia*:

3              (a)    "[O]versee the accounting and financial reporting processes of the

4    Company and the audits of the financial statements of the Company."

5              (b)    "Assist the Board of Directors in oversight and monitoring of (i) the

6    integrity of the Company's financial statements; (ii) Company's compliance with legal and

7    regulatory requirements; (iii) the independent auditor's qualifications, independence and

8    performance; and (iv) the Company's internal accounting and financial controls."

9              (c)    "Prepare the report that the rules of the [SEC] required to be included in

10    the Company's annual proxy statement."

11             (d)    "[P]rovide the Board with the results of its monitoring and

12    recommendations derived therefrom."

13             (e)    "[P]rovide to the Board such additional information and materials as it

14    may deem necessary to make the Board aware of significant financial matters that require the

15    attention of the Board."

16        44.    The Audit Committee Charter further states that the responsibilities of the Audit

17    Committee include:

18             (a)    "Reviewing on a continuing basis the adequacy of the Company's system

19    of internal controls, including meeting periodically with the Company's management and the

20    independent auditors to review the adequacy of such controls and to review before release the

21    disclosure regarding such system of internal controls required under SEC rules to be contained

22    in the Company's periodic filings and the attestations or reports by the independent auditors

23    relating to such disclosure."

24             (b)    "Reviewing and discussing with management and independent auditors

25    the annual audited financial statements and quarterly unaudited Financial Statements, including

26    the Company's disclosures under 'Management's Discussion and Analysis of Financial

27    Condition and Results of Operations' to be included in the Company's Annual Report on Form

28

1    10K… and Quarterly Reports on Form 10-Q, respectively, prior to their filing with the SEC."

2              (c)      "Conducting a post-audit review of the financial statements and audit

3    findings."

4              (d)      "Reviewing before release the unaudited quarterly operating results in the

5    Company's quarterly earnings release."

6              (e)      "Overseeing compliance with the requirements of the SEC for disclosure

7    of auditor's services and audit committee members, member qualifications and activities."

8              (f)      "Reviewing, approving and monitoring the Company's code of ethics for

9    its senior financial officers."

10             (g)      "Reviewing, in conjunction with counsel, any legal matters that could

11   have a significant impact on the Company's financial statements."

12             (h)      "Providing a report in the Company's proxy statement in accordance

13   with the rules and regulations of the SEC."

14        45.    The Audit Committee Charter further provides that "[e]ach member [of the Audit

15   Committee] will be able to read and understand fundamental financial statements in accordance

16   with the Nasdaq National Market Audit Committee Requirements." During fiscal years 2001,

17   2002, 2003, 2004, 2005 and 2006, the Audit Committee met five, four, twelve, ten, eleven and

18   six times, respectively.

19        46.    In substantially identical language, each of KLA's Proxy Statements for 2001

20   through 2006 included an Audit Committee report, which stated that, "[b]ased on the reviews

21   and discussions referred to above, the Audit Committee recommended to the Board of

22   Directors, and the Board of Directors approved, the inclusion of the audited financial statements

23   in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, [2001-2006]

24   filed with the [SEC]."

25             (v)      **The Nominating and Governance Committee Defendants: Levy,**
                        **Morton, Barnholt, Schroeder, Elkus, Bingham and Kaufman**
26

27        47.    Kenneth Levy ("Levy"), a founder of KLA, served as a director of the Company

28

from 1975 through October 16, 2006 and as Chairman of the Board from July 1999 through October 2006, when he retired amidst the Special Committee investigation. Levy also served as CEO of the Company from July 1998 to June 1999 and as a member of the Nominating Committee in at least 2000 and 2001. Levy signed false and misleading KLA filings during the Class Period, including the 2001, 2002, 2003, 2004 and 2005 Form 10-Ks. Levy is a citizen of the State of California.

48.     Morton was a member of the Nominating and Governance Committee during fiscal year 2001.

49.     Barnholt has been a member of the Nominating and Governance Committee since fiscal year 2000 and served as chairman of the Nominating and Governance Committee during fiscal years 2004, 2005 and 2006.

50.     Schroeder was a member of the Nominating and Governance Committee during at least fiscal years 2001 and 2002.

51.     Elkus was a member of the Nominating and Governance Committee from fiscal year 2003 to November 4, 2005.

52.     Bingham has been a member of the Nominating and Governance Committee since fiscal year 2006.

53.     Kaufman has been a member of the Nominating and Governance Committee since fiscal year 2005.

54.     Defendants Levy, Morton, Barnholt, Schroeder, Elkus, Bingham and Kaufman are collectively referred to hereinafter as the "Nominating and Governance Committee Defendants." According to KLA's Nominating and Governance Committee Charter, the purpose of the Nominating and Governance Committee is to, *inter alia*, "provide assistance to the Board of Directors in fulfilling its responsibility to its stockholders, potential stockholders and investment community by":

a.     "Identifying individuals qualified to become directors and selecting, or recommending that the Board of Directors select, the candidates for all directorships to be filled by the Board of Directors or by the stockholders."

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          19

b. "Developing and recommending to the Board of Directors a set of corporate governance principles applicable to the KLA-Tencor Corporation."

c. "Overseeing the evaluation of the Board of Directors and ensuring that the Board of Directors is properly constituted to meet its fiduciary obligations to the Corporation and its stockholders and that the Corporation has and follows appropriate governance standards."

d. "Otherwise taking a leadership role in shaping the corporate governance of the Corporation."

55. The Nominating and Governance Committee Charter states that the responsibilities and duties of the Nominating and Governance Committee include the duties to:

a. "Evaluate the current composition, organization and governance of the Board of Directors and its committees, determine future requirements and make recommendations to the Board of Directors for approval."

b. "Identify individuals believed to be qualified as candidates to serve on the Board of Directors and select, or recommend that the Board of Directors select, the candidates for all directorships to be filled by the Board of Directors or by the stockholders at an annual or special meeting."

c. "Review and make recommendations to the full Board of Directors, or determine, whether members of the Board should stand for re-election."

d. "Conduct all necessary and appropriate inquiries into the backgrounds and qualifications of possible candidates."

e. "Consider questions of independence and possible conflicts of interest of members of the Board of Directors and executive officers."

f. "Review and make recommendations, as the Committee deems appropriate, regarding the composition and size of the Board of Directors in order to ensure the Board has the requisite expertise and its membership consists of persons with sufficiently diverse and independent backgrounds."

g. "Evaluate and recommend termination of membership of individual directors in accordance with the Board of Directors' governance principles, for cause or for other appropriate reasons."

h. "Recommend members of the Board of Directors to serve on the committees of the Board, giving consideration to the criteria for service on each committee as set forth in the charter for such committee, as well as to any other factors the Committee deems relevant, and where appropriate, make recommendations regarding

the removal of any member of any committee."

i. "Develop and recommend to the Board of Directors a set of corporate governance principles and keep abreast of developments with regard to corporate governance to enable the Committee to make recommendations to the Board of Directors in light of such developments as may be appropriate."

j. "Report regularly to the Board of Directors (i) following meetings of the Committee, (ii) with respect to such other matters as are relevant to the Committee's discharge of its responsibilities and (iii) with respect to such recommendations as the Committee may deem appropriate."

56. The Nominating and Governance Committee did not meet during the 2001 and 2002 fiscal years. During fiscal years 2003, 2004, 2005 and 2006, the Nominating and Governance Committee met two, three, five and four times, respectively.

**(vi)    The Additional Outside Director Defendant: Tompkins**

57. Jon D. Tompkins ("Tompkins") served as a director of KLA from April 1997 with his resignation on December 21, 2006. Tompkins served as Chairman of the Board from July 1998 to June 1999 and as CEO of the Company from May 1997 to July 1998. According to the Company's 2006 Form 10-K, Tompkins also served as a member of the Stock Option Committee from mid-1997 until mid-1999. Tompkins signed KLA's false and misleading SEC filings during the Class Period, including the 2001, 2002, 2003, 2004 and 2005 Form 10-Ks. Tompkins is a citizen of the State of California.

58. Defendants Wallace, Schroeder, Urbanek, Marks, Barnholt, Bond, Bingham, Elkus, Morton, Kaufman, Levy and Tompkins are collectively referred hereinafter as the "Director Defendants." During the Class Period, KLA's Board of Directors was responsible for the oversight and monitoring of (a) the integrity of the financial statements; (b) the Company's compliance with legal and regulatory requirements; (c) the independent auditor's qualifications, independence and performance; and (d) the Company's internal accounting and financial controls. The Board had final decision-making authority regarding compensation and determined the compensation to be provided to executive officers and directors of the Company, including salaries, retainers, stock compensation and loans, and all salary, bonus and

1    stock compensation to all employees. In addition, the Board was the administrator of KLA's

2    stock option plans. In that capacity, the Board had the authority, among other things, to

3    determine the terms and conditions of the awards granted under the stock option plans, which

4    includes establishing the exercise price of the stock options, deciding who will receive stock

5    options and determining number of stock options awarded to each recipient. Members of the

6    Board committees, including the Audit Committee, Compensation Committee and Nominating

7    Governance Committee, reported to the Board. In addition to its responsibilities to KLA, the

8    Board had fiduciary responsibilities to its stockholders, potential stockholders and the

9    investment community.

10          59.    Wallace, Schroeder, Dickerson, Kispert, Hall, Boehlke, Nichols, Urbanek,

11   Marks, Barnholt, Bond, Bingham, Elkus, Morton, Kaufman, Levy and Tompkins are

12   collectively referred to herein as the "Individual Defendants." Because of the Individual

13   Defendants' positions within the Company, they had access to adverse undisclosed material

14   information about KLA's financial condition, earnings and expenses, officer and director

15   compensation, stock option grants and management integrity. They were privy to such

16   undisclosed information from internal corporate documents, communications with other officers

17   and employees of the Company and attendance at, and documents received during, meetings of

18   management, the Board of Directors, the Stock Option Committee, the Compensation

19   Committee, the Audit Committee and/or the Nominating Committee. They each knew or were

20   deliberately reckless in not knowing of the adverse material facts which rendered the statements

21   alleged herein false and misleading.

22          60.    The Individual Defendants, as officers and/or directors of the Company, had a

23   duty to disseminate complete, accurate and truthful information about KLA's financial

24   condition, earnings and expenses, stock option grants, officer and director compensation and

25   management integrity. The Individual Defendants had a duty to promptly correct any public

26   statements issued by KLA that had become false and misleading. The Individual Defendants

27   were involved in the drafting, producing, reviewing and/or dissemination of the false and

28

1    misleading statements alleged herein.

2      61.    Because of their positions, their ability to exercise power and influence with

3 respect to KLA's course of conduct and their access to material inside information about KLA,

4 the Individual Defendants were, at the time of the wrongs alleged herein, controlling persons

5 within the meaning of Section 20(a) of the Exchange Act.

6      62.    It is appropriate to treat the Individual Defendants as a group for pleading

7 purposes and to presume that the false, misleading and/or incomplete information conveyed in

8 the Company's public filings, press releases and other publications as alleged herein are the

9 collective action of the Individual Defendants identified above.

10 **IV.    CLASS ACTION ALLEGATIONS**

11      63.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and

12 (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and

13 entities who purchased KLA securities during the Class Period and were damaged thereby

14 ("Class"). Excluded from the Class are defendants herein, officers and directors of KLA,

15 members of their immediate families and the heirs, successors or assigns of any of the

16 foregoing.

17      64.    The members of the Class are so numerous that joinder of all members is

18 impracticable. While the exact number of Class members is unknown to Lead Plaintiffs at this

19 time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe there

20 are, at a minimum, thousands of members of the Class. According to the 2006 Form 10-K,

21 there were 199,725,957 shares of common stock outstanding as of December 31, 2006, which

22 securities traded actively in an open and efficient market on the NASDAQ National Market

23 under the symbol "KLAC."

24      65.    Common questions of law and fact exist as to all members of the Class and

25 predominate over any questions affecting solely individual members of the Class. The

26 following are questions of law and fact common to the Class:

27         •   whether defendants engaged in acts or conduct in violation of federal securities

28

1    laws as alleged herein;

2    • whether the misrepresentations were material;

3    • whether the misrepresentations contained in the proxy statements were

4    essentially linked to the votes sought by the proxy;

5    • whether KLA issued false and misleading financial statements and information

6    about stock option expenses, officer and director compensation and KLA

7    financial condition during the Class Period;

8    • whether the Individual Defendants caused KLA to issue false and misleading

9    financial statements and information about stock options, officer and director

10    compensation and KLA financial condition during the Class Period;

11    • whether the Individual Defendants falsified or permitted the falsification of

12    documents relating to stock option grants;

13    • whether defendants acted knowingly or with deliberate recklessness in issuing

14    false and misleading financial statements and information about stock options,

15    officer and director compensation and KLA financial condition;

16    • whether defendants improperly manipulated the terms of the stock options

17    granted to the Individual Defendants and others and misled investors regarding

18    such terms and KLA's financial condition;

19    • whether defendants engaged in a scheme to defraud by manipulating the terms of

20    stock options granted to the Individual Defendants and others;

21    • whether the market prices of KLA securities during the Class Period were

22    artificially inflated because of defendants' conduct complained of herein;

23    • whether the members of the Class have sustained damages and, if so, what is the

24    proper measure of damages; and

25    • what form of equitable relief should be awarded.

26    66.    Lead Plaintiffs' claims are typical of the claims of the other members of the

27    Class and the other members of the Class sustained damages arising out of defendants'

28

1    wrongful conduct in violation of federal law as complained of herein.

2        67.    Lead Plaintiffs will fairly and adequately protect the interests of the members of

3    the Class and have retained counsel competent and experienced in class actions and securities

4    litigation.  Lead Plaintiffs have no interests antagonistic to, or in conflict with, those of the

5    Class.

6        68.    A class action is superior to other available methods for the fair and efficient

7    adjudication of the controversy since joinder of all the members of the Class is impracticable.

8    Furthermore, because the damages suffered by the individual Class members may be relatively

9    small, the expense and burden of individual litigation makes it impracticable for the Class

10   members individually to redress the wrongs done to them.  There will be no difficulty in the

11   management of this action as a class action.

12       69.    Lead Plaintiffs will rely, at least in part, upon the presumption of reliance

13   established by the fraud-on-the-market doctrine in that:

14       •   defendants made public misrepresentations and omissions during the Class

15           Period;

16       •   the omissions and misrepresentations were material;

17       •   the Company's securities traded on the NASDAQ, an efficient and open

18           exchange;

19       •   the misrepresentations and omissions alleged would tend to induce a reasonable

20           investor to misjudge the value of the Company's securities;

21       •   Lead Plaintiffs and the other members of the Class purchased their KLA stock

22           between the time defendants failed to disclose or misrepresented material facts

23           and the time the true facts were disclosed, without knowledge of the omitted or

24           misrepresented facts;

25       •   as a regulated issuer, KLA submitted regular public filings to the SEC, such as

26           on Forms 10-K and 10-Q; and

27       •   the Company's stock was followed by numerous financial analysts, including

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                        25

1    Cowen & Company and Goldman Sachs & Co. Thus, the Company's stock
2    reflected the effect of information disseminated into the market.

3    70.    Based upon the foregoing, all purchasers of KLA securities during the Class
4  Period suffered similar injury, including injury through their purchase of the securities at
5  artificially inflated prices, and a presumption of reliance applies.

6  **V.    BACKGROUND**

7    **A.    CONFIDENTIAL WITNESSES**

8    71.    The allegations are supported by, among other things, the information provided
9  by Confidential Witnesses who worked in various positions within the Company organization
10 prior to and/or during the Class Period:

11    (a)    Lead Plaintiffs are informed and believe that Confidential Witness No. 1
12 ("CW #1") worked for the Company from 1995 to early 2003 as a financial analyst, director of
13 finance and division controller. As division controller, CW #1 often had to prepare documents
14 for the Board of Directors and would "occasionally prepare the CFO's presentation to the
15 Operating Committee and the Board of Directors."

16    (b)    Lead Plaintiffs are informed and believe that Confidential Witness No. 2
17 ("CW #2") worked as director of staffing and reported to Tom Coffey during 2002.

18    (c)    Lead Plaintiffs are informed and believe that Confidential Witness No. 3
19 ("CW #3") worked as a senior director of finance from 2001 until 2002.

20    (d)    Lead Plaintiffs are informed and believe that Confidential Witness No. 4
21 ("CW #4") worked for the Company from 1993 to 2004 in various human resources positions.
22 CW #4 assisted with the preparation of data for obtaining the approval of new hire or
23 promotion-related stock option grants. In this capacity, CW #4 helped prepare quarterly
24 spreadsheets containing information such as the type of grant (*i.e.*, new hire, employee
25 promotion, annual (focal) performance review or retention), employee name, employee hire
26 date, employee title and number of shares being recommended.

27    (e)    Lead Plaintiffs are informed and believe that Confidential Witness No. 5
28

1  ("CW #5") worked for the Company as an executive assistant until late 2004 and participated in

2  preparing agendas for executive meetings, inviting attendees to such meetings and reviewing

3  meeting minutes.  CW #5 stated that he/she prepared agendas for some of the Stock Option

4  Committee meetings.

5          (f)      Lead Plaintiffs are informed and believe that Confidential Witness No. 6

6  ("CW #6") worked for the Company from 1999 to 2005 as a director of stock and retirement

7  services, as a staff benefits analyst and as a benefits manager.  CW #6 reported to Joy Nyberg

8  ("Nyberg"), the director of Compensation and Benefits.

9          (g)      Lead Plaintiffs are informed and believe that Confidential Witness No. 7

10  ("CW #7") worked for the Company from 2001 to 2002 as compensation manager.  CW #7 was

11  responsible for benefits and pay for all U.S. employees of the Company and reported directly to

12  Nyberg, the director of Compensation and Benefits.

13          (h)      Lead Plaintiffs are informed and believe that Confidential Witness No. 8

14  ("CW #8") worked for the Company from late 2003 through summer 2005 in operations and

15  later in finance.

16  **B.      KLA'S STOCK OPTION PLANS**

17      72.      Companies may grant stock options to its officers, directors and employees only

18  under a written stock option plan filed with the SEC and disclosed to the public.  Companies

19  must comply with the terms of their written stock option plans.

20      73.      According to KLA's filings with the SEC, it appears that KLA granted stock

21  options during the Class Period pursuant to at least the following four plans: (a) the Restated

22  1982 Stock Option Plan, which applies to employees, consultants, officers and inside directors;

23  (b) the 1998 Outside Director Option Plan, which applies to outside directors, (c) the 2000

24  Nonstatutory Stock Option Plan, which applies to employees and consultants; and (d) the 2004

25  Equity Incentive Plan, which applies to employees, including officers and directors.  *The*

26  *backdated option grants violated the terms of at least three of these plans.*

27

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                  27

1.    **1.    The Restated 1982 Stock Option Plan**

2        74.    The Restated 1982 Stock Option Plan ("1982 Plan"), as amended on November

3    18, 1996, was originally adopted by KLA Instruments Corporation in 1981. *See KLA*

4    *Instrument Corporation's* SEC Form S-8, filed on March 7, 1997. The 1982 Plan was attached

5    as Exhibit 10.10 to KLA's Form 10-K for the fiscal year ended June 30, 2001 and was operative

6    through October 18, 2004. *See* Form 10-Q filed November 3, 2004.

7        75.    Pursuant to Section 3.1 ("Administration by the Board") of the 1982 Plan, the

8    Plan is administered by the "Board" or "any duly appointed Committee of the Board." Section

9    3.4 ("Powers of the Board") of the 1982 Plan provides, in part, that, *"subject to the provisions*

10    *of the Plan*, the Board shall have the full and final power and authority, in its sole discretion"

11    (a) to determine who is awarded an option and the time at which the person is awarded an

12    option; (b) to determine the number of shares of stock awarded pursuant to each option; (c) to

13    designate options as Incentive Stock Options or Nonstatutory Stock Options; (d) to determine

14    the fair market value of shares of stock; and (e) to determine the terms, conditions and

15    restrictions of each option and any shares acquired upon exercise of an option, including, but

16    not limited to, the exercise price of the option. (Emphasis added.)

17        76.    Section 5.1 ("Persons Eligible for Options") states that employees, consultants

18    and directors are the only persons eligible to receive options under the 1982 Plan. This section

19    also states that directors who are not employees are ineligible to be granted options under the

20    1982 Plan.

21        77.    In addition, Section 5.2 ("Option Grant Restrictions") states that "[a]n Option

22    granted to a prospective Employee, Consultant or Director upon condition that such person

23    commence Service with the Participating Company Group shall be deemed granted effective on

24    the date such person's Service commences, with an exercise price determined as of such date in

25    accordance with Section 6.1."

26        78.    Section 6.1 ("Exercise Price") of the 1982 Plan states that "[t]he exercise price

27    for each Option shall be established in the sole discretion of the Board; provided, however, that

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          28

1    (a) *no Option shall have an exercise price per share less than the Fair Market Value of a*

2    *share of Stock on the effective date of grant of the Option* and (b) no Incentive Stock Option

3    granted to a Ten Percent Owner Optionee shall have an exercise price per share less than one

4    hundred ten percent (110%) of the Fair Market Value of a share of Stock on the effective date

5    of grant of the Option." (Emphasis added.)

6                        **2.    The 1998 Outside Director Option Plan**

7            79.    On November 17, 1998, KLA's shareholders approved the 1998 Outside

8    Director Option Plan ("1998 Outside Director Plan").  The 1998 Outside Director Plan was

9    attached as Exhibit 10.1 to KLA's Form 10-K for the fiscal year ended June 30, 2001 and was

10   operative at all times during the Class Period.

11           80.    Under Section 1 ("Purposes of the Plan") of the 1998 Outside Director Plan,

12   options granted under the Plan are nonstatutory stock options.

13           81.    Section 4(a) ("Discretionary Plan") of the 1998 Outside Director Plan states that

14   "[t]he Board (or its committee) shall have the authority, in its discretion, to make discretionary

15   grants of Options hereunder to Outside Directors and to specify the terms and conditions of

16   such discretionary Option grants."  "Outside Directors" is defined under Section 2(n) as a

17   "Director who is not an employee."  Section 4(b) ("Automatic Grants") provides for automatic

18   grants on the date on which such person first becomes an Outside Director ("First Option") and

19   thereafter annually on the day of the Company's annual shareholder meetings ("Subsequent

20   Option").

21           82.    Section 4(b)(iii)(C) of the 1998 Outside Director Plan provides that "the exercise

22   price per Share shall be 100% of the Fair Market Value per Share on the date of the grant of the

23   First Option."  Similarly, Section 4(b)(iv)(C) states that "the exercise price per Share shall be

24   100% of the Fair Market Value per Share on the date of the grant of the Subsequent Option."

25   Section 4(b)(iv)(D) provides that the "Subsequent Option shall become exercisable as to 100%

26   of the Shares on the date of the grant."

27

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    29

### 3.    The 2004 Equity Incentive Plan

83.    On October 18, 2004, KLA's shareholders approved the Company's 2004 Equity Incentive Plan ("2004 Equity Incentive Plan"), which replaced the 1982 Plan and the 2000 Nonstatutory Stock Option Plan, and supplemented the 1998 Outside Director Plan. *See* Appendix A to KLA's September 9, 2004 Schedule 14A Proxy Statement. *See* Q1FY05 Form 10-Q filed November 3, 2004.

84.    According to Section 1 ("Purposes of the Plan") of the 2004 Equity Incentive Plan, the 2004 Equity Incentive Plan provides for the grant of Incentive Stock Options, Nonstatutory Stock Options, Restricted Stock, Stock Appreciation Rights, Performance Shares, Performance Units and Deferred Stock Units.

85.    Pursuant to Section 5 ("Eligibility") of the 2004 Equity Incentive Plan, "Restricted Stock, Performance Shares, Performance Units, Stock Appreciation Rights, Deferred Stock Units and Non Statutory Stock Options may be granted to Service Providers. Incentive Stock Options may be granted only to Employees." "Service Providers" are defined in Section 2(rr) of the Plan as "an Employee, Consultant or Director."

86.    Section 2(a) ("Definitions") of the 2004 Equity Incentive Plan defines the Plan "Administrator" as "the Board or any of its Committees as shall be administering the Plan, in accordance with Section 4 of the Plan." Pursuant to Section 4(a)(i) ("Administration of the Plan") of the 2004 Equity Incentive Plan, "[t]he Plan may be administered by different Committees with respect to different groups of Service Providers." In addition, Section 4(a)(iv) states that "the Plan shall be administered by (A) the Board or (B) a Committee, which committee shall be constituted to satisfy Applicable Laws."

87.    Under Section 4(b) ("Powers of the Administrator") of the 2004 Equity Incentive Plan, the Board or its Committee has the authority, *subject to the provisions of the plan*," among other things, (a) "to determine the Fair Market Value of the Common Stock, in accordance with Section 2(u) of the Plan"; (b) "to select Service Providers to whom Awards may be granted;" (c) "to determine the number of shares of Common Stock or equivalent units

1   to be covered by each Award granted;" and (d) "to determine the terms and conditions, *not*
2   *inconsistent with the terms of the Plan,* of any award grant… [including] the exercise price."
3       88.    Section 9(b) ("Option Exercise Price") of the 2004 Equity Incentive Plan states
4   that *"[t]he per share exercise price for the Shares to be issued pursuant to exercise of an*
5   *Option shall be determined by the Administrator and shall be no less than 100% of the Fair*
6   *Market Value per share on the date of the grant."* (Emphasis added.)
7       89.    Section 9(c) ("No Repricing") of the 2004 Equity Incentive Plan provides that
8   "[t]he exercise price for an Option may not be reduced without the consent of the Company's
9   stockholders.  This shall include, without limitation, a repricing of the Option as well as an
10  Option exchange program whereby the Participant agrees to cancel an existing Option in
11  exchange for an Option, SAR or other Award."

## VI.    SUBSTANTIVE ALLEGATIONS

13      90.    Defendants violated the federal securities laws in several ways.  First, defendants
14  issued false and misleading statements and controlled persons who issued false and misleading
15  statements in violation of Rule 10b-5(b), 14(a) and 20(a) of the Exchange Act.  The false and
16  misleading statements are summarized in ¶¶91-140, 165-213, 221-235 below.    Second,
17  defendants each committed manipulative or deceptive acts in furtherance of the fraudulent
18  scheme in violation of Rule 10b-5(a) and (c) and 20(a).  These manipulative and deceptive acts
19  are summarized in ¶¶242-265 below.  Third, defendants engaged in insider trading in violation
20  of Sections 10(b) and 20A.  This trading is summarized in ¶¶309-313.

### A.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

22      91.    During the Class Period, defendants issued a series of false and misleading
23  statements in violation of Sections 10(b), 14(a) and 20(a) of the Exchange Act and Rule 10b-5.
24  These statements fall within several categories, discussed more fully below.  First, defendants
25  issued false and misleading statements regarding the Company's financials.  Second, defendants
26  issued false and misleading statements regarding the terms and value of the options granted to
27  officers, directors and employees.  Third, defendants issued false and misleading statements

28

1 regarding the Company's internal controls relating to stock option grants and related financial

2 reporting.

3      **1.     False and Misleading Financial Statements**

4          **(a)     The Misleading Financials**

5      92.    On April 18, 2001, the Company issued a press release entitled "KLA-Tencor

6 Reports Operating Results for Third Fiscal Quarter 2001," which ended March 31, 2001. The

7 press release, which quotes Schroeder, states in part:

> SAN JOSE, Calif., Apr. 18, 2001 - KLA-Tencor Corporation today announced its
> operating results for the third fiscal quarter ended March 31, 2001. Revenues
> were $529 million, a 28 percent increase from $413 million in the March 2000
> quarter, and an 8 percent decrease from the previous quarter. Compared to the
> March 2000 quarter, net income increased 25 percent to $91 million and earnings
> per share increased from $0.38 to $0.48. On a quarter-to-quarter basis, net income
> declined 16 percent compared to $109 million, or $0.57 per share, in the
> December 2000 quarter.
>
>                              * * *
>
> The Company ended the quarter with over six months backlog at current shipping
> levels. Gross margins declined from 57 percent last quarter to 54 percent, due
> primarily to lower production volumes and new product introduction costs. Total
> fixed costs decreased to $174 million from $191 million in the last fiscal quarter.
> Cash and investments increased by $119 million during the quarter to $936
> million due to income from operations and reduced working capital requirements.

16     93.    On May 14, 2001, the Company filed its quarterly report on Form 10-Q for its

17 third quarter of fiscal 2001 with the SEC ("Q3FY01 Form 10-Q"), which was signed by

18 Kispert. The Q3FY01 Form 10-Q contained the following false and misleading statements:

19 For the three-month period ended March 31, 2001, the Company reported net income of

20 $91,410,000 ($0.48 per diluted share) and expenses of $416,437,000.

21     94.    On July 31, 2001, the Company issued a press release entitled "KLA-Tencor

22 Reports Operating Results For Fiscal Year 2001," which ended on June 30, 2001. The press

23 release, which quotes Schroeder, states in relevant part:

> KLA-Tencor Corp. (Nasdaq: KLAC) today announced its operating results for the
> fourth quarter and fiscal year ended June 30, 2001. The company also reported its
> fourth quarter transition from historical accounting methods to the new methods
> required by the Securities and Exchange Commission Staff Accounting Bulletin
> No. 101 (SAB 101). Reflecting this transition, historical results are provided first,
> followed by the SAB 101 results.
>
> On an historical basis, revenues for the June 2001 quarter were $462 million, a 4

1    percent decrease from the June 2000 quarter and a 13 percent decrease from the March 2001 quarter. On the same basis, net income was $56 million or $0.29 per
2    share versus $92 million or $0.47 per share in the June 2000 quarter, and $91 million or $0.48 per share for the March 2001 quarter.

3    For fiscal 2001, historical basis revenue reached a record $2.1 billion, a 40 percent increase over fiscal 2000 revenue of $1.5 billion. Net income before
4    applying SAB 101 also reached record levels of $363 million or $1.87 per share-a 43 and 42 percent increase respectively over last year's net income of $254
5    million or $1.32 per share.

                                        * * *

6    On a SAB 101 basis, fourth quarter revenue for fiscal 2001 was $603 million and net income was $130 million or $0.67 per share. SAB 101 revenue for fiscal 2001
7    was $2.1 billion, while net income for the year was $373 million or $1.93 per share before a cumulative impact of $306 million or $1.59 per share from the
8    transition to SAB 101 accounting principles. This change further resulted in cumulative deferred revenue of $655 million as of June 30, 2001 versus $661
9    million as of June 30, 2000.

10    95.    On September 21, 2001, the Company filed its 2001 Form 10-K, which was

11   signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Tompkins and Urbanek.

12   The 2001 Form 10-K included (a) certifications by Levy, Schroeder, Kispert, Barnholt,

13   Bingham, Bond, Elkus, Morton, Tompkins and Urbanek stating that, "[p]ursuant to the

14   requirements of the Securities Exchange Act of 1934, this report has been signed below by the

15   following persons on behalf of the registrant and in the capacities and on the dates indicated;"

16   and (b) a certification by Levy stating that, "[p]ursuant to the requirements of Section 13 or

17   15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be

18   signed on its behalf by the undersigned, thereunto duly authorized on September 21, 2001."

19   This 2001 Form 10-K contained the following statements, which were false and misleading:

20         (a)    For fiscal 2001, the Company reported net income of $66,683,000 ($0.34

21   per diluted share) and expenses of $1,645,289,000.

22         (b)    For the three-month period ended June 30, 2001, KLA reported net

23   income of $116,104,000 ($0.47 per diluted share).

24         (c)    "Stock-Based Compensation Plans KLA-Tencor accounts for its

25   employee stock option plans and employee stock purchase plan in accordance with provisions

26   of APB 25, 'Accounting for Stock Issued to Employees.' KLA-Tencor provides additional *pro*

27   *forma* disclosures required by SFAS 123, 'Accounting for Stock-Based Compensation' (see

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                      33

1    Note 6)." The 2001 Form 10-K reported a *pro forma* net loss for fiscal 2001 of $27,013,000

2    (loss of $0.15 per diluted share).[1]

3         96.    On October 18, 2001, the Company issued a press release entitled "KLA-Tencor

4    Reports First Quarter Operating Results for Fiscal 2002," which ended September 30, 2001.

5    The press release, which quotes Schroeder, states in part:

6         KLA-Tencor Corp. (Nasdaq: KLAC) today announced its operating results for the
          first quarter of fiscal 2002, ended September 30, 2001. Revenue was $503
7         million, down 17 percent from the previous quarter's revenue of $603 million.
          This was a 31 percent increase from the $383 million in revenue for the
8         September 2000 fiscal quarter. Income after tax for the September 2001 quarter
          was $86 million, or $0.44 per share, compared to $29 million, or $0.15 per share
9         in the corresponding quarter a year ago before the cumulative effect of a change
          in accounting principles.
10                                            * * *
          Gross margins for the current quarter were 51.4 percent versus 55.3 percent in the
11        prior quarter-primarily due to unfavorable overhead absorption based on reduced
          business levels during the quarter and a higher percentage of service revenue.
12        Operating expenses were $154 million, a decrease of $18 million from the June
          2001 quarter.
13

14        97.    On November 14, 2001, the Company filed its quarterly report on Form 10-Q for

15   the first quarter of 2002 with the SEC ("Q1FY02 Form 10-Q"), which was signed by Kispert.

16   The Q1FY02 Form 10-Q contained the following false and misleading statements: For the

17   three-month period ended September 30, 2001, the Company reported net income of

18   $86,465,000 ($0.44 per diluted share) and expenses of $398,539,000.

19        98.    On January 23, 2002, the Company issued a press release entitled "KLA-Tencor

20   Reports Second Quarter Operating Results for Fiscal 2002." The press release, which quotes

21   Schroeder, states in part:

22        KLA-Tencor Corp. (Nasdaq: KLAC) today announced its operating results for its
          second fiscal quarter ended December 31, 2001. Consistent with the company's
23        earlier guidance, KLA-Tencor reported after tax net income of $49 million or
          $0.25 per share on revenue of $404 million. Compared to the same period one
24        year ago, when the company reported net income of $78 million or $0.41 per
          share on revenue of $501 million, revenue and net income for the second quarter
25        ended December 31, 2001 were down 19 and 37 percent respectively. On a
          sequential quarter basis, revenue and net income declined 20 and 43 percent
26

27

28   [1] As explained more fully in ¶¶144-146 below, SFAS 123 required *pro forma* disclosures of net
     income and net income per share.

     [06-cv-04065-MJJ] CONSOLIDATED FEDERAL
     SECURITIES CLASS ACTION COMPLAINT                                                    34

respectively from the September 2001 quarter.

\* \* \*

Gross margins for the current quarter were 50.1 percent versus 51.4 percent in the prior quarter-primarily due to a higher percentage of service revenue and the larger percentage decrease in shipments versus manufacturing overhead expense. Operating expenses were $146 million, $8 million lower than the September 2001 quarter.

99.   On December 26, 2001, KLA filed a Form S-8 Registration Statement with the SEC, which registered securities to be issued under the Company's Employee Benefit Plan.  In this Registration Statement, KLA incorporated by reference the following documents which contained false and misleading statements (a) the 2001 Form 10-K; (b) the Q1FY02 Form 10-Q; and (c) the 2001 Proxy Statement.  This Registration Statement also stated that all documents subsequently filed by the Registrant pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, prior to the filing of a post-effective amendment to this Registration Statement, shall be deemed to be incorporated by reference in this Registration Statement from the date of filing of such documents.

100.   On February 13, 2002, the Company filed its quarterly report on Form 10-Q for the period ended December 31, 2001 with the SEC ("Q2FY02 Form 10-Q"), which was signed by Kispert.  The Q2FY02 Form 10-Q contained the following false and misleading statements: For the three-month period ended December 31, 2001, the Company reported net income of $49,048,000 ($0.25 per diluted share) and expenses of $347,868,000.  For the six-month period ended December 31, 2001, the Company reported net income of $135,513,000 ($0.70 per diluted share) and expenses of $746,407,000.

101.   On April 18, 2002, the Company issued a press release entitled "KLA-Tencor Reports Third Quarter Operating Results for Fiscal 2002."  The press release, which quotes Schroeder, states in part:

KLA-Tencor Corp. (Nasdaq: KLAC) today announced operating results for its third fiscal quarter ended March 31, 2002. KLA-Tencor reported after tax net income of $34 million or $0.17 per fully diluted share on revenues of $357 million.  As expected, compared to the same period one year ago, the current quarter's revenues and net income were down 42 and 75 percent respectively. On a quarter over quarter basis, revenues and net income declined 12 and 30 percent respectively from the December 2001 quarter.

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    35

\* \* \*

1   Gross margins for the current quarter were 49.0 percent versus 50.1 percent in the prior quarter largely due to a higher percentage of service revenue versus system
2   revenue.  Operating expenses were $138 million, $8 million lower than the December 2001 quarter.  Engineering expenses declined $2.6 million and sales,
3   marketing, and administration decreased $5.6 million versus the previous quarter.

4   102.   On May 13, 2002, the Company filed its quarterly report on Form 10-Q for the

5   period ended March 31, 2002 with the SEC ("Q3FY02 Form 10-Q"), which was signed by

6   Kispert.  The Q3FY02 Form 10-Q contained the following false and misleading statements: For

7   the three-month period ended March 31, 2002, the Company reported net income of

8   $34,149,000, ($0.17 per diluted share) and expenses of $320,011,000.  For the nine-month

9   period ended March 31, 2002, the Company reported net income of $169,662,000 ($0.86 per

10  diluted share) and expenses of $1,066,418,000.

11  103.   On July 30, 2002, the Company issued a press release entitled "KLA-Tencor

12  Reports Operating Results for Fiscal Year 2002."  The press release, which quotes Schroeder,

13  states in part:

14  KLA-Tencor Corporation (Nasdaq: KLAC) today announced its operating results for its fourth quarter and 2002 fiscal year, which ended on June 30, 2002.  The
15  company reported $47 million in net income and earnings per share of $0.23 on revenues of $373 million for the fourth quarter.  In the fourth quarter of fiscal
16  year 2001, by comparison, KLA-Tencor reported net income of $130 million and earnings per share of $0.67 on revenues of $603 million.  In a quarter-over-
17  quarter comparison with the March 2002 fiscal third quarter, net income rose 36 percent from $34 million, earnings per share increased 35 percent from $0.17, and
18  revenue rose 4.5 percent from $357 million.  For the full fiscal year 2002, KLA-Tencor reported net income of $216 million and earnings per share of $1.10 on
19  revenue of $1.64 billion.  This compares with net income of $373 million and earnings per share of $1.93 (prior to the cumulative effect of the implementation
20  of SAB 101 accounting principles) on revenue of $2.1 billion for the 2001 fiscal year.

21

\* \* \*

22  Gross margins for the current quarter were 50.1 percent versus 49.0 percent in the prior quarter.  Operating expenses were $140 million, or 37.5% of revenue.  Cash
23  and marketable securities were $1.33 billion, an increase of $117 million from the previous quarter.

24

25  104.   On September 20, 2002, the Company filed its 2002 Form 10-K, which was

26  signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Tompkins and Urbanek.

27  The 2002 Form 10-K contained the following statements, which were false and misleading:

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    36

1    (a)    For fiscal 2002, the Company reported net income of $216,166,000

2  ($1.10 per diluted share) and expenses of $1,392,389,000.

3    (b)    For the three-month period ended June 30, 2002, KLA reported net

4  income of $47,223,000 ($0.23 per diluted share).

5    (c)    The same representation regarding the application of APB No. 25 as

6  contained in the 2001 Form 10-K. The 2002 Form 10-K reported *pro forma* net income figure

7  for fiscal 2002 of $92,364,000 ($0.47 per diluted share).

8    (d)    Certifications by Schroeder and Kispert stating that:

9
10    I, [____], certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to
    Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of KLA-
    Tencor Corporation on Form 10-K for the fiscal year ended June 30, 2002 fully
11    complies with the requirements of Section 13(a) or 15(d) of the Securities
    Exchange Act of 1934 and that information contained in such Annual Report on
12    Form 10-K fairly presents in all material respects the financial condition and
    results of operations of KLA-Tencor Corporation.
13

14    105.    On September 27, 2002, KLA filed a Form S-8 Registration Statement, which

15  registered securities to be issued under the Company's Employee Benefit Plan. In this

16  Registration Statement, KLA incorporated by reference the following documents which

17  contained false and misleading statements: (a) 2002 Form 10-K; and (b) 2002 Proxy Statement.

18  This Registration Statement also stated that all documents subsequently filed by the Registrant

19  pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, prior to the filing of a post-

20  effective amendment to this Registration Statement, shall be deemed to be incorporated by

21  reference in this Registration Statement from the date of filing of such documents.

22    106.    On October 22, 2002, the Company issued a press release entitled "KLA-Tencor

23  Posts $51 Million in Net Income for Its First Fiscal Quarter 2003." The press release, which

24  quotes Schroeder, states in part:

25    KLA-Tencor Corp. (Nasdaq: KLAC) today announced its operating results for its
    first quarter of fiscal 2003, ended September 30, 2002. The company posted net
26    income of $51 million and earnings per share of $0.26 on revenues of $376
    million. Revenue, net income and earnings per share were all up slightly from the
27    prior fiscal quarter's results of $374 million, $47 million and $0.23 per share
    respectively-due in part to a one-time net pre-tax gain of $9 million related to the
28    sale of technology offset by charges related to facilities consolidations.

1    Reflecting the current business environment, net income and revenue were down
     on a year-over-year basis from the levels of the first fiscal quarter of 2002 when
2    the company posted net income of $86 million on revenues of $503 million.

3        107.    On November 13, 2002, the Company filed its quarterly report on Form 10-Q for

4    the period ended September 30, 2002 with the SEC ("Q1FY03 Form 10-Q"), which was signed

5    by Schroeder and Kispert.    This Q1FY03 Form 10-Q contained the following false and

6    misleading statements:

7        (a)    For the three-month period ended September 30, 2002, the Company

8    reported net income of $51,265,000 ($0.26 per diluted share) and expenses of $318,236,000.

9        (b)    SOX certifications by Schroeder and Kispert stating that:

10   I, [  ] certify that:

11   1.    I have reviewed this quarterly report on Form 10-Q of KLA-Tencor
     Corporation;
12

13   2.    Based on my knowledge, this quarterly report does not contain any untrue
     statement of a material fact or omit to state a material fact necessary to make the
     statements made, in light of the circumstances under which such statements were
14   made, not misleading with respect to the period covered by this quarterly report;

15   3.    Based on my knowledge, the financial statements, and other financial
     information included in this quarterly report, fairly present in all material respects
16   the financial condition, results of operations and cash flows of the registrant as of,
     and for, the periods presented in this quarterly report[.]
17

18       (c)    Certifications by Schroeder and Kispert pursuant to 18 U.S.C. Section

19   1350 substantially identical to the one in the 2002 Form 10-K.

20       108.    On January 23, 2003, the Company issued a press release entitled "KLA-Tencor

21   Posts Second Quarter Earnings of $29 million on Revenues of $335 Million."    The press

22   release, which quotes Schroeder, states in part:

23   KLA-Tencor Corp. (Nasdaq: KLAC) today announced its operating results for its
     second quarter of fiscal 2003, ended December 31, 2002.    The company posted
24   net income of $29 million and earnings per share of $0.15 on revenues of $335
     million, as compared to $49 million on revenues of $404 million for the same
25   period of the prior fiscal year.    Revenue declined by 11 percent, as compared with
     the first quarter of fiscal 2003.    Income was lower by 43 percent, as a result of the
26   change in revenue, gains in the first quarter and restructuring-related expenses in
     the second quarter.    For the three-month period the company continued to realize
27   significant net income and strong cash flow.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                      38

1       109.   On February 13, 2003, the Company filed its quarterly report on Form 10-Q for

2    the period ended December 31, 2002 with the SEC ("Q2FY03 Form 10-Q"), which was signed

3    by Schroeder and Kispert.  The Company's Q2FY03 Form 10-Q contained the following false

4    and misleading statements

5          (a)    For the three-month period ended December 31, 2002, the Company

6    reported net income of $29,228,000 ($0.15 per diluted share) and expenses of $308,162,000.

7    For the six-month period ended December 31, 2002, the Company reported net income of

8    $80,493,000 ($0.42 per diluted share) and expenses of $626,398,000.

9          (b)    **"Accounting for Stock-Based Compensation Plans** KLA-Tencor

10   accounts for its employee stock option and employee stock purchase plans under the recognition

11   and measurement principles of APB Opinion No. 25, Accounting for Stock Issued to

12   Employees, and related Interpretations.  No stock-based employee compensation is reflected in

13   net income, as all options granted under those plans had an exercise price equal to the market

14   value of the underlying common stock on the date of grant."

15         (c)    SOX certifications by Schroeder and Kispert substantially identical to

16   those in the Q1FY03 Form 10-Q.

17         (d)    Certifications by Schroeder and Kispert pursuant to 18 U.S.C. Section

18   1350 substantially identical to those in the 2002 Form 10-K.

19       110.   On April 23, 2003, the Company issued a press release entitled "KLA-Tencor

20   Posts $27 Million in Net Income for Third Quarter Fiscal 2003."  The press release, which

21   quotes Schroeder, states in part:

22
23      KLA-Tencor Corp. (Nasdaq: KLAC) today announced operating results for its
         third quarter of fiscal 2003, ended March 31, 2003. For the three-month period,
         the company posted net income of $27 million or $0.14 per share on revenue of
24      $304 million versus $34 million or $0.17 per share on revenues of $357 million
         for the same period last year.  When compared to the prior quarter, revenue
25      decreased from $335 million while net income decreased 6% from $29 million.

26      For the nine-month period, the company posted net income of $108 million or
         $0.56 per share on revenues of $1.01 billion compared to earnings of $170 million
27      or $0.86 per share and $1.26 billion in revenue in the first nine months of the
         previous fiscal year.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT             39

111.    On May 14, 2003, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2003 with the SEC ("Q3FY03 Form 10-Q"), which was signed by Schroeder and Kispert. The Company's Q3FY03 Form 10-Q contained the following false and misleading statements:

(a)    For the three-month period ended March 31, 2003, the Company reported net income of $27,339,000 ($0.14 per diluted share) and expenses of $278,698,000. For the nine-month period ended March 31, 2003, the Company reported net income of $107,832,000 ($0.56 per diluted share) and expenses of $905,096,000.

(b)    **"Accounting for Stock-Based Compensation Plans** KLA-Tencor accounts for its employee stock option and employee stock purchase plans under the recognition and measurement principles of APB Opinion No. 25, Accounting for Stock Issued to Employees, and related Interpretations. No stock-based employee compensation is reflected in net income, as all options granted under those plans had an exercise price equal to the market value of the underlying common stock on the date of grant. In December 2002, FASB issued Statement of Financial Accounting Standards No. 148 (SFAS 148), 'Accounting for Stock-Based Compensation Transition and Disclosure'. This Statement amends SFAS 123, to provide alternative methods of transition for an entity that voluntarily changes to the fair value based method of accounting for stock-based employee compensation. It also amends the disclosure provisions of that Statement to require prominent disclosure about the effects on reported net income of an entity's accounting policy decisions with respect to stock-based employee compensation. Finally, this Statement amends APB Opinion No. 28, 'Interim Financial Reporting,' to require disclosure about those effects in interim financial information. Since KLA-Tencor continues to account for stock-based compensation according to APB 25, its adoption of SFAS No. 148 required the Company to provide prominent disclosures about the effects of SFAS 123 on reported income and required the Company to disclose these affects in the interim financial statements as well." The Q3FY03 reported *pro forma* results regarding the effect of stock-based employee compensation as follows:

1     (i) For the three months ended March 31, 2002, the Company

2 reported total stock-based employee compensation expense, net of related tax effects, of

3 $24,813,000 and reported *pro forma* net income of $9,336,000 ($0.05 per diluted share).

4     (ii) For the three months ended March 31, 2003, the Company

5 reported total stock-based employee compensation expense, net of related tax effects, of

6 $20,411,000 and reported *pro forma* net income of $6,928,000 ($0.04 per diluted share).

7     (iii) For the nine months ended March 31, 2003 [sic], the Company

8 reported total stock-based employee compensation expense, net of related tax effects, of

9 $76,171,000 and reported *pro forma* net income of $93,491,000 ($0.48 per diluted share).

10     (iv) For the nine months ended March 31, 2003, the Company

11 reported total stock-based employee compensation expense, net of related tax effects, of

12 $68,018,000 and reported *pro forma* net income of $39,814,000 ($0.21 per diluted share).

13    (c) SOX certifications by Schroeder and Kispert substantially identical to

14 those in the Q1FY03 Form 10-Q.

15    (d) Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

16 1350, substantially identical to those in the 2002 Form 10-K.

17   112. On July 24, 2003, the Company issued a press release entitled "KLA-Tencor

18 Reports $137 Million In Net Income on Revenue Of $1.32 Billion For Fiscal Year 2003." The

19 press release, which quotes Schroeder, states in part:

20   KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
21   for its fourth quarter and 2003 fiscal year.   For the quarter ending June 30, 2003,
    the company reported improvement on a quarter-over-quarter basis.   Net income
22   of $29 million and earnings per share of $0.15 in the June 2003 fiscal quarter
    were a 7 percent improvement over net income of $27 million and earnings per
23   share of $0.14 posted in the March quarter.   Revenue of $308 million in the June
    quarter was up slightly from revenue of $304 million in the March quarter.   The
24   June 2003 quarter results compare to net income of $47 million and earnings per
    share of $0.23 on revenues of $373 million for the same period last year.   For the
25   full 2003 fiscal year, KLA-Tencor reported net income of $137 million and
    earnings per share of $0.70 on revenue of $1.32 billion compared, to fiscal year
26   2002 net income of $216 million and earnings per share of $1.10 on revenues of
    $1.64 billion.
                * * *
27   Gross margins improved from 48.5 percent in the third quarter of fiscal year 2003
28   to 49.0 percent in the fourth quarter.   Cost reductions in service and

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT           41

1  manufacturing expenses contributed to the improvement in gross margins. Operating expenses were unchanged at $122 million, a decrease in selling,
2  general and administrative expense offset a $3 million increase in engineering expense.

3     113.    On September 16, 2003, the Company filed its annual report on Form 10-K for

4  the period ended June 30, 2003 with the SEC. On September 29, 2003, the Company filed an

5  amended Form 10-K. The original Form 10-K and the amended Form 10-K are collectively

6  referred to hereinafter as the "2003 Form 10-K." The 2003 Form 10-K was signed by Levy,

7  Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Kaufman, Tompkins and Urbanek. The

8  Company's 2003 Form 10-K contained the following statements, which were false and

9  misleading:

10         (a)    For 2003, the Company reported net income of $137,191,000 ($0.70 per

11  diluted share) and expenses of $1,184,327,000.

12         (b)    For the three-month period ended June 30, 2003, KLA reported net

13  income of $29,359,000 ($0.15 per diluted share).

14         (c)    **"Accounting for Stock-Based Compensation Plans** KLA-Tencor

15  accounts for its employee stock option and employee stock purchase plans under the recognition

16  and measurement principles of APB Opinion No. 25, Accounting for Stock Issued to

17  Employees, and related Interpretations. No stock-based employee compensation is reflected in

18  net income, as all options granted under those plans had an exercise price equal to the market

19  value of the underlying common stock on the date of grant. In December 2002, FASB issued

20  Statement of Financial Accounting Standards No. 148 (SFAS 148), 'Accounting for Stock-

21  Based Compensation Transition and Disclosure.' This Statement amends SFAS 123, to provide

22  alternative methods of transition for an entity that voluntarily changes to the fair value based

23  method of accounting for stock-based employee compensation. It also amends the disclosure

24  provisions of that Statement to require prominent disclosure about the effects on reported net

25  income of an entity's accounting policy decisions with respect to stock-based employee

26  compensation. Finally, this Statement amends APB Opinion No. 28, Interim Financial

27  Reporting, to require disclosure about those effects in interim financial information. Since

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                           42

1   KLA-Tencor continues to account for stock-based compensation according to APB Opinion No.

2   25, its adoption of SFAS No. 148 required the Company to provide prominent disclosures about

3   the effects of SFAS 123 on reported income and required the Company to disclose these affects

4   in the financial statements as well." The 2003 Form 10-K reported total stock-based employee

5   compensation expense (net of related tax effects) of $90,880,000 and reported *pro forma* net

6   income of $46,311,000 ($0.24 per diluted share).

7           (d)     SOX certifications by Schroeder and Kispert substantially identical to

8   those in the Q1FY03 Form 10-Q.

9           (e)     Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

10  1350, substantially identical to those in the 2002 Form 10-K.

11      114.    On October 22, 2003, the Company issued a press release entitled "KLA-Tencor

12  Posts $37 Million In Net Income On Revenue of $318 Million for First Quarter of Fiscal Year

13  2004." The press release, which quotes Schroeder, states in part:

14      KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
        for its first quarter of fiscal 2004, ended September 30, 2003. The company
15      recorded net income of $37 million and earnings per share of $0.18 on revenue of
        $318 million in the September quarter, each of which reflect a sequential quarter-
16      to-quarter improvement over net income of $29 million, earnings per share of
        $0.15 and revenue of $308 million in the June quarter. For the first quarter of last
17      fiscal year, the company earned net income of $51 million and earnings per share
        of $0.26 on revenues of $376 million.
18
                                    * * *
19      Gross margins improved from 49.0 percent in the June quarter to 51.1 percent in
        the September quarter. Improvements in manufacturing and service costs
20      contributed to the increase in gross margins. Operating expenses increased
        slightly to $125 million.
21

22      115.    On November 7, 2003, the Company filed its quarterly report on Form 10-Q for

23  the period ended September 30, 2003 with the SEC ("Q1FY04 Form 10-Q"), which was signed

24  by Schroeder and Kispert. This Q1FY04 Form 10-Q contained the following false and

25  misleading statements:

26          (a)     For the three-month period ended September 30, 2003, the Company

27  reported net income of $36,837,000 ($0.18 per diluted share) and expenses of $281,002,000.

28

1          (b)     **"Accounting for Stock-Based Compensation Plans** KLA-Tencor

2   accounAts for its employee stock option and employee stock purchase plans under the

3   recognition and measurement principles of Accounting Principles Board Opinion No. 25,

4   Accounting for Stock Issued to Employees, and related Interpretations.   No stock-based

5   employee compensation is reflected in net income, as all options granted under those plans had

6   an exercise price equal to the market value of the underlying common stock on the date of

7   grant.  In December 2002, FASB issued Statement of Financial Accounting Standards No. 148

8   (SFAS 148), "Accounting for Stock-Based Compensation Transition and Disclosure."  This

9   Statement amends SFAS 123, to provide alternative methods of transition for an entity that

10  voluntarily changes to the fair value based method of accounting for stock-based employee

11  compensation.  It also amends the disclosure provisions of that Statement to require prominent

12  disclosure about the effects on reported net income of an entity's accounting policy decisions

13  with respect to stock-based employee compensation.   Finally, this Statement amends APB

14  Opinion No. 28, Interim Financial Reporting, to require disclosure about those effects in interim

15  financial information.   Since KLA-Tencor continues to account for stock-based compensation

16  according to APB 25, its adoption of SFAS 148 required the Company to provide prominent

17  disclosures about the effects of SFAS 123 on reported income and required the Company to

18  disclose these affects in the financial statements as well."  The Q1FY04 reported *pro forma*

19  results regarding the effect of stock-based employee compensation as follows:

20          (i)     For the three months ended September 30, 2002, the Company

21  reported total stock-based employee compensation expense, net of related tax effects, of

22  $24,976,000 and reported *pro forma* net income of $26,289,000 ($0.14 per diluted share).

23          (ii)    For the three months ended September 30, 2003, the Company

24  reported total stock-based employee compensation expense, net of related tax effects, of

25  $22,567,000 and reported *pro forma* net income of $14,270,000 ($0.07 per diluted share).

26          (c)     SOX certifications by Schroeder and Kispert substantially identical to

27  those in the Q1FY03 Form 10-Q.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              44

1            (d)    Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

2    1350, substantially identical to those in the 2002 Form 10-K.

3            116.   On January 22, 2004, the Company issued a press release entitled "KLA-Tencor

4    Posts Earnings Of $45 Million on Revenues Of $339 Million For Second Quarter of Fiscal

5    2004." The press release, which quotes Schroeder, states in part:

6         KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
     for its second quarter of fiscal 2004, ended December 31, 2003. The company
7         reported net income of $45 million and diluted earnings per share of $0.22 on
     revenues of $339 million – an increase on both a year-over-year and sequential
8         basis. In comparison, the second quarter of fiscal 2003 resulted in net income of
     $29 million and diluted earnings per share of $0.15 on revenues of $335 million,
9         while in its first fiscal quarter of fiscal 2004 KLA-Tencor realized net income of
     $37 million and diluted earnings per share of $0.18 on revenues of $318 million.
10

                                  * * *

11         Gross margins improved three percent sequentially to 54 percent, which helped
     drive net income higher by 21 percent over the previous quarter. Improvements in
12         capacity absorption and manufacturing efficiencies contributed to the gain in
     gross margins.
13

14            117.   On February 6, 2004, the Company filed its quarterly report on Form 10-Q for

15    the period ended December 31, 2003 with the SEC ("Q2FY04 Form 10-Q"), which was signed

16    by Schroeder and Kispert.   This Q2FY04 Form 10-Q contained the following false and

17    misleading statements:

18            (a)    For the three-month period ended December 31, 2003, the Company

19    reported net income of $44,515,000 ($0.22 per diluted share) and expenses of $287,476,000.

20    For the six-month period ended December 31, 2003, the Company reported net income of

21    $81,352,000 ($0.40 per diluted share) and expenses of $568,478,000.

22            (b)    The identical representation regarding the application of APB No. 25 and

23    the fact that there is no stock-based employee compensation reflected in net income, "as all

24    options granted under those plans had an exercise price equal to the market value of the

25    underlying common stock on the date of grant," as contained in the Q1FY03 Form 10-Q. The

26    Q2FY04 reported *pro forma* results regarding the effect of stock-based employee compensation

27    as follows:

28

1          (i)    For the three months ended December 31, 2002, the Company
2    reported total stock-based employee compensation expense, net of related tax effects, of
3    $24,976,000 and reported *pro forma* net income of $5,829,000 ($0.03 per diluted share).

4          (ii)    For the three months ended December 31, 2003, the Company
5    reported total stock-based employee compensation expense, net of related tax effects, of
6    $24,284,000 and reported *pro forma* net income of $20,231,000 ($0.10 per diluted share).

7          (iii)    For the six months ended December 31, 2002, the Company
8    reported total stock-based employee compensation expense, net of related tax effects, of
9    $48,375,000 and reported *pro forma* net income of $32,118,000 ($0.17 per diluted share).

10          (iv)    For the six months ended December 31, 2003, the Company
11    reported total stock-based employee compensation expense, net of related tax effects, of
12    $46,851,000 and reported *pro forma* net income of $34,501,000 ($0.17 per diluted share).

13          (c)    SOX certifications by Schroeder and Kispert substantially identical to
14    those in the Q1FY03 Form 10-Q.

15          (d)    Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section
16    1350, substantially identical to those in the 2002 Form 10-K.

17          118.    On March 5, 2004, KLA filed a Form S-8 Registration Statement, which
18    registered securities to be issued under the Company's Employee Benefit Plan.    In this
19    Registration Statement, KLA incorporated by reference the following documents, which
20    contained false and misleading statements: (a) 2003 Form 10-K; (b) Q1FY04 and Q2FY04
21    Forms 10-Q; and (c) 2003 Proxy Statement.    This Registration Statement also stated that all
22    documents subsequently filed by the Registrant pursuant to Sections 13(a), 13(c), 14 and 15(d)
23    of the Exchange Act, prior to the filing of a post-effective amendment to this Registration
24    Statement, shall be deemed to be incorporated by reference in this Registration Statement from
25    the date of filing of such documents.

26          119.    On April 21, 2004, the Company issued a press release entitled "KLA-Tencor
27    Posts Third Quarter Fiscal Year 2004 Earnings Of $66 Million On Revenues Of $390 Million."

28

1    The press release, which quotes Schroeder, states in part:

2        KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
         for its third quarter of fiscal 2004, ended March 31, 2004. Revenues for the
3        quarter were $390 million, up 15% from $339 million in the previous quarter, and
         up 28% from $304 million in the third quarter of fiscal 2003. The net income for
4        the quarter was $66 million or $0.33 per diluted share, compared with net income
         of $45 million or $0.22 per diluted share in the prior quarter, and $27 million or
5        $0.14 per diluted share in the third quarter of fiscal 2003.

6                                        * * *

7        Gross margins improved two percent sequentially to 56 percent in the March
         quarter from 54 percent in the December quarter, primarily driven by cost
8        reduction initiatives along with improvements in capacity absorption.

9        120.    On May 5, 2004, the Company filed its quarterly report on Form 10-Q for the

10   period ended March 31, 2004 with the SEC ("Q3FY04 Form 10-Q"), which was signed by

11   Schroeder and Kispert.  This Q3FY04 Form 10-Q contained the following false and misleading

12   statements:

13               (a)     For the three-month period ended March 31, 2004, the Company reported

14   net income of $66,182,000 ($0.33 per diluted share) and expenses of $302,019,000.  For the

15   nine-month period ended March 31, 2004, the Company reported net income of $147,534,000

16   ($0.73 per diluted share) and expenses of $870,497,000.

17               (b)     The identical representation as contained in the Q1FY04 Form 10-Q

18   regarding the application of APB No. 25 and the fact that there is no stock-based employee

19   compensation reflected in net income "as all options granted under those plans had an exercise

20   price equal to the market value of the underlying common stock on the date of grant."  The

21   Q1FY04 reported *pro forma* results regarding the effect of stock-based employee compensation

22   as follows:

23               (i)     For the three months ended March 31, 2003, the Company

24   reported total stock-based employee compensation expense, net of related tax effects, of

25   $20,740,000 and reported *pro forma* net income of $6,599,000 ($0.03 per diluted share).

26               (ii)    For the three months ended March 31, 2004, the Company

27   reported total stock-based employee compensation expense, net of related tax effects, of

28

1   $21,718,000 and reported *pro forma* net income of $44,464,000 ($0.22 per diluted share).

2        (iii)    For the nine months ended March 31, 2003, the Company

3   reported total stock-based employee compensation expense, net of related tax effects, of

4   $69,115,E000 and reported *pro forma* net income of $38,717,000 ($0.20 per diluted share).

5        (iv)    For the nine months ended March 31, 2004, the Company

6   reported total stock-based employee compensation expense, net of related tax effects, of

7   $68,569,000 and reported *pro forma* net income of $78,965,000 ($0.39 per diluted share).

8        (c)    SOX certifications by Schroeder and Kispert substantially identical to

9   those in the Q1FY03 Form 10-Q.

10        (d)    Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

11   1350, substantially identical to those in the 2002 Form 10-K.

12        121.    On July 29, 2004, the Company issued a press release entitled "KLA-Tencor

13   Reports Earnings of $244 Million on Revenues of $1.5 Billion for Fiscal Year 2004." The press

14   release, which quotes Schroeder, states in part:

15   KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
     for its fourth quarter and 2004 fiscal year ended June 30, 2004. The company
16   reported strong gains for both the quarter and full fiscal year. For the quarter, the
     company reported net income of $96 million and earnings per diluted share of
17   $0.48 on revenues of $450 million, which represented an increase on both a
     sequential and year-over-year basis. Revenues rose 16 percent from $390 million
18   in the prior quarter and 46 percent from $308 million compared to the same
     period last year. Net income was also significantly higher, increasing from $66
19   million or $0.33 per diluted share in the prior quarter and $29 million or $0.15 per
     diluted share in the fourth quarter of fiscal 2003. For the full 2004 fiscal year,
20   KLA-Tencor reported net income of $244 million or $1.21 per diluted share on
     revenues of $1.5 billion versus net income of $137 million or $0.70 per diluted
21   share on revenues of $1.3 billion in its 2003 fiscal year.

22                                    * * *

23   Gross margins improved during the quarter, rising another two percent
     sequentially to 58 percent compared to 56 percent in the third quarter. This
24   improvement was primarily driven by cost reduction initiatives. Cash, cash
     equivalents and marketable securities increased by $156 million to $1.88 billion.
25   Accounts receivable increased $10 million to $373 million on higher product
     shipments. Inventory increased by $27 million to $337 million, as the company
26   continued to ramp production to meet customer demand.

27        122.    On August 30, 2004, the Company filed its 2004 Form 10-K, which was signed

28

1   by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Kaufman, Marks, Tompkins and

2   Urbanek.    The 2004 Form 10-K contained the following statements, which were false and

3   misleading:

4       (a)  The Company reported net income of $243,701,000 ($1.21 per diluted

5   share) and expenses of $1,199,360,000.

6       (b)  For the three-month period ended June 30, 2004, KLA reported net

7   income of $96,167,000 ($0.48 per diluted share).

8       (c)  The identical representations as contained in the 2003 Form 10-K

9   regarding the application of APB No. 25 and  the fact that there is no stock-based employee

10  compensation reflected in net income "as all options granted under those plans had an exercise

11  price equal to the market value of the underlying common stock on the date of grant."  The

12  Company reported a total stock-based employee compensation expense (net of related tax

13  effects) of $82,446,000 and reported *pro forma* net income of $161,225,000 ($0.80 per diluted

14  share).

15      (d)  SOX certifications by Schroeder and Kispert substantially identical to

16  those in the Q1FY03 Form 10-Q.

17      (e)  Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

18  1350, substantially identical to those in the 2002 Form 10-K.

19      123.  On October 21, 2004, the Company issued a press release entitled "KLA-Tencor

20  Reports Earnings of $116 Million on Revenues of $519 Million for First Quarter of Fiscal Year

21  2005." The press release, which quotes Schroeder, states in part:

22    KLA-Tencor Corporation (Nasdaq:KLAC) today announced operating results for
23    its first quarter of fiscal 2005, ended September 30, 2004.  Net income and
  earnings per diluted share roles to $116 million and $0.58 on revenues of $519
24    million, as the company reported sequential and year-over-year improvements in
  operating results.  Revenues rose 15 percent from $450 million in the prior
25    quarter and 63 percent from $318 million compared to the same period last year.
  Net income was also significantly higher, increasing from $96 million or $0.48
26    per diluted share in the prior quarter and $37 million or $0.18 per diluted share in
  the first quarter of fiscal 2004.
           * * *
27    Rising revenues and improved cost-structure resulted in record level gross
28    margin, pretax, and operating margin percentages in the current quarter.

1    Operating expenses increased from $141 million in the prior quarter to $146 million in the current quarter.

2    124.    On November 3, 2004, the Company filed its quarterly report on Form 10-Q for

3    the period ended September 30, 2004 with the SEC ("Q1FY05 Form 10-Q"), which was signed

4    by Schroeder and Kispert.    This Q1FY05 Form 10-Q contained the following false and

5    misleading statements:

6    (a)    For the three-month period ended September 30, 2004, the Company

7    reported net income of $116,405,000 ($0.58 for diluted share) and expenses of $361,806,000.

8    (b)    **"Accounting for Stock-Based Compensation Plans** KLA-Tencor

9    accounts for its employee stock option and employee stock purchase plans under the intrinsic

10    value recognition and measurement principles of Accounting Principles Board Opinion ('APB')

11    No. 25, 'Accounting for Stock Issued to Employees,' and related Interpretations, and has

12    adopted the disclosure-only provisions of Statement of Financial Accounting Standard ('SFAS')

13    No. 123, 'Accounting for Stock-Based Compensation,' as amended by SFAS No. 148,

14    'Accounting for Stock-Based Compensation – Transition and Disclosures.' No stock-based

15    employee compensation is reflected in net income, as all options granted under those plans had

16    an exercise price equal to the market value of the underlying common stock on the date of

17    grant." The Q1FY05 reported *pro forma* results regarding the effect of stock-based employee

18    compensation as follows:

19    (i)    For the three months ended September 30, 2003, the Company

20    reported total stock-based employee compensation expense, net of related tax effects, of

21    $22,567,000 and reported *pro forma* net income of $14,270,000 ($0.07 per diluted share).

22    (ii)    For the three months ended September 30, 2004, the Company

23    reported total stock-based employee compensation expense, net of related tax effects, of

24    $20,453,000 and reported *pro forma* net income of $95,952,000 ($0.48 per diluted share).

25    (c)    SOX certifications by Schroeder and Kispert substantially identical to

26    those in the Q1FY03 Form 10-Q.

27    (d)    Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          50

1   1350, substantially identical to those in the 2002 Form 10-K.

2        125.    On November 4, 2004, KLA filed a Form S-8 Registration Statement, which

3   registered securities to be issued under the Company's Employee Benefit Plan.    In this

4   Registration Statement, KLA incorporated by reference the following documents, which

5   contained false and misleading statements: (a) 2004 Form 10-K; (b) Q2FY05 Form 10-Q; and

6   (c) 2004 Proxy Statement.    This Registration Statement also stated that all documents

7   subsequently filed by the Registrant pursuant to Sections 13(a), 13(c), 14 and 15(d) of the

8   Exchange Act, prior to the filing of a post-effective amendment to this Registration Statement,

9   shall be deemed to be incorporated by reference in this Registration Statement from the date of

10  filing of such documents.

11        126.    On December 23, 2004, KLA filed a Form S-8 Registration Statement, which

12  registered securities to be issued under the Company's Employee Benefit Plan.    In this

13  Registration Statement, KLA incorporated by reference the following documents, which

14  contained false and misleading statements: (a) 2004 Form 10-K; (b) Q1FY05 Form 10-Q; and

15  (c) 2004 Proxy Statement.    This Registration Statement also stated that all documents

16  subsequently filed by the Registrant pursuant to Sections 13(a), 13(c), 14 and 15(d) of the

17  Exchange Act, prior to the filing of a post-effective amendment to this Registration Statement,

18  shall be deemed to be incorporated by reference in this Registration Statement from the date of

19  filing of such documents.

20        127.    On January 20, 2005, the Company issued a press release entitled "KLA-Tencor

21  Posts Second Quarter Fiscal Year 2005 Earnings of $122 Million on Revenues of $533

22  Million." The press release, which quotes Schroeder, states in part:

23        KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
          for its second quarter of fiscal 2005, ended December 31, 2004.  Revenues for the
24        quarter were $533 million, up 3% from $519 million in the previous quarter, and
          up 57% from $339 million in the second quarter of fiscal 2004.  The net income
25        for the quarter was $122 million or $0.61 per diluted share, compared with net
          income of $116 million or $0.58 per diluted share in the prior quarter, and $45
26        million or $0.22 per diluted share in the second quarter of fiscal 2004.

27        128.    On February 3, 2005, the Company filed its quarterly report on Form 10-Q for

28

1   the period ended December 31, 2004 with the SEC ("Q2FY05 Form 10-Q"), which was signed
2   by Schroeder and Kispert.  This Form 10-Q contained the following false and misleading
3   statements:

4           (a)    For the three-month period ended December 31, 2004, the Company
5   reported net income of $122,077,000 ($0.61 per diluted share) and expenses of $377,345,000.
6   For the six-month period ended December 31, 2004, the Company reported net income of
7   $238,482,000 ($1.19 per diluted share) and expenses of $739,151,000.

8           (b)    **"Accounting for Stock-Based Compensation Plans** KLA-Tencor
9   accounts for its employee stock option and employee stock purchase plans under the intrinsic
10  value recognition and measurement principles of Accounting Principles Board Opinion ('APB')
11  No. 25, 'Accounting for Stock Issued to Employees,' and related Interpretations, and has
12  adopted the disclosure-only provisions of Statement of Financial Accounting Standard ('SFAS')
13  No. 123, 'Accounting for Stock-Based Compensation,' as amended by SFAS No. 148,
14  'Accounting for Stock-Based Compensation - Transition and Disclosures.'"  The Q2FY05
15  reported *pro forma* results regarding the effect of stock-based employee compensation as
16  follows:

17          (i)    For the three months ended December 31, 2003, the Company
18  reported total stock-based compensation expense, net of related tax effects, of $24,284,000 and
19  reported *pro forma* net income of $20,231,000 ($0.10 per diluted share).

20          (ii)   For the three months ended December 31, 2004, the Company
21  reported total stock-based compensation expense, net of related tax effects, of $21,077,000 and
22  reported *pro forma* net income of $101,000,000 ($0.50 per diluted share).

23          (iii)  For the six months ended December 31, 2003, the Company
24  reported total stock-based compensation expense, net of related tax effects, of $46,851,000 and
25  reported *pro forma* net income of $34,501,000 ($0.17 per diluted share).

26          (iv)   For the six months ended December 31, 2004, the Company
27  reported total stock-based compensation expense, net of related tax effects, of $41,530,000 and

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    52

1    reported *pro forma* net income of $196,952,000 ($0.98 per diluted share).

2              (c)    SOX certifications by Schroeder and Kispert substantially identical to

3    those in the Q1FY03 Form 10-Q.

4              (d)    Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

5    1350, substantially identical to those in the 2002 Form 10-K.

6        129.  On April 28, 2005, the Company issued a press release entitled "KLA-Tencor

7    Posts Third Quarter Fiscal Year 2005 Earnings of $123 Million on Revenues of $542 Million."

8    The press release, which quotes Schroeder, states in part:

9        KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
         for its third quarter of fiscal 2005, ended March 31, 2005.  Revenues for the
10       quarter were $542 million, up 2% from $533 million in the previous quarter and
         up 39% from $390 million in the third quarter of fiscal 2004.  The net income for
11       the quarter was $123 million or $0.61 per diluted share, compared with net
         income of $122 million or $0.61 per diluted share in the prior quarter and $66
12       million or $0.33 per diluted share in the third quarter of fiscal 2004.

13                                   * * *

14       We continued to have strong gross margins as we benefit from cost reductions
         initiatives and high manufacturing utilization.  Operating expenses increased from
15       $160 million in the prior quarter to $165 million in the current quarter as a result
         of investment in research and development for new process control technology
16       solutions and systems to drive business efficiencies.

17       130.  On May 9, 2005, the Company filed its quarterly report on Form 10-Q for the

18   period ended March 31, 2005 with the SEC ("Q3FY05 Form 10-Q"), which was signed by

19   Schroeder and Kispert.  This Q3FY05 Form 10-Q contained the following false and misleading

20   statements:

21             (a)    For the three-month period ended March 31, 2005, the Company reported

22   net income of $123,163,000 ($0.61 per diluted share) and expenses of $386,764,000.  For the

23   nine-month period ended March 31, 2005, the Company reported net income of $361,645,000

24   ($1.80 per diluted share) and expenses of $1,125,915,000.

25             (b)    The identical representations regarding the application of APB No. 25 as

26   contained in the Q2FY05 Form 10-Q.  The Q3FY05 reported *pro forma* results regarding the

27   effect of stock-based employee compensation as follows:

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          53

1              (i)    For the three months ended March 31, 2004, the Company

2    reported total stock-based compensation expense, net of related tax effects, of $21,718,000 and

3    reported *pro forma* net income of $44,464,000 ($0.22 per diluted share).

4              (ii)   For the three months ended March 31, 2005, the Company

5    reported total stock-based compensation expense, net of related tax effects, of $24,575,000 and

6    reported *pro forma* net income of $98,588,000 ($0.49 per diluted share).

7              (iii)  For the nine months ended March 31, 2004, the Company

8    reported total stock-based compensation expense, net of related tax effects, of $68,569,000 and

9    reported pro forma net income of $78,965,000 ($0.39 per diluted share).

10             (iv)   For the nine months ended March 31, 2005, the Company

11   reported total stock-based compensation expense, net of related tax effects, of $66,105,000 and

12   reported *pro forma* net income of $295,540,000 ($1.47 per diluted share). ......

13             (c)    SOX certifications by Schroeder and Kispert substantially identical to

14   those in the Q1FY03 Form 10-Q.

15             (d)    Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

16   1350, substantially identical to those in the 2002 Form 10-K.

17        131.   On July 28, 2005, the Company issued a press release entitled "KLA-Tencor

18   Reports Earnings of $467 Million on Revenues of $2.1 Billion for Fiscal Year 2005." The press

19   release, which quotes Schroeder, states in part:

20        KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
          for its fourth quarter and 2005 fiscal year ended June 30, 2005. The company
21        realized strong gains for the full 2005 fiscal year, and reported net income of $467
          million or $2.32 per diluted share on revenues of $2.1 billion versus net income of
22        $244 million or $1.21 per diluted share on revenues of $1.5 billion in its 2004
          fiscal year. For the quarter ended June 30, 2005, the company reported net
23        income of $105 million and earnings per diluted share of $0.52 on revenues of
          $492 million compared to net income of $96 million or $0.48 per diluted shares
24        on revenue of $450 million in the fourth quarter of fiscal 2004, and net income of
          $123 million or $0.61 per diluted shares on revenue of $542 million in the third
25        quarter of fiscal 2005.

26        132.   On September 2, 2005, the Company filed its 2005 Form 10-K, which was

27   signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Kaufman, Marks,

28

1  Tompkins and Urbanek. This 2005 Form 10-K contained the following statements, which were

2  false and misleading:

3            (a)      The Company reported net income of $466,695,000 ($2.32 per diluted

4  share) and expenses of $1,502,591,000.

5            (b)      For the three-month period ended June 30, 2005, KLA reported net

6  income of $105,050,000 ($0.52 per diluted share).

7            (c)      The identical representations regarding the application of APB No. 25 as

8  contained in the Q2FY05 Form 10-Q. The 2005 Form 10-K reported (i) total stock-based

9  compensation expenses included in reported net income (net of tax) of $1,831,000; (ii) total

10  stock-based employee compensation expense determined under the fair value based method (net

11  of related tax effects) of $93,281,000; and (iii) *pro forma* net income of $375,245,000 ($1.87

12  per diluted share).

13            (d)      SOX certifications by Schroeder and Kispert substantially identical to

14  those in the Q1FY03 Form 10-Q.

15            (e)      Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

16  1350, substantially identical to those in the 2002 Form 10-K.

17      133.    On October 27, 2005, KLA issued a press release entitled "KLA-Tencor Reports

18  First Quarter of 2006 Earnings Per Share of $0.38 ($0.50 Excluding Equity Based

19  Compensation Of $0.12) on Revenue of $484 Million." The press release, which quotes

20  Schroeder, states in part:

21          KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
            for its first quarter of fiscal 2006, ended September 30, 2005. The company
22          reported net income of $77 million and earnings per diluted share of $0.38 on
            revenues of $484 million compared to net income of $105 million or $0.52 per
23          diluted shares on revenue of $492 million in the fourth quarter of fiscal 2005, and
            net income of $116 million or $0.58 per diluted shares on revenue of $519 million
24          in the first quarter of fiscal 2005. The results include the impact from adoption in
            the first quarter of fiscal 2006 of SFAS 123 (R). The company included equity
25          based compensation expenses of $24 million or $0.12 per diluted share, after
            income tax expenses, in its costs and operating expenses during the first quarter of
26          fiscal 2006. Excluding the $24 million of equity based compensation, net income
            would have been $101 million and earnings per diluted share would have been
27          $0.50 for the first quarter of fiscal 2006.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                          55

134.   On November 8, 2005, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2005 with the SEC ("Q1FY06 Form 10-Q"), which was signed by Schroeder and Kispert.   This Q1FY06 Form 10-Q contained the following false and misleading statements:

(a)   For the three-month period ended September 30, 2005, the Company reported net income of $76,678,000 ($0.38 per diluted share) and expenses of $403,022,000.

(b)   For the three-month period ended September 30, 2005, the Company reported total stock-based compensation expense pursuant to SFAS No. 123(R), of $34,828,000 and $24,172,000 or $0.12 per diluted share, net of related tax effects.

(c)   "Effective July 1, 2005, KLA-Tencor adopted the provisions of SFAS No. 123(R), 'Share-Based Payment'. SFAS No. 123(R) establishes accounting for stock-based awards exchanged for employee services.   Accordingly, stock-based compensation cost is measured at grant date, based on the fair value of the award, and is recognized as expense over the employee requisite service period.   The Company previously applied Accounting Principles Board (APB) Opinion No. 25, 'Accounting for Stock Issued to Employees,' and related Interpretations and provided the required pro forma disclosures of SFAS No. 123, 'Accounting for Stock-Based Compensation.'"   The Q1FY06 reported, for the three months ended September 30, 2004, total stock-based compensation expense, net of related tax effects, of $20,453,000 and *pro forma* net income of $95,952,000 ($0.48 per diluted share).

(d)   SOX certifications by Schroeder and Kispert substantially identical to those in the Q1FY03 Form 10-Q.

(e)   Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section 1350, substantially identical to those in the 2002 Form 10-K.

135.   On November 21, 2005, KLA filed a Form S-8 Registration Statement, which registered securities to be issued under the Company's Employee Benefit Plan.   In this Registration Statement, KLA incorporated by reference the following documents which contained false and misleading statements: (a) 2005 Form 10-K; (b) Q1FY06 Form 10-Q; and

1   (c) 2005 Proxy Statement.  This Registration Statement also stated that all documents

2   subsequently filed by the Registrant pursuant to Sections 13(a), 13(c), 14 and 15(d) of the

3   Exchange Act, prior to the filing of a post-effective amendment to this Registration Statement,

4   shall be deemed to be incorporated by reference in this Registration Statement from the date of

5   filing of such documents.

6       136.   On January 26, 2006, the Company issued a press release entitled "KLA-Tencor

7   Reports 2nd Quarter of Fiscal 2006 Earnings Per Share of $0.38 ($0.50 Excluding Equity Based

8   Compensation) on Revenue of $488 Million."  The press release, which quotes Wallace, states

9   in part:

10          KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
            for its second quarter of fiscal 2006, ended December 31, 2005.  The company
11          reported net income of $77 million and earnings per diluted share of $0.38 on
            revenues of $488 million compared to net income of $77 million or $0.38 per
12          diluted share on revenue of $484 million in the first quarter of fiscal 2006, and net
            income of $122 million or $0.61 per diluted share on revenue of $533 million in
13          the second quarter of fiscal 2005.  The results for the fiscal 2006 quarters include
            the impact from adoption of SFAS 123 (R) "Stock Based Compensation".  The
14          company recorded after-tax equity-based compensation expenses of $25 million
            during the second quarter of fiscal 2006 and $24 million during the first quarter of
15          fiscal 2006, in its costs and operating expenses.  Excluding the impact of equity-
            based compensation, net income would have been $102 million or $0.50 per
16          diluted share in the second quarter of fiscal 2006 and $101 million or $0.50 per
            diluted share for the first quarter of fiscal 2006.
17

18      137.   On February 2, 2006, the Company filed its quarterly report on Form 10-Q for

19   the period ended December 31, 2005 with the SEC ("Q2FY06 Form 10-Q"), which was signed

20   by Wallace and Hall.  This Q2FY06 Form 10-Q contained the following false and misleading

21   statements:

22          (a)    For the three-month period ended December 31, 2005, the Company

23   reported net income of $76,649,000 ($0.38 per diluted share) and expenses of $411,455,000.

24   For the six-month period ended December 31, 2005, the Company reported net income of

25   $153,327,000 ($0.76 per diluted share) and expenses of $814,477,000.

26          (b)    For the three-month period ended December 31, 2005, the Company

27   reported total stock-based compensation expense pursuant to SFAS No. 123(R) of $36,254,000

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                             57

1    ($25,812,000 or $0.13 per diluted share net of related tax effects).

2    (c)    For the three-month period ended December 31, 2004, the Company

3    reported total stock-based expense of $21,077,000 and net income of $101,800,000 ($0.50 per

4    diluted share).

5    (d)    For the six-month period ended December 31, 2005, the Company

6    reported total stock-based compensation expense pursuant to SFAS No. 123(R) of $71,082,000

7    ($49,984,000 or $0.25 per diluted share net of related tax effects).

8    (e)    For the six-month period ended December 31, 2004, the Company

9    reported total stock-based compensation expense of $41,530,000 and net income of

10    $196,952,000 ($0.98 per diluted share).

11    (f)    The identical statement regarding the adoption of SFAS No. 123(R), as

12    contained in the Q1FY06 Form 10-Q.

13    (g)    SOX certifications by Wallace and Hall substantially identical to those in

14    the Q1FY03 Form 10-Q.

15    (h)    Certifications by Wallace and Hall, pursuant to 18 U.S.C. Section 1350,

16    substantially identical to those in the 2002 Form 10-K.

17    138.    On April 27, 2006, the Company issued a press release entitled "KLA-Tencor

18    Reports Third Quarter of Fiscal 2006 Earnings Per Share of $0.48 ($0.63 Excluding Equity

19    Based Compensation) on Revenue of $518 Million." The press release, which quotes Wallace,

20    states in part:

21    KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
     for its third quarter of fiscal 2006, ended March 31, 2006. The company reported
22    net income of $98 million and earnings per diluted share of $0.48 on revenues of
     $518 million compared to net income of $77 million or $0.38 per diluted share on
23    revenue of $488 million in the second quarter of fiscal 2006, and net income of
     $123 million or $0.61 per diluted share on revenue of $542 million in the third
24    quarter of fiscal 2005. The results for the fiscal 2006 quarters include the impact
     from adoption of SFAS 123 (R) "Stock Based Compensation". The company
25    recorded after tax equity based compensation expenses of $31 million during the
     third quarter of fiscal 2006 and $25 million during the second quarter of fiscal
26    2006, in its costs and operating expenses. Excluding the impact of equity based
     compensation, net income would have been $129 million or $0.63 per diluted
27    share for the third quarter of fiscal 2006 and $102 million or $0.50 per diluted
     share in the second quarter of fiscal 2006.
28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                    58

1     "We had a quarter of strong financial results, as semiconductor manufacturers
2     continue to make investments in our leading-edge process control solutions in
order to reduce the time and costs associated with producing next-generation
3     devices," stated Rick Wallace, chief executive officer of KLA-Tencor. "We
remain focused on investing in the solutions our customers will need in order to
4     remain competitive as next-generation applications enter production."

                                  \* \* \*

5     KLA-Tencor's financial position remained strong with cash, cash equivalents and
marketable securities of $2.3 billion and no long term debt. Inventory increased
6     by $27 million compared to the prior quarter to $438 million as build plans ramp
to meet increased customer demand. Accounts receivable increased by $84
7     million compared to the prior quarter to $456 million on higher shipments.

8          139.    On May 4, 2006, the Company filed its quarterly report on Form 10-Q with the

9    SEC ("Q3FY06 Form 10-Q"), which was signed by Wallace and Hall. This Q3FY06 Form

10    10-Q contained the following false and misleading statements:

11           (a)     For the three-month period ended March 31, 2006, the Company reported

12    net income of $98,143,000 ($0.48 per diluted share) and expenses of $430,911,000.

13           (b)     For the nine-month period ended March 31, 2006, the Company reported

14    net income of $251,470,000 ($1.23 per diluted share) and expenses of $1,245,388,000.

15           (c)     For the three-month period ended March 31, 2006, the Company reported

16    total stock-based compensation expense pursuant to SFAS No. 123(R) of $44,551,000

17    ($30,788,000 or $0.15 per diluted share net of related tax effects).

18           (d)     For the nine-month period ended March 31, 2006, the Company reported

19    total stock-based compensation expense pursuant to SFAS No. 123(R) of $115,633,000

20    ($80,772,000 or $0.40 per diluted share net of related tax effects).

21           (e)     The identical statement regarding the adoption of SFAS No. 123(R), as

22    contained in the Q1FY06 Form 10-Q.

23           (f)     SOX certifications by Wallace and Hall substantially identical to those in

24    the Q1FY03 Form 10-Q.

25           (g)     Certifications by Wallace and Hall, pursuant to 18 U.S.C. Section 1350,

26    substantially identical to those in the 2002 Form 10-K.

27          140.    On May 18, 2006, KLA filed Proxy Statement/Prospectus on Form S-4A with

28

1   the SEC. This Proxy Statement/Prospectus incorporated by reference the following KLA filings

2   which contained false and misleading statements: (a) 2005 Form 10-K; (b) Q1FY06, Q2FY06

3   and Q3FY06 Forms 10-Q; (c) reports on Form 8-K filed on July 28, 2005 (Item 5.02 and

4   corresponding Exhibit 99.1 press release only) and November 8, 2005. This Registration

5   Statement also stated that all documents subsequently filed by the Registrant pursuant to

6   Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, prior to the filing of a post-effective

7   amendment to this Registration Statement, shall be deemed to be incorporated by reference in

8   this Registration Statement from the date of filing of such documents.

9              **(b)      The Reasons Why The Financial Statements Were False And**
                          **Misleading**
10

11         141.   As alleged more fully below, the statements contained in ¶¶92-140 (including the

12   reported financial figures and representations regarding compliance with GAAP, SEC

13   regulations and SOX) were materially false and misleading. The Company's financial and

14   operating results reported during the Class Period were due, in material part, as the Company

15   has admitted, to falsification of financial results.

16         142.   According to SEC regulations, public companies must prepare their financial

17   statements in accordance with GAAP. GAAP are the principles recognized by the accounting

18   profession as the conventions, rules and procedures necessary to define accepted accounting

19   practices at a particular time. GAAP is also a term used to broadly describe the body of

20   principles that governs the accounting for financial transactions underlying the preparation of a

21   set of financial statements. GAAP are derived from a variety of sources, including

22   promulgations of the Financial Accounting Standards Board and its predecessor, the APB, and

23   AICPA. Other sources include the general body of accounting literature consisting of

24   textbooks, articles, papers, etc. GAAP standards are the official standards accepted by the SEC.

25   By failing to comply with GAAP, KLA's financial statements are presumptively in violation of

26

27

28

1    those regulations.[2]

2        143.    The statements contained in ¶¶92-140 violated GAAP with respect to the

3    Company's specific reporting of its compensation expenses, its net income figures and its tax

4    liabilities as well as with respect to the reporting of the Company's financial condition

5    generally. Paragraphs 144-151 summarize how the compensation expenses were understated

6    and how the net income figures were overstated. Paragraphs 152-155 summarize the improper

7    recording of tax liabilities. Paragraphs 156-164 summarize how the Management Discussion

8    and Analysis of Financial Condition and Results of Operations ("MD&A") failed to disclose

9    that KLA was not in compliance with GAAP or the terms of its own option plans.

10        **(i)    Improper Accounting For Stock Options**

11        144.    Since 1995, the principal accounting guidance for stock options is contained in

12    SFAS 123. However, for interim or annual periods beginning prior to June 15, 2005,

13    companies were permitted to account for stock options under the previous guidance known as

14    the "intrinsic value method" contained in APB No. 25, so long as they included added

15    disclosure requirements.[3]

16

17    [2] SEC Rule 4-01(a) of SEC regulation S-X states that "[f]inancial statements filed with the
18    Commission which are not prepared in accordance with [GAAP] will be presumed to be
      misleading or inaccurate, despite footnote or other disclosures, unless the Commission has
      otherwise provided." 17 C.F.R. §210.4-01(a)(1). Regulation S-X requires that interim financial
19    statements must also comply with GAAP. 17 C.F.R. §210.10-01(a). The SEC also regulates
      statements by registrants "that can reasonably be expected to reach investors and the trading
20    markets, whoever the intended primary audience." Public Statements by Corporate
      Representatives, SEC Release Nos. 33-6504, 34-20560, 3 Fed. Sec. L. Rep. (CCH) ¶23,120B, at
21    17,096, 1984 SEC LEXIS 2559, at *2 (Jan. 13, 1984).

22    [3] SFAS 123, ¶11, stated in part:
          This Statement provides a choice of accounting methods for transactions with
23        employees that are within the scope of Opinion 25. Paragraphs 16-44 of this
          Statement describe a method of accounting based on the fair value, rather than the
24        *intrinsic value*, of an employee stock option or a similar equity instrument. The
          Board encourages entities to adopt the fair value based method of accounting,
25        which is preferable to the Opinion 25 method for purposes of justifying a change
          in accounting principle under APB Opinion No. 20, *Accounting Changes*.
26        However, an entity may continue to apply Opinion 25 in accounting for its stock-
          based compensation arrangements. An entity that does so shall disclose
27        pro forma net income and, if presented, earnings per share, determined as if the
          fair value based method had been applied in measuring compensation cost
28        (paragraph 45).

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

61

145.    KLA represented that it had adopted APB No. 25 and purportedly applied this rule through its fiscal year ended June 30, 2005. APB No. 25, ¶10 provides that:

> Compensation for services that a corporation receives as consideration for stock issued through employee stock option, purchase, and award plans should be measured by the quoted market price of the stock at the measurement date less the amount, if any, that the employee is required to pay.
>
> * * *
>
> Thus a corporation recognizes compensation cost for stock issued through compensatory plans unless the employee pays an amount that is at least equal to the quoted market price of the stock at the measurement date.

146.    Under the intrinsic value method, total compensation cost (stock option expense) is computed as the excess of the market price of the stock over the option price on the date when both the number of shares to which the employees are entitled and the option or purchase price for those shares are known. This date is called the "measurement date." For many plans, the measurement date is the grant date. In essence, APB No. 25 requires that companies recognize compensation expense for options granted where the market price of the stock exceeds the option's exercise price on the date of the grant. Total compensation is equal to the total number of options granted multiplied by the difference between the exercise price and market price of the stock on the date of grant. The intrinsic value or total compensation is then recognized as an expense "over the period the employee performs related services" – that is, the intrinsic value is amortized as compensation expense over the option's vesting period. If the exercise price equals the prevailing market price, then this expense is zero. If the options are priced below a stock's fair market value when they are awarded, there is an instant paper gain. Under APB No. 25, that paper gain is the equivalent of additional compensation to the executive that must be treated as a cost to the corporation. A company that fails to record or amortize the intrinsic value of the in-the-money options understates compensation expense and overstates net income on its income statement each year during the vesting period of an option.

147.    From prior to the start of the Class Period through June 30, 2006, KLA violated APB No. 25 by ascribing little to no value to the total compensation expense. In fact, the

(Emphasis in original, footnote omitted.)

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

62

1    Company should have reported hundreds of millions of dollars of added compensation cost

2    caused when option grants were backdated such that the amounts employees were required to

3    pay were less than the price of the options at grant date.  The Company has admitted to these

4    violations:

5         (a)    In its 2006 Form 10-K, the **Company admitted that certain of its stock**

6    **options had been retroactively priced** such that the option exercise price was not the market

7    price of the option shares on the actual grant date of the option but rather was a lower market

8    price from a different date.

9         (b)    It has also admitted that "[t]he actual grant date – when the essential

10   actions necessary to grant the option were completed, including the final determination of the

11   number of shares to be granted to each employee and the exercise price – is the correct

12   measurement date to determine the market price of the option shares under the accounting rules

13   in effect at the time."

14        (c)    Yet, as the **Company admitted, "the retroactively priced options were**

15   **not accounted for correctly in our previously issued financial statements."**  (Emphasis added.)

16   Specifically, the Company explained in its 2006 Form 10-K that:

17        *"[b]ecause each of our retroactively priced options had an exercise price below*
          *the market price on the actual grant date, there should have been a charge for*
18        *each of these options under APB Opinion No. 25 equal to the number of option*
          *shares, multiplied by the difference between the exercise price and the market*
19        *price on the actual grant date.*  That expense should have been amortized over
          the vesting period of the option." (Emphasis added)
20

21        (d)    As detailed in ¶150 below, the Company recorded additional pre-tax,

22   non-cash, stock-based compensation expense of $348 million for the periods July 1, 1994 to

23   June 30, 2005 under APB No. 25 in order to correct these past accounting misrepresentations.

24        148.   In December 2004, SFAS 123 was revised.  The new standard, SFAS 123(R),

25   required recognition of the cost of options (as per the fair value method) in the financial statements

26   and eliminated the use of APB No. 25:

27        10. An entity shall account for the compensation cost from share-based payment
          transactions with employees in accordance with the fair-value-based method set
28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    63

forth in paragraphs 11–63 of this Statement.

SFAS 123(R) became effective for interim or annual periods beginning after June 15, 2005.

149.    According to its public filings, KLA adopted SFAS No. 123(R) for its first quarter of fiscal 2006.  Thus, as KLA explained in its 2006 Form 10-K, "for fiscal year 2006, the additional stock-based compensation expense required to be recorded for each retroactively priced option was equal to the incremental fair value of these options on the actual grant date over the remaining vesting period of the option."

150.    KLA's financial results for Q1FY06, Q2FY06 and Q3FY06 violated SFAS No. 123(R) by failing to record certain stock-based compensation, as evidenced by the Company's own admissions.  In its 2006 Form 10-K, *the Company admitted that it "did not record…stock-based compensation expenses under…SFAS No. 123(R) related to our retroactively priced options in our previously issued financial statements."* (Emphasis added.)

151.    Thus, as KLA admitted in its 2006 Form 10-K, because of the failure to properly record stock-based compensation expenses under APB No. 25 and SFAS No. 123(R), it was "restating them in this filing."  Specifically, *it stated that, "[t]o correct our past accounting for stock options, we recorded additional pre-tax, non-cash, stock-based compensation expense of (a) $348 million for the periods July 1, 1994 to June 30, 2005 under APB Opinion No. 25; and (b) $22 million for the year ended June 30, 2006 under SFAS No. 123(R).  We expect to amortize an additional $6 million of such pre-tax charges…in future periods …."* (Emphasis added.)  On February 9, 2007, the Company issued its quarterly report on Form 10-Q for the period ended December 31, 2006 ("Q2FY07 Form 10-Q") increasing the restatement to *$28 million for the period from July 1, 2005 through December 31, 2006 under SFAS No. 123(R).* Attached hereto as Exhibit A is a chart identifying key restatement amounts.

(ii)    **Improper Tax Reporting For Stock Options**

152.    KLA's financial statements also violated GAAP and the SEC Regulations because the Company understated its tax liabilities under IRC Section 162(m), 28 U.S.C.

1   §162(m).[4]

2   153.    Under IRC Section 162(m), a publicly held corporation's tax deduction for

3   compensation paid to its chief executive officer and to its next four highest compensated

4   officers is limited to $1 million per year, except for payments that qualify as commissions or as

5   "performance-based" compensation.  Option compensation that satisfies certain criteria may be

6   considered "performance-based compensation" and, as such, would be excluded from the $1

7   million limit.  Ordinarily, stock options with an exercise price that is no less than the fair market

8   value of the stock on the date of grant qualify as "performance-based" compensation under

9   §162(m).  However, if a stock option has been backdated and, as a result, was granted with an

10  exercise price that was less than the fair market value of the stock on the date of the actual

11  grant, all of the income resulting from the exercise of the option must be included for purposes

12  of calculating whether the executive's compensation exceeded the $1 million cap under Section

13  162(m).

14  154.    According to KLA's proxy statements, the following defendants were among the

15  top five paid executives during the Class Period and, thus, potentially subject to the $1 million

16  cap under IRC Section 162(m): Levy, Schroeder, Hall, Dickerson, Tompkins, Kispert and

17  Wallace.  Because these officers were granted "in-the-money" options as alleged herein, their

18  compensation did not qualify for special treatment under IRC Section 162(m) and the Company

19  should not have been allowed to deduct the compensation to these officers that exceeded $1

20  million for tax purposes.

21  155.    The Company has conceded that, because options were backdated, it improperly

22  recorded additional deferred tax assets related to stock-based compensation on certain executive

23  compensation.  In its 2006 Form 10-K, the Company stated that *"it should not have taken a*

24  *United States tax deduction in prior years for stock option related amounts pertaining to*

25  *certain executives under [IRC] Section 162(m)."*  (Emphasis added.)  *The Company further*

26

27  _____

28  [4] As discussed below, the Company also violated their withholding obligations under IRC
    Section 421(a).

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                          65

1   *admitted that "excess deductions were taken on prior tax returns due to the finding that*

2   *retroactive pricing of certain stock options occurred.   As a result, the Company's tax*

3   *liabilities have increased by approximately $8 million."*   (Emphasis added.)

4              (iii)    **The Misleading Statements In The Management Discussion**
                       **And Analysis Section Of The Financial Statements**
5

6      156.   The discussions also violated GAAP and the SEC regulations in that the MD&A

7   of Financial Condition and Results of Operations failed to disclose that KLA was not in

8   compliance with GAAP or the terms of its own option plans.

9      157.   The financial statements' Item 7 of Form 10-K and Item 2 of Form 10-Q,

10  MD&A of Financial Condition and Results of Operations, required the issuer to furnish

11  information required by Item 303 of Regulation S-K (17 C.F.R. §229.303).  On May 18, 1989,

12  the SEC issued an interpretive release, Securities Act release No. 6835, 54 Fed. Reg. 22427

13  (May 18, 1989), which stated in part:

14         The MD&A requirements are intended to provide, in one section of a filing,
           material historical and prospective textual disclosure enabling investors and other
15         users to assess the financial condition and results of operations of the registrant,
           with particular emphasis on the registrant's prospects for the future.   As the
16         Concept Release states:

17             The Commission has long recognized the need for a narrative
               explanation of the financial statements, because a numerical
18             presentation and brief accompanying footnotes alone may be
               insufficient for an investor to judge the quality of earnings and the
19             likelihood that past performance is indicative of future
               performance.   MD&A is intended to give the investor an
20             opportunity to look at the company through the eyes of
               management by providing both a short and long-term analysis of
21             the business of the company.   The Item asks management to
               discuss the dynamics of the business and to analyze the financials.
22

23  (Footnotes omitted.)

24     158.   Securities Act Release No. 6349, 23 S.E.C Docket 962 (Sept. 28, 1981) provides

25  that:

26             It is the responsibility of management to identify and address those key variables
               and other qualitative and quantitative factors which are peculiar to and necessary
27             for an understanding and evaluation of the individual company.

28

159.    Under SEC regulations, the management of a public company has a duty "to make full and prompt announcements of material facts regarding the company's financial condition."[5]  Defendants violated this regulation throughout the Class Period by deliberately and/or recklessly misrepresenting the specific terms and annual costs of the Company's employee and director stock option grants.

160.    Defendants failed to explain in the MD&A sections of their annual and quarterly SEC filings that they had caused KLA *to not be in compliance with GAAP or the terms of its own option plans*.  Moreover, defendants violated the basic precepts noted above by (a) concealing from the public a complete understanding of material facts relating to KLA's compensation expenses, specifically the costs the Company would have incurred if it had properly accounted for stock options that defendants improperly backdated; and (b) concealing from the public a complete understanding of material facts relating to defendants' practice of opportunistically granting options, specifically that: (i) while the options granted to executives, employees and directors of the Company appeared, based on the usual characteristics of such instruments, to be a form of "risk-based compensation," they were, instead, a disguised form of straight compensation, as defendants' practices substantially eliminated the risks faced by these option recipients; and (ii) by means of this subterfuge, defendants' compensation practices were performed in an improper manner.

161.    Due to all these accounting improprieties set forth above, KLA presented its financial results and statements in a manner which violated GAAP including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10).

(b)    The principle that financial reporting should provide information that is

---

[5] Timely Disclosure of Material Corporate Developments, Exchange Act Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) ¶23,120A, at 17,095, 17 C.F.R. §241.8995, 1970 WL 10576 (Oct. 15, 1970).

1   useful to present and potential investors, creditors and other users in making rational

2   investment, credit and similar decisions (FASB Statement of Financial Accounting Concepts

3   No. 1, ¶34).

4          (c)     The principle that financial reporting should provide information about

5   the economic resources of an enterprise, the claims to those resources and effects of

6   transactions, events and circumstances that change resources and claims to those resources

7   (FASB Statement of Financial Accounting Concepts No. 1, ¶48).

8          (d)     The principle that financial reporting should provide information about

9   how management of an enterprise has discharged its stewardship responsibility to owners

10  (stockholders) for the use of enterprise resources entrusted to it. To the extent that management

11  offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

12  accountability to prospective investors and to the public in general (FASB Statement of

13  Financial Accounting Concepts No. 1, ¶50).

14         (e)     The principle that financial reporting should provide information about

15  an enterprise's financial performance during a period. Investors and creditors often use

16  information about the past to help in assessing the prospects of an enterprise. Thus, although

17  investment and credit decisions reflect investors' expectations about future enterprise

18  performance, those expectations are commonly based at least partly on evaluations of past

19  enterprise performance (FASB Statement of Financial Accounting Concepts No. 1, ¶42).

20         (f)     The principle that financial reporting should be reliable in that it

21  represents what it purports to represent. That information should be reliable as well as relevant

22  is a notion that is central to accounting (FASB Statement of Financial Accounting Concepts No.

23  2, ¶¶58-59).

24         (g)     The principle of completeness, which means that nothing is left out of the

25  information that may be necessary to insure that it validly represents underlying events and

26  conditions was violated (FASB Statement of Financial Accounting Concepts No. 2, ¶79).

27         (h)     The principle that conservatism be used as a prudent reaction to

28

1    uncertainty to try to ensure that uncertainties and risks inherent in business situations are

2    adequately considered. The best way to avoid injury to investors is to try to ensure that what is

3    reported represents what it purports to represent (FASB Statement of Financial Accounting

4    Concepts No. 2, ¶¶95, 97).

5        162.    Because of these GAAP violations, the Company restated its financial statements

6    for 1997 through 2005 in its 2006 Form 10-K and Q2FY07 Form 10-Q. Attached as Exhibit A

7    hereto is a chart summarizing the Restatement.

8        163.    The Company has further stated that it intends to later restate its previously filed

9    financial statements for the quarter ended March 31, 2006.

10       164.    Pursuant to GAAP, as set forth in APB Opinion No. 20,[6] restatements are

11    required to correct *material* accounting errors that existed at the time the financial statements

12    were issued and are permitted for the purpose of correcting improper accounting only when it

13    results in *material* misstatements. By restating KLA's financial statements, the Company is

14    admitting that each document publishing the original financial statements for the restated

15    periods contained untrue statements and/or omissions of material fact.    Similarly, by

16    announcing the restatement, the Company is also conceding that each of the press releases

17    disseminated to the investing public and each of the annual and quarterly reports on Form 10-K

18    and Form 10-Q that were filed with the SEC during the Class Period contained untrue

19    statements of material fact and/or failed to disclose material facts.

20           2.    **The False and Misleading Statements Regarding the Option Grants**

21              (a)    **The Misleading Statements**

22       165.    In the section discussing "Stock Option and Incentive Plans," the Company's

23    2001 Form 10-K stated that "[u]nder KLA-Tencor's stock option plans, options generally have

24    vesting periods of four or five years, are exercisable for a period not to exceed ten years from

25

26

----

[6] As of December 2005, APB Opinion No. 20 was superseded by SFAS No. 154, "Accounting

27    Changes and Error Corrections a replacement of APB Opinion No. 20 and FASB Statement No.

3," which carried forward without change the guidance contained in APB Opinion No. 20 for

28    reporting the correction of an error in previously issued financial statements.

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                        69

the date of issuance and *are granted at prices not less than the fair market value of KLA-Tencor's common stock at the grant date."* (Emphasis added.) The Company's 2001 Form 10-K also incorporated by reference information contained in the 2001 Proxy Statement regarding Executive Compensation.

166. On September 28, 2001, the Company filed a definitive proxy statement with the SEC ("2001 Proxy Statement"). Regarding the "Compensation of Directors," the 2001 Proxy Statement stated that: (a) members of the Board of Directors who are not employees of the Company receive benefits under the 1998 Outside Director Plan; (b) each Outside Director also receives a nonstatutory option to purchase 20,000 shares of common stock as of the date on which such director first becomes an Outside Director; (c) each Outside Director is also granted a nonstatutory option to purchase an additional 10,000 shares of common stock on the date of the subsequent annual meetings on which he or she remains an Outside Director; (d) the term of options granted under the 1998 Outside Director Plan may not exceed ten years; and (e) the 1998 Outside Director Plan provides that *"the exercise price shall be equal to the fair market value of the Common Stock on the date of grant of the option."* (Emphasis added.) Options granted under the 1998 Director Plan become exercisable immediately upon the date of grant.

167. The 2001 Proxy Statement also stated that the Company had granted under the 1982 Plan (a) 37,901, 75,800, 65,000 and 30,000 options with an exercise price of $44.69 to Levy, Schroeder, Dickerson and Neil Richardson ("Richardson"), respectively, on August 11, 2000; (b) 18,951, 37,900, 32,500, 15,000 and 10,000 options with an exercise price of $26.25 to Levy, Schroeder, Dickerson, Richardson and Tompkins, respectively, on November 10, 2000; and (c) 18,951, 37,900, 32,500 and 45,000 options with an exercise price of $32.75 to Levy, Schroeder, Dickerson and Richardson, respectively, on April 4, 2001. Identified among the *"material terms of the grants"* was the following: *"the exercise price of the options is the fair market value of Common Stock as of the date of grant."* (Emphasis added.)

168. The 2001 Proxy Statement also identified the 2000 and 1999 Executive Compensation for Levy, Schroeder, Dickerson, Richardson and Tompkins. In 2000, Levy,

1    Schroeder, Dickerson, Richardson and Tompkins were granted (among other compensation)

2    90,000, 150,000, 100,000, 50,000 and 10,000 options, respectively. In 1999, Levy, Schroeder,

3    Dickerson, Richardson and Tompkins were granted (among other compensation) 102,136,

4    102,136, 62,882, 87,717 and 50,809 options, respectively.

5       169.   The 2001 Proxy Statement stated that *"[a]ctual gains, if any, on option*

6    *exercises are dependent on the future performance of the Company's Common Stock and*

7    *overall market conditions."* (Emphasis added.)

8       170.   The 2001 Proxy Statement also contained the Report of the Compensation

9    Committee on Executive Compensation. In pertinent part, the Report provided:

10        *Compensation Philosophy:* The goals of the Company's compensation policy are
          to attract, retain and reward executive officers who contribute to the overall
11        success of the Company by offering compensation that is competitive in the
          industry, to motivate executive officers to achieve the Company's business
12        objectives *and to align the interests of executive officers with the long term
          interests of stockholders....*
13
          The compensation philosophy of the Compensation Committee is to provide a
14        comprehensive compensation package for each executive officer that is well
          suited to support accomplishment of the Company's business strategies,
15        objectives and initiatives. *For incentive-based compensation, the Compensation
          Committee considers the desirability of structuring such compensation*
16        *arrangements so as to qualify for deductions available under Section 162(m) of
          the Internal Revenue Code, which disallows a tax deduction for any publicly-*
17        *held corporation for individual compensation exceeding One Million dollars in
          any taxable year for any of the named executive officers, other than*
18        *compensation that is "performance based."* The Compensation Committee
          applies this compensation philosophy in determining appropriate executive
19        compensation levels and other compensation factors and the Compensation
          Committee reaches its decisions with a view towards the Company's overall
20        financial performance.

21        *Executive Officer Compensation:* The Committee's approach is based upon a
          belief that a substantial portion of aggregate annual *compensation for executive*
22        *officers should be contingent upon the Company's performance* and an
          individual's contribution to the Company's success. In addition, the Committee
23        strives to align the interests of the Company's executive officers with the long-
          term interests of stockholders through stock option grants that can result in
24        ownership of the Company's Common Stock. The Committee endeavors to
          structure each executive officer's overall compensation package to be consistent
25        with this approach and to enable the Company to attract, retain and reward
          personnel who contribute to the success of the Company.
26
                                          * * *
27        *Long-term Incentives:* Longer term incentives are provided through the Stock
          Option Plan and the Excess Profit Stock Plan, each of which reward executive
28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              71

officers through the growth in value of the Company's Common Stock.... *Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price.*

(Emphasis added.)

171. On September 20, 2002, the Company filed a definitive proxy statement and, on September 25, 2002, it filed a revised proxy statement with the SEC (collectively referred to herein as the "2002 Proxy Statement"). Regarding the "Compensation of Directors," the 2002 Proxy Statement stated that: (a) members of the Board of Directors who are not employees of the Company receive benefits under the 1998 Outside Director Plan; (b) each Outside Director received a nonstatutory stock option to purchase 20,000 shares of Common Stock as of the date on which such director first became on Outside Director. In fiscal year 2003, the Board approved a change in the amount of the First Option, reducing the size of that grant to 10,000 shares of Common stock to be effective when a new Outside Director first joins the Board; (c) each Outside Director is automatically granted a nonstatutory stock option to purchase an additional 10,000 shares of Common Stock on the date of the subsequent annual meetings on which he or she remains an Outside Director; (d) the terms of options granted under the 1998 Outside Director Plan may not exceed 10 years; and (e) the 1998 Outside Director Plan provides that *"the exercise price shall be equal to the fair market value of the Common Stock on the date of grant of the option."* (Emphasis added.) Options granted under the 1998 Director Plan become exercisable immediately upon the date of grant.

172. The 2002 Proxy Statement also stated that, under the 1982 Stock Option Plan, the Company had granted 28,425, 341,100, 105,000, 60,000 and 45,000 options with an exercise price of $29.31 to Levy, Schroeder, Dickerson, Kispert and Dennis J. Fortino ("Fortino"), respectively, on October 2, 2001. The 2002 Proxy Statement specifically said that these *"[o]ptions were granted at an exercise price equal to the fair market value of the Company's Common Stock on October 2, 2001."* (Emphasis added.)

173. The 2002 Proxy Statement also reiterated information from the 2001 Proxy Statement on Executive Compensation for Levy, Schroeder and Dickerson in 2001 and 2000,

1    including the options granted to them in those years. The Executive Compensation section

2    also revealed that (a) during 2001, Kispert and Fortino were granted 80,000 and 90,000

3    options, respectively; and (b) during 2000, Kispert and Fortino were granted 30,000 and

4    60,000 options, respectively.

5        174.    The 2002 Proxy Statement stated that *"[a]ctual gains, if any, on option*

6    *exercises are dependent on the future performance of the Company's Common Stock and*

7    *overall market conditions."* (Emphasis added.)

8        175.    The 2002 Proxy Statement also included the Report of the Compensation

9    Committee on Executive Compensation, which described its philosophy on Executive Officer

10   compensation and terms concerning Long-term Incentives in language substantially identical

11   to the language in the 2001 Proxy Statement.

12       176.    In the section discussing "Stock Options and Incentive Plans," the Company's

13   2002 Form 10-K provided that "KLA-Tencor's stock option program is a broad-based, long

14   term retention program that is intended to attract and retain qualified management and

15   technical employees...*and align stockholder and employee interests*.... Under KLA-

16   Tencor's stock option plans, options generally have vesting periods of four or five years, are

17   exercisable for a period not to exceed ten years from the date of issuance and *are granted at*

18   *prices not less than the fair market value of KLA-Tencor's common stock at the grant*

19   *date."* (Emphasis added.) The Company's 2002 Form 10-K also incorporated by reference

20   information contained in the 2002 Proxy Statement regarding Executive Compensation.

21       177.    The Company's Q1FY03 Form 10-Q repeated the identical information

22   regarding the purpose of the stock option program and the exercise price of the option grants

23   set forth above from the Company's 2002 Form 10-K.

24       178.    The Company's Q2FY03 Form 10-Q repeated the identical information

25   regarding the purpose of the stock option program and the exercise price of the option grants

26   set forth above from the Company's 2002 Form 10-K.

27       179.    The Company's Q3FY03 Form 10-Q repeated the identical information

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          73

1  regarding the purpose of the stock option program and the exercise price of the option grants

2  set forth above from the Company's 2002 Form 10-K.

3      180.    On September 23, 2003, the Company filed a definitive proxy statement with

4  the SEC ("2003 Proxy Statement").  Regarding "Director Compensation," the 2003 Proxy

5  Statement provided information that was substantially identical to that provided in the 2002

6  Proxy Statement regarding option grants under the 1998 Outside Director Plan (except that the

7  Outside Directors now receive a nonstatutory stock option to purchase 10,000 shares of

8  common stock as of the date on which such director first becomes an Outside Director).

9      181.    The 2003 Proxy Statement also stated that the Company granted (a) 31,450,

10  25,000, 12,500, 12,500 and 12,500 options with an exercise price of $37.05 to Schroeder,

11  Dickerson, Kispert, Fortino and Wallace, respectively, on November 8, 2002; (b) 62,900,

12  50,000, 25,000, 25,000 and 25,000 options with an exercise price of $34.67 to Schroeder,

13  Dickerson, Kispert, Fortino and Wallace, respectively, on January 28, 2003; and (c) 1,000

14  options with an exercise price of $40.14 per share to Dickerson, Fortino and Wallace on May

15  22, 2003.  The 2003 Proxy Statement provided that *options were granted at an exercise price*

16  *equal to the fair market value of the Company's common stock.*

17      182.    The 2003 Proxy Statement also reiterated information from the 2002 Proxy

18  Statement on Executive Compensation for Schroeder, Dickerson, Kispert and Fortino in 2002

19  and 2001, including the options granted to them in those years.  The Executive Compensation

20  section also revealed that, during 2002 and 2001, Wallace was granted 45,000 and 70,000

21  options, respectively.

22      183.    The 2003 Proxy Statement stated that *"[a]ctual gains, if any, on option*

23  *exercises are dependent on the future performance of the Company's Common Stock and*

24  *overall market conditions."*  (Emphasis added.)

25      184.    The 2003 Proxy Statement also included the Report of the Compensation

26  Committee on Executive Compensation which described its philosophy on Executive Officer

27  compensation and terms concerning Long-term Incentives in language substantially similar to

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          74

1    the language in the 2001 Proxy Statement.

2        185.    The 2003 Proxy Statement also provided that, during the fiscal year ended June

3    30, 2002, Tompkins ceased to be an employee of KLA and pursuant to the terms of his options

4    granted under the 1982 Plan, had 30 days to exercise certain options. However, "due to a

5    miscommunication," from KLA, Tompkins was misled as to the expiration date of certain of

6    these options and the independent members of the Board agreed to provide a "one-time cash

7    payment of $206,800 to him as a remedy for the miscommunication. "The amount paid was

8    measured as 'in the money' value had Mr. Tompkins exercised such options on their

9    expiration date."

10       186.    The 2003 Form 10-K repeated the exact information regarding the purpose of

11   the stock option program and the exercise price of the option grants set forth above from the

12   Company's 2002 Form 10-K (except that it stated that options generally have a vestingperiod

13   of five years). The Company's 2003 Form 10-K also incorporated by reference information

14   contained in the 2003 Proxy Statement regarding Executive Compensation.

15       187.    The Company's Q1FY04 Form 10-Q repeated the identical information

16   regarding the purpose of the stock option program and the exercise price of the option grants

17   set forth above from the Company's 2002 Form 10-K (except that it stated that options

18   generally have a vesting period of five years).

19       188.    The Company's Q2FY04 Form 10-Q repeated the identical information

20   regarding the purpose of the stock option program and the exercise price of the option grants

21   set forth above from the Company's 2002 Form 10-K (except that it stated that options

22   generally have a vesting period of five years).

23       189.    The Company's Q3FY04 Form 10-Q repeated the identical information

24   regarding the purpose of the stock option program and the exercise price of the option grants

25   set forth above from the Company's 2002 Form 10-K (except that it stated that options

26   generally have a vesting period of five years).

27       190.    The Company's 2004 Form 10-K repeated the identical information regarding

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                           75

1    the purpose of the stock option program and the exercise price of the option grants set forth

2    above from the Company's 2002 Form 10-K (except that it stated that options generally have a

3    vesting period of five years). The Company's 2004 10-K also incorporated by reference

4    information contained in the 2004 Proxy Statement regarding Executive Compensation.

5         191.    On September 9, 2004, the Company filed a definitive proxy statement with the

6    SEC ("2004 Proxy Statement"). Regarding "Director Compensation," the 2004 Proxy

7    Statement provided information that was substantially identical to that provided in the 2003

8    Proxy Statement regarding option grants under the 1998 Outside Director Plan.

9         192.    The 2004 Proxy Statement stated that the Company granted (a) 31,450, 25,000,

10   12,500, 12,500 and 12,500 options with an exercise price of $51.23 to Schroeder, Dickerson,

11   Kispert, Fortino and Wallace, respectively, on July 30, 2003; (b) 60,000, 50,000, 30,000,

12   30,000 and 30,000 options with an exercise price of $53.86 to Schroeder, Dickerson, Kispert,

13   Fortino and Wallace, respectively, on October 27, 2003; (c) 30,000, 25,000, 15,000, 15,000

14   and 15,000 options with an exercise price of 58.10 to Schroeder, Dickerson, Kispert, Fortino

15   and Wallace, respectively, on January 27, 2004; and (d) 37,500, 31,250, 18,750, 18,750 and

16   18,750 options with an exercise price of $45.16 to Schroeder, Dickerson, Kispert, Fortino and

17   Wallace, respectively, on April 26, 2004. The 2004 Proxy Statement further revealed that

18   during fiscal year 2004, in order to provide Schroeder with an incentive to remain long-term,

19   he received options covering 83,380 shares of common stock with delayed vesting. The 2004

20   Proxy Statement also stated that options were granted at an exercise price equal to the fair

21   market value of the Company's common stock.

22        193.    The 2004 Proxy Statement also reiterated information from the 2003 Proxy

23   Statement on Executive Compensation for Schroeder, Dickerson, Kispert, Wallace and Fortino

24   in 2003 and 2002, including the options granted to them in those years.

25        194.    The 2004 Proxy Statement stated that *"[a]ctual gains, if any, on option*

26   *exercises are dependent on the future performance of the Company's Common Stock and*

27   *overall market conditions."* (Emphasis added.)

28

1    195.    The 2004 Proxy Statement also included the Report of the Compensation

2    Committee on Executive Compensation which described its philosophy on Executive Officer

3    compensation and terms concerning Long-term Incentives in language substantially similar to

4    the language in the 2001 Proxy Statement.

5    196.    The 2004 Proxy Statement also solicited shareholder votes for approval of the

6    Company's 2004 Equity Incentive Plan, including approval of its material terms and

7    performance goals for the purpose of helping awards under the 2004 Equity Incentive Plan

8    qualify as "performance-based" compensation under IRC Section 162(m).

9    197.    In discussing the 2004 Equity Incentive Plan, the 2004 Proxy Statement

10    provided that (a) its purposes were to "attract and retain the best available personnel for

11    positions of substantial responsibility, provide additional incentive to our employees and

12    consultants, and promote the success of our business"; (b) options and SARS may not be

13    granted with an exercise price lower than 100% of the fair market value of the underlying

14    shares; and (c) it "prohibits option or stock appreciation right repricing, including by way of

15    an exchange for another award, unless stockholder approval is obtained."

16    198.    The 2004 Proxy Statement further stated that "[w]e have designed the 2004

17    Equity Incentive Plan so that it permits us to issue awards that qualify as performance-based

18    under Section 162(m) of the Code."

19    199.    In discussing the "Terms and Conditions of Options," (regarding options

20    granted under the 2004 Equity Incentive Plan), the 2004 Proxy Statement provided: *"[t]he

21    exercise price of options may not be less than 100% of the fair market value of the common

22    stock on the grant date the option [sic].    As our common stock is listed on the Nasdaq

23    National Market, the fair market value is the closing sale price for the common stock (or the

24    closing bid if no sales were reported) on the grant date."* (Emphasis added.)

25    200.    On October 1, 2004, the Company filed an amendment to its 2004 Proxy

26    Statement ("Amended 2004 Proxy Statement"). Among other things, the Amended 2004 Proxy

27    Statement represented that:

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                             77

1
2
3
4
5
6
7
8

In the history of the Company, equity compensation has been a critical component of our ability to attract and retain the talent needed in our industry.... *KLA-Tencor has utilized stock options responsibly in the past and will continue to do so*.... While the new plan results in fewer options available for grant, it also gives the Company much greater flexibility in how we structure equity compensation. We believe this new plan will allow KLA-Tencor to continue attracting high-caliber employees. The 2004 Plan would allow us to grant restricted stock, stock appreciation rights, performance shares, performance units and deferred stock units which would give us a range of flexibility in designing competitive packages for our employees while aligning them with increasing shareholder value for you, the Stockholder. The members of our Board of Directors unanimously recommend a vote "FOR" approval of the 2004 Equity Incentive Plan.

9   (Emphasis added.)

10      201.   The Company's Q1FY05 Form 10-Q repeated substantially identical

11   information regarding the purpose of the stock option program and the exercise price of the

12   option grants set forth above from the Company's 2002 Form 10-K (except that it stated that

13   options generally have a vesting period of five years).

14      202.   The Company's Q2FY05 Form 10-Q provided that the "equity incentive

15   program is a broad-based, long-term retention program that is intended to attract and retain

16   qualified management and technical employees...and align stockholder and employee

17   interests.... Under our equity incentive program, stock options generally have a vesting period

18   of five years, are exercisable for a period not to exceed ten years from the date of issuance and

19   are generally *granted at prices not less than the fair market value of our common stock at*

20   *the grant date.*" (Emphasis added.)

21      203.   The Company's Q3FY05 Form 10-Q repeated the identical information

22   regarding the purpose of the stock option program and the exercise price of the option grants

23   set forth above from the Company's Q2FY05 Form 10-Q.

24      204.   The Company's 2005 Form 10-K repeated the identical information regarding

25   the purpose of the stock option program and the exercise price of the option grants set forth

26   above from the Company's Q2FY05 Form 10-Q. The Company's 2005 10-K also incorporated

27   by reference information contained in the 2005 Proxy Statement regarding Executive

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

78

1    Compensation.

2      205.   On October 13, 2005, the Company filed a definitive proxy statement ("2005

3    Proxy Statement") with the SEC.   Regarding "Director Compensation," the 2005 Proxy

4    Statement provided information regarding option grants under the 1998 Outside Director Plan,

5    which was substantially identical to that provided in the 2003 Proxy Statement.   However,

6    with respect to the subsequent grant (nonstatutory stock option to purchase an additional

7    aggregate 10,000 shares of common stock) the 2005 Proxy Statement stated that it would be

8    provided to each Outside Director in 2,500 share increments each quarter, approximately two

9    business days following the Company's earnings release for the prior fiscal quarter.   It further

10   provided that "the Chairman of the Audit Committee receives an additional nonstatutory stock

11   option grant to purchase an additional 2,500 shares of Common Stock on the date of each

12   subsequent annual meeting on which such Director remains the Chairman of the Audit

13   Committee."

14     206.   The 2005 Proxy Statement also stated that the Company had granted (a) 22,500,

15   11,250, 11,250, 6,000 and 3,750 options with an exercise price of $40.66 to Schroeder,

16   Kispert, Wallace, Avi Cohen ("Cohen") and Lance Glasser ("Glasser"), respectively, on

17   August 2, 2004; and (b) 325,800, 75,000, 75,000, 75,000 and 75,000 options with an exercise

18   price of $41.79 to Schroeder, Kispert, Wallace, Cohen and Glasser, respectively, on September

19   21, 2004.

20     207.   The 2005 Proxy Statement also reiterated information from the 2004 Proxy

21   Statement on Executive Compensation for Schroeder, Kispert and Wallace in 2004 and 2003,

22   including the options granted to them in those years.   The 2005 Proxy Statement also provided

23   the 2004 and 2003 Executive Compensation for Cohen and Lance.   In 2004, Cohen and

24   Glasser were granted (among other compensation) 40,250 and 25,750 options, respectively.   In

25   2003, Cohen and Glasser were granted (among other compensation) 18,750 and 13,500

26   options, respectively.

27     208.   The 2005 Proxy Statement stated that *"[a]ctual gains, if any, on option*

28

1  *exercises are dependent on the future performance of the Company's Common Stock and*

2  *overall market conditions."* (Emphasis added.)

3      209.   The 2005 Proxy Statement also included the Report of the Compensation

4  Committee on Executive Compensation. With respect to "Compensation Philosophy," the

5  2005 Proxy Statement provided, among other things, that it is designed to "(i) attract, retain,

6  and reward Executives who contribute to the overall success of the Company; (ii) support

7  accomplishment of the Company's business strategies, objectives and initiatives; (iii) have a

8  substantial portion of annual compensation be contingent upon the Company's financial

9  performance and an individual's contribution to the Company's success; and (iv) align the

10  interests of Executives with the long term interests of stockholders." With respect to "Long-

11  term Incentives," the Report provided that:

12      Long-term incentives are currently provided under the 2004 Equity Incentive Plan
    through grants of stock options and restricted stock units. Such awards provide
13      value to Executives through the growth in value of the Company's Common
    Stock. The Compensation Committee believes that employee equity ownership is
14      highly motivating, provides a major incentive for employees to build shareholder
    value and serves to align the interests of employees with those of stockholders....
15      *Stock options are granted at market price on the date of grant and will provide*
    *value to the Executive only when the price of the Company's Common Stock*
16      *increases over the exercise price.*

17  (Emphasis added.)

18      210.   In discussing the "Deductibility of Compensation under Internal Revenue Code

19  Section 162(m)," the Report of the Compensation Committee also provided that:

20      The Company's equity compensation programs, including the 2004 Equity
    Incentive Plan approved by stockholders at the last annual meeting, are structured
21      so that compensation from such programs is "performance based" when earned....
    Annual incentive compensation has historically not been structured to qualify
22      under Section 162(m). Under Proposal 2 in this Proxy Statement [approving the
    162(m) Performance Bonus Plan], the Company's stockholders are being asked to
23      approve the KLA-Tencor Internal Revenue Code Section 162(m) Performance
    Bonus Plan which is structured to qualify incentive compensation as
24      "performance-based" for fiscal years beginning in 2006.

25      Compensation paid in fiscal 2005 subject to the Section 162(m) cap is expected to
    exceed $1 million for Mr. Schroeder and Mr. Kispert. The Committee thus
26      believes that the Company will be subject to limitations on the deductibility of
    compensation paid to these named executive officers for fiscal year 2005.

27

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT        80

1    211.    The Company's Q1FY06 Form 10-Q repeated the identical information

2  regarding the purpose of the stock option program and the exercise price of the option grants set

3  forth above from the Company's Q2FY05 Form 10-Q.

4    212.    The Company's Q2FY06 Form 10-Q repeated the identical information

5  regarding the purpose of the stock option program and the exercise price of the option grants set

6  forth above from the Company's Q2FY05 Form 10-Q.

7    213.    The Company's Q3FY06 Form 10-Q repeated the identical information

8  regarding the purpose of the stock option program and the exercise price of the option grants set

9  forth above from the Company's Q2FY05 Form 10-Q.

10                (b)    **The Reasons Why The Statements Were False And**
                        **Misleading**
11

12    214.    The statements contained in ¶¶165-213 were false and misleading for the

13  following reasons.

14    215.    First, the actual grants identified were false and misleading because the options

15  were not granted on the dates identified but, rather, on dates chosen with hindsight for their

16  lower stock prices, as detailed above.  Moreover, in recognition that certain of the defendants'

17  option grants identified above were backdated, the Company has announced that it has canceled

18  or repriced their outstanding retroactively priced stock options.

19    216.    Second, the statements that options were granted at prices not less than the fair

20  market value of KLA's common stock price on the date of the grant pursuant to the Stock

21  Option Plans were false and misleading because the options were not granted in accordance

22  with such requirements but rather were backdated, as evidenced above.

23    217.    Third, the statements that actual gains, if any, on option exercises are dependent

24  on the future performance of the Company's Common Stock and overall market conditions are

25  false and misleading because the backdated options were "in-the-money" (*i.e.*, the exercise

26  price was actually lower than the fair market value on the true date of the grant), as evidenced

27  above.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                           81

1    218.   Fourth, the statements in KLA's Proxy Statements regarding the Company's

2  philosophy in granting options were false and misleading in that the options were "in-the-

3  money" on the date of the actual grant, as evidenced above.

4    219.   Fifth, the statements in KLA's Proxy Statement regarding the Company's

5  compliance with IRC Section 162(m), 28 U.S.C. §162(m), were false and misleading because

6  the Company did not comply with Section 162(m)), as discussed above.

7    220.   As a result of these false statements (a) KLA shareholders were misled regarding

8  compensation of the Company's officers and directors, including the specific grants identified

9  in the Proxy Statements; (b) KLA shareholders were misled regarding the integrity of

10  management and the Board of Directors; (c) the election of directors was obtained pursuant to

11  misleading Proxy Statements; (d) the approval of the 2004 Equity Incentive Plan was obtained

12  through a misleading Proxy Statement; and (e) the Performance Bonus Plan was approved

13  through a misleading Proxy Statement.

14        **3.**     **The False and Misleading Statements Regarding Internal Controls**

15           **(a)**     **The Misleading Statements**

16    221.   In their Q1FY03 Form 10-Q certification, Schroeder and Kispert each certified

17  that:

18        4.   The registrant's other certifying officers and I are responsible for

19        establishing and maintaining disclosure controls and procedures (as defined
           in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

20        a)   designed such disclosure controls and procedures to ensure that

21        material information relating to the registrant, including its consolidated
           subsidiaries, is made known to us by others within those entities,

22        particularly during the period in which this quarterly reports being
           prepared;

23        b)  evaluated the effectiveness of the registrant's disclosure controls and

24        procedures as of a date within 90 days prior to the filing date of this
           quarterly report (the "Evaluation Date"); and

25        c)   presented in this quarterly report our conclusions about the

26        effectiveness of the disclosure controls and procedures based on our
           evaluation as of the Evaluation Date;

27        5.  The registrant's other certifying officers and I have disclosed, based on

28        our most recent evaluation, to the registrant's auditors and the audit

committee of registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

(Emphasis added.) Moreover, in Item 4, "Controls and Procedures," the Q1FY03 Form 10-Q provided:

Evaluation of disclosure controls and procedures

Within 90 days prior to the date of this report (the Evaluation date), the Company's Chief Executive Officer (principal executive officer) and Executive Vice President and Chief Financial Officer (Principal financial officer), carried out an evaluation of the effectiveness of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934 Rules 13a-14(c) and 15(d)-14(c)). *Based on that evaluation, these officers have concluded that as of the Evaluation Date, the Company's disclosure controls and procedures were adequate and designed to ensure that material information relating to the Company and the Company's consolidated subsidiaries would be made known to them by others within those entities.* (Emphasis added.)

222. In the Q2FY03 Form 10-Q, Schroeder and Kispert each signed certifications identical to the Q1FY03 Form 10-Q certifications, as cited above. Regarding "Controls and Procedures," the Q2FY03 Form 10-Q repeated the language set forth in the Q1FY03 Form 10-Q but added additional language as underlined:

Within 90 days prior to the date of this report (the Evaluation date), the Company's Chief Executive Officer (principal executive officer) and Executive Vice President and Chief Financial Officer (Principal financial officer), carried out an evaluation of the effectiveness of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934 Rules 13a-14(c) and 15(d)-14(c)). *Based on that evaluation, these officers have concluded that as of the Evaluation Date, the Company's disclosure controls and procedures were adequate and designed to ensure that material information relating to the Company and the Company's consolidated subsidiaries would be made known to them by others within those entities, and are effective to ensure*

1  *that the information required to be disclosed by us in reports that we file or*
   *submit under the Securities Exchange Act of 1934 is recorded, processed and*
2  *reported within the time periods specified in Securities and Exchange*
   *Commission rules and forms.*  (Emphasis added.)

3      223.   In the Q3FY03 Form 10-Q, Schroeder and Kispert each signed certifications

4  substantially identical to the Q1FY03 certifications, as cited above.  Regarding "Controls and

5  Procedures," the Q3FY03 Form 10-Q repeated the language set forth in the Q2FY03 Form 10-Q

6  but added additional language as underlined:

7      Within 90 days prior to the date of this report (the Evaluation date), the
       Company's Chief Executive Officer (principal executive officer) and Executive
8      Vice President and Chief Financial Officer (Principal financial officer) *with the*
       *participation of other members of management,* carried out an evaluation of the
9      effectiveness of the Company's "disclosure controls and procedures" (as defined
       in the Securities and Exchange Act of 1934 Rules 13a-14(c) and 15(d)-14(c)).
10     *Based on that evaluation, these officers have concluded that as of the*
       *Evaluation Date, the Company's disclosure controls and procedures were*
11     *adequate and designed to ensure that material information relating to the*
       *Company and the Company's consolidated subsidiaries would be made known*
12     *to them by others within those entities, and are effective to ensure that*
       *information required to be disclosed by us in reports that we file or submit*
13     *under the Securities Exchange Act of 1934 is recorded, processed and reported*
       *within the time periods specified in Securities and Exchange Commission rules*
14     *and forms.*  (Emphasis added.)

15     224.   In the 2003 Form 10-K, Schroeder and Kispert each signed certifications

16  substantially identical to the Q1FY03 certifications, as cited above.[7]   Regarding "Controls and

17  Procedures," the 2003 Form 10-K provided:

18     Our management evaluated, with the participation of our Chief Executive Officer
       and our Chief Financial Officer, the effectiveness of our disclosure controls and
19     procedures as of the end of the period covered by this Annual Report on Form 10-
       K.  *Based on this evaluation, our Chief Executive Officer and our Chief*
20     *Financial Officer have concluded that our disclosure controls and procedures*
       *are effective to ensure that information we are required to disclose in reports*
21     *that we file or submit under the Securities Exchange Act of 1934 is recorded,*
       *processed, summarized and reported within the time periods specified in*
22     *Securities and Exchange Commission rules and forms.*  (Emphasis added.)

23     225.   In the Q1FY04 Form 10-Q, Schroeder and Kispert each signed certifications

24  substantially identical to the Q1FY03 certifications, as cited above.  Regarding "Controls and

25  Procedures," the Q1FY04 Form 10-Q repeated the same information provided in the 2003 Form

26

27  _____

28  [7] Beginning with the 2003 Form 10-K, the certifications referred to Exchange Act Rules 13a-
    15(e) and 15d-15(e), as opposed to Exchange Act Rules 13a-14 and 15d-14.

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          84

1   10-K, except that it represented the information as of the end of the period covered by this

2   Quarterly Report on Form 10-Q.

3        226.   In the Q2FY04 Form 10-Q, Kispert signed a certification substantially identical

4   to the Q1FY03 certifications, as cited above. Regarding "Controls and Procedures," the

5   Q2FY04 Form 10-Q repeated the same information provided in the 2003 Form 10-K, except

6   that it represented the information as of the end of the period covered by this Quarterly Report

7   on Form 10-Q.

8        227.   In the Q3FY04 Form 10-Q, Schroeder and Kispert each signed certifications

9   substantially identical to the Q1FY03 certifications, as cited above.  Regarding "Controls and

10  Procedures," the Q3FY04 Form 10-Q repeated the same information provided in the 2003 Form

11  10-K, except that it represented the information as of the end of the period covered by this

12  Quarterly Report on Form 10-Q.

13       228.   In the 2004 Form 10-K, Schroeder and Kispert each signed certifications

14  substantially identical to the Q1FY03 certifications, as cited above.  Regarding "Controls and

15  Procedures," the 2004 Form 10-K repeated the same information provided in the 2003 Form 10-

16  K, except that it represented the information as of the end of the period covered by this Annual

17  Report on Form 10-K.

18       229.   In the Q1FY05 Form 10-Q, Schroeder and Kispert each signed certifications

19  substantially identical to the Q1FY03 certifications, as cited above.  Regarding "Controls and

20  Procedures," the Q1FY05 Form 10-Q repeated the same information provided in the 2003 Form

21  10-K, except that it represented the information as of the end of the period covered by this

22  Quarterly Report on Form 10-Q.

23       230.   In the Q2FY05 Form 10-Q, Kispert signed a certification substantially identical

24  to the Q1FY03 certifications, as cited above. Regarding "Controls and Procedures," the

25  Q2FY05 Form 10-Q stated:

26      **Evaluation of Disclosure Controls and Procedures and Related CEO and
    CFO Certifications**

27

28      We conducted an evaluation of the effectiveness of the design and operation of

1   our disclosure controls and procedures (Disclosure Controls) as of the end of the
    period covered by this Quarterly Report. The controls evaluation was conducted
2   under the supervision and with the participation of management, including our
    Chief Executive Officer (CEO) and Chief Financial Officer (CFO). *Based on this*
3   *evaluation, our CEO and our CFO have concluded that our disclosure controls*
    *and procedures are effective to ensure that information we are required to*
4   *disclose in reports that we file or submit under the Securities Exchange Act of*
    *1934 is recorded, processed, summarized and reported within the time periods*
5   *specified in Securities and Exchange Commission rules and forms.*

6   Attached as exhibits to this Quarterly Report are certifications of the CEO and
    CFO, which are required in accordance with Rule 13a-14 of the Securities
7   Exchange Act of 1934, as amended (Exchange Act).    This Controls and
    Procedures section includes the information concerning the controls evaluation
8   referred to in the certifications, and it should be read in conjunction with the
    certifications for a more complete understanding of the topics presented.

9   **Definition of Disclosure Controls**

10  Disclosure Controls are controls and procedures designed to reasonably assure
    that information required to be disclosed in our reports filed under the Exchange
11  Act, such as this Quarterly Report, is recorded, processed, summarized and
    reported within the time periods specified in the Securities and Exchange
12  Commission's rules and forms.    Disclosure Controls are also designed to
    reasonably assure that such information is accumulated and communicated to our
13  management, including the CEO and CFO, as appropriate to allow timely
    decisions regarding required disclosure. Our Disclosure Controls include
14  components of our internal control over financial reporting, which consists of
    control processes designed to provide reasonable assurance regarding the
15  reliability of our financial reporting and the preparation of financial statements in
    accordance with generally accepted accounting principles in the U.S. To the
16  extent that components of our internal control over financial reporting are
    included within our Disclosure Controls, they are included in the scope of our
17  quarterly controls evaluation.

18  (Emphasis added).

19      231.    In the Q3FY05 Form 10-Q, Schroeder and Kispert each signed certifications

20  substantially identical to the Q1FY03 certifications, as cited above. Regarding "Controls and

21  Procedures," the Q3FY05 Form 10-Q repeated the same information provided in the Q2FY05

22  Form 10-Q, except that it represented the information as of the end of the period covered by this

23  Quarterly Report on Form 10-Q.

24      232.    In their 2005 Form 10-K Certification, Schroeder and Kispert each certified that:

25      4.    The registrant's other certifying officer(s) and I are responsible for
    establishing and maintaining disclosure controls and procedures (as defined
26  in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over
    financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-
27  15(f)) for the registrant and have:

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                            86

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Regarding "Controls and Procedures," the 2005 Form 10-K provided substantially similar information provided in the Q2FY05 Form 10-Q regarding the Evaluation of Disclosure Controls and Procedures and the Definition of Disclosure Controls, except that it referenced Rules 13a-15(e) and 15d-15(e) under the Exchange Act when discussing Disclosure Controls and represented the information as of the end of the period covered by this Annual Report on Form 10-K.

233. In the Q1FY06 Form 10-Q, Schroeder and Kispert each signed certifications substantially identical to the 2005 Form 10-K certifications, as cited above. Regarding

1    "Controls and Procedures," the Q1FY06 Form 10-Q provided that:

2    **Evaluation of Disclosure Controls and Procedures and Related CEO and CFO Certifications**

3

4    We conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (Disclosure Controls) as of the end of the period covered by this Quarterly Report. The controls evaluation was conducted

5    under the supervision and with the participation of management, including our Chief Executive Officer (CEO) and Chief Financial Officer (CFO). *Based on this*

6    *evaluation, our CEO and our CFO have concluded that our disclosure controls*

7    *and procedures were effective as of the end of the period covered by this Quarterly Report to ensure that information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934 is*

8    *recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.*

9

10    (Emphasis added.) In all other respects, the information provided was substantially similar to

11    that provided in the Q2FY05 Form 10-Q.

12    234.    In the Q2FY06 Form 10-Q, both Wallace and Hall each signed certifications

13    substantially identical to the 2005 Form 10-K certifications, as cited above. Regarding

14    "Controls and Procedures," the Q2FY06 Form 10-Q provided substantially similar information

15    to that provided in the Q1FY05 Form 10-Q, except that it represented the information as of the

16    end of the period covered by this Quarterly Report on Form 10-Q.

17    235.    In the Q3FY06 Form 10-Q, both Wallace and Hall each signed certifications

18    substantially identical to the 2005 Form 10-K certifications, as cited above. Regarding

19    "Controls and Procedures," the Q3FY06 Form 10-Q provided substantially similar information

20    to that provided in the Q1FY05 Form 10-Q, except that it represented the information as of the

21    end of the period covered by this Quarterly Report on Form 10-Q.

22                    (b)    **The Reasons Why These Statements Were False and Misleading**

23

24    236.    The statements contained in ¶¶221-235 were false and misleading because (a)

25    the SEC filings did not identify deficiencies or material weaknesses in the internal controls

26    relating to option grants accounting and reporting; (b) the SEC filings did not disclose the

27    fraudulent scheme alleged herein; (c) no proper evaluation and report were ever conducted by

28.

1    the certifying officers for the purpose of identifying and eliminating internal control problems;

2    and (d) defendants wholly failed to maintain effective internal controls over financial reporting

3    designed to provide reasonable assurance regarding the reliability of financial reporting and the

4    preparation of financial statements for external purposes in accordance with GAAP as required

5    by Public Company Accounting Oversight Board Auditing Standard No. 2, ¶7.

6        237.    The lack of sound internal controls and the existence of deficiencies and material

7    weaknesses are evidenced by the Company's own admissions.

8        238.    In its 2006 Form 10-K, the Company has admitted that:

9    *As a result of the Special Committee investigation, the Company identified
     certain material weaknesses in its internal control over financial reporting in
10   periods ending prior to June 30, 2006.* Before June 30, 2002, the Company did
     not have sufficient safeguards in place to monitor its control practices regarding
11   stock option pricing and related financial reporting and to foster an effective flow
     of information between those responsible for stock option pricing and those
12   responsible for financial reporting. Inadequate training, communication and
     coordination in and among the Company's human resources, stock administration,
13   legal and finance functions prevented the Company from assuring that stock
     options were priced and accounted for correctly, primarily from July 1, 1997 to
14   June 30, 2002.

15   In addition, the stock option pricing process during that time period was overly
     dependent on certain former executive officers of the Company, and was
16   administered by a stock option committee that was not always properly
     constituted and sometimes acted outside the scope of the authority delegated to it
17   by the Company's Board of Directors. *The individual who served as the
     Company's Chief Executive Officer during part of that time period and
18   continuing until midway through the last fiscal year, was involved in the past
     retroactive pricing of stock options. To that extent, the material weaknesses in
19   the Company's internal control over financial reporting continued until
     midway through the Company's fiscal year ended June 30, 2006.*

20

21   (Emphasis added.)

22       239.    The fact that the certifying officers did not conduct proper evaluations and failed

23   to report and remedy material weaknesses in control is also evidenced by the following facts.

24       240.    First, the pervasiveness of the backdating and internal control deficiencies

25   described by the Company creates a strong inference that, had a proper review been conducted,

26   the certifying officers would have uncovered that the Company lacked the proper internal

27   controls necessary to, among other things, prevent defendants from engaging in the fraudulent

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    89

1    backdating and ensure that the stock options were properly accounted for and reported in the

2    Company's financial statements. Indeed, had a review been conducted, the problems would

3    have been revealed as they were when the Special Committee conducted its internal

4    investigation.

5        241.    Second, the fact that the certifying officers – in particular Schroeder and Kispert

6    – abused the lack of the internal controls in order to effectuate and profit from the fraud

7    evidences their failure to conduct a proper investigation of the internal controls.

8    **B.    DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD**

9        242.    The conduct alleged above also gives rise to liability under Rule 10b-5(a) and

10   (c). Defendants are liable as participants in a scheme, plan and course of conduct to backdate

11   options that began in the 1990s and continued throughout the Class Period. This backdating

12   scheme operated as a fraud and deceit on Lead Plaintiffs and the other Class members by failing

13   to disclose material facts and misleading them regarding (a) the Company's financial results; (b)

14   officer and director compensation; (c) the Company's compliance with its own internal policies

15   and stock option plans; (d) the Company's compliance with tax laws; and (e) the integrity of

16   management.

17       243.    As detailed below, defendants each knowingly or with deliberate recklessness

18   committed manipulative or deceptive acts in furtherance of the scheme including (a) causing

19   and/or permitting the manipulation of stock option grants by, *inter alia*, the setting of

20   retroactively selected exercise prices for option grants in order to understate compensation

21   expenses and personally obtain larger than reported compensation; (b) exercising backdated

22   options and selling the shares obtained therefrom; (c) preparing, approving and signing SEC

23   filings that overstated the Company's results and understated its expenses and tax liabilities in

24   its financial results; (d) preparing, approving and signing SEC filings that understated and

25   misrepresented officer and director compensation; (e) failing to properly withhold taxes when

26   employees exercised options; and/or (f) taking steps to ensure that the Company lacked sound

27   internal controls and contained deficiencies and material weaknesses.

28

1           **1.**      **Defendants' Manipulation of Option Grants and KLA's Stock Purchase Plan**

2

3        244.   As noted above, the Company has conceded in its Restatement that options

4 granted to officers, directors and employees were "retroactively" priced such that the "option

5 exercise price was not the market price of the option shares on the actual grant date of the

6 option, but instead was a lower market price on an earlier date."

7        245.   The Compensation Committee Defendants and the members of the Stock Option

8 Committee (Schroeder, Nichols, Hall, Kispert, Urbanek, Marks, Dickerson, Barnholt, Bond,

9 Tompkins and possibly other defendants) each backdated the option grants for the principal

10 purpose of furthering the fraudulent scheme as evidenced by the following facts.

11        246.   First, in its 2006 Form 10-K, the Company concluded that "[t]he individual who

12 served as the Company's Chief Executive Officer during part of that time period and continuing

13 until midway through the last fiscal year, was involved in the past retroactive pricing of

14 options." Based on the Company's reporting of officers, it is clear that this individual is

15 Schroeder.

16        247.   Second, Schroeder, Nichols, Hall, Kispert, Dickerson and Tompkins were

17 members of or attendees at meetings of the Stock Option Committee where decisions were

18 made as to what grants should be approved and what the grant dates should be, as evidenced by

19 the Company's own acts and admissions and statements by Confidential Witnesses who

20 prepared agendas and reports for meetings of the Stock Option Committee.

21        (a)    In its 2006 Form 10-K, *the Company admitted that Schroeder and*

22 *Tompkins were members of the Company's Stock Option Committee* from 1994 through fall

23 2006 and from mid-1997 through mid-1999, respectively. According to its 2006 Form 10-K,

24 the Company suspended this Stock Option Committee in fall 2006 as it conducted its

25 investigation into the backdating. *The Company further stated that "the stock option pricing*

26 *process during that time period...was administrated by a stock option committee that was not*

27 *always properly constituted and sometimes acted outside the scope of the authority delegated*

28

1    *to it by the Company's Board of Directors.*" (Emphasis added.)

2    　　　(b)    While CW #5 could not recall the identity of every executive who was a

3    member of the Stock Option Committee and attended its meetings ("Stock Option Committee

4    Meetings"), CW #5 stated that it definitely included the following persons: Schroeder, Nichols,

5    Hall, Kispert, and the Company's senior corporate counsel, Kim Jackson.    CW #5 was aware of

6    this fact because he/she was involved in creating the agendas for some of the meetings.    While

7    he/she could not recall precisely how often the Stock Option Committee convened or what

8    topics were identified in the agendas, he/she believed it met quarterly.

9    　　　(c)    CW #4 confirmed that the Stock Option Committee Meetings occurred

10    quarterly and that Schroeder and Dickerson attended these meetings.    CW #4 was aware of

11    these facts because, in his/her capacity as an employee in the human resources department,

12    he/she helped prepare quarterly spreadsheets identifying grants for executives and employees at

13    all levels of the Company and containing information such as the type of grant (*i.e.*, new hire,

14    employee promotion, annual (focal) performance review or retention), employee name,

15    employee hire date, employee title and number of shares being recommended, which were then

16    submitted to the Stock Option Committee ("Option Spreadsheets").

17    　　　(d)    CW #4 explained that the Stock Option Committee made the decisions

18    regarding the option dates and price data.    Specifically, CW #4 stated that, while these Option

19    Spreadsheets were prepared under the direction of Nyberg (the director of compensation and

20    benefits), the *Compensation Department did not include share price data or grant dates on*

21    *these spread sheets prior to sending them to the Stock Option Committee.    Rather, the Stock*

22    *Option Committee returned the Option Spreadsheets to the Compensation Department with*

23    *the option grant dates and stock prices information completed after their meeting.*

24    　　　(e)    CW #4 further stated that Option Spreadsheets were returned to the

25    Compensation Department with the signatures of either Schroeder or Dickerson.

26    　　248.    Third, as detailed in ¶¶34-37 above, the Compensation Committee Defendants

27    (Urbanek, Marks, Barnholt and Bond) participated in decisions regarding the options grants

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    92

1    including the setting of option grant dates and exercise prices.

2        249.    The Director Defendants (Wallace, Schroeder, Urbanek, Marks, Barnholt, Bond,

3    Bingham, Elkus, Morton, Kaufman, Levy and Tompkins) each approved the backdating of

4    options grants. As detailed in ¶¶34-35, 58, 72-89, each Director Defendant was ultimately

5    responsible for administering and deciding the terms of the option grants – including the grant

6    date – and for ensuring compliance with the Option Plans. Indeed, CW #7 confirmed that,

7    while the Compensation Committee was charged with actually awarding the stock and date that

8    it was based on," "procedurally, the board had to meet and they had to approve [grants]."

9        250.    Defendants also engaged in a related scheme to defraud in connection with the

10    Company's Employees Stock Purchase Plan. Although the Company does not provide any

11    details regarding this scheme, it does concede in its 2006 Form 10-K that the Company needed

12    to record "additional non-cash adjustments...relating primarily to the accounting for employee

13    stock purchase plans." CW #8 provides an explanation of manipulation regarding the employee

14    stock purchase plan.

15        251.    The Second Amended and Restated 1981 Employee Stock Purchase Plan ("Stock

16    Purchase Plan") provides that employees can purchase KLA stock through payroll deductions

17    during six-month "Purchase Periods." On the last day of each Purchase Period, employees are

18    entitled to buy KLA stock at 85% of the lower of (a) the closing stock price on the first day of

19    said six-month Purchase Period or (b) the closing stock price on the last day of said six-month

20    Purchase Period. Under APB No. 25, the 15% discount (an IRS limit) was permitted and the

21    plan was considered "non-compensatory" and, thus, there was no compensation expense to

22    report.

23        252.    However, according to CW #8, the Company implemented an additional step to

24    the Stock Purchase Plan. Specifically, the Company would assign each employee who

25    purchased stock on the last day of the Purchase Period a "term number." This term number

26    enabled the employee to later change the purchase price for such shares. The higher the term

27    number (1-5), the more time an employee had to change their share price. Although he/she

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              93

1  could not recall with any certainty, CW #8 thought that the term number "5" granted an

2  employee a two-and-a-half-year window to change the price of their shares and the term

3  number "1" granted the employee a two-or-three-month window.   CW #8 provided the

4  following example of what occurred:  if an employee purchased their shares at $50 in January

5  2003 and the price dropped to $45 in March 2003, then the price of the shares purchased by the

6  employee in January would have been changed to $45, assuming that the employee's term

7  window was still open in March 2003.

8        2.    **Defendants' Manipulative And Deceptive Exercise Of Backdated**
               **Options**
9

10      253.   As detailed in ¶¶312-313 herein, during the Class Period, Wallace, Schroeder,

11  Kaufman, Levy, Tompkins, Dickerson, Hall, Kispert, Urbanek, Marks, Barnholt, Bond, Elkus,

12  Bingham, Morton and Nichols each knowingly and/or recklessly exercised options that were

13  backdated (either prior to or during the Class Period) and/or sold the resulting shares for the

14  primary purpose of furthering the fraudulent scheme.  These trades constitute manipulative and

15  deceptive acts in furtherance of the fraudulent scheme.

16        3.    **Defendants' Manipulative And Deceptive Understating of Expenses,**
               **Improper Tax Treatment of Options And Misrepresentation Of The**
17              **Company's Financial Results**

18      254.   As detailed above, defendants reported inflated net income figures for KLA by

19  failing to properly account for stock options made to KLA senior officers, directors and

20  employees.  Specifically, KLA's expenses were understated and income was overstated due to

21  the Company's failure to record the compensation expense from the backdated stock options

22  that were granted to officers, directors and employees and its improper tax treatment of the

23  options.

24      255.   Each of the defendants took manipulative and deceptive acts in connection with

25  the issuance of such misleading statements for the principal purpose of furthering this scheme

26  by preparing, approving or signing the SEC filings that understated and misrepresented officer

27  and director compensation:

28

1         (a)    Kispert, Hall and Boehlke held the position of CFO. Hall was also Vice

2 President of Finance and Accounting prior to becoming CFO. As such, they were responsible

3 for the preparation of the Company's financial statements and for ensuring that the periodic

4 reports filed with the SEC containing such financial statements complied fully with the

5 disclosure requirements of the federal securities laws.

6         (b)    Schroeder, Kispert, Wallace and Hall all signed certifications for various

7 quarterly or fiscal year-end financial statements pursuant to SOX. By signing the certifications

8 pursuant to SOX, Schroeder, Kispert, Wallace and Hall have certified that (i) the Company's

9 annual and quarterly reports fully complied with the requirements of the Exchange Act, as

10 amended; (ii) the information contained in the annual reports fairly presented, in all material

11 respects, KLA's financial condition and results; (iii) the quarterly and annual reports contained

12 no misstatements or omissions of material fact; (iv) they attested to the accuracy of the

13 Company's financial reports and sufficiency of the internal controls; and (v) they had disclosed

14 all instances of fraud involving management or other employees who had a significant role in

15 the Company's internal control over financial reporting.

16         (c)    Wallace, Schroeder, Hall, Kispert, Urbanek, Marks, Barnholt, Bond,

17 Bingham, Elkus, Morton, Kaufman, Levy and Tompkins all signed various quarterly or fiscal

18 year-end financial statements during the Class Period.

19         (d)    Each of the Officer Defendants (Wallace, Schroeder, Dickerson, Kispert,

20 Hall, Boehlke and Nichols) was responsible for ensuring the accuracy of the reporting of the

21 Company's financial results, as set forth in ¶¶28-29 above.

22         (e)    According to KLA's Audit Committee Charter, each Audit Committee

23 Defendant (Bingham, Bond, Elkus and Kaufman) oversaw the accounting and financial

24 reporting process of the Company and the audits of the financial statements of the Company and

25 assisted the Board with, among other things, the oversight and monitoring of the integrity of the

26 Company's financial statements and the Company's compliance with legal and regulatory

27 requirements.

28

1

2

          **4.**      **Defendants' Participation In The Understating And**
                     **Misrepresentation Of Officer And Director Compensation**

3        256.    As discussed above, KLA's annual Proxy Statements for fiscal years 2001

4  through 2005 contained false statements about the compensation of KLA's officers and

5  directors because they stated, among other things, that the exercise price of the stock options is

6  equal to the price of the stock on date of the grant.  Because of these false statements,

7  shareholders were misled when they were asked to approve the Company's 2004 Equity

8  Incentive Plan, approve a Performance Bonus Plan and vote for directors.

9        257.    Each of the defendants committed manipulative and deceptive acts in connection

10  with the issuance of these and other false and misleading statements regarding officer and

11  director compensation for the principal purpose of furthering this scheme.  Indeed, as officers

12  and directors, the Individual Defendants had a duty to disseminate complete, accurate and

13  truthful information about KLA's executive and director compensation.  The Individual

14  Defendants had a duty to promptly correct any public statements issued by KLA that had

15  become false and misleading.  The Individual Defendants were involved in the drafting,

16  producing, reviewing and/or dissemination of the false and misleading statements alleged

17  herein.  Moreover, as alleged in ¶¶34-37, 43-46 above, the Company's charters expressly state

18  that members of the Compensation Committee Defendants and the Audit Committee

19  Defendants had responsibilities for the proxy statements.

20

21

          **5.**      **Defendants' Manipulative And Deceptive Acts Regarding The**
                    **Company's Tax Withholding Obligations**

22        258.    In addition to failing to properly report its tax liabilities, the Company also

23  violated tax laws by failing to properly withhold tax liabilities upon the exercise of options as

24  required by IRC §422.

25        259.    The September 6, 2006 testimony of Linda Thomsen, Director of the SEC's

26  Division of Enforcement, before the U.S. Senate Committee on Finance explained the

27  withholding obligations:

28

When an employee exercises a non-statutory option, the difference between the exercise price and the fair market value of the company's stock on the date of exercise is treated as ordinary compensation and the employee is generally taxed on the gain at his or her ordinary income tax rates. The company incurs employee withholding obligations on this gain, but also is entitled to an associated tax deduction on the gain. When companies backdate option grants to a lower exercise price, employees can obtain a larger taxable gain upon the exercise of an NSO and companies can obtain a correspondingly larger tax deduction and withholding obligation on that gain.

Unlike the exercise of NSOs, incentive stock options, or ISOs, afford employees favorable tax treatment because any gain at exercise is not taxed as ordinary income, although the gain may be subject to alternative minimum tax. Accordingly, a company does not obtain any corresponding tax deduction (or incur withholding obligations) at the time of exercise. In addition, if an employee holds the stock for the statutory holding period prior to sale - one year after exercise and two years after grant - then the sale is considered a "qualifying disposition" and the entire gain on sale is taxed at favorable capital gains rates. However, among the statutory requirements of ISOs is that they be granted at-the-money. An ISO that is granted in-the-money loses its favorable status and instead is treated under the tax code as a non-statutory option (NSO), including ordinary income recognition by the employee on any gain at exercise and a corresponding tax deduction by the company on that gain. Backdating allows an employee to treat what is in fact a non-qualified option as an incentive stock option, which can result in the employee underpaying taxes while causing the company to lose the tax deduction to which it otherwise would have been entitled.

260.    Specifically, for a stock option to qualify as an Incentive Stock Option ("ISO") (and thus receive the special tax treatment described above under IRC Section 421(a)), it must meet the requirements of IRC Section 422 when granted and at all times beginning from the grant until its exercise. Under IRC Section 422, the option price must equal or exceed the fair market value of the underlying stock at the time of the grant, *i.e.*, the option cannot be in-the-money when granted. A backdated stock option that has been granted at a discount, therefore, would violate one of the requirements that apply to ISOs and would not qualify as an ISO.

261.    If the requirements for an ISO have not been followed, the option will be treated under the tax rules as a non-qualified option. ISOs are subject to taxation only upon the sale of the stock. Non-qualified options, however, are subject to income tax and Federal Insurance Contributions Act ("FICA") withholding upon exercise. The backdated stock options granted to KLA officers, directors and employees did not qualify as ISOs because they were granted at a discount and, therefore, they should have been classified as non-qualified options.

1    262.    Because the backdated stock options constituted non-qualified options, KLA was

2    liable for the income tax and payments under FICA that it failed to withhold upon the

3    recipient's exercise of the discounted options.  Defendants, as well as others, exercised options

4    during the Class Period that were granted between the mid-1990s and 2003 (¶312) – the period

5    during which options were backdated.  Accordingly, KLA should have, but failed to, withhold

6    monies when these backdated options were exercised.

7    263.    The Company's 2006 Form 10-K strongly supports an inference that KLA issued

8    ISOs that were disqualified because of the backdated option prices, but failed to withhold monies:

> Because virtually all holders of retroactively priced options issued by the Company were not involved in or aware of the retroactive pricing, *the Company has taken and intends to take certain actions to deal with the adverse tax consequences that may be incurred by the holders of retroactively priced options.* The adverse tax consequences are that retroactively priced stock options vesting after December 31, 2004 ("409A Affected Options") subject the option holder to a penalty tax under IRC Section 409A (and, as applicable, similar penalty taxes under California and other state tax laws).  One such action by the Company is to offer to amend the 409A Affected Options to increase the exercise price to the market price on the actual grant date or, if lower, the market price at the time of the amendment.  The amended options would not be subject to taxation under IRC.
>
> * * *
>
> Another action is to approve bonuses payable to holders of the amended options to compensate them for the resulting increase in their option exercise price. The amount of these bonuses would be effectively repaid to the Company if and when the options are exercised and the increased exercise price is paid (but there is no assurance that the options will be exercised).  *Finally, the Company intends to compensate certain option holders who have already exercised 409A Affected Options for the additional taxes they incur* under IRC Section 409A (and, as applicable, similar state tax laws).
>
> Three of the Company's option holders were subject to the December 31, 2006 deadline described above. Accordingly, in December 2006, the Company offered to amend the 409A Affected Options held by Mr. Wallace, the Company's Chief Executive Officer, and two former executive officers to increase the exercise price so that these options will not subject the option holder to a penalty tax under IRC Section 409A.  All three individuals accepted the Company's offer.  In addition, the Company agreed to pay each of the three individuals a cash bonus in January 2008 equal to the aggregate increase in the exercise prices for his amended options.  For Mr. Wallace, the amount of this bonus is $0.4 million. The Company plans to take similar actions with respect to the outstanding 409A Affected Options granted to non-officers as soon as possible after the filing of this Report.  *The Company estimates that the total cash payments needed to deal with the adverse tax consequences of retroactively priced options granted to non-officers will be approximately $30 million.*

1    (Emphasis added.) *See also* Form 8-K filed on February 27, 2007, described in ¶295 below.

2    **6.    Defendants' Failure To Establish Sound Internal Controls And
         Allow Deficiencies And Material Weaknesses**

3

4    264.    As noted above, the Company has conceded in its Restatement that the

5    Company lacked sound internal controls and that its internal controls contained deficiencies

6    and material weaknesses.

7    265.    Each of the Individual Defendants was responsible for ensuring that the

8    Company had proper internal controls and took steps in furtherance of the fraudulent scheme

9    by ensuring that the Company's internal controls were deficient even while expressly

10   representing that such controls were adequate:

11   (a)    Schroeder, Kispert, Wallace and Hall all signed certifications for various

12   quarterly or fiscal year-end financial statements pursuant to SOX. By signing the certifications

13   pursuant to SOX, these defendants certified that they are responsible for establishing and

14   maintaining proper controls, have taken (with the participation of management) certain steps to

15   ensure that internal controls are sufficient and have reported all significant deficiencies.

16   Moreover, as set forth above, Schroeder, Kispert, Wallace and Hall have each certified that the

17   Company's internal controls were adequate, effective and designed to ensure that material

18   information relating to the Company and the Company's consolidated subsidiaries would have

19   been know to them by others within those entities.

20   (b)    The Officer Defendants were responsible under Section 110.03 of the

21   AICPA for adopting sound accounting policies and establishing and maintaining internal

22   controls consistent with management's assertions in the Company's financial statements, as set

23   forth in ¶28. The Company's own filings confirm that management was responsible for

24   establishing and maintaining a system for internal controls and the financial reporting process,

25   as set forth in ¶29.

26   (c)    According to the Audit Committee Charter, the Audit Committee

27   Defendants were responsible for overseeing the Company's accounting and financial reporting

28

1    processes, reviewing on a continuous basis the adequacy of the Company's systems of internal

2    controls, as set forth in ¶¶43-44.

3                    (d)    According to the Nominating Committee Charter, the Nominating

4    Committee Defendants were responsible for developing and recommending to the Board of

5    Directors a set of corporate governance principles and for evaluating the governance of the

6    Board of Directors, as set forth in ¶¶54-55.

7                    (e)    The Director Defendants were also ultimately responsible for the

8    Company's internal accounting and financial controls, as set forth in ¶¶34, 43-44, 54-55, 58.

9    **C.    THE TRUTH BEGINS TO EMERGE**

10        266.    On May 22, 2006, *The Wall Street Journal* carried a front-page story analyzing

11    the stock options that a few companies, including KLA, granted to its top executives.  The

12    article explained that, in 2001, KLA granted Levy and Schroeder two batches of stock options:

13    (a) the first dated at the share price's yearly first-half low and (b) the second at its yearly

14    second-half low.  In all, the article states that Levy had received ten grants from KLA and its

15    predecessor company between 1994 and 2001 – all preceding quick run-ups in the share price.

16    *The Wall Street Journal* further reported that "Mr. Levy has reaped at least $6 million from

17    cashing out options" while "Mr. Schroeder has pocketed at least $10 million."

18        267.    Merrill Lynch also issued a report on May 22, 2006 analyzing the options grant

19    timing for the semiconductor and semiconductor equipment companies in the Philadelphia

20    Semiconductor Index.  Covering the period from 1997 through 2002, Merrill Lynch's analysis

21    revealed that KLA's stock generated average annualized excess return of 800% for the 20 days

22    following options grants, ranking second out of the 16 companies studied.  Merrill Lynch

23    specifically identified that the following suspicious stock option grants were made to Levy,

24    Schroeder, Kispert and Wallace: (a) 4/30/1997 at $22.25 per option; (b) 7/31/1997 at $30.28 per

25    option; (c) 8/31/1998 at $10.63 per option; (d) 10/23/1998 at $16.97 per option; (e) 10/27/1999

26    at $16.88 per option; (f) 8/11/2000 at $44.69 per option; (g) 11/10/2000 at $26.25 per option;

27    (h) 4/4/2001 at $32.75 per option; (i) 10/2/2001 at $29.31 per option; and (j) 11/8/2002 at

28

1   $37.05 per option.

2       268.    At a conference on May 22, 2006, CFO Hall announced that the DOJ had served

3   the Company with a subpoena requesting stock option grant data related to its stock option

4   grants and announced that the Company had formed an independent committee to investigate its

5   stock option grants over the past ten years.

6       269.    After the May 22, 2006 disclosures raising the possibility of an options

7   backdating scheme, *the common stock price fell 10.39% from $45.24 per share on May 19,*

8   *2006 to close at $40.54 per share on May 22, 2006 on heavy volume of 13,615,220 shares*

9   *traded, which was three times the average trading volume for the prior three months.*   On

10  May 23, 2006, KLA's stock fell again by 3.6% or $1.46 to close at $39.07 per share on heavy

11  volume of 11,193,220 shares traded.

12      270.    Analysts also reacted to these revelations by issuing reports expressing specific

13  concerns regarding the backdating issue:

14              (a)   Analyst D. Kaplan at Standard & Poor's downgraded the stock to a "sell"

15  from a "strong buy."

16              (b)   On May 22, 2006, analyst Robert Maire at Needham & Co. downgraded

17  KLA's stock to "hold" from a "buy," stating that the stock will likely be under significant

18  pressure for a period of time due to the stock option controversy.

19              (c)   A.G. Edwards Analyst Gavin Duffy downgraded KLA to "hold" from

20  "buy" on May 23, 2006, stating that "[w]ith the current environment where investors are skittish

21  about the possibility of any corporate scandal, we believe shares of KLA-Tencor will be range

22  bound at best until the current investigation is completed and the situation has closure in one

23  form or another."  Duffy continued: "We feel that investors are better advised to remain on the

24  sidelines in the near terms until we get a better sense of how this investigation will turn out."

25      271.    Over the next eight months, the Company started to make some admissions

26  about liability, which in some instances were also misleading, and attempted to limit the blame

27  to certain former executives, as discussed below.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              101

272.    After the market closed on May 24, 2006, the Company filed a Form 8-K with the SEC formally announcing the appointment of a Special Committee of independent directors "to conduct an internal investigation relating to past stock option grants, the timing of such grants and related accounting and documentation" with the assistance of outside legal counsel and accounting experts.  The Company also reiterated that it had "received subpoenas from the U.S. Attorney's Offices for the Eastern District of New York and the Northern District of California requesting information relating to its past stock option grants."

273.    In the pre-market hours of May 30, 2006, the Company disclosed in a SEC Form 8-K that "it received notice from the [SEC] of an informal inquiry relating to past stock option grants."

274.    The market reacted positively to misrepresentations by CEO Wallace on May 31, 2006, attempting to exonerate current management of any potential wrongdoing.  On May 31, 2006, *Bloomberg* published an article revealing that, during a Cowen & Co. Technology Conference in New York, Wallace claimed that "[t]he current management team wasn't involved in making decisions about stock options."  The stock price rose from $40.61 per share on May 30, 2006 to $41.04 per share on May 31, 2006.  It continued to rise on June 1, 2006, closing at $42.19 per share.

275.    On June 30, 2006, prior to the opening of the market, KLA issued a press release providing an update on the investigation by the Special Committee into the Company's stock option granting practices.  The press release states in part:

> KLA-Tencor Corporation (NASDAQ: KLAC) today announced that *a Special Committee of the Company's Board of Directors has reached a preliminary conclusion that the actual measurement dates for financial accounting purposes of certain stock option grants issued in prior years likely differ from the recorded grant dates of such awards.* . . .
>
>                          * * *
>
> Based on the Special Committee's investigation to date, the Company now anticipates that it may record additional non-cash charges for stock-based compensation expense. The Company has not yet determined the amount of such charges or the resulting tax impact of these actions.  In the event that the Company determines that these items are material, KLA-Tencor may be required to restate its financial statements for the relevant prior fiscal periods.

1    (Emphasis added.) The stock price fell again in reaction to this June 30, 2006 announcement.

2    On June 30, 2006, the stock closed at $41.57 per share, a decline of 1% or $0.42 from the

3    previous trading day's closing price.

4          276.    The stock options controversy at KLA continued to impact the recommendations

5    of analysts in the following weeks:

6                (a)    On July 12, 2006, in his report on KLA, analyst Patrick J. Ho of Stiffel

7    Nicolaus ("Ho") maintained a "hold" rating for the Company based on a concern about the

8    stock options issue: "While the company's fundamental remains among the best of the industry

9    (market position, business model, order growth), we believe that some level of overhang

10   remains due to questions surrounding its past stock option grants to Chairman Kenneth Levy."

11   In the wake of this report, the stock fell from $42.56 per share on July 11, 2006 to $40.99 per

12   share on July 12, 2006, representing a $1.56 or 3.7% drop in the price of the stock. The

13   Company's stock continued to fall on July 13, 2006, closing at $40.50 per share.

14               (b)    In a July 26, 2006 report, Ho maintained his "hold" rating due, in part, to

15   KLA's June 30, 2006 announcement: "Recently, the company announced that on a preliminary

16   basis, an appointed special committee did find some 'irregularities' in its past stock option grant

17   policy. While this issue does not have any impact on near-term fundamentals, we believe there

18   is risk related to the credibility of the company and this issue could create a continuing

19   overhang on the stock until the matter is completely resolved." Following the Company's

20   fourth quarter conference call on July 27, 2006, Ho maintained his "hold" rating, stating in his

21   July 28, 2006 report: "[T]here remains a cloud hanging over the company related to its past

22   stock options policy and the ongoing investigation by an independent committee."

23         277.    On July 24, 2006, after the close of the market, the Company issued a press

24   release announcing that it would delay releasing results for the fourth quarter and 2006 fiscal

25   year ended June 30, 2006 pending completion of the internal investigation into stock option

26   grants. The press release also reiterated the Special Committee's preliminary results. The next

27   day, the stock price fell another $0.03 to $39.80.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              103

1    278.    After the market closed on July 27, 2006, the Company issued a press release

2    entitled "KLA-Tencor Reports Q4 2006 Revenue of $579 Million Fiscal Year 2006 Revenue

3    $2.1 Billion." In this release, KLA announced selected financial results for its fourth quarter

4    and reiterated that, "[a]s a result of the on-going investigation and the potential for restatement,

5    the Company is unable to provide detailed GAAP or non-GAAP financials for the quarter or

6    year ended June 30, 2006. In addition, the Company will not file its annual report on Form 10-

7    K until after the completion of the investigation. The Company does not expect the

8    investigation to be completed until after the date the Form 10-K is required to be filed."

9    279.    On September 13, 2006, after the close of the market, KLA filed Notification of

10   Late Filing with the SEC, disclosing that it would not timely file its Form 10-K due to its

11   ongoing stock options investigation. The stock price fell from $46.11 on September 13, 2006 to

12   $45.96 on September 14, 2006.

13   280.    On September 14, 2006, the Company issued a press release entitled "KLA-

14   Tencor Delays Filing Form 10-K And Receives Notice From NASDAQ." In this release, the

15   Company explained that it received a NASDAQ Staff Determination notice indicating that the

16   Company is not in compliance with the filing requirements for continued listing as set forth in

17   NASDAQ Marketplace Rule 4310(c)(14) and that its common stock is subject to delisting from

18   the NASDAQ Global Select Market. The Company also stated that it is focused on resolving

19   the backdating issues as quickly as possible and plans to file its Form 10-K as soon as

20   practicable following completion of the Special Committee's investigation. The stock price fell

21   again on September 15, 2006 from $45.96 to $45.44.

22   281.    On September 28, 2006, the Company issued a pre-market open press release

23   entitled "KLA-Tencor Will Restate Financial Statements Related to Stock Options." In the

24   press release, the Company revealed that *KLA's financial statements dating back to July 1,*

25   *1997 should no longer be relied upon and certain financial results will have to be restated*

26   *because incorrect measurement dates for certain stock option grants were used:*

27       KLA-Tencor Corporation (NASDAQ: KLAC) today announced that *it will restate*
         *previously issued financial statements to correct the Company's past*
28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    104

1   *accounting for stock options. Based on a report received from a Special
    Committee of the Board of Directors, the Board concluded that incorrect
2   measurement dates for certain stock option grants were used for financial
    accounting purposes,* principally during the periods July 1, 1997 through
3   June 30, 2002. *As a result, the Company will be required to record non-cash
    charges for compensation expenses relating to those past stock option grants.*

4   The Company has not determined the exact amount of such charges, the resulting
    tax and accounting impact, or which specific reporting periods may require
5   restatement. Accordingly, the Company is filing a Form 8-K today stating that the
    financial statements and all earnings and press releases and similar
6   communications issued by the Company relating to periods beginning on or after
    July 1, 1997, should no longer be relied upon. KLA-Tencor intends to file its
7   restated financial results and Annual Report on Form 10-K as quickly as
    practicable.

8

9   (Emphasis added.)  In response to this announcement, the stock price fell $0.27 from $44.74 to

10  $44.47 on September 29, 2006.

11      282.    Shortly before the close of the stock market on October 3, 2006, the Company

12  filed a SEC Form 8-K providing additional details regarding the restatements and revealed, for

13  the first time, that KLA believed that the restatement of previous financial statements would be

14  "*material*."  The stock fell $0.20 from $44.05 on October 2, 2006 to $43.85 on October 3, 2006.

15      283.    On October 5, 2006, Analysts Gary Hsueh and Srini Sundararajan of CIBC

16  World Markets stated in their report that the stock options "overhang" on the KLA would

17  continue: "In our view, pending restatement due to options is the bigger issue."  The report also

18  drew attention to KLA's risk of NASDAQ de-listing because of the Company's likely failure to

19  file its 2006 Form 10-K by the deadline imposed by the SEC as a results of to the Company's

20  ongoing internal investigation and financial restatement: "Despite ongoing communication with

21  NASDAQ in anticipation of this issue, such a risk on an $8B market cap stock could drive P/B

22  and forward P/E multiples BELOW the prior, purely fundamental driven, trough in valuation."

23  The report further stated that the "more tangible risk of NASDAQ de-listing could drive shares

24  to the low $30-range."

25      284.    After the close of the market on October 16, 2006, the Company issued a press

26  release (expressly incorporated into its October 18, 2006 Form 8-K filed with the SEC) entitled

27  "KLA-Tencor Announces Results of Special Committee Investigation of Historical Stock

28

1    Option Practices," *revealing that the restatements to correct accounting for stock-based*
2    *compensation would result in additional non-cash charges of up to $400 million.*

3        285.    On October 17, 2006, before the market opened, the Company issued a press
4    release entitled "KLA-Tencor Announces Retirement of Board Chairman Kenneth Levy"
5    (expressly incorporated into its October 18, 2006 Form 8-K filed with the SEC). In this release
6    the Company also stated that, "[b]ased upon that investigation, the Company intends to re-price
7    all outstanding retroactively priced options held by Mr. Levy and certain other former and
8    current executives of the Company.    The exercise price of each re-priced option will be
9    increased to the fair market value on the corrected measurement date." Following the October
10   16 and 17 news, the stock price fell $1.22 or 2.46% on October 17, 2006, closing at $48.32 per
11   share. On October 18, 2006, the stock fell $1.91 or 3.96% to close at $46.29 per share.

12       286.    Analysts continued to comment on the materiality of the options backdating
13   scheme at KLA and reacted to the Company's misleading assertions that current management
14   had no responsibility for the fraud:

15           (a)    On October 16, 2006, Analysts Michael J. O'Brien, Michael D. Winters
16   and Andrew J. Liersch of Bears, Stearns & Co. Inc. issued a report citing KLA's disclosures
17   regarding the restatement of previous financial statements and the completion of the internal
18   investigation. The report highlighted that (i) the total cash charge of the financial restatements
19   is expected to be $400 million; (ii) the current company management was not involved in the
20   improper stock option practices; (iii) the stock option grants to Kispert would be re-priced; (iv)
21   CEO Schroeder was terminated and all of his outstanding options would be cancelled; and (v)
22   Nichols had resigned and all of his outstanding options held by him would be re-priced. The
23   report stated that: "In our view, this should help eliminate the overhang on the stock and it can
24   begin to trade on fundamental again." Analysts at Citigroup and Edwards also issued reports on
25   October 16, 2006 which reiterated these disclosures made by the Company.

26           (b)    On October 17, 2006, Analyst Patrick J. Ho of Stiffle Nicolaus issued a
27   report relying upon the Company's announcement attributing all the wrongdoing to a few

28

1     defendants: "[t]he company announced that there was no involvement in these improper stock

2     option practices by any current members of the executive management team, including Rick

3     Wallace (CEO), John Kispert (President and COO, and former CFO) and Jeff Hall (CFO).

4     Based on this announcement, it appears that the stock options in question were tied to those of

5     Mr. Schroeder. We believe this announcement reduces a significant overhang on the stock, and

6     given that current management team (Mr. Wallace, Mr. Kispert and Mr. Hall) was not

7     implicated, we believe this also re-establishes the credibility among these key participants with

8     investors."

9         287.    On December 27, 2006, the Company announced the resignation of Tompkins

10    from the Board of Directors effective December 21, 2006. The stock fell $0.32 on December

11    28, 2006, closing at $49.89 per share.

12         288.    More surprising admissions by KLA were to come. In a Form 8-K filed with the

13    SEC before the market opened on January 5, 2007, KLA admitted that certain outstanding

14    options have exercise prices below the fair market value of the Company's common stock on

15    the actual date on which those particular options were granted and the exercise prices for those

16    options were set at the fair market value of the common stock on an earlier date when the fair

17    market value was lower. KLA further admitted that, to the extent the back-dated options were

18    not vested as of December 31, 2004, it had violated IRC Section 409A. In that same filing, the

19    Company announced specific steps to off-set the illicit benefit received by some of the

20    defendants. KLA re-priced the back-dated stock options of Wallace, Richardson and Fortino by

21    increasing the per share exercise price to the fair market value of the common stock on the

22    actual grant dates of the options. On this news, the stock price increased slightly on January 5,

23    2007, closing up $0.10 per share at $50.15 per share.

24         289.    On January 29, 2007, the Company issued its 2006 Form 10-K wherein it

25    restated previously filed financial results for fiscal years 2005, 2004, 2003 and 2002. KLA also

26    revealed even more damning facts regarding the fraud, including the fact that the backdating of

27    the option grants and corresponding public misrepresentations were not the result of inadvertent

28

1    error but rather intentional misconduct and that documents were falsified in furtherance of this

2    fraud. The key admissions regarding the nature of the fraudulent acts are as follows:

3    • *"[C]ertain of our stock options,* primarily those granted from July 1, 1997 to June 30,
4       2002, *had been retroactively priced for all employees who received these grants* ....
        This means that the option exercise price was not the market price of the option shares
5       on the actual grant date of the option, but instead was a lower market price on an earlier
6       date. The actual grant date – when the essential actions necessary to grant the option
        were completed, including the final determination of the number of shares to be granted
7       to each employee and the exercise price – is the correct measurement date to determine
        the market price of the option shares under the accounting rules in effect at the time."
8       (Emphasis added.)

9    • "[T]here was retroactive pricing of stock options granted to all employees who received
10      options, primarily during the periods from July 1, 1997 to June 30, 2002 ...."

11   • *"[T]he retroactively priced options were not accounted for correctly in our previously
12      issued financial statements* ...." (Emphasis added.)

13   • "to correct our past accounting for stock options, we recorded additional pre-tax, non-
14      cash, stock-based compensation expense of *(a) $348 million for the periods July 1,
        1994 to June 30, 2005 under APB Opinion No. 25 and (b) $22 million for the year
15      ended June 22, 2006 under SFAS No. 123(R).* We expect to amortize an additional $6
        million of such pre-tax charges...in future periods ...." (Emphasis added.)
16

17   • *"[T]he retroactive pricing of options involved the falsification of Company records,
        resulting in erroneous statements being made in financial and other reports
18      previously filed with the SEC,* as well as in information previously provided to our
        independent registered public accounting firm ...." (Emphasis added.)
19

20   • "[I]n most instances, the retroactive pricing of options violated the terms of our stock
        option plans...."
21

22   • *"[W]e identified past material weaknesses in our internal controls and procedures* ....
        A material weakness is a control deficiency, or combination of them, that results in more
23      than a remote likelihood that a material misstatement in our financial statements will not
        be prevented or detected." (Emphasis added.)
24

25   • "The discovery that we had retroactively priced stock options (primarily from July 1,
        2007 to June 30, 2002) and had not accounted for them correctly has had, and may
26      continue to have, a material adverse effect on our financial results."

27   • "The ongoing government inquiries relating to our historical stock option practices are
        time consuming and expensive and could result in injunctions, fines and penalties that
28

may have a material adverse effect on our financial condition and results of operations."

- "The Special Committee investigation and restatement activities have required us to expend significant management time and incur significant accounting, legal, and other expenses. The resulting restatements have had a material adverse effect on our results of operations...."

- *"[T]he retroactive pricing of options was intentional, not inadvertent or through administrative error ...."* (Emphasis added.)

- "[T]he retroactive pricing of options involved the selection of fortuitously low exercise prices by certain former executive officers, and other former executives may have been aware of this conduct ...."

- *"The individual who served as the Company's Chief Executive Officer during part of that time period and continuing until midway through the last fiscal year, was involved in the past retroactive pricing of stock options."* (Emphasis added.) *Based on public filings, the individual who held these positions was Schroeder.*

- Under the "Findings and Remedial Actions" section of the Form 10-K, the Company stated that, "[a]s a result of the Special Committee investigation, on October 16, 2006, we terminated our employment relationship and agreement with Kenneth L. Schroeder, and we announced our intent to cancel all outstanding stock options held by Mr. Schroeder that were retroactively priced or otherwise improperly granted. Those options were canceled in December 2006.... Accordingly, in the second quarter of fiscal 2007 the Company will reverse approximately $20 million of the non-cash, stock-based compensation recorded in prior periods. ... "

- Under the "Findings and Remedial Actions" section of the Form 10-K, the Company reiterated that Nichols had resigned in fall 2006 and stated that the Company and Nichols had entered into a "Separation Agreement and General Release under which Mr. Nichols' outstanding retroactively priced stock options have been re-priced by increasing the exercise price to the market price of the option shares on the actual grant date. The exercise price of each re-priced option was increased to the market price on the actual grant date. Under SFAS No. 123(R), no incremental charge will be recognized in the financial statements for the quarter ended December 31, 2006."

- Under the "Findings and Remedial Actions" section of the Form 10-K, the Company reiterated that Levy had resigned in fall 2006 and stated that the Company and Levy had entered into a "Separation Agreement and General Release under which Mr. Levy's outstanding retroactively priced stock options have been re-priced by increasing the exercise price to the market price of the option shares on the actual grant date.... The exercise price of each re-priced option was increased to the market price on the actual grant date. Under SFAS No. 123(R), no incremental charge will be recognized in the financial statements for the quarter ended December 31, 2006."

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

109

- Under the "Findings and Remedial Actions" section of the Form 10-K, the Company announced that Tompkins had resigned on December 21, 2006 in fall 2006 and stated that the Company "agreed to modify the outstanding options held by Mr. Tompkins (all of which were fully vested) to extend the post-termination exercisability period to December 31, 2007, which is the last day of the calendar year in which those options would have terminated in the absence of such extension...."

- The U.S. Department of Labor is conducting an examination of KLA's 401(k) Savings Plan.

290.    Significantly, it appears that defendants' misconduct went beyond the stock option manipulation fraud.  In the 2006 Form-10K, the Company also revealed that:

> *"[i]n addition to restating the consolidated financial statements in response to the Special Committee's findings, the Company is recording additional non-cash adjustments that were previously considered to be immaterial relating primarily to the accounting for employee stock purchase plans, corrections for the recognition of deferred tax assets, the release of tax reserves, the timing of revenue recognition, gains and losses on hedging contracts and the calculation of minority interest...."*

(Emphasis added.)

291.    On February 9, 2007, KLA filed its Q2FY07 Form 10-Q, which includes restatements for condensed consolidated financial statements for its quarter ended December 31, 2006 (and related disclosures).  In its Q2FY07 Form 10-Q, KLA admitted that it "did not record the required stock-based compensation expenses under SFAS No. 123(R) related to our retroactively priced options in our previously issued financial statements for our quarter ended December 31, 2005, and that is why we are restating them in this filing." *KLA further stated that "[t]o correct our past accounting for stock options, in total we have recorded additional pre-tax, non-cash, stock-based compensation expense of (a) $348 million for the periods July 1, 1994 to June 30, 2005 under APB Opinion No. 25 and (b) $28 million for the period from July 1, 2005 through December 31, 2006 under SFAS No. 123(R)."* (Emphasis added.)   The Company also said that it "will later restate our previously filed financial statements for the quarter ended March 31, 2006 when included in our Quarterly Report on Form 10-Q for the quarter ended March 31, 2007."

292.    In its Q2FY07 Form 10-Q, the Company further clarified that "[m]anagement agrees with the Special Committee that there was retroactive pricing of stock options to all

1    option holders ....'" KLA stated that, "[i]n addition to restating the consolidated financial

2    statements in response to the Special Committee's findings, the Company recorded additional

3    non-cash adjustments [for the quarter ended December 31, 2005] that were previously

4    considered to be immaterial relating primarily to the accounting for employee stock purchase

5    plans, corrections for the recognition of deferred tax assets, the release of tax reserves, the

6    timing of revenue recognition, gains and losses on hedging contracts and the calculation of

7    minority interest." The Company also revealed that, on February 2, 2007, it learned "that the

8    SEC has opened a formal investigation into these matters."

9          293.   In its Q2FY07 Form 10-Q, the Company further stated that:

10   •   As a result of terminating Mr. Schroeder, "vesting of Mr. Schroeder's then
         outstanding stock options and restricted stock awards immediately ceased, and the
11       890,914 unvested option shares and 100,000 unvested restricted stock award shares
         held by Mr. Schroeder at the time of termination were canceled. Accordingly, in the
12       second quarter of fiscal 2007 we reversed $20 million of the non-cash, stock-based
         compensation charges that had been recorded in prior periods .... In December 2006,
13       we canceled 596,740 vested option shares held by Mr. Schroeder as of the time of
         termination, representing those shares that had been retroactively priced or otherwise
14       improperly granted."

15   •   "During the three months ended December 31, 2006 and 2005, we recorded stock-
         based compensation expense of $16.1 million (net of a $20 million reversal of stock-
16       based compensation charges for our former Chief Executive Officer) and $38.8
         million, respectively. During the six months ended December 31, 2006 and 2005, we
17       recorded stock-based compensation expense of $53.1 million (net of a $20 million
         reversal of stock-based compensation charges for our former Chief Executive
18       Officer) and $78.6 million."

19         294.   On February 27, 2007, KLA filed a definitive proxy statement with the SEC

20   ("2006 Proxy Statement"). In the section titled "About the Board of Directors and Its

21   Committees" under "The Board of Directors," the 2006 Proxy Statement states in part:

22         In addition to the three standing Committees, in May 2006 the Board
           appointed a Special Committee, consisting of Mr. Bingham and Mr.
23         Kaufman, to conduct an independent investigation of the Company's
           historical stock option practices, and in the fall of 2006, the Board of
24         Directors appointed a Special Litigation Committee, consisting of Mr.
           Kaufman and Mr. Wang, to conduct an independent investigation of the
25         claims asserted in the related stockholder derivative actions and to
           determine the Company's position with respect to those claims.
26

27   In the section titled "Report of the Compensation Committee on Executive Compensation"

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                      111

1    under "Deductibility of Compensation Under Internal Revenue Code Section 162(m)" the

2    2006 Proxy Statement states in part:

3            The Company's existing equity compensation plans, including the 2004
         Equity Incentive Plan, are structured so that the compensation deemed paid
4        to an executive officer in connection with the exercise of stock options
         granted under those plans should qualify as performance-based
5        compensation not subject to the $1 million limitation. However, the
         Company has determined that certain of its past stock options were
6        retroactively priced and, therefore, have exercise prices below the fair
         market values of the underlying shares on the grant dates of the options.
7        Because retroactively priced options do not qualify as performance-based
         compensation, the compensation deemed paid when those options are
8        exercised is subject to the Section 162(m) limitation. *As a result, a
         substantial portion of the compensation realized by Mr. Kispert in
9        connection with his option exercises during fiscal year 2006 is subject to
         the Section 162(m) limitation. In addition, other awards made under
10       those plans may or may not qualify as performance-based compensation.*

11   (Emphasis added.) This section of the 2006 Proxy Statement further states:

12           Until fiscal year 2006, the Company's annual cash incentive programs were
         not designed to provide bonus payments that would qualify as performance-
13       based compensation under Section 162(m). However, at the 2005 annual
         meeting, the stockholders approved a new Performance Bonus Plan
14       structured in a manner that will allow the Company to qualify all or part of
         the compensation earned under that plan as performance-based
15       compensation not subject to the $1 million limit on deductibility under
         Section 162(m). As a result, a substantial portion of the incentive
16       compensation earned by the executive officers under that plan for fiscal
         year 2006 should qualify as performance-based compensation not subject to
17       the Section 162(m) limitation. However, a portion of the incentive
         compensation earned by certain executive officers for fiscal year 2006 is
18       not expected to constitute performance-based compensation under Section
         162(m), and that portion, when added to other non-performance based
19       compensation earned for fiscal year 2006, is expected to exceed the $1
         million limit under Section 162(m) for Mr. Wallace, Mr. Kispert and
20       possibly other executive officers."

21       295.    On February 27, 2007, the Company filed a Form 8-K announcing that:

22           On February 27, 2007, KLA-Tencor Corporation (the "Company")
         commenced a formal tender offer to its employees that will allow them to
23       tender for amendment or replacement certain outstanding options under the
         Company's Restated 1982 Stock Option Plan, 2000 Nonstatutory Stock
24       Option Plan and 2004 Equity Incentive Plan. The options subject to the
         offer have been determined, as a result of a lengthy investigation of the
25       Company's past option grant practices, to have exercise prices based on the
         fair market value per share of its common stock on a date earlier than the
26       actual dates on which those options were granted. As a result, those options
         have exercise prices below the fair market value of the Company's common
27       stock on the grant date.

28

Section 409A of the Internal Revenue Code provides that options granted with a below-market exercise price, to the extent unvested as of December 31, 2004, will be subject to adverse income taxation, unless certain remedial action is taken before those options are exercised. The offer is designed to allow employees the opportunity to avoid those tax consequences by offering to amend or replace each of their Section 409A-covered options. If such an option is tendered for amendment pursuant to the offer, then the exercise price of that option will, on the next business day following the expiration date of the offer, be adjusted to the lower of (i) the fair market value per share of the Company's common stock on the date on which that option was actually granted or (ii) the closing selling price per share of its common stock on the date on which the option is amended pursuant to the offer (the "Adjusted Exercise Price").

**D.    ADDITIONAL *SCIENTER* ALLEGATIONS**

296.    As alleged herein, defendants acted with *scienter* in that they (a) had access to all internal data concerning the Company's stock option plans; (b) directed and/or participated in establishing the terms of the option grants, including the choice of grant dates and exercise price; (c) knew or with deliberate recklessness disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false, incomplete or misleading; (d) knew or with deliberate recklessness disregarded that such statements or documents would be issued or disseminated to the investing public; and (e) knowingly or with deliberate recklessness participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

297.    Additional facts provide actual and strong circumstantial evidence of defendants' *scienter* including: (a) the Company's concessions and admissions; (b) defendants' roles, responsibilities for granting and administering option grants, including their specific attendance at meetings where options were backdated; (c) defendants' desire to boost compensation when KLA lacked the funds to pay salaries or give pay raises; (d) defendants' desire to personally obtain greater compensation without public scrutiny; and (e) the pervasiveness and nature of the fraud.

1.    **The Company's Own Admissions And Recent Actions Establish Defendants' *Scienter***

298.    Most notably, the Company has made admissions and taken actions that establish, without resort to circumstantial evidence, the *scienter* of the Company and numerous Individual Defendants:

(a)    In the fall of 2006 and in its 2006 Form 10-K, the Company admitted that options were backdated. Indeed, in its 2006 Form 10-K, the Company explained that *"certain of our stock options, primarily those granted from July 1, 1997 to June 30, 2002, had been retroactively priced for all employees who received these grants* …. This means that the option exercise price was not the market price of the option shares on the actual grant date of the option, but instead was a lower market price on an earlier date." (Emphasis added.)

(b)    In its 2006 Form 10-K, the Company conceded that *"the retroactive pricing of options was intentional, not inadvertent or through administrative error."* (Emphasis added.)

(c)    The Company's statement that the backdating occurred "primarily" prior to 2002 is a tacit admission that some backdating occurred after 2002, which is after SOX changed the requirements for reporting option grants. After August 29, 2002, option grants had to be reported to the SEC within two days of the grant. The fact that the options misconduct occurred after this SOX provision was enacted suggests a knowing violation of securities laws or at least severe recklessness.

(d)    In its 2006 Form 10-K, the Company concluded that *"[t]he individual who served as the Company's Chief Executive Officer during part of that time period and continuing until midway through the last fiscal year, was involved in the past retroactive pricing of stock options."* (Emphasis added.) Based on the Company's reporting of officers, it is clear that this individual is Schroeder.

(e)    In its 2006 Form 10-K, the Company stated that, *"[a]s a result of the Special Committee investigation, on October 16, 2006, we terminated our employment*

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    114

1    *relationship and agreement with [defendant] Schroeder,* and we announced *our intent to*

2    *cancel all outstanding stock options held by Mr. Schroeder* that were retroactively priced or

3    otherwise improperly granted." According to KLA, these options were allegedly canceled in

4    December 2006.

5    　　　　　(f)　　After the Special Committee finished its investigation, the Company

6    announced resignations by Nichols, Levy and Tompkins and the re-pricing of all outstanding

7    retroactively priced stock options held by Nichols and Levy to the correct fair market value on

8    the corrected measurement date.

9    　　　　**2.**　　**Defendants' Specific Participation In The Backdating Establish**
　　　　　　　**Their *Scienter***
10

11    　　　299.　　The Company also concluded that "the stock option pricing process during that

12    time period was overly dependent on certain former executive officers of the Company, and was

13    administered by a stock option committee that was not always properly constituted...." As

14    described above, Schroeder, Nichols, Hall, Kispert and Dickerson, and possibly other

15    defendants, were members of the Stock Option Committee and/or attended meetings at which

16    employee and executive stock option grants were approved and grant dates assigned during the

17    Class Period. Tompkins was also a member of this committee between mid-1997 and 1999,

18    during which time the backdating of option grants also occurred.

19    　　　300.　　As alleged above, the members of the Stock Option Committee and the

20    Compensation Committee Defendants (Schroeder, Nichols, Hall, Kispert, Urbanek, Marks,

21    Dickerson, Barnholt, Bond and Tompkins) each participated in the actual selection of backdated

22    grant dates for the principal purpose of furthering the fraud.

23    　　　301.　　From the beginning, the Company has attempted to minimize the fall-out from

24    the disclosure of its fraud by placing blame entirely on a couple of defendants and exonerating

25    the Company's current management. This effort has been effective as analysts expressed relief

26    over this fact. However, for the reasons alleged herein, the facts do not support this

27    exoneration.

28

1    302.    Most significantly, the Board of Directors has taken overt actions to prevent any

2    independent investigation into the details of who was behind or who participated in this

3    admitted fraud by obtaining a signed agreement from the one key employee who allegedly has

4    intimate knowledge of the facts, prohibiting her from speaking with anyone about the options-

5    related fraud.  As described above, CW ##6 and 7 and others confirmed that Nyberg would be

6    the one former employee other than defendants who had direct contact with senior executives

7    and would have personal knowledge of the key issues relating to alleged backdating.  According

8    to CW #7, Nyberg would analyze stock options, make recommendations as to who got what,

9    present to the Board regarding what the executives should get and present to the executives

10   what the rank and file should get.  In fact, CW #7 described Nyberg as the "woman who had the

11   first ringside seat for a decade" and "is totally where all the coffins got buried."  Yet, Nyberg,

12   who is no longer employed by KLA, informed plaintiffs' counsels' representatives that she

13   could not speak with them because the Company has instructed her not to speak with anyone

14   and her husband clarified that Nyberg had executed a written agreement with the Board of

15   Directors prohibiting her from speaking to anyone regarding KLA.  Moreover, unlike other

16   companies, KLA has not publicly disclosed the report issued by its Special Committee.

17   303.    In addition, several Confidential Witnesses confirmed that defendants were very

18   involved in all aspects of the Company.  CW #7 described KLA as a company "that was run

19   from the top down.  Every division had to report personally to the CEO every quarter."  CW #7

20   further stated that the Company was run as a "dictatorship" and that Schroeder and Levy, "the

21   Kens" "ran this company with an iron fist."  CW #2 also noted that Schroeder "ran everything"

22   and that Dickerson also exercised power at the Company.

23       **3.    Defendants' Efforts To Recruit And Retain Executives And**
            **Employees Supports A Strong Inference Of *Scienter***
24

25   304.    In the highly volatile market for technology companies, the granting of stock

26   options is often a company's strongest means for obtaining skilled labor.  Indeed, according to

27   CW #6, the Company hired Iquantic to conduct an analysis of KLA's benefits program in 2001.

28

1    In connection with this analysis, Iquantic surveyed KLA's employees and learned that the

2    employees wanted to take home cash.  Thus, the compensation department began to strategize

3    on how to provide employees with more cash without raising their salaries and the Company

4    executives, including defendants here, sought to "optimize" the benefits from stock options by

5    any means possible.

6    305.    A number of witnesses and documents evidence the fact that, as of at least 2000,

7    the Company lacked the ability to properly compensate employees with cash.

8    (a)    According to CW #6, KLA was not doing well financially in 2002 and

9    2003 so it implemented a pay freeze.

10    (b)    CW #8 confirmed that when he/she started at the Company in 2003,

11    he/she was informed that the Company had been having financial problems and had not given

12    employees raises during the prior few years.

13    (c)    CW #3 stated that in 2001 KLA was experiencing "money troubles" and

14    informed all employees that they would not be receiving raises.  CW #3 further stated that, in

15    spring or summer 2001, all employees at the supervisory level and above were asked to take pay

16    cuts (although vice presidents received 10% raises for their annual merit increase in 2001).

17    (d)    CW #1 stated that KLA was "running its business based on options" and

18    that "instead of spending real money on salary and bonuses, they would give options."

19    (e)    A presentation slide titled "Q1 Focus" (page 28) from the "Human

20    Resources Executive Review dated June 26, 2001 – Tom Coffey" identifies one of the action

21    steps as "Decrease Management Salaries effective 7/1/01."

22    (f)    A presentation slide titled "Q1 Status Update Compensation" (page 18)

23    from the "Human Resources Executive Review dated September 19, 2001 – Tom Coffey" states

24    that the HR Department has "Processed Management Salary Decreases."    The slide also

25    confirms that "All salary actions require Compensation approval."

26    (g)    A presentation slide titled "Q2 Status Update Compensation" (page 28)

27    from the "Human Resources Executive Review dated December 10, 2001 – Tom Coffey" states

28

1   that "Salary increases for FY02 cancelled."

2        306.   Thus, the Company offered employees additional stock options during the pay

3   freeze or in exchange for pay cuts.

4            (a)    CW #6 stated that the Company asked employees to accept stock options

5   in exchange for pay cuts.

6            (b)    The presentation slide titled "Q4 Status Update" (page 26) from the

7   "Human Resources Executive Review dated June 26, 2001 – Tom Coffey" states that (i) "2nd

8   Supplemental [stock options] Approved for Officers, communicated and implemented into

9   stock system"; and (ii) "Recommended and received approval for 2nd Supplemental Focal

10  Stock Option."

11           (c)    The presentation slide titled "Q2 Status Update Compensation" (page 28)

12  from the "Human Resources Executive Review dated December 10, 2001 – Tom Coffey" also

13  states that (i) "Focal stock issued at 150%"; and (ii) "Developed, presented and received

14  approval for proposal to issue 100 share option to employees without Focal stock." The slide

15  further indicates that there was "[p]ositive feedback regarding stock" for both these action steps.

16       307.   Defendants' willingness to manipulate option grants as a means of boosting

17  compensation for themselves and employees is further evidenced by their practice of "re-

18  pricing" stock options that were "out-of the-money," that is, where the stock price fell below

19  the exercise price.

20           **4.    Defendants' Personal Enrichment Through Lucrative Stock Option**
             **Grants And Insider Trading Further Supports A Finding Of**
21           ***Scienter***

22       308.   Defendants were motivated to commit the fraudulent scheme in order to reap

23  significant personal profits.   Defendants provided themselves with a direct form of

24  compensation, which amounted to undisclosed and unaccounted for compensation in a number

25  of ways.

26       309.   First, the Individual Defendants each personally obtained backdated options.

27  The following charts set forth the options granted to certain defendants prior to and during the

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                            118

Class Period as reported in the Company's Proxy Statements and Form 4's filed with the SEC:

**July 26, 1994 - Fiscal 1995**

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Ken Levy | 7/26/94 | $9.31 | $9.12 | $9.06 | $11.24 | 240,000 |
| Ken Schroder | 7/26/94 | $9.31 | $9.12 | $9.06 | $11.24 | 240,000 |

**April 18, 1995 - Fiscal 1995**

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| John Kispert | 4/18/95 | $15.31 | $15.00 | $14.70 | $16.56 | 2,440 |

**September 17, 1996 - Fiscal 1997**

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| John Kispert | 9/17/96 | $10.94 | $10.72 | $8.70 | $12.19 | 3,000 |

**October 8, 1996 - Fiscal 1997**

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| John Kispert | 10/8/96 | $10.81 | —$10.59 | $8.88 | $12.80 | 2,625 |
| Gary Dickerson | 10/8/96 | $10.81 | $10.59 | $8.88 | $12.80 | 12,750 |
| Ken Levy | 10/8/96 | $10.81 | $10.59 | $8.88 | $12.80 | 125,000 |

July 21, 1997 - Fiscal 1998

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Dean Morton | 7/21/1997 | $27.38 | $26.82 | $23.88 | $33.01 | 5,000 |
| Richard Elkus | 7/21/1997 | $27.38 | $26.82 | $23.88 | $33.01 | 5,000 |

June 15, 1998 - Fiscal 1998

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Dean Morton | 6/15/98 | $12.78 | $12.52 | $12.22 | $19.01 | 5,000 |

August 31, 1998 - Fiscal 1999

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Richard Wallace | 8/31/98 | $10.63 | $10.41 | $10.41 | $15.83 | 9,251 |
| John Kispert | 8/31/98 | $10.63 | $10.41 | $10.41 | $15.83 | 22,600 |
| Gary Dickerson | 8/31/98 | $10.63 | $10.41 | $10.41 | $15.83 | 41,921 |
| Ken Schroder | 8/31/98 | $10.63 | $10.41 | $10.41 | $15.83 | 125,000 |
| Ken Levy | 8/31/98 | $10.63 | $10.41 | $10.41 | $15.83 | 204,272 |
| Jon Tompkins | 8/31/98 | $10.63 | $10.41 | $10.41 | $15.83 | 60,595 |

October 23, 1998 - Fiscal 1999

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Gary Dickerson | 10/23/98 | $16.97 | $16.63 | $10.53 | $20.21 | 65,449 |
| Jon Kispert | 10/23/98 | $16.97 | $16.63 | $10.53 | $20.21 | 30,135 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name of Executive/Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Ken Levy | 10/23/98 | $16.97 | $16.63 | $10.53 | $20.21 | 220,728 |
| Ken Schroder | 10/23/98 | $16.97 | $16.63 | $10.53 | $20.21 | 220,728 |
| Jon Tompkins | 10/23/98 | $16.97 | $16.63 | $10.53 | $20.21 | 87,016 |

November 17, 1998 - Fiscal 1999

| Name of Executive/Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Dean Morton | 11/17/98 | $17.59 | $17.24 | $13.75 | $22.41 | 7,082 |

May 26, 1999 - Fiscal 1999

| Name of Executive/Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Richard Wallace | 05/26/99 | $22.56 | $22.11 | $21.40 | $29.55 | 5,417 |

October 27, 1999 - Fiscal 1999

| Name of Executive/Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Gary Dickerson | 10/27/99 | $33.75 | $33.07 | $31.84 | $47.40 | 100,000 |
| Ken Levy | 10/27/99 | $33.75 | $33.07 | $31.84 | $47.40 | 90,000 |
| John Kispert | 10/27/99 | $33.75 | $33.07 | $31.84 | $47.40 | 30,000 |
| Stuart Nichols | 10/27/99 | $33.75 | $33.07 | $31.84 | $47.40 | 35,000 |
| Ken Schroder | 10/27/99 | $33.75 | $33.07 | $31.84 | $47.40 | 150,000 |
| Richard Wallace | 10/27/99 | $33.75 | $33.07 | $31.84 | $47.40 | 36,250 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

<u>August 11, 2000 - Fiscal 2001</u>

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Gary E. Dickerson | 8/11/2000 | $44.687 | $44.69 | $42.38 | $66.81 | 41,585 |

<u>August 13, 2000 - Fiscal 2001</u>

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth Levy | 8/13/2000 | $44.69 | $44.69 | $42.38 | $66.81 | 37,901 |
| Kenneth L. Schroeder | 8/13/2000 | $44.69 | $44.69 | $42.38 | $66.81 | 75,800 |
| Gary E. Dickerson | 8/13/2000 | $44.69 | $44.69 | $42.38 | $66.81 | 65,000 |
| John H. Kispert | 8/13/2000 | $44.69 | $44.69 | $42.38 | $66.81 | 40,000 |
| Richard P. Wallace | 8/13/2000 | $44.69 | $44.69 | $42.38 | $66.81 | 21,878 |

<u>August 15, 2000 - Fiscal 2001</u>

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Raymond Bingham | 8/15/2000 | $59.44 | $52.75 | $42.38 | $66.81 | 20,000 |
| Robert Bond | 8/15/2000 | $59.44 | $52.75 | $42.38 | $66.81 | 20,000 |

<u>November 10, 2000 - Fiscal 2001</u>

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth Levy | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 18,951 |
| Kenneth L. Schroeder | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 37,900 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Gary E. Dickerson | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 32,500 |
| John H. Kispert | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 20,000 |
| Richard P. Wallace | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 12,250 |
| Richard J. Elkus | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 10,000 |
| Lida Urbanek | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 10,000 |
| Edward Barnholt | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 10,000 |
| Jon D. Tompkins | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 10,000 |
| Dean Morton | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 10,000 |
| Stuart Nichols | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 6,000 |

April 4, 2001 - Fiscal 2001

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth Levy | 4/4/2001 | $32.75 | $32.75 | $32.75 | $54.50 | 18,951 |
| Kenneth L. Schroeder | 4/4/2001 | $32.75 | $32.75 | $32.75 | $54.50 | 37,900 |
| Gary E. Dickerson | 4/4/2001 | $32.75 | $32.75 | $32.75 | $54.50 | 32,500 |
| John H. Kispert | 4/4/2001 | $32.75 | $32.75 | $32.75 | $54.50 | 20,000 |
| Richard P. Wallace | 4/4/2001 | $32.75 | $32.75 | $32.75 | $54.50 | 13,832 |
| Stuart Nichols | 4/4/2001 | $32.75 | $32.75 | $32.75 | $54.50 | 6,000 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

123

October 2, 2001 – Fiscal 2002

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 10/2/2001 | $29.31 | $29.31 | $28.86 | $51.46 | 341,100 |
| Gary E. Dickerson | 10/2/2001 | $29.31 | $29.31 | $28.86 | $51.46 | 105,000 |
| John H. Kispert | 10/2/2001 | $29.31 | $29.31 | $28.86 | $51.46 | 60,000 |
| Richard P. Wallace | 10/2/2001 | $29.31 | $29.31 | $28.86 | $51.46 | 45,000 |
| Kenneth Levy | 10/2/2001 | $29.31 | $29.31 | $28.86 | $51.46 | 28,425 |
| Jeffrey Hall | 10/2/2001 | $29.31 | $29.31 | $28.86 | $51.46 | 22,500 |
| Stuart Nichols | 10/2/2001 | $29.31 | $29.31 | $28.86 | $51.46 | 12,000 |

November 9, 2001 – Fiscal 2002

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Raymond Bingham | 11/9/01 | $47.23 | $47.23 | $34.88 | $56.96 | 10,000 |
| Robert Bond | 11/9/01 | $47.23 | $47.23 | $34.88 | $56.96 | 10,000 |

November 8, 2002 – Fiscal 2003

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 31,450 |
| Gary E. Dickerson | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 25,000 |
| John H. Kispert | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 12,500 |
| Richard P. Wallace | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 12,500 |
| Edward Barnholt | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 10,000 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

124

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Raymond Bingham | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 10,000 |
| Robert T. Bond | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 10,000 |
| Richard J. Elkus | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 10,000 |
| Stephen Kaufman | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 10,000 |
| Lida Urbanek | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 10,000 |
| Jon D. Tompkins | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 10,000 |
| Jeffrey Hall | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 3,250 |

January 28, 2003 – Fiscal 2003

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 1/28/2003 | $34.67 | $34.67 | $31.15 | $40.77 | 62,900 |
| Gary E. Dickerson | 1/28/2003 | $34.67 | $34.67 | $31.15 | $40.77 | 50,000 |
| John H. Kispert | 1/28/2003 | $34.67 | $34.67 | $31.15 | $40.77 | 25,000 |
| Richard P. Wallace | 1/28/2003 | $34.67 | $34.67 | $31.15 | $40.77 | 25,000 |

May 22, 2003 – Fiscal 2003

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Jeffrey Hall | 5/22/2003 | $40.14 | $40.14 | $38.34 | $48.60 | 5,500 |
| Gary E. Dickerson | 5/22/2003 | $40.14 | $40.14 | $38.34 | $48.60 | 1,000 |
| Richard P. Wallace | 5/22/2003 | $40.14 | $40.14 | $38.34 | $48.60 | 1,000 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

July 30, 2003 – Fiscal 2004

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 7/30/2003 | $51.23 | $51.23 | $46.50 | $58.69 | 31,450 |
| Gary E. Dickerson | 7/30/2003 | $51.23 | $51.23 | $46.50 | $58.69 | 25,000 |
| John H. Kispert | 7/30/2003 | $51.23 | $51.23 | $46.50 | $58.69 | 12,500 |
| Richard P. Wallace | 7/30/2003 | $51.23 | $51.23 | $46.50 | $58.69 | 12,500 |
| Jeffrey Hall | 7/30/2003 | $51.23 | $51.23 | $46.50 | $58.69 | 3,250 |

October 27, 2003 – Fiscal 2004

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 10/27/2003 | $53.86 | $53.86 | $51.60 | $60.88 | 60,000 |
| Gary E. Dickerson | 10/27/2003 | $53.86 | $53.86 | $51.60 | $60.88 | 50,000 |
| John H. Kispert | 10/27/2003 | $53.86 | $53.86 | $51.60 | $60.88 | 30,000 |
| Richard P. Wallace | 10/27/2003 | $53.86 | $53.86 | $51.60 | $60.88 | 30,000 |
| Jeffrey Hall | 10/27/2003 | $53.86 | $53.86 | $51.60 | $60.88 | 5,200 |

November 5, 2003 – Fiscal 2004

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 11/05/03 | $59.44 | $59.44 | $52.29 | $59.65 | 10,000 |
| Michael Marks | 11/05/03 | $59.44 | $59.44 | $52.29 | $59.65 | 10,000 |
| Raymond Bingham | 11/05/03 | $59.44 | $59.44 | $52.29 | $59.65 | 10,000 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

126

January 27, 2004 – Fiscal 2004

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 1/27/2004 | $58.10 | $58.10 | $53.64 | $62.52 | 30,000 |
| Gary E. Dickerson | 1/27/2004 | $58.10 | $58.10 | $53.64 | $62.52 | 25,000 |
| John H. Kispert | 1/27/2004 | $58.10 | $58.10 | $53.64 | $62.52 | 15,000 |
| Richard P. Wallace | 1/27/2004 | $58.10 | $58.10 | $53.64 | $62.52 | 15,000 |
| Jeffrey Hall | 1/27/2004 | $58.10 | $58.10 | $53.64 | $62.52 | 2,600 |

April 26, 2004 – Fiscal 2004

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 4/26/2004 | $45.16 | $45.16 | $41.70 | $53.88 | 37,500 |
| Gary E. Dickerson | 4/26/2004 | $45.16 | $45.16 | $41.70 | $53.88 | 31,250 |
| John H. Kispert | 4/26/2004 | $45.16 | $45.16 | $41.70 | $53.88 | 18,750 |
| Richard P. Wallace | 4/26/2004 | $45.16 | $45.16 | $41.70 | $53.88 | 18,750 |
| Jeffrey Hall | 4/26/2004 | $45.16 | $45.16 | $41.70 | $53.88 | 3,250 |

August 2, 2004 – Fiscal 2005

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 8/2/2004 | $40.66 | $40.66 | $35.69 | $46.30 | 22,500 |
| John H. Kispert | 8/2/2004 | $40.66 | $40.66 | $35.69 | $46.30 | 11,250 |
| Richard P. Wallace | 8/2/2004 | $40.66 | $40.66 | $35.69 | $46.30 | 11,250 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Avi Cohen | 8/2/2004 | $40.66 | $40.66 | $35.69 | $46.30 | 6,000 |
| Lance Glasser | 8/2/2004 | $40.66 | $40.66 | $35.69 | $46.30 | 3,750 |
| Jeffrey Hall | 8/2/2004 | $40.66 | $40.66 | $35.69 | $46.30 | 1,950 |

September 21, 2004 – Fiscal 2005

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 9/21/2004 | $41.79 | $41.79 | $36.60 | $43.67 | 325,800 |
| John H. Kispert | 9/21/2004 | $41.79 | $41.79 | $36.60 | $43.67 | 75,000 |
| Richard P. Wallace | 9/21/2004 | $41.79 | $41.79 | $36.60 | $43.67 | 75,000 |
| Avi Cohen | 9/21/2004 | $41.79 | $41.79 | $36.60 | $43.67 | 75,000 |
| Lance Glasser | 9/21/2004 | $41.79 | $41.79 | $36.60 | $43.67 | 75,000 |
| Jeffrey Hall | 9/21/2004 | $41.79 | $41.79 | $36.60 | $43.67 | 20,000 |

October 18, 2004 – Fiscal 2005

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 10/18/2004 | $40.68 | $40.68 | $39.49 | $45.70 | 2,500 |
| Raymond Bingham | 10/18/2004 | $40.68 | $40.68 | $39.49 | $45.70 | 2,500 |

January 25, 2005 – Fiscal 2005

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 1/25/2005 | $44.76 | $44.76 | $42.25 | $50.50 | 2,500 |
| Raymond Bingham | 1/25/2005 | $44.76 | $44.76 | $42.25 | $50.50 | 5,000 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

128

May 11, 2005 - Fiscal 2005

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 5/11/05 | $40.24 | $40.24 | $38.86 | $46.87 | 2,500 |
| Raymond Bingham | 5/11/05 | $40.24 | $40.24 | $38.86 | $46.87 | 2,500 |

August 2, 2005 – Fiscal 2006

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 8/02/2005 | $51.35 | $51.35 | $44.37 | $51.70 | 2,500 |
| Michael Marks | 8/02/2005 | $51.35 | $51.35 | $44.37 | $51.70 | 2,500 |
| Raymond Bingham | 8/02/2005 | $51.35 | $51.35 | $44.37 | $51.70 | 2,500 |

November 4, 2005 – Fiscal 2006

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 11/04/2005 | $49.99 | $49.99 | $45.52 | $54.09 | 1,250 |
| Michael Marks | 11/04/2005 | $49.99 | $49.99 | $45.52 | $54.09 | 1,250 |
| Raymond Bingham | 11/04/2005 | $49.99 | $49.99 | $45.52 | $54.09 | 3,750 |

September 26, 2005 - Fiscal 2006

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Richard P. Wallace | 9/26/2005 | $47.95 | $47.95 | $45.17 | $50.71 | 125,000 |
| John H. Kispert | 9/26/2005 | $47.95 | $47.95 | $45.17 | $50.71 | 75,000 |
| Jeffrey L. Hall | 9/26/2005 | $47.95 | $47.95 | $45.17 | $50.71 | 30,000 |
| Avi Cohen | 9/26/2005 | $47.95 | $47.95 | $45.17 | $50.71 | 75,000 |
| Kenneth Schroeder | 9/26/2005 | $47.95 | $47.95 | $45.17 | $50.71 | 325,800 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Lance Glasser | 9/26/2005 | $47.95 | $47.95 | $45.17 | $50.71 | 75,000 |

January 31, 2006 – Fiscal 2006

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 1/31/06 | $51.98 | $51.98 | $49.33 | $54.18 | 1,250 |
| Michael Marks | 1/31/06 | $51.98 | $51.98 | $49.33 | $54.18 | 1,250 |
| Raymond Bingham | 1/31/06 | $51.98 | $51.98 | $49.33 | $54.18 | 1,250 |

February 17, 2006 - Fiscal 2006

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Richard P. Wallace | 2/17/2006 | $52.53 | $52.53 | $48.67 | $54.18 | 50,000 |
| John H. Kispert | 2/17/2006 | $52.53 | $52.53 | $48.67 | $54.18 | 25,000 |
| Jeffrey L. Hall | 2/17/2006 | $52.53 | $52.53 | $48.67 | $54.18 | 15,000 |

May 2, 2006 - Fiscal 2006

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 5/02/06 | $47.86 | $47.86 | $39.07 | $50.39 | 1,250 |
| Raymond Bingham | 5/02/06 | $47.86 | $47.86 | $39.07 | $50.39 | 1,250 |
| Michael Marks | 5/02/06 | $47.86 | $47.86 | $39.07 | $50.39 | 1,250 |

310.    Other options granted to defendants during the Class Period are identified in the charts below showing actual exercises of options and sales of stock.

311.    While KLA has not identified precisely which options were backdated, it has

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

1   confirmed that options granted during this period had been retroactively priced for all

2   employees who received such grants. It has also admitted that Schroeder, Kispert, Nichols,

3   Levy and Wallace all received backdated options. Based on these admissions and the following

4   charts showing how all the alleged grant dates fell suspiciously at or close to low stock prices,

5   there is a strong inference that all of the options granted to all defendants during the Class

6   Period were backdated options:

7   **July 26, 1994**



**April 18, 1995**



**October 8, 1996**



1
2
3
4
5
6
7
8
9
10
11

**July 21, 1997**



12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**June 15, 1998**



[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

133

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**August 31, 1998**



**November 17, 1998**



1
2  **May 26, 1999**
3
4  
5
6
7
8
9
10
11
12
13
14  **October 27, 1999**
15
16
17  
18
19
20
21
22
23
24
25
26
27
28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                    135

**August 11, 2000**



**November 10, 2000**



1   **April 4, 2001**

2

3   

4

5

6

7

8

9

10

11

12

13   **October 2, 2001**

14

15   

16

17

18

19

20

21

22

23

24

25

26

27

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

137

1

**November 8, 2002**

2

3



4

5

6

7

8

9

10

11

12

13

14

**January 28, 2003**

15

16

17



18

19

20

21

22

23

24

25

26

27

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

138

1  **May 22, 2003**

2

3    

4

5

6

7

8

9

10

11

12

13

14  **July 30, 2003**

15

16    

17

18

19

20

21

22

23

24

25

26

27

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

**October 27, 2003**



**April 26, 2004**



312.    Second, Wallace, Schroeder, Levy, Tompkins, Dickerson, Hall, Kispert, Urbanek, Marks, Barnholt, Bond, Elkus, Morton, Kaufman and Bingham actually exercised backdated options, thereby cashing in on their fraudulent scheme.  The following charts set

forth the proceeds realized by each defendant when they exercised their stock option grants:

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized on Transaction |
|---|---|---|---|---|---|---|---|
| Wallace, Richard P | 10/27/99 | 12/03/03 | $56.75 | 5,041 | $59.5382 | 5,041 | $129,998.32 |
| | 08/13/00 | 12/03/03 | $44.875 | 2,709 | $59.5382 | 2,709 | $40,241.55 |
| | 11/10/00 | 12/03/03 | $26.25 | 875 | $59.5382 | 875 | $29,127.18 |
| | 04/04/02 | 12/03/03 | $32.75 | 875 | $59.5382 | 875 | $23,459.68 |
| | 10/02/01 | 12/03/03 | $29.31 | 3,000 | $59.5382 | 3,000 | $90,684.60 |
| | 11/08/02 | 12/03/03 | $37.05 | 2,500 | $59.5382 | 2,500 | $446,332.55 |
| | 01/23/03 | 12/03/03 | $34.67 | 5,000 | $59.5382 | 5,000 | $124,341.00 |
| | 10/27/99 | 08/21/03 | $33.75 | 18,667 | $54.82 | 18,667 | $393,313.69 |
| | 11/10/00 | 08/21/03 | $26.25 | 292 | $54.82 | 292 | $8,342.44 |
| | 04/04/01 | 08/21/03 | $32.75 | 291 | $54.82 | 291 | $6,422.37 |
| | 10/02/01 | 08/21/03 | $29.31 | 750 | $54.82 | 750 | $19,132.50 |
| | 10/27/99 | 07/31/03 | $33.75 | 1,292 | $52.6275 | 1,292 | $24,339.78 |
| | 11/10/00 | 07/31/03 | $26.25 | 588 | $52.6275 | 588 | $15,578.086 |
| | 04/04/01 | 07/31/03 | $32.75 | 4,207 | $52.6275 | 4,207 | $88,624.64 |
| | 10/02/01 | 07/31/03 | $29.31 | 13,918 | $52.6275 | 13,918 | $324,532.97 |
| | 08/31/98 | 06/06/03 | $10.63 | 1,250 | $50.885 | 1,250 | $50,318.75 |
| | 08/31/98 | 06/06/03 | $10.63 | 834 | $50.885 | 834 | $33,572.67 |
| | 08/31/98 | 06/06/03 | $10.63 | 2,500 | $50.885 | 2,500 | $100,637.50 |
| | 08/31/98 | 06/06/03 | $10.63 | 2,500 | $50.885 | 2,500 | $100,637.50 |
| | 08/31/98 | 06/06/03 | $10.63 | 2,167 | $50.885 | 2,167 | $87,232.59 |
| | 05/26/99 | 06/06/03 | $22.56 | 5,417 | $50.885 | 5,417 | $153,436.53 |
| | 11/10/00 | 06/06/03 | $26.25 | 3,500 | $50.885 | 3,500 | $86,222.50 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized on Transaction |
|---|---|---|---|---|---|---|---|
| | 10/02/01 | 06/06/03 | $29.31 | 1,832 | $50.885 | 1,832 | $39,525.40 |
| TOTAL | | | | | | | $2,110,923.71 |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Schroeder, Kenneth | 02/08/06 | $16.97 | 132,658 | $58.0455 | 132,658 | $4,901,116.14 |
| | 02/08/06 | | | | | | |
| | 10/23/98 | 11/30/05 | $16.97 | 21,136 | $51.7382 | 21,136 | $734,860.68 |
| | 10/23/98 | 11/30/05 | $16.97 | 28,864 | $51.7382 | 28,864 | $1,003,549.33 |
| | 10/23/98 | 11/04/05 | $16.97 | 50,000 | $49.5026 | 50,000 | $1,626,680.00 |
| | 08/31/98 | 08/23/05 | $10.63 | 35,304 | $49.6331 | 35,304 | $1,376,965.44 |
| | 10/23/98 | 08/23/05 | $16.97 | 14,696 | $49.6331 | 14,696 | $488,933.94 |
| | 08/31/98 | 02/28/05 | $10.63 | 43,968 | $50.4927 | 43,968 | $1,752,683.19 |
| | 10/23/98 | 12/03/04 | $16.97 | 47,361 | $49.2846 | 47,361 | $1,530,451.77 |
| | 10/23/98 | 12/02/04 | $16.97 | 2,639 | $47.50 | 2,639 | $80,568.67 |
| | 08/31/98 | 01/28/04 | $10.63 | 25,000 | $58.5754 | 25,000 | $1,198,635.00 |
| | 08/31/98 | 01/28/04 | $10.63 | 25,000 | $58.5754 | 25,000 | $1,198,635.00 |
| | 08/31/98 | 08/22/03 | $10.63 | 50,000 | $57.8089 | 50,000 | $2,358,945.00 |
| | 08/31/98 | 08/19/03 | $10.81 | 25,000 | $54.4637 | 25,000 | $1,091,092.50 |
| | 10/08/96 | 08/19/03 | $10.63 | 25,000 | $54.4637 | 25,000 | $1,091,092.50 |
| | 10/08/96 | 08/15/03 | $10.81 | 25,000 | $52.0009 | 25,000 | $1,029,772.50 |
| | 10/08/96 | 08/14/03 | $10.81 | 25,000 | $52 | 25,000 | $1,029,730.00 |
| | 10/08/96 | 08/04/03 | $10.81 | 25,000 | $52.25 | 25,000 | $1,036,000.00 |
| | 07/26/94 | 07/31/03 | $9.31 | 24,100 | $52.758 | 24,100 | $1,046,976.30 |
| | 07/26/94 | 06/06/03 | $9.31 | 35,900 | $50.0917 | 35,900 | $1,464,063.03 |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| **TOTAL** | | | | | | | $26,040,720.99 |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized On Sale |
|---|---|---|---|---|---|---|---|
| Levy, Kenneth | 08/31/98 | 11/18/05 | $10.63 | 50,000 | $51.20 | 50,000 | $2,028,500.00 |
| | 10/08/96 | 08/02/05 | $10.81 | 75,000 | $51.2675 | 75,000 | $3,084,312.50 |
| | 10/08/96 | 12/15/04 | $10.81 | 25,000 | $46.9809 | 25,000 | $904,272.50 |
| | 10/08/96 | 11/01/04 | $10.81 | 25,000 | $45.2039 | 25,000 | $869,874.50 |
| | 07/26/94 | 05/26/04 | $9.31 | 25,000 | $46.281 | 25,000 | $924,275.00 |
| | 07/26/94 | 05/20/04 | $9.31 | 15,000 | $46.1865 | 15,000 | $553,099.50 |
| | 07/26/94 | 05/19/04 | $9.31 | 15,000 | $46.2133 | 15,000 | $553,549.50 |
| | 07/26/94 | 05/18/04 | $9.31 | 15,000 | $44.8197 | 15,000 | $532,645.50 |
| | 07/26/94 | 05/13/04 | $9.31 | 35,000 | $44.00 | 35,000 | $1,214,150.00 |
| | 07/26/94 | 10/30/03 | $9.31 | 55,000 | $57.8927 | 55,000 | $2,644,648.50 |
| | 07/26/04 | 09/16/03 | $9.31 | 30,000 | $57.0852 | 30,000 | $1,433,256.00 |
| | 07/26/94 | 08/22/03 | $9.31 | 50,000 | $57.6186 | 50,000 | $2,405,450.00 |
| **TOTAL** | | | | | | | $17,082,914 |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized On Sale |
|---|---|---|---|---|---|---|---|
| Tompkins, Jon D. | 8/31/98 | 6/7/01 | $10.63 | 8,000 | $59.22 | 8,000 | $533,720.00 |
| | 8/31/98 | 6/7/01 | $10.63 | 12,000 | $59.22 | 12,000 | $581,080.00 |
| | 8/31/98 | 8/3/01 | $10.63 | 10,000 | $58.50 | 10,000 | $478,700.00 |
| | 8/31/98 | 8/3/01 | $10.63 | 10,000 | $58.50 | 10,000 | $478,700.00 |
| | 8/31/98 | 8/24/01 | $10.63 | 2,000 | $50.90 | 2,000 | $80,540.00 |
| | 8/31/98 | 8/24/01 | $10.63 | 6,000 | $50.90 | 6,000 | $241,620.00 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

143

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized On Sale |
|---|---|---|---|---|---|---|---|
| | 10/23/98 | 8/24/01 | $16.97 | 10,000 | $51.00 | 10,000 | $340,300.00 |
| | 10/23/98 | 8/27/01 | $16.97 | 10,000 | $52.00 | 10,000 | $350,300.00 |
| | 10/23/98 | 11/1?/01 | $16.97 | 20,000 | $50.00 | 20,000 | $660,600.00 |
| | 10/23/98 | 1/30/02 | $16.97 | 10,000 | $55.35 | 10,000 | $383,800.00 |
| | 10/23/98 | 2/4/02 | $16.97 | 5,000 | $58.10 | 5,000 | $205,650.00 |
| | 10/23/98 | 2/13/02 | $16.97 | 10,000 | $60.075 | 10,000 | $431,050.00 |
| | 10/23/98 | 3/1/02 | $16.97 | 3,000 | $60.90 | 3,000 | $131,790.00 |
| | 10/23/98 | 3/7/02 | $16.97 | 3,000 | $67.0688 | 3,000 | $150,294.90 |
| | 8/31/98 | 3/8/02 | $10.63 | 5,000 | $70.00 | 5,000 | $296,850.00 |
| | 8/31/98 | 5/14/02 | $10.63 | 5,100 | $60.35 | 5,100 | $253,572.00 |
| | 8/31/98 | 7/29/02 | $10.63 | 2,161 | N/A | N/A | N/A |
| | 8/31/98 | 7/29/02 | $10.63 | 354 | N/A | N/A | N/A |
| | 10/23/98 | 7/29/02 | $16.97 | 14,016 | N/A | N/A | N/A |
| | 11/08/02 | 08/29/05 | $37.05 | 5,000 | $49.75 | 5,000 | $63,500.00 |
| | 11/08/02 | 08/29/05 | $37.05 | 5,000 | $49.75 | 5,000 | $63,500.00 |
| | 10/18/04 | 08/29/05 | $40.68 | 2,500 | $49.75 | 2,500 | $22,675.00 |
| | 05/11/05 | 08/29/05 | $40.24 | 2,500 | $49.75 | 2,500 | $23,775.00 |
| TOTAL | | | | | | | $5,629,016.90 |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Dickerson, Gary | 8/31/98 | 08/18/03 | $10.63 | 7,500 | $54.2781 | 7,500 | $327,360.75 |
| | 10/23/98 | 08/18/03 | $16.97 | 9,622 | $54.2781 | 9,622 | $358,978.54 |
| | 10/23/98 | 08/18/03 | $16.97 | 2,264 | $54.2781 | 2,264 | $84,465.54 |
| | 10/23/98 | 08/18/03 | $16.97 | 12,393 | $54.2781 | 12,393 | $462,359.28 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

144

|  | 8/31/98 | 08/18/03 | $10.63 | 8,221 | $54.2781 | 8,221 | $358,831.03 |
| **TOTAL** | | | | | | | $1,591,995.14 |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Hall, Jeffrey | 10/02/01 | 11/18/05 | $29.31 | 4,000 | $51.12 | 4,000 | $87,240.00 |
|  | 10/02/01 | 08/19/05 | $29.31 | 3,000 | $49.3988 | 3,000 | $60,266.40 |
|  | 10/02/01 | 05/26/05 | $29.31 | 2,300 | $45.80 | 2,300 | $37,927.00 |
|  | 10/02/01 | 12/03/04 | $29.31 | 3,000 | $49.6833 | 3,000 | $61,119.90 |
| **TOTAL** | | | | | | | $246,553 |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Kispert, John H. | 4/18/95 | 1/28/02 | $16.31 | 2,440 | $55.00 | 2,440 | $96,848.60 |
|  | 9/17/96 | 1/28/02 | $10.94 | 3,000 | $55.00 | 3,000 | $132,180.00 |
|  | 10/08/97 | 1/28/02 | $11.81 | 2,625 | $55.00 | 2,625 | $113,598.75 |
|  | 8/31/98 | 1/28/02 | $10.63 | 6,000 | $55.00 | 6,000 | $266,220.00 |
|  | 8/31/98 | 1/28/02 | $10.63 | 3,500 | $55.00 | 3,500 | $155,295.00 |
|  | 8/31/98 | 1/28/02 | $10.63 | 7,600 | $55.00 | 7,600 | $337,212.00 |
|  | 8/31/98 | 1/28/02 | $10.63 | 2,500 | $55.00 | 2,500 | $110,925.00 |
|  | 8/31/98 | 1/28/02 | $10.63 | 3,000 | $55.00 | 3,000 | $133,110.00 |
|  | 08/31/98 | 09/15/05 | $10.63 | 1,000 | $50.5089 | 1,000 | $39,878.90 |
|  | 08/31/98 | 09/15/05 | $10.63 | 299 | $50.5089 | 299 | $11,923.79 |
|  | 08/31/98 | 09/15/05 | $10.63 | 2,534 | $50.5089 | 2,534 | $101,053.13 |
|  | 08/31/98 | 09/15/05 | $10.63 | 1,167 | $50.5089 | 1,167 | $46,538.68 |
|  | 11/10/00 | 09/15/05 | $33.75 | 1,875 | $50.5089 | 1,875 | $31,422.94 |
|  | 04/04/01 | 09/15/05 | $26.25 | 8,000 | $50.5089 | 8,000 | $19,4071.20 |
|  | 04/04/01 | 09/15/05 | $32.75 | 8,000 | $50.5089 | 8,000 | $142,071.20 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

145

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| | 10/02/01 | 09/15/05 | $29.31 | 24,000 | $50.5089 | 24,000 | $508,773.60 |
| | 11/08/02 | 09/15/05 | $37.05 | 6,875 | $50.5089 | 6,875 | $92,529.94 |
| | 01/28/03 | 09/15/05 | $34.67 | 13,750 | $50.5089 | 13,750 | $217,784.88 |
| | 08/31/98 | 08/21/03 | $10.63 | 555 | $56 | 555 | $24,272.95 |
| | 08/31/98 | 08/21/03 | $10.63 | 2,000 | $56 | 2,000 | $90,740.00 |
| | 10/27/98 | 08/21/03 | $3.75 | 18,790 | $56 | 18,790 | $413,077.50 |
| | 08/11/00 | 08/21/03 | $44.6875 | 5,370 | $56 | 5,370 | $60,743.13 |
| | 08/13/00 | 08/21/03 | $44.6875 | 25,972 | $56 | 25,972 | $293,808.25 |
| | 11/10/00 | 08/21/03 | $16.25 | 11,000 | $56 | 11,000 | $327,250.00 |
| | 04/04/01 | 08/21/03 | $32.76 | 9,336 | $56 | 9,336 | $216,992.28 |
| | 10/02/01 | 08/21/03 | $29.31 | 22,000 | $56 | 22,000 | $587,180.00 |
| TOTAL | | | | | | | $4,752,901.68 |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Urbanek, Lida | 05/13/96 | 02/27/06 | $12.50 | 280 | $51.931 | 280 | $11,040.68 |
| | 05/13/96 | 02/14/06 | $12.50 | 5,000 | $47.1658 | 5,000 | $173,329.00 |
| TOTAL | | | | | | | $184,369.68 |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Marks, Michael | 05/11/05 | 05/09/06 | $40.24 | 2,500 | $48.45 | 2,500 | $20,525.00 |
| | 10/18/04 | 05/09/06 | $40.68 | 2,500 | $48.68 | 2,500 | $20,000.00 |
| | 01/25/05 | 05/09/06 | $44.76 | 2,500 | $48.83 | 2,500 | $10,175.00 |
| TOTAL | | | | | | | $50,700.00 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Barnholt, Edward | 10/25/96 | 11/18/05 | $10.63 | 2,500 | $51.04 | 2,500 | $101,025.00 |
| | 10/25/96 | 11/18/05 | $10.63 | 2,500 | $51.03 | 2,500 | $101,000.00 |
| | 10/25/96 | 11/18/05 | $10.63 | 5,000 | $51 | 5,000 | $201,850.00 |
| | 09/21/98 | 11/18/05 | $11.66 | 500 | $51 | 500 | $19,670.00 |
| | 09/21/98 | 11/18/05 | $11.66 | 2,500 | $50.96 | 2,500 | $98,250.00 |
| | 09/21/98 | 11/18/05 | $11.66 | 2,000 | $50.93 | 2,000 | $99,528.00 |
| | 09/19/97 | 11/18/05 | $34.94 | 4,000 | $50.96 | 4,000 | $64,080.00 |
| | 09/20/95 | 12/1/04 | $26.28 | 10,000 | $46.3877 | 10,000 | $201,077.00 |
| TOTAL | | | | | | | $916,480.00 |

| Name | Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Bond, Robert T. | 11/08/02 | 09/13/05 | $37.05 | 5,000 | $50.6136 | 5,000 | $67,818.00 |
| | 11/08/02 | 09/13/05 | $37.05 | 5,000 | $50.6136 | 5,000 | $67,818.00 |
| | 08/02/02 | 11/22/05 | $51.35 | 2,500 | $52.6097 | 2,500 | $3,149.25 |
| TOTAL | | | | | | | $138,785.25 |

| Name | Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Elkus, Richard | 08/02/02 | 11/22/05 | $51.35 | 2,500 | $52.6097 | 2,500 | $3,149.25 |
| | 10/13/04 | 03/09/05 | $40.68 | 2,500 | $49.36 | 2,500 | $21,700.00 |
| | 05/11/05 | 08/09/05 | $40.24 | 2,400 | $49.34 | 2,400 | $21,840.00 |
| | 05/11/05 | 03/09/05 | $40.24 | 100 | $49.36 | 100 | $912.00 |
| | 01/25/05 | 03/09/05 | $44.76 | 2,500 | $49.36 | 2,500 | $11,500.00 |
| | 11/09/01 | 12/01/03 | $47.23 | 5,000 | $59.1123 | 5,000 | $59,411.50 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name | Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|------|-----------|-----------------|---------------|--------------------------------------|-----------|----------------------|-------------------|
|  | 11/09/01 | 12/01/03 | $47.23 | 5,000 | $59.1123 | 5,000 | $59,411.50 |
|  | 11/08/02 | 10/29/03 | $37.05 | 5,000 | $57.335 | 5,000 | $101,675.00 |
|  | 11/08/02 | 10/27/03 | $37.05 | 5,000 | $53.47 | 5,000 | $82,100.00 |
|  | 07/21/97 | 05/30/03 | $27.38 | 5,000 | $45.728 | 5,000 | $91,740.00 |
|  | 04/30/98 | 05/15/03 | $20.16 | 209 | $41.6081 | 209 | $4,482.65 |
|  | 11/10/00 | 05/15/03 | $26.25 | 2,291 | $41.6081 | 2,291 | $35,185.41 |
|  | 11/10/00 | 05/15/03 | $26.25 | 5,000 | $41.6081 | 5,000 | $76,790.50 |
| TOTAL |  |  |  |  |  |  | $569,897.81 |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|------|--------------------|-----------------|---------------|--------------------------------------|-----------|----------------------|-------------------|
| Bingham, Raymond | 11/08/02 | 11/22/05 | $37.05 | 5,000 | $52.6201 | 5,000 | $77,850.50 |
|  | 11/08/02 | 11/22/05 | $37.05 | 5,000 | $52.6201 | 5,000 | $77,850.50 |
| TOTAL |  |  |  |  |  |  | $155,701.00 |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|------|--------------------|-----------------|---------------|--------------------------------------|-----------|----------------------|-------------------|
| Morton, Dean | 7/21/97 | 8/26/02 | $27.38 | 5,000 |  | ..... |  |
|  | 6/15/98 | 8/26/02 | $12.78 | 5,000 |  |  |  |
|  | 11/17/98 | 8/26/02 | $17.59 | 7,082 |  |  |  |
|  | 11/10/00 | 8/26/02 | $26.25 | 5,000 |  |  |  |
|  | 11/10/00 | 8/26/02 | $26.25 | 5,000 |  |  |  |

| Name | Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|------|-----------|-----------------|---------------|--------------------------------------|-----------|----------------------|-------------------|
| Nichols, Stuart | 10/27/99 | 11/13/01 | $33.75 | 10,000 | $50.0855 | 10,000 | $163,055.00 |
|  | 10/27/99 | 4/22/02 | $33.75 | 3,000 | $63.8347 | 3,000 | $90,254.10 |
|  | 10/27/99 | 4/30/02 | $33.75 | 1,000 | $59.3785 | 1,000 | $25,628.50 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

148

| TOTAL | | | | | | | $278,937.60 |
|-------|--|--|--|--|--|--|-------------|

313.   Third, Barnholt, Bingham, Bond, Dickerson, Elkus, Hall, Kaufman, Kispert, Levy, Schroeder, Tompkins, Urbanek, Wallace and Nichols also sold 1,666,971 shares of stock during the Class Period for proceeds of $ 59,749,896.76 million.   The bulk of the Class Period sales occurred as same day exercises of options and sales of the corresponding share, as set forth in the prior charts.  However, there were additional sales as follows:

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|----------------------|-----------|----------------|
| Barnholt, Edward W. | 11/18/2005 | 2,500 | $51.0400 | $127,600.00 |
| | 11/18/2005 | 2,500 | $51.0300 | $127,575.00 |
| | 11/18/2005 | 5,000 | $51.0000 | $255,000.00 |
| | 11/18/2005 | 500 | $51.0000 | $25,500.00 |
| | 11/18/2005 | 2,500 | $50.9600 | $127,400.00 |
| | 11/18/2005 | 2,000 | $50.9300 | $101,860.00 |
| | 11/18/2005 | 4,000 | $50.9600 | $203,840.00 |
| | 12/10/2004 | 10,000 | $46.3877 | $463,877.00 |
| TOTAL | | 29,000 | | $1,432,652.00 |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|----------------------|-----------|----------------|
| Bingham, Raymond | 11/22/2005 | 5,000 | $52.6201 | $263,100.50 |
| | 11/22/2005 | 5,000 | $52.6201 | $263,100.50 |
| TOTAL | | 10,000 | | $526,201.00 |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|----------------------|-----------|----------------|
| Bond, Robert T. | 9/13/2005 | 5,000 | $50.6136 | $253,068.00 |
| | 9/13/2005 | 5,000 | $50.6136 | $253,068.00 |
| TOTAL | | 10,000 | | $506,136.00 |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|----------------------|-----------|----------------|
| Dickerson, Gary | 8/18/2003 | 7,500 | $54.2781 | $407,085.75 |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|---|---|---|---|---|
|  | 8/18/2003 | 9,622 | $54.2551 | $522,042.57 |
|  | 8/18/2003 | 2,264 | $54.2638 | $122,853.24 |
|  | 8/18/2003 | 12,393 | $54.2926 | $672,848.19 |
|  | 8/18/2003 | 8,221 | $54.2553 | $446,032.82 |
|  | 3/4/2002 | 1,370 | $64.7100 | $88,652.70 |
|  | 3/4/2002 | 2,380 | $64.5895 | $153,723.01 |
|  | 3/4/2002 | 1,250 | $64.7000 | $80,875.00 |
|  | 3/8/2002 | 2,830 | $69.8400 | $197,647.20 |
|  | 3/8/2002 | 727 | $69.8400 | $50,773.68 |
|  | 2/13/2002 | 1,370 | $60.5200 | $82,912.40 |
|  | 2/13/2002 | 2,380 | $60.4600 | $143,894.80 |
|  | 2/13/2002 | 1,250 | $60.5100 | $75,637.50 |
|  | 1/30/2002 | 10,960 | $55.0000 | $602,800.00 |
|  | 1/30/2002 | 6,540 | $55.0000 | $359,700.00 |
|  | 1/30/2002 | 2,500 | $55.0000 | $137,500.00 |
|  | 1/30/2002 | 65 | $56.2500 | $3,656.25 |
|  | 12/5/2001 | 7,500 | $56.3047 | $422,285.25 |
|  | 11/13/2001 | 12,750 | $50.5000 | $643,875.00 |
| **TOTAL** |  | **93,872** |  | **$5,214,795.37** |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|---|---|---|---|---|
| Elkus, Richard J., Jr | 11/29/2005 | 5,000 | $51.9591 | $259,795.50 |
|  | 11/22/2005 | 2,500 | $52.6097 | $131,524.25 |
|  | 8/9/2005 | 2,500 | $49.3600 | $123,400.00 |
|  | 8/9/2005 | 2,500 | $49.3600 | $123,400.00 |
|  | 8/9/2005 | 2,400 | $49.3400 | $118,416.00 |
|  | 8/9/2005 | 100 | $49.3600 | $4,936.00 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

150

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|-----------------------|------------|----------------|
|  | 6/1/2005 | 5,000 | $45.7222 | $228,611.00 |
|  | 3/10/2005 | 5,000 | $48.0800 | $240,400.00 |
|  | 9/14/2004 | 10,000 | $40.3312 | $403,312.00 |
|  | 6/15/2004 | 5,000 | $45.8954 | $229,477.00 |
|  | 6/1/2001 | 5,000 | $47.4600 | $237,300.00 |
|  | 12/1/2003 | 5,000 | $59.1123 | $295,561.50 |
|  | 12/1/2003 | 5,000 | $59.1123 | $295,561.50 |
|  | 11/12/2003 | 10,000 | $59.5100 | $595,100.00 |
|  | 10/29/2003 | 5,000 | $57.3850 | $286,925.00 |
|  | 10/27/2003 | 5,000 | $53.4700 | $267,350.00 |
|  | 5/30/2003 | 5,000 | $45.7280 | $228,640.00 |
|  | 5/15/2003 | 209 | $41.6081 | $8,696.09 |
|  | 5/15/2003 | 2,291 | $41.6081 | $95,324.16 |
|  | 5/15/2003 | 5,000 | $41.6081 | $208,040.50 |
|  | 3/15/2002 | 1,709 | $64.5120 | $110,251.01 |
|  | 3/15/2002 | 791 | $64.5120 | $51,028.99 |
|  | 12/6/2001 | 1,000 | $55.5500 | $55,550.00 |
| TOTAL |  | 96,000 |  | $4,492,021.51 |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|-----------------------|------------|----------------|
| Hall, Jeffrey | 11/18/2005 | 4,000 | $51.1200 | $204,480.00 |
|  | 8/19/2005 | 3,000 | $49.3988 | $148,196.40 |
|  | 5/26/2005 | 2,300 | $45.8000 | $105,340.00 |
|  | 12/3/2004 | 3,000 | $49.6833 | $149,049.90 |
| TOTAL |  | 12,300 |  | $607,066.30 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

151

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------|------|------|------|
| Kispert, John H. | 9/15/2005 | 1,000 | $50.5089 | $50,508.90 |
| | 9/15/2005 | 229 | $50.5089 | $11,566.54 |
| | 9/15/2005 | 2,534 | $50.5089 | $127,989.55 |
| | 9/15/2005 | 1,167 | $50.5089 | $58,943.89 |
| | 9/15/2005 | 1,875 | $50.5089 | $94,704.19 |
| | 9/15/2005 | 8,000 | $50.5089 | $404,071.20 |
| | 9/15/2005 | 8,000 | $50.5089 | $404,071.20 |
| | 9/15/2005 | 24,000 | $50.5089 | $1,212,213.60 |
| | 9/15/2005 | 6,875 | $50.5089 | $347,248.69 |
| | 9/15/2005 | 13,750 | $50.5089 | $694,497.36 |
| | 8/21/2003 | 535 | $56.0000 | $29,960.00 |
| | 8/21/2003 | 2,000 | $56.0000 | $112,000.00 |
| | 8/21/2003 | 18,790 | $56.0000 | $1,052,240.00 |
| | 8/21/2003 | 5,370 | $56.0000 | $300,720.00 |
| | 8/21/2003 | 25,972 | $56.0000 | $1,454,432.00 |
| | 8/21/2003 | 11,000 | $56.0000 | $616,000.00 |
| | 8/21/2003 | 9,333 | $56.0000 | $522,648.00 |
| | 8/21/2003 | 22,000 | $56.0000 | $1,232,000.00 |
| | 1/28/2002 | 9,335 | $55.0000 | $513,425.00 |
| | 1/28/2002 | 6,000 | $55.0000 | $330,000.00 |
| | 1/28/2002 | 3,500 | $55.0000 | $192,500.00 |
| | 1/28/2002 | 7,600 | $55.0000 | $418,000.00 |
| | 1/28/2002 | 2,500 | $55.0000 | $137,500.00 |
| **TOTAL** | | **191,365** | | **$10,317,240.13** |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|---|---|---|---|---|
| Levy, Kenneth | 11/18/2005 | 50,000 | $51.2000 | $2,560,000.00 |
| | 8/2/2005 | 75,000 | $51.2675 | $3,845,062.50 |
| | 12/15/2004 | 25,000 | $46.9809 | $1,174,522.50 |
| | 11/1/2004 | 25,000 | $45.2039 | $1,130,097.50 |
| | 5/26/2004 | 25,000 | $46.2810 | $1,157,025.00 |
| | 5/20/2004 | 15,000 | $45.1833 | $677,749.50 |
| | 5/19/2004 | 15,000 | $46.2133 | $693,199.50 |
| | 5/18/2004 | 15,000 | $44.8197 | $672,295.50 |
| | 5/13/2004 | 25,000 | $44.0000 | $1,100,000.00 |
| | 10/30/2003 | 55,000 | $57.3927 | $3,156,598.50 |
| | 9/16/2003 | 30,000 | $57.0852 | $1,712,556.00 |
| | 8/22/2003 | 50,000 | $57.6186 | $2,880,930.00 |
| | 1/31/2002 | 107 | $56.2500 | $6,018.75 |
| TOTAL for Levy | | 405,107 | | $20,766,055.25 |
| | | | | |
| KGMW, LP | 8/17/2005 | 40,000 | $49.2586 | $1,970,344.00 |
| | 3/1/2005 | 20,000 | $50.0012 | $1,000,024.00 |
| | 6/6/2003 | 80,000 | $50.6100 | $4,048,800.00 |
| | 5/28/2003 | 100,000 | $43.4308 | $4,343,080.00 |
| | 11/22/2002 | 50,000 | $42.1679 | $2,108,395.00 |
| | 2/6/2002 | 20,000 | $58.8500 | $1,177,000.00 |
| TOTAL for KGMW | | 310,000 | | $14,647,643.00 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|----------------------|-----------|----------------|
| Levy Family Trust | 9/1/2005 | 30,000 | Gift of shares to Charity | |
| | 8/2/2005 | 75,000 | $51.2675 | $3,845,062.50 |
| | 9/14/2004 | 25,000 | Shares Gifted from Levy Family Trust | |
| | 9/13/2004 | 25,000 | $40.0542 | $1,001,355.00 |
| | 8/20/2003 | 2,500 | Gift of shares on form 5 | |
| | 8/22/2003 | 50,000 | $57.6411 | $2,882,055.00 |
| | 8/25/2003 | 50,000 | $57.6411 | $2,882,055.00 |
| | 11/22/2002 | 25,000 | $42.1679 | $1,054,197.50 |
| | 11/22/2002 | 25,000 | $43.0500 | $1,076,250.00 |
| | 2/6/2002 | 40,000 | $58.4500 | $2,338,000.00 |
| | 8/6/2001 | 20,000 | $58.4200 | $1,168,400.00 |
| **TOTAL for Levy Fam. Trust** | | **367,500** | **$408.6918** | **$16,247,375.00** |
| **Levy Family Foundation** | N/A | N/A | N/A | N/A |
| **TOTAL** | | **1,082,607** | | **$63,504,886.00** |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|----------------------|-----------|----------------|
| Marks, Michael | 5/9/2006 | 2,500 | $48.4500 | $121,125.00 |
| | 5/9/2006 | 2,500 | $48.6800 | $121,700.00 |
| | 5/9/2006 | 2,500 | $48.8300 | $122,075.00 |
| **TOTAL** | | **7,500** | | **$364,900.00** |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

154

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|---|---|---|---|---|
| Nichols, Stuart | 4/22/2002 | 3,000 | $63.8347 | $191,504.10 |
| | 4/30/2002 | 1,700 | $59.3785 | $100,943.45 |
| | 4/30/2002 | 1,000 | $59.3785 | $59,378.50 |
| | 11/13/2001 | 10,000 | $50.0855 | $500,855.00 |
| | 11/13/2001 | 454 | $50.5400 | $22,945.16 |
| **TOTAL** | | **16,154** | | **$875,626.21** |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|---|---|---|---|---|
| Schroeder, Kenneth L. | 2/8/2006 | 56,032 | $53.9155 | $3,020,993.30 |
| | 2/8/2006 | 30,000 | $53.9155 | $1,617,465.00 |
| | 11/30/2005 | 21,136 | $51.7382 | $1,093,538.60 |
| | 11/30/2005 | 28,864 | $51.7382 | $1,493,371.40 |
| | 11/4/2005 | 50,000 | $49.5026 | $2,475,130.00 |
| | 8/23/2005 | 35,304 | $49.6331 | $1,752,246.96 |
| | 8/23/2005 | 14,696 | $49.6331 | $729,408.04 |
| | 2/28/2005 | 43,968 | $50.4927 | $2,220,063.03 |
| | 12/3/2004 | 47,361 | $49.2846 | $2,334,167.94 |
| | 12/2/2004 | 2,639 | $47.5000 | $125,352.50 |
| | 1/28/2004 | 25,000 | $58.5754 | $1,464,385.00 |
| | 1/28/2004 | 25,000 | $58.5754 | $1,464,385.00 |
| | 12/16/2003 | 50,000 | $55.0800 | $2,754,000.00 |
| | 8/22/2003 | 50,000 | $57.8089 | $2,890,445.00 |
| | 8/19/2003 | 25,000 | $54.4537 | $1,361,342.50 |
| | 8/19/2003 | 25,000 | $54.4537 | $1,361,342.50 |
| | 8/15/2003 | 25,000 | $52.0009 | $1,300,022.50 |
| | 8/14/2003 | 25,000 | $52.0000 | $1,300,000.00 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------|------|------|------|
| | 8/4/2003 | 50,000 | $52.2500 | $2,612,500.00 |
| | 7/31/2003 | 241,000 | $52.7530 | $12,713,473.00 |
| | 6/6/2003 | 35,900 | $50.0917 | $1,798,292.03 |
| | 5/14/2002 | 35,000 | $60.2900[8] | $2,110,150.00 |
| | 3/4/2002 | 900 | $66.7900 | $60,111.00 |
| | 3/4/2002 | 1,000 | $66.7700 | $66,770.00 |
| | 3/4/2002 | 600 | $66.6000 | $39,960.00 |
| | 3/4/2002 | 8,000 | $66.7000 | $533,600.00 |
| | 3/4/2002 | 8,000 | $66.5000 | $532,000.00 |
| | 2/13/2002 | 30,000 | $58.1200 | $1,743,600.00 |
| | 2/4/2002 | 30,000 | $58.9065 | $1,767,195.00 |
| | 12/12/2001 | 30,000 | $55.0200 | $1,650,600.00 |
| | 12/11/2001 | 9,090 | $56.1350 | $510,267.15 |
| | 12/6/2001 | 30,000 | $56.3000 | $1,689,000.00 |
| | 12/5/2001 | 30,000 | $55.0718 | $1,652,154.00 |
| **TOTAL** | | **1,119,490** | | **$60,237,331.45** |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------|------|------|------|
| Tompkins, Jon | 8/29/2005 | 5,000 | $49.7500 | $248,750.00 |
| | 8/29/2005 | 5,000 | $49.7500 | $248,750.00 |
| | 8/29/2005 | 2,500 | $49.7500 | $124,375.00 |
| | 8/29/2005 | 2,500 | $49.7500 | $124,375.00 |
| | 3/12/2004 | 7,500 | $53.0000 | $397,500.00 |
| | 8/27/2003 | 5,000 | $58.3800 | $291,900.00 |

[8] Price not reported on Form 4. Price stated is the closing price on the date of sale.

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|----------------------|-----------|----------------|
|  | 8/22/2003 | 5,000 | $57.8000 | $289,000.00 |
|  | 5/14/2002 | 5,100 | $60.3500 | $307,785.00 |
|  | 3/1/2002 | 3,000 | $60.9000 | $182,700.00 |
|  | 3/7/2002 | 3,000 | $67.0683 | $201,204.90 |
|  | 3/8/2002 | 5,000 | $70.0000 | $350,000.00 |
|  | 2/13/2002 | 10,000 | $60.7500 | $607,500.00 |
|  | 2/4/2002 | 5,000 | $58.1000 | $290,500.00 |
|  | 1/30/2002 | 10,000 | $55.3500 | $553,500.00 |
|  | 12/14/2001 | 1,891 | $51.4000 | $97,197.40 |
|  | 11/13/2001 | 20,000 | $50.0000 | $1,000,000.00 |
|  | 8/3/2001 | 10,000 | $58.5000 | $585,000.00 |
|  | 8/3/2001 | 10,000 | $58.5000 | $585,000.00 |
|  | 8/3/2001 | 2,000 | $50.9000 | $101,800.00 |
|  | 8/3/2001 | 10,000 | $51.0000 | $510,000.00 |
|  | 8/3/2001 | 6,000 | $50.9000 | $305,400.00 |
| **TOTAL for Tompkins** |  | **133,491** |  | **$7,402,237.30** |
| Trust | 2/27/2004 | 8,819 | $53.0000 | $467,407.00 |
| **TOTAL** |  | **142,310** |  | **$7,869,644.30** |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|----------------------|-----------|----------------|
| Urbanek, Lida | 2/27/2006 | 280 | $51.9310 | $14,540.68 |
|  | 12/14/2004 | 5,000 | $47.1658 | $235,829.00 |
| **TOTAL for Urbanek** |  | **5,280** |  | **$250,369.68** |
| Family Foundation | 12/12/2003 | 1,369 | $57.0000 | $78,033.00 |
|  | 8/6/2003 | 700 | $50.7100 | $35,497.00 |
|  | 8/6/2003 | 300 | $50.6300 | $15,189.00 |
|  | 5/6/2003 | 1,000 | $43.1900 | $43,190.00 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                        157

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|---|---|---|---|---|
| | 12/14/2001 | 500 | $52.0500 | $26,025.00 |
| **TOTAL for Foundation** | | 3,869 | | $197,934.00 |
| **TOTAL** | | 9,149 | | $448,303.68 |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|---|---|---|---|---|
| Wallace, Richard | 12/3/2003 | 5,041 | $59.5382 | $300,132.07 |
| | 12/3/2003 | 2,709 | $59.5832 | $161,410.89 |
| | 12/3/2003 | 875 | $59.5832 | $52,135.30 |
| | 12/3/2003 | 875 | $59.5832 | $52,135.30 |
| | 12/3/2003 | 3,000 | $59.5832 | $178,749.60 |
| | 12/3/2003 | 2,500 | $59.5832 | $148,958.00 |
| | 12/3/2003 | 5,000 | $59.5832 | $297,916.00 |
| | 8/21/2003 | 18,667 | $54.8200 | $1,023,324.94 |
| | 8/21/2003 | 292 | $54.8200 | $16,007.44 |
| | 8/21/2003 | 291 | $54.8200 | $15,952.62 |
| | 8/21/2003 | 750 | $54.8200 | $41,115.00 |
| | 7/31/2003 | 1,292 | $52.6275 | $67,994.73 |
| | 7/31/2003 | 583 | $52.6275 | $30,681.83 |
| | 7/31/2003 | 4,207 | $52.6275 | $221,403.89 |
| | 7/31/2003 | 13,918 | $52.6275 | $732,469.55 |
| | 6/6/2003 | 1,250 | $50.8850 | $63,606.25 |
| | 6/6/2003 | 834 | $50.8850 | $42,438.09 |
| | 6/6/2003 | 2,500 | $50.8850 | $127,212.50 |
| | 6/6/2003 | 2,500 | $50.8850 | $127,212.50 |
| | 6/6/2003 | 2,167 | $50.8850 | $110,267.80 |
| | 6/6/2003 | 5,417 | $50.8850 | $275,644.05 |
| | 6/6/2003 | 3,500 | $50.8850 | $178,097.50 |
| | 6/6/2003 | 1,832 | $50.8850 | $93,221.32 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|----------------------|------------|----------------|
|  | 5/16/2002 | 24 | $59.8100 | $1,435.44 |
|  | 5/16/2002 | 525 | $59.8400 | $31,416.00 |
|  | 5/16/2002 | 416 | $59.7750 | $24,866.40 |
|  | 5/16/2002 | 84 | $59.7750 | $5,021.10 |
|  | 5/16/2002 | 275 | $59.8400 | $16,456.00 |
|  | 3/1/2002 | 4,766 | $60.8400 | $289,963.44 |
|  | 3/1/2002 | 1,253 | $60.8400 | $76,232.52 |
|  | 3/1/2002 | 1,250 | $60.8400 | $76,050.00 |
|  | 3/1/2002 | 417 | $60.8400 | $25,370.28 |
|  | 3/1/2002 | 542 | $60.8400 | $32,975.28 |
|  | 2/13/2002 | 750 | $61.1000 | $45,825.00 |
|  | 2/13/2002 | 574 | $61.0900 | $35,065.66 |
|  | 2/13/2002 | 719 | $61.0900 | $43,923.71 |
|  | 2/13/2002 | 281 | $61.0900 | $17,166.29 |
|  | 2/13/2002 | 2,000 | $61.1200 | $122,240.00 |
|  | 1/31/2002 | 32 | $56.2500 | $1,800.00 |
|  | 12/10/2001 | 2,000 | $55.0900 | $110,180.00 |
|  | 12/10/2001 | 1,625 | $55.1200 | $89,570.00 |
|  | 12/10/2001 | 1,062 | $55.1200 | $58,537.44 |
|  | 12/10/2001 | 163 | $55.1200 | $8,984.56 |
|  | 12/10/2001 | 100 | $55.1210 | $5,512.10 |
|  | 11/27/2001 | 4,000 | $52.0400 | $208,160.00 |
|  | 11/27/2001 | 145 | $52.0500 | $7,547.25 |
|  | 11/27/2001 | 1,667 | $52.0500 | $86,767.35 |
|  | 11/27/2001 | 1,625 | $52.0500 | $84,581.25 |
|  | 11/27/2001 | 1,875 | $52.0500 | $97,593.75 |
|  | 8/7/2001 | 1,500 | $54.7400 | $82,110.00 |
|  | 8/7/2001 | 324 | $54.6800 | $17,716.32 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------|------|------|------|
| | 8/7/2001 | 34 | $54.7000 | $1,859.80 |
| | 8/7/2001 | 267 | $54.7600 | $14,620.92 |
| | 8/7/2001 | 416 | $54.7000 | $22,755.20 |
| **TOTAL** | | **110,711** | | **$6,100,390.22** |

| GRAND TOTAL FOR ALL LISTED RECIPENTS | | 2,930,458 | | $156,454,706.86 |
|------|------|------|------|------|

314.    Since this fraudulent scheme had commenced by at least 1997, no meaningful comparison of prior trading patterns can be performed. However, the Class Period trades were highly suspicious. In particular, several of the defendants sold shares in May 2006, after some preliminary reports that companies were backdating options and just weeks before the first news that KLA was possibly among the list of companies engaging in such conduct.

315.    Defendants clearly had the opportunity to perpetrate the fraudulent scheme described herein by virtue of their positions at the Company and roles in the backdating scheme as alleged herein.

5.    **The Pervasiveness Of The Fraudulent Conduct And The Nature Of The Accounting Rules At Issue Further Support A Strong Inference Of *Scienter***

316.    The duration, magnitude and pervasiveness of the scheme support a strong inference of fraudulent conduct on the part of the Company and the Individual Defendants. KLA admits that the backdating occurred from 1997 forward and that the retroactive pricing of stock options affected all employees who received options. Further, as a result of defendants' improper reporting of backdated options, *the financial results for fiscal years 2002 through 2006 have been restated*. To date, in the Restatement, the Company recorded additional pre-tax, non-cash, stock-based compensation expense of (a) $348 million for the periods July 1, 1994 to June 30, 2005 under APB No. 25; and (b) $28 million for the period from July 1, 2005 through December 31, 2006 under SFAS No. 123(R).

317. A strong inference of *scienter* is further supported by the nature of the accounting rules at issue. As a preliminary matter, the accounting rules at issue – APB No. 25 and SFAS 123(R) – were simple and straightforward in application.

318.. Moreover, the issue of how to account for officer, director and employee stock option grants was a particularly highly charged and prominent issue for KLA during the Class Period.

(a)     After more than a decade of debate, FASB considered complete adoption of SFAS 123 in 2004. In March 2004, FASB issued the March 2004 Exposure Draft ("March 2004 ED"), *Share-Based Payment*, which amended FAS 123 *Accounting for Stock-Based Compensation* and FAS 95 *Statement of Cash Flows*. If adopted, these changes would require compensation costs for options granted to be recognized in financial statements using the fair value at the grant date. After the release of the March 2004 ED, FASB accepted comments on the proposed standard through June 30, 2004. In response, many companies, including KLA, entered the debate to vehemently oppose the proposed changes.

(b)     KLA was a very active participant in efforts to convince FASB not to change the rule on reporting employee stock option expenses. Indeed, KLA sent letters to FASB during the comment period to voice the Company's opposition to the proposed rule changes. In one letter, Maureen Lamb, KLA's Vice President of Finance at the time, not only expressed KLA's position with regard to the expensing of stock options but also misrepresented the Company's practices regarding option grants:

> Maureen Lamb, then a vice president, finance, wrote that while there were flaws in the accounting rules for stock-based compensation, "the politically charged belief that the blame lies with executives unwilling to give up their ill-begotten compensation is backward and unproductive."
>
> Ms. Lamb, who is no longer with the company, added that ***"KLA-Tencor does not currently have the ability to issue any equity-based compensation other than at-the-money stock options"***[9]

---

[9] "FASB Appears In a New Light On Stock Options: Some Companies That Opposed Expensing Rule Are Caught Up In U.S. Probe on 'Backdating,'" by David Reilly, *The Wall Street Journal*, August 14, 2006.

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                161

1   (Emphasis added.)

2            (c)    In its public filings, the Company specifically acknowledged the

3   importance of the accounting rules relating to option grants.  For example, in its 2005 Form 10-

4   K, the Company represented that the "adoption of SFAS No. 123(R) which would require us to

5   measure all employee stock-based compensation awards using a fair value method beginning in

6   fiscal year 2006 and record such expense in our consolidated financial statements will have a

7   material impact on our consolidated financial statements as reported under generally accepted

8   accounting principles in the United States."  It also states that it will have a "material impact on

9   the Company's consolidated results of operations, financial position and statement of cash

10  flows."

11       319.    Significantly, defendants' knowledge and intent with respect to backdating of

12  stock options is further supported by the fact that such conduct occurred at other companies

13  with which they were involved:

14           (a)    Levy is currently on the Board of Directors of Juniper Networks, Inc.

15  According to Juniper Networks' 2006 Proxy Statement, filed on April 10, 2006, Levy has

16  served as a member of the Board of Directors since 2003.  He is a member of Juniper Networks'

17  Compensation Committee and Nominating and Governance Committee.  The DOJ has launched

18  an investigation into Juniper's option grants.  Moreover, Juniper has admitted that "there were

19  numerous instances in which grant dates were chosen with the benefit of hindsight as to the

20  price of the company's stock, so as to give favorable prices," that prior financial results need to

21  be restated and that it anticipates recording additional non-cash stock-based compensation

22  expense of approximately $900 million.

23           (b)    Levy is also currently on the Board of Directors of Extreme Networks,

24  Inc.  According to Extreme Networks' 2005 Proxy Statement, Levy has served as a director on

25  the Board of Directors since October 2001.  He has served on Extreme Network's Audit

26  Committee, Compensation Committee and Nominating and Corporate Governance Committee.

27  The DOJ has launched an investigation into Extreme Network's option grants.  Moreover,

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

162

1    Extreme Networks has admitted that it would take charges on option restatements, therefore, its

2    financial reports relating to fiscal periods 2000 through 2005 and the first, second and third

3    quarters of 2006 should no longer be relied upon.   Extreme Network's special committee had

4    "reached a preliminary conclusion that the appropriate measurement dates for financial

5    accounting purposes of certain stock option grants differ from the recorded grant dates of those

6    awards" and "additional non-cash charges for stock-based compensation expense will be

7    required that will be material with respect to certain fiscal periods."

8       (c)  Barnholt is currently on the Board of Directors of Adobe Systems Inc.

9    According to Adobe Systems' 2006 Proxy Statement, filed on February 24, 2006, Barnholt has

10   served as a director on the Board of Directors since 2005.   Adobe has announced "certain

11   instances relating to grants made to employees where the list of employees and/or shares

12   allocated to them was not sufficiently definitive for the grant to be deemed final as of the

13   reported grant date" and that "adjustments were made to some employees grants after the grant

14   date without a corresponding change to the measurement date."   On January 4, 2007, Adobe

15   announced that it "has recently determined that certain stock options were granted, for

16   accounting purposes, with an exercise price that is less than the fair market value of the Adobe

17   common stock subject to such options on the applicable 'measurement date."

18      (d)  Morton is currently on the Board of Directors of BEA Systems

19   Incorporated.   According to BEA System's 2006 Proxy Statement, Morton has served as a

20   director of the BEA Systems since March 1996.   He has served on BEA Systems' Audit

21   Committee and Nominating and Governance Committee.   Morton has also served as Chair of

22   the Audit Committee of the company.   In December 2006, BEA Systems admitted in a Form 8-

23   K filed with the SEC that the actual measurement dates for certain stock options differed from

24   the recorded measurement dates for those options and that "the difference in these measurement

25   dates will result in material non-cash, stock-based compensation expenses."   On February 14,

26   2007, BEA Systems filed a Form 8-K with the SEC announcing that it "expects that it will

27   restate its financial statements from Fiscal 1998 through its first quarter of fiscal 2007 and that

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

1   it will record non-cash compensation expense, on a pre-tax basis, of between $340 and $390

2   million."

3          (e)    Morton served on the Board of Directors of The Clorox Company.

4   Morton served as a director of that company from at least fiscal year 1997 to 2002.  He served

5   on The Clorox Company's Executive Committee, Finance Committee, Compensation

6   Committee and Board Administration and Public Policy Committee.  Morton also served as the

7   Chair of the Compensation Committee for the company.  On August 2, 2006, The Clorox

8   Company announced in a press release that it would take a $25 million pre-tax charge for stock-

9   based compensation expense for the fourth quarter ended June 30, 2006, following a review of

10  its historical stock option granting practices.

11      **E.    LOSS CAUSATION**

12         320.    Defendants' scheme operated as a fraud or deceit on Lead Plaintiffs and the

13  members of the Class because the false and misleading statements artificially inflated KLA's

14  securities prices.  Indeed, the false and misleading representations concerning KLA's financial

15  results and management compensation – plus the non-disclosures of material facts concerning

16  the Company's violation of Company and SEC policies and accounting regulations regarding

17  compensation expenses – caused and maintained the artificial inflation in KLA securities prices

18  throughout the Class Period and until the truth was slowly revealed to the market.

19         321.    When defendants' prior misrepresentations and fraudulent conduct began to be

20  disclosed and started to become apparent to the market, KLA's stock declined as the prior

21  artificial inflation came out of KLA's securities prices.

22         322.    These disclosures and public revelations about the stock option abuses at KLA

23  did not come to light all at once but came from a variety of sources over a period of time.  For

24  example, *The Wall Street Journal* published a front-page article in May 2006 exposing

25  fortuitously timed stock option grants to former KLA executives Levy and Schroeder.

26         323.    As investors and the market became aware of the true facts, which had been

27  concealed by defendants, the prior artificial inflation came out of KLA's securities prices.

28

1 From the very first announcement of potential backdating on May 22, 2006, the market has

2 reacted to the news and the stock price has fallen as the prior artificial inflation was slowly

3 removed from the value of KLA's securities. *Significantly, the stock lost approximately $935*

4 *million in market capitalization* when KLA's common stock price plummeted from a closing

5 price of $45.24 per share on May 19, 2006 to a closing price of $40.54 *after the May 22, 2006*

6 *announcement on heavy volume of 13,615,220 shares traded – which was three times the*

7 *average trading volume for the prior three months.* These stock drops caused real economic

8 loss to investors who had purchased the securities during the Class Period.

9     324.   The totality of the circumstances around KLA's stock price drops combine to

10 negate any inference that the economic loss suffered by Lead Plaintiffs and the other members

11 of the Class was caused by changed market conditions, macroeconomic or industry factors or

12 KLA-specific facts unrelated to defendants' fraudulent conduct. While there was some post-

13 Class Period rebound of KLA's stock price, these price increases were attributable to

14 defendants' statements downplaying the fraud, new market conditions, macroeconomic or other

15 factors and Company-specific facts unrelated to the fraudulent conduct alleged herein.

16     325.   As a result of their purchases of KLA securities during the Class Period, Lead

17 Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the

18 federal securities laws. The economic loss was a direct result of the fraudulent scheme to

19 artificially inflate KLA's securities prices and the subsequent significant decline in the value of

20 KLA's securities when the truth was revealed.

21     326.   The resulting decline in KLA's stock price was foreseeable at the time of

22 defendants' misrepresentations. Indeed, despite being aware of the consequences of their

23 fraudulent conduct, defendants nevertheless knowingly backdated options and engaged in the

24 other alleged misconduct, which, when the truth emerged, caused the stock price to decline.

25     327.   KLA's stock had been negatively affected by the growing stock option

26 backdating controversy. The declines in KLA's stock price at the end of the Class Period was a

27 direct result of defendants' fraudulent conduct alleged herein finally being revealed to KLA's

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

1    investors and the market. A company's ultimate destiny is dependent on the integrity of

2    management. In this particular case, the backdating of stock option grants to increase the

3    profitability of the options is a classic example of loss of confidence on the part of investors

4    since management is effectively taking from the Company in order to line their own pockets.

5    **F.    PRESUMPTION OF RELIANCE**

6        328.    At all relevant times, the market for KLA's publicly traded securities was an

7    efficient market for the following reasons, among others:

8            (a)    The Company's common stock met the requirements for public listing

9    and was listed and actively traded on the NASDAQ, a highly efficient market.

10            (b)    As a regulated issuer, the Company filed reports with the SEC.

11            (c)    The Company regularly issued press releases, which were carried by

12    national news wires. Each of these releases was publicly available and entered the public

13    marketplace.

14            (d)    The Company's stock was followed by numerous analysts.

15        329.    As a result, the market for the Company's publicly traded securities promptly

16    digested current information with respect to KLA from all publicly available sources and

17    reflected such information in the price of the Company's securities. Under these circumstances,

18    all purchasers of the Company's publicly traded securities during the Class Period suffered

19    similar injury through their purchase of KLA's publicly traded securities at artificially inflated

20    prices and a presumption of reliance applies.

21    **G.    NO SAFE HARBOR**

22        330.    The statutory safe harbor provided for forward-looking statements under certain

23    circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

24    None of the specific statements alleged herein are forward looking. Many of the specific

25    statements alleged herein were not identified as "forward-looking statements" when made. To

26    the extent there were any forward-looking statements, there were no meaningful cautionary

27    statements identifying important factors that could cause actual results to differ materially from

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                166

1   those in the purportedly forward-looking statements. Alternatively, to the extent that the

2   statutory safe harbor does apply to any forward-looking statement, these statements are

3   actionable because, at the time any forward-looking statement was made, the particular speaker

4   knew that the particular forward-looking statement was false and/or the forward-looking

5   statement was authorized and/or approved by an executive officer of KLA who knew that those

6   statements were false when made.

7                          **Claims For Relief**

8                           **COUNT I**

9       **(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated**

10                 **Thereunder Against All Defendants)**

11      331.    Lead Plaintiffs repeat and restate each and every allegation contained in the

12   foregoing paragraphs as if fully set forth herein.

13      332.    The defendants named in this count include KLA, Wallace, Schroeder, Levy,

14   Dickerson, Kispert, Hall, Urbanek, Marks, Barnholt, Bond, Bingham, Elkus, Kaufman, Morton,

15   Tompkins, Nichols and Boehlke.

16      333.    During the Class Period, defendants carried out a plan, scheme and course of

17   conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing

18   public, including Lead Plaintiffs and the other members of the Class, as alleged herein; (b)

19   artificially inflate the market price of KLA's securities; and (c) cause Lead Plaintiffs and the

20   other members of the Class to purchase KLA's securities at artificially inflated prices.

21      334.    In furtherance of this unlawful scheme, plan and course of conduct, defendants,

22   individually and jointly, took the actions set forth herein. Indeed, defendants: (a) employed

23   devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or

24   omitted to state material facts necessary to make the statements made not misleading; and (c)

25   engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the

26   purchasers of the Company's securities in an effort to create and maintain artificially high

27   market prices for KLA's securities in violation of Section 10(b) of the Exchange Act and Rule

28

1    10b-5 promulgated thereunder. Each of the defendants was a direct, necessary and substantial

2    participant in the common course of conduct alleged herein.

3        335.    In addition to the duties of full disclosure imposed on defendants as a result of

4    their making affirmative statements and reports to the investing public, defendants had a duty to

5    promptly disseminate truthful information that would be material to investors in compliance

6    with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17

7    C.F.R. §210.1-01, *et seq.*) and Regulation S-K (17 C.F.R. §229.10, *et seq.*) and other SEC

8    regulations, including accurate and truthful information with respect to the Company's financial

9    condition, earnings and expenses, officer and director compensation and management integrity

10   so that the market price of the Company's securities would be based on truthful, complete and

11   accurate information.

12       336.    Defendants, directly and indirectly, by the use, means or instrumentalities of

13   interstate commerce and/or of the mails, engaged and participated in a continuous course of

14   conduct to misrepresent and to not disclose adverse material information about KLA's financial

15   condition, stock option grants, officer and director compensation and management integrity as

16   detailed herein.

17       337.    Defendants employed devices, schemes and artifices to defraud while in

18   possession of material adverse non-public information and engaged in acts, practices and a

19   course of conduct as alleged herein in an effort to deceive and/or mislead concerning KLA's

20   stock options, officer and director compensation, financial condition and management integrity.

21   Said schemes, devices, acts and artifices included: (a) the making of or participation in the

22   making of untrue statements; (b) the omitting of material facts necessary in order to make the

23   statements made, in light of the circumstances under which they were made, not misleading;

24   and (c) engaging in transactions, practices and a course of conduct which operated as a fraud

25   and deceit upon the purchasers of KLA's securities during the Class Period. For example,

26   defendants (a) concealed the fact that defendants were allowing insiders to manipulate the

27   Company's stock option plans; (b) obtained and/or allowed KLA officers and directors to obtain

28

1 options using improper exercise prices in violation of its own policies and failed to properly

2 expense compensation derived therefrom; (c) engaged in insider trading and/or allowed KLA

3 officers and directors to trade securities based on material non-public information, which

4 trading was contemporaneous with purchases by members of the Class; and (d) allowed

5 themselves and others to retain executive and directorial positions at KLA and the profits,

6 power and prestige, which defendants enjoyed as a result of these positions.

7  338. Defendants' material misrepresentations, omissions and acts in furtherance of the

8 fraud were done knowingly or with deliberate recklessness and for the purpose and effect of

9 misrepresenting KLA's financial condition, stock option grants, officer and director

10 compensation and management integrity to the investing public and thereby artificially inflating

11 the price of KLA's securities.

12  339. As a result of the above alleged fraudulent scheme and dissemination of the

13 materially false and misleading information regarding KLA's financial results, officer and

14 director compensation and management integrity, the market price of KLA's securities was

15 artificially inflated prior to and during the Class Period. In ignorance of the fact that market

16 prices of KLA's publicly traded securities were artificially inflated and relying, directly or

17 indirectly, on the false and misleading statements made by defendants or upon the integrity of

18 the market in which the securities traded and/or on the absence of material adverse information,

19 Lead Plaintiffs and the other members of the Class acquired KLA securities during the Class

20 Period at artificially high prices and were damaged thereby.

21  340. By virtue of the foregoing, defendants have violated Section 10(b) of the

22 Exchange Act and Rule 10b-5 promulgated thereunder.

23  341. At the time of said misrepresentations and omissions, Lead Plaintiffs and the

24 other members of the Class were ignorant of their falsity and believed them to be true. Had

25 Lead Plaintiffs and the other members of the Class and the marketplace known of the true

26 financial condition of the Company and of its stock option fraud, officer and director

27 compensation and management integrity issues, Lead Plaintiffs and the other members of the

28

1  Class would not have purchased or otherwise acquired the KLA securities or, if they had

2  purchased and/or otherwise acquired such securities during the Class Period, they would not

3  have done so at the artificially inflated prices that they paid.

4      342.   As the truth about the extent and severity of KLA's stock option abuses, false

5  and misleading financials and harm to its reputation and credibility in the market started to be

6  released and become apparent to the market, KLA's common stock price plummeted as the

7  prior artificial inflation came out of the Company's stock price. This price decline occurred as

8  the markets continued to digest the impact and meaning of defendants' stock option and other

9  schemes and its impact on KLA. All or a significant portion of the decrease in KLA's stock

10  price was due to the disclosure, revelation and/or leakage of information inconsistent with

11  defendants' prior financial disclosures and other Company filings and releases. This drop

12  removed the inflation from KLA's stock price, causing real economic loss and damage to

13  investors who had purchased the stock during the Class Period.

14      343.   As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs

15  and the other members of the Class suffered damages in connection with their respective

16  purchases and sales of the Company's securities during the Class Period.

17                          **COUNT II**

18      **(Violations of Section 20(a) of the Exchange Act Against The Individual**
                                   **Defendants)**
19

20      344.   Lead Plaintiffs repeat and restate each and every allegation contained in the

21  foregoing paragraphs as if fully set forth herein.

22      345.   The defendants named in this count, including Wallace, Schroeder, Levy,

23  Dickerson, Hall, Kispert, Urbanek, Marks, Barnholt, Bond, Bingham, Elkus, Kaufman, Morton,

24  Tompkins, Nichols and Boehlke, acted as controlling persons of KLA within the meaning of

25  §20(a) of the Exchange Act. By reason of their high-level positions with the Company, their

26  ownership of KLA stock, their participation in and/or awareness of the Company's operations

27  and/or intimate knowledge of the fraudulent scheme, the false financial statements and

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          170

1   misrepresentations regarding stock options and executive compensation filed with the SEC and

2   disseminated to the investing public and their participation in the fraudulent acts and/or

3   awareness of such acts, these defendants had the power and authority to control and cause KLA

4   and its employees to engage in the wrongful conduct complained of herein. By reason of such

5   conduct, the defendants named herein are liable pursuant to §20(a) of the Exchange Act.

6       346.    As set forth above, KLA and the Individual Defendants each violated Section

7   10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of

8   their positions as controlling persons, the Individual Defendants are liable pursuant to Section

9   20(a) of the Exchange Act.

10      347.    As a direct and proximate result of the Individual Defendants' wrongful conduct,

11  Lead Plaintiffs and the other members of the Class suffered damages in connection with their

12  purchases of the Company's securities during the Class Period, upon disclosure of the truth.

13                          **COUNT III**

14  **(Negligent Violations of Section 14(a)of the Exchange Act and Rule 14a-9 Promulgated
          Thereunder Against All Defendants)**

15

16      348.    Lead Plaintiffs repeat and restate each and every allegation contained in the

17  foregoing paragraphs as if fully set forth herein, except allegations of fraud or intent which are

18  not necessary to assert this Claim. For purposes of this Claim only, Lead Plaintiffs assert

19  negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

20      349.    Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), provides that "[i]t shall be

21  unlawful for any person, by the use of the mails or by any means of instrumentality of interstate

22  commerce or of any facility of a national securities exchange or otherwise, in contravention of

23  such rules and regulations as the Commission may prescribe as necessary or appropriate in the

24  public interest or for the protection of investors, to solicit or to permit the use of his name to

25  solicit any proxy or consent or authorization in respect of any security (other than an exempted

26  security) registered pursuant to section 12 of this title [15 USCS §78l]." Rule 14a-9,

27  promulgated pursuant to §14(a) of the Exchange Act, provides that no Proxy Statement shall

28

1   contain "any statement which, at the time and in the light of the circumstances under which it is

2   made, is false or misleading with respect to any material fact, or which omits to state any

3   material fact necessary in order to make the statements therein not false or misleading or

4   necessary to correct any statement in any earlier communication with respect to the solicitation

5   of a proxy for the same meeting or subject matter which has become false or misleading." 17

6   C.F.R. §240.14a-9(a).

7       350.    During the Class Period, Lead Plaintiffs and other KLA's shareholders were

8   solicited to vote to elect certain directors, among other proposals. In 2004, in addition to voting

9   on the election of directors, KLA shareholders were also solicited to approve the Company's

10  2004 Equity Incentive Plan, which included approval of its material terms and performance

11  goals for the purposes of IRC Section 162(m). In 2005, KLA shareholders were solicited to

12  "approve the Company's [IRC] Code Section 162(m) Performance Bonus Plan." A shareholder

13  vote was required to approve these proposals and elect these directors.

14      351.    The 2001-2005 Proxy Statements violated Section 14(a) and Rule 14a-9 because

15  they (a) contained false and misleading statements regarding the terms of KLA's grants of stock

16  options pursuant to KLA's Stock Option Plans; (b) misrepresented that the stock options

17  exercise prices would be the Company's stock price market price on the date of the grants

18  when, in fact, the options were backdated to a date when the Company's stock price was lower

19  than on the actual grant date; (c) contained false and misleading statements regarding the

20  directors' compensation; (d) misrepresented that the Company complied with IRC Section

21  162(m), 28 U.S.C. §162(m); (e) contained false and misleading statements regarding the stated

22  philosophy of KLA's Compensation Committee on executive compensation; and (f) contained

23  false and misleading statement regarding management's integrity.

24      352.    At the time of the materially false and misleading 2001 though 2005 Proxy

25  Statements, KLA shareholders were ignorant of the true facts. These facts would have been

26  material to a reasonable investor or shareholder in considering how to vote on the election of

27  directors, the approval of the 2004 Equity Incentive Plan or the approval of the Company's IRC

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    172

1     Section 162(m) Performance Bonus Plan.  Thus, the shareholders' corporate suffrage rights

2     were violated.

3        353.    Each of the Individual Defendants permitted the use of his or her name to solicit

4     the proxies.  In the exercise of reasonable care, defendants should have known that the Proxy

5     Statements were materially false and misleading.

6        354.    The  misrepresentations  in  the  Proxy  Statements  were  material  to  KLA

7     shareholders in voting on each Proxy Statement.  The Proxy Statements were an essential link

8     in the accomplishment of the continuation of defendants' unlawful stock option backdating

9     scheme,  as  revelations  of  the  truth  would  have  immediately  thwarted  a  continuation  of

10     shareholders' endorsement of the directors' elections and positions as well as approval of the

11     2004 Equity Incentive Plan and the IRC Section 162(m) Performance Bonus Plan.

12        355.    Lead Plaintiffs and other members of the Class suffered injury as a result of the

13     material misrepresentations and omissions in the 2001-2005 Proxy Statements.

14                              **COUNT IV**

15     **(Fraudulent Violations of Section 14(a)of the Exchange Act and Rule 14a-9 Promulgated**
                                     **Thereunder Against All Defendants)**

16

17        356.    Lead Plaintiffs allege a separate and distinct claim herein under Section 14(a) of

18     the Exchange Act for defendants' fraudulent conduct, as opposed to the prior count, which

19     alleges claims for negligent misrepresentations.  Lead Plaintiffs repeat and restate each and

20     every allegation contained in the foregoing paragraphs as if fully set forth herein.  For purposes

21     of this Claim, Lead Plaintiffs assert violations of Section 14(a) for conduct that was fraudulent

22     in nature.

23        357.    While Section 14(a) of the Exchange Act gives rise to liability for negligent

24     misrepresentation, plaintiffs also argue that defendants' intentional violation of Section 14(a)

25     gives rise to a claim under Section 14(a) as well.

26        358.    During the Class Period, Lead Plaintiffs and other KLA shareholders were

27     solicited to vote to elect certain directors, among other proposals.  In 2004, in addition to voting

28

1  on the election of directors, KLA shareholders were also solicited to approve the Company's

2  2004 Equity Incentive Plan, which included approval of its material terms and performance

3  goals for the purposes of IRC Section 162(m). In 2005, KLA shareholders were solicited to "to

4  approve the Company's [IRC] Section 162(m) Performance Bonus Plan." A shareholder vote

5  was required to approve these proposals and elect these directors.

6         359.    The 2001-2005 Proxy Statements violated Section 14(a) and Rule 14a-9 because

7  they (a) contained false and misleading statements regarding the terms of KLA's grants of stock

8  options pursuant to KLA's Stock Option Plans; (b) misrepresented that the stock options

9  exercise prices would be the Company's stock market price on the date of the grants when, in

10 fact, the options were backdated to a date when the Company's stock price was lower than on

11 the actual grant date; (c) contained false and misleading statements regarding the directors'

12 compensation; (d) misrepresented that the Company complied with IRC Section 162(m), 28

13 U.S.C. §162(m); (e) contained false and misleading statements regarding the stated philosophy

14 of KLA's Compensation Committee on executive compensation; and (f) contained false and

15 misleading statement regarding management's integrity.

16        360.    At the time of the materially false and misleading 2001-2005 Proxy Statements,

17 KLA shareholders were ignorant of the true facts. These facts would have been material to a

18 reasonable investor or shareholder in considering how to vote on the election of directors, the

19 approval of the 2004 Equity Incentive Plan or the approval the Company's IRC Section 162(m)

20 Performance Bonus Plan. Thus, the shareholders' corporate suffrage rights were violated.

21        361.    Each of the Individual Defendants permitted the use of his or her name to solicit

22 the proxies. As detailed above, Defendants knew and/or were deliberately reckless in not

23 knowing that the Proxy Statements were materially false and misleading.

24        362.    The misrepresentations in the Proxy Statements were material to KLA

25 shareholders in voting on each Proxy Statement. The Proxy Statements were an essential link

26 in the accomplishment of the continuation of defendants' unlawful stock option backdating

27 scheme, as revelations of the truth would have immediately thwarted a continuation of

28

1  shareholders' endorsement of the directors' elections and positions as well as approval of the

2  2004 Equity Incentive Plan and the IRC Section 162(m) Performance Bonus Plan.

3       363.    Lead Plaintiff and other members of the Class suffered injury as a result of the

4  material misrepresentations and omissions in the 2001-2005 Proxy Statements.

5  <div align="center">**COUNT V**</div>

6  <div align="center">**(Violations of Section 20A of the Exchange Act Against KLA, Wallace, Levy, Schroeder, Dickerson, Kaufman, Kispert, Elkus, Hall, Barnholt, Urbanek, Tompkins, Nichols, Marks, Bingham, Morton and Bond)**</div>

7

8       364.    Lead Plaintiffs repeat and restate each and every allegation contained in the

9  foregoing paragraphs as if fully set forth herein.

10       365.    The defendants named in this Count are the defendants who: (a) granted or

11  received backdated options; (b) exercised the backdated options; and/or (c) otherwise sold KLA

12  stock during the Class Period and include KLA, Wallace, Levy, Schroeder, Dickerson,

13  Kaufman, Kispert, Elkus, Hall, Barnholt, Urbanek, Tompkins, Nichols, Marks, Bingham,

14  Morton and Bond.

15       366.    Lead Plaintiffs purchased at least one KLA stock contemporaneously with (a) the

16  grant of backdated options to defendants; (b) defendants' exercise of backdated options; and/or

17  (c) sales of KLA stock by defendants named in this Count.

18       367.    By virtue of their positions at KLA and the specific facts alleged herein, these

19  defendants were in possession of material, adverse, non-public information about KLA

20  contemporaneously with when backdated options were granted and/or exercised and/or

21  defendants sold their KLA stock to Lead Plaintiffs and members of the Class at artificially

22  inflated prices.  For example, defendants were in possession of the material, non-public

23  information regarding (a) the falsity of the Company's financial statements; and (b) the

24  misrepresentations regarding the value of options granted to officers and directors.

25       368.    As alleged above, each of the defendants violated Sections 10(b), 14(a) and/or

26  20(a) of the Exchange Act.

27       369.    These defendants violated Section 20A of the Exchange Act and applicable rules

28

1    and regulations thereto by granting and/or receiving backdated options, exercising backdated

2    options and/or selling KLA stock while in possession of material, non-public information about

3    the adverse information detailed herein.

4         370.    Lead Plaintiffs and other members of the Class who traded in KLA securities

5    contemporaneously with the grants, exercise of backdated options and/or sales of KLA stock by

6    defendants named in this Count have suffered substantial damages in that they paid artificially

7    inflated prices for KLA stock as a result of the violations of Sections 10(b), 14(a) and 20(a) and

8    Rule 10b-5 and Rule 14a-9 herein described.  Moreover, these Class members would not have

9    traded KLA securities at the prices they paid or received, or at all, if they had been aware that

10   the market prices had been artificially inflated by defendants' false and misleading statements

11   and scheme to defraud.

12        371.    The defendants named in this Count are required to account for all such stock

13   sales and to disgorge their profits or ill-gotten gains.

### Prayer For Relief

15   **WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

16        A.    Determining that this action is a proper class action, certifying Lead Plaintiffs as

17   class representatives under Rule 23 of the Federal Rules of Civil Procedure and appointing Lead

18   Plaintiffs' Counsel as Class Counsel;

19        B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other

20   members of the Class against defendants for all damages sustained as a result of defendants'

21   wrongdoing in an amount to be proven at trial, including pre-judgment and post-judgment

22   interest thereon;

23        C.    Awarding disgorgement of all insider trading profits in favor of Lead Plaintiffs

24   and the other members of the Class who purchased contemporaneously with defendants;

25        D.    Awarding preliminary and permanent injunctive relief in favor of Lead Plaintiffs

26   and the Class members against defendants, including relief in the form of an order (i) declaring

27   the proxies null and void; (ii) nullifying the corporate action taken as a result of the proxy vote;

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          176

1   (iii) rescinding the amendment to the stock option plan; (iv) declaring the backdated option

2   grants null and void; (v) granting an accounting for and imposition of a constructive trust and/or

3   an asset freeze on defendants' ill-gotten gains; (vi) increasing shareholder participation in

4   decisions regarding all executive compensation; and/or (vii) granting reforms that raise the

5   competency level of directors.

6     E.  Awarding Lead Plaintiffs and the other members of the Class their reasonable

7   costs and expenses incurred in this action, including counsel fees and expert fees; and

8     F.  Such other and further relief as the Court may deem just and proper.

9            **Demand For Trial By Jury**

10    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiffs hereby

11  demand trial by jury of all issues that may be so tried.

12  DATED: March 6, 2007       **BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO**

13

14            By: __/s/ NicoleLavallee__
                 NICOLE LAVALLEE

15            Joseph J. Tabacco, Jr.
              Christopher T. Heffelfinger

16            Lesley Hale
              425 California Street, Suite 2100

17            San Francisco, CA  94104-2205
              Telephone: (415) 433-3200

18            Facsimile: (415) 433-6382

19            **Member of Plaintiffs' Executive Committee and Liaison Counsel**

20

21            **KOHN, SWIFT & GRAF, P.C.**
              Denis F. Sheils

22            Joseph C. Kohn
              William E. Hoese

23            One South Broad Street, Suite 2100
              Philadelphia, PA  19107

24            Telephone: (215) 238-1700
              Facsimile: (215) 238-1968

25            Email: dsheils@kohnswift.com
              Email: jkohn@kohnswift.com

26            Email: whoese@kohnswift.com

27

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT         177

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BERGER & MONTAGUE, P.C.**
Sherrie R. Savett
Douglas M. Risen
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
Email: ssavett@bm.net
Email: drisen@bm.net

**TRUJILLO RODRIGUEZ
 & RICHARDS LLC**
Kenneth I. Trujillo
Ira Neil Richards
Kathryn C. Harr
1717 Arch Street, Suite 3838
Philadelphia, PA 19103
Telephone: (215) 731-9004
Facsimile: (215) 731-9044
Email: KTrujillo@trrlaw.com
Email: IRichards@trrlaw.com
Email: Kharr@trrlaw.com

**Members of Plaintiffs' Executive Committee**

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

178

## Exhibit A

### KLA-Tencor, Inc.
### Analysis of Stock Option Restatement Impact

Quarterly Data (from previous 10-K filings):
All data in 000s, except per share data

| | Originally Reported | | | | Restatement Charges | | | | As Restated | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Operating Income | Net Income (Loss) | EPS | Avg Shares | Operating Income | Net Income (Loss) | Operating Income | % Change | Net Income (Loss) | EPS | % Change |
| FY 1995 Annual | $ 156,609 | $ 104,811 | $ 1.34 | 78,427 | $ (2,904) | $ (1,866) | $ 153,705 | (2%) | $ 102,945 | $ 1.31 | (2%) |
| FY 1996 Annual | $ 296,266 | $ 196,634 | $ 2.34 | 84,195 | $ (2,747) | $ (1,764) | $ 293,519 | (1%) | $ 194,870 | $ 2.31 | (1%) |
| FY 1997 Annual | $ 145,832 | $ 105,396 | $ 1.24 | 85,203 | $ (2,852) | $ (1,816) | $ 142,980 | (2%) | $ 103,580 | $ 1.22 | (2%) |
| FY 1998 Annual | $ 164,631 | $ 134,096 | $ 1.52 | 88,522 | $ (5,219) | $ (3,358) | $ 159,412 | (3%) | $ 130,738 | $ 1.48 | (3%) |
| FY 1999 Annual | $ (10,334) | $ 39,212 | $ 0.21 | 183,344 | $ (17,630) | $ (11,576) | $ (27,964) | (171%) | $ 27,636 | $ 0.15 | (30%) |
| FY 2000 Annual | $ 311,541 | $ 253,798 | $ 1.32 | 192,564 | $ (23,296) | $ (16,098) | $ 288,245 | (7%) | $ 237,700 | $ 1.23 | (6%) |
| FY 2001 Annual | $ 458,468 | $ 66,683 | $ 0.34 | 193,435 | $ (59,261) | $ (41,999) | $ 399,207 | (13%) | $ 24,684 | $ 0.13 | (63%) |
| FY 2002 Annual | $ 244,893 | $ 216,166 | $ 1.10 | 196,594 | $ (76,582) | $ (50,482) | $ 168,311 | (31%) | $ 165,684 | $ 0.84 | (23%) |
| FY 2003 Annual | $ 138,722 | $ 137,191 | $ 0.70 | 194,785 | $ (70,032) | $ (43,196) | $ 68,690 | (50%) | $ 93,995 | $ 0.48 | (31%) |
| FY 2004 Annual | $ 297,358 | $ 243,701 | $ 1.21 | 201,799 | $ (53,728) | $ (31,225) | $ 243,630 | (18%) | $ 212,476 | $ 1.05 | (13%) |
| FY 2005 Q1 | $ 156,967 | $ 116,405 | $ 0.58 | 199,969 | $ (10,407) | $ (6,133) | $ 146,560 | (7%) | $ 110,272 | $ 0.55 | (5%) |
| Q2 | $ 155,508 | $ 122,077 | $ 0.61 | 200,946 | $ (7,175) | $ (55) | $ 148,333 | (5%) | $ 122,022 | $ 0.61 | (0%) |
| Q3 | $ 154,847 | $ 123,163 | $ 0.61 | 202,329 | $ (11,212) | $ (6,276) | $ 143,635 | (7%) | $ 116,887 | $ 0.58 | (5%) |
| Q4 | $ 115,240 | $ 105,050 | $ 0.52 | 201,014 | $ (8,648) | $ (9,182) | $ 106,592 | (8%) | $ 95,868 | $ 0.48 | (9%) |
| Annual | $ 582,562 | $ 466,695 | $ 2.32 | 201,014 | $ (37,442) | $ (21,646) | $ 545,120 | (6%) | $ 445,049 | $ 2.21 | (5%) |
| FY 2006 Q1 | $ 80,838 | $ 76,678 | $ 0.38 | 202,715 | $ (5,848) | $ (1,191) | $ 74,990 | (7%) | $ 75,487 | $ 0.37 | (2%) |
| Q2 | $ 76,515 | $ 76,649 | $ 0.38 | 203,345 | $ (1,521) | $ (44) | $ 74,994 | (2%) | $ 76,605 | $ 0.38 | (0%) |
| Q3 | $ 87,345 | $ 98,143 | $ 0.48 | 204,318 | $ (2,418) | $ (1,459) | $ 84,927 | (3%) | $ 96,684 | $ 0.47 | (1%) |
| Q4 | Q4 not restated, because not previously reported ⟶ | | | | | | $ 74,880 | N/M | $ 131,676 | $ 0.65 | N/M |
| Annual | | | | | | | $ 309,791 | N/M | $ 380,452 | $ 1.86 | N/M |

11/13/2007 13:40 FAX 9835      1 BERRY & BERRY      MORGAN LEWIS      ☒001/001

**Berry & Berry PLC**
A Professional Law Corporation
TELEPHONE (510) 250-0200
FAX (510) 835-5117

NOTICE OF OPTIONAL PROCEDURE
11/13/2007

Case Name: STINNETT, JAMES V. ALLIS -CHALMERS      SFSC 274083      M1842.ASB
Category: DA

Procedure:      PULMONARY REVIEW
Priority Date:  Status and Setting Confer      02/21/2008
Matter #:       M1842.PUL      HeidiW      Page      3

RESPONSE TO NOTICE OF OPTIONAL PROCEDURE:

If you do not wish to participate in the above optional procedure, please
sign this form and check the box next to your client's name(s) listed
below.  Return this completed form in a manner that assures delivery to
Berry & Berry attention: Nanette Kunewa no later than 5:00 pm on
11/28/2007
Failure to return the form indicates your agreement to pay a share
of the costs and fees of the procedure listed above.

Late return of this form will cause your client to accrue costs and fees
until the form is received by Berry & Berry.

_____  NO, I do not want to participate in the optional procedure
listed above on behalf of my client(s).  (Check clients listed below.)

Attorney or Other Authorized Signature: _____

Please Print Name: _____  Date: _____

|  |  |  |
|---|---|---|
| | MCNAMARA, DODGE, NEY, BEATTY, SLATTERY | 054 |
| _____ | FMC CORPORATION | 2408.6059 |
| | MORGAN, LEWIS & BOCKIUS, LLP | 027 |
| _____ | GRINNELL CORPORATION | 2300.6937 |
| | MORGAN, LEWIS & BOCKIUS, LLP | 415-442-1001 |
| _____ | YARWAY CORPORATION | 4436.6937 |
| | PERKINS COIE | 58 |
| _____ | GEORGIA-PACIFIC CORPORATION | 2055.6886 |
| | PERKINS COIE | 58 |
| _____ | HONEYWELL (AKA-ALLIED-SIGNAL, INC. (BENDIX) | 2042.6886 |
| | POND & NORTH | 70 |
| _____ | FAMILIAN CORPORATION | 2872.6982 |
| | POND & NORTH | 70 |
| _____ | KEENAN SUPPLY CO./KEENAN PROPERTIES | 3007.6982 |
| | PRINDLE, DECKER & AMARO | 062 |
| _____ | AMERICAN STANDARD, INC.(AKA THE TRANE COMPANY) | 2043.6212 |
| | SELMAN-BREITMAN LLP | 16 |
| _____ | LUPPEN & HAWLEY, INC. | 3879.6799 |
| | SELMAN-BREITMAN LLP | 16 |
| _____ | MILWAUKEE VALVE COMPANY, INC. | 4144.6799 |

MAILING ADDRESS:
P.O. Box 16070, Oakland, CA 94610

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

**E-FILED**

Nov 14, 2007 8:00 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6052
By A. Ilas, Deputy

### THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
### IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, <br> vs. | Lead Case No.1-07-CV-093465 |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | Judge Jack Komar |
| Defendant. | |
| AND RELATED ACTIONS | PROOF OF SERVICE <br> Electronic Proof of Service |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Tue. November 13, 2007 at 5:03 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Tue. November 13, 2007 at 5:03 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on November 13, 2007 at Oakland, California.

Dated: November 13, 2007                    For WWW.SCEFILING.ORG

E-Filed: Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

Andy Jamieson

E-Filed: Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

1    **THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
     **ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG**

2    **Electronic Proof of Service**
     **Page 2**

3    **Document(s) submitted by Joseph Floren of Morgan, Lewis & Bockius LLP on Tue. November 13, 2007 at 5:03 PM**
     **PST**

4    1. Req:Judicial Ntc: Request for Judicial Notice in Support of Defendant KLA-Tencor's Motion to Stay; Declaraton of Joseph
     E. Floren

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1  JOHN H. HEMANN (SBN 165823)
   JOSEPH E. FLOREN (SBN 168292)
2  TERA M. HEINTZ (SBN 241414)
   MATTHEW WEILER (SBN 236052)
3  MORGAN, LEWIS & BOCKIUS LLP
   One Market, Spear Street Tower
4  San Francisco, CA  94105-1126
   Tel:  415.442.1000
5  Fax:  415.442.1001

6  Attorneys for Defendant
   KLA-Tencor Corporation

7

**E-FILED**

Jan 8, 2008 5:00 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6652
By A. Ilas, Deputy

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       COUNTY OF SANTA CLARA

10

11  CHRIS CRIMI, on Behalf of Himself and      Case No. 107CV093465
    All Others Similarly Situated,
12                                             **DEFENDANT KLA-TENCOR'S NOTICE**
                    Plaintiff,                 **OF DEMURRER AND DEMURRER;**
13                                             **MEMORANDUM OF POINTS AND**
           vs.                                 **AUTHORITIES**
14
    EDWARD W. BARNHOLT, H.                      Date: February 1, 2008
15  RAYMOND BINGHAM, ROBERT T.                  Time: 9:00 a.m.
    BOND, RICHARD J. ELKUS, JR.,               Department:  17C
16  STEPHEN P. KAUFMAN, KENNETH                 Judge:  Hon. Jack Komar
    LEVY, MICHAEL E. MARKS, DEAN O.
17  MORTON, KENNETH L. SCHROEDER,               Date Filed:  September 4, 2007
    JON D. TOMPKINS, RICHARD P.                 Trial Date:  None Set
18  WALLACE, KLA-TENCOR
    CORPORATION, and DOES 1 through 25,
19
                    Defendants.
20

21

22

23

24

25

26

27

28

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1

2                               **NOTICE OF DEMURRER AND DEMURRER**

3      TO THE HONORABLE COURT AND ALL COUNSEL OF RECORD:

4              Please take notice that on February 1, 2008 at 9:00 a.m., or as soon thereafter as the matter

5      may be heard in Department 17 of the Superior Court of the State of California for the County of

6      Santa Clara, defendant KLA-Tencor Corporation ("KLA") will, and hereby does, demur to

7      Plaintiff Chris Crimi's Complaint in its entirety, in the event the Court declines to stay the case

8      based on KLA's pending Motion to Stay.[1]

9              This demurrer is based Plaintiff's failure to state a cause of action against KLA or any

10     defendant under controlling Delaware law.  Rather, his First and Second Causes of Action are

11     exclusively derivative in nature and may not be alleged in a direct action such as this one.

12             This Demurrer is based on this Notice, the attached Demurrer and Memorandum of Points

13     and Authorities, the supporting Declaration of Joseph E. Floren, all pleadings on file in this

14     matter and matters of which judicial notice may be taken, and all arguments to be presented to

15     this Court at oral argument.

16     DATED:  January 8, 2008

17                                                     Respectfully submitted,

18                                                     MORGAN LEWIS & BOCKIUS, LLP

19                                                     By:_____/s/_____
                                                            JOSEPH E. FLOREN
20                                                     *Attorneys for Defendant KLA-Tencor Corporation*

21

22

23

24

25

26     [1]  KLA earlier filed a separate Motion to Stay this case on the basis of the overlapping, earlier-
            filed litigation concerning the same claims, same alleged facts, and same defendants pending
27          in three courts, including this Court.  The Motion to Stay is set for hearing at the same time
            and place as this demurrer, which KLA asserts only in the alternative only, in the event the
28          Court declines to stay or dismiss the action for the reasons stated in KLA's Motion to Stay.

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

# DEMURRER

Defendant KLA-Tencor Corporation ("KLA") hereby demurrers to the First and Second Causes of Action asserted in the Complaint filed by Plaintiff Chris Crimi on each of the following grounds:

### Demurrer to the First Cause of Action

KLA demurrers to the First Cause of Action pursuant to Cal. Code of Civil Pro. § 430.10(e) because Plaintiff fails to allege facts that would entitle him to relief. Specifically, Plaintiff's First Cause of Action is derivative in nature and cannot be maintained as a direct action.

### Demurrer to the Second Cause of Action

KLA demurrers to the Second Cause of Action pursuant to Cal. Code of Civil Pro. § 430.10(e) because Plaintiff fails to allege facts that would him to relief. Specifically, Plaintiff's Second Cause of Action is derivative in nature and cannot be maintained as a direct action.

WHEREFORE KLA prays that this demurrer be sustained without leave to amend.

DATED: January 8, 2008

Respectfully submitted,

MORGAN LEWIS & BOCKIUS, LLP

By:_____/s/_____
JOSEPH E. FLOREN
*Attorneys for Defendant KLA-Tencor Corporation*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

2

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff's Complaint is an unsuccessful attempt to fashion a direct shareholder cause of action for dilution, a harm that is plainly derivative under controlling Delaware law, and for which only defendant KLA-Tencor Corporation ("KLA") could have a potential right to recover. KLA believes that this action should be stayed, for the reasons explained in its Motion to Stay. In the event the Court is not inclined to grant a stay, KLA requests that the Court consider this demurrer, which is based on Plaintiff's failure to assert any direct claim against KLA.[2]

Apparently recognizing that he lacks standing to bring any derivative claim in the name of KLA (he is no longer a shareholder), Plaintiff attempts to state a limited direct action against KLA and certain present and former KLA officers and directors, claiming that his equity interest and voting rights were impaired by the failure to disclose alleged "backdating" at KLA during earlier years. Specifically, according to Plaintiff's Complaint, defendants' purported failure during the period September 2002 to September 2006 to disclose information about *prior* backdating justifies an award of damages for the dilution of shareholder ownership interests that resulted from KLA's issuance of additional, non-backdated stock options in more recent years. Plaintiff even seeks the rescission of those more recent option grants to the innocent KLA officers and employees who received them (who are not named as parties). This claim is patently spurious on multiple levels, but to dispose of the case the Court need consider only the absolute unavailability of the relief Plaintiff seeks in this direct action. As a matter of law, such claims based on dilution are exclusively derivative in nature and may be asserted only by the corporation, not by a shareholder or putative class of shareholders. As a result, Plaintiff's

---

[2] Because it should dispose of this action in its entirety, this demurrer addresses only the legal conclusions that Plaintiff's Compliant is derivative in nature and cannot be maintained directly. There are several other serious defects in the Complaint that need not be addressed at this time. For example, Plaintiff has not properly alleged any actionable misstatements or failures to disclose by defendants during the putative class period; Plaintiff's own allegations eliminate any possibility of causation of damages, since it is clear that the issuance of the challenged options during the putative class period had no relation to any purported misstatement by defendants in any proxy statement, and those options would have been issued anyhow; and Plaintiff's cause of action for rescission does not exist under Delaware law, as rescission is only a potential remedy for a breach of fiduciary duty, not a separate cause of action. KLA reserves the right to raise these and other challenges to these other defects in the Complaint at the appropriate time, if necessary.

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1    Complaint must fail.

2       This is not the usual stock option backdating[3] case, in which a shareholder plaintiff alleges

3 either harm to the company caused by individuals' misconduct (a derivative action), or harm to

4 shareholders through loss in value of the stock caused by the misconduct.  Rather, the essence of

5 Plaintiff's convoluted allegations is that KLA and its directors and officers failed to disclose the

6 backdating of certain stock option grants from 1997 through June 2002 (which allowed option

7 recipients to purchase KLA stock at prices that were lower than the market prices when the

8 options were granted), and that defendants issued additional options *thereafter*, during the

9 putative class period from September 2002 through 2006 – options that supposedly would not

10 have been issued had the prior backdating been disclosed.  While Plaintiff claims that the exercise

11 of these options resulted in the issuance of shares that "diluted" Plaintiff's voting power and

12 ownership interest, it is axiomatic that any such marginal diminution impacted all shareholders

13 equally, with the equally incontestable result that the claim – if any claim exists at all here – must

14 be derivative under the controlling Delaware law, including the leading Delaware Supreme Court

15 cases *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004), and *Gentile*

16 *v. Rossette*, 906 A.2d 91, 99-100 (Del. 2006).

17       Plaintiff's reason for attempting to manufacture a claim in such a roundabout way is

18 obvious:  Numerous other plaintiffs have beaten Mr. Crimi to the punch by more than a year in

19 suing these same defendants in multiple derivative and class action lawsuits based on the same

20 alleged failure to disclose options backdating at KLA – cases filed in three different courts,

21 including this one, in mid-2006 on the heels of a May 22, 2006 *Wall Street Journal* article

22 suggesting that KLA and several other companies had "backdated" stock options between 1994

23

24   [3]   "Backdating," also termed "retroactive pricing," generally refers to the selection of exercise
25        prices for stock options based not on the market price for the underlying stock on the date the
       option grant was completed or finally approved, but on a lower market price for the stock on
26        an earlier date.  The actual grant date, or "measurement date" for accounting purposes, is
       deemed to be the date that all essential actions necessary to complete the granting of the
27        option are concluded, including identification of all grantees and final determination of the
       number of shares granted to each and the exercise price of the option.  Options are said to be
28        "backdated" or "retroactively priced" if the exercise price is set as of a date before the
       measurement date. *See generally* Complaint ¶¶ 29-31, 66.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1    and 2001.[4]  *See* Complaint ¶ 47.  Plaintiff, who admittedly was not a KLA shareholder at the time

2    of the stock option backdating alleged in the Complaint, seeks to throw another log on the

3    litigation bonfire by inventing a new kind of claim – straining to assert rights as a shareholder

4    apart from the Company to complain about dilution, while assiduously avoiding making any

5    claim for losses on the purchase, sale, or holding of KLA stock, which would make this case

6    removable and subject to mandatory dismissal under the Securities Litigation Uniform Standards

7    Act ("SLUSA"), 15 U.S.C. § 78bb(f)(1).  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v.*

8    *Dabit*, 547 U.S. 71 (2006).

9         Plaintiff's effort cannot succeed under Delaware law, which dictates that these claims are

10   derivative in nature.  Plaintiff alleges two forms of dilution purportedly resulting from KLA's

11   issuance of stock options during the putative class period: dilution in his ownership interest in

12   KLA, and dilution in his voting power.  *See* Complaint ¶¶ 79, 85.  As a shareholder of a public

13   company with hundreds of millions of shares outstanding, if Plaintiff's voting rights and

14   ownership interest were impacted by the challenged stock options, then those rights necessarily

15   were impacted in the same marginal, fractional way as the rights of every other shareholder.

16   Plaintiff's failure to allege a specific harm to him that is independent of any harm to the Company

17   or shareholders at large makes the claim essentially derivative in nature.

18        Plaintiff also fails to plead facts that might support any claim for improper dilution of

19   voting rights under Delaware law.  Plaintiff does not allege the stock option grants at issue were

20

21   [4]  Between May 22, 2006 and July 3, 2006, five shareholder derivative actions were filed in the
     United States District Court for the Northern District of California, San Jose Division, each of

22   which asserted claims based on the same stock option backdating and related misstatements
     against nominal defendant KLA and current and former officers and directors of KLA,

23   including all of the defendants in the instant case.  These cases have been consolidated and are
     now pending under the caption *In re KLA-Tencor Corporation Shareholder Derivative*

24   *Litigation*, Case. No. 06-03445 JW (N.D. Cal.).  *See* Request for Judicial Notice in Support of
     KLA's Motion to Stay, filed November 13, 2007 ("Stay RJN"), Ex. 3.  Another derivative

25   action is pending in *this* court, with *the same plaintiff's counsel* as the instant case, under the
     caption *Rabin v. Barnholt, et al.*, No. 1-06-CV-064841.  Stay RJN, Ex. 2.  Another hybrid

26   derivative-class action that alleges both derivative claims and a shareholder class claim for
     dilution is pending in the Delaware Chancery Court under the caption *Langford v. Barnholt,*

27   *et al.*, No. 2295-N.  Stay RJN, Ex. 1.  Yet another consolidated shareholder class action, in
     which the plaintiffs assert federal securities causes of action, is pending in the United States

28   District Court for the Northern District of California under the caption *In re KLA-Tencor*
     *Corporation Securities Litigation*, No. C 06-4065 MJJ.  Stay RJN, Ex. 4

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FRANCISCO

5

1    an attempt by a controlling shareholder to increase voting control at the expense of Plaintiff and

2    other public shareholders, because he cannot do so.  Nor can Plaintiff's claim actually proceed as

3    a derivative action: Plaintiff states that he is no longer a shareholder, which is fatal to his ability

4    to maintain a derivative action under Delaware law.  Accordingly, KLA asks that this Court

5    sustain its demurrer without leave to amend.

6    **I.    FACTUAL AND PROCEDURAL HISTORY**

7        **A.    Plaintiff's Complaint**

8        Plaintiff filed the Complaint in this case on September 4, 2007, asserting two causes of

9    action for breach of fiduciary duty and rescission.[5]  Plaintiff alleges that KLA and the individual

10   defendants – eleven former and current officers and directors of KLA – breached their fiduciary

11   duties to Plaintiff by failing to disclose that KLA had purportedly granted backdated options

12   between 1997 and June 30, 2002.  Complaint ¶ 1.  Given that Plaintiff admittedly did not even

13   own KLA stock during the period of alleged backdating, he does not allege any injury arising out

14   of the backdating itself or based on the purported misstated financial statements that resulted.

15   Complaint ¶ 5.  Rather, Plaintiff claims that *if* he had known about the backdating in the years

16   after the purported backdating had ceased, he would not have approved KLA's adoption of its

17   2004 Equity Compensation Plan in 2004.  Plaintiff does not allege, however, that adoption of the

18   new Plan in 2004 was in any way necessary to or an essential link in bringing about the dilution

19   of which he complains.  Plaintiff also alleges, impossibly, that he somehow would have

20   disallowed the automatic issuance of additional options under the "Evergreen Provision" of the

21   prior plan (the 1982 Stock Option Plan) in 2003 and 2004 but for the alleged misconduct, even

22   though his own allegations show this was not a matter on which Plaintiff was entitled to vote.

23   Complaint ¶¶ 78-79.  The "Evergreen Provision" under the 1982 Stock Option Plan automatically

24   authorized the issuance each year of stock options covering an amount of shares equal to 3% of

25   KLA-Tencor's outstanding shares of common stock as of the end of the prior fiscal year.

26   Complaint ¶ 32.  As the Complaint makes clear, however, the authorization of additional shares

27   [5]    KLA admits none of Plaintiff's allegations, and hereby reserves the right to challenge the
28   sufficiency of the pleadings, including whether Plaintiff has alleged any valid cause of action
     against KLA, at the appropriate time.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

6

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1   under the Evergreen provision had no relationship to any supposed misstatements or breaches of

2   duty by defendants because, as Plaintiff alleges, it was "automatic." Complaint ¶ 32.

3          Notwithstanding that Plaintiff alleges *no* factual connection between any wrongdoing in

4   the form of purported backdating at KLA and the 2004 Equity Compensation Plan or the issuance

5   of shares under the Evergreen provision, Plaintiff alleges that he and the putative class were

6   injured "as a result of the dilution of its voting power and proportionate share of the Company

7   due to the dedication of over millions [sic] of KLA-Tencor shares as a result of the addition of

8   stock pursuant to the Evergreen Provision and adoption of the 2004 Equity Incentive Plan."

9   Complaint ¶ 79.  Plaintiff seeks to rescind "all stock added to the 1982 Stock Option Plan

10  pursuant to the terms of the Evergreen Provision" and the 2004 Equity Incentive Plan. *Id.* ¶ 81.

11  Additionally, Plaintiff seeks cancellation of the shares of stock added pursuant the Evergreen

12  Provision and Equity Incentive Plan. *Id.*

13  **II.     ARGUMENT**

        **A.     Plaintiff's First and Second Causes of Action Are Derivative Under Delaware**
14          **Law**

15         Plaintiff's First and Second Causes of Action are derivative under controlling Delaware

16  law because they seek to redress the same fundamental harm, namely that Plaintiff's equity and

17  voting interests were diluted as a result of the exercise of allegedly backdated options.  California

18  courts apply the law of the state of incorporation to claims relating to internal corporate affairs.

19  *State Farm Mut. Auto. Ins. Co. v. Superior Court*, 114 Cal. App. 4th 434, 442 (2003).  As KLA is

20  a Delaware corporation (*see* Complaint ¶ 17), and the claim patently concerns KLA's internal

21  affairs,[6] Delaware law determines whether this action is derivative or direct.[7]  The Supreme Court

22

23  [6]  The internal affairs doctrine requires that the law of the state of incorporation applies when
        the lawsuit covers the subject matter of a corporation's dispute with shareholders. *Friese v.*
24      *Superior Court*, 134 Cal. App. 4th 693, 706 (2005) ("The internal affairs doctrine is a conflict
        of laws principle which recognizes that only one State should have the authority to regulate a
25      corporation's internal affairs-matters peculiar to the relationships among or between the
        corporation and its current officers, directors, and shareholders") (citation omitted); *see also*
26      *Edgar v. MITE Corp.*, 457 U.S. 624, 645-46 (1982) ("[t]he internal affairs doctrine is a . . .
        principle which recognizes that only one State should have authority to regulate a
27      corporation's internal affairs, [i.e.,] matters peculiar to the relationships among or between the
        corporation and its current officers, directors, and shareholders.")  Accordingly, Delaware law
28      applies to shareholder actions, such as this one, related to the issuance of stock options. *See*
        *also Elster v. Am. Airlines*, 100 A.2d 219 (Del. Ch. 1953) (applying Delaware law to claims

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1   of Delaware has stated that "a court should look to the nature of the wrong and to whom the relief

2   should go. The stockholder's claimed direct injury must be **independent of any alleged injury**

3   **to the corporation.**" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del.

4   2004) (emphasis added). A court should sustain a demurrer when an action is derivative in nature

5   and cannot be maintained directly. *Schuster v. Gardner*, 127 Cal. App. 4th 305, 317-318 (2005)

6   (affirming dismissal; holding demurrer properly sustained to complaint that alleged no direct

7   claims under *Tooley*); Cal. Code Civ. Pro. § 430.10(e) (California law requires that demurrer be

8   sustained where a plaintiff has pled no set of facts that entitled him to relief). Since the harm

9   Plaintiff alleges is entirely derivative of harm to KLA, and any relief would ultimately benefit

10   KLA, the action is derivative in nature and the claim must fail as a class action.

11            1.    Plaintiff Alleges No Harm Independent Of Harm To The Company

12            The instant Complaint is nothing more than "a plaintiff creatively attempting to recast a

13   derivative claim by alleging the same fundamental harm in a slightly different way." *Feldman v.*

14   *Cutaia*, 2007 WL 2215956, at *10 (Del .Ch. Aug. 1, 2007). Rephrasing a claim traditionally

15   understood as derivative to claim harm to a shareholder, however, "is disfavored by Delaware

16   courts." *Id.* Delaware courts recognize that claims alleging damage based upon equity dilution

17   are *fundamentally derivative* because, among other things, such claims are based upon the alleged

18   waste of corporate assets. *Elster v. Am. Airlines, Inc.*, 100 A.2d 219, 222 (Del. Ch. 1953);

19   *Cutaia*, 2007 WL 2215956, at *7 ("Mere claims of dilution, without more, cannot convert a

20   claim, traditionally understood as derivative, into a direct one.").

21            Like the case at bar, the *Elster* action involved a complaint by an individual stockholder

22

23   related to issuance of stock options); *Beard v. Elster*, 120 A.2d 731, 735 (Del. Ch. 1960)
     ("The issuance of stock option plans by Delaware corporations involves the internal affairs of
24   a Delaware corporation and is, therefore, controlled by the laws of Delaware.").

25   [7]  Plaintiff's claims must be based *exclusively* upon Delaware law for the further reason that
     they otherwise would be absolutely barred as a matter of federal law. SLUSA bars any
26   attempt to make a state law shareholder class action claim except to the extent the claim
     remains within the narrow exception from SLUSA for actions "based upon the statutory or
27   common law of the State in which the issuer is incorporated" that involve "communication[s]
     with respect to the sale of securities of an issuer" that are made to stockholders
28   concerning their voting rights (*i.e.*, the proxy statements on which the Complaint is based).
     15 U.S.C. § 78bb(3)(A).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

8

1    seeking to rescind and cancel the issuance of stock options on terms he felt were detrimental to

2    the corporation and shareholders.  845 A.2d at 220.  After examining the complaint, the Delaware

3    Court of Chancery held that "[a]ny injury which plaintiff may receive by reason of the dilution of

4    his stock would be equally applicable to all the stockholders of the defendant, since plaintiff holds

5    such a small amount of stock in proportion to the stock outstanding that the control or

6    management of defendant would not be affected by the granting of these options...."  *Id.* at 222.

7    The same circumstances are presented here, because Plaintiff has not alleged that the stock option

8    grants were issued and exercised in such a way to wrest voting control from himself and other

9    public shareholders.  This case alleges identical harm to all shareholders, not the kind of

10   differential harm (such as dilution of minority shareholders or overriding their voting rights) that

11   might be addressed through a direct action.  The *Elster* court further explained that equity dilution

12   claims are predicated on harm done to the corporation:

> Plaintiff claims that the value of his stock will deteriorate and that his
> proportionate share of the stock will be decreased as a result of the granting
> and exercise of the stock options.  Assuming plaintiff's contention is
> correct, this would apply to the stock of all other shareholders as well.
> ...
> Here the wrong of which Plaintiff complains is not a wrong inflicted upon
> him alone or a wrong affecting any particular right which is asserting –
> such as his pre-emptive rights as a stockholder, rights involving the control
> of the corporation, or a wrong affecting the stockholders and not the
> corporation – but is an indirect injury as a result of the harm done to the
> corporation.

19   *Id.* at 222-223.  Drawing an analogy to corporate overpayment, the Delaware Supreme Court

20   recently reaffirmed the essential holding of *Elster* and announced the standard for pleading a

21   direct action for shareholder dilution:

> In the typical corporate overpayment case, a claim against the corporation's
> fiduciaries for redress is regarded as exclusively derivative, irrespective of
> whether the currency or form of overpayment is cash or the corporation's
> stock. **Such claims are not normally regarded as direct, because any
> dilution in value of the corporation's stock is merely the unavoidable
> result (from an accounting standpoint) of the reduction in the value of
> the entire corporate entity, of which each share of equity represents an
> equal fraction.** In the eyes of the law, such equal "injury" to the shares
> resulting from a corporate overpayment is not viewed as, or equated with,
> harm to specific shareholders individually.
>
> Because the shares representing the "overpayment" embody both economic

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1   value and voting power, the end result of [over-issuing shares to a controlling shareholder] is an improper transfer—or expropriation—of
2   economic value and voting power from the public shareholders to the majority or controlling stockholder. For that reason, the harm resulting
3   from the overpayment is **not confined to equal dilution of the economic value and voting power of each of the corporation's outstanding**
4   **shares.**

5   *Gentile v. Rossette*, 906 A.2d 91, 99-100 (Del. 2006) (emphasis added). Thus, under *Gentile*,

6   where (as here) a plaintiff alleges dilution of equity and voting rights that amounts to "equal

7   dilution of the economic value and voting power of each of the corporation's outstanding shares,"

8   the claim is derivative in nature.

9   The First and Second Causes of Action in the Complaint are plainly derivative because

10  Plaintiff does not allege that *his* equity or voting power was diluted to benefit a controlling

11  shareholder, or any other harm that is different from the purported dilutive harm to all

12  shareholders. *See Cutaia*, 2007 WL 2215956. In *Cutaia*, the Delaware Court of Chancery

13  granted a defendant's motion to dismiss on the ground that plaintiff's complaint – which alleged

14  dilution in the form of diminution of equity and voting power – did not state a direct cause of

15  action. The plaintiff's claim there was deemed derivative because the complaint did not plead

16  more than a diminution that impacted all shareholders equally: "[a] claim for wrongful equity

17  dilution is premised on the notion that the corporation, by issuing additional equity for

18  insufficient consideration, made the complaining stockholder's stake less valuable. Equity

19  dilution claims are typically viewed as derivative under Delaware law." *Id.* at *7.

20  Here, similarly, the gravamen of Plaintiff's First and Second Causes of Action is that the

21  interests of shareholders were diluted by the allegedly improperly procured issuance of stock

22  options. Plaintiff claims that "[t]he class was harmed as a result of the dilution of its voting

23  power and proportionate share of the Company due to the dedication of over millions of KLA-

24  Tencor shares as a result of the addition of stock pursuant to Evergreen Provision and adoption of

25  the 2004 Equity Incentive Plan." Complaint ¶ 79. *See also id.* ¶ 85 ("The Class was also harmed

26  as a result of the dilution of its voting power and proportionate share of the Company due to the

27  dedication of millions [of] KLA-Tencor shares . . . ."). Crucially, Plaintiff does not allege that

28  any controlling stockholder or group of them gained from the transaction to the benefit of

1    Plaintiff and other public shareholders, which is the only way he might make out a direct claim

2    here. Such an allegation would be essential to sustain a direct claim because "the harm *Gentile*

3    ... seek[s] to remedy **can only arise when a controlling stockholder, with sufficient power to**

4    **manipulate the corporate process, engineers a dilutive transaction whereby the stockholder**

5    **receives an exclusive benefit of increased equity ownership and voting power for inadequate**

6    **consideration.**" *Cutaia*, 2007 WL 2215956 at *8. No such allegations are presented here, nor

7    could there be, as this is not a case of misconduct by controlling shareholders to increase their

8    own equity or voting power at the expense of other shareholders.

9        Not only is the narrow fact pattern that might support a direct cause of action under

10   Delaware law absent here, but it *cannot* possibly be alleged, given that KLA is a large publicly

11   traded corporation with diffuse ownership. Plaintiff cannot allege that his interest in KLA was

12   diluted to the benefit of a controlling shareholder because KLA, which has hundreds of millions

13   of outstanding shares and thousands of shareholders, does not have any controlling shareholders.

14   The class Plaintiff purports to represent is defined as "thousands of KLA-Tencor stockholders of

15   record ... located throughout the United States" who own "millions of KLA-Tencor stock."

16   Complaint ¶ 27(a). But Plaintiff nowhere alleges that the defendants constitute a voting majority

17   or anything close to it, much less that the issuance of the stock options in question had any effect

18   to increase the voting power or equity of any controlling shareholders. Rather, Plaintiff alleges

19   that these options were issued to all eligible employees. *See* Complaint ¶¶ 39-46, 62.

20       The proxy statements incorporated by reference in Plaintiff's own Complaint plainly

21   demonstrate that there has been, and is no, controlling shareholder here.[8] For example, KLA's

22

---

23   [8]  A court may consider documents incorporated by reference in the complaint and matters
     which are subject to judicial notice in ruling on a demurrer. *Barratt American, Inc. v. City of*
24   *San Diego*, 117 Cal.App.4th 809, 812 n.2 (2004). Here, KLA's proxy statements may be
     considered in demurrer because they are incorporated by reference in Plaintiff's Complaint.
25   *See* Complaint ¶¶ 30,33-36, 38-39, 41, 43-44, 46, 76, 77. Plaintiff quotes form the proxy
     statements in order to plead his claims against KLA. Thus, it is only fair that Court consider
26   the totality of the proxy statement in determining whether Plaintiff has pled a valid cause of
     action. Moreover, the facts regarding ownership of shares of KLA is type of fact that cannot
27   reasonably be disputed. *See* Cal. Evidence Code § 452(h). Thus, this Court can judicially
     notice the ownership statistics recited therein. *StorMedia, Inc. v. Superior Court*, 20 Cal. 4th
28   449, 457, n.9 (1999) ("In ruling on a demurrer, a court may consider facts of which it has
     taken judicial notice."); Cal. Code Civ. Proc., § 430.30(a).

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1    2004 Definitive Proxy discloses that "[a]ll directors and executive officers as a group" owned

2    only 3.16% of the shares of KLA. *See* Request for Judicial Notice ("RJN"), Ex. 1. Additionally,

3    the 1998 Definitive Proxy states that "[a]ll directors and executive officers as a group" owned

4    only 4.99% of the shares. *See* RJN, Ex. 2. Thus, Plaintiff cannot show that KLA had a

5    controlling shareholder, and under no circumstances could he show that the defendants increased

6    their voting power at the expense of other shareholders through the option issuances in question.

7       A recent order in a stock options backdating case from the Northern District of California

8    confirms that the purported dilution related to alleged backdated options is derivative. *See Vogel*

9    *v. Jobs*, No. 06-5208 JF, 2007 WL 3461163 (N.D. Cal. Nov. 14, 2007). In *Vogel*, a plaintiff

10    shareholder (represented by Plaintiff's same counsel) attempted to bring a class action alleging

11    that officers and directors of Apple, Inc. breached their fiduciary duties of disclosure by issuing

12    false and misleading proxies. *Id.* at *2. The District Court granted the 12(b)(6) motion filed by

13    defendants, which sought dismissal on the grounds the claims asserted by the class were

14    derivative under California law. Finding that "California corporate law is functionally equivalent

15    to Delaware law," the District Court held that the claims asserted were derivative under *Tooley*

16    and *Gentile* because plaintiff did not allege that Apple Inc., a large publicly-traded corporation

17    like KLA, had a controlling shareholder. *Id.* at *2-*3. In the absence of a controlling

18    shareholder, the District Court held that the allegations amounted to nothing more than corporate

19    waste: "Lead Plaintiff's allegations properly are analyzed as claims of corporate overpayment that

20    must be treated as derivative under the *Tooley* test. The thrust of the allegations is that the

21    recipients of the backdated options were overpaid, in violation of Apple's stock options plans.

22    Such allegations necessarily involve an injury to the corporation in that overpayment entails a

23    reduction in corporate assets." *Id.* at *3.

24       2.    <u>The Relief Plaintiff Seeks Would Benefit The Company</u>

25       Although the foregoing discussion should dispose of this case, it bears noting that

26    Plaintiff's "rescission" claim further betrays the inherently derivative nature of his claims.

27    Plaintiff seeks rescission and cancellation of options issued by KLA to its employees and shares

28    issued upon the exercise of such options. *See* Complaint ¶ 81. Under both causes of action,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

1   Plaintiff seeks rescission of shares issued pursuant to the 1982 Stock Options Plan and the 2004

2   Equity Incentive Plan.   Plaintiff alleges that the 1982 Stock Options Plan governed the issuance

3   of stock options to employees, and that the Board of Directors was responsible for its

4   implementation. *See* Complaint ¶¶ 31-43. Similarly, the 2004 Equity Incentive Plan governs

5   issuance of stock options to employees and is administered by the Board of Directors. *Id.*, ¶¶ 44-

6   46.  Plaintiff does not allege that he or any other shareholder had any rights or obligations under

7   these plans and agreements.  Rather, Plaintiff alleges that the "pervasive backdating scheme"

8   caused "options to be issued … to carry a much lower price than the strike price." *Id.*, ¶ 76.

9   Thus, if the plans and stock issued thereunder were rescinded, the Company would be the

10  recipient of the shares of stock issued under the stock options plan.  In seeking to undo the

11  issuance of options, "the wrong for which the complaint is made is the action of the corporation

12  in entering into the contract." *Elster*, 845 A.2d at 222. Like the instant matter, *Elster* considered

13  a prayer for relief asking a court to enjoin issuance of stock under a stock option plan, and sought

14  cancellation of stock already issued. *Id.* The relief benefits the corporation because in alleging

15  issuance of options at less-than market value, "the loss in each instance is to the corporation and

16  to the stockholders as a whole." *Id.* at 223.

17       **B.     Plaintiff Lacks Standing To Bring A Derivative Claim**

18          Delaware law unequivocally requires a Plaintiff to be a current shareholder of a company

19  in order to bring and maintain a derivative suit. *Bradley v. First Interstate Bancorp*, 748 A.2d

20  913 (Del. 2000); *Ash v. McCall*, 2000 WL 1370341, at *12 (Del. Ch. Sept. 15. 2000) (describing

21  Delaware's continuous ownership standing requirement as "iron clad").  Plaintiff here admits that

22  he is no longer a shareholder of KLA. *See* Complaint ¶ 5 (alleging that Plaintiff owned shares of

23  KLA stock "between September 20, 2002 and September 27, 2006").  Accordingly, Plaintiff lacks

24  standing to maintain a derivative action, and this Court should not grant leave to amend to allow

25  Plaintiff to style his Complaint as a derivative action.

26  **III.    CONCLUSION**

27          This Court should sustain KLA's demurrer to Plaintiff's complaint because it cannot be

28  maintained as an individual action.  Moreover, because it is clear from Plaintiff's Complaint that

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1    he is no longer a shareholder of KLA, this Court should deny leave to amend the Complaint as a

2    derivative action.

3

4    DATED:  January 8, 2008              Respectfully submitted,

5                            MORGAN LEWIS & BOCKIUS, LLP

6

7                        By:_____/s/_____

8                             JOSEPH E. FLOREN
                             *Attorneys for Defendant KLA-Tencor Corporation*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1

## PROOF OF SERVICE BY ELECTRONIC TRANSMISSION

2

### *Chris Crimi, et al. v. Edward W. Barnholt, et al.*
### Santa Clara County Superior Court Case No. 107CV093465

3

4

    I, the undersigned, declare: that I am, and was at the time of service of the documents herein referred to, over the age of 18 years, and not a party to the action; and I am employed in the County of San Francisco, California. My business address is One Market, Spear Street Tower, San Francisco, California 94105.

5

6

7

    On the date executed below, I electronically served the document(s) via the Santa Clara Superior Court's electronic filing system described as:

8

9

**DEFENDANT KLA-TENCOR'S NOTICE OF DEMURER AND DEMURRER;**
**MEMORANDUM OF POINTS AND AUTHORITIES**

10

11

on the recipients designated on the Transaction Receipt located on the Santa Clara County Superior Court's electronic filing website.

12

    I also served the above document via Hand Delivery on the following party:

13

Patrice L. Bishop
Stull, Stull & Brody
10940 Wilshire Blvd., Suite 2350
Los Angeles, CA 90024

14

15

16

    I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct and was executed on January 8, 2008.

17

18

19

                         /s/

20

                    Erika R. Eberline

21

22

23

24

25

26

27

28

---

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER

1  MORGAN, LEWIS & BOCKIUS LLP
   JOSEPH E. FLOREN (SBN 168292)
2  TERA M. HEINTZ (SBN 241414)
   MATTHEW S. WEILER (SBN 236052)
3
   One Market, Spear Street Tower
4  San Francisco, CA  94105-1126
   Tel:  415.442.1000
5  Fax:  415.442.1001

6  Attorneys for Defendant KLA-Tencor Corporation

7

**E-FILED**

Nov 14, 2007 8:00 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6052
By A. Ilas, Deputy

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    COUNTY OF SANTA CLARA

10

11  CHRIS CRIMI, on Behalf of Himself and         Case No. 107CV093465
    All Others Similarly Situated,
12                                                 **APPENDIX OF OUT-OF-STATE**
                    Plaintiff,                     **AUTHORITIES**
13
            vs.                                    Hearing Date:  January 18, 2008
14                                                 Hearing Time:  9:00 A.M.
    EDWARD W. BARNHOLT, H.                         Department:  17C
15  RAYMOND BINGHAM, ROBERT T.                     Judge:  Hon. Jack Komar
    BOND, RICHARD J. ELKUS, JR.,
16  STEPHEN P. KAUFMAN, KENNETH                    Date Filed:  September 4, 2007
    LEVY, MICHAEL E. MARKS, DEAN O.
17  MORTON, KENNETH L. SCHROEDER,
    JON D. TOMPKINS, RICHARD P.
18  WALLACE, KLA-TENCOR
    CORPORATION, and DOES 1 through 25,
19
                    Defendants.
20

21

22

23

24

25

26

27

28

APPENDIX OF OUT-OF-STATE AUTHORITIES

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

1  **TO THE COURT AND ALL PARTIES OF RECORD:**

2      Please take notice that Defendant KLA-Tencor Corporation hereby submits the following

3  out-of-state authorities in support of its motion to stay:

4

5  CTS Corp. v. Dynamics Corporation of America,
    481 U.S. 69,
    107 S. Ct. 1637,
6      95 L. Ed.2d (1987) ..................................................................................................Tab 1

7  Hart v. General Motors Corp.,
    517 N.Y.S.2d 490 (1987) ......................................................................................Tab 2
8

  In re Oracle Corp. Derivative Litig.,
9      808 A.2d 1206 (Del. Ch. 2002) ............................................................................Tab 3

10  In re Topps Co. S'holders Litig.,
    924 A.2d 951 (Del. Ch. 2007) ..............................................................................Tab 4
11

  Johnson v. Hui,
12      811 F. Supp. 479 (N.D. Cal. 1991) .......................................................................Tab 5

13  Langfelder v. Universal Labs.,
    293 N.Y. 200 (1944) .............................................................................................Tab 6

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FRANCISCO

APPENDIX OF OUT-OF-STATE AUTHORITIES

E-Filed Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

1

## PROOF OF SERVICE BY ELECTRONIC TRANSMISSION

2

*Chris Crimi, et al. v. Edward W. Barnholt, et al.*
**Santa Clara County Superior Court Case No. 107CV093465**

3

4

I, the undersigned, declare: that I am, and was at the time of service of the documents

5

herein referred to, over the age of 18 years, and not a party to the action; and I am employed in

the County of San Francisco, California. My business address is One Market, Spear Street

6

Tower, San Francisco, California 94105.

7

On the date executed below, I electronically served the document(s) via the Santa Clara

Superior Court's electronic filing system described as:

8

9

## APPENDIX OF OUT-OF-STATE AUTHORITIES

10

on the recipients designated on the Transaction Receipt located on the Santa Clara County

11

Superior Court's electronic filing website. I declare under penalty of perjury pursuant to the laws

of the State of California that the foregoing is true and correct and was executed on November 13,

12

2007.

13

14

15

                                                                    /s/

Erika R. Eberline

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FRANCISCO

APPENDIX OF OUT-OF-STATE AUTHORITIES

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

# E-FILED

Nov 14, 2007 8:00 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6052
By A. Ilas, Deputy

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, vs. | Lead Case No.1-07-CV-093465 |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | Judge Jack Komar |
| Defendant. | |
| AND RELATED ACTIONS | PROOF OF SERVICE Electronic Proof of Service |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Tue. November 13, 2007 at 5:03 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Tue. November 13, 2007 at 5:03 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on November 13, 2007 at Oakland, California.

Dated: November 13, 2007                    For WWW.SCEFILING.ORG

E-Filed: Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

Andy Jamieson

E-Filed: Nov 14, 2007 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6052

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG

**Electronic Proof of Service**
**Page 2**

**Document(s) submitted by Joseph Floren of Morgan, Lewis & Bockius LLP on Tue. November 13, 2007 at 5:03 PM PST**

1. Appendix: Appendix of Out-Of-State Authorities

Westlaw.

107 S.Ct. 1637                                                                                            Page 1
481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
(Cite as: 481 U.S. 69, 107 S.Ct. 1637)

▷       Supreme Court of the United States
        CTS CORPORATION, Appellant
                    v.
DYNAMICS CORPORATION OF AMERICA.
        INDIANA, Appellant
                    v.
DYNAMICS CORPORATION OF AMERICA.
            No. 86-71, 86-97.

            Argued March 2, 1987.
            Decided April 21, 1987.

Tender offeror brought suit to enjoin enforcement
of Indiana's statute regulating takeovers.   Target
company counterclaimed seeking injunction against
tender offer.   The United States District Court for
the Northern District of Illinois, Eastern Division,
637 F.Supp. 389, 637 F.Supp. 406, Susan Get-
zendanner, J., issued a series of orders and granted
tender offeror a preliminary injunction.   Appeal
was taken.   The Court of Appeals, 794 F.2d 250,
Posner, Circuit Judge, affirmed, ruling that the Indi-
ana Act was preempted by the federal Williams
Act.   The Supreme Court, Justice Powell, held that:
(1) the Indiana Act was consistent with the provi-
sions and purposes of the Williams Act and was not
thereby preempted, and (2) the Indiana Act did not
violate the Commerce Clause.

Reversed.

Justice Scalia, filed an opinion concurring in part
and concurring in judgment.

Justice White, filed dissenting opinion, in Part II of
which Justice Blackmun and Justice Stevens joined.

            West Headnotes

[1] States ☞18.77
360k18.77 Most Cited Cases
The Indiana Control Share Acquisitions Act could
be preempted by the federal Williams Act only if it
frustrated the purposes of the federal law where it
was entirely possible for entities to comply with

both the federal and state provisions. IC 23-1-42-1
et seq. (1986 Supp.); Securities Exchange Act of
1934, §§ 13(d,e), 14(d-f), as amended, 15 U.S.C.A.
§§ 78 m(d,e), 78n(d-f).

[2] States ☞18.77
360k18.77 Most Cited Cases
The Indiana Control Share Acquisitions Act protec-
ted independent shareholders from coercive aspects
of tender offers by allowing them to vote as a group
and thereby furthered the federal Williams Act's ba-
sic purpose of placing investors on an equal footing
with takeover bidders; it did not give either man-
agement or the offeror advantage in communicating
with shareholders, did not impose an indefinite
delay on offers, and did not allow state government
to interpose its views of fairness between willing
buyers and sellers. IC 23-1-42-1 et seq. (1986
Supp.); Securities Exchange Act of 1934, §§
13(d,e), 14(d-f), as amended, 15 U.S.C.A. §§ 78
m(d,e), 78n(d-f).

[3] Securities Regulation ☞244
349Bk244 Most Cited Cases
Fact that Indiana Control Share Acquisitions Act
imposed additional expenses on takeover offeror in
requiring it to pay costs of special shareholder
meetings to vote on transfer of voting rights, thus
making tender offers more expensive and slightly
deterring them, did not render Act invalid. IC
23-1-42-1 et seq., 23-1-42-7(a)(1986 Supp.).

[4] States ☞18.77
360k18.77 Most Cited Cases
Possibility that Indiana Control Share Acquisitions
Act would delay some tender offers did not man-
date preemption by federal Williams Act where In-
diana Act did not impose absolute 50-day delay on
tender offers or preclude an offeror from purchas-
ing shares as soon as federal law permits, and per-
mitted an offeror fearing an adverse shareholder
vote to make a conditional tender offer by offering
to accept shares on condition that shares receive
voting rights within certain period of time. IC
23-1-42-1 et seq. (1986 Supp.); Securities Ex-
change Act of 1934, §§ 13(d,e), 14(d-f), as

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

107 S.Ct. 1637

481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213

**(Cite as: 481 U.S. 69, 107 S.Ct. 1637)**

Page 2

amended, 15 U.S.C.A. §§ 78 m(d,e), 78n(d-f).

**[5] Securities Regulation** ☞244
349Bk244 Most Cited Cases
Indiana Control Share Acquisitions Act provision that full voting rights be vested if at all within 50 days after commencement of takeover offer fell within 60-day maximum period Congress established for tender offers and thus was not unreasonable. IC 23-1-42-1 et seq. (1986 Supp.); Securities Exchange Act of 1934, § 14(d)(5), as amended, 15 U.S.C.A. § 78n(d)(5).

**[6] States** ☞18.77
360k18.77 Most Cited Cases
The Williams Act did not necessarily preempt any state corporate laws which caused delay on consummation of tender offers given long-standing prevalence of state regulation of corporations. Securities Exchange Act of 1934, §§ 13(d, e), 14(d-f), as amended, 15 U.S.C.A. §§ 78m(d, e), 78n(d-f).

**[7] Commerce** ☞62.4
83k62.4 Most Cited Cases

**[7] Securities Regulation** ☞244
349Bk244 Most Cited Cases
Indiana Control Share Acquisitions Act, which had the same effects on tender offers whether or not offeror was a domiciliary or resident of Indiana and thus visited its effects equally upon both interstate and local business, did not violate Commerce Clause by imposing a greater burden on out-of-state offerors than it did on similarly situated Indiana offerors, regardless of fact that Act might apply most often to out-of-state entities launching hostile tenders offers. IC 23-1-42-1 et seq. (1986 Supp.); U.S.C.A. Const. Art. 1, § 8, cl. 3.

**[8] Securities Regulation** ☞244
349Bk244 Most Cited Cases
Indiana Control Share Acquisitions Act did not create impermissible risk of inconsistent regulation by different states, but merely exercised state's firmly established authority to define voting rights of shareholders in Indiana corporations, thus subjecting the corporation to the law of only one state. IC 23-1-42-1 et seq. (1986 Supp.); U.S.C.A. Const.

Art. 1, § 8, cl. 3.

**[9] Securities Regulation** ☞244
349Bk244 Most Cited Cases
A state has interest in promoting stable relationships among parties involved in the corporations it charters, as well as in ensuring that investors in such corporations have an effective voice in corporate affairs.

**[10] Commerce** ☞62.4
83k62.4 Most Cited Cases

**[10] Securities Regulation** ☞244
349Bk244 Most Cited Cases
Indiana Control Share Acquisitions Act reflected valid concerns of state in promoting stable relationships among parties involved in corporations chartered by state and thus did not violate Commerce Clause; a primary purpose of Act was to protect shareholders of Indiana corporations by affording them an opportunity to decide collectively whether resulting change in voting control of corporation would be desirable when takeover offer is made. IC 23-1-42-1 et seq. (1986 Supp.); U.S.C.A. Const. Art. 1, § 8, cl. 3.

**[11] Securities Regulation** ☞244
349Bk244 Most Cited Cases
State had interest in providing for shareholders of corporations incorporated in Indiana, regardless of whether shareholders were Indiana residents, under Indiana Control Share Acquisitions Act, which only applied to corporations having a substantial number of shareholders in Indiana, whom the state indisputably had an interest in protecting. IC 23-1-42-1 et seq. (1986 Supp.)

**[12] Commerce** ☞62.4
83k62.4 Most Cited Cases

**[12] Securities Regulation** ☞244
349Bk244 Most Cited Cases    . . . .
Fact that Indiana Control Share Acquisitions Act might decrease number of successful tender offers for Indiana corporations did not violate Commerce Clause, where Act did not prohibit any resident or nonresident from offering to purchase or from purchasing shares in Indiana corporations or from at-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

107 S.Ct. 1637                                                                    Page 3
481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
(Cite as: 481 U.S. 69, 107 S.Ct. 1637)

tempting thereby to gain control, but only regulated particular structure for methods of operation in a market in order to better protect corporate shareholders. IC 23-1-42-1 et seq. (1986 Supp.)

**\*1639 Syllabus [FN\*]**

FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499 (1906).

\*69 The federal Williams Act and implementing regulations govern hostile corporate stock tender offers by requiring, *inter alia,* that offers remain open for at least 20 business days. An Indiana Act applies to certain business corporations chartered in Indiana that have specified levels of shares or shareholders within the State and that opt into the Act's protection. The Indiana Act provides that the acquisition of "control shares" in such a corporation--shares that, but for the Act, would bring the acquiring entity's voting power to or above certain threshold levels--does not include voting rights unless a majority of all pre-existing disinterested shareholders so agree at their next regularly scheduled meeting. However, the stock acquiror can require a special meeting within 50 days by following specified procedures. Appellee Dynamics Corporation announced a tender offer that would have raised its ownership interest in CTS Corporation above the Indiana Act's threshold. Dynamics also filed suit in Federal District Court alleging federal securities violations by CTS. After CTS opted into the Indiana Act, Dynamics amended its complaint to challenge the Act's validity. The District Court granted Dynamics' motion for declaratory relief, ruling that the Act is pre-empted by the Williams Act and violates the Commerce Clause. The Court of Appeals affirmed, adopting the holding of the plurality opinion in *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), that the Williams Act pre-empts state statutes that upset the balance between target company management and a tender offeror. The court based its pre-emption finding on the view that the Indiana Act, in effect, imposes at least a 50-day delay on the con-

summation of tender offers and that this conflicts with the minimum 20-day, hold-open period under the Williams Act. The court also held that the state Act violates the Commerce Clause since it deprives nonresidents of the valued opportunity to accept tender offers from other nonresidents, and that it violates the conflict-of-laws "internal affairs" doctrine in that it has a direct, intended, and \*70 substantial effect on the interstate market in securities and corporate control.

*Held:*

1. The Indiana Act is consistent with the provisions and purposes of the Williams Act and is not pre-empted thereby. Pp. 7-1647.

(a) The Indiana Act protects independent shareholders from the coercive aspects of tender offers by allowing them to vote as a group, and thereby furthers the Williams Act's basic purpose of placing investors on an equal footing with takeover bidders. Moreover, the Indiana Act avoids the problems the plurality discussed in *MITE,* since it does not give either management or the offeror an advantage in communicating with shareholders, nor impose an indefinite delay on offers, nor allow the state government to interpose its views of fairness between willing buyers and sellers. Thus, the Act satisfies even the *MITE* plurality's broad interpretation of the Williams Act. Pp. 1645-1647.

(b) The possibility that the Indiana Act will delay some tender offers does not mandate pre-emption. The state Act neither imposes an absolute 50- day delay on the consummation of tender offers nor precludes offerors from purchasing shares as soon as federal law permits. If an adverse shareholder vote is feared, the tender offer can be conditioned on the shares' receiving voting rights within a specified period. Furthermore, even assuming that the Indiana Act does impose some additional delay, the *MITE* plurality found only that "unreasonable" delays conflict with the Williams Act. Here, it cannot be said that a 50-day delay is unreasonable since that period falls within a 60- day period Congress \*\*1640 established for tendering shareholders

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

107 S.Ct. 1637
481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
(Cite as: 481 U.S. 69, 107 S.Ct. 1637)

Page 4

to withdraw their unpurchased shares. If the Williams Act were construed to pre-empt any state statute that caused delays, it would pre-empt a variety of state corporate laws of hitherto unquestioned validity. The longstanding prevalence of state regulation in this area suggests that, if Congress had intended to pre-empt all such state laws, it would have said so. Pp. 1647-1648.

2. The Indiana Act does not violate the Commerce Clause. The Act's limited effect on interstate commerce is justified by the State's interests in defining attributes of its corporations' shares and in protecting shareholders. Pp. 1648-1652.

(a) The Act does not discriminate against interstate commerce since it has the same effect on tender offers whether or not the offeror is an Indiana domiciliary or resident. That the Act might apply most often to out-of-state entities who launch most hostile tender offers is irrelevant, since a claim of discrimination is not established by the mere fact that the burden of a state regulation falls on some interstate companies. Pp. 1648-1649.

*71 (b) The Act does not create an impermissible risk of inconsistent regulation of tender offers by different States. It simply and evenhandedly exercises the State's firmly established authority to define the voting rights of shareholders in Indiana corporations, and thus subjects such corporations to the law of only one State. Pp. 1649-1650.

(c) The Court of Appeals' holding that the Act unconstitutionally hinders tender offers ignores the fact that a State, in its role as overseer of corporate governance, enacts laws that necessarily affect certain aspects of interstate commerce, particularly with respect to corporations with shareholders in other States. A State has interests in promoting stable relationships among parties involved in its corporations and in ensuring that investors have an effective voice in corporate affairs. The Indiana Act validly furthers these interests by allowing shareholders collectively to determine whether the takeover is advantageous to them. The argument that Indiana has no legitimate interest in protecting

nonresident shareholders is unavailing, since the Act applies only to corporations incorporated in Indiana that have a substantial number of shareholders in the State. Pp. 1650-1652.

(d) Even if the Act should decrease the number of successful tender offers for Indiana corporations, this would not offend the Commerce Clause. The Act does not prohibit any resident or nonresident from offering to purchase, or from purchasing, shares in Indiana corporations, or from attempting thereby to gain control. It only provides regulatory procedures designed for the better protection of the corporations' shareholders. The Commerce Clause does not protect the particular structure or methods of operation in a market. P. 1652.

794 F.2d 250 (CA 7 1986), reversed.

POWELL, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and BRENNAN, MARSHALL, and O'CONNOR, JJ., joined, and in Parts I, III-A, and III-B of which SCALIA, J., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, post, p. ----. WHITE, J., filed a dissenting opinion, in Part II of which BLACKMUN and STEVENS, JJ., joined, post, p. ----.

James A. Strain argued the cause for appellant in No. 86-71. With him on the brief were Richard E. Deer and Stanley C. Fickle. John F. Pritchard argued the cause and filed a brief for appellant in No. 86-97.

*72 Lowell E. Sachnoff argued the cause for appellee in both cases. With him on the brief were Dean A. Dickie and Sarah R. Wolff.† · · ·

† Briefs of amici curiae urging the reversal were filed for the State of New York by Robert Abrams, Attorney General, O. Peter Sherwood, Solicitor General, Mary Ellen Burns, Deputy Chief Assistant Attorney General, and Colvin W. Grannum, Assistant Attorney General; for the State of Minnesota by Hubert H. Humphrey III, Attorney General, and Alan I. Gilbert and Barry R. Greller, Special Assistant Attorneys General; and for the Indiana

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

107 S.Ct. 1637                                                                    Page 5
481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
(Cite as: 481 U.S. 69, 107 S.Ct. 1637)

Chamber of Commerce et al. by *Donald F. Elliott, Jr.,* and *Barton R. Peterson.*

Briefs of *amici curiae* urging affirmance were filed for the Securities and Exchange Commission et al. by *Solicitor General Fried, Deputy Solicitor General Cohen, Roy T. Englert, Jr., Daniel L. Goelzer,* and *Paul Gonson;* for the Securities Industry Association, Inc., by *Marc P. Cherno, Irwin Blum,* and *William J. Fitzpatrick;* and for the United Shareholders Association by *James Edward Maloney* and *David E. Warden.*

Justice POWELL delivered the opinion of the Court.

These cases present the questions whether the Control Share Acquisitions Chapter of the Indiana Business Corporation Law, Ind. Code § 23-1-42-1 *et seq.* (Supp.1986), is pre-empted by the Williams Act, 82 Stat. **1641 454, as amended, 15 U.S.C. §§ 78m(d)-(e) and 78n(d)-(f) (1982 ed. and Supp. III), or violates the Commerce Clause of the Federal Constitution, Art. I, § 8, cl. 3.

I
A

On March 4, 1986, the Governor of Indiana signed a revised Indiana Business Corporation Law, Ind. Code § 23-1-17-1 *et seq.* (Supp.1986). That law included the Control Share Acquisitions Chapter (Indiana Act or Act). Beginning on August 1, 1987, the Act will apply to any corporation incorporated in Indiana, § 23-1-17-3(a), unless the corporation amends its articles of incorporation or bylaws to opt out of the Act, § 23-1-42-5. Before that date, any Indiana corporation can opt into the Act by resolution of its board of directors. § 23-1-17-3(b). The Act applies only to "issuing *73 public corporations." The term "corporation" includes only businesses incorporated in Indiana. See § 23-1-20-5. An "issuing public corporation" is defined as:

"a corporation that has:

"(1) one hundred (100) or more shareholders;

"(2) its principal place of business, its principal office, or substantial assets within Indiana; and

"(3) either:

"(A) more than ten percent (10%) of its shareholders resident in Indiana;

"(B) more than ten percent (10%) of its shares owned by Indiana residents; or

"(C) ten thousand (10,000) shareholders resident in Indiana." § 23-1-42- 4(a). [FN1]

FN1. These thresholds are much higher than the 5% threshold acquisition requirement that brings a tender offer under the coverage of the Williams Act. See 15 U.S.C. § 78n(d)(1).

The Act focuses on the acquisition of "control shares" in an issuing public corporation. Under the Act, an entity acquires "control shares" whenever it acquires shares that, but for the operation of the Act, would bring its voting power in the corporation to or above any of three thresholds: 20%, 33 1/3 %, or 50%. § 23-1-42-1. An entity that acquires control shares does not necessarily acquire voting rights. Rather, it gains those rights only "to the extent granted by resolution approved by the shareholders of the issuing public corporation." § 23-1-42-9(a). Section 23-1-42-9(b) requires a majority vote of all disinterested [FN2] shareholders holding each *74 class of stock for passage of such a resolution. The practical effect of this requirement is to condition acquisition of control of a corporation on approval of a majority of the pre-existing disinterested shareholders. [FN3]

FN2. "Interested shares" are shares with respect to which the acquiror, an officer, or an inside director of the corporation "may exercise or direct the exercise of the voting power of the corporation in the election of directors." § 23-1-42-3. If the record date passes before the acquiror purchases shares pursuant to the tender offer, the purchased shares will not be "interested shares" within the meaning of the Act; although the acquiror may own the shares on the date of the meeting, it will not "exercise ... the voting power" of the shares.

107 S.Ct. 1637                                                                                                                Page 6
481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
(Cite as: 481 U.S. 69, 107 S.Ct. 1637)

As a practical matter, the record date usually will pass before shares change hands. Under Securities and Exchange Commission (SEC) regulations, the shares cannot be purchased until 20 business days after the offer commences. 17 CFR § 240.14e-1(a) (1986). If the acquiror seeks an early resolution of the issue--as most acquirors will--the meeting required by the Act must be held no more than 50 calendar days after the offer commences, about three weeks after the earliest date on which the shares could be purchased. See § 23-1-42-7. The Act requires management to give notice of the meeting "as promptly as reasonably practicable ... to all shareholders of record as of the record date set for the meeting." § 23-1-42-8(a). It seems likely that management of the target corporation would violate this obligation if it delayed setting the record date and sending notice until after 20 business days had passed. Thus, we assume that the record date usually will be set before the date on which federal law first permits purchase of the shares.

FN3. The United States and appellee Dynamics Corporation suggest that § 23-1-42-9(b)(1) requires a second vote by *all* shareholders of record. Brief for SEC and United States as *Amici Curiae* 5, and n. 6; Brief for Appellee 2-3, and n. 5. Indiana disputes this interpretation of its Act. Brief for Appellant in No. 86-97, p. 29, n. Section 23-1-42-9(b)(1) provides:
"[T]he resolution must be approved by:
"(1) each voting group entitled to vote separately on the proposal by a majority of all the votes entitled to be cast by that voting group, with the holders of the outstanding shares of a class being entitled to vote as a separate voting group if the proposed control share acquisition would, if fully carried out, result in any of the changes described in [Indiana Code § 23-1-38-4(a) (describing fundamental changes in cor-

porate organization)]."
The United States contends that this section always requires a separate vote by all shareholders and that the last clause merely specifies that the vote shall be taken by separate groups if the acquisition would result in one of the listed transactions. Indiana argues that this section requires a separate vote only if the acquisition would result in one of the listed transactions. Because it is unnecessary to our decision, we express no opinion as to the appropriate interpretation of this section.

**1642 The shareholders decide whether to confer rights on the control shares at the next regularly scheduled meeting of the shareholders, or at a specially scheduled meeting. The *75 acquiror can require management of the corporation to hold such a special meeting within 50 days if it files an "acquiring person statement," [FN4] requests the meeting, and agrees to pay the expenses of the meeting. See § 23-1-42-7. If the shareholders do not vote to restore voting rights to the shares, the corporation may redeem the control shares from the acquiror at fair market value, but it is not required to do so. § 23-1-42-10(b). Similarly, if the acquiror does not file an acquiring person statement with the corporation, the corporation may, if its bylaws or articles of incorporation so provide, redeem the shares at any time after 60 days after the acquiror's last acquisition. § 23-1-42-10(a).

FN4. An "acquiring person statement" is an information statement describing, *inter alia,* the identity of the acquiring person and the terms and extent of the proposed acquisition. See § 23-1-42-6.

B
On March 10, 1986, appellee Dynamics Corporation of America (Dynamics) owned 9.6% of the common stock of appellant CTS Corporation, an Indiana corporation. On that day, six days after the Act went into effect, Dynamics announced a tender offer for another million shares in CTS; purchase of those shares would have brought Dynamics'

107 S.Ct. 1637                                                                                                Page 7
481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
(Cite as: 481 U.S. 69, 107 S.Ct. 1637)

ownership interest in CTS to 27.5%. Also on March 10, Dynamics filed suit in the United States District Court for the Northern District of Illinois, alleging that CTS had violated the federal securities laws in a number of respects no longer relevant to these proceedings. On March 27, the board of directors of CTS, an Indiana corporation, elected to be governed by the provisions of the Act, see §. 23-1-17-3.

Four days later, on March 31, Dynamics moved for leave to amend its complaint to allege that the Act is pre-empted by the Williams Act, 15 U.S.C. §§ 78m(d)-(e) and 78n(d)-(f) (1982 ed. and Supp. III), and violates the Commerce Clause, Art. I, § 8, cl. 3. Dynamics sought a temporary restraining order, a preliminary injunction, and declaratory relief against *76 CTS' use of the Act. On April 9, the District Court ruled that the Williams Act pre-empts the Indiana Act and granted Dynamics' motion for declaratory relief. 637 F.Supp. 389 (N.D.Ill.1986). Relying on Justice WHITE's plurality opinion in *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), the court concluded that the Act "wholly frustrates the purpose and objective of Congress in striking a balance between the investor, management, and the takeover-bidder in takeover contests." 637 F.Supp., at 399. A week later, on April 17, the District Court issued an opinion accepting Dynamics' claim that the Act violates the Commerce Clause. This holding rested on the court's conclusion that "the substantial interference with interstate commerce created by the [Act] outweighs the articulated local benefits so as to create an impermissible indirect burden on interstate commerce." *Id.*, at 406. **1643 The District Court certified its decisions on the Williams Act and Commerce Clause claims as final under Federal Rule of Civil Procedure 54(b). *Ibid.*

.CTS appealed the District Court's holdings on these claims to the Court of Appeals for the Seventh Circuit. Because of the imminence of CTS' annual meeting, the Court of Appeals consolidated and expedited the two appeals. On April 23--23 days after Dynamics first contested application of the

Act in the District Court--the Court of Appeals issued an order affirming the judgment of the District Court. The opinion followed on May 28. 794 F.2d 250 (CA7 1986).

After disposing of a variety of questions not relevant to this appeal, the Court of Appeals examined Dynamics' claim that the Williams Act pre-empts the Indiana Act. The court looked first to the plurality opinion in *Edgar v. MITE Corp., supra,* in which three Justices found that the Williams Act pre-empts state statutes that upset the balance between target management and a tender offeror. The court noted that some commentators had disputed this view of the Williams Act, concluding instead that the Williams Act was "an anti-takeover statute, expressing a view, however benighted, *77 that hostile takeovers are bad." 794 F.2d, at 262. It also noted:

> "[I]t is a big leap from saying that the Williams Act does not itself exhibit much hostility to tender offers to saying that it implicitly forbids states to adopt more hostile regulations.... But whatever doubts of the Williams' Act preemptive intent we might entertain as an original matter are stilled by the weight of precedent." *Ibid.*

Once the court had decided to apply the analysis of the *MITE* plurality, it found the case straightforward:

> "Very few tender offers could run the gauntlet that Indiana has set up. In any event, if the Williams Act is to be taken as a congressional determination that a month (roughly) is enough time to force a tender offer to be kept open, 50 days is too much; and 50 days is the minimum under the Indiana act if the target corporation so chooses." *Id.*, at 263.

The court next addressed Dynamic's Commerce Clause challenge to the Act. Applying the balancing test articulated in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the court found the Act unconstitutional:

> "Unlike a state's blue sky law the Indiana statute is calculated to impede transactions between residents of other states. For the sake of trivial or even negative benefits to its residents Indiana is

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

107 S.Ct. 1637                                                                 Page 8
481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
(Cite as: 481 U.S. 69, 107 S.Ct. 1637)

depriving nonresidents of the valued opportunity to accept tender offers from other nonresidents. "... Even if a corporation's tangible assets are immovable, the efficiency with which they are employed and the proportions in which the earnings they generate are divided between management and shareholders depends on the market for corporate control--an interstate, indeed international, market that the State of Indiana is not authorized to opt out of, as in effect it has done in this statute." 794 F.2d, at 264.

*78 Finally, the court addressed the "internal affairs" doctrine, a "principle of conflict of laws ... designed to make sure that the law of only one state shall govern the internal affairs of a corporation or other association." *Ibid.* It stated:

"We may assume without having to decide that Indiana has a broad latitude in regulating those affairs, even when the consequence may be to make it harder to take over an Indiana corporation.... But in this case the effect on the interstate market in securities and corporate control is direct, intended, and substantial.... [T]hat the mode of regulation involves jiggering with voting rights cannot take it outside the scope of judicial review under the commerce clause." *Ibid.*

Accordingly, the court affirmed the judgment of the District Court.

**1644 Both Indiana and CTS filed jurisdictional statements. We noted probable jurisdiction under 28 U.S.C. § 1254(2), 479 U.S. 810, 107 S.Ct. 258, 93 L.Ed.2d 17 (1986), and now reverse. [FN5]

FN5. CTS and Dynamics have settled several of the disputes associated with Dynamics' tender offer for shares of CTS. The case is not moot, however, because the judgment of this Court still affects voting rights in the shares Dynamics purchased pursuant to the offer. If we were to affirm, Dynamics would continue to exercise the voting rights it had under the judgment of the Court of Appeals that the Act was pre-empted and unconstitutional. Because we decide today to reverse the judgment of

the Court of Appeals, Dynamics will have no voting rights in its shares unless shareholders of CTS grant those rights in a meeting held pursuant to the Act. See Settlement Agreement, p. 7, par. 12, reprinted in letter from James A. Strain, Counsel for CTS, to Joseph F. Spaniol, Jr., Clerk of the United States Supreme Court (Mar. 13, 1987).

II

[1] The first question in these cases is whether the Williams Act pre-empts the Indiana Act. As we have stated frequently, absent an explicit indication by Congress of an intent to pre-empt state law, a state statute is pre-empted only

*79 " 'where compliance with both federal and state regulations is a physical impossibility ...,' *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142-143 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248] (1963), or where the state 'law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *Hines v. Davidowitz,* 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941)....'" *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978).

Because it is entirely possible for entities to comply with both the Williams Act and the Indiana Act, the state statute can be pre-empted only if it frustrates the purposes of the federal law.

A

Our discussion begins with a brief summary of the structure and purposes of the Williams Act. Congress passed the Williams Act in 1968 in response to the increasing number of hostile tender offers. Before its passage, these transactions were not covered by the disclosure requirements of the federal securities laws. See *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 22, 97 S.Ct. 926, 939-940, 51 L.Ed.2d 124 (1977). The Williams Act, backed by regulations of the SEC, imposes requirements in two basic areas. First, it requires the offeror to file a statement disclosing information about the offer, including: the offeror's background and identity; the source and amount of the funds to be used

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
**(Cite as: 481 U.S. 69, 107 S.Ct. 1637)**

in making the purchase; the purpose of the purchase, including any plans to liquidate the company or make major changes in its corporate structure; and the extent of the offeror's holdings in the target company.    See 15 U.S.C. § 78n(d)(1) (incorporating § 78m(d)(1) by reference); 17 CFR §§ 240.13d-1, 240.14d-3 (1986).

Second, the Williams Act, and the regulations that accompany it, establish procedural rules to govern tender offers.    For example, stockholders who tender their shares may withdraw them while the offer remains open, and, if the offeror has not purchased their shares, any time after 60 days from commencement of the offer. 15 U.S.C. § 78n(d)(5); **\*80**17 CFR § 240.14d-7(a)(1) (1986) as amended, 51 Fed.Reg. 25873 (1986).    The offer must remain open for at least 20 business days.    17 CFR § 240.14e-1(a) (1986).    If more shares are tendered than the offeror sought to purchase, purchases must be made on a pro rata basis from each tendering shareholder. 15 U.S.C. § 78n(d)(6); 17 CFR § 240.14(8) (1986).    Finally, the offeror must pay the same price for all purchases; if the offering price is increased before the end of the offer, those who already have tendered must receive the benefit of the increased price. § 78n(d)(7).

**\*\*1645 B**
The Indiana Act differs in major respects from the Illinois statute that the Court considered in *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982).    After reviewing the legislative history of the Williams Act, Justice WHITE, joined by Chief Justice Burger and Justice BLACK-MUN (the plurality), concluded that the Williams Act struck a careful balance between the interests of offerors and target companies, and that any state statute that "upset" this balance was pre-empted. *Id.*, at 632-634, 102 S.Ct., at 2635-2636.

The plurality then identified three offending features of the Illinois statute.    Justice WHITE's opinion first noted that the Illinois statute provided for a 20-day precommencement period.    During this time, management could disseminate its views on the upcoming offer to shareholders, but offerors could not publish their offers.    The plurality found that this provision gave management "a powerful tool to combat tender offers." *Id.*, at 635, 102 S.Ct., at 2637.    This contrasted dramatically with the Williams Act;    Congress had deleted express precommencement notice provisions from the Williams Act. According to the plurality, Congress had determined that the potentially adverse consequences of such a provision on shareholders should be avoided. Thus, the plurality concluded that the Illinois provision "frustrate[d] the objectives of the Williams Act." *Ibid.* The second criticized feature of **\*81** the Illinois statute was a provision for a hearing on a tender offer that, because it set no deadline, allowed management " 'to stymie indefinitely a takeover,' " *id.*, at 637, 102 S.Ct., at 2638 (quoting *MITE Corp. v. Dixon*, 633 F.2d 486, 494 (CA7 1980)).    The plurality noted that " 'delay can seriously impede a tender offer,' " 457 U.S., at 637, 102 S.Ct., at 2638 (quoting *Great Western United Corp. v. Kidwell*, 577 F.2d 1256, 1277 (CA5 1978) (Wisdom, J.)), and that "Congress anticipated that investors and the takeover offeror would be free to go forward without unreasonable delay," 457 U.S., at 639, 102 S.Ct., at 2639.    Accordingly, the plurality concluded that this provision conflicted with the Williams Act.    The third troublesome feature of the Illinois statute was its requirement that the fairness of tender offers would be reviewed by the Illinois Secretary of State.    Noting that "Congress intended for investors to be free to make their own decisions," the plurality concluded that " '[t]he state thus offers investor protection at the expense of investor autonomy--an approach quite in conflict with that adopted by Congress.' " *Id.*, at 639-640, 102 S.Ct., at 2639 (quoting *MITE Corp. v. Dixon*, *supra*, at 494).

**C**
[2][3] As the plurality opinion in *MITE* did not represent the views of a majority of the Court, [FN6] we are not bound by its reasoning.    We need not question that reasoning, however, because we believe the Indiana Act passes muster even under the broad interpretation of the Williams Act articulated by Justice WHITE in *MITE*.    As is apparent from our summary of its reasoning, the overriding con-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

107 S.Ct. 1637

481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
(Cite as: 481 U.S. 69, 107 S.Ct. 1637)

cern of the *82 *MITE* plurality was that the Illinois statute considered in that case operated to favor management against offerors, to the detriment of shareholders. By contrast, the statute now before the Court protects the independent shareholder against the contending parties. Thus, the Act furthers a basic purpose of the Williams Act, " 'plac[ing] investors on an equal footing **1646 with the takeover bidder,' " *Piper v. Chris-Craft Industries, Inc.,* 430 U.S., at 30, 97 S.Ct., at 943 (quoting the Senate Report accompanying the Williams Act, S.Rep. No. 550, 90th Cong., 1st Sess., 4 (1967)). [FN7]

FN6. Justice WHITE's opinion on the preemption issue, 457 U.S., at 630-640, 102 S.Ct., at 2634-2640, was joined only by Chief Justice BURGER and by Justice BLACKMUN. Two Justices disagreed with Justice WHITE's conclusion. See *id.,* at 646-647, 102 S.Ct., at 2642-2643 (POWELL, J., concurring in part); *id.,* at 655, 102 S.Ct., at 2647 (STEVENS, J., concurring in part and concurring in judgment). Four Justices did not address the question. See *id.,* at 655, 102 S.Ct., at 2647 (O'CONNOR, J., concurring in part); *id.,* at 664, 102 S.Ct., at 2652 (MARSHALL, J., with whom BRENNAN, J., joined, dissenting); *id.,* at 667, 102 S.Ct., at 2653 (REHNQUIST, J., dissenting).

FN7. Dynamics finds evidence of an intent to favor management in several features of the Act. It argues that the provision of the Act allowing management to opt into the Act, see § 23-1-17-3(b), grants management a strategic advantage because tender offerors will be reluctant to take the expensive preliminary steps of a tender offer if they do not know whether their efforts will be subjected to the Act's requirements. But this provision is only a temporary option available for the first 17 months after enactment of the Act. The Indiana Legislature reasonably could have concluded

that corporations should be allowed an interim period during which the Act would not apply automatically. Because of its short duration, the potential strategic advantage offered by the opportunity to opt into the Act during this transition period is of little significance.

The Act also imposes some added expenses on the offeror, requiring it, *inter alia,* to pay the costs of special shareholder meetings to vote on the transfer of voting rights, see § 23-1-42-7(a). In our view, the expenses of such a meeting fairly are charged to the offeror. A corporation pays the costs of annual meetings that it holds to discuss its affairs. If an offeror--who has no official position with the corporation--desires a special meeting solely to discuss the voting rights of the offeror, it is not unreasonable to have the offeror pay for the meeting.

Of course, by regulating tender offers, the Act makes them more expensive and thus deters them somewhat, but this type of reasonable regulation does not alter the balance between management and offeror in any significant way. The principal result of the Act is to grant shareholders the power to deliberate collectively about the merits of tender offers. This result is fully in accord with the purposes of the Williams Act.

The Indiana Act operates on the assumption, implicit in the Williams Act, that independent shareholders faced with tender offers often are at a disadvantage. By allowing such *83 shareholders to vote as a group, the Act protects them from the coercive aspects of some tender offers. If, for example, shareholders believe that a successful tender offer will be followed by a purchase of nontendering shares at a depressed price, individual shareholders may tender their shares--even if they doubt the tender offer is in the corporation's best interest--to protect themselves from being forced to sell their shares at a depressed price. As the SEC explains: "The alternative of not accepting the tender offer is virtual assur-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

107 S.Ct. 1637

Page 11

481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213

**(Cite as: 481 U.S. 69, 107 S.Ct. 1637)**

ance that, if the offer is successful, the shares will have to be sold in the lower priced, second step." Two-Tier Tender Offer Pricing and Non-Tender Offer Purchase Programs, SEC Exchange Act Rel. No. 21079 (June 21, 1984), [1984 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 83,637, p. 86,916 (footnote omitted) (hereinafter SEC Release No. 21079). See Lowenstein, Pruning Deadwood in Hostile Takeovers: A Proposal for Legislation, 83 Colum.L.Rev. 249, 307-309 (1983). In such a situation under the Indiana Act, the shareholders as a group, acting in the corporation's best interest, could reject the offer, although individual shareholders might be inclined to accept it. The desire of the Indiana Legislature to protect shareholders of Indiana corporations from this type of coercive offer does not conflict with the Williams Act. Rather, it furthers the federal policy of investor protection.

In implementing its goal, the Indiana Act avoids the problems the plurality discussed in *MITE*. Unlike the *MITE* statute, the Indiana Act does not give either management or the offeror an advantage in communicating with the shareholders about the impending offer. The Act also does not impose an indefinite delay on tender offers. Nothing in the Act prohibits an offeror from consummating an offer on the 20th business day, the earliest day permitted under applicable federal regulations, see 17 CFR § 240.14e-1(a) (1986). Nor does the Act allow the state government to interpose its views of fairness between willing buyers and sellers of shares *84 of the target company. Rather, the Act allows *shareholders* to evaluate the fairness of the offer collectively.

**D**

The Court of Appeals based its finding of pre-emption on its view that the practical **1647 effect of the Indiana Act is to delay consummation of tender offers until 50 days after the commencement of the offer. 794 F.2d, at 263. As did the Court of Appeals, Dynamics reasons that no rational offeror will purchase shares until it gains assurance that those shares will carry voting rights. Because it is possible that voting rights will not be conferred un-

til a shareholder meeting 50 days after commencement of the offer, Dynamics concludes that the Act imposes a 50-day delay. This, it argues, conflicts with the shorter 20-business-day period established by the SEC as the minimum period for which a tender offer may be held open. 17 CFR § 240.14e-1 (1986). We find the alleged conflict illusory.

[4] The Act does not impose an absolute 50-day delay on tender offers, nor does it preclude an offeror from purchasing shares as soon as federal law permits. If the offeror fears an adverse shareholder vote under the Act, it can make a conditional tender offer, offering to accept shares on the condition that the shares receive voting rights within a certain period of time. The Williams Act permits tender offers to be conditioned on the offeror's subsequently obtaining regulatory approval. *E.g.*, Interpretive Release Relating to Tender Offer Rules, SEC Exchange Act Rel. No. 34-16623 (Mar. 5, 1980), 3 CCH Fed.Sec.L.Rep. ¶ 24,284I, p. 17,758, quoted in *MacFadden Holdings, Inc. v. JB Acquisition Corp.*, 802 F.2d 62, 70 (CA2 1986). [FN8] There is no reason to doubt that *85 this type of conditional tender offer would be legitimate as well. [FN9]

> FN8. Although the SEC does not appear to have spoken authoritatively on this point, similar transactions are not uncommon. For example, Hanson Trust recently conditioned consummation of a tender offer for shares in SCM Corporation on the removal of a "lockup option" that would have seriously diminished the value of acquiring the shares of SCM Corporation. See *Hanson Trust PLC, HSCM v. ML SCM Acquisition Inc., ML L.B.O.*, 81 F.2d 264, 272, and n. 7 (CA2 1986).

> FN9. Dynamics argues that conditional tender offers are not an adequate alternative because they leave management in place for three extra weeks, with "free rein to take other defensive steps that will diminish the value of tendered shares."

. . . .

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

107 S.Ct. 1637

481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213

**(Cite as: 481 U.S. 69, 107 S.Ct. 1637)**

Page 12

Brief for Appellee 37. We reject this contention. In the unlikely event that management were to take actions designed to diminish the value of the corporation's shares, it may incur liability under state law. But this problem does not control our pre-emption analysis. Neither the Act nor any other federal statute can assure that shareholders do not suffer from the mismanagement of corporate officers and directors. Cf. *Cort v. Ash*, 422 U.S. 66, 84, 95 S.Ct. 2080, 2090-2091, 45 L.Ed.2d 26 (1975).

[5] Even assuming that the Indiana Act imposes some additional delay, nothing in *MITE* suggested that *any* delay imposed by state regulation, however short, would create a conflict with the Williams Act. The plurality argued only that the offeror should "be free to go forward without *unreasonable* delay." 457 U.S., at 639, 102 S.Ct., at 2639 (emphasis added). In that case, the Court was confronted with the potential for indefinite delay and presented with no persuasive reason why some deadline could not be established. By contrast, the Indiana Act provides that full voting rights will be vested--if this eventually is to occur--within 50 days after commencement of the offer. This period is within the 60-day period Congress established for restitution of withdrawal rights in 15 U.S.C. § 78n(d)(5). We cannot say that a delay within that congressionally determined period is unreasonable.

[6] Finally, we note that the Williams Act would pre-empt a variety of state corporate laws of hitherto unquestioned validity if it were construed to pre-empt any state statute that may limit or delay the free exercise of power after a successful tender offer. State corporate laws commonly permit corporations to stagger the terms of their directors. See Model Business Corp. Act § 37 (1969 draft) in 3 Model Business Corp. Act Ann. (2d ed. 1971) (hereinafter MBCA); American *86 Bar Foundation, Revised Model Business Corp. Act § 8.06 (1984 draft) (1985) (hereinafter **1648 RMBCA). [FN10] By staggering the terms of directors, and thus having annual elections for only one class of

directors each year, corporations may delay the time when a successful offeror gains control of the board of directors. Similarly, state corporation laws commonly provide for cumulative voting. See 1 MBCA § 33, ¶ 4; RMBCA § 7.28. [FN11] By enabling minority shareholders to assure themselves of representation in each class of directors, cumulative voting provisions can delay further the ability of offerors to gain untrammeled authority over the affairs of the target corporation. See Hochman & Folger, Deflecting Takeovers: Charter and By-Law Techniques, 34 Bus.Law. 537, 538-539 (1979).

FN10. Every State except Arkansas and California allows classification of directors to stagger their terms of office. See 2 Model Business Corp. Act Ann. § 8.06, p. 830 (3d ed., Supp.1986).

FN11. "Cumulative voting is a means devised to protect minorities by providing a method of voting which assures to a minority, if it is sufficiently purposeful and cohesive, representation on the board of directors to an extent roughly proportionate to the minority's size. This is achieved by permitting each shareholder ... to cast the total number of his votes for a single candidate for election to the board, or to distribute such total among any number of such candidates (the total number of his votes being equal to the number of shares he is voting multiplied by the number of directors to be elected)." 1 MBCA § 33, ¶ 4 comment. Every State permits cumulative voting. See 2 Model Business Corp. Act Ann. § 7.28, pp. 675-677 (3d ed., Supp.1986).

In our view, the possibility that the Indiana Act will delay some tender offers is insufficient to require a conclusion that the Williams Act pre-empts the Act. The longstanding prevalence of state regulation in this area suggests that, if Congress had intended to pre-empt all state laws that delay the acquisition of voting control following a tender offer,

107 S.Ct. 1637                                                                                                    Page 13
481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
(Cite as: 481 U.S. 69, 107 S.Ct. 1637)

it would have said so explicitly. The regulatory conditions that the Act places on tender offers are consistent with the text and the purposes of the Williams Act. Accordingly, we *87 hold that the Williams Act does not pre-empt the Indiana Act.

### III

As an alternative basis for its decision, the Court of Appeals held that the Act violates the Commerce Clause of the Federal Constitution. We now address this holding.   On its face, the Commerce Clause is nothing more than a grant to Congress of the power "[t]o regulate Commerce ... among the several States ...," Art. I, § 8, cl. 3. But it has been settled for more than a century that the Clause prohibits States from taking certain actions respecting interstate commerce even absent congressional action.   See, e.g., Cooley v. Board of Wardens, 12 How. 299, 13 L.Ed. 996 (1852).   The Court's interpretation of "these great silences of the Constitution," H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 535, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949), has not always been easy to follow. Rather, as the volume and complexity of commerce and regulation have grown in this country, the Court has articulated a variety of tests in an attempt to describe the difference between those regulations that the Commerce Clause permits and those regulations that it prohibits.   See, e.g., Raymond Motor Transportation, Inc. v. Rice, 434 U.S. 429, 441, n. 15, 98 S.Ct. 787, 794, n. 15, 54 L.Ed.2d 664 (1978).

### A

[7] The principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce. See, e.g., Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 36-37, 100 S.Ct. 2009, 2015-2016, 64 L.Ed.2d 702 (1980); Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535-2536, 57 L.Ed.2d 475 (1978). See generally Regan, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause, 84 Mich.L.Rev. 1091 (1986). The Indiana Act is not such a statute. It has the same effects on tender offers whether or not the offeror is a domiciliary **1649 or resident of Indiana. Thus,

it "visits its effects equally upon both interstate and local business," Lewis v. BT Investment Managers, Inc., supra, 447 U.S., at 36, 100 S.Ct., at 2015.

*88 Dynamics nevertheless contends that the statute is discriminatory because it will apply most often to out-of-state entities. This argument rests on the contention that, as a practical matter, most hostile tender offers are launched by offerors outside Indiana. But this argument avails Dynamics little. "The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 126, 98 S.Ct. 2207, 2214, 57 L.Ed.2d 91 (1978). See Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 471-472, 101 S.Ct. 715, 727-728, 66 L.Ed.2d 659 (1981) (rejecting a claim of discrimination because the challenged statute "regulate[d] evenhandedly ... without regard to whether the [commerce came] from outside the State"); Commonwealth Edison Co. v. Montana, 453 U.S. 609, 619, 101 S.Ct. 2946, 2954, 69 L.Ed.2d 884 (1981) (rejecting a claim of discrimination because the "tax burden [was] borne according to the amount ... consumed and not according to any distinction between in-state and out-of-state consumers"). Because nothing in the Indiana Act imposes a greater burden on out-of-state offerors than it does on similarly situated Indiana offerors, we reject the contention that the Act discriminates against interstate commerce.

### B

[8] This Court's recent Commerce Clause cases also have invalidated statutes that may adversely affect interstate commerce by subjecting activities to inconsistent regulations. E.g., Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573, 583-584, 106 S.Ct. 2080, 2086-2087, 90 L.Ed.2d 552 (1986); Edgar v. MITE Corp., 457 U.S., at 642, 102 S.Ct., at 2640-2641 (plurality opinion of WHITE, J.); Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 671, 101 S.Ct. 1309, 1316-1317, 67 L.Ed.2d 580 (1981) (plurality opinion of POWELL, J.). See Southern Pacific Co. v. Arizona, 325 U.S. 761, 774, 65 S.Ct. 1515,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

107 S.Ct. 1637                                                                 Page 14
481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
(Cite as: 481 U.S. 69, 107 S.Ct. 1637)

1522-1523, 89 L.Ed. 1915 (1945) (noting the "confusion and difficulty" that would attend the "unsatisfied need for uniformity" in setting maximum limits on train lengths); *Cooley v. Board of Wardens, supra,* 12 How., at 319 (stating that the Commerce Clause prohibits States from regulating *89 subjects that "are in their nature national, or admit only of one uniform system, or plan of regulation"). The Indiana Act poses no such problem. So long as each State regulates voting rights only in the corporations it has created, each corporation will be subject to the law of only one State. No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of shareholders. See Restatement (Second) of Conflict of Laws § 304 (1971) (concluding that the law of the incorporating State generally should "determine the right of a shareholder to participate in the administration of the affairs of the corporation"). Accordingly, we conclude that the Indiana Act does not create an impermissible risk of inconsistent regulation by different States.

C

The Court of Appeals did not find the Act unconstitutional for either of these threshold reasons. Rather, its decision rested on its view of the Act's potential to hinder tender offers. We think the Court of Appeals failed to appreciate the significance for Commerce Clause analysis of the fact that state regulation of corporate governance is regulation of entities whose very existence and attributes are a product of state law. As Chief Justice Marshall explained:

"A corporation is an artificial being, invisible, intangible, and existing only in **1650 contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence. These are such as are supposed best calculated to effect the object for which it was created." *Trustees of Dartmouth College v. Woodward,* 4 Wheat. 518, 636, 4 L.Ed. 518 (1819).

See *First National Bank of Boston v. Bellotti,* 435

U.S. 765, 822- 824, 98 S.Ct. 1407, 1439-1441, 55 L.Ed.2d 707 (1978) (REHNQUIST, J., dissenting). Every State in this country has enacted laws regulating corporate governance. *90 By prohibiting certain transactions, and regulating others, such laws necessarily affect certain aspects of interstate commerce. This necessarily is true with respect to corporations with shareholders in States other than the State of incorporation. Large corporations that are listed on national exchanges, or even regional exchanges, will have shareholders in many States and shares that are traded frequently. The markets that facilitate this national and international participation in ownership of corporations are essential for providing capital not only for new enterprises, but also for established companies that need to expand their businesses. This beneficial free market system depends at its core upon the fact that a corporation--except in the rarest situations--is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of its incorporation.

These regulatory laws may affect directly a variety of corporate transactions. Mergers are a typical example. In view of the substantial effect that a merger may have on the shareholders' interests in a corporation, many States require supermajority votes to approve mergers. See, *e.g.,* 2 MBCA § 73 (requiring approval of a merger by a majority of all shares, rather than simply a majority of votes cast); RMBCA § 11.03 (same). By requiring a greater vote for mergers than is required for other transactions, these laws make it more difficult for corporations to merge. State laws also may provide for "dissenters' rights" under which minority shareholders who disagree with corporate decisions to take particular actions are entitled to sell their shares to the corporation at fair market value. See, *e.g.,* 2 MBCA §§ 80, 81; RMBCA § 13.02. By requiring the corporation to purchase the shares of dissenting shareholders, these laws may inhibit a corporation from engaging in the specified transactions. [FN12]

FN12. Numerous other common regulations may affect both nonresident and resident shareholders of a corporation. Spe-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

107 S.Ct. 1637                                                                                                    Page 15
481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
**(Cite as: 481 U.S. 69, 107 S.Ct. 1637)**

cified votes may be required for the sale of all of the corporation's assets.    See 2 MBCA § 79; RMBCA § 12.02.    The election of directors may be staggered over a period of years to prevent abrupt changes in management.    See 1 MBCA § 37; RMBCA § 8.06.    Various classes of stock may be created with differences in voting rights as to dividends and on liquidation. See 1 MBCA § 15; RMBCA § 6.01(c). Provisions may be made for cumulative voting.    See 1 MBCA § 33, ¶ 4; RMBCA § 7.28; n. 9, *supra*.    Corporations may adopt restrictions on payment of dividends to ensure that specified ratios of assets to liabilities are maintained for the benefit of the holders of corporate bonds or notes. See 1 MBCA § 45 (noting that a corporation's articles of incorporation can restrict payment of dividends); RMBCA § 6.40 (same).    Where the shares of a corporation are held in States other than that of incorporation, actions taken pursuant to these and similar provisions of state law will affect all shareholders alike wherever they reside or are domiciled.

Nor is it unusual for partnership law to restrict certain transactions. For example, a purchaser of a partnership interest generally can gain a right to control the business only with the consent of other owners. See Uniform Partnership Act § 27, 6 U.L.A. 353 (1969); Uniform Limited Partnership Act § 19 (1916 draft), 6 U.L.A. 603 (1969); Revised Uniform Limited Partnership Act §§ 702, 704 (1976 draft), 6 U.L.A. 259, 261 (Supp.1986).    These provisions--in force in the great majority of the States--bear a striking resemblance to the Act at issue in this case.

[9] *91 It thus is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares.    **1651 A State has an interest in promoting stable relationships among parties involved in the corporations it charters, as well as in ensuring that investors in such corporations have an effective voice in corporate affairs.

[10] There can be no doubt that the Act reflects these concerns.    The primary purpose of the Act is to protect the shareholders of Indiana corporations.    It does this by affording shareholders, when a takeover offer is made, an opportunity to decide collectively whether the resulting change in voting control of the corporation, as they perceive it, would be desirable.    A change of management may have important effects on the shareholders' interests;  it is well within the State's role as overseer of corporate governance to offer this opportunity. The autonomy provided by allowing shareholders collectively to determine whether the takeover is advantageous to their *92 interests may be especially beneficial where a hostile tender offer may coerce shareholders into tendering their shares.

Appellee Dynamics responds to this concern by arguing that the prospect of coercive tender offers is illusory, and that tender offers generally should be favored because they reallocate corporate assets into the hands of management who can use them most effectively. [FN13]    See generally Easterbrook & Fischel, The Proper Role of a Target's Management in Responding to a Tender Offer, 94 Harv.L.Rev. 1161 (1981).    As indicated *supra*, at 1646, Indiana's concern with tender offers is not groundless. Indeed, the potentially coercive aspects of tender offers have been recognized by the SEC, see SEC Release No. 21079, p. 86,916, and by a number of scholarly commentators, see, *e.g.*, Bradley & Rosenzweig, Defensive Stock Repurchases, 99 Harv.L.Rev. 1377, 1412-1413 (1986); Macey & McChesney, A Theoretical Analysis of Corporate Greenmail, 95 Yale L.J. 13, 20-22 (1985); Lowenstein, 83 Colum.L.Rev., at 307-309.    The Constitution does not require the States to subscribe to any particular economic theory.    We are not inclined "to second-guess the empirical judgments of lawmakers concerning the utility of legislation," *Kassel v. Consolidated Freightways Corp.*, 450 U.S., at 679, 101 S.Ct., at 1321 (BRENNAN, J., concurring in judgment).    In our view, the possibility of coer-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
**(Cite as: 481 U.S. 69, 107 S.Ct. 1637)**

cion in some takeover bids offers additional justi-fication for Indiana's decision to promote the autonomy of independent shareholders.

> FN13. It is appropriate to note when dis-cussing the merits and demerits of tender offers that generalizations usually require qualification.   No one doubts that some successful tender offers will provide more effective management or other benefits such as needed diversification.   But there is no reason to *assume* that the type of con-glomerate corporation that may result from repetitive takeovers necessarily will result in more effective management or otherwise be beneficial to shareholders.   The diver-gent views in the literature--and even now being debated in the Congress--reflect the reality that the type and utility of tender of-fers vary widely.   Of course, in many situ-ations the offer to shareholders is simply a cash price substantially higher than the market price prior to the offer.

[11] *93 Dynamics argues in any event that the State has " 'no legitimate interest in protecting the nonresident shareholders.' "   Brief for Appellee 21 (quoting *Edgar v. MITE Corp.,* 457 U.S., at 644, 102 S.Ct., at 2641-2642).   Dynamics relies heavily on the statement by the *MITE* Court that "[i]nsofar as the ... law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law." 457 U.S., at 644, 102 S.Ct., at 2641.   But that comment was made in reference to an Illinois law that applied as well to out-of-state corporations as to in-state corporations.   We agree that Indiana has no interest in protecting nonresident sharehold-ers *of nonresident corporations.*   But this Act ap-plies only to corporations incorporated in Indiana.   We reject the contention that Indiana has no interest in providing for the shareholders of its corporations the voting autonomy granted by the Act.   Indiana has a substantial interest in preventing the corporate form from becoming a shield for unfair **1652 business dealing.   Moreover, unlike the Illinois statute invalidated in *MITE,* the Indiana Act applies only to corporations that have a substantial number

of shareholders in Indiana.   See Ind. Code § 23-1-42- 4(a)(3) (Supp.1986).   Thus, every applic-ation of the Indiana Act will affect a substantial number of Indiana residents, whom Indiana indis-putably has an interest in protecting.

### D

[12] Dynamics' argument that the Act is unconstitu-tional ultimately rests on its contention that the Act will limit the number of successful tender offers.   There is little evidence that this will occur.   But even if true, this result would not substantially af-fect our Commerce Clause analysis.   We reiterate that this Act does not prohibit any entity--resident or nonresident-- from offering to purchase, or from purchasing, shares in Indiana corporations, or from attempting thereby to gain control.   It only provides regulatory procedures designed for the better protection of the corporations' shareholders.   We have rejected the "notion that the Commerce *94 Clause protects the particular structure or methods of operation in a ... market." *Exxon Corp. v. Governor of Maryland,* 437 U.S., at 127, 98 S.Ct., at 2215. The very commodity that is traded in the securities market is one whose characteristics are defined by state law.   Similarly, the very com-modity that is traded in the "market for corporate control"--the corporation--is one that owes its exist-ence and attributes to state law.   Indiana need not define these commodities as other States do;   it need only provide that residents and nonresidents have equal access to them.   This Indiana has done.   Accordingly, even if the Act should de-crease the number of successful tender offers for Indiana corporations, this would not offend the Commerce Clause. [FN14]

> FN14. CTS also contends that the Act does not violate the Commerce Clause--regardless of any burdens it may impose on interstate commerce-- because a corpor-ation's decision to be covered by the Act is purely "private" activity beyond the reach of the Commerce Clause.   Because we re-verse the judgment of the Court of Appeals on other grounds, we have no occasion to consider this argument.

481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
(Cite as: 481 U.S. 69, 107 S.Ct. 1637)

## IV

On its face, the Indiana Control Share Acquisitions Chapter evenhandedly determines the voting rights of shares of Indiana corporations. The Act does not conflict with the provisions or purposes of the Williams Act. To the limited extent that the Act affects interstate commerce, this is justified by the State's interests in defining the attributes of shares in its corporations and in protecting shareholders. Congress has never questioned the need for state regulation of these matters. Nor do we think such regulation offends the Constitution. Accordingly, we reverse the judgment of the Court of Appeals.

*It is so ordered.*

Justice SCALIA, concurring in part and concurring in the judgment.

I join Parts I, III-A, and III-B of the Court's opinion. However, having found, as those Parts do, that the Indiana *95 Control Share Acquisitions Chapter neither "discriminates against interstate commerce," *ante,* at 1649, nor "create[s] an impermissible risk of inconsistent regulation by different States," *ante,* at 1649, I would conclude without further analysis that it is not invalid under the dormant Commerce Clause. While it has become standard practice at least since *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), to consider, in addition to these factors, whether the burden on commerce imposed by a state statute "is clearly excessive in relation to the putative local benefits," *id.,* at 142, 90 S.Ct., at 847, such an inquiry is ill suited to the judicial function and should be undertaken rarely if at all. This case is a good illustration of the point. Whether the control shares statute "protects shareholders **1653 of Indiana corporations," Brief for Appellant in No. 86-97, p. 88, or protects incumbent management seems to me a highly debatable question, but it is extraordinary to think that the constitutionality of the Act should depend on the answer. Nothing in the Constitution says that the protection of entrenched management is any less important a "putative local benefit" than the protection of entrenched shareholders, and I do not know

what qualifies us to make that judgment--or the related judgment as to how effective the present statute is in achieving one or the other objective--or the ultimate (and most ineffable) judgment as to whether, given importance-level *x,* and effectiveness-level *y,* the worth of the statute is "outweighed" by impact-on-commerce *z.*

One commentator has suggested that, at least much of the time, we do not in fact mean what we say when we declare that statutes which neither discriminate against commerce nor present a threat of multiple and inconsistent burdens might nonetheless be unconstitutional under a "balancing" test. See Regan, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause, 84 Mich.L.Rev. 1091 (1986). If he is not correct, he ought to he. As long as a State's corporation law governs only its own corporations and does not discriminate against out-of-state interests, it should survive this Court's scrutiny under *96 the Commerce Clause, whether it promotes shareholder welfare or industrial stagnation. Beyond that, it is for Congress to prescribe its invalidity.

I also agree with the Court that the Indiana Control Share Acquisitions Chapter is not pre-empted by the Williams Act, but I reach that conclusion without entering into the debate over the purposes of the two statutes. The Williams Act is governed by the antipre-emption provision of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a), which provides that nothing it contains "shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder." Unless it serves no function, that language forecloses pre-emption on the basis of conflicting "purpose" as opposed to conflicting "provision." Even if it does not have literal application to the present case (because, perhaps, the Indiana agency responsible for securities matters has no enforcement responsibility with regard to this legislation), it nonetheless refutes the proposition that Congress meant the Williams Act to displace *all* state laws with con-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
**(Cite as: 481 U.S. 69, 107 S.Ct. 1637)**

flicting purpose.    And if any are to survive, surely the States' corporation codes are among them.    It would be peculiar to hold that Indiana could have pursued the purpose at issue here through its blue-sky laws, but cannot pursue it through the State's even more sacrosanct authority over the structure of domestic corporations.    Prescribing voting rights for the governance of state-chartered companies is a traditional state function with which the Federal Congress has never, to my knowledge, intentionally interfered.    I would require far more evidence than is available here to find implicit pre-emption of that function by a federal statute whose provisions concededly do not conflict with the state law.

I do not share the Court's apparent high estimation of the beneficence of the state statute at issue here. But a law can *97 be both economic folly and constitutional.    The Indiana Control Share Acquisitions Chapter is at least the latter.    I therefore concur in the judgment of the Court.

Justice WHITE, with whom Justice BLACKMUN and Justice STEVENS join as to Part II, dissenting.

The majority today upholds Indiana's Control Share Acquisitions Chapter, a statute which will predictably foreclose completely some tender offers for stock in Indiana corporations.    I disagree with the conclusion that the Chapter is neither pre-empted by the Williams Act nor in conflict **1654 with the Commerce Clause.    The Chapter undermines the policy of the Williams Act by effectively preventing minority shareholders, in some circumstances, from acting in their own best interests by selling their stock.    In addition, the Chapter will substantially burden the interstate market in corporate ownership, particularly if other States follow Indiana's lead as many already have done. The Chapter, therefore, directly inhibits interstate commerce, the very economic consequences the Commerce Clause was intended to prevent.    The opinion of the Court of Appeals is far more persuasive than that of the majority today, and the judgment of that court should be affirmed.

                                    I

The Williams Act expressed Congress' concern that individual investors be given sufficient information so that they could make an informed choice on whether to tender their stock in response to a tender offer.    The problem with the approach the majority adopts today is that it equates protection of individual investors, the focus of the Williams Act, with the protection of shareholders as a group.    Indiana's Control Share Acquisitions. Chapter undoubtedly helps protect the interests of a majority of the shareholders in any corporation subject to its terms, but in many instances, it will effectively prevent an individual investor from selling his stock at a premium.    Indiana's statute, therefore, does not *98 "furthe[r] the federal policy of *investor* protection," *ante,* at 1646 (emphasis added), as the majority claims.

In discussing the legislative history of the Williams Act, the Court, in *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), looked to the legislative history of the Williams Act and concluded that the Act was designed to protect individual investors, not management and not tender offerors: "The sponsors of this legislation were plainly sensitive to the suggestion that the measure would favor one side or the other in control contests; however, they made it clear that the legislation was designed solely to get needed information to the investor, the constant focal point of the committee hearings." *Id.,* at 30-31, 97 S.Ct., at 943-944.    The Court specifically noted that the Williams Act's legislative history shows that Congress recognized that some "takeover bids ... often serve a useful function." *Id.,* at 30, 97 S.Ct., at 943.    As quoted by the majority, *ante,* at 1645, the basic purpose of the Williams Act is " 'plac[ing] *investors* on an equal footing with the takeover bidder.' " *Piper, supra,* at 30, 97 S.Ct., at 943 (emphasis added).

The Control Share Acquisitions Chapter, by design, will frustrate individual investment decisions. Concededly, the Control Share Acquisitions Chapter allows the majority of a corporation's shareholders to block a tender offer and thereby thwart the desires of an individual investor to sell

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

his stock.    In the context of discussing how the Chapter can be used to deal with the coercive aspects of some tender offers, the majority states: "In such a situation under the Indiana Act, the shareholders as a group, acting in the corporation's best interest, could reject the offer, although individual shareholders might be inclined to accept it." *Ante,* at 1646.  I do not dispute that the Chapter provides additional protection for Indiana corporations, particularly in helping those corporations maintain the status quo.    But it is clear to me that Indiana's scheme conflicts with the Williams Act's careful balance, which was intended to protect individual investors and permit them to decide whether it is in their best interests *99 to tender their stock.  As noted by the plurality in *MITE,* "Congress ... did not want to deny shareholders 'the opportunities which result from the competitive bidding for a block of stock of a given company,' namely, the opportunity to sell shares for a premium over their market price.  113  Cong.Rec.  24666  (1967) (remarks of Sen. Javits)." *Edgar v. MITE Corp.,* 457 U.S. 624, 633, n. 9, 102 S.Ct. 2629, 2636, n. 9, 73 L.Ed.2d 269 (1982).

**1655 The majority claims that if the Williams Act pre-empts Indiana's Control Share Acquisitions Chapter, it also pre-empts a number of other corporate-control provisions such as cumulative voting or staggering the terms of directors.  But this view ignores the fundamental distinction between these other corporate-control provisions and the Chapter: unlike those other provisions, the Chapter is designed to prevent certain tender offers from ever taking place.  It is transactional in nature, although it is characterized by the State as involving only the voting rights of certain shares.  "[T]his Court is not bound by '[t]he name, description or characterization given [a challenged statute] by the legislature or the courts of the State,' but will determine for itself the practical impact of the law." *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979) (quoting *Lacoste v. Louisiana Dept. of Conservation,* 263 U.S. 545, 550, 44 S.Ct. 186, 188, 68 L.Ed. 437 (1924)).  The Control Share Acquisitions Chapter will effectively prevent minority shareholders in

some circumstances from selling their stock to a willing tender offeror.  It is the practical impact of the Chapter that leads to the conclusion that it is pre-empted by the Williams Act.

II

Given the impact of the Control Share Acquisitions Chapter, it is clear that Indiana is directly regulating the purchase and sale of shares of stock in interstate commerce.  Appellant CTS' stock is traded on the New York Stock Exchange, and people from all over the country buy and sell CTS' shares daily.  Yet, under Indiana's scheme, any prospective purchaser will be effectively precluded from purchasing CTS' *100 shares if the purchaser crosses one of the Chapter's threshold ownership levels and a majority of CTS' shareholders refuse to give the purchaser voting rights.    This Court should not countenance such a restraint on interstate trade.

The United States, as *amicus curiae,* argues that Indiana's Control Share Acquisitions Chapter "is written as a restraint on the *transferability* of voting rights in specified transactions, and it could not be written in any other way without changing its meaning.  Since the restraint on the transfer of voting rights is a restraint on the transfer of shares, the Indiana Chapter, like the Illinois Act [in *MITE* ], restrains 'transfers of stock by stockholders to a third party.' "  Brief for Securities and Exchange Commission and United States as *Amici Curiae* 26.  I agree.  The majority ignores the practical impact of the Chapter in concluding that the Chapter does not violate the Commerce Clause.    The Chapter is characterized as merely defining "the attributes of shares in its corporations," *ante,* at 1652.  The majority sees the trees but not the forest.

The Commerce Clause was included in our Constitution by the Framers to prevent the very type of economic protectionism Indiana's Control Share Acquisitions Chapter represents:
  "The few simple words of the Commerce Clause--'The Congress shall have Power ... To regulate Commerce  ...  among  the  several  States ...'--reflected a central concern of the Framers that was an immediate reason for calling the Con-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67, 55 USLW 4478, Fed. Sec. L. Rep. P 93,213
(Cite as: 481 U.S. 69, 107 S.Ct. 1637)

stitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes, supra,* at 325-326, 99 S.Ct., at 1730-1731.

The State of Indiana, in its brief, admits that at least one of the Chapter's goals is to protect Indiana corporations. The State notes that the Chapter permits shareholders "to determine ... *101 whether [a tender offeror] will liquidate the company or remove it from the State." Brief for Appellant in No. 86-97, p. 19. The State repeats this point later in its brief: "The Statute permits shareholders (who may also be **1656 community residents or employees or suppliers of the corporation) to determine the intentions of any offeror concerning the liquidation of the company or its possible removal from the State." *Id.,* at 90. A state law which permits a majority of an Indiana corporation's stockholders to prevent individual investors, including out-of-state stockholders, from selling their stock to an out-of-state tender offeror and thereby frustrate any transfer of corporate control, is the archetype of the kind of state law that the Commerce Clause forbids.

Unlike state blue sky laws, Indiana's Control Share Acquisitions Chapter regulates the purchase and sale of stock of Indiana corporations in interstate commerce. Indeed, as noted above, the Chapter will inevitably be used to block interstate transactions in such stock. Because the Commerce Clause protects the "interstate market" in such securities, *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 127, 98 S.Ct. 2207, 2214, 57 L.Ed.2d 91 (1978), and because the Control Share Acquisitions Chapter substantially interferes with this interstate market, the Chapter clearly conflicts with the Commerce Clause.

With all due respect, I dissent.

For U.S. Supreme Court Briefs See:

1986 WL 727886 (Appellate Brief), Brief of Inter-

venor-Appellant State of Indiana, (December 4, 1986)

1986 WL 727970 (Appellate Brief), Brief for Appellant Cts Corporation, (December 4, 1986)

1986 WL 727974 (Appellate Brief), Brief for Appellee., (1986)

1987 WL 880971 (Appellate Brief), Reply Brief of Appellant Cts Corporation, (February 28, 1987)

1986 WL 727971 (Appellate Brief), Brief Amicus Curiae of the State of New York in Support of Appellants, (December 4, 1986)

1986 WL 727972 (Appellate Brief), Amicus Curiae Brief of State of Minnesota, (December 4, 1986)

1986 WL 727973 (Appellate Brief), Joint Brief of the Indiana Chamber of Commerce and Indiana Legal Foundation, Inc. as Amici Curiae in Support of Appellants Cts Corporation and the State of Indiana, (December 3, 1986)

1987 WL 880968 (Appellate Brief), Brief Amicus Curiae of United Shareholders Association in Support of Appellee, (January 20, 1987)

1987 WL 880969 (Appellate Brief), Brief for the Securities and Exchange Commission and the United States as Amici Curiae, (January 20, 1987)

1987 WL 880970 (Appellate Brief), Amicus Curiae Brief of the Securities Industry Association, Inc. in Support of Appellee, (January 20, 1987)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

517 N.Y.S.2d 490                                                                                           Page 1
129 A.D.2d 179, 517 N.Y.S.2d 490
(Cite as: 129 A.D.2d 179, 517 N.Y.S.2d 490)

▷

Supreme Court, Appellate Division, First Depart-
ment, New York.
Milledge A. HART, III, individually and on behalf
of all holders of General
Motors Corporation Class E Common Stock simil-
arly situated and derivatively on
behalf of General Motors Corporation, Plaintiff-
Respondent,
v.
GENERAL MOTORS CORPORATION, Roger B.
Smith, Anne L. Armstrong, Donald J.
Atwood, Catherine B. Cleary, James H. Evans,
Walter A. Fallon, Charles T.
Fisher, III, Marvin L. Goldberger, John J. Horan,
Howard H. Kehrl, F. James
McDonald, Thomas A. Murphy, Edmund T. Pratt,
Jr., Lloyd E. Reuss, James D.
Robinson, III, John G. Smale, F. Alan Smith,
Robert C. Stempel, Leon H.
Sullivan, Dennis Weatherstone, Thomas H. Wyman
and H. Ross Perot, Defendants-
Appellants.

June 25, 1987.

Shareholder brought action against corporation, dir-
ectors, and former director challenging board's de-
cision authorizing purchase of former director's
stock. The Supreme Court, New York County,
Santaella, J., denied motions to dismiss. Defendants
appealed. The Supreme Court, Appellate Division,
Sullivan, J., held that action was subject to dis-
missal on basis of forum non conveniens.

Reversed.

West Headnotes

[1] Corporations ⟜189(.5)
101k189(.5) Most Cited Cases
(Formerly 101k189)
For choice of law purposes, decision by sharehold-
ers to incorporate under law of one jurisdiction is
no different from designating law governing busi-

ness trust, which, prima facie determines applicable
law for shareholder action.

[2] Courts ⟜28
106k28 Most Cited Cases
A court may dismiss where it is determined that ac-
tion, although jurisdictionally sound, would be bet-
ter adjudicated elsewhere.

[3] Courts ⟜28
106k28 Most Cited Cases
Among relevant considerations in forum non con-
veniens applications are burden on state courts, po-
tential hardship to defendant, and unavailability of
alternative forum in which plaintiff may bring suit.

[4] Courts ⟜28
106k28 Most Cited Cases
Shareholder's action against corporation, its direct-
ors, and former director challenging board's de-
cision authorizing purchase of former director's
stock was subject to dismissal on basis of forum
non conveniens; derivative actions challenging
same transaction on behalf of corporation were be-
ing litigated in Delaware, action subjected corpora-
tion and directors to expense of litigating same
claims in separate forums, as well as exposing them
to possibility of inconsistent judgments, and share-
holder had another readily available forum in which
to pursue claim.
**490 *180 Dennis J. Block, of counsel (Irwin H.
Warren, Stephen A. Radin and Timothy E. Hoeffn-
er, with him on the brief; Weil, Gotshal & Manges,
New York City, attorneys), for Individual Directors
of General Motors Corp.

Roy L. Reardon, Joseph F. Tringali, New York
City, Stephen C. Neal, Robert J. Kopecky and Wil-
liam F. Dolan, Chicago, Ill., of counsel; Simpson
Thacher & Bartlett, New York City, Kirkland & El-
lis, Chicago, Ill., and Michael J. Basford (Louis H.
Lindeman, Jr., Detroit, Mich., attorneys), for de-
fendant-appellant General Motors.

Evan R. Chesler, of counsel (Thomas D. Barr,
Robert N. Feltoon, Robert B. Silver, Christopher

517 N.Y.S.2d 490                                                                Page 2
129 A.D.2d 179, 517 N.Y.S.2d 490
(Cite as: 129 A.D.2d 179, 517 N.Y.S.2d 490)

M. Mason, New York City, Thomas W. Luce, III and M. David Bryant, Jr., Dallas, Tex., with him on the brief; Cravath, Swaine & Moore, New York City, and Hughes & Luce, Dallas, Tex., attorneys), for defendant-appellant Perot.

Melvyn I. Weiss, of counsel (Michael C. Spencer and Steven G. Schulman, with him on the brief; Milberg Weiss Bershad Specthrie & **491 Lerach, New York City, attorneys), for plaintiff-respondent.

Before MURPHY, P.J., and SULLIVAN, ROSS, ASCH and WALLACH, JJ.

SULLIVAN, Justice.

In October 1984, General Motors (GM), a Delaware corporation with its principal place of business in Michigan, acquired 100% of the voting securities of Electronic Data Systems Corp. (EDS), a highly successful computer services firm, at a cost of some $2,500,000,000. Under the terms of the acquisition, each outstanding share of EDS stock was exchanged, at the option of the EDS shareholder, for either $44.00 in cash or a combination of $35.20 in cash, a share of a newly created class of GM common stock (Class E stock), a non-transferrable contingent promissory note, maturing in 1991, entitling the holder to an amount equal to the difference between $62.50 and the 1991 market price of Class E stock, and a "Special Interest" designed to compensate for certain federal tax consequences. H. Ross Perot, the then Chairman of EDS, chose the second option and became GM's largest individual shareholder in the process. Perot remained as Chairman of EDS and was also named a director of GM.

Problems began to develop between EDS and GM almost immediately, and Perot became an increasingly vocal critic of GM. As the end of 1986 approached, Perot's differences with GM's Board of Directors had intensified to the point that they *181 decided to buy him out. Accordingly, GM's directors and Perot negotiated an agreement whereby GM, for a total price of approximately $750,000,000, the purported equivalent of approximately $61.90 per share and related note, would purchase Perot's Class E stock and corresponding contingent notes and those of three of his associates in return for, *inter alia,* Perot's resignation as a GM director and chairman of EDS and his agreement not to criticize GM publicly or repurchase its stock or otherwise seek to exercise control over GM for the next five years. If Perot were to voice any public criticism of GM or its management he could be penalized up to $7,500,000. On November 30, 1986, approval of the transaction was recommended by a special review committee of GM's Board of Directors, which, itself, on the following day, gave its unanimous approval. The transaction was consummated that same day.

On December 5, 1986, plaintiff, a Texas resident who had become a holder of several hundred thousand shares of GM Class E stock and related notes in 1984 in exchange for his stock holdings in EDS, purporting to act derivatively on behalf of GM and as a class representative of all its Class E stockholders, commenced this action against GM, its directors and Perot, challenging the Board's December 1, 1986 decision authorizing the purchase transaction. Alleging breach of fiduciary duty and waste, plaintiff claims that GM's purchase of Perot's stock and notes, as well as Perot's resignations from both GM and EDS, damaged GM, EDS and GM's Class E stockholders. In essence, plaintiff contends that the payment of $750,000,000 incorporated a premium amounting to hundreds of millions of dollars over the fair market value of the surrendered stock and notes, and that the premium was paid to induce Perot to remove himself from his corporate offices and directorship of GM. In effect, plaintiff alleges a sale of corporate office for personal gain. In the only cause of action asserted against Perot, plaintiff seeks rescission of the transaction. Plaintiff did not, however, prior to the commencement of this action, make a demand on GM's Board of Directors that it cause GM to pursue the claim. In conclusory terms, he alleges that such a demand would have been futile.

On December 4, 1986, the day before the commencement of this action, two similar derivative actions were filed in the Delaware Chancery Court by

517 N.Y.S.2d 490                                                                    Page 3
129 A.D.2d 179, 517 N.Y.S.2d 490
(Cite as: 129 A.D.2d 179, 517 N.Y.S.2d 490)

other GM shareholders, and four additional state court actions were instituted in Delaware between December 5, 1986 and February 4, 1987. On April 13, *182 1987, during the pendency of this appeal, the Delaware Chancery Court dismissed one of the December 4th actions **492 on the ground that the plaintiffs had failed to make a prelitigation demand on the Board of Directors, or to plead with particularity facts which, if proved, would excuse such demand. We note that the complaint there apparently contained allegations substantially more particularized than those pleaded here as to the futility of a pre-litigation demand.

A total of nine additional actions have been filed in federal courts in five different states. These actions also include the same common law claims of breach of fiduciary duty and waste as are alleged in the instant action and the Delaware actions, as well as allegations under the federal securities laws. These nine actions, four of which currently name Perot as a defendant, were referred to the Judicial Panel on Multidistrict Litigation, which consolidated them and transferred the eight actions pending in districts other than the District of Delaware to the Delaware court "to prevent duplication of discovery and avoid inconsistent pretrial rulings (especially with respect to class and derivative action issues)."

After the defendants had moved in the Delaware state court actions to dismiss due to the plaintiffs' failure to make a demand on GM's Board of Directors, the GM defendants moved, at the court's direction, to dismiss this action on two independent grounds: plaintiff's failure to make a demand on GM's Board of Directors--the precise issue already before the Delaware Chancery Court--and *forum non conveniens*, or, alternatively, on the latter ground only, for a stay of the action. Perot also moved to dismiss or to stay the New York proceedings. [FN1] The motions were denied in all respects, and this appeal followed. We reverse and dismiss the complaint on the ground of *forum non conveniens*.

FN1. Perot moved to dismiss the first

cause of action for rescission on the ground that no wrongdoing is attributed to him and since, in any event, plaintiff has an adequate remedy at law, and also moved to dismiss or, alternatively, to stay the action because of the pendency of prior actions seeking virtually the same relief.

The nature of the challenged transaction itself, as well as the equitable relief sought, militates against separate determinations by courts in different jurisdictions. One of the abiding principles of the law of corporations is that the issue of corporate governance, including the threshold demand issue, is governed by the law of the state in which the corporation is chartered, in this case, Delaware. As the Court of Appeals *183 stated in *Diamond v. Oreamuno*, 24 N.Y.2d 494, 503-504, 301 N.Y.S.2d 78, 248 N.E.2d 910, in discussing the duties and obligations of directors and officers and their relation to the corporation, "The primary source of the law in this area ever remains that of the State which created the corporation." The United States Supreme Court has recently observed, "No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations...." (*CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 107 S.Ct. 1637, 1649, 95 L.Ed.2d 67.) In upholding the concept of single state resolution of issues of corporate governance against a Commerce Clause challenge, the court noted: "This beneficial free market system depends at its core upon the fact that a corporation--except in the rarest situations-- is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of its incorporation." (*Id.* 107 S.Ct. at 1650.) Thus, in accordance with well-settled principles these derivative claims should be resolved under the law of Delaware, the state of GM's incorporation. [FN2]

FN2. Although plaintiff has labeled his claims on behalf of the Class E shareholders as direct claims by asserting a class action, they appear to be purely derivative in nature. Plaintiff alleges that the December 1st transaction diminished the value of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

all the Class E shares held by GM's thousands of Class E shareholders. Courts have repeatedly held that an allegation of diminution in the value of stock based on a breach of fiduciary duty gives rise to a derivative action only. (*See, e.g., Lewis v. Chiles*, 9th Cir., 719 F.2d 1044, 1049; *Papilsky v. Berndt*, 2 Cir., 466 F.2d 251, 255; *cert. denied* 409 U.S. 1077, 93 S.Ct. 689, 34 L.Ed.2d 665; *Bokat v. Getty Oil Co.*, 262 A.2d 246, 249.) To the extent a diminished earnings prospect on the part of EDS is alleged, an injury only to EDS, and in turn GM, which owns 100% of EDS, and not to GM's Class E shareholders, who own shares in GM, not EDS, is asserted.

**493 In this regard, the motion court erred in concluding that the December 1st transaction "falls within that category of corporate acts where the liability of a director can be decided by different local law rules in different states." The validity of the GM/Perot transaction cannot be decided on a state-by-state basis. In this case, for example, plaintiff asks the court to order "the return to GM of the payments made to Mr. Perot and the return to him of his Class E shares and the contingent notes." Plaintiff also seeks Perot's reinstatement as a director of GM and EDS. Most of the other fifteen pending derivative actions also seek rescission. The confusion which would be created by a New York judgment granting rescission nullifying the December 1st transaction and reinstating Perot as a director and the denial of such relief in Delaware is self*184-evident. "Uniform treatment of directors, officers and shareholders", the Restatement notes, "is an important objective which can only be attained by having the rights and liabilities of those persons with respect to the corporation governed by a single law." (*Restatement, Second, Conflict of Laws*, § 302, comment e, at 309.)

The motion court's reasoning that "[b]y choosing to do business in every state GM has subjected itself to public policy as embodied in the laws of those states," an argument that has some merit, ignores the risk that every state might seek to judge the

same Board of Directors' decision under different public policy standards, and completely disregards, as well, the need for uniform application of one body of law to corporations and their directors on issues involving the regulation of a corporation's internal affairs. As the Supreme Court has noted:

[O]nly one State should have the authority to regulate a corporation's internal affairs--matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders--because otherwise a corporation could be faced with conflicting demands.... The [challenged Illinois] Act ... applies to corporations that are not incorporated in Illinois and have their principal place of business in other States. Illinois has no interest in regulating the internal affairs of foreign corporations. (*Edgar v. Mite Corp.*, 457 U.S. 624, 645-646, 102 S.Ct. 2629, 2642-2643, 73 L.Ed.2d 269.)

In *Greenspun v. Lindley*, 36 N.Y.2d 473, 369 N.Y.S.2d 123, 330 N.E.2d 79, a case involving a Massachusetts business trust in which the trust instrument contained an explicit choice of law provision, the Court of Appeals likewise recognized the salutary effect of a rule that promotes certainty and uniformity: "[W]e incidentally note the pragmatic as well as the theoretical advantages which would appear to flow from a conclusion that the rights of all shareholders of this real estate investment trust in comparable situations should be determined on a trust-wide basis rather than in consequence of the litigants' choice of forum or the assessment by several courts as to which State it is where the investment trust may be said to be present." (*Id.*, at 477, 369 N.Y.S.2d 123, 330 N.E.2d 79; *see, also, Skolnik v. Rose*, 55 N.Y.2d 964, 965-966, 449 N.Y.S.2d 182, 434 N.E.2d 251.)

[1] Moreover, contrary to the motion court's finding, GM's incorporation in Delaware cannot be dismissed as merely "fortuitous." In incorporating in a particular state, shareholders, for their own particular reasons, determine the body of law that will govern the internal affairs of the corporation and the conduct of their directors. Delaware is obviously a *185 state in which, for various reasons,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

517 N.Y.S.2d 490                                                                Page 5
129 A.D.2d 179, 517 N.Y.S.2d 490
**(Cite as: 129 A.D.2d 179, 517 N.Y.S.2d 490)**

many businesses choose to incorporate. The corporation and its shareholders rightfully expect that the laws under which they have chosen to do business will be applied. For choice of law purposes, the decision by shareholders to incorporate under the law of one jurisdiction is no different from designating the law governing a business trust, which, prima facie (*Greenspun v. Lindley, supra,* 36 N.Y.2d at 477, 369 N.Y.S.2d 123, 330 N.E.2d 79), determines the applicable law.

**\*\*494** Furthermore, contrary to the motion court's finding, it is Delaware, not New York, which has an interest superior to that of all other states in deciding issues concerning directors' conduct of the internal affairs of corporations chartered under Delaware law. [FN3] While many states other than Delaware may claim some interest in this transaction, none of them, in the context of the derivative claims raised, are in a position to overcome the presumption in favor of the law of the state of incorporation.

> FN3. The motion court emphasized that the payment of the cash consideration was accomplished by a transfer of funds from a GM account to Perot's account in the same New York bank and that GM's directors approved the transaction at a meeting in New York. The wiring of money through a New York bank is not significant for purposes of determining the applicable law with respect to claims of breach of fiduciary duty, and the choice of a meeting place is not dispositive lest the shareholders be deprived of the protections afforded by the law of the state of incorporation. Directors could evade their obligations by scheduling a meeting out of state. The court also emphasized that GM has a significant number of individual and institutional shareholders in New York. Such contact is not controlling in determining the appropriate forum to hear a stockholders' derivative action since the corporation is the real party in interest. (*Bader & Bader v. Ford,* 66 A.D.2d 642, 414 N.Y.S.2d 132,

*appeal dismissed* 48 N.Y.2d 649, 421 N.Y.S.2d 199, 396 N.E.2d 481.)

[2] Given Delaware's paramount interest in determining whether a Delaware corporation properly purchased securities from a group of its shareholders, including one of its directors, the pendency of virtually identical actions in that jurisdiction and the need for uniformity in the application of the pertinent law to this controversy, the court erred in denying the motion to dismiss on the ground of *forum non conveniens.* [FN4] A court may dismiss "where it is determined that the action, although jurisdictionally sound, would be better adjudicated elsewhere [citations omitted]." (*Islamic Republic of Iran v. Pahlavi,* 62 N.Y.2d 474, 478-479, 478 N.Y.S.2d 597, 467 N.E.2d 245, *cert. \*186 denied* 469 U.S. 1108, 105 S.Ct. 783, 83 L.Ed.2d 778; *see, also, Irrigation & Industrial Development Corp. v. Indag, S.A.,* 37 N.Y.2d 522, 375 N.Y.S.2d 296, 337 N.E.2d 749.) In *Mantei v. Creole Petroleum Corp.,* 61 A.D.2d 910, 402 N.Y.S.2d 822, in reasoning equally applicable here, this court affirmed the dismissal of an action alleging fraud, as well as breach of fiduciary duty, against the minority shareholders of a Delaware corporation, holding, "Whether considered under the rubric of 'internal affairs of a foreign corporation' or '*forum non conveniens* ', we think that the action should be pursued, if at all, in the courts of the State of Delaware rather than New York." (*Id.*)

> FN4. CPLR 327(a) codifies the common law doctrine of *forum non conveniens* as follows:
> When the court finds that in the interest of substantial justice the action should be heard in another forum, the court, on the motion of any party, may stay or dismiss the action in whole or in part on any conditions that may be just.

[3][4] We are aware, of course, that the "internal affairs" rule is, by current legal standards, only one aspect under the general principles of *forum non conveniens.* (*Koster v. Lumbermens Mutual Co.,* 330 U.S. 518, 527, 67 S.Ct. 828, 833, 91 L.Ed.

1067; *Broida v. Bancroft,* 103 A.D.2d 88, 91, 478 N.Y.S.2d 333; *Restatement, Second, Conflict of Laws,* § 84, comment d, at 252.) Among the relevant considerations in *forum non conveniens* applications are "the burden on the New York courts, the potential hardship to the defendant, and the unavailability of an alternative forum in which plaintiff may bring suit [citations omitted]." (*Islamic Republic of Iran v. Pahlavi, supra,* 62 N.Y.2d at 479, 478 N.Y.S.2d 597, 467 N.E.2d 245.) Each of these factors suggests dismissal here, rather than a stay, in deference to the pending Delaware actions in which plaintiff may seek to intervene or any action that he may be advised to institute there. [FN5] Since derivative actions challenging the same transaction on behalf of the same corporation are **495 being litigated in Delaware, the courts of this state should not be burdened with unnecessarily expending their resources on a duplicative action governed by Delaware law. Furthermore, this action subjects GM and its twenty individual directors to the expense of litigating the same claims in separate forums, as well as exposing them to the possibility of inconsistent judgments as to the ownership of GM's Class E stock and the composition of its Board of Directors. Plaintiff's counsel has openly admitted that he believes the outcome in New York may well differ from that in Delaware. [FN6]

> FN5. Although Perot moved alternatively to dismiss or stay on the basis of the pendency of prior similar actions (CPLR 3211(a)[4] ), not *forum non conveniens,* he is entitled nonetheless to the benefit of a dismissal on the latter ground since, in this case, essentially the same issues are raised in the presentation of the two arguments.

> FN6. Plaintiff's counsel has stated:
> I'll be very very candid about my concern. If this case goes to Delaware, based upon our reading of the law in Delaware, there is a chance that the Court might rule that a demand was required under Delaware law.... I am convinced that if New York law is applied ... a demand will be ruled as not necessary and futile and

therefore excused.

*187 Finally, plaintiff has another readily available forum in which to pursue his claim. "Without doubt, the availability of another suitable forum is a most important factor to be considered in ruling on a motion to dismiss...." (*Id.* at 481, 478 N.Y.S.2d 597, 467 N.E.2d 245.) Dismissal of his claim here in favor of the duplicative actions pending in Delaware in which he may intervene or any proceeding he may be disposed to bring there will not impose any undue hardship on plaintiff, a man of substantial resources. Indeed, this court has directed dismissal pursuant to the *forum non conveniens* doctrine even where a duplicative litigation was not already pending in a foreign court. (*See, e.g., Tanzer v. Turbodyne Corp.,* 68 A.D.2d 614, 621-622, 417 N.Y.S.2d 706; *Bader & Bader v. Ford,* 66 A.D.2d 642, 414 N.Y.S.2d 132, *appeal dismissed* 48 N.Y.2d 649, 421 N.Y.S.2d 199, 396 N.E.2d 481; *Mantei v. Creole Petroleum Corp., supra,* 61 A.D.2d 910, 402 N.Y.S.2d 822.)

We do not reach the respective merits of the alternate grounds for dismissal urged by the GM defendants and Perot since, in light of our dismissal of the action on the ground of *forum non conveniens,* [FN7] these are matters more appropriately reserved for the Delaware courts.

> FN7. Plaintiff's argument that the Delaware Court's dismissal of one of the December 4th actions renders the *forum non conveniens* argument academic is without merit. That litigation is not over until the Delaware plaintiffs exhaust their right of appeal. Moreover, those plaintiffs may, as the Delaware court noted in its opinion, make a demand, which, if rejected, may be asserted as wrongful in another derivative action. That precise claim has already been raised in another action pending in the Delaware Chancery Court.

Accordingly, the order of the Supreme Court, New York County (Irma Vidal Santaella, J.), entered February 10, 1987, which denied defendants' mo-

517 N.Y.S.2d 490

129 A.D.2d 179, 517 N.Y.S.2d 490

**(Cite as: 129 A.D.2d 179, 517 N.Y.S.2d 490)**

tions to dismiss or, alternatively, to stay the action should be reversed, on the law and on the facts and in the exercise of discretion, without costs or disbursements, to the extent of granting the motion to dismiss the action on the ground of *forum non conveniens* on condition that all defendants stipulate that they will accept service of process in and submit to the jurisdiction of the courts of the State of Delaware in any pending action or action to be there commenced on the causes of action alleged in the amended complaint, and that in any such action defendants will not plead and thereby waive any statute of limitations or lack of jurisdiction defense.

*188 Order, Supreme Court, New York County (Irma Santaella, J.), entered on February 10, 1987, unanimously reversed, on the law and on the facts and in the exercise of discretion, without costs and without disbursements, to the extent of granting the motion to dismiss the action on the ground of forum non conveniens on condition that all defendants stipulate that they will accept service of process in and submit to the jurisdiction of the courts of the State of Delaware in any pending action or action to be there commenced on the causes of action alleged in the amended complaint, and that in any such action defendants will not plead and thereby waive any statute of limitations or lack of jurisdiction defense.

All concur.

129 A.D.2d 179, 517 N.Y.S.2d 490

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.
808 A.2d 1206                                                    Page 1
808 A.2d 1206
(Cite as: 808 A.2d 1206)

**H**

Court of Chancery of Delaware,
New Castle County.
In re ORACLE CORP. DERIVATIVE LITIGA-
TION.
C.A. No. 18751.

Submitted: June 27, 2002.
Decided: July 10, 2002.

Stockholders brought derivative action against cor-
porate board members, alleging that certain corpor-
ate officers and directors engaged in insider trading.
After filing similar action in California, and after
corporation established special litigation commit-
tee, stockholders filed motion to voluntarily dismiss
action. The Chancery Court, New Castle County,
Strine, Vice Chancellor, held that stockholders
could not voluntarily dismiss derivative action over
opposition of corporation's special litigation com-
mittee.

Motion denied; action stayed.

West Headnotes

**[1] Corporations** ⊂⟿**206(1)**
101k206(1) Most Cited Cases
Stockholders could not voluntarily dismiss derivat-
ive action arising out of alleged insider trading over
opposition of corporation's special litigation com-
mittee, as during the time period reasonably needed
for the committee to perform its investigation and
decide on its course of action, the committee had
primacy in controlling the litigation on behalf of the
corporation. 8 Del.C. § 141(a), (c)(2).

**[2] Pretrial Procedure** ⊂⟿**507**
307Ak507 Most Cited Cases
Motion for voluntary dismissal filed after defend-
ants have answered the complaint will not be gran-
ted if dismissal would result in plain legal prejudice
to the defendants. Chancery Court Rule 41(a)(2).

**[3] Corporations** ⊂⟿**206(1)**
101k206(1) Most Cited Cases

When a special litigation committee is empowered
to decide whether and in what manner a derivative
suit should proceed, the case is taken away from the
derivative plaintiff, his allegations are turned over
to special agents appointed on behalf of the corpor-
ation for the purpose of making an informal, intern-
al investigation of his charges, and the plaintiff is
placed on the defensive if a motion to dismiss is
filed by the special litigation committee.

**[4] Corporations** ⊂⟿**206(1)**
101k206(1) Most Cited Cases
The deference state law pays to the special litiga-
tion committee process in a shareholder derivative
action is a matter of the state's substantive, not pro-
cedural, law.
*1206 Victor F. Battaglia, Sr. and Robert D. Gold-
berg, Esquires, of Biggs & Battaglia, Wilmington,
Delaware; Of Counsel: Steven E. Cauley, Esquire,
of Cauley, Geller, Bowman & Coates, Little Rock,
Arkansas; Paul J. Geller, Howard K. Coates, Jr.,
and Jonathan M. Stein, Esquires, of Cauley, Geller,
Bowman & Coates, Boca Raton, Florida; John G.
Emerson, Jr., Esquire, of the Emerson Firm, Little
Rock, Arkansas; Marc A. Topaz and Robert B.
Weiser, Esquires, of Schiffrin & Barroway, Bala
Cynwyd, Pennsylvania, Attorneys for Plaintiffs.

Kenneth J. Nachbar, Esquire, of Morris, Nichols,
Arsht & Tunnell, Wilmington, Delaware, Attorney
for the Individual Defendants.

David C. McBride, Adam W. Poff, and Christian
Douglas Wright, Esquires, of Young Conaway Star-
gatt & Taylor, Wilmington, Delaware; Of Counsel:
George Newcombe, James G. Kreissman, and Alex-
is Coll, Esquires, of Simpson Thacher *1207 &
Bartlett, Palo Alto, California, Attorneys for Nom-
inal Defendant Oracle Corporation.

OPINION
STRINE, Vice Chancellor.

This is a derivative action brought in the name of
Oracle Corp., a Delaware corporation. The Oracle
stockholders who filed this action as derivative

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

plaintiffs now seek to dismiss this action voluntarily, over the objection of Oracle's "Special Litigation Committee," which has been empowered to investigate and decide whether to prosecute this action. By their dismissal motion, the moving derivative plaintiffs do not hope to terminate all litigation relating to the claims asserted in this action. Rather, the "Delaware Derivative Plaintiffs" seek to dismiss only this case, leaving derivative actions involving the same subject matter pending in the state and federal courts of California.

To permit the Delaware Derivative Plaintiffs to dismiss this action over the opposition of the Special Litigation Committee would usurp that Committee's legitimate authority. During the time period reasonably needed for the Committee to perform its investigation and decide on its course of action, the Committee has primacy in controlling this litigation on behalf of Oracle. If the Delaware Derivative Plaintiffs were allowed to dismiss this action, the Special Litigation Committee's range of action would be impinged in contravention of the substantive law of this state, as reflected in 8 *Del. C.* § 141(a), [FN1] (c)(2) [FN2] and the line of cases under *Zapata Corp. v. Maldonado.* [FN3]

> FN1. "The business and affairs of every corporation ... shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."

> FN2. "The board of directors may designate 1 or more committees.... Any such committee, to the extent provided in the resolution of the board of directors, or in the bylaws of the corporation, shall have and may exercise all the powers and authority of the board of directors in the management of the business and affairs of the corporation...."

FN3. 430 A.2d 779 (Del.1981).

I.
Oracle is a corporation "organized under the laws

of the State of Delaware," with its principal place of business in California. [FN4] It supplies software that aids in the management of business enterprises.

FN4. Calif. Cons.Deriv. Compl. ¶ 17.

This derivative action has been brought in Oracle's name. The original complaint was filed on March 12, 2001 by the law firms of Millberg, Weiss, Bershad, Hynes & Lerach and Cauley, Geller, Bowman & Coates. The same day, Millberg Weiss filed a virtually identical derivative action in Oracle's name in the state courts of California.

These derivative complaints were filed on the heels of an earlier federal securities class action filed by Millberg Weiss against Oracle and certain of its officers and directors. [FN5] Eventually, Millberg Weiss withdrew from the derivative actions because its federal suit seeking damages against Oracle conflicted with its ability to represent plaintiffs seeking damages on behalf of Oracle.

> FN5. That action was dismissed without prejudice on March 12, 2002. Briefing on a motion to dismiss the plaintiffs' amended complaint is now being completed in that case.

As is by now expected in these circumstances, the initial derivative complaints were followed by later complaints. All of the Delaware complaints were consolidated *1208 under the caption of this suit, with the law firms of Schriffin & Barroway; Cauley, Geller, Bowman & Coates; and the Emerson Law Firm named as co-lead counsel. All of the California state court actions were eventually consolidated into one suit as well (the "California State Derivative Action"), with the law firms of Berman, DeValerio, Pease, Tabacco, Burt & Pucillo and Corey, Luzaich, Pliska, de Ghetaldi & Nastari acting as co-lead counsel. A separate derivative suit was also filed in federal court in California (the "California Federal Derivative Action").

II.
Regardless of forum, the derivative claims filed on Oracle's behalf all center on a core allegation. To

808 A.2d 1206
808 A.2d 1206
(Cite as: 808 A.2d 1206)

wit, the derivative plaintiffs allege that certain Oracle officers and/or directors--Michael J. Boskin, [FN6] Lawrence J. Ellison, [FN7] Jeffrey O. Henley, [FN8] and Donald L. Lucas [FN9]--sold over thirty million of their own shares in January 2001 for prices as high as $33.50 per share. This was at a time when these "Oracle Insiders" allegedly possessed material, non-public information regarding the company. Specifically, it is contended that the selling Insiders knew that Oracle was likely to fall far short of its projected earnings and revenues for that quarter in the company's fiscal year, and that the company's prospects for the remainder of the fiscal year were highly uncertain. This information contradicted optimistic statements that Oracle had made to market analysts in December and January 2001, which had allegedly bolstered Oracle's stock price.

> FN6. Boskin is an Oracle director.

> FN7. Ellison is Oracle's chairman of the board and chief executive officer.

> FN8. Henley is chief financial officer, executive vice president, and a director of Oracle.

> FN9. Lucas is a director and chairman of Oracle's Executive Committee.

Despite knowing that the company's previous statements to the marketplace were misleading, the Oracle Insiders did not promptly correct them. Instead, it is alleged, they advantaged themselves unfairly at the expense of others by selling their stock in advance of Oracle's public announcement of this bad news.

On March 1, 2001, Oracle finally released the news that its earnings for the quarter would fall short of projections, that its revenues were $200 million below publicly released expectations, and that the company's outlook for the final quarter of fiscal year was unclear. According to the Derivative Plaintiffs, these revelations caused Oracle's stock price to drop to a yearly low of $15.75, or by over forty percent. The depressive effect of this announcement on the company's stock price allegedly continues to this day.

In the Delaware Derivative Action, the Derivative Plaintiffs allege that the Oracle Insiders' alleged malfeasance constitutes a breach of their fiduciary duties to Oracle. As relief, the Delaware Derivative Plaintiffs seek, among other things, a constructive trust over the Oracle Insiders' trading profits, and damages for the loss in goodwill and any costs incurred by Oracle in connection with numerous federal securities actions brought as a result of the Oracle Insiders' stock sales. The Delaware Derivative Plaintiffs also label this alleged misconduct as "illegal insider trading" and "misappropriation of corporate assets," terms that in the context of state law claims seem to describe the type of fiduciary duty claims asserted, rather than to constitute independent causes of action. For that reason, perhaps, those labels are included in one of the three counts for *1209 breach of fiduciary duty pled in the amended complaint. The Delaware Derivative Plaintiffs have also sued the other members of the Oracle board, who were in office at the time of the Insiders' sales, but who did not engage in sales themselves during the supposedly critical period.

In the California State Derivative Action, the derivative plaintiffs sued only the Oracle Insiders. The "California State Derivative Plaintiffs" essentially pled the same breach of fiduciary duty claims as the Delaware Derivative Plaintiffs, as well as two additional counts not present in the Delaware complaint. The first is a count for unjust enrichment, which seeks restitution and disgorgement against the Oracle Insiders. The second is a claim under California Corporations Code §§ 25402 and 25502.5(a). Under those statutes, an insider of an issuer who profits by stock trades while in possession of material, non-public information is liable to the issuer for treble his illicit trading profits, plus litigation costs.

The California Federal Derivative Action involves claims for relief that are functionally identical to those pending in the California State and Delaware Derivative Actions.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

808 A.2d 1206
808 A.2d 1206
(Cite as: 808 A.2d 1206)

Page 4

After the various Derivative Actions were commenced, events did not move with any particular urgency. Most pertinently, consolidated amended complaints were not filed in the Delaware Derivative and California State Derivative Actions until October 9, 2001 [FN10] and January 28, 2002, respectively. In the Delaware Derivative Action, the Derivative Plaintiffs did not press for a scheduling order or a prompt reply to the amended complaint. By late 2001, however, the Delaware Derivative Plaintiffs did insist that the defendants file an answer to an extensive, sixty-two page amended complaint. That answer was filed on February 8, 2002.

> FN10. The Delaware Derivative Plaintiffs filed an initial amended complaint on September 27, 2001 but revised it on October 9, 2001.

Shortly before that date--on February 1, 2002--Oracle's board of directors took action that appears partly to have inspired the motion now before the court. That day, the Oracle board established the Special Litigation Committee, which is empowered to investigate the claims alleged in the Delaware Derivative Action and determine whether to prosecute, settle, or dismiss those claims on behalf of Oracle--to the exclusion of the other members of the Oracle board of directors. Within a short time thereafter, the Special Litigation Committee's charge was expanded to encompass the California State and Federal Derivative Actions as well. The Committee's members are Joseph A. Grundfest and Hector Garcia-Molina, two Stanford University professors added to the Oracle board after the events giving rise to the derivative suits. On this motion, no challenge to the independence or disinterestedness of the Special Litigation Committee members has been mounted.

The Special Litigation Committee has retained Simpson, Thacher & Bartlett and Young Conaway Stargatt & Taylor as its legal advisors, and National Economic Research Associates as its financial and economic advisor. With the help of its advisors, the Special Litigation Committee has begun its factual and legal investigation of the claims raised in the various Derivative Actions by, among other things, gathering numerous documents and scheduling interviews with persons who might have knowledge of relevant information. The Committee hopes to make its decision about how to proceed by early autumn.

## *1210 III.

The formation of the Oracle Special Litigation Committee is consistent with the substantive law of Delaware, as articulated in *Zapata v. Maldonado*. [FN11] *Zapata* permits a corporation to use a special litigation committee to restore control over derivative litigation if a group of independent directors is so empowered to act for the corporation. So long as the committee's actions withstand judicial review under the standards set forth by the Supreme Court in its *Zapata* opinion, a special litigation committee may decide to dismiss an action, or to prosecute it, in the manner of its choosing.

> FN11. 430 A.2d 779 (Del.1981).

Within weeks of being informed of the formation of the Special Litigation Committee and within days of the dismissal without prejudice of the federal securities class action filed against the Oracle Insiders, the Delaware Derivative Plaintiffs filed a motion under Court of Chancery Rule 41(a)(2) to dismiss this action voluntarily. [FN12] The motion constituted a reversal in position, because the Delaware Derivative Plaintiffs had recently insisted that the defendants investigate and answer their lengthy amended complaint.

> FN12. That Rule provides, in pertinent part, that "an action shall not be dismissed at the plaintiff's instance save upon order of the Court and upon such terms and conditions as the Court deems proper."

In their reply brief on this motion, however, the attorneys for the Delaware Derivative Plaintiffs claim that they reached an agreement in February, 2002 with the attorneys for the California State Derivative Plaintiffs that it would be more efficient and convenient if only one derivative suit involving the alleged insider trading were litigated. Thus, they

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

sought dismissal of the year-old Delaware Derivative Action, in which the defendants had already incurred the time and expense of answering the detailed, sixty-two page amended complaint. The Delaware Derivative Plaintiffs disavow any substantial connection between the formation of the Special Litigation Committee and their desire to seek dismissal of the Delaware Derivative Action.

## IV.

[1][2] Because the defendants have answered the amended complaint in this Action, the Delaware Derivative Plaintiffs' motion for voluntary dismissal arises under Court of Chancery Rule 41(a)(2). Such a motion will not be granted if dismissal would result in "plain legal prejudice" to the defendants. [FN13] In this situation, the fundamental problem with the Delaware Derivative Plaintiffs' motion is that they ask this court to take action that would prejudice the ability of the Special Litigation Committee--if it acts in an independent and informed manner that demands judicial respect under the standards articulated in *Zapata* [FN14]--to control if, how, and where Oracle would press any claims arising out of the alleged insider trading.

>    FN13. *Draper v. Gardner Defined Plan Trust,* 625 A.2d 859, 863 (Del.1993).

>    FN14. 430 A.2d 779.

[3] When a special litigation committee is empowered to decide whether and in what manner a derivative suit should proceed, "the *Zapata* procedure takes the case away from the [derivative] plaintiff, turns his allegations over to special agents appointed on behalf of the corporation for the purpose of making an informal, internal investigation of his charges, and places the plaintiff on the defensive [if a] motion to dismiss is filed by the a special litigation *1211 committee ...." [FN15] For that reason, this court has acknowledged its duty to stay derivative actions at the instance of a special litigation committee, "pending the investigation and report of the Committee .... Otherwise, the entire rationale of *Zapata, i.e.,* the inherent right of the board of directors to control and look to the well-

being of the corporation in the first instance, collapses." [FN16]

>    FN15. *Kaplan v. Wyatt,* 484 A.2d 501, 509 (Del.Ch.1984), *aff'd,* 499 A.2d 1184 (Del.1985).

>    FN16. *Kaplan,* 484 A.2d at 510. Other cases to the same effect include *Katell v. Morgan Stanley Group, Inc.,* 1993 WL 390525, at *4 (Del.Ch.), and *Pompeo v. Hefner,* 1983 WL 20284, at *2 (Del.Ch.). It is true that in one Delaware case, a member of this court permitted derivative plaintiffs to take discovery on the merits while a special litigation committee was undertaking its investigation. That case, however, is the type of exception to general practice that tends to prove the rule. In *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* 1996 WL 33167168, tr. (Del. Ch.), a special litigation committee was formed eighteen months after the derivative litigation commenced. Unlike the current case in which the only substantial action taken by the derivative plaintiffs has been the filing of an amended complaint, the plaintiffs in *Carlton Investments* had already litigated and defeated a motion to dismiss, and had already completed document discovery and eight weeks of depositions before the special litigation committee stepped in to try to call a halt. As the plaintiffs' lawyer in that case noted, no other case in Delaware had "ever presented anything like" that situation. 1996 WL 33167168, at *5. The oral ruling of the court in *Carlton Investments* to permit discovery to continue was consistent with *Zapata,* because the court refused to allow a special litigation committee to stymie derivative plaintiffs after the company had permitted full-blown, expensive pre-trial proceedings to proceed for over a year and a half. *Zapata* contemplates that this court will oversee special litigation committee tactics in order

808 A.2d 1206
808 A.2d 1206
(Cite as: 808 A.2d 1206)

to avoid abuse. *See, e.g., Abbey v. Computer & Communications Tech. Corp.,* 1983 WL 18005, at *3 (Del.Ch.) (special litigation committee may control derivative litigation to the exclusion of the derivative plaintiffs until such time as the court concludes, among other possibilities, that the committee is acting unreasonably). The unique factors present in *Carlton Investments* do not pertain here. Any delay in Oracle's formation of the Special Litigation Committee here is more than overcompensated for by the languid pace of the Derivative Plaintiffs in the various actions.

Indeed, in a later opinion in the *Carlton Investments* case, Chancellor Allen limited the discovery the plaintiffs could take in opposing a settlement proposed by the special litigation committee, and noted that:

[O]nce a special litigation committee has entered into a proposed settlement with defendants, a derivative plaintiff is no longer entitled to engage in expansive discovery, but rather must tailor its discovery requests to the narrow scope of the inquiry appropriate for the state in the proceeding .... Under the first step of the *Zapata* test, the Court must 'inquire into the independence and good faith of the committee and the bases supporting its conclusion. Limited discovery may be ordered to facilitate such inquiries'.... [D]iscovery into the merits of the derivative plaintiff claims are generally or presumptively beyond the scope of this inquiry.... The efficiency of the utilization of a special litigation committee would be defeated, at the least in part, by permitting full discovery on the merits by a party objecting to the committee's recommendation, without any showing of evidence that the committee did not proceed in good faith.

*Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* 1997 WL 38130, at * 3 & n. 4 (Del.Ch.).

In another of its decisions, this court rejected a de-

rivative plaintiff's request to take discovery simultaneously with a special litigation committee's investigation. In so ruling, this court stated:

If *Zapata* is to be meaningful, then it would seem that such an independent committee, once appointed, should be afforded a reasonable time to carry out its function. It would likewise seem reasonable to hold normal discovery and other matters in abeyance during this interval. If a derivative plaintiff were to be permitted to depose corporate officers *1212 and directors and to demand the production of corporate documents, etc. at the same time that a duly authorized litigation committee was investigating whether or not it would be in the best interests of the corporation to permit the suit to go forward, the very justification for the creating of the litigation committee in the first place might well be subverted. Likewise, in effect, it would likely amount to simultaneous discovery of the same persons and materials by two separate sources, both allegedly acting on behalf of the corporation....

Plaintiff contends that as a party plaintiff in a pending suit she has the subpoena power of the Court and other discovery tools available to her which, arguably, the Litigation Committee does not .... For this reason, she argues that discovery by her should be permitted to go forward even while the Litigation Committee goes about its task.

This, however, is nothing more than an argument that if permitted she could possibly do a better job of investigating the matter than could the Litigation Committee.

The determining factor, however, is not who could do the better job. Again, the focus in *Zapata* was on the right of a derivative plaintiff to maintain an action after it had been properly filed in a "demand excused" situation. The purpose of the independent committee as authorized by *Zapata* is to act as an independent arm of the ultimate power given to a board of directors under 8 *Del. C.* § 141(a) to determine whether or not a derivative plaintiff's pending suit brought on behalf of the corporation should be maintained when measured against the overall best interests

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

of the corporation. If the purpose is to determine the right of the plaintiff to maintain the suit, then it would seem that the right of the independent committee to investigate and report its findings must take priority over any entitlement of the plaintiff to go forward with the pending action. Thus, I think that a stay of all proceedings in this case is proper. [FN17]

> FN17. *Abbey v. Computer & Communications Tech. Corp.,* 457 A.2d 368, 375-76 (Del.Ch.1983).

[4] The deference Delaware law pays to the special litigation committee process is a matter of our state's substantive, not procedural, law. [FN18] It is among the many important policy choices that our state has made regarding the circumstances when it is appropriate to divest the board of directors of a Delaware corporation of a portion of its statutory authority to manage the corporation's affairs, *i.e.,* its right to control litigation brought on behalf of the corporation. [FN19] And these choices are **\*1213** properly made by the state whose law governs the corporation, because that is the law that the corporation's stockholders have chosen to govern the firm and their relationship with it. Indeed, if the internal affairs of business corporations were not governed solely by the law of their chosen domicile, and were instead subjected to a myriad of inconsistent and supplemental requirements by other states, the burden on the rights of stockholders to carry out joint economic activity through the corporate form would be markedly impaired, to their detriment, and likely to the nation's. [FN20]

> FN18. *See, e.g., Draper v. Gardner Defined Plan Trust,* 625 A.2d 859, 865 & n. 9 (Del.1993) (law of demand excusal is substantive, not procedural, and citing several other cases to that effect); *Kamen v. Kemper Fin. Servs. Inc.,* 500 U.S. 90, 96-97, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (corporate law allocating power between board of directors and stockholders over the procession of derivative actions is substantive, and not merely pro-

cedural, in nature).

> FN19. *See Spiegel v. Buntrock,* 571 A.2d 767, 773 (Del.1990) ("The decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation."); 8 *Del. C.* § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors...."); *see also Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 530, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984) (it is a "basic principle of corporate governance that the decisions of a corporation--including the decision to initiate litigation--should be made by the board of directors....") (citations omitted).

> FN20. As the United States Supreme Court stated in *CTS Corp. v. Dynamics Corp. of America:*
> The markets that facilitate [the] national and international participation in ownership of corporations are essential for providing capital not only for new enterprises but also for established companies that need to expand their businesses. This beneficial free market system depends at its core upon the fact that a corporation--except in the rarest situations--is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of its incorporation. 481 U.S. 69, 90, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987).

Here, the Delaware Derivative Plaintiffs seek to dismiss this case over the objection of the Oracle Special Litigation Committee. That is, they wish to usurp the authority of the Committee before the Committee has even had a reasonable time to complete its review and investigation. In my view, such an intrusion on the putative authority of the Committee would be even more substantial than allowing the Delaware Derivative Plaintiffs to pro-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

808 A.2d 1206
808 A.2d 1206
(Cite as: 808 A.2d 1206)

ceed with discovery during the Committee's process.

At the end of their investigation, the Oracle Special Litigation Committee might choose to press all or some of the various claims raised in Delaware, California State, and California Federal Derivative Actions. The Special Litigation Committee might, however, prefer to litigate all of those claims in one of the three forums, and to stay or dismiss the other two actions. Indeed, the Special Litigation Committee has informed this court that it is likely to take this approach, if it chooses to prosecute claims based on the trading of the Oracle Insiders.

Likewise, the Special Litigation Committee might choose to seek dismissal of all or some of the claims. In its discretion, it might file its dismissal motion in one of the three actions, and request that a particular court first decide the issue of whether its deliberations must be respected under the standard articulated in *Zapata*. Once a final judgment on that issue has been entered in that forum, presumably other forums would give it full faith and credit. [FN21]

> FN21. *See Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 373, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (Full Faith and Credit Act "directs all courts to treat a state court judgment with the same respect that it would receive in the courts of the rendering state"); *Draper,* 625 A.2d at 864-65 ("The California courts will have to apply appropriate choice of law principles in accordance with the laws of that jurisdiction and the United States Constitution. Under the internal affairs doctrine, the law of the state of incorporation (Delaware) would apply to matter of substantive law raised in the Delaware and California state court proceedings.); *see also Kamen,* 500 U.S. at 98, 111 S.Ct. 1711 (" 'Corporations' ... 'are creatures of state law,' ... and it is state law which is the font of corporate directors' powers.") (internal citations omitted); *CTS Corp.,* 48 I U.S. at 89, 107 S.Ct. 1637

("No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations....") (citing Restatement (Second) of Conflict of Laws § 304 (1971) (concluding that the law of the incorporating State generally should "determine the right of a shareholder to participate in the administration of the corporation")).

**\*1214** In exercising its discretion, the Special Litigation Committee might also take cognizance of the nature of the claims at issue, and the substantive law governing them. In this case, for example, the Oracle Insiders are alleged to have breached their fiduciary duties to Oracle by engaging in insider trading. Among the remedies sought on behalf of Oracle is payment of any trading profits to the corporation. In the recent case of *Goldman v. Isaacs,* [FN22] this court asked the parties to comment on whether a Delaware corporation can recover such profits against an insider who has engaged in illicit trading, absent a showing of harm to the corporation. When it sought this input, the court noted that the Delaware case--*Brophy v. Cities Service Co.* [FN23]--that supported a recovery of the insider's trading profits in the absence of corporate harm was so venerable as to pre-date much of the pertinent federal law, in particular that arising under Securities and Exchange Commission Rule 10b-5. As a result, the court was interested in whether these federal law developments undermined *Brophy,* because, among other concerns, allowing corporations to recover trading profits under state corporate law could potentially subject corporate insiders to double liability, given their exposure to liability under Rule 10b-5. After the court requested the parties' views on these interesting issues, the *Goldman* case resolved itself, obviating the need for a ruling on the motion that provoked the court's inquiry. Because of the arguably unsettled nature of the Delaware law issues raised by the fiduciary claims against the Oracle Insiders, the Special Litigation Committee might choose to have those claims litigated in Delaware, rather than elsewhere. A preference by the Committee to have the courts of the state whose substantive law governs

the corporation resolve its claims could hardly be seen as irrational. [FN24]

> FN22. 2001 WL 1671439 (Del.Ch.).

> FN23. 70 A.2d 5 (1949).

> FN24. *Cf. Nagy v. Riblet Prods. Corp.*, 79 F.3d 572, 577-78 (7th Cir.1996) ("Recognizing the nationwide application of Delaware corporate law, and the benefits of making that law more certain, we think the best way to resolve a [debate about Delaware law] is to ask the Supreme Court of Delaware. Only that court can give a definitive answer.").

To permit the Delaware Derivative Plaintiffs to dismiss this Action would cabin the flexibility available to the Special Litigation Committee and undermine its discretion to act on behalf of Oracle. Like a decision to permit discovery to proceed simultaneously with the Special Litigation Committee's investigation, a decision to grant the motion before me would disrespect the authority granted to Oracle's Special Litigation Committee under the law of our state. [FN25] Therefore, in accordance with *Zapata* and its progeny, I deny the Delaware Derivative Plaintiffs' motion to dismiss.

> FN25. *See* 8 *Del. C.* § 141(a), (c)(2); *Zapata*, 430 A.2d 779.

Because the motion must be denied on other grounds, I need not address the defendants' alternative grounds for objecting to dismissal of this case. [FN26] I do note, **\*1215** however, that the defendants have produced evidence that supports the inference that the California State Derivative Plaintiffs are seeking to have the California state courts ignore the substantive law of this state regarding the appropriate deference due a special litigation committee of a Delaware corporation. Apparently, the California State Derivative Plaintiffs intend to argue that the Delaware corporate law articulating the need to defer to a special litigation committee's request for a stay during its investigation is merely "procedural" in nature, and not an aspect of this

state's substantive corporate law. The California State Derivative Plaintiffs therefore seek to take merits discovery simultaneous with the Special Litigation Committee's inquiry, and have refused to stay discovery voluntarily. The defendants contend that the California court handling the California State Derivative Action has already adopted the view that Delaware's law regarding the deference due to a special litigation committee during its investigation is merely procedural and is permitting discovery that would be denied under the line of cases following *Zapata*, as being inconsistent with the Special Litigation Committee's authority. [FN27]

> FN26. The only substantial reasons given by the Delaware Derivative Plaintiffs for their tardy decision to seek dismissal are: (1) their desire to have all the claims common to the various actions litigated in one place; and (2) the fact that California is the state in which most of the evidence is located. Putting aside the Special Litigation Committee, these reasons would not mandate dismissal even if the motion to dismiss were only opposed by the individual defendants. Although the individual plaintiffs in the various actions may be different, it is clear that the multiple law firms who brought them are no strangers to having similar or identical actions pending in more than one court at a time, and that this was so in this case. It was the various Derivative Plaintiffs and their lawyers who chose to sue in three different courts, and it was the Delaware Derivative Plaintiffs who chose this state as a convenient forum over a year before bringing their dismissal motion. *See Catibayan v. Fischer Eng'g & Maintenance Co.*, 1997 WL 666969, at \*2-\*3 (Del.Ch.) (denying a Rule 41(a)(2) motion predicated on plaintiffs' desire to litigate elsewhere, in part, because plaintiffs waited many months to file the motion and because "plaintiffs cannot now be heard to claim that litigation in two jurisdictions will be a burden when it is

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

808 A.2d 1206

808 A.2d 1206

**(Cite as: 808 A.2d 1206)**

plaintiffs alone who are responsible for the dual proceedings"); *In re Walt Disney Co. Derivative Litig.,* 1997 WL 118402, at *4 (Del.Ch.) ("If inconvenience is the reason for litigation in California, no legitimate reason has been offered why these cases were filed in Delaware in the first place."). The Delaware Derivative Plaintiffs' newly felt regard for litigative efficiency is not a weighty concern, especially given the applicability of Delaware law to this dispute and the legitimate interest of the defendants in having this state's courts grapple with some of the difficult issues raised by the claims against the Oracle Insiders.

The words of Chancellor Chandler in denying a Rule 41(a)(2) motion in a prior case resonate here: Delaware is especially appropriate as a forum to resolve questions of Delaware law when a plaintiff has consciously and deliberately chosen this forum and when director defendants have willingly agreed to defend in this forum .... I do not believe that equity or fairness is served by allowing plaintiffs' counsel to repudiate the jurisdiction in which they have deliberately chosen to litigate, a jurisdiction they selected while fully aware of the convenience and efficiency concerns that they now invoke as grounds for suspending operations on the Delaware front and moving to an alternative battle ground. One must wonder what theory of judicial efficiency or comity would promote a rule that encourages plaintiffs' counsel to file in multiple jurisdictions, force defendants to commit resources from coast to coast, and then allow plaintiffs' counsel, at their own whim, to move the lines of battle after they have already begun to form?

*In re Walt Disney Co. Derivative Litig.,* 1997 WL 118402, at *3.

FN27. *See, e.g., Kindt v. Lund,* 2001 WL 1671438, at *1 (Del.Ch.) ("[A]llowing full-blown discovery ... would eviscerate

the very purpose of having a special committee."); *Abbey v. Computer & Communications Tech. Corp.,* 1983 WL 18005, at *1-*2 (Del.Ch.) ("[I]f a derivative plaintiff is to be permitted full discovery ... what would be the need for having the special litigation committee procedure to begin with?").

The California State Derivative Plaintiffs' arguments do seem to fly in the face of clear pronouncements by the Delaware Supreme Court and, indeed, by the United States Supreme Court, that the law governing the circumstances in which a board's ability to control corporate litigation *1216 is substantive and not procedural. [FN28] This substantive body of law includes *Zapata* and the cases that implement its teachings. [FN29]

FN28. *See Draper v. Gardner Defined Plan Trust,* 625 A.2d 859, 865 & n. 9 (Del.1993); *Kamen v. Kemper Fin. Servs. Inc.,* 500 U.S. 90, 96-97, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991); *Abrams v. Koether,* 766 F.Supp. 237, 248 n. 13 (D.N.J.1991) (applying Delaware law to determine whether a plaintiff may take discovery of a Delaware corporation relating to demand futility while a Rule 23.1 motion was pending).

FN29. Any reasonable reader of *Zapata* and the legal commentary discussing it must recognize the substantive nature of the policy choice made in that case, which, among other things, subjected special litigation committees to a form of judicial review more intense than the business judgement standard of review. Within its domain, *Zapata* is as substantive as *Aronson v. Lewis,* 473 A.2d 805 (Del.1984), which addresses when demand is excused.

I, however, am unconvinced that the California State Derivative Plaintiffs have persuaded the California state court of their view. To the contrary, it appears possible that the only reason that discovery

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

is proceeding in the California State Derivative Action is that the Special Litigation Committee did not follow the correct procedure to bring its motion to stay before the court there. Once the procedural issue governing the method by which the Oracle Special Litigation Committee should enter its appearance in the California State Derivative Action is rectified, I presume that the California state court will give full effect to the substantive Delaware law addressing stay requests made by special litigation committees. Of course, if it does otherwise, it will be even more clear why a dismissal of the Delaware action is inappropriate and might threaten Oracle with substantial prejudice.

II.

For all the foregoing reasons, the Delaware Derivative Plaintiffs' motion to dismiss under Rule 41(a)(2) is hereby denied. This action is hereby stayed until further order of the court, provided that the Special Litigation Committee shall report to the court on the progress of its work on or before September 15, 2002. IT IS SO ORDERED.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

924 A.2d 951

Page 1

924 A.2d 951
(Cite as: 924 A.2d 951)

**H**

Court of Chancery of Delaware,
New Castle County.
In re The TOPPS COMPANY SHAREHOLDERS
LITIGATION.
C.A. No. 2786-VCS.

Submitted: May 8, 2007.
Decided: May 9, 2007.

**Background:** Shareholders brought breach of fiduciary duty class action against directors seeking to enjoin sale of publicly traded Delaware corporation to a group of private equity buyers. Defendants moved to stay or dismiss Delaware action because of pending identical action filed in New York.

**Holding:** The Court of Chancery, New Castle County, Strine, Vice Chancellor, held that Delaware Court of Chancery under the internal affairs doctrine had jurisdiction over shareholder breach of fiduciary duty class actions regarding Delaware corporation.

Motion to dismiss denied.

West Headnotes

**[1] Corporations ⟨⟩640**
101k640 Most Cited Cases
Under New York law, the fact that a foreign corporation may have its records and principal place of business in New York does not affect a decision to decline jurisdiction under the internal affairs doctrine.

**[2] Corporations ⟨⟩640**
101k640 Most Cited Cases
When a corporation forms under the laws of a particular state, the rights of its stockholders are determined by that state's law and the chartering state has a powerful interest in ensuring the uniform interpretation and enforcement of its corporation law, so as to facilitate economic growth and efficiency.

**[3] Corporations ⟨⟩640**
101k640 Most Cited Cases

When new issues arise regarding director responsibility, the state of incorporation has a particularly strong interest in addressing them, and providing guidance.

**[4] Corporations ⟨⟩640**
101k640 Most Cited Cases
Delaware Court of Chancery, rather than New York trial court, had pursuant to the internal affairs doctrine jurisdiction over shareholder breach of fiduciary duty class actions brought against directors seeking to enjoin sale of publicly traded Delaware corporation to a group of private equity buyers who intended to retain existing management, though corporation had its place of business in New York and first New York action was filed day before first action was filed in Delaware, as Delaware had a powerful interest as the chartering State in ensuring the uniform interpretation and enforcement of its corporate laws, proposed purchase by private equity buyers who intended to retain management was part of a newly emerging wave of transactions which raised new issues of director responsibility which Delaware had a particularly strong interest in addressing, and determination of which court had jurisdiction should not depend on who won the filing derby.

**[5] Corporations ⟨⟩208**
101k208 Most Cited Cases
When a shareholder brings a derivative action in the State of incorporation after another shareholder has filed an identical or similar action in another State, a court proceeds cautiously when faced with the question of whether to defer to a first filed representative suit, examining more closely the relevant factors bearing on where the case should best proceed, using something akin to a forum non conveniens analysis.

*952 Seth D. Rigrodsky, and Brian D. Long, Rigrodsky & Long, P.A., Wilmington, DE; Joseph A. Rosenthal, Rosenthal, Monhait & Goddess, P.A., Wilmington, DE; Robert M. Kornreich, and Carl L. Stine, Wolf Popper, LLP, New York City, for Plaintiff.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

924 A.2d 951
924 A.2d 951
(Cite as: 924 A.2d 951)

Page 2

Gregory P. Williams, and Blake K. Rohrbacher, Richards, Layton & Finger, P.A., Wilmington, DE; Robert K. Payson, and Bradley W. Voss, Potter Anderson & Corroon, LLP, Wilmington, DE; Brian E. O'Connor, Russell D. Morris, and Andrew L. Weiner, Willkie Farr & Gallagher, LLP, New York City, for the various Defendants.

**\*953 OPINION**
STRINE, Vice Chancellor.

This opinion resolves a motion to dismiss or stay a consolidated shareholder class action seeking to enjoin a merger transaction (the "Merger") in which The Topps Company, Inc. ("Topps"), a publicly traded Delaware corporation headquartered in New York, will be sold to a group of private equity buyers. The motion is unusual in that the defendants do not contend that Delaware is, in any way, an improper or inconvenient forum. In fact, the defendants preferred to have the propriety of the Merger decided by the courts of Delaware, the state whose law is at issue. Thus, the defendants sought leave to file a motion to stay identical actions pending in the courts of New York. But the defendants were denied leave to present their motion on the ground that the initial New York action, which was filed by an Ohio resident a day before the first Delaware action, was first filed. By that time, the various Delaware actions had already been consolidated and expedited discovery had begun. Soon thereafter, a schedule for the consideration of a motion for a preliminary injunction against the Merger's procession was set.

Presented with the inefficient prospect of litigating identical issues in two courts simultaneously, the defendants now seek to have this court refrain from hearing the injunction motion in order to avoid an unseemly and wasteful duplication of effort.

Although I am sympathetic for the defendants' plight, I deny the motion. In a representative action such as this one, the desire of an individual plaintiff to litigate in a forum other than the state of incorporation has no legal or equitable force, particularly when the plaintiff is not even a resident of the state

in which he seeks to litigate. The paramount interest is ensuring that the interests of the stockholders in the fair and consistent enforcement of their rights under the law governing the corporation are protected. In a situation like this one, when all the actions are filed essentially simultaneously on the heels of the announcement of a transaction, the mere fact that one plaintiff won the filing Olympics by beating his competitors to court by a day also has no logical bearing on where the case should proceed.

[1][2] Instead, well--settled principles of public policy and comity--as recognized by the United States Supreme Court and the New York Court of Appeals--point toward the appropriate basis for resolving where cases like this should be decided. In *Langfelder v. Universal Laboratories*, [FN1] the New York Court of Appeals stated that "it is well settled that jurisdiction in any case will be declined ... where a determination of the rights of the litigants involves regulation and management of the internal affairs of [a] corporation dependent upon the laws of [a] foreign state." [FN2] Moreover, "the fact that a foreign corporation may have its records and principal place of business in New York does not affect a decision to decline jurisdiction under the internal affairs doctrine." [FN3] The New York Court of Appeals' reasoning is grounded in the long-understood notion that when a corporation forms under the laws of a particular state, the rights of its stockholders are determined by that state's law and that the chartering state has a powerful interest in ensuring the uniform interpretation and enforcement of its corporation law, so as to facilitate economic growth and efficiency.

FN1. 293 N.Y. 200, 56 N.E.2d 550 (1944).

FN2. *Id.* at 204, 56 N.E.2d 550.

FN3. *Prescott v. Plant Industries, Inc.*, 88 F.R.D. 257, 262 (S.D.N.Y.1980); *see also Langfelder*, 293 N.Y. at 206, 56 N.E.2d 550.

**\*954** *Langfelder* was no novelty, it is based on long-standing teaching from the United States Su-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

924 A.2d 951
924 A.2d 951
(Cite as: 924 A.2d 951)

preme Court that it "has long been settled doctrine that a court--state or federal--will, as a general rule, decline to interfere with, or control by injunction or otherwise, [a] corporation organized under the laws of another state but will leave controversies as to such matters to the courts of the state of domicile...." [FN4] More recently, our nation's highest court has stated that

> FN4. *Rogers v. Guaranty Trust Co. of New York,* 288 U.S. 123, 130, 53 S.Ct. 295, 77 L.Ed. 652 (1933).

No principle of corporation law ... is more firmly established than a state's authority to regulate domestic corporations.... The beneficial free market system depends at its core upon the fact that a corporation--except in the rarest of situations--is organized under, and governed by, the law of a single jurisdiction, traditionally the State of its incorporation.... A state has an interest in promoting stable relationships among parties involved in the corporations it charters. [FN5]

> FN5. *CTS Corp. v. Dynamics Corporation of America,* 481 U.S. 69, 89, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987).

As a corollary to those principles, the U.S. Supreme Court has also firmly held that no state has a legitimate interest "in regulating the internal affairs of foreign corporations." [FN6]

> FN6. *Edgar v. MITE Corp.,* 457 U.S. 624, 645-46, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982).

[3] In a situation like this one, when this court is clearly an efficient and convenient forum prepared to issue a timely ruling, public policy and comity indicate that this state's courts should answer the question of whether the pending Merger involving Topps should be enjoined. In this regard, the reality is that the Topps Merger is part of a newly emerging wave of going private transactions involving private equity buyers who intend to retain current management. This wave raises new and subtle issues of director responsibility that have only begun

to be considered by our state courts. This factor bears importantly on the question of where this case should be heard. When new issues arise, the state of incorporation has a particularly strong interest in addressing them, and providing guidance. [FN7] Noteworthy, too, is that the procession of cases like this in Delaware provide litigants the timely opportunity to seek review from this state's highest court, the Delaware Supreme Court, by way of requesting an expedited and direct interlocutory appeal. That opportunity for prompt definitive guidance is obviously unavailable in the courts of another state.

> FN7. *Armstrong v. Pomerance,* 423 A.2d 174, 178 (Del.1980); *Ryan v. Gifford,* 918 A.2d 341, 350-51 (Del.Ch.2007).

### I. *Factual Background*

Topps is a Delaware corporation with its principal executive offices in Manhattan. It is best known for marketing baseball cards and other memorabilia featuring professional athletes and popular television and movie characters. It also operates a confectionary business whose brands include quintessentially-American standards such as Ring Pops, Push Pops, and Bazooka Joe bubble gum. Topps was founded in 1938 and went public as a Delaware Corporation shortly after World War II.

On March 6, 2007, Topps announced that it had entered into a definitive agreement to be acquired by The Tornante Company, LLC and Madison Dearborn Partners, LLC (collectively, the "Private Equity Buyers") in the $9.75 per share all cash Merger. The next day, March 7, the first of a number of putative shareholder class *955 actions seeking to enjoin the Merger was filed in the Commercial Division of the New York State Supreme Court. The named plaintiff in that case is a resident of the state of Ohio and appears to have no substantial ties to New York. [FN8] The first Delaware action challenging the Merger was filed at 12:43 pm the next day, March 8 (i.e., only a few business hours later). By the end of the next week, a total of nine (five Delaware and four New York) complaints had been filed.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

924 A.2d 951
924 A.2d 951
(Cite as: 924 A.2d 951)

FN8. The plaintiffs in other of the New York actions are based in New Jersey. As far as I am aware, none of the named plaintiffs in the New York actions is a New York resident.

The consolidated complaints in the New York and Delaware actions contain virtually identical allegations. In sum, those complaints contend that the Topps board of directors failed to fulfill their fiduciary duties in a myriad of ways during the process leading to the signing of the Merger Agreement with the Private Equity Buyers, a Merger Agreement they contend allows the Private Equity Buyers to get Topps at a bargain price. In that connection, the plaintiffs raise concerns about conflicts of interest, the adequacy of the Topps board's pursuit of other bidders, the preclusiveness of the deal protections of the Merger Agreement on other interested parties, and the utility of a so-called "go shop" provision in ensuring value maximization. That is, the complaints raise a number of the emerging issues facing corporate directors, managers, and stockholders during this new wave of mergers and acquisitions activity, in which private equity buyers buy companies and retain current management.

On March 26, 2007, this court consolidated the various actions pending before it. [FN9] The plaintiffs promptly filed a motion to expedite. The defendants obviated the hearing on that motion by acceding to the expedited production of documents. As of that time, the New York actions had not been consolidated and no substantial activity was undertaken. Once it became clearer when a meeting on the Merger would be held, a hearing for a preliminary injunction was scheduled in this court for May 23. Due to a slippage in the finalization of the Merger meeting schedule, the date for the hearing has been moved to early June.

FN9. See Order of Consolidation (May 26, 2007).

In the first week of April, a conference was held in the New York cases. At that conference, the defendants sought leave to present a motion to dismiss or stay the New York actions in light of the pending actions in Delaware, the expedited production that was about to begin, and the applicability of Delaware law to important issues facing a Delaware corporation and its stockholders. The court declined to permit the defendants to file their motion, in view of the fact that the first New York case had been filed a day before the first Delaware case. Thus, the defendants did not submit to the court the precedent, including that of the New York Court of Appeals, cited in this decision.

The defendants then sought a conference with this court and expressed concern about being whipsawed. At that conference, I expressed my initial view that Delaware was the appropriate forum to decide whether to enjoin a merger involving a Delaware corporation and that my prior experience had been that other courts recognized and deferred to our state's legitimate interests in these matters. I expressed my hope and anticipation that an agreement to that effect would be achieved. To that end, I encouraged the Delaware plaintiffs' counsel to reach out to their colleagues in the New York actions and offer jointly to prosecute the case *956 here, and for the defendants to provide the New York plaintiffs with discovery simultaneously with the Delaware plaintiffs. [FN10] Within that same week, I encouraged the Delaware counsel to make clear that they were offering their colleagues in New York an equal seat at the table. Regrettably, none of these efforts has to date broken the logjam and the defendants felt compelled to file this motion, lest they face two injunction proceedings against the same transaction.

FN10. Transcript of Status Conference (April 16, 2007) at 13-14, 18.

With that said, it appears that the New York Supreme Court is awaiting this court's ruling on this motion before deciding how to proceed. Although it has not permitted the defendants to file a motion to dismiss or stay, the New York Supreme Court has also indicated sensitivity to the need for the dispute to proceed in one forum. [FN11] I read that as saying that the New York Supreme Court is awaiting

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

this court's ruling on this motion before making a determination whether to proceed. Indeed, another teleconference in the New York action is scheduled for May 10, at which the Court suggested it will consider the outcome of this Delaware motion to stay. For that reason, I have endeavored to issue this decision in an expedited fashion, in the hopes of ensuring an outcome consistent with the interests of efficiency, public policy, and comity.

> FN11. Transcript of Status Conference (April 20, 2007), *Lipscomb v. The Topps Co., Inc.,* N.Y. Sup.Ct., Index No. 600715/07, at 6.

## II. *Discussion*

The defendants have moved to dismiss or stay the Delaware proceedings primarily under the principles outlined in *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* [FN12] and, alternatively, under the related *forum non conveniens* doctrine.

> FN12. 263 A.2d 281 (Del.1970).

[4] As noted, however, this is an odd *McWane* motion. The defendants did not prefer to litigate this matter in New York, they preferred to litigate it here. But having been denied the chance to seek a stay of the New York matter, and facing dueling injunction hearings, the defendants are now taking the position that "New York is not an inconvenient forum," [FN13] and, in light of the New York court's failure as yet to stay the New York litigation, that it would be burdensome for the defendants to litigate here also.

> FN13. Defendants' Opening Brief in Support of Their Motion to Dismiss or Stay at 9.

This is a strained *McWane* motion for another reason. *McWane* most clearly applies when an individual plaintiff sues a defendant in a convenient forum and is then met with a responsive suit by the defendant in another forum. [FN14] In that circumstance, the first-filing plaintiff is rightly given primacy, assuming that her chosen forum is a con-

venient one that can do substantial justice between the parties.

> FN14. *McWane* itself involved a situation where a plaintiff brought a breach of contract claim in Alabama. A month later, the defendant in the Alabama case filed suit in Delaware asserting claims that were identical to counterclaims that it also brought in Alabama. *McWane,* 263 A.2d at 282.

[5] In the representative action context, *McWane* has far less bite and for good reason. [FN15] A first-filing plaintiff has no legitimacy to "call forum" for all the other stockholders of a corporation, as if their rights turned on a schoolboy playground convention. What is most important is not that the filing plaintiff get her way, but that the stockholders she seeks to represent have their legitimate expectations *957 upheld. As Chancellor Chandler recently explained in the analogous context of a derivative suit:

> FN15. *E.g., Biondi v. Scrushy,* 820 A.2d 1148, 1158-59 (Del.Ch.2003); *Ryan,* 918 A.2d at 349.

A shareholder plaintiff does not sue for his direct benefit. Instead, he alleges injury to and seeks redress on behalf of the corporation. Further, ... any shareholder with standing may represent the injured party. Thus, this Court places less emphasis on the celerity of such plaintiffs and grants less deference to the speedy plaintiff's choice of forum. [Thus], this Court proceeds cautiously when faced with the question of whether to defer to a first filed [representative] suit, examining more closely the relevant factors bearing on where the case should best proceed, using something akin to a *forum non conveniens* analysis. [FN16]

> FN16. *Id.* (citing *Biondi,* 820 A.2d at 1159).

The situation here is a perfect example of why this must also be so in the logically identical context of a putative class action. The reality is that every

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

merger involving Delaware public companies draws shareholder litigation within days of its announcement. An unseemly filing Olympiad typically ensues, with the view that speedy filing establishes a better seat at the table for the plaintiffs' firms involved. Therefore, as explained in *Biondi,* the application of *McWane* to class and representative actions is "troublesome," because "the potential divergence in the best interests of the plaintiffs' attorneys and the plaintiffs they are purporting to represent ... are not addressed, and indeed may be exacerbated by a legal rule that places determinative weight on which complaint was filed first." [FN17]

FN17. *Biondi,* 820 A.2d at 1159.

Just as it has no substantial weight in determining who should be lead counsel in a representative action, the fact that a particular plaintiff filed the first complaint in a wave of hastily-crafted class action complaints attacking a just-announced transaction has no rational force in determining where a motion to enjoin that transaction should be heard. [FN18] In fact, in our prior cases, we have treated complaints as simultaneously filed when there are trivial time differences. [FN19] That is the case here. The first New York Action was filed a day before the first Delaware Action. It is no more rational to give that factor great weight than it would be to declare that because there are five Delaware complaints, and only four New York complaints, the dispute should proceed in Delaware because there are more plaintiffs who want to litigate here, or because the five Delaware complaints were (as a group) filed more speedily than the four New York complaints (as a group). Trivialities like these should not drive important determinations.

FN18. *E.g., id.*

FN19. *In re IBP, Inc.,* 2001 WL 406292, at *7-8 (Del.Ch.2001) (treating two complaints filed five business hours apart as contemporaneously filed); *Friedman v. Alcatel Alsthom,* 752 A.2d 544, 551-52 (Del.Ch.1999) (refusing to treat a complaint filed in federal court in New York as

first filed where it preceded the Delaware complaint by only a few hours in order to avoid rewarding the winner in a race to the courthouse); *In re Chambers Development Co., Inc. S'holders Litig.,* 1993 WL 179335, at *7 (Del.Ch.1993) (treating complaints filed "in the same general time period" as contemporaneous).

This is not to say that the consideration of which action is first filed cannot play a useful tie-breaking role when all other considerations are equal. This is especially true when the first-filed action is farther along than the Delaware action and no other public policy considerations weigh heavily in favor of proceeding with the case here. But, in this current situation, the Delaware actions actually proceeded **\*958** more briskly than the New York actions and the first-filed New York complaint was simply the winner in a filing derby completed within a week of the Merger's announcement. In this circumstance, other more compelling considerations become paramount. [FN20]

FN20. *See Atkins v. Hiram,* 1993 WL 287617, at *3 (Del.Ch.1993) (noting that it is less important that an action was first filed when neither action is in a more procedurally advanced state).

As the United States Supreme Court, the Delaware Supreme Court, and the New York Court of Appeals all recognize, a state has a compelling interest in ensuring the consistent interpretation and enforcement of its corporation law. Corporations are chartered by states, and the managers and investors who form them are free to choose from among a variety of laws to govern their relationships. Their contractual expectations deserve respect. The authority of a state to regulate the internal affairs of the corporations it charters is one of the oldest and most firmly established doctrines in American corporation law. [FN21] As the Supreme Court of the United States explained in *Edgar v. MITE Corp.,* [FN22] "[t]he internal affairs doctrine is a ... principle which recognizes that only one State should have authority to regulate a corporation's internal

affairs, [i.e.,] matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders." [FN23]

>    FN21. *See CTS Corp.,* 481 U.S. at 89, 107 S.Ct. 1637 ("No principle of corporation law is more firmly established than a state's authority to regulate domestic corporations.").

>    FN22. 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982).

>    FN23. *Id.* at 645, 102 S.Ct. 2629.

Venerable authority recognizes that a chartering state's interest in promoting an efficient and predictable corporation law can be undercut if other states do not show comity by deferring to the courts of the chartering state when a case is presented that involves the application of the chartering state's corporation law. That recognition is easily understandable as it applies to Delaware's corporate law, which has a broadly enabling statute that gives directors wide leeway to manage the corporation, but subject to fiduciary duty review by a court of equity comprised of five judges dedicated in large measure to that specific purpose and further by an appellate court only a direct appeal away. [FN24] By contrast to the much larger federal judiciary, *959 ten judges are involved in these decisions, avoiding phenomena such as "circuit splits," which more than a decade ago were considered obstructive enough of commercial efficiency to impel the federal government to create the specialized Federal Circuit to handle all patent appeals. [FN25] The important coherence-generating benefits created by our judiciary's handling of corporate disputes are endangered if our state's compelling public policy interest in deciding these disputes is not recognized and decisions are instead routinely made by a variety of state and federal judges who only deal episodically with our law. [FN26]

>    FN24. This court's unique position as the regular arbiter of corporate law disputes, and the manner in which this court interacts with the Delaware Supreme Court

have played an important role in the development of Delaware's corporate law. As one leading commentator has put it,

> One reason that Delaware fiduciary duty law is both coherent and adaptive in the classic common law tradition is that it is made by an informed group of judges who are repeat players on matters of corporate law. Most American law on fiduciary duty is made in Delaware by a group of just ten judges. Five are on the Court of Chancery, the trial court where all corporate cases originate, and five sit on the Delaware Supreme Court which hears appeals from the Court of Chancery. For these chancery court judges their experience, both prior to and after becoming judges, gives them an unmatched expertise in the field of corporate law. In contrast, [veil] piercing cases are spread around the country. Delaware has less than one percent of all reported cases. For judges hearing piercing cases, corporate issues are not a major part of their docket and they seldom will have the opportunity to use any expertise they may have gained in another piercing case. The multiplicity of appellate courts which hear appeals from these cases likewise dilutes the possibility of repeat players among the judges. While the common law process enables each judge to draw on the best of the received wisdom from across the country, whatever coherence that may develop in the piercing area is not likely to match fiduciary duty in Delaware.

Robert V. Thompson, *Piercing the Veil: Is the Common Law the Problem?,* 37 CONN. L.REV. 619, 628 (2005); *see also generally* Jill E. Fisch, *The Peculiar Role of the Delaware Courts in the Competition for Corporate Charters,* 68 U. CIN. L.REV. 1061 (2000) (explaining that Delaware law relies on judicial lawmaking in corporate law to a greater extent than other states and that the peculiar characteristics and specialization of the Court of

Chancery play an important role in developing flexible and workable principles).

FN25. *See* 28 U.S.C. § 1295(a)(1) (granting the Federal Circuit exclusive jurisdiction over appeals from the United States District Courts in all patent cases); *Kennedy v. Wright,* 851 F.2d 963, 966 (7th Cir.1988) ( "The Federal Circuit's exclusive jurisdiction under § 1295(a)(1) was created, after all so that there could be a uniform jurisprudence of patent law.").

FN26. Scholarship recognizes the importance of this concern. *See, e.g.,* Thompson, *supra* n. 24; Paul E. Loving, *The Justice of Certainty,* 73 OR. L.REV. 743, 743 n. 4 (1994) (discussing the need for certainty and predictability in the law, especially in regard to business planning and noting that the size and structure of the judicial system itself can create uncertainty: "The more judges there are deciding cases, the more likely there will be conflicts in the law stemming from inconsistent interpretations of the law and case precedents."); Note, *The Rise and Fall of Patent Law Uniformity and the Need For a Congressional Response,* 81 CHI.-KENT L.REV. 713, 717-18 (2006) (reflecting upon the creation of the Federal Circuit to hear all patent appeals and noting that the lack of uniformity caused by diverse interpretation of the law by different courts "leads to forum shopping that not only increases litigation costs inordinately and decreases one's ability to advise clients, it demeans the entire judicial process and the patent system as well").

Both the United States Supreme Court and the New York Court of Appeals understand these concerns and have instructed courts under their purview to accord comity to the courts of a corporation's chartering state. In *Rogers v. Guaranty Trust Co. of New York,* [FN27] the United States Supreme Court stated that "[i]t has long been settled that a court--

-state or federal--sitting in one state will as a general rule, decline to interfere with, or control by injunction or otherwise, [a] corporation organized under the laws of another state but will leave controversies as to such matters to the courts of the state of the domicile." [FN28] The courts of New York have long respected this teaching. Thus, for example, in *Langfelder,* the New York Court of Appeals upheld dismissal of a complaint that sought to determine the rights of preferred stockholders in a Delaware corporation following a stock-for-stock merger. [FN29] Likewise, Judge Learned Hand, one of New York's most distinguished jurists, observed that "when a trial involve[s] the internal affairs of a corporation, the rule is that the courts of a foreign forum will not assume jurisdiction over it." [FN30] Applying this precedent, the *960 United States District Court for the Southern District of New York, applying New York law, declined under the internal affairs rule to hear a case seeking a declaration of whether certain corporate directors were properly elected. [FN31] That decision noted that dismissal was particularly appropriate where a "determination of plaintiffs' contentions requires ascertainment of undeveloped Delaware law." [FN32]

FN27. 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652 (1933).

FN28. *Id.* at 130, 53 S.Ct. 295.

FN29. *Langfelder,* 293 N.Y. at 206, 56 N.E.2d 550.

FN30. *Weiss v. Routh,* 149 F.2d 193, 195 (2d Cir.1945); *see also Prescott,* 88 F.R.D. at 261 ("Although there is no rigid, generalized rule as to what constitutes 'internal affairs' for this purpose, courts have declined jurisdiction where a decision would affect corporate structure or policy.").

FN31. *Prescott,* 88 F.R.D. at 261-263.

FN32. *Id.* at 263.

The teaching of *Rogers* and *Langfelder* are implicated here. There can be no doubt of the importance

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

to Delaware of its corporation law. Although our courts have deferred to clearly first-filed actions in corporation cases involving settled questions of law, such as derivative actions raising claims of self-dealing, [FN33] our courts have long been chary about doing so when a case involves important questions of our law in an emerging area. [FN34] Anyone interested in the mergers and acquisitions market knows that the current wave of going private transactions involving private equity buyers is presenting transactional planners with interesting new questions about how to address potential conflicts of interest and how to balance deal certainty against obtaining price competition in a very different market dynamic. [FN35] As with the phenomenon of stock options backdating, Delaware has an important policy interest in having its courts speak to these emerging issues in the first instance, [FN36] creating a body of decisional authority that directors and stockholders may confidently rely upon. Indeed, in Delaware's system of corporate law, the adjudication of cases involving the fiduciary duties of directors in new business dynamics is one of the most important methods of regulating the internal affairs of corporations, as these cases articulate the equitable boundaries that cabin directors' exercise of their capacious statutory authority. In the context of mergers and acquisitions--the context pertinent to this matter--most of the law governing directors' responsibility is set forth in our common law of corporations, not in our statute. [FN37]

> FN33. *E.g., Chambers*, 1993 WL 179335, at *3 (granting a motion to stay a case involving Delaware law fiduciary duty claims that were not novel and involved application of well settled law); *see also Dura Pharmaceuticals, Inc. v. Scandipharm, Inc.*, 713 A.2d 925, 931 (Del.Ch.1998) (granting a motion to stay in a case involving simple Delaware law issues of contract interpretation but suggesting an opposite result would obtain when complex issues of fiduciary duty are involved).

FN34. *E.g., Armstrong*, 423 A.2d at 178 (explaining that allowing substantial questions of Delaware law to be resolved in other courts "might create excessive uncertainty about the meaning of the Delaware law as a result of too many forums interpreting it since there would be no certiorari process available to the Delaware Supreme Court to resolve conflicts"); *MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.*, 1985 WL 21129, at *2 (Del.Ch.1985) ("Where a novel, significant question of Delaware law is presented, it should weigh ... heavily against a motion to stay" because "these issues are best resolved in a Delaware court.").

FN35. Only two Delaware decisions have so far touched on the issues raised in the current deal environment. *See In re Netsmart Technologies, Inc. S'holders Litig.*, 2007 WL 926213 (Del.Ch.2007) (addressing several issues presented by this new deal paradigm); *In re SS & C Technologies, Inc. S'holders Litig.*, 911 A.2d 816 (Del.Ch.2006) (disapproving a settlement in a case involving a management-led cash-out merger supported by a private equity firm because several important issues about the way private equity buyouts are negotiated were not properly considered by the proponents of the settlement).

FN36. *See Ryan*, 918 A.2d at 350-51 (denying a motion to stay in a recent opinion addressing stock options backdating because of Delaware's interest in establishing its law on the subject).

FN37. *Cf. Hanover Affiliates Corp. v. Pamrex Corp.*, 236 N.Y.S.2d 94, 96 (N.Y.Sup.Ct.1963) (noting that while in some situations New York courts have entertained breach of fiduciary duty suits involving foreign corporations, for the most part, those were merely cases in which

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

924 A.2d 951
924 A.2d 951
(Cite as: 924 A.2d 951)

stockholders sought redress for mismanagement, waste, or other misconduct by officers and directors, not cases seeking to enjoin corporate directors from consummating important corporate transactions).

**\*961** This policy interest far outweighs any other consideration in this case. The defendants do not even attempt to argue that this court is inconvenient for them. As with most corporate cases, the defendants are the ones who will produce most of the discovery and have their depositions taken. As they and all experienced corporate practitioners know, the discovery will take place in a location convenient to the party producing the documents and being deposed. Indeed, as indicated, the defendants preferred to have the dispute adjudicated here, so that the courts whose law is at stake will decide whether they complied with their duties.

Likewise, there is no countervailing interest any party has in litigating this case elsewhere. Representative plaintiffs seeking to wield the cudgel for all stockholders of a Delaware corporation have no legitimate interest in obtaining a ruling from a non-Delaware court. For investors in Delaware corporations, it is important that the responsibilities of directors be articulated in a consistent and predictable way. Random results may be good for plaintiffs' lawyers who can use the uncertainty factor that comes with disparate forums to negotiate settlements of cases that might otherwise be dismissed as unmeritorious. But random litigation results are not good for investors. What investors want is to have cases fairly determined, to hold directors accountable either through injunctions against their improper actions when that is necessary to prevent threatened harm or through damages awards when the harm has already been incurred. But just as important, stockholders want to have unmeritorious cases dismissed without rewarding plaintiffs' lawyers for the simple fact that they filed a lawsuit. [FN38]

FN38. Absent the rational sifting out of non-meritorious cases, stockholders suffer as the costs of litigation exact an undue toll

on the procession of transactions valuable to stockholders and cause a harmful diminution in wealth-generating risk-taking by directors.

Here, the first filed action was brought by an Ohio resident in New York. His personal convenience is therefore of no relevance at all. Indeed, none of the New York plaintiffs are New York residents. Even if they were, a representative plaintiff has no cognizable interest in having a court of another state adjudicate a claim involving Delaware law. [FN39] Of equal importance is the fact that New York has no countervailing interest at stake that is **\*962** compromised by the procession of this case in Delaware. As the Supreme Court of the United States has long recognized, states have no legitimate interest in regulating the internal affairs of foreign corporations. [FN40] New York courts themselves have long acknowledged this.

FN39. There is no rational basis to believe that stockholder-plaintiffs cannot secure important relief in the Delaware courts. A sampling of cases decided in the last year alone would belie that notion. *See, e.g., Sample v. Morgan,* 914 A.2d 647 (Del.Ch.2007) (denying defendants' motion to dismiss upon claims that corporate insiders entrenched and enriched themselves through a stock incentive program); *ATR-Kim Eng Financial Corp. v. Araneta,* 2006 WL 3783520 (Del.Ch.2006) (awarding damages and attorneys fees to plaintiffs when controller removed assets from a Delaware corporation, refused to communicate with shareholders, and exercised bad faith in litigation); *Netsmart,* 2007 WL 926213 (finding reasonable probability of success on the merits for plaintiffs' claims that management did not properly shop the company and enjoining stockholder vote until curative disclosures were issued); *In re Tyson Foods, Inc.,* 919 A.2d 563, 2007 WL 1018209 (Del.Ch.2007) (ruling in the motion to dismiss context that alleged spring-loading of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

924 A.2d 951

924 A.2d 951

(Cite as: **924 A.2d 951**)

stock options stated a claim of disloyalty); *Ryan,* 918 A.2d 341 (holding that well-pled allegations of backdating options created a substantial likelihood of director liability and removed the presumption of valid business judgment for purposes of demand excusal); *In re Primedia Derivative Litigation,* 910 A.2d 248 (Del.Ch.2006) (finding that plaintiffs stated a claim against a controller for redemption of preferred stock by a "premature payment" at an "excessive price"); *Louisiana Municipal Police Employees' Retirement System v. Crawford,* 918 A.2d 1172 (Del.Ch.2007) (finding disclosure violations in merger context and enjoining merger until stockholders were afforded appraisal rights); *Valeant Pharmaceuticals Intern. v. Jerney,* 2007 WL 704935 (Del.Ch.2007) (post-trial opinion requiring director to disgorge full amount of self-interested bonus received, plus interest, as well as pay damages flowing from that breach of loyalty). Indeed, some of the more controversial corporate decisions of Delaware courts in the last several years have involved rulings for stockholder-plaintiffs. *See, e.g., Omnicare Inc. v. NCS Healthcare, Inc.,* 818 A.2d 914 (Del.2003); *McMullin v. Beran,* 765 A.2d 910 (Del.2000); *In re Emerging Communications, Inc. S'holders Litig.,* 2004 WL 1305745 (Del.Ch.2004). Nor can stockholder-plaintiffs believe that their lawyers will not receive appropriate remuneration in this court for achieving an important benefit for the corporation or a class of stockholders. *See, e.g., In re Telecorp PCS, Inc. S'holders Litig.,* C.A. No. 19260-VCS, Order and Final Judgment (Aug. 20, 2003) ($14.2 million attorneys' fee award); *In re Digex, Inc. S'holders Litig.,* C.A. No. 18336-NC, 2002 WL 749184, Order and Final Judgment (April 6, 2001) (more than $12 million fee award); *In re Best Lock Corp. S'holder Litig.,* C.A. No. 16281-CC, Order and Final Judgment (Oct. 16, 2002)

($13 million attorneys' fee award); *In re Pure Resources, Inc. S'holders Litig.,* C.A. No. 19876-NC, Order and Final Judgment (June 16, 2002) ($4.6 million attorneys' fee award); *In re Seagate Technology, Inc. S'holders Litig.,* C.A. No. 17932-NC, Final Order and Judgment (April 12, 2001) ($15.25 million attorneys' fee award); *In re Ascent Entertainment Group, Inc. S'holders Litig.,* C.A. No 17201-NC, Final Order and Judgment (December 18, 2000) ($4 million attorneys' fee award). That said, it is true that our courts take very seriously the responsibility of monitoring the representative litigation process and have not hesitated to dismiss non-viable claims, *e.g., McMillan v. Intercargo Corp.,* 768 A.2d 492 (Del.2000), or reject settlements that do not benefit the stockholders. *E.g., SS & C Technologies,* 911 A.2d 816.

FN40. *MITE,* 457 U.S. at 645-46, 102 S.Ct. 2629.

Moreover, the fact that Topps is headquartered in New York has no bearing on where this particular suit should be heard. Topps has been incorporated in Delaware for generations. It has stockholders all over the nation. Those stockholders invested on the understanding that Delaware law would govern their relations with the firm. Now, it is unquestionably true that the location of Topps' headquarters could have great importance in a choice of law or forum analysis if different types of claims were at issue. One can imagine a myriad of contract, employment, worker safety, environmental, and tort claims against Topps that would be much more properly heard in a New York court than in this court, irrespective of Topps' status as a Delaware corporation. In such cases, this court would not hesitate to defer in a "New York minute," as it were. Indeed, on several occasions, this court has displayed deference to the primacy of other states' interest in the evolution and enforcement of their laws. [FN41]

FN41. *See, e.g., Viking Pump, Inc. v.*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

*Liberty Mutual Ins. Co.,* 2007 WL 1207107, at *30 n. 133 (Del.Ch.2007) (resolving a summary judgment motion on certain specific undisputed facts and thereby declining the parties' invitation to make a broad pronouncement on an important issue of another state's law); *Midland Food Services v. Castle Hills Holdings,* 1999 WL 669324, at *1 (Del.Ch.1999) (declining to hear certain Ohio law counterclaims after claims involving important Delaware corporate law issues had been dismissed and leaving those claims for the Ohio courts); *IM2 Merchandising and Manufacturing, Inc. v. Tirex Corp.,* 2000 WL 1664168, at *10-11 (Del.Ch.2000) (granting a *forum non conveniens* motion where the Delaware law claims were trivial and substantial and difficult questions of Canadian law were involved); *cf. Weil v. Morgan Stanley DW, Inc.,* 877 A.2d 1024, 1035 (Del.Ch.2005) (deciding to apply California law to the plaintiff's breach of fiduciary duty claims based on a contractual choice of law provision and noting that it would be "imprudent and inconsistent for a Delaware court to fail to give determinative weight to the parties' choice of California law. Our state obviously relies upon the willingness of other state courts to honor the choice of law reflected in the corporate charters of Delaware firms, even when the parties before them are not geographically situated in Delaware.").

**\*963** But here, the location of Topps' headquarters has no rational relation to where this case should proceed. This case is about the responsibilities of directors of a Delaware corporation to the corporation and its stockholders under Delaware law. As the New York Court of Appeals stated in *Langfelder,* "the fact that a foreign corporation may have its records and principal place of business in New York does not affect a decision to decline jurisdiction under the internal affairs doctrine." [FN42]

FN42. *Langfelder,* 293 N.Y. at 206, 56 N.E.2d 550; *see also* Hanover Affiliates, 236 N.Y.S.2d at 95-96 (same).

Few contexts are more important to stockholders than the pendency of a transaction in which they exchange their shares for cash and the company is taken private. With a new M & A market dynamic have come important new issues of appropriate director responsibility that should be addressed in the first instance by Delaware courts. That is particularly the case when the question is whether to enjoin a merger transaction. It is a very delicate corporate law exercise to determine whether to enjoin a premium-paying merger affecting thousands of stockholders at the instance of stockholders holding a small fraction of the company's shares. In that respect, it is no insult to the courts of other states, and certainly not the courts of New York, [FN43] **\*964** to say that the Delaware courts are better positioned to provide a reliable answer about Delaware corporate law in emerging areas like the ones presented by this dispute. That is especially so because appeals from this court go directly to the Delaware Supreme Court, [FN44] the definitive authority on our common law of corporations, which regulates much of the internal affairs of Delaware corporations. [FN45]

FN43. New York is one of the states that has formed a commercial part of its court system to improve its handling of business disputes. That is admirable and nothing in this opinion suggests that the New York courts are not adroit at that function. But the intended purpose behind the creation of New York's and other states' commercial courts was to facilitate the more expert and efficient adjudication of business disputes involving their home states' laws. *See* Marcel Kahan & Ehud Kamar, *The Myth of State Competition in Corporate Law,* 55 STAN.L.REV. 679, 710 (2002) (explaining that the creation of the commercial parts of the New York Supreme Court were not intended to help New York compete for incorporations and that rather, "[t]he design

of commercial divisions is consistent with the stated goal behind their establishment; to shorten the long delays in the resolution of commercial disputes in New York's overburdened trial courts"); Judith S. Kaye, *Refinement or Reinvention, The State of Reform in New York: The Courts*, 69 ALB. L.REV. 831, 839-40 (2006) ("By the early 1990s, New York Courts were so overburdened that the business community and commercial bar often turned to federal courts and alternate private forums. Because commercial cases tend to be paper-intensive, they place heavy burdens on state supreme court justices who might have several hundred cases of all types on their dockets, which in turn led to delays."). These include huge numbers of important contract disputes governed by those laws and the states who have created such courts have an interest, akin to Delaware's, in having their own courts decide them in order to ensure the consistency of their commercial law. To a lesser extent, some of these courts--but not apparently New York's--were inspired by a desire to encourage businesses to incorporate in those states. *Compare* Rochelle C. Dreyfuss, *Forums of the Future: The Role of Specialized Courts in Resolving Business Disputes*, 61 BROOK. L.REV. 1 (1995) (discussing a proposal for a Pennsylvania Chancery Court designed to compete with Delaware in attracting corporations) *with* Kahan & Kamar, *supra* ("All these courts are divisions of the regular trial court and none affects the right to a jury trial. All have relatively broad jurisdiction, and thus deal mostly with more common contract and commercial disputes rather than with corporate law disputes, and none is designed to generate a coherent body of corporate law precedents."). Certainly, the states that create such courts have a legitimate interest, identical to Delaware's in this case, in having their

own courts be the primary adjudicator of cases involving their own corporation laws. But, it is unsurprising that no commercial court's creation was justified as providing a forum for stockholders of *foreign* corporations to litigate cases governed by *foreign* law. That sort of attempt to become a tribunal for the regulation of foreign corporations is exactly what the United States Supreme Court and the New York Court of Appeals have proscribed as disruptive of commerce, the contractual expectations and rights of investors, and considerations of comity among sister states.

Relevantly, the very fact that states like New York have formed commercial parts buttresses the logic of *Rogers, Langfelder,* and other similar cases. Commercial parts allow judges to become experts in commercial law, who can then provide more coherent and timely guidance to parties seeking to engage in commerce in reliance on a state's law. The intuition that there is a value to specialization (and admittedly costs) in these areas applies here. It is not that judges in Delaware are somehow better than judges elsewhere; our judiciary would never make such a hubristic claim. Rather, like judges in New York and elsewhere charged with the responsibility to regularly decide certain types of cases under a particular governing law, it is natural to expect we have some advantage in our own domain. *See* Dreyfuss, *supra* at 18-20 ("Delaware's Chancery Court seems to have captured the benefits of specialization fully.... Delaware Chancery has succeeded nicely. Its understanding of financial markets has enabled it to decide questions in the time frame required by the fast-paced transactions it regularly reviews."). As I noted in a prior conference in this case, I ask for chambers copies of decisions of other state courts when foreign law is at issue. I don't have those decisions on my

924 A.2d 951
924 A.2d 951
(Cite as: 924 A.2d 951)

shelves, and, in those cases, I must spend a good deal of time ensuring that I have grasped the full context and emphasis of a foreign jurisdiction's jurisprudence. For that reason, I have also deferred when it was possible to remit the question to the courts of the sovereign whose law was at issue. *E.g., IM2,* 2000 WL 1664168, at *10-11.

FN44. By contrast, New York has a system of intermediate appellate courts, divided by departments. *See A Court System for the Future: The Promise of Court Restructuring in New York State;* Report by the Special Commission on the Future of New York State Courts, at 15, 24-26 (Feb. 2007), *available at ht-tp://www.nycourts.gov/reports/courtsys-4f uture--2007. pdf; Report of the Office of Court Administration to the Chief Judge on the Commercial Division Focus Groups,* at 5 (July 2006), *available at ht-tp://www.courts. state.ny.us/reports/ComDivFocusGroupRe port.pdf.* Even New York's highest court could not provide definitive guidance for the obvious reason that it is not the final arbiter of Delaware law.

FN45. *See* Dreyfuss, *supra* n. 43 at 28-29 ("Delaware's quality of decisionmaking is facilitated by the way that Chancery and the Supreme Court of Delaware interact.... [The Supreme Court's] own expertise means that it usually can appreciate all of the factors Chancery took into account in reaching its decisions.").

In the end, the only factor that really cuts in favor of New York as a forum is the fact that the New York court has, to date, not stayed its hand in deference to this court, and that the possibility for an unseemly and inefficient duplication of effort and for the production of inconsistent results therefore looms. But, as indicated, it appears to me from the transcripts of the New York proceedings that my

learned colleague in New York was waiting to make that final determination until this court could consider this motion, based on the full briefing that he knew would be presented to me. In view of the comity traditionally shown by New York in these situations to the courts of the chartering state and mandated by *Langfelder,* I *965 therefore have confidence that the result the defendants fear will not come to pass. [FN46]

> FN46. In this regard, I expect that the Delaware plaintiffs will continue to offer a meaningful role to their New York colleagues.

### III. *Conclusion*

For all these reasons, the defendants' motion to dismiss or stay is DENIED. IT IS SO ORDERED. The parties shall present the briefing schedule on the motion for preliminary injunction discussed at the prior conference.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

811 F.Supp. 479                                                                                          Page 1
811 F.Supp. 479, Fed. Sec. L. Rep. P 97,207
**(Cite as: 811 F.Supp. 479)**

United States District Court,
N.D. California.
John C. JOHNSON, Jr., Plaintiff,
v.
Steven L.W. HUI, et al., Defendants.
**No. C-90-1863 DLJ.**

Sept. 5, 1991.

Corporate shareholder brought securities fraud
cause of action against officers and/or directors of
corporation. Corporation, as nominal defendant,
brought motion to terminate. The District Court,
Jensen, J., held that: (1) determination by special
litigation committee (SLC) formed by corporation,
that evidence did not support plaintiff's allegations
that further prosecution of suit would not serve cor-
poration's interests was reasonable, and (2) court
would not decline to grant motion to terminate des-
pite conclusion that SLC's termination recommend-
ation had been made independently, reasonably,
and in good faith.

Motion granted.

See also 752 F.Supp. 909.

West Headnotes

**[1] Corporations ⟨key⟩202**
101k202 Most Cited Cases
Under Delaware law, when a derivative suit is
brought on behalf of corporation by shareholder,
corporation has power to form special litigation
committee (SLC) of board of directors, and to
either terminate or assume prosecution of suit based
upon SLC's review and recommendation. 8 Del.C. §
141(a, c).

**[2] Corporations ⟨key⟩213**
101k213 Most Cited Cases
Special litigation committee (SLC) may terminate
derivative action with leave of court following ap-
propriate motion to terminate by affected corpora-
tion. 8 Del.C. § 141(a, c).

**[3] Corporations ⟨key⟩202**
101k202 Most Cited Cases
A motion to terminate brought by corporation
which is a nominal defendant in shareholder deriv-
ative suit brought by one of the corporation's share-
holders is a motion which borrows heavily from the
summary judgment rule, but arises out of derivative
action rule. Fed.Rules Civ.Proc.Rules 23.1, 56, 28
U.S.C.A.

**[4] Corporations ⟨key⟩213**
101k213 Most Cited Cases
When reviewing determination of special litigation
committee (SLC) which recommended termination
of derivative action, court is required to consider
biases, interests, independence, and good faith of
SLC; moreover, court must weigh conflicting evid-
ence to conduct discretionary second step of review
requiring court to apply its own independent busi-
ness judgment in light of
entire evidentiary record. Fed.Rules Civ.Proc.Rule
23.1, 28 U.S.C.A.

**[5] Corporations ⟨key⟩213**
101k213 Most Cited Cases
Where motion to terminate a derivative action has
been denied on basis of special litigation commit-
tee's (SLC) report recommending termination not
being prepared in good faith, movant does not have
right to proceed to full bench trial of issues raised
by motion to terminate. Fed.Rules Civ.Proc.Rule
23.1, 28 U.S.C.A.

**[6] Corporations ⟨key⟩213**
101k213 Most Cited Cases
If court determines that a corporation which has
brought a motion to terminate derivative litigation
has carried its initial burden, court, at its discretion,
may deny motion to terminate if it determines that
policies which derivative litigation were meant to
serve would be furthered by allowing litigation to
go forward or that unique circumstances of case
presented other reasons for allowing action to be
pursued further, and if court conducts second level
of analysis, it would do so on basis of entire record

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

811 F.Supp. 479
811 F.Supp. 479, Fed. Sec. L. Rep. P 97,207
(Cite as: 811 F.Supp. 479)

Page 2

in matter viewed in light of equity, law, and public policy, not with reference to any evidentiary burden placed on parties. Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.

**[7] Corporations ☞213**
101k213 Most Cited Cases
Special litigation committee (SLC) formed by corporation was independent and acted in good faith, for purposes of recommendation by SLC that evidence did not support derivative action; there was little or no evidence that SLC member was biased or interested, there was no evidence that SLC's counsel were biased or had any improper interest in matter and no evidence that counsel had any personal or business contacts with corporation or individual defendant, even though one of the SLC members was named defendant and also director of corporation; the member did not have substantial bias or interest so as to cause court to question SLC's ability to base decision on merits. Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.

**[8] Corporations ☞213**
101k213 Most Cited Cases
Conclusion of special litigation committee (SLC) that it was not in interest of corporation to further pursue shareholder's derivative securities fraud suit had reasonable basis in record; there was insufficient evidence that defendant had knowledge of corporation's alleged financial distress, defendants' alleged scheme to mislead market through optimistic press releases had little or no evidentiary bias, defendant sold stock following trading patterns consistent with insider trading scheme alleged, statement by president and chief executive officer to board was not substantially different from press release. Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.

**[9] Corporations ☞213**
101k213 Most Cited Cases
Court conducting second-level inquiry on corporation's interest or motion to terminate derivative litigation must independently consider essential merits of plaintiff's claim, and court must determine, through exercise of its independent business judgment, whether facts and legal authorities placed be-

fore court establish that continuing derivative litigation would benefit
corporation on whose behalf derivative claim is presented. Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.

**[10] Corporations ☞213**
101k213 Most Cited Cases
Facts and legal theories placed before court on motion to terminate derivative securities fraud suit based on recommendation of special litigation committee (SLC) failed to establish that continuing litigation would benefit corporation; shareholder's liability theory was not one which was likely to prevail, in that corporation was not financially weak, and, thus, case was not one in which court would decline to grant motion to terminate despite court's prior conclusion that special litigation committee's (SLC) termination recommendation had been made independently, reasonably, and in good faith. Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.
**\*480** Alan M. Mansfield, Milberg, Weiss, Bershad, Specthrie & Lerach, San Diego, CA, for plaintiff.

Norman J. Blears, Heller, Ehrman, White & McAuliffe, Palo Alto, CA, for defendants.

ORDER
JENSEN, District Judge.

This motion came on for hearing on August 14, 1991.   Norman Blears appeared for nominal defendant Everex Systems, Inc.   Alan Mansfield appeared on behalf of plaintiff John C. Johnson, Jr. For the reasons described below, nominal defendant Everex System, Inc.'s motion to terminate **\*481** further litigation of plaintiff Johnson's shareholder derivative claim is GRANTED.

1. BACKGROUND.

This motion arises in the context of a securities fraud suit initiated by plaintiff John C. Johnson ("Johnson") on behalf of himself and derivatively on behalf of Everex Systems, Inc. ("Everex"). Everex is a company which manufactures personal computers and computer peripherals.   Everex is incorporated in Delaware and maintains its principle

place of business in Fremont, California. In simplest terms, Johnson alleges here that certain large investors in Everex, along with Everex's officers and directors manipulated press releases and public disclosures to insure that they would be able to sell Everex stock at inflated prices. Everex, appearing as a nominal defendant, now moves to terminate this litigation to the extent that Johnson proceeds on behalf of Everex under Federal Rule of Civil Procedure [FN1] 23.1, Derivative Actions by Shareholders. The relevant facts can be summarized as follows.

> FN1. Hereinafter, the "Rules" or the "Rule."

*A. The Defendants.*

We begin with a review of the many defendants named in this action. The named defendants who are officers and/or directors of Everex include:

Steven Hui ("Hui"), the President and Chief Executive officer of Everex from its founding in 1983 to January 1991;
John Lee ("Lee"), a co-founder, Vice President and director of Everex;
Raymond Yu ("Yu"), Everex's Vice President of Engineering from 1986 through March of 1991;
Robert Teal ("Teal"), a director of Everex since 1987;
Gregory Avis ("Avis"), a director of Everex from October of 1986 through November of 1990;
Michael Wong ("Wong"), a director since 1983, and Chairman of the Board from October, 1985 through January, 1991;
Michael Everitt ("Everitt"), a director from 1986 through June of 1989;
Gabriel Chan ("Chan"), Chan became a director in June of 1989 when Everitt resigned.

In addition to these director and officer defendants, Johnson has also named Gatcombe Corporation ("Gatcombe") and Aciest Company, Ltd. ("Aciest"). Gatcombe and Aciest are affiliates of Wong's Industrial (Holdings) Ltd., ("Wong's Holdings"). Wong's Holdings is a Hong Kong corporation controlled by the Wong family. Defendants Wong and

Everitt are members of the Wong family, and Chan is an executive of Wong's Holdings. Through Gatcombe and Aciest, Wong's Holdings has been Everex's largest shareholder, and still retains over 20% of Everex's outstanding stock.

*B. The Misconduct Alleged In The Complaint.*

It is undisputed that between March 9 and October 3 of 1989 the defendants collectively sold over two million shares of Everex stock. Plaintiff Johnson alleges that these stock sales were made in violation of defendants' fiduciary duty to Everex and other Everex shareholders. In particular, plaintiff alleges that during this period defendants had insider knowledge that Everex stock was overvalued by the market. According to plaintiff, this knowledge took two forms.

First, plaintiff alleges that each of the defendants was aware that competitive pressures in the market for personal computers and computer peripherals were pushing down Everex's revenues and profitability. For example, in paragraph 15 of the complaint, [FN2] Johnson alleges:

> FN2. All references to the "complaint" refer to plaintiff's Verified Derivative Complaint for Violations of Fiduciary Duties and Damages, filed on July 2, 1990.

In 1988, there was a severe semiconductor shortage. This resulted in greater [Static and Dynamic Random Access Memory Chip] prices, and, consequently, lower profit margins for personal computer manufacturers. Everex's earnings per share fell [as a result....]
*482 By early 1989, it was apparent that semiconductor supplies had rebounded and that [memory chip] prices would decrease. However, market entry and technological innovation continued to place downward pressure on personal computer prices. As a result of this competitive environment, market participants transferred their lower costs, realized from improvement in the semiconductor market, into lower personal computer prices.
Consequently, Everex's record revenue growth

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

811 F.Supp. 479
811 F.Supp. 479, Fed. Sec. L. Rep. P 97,207
(Cite as: 811 F.Supp. 479)

began to decline.    The Company's quarter-to-quarter revenue growth averaged only 5.5 percent per quarter in 1989 compared to nearly 13 percent per quarter growth realized in 1988. Complaint at 7-8, ¶ 16 (paragraphing added).

In addition to each defendant's alleged knowledge of the effect of these market pressures on Everex, Johnson alleges that defendants also encouraged false market optimism by causing Everex to issue a series of press releases which did not warn of decreasing profits and heralded continued increases in revenues and profits.    Six press releases are identified specifically in plaintiff's complaint, and these releases fall into two categories.

First, on March 2, May 23, and September 6 of 1989 Everex issued press releases summarizing and commenting upon Everex's financial results as described in quarterly financial reports.    These quarterly financial reports were prepared and released just one or two days before the March 2, May 23, and September 6 press releases.    All three releases in this group describe substantial growth over the parallel quarter from the previous year.    In particular, these releases highlight "continued rapid revenue growth and improving gross [profit] margins" based on "a decrease in some component costs, manufacturing efficiencies and better absorption of overhead costs, and an increase in the sale of higher margin products such as our ... personal computers."    May 23, 1989 Release, Report [FN3] at Exh. 4, p. 1.

> FN3. All citations to "Report" refer to the Report of the Special Committee of the Board of Directors of Everex Systems, Inc., Dated April 15, 1991.

Second on April 10, August 2, August 14 of 1989, and in a portion of the above referenced May 23 release, Everex announced various new products and new deals.    On April 10 Everex announced that it had begun shipping its newest computer model, the STEP 386/33.    On May 23 Everex announced a cross-licensing agreement with IBM.    On August 2, Everex announced the release of its own version of the Microsoft OS/2 operating software which enhanced the performance of Everex's STEP computers.    And on August 14 Everex allegedly announced that it had been awarded a contract to supply its computers to the United States Postal Service.

In sum, the complaint alleges that the defendants collectively sold over two million shares of stock at a time when they knew, or should have known, that the market price of the stock was inflated by press releases which optimistically heralded continued growth while failing to inform investors that Everex's revenue and profits were in fact being reduced by competitive pressures in the computer marketplace.

*C. The Report Of The Special Litigation Committee.*

[1] It is undisputed that Delaware law provides Everex with certain prerogatives in a derivative suit brought on behalf of Everex by a shareholder. Most relevant here, Delaware law endows Everex with the power to form a special litigation committee (SLC) of the board of directors, and to either terminate or assume prosecution of the suit based upon the SLC's review and recommendation.    8 Del.Code §§ 141(a) & (c); *Zapata Corporation v. Maldonado,* 430 A.2d 779 (Del.1981).

On November 19, 1990, the Board of Directors of Everex created a SLC, and appointed defendant Robert Teal as its then sole member.    Teal's first steps were to fill out the staff of the SLC.    In December of 1990, Teal hired the law firm of *483 Morrison & Foerster as SLC counsel (hereinafter, "committee counsel").    On February 13, 1991, Teal also oversaw the appointment to the SLC of Robert Louthan ("Louthan").

Following its formation, the SLC initiated its investigation of the merits of plaintiff Johnson's derivative suit, and the desirability of its continued prosecution.    Much of the investigation was conducted through committee counsel.    Committee counsel initially circulated document requests throughout Everex.    The specific terms of counsel's document requests do not appear in the record.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Committee counsel also reviewed the reports of outside securities analysts issued during the period of the insider stock sales alleged by Johnson. It is also clear from the record that counsel examined certain publicly available documents, including Securities and Exchange Commission filings by Everex and many of the individual defendants. The final report of the SLC states that in all, committee counsel reviewed roughly 4500 pages of documents.

In addition to its review of the documentary record, committee counsel also interviewed ten witnesses. A full list of these witnesses is set out in the notes, and includes five defendants, four non-defendant Everex managers, and one outside financial analyst. [FN4]

> FN4. Committee Counsel interviewed defendants Avis, Wong, Yu, Chan, and Everitt. Additionally, committee counsel interviewed: Chris Leslie, Everex's Corporate Counsel; Michael McClosky, Everex's Vice President of Finance; Alan Bushnell, Everex's Vice President of Operations; Anne Butler, Everex's Investor Relations Manager; Bruce Dunlevie, Everex's Vice President of Computer Systems and Corporate Development; Eric Zimits, an outside financial analyst employed by Rauscher Pierce Refsnes, Inc.

The SLC supplemented the investigation of committee counsel with its own investigation. On March 25, April 1, April 8, and April 15 of 1991, the SLC met with committee counsel to review the progress of counsel's investigation, to provide guidance to committee counsel, and, at the April 1 meeting, to interview witnesses. On April 1, the SLC interviewed defendants Hui, Lee, and Avis, as well as one of Everex's outside auditors, Mark Pickup, a partner of Ernst & Young.

On April 15, 1991, the SLC met and approved its final Report of the Special Committee of the Board of Directors of Everex Systems, Inc., (the "Report"). The Report details the analysis and conclu-

sions of the SLC in some detail. These details will not be repeated here, although the Court has assumed some familiarity with the Report in drafting the terms of this Order. Suffice it to say that the SLC found that the evidence did not support Johnson's allegations, and that further prosecution of Johnson's suit did not serve the interests of Everex.

### D. The Present Motion To Terminate.

On May 17, 1991, Everex filed the present motion to terminate the litigation based upon the recommendation of the SLC. In its Orders of June 12 and June 28, 1991, the Court allowed plaintiff Johnson to take discovery into the nature the SLC, the scope of its investigation, and, to a limited extent, the merits of its conclusions. On July 17, 1991, plaintiff filed his opposition to Everex's motion and the matter now comes on for hearing.

## II. ANALYSIS.

### A. The Standard of Review.

In *Burks v. Lasker*, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979), the Supreme Court held that a special litigation committee has the power to terminate a derivative action to the extent allowed by the law of the state of incorporation. *Id.*, at 486, 99 S.Ct. at 1841. Everex is incorporated in Delaware, and under Delaware law, a special litigation committee has the power to terminate a derivative action under certain circumstances. 8 Del.Code §§ 141(a) & (c); *Zapata v. Maldonado*, 430 A.2d 779 (Del.1981) (hereinafter "Zapata").

[2] Under *Zapata*, a special litigation committee may terminate a derivative action with leave of the court following an appropriate motion to terminate by the affected *484 corporation. *Id.* In *Zapata*, the Supreme Court of Delaware laid out a two step standard of review applicable to motions to terminate derivative actions based on the recommendation of an SLC:

> *First*, the Court should inquire into the independence and good faith of the committee and the bases supporting its conclusions. Limited discovery may be ordered to facilitate such inquir-

811 F.Supp. 479                                                                    Page 6
811 F.Supp. 479, Fed. Sec. L. Rep. P 97,207
**(Cite as: 811 F.Supp. 479)**

ies. The corporation should have the burden of proving independence, good faith and reasonable investigation.... If the Court determines either that the committee is not independent or has not shown reasonable bases for its conclusions ... the Court shall deny the corporations motion. If, however, the Court is satisfied under Rule 56 standards that the committee was independent and showed reasonable bases for good faith findings and recommendations, the Court may proceed, in its discretion, to the next step....

[*Second*,] [t]he Court should determine applying its own independent business judgment, whether the motion should be granted. This means, of course, that instances could arise where a committee can establish its independence and sound bases for its good faith decisions and still have the corporation's motion denied. The second step is intended to thwart instances where corporate actions meet the criteria of step one, but the result does not appear to satisfy its spirit,.... If the Court's independent business judgement is satisfied, the Court may proceed to grant the motion, subject, of course, to any equitable terms or conditions the Court finds necessary or desirable. *Zapata*, 430 A.2d at 788-89 (emphasis added).

Because the power to bring a motion to terminate a shareholder derivative suit under *Zapata* emerges from state law, the place of such a motion within the procedural framework established by the Federal Rules of Civil Procedure is unclear, at least at first glance.

Without explicitly ruling on the issue, some courts have treated a motion to terminate as one for summary judgment brought under Rule 56. *See e.g.*, *Gaines v. Haughton*, 645 F.2d 761 (9th Cir.1981) (interpreting California law). Other courts have treated this type of motion as one which borrows heavily from Rule 56, but which ultimately arises under Rule 23.1. *Peller v. Southern Co.*, 911 F.2d 1532, 1538-39 (11th Cir.1990) (applying Delaware law).

Finally, Delaware courts have defined a motion to terminate *sui generis*, referring to it as neither a

"neither a motion to dismiss under Rule 12(b), nor ... a motion for summary judgment pursuant to Rule 56.... Rather, the motion is a hybrid one, derived by analogy to a motion to dismiss a derivative suit based upon a voluntary settlement...." *Kaplan v. Wyatt*, 484 A.2d 501, 506-07 (Del.Ch.1984) *aff'd* 499 A.2d 1184 (Del.1985).

[3] The Court finds that the view adopted by the Eleventh Circuit in *Peller* is the best view. Rule 23.1 provides in relevant part:

In a derivative action brought by one or more shareholders or members to enforce a right of a corporation ..., the corporation ... having failed to enforce a right which may be properly asserted by it,.... The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation.... The action shall not be dismissed or compromised without the approval of the court.... Fed.R.Civ.P. 23.1.

The above quoted terms of Rule 23.1 clearly contemplate judicial review of the conduct of derivative actions to insure that the actions are in the best interests of the corporation, and in the best interests of absent shareholders who may be affected by the outcome of the suit. The review of SLC reports contemplated by *Zapata* falls within the ambit of the judicial review called for by Rule 23.1.

Of course, Rule 23.1 does not establish a standard of review to be applied to motions brought under *Zapata*. Following the lead *485 of *Zapata* itself, courts have looked to Rule 56 for guidance on these issues. For instance, in *Kaplan v. Wyatt*, 484 A.2d 501 (Del.Ch.1984) *aff'd* 499 A.2d 1184 (Del.1985), the court found that the corporation moving for termination bears a burden of proving the independence, good faith, and reasonability of the SLC's review by evidence sufficient to eliminate any genuine questions of fact with regard to these issues. *Id.*

[4] However, it is clear from *Kaplan* and *Peller* that the use of the standard of review commonly associated with Rule 56 has not converted *Zapata* mo-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

811 F.Supp. 479
811 F.Supp. 479, Fed. Sec. L. Rep. P 97,207
**(Cite as: 811 F.Supp. 479)**

tions into motions for summary judgment under Rule 56. For example, when considering a plaintiff's motion for summary judgment under Rule 56, the Court does not make determinations of credibility or weigh conflicting evidence. *T.W. Electric Service, Inc. v. Pacific Elec. Contractors,* 809 F.2d 626, 630-31 (9th Cir.1987) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). Yet determinations of credibility are essential to the first step of a *Zapata* review, which requires the Court to consider the biases, interests, independence, and good faith of the SLC. Moreover, the Court must weigh conflicting evidence to conduct the discretionary second step of a *Zapata* review, which requires the Court to apply its own independent business judgment in light of the entire evidentiary record.

[5] Similarly, a plaintiff whose motion for summary judgment is denied under Rule 56 nonetheless retains the right to proceed to trial in the absence of a successful cross-motion for summary judgment by defendants. In contrast, where courts have denied a *Zapata* motion to terminate because, for example, the SLC's report was not prepared in good faith, the movant has not retained a right to proceed to a full bench trial of the issues raised by the motion to terminate. *Peller v. Southern Co.,* 911 F.2d 1532 (11th Cir.1990). [FN5] This limitation is in accord with the underlying efficiency rationale of the *Zapata* rule. It would be, at best, inconsistent with the purposes of *Zapata* to hold a full trial on the issue of whether or not the suit merits a full trial.

> FN5. Defendant Everex argues that if the Court denies its motion to terminate the litigation because the SLC, say, did not act in good faith, then Everex retains the right to proceed to full bench trial of the good faith issue. *Lewis v. Anderson,* 615 F.2d 778 (9th Cir.1980). *Lewis* does support this argument. Under *Zapata* and Rule 23.1 the Court may order evidentiary hearings *before* ruling on a motion to terminate, and this type of proceeding went forward in *Lewis. Lewis,* however, does not stand for

the proposition that the corporation retains the right to a proceed to a bench trial *after* the court has ruled on all issues raised by a *Zapata* motion.

In sum, then, Everex's motion to terminate shareholder derivative litigation will be treated as one brought under Rule 23.1. The standard of review is determined by Delaware law, and Delaware has chosen to apply a standard commonly applied to motions for summary judgment brought under Rule 56. Thus, Everex bears the burden to support its motion for termination with evidence sufficient to eliminate genuine issues of fact as to the SLC's independence, good faith and reasonability.

[6] If the Court finds that Everex has not carried this burden, then Everex's motion will be denied and Johnson's suit will proceed under Johnson's control. Alternatively, if Everex carries its initial burden regarding a first-step analysis under *Zapata,* then the Court, at its discretion, may nonetheless deny Everex's motion if it determines that the policies which derivative litigation were meant to serve would be furthered by allowing the litigation to go forward in the hands of plaintiff Johnson, or if the Court finds that the unique circumstances of this case present other reasons for allowing Johnson to pursue the action further.

It is important to note that this second level of analysis is not one which is conducted with reference to any evidentiary burden placed on the parties. Rather, should the Court exercise its discretion to conduct this second level of review, the Court will do so on the basis of the entire record in this matter viewed in light of \*486 equity, law, and public policy. *Kaplan v. Wyatt,* 484 A.2d 501, 508-09 (Del.Ch.1984).

*B. The Good Faith And Independence Of The SLC.*

To determine whether or not the SLC has acted independently and in good faith, the Court must review the totality of the circumstances to determine whether the members of the SLC are "in a position to base [their] decision on the merits of the issue rather than ... extraneous considerations or influ-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

811 F.Supp. 479
811 F.Supp. 479, Fed. Sec. L. Rep. P 97,207
**(Cite as: 811 F.Supp. 479)**

Page 8

ences." *Kaplan v. Wyatt,* 499 A.2d 1184, 1189 (Del.1985). Applying this totality of the circumstances test, courts have highlighted the following six factors:

1. *Status as a defendant, and potential liability:* Courts have found SLC's independent and unbiased even though a member of the SLC is a nominal defendant or subject to small or indirect liability. However, where liability may be direct and substantial the SLC's independence may be questioned. *Mills v. Esmark, Inc.,* 544 F.Supp. 1275, 1283 (N.D.Ill.1982) (merely nominal defendant); *compare In re General Tire & Rubber Co. Securities Litigation,* 726 F.2d 1075, 1083-84 (6th Cir.1984) *and Lewis v. Anderson,* 615 F.2d 778 (9th Cir.1979) *with Abbey v. Control Data Corp.,* 603 F.2d 724 (8th Cir.1979).

2. *Participation in or approval of the alleged wrongdoing:* Once again the participation and/or approval must be substantial, and not the result of innocent or *pro forma* involvement or affiliations. *Mills v. Esmark, Inc.,* 544 F.Supp. 1275, 1283 (N.D.Ill.1982); *Kaplan v. Wyatt,* 499 A.2d 1184, 1189 (Del.1985); *see Bach v. National Western Life Insurance Co.,* 810 F.2d 509, 513 (5th Cir.1987).

3. *Past or present business dealings with the corporation:* *Hasan v. CleveTrust Realty Investors,* 729 F.2d 372, 378-79 (6th Cir.1984); *Rosengarten v. Buckley,* 613 F.Supp. 1493 (D.Md.1985); *In re General Tire & Rubber Co. Securities Litigation,* 726 F.2d 1075, 1083-84 (6th Cir.1984).

4. *Past or present business or social dealings with individual defendants:* *Lewis v. Fuqua,* 502 A.2d 962, 966-67 (Del.Ch.1985); *Hasan v. CleveTrust Realty Investors,* 729 F.2d 372, 378-79 (6th Cir.1984)

5. *The number of directors on the SLC:* The larger the number of directors, the less weight accorded to any disabling interest affecting only one director. *Lewis v. Fuqua,* 502 A.2d 962, 967 (Del.Ch.1985).

6. *The "structural bias" of the SLC:* Here the court considers whether manner in

which the SLC was appointed and proceeded was one which was inevitably bound to be empathetic to defendants, and, therefore, biased in favor of terminating the litigation. *Lasker v. Burks,* 567 F.2d 1208 (2d Cir.1978); *Joy v. North,* 692 F.2d 880 (2d Cir.1982). [FN6]

> FN6. Some interpreters of these Second Circuit cases have suggested that they stand for the proposition that SLC's are inherently biased and untrustworthy. *See e.g. Joy v. North,* 692 F.2d 880 (2d Cir.1982) (J. Cardamone, dissenting). If, they argue, the defendant directors did not expect that the SLC would recommend termination, the directors would never vote to appoint an SLC. *Id.* The Court does not adhere to this interpretation of Second Circuit cases, and finds, in any event, that this interpretation is at odds with Delaware law. If SLC's are all viewed as inherently biased then the purpose of the *Zapata* rule, *ie.* to allow SLC's to terminate derivative litigation in appropriate cases, will be frustrated entirely.

[7] Applying these factors here, the Court finds that the SLC was independent and acted in good faith. There is little or no evidence that SLC member Robert Louthan is biased or interested under any of the factors just discussed. At the time of the alleged wrongdoing Louthan was an independent consultant who had no identified business or personal relationship with Everex or any of the defendants. Louthan became a director of Everex in February of 1991. However, Louthan has not been named as a defendant, and plaintiff has not alleged that Louthan participated in or approved of the insider trading scheme asserted by Johnson in his complaint. Plaintiff alleges that Louthan discussed an unidentified business arrangement with certain *487 of the defendants roughly two months before he was appointed to the SLC. There is no evidence, though, that this alleged business arrangement ever moved beyond the stage of speculative discussion, or, more significantly, that the success or failure of this venture is in any way connected with

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

811 F.Supp. 479
811 F.Supp. 479, Fed. Sec. L. Rep. P 97,207
**(Cite as: 811 F.Supp. 479)**

Page 9

Louthan's performance as a member of the SLC.

Similarly, there is no evidence that the SLC's counsel, Morrison & Foerster, are biased or have any improper interest in this matter. There is also no evidence that attorneys from Morrison & Foerster have had any personal or business contacts with Everex or the individual defendants, other than in its role as committee counsel.

The record with regard to Teal is not void of evidence related to interest or bias. Teal is a named defendant in this action. Teal is also a director of Everex, and, in that capacity presumably has business and personal contacts with other defendant directors of Everex. These facts, however, do not demonstrate the sort of substantial bias or interest which would cause the Court to question the SLC's ability "to base [its] decision on the merits of the issue rather than ... extraneous considerations or influences." *Kaplan v. Wyatt,* 499 A.2d 1184, 1189 (Del.1985).

While Teal is named as a defendant, it is undisputed that he did not sell Everex stock during the alleged period of insider trading, or at any other time. Nor is there any evidence that Teal drafted press releases or otherwise actively participated in the pattern of misconduct alleged by plaintiff Johnson. Thus, Teal's nominal appearance as a defendant does not undermine his ability to operate as an independent and unbiased member of the SLC. *Mills v. Esmark, Inc.,* 544 F.Supp. 1275, 1283 (N.D.Ill.1982).

Moreover, even if the evidence suggests that Teal is tainted to some degree, this taint does not rise to the level where the Court should conclude that the SLC is tainted. Teal is not the only member of the SLC, and there is no indication that the objectivity of Louthan or committee counsel were overborne by the arguments or conduct of Teal.

For the reasons just stated, the Court finds that the Everex SLC was independent and acted in good faith.

*C. The SLC's Conclusion Has A Reasonable Basis*

*In The Record.*

[8] In its April 15, 1991, report, the SLC concluded that it was not in the interest of Everex to further pursue Johnson's derivative suit. The SLC's reasoning in support of its conclusion that Johnson's derivative suit should be terminated is stated clearly in its Report, and will not be reiterated in full detail here. However, a summary review of the SLC's analysis may be helpful.

With regard to the defendants knowledge of Everex's alleged financial distress, the SLC concluded that there was insufficient evidence to support the conclusion that Everex was experiencing financial distress, or that defendants had any knowledge of this alleged distress.

Moreover, the SLC concluded that defendants' alleged scheme to mislead the market through optimistic press releases has little or no evidentiary basis. Most press releases included only publicly available information previously stated in Everex's quarterly reports. It is now undisputed that Everex's releases regarding new products and new deals were timely and accurate. With regard to Everex's alleged August 14, 1989 announcement that it had received a contract from the U.S. Postal Service, it is now undisputed that the announcement was not made by Everex, and that Everex was a subcontractor not the recipient of the prime contract.

Finally, the SLC concluded that defendants all sold stock following trading patterns inconsistent with the insider trading scheme alleged by defendants. Most stock sales were made during "window periods" established by Everex for the sale of stock by directors. These "window periods" began a few days after the release of quarterly financial reports and continued for ten days. Additionally, most sales follow financial plans which arose prior to the alleged insider trading period, and over sixty *488 percent of the alleged insider trades were made at a price *lower* than the market price of Everex's stock following Everex's October 18, 1989 press release which allegedly confessed Everex's weak financial position to market analysts and the public.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

The conclusions of the SLC appear well reasoned, and are substantially supported by the evidence relied on by the SLC in its Report, as well as by the evidence submitted by Everex in support of its motion to terminate.

Plaintiff Johnson challenges the conclusion of the report, and attempts to raise a genuine issue of fact, in two ways. First, Johnson argues that the SLC "ignored or discounted compelling evidence of defendants' knowledge of the imminent Everex market slowdown and subsequent insider selling." Plaintiff's Memorandum [FN7] at 24. Specifically, Johnson notes that at a September 5, 1989 Everex board meeting defendant Hui made statements recorded in contemporaneous notes as follows:

> FN7. In full, Plaintiff's Memorandum of Points and Authorities in Opposition to Motion of Everex Systems, Inc., to Terminate Shareholder Derivative Action Pursuant To Fed.R.Civ.P. 56, filed on July 17, 1991.

The computer industry is in a period of consolidation with lower sales generally. [Hui] reported that some of the Company's major customers were experiencing a 50% slowdown in sales. He noted that diversification of [Everex's] product line had resulted in a lesser impact on [Everex] of the general sales slow-down than felt by some competitors.... .
[Everex] has concentrated on inventory control and selective increases in sales and its gross margins have been steadily increasing. [Everex's] operating income has increased largely due to a shift in [Everex's] product, from emphasis on [peripherals to computers systems....] He advised the directors that [Everex] intended to increase its product development expenditures to maintain and expand its competitive product base.

Plaintiff contrasts this purportedly pessimistic statement to Everex insiders with the following statement in a press release issued on September 6, 1991:

Steven Hui, president of Everex, attributed the excellent [fourth quarter] results to continued strong demand for Everex's product line and to further improvement in gross margin. 'Our gross profit margin increased from 27.4% in the third quarter to 28.5% in the fourth quarter. This reflects strong demands for our systems products [....]' Personal computer sales accounted for 58% of sales in the fourth quarter versus 55% during the third quarter and 50% in the second quarter of fiscal 1989.

Plaintiff's argument here is entirely unpersuasive. Initially, the supposed contradiction between Hui's statements to insiders and Everex's press release to the public is subtle to the point of obscurity. Admittedly, in his statement to the Board Hui noted the existence of a slowdown in the computer market, and its effects on some Everex customers. However, in both his statement to the Board and in Everex's press release Hui emphasized his belief that Everex would remain profitable based on Everex's continuing successful transition away from peripherals and toward computer systems.

Furthermore, to the extent Hui's statement to the Board contained information omitted from the press release, it did not contain idiosyncratic inside information about Everex. The only information omitted from the press release is Hui's generic statement about the state of the computer industry, and the problems of other computer companies. This is primarily public information.

In addition to Johnson's limited attack on the merits of the SLC's conclusion, Johnson urges the Court to discredit the SLC's Report because of its methodology. Johnson argues that the SLC placed excessive reliance on committee counsel citing *Peller v. The Southern Co.*, 911 F.2d 1532 (11th Cir.1990).

Johnson also notes that the SLC Report fails to consider certain factors which Johnson asserts should have been central to the *489 SLC's deliberations. These factors include: (1) the availability of insurance coverage and the possible affect of an adverse judgment on Everex's future insurance costs; (2) the possibility of indemnification; (3) the cost of litiga-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

811 F.Supp. 479
811 F.Supp. 479, Fed. Sec. L. Rep. P 97,207
(Cite as: 811 F.Supp. 479)

tion; and (4) the consumption of management's time defending litigation and the resultant impairment of management's ability to conduct ongoing business. Plaintiff's Memorandum at 16-17. [FN8]

> FN8. Johnson also argues that the SLC did not consider the merits of his claim. This argument is patently implausible. The SLC report is replete with analysis of factual allegations essential to Johnson's claims here.

Finally, Johnson attacks the manner in which the SLC interviewed witnesses. Johnson complains that these interviews were too short in duration, were not conducted with the informant under oath, and were not transcribed.

Johnson's attack of the SLC's investigative methodology is unavailing. With regard to use of counsel, Johnson is correct to suggest that the SLC's use of committee counsel is subject to judicial scrutiny. SLC's, however, have been praised just as often as castigated for their reliance on competent counsel. *See e.g., Grafman v. Century Broadcasting Corporation,* 762 F.Supp. 215, 220 (N.D.Ill.1991) ("Another indicia of good faith and reasonableness of the investigation is the use of capable counsel."); *Kaplan v. Wyatt,* 499 A.2d 1184, 1191 (Del.1985). The issue before the Court now is not whether the SLC's reliance on counsel was substantial, but whether the SLC's reliance on counsel amounts to an abdication by the SLC of its investigative role, or renders the SLC's conclusions unreasonable or unreliable. In the context of the present suit, the SLC's substantial reliance on Morrison & Foerster to gather documents and interview witnesses does not appear to have affected the independence of the SLC, the reliability the SLC's evidence gathering, or the reasonability of the SLC's analysis.

Johnson's remaining attack on the SLC's methodology is equally flawed. In light of the SLC's conclusion that Johnson's factual allegations were without sufficient support, it is hard to see how the SLC's consideration of any of the "critical factors" listed by Johnson could have--or should have--affected the SLC's conclusions. Indeed, a further analysis of most of these factors militates against allowing the litigation to proceed. For example, it is hard to imagine how the high monetary cost of further litigation could tip the scales in favor of Johnson and cause the SLC to recommend that the litigation be allowed to continue. The same can be said of the disruptive affect of litigation on day-to-day management, and the possible affect of an adverse judgment on Everex's insurance.

Finally, Johnson's objection that witness interviews were too short and were not transcribed is not dispositive. Of course, long transcribed interviews might provide both substantive support for the SLC's conclusions and evidence of the SLC's good faith. But the absence of long transcribed interviews does not undermine the undisputed facts which the SLC has managed to prove without the aid of long transcribed interviews. It is important to note that most of the facts relied on by the SLC are not even disputed by Johnson's allegations, much less by contradictory evidence. While the record could be longer, it is now long enough to adequately support Everex's motion to terminate the present litigation.

*D. The Court Should Decline To Conduct A Second Step Analysis.*

As we noted at the outset, even if the SLC's recommendation to terminate the litigation was prepared independently, in good faith, and presents conclusions with a reasonable basis in the record, the Court may nonetheless refuse to terminate the action on the basis of a discretionary second-step analysis. *Zapata v. Maldonado,* 430 A.2d 779, 788-89 (Del.1981). Specifically, the Court may "determine, applying its own independent business judgment, whether the motion should be granted." *Id.* "The second step is intended to thwart instances where corporate actions meet the criteria of step one, but the result does not appear *490 to satisfy its spirit...." *Zapata,* 430 A.2d at 788-89.

At first glance, the analytic process by which courts decide whether or not to carry out the "discretion-

811 F.Supp. 479
811 F.Supp. 479, Fed. Sec. L. Rep. P 97,207
**(Cite as: 811 F.Supp. 479)**

ary" second-step analysis created by *Zapata* appears fundamentally imprecise. For instance, it is unclear how the threshold issue of whether or not to engage in a discretionary second-step analysis can be held discrete from the substance of the second-step analysis itself. It seems obvious that a court cannot consider the case before it in order to decide whether or not the case warrants a second-step analysis without considering the legal and factual questions involved in the substance of a second-step analysis. Nor do *Zapata* or its descendants provide a principled basis for sorting a second-step analysis out from a first-step review for independence, good faith, and reasonability. *Zapata's* second-step analysis appears to be, at best, undefined, and at worst, an illusory legal fiction which serves only to create an unprincipled judicial veto power over otherwise well taken motions to terminate derivative litigation.

Below the surface of *Zapata* 's terms, though, are legitimate concerns which both serve to distinguish the first and second steps of a *Zapata* analysis and provide some guidance to the Court. Undoubtedly, the second-step procedure was adopted in recognition of the atypical evidentiary posture of a motion to terminate brought under *Zapata*. While the party seeking termination is permitted to develop the merits of the claims at issue in an unlimited fashion, the party seeking to defeat termination has little or no opportunity to conduct merits discovery before the Court decides whether the claim should be terminated. [FN9] The second step of the *Zapata* procedure, then, serves as a judicial back-stop to prevent SLC's from manipulating their procedural advantages to terminate meritorious derivative claims. It can be, to use plaintiff's phrase, an imprecise "smell test" allowing the court to search between the lines of the SLC's report for the scent of a meritorious claim enclosed within a record that has not been opened by truly adversarial proceedings.

FN9. This one-sided development of the evidentiary record flatly contradicts the policy favoring liberal discovery and resolution on the merits which is reflected

throughout the Federal Rules of Civil Procedure. Nonetheless, strict limitation of the plaintiff's ability to take discovery regarding the SLC's report arises as an essential corollary of *Zapata* 's efficiency rationale: Allowing adversarial discovery on the merits would eviscerate the SLC's power in a way that Delaware law has deemed more timely and cost effective than full litigation under the Federal Rules of Civil Procedure.

[9] With this purpose in mind, the court conducting a second-step analysis must independently consider the essential merits of plaintiff's claim. Moreover, the Court must determine, through the exercise of its independent business judgment, whether the facts and legal authorities placed before the court establish that continuing the derivative litigation will benefit of the corporation on whose behalf the derivative claim is presented.

[10] Here, the asserted theories of liability and the evidentiary record have already been summarized in this Order. In the Court's view, plaintiff's core liability theory--ie. that defendants masked their knowledge of Everex's financial weakness--is one which is not likely to prevail. Most obviously undercutting plaintiff's core theory is the undisputed evidence submitted by the SLC that Everex is not now, nor has it been, financially weak. There was, in other words, scant adverse financial information for the defendants to hide. Equally important, it appears to this Court that the available and realistically discoverable evidentiary support for the existence of actual misrepresentation, omission, or scienter simply lacks the convincing force necessary for plaintiff to prevail.

On the other side of the balance, it appears to the Court that Everex's use of the SLC mechanism in this matter is the product of a sound business decision which furthers the interests of Everex. The reasonability of the SLC's report, when read alone, has already been discussed in this order. In a second-step analysis the Court may review the SLC's report in the broad *491 context of the man-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

811 F.Supp. 479
811 F.Supp. 479, Fed. Sec. L. Rep. P 97,207
**(Cite as: 811 F.Supp. 479)**

agement history of Everex. In this context the conclusions of the SLC appear even more sound. The record discloses a history of good business judgment exercised by Everex's directors on behalf of Everex and Everex's shareholders. There is no basis in this record for this Court to take the extraordinary step of substituting its own business judgment for that of the Everex SLC.

Exercising its second-step review then, the Court concludes that this is not a case where the Court should decline to grant the motion to terminate despite the Court's prior conclusion that the SLC's termination recommendation has been made independently, reasonably, and in good faith.

III. CONCLUSION.

For the reasons discussed above, Everex's motion to terminate Johnson's shareholder derivative claim is GRANTED. Johnson's shareholder derivative claim is DISMISSED WITH PREJUDICE.

IT SO ORDERED.

811 F.Supp. 479, Fed. Sec. L. Rep. P 97,207

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

293 N.Y. 200                                                                                    Page 1
293 N.Y. 200, 56 N.E.2d 550, 155 A.L.R. 1226
**(Cite as: 293 N.Y. 200)**

FRED LANGFELDER et al., Appellants,

v.

UNIVERSAL LABORATORIES, INC., Respondent.

Court of Appeals of New York.

Argued June 13, 1944.

Decided July 19, 1944.

CITE TITLE AS: Langfelder v Universal Labs.

**\*200 Corporations**

Jurisdiction over controversies involving affairs of foreign corporations --- (1) Plaintiffs, stockholders of Delaware corporation, seek relief against effects of merger with corporation of that State; fact that two of eight causes of action besides injunction seek money damages does not render usual rules inapplicable; not abuse of discretion to refuse jurisdiction --- (2) Review of Delaware statutes and decisions required, unseemly for courts of this State --- (3) Regulation and management of internal affairs of foreign corporation involved --- (4) Location of property and office in this State does not render rules inapplicable

1. Plaintiffs, holders of preferred stock in a Delaware corporation, which, by written agreement, has merged with another corporation of that State, assert that the merger was ineffective under Delaware law to cut off their rights in such preferred stock. By eight causes of action in equity, they seek relief of various kinds including the issuance of new stock provided for in the merger agreement but on different terms from those provided therein with respect to payments by way of dividends and otherwise. Two of the causes of action seek a money judgment for damages, on the basis of an alleged breach of the contract under which plaintiffs hold their stock, and a decree restraining the operation of the agreement until the amount thereof has been determined and judgment therefor rendered. The fact that a money judgment is sought does not change the application of the rules under which the courts under certain circumstances refuse jurisdiction of controversies involving foreign corporations. The lower courts did not abuse their discretion in declining jurisdiction.

2. Said causes of action on contract may not be resolved into a money judgment except upon a review of the statutes and decisions of Delaware which, under the circumstances, would at least be unseemly and inappropriate for our courts to undertake.

3. Additionally, entertainment of jurisdiction by our courts would necessarily involve regulation and management of the internal affairs of a corporation dependent upon the laws of a foreign State.

**\*201 4.** Nor will the application of the rules be changed by the fact that the several corporations have in New York their manufacturing plant and their office where their principal business is transacted and their records kept.

Langfelder v. Universal Laboratories, Inc., 267 App. Div. 900, affirmed.

APPEAL, by permission of the Appellate Division of the Supreme Court in the first judicial department, from a judgment of said court, entered March 30, 1944, unanimously affirming a judgment of the Supreme Court, New York County, in favor of defendant, entered upon an order of the court at Special Term (WALTER, J.) granting a motion by defendant, made upon the complaint and an affidavit of an officer of the defendant before service of an answer, for a dismissal of the complaint upon the ground that the court, in its discretion, should decline jurisdiction of the subject matter of the action.

Charles Rosenbaum and Maurice Gellar for appellants. The courts of the State of New York should not reject jurisdiction of a cause of action on contract against a foreign corporation for a sum of money alleged to be due and in default. (Travis v. Knox Terpezone Co., 215 N.Y. 259; Equitable L. A. Society v. U. P. R. R. Co., 212 N. Y. 360; Gregonis v. P. & R. Coal & Iron Co., 235 N. Y. 152; Sauerbrunn v. Hartford Life Ins. Co., 220 N. Y. 363.)

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

293 N.Y. 200                                                                    Page 2
293 N.Y. 200, 56 N.E.2d 550, 155 A.L.R. 1226
(Cite as: 293 N.Y. 200)

Orison S. Marden for respondent. I. The Special Term properly declined to take jurisdiction of the action. (Cohn v. Mishkoff Costello Co., 256 N. Y. 102; Sternfeld v. Toxaway Tanning Co., 290 N. Y. 294; Bickart v. Kelly-Springfield Tire Co., 243 App. Div. 72; Miesse v. Seiberling Rubber Co., 264 App. Div. 373; Koster v. Shenandoah Corp., 258 App. Div. 1079, 283 N. Y. 778; Nothiger v. Corroon & Reynolds Corp., 266 App. Div. 299; Harris v. Weiss Engineering Corp., 267 App. Div. 96; Graybar Electric Co. v. New Amsterdam Casualty Co., 292 N. Y. 246; Cohen v. American Window Glass Co., 126 F. 2d 111; Rogers v. Guaranty Trust Co., 288 U. S. 123.) II. In declining jurisdiction, the Special Term exercised a judicial discretion and appellate review is limited to determining whether there has been an abuse of such discretion. (Rogers v. Guaranty Trust Co., 288 U. S. 123; Koster v. Shenandoah Corp., 258 App. Div. 1079; *202Murnan v. Wabash Railway Co., 246 N.Y. 244; Civil Practice Act, § 605; Wedemann v. United States Trust Co., 258 N. Y. 315; Matter of Cornell, 267 N.Y. 456.)

RIPPEY, J.

The Vadsco Sales Corporation and Delettrez, Inc., a wholly owned subsidiary of the former, were and are corporations organized and existing under the laws of the State of Delaware. On June 29, 1943, the two corporations merged by written agreement and the name of the former as the continuing corporation under the merger was changed to Universal Laboratories, Inc. The agreement was approved by the requisite vote of stockholders representing more than two thirds of the total outstanding capital stock of each of the merging corporations as required by the Corporation Law of Delaware (see §§ 26, 59, 59A, 61, referred to in the complaint and other moving papers) and the merger became effective under that law on the aforesaid date.

The corporate stock of Vadsco Sales Corporation before the merger consisted of 7% cumulative preferred stock of a par value of $100 per share and a liquidating value of $110 per share plus accumulated unpaid dividends with interest and certain oth-

er preferential rights and common stock of no par value. Delettrez, Inc., had a common stock issue of a par value of $100 per share. The purpose of the merger was to effect a reorganization and recapitalization of Vadsco Sales Corporation. To effect that purpose, by the merger agreement, among other things, the certificate of incorporation of Vadsco and its bylaws are, in some important respects, amended, its capital stock is reduced and reclassified, its obligation to pay cumulated preferred stock dividends accruing prior to the merger is terminated, the new preferred stock has no par value but a stated liquidating value of $50 per share with annual dividends of $2.50 per share, and the new common stock has a par value of $1 per share. The rights of preferred stockholders are, in some few respects, increased, but, in many more important respects, circumscribed or curtailed and a management committee is given options to purchase common stock over a period of five years at varying prices. Automatically, on the day the merger became effective, each share of preferred stock of Vadsco was converted into one share of the new preferred stock and five shares of the common stock of Universal.

*203 In the certificate of incorporation of the Vadsco Sales Corporation and in its stock certificates, it was provided that, 'In the event of any reduction in the capital stock of the corporation resulting in a reduction of the preferred stock either as to number of shares or as to the par value thereof, except a reduction in the number of shares thereof for the purpose of effecting a statutory cancellation of preferred stock purchased for retirement or redeemed, or in the event of a voluntary dissolution of the corporation, the holders of the shares of said preferred stock affected by such reduction and to the extent thereof, or affected by voluntary dissolution, shall be entitled to receive and shall be paid an amount in cash not less than one hundred and ten percent (110%) of the amount of the reduction or in the case of voluntary dissolution one hundred and ten percent (110%) of the par value of their shares, and in any case all cumulated and unpaid dividends thereon and a sum equal to a dividend at the rate of seven percent (7%) per annum from the last di-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

vidend date to the date of such reduction or voluntary dissolution.'

Plaintiffs, residents of New York City, are the owners of 370 shares of the preferred stock of the Vadsco Sales Corporation. They assert that the merger was ineffective under Delaware law to cut off their rights and interests in the preferred stock of Vadsco and that those rights must be determined as they existed prior to the merger. On that theory, it is shown that plaintiffs would be entitled to receive from defendant the difference between $110 and $50 par value and the accumulated annual unpaid dividend of 7% per share on each share of preferred stock held by them. Plaintiffs, in their complaint in equity, as nonassenting stockholders of Vadsco to the merger and upon appropriate allegations, set out in eight causes of action, seek judgment declaratory of their rights in the premises, that those rights as stockholders as they existed before the merger were not affected by the merger and that defendant be directed to pay them the difference between $110 per share as the declared value of their stock since the defendant reduced the number of shares of its stock and $50 per share as fixed in the merger agreement and additionally issue to them one share of the new preferred stock plus five shares of the new common stock or, in the alternative, declaring that the cumulated *204 unpaid dividends on their preferred stock were not affected, impaired or satisfied by the merger and that they are entitled to be paid those dividends before any other dividends are paid, directing defendant to issue to them the substituted stock specified in the merger agreement without requiring them to surrender their right to unpaid dividends on the Vadsco stock, restraining the defendant from declaring or paying any dividend upon the new stock of defendant without first providing for the payment of the unpaid accrued dividends on their Vadsco stock, for a temporary injunction from so doing and for such other relief as might be appropriate.

There are cases in which our courts will entertain jurisdiction in suits against foreign corporations where suitors, even stockholders, are entitled to some relief which the State court is competent to grant. But it is well settled that jurisdiction in any case will be declined either in the absence of jurisdiction in the strict sense or where a determination of the rights of litigants involves regulation and management of the internal affairs of the corporation dependent upon the laws of the foreign State or where the court in which jurisdiction is sought is unable to enforce a decree if made or where the relief sought may be more appropriately adjudicated in the courts of the State or country to which the corporation owes its existence (Fletcher, Cyclopedia of the Law of Private Corporations, vol. 17, §§ 8426-8429; Bickart v. Kelly-Springfield Tire Co., 243 App. Div. 72; Travis v. Knox Terpezone Co., 215 N. Y. 259; Cohn v. Mishkoff Costello Co., 256 N. Y. 102; Sternfeld v. Toxaway Tanning Co., 290 N. Y. 294; Nothiger v. Corroon & Reynolds Corp., 293 N. Y. 682; Cohen v. American Window Glass Co., 126 F. 2d 111).

The fact that the third and seventh causes of action seek a money judgment on the basis of an alleged breach of the contract under which plaintiffs hold the Vadsco stock, which plaintiffs particularly urge as a ground for entertaining jurisdiction, does not change the application of the above-mentioned rules to this case since recovery thereunder may not be had if the merger agreement is valid and binding on the plaintiffs. A representative action was brought in the Chancery Court of the State of Delaware in behalf of all holders of the preferred stock of Vadsco as their rights in such stock existed before *205 the merger to enjoin Vadsco from consummating the then proposed agreement of merger in which action were involved some of the same objections to the agreement which are set up in the instant complaint. That action, were plaintiffs therein successful, would seem to afford plaintiffs the basic relief which they now seek in the instant case. (Porges v. Vadsco Sales Corporation, 32 Atl. 2d 148.) An injunction restraining the merger pendente lite was refused. We are not advised whether that action is still pending. What rights of plaintiffs as preferred stockholders of Vadsco may have been or may be affected by the outcome of that action depends upon the statutory and decisional law of the State of Delaware. In any event, the merger has

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

293 N.Y. 200

293 N.Y. 200, 56 N.E.2d 550, 155 A.L.R. 1226

(Cite as: 293 N.Y. 200)

been accomplished in fact. In the complaint in the instant case, plaintiffs admit that fact. Though the merger is admittedly accomplished, they seek in the third and seventh causes of action to secure a money judgment for the amount by which they claim their stock was depreciated in value by the merger and for unpaid dividends thereon and a decree restraining the operation of the agreement until that amount has been determined and judgment therefor granted. It is not a simple contract on which they sue in which the rights and obligations of the parties are plainly written into the contract a violation of which constitutes a breach giving rise to recovery of a money judgment in a court of law. The laws of the State of Delaware where Vadsco was incorporated as affecting the validity, construction and performance of the contract when made and the laws of that State applicable to the enforcement of the contract and the remedy for its breach, providing no substantial right secured by the contract is by the latter impaired, form a part of it with the same force and effect as though they were expressly referred to or incorporated in its terms (Home Bldg. & L. Assn. v. Blaisdell, 290 U. S. 398; People ex rel. City of New York v. Nixon, 229 N.Y. 356, 360-361). Under the laws of that State, a merger is apparently authorized and given effect except under exceptional circumstances but, in any event, a nonassenting stockholder may refuse to accept the merger and obtain money for the value of his stock by proceeding according to the terms of the statute (Porges v. Vadsco Sales Corporation, supra). In the *206 instant case, said causes of action on contract may not be resolved into a money judgment, if at all, except upon a review of the statutes and decisions of Delaware which, under the circumstances, would at least be unseemly and inappropriate for our courts to undertake (cf. Cohen v. American Window Glass Co., supra). Additionally, entertainment of jurisdiction by our courts would necessarily involve regulation and management of the internal affairs of a corporation dependent upon the laws of the foreign State. 'Considerations of convenience, efficiency and justice point to the courts of the domicile of the corporation for settlement of the issues presented and necessarily in-

volved in a complete determination of the present case' (Sternfeld v. Toxaway Tanning Co., supra, p. 297). Nor will the fact that the several corporations have their manufacturing plant and a place of business where the principal business affairs of the corporation are transacted and their records kept within the State of New York change the application of the rule (Sternfeld v. Toxaway Tanning Co., supra).

It follows that the discretion exercised by the lower courts in declining jurisdiction was not abused.

The judgment should be affirmed, with costs. (See 293 N.Y. 767.)

LEHMAN, Ch. J., LOUGHRAN, LEWIS, CONWAY, DESMOND and THACHER, JJ., concur.

Judgment affirmed.

Copr. (c) 2007, Secretary of State, State of New York.

N.Y. 1944.

FRED LANGFELDER et al., Appellants, v. UNIVERSAL LABORATORIES, INC., Respondent.

END OF DOCUMENT

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: info@Glotrans.com

1

2

3

4

5

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

6

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | Lead Case No.1-07-CV-093465 |
| vs. | |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT | Judge Jack Komar |
| T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. | |
| MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, | |
| RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and | |
| DOES 1 through 25, Defendants. | |
| Defendant. | PROOF OF SERVICE |
| AND RELATED ACTIONS | Electronic Proof of Service |

7

8

9

10

11

12

13

I am employed in the County of Alameda, State of California.

14

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure

15

Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the

16

worldwide web on Tue. November 13, 2007 at 5:03 PM PST and served by electronic mail notification.

17

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and

am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described

18

document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Tue.

19

November 13, 2007 at 5:03 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties

20

on the electronic service list maintained for this case. The message identified the document and provided

21

instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and

22

correct. Executed on November 13, 2007 at Oakland, California.

Dated: November 13, 2007                    For WWW.SCEFILING.ORG

23

Andy Jamieson

1

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG

2

**Electronic Proof of Service**
Page 2

3

**Document(s) submitted by Joseph Floren of Morgan, Lewis & Bockius LLP on Tue. November 13, 2007 at 5:03 PM PST**

4

1. Other: Proposed Orde on Defendatn KLA-Tencor Corporation's Motion to Stay

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1   MORGAN, LEWIS & BOCKIUS LLP
    FRANKLIN B. GOWDY (SBN 47918)
2   MICHAEL J. LAWSON (SBN 66547)
    JOSEPH E. FLOREN (SBN 168292)
3   BENJAMIN P. SMITH (SBN 197551)
    One Market, Spear Street Tower
4   San Francisco, CA 94105-1126
    Tel: 415.442.1000
5   Fax: 415.442.1001

6   Attorneys for Defendant KLA-Tencor Corporation

**F I L E D**

NOV 1 5 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____ DEPUTY

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF SANTA CLARA

10

11  CHRIS CRIMI, on Behalf of Himself and          Case No. 107CV093465
    All Others Similarly Situated,
12                                                 **STIPULATION AND [PROPOSED]**
                        Plaintiff,                 **ORDER TO EXTEND TIME TO RESPOND**
13                                                 **TO PLAINTIFFS' COMPLAINT**
                        vs.
14                                                 Department: 17C
    EDWARD W. BARNHOLT, H.                         Judge: Hon. Jack Komar
15  RAYMOND BINGHAM, ROBERT T.
    BOND, RICHARD J. ELKUS, JR.,                   Date Filed: September 4, 2007
16  STEPHEN P. KAUFMAN, KENNETH                    Trial Date: None Set
    LEVY, MICHAEL E. MARKS, DEAN O.
17  MORTON, KENNETH L. SCHROEDER,
    JON D. TOMPKINS, RICHARD P.
18  WALLACE, KLA-TENCOR
    CORPORATION, and DOES 1 through 25,
19
                        Defendants.
20

21

22

23

24

25

26

27

28

_____
                    STIPULATION AND [PROPOSED] ORDER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**STIPULATION**

TO THE HONORABLE COURT AND ALL COUNSEL OF RECORD:

WHEREAS Plaintiff Chris Crimi filed his class-action Complaint on September 4, 2007, and served his Complaint on September 12.

WHEREAS by previous agreement between counsel for Plaintiff and counsel for Defendant KLA-Tencor Corporation, Defendant was granted 15 days in which to answer, or otherwise respond, to Plaintiff's Complaint.

WHEREAS on October 29, 2007, Counsel for Plaintiff agreed to grant Defendant another 15 days to answer, or otherwise respond, to Plaintiff's Complaint.

IT IS HEREBY STIPULATED AND AGREED that the time for Defendant KLA-Tencor Corporation to answer, or otherwise respond to, Plaintiff's Complaint has been extended to November 13, 2007.

DATED:  November 8, 2007              MORGAN LEWIS & BOCKIUS, LLP

                                      By: _____/s/_____
                                              Joseph E. Floren

                                      *Attorneys for Defendant KLA-Tencor Corporation*

DATED:  November 8, 2007              STULL STULL & BRODY

                                      By: _____/s/_____
                                              Patrice L. Bishop

                                      *Attorneys for Plaintiff Chris Crimi*

1    **IT IS HEREBY ORDERED:**

2    Defendant KLA-Tencor Corporation is hereby granted until November 13, 2007, to

3  respond to Plaintiff's Complaint.

4

5    DATED: November 15, 2007

6

7                                     Hon. Judge Jack Komar

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW/SAN
FRANCISCO

1-SF/7560868.1

STIPULATION AND [PROPOSED] ORDER

1

## PROOF OF SERVICE BY ELECTRONIC TRANSMISSION

2

*Chris Crimi, et al. v. Edward W. Barnholt, et al.*
Santa Clara County Superior Court Case No. 107CV093465

3

4      I, the undersigned, declare:  that I am, and was at the time of service of the documents

5   herein referred to, over the age of 18 years, and not a party to the action; and I am employed in
the County of San Francisco, California.  My business address is One Market, Spear Street

6   Tower, San Francisco, California 94105.

7      On the date executed below, I electronically served the document(s) via the Santa Clara
Superior Court's electronic filing system described as:

8

9   STIPULATION AND [PROPOSED] ORDER TO EXTEND TIME TO RESPOND TO
PLAINTIFFS' COMPLAINT

10

11   on the recipients designated on the Transaction Receipt located on the Santa Clara County
Superior Court's electronic filing website.  I declare under penalty of perjury pursuant to the laws

12   of the State of California that the foregoing is true and correct and was executed on November 9,
2007.

13

14

15                                                    _____/s/_____

16                                                              Erika R. Eberline

17

18

19

20

21

22

23

24

25

26

27

28

1-SF/7560868.1

STIPULATION AND [PROPOSED] ORDER

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
191 N. FIRST STREET
SAN JOSE, CA  95113-1090

**E-FILED**

Nov 21, 2007 10:24 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6132
By R. Walker, Deputy

TO:  FILE COPY

RE:                  **Crimi v. Barnholt, et al. (KLA-Tencor Corporation)**
CASE NUMBER:   **1-07-CV-093465**

### NOTICE OF RESCHEDULED CASE MANAGEMENT CONFERENCE

The Case Management Conference for the above entitled case has been
rescheduled (from February 1, 2008), and you are directed to appear in
court on:

Date:    January 18, 2008      At:  10:00 a.m.      In:  Department 17

Superior Court, 191 North First Street, San Jose, CA 95113.

For further information, contact the Complex Civil Litigation Department,
(408) 882-2286.

Date:    November 21, 2007            /s/  Jack Komar
                                      Judge of the Superior Court

If you, a party represented by you, or a witness to be called on behalf of
that party need an accommodation under the American with Disabilities Act,
please contact the Court Administrator's office at (408) 882-2700, or use
the Court's TDD line, (408) 882-2690 or the Voice/TDD California Relay
Service, (800) 735-2922.



"SCCSupCt E-Filing"
<info@glotrans.com>

11/21/2007 10:54 AM

Please respond to
"E-Filing Service"
<info@glotrans.com>

To    rluke@morganlewis.com

cc

bcc

Subject   SCC Superior Court E-Service

The Superior Court of California
County of Santa Clara
Hon. Jack Komar, Department 17
191 N. First Street, San Jose, CA 95113

www.scefiling.org
info@glotrans.com
(510) 208-4775

**ELECTRONIC SERVICE NOTICE #215-7**                              Service date: 11/21/2007 10:43 AM
Crimi v. Barnholt, et al. (KLA-Tencor Corporation)
Case No: 1-07-CV-093465
Document #8830:

Title:    Notice of Rescheduled Case Management Conference (from February 1, 2008 to January 18, 2008) *(Click here to view document information)*

Type:    Notice: Continued Case Management Conference

Author:   Jack Komar of Santa Clara County Superior Court

Parties:  Santa Clara County Superior Court

## Service list:

| Party name | Representative | Email address |
|---|---|---|
| Barnholt, Edward W. | | |
| Bingham, H. Raymond | | |
| Bond, Robert T. | | |
| Crimi, Chris | Bishop, Patrice – Stull, Stull & Brody | service@ssbla.com |
| Elkus, Jr., Richard J. | | |
| KLA-Tencor Corporation | Floren, Joseph – Morgan, Lewis & Bockius LLP | jfloren@morganlewis.com |
| | Weiler, Matthew – Morgan Lewis & Bockius LLP | mweiler@morganlewis.com |
| Kaufman, Stephen P. | | |
| Levy, Kenneth | | |
| Marks, Michael E. | | |
| Morton, Dean O. | | |
| Santa Clara County Superior Court | Walker, Rowena – Santa Clara County Superior Court | rwalker@scscourt.org |
| Schroeder, Kenneth L. | | |
| Tompkins, Jon D. | | |
| Wallace, Richard P. | | |

## Additional recipients of Electronic Service

| Service recipient | Email address |
|---|---|
| Floren, Joseph [Staff] | mhaut@morganlewis.com |
| Floren, Joseph [Staff] | rluke@morganlewis.com |
| Floren, Joseph [Staff] | eeberline@morganlewis.com |
| Weiler, Matthew [Staff] | eeberline@morganlewis.com |

The Superior Court of California, County of Santa Clara                    • SCEFiling Home
Case document information

• Help • FAQ • Cases • My Home • Resources

**1-07-CV-093465:  Crimi v. Barnholt, et al. (KLA-Tencor Corporation)**

**Case document information:**

| | |
|---|---|
| View document: | Notice: Continued Case Management Conference *(Click here to view document)* |
| Title: | Notice of Rescheduled Case Management Conference (from February 1, 2008 to January 18, 2008) |
| Author: | Komar, Jack |
| Filing date: | 11/21/07 |
| Parties: | Santa Clara County Superior Court | |

• File a response to this document
• Find other documents.
• View case home page.

**Attached exhibits:**

1. Proof of Electronic Service
2. Electronic service message

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
191 N. FIRST STREET
SAN JOSE, CA  95113-1090



**E-FILED**
Dec 5, 2007 11:44 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6287
By R. Walker, Deputy

TO:  FILE COPY


RE:          <u>**Crimi v. Barnholt, et al. (KLA-Tencor Corporation)**</u>
CASE NUMBER:  **1-07-CV-093465**


### ORDER AND NOTICE OF RESCHEDULED HEARINGS

The hearings for the above entitled case have been rescheduled from
January 18, 2008, on the Court's own motion, and you are directed to
appear in court on:

Date:    February 1, 2008       At:  9:00 a.m.      In:  Department 17

Superior Court, 191 North First Street, San Jose, CA  95113.


Hearings:

   (1)  Motion by Defendant KLA-Tencor Corporation to Stay Action; and
   (2)  Case Management Conference.



For further information, contact the Complex Civil Litigation Department,
(408) 882-2286.


Date:    December 5, 2007            /s/  Jack Komar
                                     Judge of the Superior Court



If you, a party represented by you, or a witness to be called on behalf of
that party need an accommodation under the American with Disabilities Act,
please contact the Court Administrator's office at (408) 882-2700, or use
the Court's TDD line, (408) 882-2690 or the Voice/TDD California Relay
Service, (800) 735-2922.

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG

**1**  c/o Glotrans
2915 McClure Street
Oakland, CA 94609

**2**  TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

**3**

**E-FILED**

Dec 5, 2007 11:44 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6287
By R. Walker, Deputy

**4**

**5**

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

**6**  CHRIS CRIMI, on behalf of himself and all others
similarly situated, Plaintiff,

**7**                          Plaintiff,

vs.

**8**  EDWARD W. BARNHOLT, H. RAYMOND BINGHAM,
ROBERT

**9**  T. BOND, RICHARD J. ELKUS, JR. STEPHEN P.
KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS,
DEAN O.

**10**  MORTON, KENNETH L. SCHROEDER, JON D.
TOMPKINS,
RICHARD P. WALLACE, KLA-TENCOR CORPORATION,
and

**11**  DOES 1 through 25, Defendants.

**12**                          Defendant.

AND RELATED ACTIONS

**13**

Crimi v. Barnholt, et al. (KLA-Tencor
Corporation)

Lead Case No.1-07-CV-093465

Judge Jack Komar

PROOF OF SERVICE
Electronic Proof of Service

**14**  I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure

**15**  Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the

**16**  worldwide web on Wed. December 5, 2007 at 11:44 AM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and

**17**  am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described

**18**  document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Wed.

**19**  December 5, 2007 at 11:44 AM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties

**20**  on the electronic service list maintained for this case. The message identified the document and provided

**21**  instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and

**22**  correct. Executed on December 5, 2007 at Oakland, California.

**23**      Dated: December 5, 2007                      For WWW.SCEFILING.ORG

E-Filed: Dec 5, 2007 11:44 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6287

Andy Jamieson

E-Filed: Dec 5, 2007 11:44 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6287

1 | **THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG**

2 | **Electronic Proof of Service**
**Page 2**

3 | **Document(s) submitted by Rowena Walker of Santa Clara County Superior Court on Wed. December 5, 2007 at 11:44 AM PST**

4 | 1. Order: Order and Notice of Rescheduled Hearings (from January 18, 2008 to February 1, 2008), signed by Judge Jack Komar

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The Superior Court of California
County of Santa Clara
Hon. Jack Komar, Department 17
191 N. First Street, San Jose, CA 95113

www.scefiling.org
info@glotrans.com
(510) 208-4775

**ELECTRONIC SERVICE NOTICE #215-9**                    Service date: 12/05/2007 12:13 PM

Crimi v. Barnholt, et al. (KLA-Tencor Corporation)
Case No: 1-07-CV-093465

Document #9042:
Title:    Order and Notice of Rescheduled Hearings (from January 18, 2008 to February 1, 2008), signed by Judge Jack Komar
          *(Click here to view document information)*
Type:     Order
Author:   Jack Komar of Santa Clara County Superior Court
Parties:  Santa Clara County Superior Court

## Service list:

| Party name | Representative | Email address |
|---|---|---|
| Barnholt, Edward W. | | |
| Bingham, H. Raymond | | |
| Bond, Robert T. | | |
| Crimi, Chris | Bishop, Patrice – Stull, Stull & Brody | service@ssbla.com |
| Elkus, Jr., Richard J. | | |
| KLA-Tencor Corporation | Floren, Joseph – Morgan, Lewis & Bockius LLP | jfloren@morganlewis.com |
| | Weiler, Matthew – Morgan Lewis & Bockius LLP | mweiler@morganlewis.com |
| Kaufman, Stephen P. | | |
| Levy, Kenneth | | |
| Marks, Michael E. | | |
| Morton, Dean O. | | |
| Santa Clara County Superior Court | Walker, Rowena – Santa Clara County Superior Court | rwalker@scscourt.org |
| Schroeder, Kenneth L. | | |
| Tompkins, Jon D. | | |
| Wallace, Richard P. | | |

## Additional recipients of Electronic Service

| Service recipient | Email address |
|---|---|
| Floren, Joseph [Staff] | mhaut@morganlewis.com |
| Floren, Joseph [Staff] | rluke@morganlewis.com |
| Floren, Joseph [Staff] | eeberline@morganlewis.com |
| Weiler, Matthew [Staff] | eeberline@morganlewis.com |

1    MORGAN, LEWIS & BOCKIUS LLP
     JOSEPH E. FLOREN (SBN 168292)
2    TERA M. HEINTZ (SBN 241414)
     MATTHEW S. WEILER (SBN 236052)
3
     One Market, Spear Street Tower
4    San Francisco, CA  94105-1126
     Tel:  415.442.1000
5    Fax:  415.442.1001
6    Attorneys for Defendant KLA-Tencor Corporation
7
8              SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                      COUNTY OF SANTA CLARA
10

11   CHRIS CRIMI, on Behalf of Himself and        Case No. 107CV093465
     All Others Similarly Situated,
12                                                **[PROPOSED] ORDER ON DEFENDANT
                          Plaintiff,              KLA-TENCOR CORPORATION'S
13                                                MOTION TO STAY**
                   vs.
14                                                Hearing Date:  January 18, 2008
     EDWARD W. BARNHOLT, H.                       Hearing Time:  9:00 A.M.
15   RAYMOND BINGHAM, ROBERT T.                   Department:  17C
     BOND, RICHARD J. ELKUS, JR.,                 Judge:  Hon. Jack Komar
16   STEPHEN P. KAUFMAN, KENNETH
     LEVY, MICHAEL E. MARKS, DEAN O.              Date Filed:  September 4, 2007
17   MORTON, KENNETH L. SCHROEDER,
     JON D. TOMPKINS, RICHARD P.
18   WALLACE, KLA-TENCOR
     CORPORATION, and DOES 1 through 25,
19
                          Defendants.
20
21
22
23
24
25
26
27
28

                          [PROPOSED] ORDER

1

**[PROPOSED] ORDER**

2      After consideration of Defendant KLA-Tencor Corporation's Motion to Stay, and any

3  opposition thereto, IT IS HEREBY ORDERED that said motion is GRANTED and this action

4  remains stayed until further notice from this Court.

5

6

7      DATED: January ___, 2008

8

9                                  Hon. Judge Jack Komar

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FRANCISCO

1-SF/7560868.1

[PROPOSED] ORDER

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | |
| vs. | Lead Case No.1-07-CV-093465 |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT | Judge Jack Komar |
| T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. | |
| MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, | |
| RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and | |
| DOES 1 through 25, Defendants. | |
| Defendant. | |
| AND RELATED ACTIONS | PROOF OF SERVICE Electronic Proof of Service |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Tue. November 13, 2007 at 5:03 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Tue. November 13, 2007 at 5:03 PM PST.

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on November 13, 2007 at Oakland, California.

Dated: November 13, 2007                    For WWW.SCEFILING.ORG

Andy Jamieson

1   THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
    ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG

2   Electronic Proof of Service
    Page 2

3   Document(s) submitted by Joseph Floren of Morgan, Lewis & Bockius LLP on Tue. November 13, 2007 at 5:03 PM
    PST

4   1. Other: Proposed Orde on Defendatn KLA-Tencor Corporation's Motion to Stay

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# E-FILED

Jan 8, 2008 5:00 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6652
By A. Ilas, Deputy

1   JOHN H. HEMANN (SBN 165823)
    JOSEPH E. FLOREN (SBN 168292)
2   TERA M. HEINTZ (SBN 241414)
    MATTHEW WEILER (SBN 236052)
3   MORGAN, LEWIS & BOCKIUS LLP
    One Market, Spear Street Tower
4   San Francisco, CA  94105-1126
    Tel:  415.442.1000
5   Fax:  415.442.1001

6   Attorneys for Defendant
    KLA-Tencor Corporation
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       COUNTY OF SANTA CLARA

10

11  CHRIS CRIMI, on Behalf of Himself and      Case No. 107CV093465
    All Others Similarly Situated,
12                                             **DEFENDANT KLA-TENCOR'S NOTICE
                   Plaintiff,                  OF DEMURRER AND DEMURRER;
13                                             MEMORANDUM OF POINTS AND
         vs.                                   AUTHORITIES**
14
    EDWARD W. BARNHOLT, H.                     Date: February 1, 2008
15  RAYMOND BINGHAM, ROBERT T.                 Time: 9:00 a.m.
    BOND, RICHARD J. ELKUS, JR.,               Department: 17C
16  STEPHEN P. KAUFMAN, KENNETH                Judge:  Hon. Jack Komar
    LEVY, MICHAEL E. MARKS, DEAN O.
17  MORTON, KENNETH L. SCHROEDER,              Date Filed:  September 4, 2007
    JON D. TOMPKINS, RICHARD P.                Trial Date:  None Set
18  WALLACE, KLA-TENCOR
    CORPORATION, and DOES 1 through 25,
19
                   Defendants.
20

21

22

23

24

25

26

27

28

---

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1

2                              **NOTICE OF DEMURRER AND DEMURRER**

3    TO THE HONORABLE COURT AND ALL COUNSEL OF RECORD:

4           Please take notice that on February 1, 2008 at 9:00 a.m., or as soon thereafter as the matter

5    may be heard in Department 17 of the Superior Court of the State of California for the County of

6    Santa Clara, defendant KLA-Tencor Corporation ("KLA") will, and hereby does, demur to

7    Plaintiff Chris Crimi's Complaint in its entirety, in the event the Court declines to stay the case

8    based on KLA's pending Motion to Stay.[1]

9           This demurrer is based Plaintiff's failure to state a cause of action against KLA or any

10   defendant under controlling Delaware law.  Rather, his First and Second Causes of Action are

11   exclusively derivative in nature and may not be alleged in a direct action such as this one.

12          This Demurrer is based on this Notice, the attached Demurrer and Memorandum of Points

13   and Authorities, the supporting Declaration of Joseph E. Floren, all pleadings on file in this

14   matter and matters of which judicial notice may be taken, and all arguments to be presented to

15   this Court at oral argument.

16   DATED:  January 8, 2008

                                        Respectfully submitted,

17                                      MORGAN LEWIS & BOCKIUS, LLP

18

19                                      By:_____/s/_____
                                               JOSEPH E. FLOREN
20                                      *Attorneys for Defendant KLA-Tencor Corporation*

21

22

23

24

25

26   [1]   KLA earlier filed a separate Motion to Stay this case on the basis of the overlapping, earlier-
         filed litigation concerning the same claims, same alleged facts, and same defendants pending
27       in three courts, including this Court.  The Motion to Stay is set for hearing at the same time
         and place as this demurrer, which KLA asserts only in the alternative only, in the event the
28       Court declines to stay or dismiss the action for the reasons stated in KLA's Motion to Stay.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

                                               1

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1

<center>**DEMURRER**</center>

2    Defendant KLA-Tencor Corporation ("KLA") hereby demurrers to the First and Second

3    Causes of Action asserted in the Complaint filed by Plaintiff Chris Crimi on each of the following

4    grounds:

5    <center>Demurrer to the First Cause of Action</center>

6    KLA demurrers to the First Cause of Action pursuant to Cal. Code of Civil Pro. §

7    430.10(e) because Plaintiff fails to allege facts that would entitle him to relief. Specifically,

8    Plaintiff's First Cause of Action is derivative in nature and cannot be maintained as a direct

9    action.

10    <center>Demurrer to the Second Cause of Action</center>

11    KLA demurrers to the Second Cause of Action pursuant to Cal. Code of Civil Pro. §

12    430.10(e) because Plaintiff fails to allege facts that would him to relief. Specifically, Plaintiff's

13    Second Cause of Action is derivative in nature and cannot be maintained as a direct action.

14    WHEREFORE KLA prays that this demurrer be sustained without leave to amend.

15

16    DATED:  January 8, 2008

Respectfully submitted,

17    MORGAN LEWIS & BOCKIUS, LLP

18

19    By:_____/s/_____

JOSEPH E. FLOREN
*Attorneys for Defendant KLA-Tencor Corporation*

20

21

22

23

24

25

26

27

28

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2    Plaintiff's Complaint is an unsuccessful attempt to fashion a direct shareholder cause of

3   action for dilution, a harm that is plainly derivative under controlling Delaware law, and for

4   which only defendant KLA-Tencor Corporation ("KLA") could have a potential right to recover.

5   KLA believes that this action should be stayed, for the reasons explained in its Motion to Stay.  In

6   the event the Court is not inclined to grant a stay, KLA requests that the Court consider this

7   demurrer, which is based on Plaintiff's failure to assert any direct claim against KLA.[2]

8    Apparently recognizing that he lacks standing to bring any derivative claim in the name of

9   KLA (he is no longer a shareholder), Plaintiff attempts to state a limited direct action against

10  KLA and certain present and former KLA officers and directors, claiming that his equity interest

11  and voting rights were impaired by the failure to disclose alleged "backdating" at KLA during

12  earlier years.  Specifically, according to Plaintiff's Complaint, defendants' purported failure

13  during the period September 2002 to September 2006 to disclose information about *prior*

14  backdating justifies an award of damages for the dilution of shareholder ownership interests that

15  resulted from KLA's issuance of additional, non-backdated stock options in more recent years.

16  Plaintiff even seeks the rescission of those more recent option grants to the innocent KLA officers

17  and employees who received them (who are not named as parties).  This claim is patently

18  spurious on multiple levels, but to dispose of the case the Court need consider only the absolute

19  unavailability of the relief Plaintiff seeks in this direct action.  As a matter of law, such claims

20  based on dilution are exclusively derivative in nature and may be asserted only by the

21  corporation, not by a shareholder or putative class of shareholders.  As a result, Plaintiff's

---

22

23   [2]   Because it should dispose of this action in its entirety, this demurrer addresses only the legal
conclusions that Plaintiff's Complaint is derivative in nature and cannot be maintained
directly.  There are several other serious defects in the Complaint that need not be addressed
24   at this time.  For example, Plaintiff has not properly alleged any actionable misstatements or
failures to disclose by defendants during the putative class period; Plaintiff's own allegations
25   eliminate any possibility of causation of damages, since it is clear that the issuance of the
challenged options during the putative class period had no relation to any purported
26   misstatement by defendants in any proxy statement, and those options would have been issued
anyhow; and Plaintiff's cause of action for rescission does not exist under Delaware law, as
27   rescission is only a potential remedy for a breach of fiduciary duty, not a separate cause of
action.  KLA reserves the right to raise these and other challenges to these other defects in the
28   Complaint at the appropriate time, if necessary.

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1   Complaint must fail.

2       This is not the usual stock option backdating[3] case, in which a shareholder plaintiff alleges

3   either harm to the company caused by individuals' misconduct (a derivative action), or harm to

4   shareholders through loss in value of the stock caused by the misconduct.  Rather, the essence of

5   Plaintiff's convoluted allegations is that KLA and its directors and officers failed to disclose the

6   backdating of certain stock option grants from 1997 through June 2002 (which allowed option

7   recipients to purchase KLA stock at prices that were lower than the market prices when the

8   options were granted), and that defendants issued additional options *thereafter*, during the

9   putative class period from September 2002 through 2006 – options that supposedly would not

10  have been issued had the prior backdating been disclosed.  While Plaintiff claims that the exercise

11  of these options resulted in the issuance of shares that "diluted" Plaintiff's voting power and

12  ownership interest, it is axiomatic that any such marginal diminution impacted all shareholders

13  equally, with the equally incontestable result that the claim – if any claim exists at all here – must

14  be derivative under the controlling Delaware law, including the leading Delaware Supreme Court

15  cases *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004), and *Gentile*

16  *v. Rossette*, 906 A.2d 91, 99-100 (Del. 2006).

17      Plaintiff's reason for attempting to manufacture a claim in such a roundabout way is

18  obvious:  Numerous other plaintiffs have beaten Mr. Crimi to the punch by more than a year in

19  suing these same defendants in multiple derivative and class action lawsuits based on the same

20  alleged failure to disclose options backdating at KLA – cases filed in three different courts,

21  including this one, in mid-2006 on the heels of a May 22, 2006 *Wall Street Journal* article

22  suggesting that KLA and several other companies had "backdated" stock options between 1994

23

24  [3]  "Backdating," also termed "retroactive pricing," generally refers to the selection of exercise
    prices for stock options based not on the market price for the underlying stock on the date the
25  option grant was completed or finally approved, but on a lower market price for the stock on
    an earlier date.  The actual grant date, or "measurement date" for accounting purposes, is
26  deemed to be the date that all essential actions necessary to complete the granting of the
    option are concluded, including identification of all grantees and final determination of the
27  number of shares granted to each and the exercise price of the option.  Options are said to be
    "backdated" or "retroactively priced" if the exercise price is set as of a date before the
28  measurement date.  *See generally* Complaint ¶¶ 29-31, 66.

1   and 2001.[4]  *See* Complaint ¶ 47.  Plaintiff, who admittedly was not a KLA shareholder at the time

2   of the stock option backdating alleged in the Complaint, seeks to throw another log on the

3   litigation bonfire by inventing a new kind of claim – straining to assert rights as a shareholder

4   apart from the Company to complain about dilution, while assiduously avoiding making any

5   claim for losses on the purchase, sale, or holding of KLA stock, which would make this case

6   removable and subject to mandatory dismissal under the Securities Litigation Uniform Standards

7   Act ("SLUSA"), 15 U.S.C. § 78bb(f)(1).  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v.*

8   *Dabit*, 547 U.S. 71 (2006).

9          Plaintiff's effort cannot succeed under Delaware law, which dictates that these claims are

10  derivative in nature.  Plaintiff alleges two forms of dilution purportedly resulting from KLA's

11  issuance of stock options during the putative class period: dilution in his ownership interest in

12  KLA, and dilution in his voting power.  *See* Complaint ¶¶ 79, 85.  As a shareholder of a public

13  company with hundreds of millions of shares outstanding, if Plaintiff's voting rights and

14  ownership interest were impacted by the challenged stock options, then those rights necessarily

15  were impacted in the same marginal, fractional way as the rights of every other shareholder.

16  Plaintiff's failure to allege a specific harm to him that is independent of any harm to the Company

17  or shareholders at large makes the claim essentially derivative in nature.

18         Plaintiff also fails to plead facts that might support any claim for improper dilution of

19  voting rights under Delaware law.  Plaintiff does not allege the stock option grants at issue were

---

20  [4]   Between May 22, 2006 and July 3, 2006, five shareholder derivative actions were filed in the
21  United States District Court for the Northern District of California, San Jose Division, each of
    which asserted claims based on the same stock option backdating and related misstatements
22  against nominal defendant KLA and current and former officers and directors of KLA,
    including all of the defendants in the instant case.  These cases have been consolidated and are
23  now pending under the caption *In re KLA-Tencor Corporation Shareholder Derivative
    Litigation*, Case No. 06-03445 JW (N.D. Cal.).  *See* Request for Judicial Notice in Support of
24  KLA's Motion to Stay, filed November 13, 2007 ("Stay RJN"), Ex. 3.  Another derivative
    action is pending in *this* court, with *the same plaintiff's counsel* as the instant case, under the
25  caption *Rabin v. Barnholt, et al.*, No. 1-06-CV-064841.  Stay RJN, Ex. 2.  Another hybrid
    derivative-class action that alleges both derivative claims and a shareholder class claim for
26  dilution is pending in the Delaware Chancery Court under the caption *Langford v. Barnholt,
    et al.*, No. 2295-N.  Stay RJN, Ex. 1.  Yet another consolidated shareholder class action, in
27  which the plaintiffs assert federal securities causes of action, is pending in the United States
    District Court for the Northern District of California under the caption *In re KLA-Tencor
28  Corporation Securities Litigation*, No. C 06-4065 MJJ.  Stay RJN, Ex. 4

1   an attempt by a controlling shareholder to increase voting control at the expense of Plaintiff and

2   other public shareholders, because he cannot do so.  Nor can Plaintiff's claim actually proceed as

3   a derivative action: Plaintiff states that he is no longer a shareholder, which is fatal to his ability

4   to maintain a derivative action under Delaware law.  Accordingly, KLA asks that this Court

5   sustain its demurrer without leave to amend.

6   **I.    FACTUAL AND PROCEDURAL HISTORY**

7       **A.    Plaintiff's Complaint**

8           Plaintiff filed the Complaint in this case on September 4, 2007, asserting two causes of

9   action for breach of fiduciary duty and rescission.[5]  Plaintiff alleges that KLA and the individual

10  defendants – eleven former and current officers and directors of KLA – breached their fiduciary

11  duties to Plaintiff by failing to disclose that KLA had purportedly granted backdated options

12  between 1997 and June 30, 2002.  Complaint ¶ 1.  Given that Plaintiff admittedly did not even

13  own KLA stock during the period of alleged backdating, he does not allege any injury arising out

14  of the backdating itself or based on the purported misstated financial statements that resulted.

15  Complaint ¶ 5.  Rather, Plaintiff claims that *if* he had known about the backdating in the years

16  after the purported backdating had ceased, he would not have approved KLA's adoption of its

17  2004 Equity Compensation Plan in 2004.  Plaintiff does not allege, however, that adoption of the

18  new Plan in 2004 was in any way necessary to or an essential link in bringing about the dilution

19  of which he complains.  Plaintiff also alleges, impossibly, that he somehow would have

20  disallowed the automatic issuance of additional options under the "Evergreen Provision" of the

21  prior plan (the 1982 Stock Option Plan) in 2003 and 2004 but for the alleged misconduct, even

22  though his own allegations show this was not a matter on which Plaintiff was entitled to vote.

23  Complaint ¶¶ 78-79.  The "Evergreen Provision" under the 1982 Stock Option Plan automatically

24  authorized the issuance each year of stock options covering an amount of shares equal to 3% of

25  KLA-Tencor's outstanding shares of common stock as of the end of the prior fiscal year.

26  Complaint ¶ 32.  As the Complaint makes clear, however, the authorization of additional shares

27  ----

[5]    KLA admits none of Plaintiff's allegations, and hereby reserves the right to challenge the
28  sufficiency of the pleadings, including whether Plaintiff has alleged any valid cause of action
against KLA, at the appropriate time.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

6

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1   under the Evergreen provision had no relationship to any supposed misstatements or breaches of

2   duty by defendants because, as Plaintiff alleges, it was "automatic." Complaint ¶ 32.

3        Notwithstanding that Plaintiff alleges *no* factual connection between any wrongdoing in

4   the form of purported backdating at KLA and the 2004 Equity Compensation Plan or the issuance

5   of shares under the Evergreen provision, Plaintiff alleges that he and the putative class were

6   injured "as a result of the dilution of its voting power and proportionate share of the Company

7   due to the dedication of over millions [sic] of KLA-Tencor shares as a result of the addition of

8   stock pursuant to the Evergreen Provision and adoption of the 2004 Equity Incentive Plan."

9   Complaint ¶ 79. Plaintiff seeks to rescind "all stock added to the 1982 Stock Option Plan

10  pursuant to the terms of the Evergreen Provision" and the 2004 Equity Incentive Plan. *Id.* ¶ 81.

11  Additionally, Plaintiff seeks cancellation of the shares of stock added pursuant the Evergreen

12  Provision and Equity Incentive Plan. *Id.*

13  **II.    ARGUMENT**

14      **A.    Plaintiff's First and Second Causes of Action Are Derivative Under Delaware Law**

15       Plaintiff's First and Second Causes of Action are derivative under controlling Delaware

16  law because they seek to redress the same fundamental harm, namely that Plaintiff's equity and

17  voting interests were diluted as a result of the exercise of allegedly backdated options. California

18  courts apply the law of the state of incorporation to claims relating to internal corporate affairs.

19  *State Farm Mut. Auto. Ins. Co. v. Superior Court*, 114 Cal. App. 4th 434, 442 (2003). As KLA is

20  a Delaware corporation (*see* Complaint ¶ 17), and the claim patently concerns KLA's internal

21  affairs,[6] Delaware law determines whether this action is derivative or direct.[7] The Supreme Court

---

22

23  [6]    The internal affairs doctrine requires that the law of the state of incorporation applies when
     the lawsuit covers the subject matter of a corporation's dispute with shareholders. *Friese v.*
24   *Superior Court*, 134 Cal. App. 4th 693, 706 (2005) ("The internal affairs doctrine is a conflict
     of laws principle which recognizes that only one State should have the authority to regulate a
25   corporation's internal affairs-matters peculiar to the relationships among or between the
     corporation and its current officers, directors, and shareholders") (citation omitted); *see also*
26   *Edgar v. MITE Corp.*, 457 U.S. 624, 645-46 (1982) ("[t]he internal affairs doctrine is a . . .
     principle which recognizes that only one State should have authority to regulate a
27   corporation's internal affairs, [i.e.,] matters peculiar to the relationships among or between the
     corporation and its current officers, directors, and shareholders.") Accordingly, Delaware law
28   applies to shareholder actions, such as this one, related to the issuance of stock options. *See*
     *also Elster v. Am. Airlines*, 100 A.2d 219 (Del. Ch. 1953) (applying Delaware law to claims

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1  of Delaware has stated that "a court should look to the nature of the wrong and to whom the relief

2  should go. The stockholder's claimed direct injury must be **independent of any alleged injury**

3  **to the corporation.**" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del.

4  2004) (emphasis added). A court should sustain a demurrer when an action is derivative in nature

5  and cannot be maintained directly. *Schuster v. Gardner*, 127 Cal. App. 4th 305, 317-318 (2005)

6  (affirming dismissal; holding demurrer properly sustained to complaint that alleged no direct

7  claims under *Tooley*); Cal. Code Civ. Pro. § 430.10(e) (California law requires that demurrer be

8  sustained where a plaintiff has pled no set of facts that entitled him to relief). Since the harm

9  Plaintiff alleges is entirely derivative of harm to KLA, and any relief would ultimately benefit

10  KLA, the action is derivative in nature and the claim must fail as a class action.

11                 1.    Plaintiff Alleges No Harm Independent Of Harm To The Company

12          The instant Complaint is nothing more than "a plaintiff creatively attempting to recast a

13  derivative claim by alleging the same fundamental harm in a slightly different way." *Feldman v.*

14  *Cutaia*, 2007 WL 2215956, at *10 (Del .Ch. Aug. 1, 2007). Rephrasing a claim traditionally

15  understood as derivative to claim harm to a shareholder, however, "is disfavored by Delaware

16  courts." *Id.* Delaware courts recognize that claims alleging damage based upon equity dilution

17  are *fundamentally derivative* because, among other things, such claims are based upon the alleged

18  waste of corporate assets. *Elster v. Am. Airlines, Inc.*, 100 A.2d 219, 222 (Del. Ch. 1953);

19  *Cutaia*, 2007 WL 2215956, at *7 ("Mere claims of dilution, without more, cannot convert a

20  claim, traditionally understood as derivative, into a direct one.").

21          Like the case at bar, the *Elster* action involved a complaint by an individual stockholder

22

23  related to issuance of stock options); *Beard v. Elster*, 120 A.2d 731, 735 (Del. Ch. 1960)
    ("The issuance of stock option plans by Delaware corporations involves the internal affairs of
    a Delaware corporation and is, therefore, controlled by the laws of Delaware.").

24

25  [7]  Plaintiff's claims must be based *exclusively* upon Delaware law for the further reason that
    they otherwise would be absolutely barred as a matter of federal law. SLUSA bars any

26  attempt to make a state law shareholder class action claim except to the extent the claim
    remains within the narrow exception from SLUSA for actions "based upon the statutory or

27  common law of the State in which the issuer is incorporated" that involve "communication[s]
    with respect to the sale of securities of an issuer" that are made to stockholders

28  concerning their voting rights (*i.e.*, the proxy statements on which the Complaint is based).
    15 U.S.C. § 78bb(3)(A).

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1   seeking to rescind and cancel the issuance of stock options on terms he felt were detrimental to

2   the corporation and shareholders.  845 A.2d at 220.  After examining the complaint, the Delaware

3   Court of Chancery held that "[a]ny injury which plaintiff may receive by reason of the dilution of

4   his stock would be equally applicable to all the stockholders of the defendant, since plaintiff holds

5   such a small amount of stock in proportion to the stock outstanding that the control or

6   management of defendant would not be affected by the granting of these options...." *Id.* at 222.

7   The same circumstances are presented here, because Plaintiff has not alleged that the stock option

8   grants were issued and exercised in such a way to wrest voting control from himself and other

9   public shareholders.  This case alleges identical harm to all shareholders, not the kind of

10  differential harm (such as dilution of minority shareholders or overriding their voting rights) that

11  might be addressed through a direct action.  The *Elster* court further explained that equity dilution

12  claims are predicated on harm done to the corporation:

13          Plaintiff claims that the value of his stock will deteriorate and that his
            proportionate share of the stock will be decreased as a result of the granting
14          and exercise of the stock options.  Assuming plaintiff's contention is
            correct, this would apply to the stock of all other shareholders as well.
15                  ...
16          Here the wrong of which Plaintiff complains is not a wrong inflicted upon
            him alone or a wrong affecting any particular right which is asserting –
17          such as his pre-emptive rights as a stockholder, rights involving the control
            of the corporation, or a wrong affecting the stockholders and not the
18          corporation – but is an indirect injury as a result of the harm done to the
            corporation.

19  *Id.* at 222-223.  Drawing an analogy to corporate overpayment, the Delaware Supreme Court

20  recently reaffirmed the essential holding of *Elster* and announced the standard for pleading a

21  direct action for shareholder dilution:

22          In the typical corporate overpayment case, a claim against the corporation's
            fiduciaries for redress is regarded as exclusively derivative, irrespective of
23          whether the currency or form of overpayment is cash or the corporation's
            stock.  **Such claims are not normally regarded as direct, because any**
24          **dilution in value of the corporation's stock is merely the unavoidable**
            **result (from an accounting standpoint) of the reduction in the value of**
25          **the entire corporate entity, of which each share of equity represents an**
            **equal fraction.**  In the eyes of the law, such equal "injury" to the shares
26          resulting from a corporate overpayment is not viewed as, or equated with,
            harm to specific shareholders individually.
27                  ...
28          Because the shares representing the "overpayment" embody both economic

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1    value and voting power, the end result of [over-issuing shares to a
controlling shareholder] is an improper transfer—or expropriation—of

2    economic value and voting power from the public shareholders to the
majority or controlling stockholder.  For that reason, the harm resulting

3    from the overpayment is **not confined to equal dilution of the economic
value and voting power of each of the corporation's outstanding**

4    **shares.**

5    *Gentile v. Rossette*, 906 A.2d 91, 99-100 (Del. 2006) (emphasis added).  Thus, under *Gentile*,

6    where (as here) a plaintiff alleges dilution of equity and voting rights that amounts to "equal

7    dilution of the economic value and voting power of each of the corporation's outstanding shares,"

8    the claim is derivative in nature.

9        The First and Second Causes of Action in the Complaint are plainly derivative because

10    Plaintiff does not allege that *his* equity or voting power was diluted to benefit a controlling

11    shareholder, or any other harm that is different from the purported dilutive harm to all

12    shareholders.  *See Cutaia*, 2007 WL 2215956.  In *Cutaia,* the Delaware Court of Chancery

13    granted a defendant's motion to dismiss on the ground that plaintiff's complaint – which alleged

14    dilution in the form of diminution of equity and voting power – did not state a direct cause of

15    action.  The plaintiff's claim there was deemed derivative because the complaint did not plead

16    more than a diminution that impacted all shareholders equally: "[a] claim for wrongful equity

17    dilution is premised on the notion that the corporation, by issuing additional equity for

18    insufficient consideration, made the complaining stockholder's stake less valuable.  Equity

19    dilution claims are typically viewed as derivative under Delaware law."  *Id.* at *7.

20        Here, similarly, the gravamen of Plaintiff's First and Second Causes of Action is that the

21    interests of shareholders were diluted by the allegedly improperly procured issuance of stock

22    options.  Plaintiff claims that "[t]he class was harmed as a result of the dilution of its voting

23    power and proportionate share of the Company due to the dedication of over millions of KLA-

24    Tencor shares as a result of the addition of stock pursuant to Evergreen Provision and adoption of

25    the 2004 Equity Incentive Plan."  Complaint ¶ 79.  *See also id.* ¶ 85 ("The Class was also harmed

26    as a result of the dilution of its voting power and proportionate share of the Company due to the

27    dedication of millions [of] KLA-Tencor shares . . . .").  Crucially, Plaintiff does not allege that

28    any controlling stockholder or group of them gained from the transaction to the benefit of

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1   Plaintiff and other public shareholders, which is the only way he might make out a direct claim

2   here. Such an allegation would be essential to sustain a direct claim because "the harm *Gentile*

3   … seek[s] to remedy **can only arise when a controlling stockholder, with sufficient** power to

4   **manipulate the corporate process, engineers a dilutive transaction whereby the stockholder**

5   **receives an exclusive benefit of increased equity ownership and voting power for inadequate**

6   **consideration.**" *Cutaia*, 2007 WL 2215956 at *8. No such allegations are presented here, nor

7   could there be, as this is not a case of misconduct by controlling shareholders to increase their

8   own equity or voting power at the expense of other shareholders.

9          Not only is the narrow fact pattern that might support a direct cause of action under

10  Delaware law absent here, but it *cannot* possibly be alleged, given that KLA is a large publicly

11  traded corporation with diffuse ownership. Plaintiff cannot allege that his interest in KLA was

12  diluted to the benefit of a controlling shareholder because KLA, which has hundreds of millions

13  of outstanding shares and thousands of shareholders, does not have any controlling shareholders.

14  The class Plaintiff purports to represent is defined as "thousands of KLA-Tencor stockholders of

15  record … located throughout the United States" who own "millions of KLA-Tencor stock."

16  Complaint ¶ 27(a). But Plaintiff nowhere alleges that the defendants constitute a voting majority

17  or anything close to it, much less that the issuance of the stock options in question had any effect

18  to increase the voting power or equity of any controlling shareholders. Rather, Plaintiff alleges

19  that these options were issued to all eligible employees. *See* Complaint ¶¶ 39-46, 62.

20         The proxy statements incorporated by reference in Plaintiff's own Complaint plainly

21  demonstrate that there has been, and is no, controlling shareholder here.[8] For example, KLA's

---

[8]  A court may consider documents incorporated by reference in the complaint and matters which are subject to judicial notice in ruling on a demurrer. *Barratt American, Inc. v. City of San Diego*, 117 Cal.App.4th 809, 812 n.2 (2004). Here, KLA's proxy statements may be considered on demurrer because they are incorporated by reference in Plaintiff's Complaint. *See* Complaint ¶¶ 30,33-36, 38-39, 41, 43-44, 46, 76, 77. Plaintiff quotes form the proxy statements in order to plead his claims against KLA. Thus, it is only fair that Court consider the totality of the proxy statement in determining whether Plaintiff has pled a valid cause of action. Moreover, the facts regarding ownership of shares of KLA is type of fact that cannot reasonably be disputed. *See* Cal. Evidence Code § 452(h). Thus, this Court can judicially notice the ownership statistics recited therein. *StorMedia, Inc. v. Superior Court*, 20 Cal. 4th 449, 457, n.9 (1999) ("In ruling on a demurrer, a court may consider facts of which it has taken judicial notice."); Cal. Code Civ. Proc., § 430.30(a).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FRANCISCO

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1   2004 Definitive Proxy discloses that "[a]ll directors and executive officers as a group" owned

2   only 3.16% of the shares of KLA. *See* Request for Judicial Notice ("RJN"), Ex. 1. Additionally,

3   the 1998 Definitive Proxy states that "[a]ll directors and executive officers as a group" owned

4   only 4.99% of the shares. *See* RJN, Ex. 2. Thus, Plaintiff cannot show that KLA had a

5   controlling shareholder, and under no circumstances could he show that the defendants increased

6   their voting power at the expense of other shareholders through the option issuances in question.

7       A recent order in a stock options backdating case from the Northern District of California

8   confirms that the purported dilution related to alleged backdated options is derivative. *See Vogel*

9   *v. Jobs*, No. 06-5208 JF, 2007 WL 3461163 (N.D. Cal. Nov. 14, 2007). In *Vogel*, a plaintiff

10  shareholder (represented by Plaintiff's same counsel) attempted to bring a class action alleging

11  that officers and directors of Apple, Inc. breached their fiduciary duties of disclosure by issuing

12  false and misleading proxies. *Id.* at *2. The District Court granted the 12(b)(6) motion filed by

13  defendants, which sought dismissal on the grounds the claims asserted by the class were

14  derivative under California law. Finding that "California corporate law is functionally equivalent

15  to Delaware law," the District Court held that the claims asserted were derivative under *Tooley*

16  and *Gentile* because plaintiff did not allege that Apple Inc., a large publicly-traded corporation

17  like KLA, had a controlling shareholder. *Id.* at *2-*3. In the absence of a controlling

18  shareholder, the District Court held that the allegations amounted to nothing more than corporate

19  waste: "Lead Plaintiff's allegations properly are analyzed as claims of corporate overpayment that

20  must be treated as derivative under the *Tooley* test. The thrust of the allegations is that the

21  recipients of the backdated options were overpaid, in violation of Apple's stock options plans.

22  Such allegations necessarily involve an injury to the corporation in that overpayment entails a

23  reduction in corporate assets." *Id.* at *3.

24          2.      The Relief Plaintiff Seeks Would Benefit The Company

25          Although the foregoing discussion should dispose of this case, it bears noting that

26  Plaintiff's "rescission" claim further betrays the inherently derivative nature of his claims.

27  Plaintiff seeks rescission and cancellation of options issued by KLA to its employees and shares

28  issued upon the exercise of such options. *See* Complaint ¶ 81. Under both causes of action,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

12

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1   Plaintiff seeks rescission of shares issued pursuant to the 1982 Stock Options Plan and the 2004

2   Equity Incentive Plan.   Plaintiff alleges that the 1982 Stock Options Plan governed the issuance

3   of stock options to employees, and that the Board of Directors was responsible for its

4   implementation. *See* Complaint ¶¶ 31-43.  Similarly, the 2004 Equity Incentive Plan governs

5   issuance of stock options to employees and is administered by the Board of Directors. *Id.*, ¶¶ 44-

6   46.  Plaintiff does not allege that he or any other shareholder had any rights or obligations under

7   these plans and agreements.  Rather, Plaintiff alleges that the "pervasive backdating scheme"

8   caused "options to be issued ... to carry a much lower price than the strike price." *Id.*, ¶ 76.

9   Thus, if the plans and stock issued thereunder were rescinded, the Company would be the

10  recipient of the shares of stock issued under the stock options plan.  In seeking to undo the

11  issuance of options, "the wrong for which the complaint is made is the action of the corporation

12  in entering into the contract." *Elster*, 845 A.2d at 222.  Like the instant matter, *Elster* considered

13  a prayer for relief asking a court to enjoin issuance of stock under a stock option plan, and sought

14  cancellation of stock already issued. *Id.*  The relief benefits the corporation because in alleging

15  issuance of options at less-than market value, "the loss in each instance is to the corporation and

16  to the stockholders as a whole." *Id.* at 223.

17      **B.      Plaintiff Lacks Standing To Bring A Derivative Claim**

18          Delaware law unequivocally requires a Plaintiff to be a current shareholder of a company

19  in order to bring and maintain a derivative suit. *Bradley v. First Interstate Bancorp*, 748 A.2d

20  913 (Del. 2000); *Ash v. McCall*, 2000 WL 1370341, at *12 (Del. Ch. Sept. 15. 2000) (describing

21  Delaware's continuous ownership standing requirement as "iron clad").  Plaintiff here admits that

22  he is no longer a shareholder of KLA. *See* Complaint ¶ 5 (alleging that Plaintiff owned shares of

23  KLA stock "between September 20, 2002 and September 27, 2006").  Accordingly, Plaintiff lacks

24  standing to maintain a derivative action, and this Court should not grant leave to amend to allow

25  Plaintiff to style his Complaint as a derivative action.

26  **III.     CONCLUSION**

27          This Court should sustain KLA's demurrer to Plaintiff's complaint because it cannot be

28  maintained as an individual action.  Moreover, because it is clear from Plaintiff's Complaint that

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

13

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

1  he is no longer a shareholder of KLA, this Court should deny leave to amend the Complaint as a

2  derivative action.

3

4  DATED:  January 8, 2008                          Respectfully submitted,

5                                                    MORGAN LEWIS & BOCKIUS, LLP

6

7                                                    By:_____/s/_____
                                                          JOSEPH E. FLOREN
8                                                    *Attorneys for Defendant KLA-Tencor Corporation*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E-Filed Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

## PROOF OF SERVICE BY ELECTRONIC TRANSMISSION

*Chris Crimi, et al. v. Edward W. Barnholt, et al.*
**Santa Clara County Superior Court Case No. 107CV093465**

I, the undersigned, declare:  that I am, and was at the time of service of the documents herein referred to, over the age of 18 years, and not a party to the action; and I am employed in the County of San Francisco, California.  My business address is One Market, Spear Street Tower, San Francisco, California 94105.

On the date executed below, I electronically served the document(s) via the Santa Clara Superior Court's electronic filing system described as:

**DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER; MEMORANDUM OF POINTS AND AUTHORITIES**

on the recipients designated on the Transaction Receipt located on the Santa Clara County Superior Court's electronic filing website.

I also served the above document via Hand Delivery on the following party:

Patrice L. Bishop
Stull, Stull & Brody
10940 Wilshire Blvd., Suite 2350
Los Angeles, CA  90024

I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct and was executed on January 8, 2008.

_____/s/_____

Erika R. Eberline

---

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

**E-FILED**

Jan 8, 2008 5:00 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6652
By A. Ilas, Deputy

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | Lead Case No.1-07-CV-093465 |
| vs. | |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | Judge Jack Komar |
| Defendant. | PROOF OF SERVICE |
| AND RELATED ACTIONS | Electronic Proof of Service |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Tue. January 8, 2008 at 4:52 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Tue. January 8, 2008 at 4:52 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on January 8, 2008 at Oakland, California.

Dated: January 8, 2008                    For WWW.SCEFILING.ORG

E-Filed: Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

Andy Jamieson

E-Filed: Jan 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6652

**THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG**

**Electronic Proof of Service**
**Page 2**

**Document(s) submitted by Joseph Floren of Morgan, Lewis & Bockius LLP on Tue. January 8, 2008 at 4:52 PM PST**

1. Demurrer w/fees: Defendant KLA-Tencor's Notice of Demurrer and Demurrer; Memorandum of Points and Authorities

1   MORGAN, LEWIS & BOCKIUS LLP
    JOHN H. HEMANN (SBN 165823)
2   JOSEPH E. FLOREN (SBN 168292)
    TERA M. HEINTZ (SBN 241414)
3   MATTHEW S. WEILER (SBN 236052)
    One Market, Spear Street Tower
4   San Francisco, CA 94105-1126
    Tel: 415.442.1000
5   Fax: 415.442.1001

6   Attorneys for Defendant KLA-Tencor Corporation

**E-FILED**

Jan 8, 2008 4:14 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6650
By R. Walker, Deputy

7

8         SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF SANTA CLARA

10

| | |
|---|---|
| 11   CHRIS CRIMI, on Behalf of Himself and All Others Similarly Situated, | Case No. 107CV093465 |
| 12 | |
|         Plaintiff, | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT KLA-TENCOR'S DEMURRER; DECLARATION OF JOSEPH E. FLOREN** |
| 13     vs. | |
| 14 | |
| 15   EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR., STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, | Date: February 1, 2008 Time: 9:00 a.m. Department: 17C Judge: Hon. Jack Komar |
| 16 | |
| 17 | Complaint Filed: September 4, 2007 |
| 18 | |
| 19 | |
| 20         Defendants. | |

21

22

23

24

25

26

27

28

E-Filed Jan 8, 2008 4:14 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6650

# REQUEST FOR JUDICIAL NOTICE

Pursuant to Rule 3.1306 of the California Rules of Court and California Evidence Code Sections 452(h) and 453, Defendant KLA-Tencor Corporation ("KLA") respectfully requests that the Court take judicial notice of certain of KLA proxy statements, which are attached as exhibits to the accompanying Declaration of Joseph E. Floren. These proxy statements are the basis of Plaintiff's claims against KLA, because Plaintiff relies on their existence to plead his claim for breach of fiduciary duty by non-disclosure, and Plaintiff refers to them expressly throughout the Complaint. *See, e.g.*, Compl., ¶¶ 30, 33-36, 38-39, 41, 43-44, 46.

This court may take judicial notice of documents whose authenticity cannot reasonably be disputed. *See* Cal. Evid. Code § 452(h) (stating that judicial notice may be taken of "[f]acts and propositions that are no reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."). KLA's proxy statements, which are documents KLA files publicly with the SEC, are documents whose authenticity cannot reasonably be disputed. The reported composition of KLA shareholders is clear from the face of the proxy statements, and none of Plaintiff's allegations relate to the inaccuracy of any such facts; thus the veracity of recitations related to composition of KLA shareholders cannot be reasonably disputed. *See Aquila, Inc. v. Superior Court*, 148 Cal. App. 4th 556, 566 (2007) (Superior Court took judicial notice of statements contained in Forms 10K and proxy statements filed by a public company with the SEC); *see also StorMedia, Inc. v. Superior Court*, 20 Cal. 4th 449, 457 n.9 (1999) (Superior Court and Court of Appeal properly took judicial notice of certain SEC filings pursuant to Section 452(h)).

DATED: January 8, 2008                    MORGAN LEWIS & BOCKIUS, LLP


                                          By:_____/s/_____
                                                    Joseph E. Floren


                                          *Attorneys for Defendant KLA-Tencor Corporation*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AY LAWSAN
FRANCISCO

1-SF/7560868.1

REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF JOSEPH E. FLOREN

E-Filed Jan 8, 2008 4:14 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6650

## DECLARATION OF JOSEPH E. FLOREN

I, Jospeh E. Floren, declare as follows:

1.      I am an attorney at law, licensed to practice before the courts of the State of California and before this Court.  I am a partner of the law firm Morgan, Lewis & Bockius LLP, attorneys of record for defendant KLA-Tencor Corporation.  I am making this declaration in support of Defendant KLA-Tencor Corporation's Demurrer.  The facts set forth in this declaration are true of my own personal knowledge, and if called I could and would testify competently thereto.

2.      Attached hereto as Exhibit 1 is a true and correct copy of a Definitive Proxy Statement filed on behalf of KLA with the SEC on or about September 28, 1998.

3.      Attached hereto as Exhibit 2 is a true and correct copy of a Definitive Proxy Statement filed on behalf of KLA with the SEC on or about September 9, 2004.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and based on my personal knowledge, and that this declaration was executed on January 8, 2008 at San Francisco, California.


By _____/s/_____
                    Joseph E. Floren

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7560868.1

REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF JOSEPH E. FLOREN

E-Filed Jan 8, 2008 4:14 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6650

1

## PROOF OF SERVICE BY ELECTRONIC TRANSMISSION

2

*Chris Crimi, et al. v. Edward W. Barnholt, et al.*
**Santa Clara County Superior Court Case No. 107CV093465**

3

4          I, the undersigned, declare: that I am, and was at the time of service of the documents

5    herein referred to, over the age of 18 years, and not a party to the action; and I am employed in
the County of San Francisco, California. My business address is One Market, Spear Street

6    Tower, San Francisco, California 94105.

7          On the date executed below, I electronically served the document(s) via the Santa Clara
Superior Court's electronic filing system described as:

8

9    **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT KLA-
TENCOR'S DEMURRER; DECLARATION OF JOSEPH E. FLOREN**

10

11   on the recipients designated on the Transaction Receipt located on the Santa Clara County
Superior Court's electronic filing website. I declare under penalty of perjury pursuant to the laws

12   of the State of California that the foregoing is true and correct and was executed on January 8,
2008.

13

14                                                              _____
                                                                          /s/
15                                                              Erika R. Eberline

16

17

18

19

20

21

22

23

24

25

26

27

28

1-SF/7560868.1

REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF JOSEPH E. FLOREN

1

PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE SECURITIES EXCHANGE ACT
OF 1934 (Amendment No.)

Filed by the Registrant [X]

Filed by a Party other than the Registrant [ ]

Check the appropriate box:

[ ]  Preliminary Proxy Statement

[ ]  Confidential, for Use of the Commission Only (as permitted by
     Rule 14a-6(e)(2))

[X]  Definitive Proxy Statement

[ ]  Definitive Additional Materials

[ ]  Soliciting Material Pursuant to Section 240.14a-11(c) or Section 240.14a-12

KLA-TENCOR CORPORATION

--------------------------------------------------------------
(Name of Registrant as Specified In Its Charter)

--------------------------------------------------------------
(Name of Person(s) Filing Proxy Statement if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X] No fee required.

[ ] Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11.

    1) Title of each class of securities to which transaction applies:
       --------------------------------------------------------------

    2) Aggregate number of securities to which transaction applies:
       --------------------------------------------------------------

    3) Per unit price or other underlying value of transaction computed
pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee
is calculated and state how it was determined):
       --------------------------------------------------------------

    4) Proposed maximum aggregate value of transaction:
       --------------------------------------------------------------

    5) Total fee paid:
       --------------------------------------------------------------

[ ]  Fee previously paid.

[ ]  Check box if any part of the fee is offset as provided by Exchange Act
     Rule 0-11(a)(2) and identify the filing for which the offsetting fee was
     paid previously. Identify the previous filing by registration statement
     number, or the Form or Schedule and the date of its filing.

    1)  Amount Previously Paid:
        --------------------------------------------------------------

    2)  Form, Schedule or Registration Statement No.:
        --------------------------------------------------------------

    3)  Filing Party:
        --------------------------------------------------------------

    4)  Date Filed:
        --------------------------------------------------------------

2

<div align="center">

KLA-TENCOR CORPORATION
NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
NOVEMBER 17, 1998

</div>

To the Stockholders:

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders of KLA-Tencor Corporation (the "Company"), a Delaware corporation, will be held on Tuesday, November 17, 1998 at 11:00 a.m., local time, at the Company's offices located at One Technology Drive, Milpitas, California 95035, for the following purposes:

1. To elect four Class III directors to serve for a three year term and until their successors are elected.

2. To approve amendments to the 1997 Employee Stock Purchase Plan (the "1997 Purchase Plan") to increase the number of shares of Common Stock of the Company (the "Common Stock") reserved for issuance thereunder by 1,000,000 shares.

3. To approve amendments to the 1997 Purchase Plan to increase the number of shares of Common Stock reserved for issuance thereunder on the first day of each subsequent fiscal year by the lesser of (a) 2,000,000 shares or (b) the number of shares which the Company estimates (based on the previous 12-month period) it will be required to issue under the 1997 Purchase Plan during the forthcoming fiscal year.

4. To approve the 1998 Outside Director Option Plan and to reserve for issuance thereunder 1,000,000 shares of the Common Stock.

5. To ratify the appointment of PricewaterhouseCoopers LLP as independent accountants of the Company for the fiscal year ending June 30, 1999.

6. To transact such other business as may properly come before the meeting and any adjournments thereof.

The foregoing items of business are more fully described in the Proxy Statement accompanying this Notice.

Only stockholders of record at the close of business on September 18, 1998 are entitled to notice of and to vote at the meeting.

<div align="right">

Sincerely,

Larry W. Sonsini
Secretary

</div>

San Jose, California
September 30, 1998

<div align="center">

YOUR VOTE IS IMPORTANT

</div>

ALL STOCKHOLDERS ARE CORDIALLY INVITED TO ATTEND THE MEETING IN PERSON, HOWEVER, TO ASSURE YOUR REPRESENTATION AT THE MEETING, YOU ARE REQUESTED TO COMPLETE, SIGN AND DATE THE ENCLOSED PROXY CARD AS PROMPTLY AS POSSIBLE AND RETURN IT IN THE ENCLOSED ENVELOPE. ANY STOCKHOLDER ATTENDING THE MEETING MAY VOTE IN PERSON EVEN IF HE OR SHE RETURNED A PROXY.

3

# KLA-TENCOR CORPORATION
------------------------

## PROXY STATEMENT

### INFORMATION CONCERNING SOLICITATION AND VOTING

GENERAL

The enclosed Proxy is solicited on behalf of KLA-Tencor Corporation (the "Company") for use at the Annual Meeting of Stockholders to be held on Tuesday, November 17, 1998 at 11:00 a.m., local time, or at any adjournment(s) thereof (the "Annual Meeting"), for the purposes set forth herein and in the accompanying Notice of Annual Meeting of Stockholders. The Annual Meeting will be held at the Company's offices at One Technology Drive, Milpitas, California 95035. The Company's principal executive offices are located at 160 Rio Robles, San Jose, California 95134 and its telephone number is (408) 875-4200.

These proxy solicitation materials were mailed on or about September 30, 1998 to all stockholders entitled to vote.

RECORD DATE

Stockholders of record at the close of business on September 18, 1998 are entitled to notice of and to vote at the Annual Meeting. As of the record date 87,321,556 shares of the Company's Common Stock, $0.001 par value, were issued and outstanding.

REVOCABILITY OF PROXIES

Any Proxy given pursuant to this solicitation may be revoked by the person giving it at any time before its use by delivering to the Company a written notice of revocation or a duly executed proxy bearing a later date or by attending the meeting and voting in person.

QUORUM; ABSTENTIONS; BROKER NON-VOTES

The required quorum for the transaction of business at the Annual Meeting is a majority of the votes eligible to be cast by holders of shares of Common Stock issued and outstanding on the record date. Shares that are voted "FOR," "AGAINST," "ABSTAIN" or "WITHHELD FROM" a matter are treated as being present at the Annual Meeting for purposes of establishing a quorum and are also treated as shares entitled to vote at the Annual Meeting (the "Votes Cast") with respect to such matter.

Abstentions will be counted for purposes of determining both (i) the presence or absence of a quorum for the transaction of business and (ii) the total number of Votes Cast with respect to a proposal (other than the election of directors). Accordingly, abstentions will have the same effect as a vote against the proposal.

Broker non-votes will be counted for purposes of determining the presence or absence of a quorum for the transaction of business, but will not be counted for purposes of determining the number of Votes Cast with respect to the particular proposal on which the broker has expressly not voted. Accordingly, broker non-votes will not affect the outcome of the voting on a proposal that requires a majority of the Votes Cast (such as the approval of a plan).

VOTING AND SOLICITATION

On all matters other than the election of directors, each share has one vote. See "PROPOSAL ONE -- REQUIRED VOTE."

The cost of soliciting proxies will be borne by the Company. The Company has retained the services of Skinner & Co. to aid in the solicitation of proxies from brokers, bank nominees and other institutional owners. The Company estimates that it will pay Skinner & Co. a fee not to exceed $5,000 for its services and will reimburse it for certain out of pocket expenses estimated to be $45,000. In addition, the Company may

4

reimburse brokerage firms and other persons representing beneficial owners of shares for their expenses in forwarding solicitation material to such beneficial owners. Proxies may be solicited by certain of the Company's directors, officers and regular employees, without additional compensation, personally or by telephone or telegram.

DEADLINE FOR RECEIPT OF STOCKHOLDER PROPOSALS

Proposals of stockholders of the Company which are intended to be presented by such stockholders at the Company's annual meeting in 1999 must be received by the Company no later than June 2, 1999 and otherwise be in compliance with applicable laws and regulations in order for such proposals to be considered for possible inclusion may be included in the Company's proxy statement and form of proxy relating to that meeting.

The attached proxy card grants the proxy holders discretionary authority to vote on any matter raised at the Annual Meeting. If a stockholder intends to submit a proposal at the Company's annual meeting in 1999, which proposal is not intended to be included in the Company's proxy statement and form of proxy relating to that meeting, the stockholder should give appropriate notice no later than August 16, 1999. If such a stockholder fails to submit the proposal by such date the Company will not be required to provide any information about the nature of the proposal in its proxy statement and the proxy holders will be allowed to use their discretionary voting authority if the proposal is raised at the Company's annual meeting in 1999.

SECURITY OWNERSHIP

PRINCIPAL STOCKHOLDERS

As of June 30, 1998, the following persons were known to the Company to be beneficial owners of more than 5% of the Company's Common Stock:

| NAME AND ADDRESS | NUMBER OF SHARES OWNED | PERCENTAGE TOTAL(1) |
|---|---|---|
| Capital Guardian Trust Co.(2)....................... 333 South Hope Street Los Angeles, CA 90071 | 7,726,700 | 8.8% |
| Jennison Associates Capital Corp.(3)............... 466 Lexington Ave New York, NY 10017 | 5,485,500 | 6.3% |
| FMR Corp.(4)....................................... 82 Devonshire Street Boston, MA 02109 | 6,347,503 | 7.3% |
| Neuberger & Berman, LLC; Neuberger & Berman Management Incorporated(5)....... 605 Third Ave., New York, NY 10158-3698 | 6,411,113 | 7.3% |
| The Prudential Insurance Company of America(6)...... Prudential Plaza Newark, NJ 07102 | 5,685,552 | 6.5% |

----------------

(1) Based on 87,443,592 outstanding shares of Common Stock as of June 30, 1998.

(2) Based on information provided pursuant to Schedule 13G filed with the Securities and Exchange Commission (the "SEC") on July 9, 1998. This share amount includes 1,037,100 shares held by Capital International Limited; 805,400 shares held by Capital International S.A. and 112,100 shares held by Capital International, Inc., affiliated entities of Capital Guardian Trust Co. (the "Reporting Entity"). Previously, The Capital Group Companies, Inc., the parent holding company of the Reporting Entity and its listed affiliated entities, reported the beneficial ownership of all of such shares. On July 9, 1998 it filed a Schedule 13G indicating that it retained no beneficial ownership of shares held by its independent investment management affiliates.

2

5

(3) Based on information provided pursuant to Schedule 13G/A filed with the SEC on February 12, 1998. Jennison Associates Capital Corp. ("Jennison") is an institutional investor and is considered the beneficial owner only as a result of its position as manager of the funds which own the shares of Common Stock of the Company. Jennison is an autonomous, wholly-owned subsidiary of The Prudential Insurance Company of America ("Prudential"). As such, the shares of Common Stock reported by Jennison are also included in the shares of Common Stock reported by Prudential in its reporting obligations with the SEC. (See Note 6 below.)

(4) Based on information provided pursuant to Schedule 13G filed with the SEC on February 10, 1998. FMR Corp. is a parent holding company and includes shares held by Fidelity Management & Research Company, Fidelity Management Trust Company and Fidelity International Limited.

(5) Based on information provided pursuant to Schedule 13G filed with the SEC on February 12, 1998. This number includes 4,373,850 shares held by Neuberger & Berman's various mutual funds, for which Neuberger & Berman LLC and Neuberger & Berman Management Inc. serve as sub-advisor and investment manager, respectively.

(6) Based on information provided pursuant to Schedule 13G/A filed with the SEC on February 9, 1998. Prudential presently holds 22,400 shares of Common Stock of the Company for the benefit of its general account. In addition, Prudential may have direct or indirect voting and/or investment discretion over 5,663,152 shares, including 5,485,500 shares held by Jennison, a wholly-owned subsidiary of Prudential (see Note 3 above).

SECURITY OWNERSHIP OF MANAGEMENT

The following table sets forth the beneficial ownership of Common Stock of the Company as of September 18, 1998 (the most recent practicable date) by all directors and nominees (naming them), each of the named executive officers set forth in the Summary Compensation Table and by all directors and current executive officers as a group:

| NAME | AMOUNT OWNED | APPROXIMATE PERCENTAGE OWNED* |
|------|--------------|-------------------------------|
| Kenneth Levy(1) | 1,874,170 | 2.15% |
| Jon D. Tompkins(2) | 160,869 | ** |
| Kenneth L. Schroeder(3) | 449,729 | ** |
| James W. Bagley(4) | 20,051 | ** |
| Edward W. Barnholt(5) | 5,213 | ** |
| Leo J. Chamberlain(6) | 27,067 | ** |
| Richard J. Elkus, Jr.(7) | 75,937 | ** |
| Dean O. Morton(8) | 15,051 | ** |
| Yoshio Nishi(9) | 32,956 | ** |
| Samuel Rubinovitz(10) | 13,623 | ** |
| Dag Tellefsen(11) | 14,206 | ** |
| Lida Urbanek(12) | 818,679 | ** |
| Robert J. Boehlke(13) | 102,526 | ** |
| Gary E. Dickerson(14) | 95,190 | ** |
| Graham J. Siddall(15) | 204,384 | ** |
| All directors and executive officers as a group (22 persons)(16) | 4,354,172 | 4.99% |

---------------
  * Based on 87,321,556 outstanding shares of the Common Stock of the Company as of September 18, 1998.

 ** Less than 1%

3

6

(1) Includes 353,093 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998 and 231,000 shares which are held in trust for the benefit of Mr. Levy's children.

(2) Includes 145,072 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(3) Includes 325,093 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(4) Includes 20,051 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(5) Includes 5,213 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(6) Includes 5,070 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(7) Includes 937 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(8) Includes 10,051 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(9) Includes 32,956 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(10) Includes 9,623 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(11) Includes 13,107 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(12) Includes 3,560 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998 and 151,500 shares which are held by Mrs. Urbanek's children.

(13) Includes 98,829 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(14) Includes 92,688 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(15) Includes 173,966 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(16) Includes 1,715,860 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

PROPOSAL ONE

TO ELECT FOUR CLASS III DIRECTORS TO SERVE FOR A
THREE YEAR TERM AND UNTIL THEIR SUCCESSORS ARE ELECTED.

NOMINEES

The Company has a classified board of twelve directors consisting of four Class I directors (Kenneth Levy, Samuel Rubinovitz, Jon D. Tompkins and Lida Urbanek), three Class II directors (Leo J. Chamberlain, Richard J. Elkus, Jr. and Dag Tellefsen) and five Class III directors (James W. Bagley, Edward W. Barnholt, Dean O. Morton, Yoshio Nishi and Kenneth L. Schroeder). The Class I directors and the Class II directors will serve until the annual meetings of stockholders to be held in 1999 and 2000 respectively, or until their respective successors are duly elected and qualified. At each annual meeting of stockholders, directors are elected for a full term of three years to succeed those directors whose terms expire at the annual meeting.

4

The terms of the Class III directors will expire on the date of the Annual Meeting. Yoshio Nishi has declined to stand for re-election. Accordingly, four of the five Class III directors of the Board of Directors are to be elected at the Annual Meeting. The nominees for election by the stockholders to these four positions are James W. Bagley, Edward W. Barnholt, Dean O. Morton and Kenneth L. Schroeder. If elected, the nominees will serve as directors until the Company's annual meeting of stockholders in 2001, or until their successors are elected and qualified. If any of the nominees declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election, the proxies may be voted for such substitute nominees as management may designate. The proxy holders also have been advised that, in the event any of the nominees shall not be available for election, a circumstance that is not currently expected, they may vote for the election of substitute nominees in accordance with their judgment. If additional persons are nominated for election as directors, the proxy holders intend to vote all proxies received by them in such a manner in accordance with cumulative voting (if invoked) as will assure the election of as many of the nominees as possible and, in such event, the specific nominees to be voted for will be determined by the proxy holders.

If a quorum is present and voting, the four nominees for Class III directors receiving the highest number of votes will be elected as Class III directors. Abstentions and shares held by brokers that are not present, but not voted because the brokers were prohibited from exercising discretionary authority, i.e., "broker non-votes," will be counted as present in determining if a quorum is present.

The following table sets forth certain information with respect to the Company's Board of Directors.

| NAME OF DIRECTOR | AGE | POSITION | DIRECTOR SINCE |
|---|---|---|---|
| Jon D. Tompkins.................. | 58 | Chairman of the Board | 1997 |
| Kenneth Levy..................... | 55 | Chief Executive Officer | 1975 |
| Kenneth L. Schroeder............. | 52 | President and Chief Operating Officer | 1991 |
| James W. Bagley.................. | 59 | Director | 1997 |
| Edward W. Barnholt............... | 55 | Director | 1995 |
| Leo J. Chamberlain............... | 68 | Director | 1982 |
| Richard J. Elkus, Jr............. | 63 | Director | 1997 |
| Dean O. Morton................... | 66 | Director | 1997 |
| Yoshio Nishi..................... | 58 | Director | 1989 |
| Samuel Rubinovitz................ | 68 | Director | 1990 |
| Dag Tellefsen.................... | 56 | Director | 1978 |
| Lida Urbanek..................... | 55 | Director | 1997 |

There are no family relationships between or among any directors or executive officers of the Company.

JON D. TOMPKINS has been Chairman of the Board since July 1, 1998. From April 30, 1997 until July 1, 1998 he was Chief Executive Officer and a Director of the Company. From 1991 until April 30, 1997 he was President and Chief Executive Officer of Tencor Instruments, a manufacturer of wafer inspection, film measurement and metrology systems for the semiconductor industry ("Tencor") prior to its merger with the Company. He was a director of Tencor from 1991 until April 1997 and was appointed chairman of the board of directors of Tencor in November 1993. He currently serves on the boards of directors of Varian Corporation and ESI Incorporated as well as chairman of the board of SEMI/SEMATECH, a private research and development consortium of U.S. semiconductor equipment and materials companies.

KENNETH LEVY is a founder of the Company and since July 1, 1998 has been Chief Executive Officer and a Director. From 1975 until April 30, 1997 he was Chairman of the Board and Chief Executive Officer. From April 30, 1997 until June 30, 1998 he was Chairman of the Board. He currently serves on the boards of directors of Ultratech Stepper, Inc. and Integrated Process Equipment Corporation.

KENNETH L. SCHROEDER has been President, Chief Operating Officer and Director of the Company since November 1991. He currently serves on the board of directors of GaSonics International.

8

JAMES W. BAGLEY has been a Director of the Company since April 30, 1997. He was a director of Tencor from June 1993 until April 30, 1997. He has been chief executive officer and a director of Lam Research Corporation, a manufacturer of semiconductor processing equipment, since August 1997. From May 1996 until August 1997 he was chairman of the board and chief executive officer of OnTrak Systems, Inc. until its merger with Lam Research Corporation in August 1997. From December 1987 until December 1993, Mr. Bagley was president and chief operating officer for Applied Materials, Inc., a manufacturer of wafer fabrication systems to the semiconductor industry. From January 1994 until October 1995 he was vice chairman and chief operating officer of Applied Materials, Inc., and vice chairman from November 1995 until May 1996. Mr. Bagley currently serves on the boards of directors of Teradyne, Inc., Kulicke & Soffa Industries, Inc., Micron Technology, Inc., and SEMI/SEMATECH.

EDWARD W. BARNHOLT has been a Director of the Company since 1995. Mr. Barnholt joined Hewlett-Packard Company, a manufacturer of electronic and computer equipment in December 1966. From 1988 to 1990 he was general manager of the Electronics Instruments Group of Hewlett-Packard Company. In July 1988, he was elected vice president and in November 1993 he was elected senior vice president of Hewlett-Packard Company. Mr. Barnholt is currently executive vice president and general manager of the Test and Measurement Organization of Hewlett Packard Company.

LEO J. CHAMBERLAIN has been a Director of the Company since 1982. He is a private investor.

RICHARD J. ELKUS, JR. has been a Director of the Company since April 30, 1997. He was executive vice president and vice chairman of the board of directors of Tencor from February 1994 until April 30, 1997. Previously, he was with Prometrix Corporation from September 1983 until February 1994 where he held the positions of chairman and chief executive officer until its merger with Tencor in February 1994. He currently serves on the boards of directors of Voyan Technology and Lam Research Corporation.

DEAN O. MORTON has been a Director of the Company since April 30, 1997. From June 1993 until April 30, 1997 he was a director of Tencor. In October 1992 Mr. Morton retired as executive vice president, chief operating officer and a director of Hewlett-Packard Company, where he held various positions from 1960 until his retirement. Mr. Morton currently serves as chairman of the board of Centigram Communications Corporation and as a director of ALZA Corporation, The Clorox Company, BEA Systems Inc. and Raychem Corporation. Mr. Morton is also a trustee of the Metropolitan Series Fund and State Street Research Funds Group and Portfolios Inc.

YOSHIO NISHI has been a Director of the Company since 1989. Since May 1995 he has been director of research and development and senior vice president of the Semiconductor Group of Texas Instruments Incorporated, a manufacturer of integrated circuits and electronic equipment. From January 1986 to April 1995 he was director of the Silicon Process Laboratory for Hewlett-Packard Laboratories, a semiconductor technology research facility affiliated with Hewlett-Packard Company.

SAMUEL RUBINOVITZ has been a Director of the Company since 1990. He previously served as a Director of the Company from October 1979 to January 1989. From April 1989 to January 1994 he was executive vice president of EG&G, Inc., a diversified manufacturer of scientific instruments and electronic, optical and mechanical equipment. He currently serves on the boards of directors of Richardson Electronics, Inc., LTX Corporation and Kronos, Inc.

DAG TELLEFSEN has been a Director of the Company since 1978. He is the general partner of the Investment Manager of Glenwood Ventures I and II, venture capital funds. He currently serves on the boards of directors of Iwerks Entertainment Corporation, Aptix, Metorex International and Aeneid.

LIDA URBANEK has been a Director of the Company since April 30, 1997. She is a private investor. She was a director of Tencor from August 1991 until April 30, 1997.

6

9

## BOARD MEETINGS AND COMMITTEES

The Board of Directors of the Company held a total of five meetings during the fiscal year ended June 30, 1998. The Board of Directors has an Audit Committee, a Compensation Committee and a Nominating Committee.

The Audit Committee, which consists of Mr. Morton, Mr. Rubinovitz and Mr. Tellefsen, held three meetings during the last fiscal year. The Audit Committee recommends engagement of the Company's independent accountants, and is primarily responsible for approving the services performed by the Company's independent accountants and for reviewing and evaluating the Company's accounting principles and its system of internal accounting controls. The Compensation Committee, which consists of Mr. Bagley, Mr. Chamberlain and Mrs. Urbanek, held three meetings during the last fiscal year. The Compensation Committee reviews and approves the Company's executive compensation policy and makes recommendations concerning the Company's employee benefit plans. The Nominating Committee, which consists of Mr. Barnholt, Mr. Levy and Mr. Tompkins did not hold a meeting during the last fiscal year. A unanimous group of the disinterested members of the board of directors nominated the four Class III directors for election, with Mr. Nishi declining to stand for reelection. The Nominating Committee is primarily responsible for identifying and evaluating the qualifications of all candidates for election to the Board of Directors. The Nominating Committee will consider nominations recommended by stockholders. Stockholders wishing to submit nominations must notify the Company of their intent to do so and provide the Company with certain information set forth in the Company's bylaws on or before the date on which stockholder proposals to be included in the proxy statement for the stockholder meeting must be received by the Company.

During the fiscal year ended June 30, 1998, all incumbent Directors attended at least 75% of the aggregate number of meetings of the Board of Directors and meetings of the committees of the Board on which they served.

## COMPENSATION OF DIRECTORS

Members of the Board of Directors who are not employees of the Company receive an annual fee of $15,000 and $1,000 for each meeting they attend ($500 if participation is by telephone), plus expenses. Committee members receive $500 per committee meeting they attend ($250 if participation is by telephone). The Company's Outside Directors Stock Option Plan (the "Director Plan") as adopted by the Board of Directors and approved by the stockholders, provides for the grant of an option to purchase 2,500 shares of Common Stock of the Company to each of the Company's non-employee directors on the date on which such person is elected a director. Thereafter, each non-employee director is automatically granted an option to purchase 2,500 shares of Common Stock of the Company on the anniversary of such date. The Director Plan provides that the exercise price shall be equal to the fair market value of the Common Stock on the date of grant of the option. Options granted pursuant to the Director Plan have a term of ten years with 25% vesting after 12 months and the remainder vesting monthly over the following 36 months, but only while the optionee is a director of the Company, within six months after death or within 30 days after the optionee ceases to serve as a director of the Company. The Company plans to terminate the Director Plan if the stockholders approve Proposal Four hereunder.

If the stockholders approve Proposal Four hereunder, the non-employee Directors shall receive benefits under the 1998 Outside Director Plan ("1998 Director Plan") and no additional options will be granted under the Director Plan and it will be terminated. Under the 1998 Director Plan, each non-employee Director ("Outside Director") shall receive a nonstatutory option to purchase 10,000 shares of Common Stock as of the date on which such director first becomes an Outside Director (the "First Option"). Accordingly, none of the existing directors will be granted a First Option. In addition, each Outside Director shall automatically be granted a nonstatutory option to purchase an additional 5,000 shares of Common Stock on the date of the subsequent annual meetings on which he or she remains an Outside Director (the "Subsequent Option"). The term of options granted under the 1998 Director Plan may not exceed 10 years. The 1998 Director Plan provides that the exercise price shall be equal to the fair market value of the Common Stock on the date of

7

10

grant of the option. Options granted under the 1998 Director Plan shall become exercisable immediately upon the date of grant.

REQUIRED VOTE

Directors shall be elected by a plurality of the votes of the shares of the Company's Common Stock entitled to vote and represented in person or by proxy at the Annual Meeting. Votes against, votes withheld and broker non-votes have no legal effect on the election of directors due to the fact that such elections are by a plurality. Every stockholder voting for the election of directors may cumulate such stockholder's votes and give one candidate a number of votes equal to the number of directors to be elected multiplied by the number of votes to which the stockholder's shares are entitled, or may distribute the stockholder's votes on the same principle among as many candidates as the stockholder thinks fit, provided that votes cannot be cast for more than the number of directors to be elected. However, no stockholder shall be entitled to cumulate votes unless the candidate's name has been placed in nomination prior to the voting and the stockholder, or any other stockholder, has given notice at the Annual Meeting prior to the voting of the intention to cumulate the stockholder's votes. The proxy holders will exercise discretionary authority to cumulate votes in the event that additional persons are nominated at the Annual Meeting for election of directors.

MANAGEMENT RECOMMENDS A VOTE FOR EACH OF THE CLASS III
NOMINEES LISTED ABOVE.

PROPOSAL TWO

APPROVAL OF AMENDMENT TO THE 1997 EMPLOYEE STOCK PURCHASE PLAN TO INCREASE THE NUMBER OF SHARES OF COMMON STOCK RESERVED FOR ISSUANCE THEREUNDER BY 1,000,000 SHARES.

GENERAL

As of the date hereof 200,000 shares of the Company's Common Stock have been reserved for issuance under the Company's 1997 Employee Stock Purchase Plan (the "1997 Purchase Plan"). In August 1998, the Board of Directors adopted an amendment to the 1997 Purchase Plan, subject to stockholder approval, to increase the number of shares reserved for issuance thereunder by 1,000,000 shares in fiscal 1999, to a total of 1,200,000 reserved shares. As of June 30, 1998, 195,598 shares of Common Stock had been issued under the 1997 Purchase Plan at an average price of $23.5344 per share and 4,402 shares remained available for purchase.

The 1997 Purchase Plan was adopted in 1997 and stockholder approval was obtained at the 1997 annual meeting of stockholders with the intention of phasing out the Company's 1981 Employee Stock Purchase Plan (the "1981 Purchase Plan") over the two year period ending June 30, 1999. The Company estimates that it will utilize the remaining available shares under the 1997 Purchase Plan leaving an insufficient number of shares for issuance in the exercise periods throughout the phase out of the 1981 Purchase Plan in fiscal 1999.

The Board of Directors believes that it is in the best interests of the Company to provide employees with an opportunity to purchase Common Stock of the Company through payroll deductions. In addition, the Board of Directors believes that the shares remaining available for issuance pursuant to the 1997 Purchase Plan are insufficient for such purpose. Accordingly, at the Annual Meeting, the stockholders are being requested to consider and to approve an amendment of the 1997 Purchase Plan to increase the number of shares reserved for issuance thereunder by 1,000,000 shares which the Company believes is a sufficient number of shares to allow the Company to continue to phase out the 1981 Purchase Plan through the next fiscal year.

8

11

The description of the 1997 Purchase Plan that follows Proposal Three is incorporated herein by this reference.

THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR APPROVAL OF THE AMENDMENT TO THE 1997 EMPLOYEE STOCK PURCHASE PLAN TO INCREASE THE NUMBER OF SHARES RESERVED FOR ISSUANCE THEREUNDER BY 1,000,000 SHARES.

PROPOSAL THREE

APPROVAL OF AMENDMENTS TO THE 1997 PURCHASE PLAN TO PROVIDE FOR AN AUTOMATIC INCREASE TO THE SHARES FOR ISSUANCE THEREUNDER ON THE FIRST DAY OF EACH NEW FISCAL YEAR

GENERAL

As of the date hereof 200,000 shares of the Company's Common Stock have been reserved for issuance under the 1997 Purchase Plan. In August 1998, in addition to the amendment described in Proposal Two above, the Board of Directors adopted an amendment to the 1997 Purchase Plan, subject to stockholder approval, to increase the number of shares reserved for issuance thereunder on the first day of each subsequent fiscal year (beginning on July 1, 1999) by the lesser of (a) 2,000,000 shares or (b) the number of shares which the Company estimates (based on the previous 12-month period) it will be required to issue under the 1997 Purchase Plan during the forthcoming fiscal year. As of June 30, 1998, 195,598 shares of Common Stock had been issued under the 1997 Purchase Plan at an average price of $23.5344 per share and 4,402 shares remained available for purchase.

The Company sought stockholder approval of the 1997 Purchase Plan at the 1997 annual meeting of stockholders with the intention of phasing out the Company's 1981 Purchase Plan over the two year period ending June 30, 1999. Following the phase out of the 1981 Purchase Plan, the 1997 Purchase Plan will need additional shares to replace the shares issued thereunder.

As described in Proposal Two above, the Company will have phased out the 1982 Purchase Plan by June 30, 1999. Thereafter, the 1997 Purchase Plan will be the Company's sole employee stock purchase plan. The Board of Directors believes that it is in the best interests to provide employees with an opportunity to purchase Common Stock of the Company through payroll deductions. The Board believes that the 1,000,000 shares of Common Stock being added to the 1997 Purchase Plan pursuant to Proposal Two will be sufficient to cover the requirements of this plan through June 30, 1999. To simplify the administration of the 1997 Purchase Plan thereafter, the Board has approved the proposed amendment which provides for automatic periodic additions of a specified number of shares of Common Stock to the plan without the need for additional stockholder approval. This amendment is intended to ensure that the 1997 Purchase Plan will continue to have a reasonable number of shares available to meet its requirements for the remainder of its term.

The description of the 1997 Purchase Plan that follows Proposal Three is incorporated herein by this reference.

REQUIRED VOTE -- PROPOSALS TWO AND THREE

The affirmative vote of a majority of the Votes Cast will be required to approve the amendments to the 1997 Purchase Plan.

THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR APPROVAL OF THE AMENDMENTS TO THE 1997 PURCHASE PLAN TO PROVIDE FOR AN AUTOMATIC INCREASE TO THE SHARES RESERVED FOR ISSUANCE THEREUNDER ON THE FIRST DAY OF EACH NEW FISCAL YEAR.

9

12

SUMMARY OF THE 1997 PURCHASE PLAN, AS AMENDED

The essential features of the 1997 Purchase Plan, as amended, are outlined below; provided however, that the following summary is qualified in its entirety by the specific language of the 1997 Purchase Plan, as amended, a copy of which is available at no charge to any stockholder upon request.

Purpose

The purpose of the 1997 Purchase Plan is to provide employees of the Company and its foreign subsidiaries designated by the Board of Directors of the Company with an opportunity to purchase Common Stock of the Company through payroll deductions.

Administration

The 1997 Purchase Plan is administered by the Board of Directors or a committee appointed by the Board of Directors. The Board of Directors has the discretion to delegate routine matters to management. All questions of interpretation or application of the 1997 Purchase Plan are determined in the sole discretion of the Board of Directors, and its decisions are final and binding upon all participants. The Board of Directors may determine, in its sole discretion, the requirements and conditions of participation, if any, by employees of foreign subsidiaries. In the event that the Board of Directors determines that the ongoing operation of the 1997 Purchase Plan may result in unfavorable financial accounting consequences, the Board of Directors may in any manner it determines, in its sole discretion, and, to the extent necessary or desirable, modify or amend the 1997 Purchase Plan, including, but not limited to altering the purchase price for any offering period including an offering period underway at the time of the change in purchase price. Such modifications or amendments shall not require stockholder approval or the consent of any participants in the 1997 Purchase Plan. Members of the Board of Directors who are eligible employees of the Company are permitted to participate in the 1997 Purchase Plan. Members of the Board of Directors will receive no additional compensation for their services in connection with the administration of the 1997 Purchase Plan. All payroll deductions received or held by the Company may be used by the Company for any corporate purpose.

Eligibility

Any person who is employed by the Company or its subsidiaries for at least 20 hours per week and more than five months in a calendar year is eligible to participate in the 1997 Purchase Plan.

Employees of foreign subsidiaries may be subject to additional requirements and restrictions depending upon applicable local law. As of June 30, 1998, approximately 3,300 employees were participating in the 1997 Purchase Plan.

Offering Dates

The 1997 Purchase Plan is implemented by 24-month offering periods (each an "Offering Period"), commencing on January 1 and July 1 of each year. Each Offering Period is composed of four consecutive six-month purchase periods (each a "Purchase Period"). The Board of Directors has the power to alter the duration of the Offering Periods without stockholder approval.

Eligible employees become participants in the 1997 Purchase Plan by delivering to the Company a subscription agreement authorizing payroll deductions. An eligible employee may participate in an Offering Period only if, as of the enrollment date of such Offering Period, such employee is not participating in the 1981 Purchase Plan or in any prior Offering Period under the 1997 Purchase Plan which is continuing at the time of such proposed enrollment. An employee who becomes eligible to participate in the 1997 Purchase Plan after the commencement of an Offering Period may not participate until the commencement of the next Offering Period.

10

13

## Purchase Price

The purchase price per share at which shares are sold under the 1997 Purchase Plan shall be 85% of the lesser of (a) the fair market value of the shares of Common Stock on the first day of such Offering Period, and (b) the fair market value of the shares of Common Stock at the time of exercise of a participant's purchase option. The fair market value of the Common Stock on a given date shall be determined by the Board of Directors based on the closing price of the Company's Common Stock on such date as reported on the Nasdaq National Market.

## Payment of Purchase Price; Payroll Deductions

The purchase price for the shares is accumulated by payroll deductions during the Offering Period. The deductions may not exceed 10% of a participant's eligible compensation. A participant may institute decreases in the rate of payroll deductions at any time and such decreases are immediately effective. Increases in the rate of payroll deductions are effective as of the commencement of the next Offering Period.

All payroll deductions are credited to the participant's account under the 1997 Purchase Plan; no interest accrues on the payroll deductions. All payroll deductions received or held by the Company may be used by the Company for any corporate purpose and such payroll deductions need not be segregated.

## Purchase of Stock; Exercise of Option

At the beginning of each Offering Period, by executing a subscription agreement to participate in the 1997 Purchase Plan, each employee is in effect granted an option to purchase shares of Common Stock. The maximum number of shares placed under option to a participant in an Offering Period is determined by dividing $20,000 by 85% of the fair market value of the Common Stock at the beginning of the Offering Period. Notwithstanding the foregoing, no employee may make aggregate purchases of stock of the Company and its subsidiaries under the 1997 Purchase Plan and any other employee stock purchase plans qualified as such under Section 423(b) of the Internal Revenue Code of 1986, as amended (the "Code") in excess of $25,000 (determined using the fair market value of the shares at the time the option is granted) during any calendar year.

## Withdrawal

While each employee in the 1997 Purchase Plan is required to sign a subscription agreement authorizing payroll deductions to participate, a participant may terminate his or her participation in the 1997 Purchase Plan at any time by signing and delivering to the Company a notice of withdrawal from the 1997 Purchase Plan. All of the participant's accumulated payroll deductions will be paid to the participant promptly after receipt of his or her notice of withdrawal and his or her participation in the current Offering Period will be automatically terminated, and no further payroll deductions for the purchase of shares will be made during the Offering Period. No resumption of payroll deductions will occur on behalf of such participant unless such participant re-enrolls in the 1997 Purchase Plan by delivering a new subscription agreement to the Company during the applicable open enrollment period preceding the commencement of a subsequent Offering Period. A participant's withdrawal from the 1997 Purchase Plan during an Offering Period does not have any effect upon such participant's eligibility to participate in subsequent Offering Periods under the 1997 Purchase Plan.

## Termination of Employment

Termination of a participant's employment for any reason, including retirement or death, cancels his or her participation in the 1997 Purchase Plan immediately. In such event, the payroll deductions credited to the participant's account will be returned to such participant or, in the case of death, to the participant's legal representative.

14

## Capital Changes

If any change is made in the capitalization of the Company, such as stock splits or stock dividends, which results in an increase or decrease in the number of shares of Common Stock outstanding or in the event of any merger, sale or other reorganization, appropriate adjustments shall be made by the Company in the 1997 Purchase Plan's reserve and the number and class of shares subject to outstanding purchase options and in the purchase price per share. Notwithstanding such adjustment, if in a transaction the stockholders of the Company no longer retain at least a majority of the beneficial interest in the voting stock of the Company following such transaction ("Transfer of Control"), the Board of Directors may, in its sole discretion (a) provide that the purchase options become fully exercisable prior to the date of the Transfer of Control, (b) provide that such successor entity assume the Company's obligations under the 1997 Purchase Plan, or (c) terminate the 1997 Purchase Plan. The Board of Directors may also make provisions for adjusting the number of shares subject to the 1997 Purchase Plan and the purchase price per share if the Company effects one or more reorganizations, recapitalizations, rights offerings or other increases or decreases in the number of shares of the Company's outstanding Common Stock.

## Amendment and Termination of the 1997 Purchase Plan

The Board of Directors may at any time amend or terminate the 1997 Purchase Plan; provided, however, amendments that would increase the number of shares reserved for purchase or would otherwise require stockholder approval in order to comply with other regulatory requirements, require stockholder approval.

## CERTAIN UNITED STATES FEDERAL INCOME TAX INFORMATION

The 1997 Purchase Plan is intended to qualify under the provisions of Sections 421 and 423 of the Code with respect to participants who are citizens of the United States ("U.S. Participants"). Under these provisions, no income will be taxable to a U.S. Participant at the time of grant of the option or purchase of shares. Upon disposition of the shares, the U.S. Participant will generally be subject to tax, the amount of which will depend upon the holding period. If the shares have been held by the U.S. Participant for more than two years after the offering date and more than one year after the exercise date, the lesser of: (a) the excess of the fair market value of the shares at the time of such disposition over the option price, or (b) the excess of the fair market value of the shares at the time the option was granted over the option price (which option price will be computed as of the grant date) will be treated as ordinary income, and any further gain will be treated as long-term capital gain. If the shares are disposed of before the expiration of these holding periods, the excess of the fair market value of the shares on the exercise date over the option price will be treated as ordinary income, and any further gain or any loss on such disposition will be long-term or short-term capital gain or loss, depending on the holding period. Special rules may apply with respect to U.S. Participants subject to Section 16(b) of the Securities Exchange Act of 1934, as amended. The Company is not entitled to a deduction for amounts taxed as ordinary income or capital gain to a U.S. Participant except to the extent of ordinary income reported by U.S. Participants upon disposition of shares prior to the expiration of the two holding periods described above. The consequences to non-U.S. Participants are governed by foreign laws, which typically do not offer the same tax advantages as U.S. laws.

The foregoing is only a summary of the effect of federal income taxation upon the participant and the Company with respect to the grant and exercise of options under the 1997 Purchase Plan, does not purport to be complete, and does not discuss the income tax laws of any municipality, state or foreign country in which a participant may reside. It is advisable that a participant contact his or her own tax advisor concerning the application of all of these tax laws.

## STOCK PRICE

The closing price of a share of the Company's Common Stock on the Nasdaq National Market on September 18, 1998 was $22.375.

15

PLAN BENEFITS

The Company cannot now determine the number of shares to be purchased in the future by the named executive officers, all current executive officers as a group or all employees (excluding executive officers) as a group. In the fiscal year ended June 30, 1998, however, the following shares of Common Stock were purchased by such persons pursuant to the 1997 Purchase Plan and the 1981 Purchase Plan:

| NAME OR GROUP | NUMBER OF SHARES |
|---|---|
| Kenneth Levy | 1,122 |
| Jon D. Tompkins | 617 |
| Kenneth L. Schroeder | 937 |
| Robert J. Boehlke | 760 |
| Gary E. Dickerson | 1,173 |
| Graham J. Siddall | 617 |
| All current executive officers (13 persons-as a group) | 12,254 |
| All employees (including current officers who are not executive officers) | 802,737 |

PROPOSAL FOUR

APPROVAL OF THE 1998 OUTSIDE DIRECTOR OPTION PLAN AND RESERVATION OF 1,000,000 SHARES OF COMMON STOCK OF THE COMPANY FOR ISSUANCE THEREUNDER.

GENERAL

The Company's 1998 Outside Director Option Plan (the "1998 Director Plan") was adopted by the Board of Directors in August 1998 and is intended to allow the Company to attract and retain the best available individuals for service as non-employee members of the Board of Directors ("Outside Directors") and to encourage their continued service on the Board. The Company has initially reserved 1,000,000 shares of Common Stock for issuance under the 1998 Director Plan. At the Annual Meeting, the stockholders are being asked to approve the 1998 Director Plan and to approve the reservation of 1,000,000 shares for issuance thereunder. Upon approval by the stockholders of the Company, the Company will no longer grant any options under the current Outside Directors Stock Option Plan and will terminate that plan.

SUMMARY OF THE 1998 DIRECTOR PLAN

The essential features of the 1998 Director Plan are outlined below; provided however, that the following summary is qualified in its entirety by the specific language of the 1998 Director Plan, a copy of which is available at no charge to any stockholder upon request.

Purpose

The 1998 Director Plan provides for the grant of nonstatutory stock options to Outside Directors to allow the Company to attract and retain the best available individuals for service as Outside Directors.

Administration

The 1998 Director Plan may be administered by the Board of Directors or a committee of the Board (as applicable, the "Administrator"). The Administrator has the power to determine the terms of the options granted, including the exercise price of the option, the number of shares subject to each option, the exercisability thereof, and the form of consideration payable upon such exercise. In addition, the Administra-

13

16

tor has the authority to amend, suspend or terminate the 1998 Director Plan,
provided that no such action may affect any share of Common Stock previously
issued and sold or any option previously granted under the 1998 Director Plan.

Eligibility

Options under the 1998 Director Plan may be granted only to Outside
Directors. No person has any discretion to select which Outside Directors shall
be granted options. In addition to discretionary grants by the Board of
Directors, the Director Plan provides for automatic grants of options to be made
in the following ways: (a) each Outside Director as of the date on which such
director first becomes an Outside Director receives a nonstatutory option to
purchase 10,000 shares of Common Stock (the "First Option"); and (b) each
Outside Director shall automatically be granted a nonstatutory option to
purchase an additional 5,000 shares of Common Stock on the date of the
subsequent annual meetings on which he or she remains an Outside Director (the
"Subsequent Option").

Terms of Options

Options granted under the 1998 Director Plan are generally not transferable
by the optionee, and each option is exercisable during the lifetime of the
optionee only by such optionee. Options granted under the 1998 Director Plan
must generally be exercised within 30 days after the end of optionee's status as
an Outside Director of the Company, or within twelve months after such
optionee's termination by death or disability, but in no event later than the
expiration of the option's term.

The exercise price of nonstatutory stock options granted under the 1998
Director Plan shall be at least equal to the fair market value of the Common
Stock on the date of grant. The term of all options granted under the 1998
Director Plan may not exceed ten years. Both the First Option and the Subsequent
Option shall become 100% exercisable on their respective dates of grant.

Amendment or Termination

The Administrator may amend or terminate the 1998 Director Plan at any
time. However, no amendment or termination may adversely affect any stock
options then outstanding under the 1998 Director Plan without the optionee's
consent.

The 1998 Director Plan provides that in the event of a merger of the
Company with or into another corporation, or a sale of substantially all of the
Company's assets, each option shall be assumed or an equivalent option
substituted for by the successor corporation. If the outstanding options are not
assumed or substituted for by the successor corporation, the Administrator shall
provide for the optionee to have the right to exercise the option as to all of
the optioned stock, including shares as to which it would not otherwise be
exercisable. If the Administrator makes an option exercisable in full in the
event of a merger or sale of substantially all of the Company's assets, the
Administrator shall notify the optionee that the option shall be fully
exercisable for a period of fifteen (15) days from the date of such notice, and
the option will terminate upon the expiration of such period.

CERTAIN UNITED STATES FEDERAL INCOME TAX INFORMATION

The following is only a summary of the effect of federal income taxation
upon the Outside Director and the Company with respect to the grant and exercise
of options under the 1998 Director Option Plan. This summary does not purport to
be complete and does not discuss the income tax laws of any municipality, state
or foreign country in which an Outside Director may reside.

Options granted under the 1998 Director Plan are nonstatutory options
("NSO"). An Outside Director will not recognize any taxable income at the time
he or she is granted an NSO. However, upon the exercise of an NSO, the optionee
will recognize ordinary income measured by the excess of the then fair market
value of the shares over the option price. Upon resale of such shares by the
Outside Director, any difference between the sale price and the exercise price,
to the extent not recognized as ordinary income as provided above, will be

17

treated as long-term or short-term capital gain or loss, depending on the holding period. The Company will be entitled to a tax deduction in the same amount as the ordinary income recognized by the Outside Director with respect to shares acquired upon exercise of an NSO.

PLAN BENEFITS

If the 1998 Director Plan is approved at the Annual Meeting, each Outside Director serving on the Board of Directors shall be entitled to each receive a Subsequent Option. If Proposals One and Four are approved by the stockholders, there will be eight Outside Directors on the Board of Directors immediately following the Annual Meeting and options to purchase an aggregate of 40,000 shares of Common Stock will therefore be outstanding under the 1998 Director Plan immediately following the Annual Meeting.

REQUIRED VOTE

The affirmative vote of a majority of the Votes Cast will be required to approve the adoption of the 1998 Director Plan and for the reservation of 1,000,000 shares of Common Stock of the Company for issuance thereunder.

THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE ADOPTION OF THE 1998 DIRECTOR PLAN AND FOR THE RESERVATION OF 1,000,000 SHARES OF COMMON STOCK OF THE COMPANY FOR ISSUANCE THEREUNDER.

PROPOSAL FIVE

TO RATIFY THE APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE INDEPENDENT ACCOUNTANTS OF THE COMPANY FOR THE FISCAL YEAR ENDING JUNE 30, 1999.

The Board of Directors has selected PricewaterhouseCoopers LLP, independent accountants, to audit the consolidated financial statements of the Company for its 1999 fiscal year and recommends that the stockholders vote for ratification of such appointment. If there is a negative vote on such ratification, the Board of Directors will reconsider its selection. Representatives of PricewaterhouseCoopers LLP are expected to be present at the Annual Meeting with the opportunity to make a statement if they desire to do so, and are expected to be available to respond to appropriate questions.

THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE RATIFICATION OF THE APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE INDEPENDENT ACCOUNTANTS OF THE COMPANY FOR THE FISCAL YEAR ENDING JUNE 30, 1999.

15

18

EXECUTIVE COMPENSATION

   The following table shows, as to the person who served as Chief Executive Officer during the fiscal year ended June 30, 1998 and each of the five other most highly compensated executive officers whose salary plus bonus exceeded $100,000, information concerning all reportable compensation awarded to, earned by or paid to each for services to the Company in all capacities during the fiscal year ended June 30, 1998, as well as such compensation for each such individual for the Company's previous two fiscal years.

SUMMARY COMPENSATION TABLE

| NAME AND PRINCIPAL POSITION | YEAR | ANNUAL COMPENSATION | | OTHER ANNUAL COMPEN-SATION ($)(1) | LONG TERM COMPENSATION | | | ALL OTHER COMPENSATION ($)(5) |
|---|---|---|---|---|---|---|---|---|
| | | | | | AWARDS | | PAYOUTS | |
| | | SALARY ($) | BONUS | | RESTRICTED STOCK AWARD(S) ($)(2) | SECURITIES UNDERLYING OPTIONS/ SARS(#)(3) | LTIP PAYOUTS ($)(4) | |
| Kenneth Levy(6).................. Chief Executive Officer | 1998 | $467,769 | $161,314 | $N/A | -0- | 61,500 | -0- | $ 44,410 |
| Chairman of the Board | 1997 | $492,122 | $114,177 | $N/A | -0- | 162,500 | -0- | $ 73,158 |
| | 1996 | $350,289 | $431,070 | $N/A | -0- | -0- | -0- | $111,021 |
| Jon D. Tompkins(7)............... | 1998 | $467,769 | $262,114 | $N/A | -0- | -0- | -0- | $ 44,410 |
| Chairman of the Board | 1997 | $285,589 | $396,441 | $N/A | -0- | 100,000 | -0- | $ 1,500 |
| Chief Executive Officer | 1996(8) | $351,067 | $361,562 | $N/A | -0- | 71,939 | -0- | $ 12,191 |
| Kenneth L. Schroeder.............. | 1998 | $455,352 | $256,757 | $N/A | -0- | 62,500 | -0- | $ 43,565 |
| President and Chief Operating Officer | 1997 | $384,211 | $312,890 | $N/A | -0- | 161,500 | -0- | $ 71,451 |
| | 1996 | $212,777 | $186,095 | $N/A | -0- | 11,500 | -0- | $106,810 |
| Robert J. Boehlke................. | 1998 | $297,135 | $116,708 | $N/A | -0- | 11,500 | -0- | $ 26,604 |
| Executive Vice President | 1997 | $257,908 | $341,567 | $N/A | -0- | 71,500 | -0- | $ 49,311 |
| and Chief Financial Officer | 1996 | $248,185 | $186,008 | $N/A | -0- | -0- | -0- | $ 79,516 |
| Gary E. Dickerson................. | 1998 | $321,115 | $161,164 | $N/A | -0- | 42,500 | -0- | $ 19,984 |
| Executive Vice President, | 1997 | $160,611 | $129,441 | $N/A | -0- | 81,500 | -0- | $ 50,197 |
| Yield Management Solutions | 1996 | $221,346 | $172,500 | $N/A | -0- | 20,000 | -0- | $ 71,104 |
| Graham J. Siddall(8).............. | 1998 | $111,115 | $ 64,717 | $N/A | -0- | -0- | -0- | $ 29,384 |
| Executive Vice President, | 1997 | $261,062 | $217,661 | $N/A | -0- | 40,000 | -0- | $ 1,500 |
| Wafer Inspection Group | 1996(8) | $341,061 | $214,132 | $N/A | -0- | 87,939 | -0- | $ 1,500 |

----------------

(1) The amounts paid during the fiscal year to the named executive officers were less than the lesser of (a) $50,000 or (b) 10% of the executive officers total reported salary and bonus.

(2) The Company has not granted any restricted stock rights.

(3) The Company has not granted any stock appreciation rights.

(4) The Company does not have any Long Term Incentive Plans as that term is defined in the regulations.

(5) "All Other Compensation" is itemized as follows:

   - In 1998, Mr. Levy received $25,496 in cash profit sharing; $9,246 in profit sharing was contributed by the Company to the 401(k) Plan; $8,688 was contributed by the Company to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

   - In 1998, Mr. Tompkins received $25,496 in cash profit sharing; $9,246 in profit sharing was contributed by the Company to the 401(k) Plan; $8,688 was contributed by the Company to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

   - In 1998, Mr. Schroeder received $25,001 in cash profit sharing; $9,230 in profit sharing was contributed by the Company to the 401(k) Plan; $8,314 was contributed by the Company to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

   - In 1998, Mr. Boehlke received $16,205 in cash profit sharing; $8,681 in profit sharing was contributed by the Company to the 401(k) Plan; $2,718 was contributed by the Company to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

   - In 1998, Mr. Dickerson received $17,016 in cash profit sharing; $9,032 in profit sharing was contributed by the Company to the 401(k) Plan; $2,936 was contributed by the Company to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

19

    - In 1998, Mr. Siddall received $17,016 in cash profit sharing; $9,032 in profit sharing was contributed by the Company to the 401(k) Plan; $2,936 was contributed by the Company to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

(6) Mr. Levy was named Chief Executive Officer effective July 1, 1998. During fiscal 1997, Mr. Levy was Chief Executive Officer until April 30, 1997 when, as a result of the merger of Tencor Instruments ("Tencor") into a wholly-owned subsidiary of the Company (the "Merger"), he became Chairman of the Board of Directors and remained in that position until July 1, 1998.

(7) Mr. Tompkins was named Chairman of the Board effective July 1, 1998. He was previously President and Chief Executive Officer of Tencor until April 1997. As a result of the Merger he became Chief Executive Officer of the Company effective April 30, 1997 and remained in that position until July 1, 1998. The compensation described in this Summary Compensation Table reflects certain amounts which were paid during the period prior to the Merger when Tencor was an independent, publicly traded company. Tencor reported its results on a calendar year basis, while the Company reports its results based on a June 30 year end.

(8) The amounts reported for 1996 for Mr. Tompkins and Mr. Siddall are those amounts reported by Tencor in its proxy statements filed with the Securities and Exchange Commission for the year ended December 31, 1996.

STOCK OPTION GRANTS AND EXERCISES

    The following tables set forth the stock options granted to the named executive officers under the Company's stock option plans and the options exercised by such named executive officers during the fiscal year ended June 30, 1998.

    The Option/SAR Grant Table sets forth hypothetical gains or "option spreads" for the options at the end of their respective ten-year terms, as calculated in accordance with the rules of the Securities and Exchange Commission. Each gain is based on an arbitrarily assumed annualized rate of compound appreciation of the market price at the date of grant of 5% and 10% from the date the option was granted to the end of the option term. Actual gains, if any, on option exercises are dependent on the future performance of the Company's Common Stock and overall market conditions.

OPTION/SAR(1) GRANTS IN LAST FISCAL YEAR

KLA-TENCOR CORPORATION 1982 STOCK OPTION PLAN(2)

| | INDIVIDUAL GRANTS | | | | POTENTIAL REALIZABLE VALUE ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM | |
| NAME | OPTIONS/SARS GRANTED (#) | PERCENT OF TOTAL OPTIONS/ SARS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE OR BASE PRICE ($/SHARE) | EXPIRATION DATE | 5% | 10% |
|---|---|---|---|---|---|---|
| Kenneth Levy............ | 62,500 | 1.73% | $60.5625 | 07/31/07 | $2,380,464 | $6,032,564 |
| Jon D. Tompkins........ | -0- | -0- | -0- | N/A | -0- | -0- |
| Kenneth L. Schroeder.... | 61,500 | 1.73% | $60.5625 | 07/31/07 | $2,380,464 | $6,032,564 |
| Robert J. Boehlke...... | 13,500 | .52% | $60.5625 | 07/31/07 | $1,375,923 | $3,233,454 |
| Gary E. Dickerson...... | 42,500 | 1.18% | $60.5625 | 07/31/07 | $1,618,716 | $4,102,144 |
| Graham J. Siddall...... | -0- | -0- | -0- | N/A | -0- | -0- |

-----------------

(1) The Company has not granted any stock appreciation rights.

(2) The material terms of the grants (other than those set forth in the table) are: (a) The exercise price of the options is the fair market value of Common Stock as of the date of grant; (b) The options vest on a four year schedule with 25% after one year and the remaining option shares vesting 1/36th per month for the remainder of the vesting term; (c) To the extent unexercised, the options lapse after ten years; (d) The options are non-transferrable and are only exercisable during the period of employment of the

20

optionee and for 30 days following termination of employment, subject to limited exceptions in the cases of certain terminations, death or permanent disability of the optionee.

AGGREGATED OPTION/SAR EXERCISES IN LAST FISCAL YEAR AND YEAR-END VALUE(1)

KLA-TENCOR CORPORATION 1982 STOCK OPTION PLAN

| NAME | NUMBER OF SHARES ACQUIRED ON EXERCISE | VALUE REALIZED | TOTAL NUMBER OF UNEXERCISED OPTIONS HELD AT FISCAL YEAR END | | TOTAL VALUE(2) OF UNEXERCISED, IN-THE-MONEY OPTIONS HELD AT FISCAL YEAR END | |
|---|---|---|---|---|---|---|
| | | | EXERCISABLE | UNEXERCISABLE | EXERCISABLE | UNEXERCISABLE |
| Kenneth Levy............. | -0- | -0- | 326,901 | 226,099 | $5,673,025 | $800,006 |
| Jon D. Tompkins.......... | -0- | -0- | 15,000 | 85,000 | -0- | -0- |
| Kenneth L. Schroeder..... | 20,000 | $1,283,750 | 298,901 | 226,099 | $4,958,276 | $800,006 |
| Robert J. Boehlke........ | 35,000 | $1,965,880 | 80,604 | 104,208 | $ 524,526 | $495,548 |
| Gary E. Dickerson........ | 26,500 | $1,379,228 | 71,815 | 128,885 | $ 316,089 | $446,517 |
| Graham J. Siddall(3)..... | -0- | -0- | 18,437 | 21,563 | -0- | -0- |

- - - - - - - - - - - - - -

(1) The Company has not granted any stock appreciation rights.

(2) Total value of vested options based on fair market value of Company's Common Stock of $27.6875 per share as of June 30, 1998.

AGGREGATED OPTION/SAR EXERCISES IN LAST FISCAL YEAR AND YEAR-END VALUE(1)

TENCOR INSTRUMENTS 1993 EQUITY INCENTIVE PLAN

| NAME | NUMBER OF SHARES ACQUIRED ON EXERCISE | VALUE REALIZED | TOTAL NUMBER OF UNEXERCISED OPTIONS HELD AT FISCAL YEAR END | | TOTAL VALUE(2) OF UNEXERCISED, IN-THE-MONEY OPTIONS HELD AT FISCAL YEAR END | |
|---|---|---|---|---|---|---|
| | | | EXERCISABLE | UNEXERCISABLE | EXERCISABLE | UNEXERCISABLE |
| Kenneth Levy(3)........ | -0- | -0- | -0- | -0- | -0- | -0- |
| Jon D. Tompkins........ | 103,172 | $5,753,834 | 70,947 | 61,003 | $ 870,737 | $721,660 |
| Kenneth L. Schroeder(3)........ | -0- | -0- | -0- | -0- | -0- | -0- |
| Robert J. Boehlke(3)... | -0- | -0- | -0- | -0- | -0- | -0- |
| Gary E. Dickerson(3)... | -0- | -0- | -0- | -0- | -0- | -0- |
| Graham J. Siddall...... | 17,050 | $ 922,255 | 105,447 | 49,625 | $1,619,674 | $523,601 |

- - - - - - - - - - - - - -

(1) The Company has not granted any stock appreciation rights.

(2) Total value of vested options based on fair market value of Company's Common Stock of $27.6875 per share as of June 30, 1998.

(3) Messrs. Levy, Schroeder, Boehlke and Dickerson have been executive officers of the Company and accordingly have never received options under the Tencor Instruments 1993 Equity Incentive Plan. Accordingly, the information under this table is inapplicable to them.

18

21

REPORT OF THE COMPENSATION COMMITTEE ON EXECUTIVE COMPENSATION

Compensation Committee

The Committee is comprised of three of the independent, non-employee members of the Board of Directors, none of whom have interlocking relationships as defined by the Securities and Exchange Commission. The Committee is responsible for setting and administering the policies governing annual compensation of executive officers, considers their performance and makes recommendations regarding their cash compensation and stock options to the full Board of Directors. The Committee periodically reviews its approach to executive compensation and makes changes as appropriate.

Compensation Philosophy

The Committee of the Board of Directors establishes the overall executive compensation strategies of the Company and approves compensation elements for the chairman of the board, the chief executive officer and other executive officers. The goals of the Company's compensation policy are to attract, retain and reward executive officers who contribute to the overall success of the Company by offering compensation that is competitive in the industry, to motivate executive officers to achieve the Company's business objectives and to align the interests of executive officers with the long term interests of stockholders. The Company currently uses salary, a management incentive plan and stock options to meet these goals.

The compensation philosophy of the Committee is to provide a comprehensive compensation package for each executive officer that is well suited to support accomplishment of the Company's business strategies, objectives and initiatives. For incentive-based compensation, the Committee considers the desirability of structuring such compensation arrangements so as to qualify for deductibility under Section 162(m) of the Internal Revenue Code. As the Committee applies this compensation philosophy in determining appropriate executive compensation levels and other compensation factors, the Committee reaches its decisions with a view towards the Company's overall financial performance.

Executive Officer Compensation

The Committee's approach is based upon a belief that a substantial portion of aggregate annual compensation for executive officers should be contingent upon the Company's performance and an individual's contribution to the Company's success. In addition, the Committee strives to align the interests of the Company's executive officers with the long-term interests of stockholders through stock option grants that can result in ownership of the Company's Common Stock. The Committee endeavors to structure each executive officer's overall compensation package to be consistent with this approach and to enable the Company to attract, retain and reward personnel who contribute to the success of the Company.

The Company provides its executive officers with a compensation package consisting of base salary, variable incentive pay and participation in benefit plans generally available to other employees. The Committee considers market information from published survey data provided to the Committee by the Company's human resources staff. The market data consists primarily of base salary and total cash compensation rates, as well as incentive bonus and stock programs of other companies considered by the Committee to be peers in the Company's industry.

For the Company's previous fiscal year, the Committee reviewed and recommended a compensation structure which had as an important component, the successful integration of KLA Instruments Corporation and Tencor Instruments. The merger was completed April 30, 1997 with the Company's fiscal 1998 year focused on integrating the two companies as well as substantial economic and business challenges in the semiconductor and semiconductor capital equipment industries worldwide.

Base Salary. Salaries for executive officers are set with reference to salaries for comparable positions among other companies in the Company's industry or in industries that employ individuals of similar education and background to the executive officer based on data provided by the Company's human resources staff.

22

Management Incentive Plan. Each year since fiscal 1979, the Company has adopted a management incentive plan (the "Incentive Plan") which provides for payments to officers and key employees based on the financial performance of the Company or the relevant business unit, and on the achievement of the person's individual performance objectives. The Incentive Plan is approved by the Committee and submitted to the Board of Directors for ratification. For fiscal 1999 the Incentive Plan sets goals for profitability, achievement of measurable objectives aimed at strategic corporate goals and achievement of objectives relating to managing the ratio of assets to sales.

Outstanding Corporate Performance Executive Bonus Plan. The Company adopted an additional incentive plan (the "Outstanding Corporate Performance Plan") which allows for an additional bonus in years when the Company achieves certain levels of profitability and growth. For those executive officers that do not have operating divisions reporting to them, the matrix is based on the Company's pre-tax margin and the growth of the Company compared to a peer group. The target percentage for the Outstanding Corporate Performance Plan is the same target percentage as utilized in determining the Incentive Plan bonus. For those executive officers who do have operating divisions reporting to them, the matrix is based on certain specified growth objectives for that division and the Company's net operating margin. The target percentage for the Outstanding Corporate Performance Plan is also the same as that utilized in determining the Incentive Plan bonus. Any amounts to be paid under the Outstanding Corporate Performance Plan will be in the form of a contribution by the Company to the Executive Deferred Savings Plan (the "EDSP") and will vest over a one year period. At the end of such one year period, the executive officer will have the choice of taking a cash payment or leaving it in the EDSP. If the executive officer should leave during that one year period, the contribution by the Company shall be forfeited. The executive officer will be eligible to participate in the Company's profit sharing plan while eligible for Company contributions under the Outstanding Corporate Performance Plan but any amounts contributed by the Company pursuant to the Outstanding Corporate Performance Plan will be offset by profit sharing paid during the year.

Long-term Incentives. Longer term incentives are provided through the Stock Option Plan and the Excess Profit Stock Plan, each of which reward executive officers through the growth in value of the Company's Common Stock. The Committee believes that employee equity ownership is highly motivating, provides a major incentive for employees to build stockholder value and serves to align the interests of employees with those of stockholders.

Grants of stock options to executive officers are based upon each executive officer's relative position, responsibilities, historical and expected contributions to the Company, and the executive officer's existing stock ownership and previous option grants, with primary weight given to the executive officer's relative rank and responsibilities. Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price.

Approval of Fiscal Year 1999 Bonus Plan and Outstanding Corporate Performance Plan

The Committee approved the fiscal year 1999 bonus plan incentive formula which is based on two components of equal weight. The first is performance against certain financial objectives and the second is achievement of certain non-financial strategic objectives. The bonuses for the Chairman of the Board, the Chief Executive Officer, the President/Chief Operating Officer and the Chief Financial Officer are based on an average of the performance of those managers reporting to the executive officers utilizing a combination of the weighted average contribution made by each manager and a simple average of those contributions. The Committee also approved the fiscal year Outstanding Corporate Performance Plan which is based on a matrix of the Company's net operating margin and certain growth objectives. The Outstanding Corporate Performance Plan does not require any contributions by the Company until the Company achieves a Pre-Tax Margin Factor of 14%. The Pre-Tax Margin Factor is calculated by taking the pre-tax, pre-profit sharing income, excluding non-recurring charges, and dividing it by total revenue.

20

23

## Chief Executive Officer Compensation

For fiscal year 1998, Jon D. Tompkins served as Chief Executive Officer and Kenneth Levy served as Chairman of the Board. Effective July 1, 1998 Mr. Tompkins assumed the role of Chairman of the Board and Mr. Levy assumed the role of Chief Executive Officer. Base salary for Mr. Tompkins for fiscal 1999 has been set at $245,440, and the base salary for Mr. Levy has been set at $490,880 based on the recommendations provided by the Company's Human Resources Compensation staff. Options to purchase 50,809 shares of the Common Stock of the Company were granted to Mr. Tompkins and options to purchase 102,136 shares of the Common Stock of the Company were granted to Mr. Levy, each with standard four year vesting terms. For fiscal 1998 a bonus of $262,314 was paid to Mr. Levy and a bonus of $262,314 was paid to Mr. Tompkins. These payments were based on the formula approved by the Compensation Committee and the Board of Directors last year. In a year in which the Company faced many challenges, including the integration of two companies and severe economic downturn in the semiconductor and semiconductor capital equipment industries worldwide, the Company successfully integrated two companies and continued its profitability with revenues of $1.2 billion and earnings per share of $1.76.

MEMBERS OF THE COMPENSATION COMMITTEE

James W. Bagley
Leo J. Chamberlain
Lida Urbanek

21

24

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

The members of the Compensation Committee are set forth in the preceding section. There are no members of the Compensation Committee who were officers or employees of the Company or any of its subsidiaries during the fiscal year, formerly officers of the Company, or had any relationship otherwise requiring disclosure hereunder.

## PERFORMANCE GRAPH

The stock price performance shown on the graph following is not necessarily indicative of future price performance.

### COMPARISON OF FIVE YEAR CUMULATIVE TOTAL RETURN AMONG KLA-TENCOR CORPORATION, THE NASDAQ -- US INDEX AND THE HAMBRECHT & QUIST TECHNOLOGY INDEX*

|         | KLA-TENCOR CORPORATION | NASDAQ - US INDEX | HAMBRECHT & QUIST TECHNOLOGY INDEX |
|---------|------------------------|-------------------|-------------------------------------|
| 6/30/93 | 100.00                 | 100.00            | 100.00                              |
| 6/30/94 | 217.39                 | 100.96            | 102.21                              |
| 6/30/95 | 447.83                 | 134.77            | 180.82                              |
| 6/30/96 | 269.57                 | 173.03            | 211.32                              |
| 6/30/97 | 565.22                 | 210.38            | 275.98                              |
| 6/30/98 | 321.01                 | 277.69            | 349.59                              |

- - - - - - - - - - - - - - -

* Assumes $100 invested on June 30, 1993. The Company's fiscal year end is June 30.

22

25

CERTAIN TRANSACTIONS

In connection with the merger between KLA Instruments Corporation and Tencor Instruments (effective April 30, 1997) the Company entered into identical employment arrangements, subsequently amended, with Kenneth Levy, Jon D. Tompkins and Kenneth L. Schroeder, all executive officers of the Company. The arrangements, as amended, provide that certain benefits would be paid if certain events took place after April 30, 1997. The purpose of these arrangements is to retain the services of Messrs. Levy, Tompkins and Schroeder to ensure the continued smooth transition associated with the Merger. The terms of those arrangements provide that if an individual were to leave the Company after April 30, 1998, subject to releasing the Company from all claims, and in connection with working part-time for 36 months, he will receive (i) his base salary for the first 24 months of part-time employment, (ii) a mutually agreeable level of compensation per month for the final 12 months of part-time employment, (iii) an annual bonus (based on an achievement of 100% of bonus objectives) in the fiscal year of his transition to part-time employment, (iv) a bonus paid in the fiscal year following the payment of the annual bonus above, (based on achievement of 100% of his individual bonus objectives) and (v) a pro-rated bonus for the fiscal year in which part-time employment ended. During the periods of part-time employment, all options to exercise stock of the Company which were granted more than 12 months prior to the termination of full-time employment will continue to vest. The same benefits shall be payable in the event the Company terminates his employment without cause. If he is terminated for cause (defined as (i) gross negligence or willful misconduct in connection with the performance of duties, (ii) conviction of or plea of nolo contendere to any felony, or (iii) the embezzlement or misappropriation of Company property) then he will receive a lump-sum payment equal to 25% of his base salary.

COMPLIANCE WITH SECTION 16(a) OF THE SECURITIES EXCHANGE ACT OF 1934

Section 16(a) of the Exchange Act requires the Company's executive officers, directors, and persons who own more than ten percent of a registered class of the Company's equity securities to file reports of ownership and changes in ownership with the SEC. Executive officers, directors and greater than ten percent stockholders are required by SEC regulations to furnish the Company with copies of all Section 16(a) forms they file. Kenneth Levy, an executive officer and director of the Company filed an amendment to his Form 4 for the month ending August 30, 1997 in order to reflect transactions by a family member and a family trust, which had inadvertently been left off of the original Form 4. Mr. Levy filed the amendment when he discovered the error. Jon D. Tompkins, an executive officer and director of the Company filed an amendment to his Form 4 for the month ending July 31, 1997 to reflect ownership of an additional 1,500 shares of the Company's Common Stock owned by Mr. Tompkins. These shares were inadvertently not reported on the original Form 4 because they were held by Mr. Tompkins under the Tencor Instruments employee stock purchase plan prior to the Merger. Mr. Tompkins filed an amendment when he discovered the error. Dean O. Morton, a director of the Company, filed an amended Form 4 for the month ending August 30, 1997 to reflect an exercise of a stock option inadvertently not reported on the original Form 4. Mr. Morton filed an amendment when he discovered the error. Graham J. Siddall, an executive officer of the Company filed an amendment to his Form 4 for the month ending August 30, 1997 in order to reflect exercises of stock options which had inadvertently been left off the original Form 4. Mr. Siddall filed the amendment when he discovered the error.

OTHER MATTERS

The Company knows of no other matters to be submitted to the stockholders at the Annual Meeting. If any other matters properly come before the Annual Meeting, it is the intention of the persons named in the enclosed form of Proxy to vote the shares they represent as the Board of Directors may recommend.

THE BOARD OF DIRECTORS

September 30, 1998

23

26

## KLA-TENCOR CORPORATION

### 1998 OUTSIDE DIRECTOR OPTION PLAN

1. Purposes of the Plan. The purposes of this 1998 Outside Director Option Plan are to attract and retain the best available personnel for service as Outside Directors (as defined herein) of the Company, to provide additional incentive to the Outside Directors of the Company to serve as Directors, and to encourage their continued service on the Board.

All options granted hereunder shall be nonstatutory stock options.

2. Definitions. As used herein, the following definitions shall apply:

(a) "Board" means the Board of Directors of the Company.

(b) "Code" means the Internal Revenue Code of 1986, as amended.

(c) "Common Stock" means the common stock of the Company.

(d) "Company" means KLA-Tencor Corporation.

(e) "Director" means a member of the Board.

(f) "Disability" means total and permanent disability as defined in section 22(e)(3) of the Code.

(g) "Employee" means any person, including officers and Directors, employed by the Company or any Parent or Subsidiary of the Company. The payment of a Director's fee by the Company shall not be sufficient in and of itself to constitute "employment" by the Company.

(h) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(i) "Fair Market Value" means, as of any date, the value of Common Stock determined as follows:

(i) If the Common Stock is listed on any established stock exchange or a national market system, including without limitation the Nasdaq National Market or The Nasdaq SmallCap Market of The Nasdaq Stock Market, its Fair Market Value shall be the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such exchange or system on the date of determination as reported in The Wall Street Journal or such other source as the Administrator deems reliable;

27

(ii) If the Common Stock is regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value of a Share of Common Stock shall be the mean between the high bid and low asked prices for the Common Stock on the date of determination, as reported in The Wall Street Journal or such other source as the Board deems reliable; or

(iii) In the absence of an established market for the Common Stock, the Fair Market Value thereof shall be determined in good faith by the Board.

(j) "Inside Director" means a Director who is an Employee.

(k) "Option" means a stock option granted pursuant to the Plan.

(l) "Optioned Stock" means the Common Stock subject to an Option.

(m) "Optionee" means a Director who holds an Option.

(n) "Outside Director" means a Director who is not an Employee.

(o) "Parent" means a "parent corporation," whether now or hereafter existing, as defined in Section 424(e) of the Code.

(p) "Plan" means this 1998 Director Option Plan.

(q) "Share" means a share of the Common Stock, as adjusted in accordance with Section 10 of the Plan.

(r) "Subsidiary" means a "subsidiary corporation," whether now or hereafter existing, as defined in Section 424(f) of the Code.

3. Stock Subject to the Plan. Subject to the provisions of Section 10 of the Plan, the maximum aggregate number of Shares which may be optioned and sold under the Plan is one million Shares (the "Pool"). The Shares may be authorized, but unissued, or reacquired Common Stock.

If an Option expires or becomes unexercisable without having been exercised in full, the unpurchased Shares which were subject thereto shall become available for future grant or sale under the Plan (unless the Plan has terminated). Shares that have actually been issued under the Plan shall not be returned to the Plan and shall not become available for future distribution under the Plan.

2

28

### 4. Administration and Grants of Options under the Plan.

(a) Discretionary Grants. The Board (or its committee) shall have the authority, in its discretion, to make discretionary grants of Options hereunder to Outside Directors and to specify the terms and conditions of such discretionary Option grants.

(b) Automatic Grants. Outside Directors under this Plan shall receive automatic Option grants as follows:

(i) Each Outside Director shall be automatically granted an Option to purchase ten thousand (10,000) Shares (the "First Option") on the date on which such person first becomes an Outside Director, whether through election by the shareholders of the Company or appointment by the Board to fill a vacancy; provided, however, that an Inside Director who ceases to be an Inside Director but who remains a Director shall not receive a First Option.

(ii) Each Outside Director shall be automatically granted an Option to purchase five thousand (5,000) Shares (a "Subsequent Option") on the day of the Company's annual meeting of shareholders of each year provided he or she is then an Outside Director, and if as of such date, he or she shall have served on the Board for at least the preceding six (6) months.

(iii) The terms of a First Option granted hereunder shall be as follows:

(A) the term of the First Option shall be ten (10) years.

(B) the First Option shall be exercisable only while the Outside Director remains a Director of the Company, except as set forth in Sections 8 and 10 hereof.

(C) the exercise price per Share shall be 100% of the Fair Market Value per Share on the date of grant of the First Option.

(D) subject to Section 10 hereof, the First Option shall become exercisable as to twenty-five percent of the Shares subject to the First Option on the first anniversary of its date of grant and as to 1/48th of the Shares initially subject to the First Option each month thereafter, so as to be 100% vested on the fourth anniversary of the date of grant, provided that the Optionee continues to serve as a Director on such dates.

(iv) The terms of a Subsequent Option granted hereunder shall be as follows:

(A) the term of the Subsequent Option shall be ten (10) years.

(B) the Subsequent Option shall be exercisable only while the Outside Director remains a Director of the Company, except as set forth in Sections 8 and 10 hereof.

3

29

(C) the exercise price per Share shall be 100% of the Fair Market Value per Share on the date of grant of the Subsequent Option.

(D) subject to Section 10 hereof, the Subsequent Option shall become exercisable as to 100% percent of the Shares subject to the Subsequent Option on the fourth anniversary of its date of grant, provided that the Optionee continues to serve as a Director on such date.

(c) Powers of the Board. Subject to the provisions of the Plan and, in the case of a committee, the specific duties delegated by the Board to such committee, and subject to the approval of any relevant authorities, the Board (or its committee) shall have the authority, in its discretion:

(i) to modify or amend each Option, including the discretionary authority to change prospectively the vesting schedules of options, to extend the post-termination exercisability period of outstanding Options longer than is otherwise provided for and/or to accelerate the vesting of any outstanding Option;

(ii) to construe and interpret the terms of the Plan and awards granted pursuant to the Plan.

(d) Share Shortfalls. In the event that any Option granted under the Plan would cause the number of Shares subject to outstanding Options plus the number of Shares previously purchased under Options to exceed the Pool, then the remaining Shares available for Option grant shall be granted under Options to the Outside Directors on a pro rata basis. No further grants shall be made until such time, if any, as additional Shares become available for grant under the Plan through action of the Board or the shareholders to increase the number of Shares which may be issued under the Plan or through cancellation or expiration of Options previously granted hereunder.

5. Eligibility. Options may be granted only to Outside Directors. The Plan shall not confer upon any Optionee any right with respect to continuation of service as a Director or nomination to serve as a Director, nor shall it interfere in any way with any rights which the Director or the Company may have to terminate the Director's relationship with the Company at any time.

6. Term of Plan. The Plan shall become effective upon the date upon which it is approved by the Company's stockholders. It shall continue in effect until it is terminated under Section 11 of the Plan.

7. Form of Consideration. The consideration to be paid for the Shares to be issued upon exercise of an Option, including the method of payment, shall consist of (i) cash, (ii) check, (iii) other shares which (x) in the case of Shares acquired upon exercise of an option, have been owned by the Optionee for more than six (6) months on the date of surrender, and (y) have a Fair

4

30

Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which said Option shall be exercised, (iv) consideration received by the Company under a cashless exercise program implemented by the Company in connection with the Plan, or (v) any combination of the foregoing methods of payment.

8. Exercise of Option.

(a) Procedure for Exercise; Rights as a Shareholder. Any Option granted hereunder shall be exercisable at such times as are set forth in Section 4 hereof.

An Option may not be exercised for a fraction of a Share.

An Option shall be deemed to be exercised when written notice of such exercise has been given to the Company in accordance with the terms of the Option by the person entitled to exercise the Option and full payment for the Shares with respect to which the Option is exercised has been received by the Company. Full payment may consist of any consideration and method of payment allowable under Section 7 of the Plan. Until the issuance (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company) of the stock certificate evidencing such Shares, no right to vote or receive dividends or any other rights as a shareholder shall exist with respect to the Optioned Stock, notwithstanding the exercise of the Option. A share certificate for the number of Shares so acquired shall be issued to the Optionee as soon as practicable after exercise of the Option. No adjustment shall be made for a dividend or other right for which the record date is prior to the date the stock certificate is issued, except as provided in Section 10 of the Plan.

Exercise of an Option in any manner shall result in a decrease in the number of Shares which thereafter may be available, both for purposes of the Plan and for sale under the Option, by the number of Shares as to which the Option is exercised.

(b) Termination of Continuous Status as a Director. Subject to Section 10 hereof, in the event an Optionee's status as a Director terminates (other than upon the Optionee's death or Disability), the Optionee may exercise his or her Option, but only within thirty days (30) following the date of such termination, and only to the extent that the Optionee was entitled to exercise it on the date of such termination (but in no event later than the expiration of its ten (10) year term). To the extent that the Optionee was not entitled to exercise an Option on the date of such termination, and to the extent that the Optionee does not exercise such Option (to the extent otherwise so entitled) within the time specified herein, the Option shall terminate.

(c) Disability of Optionee. In the event Optionee's status as a Director terminates as a result of Disability, the Optionee may exercise his or her Option, but only within twelve (12) months following the date of such termination, and only to the extent that the Optionee was entitled to exercise it on the date of such termination (but in no event later than the expiration of its ten (10) year term). To the extent that the Optionee was not entitled to exercise an Option on the date of termination, or if he or she does not exercise such Option (to the extent otherwise so entitled) within the time specified herein, the Option shall terminate.

5

31

   (d) Death of Optionee. In the event of an Optionee's death, the Optionee's estate or a person who acquired the right to exercise the Option by bequest or inheritance may exercise the Option, but only within twelve (12) months following the date of death, and only to the extent that the Optionee was entitled to exercise it on the date of death (but in no event later than the expiration of its ten (10) year term). To the extent that the Optionee was not entitled to exercise an Option on the date of death, and to the extent that the Optionee's estate or a person who acquired the right to exercise such Option does not exercise such Option (to the extent otherwise so entitled) within the time specified herein, the Option shall terminate.

   9. Non-Transferability of Options. The Option may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent or distribution and may be exercised, during the lifetime of the Optionee, only by the Optionee.

   10. Adjustments Upon Changes in Capitalization, Dissolution, Merger or Asset Sale.

   (a) Changes in Capitalization. Subject to any required action by the shareholders of the Company, the number of Shares covered by each outstanding Option, the number of Shares which have been authorized for issuance under the Plan but as to which no Options have yet been granted or which have been returned to the Plan upon cancellation or expiration of an Option, as well as the price per Share covered by each such outstanding Option, (but not the number of Shares issuable pursuant to the automatic grant provisions of Section 4 hereof) shall be proportionately adjusted for any increase or decrease in the number of issued Shares resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the Common Stock, or any other increase or decrease in the number of issued Shares effected without receipt of consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of Shares subject to an Option.

   (b) Dissolution or Liquidation. In the event of the proposed dissolution or liquidation of the Company, to the extent that an Option has not been previously exercised, it shall terminate immediately prior to the consummation of such proposed action.

   (c) Merger or Asset Sale. In the event of a merger of the Company with or into another corporation or the sale of substantially all of the assets of the Company, outstanding Options may be assumed or equivalent options may be substituted by the successor corporation or a Parent or Subsidiary thereof (the "Successor Corporation"). If an Option is assumed or substituted for, the Option or equivalent option shall continue to be exercisable as provided in Section 4 hereof for so long as the Optionee serves as a Director or a director of the Successor Corporation. Following such assumption or substitution, if the Optionee's status as a Director or director of the Successor Corporation, as applicable, is terminated other than upon a voluntary

6

32

resignation by the Optionee, the Option or option shall become fully exercisable, including as to Shares for which it would not otherwise be exercisable. Thereafter, the Option or option shall remain exercisable in accordance with Sections 8(b) through (d) above.

If the Successor Corporation does not assume an outstanding Option or substitute for it an equivalent option, the Option shall become fully vested and exercisable, including as to Shares for which it would not otherwise be exercisable. In such event the Board shall notify the Optionee that the Option shall be fully exercisable for a period of thirty (30) days from the date of such notice, and upon the expiration of such period the Option shall terminate.

For the purposes of this Section 10(c), an Option shall be considered assumed if, following the merger or sale of assets, the Option confers the right to purchase or receive, for each Share of Optioned Stock subject to the Option immediately prior to the merger or sale of assets, the consideration (whether stock, cash, or other securities or property) received in the merger or sale of assets by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares). If such consideration received in the merger or sale of assets is not solely common stock of the successor corporation or its Parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of the Option, for each Share of Optioned Stock subject to the Option, to be solely common stock of the successor corporation or its Parent equal in fair market value to the per share consideration received by holders of Common Stock in the merger or sale of assets.

11. Amendment and Termination of the Plan.

(a) Amendment and Termination. The Board may at any time amend, alter, suspend, or discontinue the Plan, but no amendment, alteration, suspension, or discontinuation shall be made which would impair the rights of any Optionee under any grant theretofore made, without his or her consent. In addition, to the extent necessary and desirable to comply with any applicable law, regulation or stock exchange rule, the Company shall obtain shareholder approval of any Plan amendment in such a manner and to such a degree as required.

(b) Effect of Amendment or Termination. Any such amendment or termination of the Plan shall not affect Options already granted and such Options shall remain in full force and effect as if this Plan had not been amended or terminated.

12. Time of Granting Options. The date of grant of an Option shall, for all purposes, be the date determined in accordance with Section 4 hereof.

13. Conditions Upon Issuance of Shares. Shares shall not be issued pursuant to the exercise of an Option unless the exercise of such Option and the issuance and delivery of such Shares pursuant thereto shall comply with all relevant provisions of law, including, without limitation, the Securities Act of 1933, as amended, the Exchange Act, the rules and regulations promulgated thereunder, state securities laws, and the requirements of any stock exchange upon

7

33

which the Shares may then be listed, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

As a condition to the exercise of an Option, the Company may require the person exercising such Option to represent and warrant at the time of any such exercise that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares, if, in the opinion of counsel for the Company, such a representation is required by any of the aforementioned relevant provisions of law.

Inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained.

14. Reservation of Shares. The Company, during the term of this Plan, will at all times reserve and keep available such number of Shares as shall be sufficient to satisfy the requirements of the Plan.

15. Option Agreement. Options shall be evidenced by written option agreements in such form as the Board shall approve.

16. Shareholder Approval. The Plan shall be subject to approval by the shareholders of the Company within twelve (12) months after the date the Plan is adopted. Such shareholder approval shall be obtained in the degree and manner required under applicable state and federal law and any stock exchange rules.

8

34

## KLA-TENCOR CORPORATION

### Proxy for 1998 Annual Meeting of Stockholders

#### THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

The undersigned, revoking all prior proxies, hereby appoints Kenneth Levy and Lisa C. Berry, and each of them, as Proxies with full power of substitution, to represent and vote as designated in this proxy any and all shares of the common stock of KLA-Tencor Corporation (the "Company"), held or owned by or standing in the name of the undersigned on the Company's books on September 18, 1998, at the Annual Meeting of Stockholders of the Company to be held at the Company's offices at One Technology Drive, Milpitas, California 95035, at 11:00 a.m. local time on Tuesday, November 17, 1998 and any continuation or adjournment thereof, with all powers the undersigned would possess if personally present at the meeting.

The undersigned hereby directs and authorizes said Proxies and each of them, or their substitute or substitutes, to vote as specified with respect to the proposals listed on the reverse side or, if no specification is made, to vote in favor thereof.

The undersigned hereby further confers upon said Proxies, and each of them, or their substitute or substitutes, discretionary authority to vote with respect to all other matters that may properly come before the meeting or any continuation or adjournment thereof.

The undersigned hereby acknowledges receipt of: (a) Notice of Annual Meeting of Stockholders of the Company, (b) accompanying Proxy Statement, and (c) Annual Report to Stockholders for the year ending June 30, 1998.

CONTINUED AND TO BE SIGNED ON REVERSE SIDE

SEE REVERSE SIDE

35
/ X /  Please mark votes as in this example.

THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS OF THE COMPANY. THE
BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE NOMINEES FOR DIRECTOR AND FOR
PROPOSALS 2, 3, 4 AND 5.

1.    To elect Class III directors to serve for a three year term and until their
successors are elected. Nominees: James W. Bagley, Edward W. Barnholt, Dean O.
Morton and Kenneth L. Schroeder.

            FOR                    WITHHELD
            / /                      / /

      / /
            --------------------------------------------------
            For all nominees, except as noted above.

2.    To approve amendments to the 1997 Employee Stock Purchase Plan to increase
the number of shares of Common Stock of the Company reserved for issuance
thereunder by 1,000,000 shares.

            FOR             AGAINST              ABSTAIN
            / /               / /                  / /

3.    To approve amendments to the 1997 Employee Stock Purchase Plan to increase
the number of shares of Common Stock of the Company reserved for issuance
thereunder on the first day of each subsequent fiscal year by the lesser of (a)
2,000,000 shares or (b) the number of shares which the Company estimates (based
on the previous 12-month period) it will be required to issue under the 1997
Employee Stock Purchase Plan during the forthcoming fiscal year.

            FOR             AGAINST              ABSTAIN
            / /               / /                  / /

4.    To approve the 1998 Outside Director Option Plan and to reserve for
issuance thereunder 1,000,000 shares of the Common Stock of the Company.

            FOR             AGAINST              ABSTAIN
            / /               / /                  / /

5.    To ratify the appointment of PricewaterhouseCoopers LLP as independent
accountants of the Company for the fiscal year ending June 30, 1999.

            FOR             AGAINST              ABSTAIN
            / /               / /                  / /


In their discretion, the proxy holders are authorized to vote on all such other
matters as may properly come before the meeting or any adjournment thereof.

/ /    Mark here if you plan to attend the meeting

/ /    Mark here for address change and note below

Please sign exactly as your name appears on your stock certificate(s), date and
return this Proxy promptly in the reply envelope provided. Please correct your
address before returning this Proxy. Persons signing in a fiduciary capacity
should so indicate. If shares are held by joint tenants or as community
property, both should sign.


Signature: _____    Date: _____
Signature: _____    Date: _____

                          [DETACH HERE]

**SCHEDULE 14A INFORMATION**
**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934**

Filed by the Registrant  ☒
Filed by a Party other than the Registrant  ☐
Check the appropriate box:
☐    Preliminary Proxy Statement
☐    Confidential, for Use of the Commission Only (as permitted by Rule 14a–6(e)(2))
☒    Definitive Proxy Statement
☐    Definitive Additional Materials
☐    Soliciting Material Pursuant to §240.14a–12

# KLA – TENCOR CORPORATION

**(Name of Registrant as Specified in its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):
☒    No fee required.
☐    Fee computed on table below per Exchange Act Rules 14a–6(i)(1) and 0–11.
　　(1)    Title of each class of securities to which transaction applies:

　　(2)    Aggregate number of securities to which transaction applies:

　　(3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0–11 (set forth the amount on which the filing fee is calculated and state how it was determined):

　　(4)    Proposed maximum aggregate value of transaction:

　　(5)    Total fee paid:

☐    Fee paid previously with preliminary materials.
☐    Check box if any part of the fee is offset as provided by Exchange Act Rule 0–11(a)(2) and identify the filing for which the offsetting fee was paid previously.  Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
　　(1)    Amount Previously Paid:

　　(2)    Form, Schedule or Registration Statement No.:

　　(3)    Filing Party:

　　(4)    Date Filed:



### NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
October 18, 2004

To the Stockholders:

### YOUR VOTE IS IMPORTANT

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders of KLA–Tencor Corporation (the "Company"), a Delaware corporation, will be held on Monday, October 18, 2004 at 1:00 p.m., local time, at the Company's offices located at Three Technology Drive, Milpitas, California 95035, for the following purposes:

1. To elect three Class III directors to each serve for a three–year term and until their successors are duly elected.

2. To approve the Company's 2004 Equity Incentive Plan, including approval of its material terms and performance goals for purposes of Internal Revenue Code Section 162(m).

3. To ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2005.

4. To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

The foregoing items of business are more fully described in the Proxy Statement accompanying this Notice.

Only stockholders of record at the close of business on August 23, 2004 are entitled to notice of, and to vote at, the Annual Meeting and any adjournment or postponement thereof.

Sincerely,

Stuart J. Nichols
Assistant Secretary
San Jose, California

September 9, 2004

All stockholders are cordially invited to attend the Annual Meeting in person; however, to assure your representation at the Annual Meeting, you are requested to complete, sign and date the enclosed proxy card and return it in the enclosed envelope or follow the instructions on the enclosed proxy card to vote by telephone or via the Internet. Any stockholder attending the Annual Meeting may vote in person even if he or she returned a proxy card.

81

2004 ANNUAL MEETING OF STOCKHOLDERS
OF
KLA–TENCOR CORPORATION

To be held on October 18, 2004

PROXY STATEMENT

## QUESTIONS AND ANSWERS REGARDING SOLICITATION AND VOTING

**Why am I receiving these materials?**

The Board of Directors of KLA–Tencor Corporation ("KLA–Tencor," the "Company" or "we") is providing these proxy materials for you in connection with KLA–Tencor's Annual Meeting of Stockholders to be held on Monday, October 18, 2004 at 1:00 p.m. local time. As a stockholder of record, you are invited to attend the Annual Meeting, which will be held at our offices at Three Technology Drive, Milpitas, California 95035. The purposes of the Annual Meeting are set forth in the accompanying Notice of Annual Meeting of Stockholders and this Proxy Statement.

These proxy solicitation materials and the enclosed Annual Report on Form 10–K for the fiscal year ended June 30, 2004, including financial statements, were first mailed on or about September 9, 2004 to all stockholders entitled to vote at the Annual Meeting. KLA–Tencor's principal executive offices are located at 160 Rio Robles, San Jose, California 95134, and our telephone number is (408) 875–3000.

**How may I obtain KLA–Tencor's Annual Report?**

A copy of our Annual Report on Form 10–K was delivered with this Proxy Statement. It is also available free of charge on the Internet from the Securities and Exchange Commission's website at www.sec.gov, as well as on our website at www.kla–tencor.com.

## QUESTIONS AND ANSWERS ABOUT THE ANNUAL MEETING

**Who may vote at the Annual Meeting?**

You may vote if our records showed that you owned shares of KLA–Tencor Common Stock as of August 23, 2004 (the "Record Date"). At the close of business on that date, we had a total of 196,247,543 shares of Common Stock issued and outstanding, which were held of record by approximately 971 stockholders. As of the Record Date, we had no shares of Preferred Stock outstanding. You are entitled to one vote for each share that you own.

**What proposals are being voted on at the Annual Meeting?**

In addition to such other business as may properly come before the Annual Meeting or any adjournment thereof, the following three proposals will be presented at the Annual Meeting:

1. Electing three Class III directors to each serve for a three–year term and until their successors are duly elected;

2. Approving the Company's 2004 Equity Incentive Plan, including approval of its material terms and performance goals for purposes of Internal Revenue Code Section 162(m); and

3. Ratifying the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2005.

82

**How can I vote if I own shares directly?**

If your shares are registered directly in your name with our transfer agent, you are considered, with respect to those shares, the stockholder of record, and these proxy materials are being sent directly to you. You may vote in accordance with the instruction described below. If you hold your shares in your own name as a holder of record, you may instruct the proxy holders how to vote your common stock in the following ways:

1. **By Telephone:** Use the toll free telephone number provided on the proxy card (specific instructions for using the telephone voting system are on the proxy card);

2. **Internet:** Use the Internet voting site listed on the proxy card (specific instructions for using the Internet voting system are on the proxy card);

3. **By Mail:** Complete, sign, date and mail the proxy card in the postage paid envelope that we have provided; or

4. **In Person:** Attend the Annual Meeting and vote your shares in person.

Whichever of these methods you select to transmit your instructions, the proxy holders will vote your shares in accordance with those instructions.

If you sign and return a proxy card without giving specific voting instructions, your shares will be voted as recommended by our Board of Directors.

**How may I vote if my shares are held in a stock brokerage account, by a bank or other nominee?**

If your shares are held in a stock brokerage account or by a bank or other nominee, you are considered the beneficial owner of shares held in street name, and these proxy materials are being forwarded to you by your broker or nominee who is considered, with respect to those shares, the stockholder of record. As the beneficial owner, you have the right to direct your broker on how to vote and you are also invited to attend the Annual Meeting. However, since you are not the stockholder of record, you may not vote these shares in person at the Annual Meeting. Your broker or nominee has forwarded instructions for you to use in directing the broker or nominee regarding how to vote your shares.

If a broker, bank or other nominee holds your shares, you will receive instructions from them that you must follow in order to have your shares voted.

**Can I change my vote?**

You may change your vote at any time prior to the vote at the Annual Meeting.
To change your proxy instructions if you are a holder of record, you must:

1. Advise our Assistant Secretary in writing at our principal executive office before the proxy holders vote your shares that you wish to revoke your proxy instructions; or

2. Deliver proxy instructions dated after your earlier proxy instructions as follows:

   (a) **By Telephone:** Use the toll free telephone number provided on the proxy card to vote again prior to 11:59 P.M. EST on October 17, 2004 (specific instructions for using the telephone voting system are on the proxy card);

   (b) **By Internet:** Use the Internet voting site listed on the proxy card to vote again prior to 11:59 P.M EST on October 17, 2004 (specific instructions for using the Internet voting system are on the proxy card);

   (c) **By Mail:** Complete, sign, date and mail another proxy card bearing a later date and deliver such proxy card prior to 11:59 P.M. EST on October 17, 2004; or

   (d) **In Person:** Attend the Annual Meeting and vote your shares in person.

83

| How are votes counted? | The Annual Meeting will be held if a majority of the outstanding Common Stock entitled to vote is represented at the Annual Meeting. If you have returned valid proxy instructions or attend the Annual Meeting in person, your Common Stock will be counted for the purpose of determining whether there is a quorum, even if you wish to abstain from voting on some or all matters at the Annual Meeting. |
|---|---|
| Who will bear the cost of this proxy solicitation? | We will pay the cost of this proxy solicitation. KLA–Tencor has retained the services of Automatic Data Processing ("ADP") and D.F. King to aid in the solicitation of proxies from brokers, bank nominees and other institutional owners. We estimate that we will pay ADP fees of approximately $100,000 for this solicitation activity and for forwarding solicitation material to beneficial and registered stockholders and processing the results. We estimate that we will pay D.F. King approximately $10,000 for this solicitation activity. Certain of our directors, officers and regular employees, without additional compensation, may solicit proxies personally or by telephone. |
| Can my broker vote my shares if I do not instruct him or her how I would like my shares voted? | Yes, except with respect to the proposal to approve the Company's 2004 Equity Incentive Plan. If you do not give your broker voting instructions with respect to Proposal Two, approval of the 2004 Equity Incentive Plan, the broker will be prevented from voting shares held in your brokerage account (a "broker non–vote"). The New York Stock Exchange ("NYSE") has issued regulations which prohibit bankers, brokers or other nominees that are NYSE member organizations from voting in favor of proposals related to equity compensation plans unless they receive specific instructions from the beneficial owner of the shares to vote in that manner. In addition, brokers who are members of the National Association of Securities Dealers ("NASD") are also prohibited from voting on such proposals without specific instructions from beneficial holders. Thus, all shares that you hold through a broker or other nominee who is a NYSE or NASD member organization will only be voted on Proposal Two if you have provided specific voting instructions to your broker or other nominee with respect to Proposal Two. |
| Are abstentions and broker non–votes counted? | Shares that are voted "FOR," "AGAINST," "WITHHELD" or "ABSTAIN" are treated as being present for purposes of determining the presence of a quorum and are also treated as shares entitled to vote at the Annual Meeting ("Votes Cast"). |
| | Since abstentions will be counted for purposes of determining both (i) the presence or absence of a quorum for the transaction of business and (ii) the total number of Votes Cast with respect to a proposal (other than the election of directors), abstentions will have the same effect as a vote against the proposal (other than election of directors). |
| | Shares that are subject to a broker non–vote are counted for purposes of determining whether a quorum exists but not for purposes of determining whether a proposal has passed. Accordingly, broker non–votes will not affect the outcome of the voting on a proposal that requires a majority of the Votes Cast. |

84

| | |
|---|---|
| **How does the Board of Directors recommend that I vote?** | The Board of Directors recommends that stockholders vote as follows:<br>   "FOR" the election of the Class III Directors—Edward W. Barnholt, Stephen P. Kaufman and Kenneth L. Schroeder to the Board of Directors;<br>   "FOR" approval of the Company's 2004 Equity Incentive Plan, including approval of its material terms and performance goals for purposes of Internal Revenue Code Section 162(m); and<br>   "FOR" ratification of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2005.<br><br>When proxies are properly dated, executed and returned, the shares represented by such proxies will be voted at the Annual Meeting in accordance with the instructions of the stockholder. However, if no specific instructions are given, the shares will be voted in accordance with the recommendations of our Board of Directors and as the proxy holders may determine in their discretion with respect to any other matters that properly come before the meeting. |
| **Will any other business be transacted at the Annual Meeting?** | We are not aware of any matters to be presented other than those described in this Proxy Statement. If any matters not described in the Proxy Statement are properly presented at the Annual Meeting, the proxy holders will use their own judgment to determine how to vote your shares. If the Annual Meeting is adjourned or postponed, the proxy holders can vote your shares on the new meeting date as well, unless you have revoked your proxy instructions. |
| **Can I present other business to be transacted at the Annual Meeting?** | Any stockholder may present a matter from the floor for consideration at a meeting of stockholders so long as certain procedures are followed. Under our bylaws, as amended, a stockholder notice must be delivered to, or mailed and received by, KLA–Tencor (attention: Assistant Secretary) at least 120 days prior to the annual meeting of stockholders (under the assumption that the next annual meeting of stockholders will occur on the anniversary of the same calendar day as the day of the most recent annual meeting of stockholders). |
| **What is required in a stockholder's notice to present other business to be transacted?** | The stockholder's notice must set forth, as to each proposed matter, the following:<br>1.   A brief description of the proposed matter and reasons for conducting such business at the meeting;<br><br>2.   Name and address, as they appear on KLA–Tencor's books, of the stockholder;<br><br>3.   The class and number of shares of KLA–Tencor that are beneficially owned by the stockholder;<br><br>4.   Any material interest of the stockholder in such business; and<br><br>5.   Any other information that is required to be provided by such stockholder pursuant to Regulation 14A under the Securities Exchange Act of 1934. |
| **Can I still present other business to be transacted if my notice is deficient?** | If the stockholder notice is not in compliance with the requirements set forth in our bylaws, the presiding officer of the meeting may refuse to acknowledge the matter. |

85

| | |
|---|---|
| **What is the deadline for stockholder proposals in connection with the 2005 Annual Meeting?** | Stockholders may present proposals for action at a future meeting only if they comply with the requirements of the proxy rules established by the Securities and Exchange Commission ("SEC") and the provisions of our bylaws. We must receive stockholder proposals that are intended to be presented by such stockholders at our 2005 Annual Meeting of Stockholders no later than May 12, 2005 to be considered for inclusion in the Proxy Statement and form of Proxy relating to that meeting. |
| | Stockholder proposals that are not intended to be included in our proxy materials for such meeting, but that are to be presented by the stockholder from the floor are subject to the advance notice provisions set forth above under **"Can I present other business to be transacted at the Annual Meeting?"** and other requirements set forth in our bylaws. |
| **How may I obtain a copy of KLA–Tencor's Bylaws?** | For a free copy of KLA–Tencor's bylaws, please contact our Investor Relations department at (408) 875–3600 or visit our website at www.kla–tencor.com/investors/contactinfo.html and fill out a request form. |
| **What should I do if I receive more than one set of voting materials?** | You may request delivery of a single copy of our future proxy statements and annual reports by writing to the address below or calling our Investor Relations department at the telephone number below. Stockholders may also request electronic delivery of our annual report and proxy statement by writing to the address below, calling our Investor Relations department at the telephone number below or via our website at www.icsdelivery.com/klatencor/index.html. |
| **May I get additional copies of these materials and the exhibits to the Annual Report?** | Certain stockholders who share an address are being delivered only one copy of this Proxy Statement and our 2004 Annual Report on Form 10–K. You may receive additional copies of this Proxy Statement and our Annual Report on Form 10–K for the fiscal year ended June 30, 2004 without charge or a copy of the exhibits to such Form 10–K for a reasonable fee (which shall be limited to our reasonable expenses in furnishing such exhibits) by sending a written request to KLA–Tencor Corporation, Attention: Investor Relations, 160 Rio Robles, San Jose, CA 95134. Requests may also be made by calling Investor Relations at KLA–Tencor at (408) 875–3600. |

86

## PROPOSAL ONE:
## ELECTION OF DIRECTORS

The Company has a classified Board of Directors currently comprised of three incumbent Class I directors (Kenneth Levy, Jon D. Tompkins and Lida Urbanek), four incumbent Class II directors (H. Raymond Bingham, Robert T. Bond, Richard J. Elkus, Jr. and Michael E. Marks) and three incumbent Class III directors (Edward W. Barnholt, Stephen P. Kaufman and Kenneth L. Schroeder). The Class I directors and the Class II directors will serve until the annual meetings of stockholders to be held in 2005 and 2006, respectively, or until their respective successors are duly elected and qualified. At each annual meeting, directors are elected for a full term of three years to succeed those directors whose terms expire at the annual meeting.

**Nominees**

The term of the three current Class III directors will expire on the date of the Annual Meeting. Three Class III directors of the Board of Directors are to be elected at the Annual Meeting. The Nominating and Governance Committee, consisting solely of independent directors as determined under the rules of the Nasdaq National Market, recommended the nominees set forth in this Proposal One, each of whom is an incumbent director. Based on that recommendation, the members of the Board of Directors unanimously resolved to nominate such individuals for election. The nominees for election by the stockholders to these three positions are:

- Edward W. Barnholt;
- Stephen P. Kaufman; and
- Kenneth L. Schroeder.

If elected, the nominees will serve as directors until the Company's annual meeting of stockholders in 2007, or until their successors are duly elected and qualified. If any of the nominees declines to serve or becomes unavailable for any reason, or a vacancy occurs before the election, the proxies may be voted for such substitute nominees as the Board of Directors may designate. As of the date of this proxy statement, the Board is not aware of any nominee who is unable or will decline to serve as a director.

**Vote Required and Recommendation**

If a quorum is present and voting, the three nominees for Class III directors receiving the highest number of affirmative votes will be elected as Class III directors. Votes withheld from any director and broker non-votes are counted for purposes of determining the presence or absence of a quorum but have no other legal effect on the selection of nominees for directors.

**THE MEMBERS OF THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMEND A VOTE "FOR" EACH OF THE CLASS III NOMINEES LISTED ABOVE.**

87

## INFORMATION ABOUT THE DIRECTORS AND THE NOMINEES

The following table sets forth certain information with respect to the Company's Board of Directors as of the date of this proxy statement:

**Nominees for Election as Class III Directors**

| | Principal Occupation of Board Members During the Past Five Years | Age | Director Since |
|---|---|---|---|
| Edward W. Barnholt | Edward W. Barnholt has been a Director of KLA–Tencor since 1995. Since May 1999, Mr. Barnholt has been President and Chief Executive Officer of Agilent Technologies, Inc. ("Agilent") and became Chairman of the Board of Agilent in November 2002. Before being named Agilent's Chief Executive Officer, Mr. Barnholt served as Executive Vice President and General Manager of Hewlett–Packard Company's Measurement Organization from 1998 to 1999. From 1990 to 1998, he served as General Manager of Hewlett–Packard Company's Test and Measurement Organization. He was elected a Senior Vice President of Hewlett–Packard Company in 1993 and an Executive Vice President in 1996. Mr. Barnholt also serves on the boards of directors of the Tech Museum of Innovation and Silicon Valley Manufacturing Group. | 61 | 1995 |
| Stephen P. Kaufman | Stephen P. Kaufman has been a Director of KLA–Tencor since November 2002. He has been a Senior Lecturer at the Harvard Business School since January 2001. He was a member of the board of directors of Arrow Electronics, Inc. ("Arrow") from 1994 to May 2003. From 1986 to June 2000, he was Chief Executive Officer of Arrow. From 1985 to June 1999, he was also Arrow's President. From 1994 to June 2002, he was Chairman of the Board of Arrow. Mr. Kaufman also serves on the boards of directors of Harris Corporation and Viacore, Inc. | 62 | 2002 |
| Kenneth L. Schroeder | Kenneth L. Schroeder joined KLA Instruments in 1979 and left in 1987 to pursue personal and other business interests. He returned to KLA Instruments in 1991. Mr. Schroeder has been Chief Executive Officer and a member of the Board of Directors of KLA–Tencor since July 1, 1999, as well as President since May 2004. He also held the position of President from November 1991 to July 2002. | 59 | 1991 |

88

**Class II Directors**

| | Principal Occupation of Board Members During the Past Five Years | Age | Director Since |
|---|---|---|---|
| **H. Raymond Bingham** | H. Raymond Bingham has been a Director of KLA−Tencor since October 1999. He served as President and Chief Executive Officer of Cadence Design Systems, Inc. ("Cadence") from May 1999 to April 2004. Mr. Bingham has been Chairman of the Board of Cadence since May 2004 and has been a director of Cadence since November 1997. From 1993 to April 1999, Mr. Bingham served as Executive Vice President and Chief Financial Officer of Cadence. Prior to joining Cadence, Mr. Bingham was Executive Vice President and Chief Financial Officer of Red Lion Hotels, Inc. for eight years. Mr. Bingham also serves on the boards of directors of Freescale Semiconductor, Inc., Onyx Software Corporation and Oracle Corporation. | 58 | 1999 |
| **Robert T. Bond** | Robert T. Bond has been a Director of KLA−Tencor since August 2000. From April 1996 to January 1998, Mr. Bond served as Chief Operating Officer of Rational Software Corporation. Prior to that, he held various executive positions at Rational Software Corporation. Mr. Bond was employed by Hewlett−Packard Company from 1967 to 1983 and held various management positions during his tenure there. Mr. Bond also serves on the boards of directors of Portal Software, MontaVista Software, Clarus Systems and DecisionPoint Applications, Inc. | 61 | 2000 |
| **Richard J. Elkus, Jr.** | Richard J. Elkus, Jr. has been a Director of KLA−Tencor since April 1997. He was Executive Vice President and Vice Chairman of the board of directors of Tencor Instruments from February 1994 until April 1997. In addition to KLA− Tencor he currently serves on the boards of directors of Sopra SA, Lam Research Corporation, Virage Logic Corporation, the Palo Alto Medical Foundation, the National Medal of Technology Foundation, and the Board of Trustees of the Scripps Research Institute. | 69 | 1997 |
| **Michael E. Marks** | Michael E. Marks has been a Director of KLA−Tencor since November 2003. He has been the Chief Executive Officer of Flextronics International Ltd. ("Flextronics") since January 1994 and also serves on its board of directors. Mr. Marks was Chairman of the Board of Flextronics from July 1993 to January 2003. Prior to joining Flextronics, he was President and Chief Executive Officer of Metcal, Inc., a precision heating instrument company. | 53 | 2003 |

89

**Class I Directors**

| | Principal Occupation of Board Members During the Past Five Years | Age | Director Since |
|---|---|---|---|
| **Kenneth Levy** | Kenneth Levy is a founder of KLA Instruments Corporation and since July 1, 1999 has been Chairman of the Board and a Director of KLA–Tencor. From July 1998 until June 30, 1999, he was Chief Executive Officer and a Director. From 1975 until April 30, 1997 he was Chief Executive Officer of KLA Instruments Corporation. He currently serves on the boards of directors of the following publicly traded companies: Juniper Networks, Inc., Extreme Networks, Inc., and PowerDsine, Inc. In addition, he is a Director Emeritus of SEMI, an industry trade association. | 61 | 1975 |
| **Jon D. Tompkins** | Jon D. Tompkins has been a Director of KLA–Tencor since April 1997. He was Chairman of the Board from July 1998 to June 1999, when he retired from such position. From May 1997 until July 1998, he was Chief Executive Officer. From April 1991 until April 1997, Mr. Tompkins was President and Chief Executive Officer of Tencor Instruments prior to its merger with KLA Instruments Corporation. He was a director of Tencor Instruments from 1991 until April 1997 and was appointed Chairman of the Board of Directors of Tencor Instruments in November 1993. Mr. Tompkins currently serves on the boards of directors of Cymer, Inc., Electro Scientific Industries, Inc. and Credence Systems Corporation. | 64 | 1997 |
| **Lida Urbanek** | Lida Urbanek has been a Director of KLA–Tencor since April 30, 1997. She is a private investor. She was a director of Tencor Instruments from August 1991 until April 30, 1997. | 61 | 1997 |

90

**PROPOSAL TWO:**
**APPROVAL OF THE COMPANY'S 2004 EQUITY INCENTIVE PLAN, INCLUDING APPROVAL OF ITS MATERIAL TERMS AND PERFORMANCE GOALS FOR PURPOSES OF INTERNAL REVENUE CODE SECTION 162(m)**

Approval of the 2004
Equity Incentive Plan

The Board of Directors is asking our stockholders to approve our 2004 Equity Incentive Plan, which will:

- Reserve 11,000,000 new shares of our Common Stock for issuance under the 2004 Equity Incentive Plan;

- Transfer up to an additional 1,500,000 shares subject to outstanding options under our 1982 Stock Option Plan and 2000 Nonstatutory Stock Option Plan if they expire or are forfeited without being exercised and terminate the 1982 Stock Option Plan (including its "evergreen" automatic replenishment feature) and 2000 Nonstatutory Stock Option Plan for any new grants; and

- Include the ability to grant restricted stock, stock appreciation rights, performance shares, performance units and deferred stock units.

The Company's stockholders are also being asked to approve the material terms of the 2004 Equity Incentive Plan and the performance goals thereunder for the purpose of helping awards under the 2004 Equity Incentive Plan qualify as "performance– based" compensation under Internal Revenue Code Section 162(m).

Any 2004 Equity Incentive Plan awards of restricted stock, performance shares, performance units or deferred stock units with a per share or unit purchase price lower than 100% of fair market value on the grant date shall be counted against the total number of shares issuable under the plan as 1.8 shares for every one share subject thereto.

As of June 30, 2004, options to purchase a total of 29,432,566 shares were

outstanding under our active stock option plans as follows:

| | |
|---|---|
| 1982 Stock Option Plan | 20,343,266 |
| 2000 Nonstatutory Stock Option Plan | 8,816,802 |
| 1998 Outside Director Option Plan | 272,498 |

As of June 30, 2004, our 1982 Stock Option Plan had 12,647,812 shares remaining available for issuance and was scheduled to expire in 2006. Moreover, our 1982 Stock Option Plan has an "evergreen" automatic annual share replenishment feature whereby on the first day of each of our fiscal years, an amount of shares equal to 3% of our outstanding shares of common stock on the last day of each fiscal year plus the number of common stock shares that we repurchase on the open market for reissuance under the Plan can be added to the Plan. Pursuant to this "evergreen" annual share replenishment feature, on July 1, 2004 an additional 5,903,603 shares as of June 30, 2004 were added to the 1982 Stock Option Plan. As of June 30, 2004, our 2000 Nonstatutory Stock Option Plan had 3,098,870 shares remaining available for issuance and was scheduled to expire in 2010. If our stockholders approve this proposal, both the 1982 Stock Option Plan (including its "evergreen" feature) and the 2000 Nonstatutory Stock Option Plan shall be terminated for any new grants.

Proposed new accounting regulations are expected to require companies to record a charge to earnings for employee and director stock option grants, including options granted under plans similar to the proposed 2004 Equity Incentive Plan. The extent to which we will make grants of awards under the 2004 Equity

91

Incentive Plan will depend on the developments in these accounting regulations as well as several other factors, including our assessment of the impact of the final rules on our earnings, actions by other companies (particularly those with whom we compete for employees and directors) with respect to the design and operation of equity incentive plans, and the attitude of financial analysts and investors towards these potentially significant non–cash charges. The 2004 Equity Incentive Plan will allow us to grant a wider range of awards than is permitted under our current stock option plans, including restricted stock, stock appreciation rights, performance shares, performance units and deferred stock units, which will help us achieve our goal of attracting, retaining and motivating our talented personnel. We believe that the 2004 Equity Incentive Plan will be an essential element of a competitive compensation package.

Our 2004 Equity Incentive Plan has been developed to replace our 1982 Stock Option Plan and 2000 Nonstatutory Stock Option Plan and to supplement our 1998 Outside Director Option Plan. Currently, our 1982 Stock Option Plan authorizes our Board of Directors to grant stock options to our eligible employees and consultants. Our 2000 Nonstatutory Stock Option Plan authorizes our Board of Directors to grant stock options to our eligible employees and consultants who are not officers or members of the Board of Directors. Our 1998 Outside Director Option Plan provides for automatic formula option grants as well as discretionary option grants to members of our Board of Directors. Our Board of Directors approved the 2004 Equity Incentive Plan in July 2004 to replace the 1982 Stock Option Plan and 2000 Nonstatutory Stock Option Plan, subject to stockholder approval at the 2004 Annual Meeting.

As of June 30, 2004, the closing price of our common stock was $49.38 per share. The 2004 Equity Incentive Plan provides for the grant of options to purchase shares of our Common Stock, stock appreciation rights ("SARs"), restricted stock, performance shares, performance units, and deferred stock units to our employees, consultants and members of our Board of Directors. As of June 30, 2004, there were approximately 5,200 employees (including officers) and members of our Board of Directors eligible to participate in the 2004 Equity Incentive Plan. Please see the summary of the 2004 Equity Incentive Plan below.

**Vote Required and Recommendation**

If a quorum is present and voting, the affirmative vote of a majority of the votes cast will be required to approve the adoption of the 2004 Equity Incentive Plan. Our executive officers and members of our Board of Directors have an interest in this proposal as they may receive awards under the 2004 Equity Incentive Plan.

**THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" APPROVAL OF THE COMPANY'S 2004 EQUITY INCENTIVE PLAN, INCLUDING APPROVAL OF ITS MATERIAL TERMS AND PERFORMANCE GOALS FOR PURPOSES OF INTERNAL REVENUE CODE SECTION 162(M).**

**SUMMARY OF THE 2004 EQUITY INCENTIVE PLAN**

The essential features of the 2004 Equity Incentive Plan are summarized below. This summary does not purport to be complete and is subject to, and qualified in its entirety by, the provisions of the 2004 Equity Incentive Plan, which is attached as Appendix A. Capitalized terms used herein and not defined shall have the meanings set forth in the 2004 Equity Incentive Plan.

92

| General | The purposes of the 2004 Equity Incentive Plan are to attract and retain the best available personnel for positions of substantial responsibility, provide additional incentive to our employees and consultants, and promote the success of our business. |
|---|---|
| Administration | The 2004 Equity Incentive Plan may be administered by our Board of Directors or a committee, which our Board of Directors may appoint from among its members (the "Administrator"). Subject to the provisions of the 2004 Equity Incentive Plan, the Administrator has the authority to: (i) interpret the plan and apply its provisions; (ii) prescribe, amend or rescind rules and regulations relating to the 2004 Equity Incentive Plan; (iii) select the persons to whom awards are to be granted; (iv) subject to individual fiscal year limits applicable to each type of award, determine the number of shares or equivalent units to be made subject to each award; (v) determine whether and to what extent awards are to be granted; (vi) determine the terms and conditions applicable to awards generally and of each individual award (including the provisions of the award agreement to be entered into between the Company and the participant); (vii) amend any outstanding award subject to applicable legal restrictions (except repricing an option or SAR, unless stockholder approval is obtained); (viii) authorize any person to execute, on our behalf, any instrument required to effect the grant of an award; (ix) approve forms of agreement for use under the Plan; (x) allow participants to satisfy withholding tax obligations by electing to have the Company withhold from the shares or cash to be issued upon exercise, vesting of an award (or distribution of a deferred stock unit) that number of shares or cash having a fair market value equal to the minimum amount required to be withheld; and (xi) subject to certain limitations, take any other actions deemed necessary or advisable for the administration of the 2004 Equity Incentive Plan. All decisions, interpretations and other actions of the Administrator shall be final and binding on all holders of options or rights and on all persons deriving their rights therefrom. |
| Discount Award Limitations | Options and SARs may not be granted with an exercise price lower than 100% of the fair market value of the underlying shares. |
| Shares Counted Against the Plan | Any 2004 Equity Incentive Plan awards of restricted stock, performance shares, performance units or deferred stock units with a per share or unit purchase price lower than 100% of fair market value on the grant date shall be counted against the total number of shares issuable under the plan as 1.8 shares for every one share subject thereto. |
| No Repricing | The 2004 Equity Incentive Plan prohibits option or stock appreciation right repricing, including by way of an exchange for another award, unless stockholder approval is obtained. |
| Eligibility | The 2004 Equity Incentive Plan provides that awards may be granted to our employees, consultants and members of our Board of Directors. Incentive stock options may only be granted to employees. Any optionee who owns more than 10% of the combined voting power of all classes of outstanding stock of the Company (a "10% Stockholder") is not eligible for the grant of an incentive stock option unless the exercise price of the option is at least 110% of the fair market value of the common stock on the date of grant. |

93

**Code Section 162(m)**
**Performance Goals**

We have designed the 2004 Equity Incentive Plan so that it permits us to issue awards that qualify as performance-based under Section 162(m) of the Code. Thus, the Administrator may make performance goals applicable to a participant with respect to an award. At the Administrator's discretion, one or more of the following performance goals may apply: annual revenue, cash position, earnings per share, net income, operating cash flow, operating income, return on assets, return on equity, return on sales, and total stockholder return, all as determined in accordance with accounting principles generally accepted in the United States. Except for cash position, return on equity and total stockholder return, a performance goal may apply either to the Company or to one of its business units.

**Terms and Conditions of**
**Options**

Each option granted under the 2004 Equity Incentive Plan is evidenced by a written stock option agreement between the optionee and us and is subject to the following terms and conditions:

(a) *Exercise Price.* The exercise price of options may not be less than 100% of the fair market value of the common stock on the grant date the option. As our common stock is listed on the Nasdaq National Market, the fair market value is the closing sale price for the common stock (or the closing bid if no sales were reported) on the grant date.

(b) *Form of Consideration.* The means of payment for shares issued upon exercise of an option is specified in each option agreement and generally may be made by cash, check, other shares of our common stock owned by the optionee, delivery of an exercise notice together with irrevocable instructions to a broker to deliver to us the exercise price from sale proceeds, or by a combination thereof.

(c) *Exercise of the Option.* Each stock option agreement will specify the term of the option and the date when the option is to become exercisable. However, in no event shall an option granted under the 2004 Equity Incentive Plan be exercised more than 10 years after the date of grant. Moreover, in the case of an incentive stock option granted to a 10% stockholder, the term of the option shall be for no more than five years from the date of grant.

(d) *Termination of Employment.* If an optionee's employment terminates for any reason (other than death or permanent disability), all options held by such optionee under the 2004 Equity Incentive Plan expire upon the earlier of (i) such period of time as is set forth in his or her option agreement or (ii) the expiration date of the option. The optionee may exercise all or part of his or her option at any time before such expiration to the extent that such option was exercisable at the time of termination of employment.

(e) *Permanent Disability.* If an optionee is unable to continue employment with us as a result of permanent and total disability (as defined in the Code), all options held by such optionee under the 2004 Equity Incentive Plan shall expire upon the earlier of (i) 12 months after the date of termination of the optionee's employment or (ii) the expiration date of the option. The optionee may exercise all or part of his or her option at any time before such expiration to the extent that such option was exercisable at the time of termination of employment.

(f) *Death.* If an optionee dies while employed by us, his or her options shall expire upon the earlier of (i) 12 months after the optionee's death or

94

(ii) the expiration date of the options. The executor or other legal representative of the optionee may exercise all or part of the optionee's option at any time before such expiration with respect to all shares subject to such option.

(g) *ISO Limitation.* If the aggregate fair market value of all shares of common stock subject to an optionee's incentive stock option that are exercisable for the first time during any calendar year exceeds $100,000, the excess options shall be treated as nonstatutory options.

(h) *Other Provisions.* The stock option agreement may contain terms, provisions and conditions that are inconsistent with the 2004 Equity Incentive Plan as determined by the Administrator.

| | |
|---|---|
| **Option and SAR 162(m) Share Limit** | No participant may be granted stock options and stock appreciation rights to purchase more than 400,000 shares of common stock in any fiscal year, except that up to 1,200,000 shares may be granted in the participant's first fiscal year of service. |
| **Exercise Price and Other Terms of Stock Appreciation Rights** | The exercise price of SARs may not be less than 100% of the fair market value of the common stock on the grant date of the option. The Administrator, subject to the provisions of the 2004 Equity Incentive Plan (including the 162(m) share limit referred to above and the exercise price restrictions), shall have complete discretion to determine the terms and conditions of SARs granted under the 2004 Equity Incentive Plan. |
| **Payment of Stock Appreciation Right Amount** | Upon exercise of a SAR, the holder of the SAR shall be entitled to receive payment in an amount equal to the product of (X) the difference between the fair market value of a share on the date of exercise and the exercise price and (Y) the number of shares for which the SAR is exercised. |
| **Payment upon Exercise of Stock Appreciation Right** | At the discretion of the Administrator, payment to the holder of a SAR may be in cash, shares of our common stock or a combination thereof. To the extent that a SAR is settled in cash, the shares available for issuance under the 2004 Equity Incentive Plan shall not be diminished as a result of the settlement. |
| **Stock Appreciation Right Agreement** | Each SAR grant shall be evidenced by an agreement that shall specify the exercise price, the term of the SAR, the conditions of exercise, and such other terms and conditions as the committee, in its sole discretion, shall determine. |
| **Expiration of Stock Appreciation Rights** | SARs granted under the 2004 Equity Incentive Plan expire as determined by the Administrator, but in no event later than ten (10) years from date of grant. No SAR may be exercised by any person after its expiration. |
| **Restricted Stock and Performance Share 162(m) Share Limit** | No participant shall be granted restricted stock or performance share awards covering, in the aggregate, more than 300,000 shares in any of our fiscal years, except that up to 750,000 shares may be granted in the participant's first fiscal year of service. |
| **Grant of Restricted Stock** | Subject to the terms and conditions of the 2004 Equity Incentive Plan, restricted stock may be granted to our employees, consultants and members of our Board of Directors at any time and from time to time at the discretion of the Administrator. Subject to the 162(m) share limit set forth above, the Administrator shall have complete discretion to determine (i) the number of shares subject to a |

95

restricted stock award granted to any participant and (ii) the conditions for grant or for vesting that must be satisfied, which typically will be based principally or solely on continued provision of services but may include a performance-based component. Until the shares are issued, no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the underlying shares.

**Restricted Stock Award Agreement**

Each restricted stock grant shall be evidenced by an agreement that shall specify the purchase price (if any) and such other terms and conditions as the Administrator shall determine; *provided, however,* that if the restricted stock grant has a purchase price, the purchase price must be paid no more than ten (10) years following the date of grant.

**Grant of Performance Shares**

Subject to the terms and conditions of the 2004 Equity Incentive Plan, performance shares may be granted to our employees and consultants at any time and from time to time as shall be determined at the discretion of the Administrator. Subject to the 162(m) share limit set forth above, the Administrator shall have complete discretion to determine (i) the number of shares of our common stock subject to a performance share award granted to any service provider and (ii) the conditions that must be satisfied for grant or for vesting, which typically will be based principally or solely on achievement of performance milestones but may include a service-based component.

**Performance Share Award Agreement**

Each performance share grant shall be evidenced by an agreement that shall specify such other terms and conditions as the Administrator, in its sole discretion, shall determine.

**Grant of Performance Units**

Performance units are similar to performance shares, except that they shall be settled in cash equivalent to the fair market value of the underlying shares of our common stock, determined as of the vesting date. The shares available for issuance under the 2004 Equity Incentive Plan shall not be diminished as a result of the settlement of a performance unit.

**Performance Unit Award Agreement**

Each performance unit grant shall be evidenced by an agreement that shall specify such terms and conditions as shall be determined at the discretion of the Administrator. However, no participant shall be granted a performance unit award covering more than one million dollars in any of our fiscal years, except that an award covering up to three million dollars may be granted in the participant's first fiscal year of service.

**Deferred Stock Units**

Deferred stock units shall consist of a restricted stock, performance share or performance unit award that the Administrator, in its sole discretion, permits to be paid out in installments or on a deferred basis, in accordance with rules and procedures established by the Administrator. Deferred stock units are subject to the individual annual limits that apply to each type of award.

**Non-Transferability of Awards**

Unless determined otherwise by the Administrator, an award granted under the 2004 Equity Incentive Plan may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent or distribution and may be exercised, during the lifetime of the recipient, only by the recipient. If the Administrator makes an award granted under the 2004 Equity Incentive Plan transferable, such award shall contain such additional terms and conditions as the Administrator deems appropriate.

96

| | |
|---|---|
| Leave of Absence | In the event that a participant goes on a leave of absence, award vesting will cease until he or she returns to work, except as required by law or as otherwise determined by the Administrator. |
| Part–Time Service | Unless the Administrator provides otherwise or except as otherwise required by law, any service–based vesting of awards granted under the 2004 Equity Incentive Plan shall be extended on a proportionate basis in the event an employee transitions from a full–time to a part–time work schedule, or if not on a full–time work schedule, to a schedule requiring fewer hours of service. Such vesting shall be proportionally re–adjusted prospectively in the event that the employee subsequently becomes regularly scheduled to work additional hours of service. |
| Adjustment Upon Changes in Capitalization | In the event that our capital stock is changed by reason of any stock split, reverse stock split, stock dividend, combination or reclassification of our common stock or any other increase or decrease in the number of issued shares of common stock effected without receipt of consideration by us, appropriate proportional adjustments shall be made in the number and class of shares of stock subject to the 2004 Equity Incentive Plan, the individual fiscal year limits applicable to restricted stock, performance share awards, SARS and options, the number and class of shares of stock subject to any award outstanding under the 2004 Equity Incentive Plan, and the exercise price of any such outstanding option or SAR or other award. Any such adjustment shall be made by the Compensation Committee of our Board of Directors, whose determination shall he conclusive. |
| Change of Control | In the event of a change of control, the successor corporation (or its parent or subsidiary) will assume or substitute each outstanding award. If the successor corporation refuses to assume the awards or to substitute equivalent awards, such awards shall become 100% vested. In such event, the Administrator shall notify the participant that each award subject to exercise is fully exercisable for fifteen (15) days from the date of such notice and that the award terminates upon expiration of such period. |
| Amendment, Suspensions and Termination of the 2004 Equity Incentive Plan | Our Board of Directors may amend, suspend or terminate the 2004 Equity Incentive Plan at any time; *provided, however,* that stockholder approval is required for any amendment to the extent necessary to comply with Rule 16b–3 promulgated under the Securities Exchange Act of 1934 ("Rule–16b–3") or Section 422 of the Code, or any similar rule or statute. If Proposal Two is approved, the 2004 Equity Incentive Plan will terminate in June 2014. |

**FEDERAL TAX INFORMATION**

| | |
|---|---|
| Options | Options granted under the 2004 Equity Incentive Plan may be either "incentive stock options," as defined in Section 422 of the Cnde, or nonstatutory options. |
| | An optionee who is granted an incentive stock option will not recognize taxable income either at the time the option is granted or upon its exercise, although the exercise may subject the optionee to alternative minimum tax. |
| | Upon the sale or exchange of the shares more than two years after grant of the option and one year after exercising the option, any gain or loss will be treated as long–term capital gain or loss. If these holding periods are not satisfied, the optionee will recognize ordinary income at the time of sale or exchange equal to the difference between the exercise price and the lower of (i) the fair market value |

97

of the shares at the date of the option exercise or (ii) the sales price of the shares. A different rule for measuring ordinary income upon such a premature disposition may apply if the optionee is also an officer, director, or 10% Stockholder. Any gain or loss recognized on such a premature disposition of the shares in excess of the amount treated as ordinary income will be characterized as long–term or short–term capital gain or loss, depending on the holding period.

All options that do not qualify as incentive stock options are referred to as nonstatutory options. An optionee will not recognize any taxable income at the time the optionee is granted a nonstatutory option. However, upon its exercise, the optionee will recognize taxable income generally measured as the excess of the then fair market value of the shares purchased over the purchase price. Any taxable income recognized in connection with an option exercise by an optionee who is also our employee will be subject to tax withholding by us. Upon resale of such shares by the optionee, any difference between the sale price and the optionee's purchase price, to the extent not recognized as taxable income as described above, will be treated as long–term or short–term capital gain or loss, depending on the holding period.

**Stock Appreciation Rights**

No taxable income is reportable when a stock appreciation right is granted to a participant. Upon exercise, the participant will recognize ordinary income in an amount equal to the amount of cash received and the fair market value of any shares of our common stock received less the purchase price. Any additional gain or loss recognized upon any later disposition of the shares of our common stock would be capital gain or loss.

**Restricted Stock, Performance Units and Performance Shares**

A participant will not have taxable income upon grant (unless, with respect to restricted stock, he or she elects to be taxed at that time). Instead, he or she will recognize ordinary income at the time of vesting equal to the fair market value (on the vesting date) of the vested shares or cash received minus any amount paid for the shares of our vested common stock.

**Deferred Stock Units**

A participant will generally recognize employment tax (e.g., Social Security taxes) on the vesting date of a deferred stock award equal to the value of the vested shares received minus any amount paid for the shares. A participant will generally recognize income tax upon receipt of the deferred stock award shares in an amount equal to the value of the shares minus any amount paid for the shares.

**Tax Effect for Us**

We generally will be entitled to a tax deduction in connection with an award under the 2004 Equity Incentive Plan in an amount equal to the ordinary income realized by a participant and at the time the participant recognizes such income (for example, the exercise of a nonqualified stock option). Special rules limit the deductibility of compensation paid to our Chief Executive Officer and to each of our four most highly compensated executive officers. Under Section 162(m) of the Code, the annual compensation paid to any of these specified executives will be deductible only to the extent that it does not exceed $1,000,000. However, we can preserve the deductibility of certain compensation in excess of $1,000,000 if the conditions of Section 162(m) are met with respect to awards. These conditions include stockholder approval of the 2004 Equity Incentive Plan and performance goals under the 2004 Equity Incentive Plan, setting individual annual limits on each type of award, and certain other requirements. The 2004 Equity Incentive Plan has been designed to permit the committee to grant awards that qualify as performance–based for purposes of satisfying the conditions of Section 162(m),

98

thereby permitting us to continue to receive a federal income tax deduction in connection with such awards.

The foregoing is only a summary of the current effect of federal income taxation upon us and upon the participant, does not purport to be complete, and does not discuss the tax consequences of the participant's death or the income tax laws of any municipality, state or foreign country in which a participant may reside.

## ACCOUNTING TREATMENT

Currently, employee awards and awards to members of our Board of Directors with purchase prices at or above fair market value on the grant date typically do not result in any direct charge to our reported earnings. However, the fair market value of these awards is required to be disclosed in the notes to our financial statements. We must also disclose, in the notes to our financial statements, the pro forma impact these awards would have on our reported earnings and earnings per share if the fair value of the awards at the time of grant was treated as a compensation expense.

Currently, employee awards and awards to members of our Board of Directors with purchase prices below fair market value on the grant date result in a direct compensation expense that is typically equal to the "spread", i.e. the difference between the purchase price and the fair market value on the grant date. Typically, this expense is amortized over our earnings over the award's vesting period.

The Financial Accounting Standards Board intends to require mandatory expensing for equity awards for fiscal years commencing after December 15, 2004 (although such implementation may be delayed). In such event, we expect that all 2004 Equity Incentive Plan awards will result in direct charges to our reported earnings.

**New Plan Benefits**

We are unable to determine the benefits or amounts under the 2004 Equity Incentive Plan that will be received by or allocated to our executive officers named in the Summary Compensation Table, other employees or members of our Board of Directors.

**PROPOSAL THREE:**
**RATIFICATION OF APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR THE FISCAL YEAR ENDING JUNE 30, 2005.**

**Audit Committee Recommendation**

The Audit Committee has the sole authority to retain or dismiss our independent auditors. The Audit Committee has selected PricewaterhouseCoopers LLP, an independent registered public accounting firm, to audit the consolidated financial statements of the Company for its 2005 fiscal year. Before making its determination, the Audit Committee carefully considered that firm's qualifications as independent auditors.

The Board of Directors, following the Audit Committee's recommendation, unanimously recommends that the stockholders vote for ratification of such appointment.

Although ratification by stockholders is not required by law, the Board of Directors has determined that it is desirable to request approval of this selection by the stockholders. If the stockholders do not ratify the appointment of PricewaterhouseCoopers LLP, the Audit Committee may reconsider its selection.

**Attendance at the Annual Meeting**

Representatives of PricewaterhouseCoopers LLP are expected to be present at the Annual Meeting with the opportunity to make a statement if they desire to do so, and are expected to be available to respond to appropriate questions.

**Fees**

The aggregate fees billed by PricewaterhouseCoopers LLP, KLA-Tencor's independent auditors, in fiscal years 2004 and 2003 were as follows:

| Services Rendered/Fees | 2004 | 2003 |
|---|---|---|
| Audit fees [1] | $ 1,193,000 | $ 998,000 |
| Audit-Related Fees [2] | $ 109,000 | $ 0 |
| Total Audit and Audit-Related Fees | $ 1,302,000 | $ 998,000 |
| Tax Compliance | $ 1,051,000 | $ 1,129,000 |
| Tax Planning and Consulting | $ 571,000 | $ 528,000 |
| Total Tax Fees [3] | $ 1,622,000 | $ 1,657,000 |
| All Other Fees [4] | $ 171,000 | $ 174,000 |

[1]    For professional services rendered for the audits of annual financial statements set forth in KLA-Tencor's Annual Report on Form 10-K for fiscal years 2004 and 2003, the review of quarterly financial statements included in KLA-Tencor's Form 10-Qs for fiscal years 2004 and 2003 and fees for services related to statutory and regulatory filings or engagements.

[2]    For fiscal year ended 2004, assurance and related services related to accounting consultations, audits in connection with acquisitions and preparatory work related to the Sarbanes-Oxley Act of 2002.

[3]    For fiscal years ended 2004 and 2003, tax services for U.S, foreign tax and expatriate compliance and tax planning and consulting.

[4]    For fiscal years ended 2004 and 2003, fees for services other that those described above, including, but not limited to, publications, consulting services on expatriate and other special projects.

100

**Pre–approval Policies and Procedures**

The Audit Committee has adopted a policy regarding non–audit services provided by PricewaterhouseCoopers LLP, our independent auditors. First, the policy ensures the independence of our auditors by expressly naming all services that the auditors may not perform and reinforcing the principle of independence regardless of the type of service. Second, certain non–audit services such as tax–related services and acquisition advisory are permitted but limited in proportion to the audit fees paid. Third, the chair of the Audit Committee pre–approves non–audit services not specifically permitted under this policy and the Audit Committee reviews the annual plan and any subsequent engagements. Thus, all of the services described above under audit–related fees, tax fees and all other fees were approved by the Audit Committee pursuant to its pre–approval policies and procedures. On a quarterly basis, management provides written updates to the Audit Committee providing an update of audit and non–audit services, the amount of audit and non–audit service fees incurred to date, and the estimated cost to complete such services.

**Independence Assessment by Audit Committee**

The Company's Audit Committee considered and determined that the provision of the services provided by PricewaterhouseCoopers LLP as set forth herein are compatible with maintaining PricewaterhouseCoopers LLP's independence and approved all non–audit related fees and services.

**Vote Required Recommendation**

If a quorum is present and voting, the affirmative vote of the Votes Cast is needed to ratify the appointment of PricewaterhouseCoopers LLP as KLA–Tencor's independent registered public accounting firm, to audit the consolidated financial statements of the Company for its 2005 fiscal year.

**THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" THE RATIFACTION OF THE APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR THE FISCAL YEAR ENDING JUNE 30, 2005.**

## OUR CORPORATE GOVERNANCE PRACTICES

At KLA–Tencor we have always believed in strong and effective corporate governance procedures and practices. In that spirit, we have summarized several of our corporate governance practices below.

**Adopting Governance Guidelines**

The Board has adopted a set of corporate governance guidelines to establish a framework within which the Board will conduct its business and to guide management in its running of your Company. The governance guidelines can be found on our website at http://ir.kla–tencor.com/disclaimer1.cfm and are summarized below.

**Monitoring Board Effectiveness**

It is important that our Board and its committees are performing effectively and in the best interest of the Company and its stockholders. The Board and each committee are responsible for annually assessing their effectiveness in fulfilling their obligations. In addition, our Nominating and Governance Committee is charged with annually reviewing the Board and its membership.

**Board Committee Responsibilities**

The Board has three standing committees: the Audit Committee; the Compensation Committee; and the Nominating and Governance Committee. The Board has determined that each of the members of each of the committees of the Board has no material relationship with the Company (including any relationship that, in the opinion of the Board, would interfere with the exercise of independent judgment as a director) and is independent within the meaning of the Nasdaq National Market director independence standards, including in the case of the Audit Committee, the heightened "independence" standard required for such committee members.

Each Committee meets regularly and has a written charter approved by the Board, all of which were attached as appendices to the Proxy Statement related to our 2003 Annual Meeting, which was filed with the Securities and Exchange Commission on September 23, 2003 and are available via our website at www.kla–tencor.com. In addition, at each regularly scheduled Board meeting, a member of each Committee reports on any significant matters addressed by the Committee. In 2002, after reviewing the Sarbanes–Oxley Act of 2002 and the proposed rules of the SEC and the Nasdaq Stock Market, the Board revised all of its Committee charters to implement voluntarily the proposed standards and to expand the responsibilities of each Committee as well as establish independence and self– assessment requirements. The Board and each Committee regularly reviews the Committee charters.

**Conducting Formal Independent Sessions**

At the conclusion of each regularly scheduled Board meeting, the independent directors meet without KLA–Tencor management and the non–independent directors.

**Hiring Outside Advisors**

The Board and each of its Committees may retain outside advisors and consultants of their choosing at the Company's expense, without management's consent.

**Avoiding Conflicts of Interest**

KLA–Tencor expects its directors, executives and employees to conduct themselves with the highest degree of integrity, ethics and honesty. KLA–Tencor's credibility and reputation depend upon the good judgment, ethical standards and personal integrity of each director, executive and employee. In order to provide assurances to KLA–Tencor and its stockholders, KLA–Tencor has updated its Standards of Business Conduct to provide clear conflict of interest guidelines to its employees, as well as an explanation of reporting and investigatory procedures.

102

| | |
|---|---|
| **Providing Transparency** | KLA–Tencor believes it is important that stockholders understand our governance practices. In order to help ensure transparency of our practices we have posted information regarding our corporate governance procedures on our website at http://ir.kla–tencor.com/disclaimer1.cfm. |
| **Communications with the Board of Directors** | Although KLA–Tencor does not have a formal policy regarding communications with the Board, stockholders may communicate with the Board by writing to the Company at KLA–Tencor Corporation, Attention: Investor Relations, 160 Rio Robles, San Jose, CA 95134. Stockholders who would like their submission directed to a member of the Board may so specify, and the communication will be forwarded, as appropriate. |
| **Standards of Business Conduct** | The Board has adopted Standards of Business Conduct for all of the Company's employees and directors, including the Company's principal executive and senior financial officers. You can obtain a copy of our Standards of Business Conduct via our website at http://ir.kla–tencor.com/disclaimer1.cfm, or by making a written request to the Company at KLA–Tencor Corporation, Attention: Investor Relations, 160 Rio Robles, San Jose, CA 95134. We will disclose any amendments to the Standards of Business Conduct or waiver of a provision therefrom, on our website at the same address. |
| **Ensuring Auditor Independence** | KLA–Tencor has taken a number of steps to ensure the continued independence of our outside auditors. Our independent auditors report directly to the Audit Committee, which also has the ability to pre–approve or reject any non–audit services proposed to be conducted by our outside auditors. |
| **Stockholder Nominations to the Board** | Please see "**ABOUT THE BOARD OF DIRECTORS AND ITS COMMITTEES**". |

### ABOUT THE BOARD OF DIRECTORS AND ITS COMMITTEES

| | |
|---|---|
| **The Board of Directors** | The Board of Directors of the Company held a total of five meetings during the fiscal year ended June 30, 2004. The Board of Directors has an Audit Committee, a Compensation Committee and a Nominating and Governance Committee.<br><br>All directors other than Messrs. Levy, Schroeder and Tompkins meet the definition of independence within the meaning of the Nasdaq National Market director independence standards. None of the Company's directors fall outside of the SEC's 10% ownership safe harbor.<br><br>During the fiscal year ended June 30, 2004, all incumbent directors attended at least 85% of the total number of meetings of the Board of Directors and each director attended 100% of the aggregate of the total number of meetings held by all committees of the Board on which each such director served (during the periods that each such director served).<br><br>Although we do not have a formal policy regarding attendance by members of the Board at our annual meetings of stockholders, directors are encouraged to attend annual meetings of KLA–Tencor stockholders. Six directors attended the 2003 Annual Meeting of stockholders. |

<div align="center">103</div>

**Audit Committee**

The Audit Committee consists of Mr. Bingham, Mr. Bond, Mr. Elkus and Mr. Kaufman. During fiscal year 2004, Mr. Bingham was the chairman of the Audit Committee. The Audit Committee is responsible for appointing, compensating and overseeing the work of the Company's independent auditors, approving the services performed by the Company's independent auditors and for reviewing and evaluating the Company's accounting principles and its system of internal accounting controls. The Audit Committee held ten meetings during the last fiscal year.

**Compensation Committee**

The Compensation Committee consists of Mr. Barnholt, Mr. Bond, Mr. Marks and Ms. Urbanek. During fiscal year 2004, Mr. Bond was the chairman of the Compensation Committee. The Compensation Committee reviews and approves the Company's executive compensation policy and administers the Company's employee equity benefit plans. The Compensation Committee held three meetings during the last fiscal year.

**Nominating and Governance Committee**

The Nominating and Governance Committee consists of Mr. Barnholt and Mr. Elkus. Mr. Barnholt served as the chairman of the Nominating and Governance Committee during fiscal year 2004. The Nominating and Governance Committee nominated the three Class III directors for election at the Annual Meeting. The Nominating and Governance Committee is primarily responsible for identifying and evaluating the qualifications of all candidates for election to the Board of Directors, as well as reviewing corporate governance policies and procedures. The Nominating and Governance Committee held three meetings during the last fiscal year.

It is the Nominating and Governance Committee's policy to consider candidates recommended by stockholders who have owned at least 1% of the Company's outstanding shares for at least one year and who have evidenced intent to continue as a substantial stockholder for the long term. Stockholders wishing to submit recommendations must notify the Company (attention: Assistant Secretary) of their intent to do so and provide the Company with certain information set forth in Section 11 of our bylaws and all other information regarding nominees that is required to be provided pursuant to Regulation 14A of the Securities Exchange Act of 1934, or as otherwise requested by the Nominating and Governance Committee. In addition, stockholders may nominate candidates for the Board of Directors pursuant to the provisions of Section 11 of our bylaws and in conformance with the requirements of Regulation 14A of the Securities Exchange Act of 1934.

In considering candidates for director nomination, including evaluating any recommendations from stockholders as set forth above, the Nominating and Governance Committee only considers candidates who have demonstrated executive experience, have experience in an applicable industry, or significant high level experience in accounting, legal or a technical field applicable to the Company. In addition, in evaluating director candidates, the Nominating and Governance Committee considers all factors it considers appropriate, which may include strength of character, mature judgment, career specialization, relevant technical skills, diversity and the extent to which the candidate would fill a present need on the Board.

104

The Nominating and Governance Committee regularly assesses the appropriate size and composition of the Board, and whether any vacancies on the Board are expected. In the event that vacancies are anticipated, or otherwise arise, the Nominating and Governance Committee considers potential candidates that may come to its attention through current members of the Board, professional search firms, stockholders who have owned at least 1% of the Company's outstanding shares for at least one year and who have evidenced intent to continue as a substantial stockholder for the long term, or other persons. In evaluating properly submitted stockholder recommendations, the Nominating and Governance Committee uses the evaluation standards discussed above and seeks to achieve a balance of knowledge, experience and capability on the Board.

## DIRECTOR COMPENSATION

**Employee Directors**

Members of the Board of Directors who are employees do not receive any additional compensation for their services as directors.

**1998 Outside Director Plan**

Members of the Board who are not employees of the Company ("Outside Directors") receive benefits under the 1998 Outside Director Plan ("1998 Director Plan"), which was approved by the stockholders at the 1998 annual meeting of stockholders. Each Outside Director receives a nonstatutory stock option to purchase 10,000 shares of Common Stock as of the date on which such director first becomes an Outside Director (the "First Option"). If the new Outside Director does not join the Board at the beginning of the Company's fiscal year, the First Option will be pro rated to reflect the quarter in which such new Outside Director joins the Board. In addition, each Outside Director is automatically granted a nonstatutory stock option to purchase an additional 10,000 shares of Common Stock on the date of each subsequent annual meeting on which he or she remains an Outside Director.

The term of options granted under the 1998 Director Plan may not exceed 10 years. The 1998 Director Plan provides that the exercise price shall be equal to the fair market value of the Common Stock on the date of grant of the option. Options granted under the 1998 Director Plan become exercisable immediately upon the date of grant.

**Cash Compensation**

Each Outside Director receives an annual fee of $20,000 and $1,000 for each Board meeting they attend ($500 if participation is by telephone), plus reasonable expenses in attending such meeting. Audit Committee members receive $1,000 per committee meeting they attend ($500 if participation is by telephone). The Audit Committee chair receives an annual retainer of $10,000. Members of the Compensation Committee and the Nominating and Governance Committee receive $500 per committee meeting they attend ($250 if participation is by telephone).

## INFORMATION ABOUT EXECUTIVE OFFICERS

Set forth below are the names, ages and positions of the executive officers of KLA–Tencor September 9, 2004.

| Name and Position | Principal Occupation of the Executive Officers During the Past Five Years | Age |
|---|---|---|
| **Kenneth Levy**<br>**Chairman of the Board** | Kenneth Levy is a founder of KLA Instruments Corporation and since July 1, 1999 has been Chairman of the Board and a Director of KLA–Tencor. From July 1998 until June 30, 1999, he was Chief Executive Officer and a Director. From 1975 until April 30, 1997 he was Chief Executive Officer of KLA Instruments Corporation. He currently serves on the boards of directors of the following publicly traded companies: Juniper Networks, Inc., Extreme Networks, Inc., and PowerDsine, Inc. In addition, he is a Director Emeritus of SEMI, an industry trade association. | 61 |
| **Kenneth L. Schroeder**<br>**President & Chief**<br>**Executive Officer** | Kenneth L. Schroeder joined KLA Instruments in 1979 and left in1987 to pursue personal and other business interests. He returned to KLA Instruments in 1991. Mr. Schroeder has been Chief Executive Officer and a member of the Board of Directors of KLA–Tencor since July 1, 1999, as well as President since May 2004. He also held the position of President from November 1991 lo July 2002. | 59 |
| **John H. Kispert**<br>**Executive Vice President &**<br>**Chief Financial Officer** | John H. Kispert has been Chief Financial Officer and Executive Vice President since July 2000. From July 1999 to July 2000, Mr. Kispert was Vice President of Finance and Accounting. From February 1998 to July 1999, he was Vice President of Operations for the Wafer Inspection Group. Mr. Kispert joined KLA–Tencor in February 1995 and has held a series of other management positions within the Company. He currently serves on the board of directors of North American SEMI, an industry trade association. | 40 |
| **Richard P. Wallace**<br>**Executive Vice President,**<br>**Customer Group** | Richard P. Wallace has been Executive Vice President of the Customer Group since May 2004. He was Executive Vice President of the Wafer Inspection, Review & Analysis Group since July 2000. From July 1999 to June 2000, he was the Group Vice President for Lithography and Films. From April 1998 to June 1999, he was Vice President and General Manager of the Mirage Group. From 1995 to March 1998, he was Vice President and General Manager of the Wisard division. Mr. Wallace joined KLA–Tencor in 1988 and has held a series of other management positions. | 44 |
| **Dennis J. Fortino**<br>**Executive Vice President,**<br>**Corporate Operations** | Dennis J. Fortino has been Executive Vice President of Corporate Operations since May 2004. He was Executive Vice President of the Lithography & Parametric Solutions Group from July 1999 to May2004. From August 1997 to June 1999, he served as Vice President and General Manager of the Surfscan Division and from November1995 to July 1997, he served as the Vice President and General Manager of the Surface Metrology Division. Mr. Fortino served as Vice President and General Manager for Spectra–Physics Lasers from July 1991 to October 1995. | 58 |

106

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

**Principal Stockholders**

As of August 23, 2004, based on our review of filings made with the SEC, we are aware of the following entities being the beneficial owner of more than 5% of the Company's Common Stock:

| Name and Address | Number of Shares Beneficially Owned | Percent of Shares Beneficially Owned (1) |
|---|---|---|
| FMR Corp. (2)(3)<br>82 Devonshire Street<br>Boston, MA 02109 | 21,671,609 | 11.04% |
| Capital Guardian Trust Co. (2)<br>333 South Hope Street<br>Los Angeles, CA 90071 | 22,676,067 | 11.55% |
| Capital Research & Management Co. (2)<br>333 South Hope Street<br>Los Angeles, CA 90071 | 12,225,000 | 6.23% |
| Wellington Management Co. LLP (2)<br>75 State Street<br>Boston, Massachusetts 02109 | 10,838,451 | 5.52% |

(1)  Based on 196,247,543 outstanding shares of Common Stock as of August 23, 2004.

(2)  Based on information provided pursuant to Schedule 13F filed with the Securities and Exchange Commission.

(3)  FMR Corp. is a parent holding company and includes shares held by Fidelity Management Research and Fidelity International Limited.

**Management**

The following table sets forth the beneficial ownership of Common Stock of the Company as of August 23, 2004 by all directors, each of the named executive officers set forth in the Summary Compensation Table, and by all directors and current executive officers as a group:

| Name and Address | Number of Shares Beneficially Owned | Percent of Shares Beneficially Owned (1) |
|---|---|---|
| Kenneth Levy (2) | 2,903,259 | 1.47% |
| Kenneth L. Schroeder (3) | 876,821 | * |
| Edward W. Barnholt (4) | 85,832 | * |
| H. Raymond Bingham (5) | 50,000 | * |
| Robert T. Bond (6) | 52,000 | * |
| Richard J. Elkus, Jr. (7) | 100,000 | * |
| Stephen P. Kaufman (8) | 21,000 | * |
| Michael E. Marks (9) | 10,000 | * |
| Jon D. Tompkins (10) | 24,200 | * |
| Lida Urbanek (11) | 1,374,861 | * |
| John H. Kispert (12) | 65,039 | * |
| Richard P. Wallace (13) | 48,654 | * |
| Dennis J. Fortino (14) | 105,787 | * |
| Gary E. Dickerson (15) | 294,523 | * |
| All directors and executive officers as a group (17 persons) (16) | 6,278,976 | 3.16% |

*  Less than 1%

107

[1] Based on 196,247,543 outstanding shares of the Common Stock of the Company as of August 23, 2004.

[2] Includes 735,122 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004, 1,769,375 shares which are held in trust for the benefit of Mr. Levy's family, 40,000 shares which are held by the Levy Family Foundation, and 358,000 shares which are held by the KGMW, L.P.

[3] Includes 714,883 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

[4] Includes 85,832 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

[5] Includes 50,000 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

[6] Includes 50,000 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

[7] Includes 10,000 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

[8] Includes 20,000 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

[9] Includes 10,000 shares subject to options which are presently exercisable or will become exercisable, within 60 days of August 23, 2004.

[10] Includes 20,000 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

[11] Includes 73,892 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004, 1,271,414 shares which are held in trust for the benefit of Ms. Urbanek's family, and 29,555 shares which are held by the Urbanek Family Foundation.

[12] Includes 58,031 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

[13] Includes 45,751 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

[14] Includes 99,916 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

[15] Includes 287,905 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

[16] Includes 2,522,764 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

108

## EXECUTIVE COMPENSATION AND OTHER MATTERS

**Executive Compensation**

The following table sets forth, as to the person who served as Chief Executive Officer during the fiscal year ended June 30, 2004 and each of the four other most highly compensated executive officers whose salary plus bonus exceeded $100,000, information concerning all reportable compensation awarded to, earned by or paid to each for services to the Company in all capacities during the fiscal year ended June 30, 2004, as well as such compensation for each such individual for the Company's previous two fiscal years.

| Name and Principal Position | | Annual Compensation | | | | Long Term Compensation (1) | |
| | Year | Salary | Bonus (3) | Other Annual Compensation ($) | Securities Underlying Options/SARs (#) | All Other Compensation (2) |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 2004 | $ 581,195 | $ 1,183,023 | N/A | 158,950 | $ 0 |
| President & Chief | 2003 | $ 577,940 | $ 199,209 | N/A | 94,350 | $ 9,231 |
| Executive Officer | 2002 | $ 492,649 | $ 218,040 | N/A | 341,100 | $ 1,000 |
| John H. Kispert | 2004 | $ 396,393 | $ 658,700 | N/A | 76,250 | 1,000 |
| Executive Vice | 2003 | $ 324,357 | $ 167,133 | N/A | 37,500 | 5,767 |
| President & Chief Financial Officer | 2002 | $ 238,350 | $ 166,843 | N/A | 60,000 | 1,000 |
| Richard P. Wallace | 2004 | $ 336,501 | $ 443,730 | N/A | 76,250 | 1,000 |
| Executive Vice | 2003 | $ 324,674 | $ 75,545 | N/A | 38,500 | 5,766 |
| President, Customer Group | 2002 | $ 240,096 | $ 66,328 | N/A | 45,000 | 1,000 |
| Dennis J. Fortino | 2004 | $ 332,618 | $ 489,589 | N/A | 76,250 | $ 1,000 |
| Executive Vice | 2003 | $ 324,674 | $ 76,670 | N/A | 38,500 | $ 5,766 |
| President, Corporate Operations | 2002 | $ 230,048 | $ 86,209 | N/A | 45,000 | $ 1,000 |
| Gary E. Dickerson | 2004 | $ 501,593 | $ 969,942 | N/A | 131,250 | $ 1,000 |
| Former President & | 2003 | $ 488,451 | $ 156,657 | N/A | 76,000 | $ 8,104 |
| Chief Operating Officer | 2002 | $ 378,269 | $ 159,046 | N/A | 105,000 | $ 1,000 |

(1)  The Company has not granted any restricted stock rights or stock appreciation rights and the Company does not have any Long Term Incentive Plans as that term is defined in the regulations.

(2)  In FY 2004 Mr. Kispert received $1,000 contributed by the Company as a matching contribution to the 401(k) Plan; Mr. Wallace received $1,000 contributed by the Company as a matching contribution to the 401(k) Plan; Mr. Fortino received $1,000 contributed by the Company as a matching contribution to the 401(k) Plan; and Mr. Dickerson received $1,000 contributed by the Company as a matching contribution to the 401(k) Plan.

(3)  In addition to other bonus payments, this amount includes payments made pursuant to the Company's Outstanding Corporate Performance Executive Bonus Plan ("OCBP"). Of the OCBP payment earned in fiscal year 2004, 34% is payable currently. The remaining 66% of the OCBP payment earned in fiscal year 2004 is automatically deferred into the Company's Executive Deferred Savings Plan ("EDSP") as a Company contribution. Executives whose employment terminates before the end of the vesting period will receive a pro rata distribution of such deferred bonus funds. The OCBP amounts for fiscal year 2004 represent 47% of the aggregate fiscal year 2004 bonus amounts for Messrs. Schroeder and Dickerson, 41% for Mr. Kispert, 51% for Mr. Wallace and 46% for Mr. Fortino.

## OPTION/SAR GRANTS IN LAST FISCAL YEAR

**Stock Option Grants and Exercises**

The following tables set forth the number of securities underlying stock options granted to the named executive officers under the Company's stock option plans and the options exercised by such named executive officers during the fiscal year ended June 30, 2004.

The Option/SAR Grant Table sets forth hypothetical gains or "option spreads" for the options at the end of their respective ten–year terms, as calculated in accordance with the rules of the Securities and Exchange Commission. Each gain is based on an arbitrarily assumed annualized rate of compound appreciation of the market price at the date of grant of 5% and 10% from the date the option was granted to the end of the option term. Actual gains, if any, on option exercises are dependent on the future performance of the Company's Common Stock and overall market conditions.

| | Number of Securities Underlying Options (1) | Percent of Total Options Granted to Employees in Fiscal Year (2) | Exercise or Base Price ($/share)(3) | Expiration Date | Potential Realizable Value At Assumed Annual Rates of Stock Price Appreciation for Option Term ($) | |
|---|---|---|---|---|---|---|
| | | | | | 5% | 10% |
| Kenneth L. Schroeder (4) | 31,450 | .50% | $ 51.23 | 7/30/2013 | $ 1,012,245 | $ 2,567,761 |
| | 60,000 | .95% | $ 53.86 | 10/27/2013 | $ 2,032,336 | $ 5,150,338 |
| | 30,000 | .48% | $ 58.10 | 1/27/2014 | $ 1,097,163 | $ 2,777,893 |
| | 37,500 | .60% | $ 45.16 | 4/26/2014 | $ 1,065,033 | $ 2,699,003 |
| Total | 158,950 | 2.53% | N/A | N/A | $ 5,206,777 | $ 13,194,996 |
| John H. Kispert | 12,500 | .20% | $ 51.23 | 7/30/2013 | $ 402,721 | $ 1,020,573 |
| | 30,000 | .48% | $ 53.86 | 10/27/2013 | $ 1,016,168 | $ 2,575,169 |
| | 15,000 | .24% | $ 58.10 | 1/27/2014 | $ 548,082 | $ 1,388,947 |
| | 18,750 | .30% | $ 45.16 | 4/26/2014 | $ 532,517 | $ 1,349,501 |
| Total | 76,250 | 1.21% | N/A | N/A | $ 2,499,487 | $ 6,334,190 |
| Richard P. Wallace | 12,500 | .20% | $ 51.23 | 7/30/2013 | $ 402,721 | $ 1,020,573 |
| | 30,000 | .48% | $ 53.86 | 10/27/2013 | $ 1,016,168 | $ 2,575,169 |
| | 15,000 | .24% | $ 58.10 | 1/27/2014 | $ 548,082 | $ 1,388,947 |
| | 18,750 | .30% | $ 45.16 | 4/26/2014 | $ 532,517 | $ 1,349,501 |
| Total | 76,250 | 1.21% | N/A | N/A | $ 2,499,487 | $ 6,334,190 |
| Dennis J. Fortino | 12,500 | .20% | $ 51.23 | 7/30/2013 | $ 402,721 | $ 1,020,573 |
| | 30,000 | .48% | $ 53.86 | 10/27/2013 | $ 1,016,168 | $ 2,575,169 |
| | 15,000 | .24% | $ 58.10 | 1/27/2014 | $ 548,082 | $ 1,388,947 |
| | 18,750 | .30% | $ 45.16 | 4/26/2014 | $ 532,517 | $ 1,349,501 |
| Total | 76,250 | 1.21% | N/A | N/A | $ 2,499,487 | $ 6,334,190 |
| Gary E. Dickerson | 25,000 | .40% | $ 51.23 | 7/30/2013 | $ 805,441 | $ 2,041,146 |
| | 50,000 | .79% | $ 53.86 | 10/27/2013 | $ 1,693,613 | $ 4,291,948 |
| | 25,000 | .40% | $ 58.10 | 1/27/2014 | $ 913,469 | $ 2,314,911 |
| | 31,250 | .50% | $ 45.16 | 4/26/2014 | $ 887,528 | $ 2,249,169 |
| Total | 131,250 | 2.08% | N/A | N/A | $ 4,300,051 | $ 10,897,174 |

(1)   The Company has not granted any stock appreciation rights.

(2)   Based on a total of 6,298,343 options granted to employees in fiscal year 2004.

(3)   Options were granted at an exercise price equal to the fair market value of the Company's Common Stock. The material terms of the grants are: (a) options granted in years 2004 and 2003, the options vest on a five year schedule with 20% vesting after one year and the remaining option shares vesting 1/48 per month for the remainder of the vesting term; (b) options granted prior to fiscal year 2002 vest on a four year schedule with 25% vesting after one year and the remaining option shares vesting 1/36 per month for the remainder of the vesting term; (c) to the extent unexercised, the options lapse after ten years; and (d) the options are non–transferable and are only exercisable during the period of employment of the optionee for 30 days following the

110

termination of employment, subject to limited exceptions in the cases of certain terminations, death or permanent disability of the optionee.

(4) During FY 2004, in order to incentivize Mr. Schroeder to remain with the Company over the long−term, Mr. Schroeder received options covering 83,380 shares of Common Stock with delayed vesting. Specifically, 20% of 18,950 option shares vest 11/8/2007 with the remaining 80% to vest monthly over the following 48 months and 20% of 64,430 option shares vest 10/27/2006 with the remaining 80% to vest monthly over the following 48 months.

### AGGREGATED OPTION/SAR EXERCISES IN LAST FISCAL YEAR AND FISCAL YEAR−END OPTION VALUES

**1982 Stock Option Plan**

The following table sets forth information with respect to the persons named in the Summary Compensation Table concerning exercised and unexercised options held as of June 30, 2004.

| | Number of Shares Acquired on Exercise | Value Realized | Number of Securities Underlying Unexercised Options at 6/30/2004 | | Value of Unexercised In−the−Money Options at 6/30/2004 (1) | |
|---|---|---|---|---|---|---|
| | | | Vested | Unvested | Exercisable | Unexercisable |
| Kenneth L. Schroeder | 274,100 | $ 12,121,399 | 676,519 | 519,481 | $ 15,832,316 | $ 6,917,528 |
| John H. Kispert | 95,000 | $ 2,019,069 | 46,588 | 140,362 | $ 755,379 | $ 1,257,527 |
| Richard P. Wallace | 60,000 | $ 1,369,178 | 35,849 | 131,529 | $ 325,749 | $ 1,084,435 |
| Dennis J. Fortino | 83,541 | $ 1,967,462 | 88,931 | 135,195 | $ 874,852 | $ 1,149,627 |
| Gary E. Dickerson | 90,000 | $ 2,868,441 | 268,171 | 246,444 | $ 3,593,603 | $ 2,247,863 |

(1) The Company has not granted any stock appreciation rights. Total value of vested options based on fair market value of Company's Common Stock of $49.38 per share as of June 30, 2004.

### EQUITY COMPENSATION PLANS

**Equity Compensation Plan Information**

The following table summarizes our equity compensation plans as of June 30, 2004.

| | Number of securities to be issued upon exercise of outstanding options | Weighted−average exercise price of outstanding options | Number of securities remaining available for future issuance under stock option plans and ESPP plans |
|---|---|---|---|
| Equity compensation plans approved by stockholders (1) | 20,879,143 | $ 34.00 | 14,252,016 |
| Equity compensation plans not approved by stockholders (2) | 8,816,802 | 37.95 | 3,098,870 |
| Total | 29,695,945 | 35.11 | 17,350,886 |

(1) In July 2004, the Company reserved an additional 5,903,603 shares of its Common Stock in accordance with the provisions of the 1982 Stock Option Plan.

(2) On November 10, 2000 the Board approved the 2000 Nonstatutory Stock Option Plan (the "2000 Plan") and amended it on November 6, 2002. The goals for the 2000 Plan are for the issuance of nonstatutory stock options to employees and consultants of the Company or any parent or subsidiary corporation; however, officers and directors of the Company are not eligible to receive options under the 2000 Plan. Options granted under the 2000 Plan have an exercise price and a term that is determined by the plan administrator and generally vest in accordance with a schedule determined by the plan administrator at the time of grant. Upon cessation of service to the Company, the optionee will have a limited period of time, generally 90 days, in which to exercise his or her outstanding options that are vested at that time; usually this period of time is longer in the event of an optionee's death or disability. Options granted under the 2000 Plan generally are not transferable during the lifetime of an optionee; however, the plan administrator

111

may permit the optionee to transfer all or a portion of an option to a member of the optionee's immediate family, or to a limited liability corporation, trust or partnership for the benefit of an immediate family member. In the event that the Company is acquired by merger or asset sale, the vesting of each outstanding option under the 2000 Plan which is not to be assumed by the successor corporation will automatically accelerate in full, and all unvested shares will immediately vest and become exercisable for a period of 15 days after the optionee has been sent a notice of the acceleration. At the end of the 15–day period, unexercised options will terminate. The Board generally is authorized to amend, alter, suspend or terminate the 2000 Plan at any time, but no amendment, alteration, suspension or termination of the 2000 Plan may adversely affect any option previously granted under the plan without the written consent of the optionee. Unless sooner terminated by the Board, the 2000 Plan will terminate in 2010.

## REPORT OF THE COMPENSATION COMMITTEE ON EXECUTIVE COMPENSATION

**Compensation Committee**

The Compensation Committee of the Board of Directors is comprised of four independent, non–employee members of the Board of Directors, none of who have interlocking relationships as defined by the Securities and Exchange Commission and all of whom meet the definition of "independent director" as currently promulgated by the Nasdaq National Market. The Compensation Committee is responsible for setting and administering the policies governing annual compensation of executive officers, considering their performance and making recommendations regarding their cash compensation and stock options to the full Board of Directors. The Compensation Committee periodically reviews its approach to executive compensation and makes changes as appropriate. The Compensation Committee may retain, and has retained in the past, consultants when necessary, as determined by the members of the Compensation Committee.

**Compensation Philosophy**

The compensation philosophy of the Compensation Committee is to provide a comprehensive compensation package for each executive officer that is well suited to support accomplishment of the Company's business strategies, objectives and initiatives. The Compensation Committee applies this compensation philosophy in determining appropriate executive compensation levels and other compensation factors, and the Compensation Committee reaches its decisions with a view towards the Company's overall financial performance. The goals of the Company's compensation policy are to:

- attract, retain and reward executive officers who contribute to the overall success of the Company by offering compensation that is competitive in the industry;

- motivate executive officers to achieve the Company's business objectives; and

- align the interests of executive officers with the long term interests of stockholders.

The Company currently uses a compensation package, which includes a salary, executive incentive plans and stock option grants to meet these goals.

For incentive–based compensation, the Compensation Committee considers the desirability of structuring such compensation arrangements so as to qualify for deductions available under Section 162(m) of the Internal Revenue Code, which disallows a tax deduction for any publicly–held corporation for individual compensation exceeding one million U.S. Dollars in any taxable year for any of the named executive officers, other than compensation that is "performance based". The 2004 Equity Incentive Plan, which is the subject of Proposal Two of this Proxy Statement, permits a range of equity compensation devices to qualify as performance based compensation under Section 162(m) of the Internal Revenue Code.

112

**Chief Executive Officer
Compensation**

For fiscal year 2004, Kenneth L. Schroeder served as Chief Executive Officer. In setting Mr. Schroeder's compensation for fiscal year 2004, the Compensation Committee considered the Company's revenue and profit in the prior fiscal year, the Company's market capitalization and data from comparable companies supplied by the Compensation Committee's compensation consultants, in addition to Mr. Schroeder's performance and continuing contributions to the Company. For fiscal year 2004, a bonus of $1,183,023 was payable to Mr. Schroeder, based on the Company's performance as measured against a formula, which is based on meeting financial and strategic objectives as well as the Company's revenue growth objectives as compared to a peer group. This bonus formula was approved by the Compensation Committee and the independent members of the Board of Directors last fiscal year.

**Executive Officer
Compensation**

The Compensation Committee's executive compensation philosophy is based upon a belief that a substantial portion of aggregate annual compensation for executive officers should be contingent upon the Company's performance and an individual's contribution to the Company's success. In addition, the Compensation Committee strives to align the interests of the Company's executive officers with the long–term interests of stockholders through stock option grants that can result in ownership of the Company's Common Stock. The Compensation Committee endeavors to structure each executive officer's overall compensation package to be consistent with this approach and to enable the Company to attract, retain and reward personnel who contribute to the success of the Company.

In addition to stock option grants, the Company provides its executive officers with a compensation package consisting of base salary, variable incentive pay and participation in benefit plans generally available to other employees. The Committee considers market information from published survey data provided to the Committee by the Company's human resources staff. The market data consists primarily of base salary and total cash compensation rates, as well as incentive bonus and stock programs of other companies considered by the Committee to be peers in the Company's industry.

For the Company's previous fiscal year, the Committee reviewed and recommended a compensation structure, after considering a number of factors, including, the substantial economic and business challenges in the semiconductor and semiconductor capital equipment industries worldwide.

*Base Salary.* Salaries for executive officers are set with reference to salaries for comparable positions among other companies in the Company's industry or in industries that employ individuals of similar education and background to the executive officer based on data provided by the Compensation Committee's compensation consultants, as well as each person's job responsibilities, level of experience, individual performance and contribution to the Company's business. In making base salary decisions, the Compensation Committee exercised its discretion and judgment based upon these factors. No specific formula was applied to determine the weight of each factor.

*Management Incentive Plan.* Each year since fiscal 1979, the Company has adopted a management incentive plan (the "Incentive Plan") which provides for payments to officers and key employees based on the financial performance of the Company or the relevant business unit, and on the achievement of key strategic objectives which are set by senior management and approved by the Board of Directors. The Incentive Plan solely as to Messrs. Levy, Schroeder, Kispert and Dickerson is approved by the Compensation Committee and submitted to the

113

Board of Directors for ratification. For fiscal year 2004, the Incentive Plan set goals for profitability, achievement of measurable objectives aimed at strategic corporate goals and achievement of objectives relating to managing the ratio of assets to sales. The target goals for fiscal year 2004 were exceeded on financial objectives but underachieved on strategic objectives. As a result, approximately 107.3% of the eligible incentive plan amounts for Messrs. Levy, Schroeder, Kispert and Dickerson were paid.

*Outstanding Corporate Performance Executive Bonus Plan.* The Company continues to utilize its incentive plan for an additional bonus to executives in years when the Company achieves certain levels of profitability and growth (the "Outstanding Corporate Performance Plan"). The performance measurements are based on the Company's pretax margin and growth of the Company's aggregate revenues over the prior twelve months against a target group of public U.S. Companies over the same period. The target percentage for the Outstanding Corporate Performance Plan bonus is the same target percentage as utilized in determining the Incentive Plan bonus. For fiscal year 2004, bonuses were paid pursuant to the Outstanding Corporate Performance Plan at a rate of 96.3% of target.

In years that the performance goals are met, one–third of each annual amount under the Outstanding Corporate Performance Plan is payable at the end of the fiscal year; an additional one–third of each annual amount payable under the plan is payable at the end of the next fiscal year, and the final one–third of each annual amount payable under the plan is payable at the end of the next fiscal year. If the executive officer leaves during that one–year period, he receives a pro rata distribution of any deferred bonus funds.

*Long–term Incentives.* Long–term incentives are currently provided through the Stock Option Plan, which rewards executive officers through the growth in value of the Company's Common Stock. The Compensation Committee believes that employee equity ownership is highly motivating, provides a major incentive for employees to build stockholder value and serves to align the interests of employees with those of stockholders.

Grants of stock options to executive officers are based upon each executive officer's relative position, responsibilities, historical and expected contributions to the Company, and the executive officer's existing stock ownership and previous option grants. Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price. If Proposal Two is adopted, the Compensation Committee will consider granting different types of awards to executive officers under the 2004 Equity Incentive Plan.

**Stock Ownership Guidelines**

The Company adopted a program, approved by the Board of Directors, pursuant to which certain Company executives with the title Vice President or above and all directors are required to own a prescribed number of shares of Common Stock of the Company. These ownership requirements for eligible executives are phased in over time. Each executive submitted a five–year plan on how they plan to comply with the guidelines.As of June 30, 2004, all executives covered by these guidelines are on track to reach full compliance by 2009.

114

### MEMBERS OF THE COMPENSATION COMMITTEE

Robert T. Bond, Chairman
Edward W. Barnholt
Michael E. Marks
Lida Urbanek

**Compensation Committee Interlocks**

The members of the Compensation Committee are set forth in the preceding section. There are no members of the Compensation Committee who were officers or employees of the Company or any of its subsidiaries during the fiscal year, formerly officers of the Company, or had any relationship otherwise requiring disclosure hereunder.

### REPORT OF THE AUDIT COMMITTEE

**Audit Committee**

The Company's Audit Committee is composed of four non–employee directors, each of whom meet the standards of independence and financial experience requirements of the Nasdaq National Market, as currently in effect. The Board has determined that H. Raymond Bingham is an "audit committee financial expert" within the meaning of the rules promulgated by the Securities and Exchange Commission. For fiscal year 2004, H. Raymond Bingham, Robert T. Bond, Richard J. Elkus, Jr. and Stephen P. Kaufman served as members on the Audit Committee. Mr. Bingham served as the Chairman of the Audit Committee for fiscal year 2004. The Board of Directors has adopted a written charter for the Audit Committee that details the responsibilities of the Audit Committee and was attached as Exhibit A to the Proxy Statement related to the 2003 Annual Meeting. This report relates to the activities undertaken by the Audit Committee in fulfilling such responsibilities. The charter is reviewed annually for changes, as appropriate, and is posted on the Company's website at http://ir.kla–tencor.com/, in the Investor Presentations and Corporate Governance section.

KLA–Tencor's management is responsible for establishing and maintaining a system for internal controls and the financial reporting process. The Audit Committee is responsible for overseeing KLA–Tencor's auditing, accounting and financial reporting processes, its system of internal controls, and legal and ethical compliance. This report relates to the activities undertaken by the Audit Committee in fulfilling such responsibilities. During fiscal year 2004, the Audit Committee reviewed and discussed with the Company's management team KLA–Tencor's audited consolidated financial statements contained in KLA–Tencor's Annual Report on Form 10–K for the fiscal year ended June 30, 2004. The Audit Committee also met routinely with the independent auditors, with and without members of the KLA–Tencor management team present, to discuss their evaluation of the Company's internal controls and the overall quality of the Company's financial reporting. The Audit Committee also met with the Company's Chief Executive Officer to discuss accounting issues and risks facing the Company.

The Audit Committee also discussed with the Company's independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61, (Communication With Audit Committees).

The Audit Committee received from the independent auditors the written disclosures and the letter from the auditors required by Independence Standards Board Standard No. 1, (Independence Discussions With Audit Committees) and has discussed with the independent auditors their independence from management and KLA–Tencor. The Audit Committee also considered whether the provision of

115

services covered by fees paid to its independent auditors was compatible with maintaining their independence.

Based on the reviews and discussions referred to above, the Audit Committee recommended to the Board of Directors, and the Board of Directors approved, the inclusion of the audited financial statements in the Company's Annual Report on Form 10–K for the fiscal year ended June 30, 2004, filed with the Securities and Exchange Commission.

**MEMBERS OF THE AUDIT COMMITTEE**


H. Raymond Bingham, Chairman
Robert T. Bond
Richard J. Elkus, Jr.
Stephen P. Kaufman

116

**PERFORMANCE GRAPH**

The stock price performance shown on the following graph is not necessarily indicative of future stock price performance.

Comparison of Five Year Cumulative Total Return Among KLA—Tencor
Corporation, The NASDAQ — US Index and The Philadelphia SOXX Index [1]



| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| KLA—Tencor Corporation | 100 | 180.538 | 180.252 | 135.613 | 143.227 | 152.229 |
| The NASDAQ—US Index | 100 | 147.831 | 80.271 | 54.681 | 60.713 | 76.526 |
| Philadelphia SOXX Index | 100 | 235.428 | 128.824 | 80.004 | 74.247 | 100.132 |

[1]  Assumes $100 invested on June 30, 1999. The Company's fiscal year end is June 30.

## CERTAIN TRANSACTIONS AND OTHER MATTERS

**Transactions with
Directors, Executive
Officers and 5%
Stockholders**

In fiscal year 2001, the Company entered into a Bonus Agreement with Mr. Kispert, whereby Mr. Kispert will receive payments of $93,900 a year, for the following four years.

**Change of Control
Agreements**

In connection with the merger between KLA Instruments Corporation and Tencor Instruments (effective April 30, 1997) the Company entered into identical employment arrangements, subsequently amended, (the "Retention and Non–Competition Agreement") with Messrs. Levy and Schroeder. The arrangements, as amended, provide that certain benefits would be paid if certain events took place after April 30, 1997. The purpose of these arrangements was to retain the services of Messrs. Levy and Schroeder to ensure the continued smooth transition associated with the merger. The terms of those arrangements provide that if an individual were to leave the Company after April 30, 1998, subject to releasing the Company from all claims, and in connection with working part–time for 36 months, he will receive (i) his base salary for the first 24 months of part–time employment, (ii) a mutually agreeable level of compensation per month for the final 12 months of part–time employment, (iii) an annual bonus (based on an achievement of 100% of bonus objectives) in the fiscal year of his transition to part–time employment, (iv) a bonus paid in the fiscal year following the payment of the annual bonus above, (based on achievement of 100% of his individual bonus objectives) and (v) a pro–rated bonus for the fiscal year in which part–time employment ended. During the periods of part–time employment, all options to exercise stock of the Company, which were granted more than 12 months prior to the termination of full–time employment, will continue to vest. The same benefits shall be payable in the event the Company terminates his employment without cause. If he is terminated for cause (defined as (i) gross negligence or willful misconduct in connection with the performance of duties, (ii) conviction of or plea of nolo contendere to any felony, or (iii) the embezzlement or misappropriation of Company property) then he will receive a lump–sum payment equal to 25% of his base salary.

In fiscal year 2002, the Board of Directors approved individual "change–in–control" agreements for Messrs. Schroeder, Dickerson and Kispert (each, an "Executive"). As of April 30, 2004, Mr. Dickerson's agreement terminated. The change–in–control provisions of these agreements take effect if the Executive's employment is terminated involuntarily or constructively within two years after a change in control of the Company. If the provisions become effective, Mr. Schroeder would receive salary and bonus under the terms of his Retention and Non–Competition Agreement and the unvested portions of his then outstanding option grants would fully accelerate. In the case of Mr. Kispert, he would become eligible to receive: (i) an amount equal to two times his annual compensation; (ii) an amount equal to two times his bonus amount; (iii) continuation of health benefits for two years; and (iv) full acceleration of vesting for all options held. For the purpose of these agreements, a change in control occurs upon merger of the Company with or into another corporation, or a change in more than half of the total voting power of the Company, or upon the sale of substantially all of the assets of the Company.

118

**Mr. Dickerson**

Mr. Dickerson, the Company's President and Chief Operating Officer resigned both positions effective as of April 30, 2004. Effective May 1, 2004 until the termination of his Severance Agreement and General Release (the "Severance Agreement"), Mr. Dickerson's job title will be "Senior Vice President, New Business Operations" and he will continue to report to the Company's Chief Executive Officer. During the term of his Severance Agreement, Mr. Dickerson will receive one−half of his base salary (effective as of April 30, 2004) plus a bonus for fiscal year 2004. Mr. Dickerson's outstanding stock options which had been granted by the Company prior to April 30, 2004, will continue to vest in accordance with the terms and conditions of the applicable original option agreements relating to such options through the earlier termination of his Agreement or March 31, 2006. In addition, during the pendency of the Severance Agreement, Mr. Dickerson will continue to receive all medical, dental, life, accident, and disability insurance and benefits that he was receiving from the Company as of April 30, 2004.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") requires the Company's executive officers, directors, and persons who own more than ten percent of a registered Class of the Company's equity securities to file reports of ownership and changes in ownership with the SEC. Executive officers, directors and greater than ten percent stockholders are required by SEC regulations to furnish the Company with copies of all Section 16(a) forms they file. With one exception and based solely on its review of the copies of such forms received by it, the Company believes that during fiscal year 2004 all executive officers, directors and greater than ten percent stockholders of the Company complied with all applicable filing requirements. Due to an administrative error, Ken Levy filed an amendment to a Form 4 which was filed on January 27, 2004 to update the aggregate share ownership set forth therein.

119

**APPENDIX A**

**KLA–TENCOR CORPORATION**
**2004 EQUITY INCENTIVE PLAN**

1. <u>Purposes of the Plan</u>. The purposes of this Equity Incentive Plan are:

   - to attract and retain the best available personnel for positions of substantial responsibility,

   - to provide additional incentive to Service Providers, and

   - to promote the success of the Company's business.

Awards granted under the Plan may be Incentive Stock Options, Nonstatutory Stock Options, Restricted Stock, Stock Appreciation Rights, Performance Shares, Performance Units or Deferred Stock Units, as determined by the Administrator at the time of grant.

2. <u>Definitions</u>. As used herein, the following definitions shall apply:

   (a)  "<u>Administrator</u>" means the Board or any of its Committees that shall be administering the Plan, in accordance with Section 4 of the Plan.

   (b)  "<u>Annual Revenue</u>" means the Company's or a business unit's net sales for the Fiscal Year, determined in accordance with generally accepted accounting principles.

   (c)  "<u>Applicable Laws</u>" means the requirements relating to the administration of equity compensation plans under U.S. state corporate laws, U.S. federal and state securities laws, the Code, any stock exchange or quotation system on which the Shares are listed or quoted and the applicable laws of any other country or jurisdiction where Awards are granted under the Plan.

   (d)  "<u>Award</u>" means, individually or collectively, a grant under the Plan of Options, Restricted Stock, Stock Appreciation Rights, Performance Shares, Performance Units or Deferred Stock Units.

   (e)  "<u>Award Agreement</u>" means the written or electronic agreement setting forth the terms and provisions applicable to each Award granted under the Plan. The Award Agreement is subject to the terms and conditions of the Plan.

   (f)  "<u>Awarded Stock</u>" means the Common Stock subject to an Award.

   (g)  "<u>Board</u>" means the Board of Directors of the Company.

   (h)  "<u>Cash Position</u>" means the Company's level of cash and cash equivalents.

   (i)  "<u>Change of Control</u>" means the occurrence of any of the following events, in one or a series of related transactions:

      (i)  any "person," as such term is used in Sections 13(d) and 14(d) of the Exchange Act, other than the Company, a subsidiary of the Company or a Company employee benefit plan, including any trustee of such plan acting as trustee, is or becomes the "beneficial owner" (as defined in Rule 13d–3 under the Exchange Act), directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the combined voting power of the Company's then outstanding securities entitled to vote generally in the election of directors; or

      (ii)  a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least fifty percent (50%) of the total voting power represented by the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; or

      (iii)  the sale or disposition by the Company of all or substantially all the Company's assets; or

120

(iv) a change in the composition of the Board, as a result of which fewer than a majority of the directors are Incumbent Directors. "Incumbent Directors" shall mean directors who either (A) are Directors as of the date this Plan is approved by the Board, or (B) are elected, or nominated for election, to the Board with the affirmative votes of at least a majority of the Incumbent Directors and whose election or nomination was not in connection with any transaction described in (i) or (ii) above or in connection with an actual or threatened proxy contest relating to the election of directors of the Company.

(j) "Code" means the Internal Revenue Code of 1986, as amended.

(k) "Committee" means a Committee appointed by the Board in accordance with Section 4 of the Plan.

(l) "Common Stock" means the Common Stock of the Company.

(m) "Company" means KLA–Tencor Corporation.

(n) "Consultant" means any person, including an advisor, engaged by the Company or a Parent or Subsidiary to render services and who is compensated for such services.

(o) "Deferred Stock Unit" means a deferred stock unit Award granted to a Participant pursuant to Section 14.

(p) "Director" means a member of the Board.

(q) "Disability" means total and permanent disability as defined in Section 22(e)(3) of the Code.

(r) "Earnings Per Share" means as to any Fiscal Year, the Company's or a business unit's Net Income, divided by a weighted average number of common shares outstanding and dilutive common equivalent shares deemed outstanding, determined in accordance with generally accepted accounting principles.

(s) "Employee" means any person, including Officers and Directors, employed by the Company or any Parent or Subsidiary of the Company. A Service Provider shall not cease to be an Employee in the case of (i) any leave of absence approved by the Company or (ii) transfers between locations of the Company or between the Company, its Parent, any Subsidiary, or any successor. For purposes of Incentive Stock Options, no such leave may exceed ninety days, unless reemployment upon expiration of such leave is guaranteed by statute or contract. If reemployment upon expiration of a leave of absence approved by the Company is not so guaranteed, then three (3) months following the 91st day of such leave any Incentive Stock Option held by the Participant shall cease to be treated as an Incentive Stock Option and shall be treated for tax purposes as a Nonstatutory Stock Option.

(t) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(u) "Fair Market Value" means, as of any date, the value of Common Stock determined as follows:

(i) If the Common Stock is listed on any established stock exchange or a national market system, including without limitation the Nasdaq National Market of the National Association of Securities Dealers, Inc. Automated Quotation ("Nasdaq") System, the Fair Market Value of a Share of Common Stock shall be the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such system or exchange (or the exchange with the greatest volume of trading in Common Stock) on the day of determination, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable;

(ii) If the Common Stock is quoted on the Nasdaq System (but not on the Nasdaq National Market thereof) or is regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value of a Share of Common Stock shall be the mean between the high bid and low asked prices for the Common Stock on the last market trading day prior to the day of determination, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable; or

(iii) In the absence of an established market for the Common Stock, the Fair Market Value shall be determined in good faith by the Administrator.

(v) "Fiscal Year" means a fiscal year of the Company.

121

(w)    "Incentive Stock Option" means an Option intended to qualify as an incentive stock option within the meaning of Section 422 of the Code and the regulations promulgated thereunder.

(x)    "Net Income" means as to any Fiscal Year, the income after taxes of the Company for the Fiscal Year determined in accordance with generally accepted accounting principles.

(y)    "Nonstatutory Stock Option" means an Option not intended to qualify as an Incentive Stock Option.

(z)    "Notice of Grant" means a written or electronic notice evidencing certain terms and conditions of an individual Award. The Notice of Grant is part of the Option Agreement.

(aa)    "Officer" means a person who is an officer of the Company within the meaning of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

(bb)    "Operating Cash Flow" means the Company's or a business unit's sum of Net Income plus depreciation and amortization less capital expenditures plus changes in working capital comprised of accounts receivable, inventories, other current assets, trade accounts payable, accrued expenses, product warranty, advance payments from customers and long–term accrued expenses, determined in accordance with generally acceptable accounting principles.

(cc)    "Operating Income" means the Company's or a business unit's income from operations but excluding any unusual items, determined in accordance with generally accepted accounting principles.

(dd)    "Option" means a stock option granted pursuant to the Plan.

(ee)    "Option Agreement" means a written or electronic agreement between the Company and a Participant evidencing the terms and conditions of an individual Option grant. The Option Agreement is subject to the terms and conditions of the Plan.

(ff)    "Parent" means a "parent corporation", whether now or hereafter existing, as defined in Section 424(e) of the Code.

(gg)    "Participant" means the holder of an outstanding Award granted under the Plan.

(hh)    "Performance Goals" means the goal(s) (or combined goal(s)) determined by the Administrator (in its discretion) to be applicable to a Participant with respect to an Award. As determined by the Administrator, the Performance Goals applicable to an Award may provide for a targeted level or levels of achievement using one or more of the following measures: (a) Annual Revenue, (b) Cash Position, (c) Earnings Per Share, (d) Net Income, (e) Operating Cash Flow, (f) Operating Income, (g) Return on Assets, (h) Return on Equity, (i) Return on Sales, and (j) Total Stockholder Return. The Performance Goals may differ from Participant to Participant and from Award to Award.

(ii)    "Performance Share" means a performance share Award granted to a Participant pursuant to Section 12.

(jj)    "Performance Unit" means a performance unit Award granted to a Participant pursuant to Section 13.

(kk)    "Plan" means this 2004 Equity Incentive Plan.

(ll)    "Restricted Stock" means Shares granted pursuant to Section 11 of the Plan.

(mm)    "Return on Assets" means the percentage equal to the Company's or a business unit's Operating Income before incentive compensation, divided by average net Company or business unit, as applicable, assets, determined in accordance with generally accepted accounting principles.

(nn)    "Return on Equity" means the percentage equal to the Company's Net Income divided by average stockholder's equity, determined in accordance with generally accepted accounting principles.

(oo)    "Return on Sales" means the percentage equal to the Company's or a business unit's Operating Income before incentive compensation, divided by the Company's or the business unit's, as applicable, revenue, determined in accordance with generally accepted accounting principles.

122

(pp)  "Rule 16b–3" means Rule 16b–3 of the Exchange Act or any successor to Rule 16b–3, as in effect when discretion is being exercised with respect to the Plan.

(qq)  "Section 16(b)" means Section 16(b) of the Securities Exchange Act of 1934, as amended.

(rr)  "Service Provider" means an Employee, Consultant or Director.

(ss)  "Share" means a share of the Common Stock, as adjusted in accordance with Section 18 of the Plan.

(tt)  "Stock Appreciation Right" or "SAR" means an Award granted pursuant to Section 10 hereof.

(uu)  "Subsidiary" means a "subsidiary corporation", whether now or hereafter existing, as defined in Section 424(f) of the Code.

(vv)  "Total Stockholder Return" means the total return (change in share price plus reinvestment of any dividends) of a Share.

3.  Stock Subject to the Plan. Subject to the provisions of Section 18 of the Plan, the maximum aggregate number of Shares which may be issued under the Plan is 11,000,000 Shares plus any shares subject to any outstanding options under the Company's 1982 Stock Option Plan and the Company's 2000 Nonstatutory Stock Option Plan that subsequently expire unexercised, up to a maximum of an additional 1,500,000 Shares.

Any Shares subject to Options or SARs shall be counted against the numerical limits of this Section 3 as one share for every share subject thereto. Any Shares or units subject to Restricted Stock, Performance Shares, Performance Units or Deferred Stock Unit Awards with a per share or unit purchase price lower than 100% of Fair Market Value on the date of grant shall be counted against the numerical limits of this Section 3 as 1.8 shares for every one share subject thereto.

The Shares may be authorized, but unissued, or reacquired Common Stock.

If an Award expires or becomes unexercisable without having been exercised in full, or, with respect to Restricted Stock, Performance Shares, Performance Units or Deferred Stock Units, is forfeited to or repurchased by the Company, the unpurchased Shares (or for Awards other than Options and SARs, the forfeited or repurchased shares) which were subject thereto shall become available for future grant or sale under the Plan (unless the Plan has terminated). With respect to SARs, only shares actually issued pursuant to an SAR shall cease to be available under the Plan; all remaining shares under SARs shall remain available for future grant or sale under the Plan (unless the Plan has terminated). However, Shares that have actually been issued under the Plan under any Award shall not be returned to the Plan and shall not become available for future distribution under the Plan; provided, however, that if Shares of Restricted Stock, Performance Shares, Performance Units or Deferred Stock Units are repurchased by the Company at their original purchase price or are forfeited to the Company, such Shares shall become available for future grant under the Plan. Shares used to pay the exercise price of an Option or Stock Purchase Right shall become available for future grant or sale under the Plan. To the extent an Award under the Plan is paid out in cash rather than stock, such cash payment shall not result in reducing the number of Shares available for issuance under the Plan.

4.  Administration of the Plan.

(a)  Procedure.

(i)  Multiple Administrative Bodies. The Plan may be administered by different Committees with respect to different groups of Service Providers.

(ii)  Section 162(m). To the extent that the Administrator determines it to be desirable to qualify Options granted hereunder as "performance–based compensation" within the meaning of Section 162(m) of the Code, the Plan shall be administered by a Committee of two or more "outside directors" within the meaning of Section 162(m) of the Code.

(iii)  Rule 16b–3. To the extent desirable to qualify transactions hereunder as exempt under Rule 16b–3, the transactions contemplated hereunder shall be structured to satisfy the requirements for exemption under Rule 16b–3.

123

(iv) *Other Administration.* Other than as provided above, the Plan shall be administered by (A) the Board or (B) a Committee, which committee shall be constituted to satisfy Applicable Laws.

(b) *Powers of the Administrator.* Subject to the provisions of the Plan, and in the case of a Committee, subject to the specific duties delegated by the Board to such Committee, the Administrator shall have the authority, in its discretion:

(i)   to determine the Fair Market Value of the Common Stock, in accordance with Section 2(u) of the Plan;

(ii)  to select the Service Providers to whom Awards may be granted hereunder;

(iii) to determine whether and to what extent Awards or any combination thereof, are granted hereunder;

(iv)  to determine the number of shares of Common Stock or equivalent units to be covered by each Award granted hereunder;

(v)   to approve forms of agreement for use under the Plan;

(vi)  to determine the terms and conditions, not inconsistent with the terms of the Plan, of any award granted hereunder. Such terms and conditions include, but are not limited to, the exercise price, the time or times when Options or SARs may be exercised or other Awards vest (which may be based on performance criteria), any vesting acceleration or waiver of forfeiture restrictions, and any restriction or limitation regarding any Award or the shares of Common Stock relating thereto, based in each case on such factors as the Administrator, in its sole discretion, shall determine;

(vii) to construe and interpret the terms of the Plan and Awards;

(viii) to prescribe, amend and rescind rules and regulations relating to the Plan, including rules and regulations relating to sub-plans established for the purpose of qualifying for preferred tax treatment under foreign tax laws;

(ix)  to modify or amend each Award (subject to Section 20(c) of the Plan), including the discretionary authority to extend the post-termination exercisability period of Options and SARs longer than is otherwise provided for in the Plan;

(x)   to authorize any person to execute on behalf of the Company any instrument required to effect the grant of an Award previously granted by the Administrator;

(xi)  to allow Participants to satisfy withholding tax obligations by electing to have the Company withhold from the Shares or cash to be issued upon exercise or vesting of an Award (or distribution of a Deferred Stock Unit) that number of Shares or cash having a Fair Market Value equal to the minimum amount required to be withheld (but no more). The Fair Market Value of any Shares to be withheld shall be determined on the date that the amount of tax to be withheld is to be determined. All elections by a Participant to have Shares or cash withheld for this purpose shall be made in such form and under such conditions as the Administrator may deem necessary or advisable;

(xii) to determine the terms and restrictions applicable to Awards; and

(xiii) to make all other determinations deemed necessary or advisable for administering the Plan.

(c) *Effect of Administrator's Decision.* The Administrator's decisions, determinations and interpretations shall be final and binding on all Participants and any other holders of Awards.

5. *Eligibility.* Restricted Stock, Performance Shares, Performance Units, Stock Appreciation Rights, Deferred Stock Units and Nonstatutory Stock Options may be granted to Service Providers. Incentive Stock Options may be granted only to Employees.

6. *No Employment Rights.* Neither the Plan nor any Award shall confer upon a Participant any right with respect to continuing the Participant's employment with the Company or its Subsidiaries, nor shall they interfere

124

in any way with the Participant's right or the Company's or Subsidiary's right, as the case may be, to terminate such employment at any time, with or without cause or notice.

7. Code Section 162(m) Provisions.

(a) Option and SAR Annual Share Limit. No Participant shall be granted, in any Fiscal Year, Options and Stock Appreciation Rights to purchase more than 400,000 Shares; provided, however, that such limit shall be 1,200,000 Shares in the Participant's first Fiscal Year of Company service.

(b) Restricted Stock and Performance Share Annual Limit. No Participant shall be granted, in any Fiscal Year, more than 200,000 Shares of Restricted Stock or Performance Shares; provided, however, that such limit shall be 600,000 Shares in the Participant's first Fiscal Year of Company service.

(c) Performance Units Annual Limit. No Participant shall receive Performance Units, in any Fiscal Year, having an initial value greater than $1,000,000, provided, however, that such limit shall be $3,000,000 in the Participant's first Fiscal Year of Company service.

(d) Section 162(m) Performance Restrictions. For purposes of qualifying grants of Restricted Stock, Performance Shares or Performance Units as "performance—based compensation" under Section 162(m) of the Code, the Administrator, in its discretion, may set restrictions based upon the achievement of Performance Goals. The Performance Goals shall be set by the Administrator on or before the latest date permissible to enable the Restricted Stock, Performance Shares or Performance Units to qualify as "performance—based compensation" under Section 162(m) of the Code. In granting Restricted Stock, Performance Shares or Performance Units which are intended to qualify under Section 162(m) of the Code, the Administrator shall follow any procedures determined by it from time to time to be necessary or appropriate to ensure qualification of the Award under Section 162(m) of the Code (e.g., in determining the Performance Goals).

(e) Changes in Capitalization. The numerical limitations in Sections 7(a) and (b) shall be adjusted proportionately in connection with any change in the Company's capitalization as described in Section 18(a).

8. Term of Plan. The Plan shall continue in effect for a term of ten (10) years following the date upon which the Board approved the Plan in 2004.

9. Stock Options.

(a) Term. The term of each Option shall be stated in the Notice of Grant; provided, however, that the term shall be ten (10) years from the date of grant or such shorter term as may be provided in the Notice of Grant. Moreover, in the case of an Incentive Stock Option granted to a Participant who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the term of the Incentive Stock Option shall be five (5) years from the date of grant or such shorter term as may be provided in the Notice of Grant.

(b) Option Exercise Price. The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be determined by the Administrator and shall be no less than 100% of the Fair Market Value per share on the date of grant; provided, however, that in the case of an Incentive Stock Option granted to an Employee who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the per Share exercise price shall be no less than 110% of the Fair Market Value per Share on the date of grant.

(c) No Repricing. The exercise price for an Option may not be reduced without the consent of the Company's stockholders. This shall include, without limitation, a repricing of the Option as well as an Option exchange program whereby the Participant agrees to cancel an existing Option in exchange for an Option, SAR or other Award.

(d) Waiting Period and Exercise Dates. At the time an Option is granted, the Administrator shall fix the period within which the Option may be exercised and shall determine any conditions which must be satisfied before the Option may be exercised. In so doing, the Administrator may specify that an Option may not be exercised until the completion of a service period or until performance milestones are satisfied.

125

(e) Form of Consideration. The Administrator shall determine the acceptable form of consideration for exercising an Option, including the method of payment. In the case of an Incentive Stock Option, the Administrator shall determine the acceptable form of consideration at the time of grant. Subject to Applicable Laws, such consideration may consist entirely of:

(i) cash;

(ii) check;

(iii) other Shares which (A) in the case of Shares acquired upon exercise of an option, have been owned by the Participant for more than six months on the date of surrender, and (B) have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which said Option shall be exercised;

(iv) delivery of a properly executed exercise notice together with such other documentation as the Administrator and the broker, if applicable, shall require to effect an exercise of the Option and delivery to the Company of the sale proceeds required to pay the exercise price;

(v) any combination of the foregoing methods of payment; or

(vi) such other consideration and method of payment for the issuance of Shares to the extent permitted by Applicable Laws.

(f) Exercise of Option; Rights as a Stockholder. Any Option granted hereunder shall be exercisable according to the terms of the Plan and at such times and under such conditions as determined by the Administrator and set forth in the Option Agreement. An Option may not be exercised for a fraction of a Share.

An Option shall be deemed exercised when the Company receives: (i) written or electronic notice of exercise (in accordance with the Option Agreement) from the person entitled to exercise the Option, and (ii) full payment for the Shares with respect to which the Option is exercised. Full payment may consist of any consideration and method of payment authorized by the Administrator and permitted by the Option Agreement and the Plan. Shares issued upon exercise of an Option shall be issued in the name of the Participant. Until the stock certificate evidencing such Shares is issued (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the optioned stock, notwithstanding the exercise of the Option. The Company shall issue (or cause to be issued) such stock certificate promptly after the Option is exercised. No adjustment will be made for a dividend or other right for which the record date is prior to the date the stock certificate is issued, except as provided in Section 18 of the Plan.

Exercising an Option in any manner shall decrease the number of Shares thereafter available for sale under the Option, by the number of Shares as to which the Option is exercised.

(g) Termination of Relationship as a Service Provider. If a Participant ceases to be a Service Provider, other than upon the Participant's death or Disability, the Participant may exercise his or her Option within such period of time as is specified in the Option Agreement to the extent that the Option is vested on the date of termination (but in no event later than the expiration of the term of such Option as set forth in the Option Agreement). In the absence of a specified time in the Option Agreement, the Option shall remain exercisable for three months following the Participant's termination. If, on the date of termination, the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option shall revert to the Plan. If, after termination, the Participant does not exercise his or her Option within the time specified by the Administrator, the Option shall terminate, and the Shares covered by such Option shall revert to the Plan.

(h) Disability. If a Participant ceases to be a Service Provider as a result of the Participant's Disability, the Participant may exercise his or her Option within such period of time as is specified in the Option Agreement to the extent the Option is vested on the date of termination (but in no event later than the expiration of the term of such Option as set forth in the Option Agreement). In the absence of a specified time in the Option Agreement, the Option shall remain exercisable for twelve (12) months following the Participant's termination. If, on the date of termination, the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option shall revert to the Plan. If, after termination, the Participant does not exercise his or her Option within the time specified herein, the Option shall terminate, and the Shares covered by such Option shall revert to the Plan.

126

(i) Death of Participant. If a Participant dies while a Service Provider, the Option may be exercised following the Participant's death within such period of time as is specified in the Option Agreement (but in no event may the option be exercised later than the expiration of the term of such Option as set forth in the Option Agreement), by the Participant's designated beneficiary, provided such beneficiary has been designated prior to Participant's death in a form acceptable to the Administrator. If no such beneficiary has been designated by the Participant, then such Option may be exercised by the personal representative of the Participant's estate or by the person(s) to whom the Option is transferred pursuant to the Participant's will or in accordance with the laws of descent and distribution. In the absence of a specified time in the Option Agreement, the Option shall remain exercisable for twelve (12) months following Participant's death. If the Option is not so exercised within the time specified herein, the Option shall terminate, and the Shares covered by such Option shall revert to the Plan.

(j) ISO $100,000 Rule. Each Option shall be designated in the Notice of Grant as either an Incentive Stock Option or a Nonstatutory Stock Option. However, notwithstanding such designations, to the extent that the aggregate Fair Market Value:

(i) of Shares subject to a Participant's Incentive Stock Options granted by the Company, any Parent or Subsidiary, which

(ii) become exercisable for the first time during any calendar year (under all plans of the Company or any Parent or Subsidiary) exceeds $100,000, such excess Options shall be treated as Nonstatutory Stock Options. For purposes of this Section 9(j), Incentive Stock Options shall be taken into account in the order in which they were granted, and the Fair Market Value of the Shares shall be determined as of the time of grant.

10. Stock Appreciation Rights.

(a) Grant of SARs. Subject to the terms and conditions of the Plan, SARs may be granted to Participants at any time and from time to time as shall be determined by the Administrator, in its sole discretion. The Administrator shall have complete discretion to determine the number of SARs granted to any Participant.

(b) Exercise Price and other Terms. Subject to Section 7(a) of the Plan, the Administrator, subject to the provisions of the Plan, shall have complete discretion to determine the terms and conditions of SARs granted under the Plan; provided, however, that no SAR may have a term of more than ten (10) years from the date of grant. The exercise price for the Shares or cash to be issued pursuant to an already granted SAR may not be changed without the consent of the Company's stockholders. This shall include, without limitation, a repricing of the SAR as well as an SAR exchange program whereby the Participant agrees to cancel an existing SAR in exchange for an Option, SAR or other Award.

(c) Payment of SAR Amount. Upon exercise of a SAR, a Participant shall be entitled to receive payment from the Company in an amount determined by multiplying:

(i) The difference between the Fair Market Value of a Share on the date of exercise over the exercise price; times

(ii) the number of Shares with respect to which the SAR is exercised.

(d) Payment upon Exercise of SAR. At the discretion of the Administrator, payment for a SAR may be in cash, Shares or a combination thereof.

(e) SAR Agreement. Each SAR grant shall be evidenced by an Award Agreement that shall specify the exercise price, the term of the SAR, the conditions of exercise, and such other terms and conditions as the Administrator, in its sole discretion, shall determine.

(f) Expiration of SARs. A SAR granted under the Plan shall expire upon the date determined by the Administrator, in its sole discretion, and set forth in the Award Agreement.

(g) Termination of Relationship as a Service Provider. If a Participant ceases to be a Service Provider, other than upon the Participant's death or Disability termination, the Participant may exercise his or her SAR within such period of time as is specified in the SAR Agreement to the extent that the SAR is vested on the date of termination (but in no event later than the expiration of the term of such SAR as set forth in the SAR Agreement).

127

In the absence of a specified time in the SAR Agreement, the SAR shall remain exercisable for three months following the Participant's termination. If, on the date of termination, the Participant is not vested as to his or her entire SAR, the Shares covered by the unvested portion of the SAR shall revert to the Plan. If, after termination, the Participant does not exercise his or her SAR within the time specified by the Administrator, the SAR shall terminate, and the Shares covered by such SAR shall revert to the Plan.

(h) Disability. If a Participant ceases to be a Service Provider as a result of the Participant's Disability, the Participant may exercise his or her SAR within such period of time as is specified in the SAR Agreement to the extent the SAR is vested on the date of termination (but in no event later than the expiration of the term of such SAR as set forth in the SAR Agreement), by the Participant's designated beneficiary, provided such beneficiary has been designated prior to Participant's death in a form acceptable to the Administrator. In the absence of a specified time in the SAR Agreement, the SAR shall remain exercisable for twelve (12) months following the Participant's termination. If, on the date of termination, the Participant is not vested as to his or her entire SAR, the Shares covered by the unvested portion of the SAR shall revert to the Plan. If, after termination, the Participant does not exercise his or her SAR within the time specified herein, the SAR shall terminate, and the Shares covered by such SAR shall revert to the Plan.

(i) Death of Participant. If a Participant dies while a Service Provider, the SAR may be exercised following the Participant's death within such period of time as is specified in the SAR Agreement (but in no event may the SAR be exercised later than the expiration of the term of such SAR as set forth in the SAR Agreement), by the Participant's designated beneficiary, provided such beneficiary has been designated prior to Participant's death in a form acceptable to the Administrator. If no such beneficiary has been designated by the Participant, then such SAR may be exercised by the personal representative of the Participant's estate or by the person(s) to whom the SAR is transferred pursuant to the Participant's will or in accordance with the laws of descent and distribution. In the absence of a specified time in the SAR Agreement, the SAR shall remain exercisable for twelve (12) months following Participant's death. If the SAR is not so exercised within the time specified herein, the SAR shall terminate, and the Shares covered by such SAR shall revert to the Plan.

11. Restricted Stock.

(a) Grant of Restricted Stock. Subject to the terms and conditions of the Plan, Restricted Stock may he granted to Participants at any time as shall be determined by the Administrator, in its sole discretion. Subject to Section 7(b) hereof, the Administrator shall have complete discretion to determine (i) the number of Shares subject to a Restricted Stock award granted to any Participant, and (ii) the conditions that must be satisfied, which typically will be based principally or solely on continued provision of services but may include a performance-based component, upon which is conditioned the grant, vesting or issuance of Restricted Stock. Restricted Stock shall be granted in the form of units to acquire Shares. Each such unit shall he the equivalent of one Share for purposes of determining the number of Shares subject to an Award. Restricted Stock may be granted in the form of restricted stock units that are not issued until the vesting conditions are satisfied. Until the Shares are issued, no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the units to acquire Shares.

(b) Other Terms. The Administrator, subject to the provisions of the Plan, shall have complete discretion to determine the terms and conditions of Restricted Stock granted under the Plan. Restricted Stock grants shall he subject to the terms, conditions, and restrictions determined by the Administrator at the time the stock or the restricted stock unit is awarded. The Administrator may require the recipient to sign a Restricted Stock Award agreement as a condition of the award. Any certificates representing the Shares of stock awarded shall bear such legends as shall be determined by the Administrator.

(c) Restricted Stock Award Agreement. Each Restricted Stock grant shall be evidenced by an agreement that shall specify the purchase price (if any) and such other terms and conditions as the Administrator, in its sole discretion, shall determine; provided; however, that if the Restricted Stock grant has a purchase price, such purchase price must be paid no more than ten (10) years following the date of grant.

12. Performance Shares.

(a) Grant of Performance Shares. Subject to the terms and conditions of the Plan, Performance Shares may be granted to Participants at any time as shall be determined by the Administrator, in its sole discretion. Subject to Section 7(b) hereof, the Administrator shall have complete discretion to determine (i) the number of Shares subject to a Performance Share award granted to any Participant, and (ii) the conditions that must be satisfied, which

128

typically will be based principally or solely on achievement of performance milestones but may include a service–based component, upon which is conditioned the grant or vesting of Performance Shares. Performance Shares shall be granted in the form of units to acquire Shares. Each such unit shall be the equivalent of one Share for purposes of determining the number of Shares subject to an Award. Until the Shares are issued, no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the units to acquire Shares.

(b) Other Terms. The Administrator, subject to the provisions of the Plan, shall have complete discretion to determine the terms and conditions of Performance Shares granted under the Plan. Performance Share grants shall be subject to the terms, conditions, and restrictions determined by the Administrator at the time the stock is awarded, which may include such performance–based milestones as are determined appropriate by the Administrator. The Administrator may require the recipient to sign a Performance Shares agreement as a condition of the award. Any certificates representing the Shares of stock awarded shall bear such legends as shall be determined by the Administrator.

(c) Performance Share Award Agreement. Each Performance Share grant shall be evidenced by an agreement that shall specify such other terms and conditions as the Administrator, in its sole discretion, shall determine.

13. Performance Units.

(a) Grant of Performance Units. Performance Units are similar to Performance Shares, except that they shall be settled in a cash equivalent to the Fair Market Value of the underlying Shares, determined as of the vesting date. Subject to the terms and conditions of the Plan, Performance Units may be granted to Participants at any time and from time to time as shall be determined by the Administrator, in its sole discretion. The Administrator shall have complete discretion to determine the conditions that must be satisfied, which typically will be based principally or solely on achievement of performance milestones but may include a service–based component, upon which is conditioned the grant or vesting of Performance Units. Performance Units shall be granted in the form of units to acquire Shares. Each such unit shall be the cash equivalent of one Share of Common Stock. No right to vote or receive dividends or any other rights as a stockholder shall exist with respect to Performance Units or the cash payable thereunder.

(b) Number of Performance Units. Subject to Section 7(c) hereof, the Administrator will have complete discretion in determining the number of Performance Units granted to any Participant.

(c) Other Terms. The Administrator, subject to the provisions of the Plan, shall have complete discretion to determine the terms and conditions of Performance Units granted under the Plan. Performance Unit grants shall be subject to the terms, conditions, and restrictions determined by the Administrator at the time the grant is awarded, which may include such performance–based milestones as are determined appropriate by the Administrator. The Administrator may require the recipient to sign a Performance Unit agreement as a condition of the award. Any certificates representing the units awarded shall bear such legends as shall be determined by the Administrator.

(d) Performance Unit Award Agreement. Each Performance Unit grant shall be evidenced by an agreement that shall specify such terms and conditions as the Administrator, in its sole discretion, shall determine.

14. Deferred Stock Units.

(a) Description. Deferred Stock Units shall consist of a Restricted Stock, Performance Share or Performance Unit Award that the Administrator, in its sole discretion permits to be paid out in installments or on a deferred basis, in accordance with rules and procedures established by the Administrator. Deferred Stock Units shall remain subject to the claims of the Company's general creditors until distributed to the Participant.

(b) 162(m) Limits. Deferred Stock Units shall be subject to the annual 162(m) limits applicable to the underlying Restricted Stock, Performance Share or Performance Unit Award as set forth in Section 7 hereof.

15. Leaves of Absence. Unless the Administrator provides otherwise or except as otherwise required by Applicable Laws, vesting of Awards granted hereunder shall cease commencing on the first day of any unpaid leave of absence and shall only recommence upon return to active service.

16. Part–Time Service. Unless the Administrator provides otherwise or except as otherwise required by Applicable Laws, any service–based vesting of Awards granted hereunder shall be extended on a proportionate basis

129

in the event an Employee transitions to a work schedule under which they are customarily scheduled to work on less than a full-time basis, or if not on a full-time work schedule, to a schedule requiring fewer hours of service. Such vesting shall be proportionately re-adjusted prospectively in the event that the Employee subsequently becomes regularly scheduled to work additional hours of service.

17. Non-Transferability of Awards. Unless determined otherwise by the Administrator, an Award may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent or distribution and may be exercised, during the lifetime of the recipient, only by the recipient. If the Administrator makes an Award transferable, such Award shall contain such additional terms and conditions as the Administrator deems appropriate.

18. Adjustments Upon Changes in Capitalization, Dissolution or Liquidation or Change of Control.

(a) Changes in Capitalization. Subject to any required action by the stockholders of the Company, the number of shares of Common Stock covered by each outstanding Award, the number of shares of Common Stock which have been authorized for issuance under the Plan but as to which no Awards have yet been granted or which have been returned to the Plan upon cancellation or expiration of an Award, as well as the price per share of Common Stock covered by each such outstanding Award and the 162(m) fiscal year share issuance limits under Sections 7(a) and (b) hereof shall be proportionately adjusted for any increase or decrease in the number of issued shares of Common Stock resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the Common Stock, or any other increase or decrease in the number of issued shares of Common Stock effected without receipt of consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." Such adjustment shall be made by the Compensation Committee, whose determination in that respect shall be final, binding and conclusive. Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares of Common Stock subject to an Award.

(b) Dissolution or Liquidation. In the event of the proposed dissolution or liquidation of the Company, the Administrator shall notify each Participant as soon as practicable prior to the effective date of such proposed transaction. The Administrator in its discretion may provide for a Participant to have the right to exercise his or her Option or SAR until ten (10) days prior to such transaction as to all of the Awarded Stock covered thereby, including Shares as to which the Award would not otherwise be exercisable. In addition, the Administrator may provide that any Company repurchase option or forfeiture rights applicable to any Award shall lapse 100%, and that any Award vesting shall accelerate 100%, provided the proposed dissolution or liquidation takes place at the time and in the manner contemplated. To the extent it has not been previously exercised (with respect to Options and SARs) or vested (with respect to other Awards), an Award will terminate immediately prior to the consummation of such proposed action.

(c) Change of Control.

(i) Stock Options and SARs. In the event of a Change of Control, each outstanding Option and SAR shall be assumed or an equivalent option or SAR substituted by the successor corporation or a Parent or Subsidiary of the successor corporation. In the event that the successor corporation refuses to assume or substitute for the Option or SAR, the Participant shall fully vest in and have the right to exercise the Option or SAR as to all of the Awarded Stock, including Shares as to which it would not otherwise be vested or exercisable. If an Option or SAR becomes fully vested and exercisable in lieu of assumption or substitution in the event of a Change of Control, the Administrator shall notify the Participant in writing or electronically that the Option or SAR shall be fully vested and exercisable for a period of fifteen (15) days from the date of such notice, and the Option or SAR shall terminate upon the expiration of such period. For the purposes of this paragraph, the Option or SAR shall be considered assumed if, following the Change of Control, the option or stock appreciation right confers the right to purchase or receive, for each Share of Awarded Stock subject to the Option or SAR immediately prior to the Change of Control, the consideration (whether stock, cash, or other securities or property) received in the Change of Control by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the Change of Control is not solely

130

common stock of the successor corporation or its Parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of the Option or SAR, for each Share of Awarded Stock subject to the Option or SAR, to be solely common stock of the successor corporation or its Parent equal in fair market value to the per share consideration received by holders of Common Stock in the Change of Control.

(ii) <u>Restricted Stock, Performance Shares, Performance Units and Deferred Stock Units</u>. In the event of a Change of Control, each outstanding Restricted Stock, Performance Share, Performance Unit and Deferred Stock Unit award shall be assumed or an equivalent Restricted Stock, Performance Share, Performance Unit and Deferred Stock Unit award substituted by the successor corporation or a Parent or Subsidiary of the successor corporation. In the event that the successor corporation refuses to assume or substitute for the Restricted Stock, Performance Share, Performance Unit or Deferred Stock Unit award, the Participant shall fully vest in the Restricted Stock, Performance Share, Performance Unit or Deferred Stock Unit including as to Shares (or with respect to Performance Units, the cash equivalent thereof) which would not otherwise be vested. For the purposes of this paragraph, a Restricted Stock, Performance Share, Performance Unit and Deferred Stock Unit award shall be considered assumed if, following the Change of Control, the award confers the right to purchase or receive, for each Share (or with respect to Performance Units, the cash equivalent thereof) subject to the Award immediately prior to the Change of Control, the consideration (whether stock, cash, or other securities or property) received in the Change of Control by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the Change of Control is not solely common stock of the successor corporation or its Parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received, for each Share and each unit/right to acquire a Share subject to the Award, to be solely common stock of the successor corporation or its Parent equal in fair market value to the per share consideration received by holders of Common Stock in the Change of Control.

19. <u>Date of Grant</u>. The date of grant of an Award shall be, for all purposes, the date on which the Administrator makes the determination granting such Award, or such other later date as is determined by the Administrator. Notice of the determination shall be provided to each Participant within a reasonable time after the date of such grant.

20. <u>Amendment and Termination of the Plan</u>.

(a) <u>Amendment and Termination</u>. The Board may at any time amend, alter, suspend or terminate the Plan; provided, however, that the Board may not materially amend the Stock Plan without obtaining stockholder approval.

(b) <u>Stockholder Approval</u>. The Company shall obtain stockholder approval of any Plan amendment to the extent necessary and desirable to comply Section 422 of the Code (or any successor rule or statute or other applicable law, rule or regulation, including the requirements of any exchange or quotation system on which the Common Stock is listed or quoted). Such stockholder approval, if required, shall be obtained in such a manner and to such a degree as is required by the applicable law, rule or regulation.

(c) <u>Effect of Amendment or Termination</u>. No amendment, alteration, suspension or termination of the Plan shall impair the rights of any Participant, unless mutually agreed otherwise between the Participant and the Administrator, which agreement must be in writing (or electronic format) and signed by the Participant and the Company.

21. <u>Conditions Upon Issuance of Shares</u>.

(a) <u>Legal Compliance</u>. Shares shall not be issued pursuant to the exercise of an Award unless the exercise of the Award or the issuance and delivery of such Shares (or with respect to Performance Units, the cash equivalent thereof) shall comply with Applicable Laws and shall be further subject to the approval of counsel for the Company with respect to such compliance.

(b) <u>Investment Representations</u>. As a condition to the exercise or receipt of an Award, the Company may require the person exercising or receiving such Award to represent and warrant at the time of any such exercise or receipt that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is required.

131

22. <u>Liability of Company</u>.

(a)  <u>Inability to Obtain Authority</u>. The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained.

(b)  <u>Grants Exceeding Allotted Shares</u>. If the Awarded Stock covered by an Award exceeds, as of the date of grant, the number of Shares which may be issued under the Plan without additional stockholder approval, such Award shall be void with respect to such excess Awarded Stock, unless stockholder approval of an amendment sufficiently increasing the number of Shares subject to the Plan is timely obtained in accordance with Section 20(b) of the Plan.

23. <u>Reservation of Shares</u>. The Company, during the term of this Plan, will at all times reserve and keep available such number of Shares as shall be sufficient to satisfy the requirements of the Plan.

132



**KLA-TENCOR CORPORATION**
**C/O EQUISERVE**
**150 ROYALL STREET**
**CANTON, MA 02021**
**MS 45-02-62**

**VOTE BY INTERNET** – www.proxyvote.com
Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 P.M. Eastern Time on October 17, 2004. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**VOTE BY PHONE – 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions up until 11:59 P.M. Eastern Time on October 17, 2004. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign, and date your proxy card and return it in the postage-paid envelope we have provided or return it to KLA-Tencor Corporation, c/o ADP, 51 Mercedes Way, Edgewood, NY 11717.

Your telephone or Internet vote authorizes the named proxies to vote your shares in the same manner as if you marked, signed and returned your proxy card.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:    KLATN1    KEEP THIS PORTION FOR YOUR RECORDS

---

DETACH AND RETURN THIS PORTION ONLY

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

## KLA-TENCOR CORPORATION (the "Company")

The Board Recommends a Vote "FOR" all Nominees for Director, "FOR" Proposal 2 and "FOR" Proposal 3.

**Vote On Directors**

|  |  | For All | Withhold All | For All Except |
|---|---|---|---|---|
| 1. | To elect three Class III directors to each serve for a three year term and until their successors are duly elected. |  |  |  |
|  | a. Edward W. Barnholt | ☐ | ☐ | ☐ |
|  | b. Stephen P. Kaufman |  |  |  |
|  | c. Kenneth L. Schroeder |  |  |  |

To withhold authority to vote, mark "For All Except" and clearly write the nominee's letter on the line below.

**Vote on Proposals**

|  |  | For | Against | Abstain |
|---|---|---|---|---|
| 2. | To approve the Company's 2004 Equity Incentive Plan, including approval of its material terms and performance goals for purposes of Internal Revenue Code Section 162(m). | ☐ | ☐ | ☐ |
| 3. | To ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2005. | ☐ | ☐ | ☐ |

To transact such other business as may properly come before the meeting or any adjournment thereof.

In their discretion, the proxy holders are authorized to vote on all such other matters as may properly come before the meeting or any adjournment or postponement thereof.

Please sign exactly as your name appears on your stock certificate(s), date and return this Proxy promptly in the postage-paid envelope provided or vote by Internet or by telephone. Please correct your address before returning this Proxy. Persons signing in a fiduciary capacity should so indicate. If shares are held by joint tenants or as community property, both should sign.

|  | Yes | No |
|---|---|---|
| **HOUSEHOLDING ELECTION** – Please indicate if you consent to receive certain future investor communications in a single package per household | ☐ | ☐ |

| Signature [PLEASE SIGN WITHIN BOX] | Date | Signature (Joint Owners) | Date |
|---|---|---|---|

**THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS**

**KLA–TENCOR CORPORATION**
Notice of Annual Meeting of Stockholders
October 18, 2004

To the Stockholders:

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders of KLA–Tencor Corporation (the "Company"), a Delaware corporation, will be held on Monday, October 18, 2004 at 1:00 P.M., local time, at the Company's offices located at Three Technology Drive, Milpitas, California 95035, for the purposes stated on the reverse side.

The undersigned hereby appoints John H. Kispert and Stuart J. Nichols, or either of them, as proxies, each with the power to appoint his substitute, and hereby authorizes them to represent and to vote, as designated on the reverse side, all of the shares of Common Stock of KLA–Tencor Corporation that the undersigned is entitled to vote at the Annual Meeting of Stockholders, and any adjournment or postponement thereof.

THIS PROXY, WHEN PROPERLY EXECUTED, WILL BE VOTED AS DIRECTED BY THE UNDERSIGNED STOCKHOLDER. IF NO SUCH DIRECTIONS ARE MADE, THIS PROXY WILL BE VOTED FOR THE ELECTION OF THE NOMINEES LISTED ON THE REVERSE SIDE FOR THE BOARD OF DIRECTORS AND FOR PROPOSALS 2 AND 3.

PLEASE MARK, SIGN, DATE AND RETURN THIS PROXY CARD PROMPTLY USING THE ENCLOSED POSTAGE–PAID ENVELOPE.

SEE REVERSE SIDE

CONTINUED AND TO BE SIGNED ON REVERSE SIDE

SEE REVERSE SIDE

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

# E-FILED

Jan 8, 2008 4:14 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6650
By R. Walker, Deputy

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | |
| vs. | Lead Case No.1-07-CV-093465 |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT | Judge Jack Komar |
| T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. | |
| MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, | |
| RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and | |
| DOES 1 through 25, Defendants. | |
| Defendant. | |
| AND RELATED ACTIONS | PROOF OF SERVICE |
| | Electronic Proof of Service |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Tue. January 8, 2008 at 4:05 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Tue. January 8, 2008 at 4:05 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on January 8, 2008 at Oakland, California.

Dated: January 8, 2008                    For WWW.SCEFILING.ORG

E-Filed: Jan 8, 2008 4:14 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6650

Andy Jamieson

E-Filed: Jan 8, 2008 4:14 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6650

1  **THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
   **ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG**

2  **Electronic Proof of Service**
   **Page 2**

3  **Document(s) submitted by Joseph Floren of Morgan, Lewis & Bockius LLP on Tue. January 8, 2008 at 4:05 PM PST**

4  1. Req.Judicial Ntc: Request for Judicial Notice in Support of Defendant KLA-Tencor's Demurrer; Declaration of Joseph E.
   Floren

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

# E-FILED

Jan 9, 2008 3:45 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6658
By R. Walker, Deputy

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | Lead Case No.1-07-CV-093465 |
| vs. | Judge Jack Komar |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | |
| Defendant. | PROOF OF SERVICE |
| AND RELATED ACTIONS | Electronic Proof of Service |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Wed. January 9, 2008 at 3:30 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Wed. January 9, 2008 at 3:30 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on January 9, 2008 at Oakland, California.

Dated: January 9, 2008                    For WWW.SCEFILING.ORG

E-Filed: Jan 9, 2008 3:45 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6658

Andy Jamieson

E-Filed: Jan 9, 2008 3:45 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6658

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG

Electronic Proof of Service
Page 2

Document(s) submitted by Joseph Floren of Morgan, Lewis & Bockius LLP on Wed. January 9, 2008 at 3:30 PM PST

1. Ntc of...: Defendant KLA-Tencor's Notice of Errata

1  JOHN H. HEMANN (SBN 165823)
   JOSEPH E. FLOREN (SBN 168292)
2  TERA M. HEINTZ (SBN 241414)
   MATTHEW WEILER (SBN 236052)
3  MORGAN, LEWIS & BOCKIUS LLP
   One Market, Spear Street Tower
4  San Francisco, CA  94105-1126
   Tel:  415.442.1000
5  Fax:  415.442.1001

6  Attorneys for Defendant
   KLA-Tencor Corporation

7

**E-FILED**

Jan 9, 2008 3:45 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6658
By R. Walker, Deputy

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF SANTA CLARA

10

11  CHRIS CRIMI, on Behalf of Himself and          Case No. 107CV093465
    All Others Similarly Situated,
12                                                 **DEFENDANT KLA-TENCOR'S NOTICE**
                     Plaintiff,                    **OF ERRATA**
13
                       vs.                          Date: February 1, 2008
14                                                 Time: 9:00 a.m.
    EDWARD W. BARNHOLT, H.                          Department:  17C
15  RAYMOND BINGHAM, ROBERT T.                      Judge:  Hon. Jack Komar
    BOND, RICHARD J. ELKUS, JR.,
16  STEPHEN P. KAUFMAN, KENNETH                     Date Filed:  September 4, 2007
    LEVY, MICHAEL E. MARKS, DEAN O.                 Trial Date:  None Set
17  MORTON, KENNETH L. SCHROEDER,
    JON D. TOMPKINS, RICHARD P.
18  WALLACE, KLA-TENCOR
    CORPORATION, and DOES 1 through 25,
19
                     Defendants.
20

21

22

23

24

25

26

27

28

1-SF/7631627.2

E-Filed Jan 9, 2008 3:45 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6658

**TO THE COURT AND ALL COUNSEL OF RECORD:**

Defendant KLA-Tencor Corporation ("KLA") hereby submits a Notice of Errata regarding the Notice of Demurrer and Demurrer filed on January 8, 2008. The Notice of Demurrer and Demurrer filed by counsel for KLA on January 8, 2008, did not include a table of contents or a table of authorities. Attached hereto as **Exhibit A** is a Notice of Demurrer and Demurrer with a table of contents and table of authorities.

DATED:  January 9, 2008

Respectfully submitted,

MORGAN LEWIS & BOCKIUS, LLP

By:_____/s/_____
              JOSEPH E. FLOREN
*Attorneys for Defendant KLA-Tencor Corporation*

1-SF/7631627.2

1

E-Filed Jan 9, 2008 3:45 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6658

**PROOF OF SERVICE BY ELECTRONIC TRANSMISSION**

*Chris Crimi, et al. v. Edward W. Barnholt, et al.*
**Santa Clara County Superior Court Case No. 107CV093465**

I, the undersigned, declare: that I am, and was at the time of service of the documents herein referred to, over the age of 18 years, and not a party to the action; and I am employed in the County of San Francisco, California. My business address is One Market, Spear Street Tower, San Francisco, California 94105.

On the date executed below, I electronically served the document(s) via the Santa Clara Superior Court's electronic filing system described as:

**DEFENDANT KLA-TENCOR'S NOTICE OF ERRATA**

on the recipients designated on the Transaction Receipt located on the Santa Clara County Superior Court's electronic filing website. I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct and was executed on January 9, 2008.

/s/
_____
Erika R. Eberline

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FRANCISCO

1-SF/7631627.2

2

NOTICE OF ERRATA

1   JOHN H. HEMANN (SBN 165823)
    JOSEPH E. FLOREN (SBN 168292)
2   TERA M. HEINTZ (SBN 241414)
    MATTHEW WEILER (SBN 236052)
3   MORGAN, LEWIS & BOCKIUS LLP
    One Market, Spear Street Tower
4   San Francisco, CA  94105-1126
    Tel:  415.442.1000
5   Fax:  415.442.1001

6   Attorneys for Defendant
    KLA-Tencor Corporation

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       COUNTY OF SANTA CLARA

10

11  CHRIS CRIMI, on Behalf of Himself and       Case No. 107CV093465
    All Others Similarly Situated,
12                                              **DEFENDANT KLA-TENCOR'S NOTICE**
                         Plaintiff,             **OF DEMURRER AND DEMURRER;**
13                                              **MEMORANDUM OF POINTS AND**
                  vs.                           **AUTHORITIES**
14
    EDWARD W. BARNHOLT, H.                       Date: February 1, 2008
15  RAYMOND BINGHAM, ROBERT T.                   Time: 9:00 a.m.
    BOND, RICHARD J. ELKUS, JR.,                 Department:  17C
16  STEPHEN P. KAUFMAN, KENNETH                  Judge: Hon. Jack Komar
    LEVY, MICHAEL E. MARKS, DEAN O.
17  MORTON, KENNETH L. SCHROEDER,                Date Filed:  September 4, 2007
    JON D. TOMPKINS, RICHARD P.                  Trial Date:  None Set
18  WALLACE, KLA-TENCOR
    CORPORATION, and DOES 1 through 25,
19
                         Defendants.
20

21

22

23

24

25

26

27

28

1-SF/7631627.2

1                    **NOTICE OF DEMURRER AND DEMURRER**

2   TO THE HONORABLE COURT AND ALL COUNSEL OF RECORD:

3         Please take notice that on February 1, 2008 at 9:00 a.m., or as soon thereafter as the matter

4   may be heard in Department 17 of the Superior Court of the State of California for the County of

5   Santa Clara, defendant KLA-Tencor Corporation ("KLA") will, and hereby does, demur to

6   Plaintiff Chris Crimi's Complaint in its entirety, in the event the Court declines to stay the case

7   based on KLA's pending Motion to Stay.[1]

8         This demurrer is based Plaintiff's failure to state a cause of action against KLA or any

9   defendant under controlling Delaware law. Rather, his First and Second Causes of Action are

10  exclusively derivative in nature and may not be alleged in a direct action such as this one.

11         This Demurrer is based on this Notice, the attached Demurrer and Memorandum of Points

12   and Authorities, the supporting Declaration of Joseph E. Floren, all pleadings on file in this

13   matter and matters of which judicial notice may be taken, and all arguments to be presented to

14   this Court at oral argument.

15   DATED: January 9, 2008              Respectfully submitted,

16                             MORGAN LEWIS & BOCKIUS, LLP

17

18                             By:_____/s/_____
                                     JOSEPH E. FLOREN

19                                *Attorneys for Defendant KLA-Tencor Corporation*

20

21

22

23

24

25

---

26 [1]   KLA earlier filed a separate Motion to Stay this case on the basis of the overlapping, earlier-
filed litigation concerning the same claims, same alleged facts, and same defendants pending

27   in three courts, including this Court. The Motion to Stay is set for hearing at the same time
and place as this demurrer, which KLA asserts only in the alternative only, in the event the

28   Court declines to stay or dismiss the action for the reasons stated in KLA's Motion to Stay.

1                                 **DEMURRER**

2         Defendant KLA-Tencor Corporation ("KLA") hereby demurrers to the First and Second

3   Causes of Action asserted in the Complaint filed by Plaintiff Chris Crimi on each of the following

4   grounds:

5                      Demurrer to the First Cause of Action

6         KLA demurrers to the First Cause of Action pursuant to Cal. Code of Civil Pro. §

7   430.10(e) because Plaintiff fails to allege facts that would entitle him to relief.  Specifically,

8   Plaintiff's First Cause of Action is derivative in nature and cannot be maintained as a direct

9   action.

10                  Demurrer to the Second Cause of Action

11        KLA demurrers to the Second Cause of Action pursuant to Cal. Code of Civil Pro.

12   § 430.10(e) because Plaintiff fails to allege facts that would him to relief.  Specifically, Plaintiff's

13   Second Cause of Action is derivative in nature and cannot be maintained as a direct action.

14        WHEREFORE KLA prays that this demurrer be sustained without leave to amend.

15

16   DATED:  January 8, 2008              Respectfully submitted,

17                                 MORGAN LEWIS & BOCKIUS, LLP

18

19                          By:_____/s/_____
                                    JOSEPH E. FLOREN
20                               *Attorneys for Defendant KLA-Tencor Corporation*

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7631627.2                    2

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

Page

I.    FACTUAL AND PROCEDURAL HISTORY..................................................4

    A.    Plaintiff's Complaint...................................................................4

II.   ARGUMENT ...........................................................................................5

    A.    Plaintiff's First and Second Causes of Action Are Derivative Under
        Delaware Law...................................................................................5

        1.    Plaintiff Alleges No Harm Independent Of Harm To The Company .........6

        2.    The Relief Plaintiff Seeks Would Benefit The Company .......................10

    B.    Plaintiff Lacks Standing To Bring A Derivative Claim.....................................11

III.  CONCLUSION ...........................................................................................11

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

1-SF/7631627.2

i

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Ash v. McCall,*
   2000 WL 1370341 (Del. Ch. Sept. 15. 2000).................................................11

5

*Barratt American, Inc. v. City of San Diego,*
   117 Cal.App.4th 809 (2004)..............................................................9

6

*Beard v. Elster,*
   120 A.2d 731 (Del. Ch. 1960)...........................................................6

7

8

*Bradley v. First Interstate Bancorp,*
   748 A.2d 913 (Del. 2000)..............................................................11

9

*Edgar v. MITE Corp.,*
   457 U.S. 624 (1982).....................................................................5

10

11

*Elster v. Am. Airlines, Inc.,*
   100 A.2d 219 (Del. Ch. 1953)....................................................6, 7, 11

12

13

*Feldman v. Cutaia,*
   2007 WL 2215956 (Del .Ch. Aug. 1, 2007)..........................................6, 8, 9

14

*Friese v. Superior Court,*
   134 Cal. App. 4th 693 (2005)...........................................................5

15

16

*Gentile v. Rossette,*
   906 A.2d 91 (Del. 2006)................................................................2

17

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,*
   547 U.S. 71 (2006).....................................................................3

18

19

*Schuster v. Gardner,*
   127 Cal. App. 4th 305 (2005)...........................................................6

20

*State Farm Mut. Auto. Ins. Co. v. Superior Court,*
   114 Cal. App. 4th 434 (2003)...........................................................5

21

22

*StorMedia, Inc. v. Superior Court,*
   20 Cal. 4th 449 (1999)..................................................................9

23

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,*
   845 A.2d 1031 (Del. 2004)..........................................................2, 6

24

25

*Vogel v. Jobs,*
   No. 06-5208 JF, 2007 WL 3461163 (N.D. Cal. Nov. 14, 2007).........................10

26

**STATUTES**

27

15 U.S.C.
   § 78bb(3)(A).............................................................................6

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

1-SF/7631627.2

ii

1

<u>TABLE OF AUTHORITIES</u>
(continued)

2
                                                                            <u>Page</u>

3   Cal. Code Civ. Proc.
        § 430.10(e)...................................................................................6
4       § 430.30(a)...................................................................................9

5   Cal. Evidence Code
        § 452(h) ......................................................................................9

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

1-SF/7631627.2                                  iii

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff's Complaint is an unsuccessful attempt to fashion a direct shareholder cause of action for dilution, a harm that is plainly derivative under controlling Delaware law, and for which only defendant KLA-Tencor Corporation ("KLA") could have a potential right to recover. KLA believes that this action should be stayed, for the reasons explained in its Motion to Stay.  In the event the Court is not inclined to grant a stay, KLA requests that the Court consider this demurrer, which is based on Plaintiff's failure to assert any direct claim against KLA.[2]

Apparently recognizing that he lacks standing to bring any derivative claim in the name of KLA (he is no longer a shareholder), Plaintiff attempts to state a limited direct action against KLA and certain present and former KLA officers and directors, claiming that his equity interest and voting rights were impaired by the failure to disclose alleged "backdating" at KLA during earlier years.  Specifically, according to Plaintiff's Complaint, defendants' purported failure during the period September 2002 to September 2006 to disclose information about *prior* backdating justifies an award of damages for the dilution of shareholder ownership interests that resulted from KLA's issuance of additional, non-backdated stock options in more recent years. Plaintiff even seeks the rescission of those more recent option grants to the innocent KLA officers and employees who received them (who are not named as parties).  This claim is patently spurious on multiple levels, but to dispose of the case the Court need consider only the absolute unavailability of the relief Plaintiff seeks in this direct action.  As a matter of law, such claims based on dilution are exclusively derivative in nature and may be asserted only by the corporation, not by a shareholder or putative class of shareholders.  As a result, Plaintiff's

---

[2]  Because it should dispose of this action in its entirety, this demurrer addresses only the legal conclusions that Plaintiff's Compliant is derivative in nature and cannot be maintained directly.  There are several other serious defects in the Complaint that need not be addressed at this time.  For example, Plaintiff has not properly alleged any actionable misstatements or failures to disclose by defendants during the putative class period; Plaintiff's own allegations eliminate any possibility of causation of damages, since it is clear that the issuance of the challenged options during the putative class period had no relation to any purported misstatement by defendants in any proxy statement, and those options would have been issued anyhow; and Plaintiff's cause of action for rescission does not exist under Delaware law, as rescission is only a potential remedy for a breach of fiduciary duty, not a separate cause of action.  KLA reserves the right to raise these and other challenges to these other defects in the Complaint at the appropriate time, if necessary.

1-SF/7631627.2                                                    1

1    Complaint must fail.

2         This is not the usual stock option backdating[3] case, in which a shareholder plaintiff alleges

3    either harm to the company caused by individuals' misconduct (a derivative action), or harm to

4    shareholders through loss in value of the stock caused by the misconduct.  Rather, the essence of

5    Plaintiff's convoluted allegations is that KLA and its directors and officers failed to disclose the

6    backdating of certain stock option grants from 1997 through June 2002 (which allowed option

7    recipients to purchase KLA stock at prices that were lower than the market prices when the

8    options were granted), and that defendants issued additional options *thereafter*, during the

9    putative class period from September 2002 through 2006 – options that supposedly would not

10   have been issued had the prior backdating been disclosed.  While Plaintiff claims that the exercise

11   of these options resulted in the issuance of shares that "diluted" Plaintiff's voting power and

12   ownership interest, it is axiomatic that any such marginal diminution impacted all shareholders

13   equally, with the equally incontestable result that the claim – if any claim exists at all here – must

14   be derivative under the controlling Delaware law, including the leading Delaware Supreme Court

15   cases *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004), and

16   *Gentile v. Rossette*, 906 A.2d 91, 99-100 (Del. 2006).

17        Plaintiff's reason for attempting to manufacture a claim in such a roundabout way is

18   obvious:  Numerous other plaintiffs have beaten Mr. Crimi to the punch by more than a year in

19   suing these same defendants in multiple derivative and class action lawsuits based on the same

20   alleged failure to disclose options backdating at KLA – cases filed in three different courts,

21   including this one, in mid-2006 on the heels of a May 22, 2006 *Wall Street Journal* article

22   suggesting that KLA and several other companies had "backdated" stock options between 1994

23

24   ───────────────
     [3]   "Backdating," also termed "retroactive pricing," generally refers to the selection of exercise
25   prices for stock options based not on the market price for the underlying stock on the date the
     option grant was completed or finally approved, but on a lower market price for the stock on
26   an earlier date.  The actual grant date, or "measurement date" for accounting purposes, is
     deemed to be the date that all essential actions necessary to complete the granting of the
27   option are concluded, including identification of all grantees and final determination of the
     number of shares granted to each and the exercise price of the option.  Options are said to be
28   "backdated" or "retroactively priced" if the exercise price is set as of a date before the
     measurement date.  *See generally* Complaint ¶¶ 29-31, 66.

1-SF/7631627.2                                            2

1    and 2001.[4]  *See* Complaint ¶ 47.  Plaintiff, who admittedly was not a KLA shareholder at the time

2    of the stock option backdating alleged in the Complaint, seeks to throw another log on the

3    litigation bonfire by inventing a new kind of claim – straining to assert rights as a shareholder

4    apart from the Company to complain about dilution, while assiduously avoiding making any

5    claim for losses on the purchase, sale, or holding of KLA stock, which would make this case

6    removable and subject to mandatory dismissal under the Securities Litigation Uniform Standards

7    Act ("SLUSA"), 15 U.S.C. § 78bb(f)(1).  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v.*

8    *Dabit*, 547 U.S. 71 (2006).

9        Plaintiff's effort cannot succeed under Delaware law, which dictates that these claims are

10   derivative in nature.  Plaintiff alleges two forms of dilution purportedly resulting from KLA's

11   issuance of stock options during the putative class period: dilution in his ownership interest in

12   KLA, and dilution in his voting power.  *See* Complaint ¶¶ 79, 85.  As a shareholder of a public

13   company with hundreds of millions of shares outstanding, if Plaintiff's voting rights and

14   ownership interest were impacted by the challenged stock options, then those rights necessarily

15   were impacted in the same marginal, fractional way as the rights of every other shareholder.

16   Plaintiff's failure to allege a specific harm to him that is independent of any harm to the Company

17   or shareholders at large makes the claim essentially derivative in nature.

18        Plaintiff also fails to plead facts that might support any claim for improper dilution of

19   voting rights under Delaware law.  Plaintiff does not allege the stock option grants at issue were

---

[4]   Between May 22, 2006 and July 3, 2006, five shareholder derivative actions were filed in the
United States District Court for the Northern District of California, San Jose Division, each of
which asserted claims based on the same stock option backdating and related misstatements
against nominal defendant KLA and current and former officers and directors of KLA,
including all of the defendants in the instant case.  These cases have been consolidated and are
now pending under the caption *In re KLA-Tencor Corporation Shareholder Derivative
Litigation*, Case. No. 06-03445 JW (N.D. Cal.).  *See* Request for Judicial Notice in Support of
KLA's Motion to Stay, filed November 13, 2007 ("Stay RJN"), Ex. 3.  Another derivative
action is pending in *this* court, with *the same plaintiff's counsel* as the instant case, under the
caption *Rabin v. Barnholt, et al.*, No. 1-06-CV-064841.  Stay RJN, Ex. 2.  Another hybrid
derivative-class action that alleges both derivative claims and a shareholder class claim for
dilution is pending in the Delaware Chancery Court under the caption *Langford v. Barnholt,
et al.*, No. 2295-N.  Stay RJN, Ex. 1.  Yet another consolidated shareholder class action, in
which the plaintiffs assert federal securities causes of action, is pending in the United States
District Court for the Northern District of California under the caption *In re KLA-Tencor
Corporation Securities Litigation*, No. C 06-4065 MJJ.  Stay RJN, Ex. 4

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7631627.2                                                                                          3

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT

1    an attempt by a controlling shareholder to increase voting control at the expense of Plaintiff and

2    other public shareholders, because he cannot do so.  Nor can Plaintiff's claim actually proceed as

3    a derivative action: Plaintiff states that he is no longer a shareholder, which is fatal to his ability

4    to maintain a derivative action under Delaware law.  Accordingly, KLA asks that this Court

5    sustain its demurrer without leave to amend.

6    I.    **FACTUAL AND PROCEDURAL HISTORY**

7          A.    **Plaintiff's Complaint**

8          Plaintiff filed the Complaint in this case on September 4, 2007, asserting two causes of

9    action for breach of fiduciary duty and rescission.[5]  Plaintiff alleges that KLA and the individual

10   defendants – eleven former and current officers and directors of KLA – breached their fiduciary

11   duties to Plaintiff by failing to disclose that KLA had purportedly granted backdated options

12   between 1997 and June 30, 2002.  Complaint ¶ 1.  Given that Plaintiff admittedly did not even

13   own KLA stock during the period of alleged backdating, he does not allege any injury arising out

14   of the backdating itself or based on the purported misstated financial statements that resulted.

15   Complaint ¶ 5.  Rather, Plaintiff claims that *if* he had known about the backdating in the years

16   after the purported backdating had ceased, he would not have approved KLA's adoption of its

17   2004 Equity Compensation Plan in 2004.  Plaintiff does not allege, however, that adoption of the

18   new Plan in 2004 was in any way necessary to or an essential link in bringing about the dilution

19   of which he complains.  Plaintiff also alleges, impossibly, that he somehow would have

20   disallowed the automatic issuance of additional options under the "Evergreen Provision" of the

21   prior plan (the 1982 Stock Option Plan) in 2003 and 2004 but for the alleged misconduct, even

22   though his own allegations show this was not a matter on which Plaintiff was entitled to vote.

23   Complaint ¶¶ 78-79.  The "Evergreen Provision" under the 1982 Stock Option Plan automatically

24   authorized the issuance each year of stock options covering an amount of shares equal to 3% of

25   KLA-Tencor's outstanding shares of common stock as of the end of the prior fiscal year.

26   Complaint ¶ 32.  As the Complaint makes clear, however, the authorization of additional shares

27   [5]   KLA admits none of Plaintiff's allegations, and hereby reserves the right to challenge the
28   sufficiency of the pleadings, including whether Plaintiff has alleged any valid cause of action
     against KLA, at the appropriate time.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7631627.2                                    4

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT

1   under the Evergreen provision had no relationship to any supposed misstatements or breaches of

2   duty by defendants because, as Plaintiff alleges, it was "automatic." Complaint ¶ 32.

3         Notwithstanding that Plaintiff alleges *no* factual connection between any wrongdoing in the

4   form of purported backdating at KLA and the 2004 Equity Compensation Plan or the issuance

5   of shares under the Evergreen provision, Plaintiff alleges that he and the putative class were

6   injured "as a result of the dilution of its voting power and proportionate share of the Company

7   due to the dedication of over millions [sic] of KLA-Tencor shares as a result of the addition of

8   stock pursuant to the Evergreen Provision and adoption of the 2004 Equity Incentive Plan."

9   Complaint ¶ 79. Plaintiff seeks to rescind "all stock added to the 1982 Stock Option Plan

10  pursuant to the terms of the Evergreen Provision" and the 2004 Equity Incentive Plan. *Id.* ¶ 81.

11  Additionally, Plaintiff seeks cancellation of the shares of stock added pursuant the Evergreen

12  Provision and Equity Incentive Plan. *Id.*

13  **II.   ARGUMENT**

14       **A.   Plaintiff's First and Second Causes of Action Are Derivative Under Delaware Law**

15

16        Plaintiff's First and Second Causes of Action are derivative under controlling Delaware

17  law because they seek to redress the same fundamental harm, namely that Plaintiff's equity and

18  voting interests were diluted as a result of the exercise of allegedly backdated options. California

19  courts apply the law of the state of incorporation to claims relating to internal corporate affairs.

20  *State Farm Mut. Auto. Ins. Co. v. Superior Court*, 114 Cal. App. 4th 434, 442 (2003). As KLA is

21  a Delaware corporation (*see* Complaint ¶ 17), and the claim patently concerns KLA's internal

22  affairs,[6] Delaware law determines whether this action is derivative or direct.[7] The Supreme Court

23  _____

24  [6]  The internal affairs doctrine requires that the law of the state of incorporation applies when the lawsuit covers the subject matter of a corporation's dispute with shareholders. *Friese v.*

25  *Superior Court*, 134 Cal. App. 4th 693, 706 (2005) ("The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a

26  corporation's internal affairs-matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders") (citation omitted); *see also*

27  *Edgar v. MITE Corp.*, 457 U.S. 624, 645-46 (1982) ("[t]he internal affairs doctrine is a . . . principle which recognizes that only one State should have authority to regulate a

28  corporation's internal affairs, [i.e.,] matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders.") Accordingly, Delaware law applies to shareholder actions, such as this one, related to the issuance of stock options. *See*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7631627.2

5

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT

1  of Delaware has stated that "a court should look to the nature of the wrong and to whom the relief

2  should go.  The stockholder's claimed direct injury must be **independent of any alleged injury**

3  **to the corporation.**"  *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del.

4  2004) (emphasis added).  A court should sustain a demurrer when an action is derivative in nature

5  and cannot be maintained directly.  *Schuster v. Gardner*, 127 Cal. App. 4th 305, 317-318 (2005)

6  (affirming dismissal; holding demurrer properly sustained to complaint that alleged no direct

7  claims under *Tooley*); Cal. Code Civ. Pro. § 430.10(e)  (California law requires that demurrer be

8  sustained where a plaintiff has pled no set of facts that entitled him to relief).  Since the harm

9  Plaintiff alleges is entirely derivative of harm to KLA, and any relief would ultimately benefit

10 KLA, the action is derivative in nature and the claim must fail as a class action.

11          1.    Plaintiff Alleges No Harm Independent Of Harm To The Company

12          The instant Complaint is nothing more than "a plaintiff creatively attempting to recast a

13 derivative claim by alleging the same fundamental harm in a slightly different way." *Feldman v.*

14 *Cutaia*, 2007 WL 2215956, at *10 (Del .Ch. Aug. 1, 2007).  Rephrasing a claim traditionally

15 understood as derivative to claim harm to a shareholder, however, "is disfavored by Delaware

16 courts." *Id.*  Delaware courts recognize that claims alleging damage based upon equity dilution

17 are *fundamentally derivative* because, among other things, such claims are based upon the alleged

18 waste of corporate assets. *Elster v. Am. Airlines, Inc.*, 100 A.2d 219, 222 (Del. Ch. 1953);

19 *Cutaia*, 2007 WL 2215956, at *7 ("Mere claims of dilution, without more, cannot convert a

20 claim, traditionally understood as derivative, into a direct one.").

21          Like the case at bar, the *Elster* action involved a complaint by an individual stockholder

22 *also Elster v. Am. Airlines*, 100 A.2d 219 (Del. Ch. 1953) (applying Delaware law to claims
   related to issuance of stock options); *Beard v. Elster*, 120 A.2d 731, 735 (Del. Ch. 1960)

23 ("The issuance of stock option plans by Delaware corporations involves the internal affairs of
   a Delaware corporation and is, therefore, controlled by the laws of Delaware.").

24
25 [7]  Plaintiff's claims must be based *exclusively* upon Delaware law for the further reason that
       they otherwise would be absolutely barred as a matter of federal law.  SLUSA bars any
       attempt to make a state law shareholder class action claim except to the extent the claim

26     remains within the narrow exception from SLUSA for actions "based upon the statutory or
       common law of the State in which the issuer is incorporated" that involve "communication[s]

27     with respect to the sale of securities of securities of an issuer" that are made to stockholders
       concerning their voting rights (*i.e.*, the proxy statements on which the Complaint is based).

28     15 U.S.C. § 78bb(3)(A).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7631627.2                                              6

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT

1  seeking to rescind and cancel the issuance of stock options on terms he felt were detrimental to

2  the corporation and shareholders.  845 A.2d at 220.  After examining the complaint, the Delaware

3  Court of Chancery held that "[a]ny injury which plaintiff may receive by reason of the dilution of

4  his stock would be equally applicable to all the stockholders of the defendant, since plaintiff holds

5  such a small amount of stock in proportion to the stock outstanding that the control or

6  management of defendant would not be affected by the granting of these options...." *Id.* at 222."

7  The same circumstances are presented here, because Plaintiff has not alleged that the stock option

8  grants were issued and exercised in such a way to wrest voting control from himself and other

9  public shareholders.  This case alleges identical harm to all shareholders, not the kind of

10 differential harm (such as dilution of minority shareholders or overriding their voting rights) that

11 might be addressed through a direct action.  The *Elster* court further explained that equity dilution

12 claims are predicated on harm done to the corporation:

13      Plaintiff claims that the value of his stock will deteriorate and that his
        proportionate share of the stock will be decreased as a result of the granting
14      and exercise of the stock options.  Assuming plaintiff's contention is
        correct, this would apply to the stock of all other shareholders as well.
15          ...
16      Here the wrong of which Plaintiff complains is not a wrong inflicted upon
        him alone or a wrong affecting any particular right which is asserting –
17      such as his pre-emptive rights as a stockholder, rights involving the control
        of the corporation, or a wrong affecting the stockholders and not the
18      corporation – but is an indirect injury as a result of the harm done to the
        corporation.

19 *Id.* at 222-223.  Drawing an analogy to corporate overpayment, the Delaware Supreme Court

20 recently reaffirmed the essential holding of *Elster* and announced the standard for pleading a

21 direct action for shareholder dilution:

22      In the typical corporate overpayment case, a claim against the corporation's
        fiduciaries for redress is regarded as exclusively derivative, irrespective of
23      whether the currency or form of overpayment is cash or the corporation's
        stock. **Such claims are not normally regarded as direct, because any**
24      **dilution in value of the corporation's stock is merely the unavoidable**
        **result (from an accounting standpoint) of the reduction in the value of**
25      **the entire corporate entity, of which each share of equity represents an**
        **equal fraction.**  In the eyes of the law, such equal "injury" to the shares
26      resulting from a corporate overpayment is not viewed as, or equated with,
        harm to specific shareholders individually.
27          ...
28      Because the shares representing the "overpayment" embody both economic

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7631627.2                              7

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT

value and voting power, the end result of [over-issuing shares to a controlling shareholder] is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder.  For that reason, the harm resulting from the overpayment is **not confined to equal dilution of the economic value and voting power of each of the corporation's outstanding shares.**

*Gentile v. Rossette*, 906 A.2d 91, 99-100 (Del. 2006) (emphasis added).  Thus, under *Gentile*, where (as here) a plaintiff alleges dilution of equity and voting rights that amounts to "equal dilution of the economic value and voting power of each of the corporation's outstanding shares," the claim is derivative in nature.

The First and Second Causes of Action in the Complaint are plainly derivative because Plaintiff does not allege that *his* equity or voting power was diluted to benefit a controlling shareholder, or any other harm that is different from the purported dilutive harm to all shareholders.  *See Cutaia*, 2007 WL 2215956.  In *Cutaia*, the Delaware Court of Chancery granted a defendant's motion to dismiss on the ground that plaintiff's complaint – which alleged dilution in the form of diminution of equity and voting power – did not state a direct cause of action.  The plaintiff's claim there was deemed derivative because the complaint did not plead more than a diminution that impacted all shareholders equally: "[a] claim for wrongful equity dilution is premised on the notion that the corporation, by issuing additional equity for insufficient consideration, made the complaining stockholder's stake less valuable.  Equity dilution claims are typically viewed as derivative under Delaware law."  *Id.* at *7.

Here, similarly, the gravamen of Plaintiff's First and Second Causes of Action is that the interests of shareholders were diluted by the allegedly improperly procured issuance of stock options.  Plaintiff claims that "[t]he class was harmed as a result of the dilution of its voting power and proportionate share of the Company due to the dedication of over millions of KLA-Tencor shares as a result of the addition of stock pursuant to Evergreen Provision and adoption of the 2004 Equity Incentive Plan."  Complaint ¶ 79.  *See also id.* ¶ 85 ("The Class was also harmed as a result of the dilution of its voting power and proportionate share of the Company due to the dedication of millions [of] KLA-Tencor shares . . . .").  Crucially, Plaintiff does not allege that any controlling stockholder or group of them gained from the transaction to the benefit of

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FRANCISCO

1-SF/7631627.2

8

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT

1    Plaintiff and other public shareholders, which is the only way he might make out a direct claim

2    here. Such an allegation would be essential to sustain a direct claim because "the harm *Gentile*

3    ... seek[s] to remedy **can only arise when a controlling stockholder, with sufficient power to**

4    **manipulate the corporate process, engineers a dilutive transaction whereby the stockholder**

5    **receives an exclusive benefit of increased equity ownership and voting power for inadequate**

6    **consideration.**" *Cutaia*, 2007 WL 2215956 at *8. No such allegations are presented here, nor

7    could there be, as this is not a case of misconduct by controlling shareholders to increase their

8    own equity or voting power at the expense of other shareholders.

9        Not only is the narrow fact pattern that might support a direct cause of action under

10   Delaware law absent here, but it *cannot* possibly be alleged, given that KLA is a large publicly

11   traded corporation with diffuse ownership. Plaintiff cannot allege that his interest in KLA was

12   diluted to the benefit of a controlling shareholder because KLA, which has hundreds of millions

13   of outstanding shares and thousands of shareholders, does not have any controlling shareholders.

14   The class Plaintiff purports to represent is defined as "thousands of KLA-Tencor stockholders of

15   record ... located throughout the United States" who own "millions of KLA-Tencor stock."

16   Complaint ¶ 27(a). But Plaintiff nowhere alleges that the defendants constitute a voting majority

17   or anything close to it, much less that the issuance of the stock options in question had any effect

18   to increase the voting power or equity of any controlling shareholders. Rather, Plaintiff alleges

19   that these options were issued to all eligible employees. *See* Complaint ¶¶ 39-46, 62.

20       The proxy statements incorporated by reference in Plaintiff's own Complaint plainly

21   demonstrate that there has been, and is no, controlling shareholder here.[8] For example, KLA's

22

23   ---

[8]    A court may consider documents incorporated by reference in the complaint and matters
24    which are subject to judicial notice in ruling on a demurrer. *Barratt American, Inc. v. City of
    San Diego*, 117 Cal.App.4th 809, 812 n.2 (2004). Here, KLA's proxy statements may be
25    considered in demurrer because they are incorporated by reference in Plaintiff's Complaint.
    *See* Complaint ¶¶ 30,33-36, 38-39, 41, 43-44, 46, 76, 77. Plaintiff quotes form the proxy
    statements in order to plead his claims against KLA. Thus, it is only fair that Court consider
26    the totality of the proxy statement in determining whether Plaintiff has pled a valid cause of
    action. Moreover, the facts regarding ownership of shares of KLA is type of fact that cannot
27    reasonably be disputed. *See* Cal. Evidence Code § 452(h). Thus, this Court can judicially
    notice the ownership statistics recited therein. *StorMedia, Inc. v. Superior Court*, 20 Cal. 4th
28    449, 457, n.9 (1999) ("In ruling on a demurrer, a court may consider facts of which it has
    taken judicial notice."); Cal. Code Civ. Proc., § 430.30(a).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7631627.2                                    9

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT

1   2004 Definitive Proxy discloses that "[a]ll directors and executive officers as a group" owned

2   only 3.16% of the shares of KLA. *See* Request for Judicial Notice ("RJN"), Ex. 1. Additionally,

3   the 1998 Definitive Proxy states that "[a]ll directors and executive officers as a group" owned

4   only 4.99% of the shares. *See* RJN, Ex. 2. Thus, Plaintiff cannot show that KLA had a

5   controlling shareholder, and under no circumstances could he show that the defendants increased

6   their voting power at the expense of other shareholders through the option issuances in question.

7       A recent order in a stock options backdating case from the Northern District of California

8   confirms that the purported dilution related to alleged backdated options is derivative. *See Vogel*

9   *v. Jobs*, No. 06-5208 JF, 2007 WL 3461163 (N.D. Cal. Nov. 14, 2007). In *Vogel*, a plaintiff

10  shareholder (represented by Plaintiff's same counsel) attempted to bring a class action alleging

11  that officers and directors of Apple, Inc. breached their fiduciary duties of disclosure by issuing

12  false and misleading proxies. *Id.* at *2. The District Court granted the 12(b)(6) motion filed by

13  defendants, which sought dismissal on the grounds the claims asserted by the class were

14  derivative under California law. Finding that "California corporate law is functionally equivalent

15  to Delaware law," the District Court held that the claims asserted were derivative under *Tooley*

16  and *Gentile* because plaintiff did not allege that Apple Inc., a large publicly-traded corporation

17  like KLA, had a controlling shareholder. *Id.* at *2-*3. In the absence of a controlling

18  shareholder, the District Court held that the allegations amounted to nothing more than corporate

19  waste: "Lead Plaintiff's allegations properly are analyzed as claims of corporate overpayment that

20  must be treated as derivative under the *Tooley* test. The thrust of the allegations is that the

21  recipients of the backdated options were overpaid, in violation of Apple's stock options plans.

22  Such allegations necessarily involve an injury to the corporation in that overpayment entails a

23  reduction in corporate assets." *Id.* at *3.

24              2.      The Relief Plaintiff Seeks Would Benefit The Company

25      Although the foregoing discussion should dispose of this case, it bears noting that

26  Plaintiff's "rescission" claim further betrays the inherently derivative nature of his claims.

27  Plaintiff seeks rescission and cancellation of options issued by KLA to its employees and shares

28  issued upon the exercise of such options. *See* Complaint ¶ 81. Under both causes of action,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7631627.2                                      10

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT

1    Plaintiff seeks rescission of shares issued pursuant to the 1982 Stock Options Plan and the 2004

2    Equity Incentive Plan.    Plaintiff alleges that the 1982 Stock Options Plan governed the issuance

3    of stock options to employees, and that the Board of Directors was responsible for its

4    implementation. *See* Complaint ¶¶ 31-43.  Similarly, the 2004 Equity Incentive Plan governs

5    issuance of stock options to employees and is administered by the Board of Directors. *Id.*, ¶¶ 44-

6    46.  Plaintiff does not allege that he or any other shareholder had any rights or obligations under

7    these plans and agreements.  Rather, Plaintiff alleges that the "pervasive backdating scheme"

8    caused "options to be issued … to carry a much lower price than the strike price." *Id.*, ¶ 76.

9    Thus, if the plans and stock issued thereunder were rescinded, the Company would be the

10    recipient of the shares of stock issued under the stock options plan.  In seeking to undo the

11    issuance of options, "the wrong for which the complaint is made is the action of the corporation

12    in entering into the contract." *Elster*, 845 A.2d at 222.  Like the instant matter, *Elster* considered

13    a prayer for relief asking a court to enjoin issuance of stock under a stock option plan, and sought

14    cancellation of stock already issued. *Id.*  The relief benefits the corporation because in alleging

15    issuance of options at less-than market value, "the loss in each instance is to the corporation and

16    to the stockholders as a whole." *Id.* at 223.

17    **B.    Plaintiff Lacks Standing To Bring A Derivative Claim**

18    Delaware law unequivocally requires a Plaintiff to be a current shareholder of a company

19    in order to bring and maintain a derivative suit. *Bradley v. First Interstate Bancorp*, 748 A.2d

20    913 (Del. 2000); *Ash v. McCall*, 2000 WL 1370341, at *12 (Del. Ch. Sept. 15. 2000) (describing

21    Delaware's continuous ownership standing requirement as "iron clad").  Plaintiff here admits that

22    he is no longer a shareholder of KLA. *See* Complaint ¶ 5 (alleging that Plaintiff owned shares of

23    KLA stock "between September 20, 2002 and September 27, 2006").  Accordingly, Plaintiff lacks

24    standing to maintain a derivative action, and this Court should not grant leave to amend to allow

25    Plaintiff to style his Complaint as a derivative action.

26    **III.    CONCLUSION**

27    This Court should sustain KLA's demurrer to Plaintiff's complaint because it cannot be

28    maintained as an individual action.  Moreover, because it is clear from Plaintiff's Complaint that

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FRANCISCO

1-SF/7631627.2                                11

1    he is no longer a shareholder of KLA, this Court should deny leave to amend the Complaint as a

2    derivative action.

3

4    DATED:  January 9, 2008                    Respectfully submitted,

5                                              MORGAN LEWIS & BOCKIUS, LLP

6

7    By:_____/s/_____

8                                              JOSEPH E. FLOREN
                                               *Attorneys for Defendant KLA-Tencor Corporation*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FRANCISCO

1-SF/7631627.2                              12

DEFENDANT KLA-TENCOR'S NOTICE OF DEMURRER AND DEMURRER; MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT

# E-FILED

Jan 9, 2008 3:24 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6657
By R. Walker, Deputy

1

2

3  JOHN H. HEMANN (SBN 165823)
   JOSEPH E. FLOREN (SBN 168292)
4  TERA M. HEINTZ (SBN 241414)
   MATTHEW WEILER (SBN 236052)
5  MORGAN, LEWIS & BOCKIUS LLP
   One Market, Spear Street Tower
6  San Francisco, CA  94105-1126
   Tel:  415.442.1000
7  Fax:  415.442.1001

8  Attorneys for Defendant
   KLA-Tencor Corporation
9

10          SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                 COUNTY OF SANTA CLARA

12

13  CHRIS CRIMI, on Behalf of Himself and         Case No. 107CV093465
    All Others Similarly Situated,
14                                                **DEFENDANT KLA-TENCOR'S**
                   Plaintiff,                     **APPENDIX OF OUT-OF-STATE**
15                                                **AUTHORITIES IN SUPPORT OF**
           vs.                                    **DEMURRER**
16
    EDWARD W. BARNHOLT, H.                         Date: February 1, 2008
17  RAYMOND BINGHAM, ROBERT T.                     Time: 9:00 a.m.
    BOND, RICHARD J. ELKUS, JR.,                   Department:  17C
18  STEPHEN P. KAUFMAN, KENNETH                    Judge:  Hon. Jack Komar
    LEVY, MICHAEL E. MARKS, DEAN O.
19  MORTON, KENNETH L. SCHROEDER,                  Date Filed:  September 4, 2007
    JON D. TOMPKINS, RICHARD P.                    Trial Date:  None Set
20  WALLACE, KLA-TENCOR
    CORPORATION, and DOES 1 through 25,
21
                   Defendants.
22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

7651799_1.TMP

APPENDIX OF OUT-OF-STATE AUTHORITIES

E-Filed Jan 9, 2008 3:24 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6657

**TO THE COURT AND ALL PARTIES OF RECORD:**

Please take notice that Defendant KLA-Tencor Corporation hereby submits the following out-of-state authorities in support of its demurrer:

<u>CASES</u>                                                                                                  **TAB**

*Ash v. McCall,*
 2000 WL 1370341 (Del. Ch. Sept. 15. 2000) ...................................................................1

*Beard v. Elster,*
 120 A.2d 731 (Del. Ch. 1960) ......................................................................................2

*Bradley v. First Interstate Bancorp,*
 748 A.2d 913 (Del. 2000)..............................................................................................3

*Edgar v. MITE Corp.,*
 457 U.S. 624 (1982)......................................................................................................4

*Elster v. Am. Airlines, Inc.,*
 100 A.2d 219 (Del. Ch. 1953) .......................................................................................5

*Feldman v. Cutaia,*
 2007 WL 2215956 (Del .Ch. Aug. 1, 2007) ...................................................................6

*Gentile v. Rossette,*
 906 A.2d 91 (Del. 2006)................................................................................................7

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,*
 547 U.S. 71 (2006) ........................................................................................................8

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,*
 845 A.2d 1031 (Del. 2004).............................................................................................9

*Vogel v. Jobs,*
 No. 06-5208 JF, 2007 WL 3461163 (N.D. Cal. Nov. 14, 2007) ...............................10

<u>STATUTES</u>

15 U.S.C. § 78bb(3)(A) ...................................................................................................11

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

7651799_1.TMP                                          1

APPENDIX OF OUT-OF-STATE AUTHORITIES

E-Filed Jan 9, 2008 3:24 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6657

1

2

3    DATED:  January 9, 2008                    Respectfully submitted,

4                                              MORGAN LEWIS & BOCKIUS, LLP

5

6                                              By:_____
                                                        /s/
7                                                  JOSEPH E. FLOREN
                                              *Attorneys for Defendant KLA-Tencor Corporation*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7651799_1.TMP                            2

**EXHIBIT A
TO DEFENDANT KLA-TENCOR'S
APPENDIX OF OUT-OF-STATE
AUTHORITIES IN SUPPORT OF
DEMURRER**

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213

(Cite as: 2000 WL 1370341 (Del.Ch.))

Page 1

**H**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Arlene ASH, Noel Saito, Kimberly Madajczyk and
Sydney H. Dalman, Plaintiffs,
v.
Charles W. MCCALL, Mark A. Pulido, Richard H.
Hawkins, Heidi E. Yodowitz,
Alfred E. Eckert III, Tully M. Friedman, Alton F.
Irby III, M. Christine
Jacobs, Gerald E. Mayo, James v. Napier, David S.
Pottruck, Carl E. Reichardt,
Alan Seelenfreund and Jane E. Shaw, Defendants,
and
MCKESSON HBOC, INC., Nominal Defendant.
No. Civ.A. 17132.

Submitted March 15, 2000.
Decided Sept. 15, 2000.

Pamela S. Tikellis, Robert J. Kriner, Jr., and
Timothy R. Dudderar, of Chimicles & Tikellis LLP,
Wilmington, Delaware, for Plaintiffs.

Joel Friedlander, of Bouchard Margules & Fried-
lander, Wilmington, Delaware; Samuel R. Miller,
of Folger Levin & Kahn LLP, San Francisco, Cali-
fornia, for the Former HBOC Outside Directors, of
counsel.

Anthony W. Clark and Paul J. Lockwood, of Skad-
den, ARPS, Slate, Meagher & Flom LLP, Wilming-
ton, Delaware; Jonathan J. Lerner, of Skadden,
Arps, Slate, Meagher & Flom LLP, New York,
New York, and James E. Lyons, of Skadden,
ARPS, Slate, Meagher & Flom LLP, San Francisco,
California, for McKesson Hboc, Inc., of counsel.

Alan J. Stone and Jessica Zeldin, of Morris, Nich-
ols, Arsht & Tunnell, Wilmington, Delaware; Kar-
en Steinberg Kennedy, of Paul, Weiss, Rifkind,
Wharton & Garrison, New York, New York, for
Defendant Charles W. McCall, of counsel.

Grover C. Brown, of Gordon, Fournaris & Mam-
marella, P.A., Wilmington, Delaware, for Defend-
ants Tully M. Friedman, David S. Pottruck, Carl E.
Reichardt, Alan Seelenfreund and Jane E. Shaw, of
counsel.

Michael D. Goldman, of Potter Anderson & Cor-
roon LLP, Wilmington, Delaware, for Defendant
Mark A. Pulido.

*MEMORANDUM OPINION*

CHANDLER, J.

*1 Shareholder plaintiffs Arlene Ash, Noel Saito,
Kimberly Madajczyk and Sydney H. Dalman assert
derivative claims on behalf of McKesson HBOC,
Inc. ("McKesson HBOC" or the "Company"), a
Delaware corporation, which was formed through
the merger of McKesson Corporation
("McKesson") and HBOC & Co. ("HBOC") on
January 12, 1999. Approximately 3 1/2 months
after McKesson's acquisition of HBOC became ef-
fective, McKesson HBOC issued the first of what
appears to be three downward revisions of reven-
ues, earnings, net income, and other financial in-
formation, for financial years 1996-1998. The com-
plaint generally asserts claims related to these revi-
sions. Pending before me is defendants' motion to
dismiss.

Ordinarily, I would summarize here the complaint's
allegations. In this instance, however, plaintiffs
have filed a complaint without specifying their
causes of action, despite having twice amended it.
The complaint does not enumerate specific counts,
nor does it present claims in any other readily dis-
cernable manner. Although the complaint is gener-
ously laden with conclusory allegations that "the
facts described herein constitute breaches of direct-
ors' duties of good faith, care and loyalty,"
plaintiffs decline to connect the facts of the com-
plaint with specific claims of wrongdoing.

Plaintiffs' answering brief, however, does suggest
several claims, some of which appear to be based
on alleged violations of directors' oversight duties,
while others are predicated exclusively on alleged

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

fiduciary breaches in connection with McKesson's due diligence investigation of HBOC in the course of the merger process. I will briefly describe plaintiffs' claims now, restating them later with the specificity that I believe necessary to rule on the pending motion.

Generally, plaintiffs allege that the directors of HBOC and McKesson HBOC failed to exercise proper oversight of the companies' financial reporting process so as to prevent accounting improprieties; that the McKesson directors breached their duty of care in the course of investigating HBOC's books and records before the merger; and, finally, that McKesson's acquisition of HBOC constituted an act of corporate waste.

Twelve of the fourteen individual defendants named in this lawsuit comprised McKesson HBOC's full board of directors when plaintiffs filed their first complaint on April 30, 1999, two days after the Company's first publication of earnings restatements. The remaining two individual defendants were senior executive officers. Defendants have moved to dismiss the complaint in part for lack of standing and otherwise for failure to plead particularized facts warranting exception to the presuit demand requirement of Chancery Rule 23.1.

For reasons described more fully below, I grant defendants' motion. I will, however, dismiss plaintiffs' complaint without prejudice, thereby affording plaintiffs an opportunity to gather additional facts and to file a complaint that is legally sufficient.

## 1. FACTUAL BACKGROUND
### A. The Merger

*2 HBOC, a Delaware corporation headquartered in Atlanta before the merger, provides computer software and technology solutions to the healthcare industry. McKesson, a Delaware corporation headquartered in San Francisco, is primarily engaged in the business of healthcare supply management.

Merger discussions between the two companies began in June 1998 when McKesson solicited HBOC's interest in a business combination in order to enter the fast-growing market of software sales to the medical industry. These discussions ripened into due diligence during the first half of July. Shortly thereafter, however, the parties suspended merger talks.

Three months later, in October 1998, discussions resumed when McKesson's Chairman and CEO, Mark Pulido, contacted his counterpart at HBOC, Charles McCall, in order to rekindle interest in a deal. On October 16, McKesson and HBOC announced a definitive merger agreement where McKesson would acquire HBOC in a tax-free, stock-for-stock merger then-valued at approximately $14 billion. Under the terms of the agreement, HBOC would merge with a McKesson acquisition subsidiary and HBOC shareholders would receive 0.37 shares of McKesson common stock in exchange for each share of HBOC common stock.

The parties signed the merger agreement on October 18, 1998. On or around November 27, McKesson and HBOC disseminated a joint proxy statement and on January 12, 1999, their shareholders voted to approve the merger, which became effective on that date. McKesson's name was changed to McKesson HBOC and HBOC, now a wholly owned subsidiary of McKesson HBOC, became the combined Company's health care information technology division.

After the merger, six directors from each pre-merger company comprised the combined Company's board of directors. Five of the six former HBOC directors on the combined Company's board were non-executive, outside directors: Alfred E. Eckert III, Alton F. Irby III, M. Christine Jacobs, Gerald E. Mayo, and James V. Napier. The one inside director, Charles W. McCall, was president, CEO, and chairman of HBOC before the merger and chairman of the combined McKesson HBOC, until his removal from the board on June 21, 1999.

Five of the six former McKesson directors on the combined Company's board were also non-executive, outside directors: Tully M. Friedman,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

David S. Pottruck, Carl E. Reichardt, Alan Seelenfruend, and Jane E. Shaw. Mark A. Pulido, president, CEO, and director of pre-merger McKesson held the same positions at McKesson HBOC after the merger. On June 21, 1999, the Company announced Pulido's resignation.

*B. McKesson HBOC's Accounting Restatements*

On April 28, 1999, McKesson HBOC announced that in connection with its year-end audit, DeLoitte & Touche ("DeLoitte"), the Company's auditor, discovered improperly recorded revenue for the financial year ending March 31, 1999. According to Company press releases, DeLoitte discovered the improprieties by mailing surveys to customers that purportedly bought HBOC software products. When DeLoitte compared the results to the Company's books, it became apparent that many sales had been improperly recorded. McKesson HBOC's share price fell by over $31, nearly half of its value, on the afternoon of the announcement.

*3 In May 1999, the Company announced that more revisions would be made to earnings. Two months later, with its internal investigations concluded, the Company announced that it would have to make a further restatement covering the two previous financial years to correct for improperly recorded revenue. In all, McKesson HBOC had to disallow $327.4 million of revenue and $191.5 million of operating income.

All of the earnings overstatements, disclosed by the Company between April and July 1999, are attributable to HBOC. It appears that HBOC began overstating earnings in 1996 and continued to do so until shortly before the board of the combined McKesson HBOC first disclosed such overstatements on April 28, 1999, approximately 3 1/2 months after the McKesson/HBOC merger closed on January 12, 1999.

The bulk of the accounting irregularities, according to the complaint, stem from the decision of HBOC senior executives (and their subordinates) to book contingent sales as final sales, both before and after the merger with McKesson. These sales remained contingent, say plaintiffs, because they were made containing "side letters" providing for rights of return and, thus, not properly booked as revenue under applicable accounting standards. The complaint also alleges that senior HBOC executives (and their subordinates) backdated sales contracts so that revenues could be falsely reported as having occurred in an earlier period.

*C. Lawsuits Mount and House Cleaning Begins*

Shortly after the first round of earnings restatements, over twenty law firms announced that they had been retained by McKesson HBOC shareholders to investigate and file class action lawsuits for violations of federal securities laws against the Company and certain of the individual defendants named in this lawsuit, among others. Defendants report that over seventy-five class action, derivative, and individual lawsuits have been filed in connection with these events at McKesson HBOC. Additionally, the U.S. Attorney for the Northern District of California and the SEC have launched investigations of the Company.

On June 21, 1999, McKesson HBOC announced that its board of directors would fire defendant McCall and remove him as chairman, and that defendant Pulido would tender his resignation as president, director, and CEO. The Company also announced the resignation of defendant Richard H. Hawkins, executive vice president and chief financial officer. Pulido's and Hawkins' resignations became effective July 15, 1999.

The board of directors also fired several senior executives of the Company's information technology subsidiary (formerly HBOC) including Albert Bergonzi (president and chief operating officer), David Held (controller and chief financial officer), Jay Lapine (senior vice president, general counsel, and secretary), and Michael Smeraski (senior vice president of sales). Contemporaneous with these terminations, the board of directors appointed new executive management for McKesson HBOC; John H. Hammergren and David L. Mahoney, previously executive vice presidents of the Company, were ap-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

pointed co-CEO's and elected to the board.

### D. The "Red Flags"

*4 Plaintiffs' overarching litigation theory, as articulated in their answering brief, is that "the directors of McKesson, HBOC and McKesson HBOC failed to institute and maintain appropriate financial controls and recommended the merger based upon a recklessly inadequate investigation in the face of clear warnings of accounting improprieties at HBOC." [FN1]

FN1. Plaintiffs' Brief at 1.

These "clear warnings" or "red flags" are the linchpin of plaintiffs' liability theory. Plaintiffs point to four "red flags" that HBOC senior officers and directors, and McKesson's board and management team (presumably in the course of due diligence), allegedly disregarded with some degree of culpability ranging from inattention to actual knowledge.

The first of these "red flags" occurred in January 1997 when *Bloomberg*, a financial news company, published a short article questioning HBOC's accounts receivable and near-term growth. Nothing more is alleged about this article.

The second "red flag" occurred three months later in April 1997 when the Center for Financial Research & Analysis, Inc. ("CFRA"), an organization that researches and publishes reports (primarily for institutional investors) relating to financial and accounting issues of public corporations, issued a report on HBOC observing, among other things, that its balance of receivables had surged upward in recent periods. [FN2] The report was mailed to CFRA clients on or about April 15, 1997.

FN2. Complaint Ex. A.

On April 17 and 18, 1997, *The Atlanta Constitution* reported that on April 15, HBOC's stock price had declined nearly 8% on market speculation that the CFRA report criticized HBOC's accounting practices. [FN3] *The Atlanta Constitution* also reported that several industry analysts, who publicly com-

mented on the CFRA report, expressed doubt that it had identified any significant problem at HBOC, citing the Company's "strong fundamentals."

FN3. Complaint Exs. C and D.

Several analysts took the extraordinary step of publishing special reports contesting the CFRA analysis point by point. An HBOC spokesperson stated that the report "doesn't warrant comment." Following these reassurances, HBOC's stock price rebounded to nearly pre-CFRA report levels.

Indefatigable (and apparently correct), on August 19, 1998, CFRA issued a second report critical of HBOC's revenue recognition procedures. CFRA published this report, the third "red flag," approximately sixteen months after the first report and two months before McKesson and HBOC signed their merger agreement. [FN4] Based upon a review of HBOC's public filings, CFRA reported, among other things, that HBOC's operations "may be deteriorating, as partially evidenced by a high and generally growing level of receivables relative to revenue." CFRA also observed that cash flows from operations trailed significantly behind net income in the first two quarters of calendar year 1998.

FN4. Complaint Ex. B.

The final alleged "red flag" flew on or around November 13, 1998, when HBOC announced that Jay Gilbertson, chief financial officer, president, and chief operating officer, would leave the company. Plaintiffs argue that "despite this clear signal of financial impropriety neither HBOC, McKesson, nor McKesson HBOC discovered and/or reported the fundamental accounting irregularities that were overstating HBOC's (and thereafter McKesson HBOC's) sales and revenue." [FN5]

FN5. Complaint at ¶ 40.

### II. CONTENTIONS OF THE PARTIES

*5 Plaintiffs have not set forth claims, based on the above-summarized facts, with particularity. As noted previously, the complaint does not enumerate specific counts; nor does it present plaintiffs' claims

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

Page 5

in any other readily discernable manner. Despite its ambiguity, the complaint, read liberally but fairly, seems to raise four claims.

Plaintiffs' first two claims can be distilled into a due care claim and a waste claim. The due care claim alleges that the directors of McKesson and the directors of HBOC breached their duty of care by failing to inform themselves of all reasonably available material information before deciding to enter into, and recommend, the merger. Put another way, plaintiffs contend that the directors breached their duty of care by failing to detect HBOC's accounting irregularities during the course of due diligence investigations performed in connection with the merger. Although this claim more logically applies to the McKesson directors, plaintiffs seem to insist that it is equally applicable to the HBOC directors.

Plaintiffs assert their waste claim against the McKesson directors. They contend that the McKesson directors' decision to enter into and recommend the merger to McKesson's shareholders constituted an act of corporate waste. That is, plaintiffs contend that the McKesson director's decision to exchange properly valued McKesson shares for overvalued HBOC shares amounts to waste.

Plaintiffs' second set of claims addresses the less often visited issue of a board's oversight duty, a subset of the duty of care, but also potentially raising issues of directors' good faith. Plaintiffs first contend that the directors of HBOC failed to monitor adequately the company's financial reporting in order to ensure compliance with applicable federal laws and regulations for approximately a two-year period preceding the merger (the "First Oversight Claim"). Plaintiffs next maintain that the directors of McKesson HBOC failed to do the same for a three-and-one-half month period after the merger (the "Second Oversight Claim").

Defendants argue that this action must be dismissed for two reasons. First, and primarily, defendants seek dismissal under Chancery Rule 23.1 on the ground that plaintiffs have not made a pre-suit de-

mand on the board of directors and have not alleged particularized facts establishing that demand would be futile. Second, defendants argue that none of the named derivative plaintiffs have proper standing to assert the First Oversight Claim (*i.e.*, the claim that HBOC directors breached fiduciary duties in failing to uncover and cure accounting irregularities before the merger).

### III. ANALYSIS

Though all four of plaintiffs' claims generally assert duty of care breaches, I believe it is sensible to analytically separate the due care and waste claims, brought in connection with the merger transaction, from the two oversight claims, which do not challenge a specific board action or decision. I do so primarily because the demand futility analysis for oversight claims differs from demand futility analysis for due care and waste claims.

*A. Demand Futility Standard for the Due Care and Waste Claims*

*6 A shareholder's right to bring a derivative action does not arise until he has made a demand on the board of directors to institute such an action directly, such demand has been wrongfully refused, or until the shareholder has demonstrated, with particularity, the reasons why pre-suit demand would be futile. [FN6] Here, plaintiffs contend demand would be futile and, thus, should be excused.

FN6. Court of Chancery Rule 23.1.

In considering a motion to dismiss under Chancery Rule 23.1, as in the case of a Rule 12(b)(6) motion to dismiss, the Court confines its attention to the face of the complaint and accepts all well-pled allegations of fact as true. To survive a motion to dismiss under Rule 23.1, however, a plaintiff must plead with particularity the reasons why pre-suit demand would have been futile. [FN7]

FN7. See id; see also *Grimes v. Donald,* Del.Supr., 673 A.2d 1207, 1213 (1996).

Plaintiffs' due care and waste claims arise in connection with an affirmative business decision made

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

by a board of directors. Accordingly, I will analyze demand futility under the two-prong test set forth by the Delaware Supreme Court in *Aronson v. Lewis.* [FN8] Under *Aronson,* pre-suit demand is excused if the shareholder alleges, with particularity, facts sufficient to create a reasonable doubt that (1) a majority of the directors are disinterested and independent, or (2) the challenged transaction is otherwise the product of the directors' valid exercise of business judgment. [FN9]

> FN8. *Del.Supr., 473 A.2d 805, 814 (1984).*

> FN9. *Id.* at 814.

1. *Are the Director Defendants Disinterested and Independent?*

If a plaintiff can raise a reasonable doubt that a majority of directors was disinterested or capable of exercising independent business judgment with respect to the transaction in question, the pre-suit demand requirement is generally excused. A director is considered interested where he receives a personal financial benefit that is not equally shared by the stockholders. [FN10] A disabling conflict of interest is also said to exist when a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders. [FN11]

> FN10. *See Aronson v. Lewis, 473 A.2d at 812.*

> FN11. *Rales v. Blasband, Del.Supr., 634 A.2d 927, 936 (1993).*

In this case, plaintiffs allege that defendants Pulido and McCall, the "masterminds" of the merger, received certain unique benefits upon consummation of the transaction. Specifically, plaintiffs allege Pulido held 1.49 million non-vested options to acquire McKesson common stock as well as 40,000 shares of restricted McKesson common stock. Upon consummation of the merger, these stock options vested and the share restrictions lapsed. Moreover, upon consummation of the merger, defendant McCall became entitled to the maximum amount pay-

able under a McKesson bonus plan-$47,600.

While not conceding that these facts render Pulido or McCall interested in the merger, defendants observe that the absence of any particularized allegations of fact indicating that any of the remaining ten directors were interested in the merger makes Pulido's and McCall's alleged interest legally irrelevant. Not the case, counter plaintiffs, arguing that Pulido and McCall "dominated" the other directors. Specifically, paragraphs 71 and 72 of the complaint provide:

> *7 71. "The six former HBOC Directors lack the independence to impartially respond to the within shareholder demand due to their loyalty to, and domination by, their former Chairman defendant McCall who exerted during his tenure on the Board, and still exerts, such influence and control over these directors."
>
> 72. "The six former McKesson Directors lack the independence to impartially respond to the within shareholder demand due to their loyalty to, and domination by, defendant Pulido and now also defendant McCall who exerts such significant control and influence over them as to render them unobjective."

Nowhere to be found in the pleadings or plaintiffs' opposition brief, however, are particularized facts supporting the conclusory allegations annexed above. Under the very clear guidance of the *Aronson* Court, conclusory allegations of domination and control are insufficient to excuse pre-suit demand:

> "in the demand futile context a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting a 'direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.' The shorthand shibboleth of 'dominated and controlled directors' is insufficient." [FN12]

> FN12. *Aronson v. Lewis* at 816 (quoting *Kaplan v. Centex, Del. Ch., 284 A.2d 119, 123 (1971).*

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213

(Cite as: 2000 WL 1370341 (Del.Ch.))

Plaintiffs have not made a single factual allegation that ten of twelve board members, all of whom were non-management, outside directors, had any material self-interest in the merger. Nor have they alleged particularized facts that would establish that Pulido or McCall-the two allegedly interested directors-dominated the ten non-management, outside directors, neutralizing their ability to make a good faith judgment with respect to the merger transaction. [FN13]

> FN13. See, e.g., Haber v. Bell, Del. Ch., 465 A.2d 353, 358 (1983) (dismissing suit for failure to make demand where only two of thirteen directors were alleged to have material interest in decision).

In short, plaintiffs have not alleged a single fact in support of their domination theory and, as Delaware courts have repeatedly observed, such assumptions will not be made in the context of pre-suit demand. Consequently, pre-suit demand is not excused under Aronson's first prong based on plaintiffs' unadorned, conclusory allegation that a majority of director defendants' were interested in the merger or not independent of allegedly interested parties. [FN14]

> FN14. Although McCall's removal and Pulido's resignation from the McKesson HBOC board post-date the filing of the first derivative complaint, these events surely belie plaintiffs' naked assertion that McCall and Pulido dominated the board of either the premerger or post-merger companies.

2. Is There a Reasonable Doubt that Approval of the Merger was the Product of a Valid Exercise of Business Judgment?

Under Aronson's second prong, the Court must determine whether the complaint raises a reasonable doubt that the "directors exercised proper business judgment in the transaction." [FN15] In this instance, the second prong of the Aronson test addresses the waste claim (purchase terms) and due care claim (informed decisions). I will first consider

the waste claim leveled against former McKesson directors.

> FN15. Grobow v. Perot, Del.Supr., 539 A.2d 180, 189 (1988).

a. The Waste Claim

Although it is indeed axiomatic that a corporate act cannot be a product of sound business judgment and also constitute waste, allegations of waste must nonetheless comply with Rule 23.1 demand requirements. To excuse demand on grounds of corporate waste, plaintiffs must allege "particularized facts that the consideration received by the corporation was 'so inadequate that no person of ordinary sound business judgment would deem it worth that which the corporation has paid.' " ' [FN16] Put another way, plaintiffs must show that the merger in question either served no corporate purpose or was so completely bereft of consideration that it effectively constituted a gift. [FN17]

> FN16. Benerofe v. Cha, Del. Ch., C.A. No. 14614, mem. op. at 19, Chandler, V.C. (Sept. 12, 1996) (quoting Grobow, 539 A.2d at 189).

> FN17. See In re 3Com Shareholders Litig., Del. Ch., C.A. No. 16721, mem. op. at 11, Steele, V.C. (Oct. 25, 1999) (citing Lewis v. Vogelstein, Del. Ch., 699 A.2d 327, 336 (1997)).

*8 Paragraph 32 of the complaint states that McKesson acquired HBOC "to enter the fast-growing business of software sales to the healthcare industry." Evidently, plaintiffs concede that the merger had a perfectly sensible corporate purpose.

It is paragraph 28 of the complaint, however, upon which plaintiffs center their waste claim. There, they quote an analyst from Warburg Dillon Read, an investment bank, who shortly after the Company's first round of corrective disclosures, purportedly stated that '[t]he marketplace is basically valuing HBOC as zero.' [FN18] On the strength of one analyst's hyperbole, made in some undisclosed and uncited medium, plaintiffs argue that McK-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

esson paid $14 billion for something (*i.e.,* HBOC before disclosure of accounting irregularities) that was really worth nothing (*i.e.,* HBOC after disclosure of accounting irregularities). This, argue plaintiffs, constitutes waste. I disagree.

FN18. Complaint ¶ 28.

When McKesson exchanged approximately $14 billion of its stock for all of HBOC's outstanding stock, the market valued HBOC stock at or around that price. That is, the merger did not appear wasteful when it was entered into, put to a shareholder vote, and approved. The fact that the merger turned out badly or, indeed, abominably for McKesson simply does not and cannot mean that approval of the merger was an act of corporate waste *at the time* the McKesson board entered into it. [FN19] The facts alleged by plaintiffs do not make out a waste claim and do not demonstrate that the merger was other than a good faith effort to advance corporate interests or the product of a valid business judgment, at the time the board approved the transaction.

FN19. *See, e.g., Gagliardi v. TriFoods Int'l., Inc.,* Del. Ch., 683 A.2d 1049, 1051 (1996) (stating that an "elementary precept of corporation law [holds that] in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith."); *see also Harbor Fin. Partners v. Huizenga,* Del. Ch., C.A. No. 14933, mem. op. at 34, Strine, V.C. (Nov. 11, 1999).

In any event, plaintiffs' argument, in my opinion, fundamentally misapprehends the nature of a waste claim. If Company A exchanges $100 for an asset from Company B that Company A believes is worth $100, it is not "waste" if it later turns out that Company B's asset was worth only $10. Company B may have perpetrated a fraud on Company A or, perhaps, Company A's directors breached their duty

of care, but Company A or its directors did not commit "waste."

Plaintiffs are examining a corporate transaction with perfect 20/20 hindsight and declaring that it turned out horribly for McKesson, so horribly that it must be a waste of corporate assets. But the relevant time to measure whether the McKesson board committed "waste" is at the time they entered into and approved the transaction. To analyze this claim under the waste standard confuses the due care standard with substantive due care-a concept that is foreign to the business judgment rule. [FN20] Due care in the decision making context is process due care-whether the board was reasonably informed of all material information reasonably available at the time it made its decision. That is the true nature of plaintiffs' attack on McKesson's board, to which I turn next.

FN20. *See Brehm v. Eisner,* Del.Supr., 746 A.2d 244 (2000).

### b. *The Due Care Claim*

Here lies the heart of the lawsuit against former McKesson directors and, to a lesser extent, former HBOC directors. [FN21] Plaintiffs contend that the directors missed several "red flags" that should have alerted them to the accounting problems, in the course of full-scale due diligence, before they approved the merger. Plaintiffs then allege that the directors failed to identify the accounting defects, with some degree of mental culpability ranging from actual knowledge to gross recklessness, reckless disregard, just plain recklessness and, finally, gross negligence.

FN21. I characterize this claim as primarily directed against the McKesson directors because the merger represented something of a windfall to the HBOC shareholders to the extent that the losses borne by HBOC shareholders in connection with the accounting irregularities were serendipitously halved (or thereabout) by virtue of the merger. In other words, because HBOC shareholders received properly valued

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

McKesson stock for their own improperly or, rather, overvalued HBOC stock, and held only a 60% interest in the combined company, as opposed to all of it when the irregularities were disclosed and the stock price plummeted, HBOC shareholders bore only 60% of whatever losses accrued from the accounting irregularities, as opposed to 100%. Former McKesson shareholders, undoubtedly to their chagrin, bore the remaining 40% of the losses. Put more simply, by reducing their ownership interest in the company containing the earnings overstatements from 100% to 60% through the merger, HBOC shareholders reduced their exposure to the overstatements by the same amount.

*9 The notion that McKesson directors had actual knowledge of HBOC's earnings overstatements and nonetheless proceeded with the merger finds no support in the amended complaint. Moreover, it is simply illogical to presume that McKesson directors would *knowingly* cause McKesson to acquire a company with significant, undisclosed earnings misstatements. Nothing in the pleadings remotely suggests a reason why McKesson would purposefully buy such a company; nor do the pleadings offer anything by way of explanation-not a single fact or theory that could possibly support such a conclusion. [FN22]

> FN22. Plaintiffs' allegation that HBOC directors proceeded with actual knowledge of accounting irregularities is a more complicated issue. It is more properly addressed in my discussion of plaintiffs' oversight claims, *infra*, at 41-44.

Taking all the facts in the complaint as true, and reading every conceivable inference in plaintiffs' favor, inexorably leads to the conclusion that plaintiffs' claims sound in negligence, at most. The McKesson board determined that it was in McKesson's strategic interests to enter the healthcare information technology business. It then acted on that objective by pursuing a business combination with

HBOC-one of the leading companies in the field. It hired expert accounting and financial advisors to perform due diligence on HBOC-DeLoitte & Touche and Bear Stearns, respectively. After DeLoitte and Bear Stearns completed their due diligence reviews, with the participation of McKesson management, they waived "green flags" to the McKesson board, in effect saying, "This merger is financially and strategically sound." The McKesson directors approved the merger.

Defendants characterize the "red flags" that plaintiffs make so much of as "dated," "obscure," and "inconsequential" relative to the prominent "green flags" given to the directors by the accounting and financial experts who conducted due diligence reviews in advance of the merger. When plaintiffs' "red flags" are juxtaposed with the clean bill of health given by DeLoitte and Bear Stearns after due diligence reviews, the complaint permits one conclusion: that the McKesson directors' reliance on the views expressed by their advisors was in good faith. What would plaintiffs have the McKesson board do in the course of making an acquisition other than hire a national accounting firm and investment bank to examine the books and records of the target company? Nothing in the pleadings otherwise casts doubt on the good faith of the McKesson directors. [FN23]

> FN23. If these facts demonstrate anything, it is merely that DeLoitte, Bear Stearns, and McKesson management performed shoddy due diligence. Plaintiffs have not brought claims against any of these parties.

Undaunted by the facts alleged in their own complaint, plaintiffs contend that "there is no authority for defendants' argument that the directors here are entitled to abdicate their duties to their experts." [FN24] It is, in reality, plaintiffs' argument that is without basis in fact or law. Directors of Delaware corporations quite properly *delegate* responsibility to qualified experts in a host of circumstances. [FN25] One circumstance is surely due diligence review of a target company's books and records. To delegate this assignment is not an "abdication" of

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

duty. [FN26]

FN24. Plaintiffs' Brief at 17.

FN25. 8 Del. C. § 141(e).

FN26. For an excellent description of the due diligence process in the context of a merger, *see generally*, A. Lajoux & C. Elson, *The Art of M & A Due Diligence* (2000). To conduct due diligence, acquirors typically draw from in-house sources of expertise and from retained outside consultants and advisers. *Id.* at 15.

The complaint here, fairly read, alleges that the McKesson directors were advised by their experts (DeLoitte and Bear Stearns) and that they relied on their expertise in conducting due diligence ancillary to the proposed merger. So the question becomes whether such directors are to be "fully protected" on the basis that they relied in good faith on qualified experts under 8 Del. C. § 141(e). The McKesson board is entitled to the presumption that it exercised proper business judgment, including proper reliance on experts. Plaintiffs have not rebutted the presumption with particularized facts creating reason to believe that the McKesson board's conduct was grossly negligent. That is, plaintiffs have not alleged particularized facts (in contrast with conclusions) that, if proved, would show that (1) the directors in fact did not rely on the expert, or (2) that their reliance was not in good faith, or (3) that they did not reasonably believe that the experts' advice was within the experts' professional competence, or (4) that the directors were at fault for not selecting experts with reasonable care, or (5) that the issue (here, alleged accounting deficiencies in HBOC's financial records) was so obvious that the board's failure to detect it was grossly negligent regardless of the experts' advice, or (6) that the board's decision was so unconscionable as to constitute waste or fraud. [FN27] This complaint is devoid of particularized allegations along these lines and is, therefore, incapable of surviving a motion to dismiss.

FN27. *Brehm v. Eisner*, Del.Supr., 746 A.2d 244, 262 (2000).

*10 More importantly, this Court has stated on several occasions that mere allegations that directors made a poor decision-absent some showing of self-dealing or suspect motivation-does not state a cause of action, much less meet the standard for excusing demand under the second prong of *Aronson*. [FN28] When the challenged transaction was approved by a board composed of a majority of independent, disinterested directors, "a heavy burden falls on [plaintiffs] to avoid pre-suit demand" by challenging the directors' fulfillment of their duty of care. [FN29]

FN28. *See, e.g., Gagliardi*, 683 A.2d at 1052 (stating that to "allege that a corporation has suffered a loss as a result of a lawful transaction, within the corporation's powers, authorized by a corporate fiduciary acting in a good faith pursuit of corporate purposes, does not state a claim for relief against that fiduciary no matter how foolish the investment may appear in retrospect.").

FN29. *Grobow*, 539 A.2d at 190.

In determining whether the complaint creates any doubt that the McKesson directors used due care in approving the merger, the Court considers whether the directors:

(i) inform[ed] themselves of available critical information before approving the transaction; (ii) consider[ed] expert opinion; (iii) provid[ed] all Board members with adequate and timely notice of the [transaction] before the full Board meeting and of its purpose; or (iv) inquir[ed] adequately into the reasons for or terms of [the transaction].... [FN30]

FN30. *Id.* at 191.

Plaintiffs have not alleged facts creating a reasonable doubt that the McKesson directors did not act in accordance with any of these guidelines. Plaintiffs' allegations that directors were less than fully informed of reasonably available material information or that they considered the merger in any other procedurally unsound manner relies entirely

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213

(Cite as: 2000 WL 1370341 (Del.Ch.))

Page 11

on the wisdom of hindsight. The complaint fails to create a reasonable doubt that the informational component of the McKesson directors' decision-making process, measured by the concept of gross negligence, included consideration of all material information reasonably available.

Defendants have also directed the Court's attention to exculpatory charter provisions, enacted under 8 Del. C. § 102(b)(7), in McKesson's and the combined McKesson HBOC's articles of incorporation. Although the exculpatory provisions serve as adequate independent grounds for dismissing the due care claim, [FN31] I principally rely on plaintiffs' failure to allege particularized facts creating a reasonable doubt that the merger, at the time it was entered into, was other than a valid exercise of business judgment.

> FN31. To be precise, the plaintiffs' complaint fails to allege adequately either pre-merger or post-merger bad faith or disloyalty by the McKesson or McKesson HBOC boards. Read fairly, this aspect of plaintiffs' complaint, which sounds in negligence and seeks money damages as a remedy, must be dismissed because of the § 102(b)(7) provision. See In re Frederick's of Hollywood, Inc. Shareholders Litig., Del. Ch., Consol. C.A. No. 15944, mem. op. at 14-16, Jacobs, V.C. (Jan. 31, 2000); In re Lukens Inc. Shareholders Litig., Del. Ch., Consol. C.A. No. 16102, mem. op. at 26-27, Lamb, V.C. (Dec. 1, 1999).

*B. Demand Futility and Standing for Oversight Claims*

The oversight claims do not challenge a director's decision or judgment but, rather, assert that directors failed to properly monitor the corporation they managed. The Delaware Supreme Court modified the demand futility analysis for claims that do not challenge a business decision in *Rales v. Blasband.* [FN32] In the oversight context, where the board has not yet made a decision, demand is excused only when the complaint contains particularized

facts creating a reasonable doubt that a majority of the directors would have been independent and disinterested when considering the demand. [FN33] Directors who are sued for failure to oversee subordinates have a disabling interest for pre-suit demand purposes when "the potential for liability is not a mere threat but instead may rise to a substantial likelihood." [FN34]

> FN32. Del.Supr., 634 A.2d 927 (1993).

> FN33. *Id.* at 934 n. 9 (stating that "where directors are sued derivatively because they have failed to do something (such as a failure to oversee subordinates), demand should not be excused automatically in the absence of allegations demonstrating why the board is incapable of considering a demand. Indeed, requiring demand in such circumstances is consistent with the board's managerial prerogatives because it permits the board to have the opportunity to take action where it has not previously considered doing so.").

> FN34. *See In re Baxter Int'l., Inc. Shareholders Litig.,* Del. Ch., 654 A.2d 1268, 1269 (1995) (quoting *Rales v. Blasband,* 634 A.2d at 936 (internal quotations omitted)).

*11 The odd procedural posture in which this case arises has caused an awkward bifurcation of plaintiffs' oversight claims. Plaintiffs allege that the directors of McKesson HBOC, the parent, *and* HBOC, now a wholly-owned subsidiary, recklessly disregarded the best interests of the respective companies by failing to monitor and control their accounting and financial reporting practices. Accordingly, plaintiffs have brought two oversight claims: the first against HBOC's board for pre-merger oversight failures (the "First Oversight Claim") and the second against McKesson HBOC's board for post-merger oversight failures (the "Second Oversight Claim").

*1. The First Oversight Claim*

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213

(Cite as: 2000 WL 1370341 (Del.Ch.))

Plaintiffs' First Oversight Claim targets the HBOC board for pre-merger oversight failures. Although the defendants contest the merits of the First Oversight Claim, they principally argue that the merits need not and should not be reached because none of the named plaintiffs have standing to bring this claim, predicated on alleged pre-merger fiduciary breaches.

Section 327 of Delaware's General Corporation Law requires a shareholder plaintiff asserting derivative claims to allege that he was a stockholder of the corporation at the time of the transaction of which he complains. [FN35] In addition to this statutory requirement, it is also settled law in Delaware that a derivative plaintiff must be a stockholder at the time he commences suit and must maintain such stockholder status throughout the course of the litigation. [FN36] This is known as the continuous ownership requirement.

> FN35. 8 *Del. C.* § 327 provides: "In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law."

> FN36. *See, e.g., Lewis v. Anderson,* Del.Supr., 477 A.2d 1040 (1984).

None of the four plaintiffs who bring this suit are presently, or were at the time of filing the complaint, shareholders of HBOC. As explained earlier, HBOC became a wholly-owned subsidiary of McKesson in connection with the merger, McKesson was renamed McKesson HBOC, and the now wholly-owned HBOC is simply the Company's information technology subsidiary. For clarity, I will refer to the post-merger HBOC entity as "HBOC Sub."

Nonetheless, two of the four purported representative plaintiffs in this action, Madajczyk and Dalman, contend that they have maintained standing to bring derivative claims against the HBOC board for al-

leged pre-merger fiduciary breaches because they were shareholders of HBOC before the merger and became shareholders of McKesson HBOC in connection with the merger. Thus, Madajczyk and Dalman insist that their continuing equity interests meet all the statutory and common law continuous ownership requirements for standing.

It is settled Delaware law, however, that once a plaintiff ceases to be a shareholder, "whether by reason of a merger or for any other reason," he loses standing to continue a derivative suit. [FN37] The Delaware Supreme Court definitively set forth this bright line rule in *Lewis v. Anderson* and recently reaffirmed it in *In re First Interstate Bancorp Consolidated Shareholder Litigation.* [FN38] The plaintiffs have not effectively distinguished either case.

> FN37. *Id.* at 1049; *see also Kramer v. Western Pac. Indus., Inc.,* Del.Supr., 546 A.2d 348, 354 (1988).

> FN38. Del. Ch., 729 A.2d 851 (1998), *aff'd sub nom., Bradley v. First Interstate Bancorp,* Del.Supr., No. 445, Walsh, J. (March 21, 2000) (ORDER).

*12 Defendants contend that in *First Interstate* this Court held that the derivative "claims" of a First Interstate Bancorp shareholder "were extinguished" as a result of the stock-for-stock merger with Wells Fargo & Company. This characterization of the *First Interstate* holding is well off the mark. *First Interstate* did not hold that a merger "extinguished" derivative "claims." Such a conclusion is utterly incompatible with 8 *Del. C.* § 259(a). [FN39] Rather, the *First Interstate* Court held that barring the applicability of either of two exceptions set forth in *Lewis v. Anderson,* the merger "extinguished" plaintiffs' "standing" to assert derivative claims. [FN40]

> FN39. Section 259(a) provides that all rights, privileges, powers and franchises pass to the surviving corporation in the event of a merger. Derivative claims of the merged corporation constitute choses in

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d

Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213

(Cite as: 2000 WL 1370341 (Del.Ch.))

action that pass to the surviving corporation by operation of § 259(a). *See Lewis v. Anderson,* 477 A.2d at 1044.

FN40. *In re First Interstate,* 729 A.2d at 867.

The two exceptions to *Lewis v. Anderson's* apparently iron-clad rule that a shareholder of a merged entity loses standing to assert pre-merger derivative claims are (i) if the merger itself is the subject of a claim of fraud or (ii) if the merger is in reality merely a reorganization which does not affect plaintiff's ownership in the business enterprise. [FN41] In *First Interstate,* plaintiff Bradley argued under the second exception to the standing rule. The Court rejected this argument holding that "the exception would not apply to mergers with outside or pre-existing corporations with substantial assets." [FN42] Although plaintiffs here have not argued under this second exception, it would be unavailing for similar reasons that (1) the McK-esson/HBOC merger involved two free-standing companies with substantial assets, and (2) the new, combined entity comprised a mix of assets distinctly different from that of the pre-merger company. This arm's length stock-for-stock transaction between two independent companies cannot be characterized as a corporate reorganization.

FN41. *Lewis v. Anderson,* 477 A.2d at 1046 n. 10 (citing *Bokat v., Getty Oil Co.,* Del.Supr., 262 A.2d 246, 249 (1970); *Schreiber v. Carney,* Del. Ch., 447 A.2d 17 (1982)).

FN42. *In re First Interstate,* 729 A.2d at 867 (internal quotations omitted) (citing *Schreiber v. Carney* at 22; also citing *Bonime v. Biaggini,* Del. Ch., C.A. No. 6925 & 6980, Walsh, V.C. (holding second exception not applicable where merger resulted in a "corporate mix ... distinctly different from that [of pre-merger company]")).

Like the plaintiff Bradley in *First Interstate,* however, plaintiffs in this case ask the Court to fol-

low the Third Circuit's decision in *Blasband v. Rales,* [FN43] which granted plaintiffs standing under virtually identical circumstances, rather than *Lewis v. Anderson,* which denied standing in circumstances also virtually identical to those here.

FN43. 971 F.2d 1034 (3 rd Cir.1992).

Plaintiffs have not explained why they believe I am free to follow *Blasband* and not *Lewis.* The *First Interstate* Court rejected the Third Circuit's reasoning in *Blasband v. Rales* in no uncertain terms. Reading *Lewis v. Anderson* expansively, the *First Interstate* Court held that former First Interstate shareholders lost standing to assert pre-merger derivative claims solely by virtue of the merger. In contrast to *Blasband v. Rales,* the fact that the purported derivative plaintiff maintained a significant, though diluted, economic interest in the combined (Wells Fargo) company after the stock-for-stock merger had no impact on the *First Interstate* Court's view of the standing issue:

"Finally, plaintiff Bradley asks the Court to follow the Third Circuit's ruling in *Blasband v. Rales,* 3 rd Cir., 971 F.2d 1034 (1992) (purporting to apply Delaware law), and a case finding post-merger standing under California law. I decline to do so, as the teaching of the Delaware Supreme Court in *Lewis v. Anderson* is both clear and controlling of my decision." [FN44]

FN44. *In re First Interstate,* 729 A.2d at 868 (footnotes omitted).

*13 In a footnote, the *First Interstate* Court described *Blasband* as being "inconsistent with the clear holding of *Lewis v. Anderson.*" [FN45]

FN45. *Id.* at 868 n. 18.

During the briefing on this motion, the Delaware Supreme Court's Order affirming *First Interstate* bolstered defendants' reliance on that case and, relatedly, defendants' reliance on their construction of *Lewis v. Anderson* and *Blasband v. Rales.* Importantly, the Supreme Court's Order concluded that the Court of Chancery correctly determined that

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

Page 14

plaintiff Bradley had pleaded derivative claims and that "[a]ccordingly, [he] lacks standing to assert those claims. See *Lewis v. Anderson,* Del.Supr., 477 A.2d 1040 (1984)." [FN46]

> FN46. *Bradley v. First Interstate Bancorp,* Del.Supr., No. 455, Walsh, J. (March 21, 2000) (ORDER) (emphasis added).

*First Interstate* clearly expressed the Delaware Courts' rejection of the Third Circuit's holding in *Blasband v. Rales* that the combination of a direct pre-merger equity interest (in the subsidiary) and a direct but diluted post-merger equity interest (in the surviving corporation) is sufficient to meet the common law continuous ownership requirement necessary to prosecute pre-merger derivative claims. The Third Circuit's view-that the plaintiff shareholders' continuing economic interest in the subsidiary and thereafter in the parent does not give rise to the concern expressed in 8 *Del. C.* § 327-has been characterized by commentators as "persuasive." [FN47] Nonetheless, it is not the law in Delaware. Accordingly, the complaint is dismissed to the extent that it purports to assert claims on behalf of former HBOC shareholders (plaintiffs Madajczyck and Dalman) for pre-merger acts or omissions of the HBOC directors.

> FN47. *See* D. Wolfe & M. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 9-2(b)(2)(ii) at 549 (1999). Quite frankly, I also find the Third Circuit's view on this issue persuasive. To be sure, it is not consistent with the Delaware Supreme Court's holding in *Lewis v. Anderson* and, for that reason, I am not free to follow it. Nonetheless, I do not think that a principled economic argument exists for denying standing to a former HBOC shareholder who continues to hold an equity interest, albeit diluted, in the HBOC subsidiary through the controlling interest of the combined entity, McKesson HBOC. Like the Third Circuit in *Blasband,* I do not understand how the concerns that animate § 327 are implicated in stock-for-stock mergers of this kind. Indeed, the Court of Chancery has suggested that former stockholders of the subsidiary who held stock in the parent post-merger should nonetheless have standing to assert derivative claims in exactly this type of situation. *See In re Caremark Derivative Litig.,* Del. Ch., 698 A.2d 959, 972 n. 30 (1996). But if this area of Delaware law is to be made consistent with basic economic principles, as well as fundamental principles of equity and fairness, it will have to come from the Delaware Supreme Court.

Although the complaint-as pleaded regarding the First Oversight Claim-must be dismissed for lack of standing, the dismissal order will be without prejudice for three reasons. First, as presently drafted, the amended complaint does not implicate either of the two exceptions to the standing requirement in the merger context. Nor have plaintiffs argued that the merger was perpetrated merely to deprive the shareholders of standing to bring a derivative action or that the merger was in reality merely a reorganization. [FN48] Nevertheless, it is conceivable that the plaintiffs might be able to allege, consistent with Rule 11, that the merger was designed in part to thwart shareholder derivative claims arising out of the HBOC board's failure to monitor the company's internal accounting practices. Dismissing the complaint without prejudice will give plaintiffs that opportunity.

> FN48. *See Kramer v. Western Pac. Indus., Inc.,* Del.Supr., 546 A . 2d 348, 354 (1988) (describing the two exceptions to the rule that a plaintiff must be a shareholder at the time of filing of the suit and must remain a shareholder throughout the litigation).

Second, plaintiffs have not asserted a double derivative claim on behalf of the parent corporation (McKesson HBOC) to enforce a cause of action (the oversight claim against the directors and management of HBOC) in favor of a related corporation (HBOC Sub). Plaintiffs' counsel tried, during oral

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

argument on the motion to dismiss, to recast this lawsuit as a double derivative action. Plaintiff Bradley, in *First Interstate*, made a somewhat similar argument, contending that the claims previously held by First Interstate had passed in the merger to the survivor, Wells Fargo, and he was therefore free to pursue them derivatively as a new stockholder of the survivor. The Court of Chancery rejected this argument on the ground that plaintiff Bradley had never purported to satisfy the demand requirements for a derivative suit on behalf of Wells Fargo. The Court did not address, however, whether standing would have been found to exist if such a showing had been made. [FN49] In any event, the plaintiffs have not adequately pled such a claim at this juncture, not having (apparently) made demand on the boards of the subsidiary company (HBOC Sub) and the parent company (McKesson HBOC) . [FN50] Here, plaintiffs appear to contend that demand is futile as to both boards. But the plaintiffs have not identified the members of the HBOC Sub board, much less pled explicitly that making a demand on them would be futile. Furthermore, plaintiffs have not named HBOC Sub as a party, also a prerequisite for asserting a double derivative action. [FN51]

> FN49. *See* D. Wolfe & M. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 9-2(b)(3)(iii) at 96 (2000 Supp.).

> FN50. 13 Fletcher Cyclopedia of Corporations, § 5977.

> FN51. *Carlton Invs. v. TLC Beatrice Int'l. Holdings, Inc.,* Del. Ch., C.A. No. 13950, mem. op. at 17, Allen, C. (Apr. 16, 1996) ("[I]t is of course well settled that in a standard double derivative action both the parent and subsidiary corporation are indispensable parties.").

*14 Third, and finally, although it is not pleaded in the existing complaint, certain allegations made in the amended complaint and during oral argument on the motion suggest that the current shareholders of the combined McKesson HBOC may be able to assert a claim for breach of fiduciary duty directly against the directors of the combined company as a result of the directors' decision not to pursue a potential claim against the former directors of HBOC for the (alleged) fraud in connection with HBOC's accounting practices. If the directors of the combined company decided not to pursue this potential claim in a manner that is grossly negligent or self-interested, such decision may itself give rise to a potential claim for breach of the fiduciary duties of care or loyalty. That claim would be separate and distinct from a claim based on the failure of HBOC's directors to oversee or monitor properly the accounting practices at HBOC before the merger (*i.e.,* the First Oversight Claim). The claim that I am suggesting might be implicated here arose when the board of the combined company refused, conceivably for reasons related to self-interest or lack of information, to pursue a potential claim or asset of the combined company. In any event, this claim is conceivably implicated by the existing pleadings and, regardless of whether or not it would withstand scrutiny on a motion to dismiss, I think, in the interest of justice, plaintiffs should be afforded an opportunity to amend their existing complaint (if possible) so as to assert it properly. By dismissing the complaint without prejudice, therefore, I afford plaintiffs an opportunity to marshal facts in support of one or more of the alternative theories implicated in the existing pleadings to avoid the impediment of the standing requirements.

2. *The Second Oversight Claim*

With the First Oversight Claim barred on standing grounds, defendants attack the Second Oversight Claim straightforwardly. They argue that the McKesson HBOC board's failure to detect and cure accounting irregularities for a mere 3 1/2 months (from the merger date in January 1999 until the disclosures of accounting irregularities in April 1999) could not possibly constitute oversight violations under the high liability standards set forth in *Graham v. Allis-Chalmers Mfg. Co.* [FN52] or *In re Caremark Int'l Inc. Derivative Litigation,* [FN53] the seminal Delaware cases addressing directors' oversight duties. This argument, no doubt, carries

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

some intuitive appeal. It also, however, exposes the awkward bifurcation of the oversight claims alluded to earlier, which I will now explain in greater detail.

> FN52. Del.Supr., 188 A.2d 125 (1963).

> FN53. Del. Ch., 698 A.2d 959 (1996).

Analysis of the Second Oversight Claim is to a significant extent shaped by my analysis of plaintiffs due care and waste claims brought against the McKesson directors. In analyzing these claims, it is evident that plaintiffs have not alleged facts creating a reasonable doubt that the McKesson directors' decision to acquire HBOC was anything other than a valid exercise of business judgment, made for the good faith purpose of advancing a legitimate corporate interest. It is equally evident, despite the complaint's prolixity, that plaintiffs have not alleged facts creating a reasonable doubt that McKesson's directors acted on an informed basis or properly relied on the advice of the expert advisors they retained in connection with the due diligence review of HBOC.

*15 Within three months of the McKesson board's recommendation and McKesson shareholders' approval of the merger, the combined Company's auditor, DeLoitte & Touche, informed the board of HBOC Sub's accounting irregularities. The McKesson HBOC board, comprised of six former McKesson directors and six former HBOC directors, responded to this information by initiating an internal investigation that culminated in a series of sweeping earnings restatements. In addition, the board made sweeping management changes, firing several senior managers and creating a new executive management structure.

In light of these facts, drawn directly from plaintiffs' complaint, it seems ineluctable that McKesson directors became aware of the accounting improprieties after the merger was consummated and immediately took decisive steps to disclose and cure them. These actions do not bespeak faithless or imprudent fiduciaries.

The role played by the six former HBOC directors on the combined Company's board in connection with the disclosure of the accounting irregularities remains somewhat unclear. A modicum of well-pled facts, sprinkled throughout the complaint, could lead to an inference that the HBOC directors might have had knowledge of suspect accounting practices and, therefore, potential accounting irregularities, in advance of the DeLoitte report. [FN54] If plaintiffs can allege such facts with particularity, which to this point they have not, relief from the demand requirement might be warranted.

> FN54. I emphasize the word "potential" because despite having (inconsistently) pled that every named defendant had "actual" knowledge of accounting irregularities and legal violations, plaintiffs have not asserted a single fact that might reasonably support such an allegation.

As recounted more fully above, plaintiffs have alleged well-pled facts that in April 1997 the CFRA published a report questioning HBOC's revenue recognition practices. This report garnered a fair amount of media attention, was the focus of much analyst commentary, and appeared to have some impact, albeit brief, on HBOC's share price. Although HBOC did not issue an official response, *The Atlanta Constitution* quoted HBOC's director of investor relations as saying "we don't think [the report] warrants comment." [FN55]

> FN55. Complaint at ¶ 21, Ex. D.

These facts indicate that HBOC, at some organizational level, knew of and responded to public criticism of its accounting practices. Plaintiffs have not, however, alleged facts that HBOC's directors had actual knowledge of these events and, therefore, possessed actual knowledge of potential accounting irregularities. Moreover, I do not, at this point, suggest that HBOC's board had constructive knowledge of a statement the company's investor relations department issued. In other words, I do not suggest that the mere existence of a statement from HBOC's investor relations department, made in re-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

sponse to the CFRA report, is sufficient to impute knowledge of such statement to the company's board of directors. [FN56] If plaintiffs can allege particularized facts that might enable this Court to infer that HBOC directors (or perhaps members of HBOC's audit committee) did possess knowledge of facts suggesting potential accounting improprieties (such as knowledge of the CFRA reports) and took no action to respond to them until they were confronted (three months after the merger) with De-Loitte's audit report, one could argue that the HBOC directors (or the audit committee members) failed to act in good faith. [FN57] As a result, demand might in turn be excused.

FN56. I leave it to plaintiffs to adduce such facts through various pre-discovery fact-gathering methods they have at their disposal. As the Delaware Supreme Court has repeatedly exhorted, shareholders plaintiffs should use the "tools at hand," most prominently § 220 books and records actions, to obtain information necessary to sue derivatively. *See, e.g., Rales v. Blasband,* 634 A.2d at 934-935 n. 10; *Brehm v. Eisner,* 746 A.2d at 249.

FN57. Plaintiffs allege that HBOC had an audit committee in place. In light of the known facts, one would be hard pressed to say that it performed particularly well. Nevertheless, the existence of an audit committee, together with HBOC's retention of Arthur Anderson as its outside auditor to conduct annual audits of the company's financial reporting, is some evidence that a monitoring and compliance system was in place at HBOC premerger. If a properly framed complaint were filed, the interesting question would be whether one could find directors liable on an oversight claim when those directors have retained a reputable independent, outside auditing firm and when the same directors have appointed an audit committee that is charged with overseeing the internal and external auditors? Would these facts support a find-

ing that the directors had "utterly fail[ed] to attempt to assure a reasonable reporting system exists" or exhibited a "sustained and systematic failure to exercise reasonable oversight [?]" *Caremark* at 971. Or do such facts indicate the malfunction or breakdown of the compliance system, rather than the absence of, or systematic failure to exercise, reasonable oversight? Without an adequately framed complaint, however, these issues are not properly before the Court. But they illustrate the problem of assessing claims, based on accounting irregularities, under the *Caremark* standard.

*16 This result presents an awkward circumstance. If HBOC directors possessed knowledge of suspect accounting practices at HBOC *before* the merger, one would think such knowledge might give rise to colorable claims that McKesson, as an acquiror, could assert against HBOC under fraud-based theories or perhaps for breaches of provisions in the parties' merger agreement. McKesson, however, is not asserting such claims.

Although one may speculate as to the reasons behind McKesson's disinclination to take legal action against HBOC and its officers and directors, such speculation is completely idle absent nonconclusory allegations of fact. [FN58] Nonetheless, if plaintiffs can allege with some particularity facts indicating that HBOC directors had actual knowledge of accounting irregularities, or knowledge of facts indicating potential accounting irregularities, and took no action until confronted with the DeLoitte audit report in early 1999 (after the merger), such facts, to my mind, could possibly excuse demand as to the Second Oversight Claim. In addition, as indicated above, such facts could give rise to claims that McKesson might bring directly attacking the merger seeking rescission or rescissory damages; or, if McKesson HBOC was unwilling to assert contract-based claims, shareholders might endeavor to bring those claims derivatively on behalf of McKesson HBOC.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213
(Cite as: 2000 WL 1370341 (Del.Ch.))

FN58. Plaintiffs have alleged, in a single conclusory paragraph, that demand was futile because the McKesson HBOC board was faced with an "inherent conflict" that made it unable to respond to the disaster or to bring suit against HBOC for fraud or breach of contract. Second Amended Compl., ¶ 77. According to the amended complaint, the McKesson HBOC board is evenly split-consisting of six former McKesson directors and six former HBOC directors. As a result, when the accounting improprieties came to light, "one half of the Board's blame was the other half of the Board's cover." Pl. Ans. Brief at 9 (Jan. 14, 2000). The notion of a paralyzed board is belied somewhat by the aggressive steps to disclose the problem and to remove certain senior managers. On the other hand, the current board's failure or refusal to pursue potential claims against HBOC's former directors and managers, or against those firms that performed the due diligence, supports the notion of an incapacitated board. But I need not address this issue now, given that plaintiffs will be afforded an opportunity to plead more particular facts about what the HBOC directors knew concerning the accounting improprieties, and when they knew it, in the context of either a direct attack on the current board's failure to pursue the claim or in a double derivative action, as mentioned earlier. Such facts, together with additional facts regarding the board's composition, would assist a court in determining whether the board is structurally unable to make an independent and disinterested judgment regarding the potential claim against HBOC.

Notwithstanding the present inadequacy of the amended complaint, I am convinced that the course of action most consistent with fairness and equity is to dismiss the Second Oversight Claim without prejudice and to grant plaintiffs leave to replead and allege additional, particularized facts that would support a demand futility determination.

IV. CONCLUSION

For the reasons set forth in this Memorandum Opinion, I dismiss plaintiffs' due care and waste claims for failure to make demand under Court of Chancery Rule 23.1. Further, I dismiss the first and second oversight claims, but this dismissal is without prejudice. Using the tools at hand, plaintiffs may seek to develop additional particularized facts in order to allege properly an oversight claim that will meet the demand futility standard and to avoid the standing requirement of Delaware's continuing ownership rule.

An Order has been entered in accordance with this Memorandum Opinion.

ORDER

For the reasons set forth in this Court's Memorandum Opinion entered in this case on this date, it is

ORDERED that plaintiffs' due care and waste claims are dismissed pursuant to Court of Chancery Rule 23.1, and that plaintiffs' first and second oversight claims are dismissed without prejudice.

Not Reported in A.2d, 2000 WL 1370341 (Del.Ch.), 27 Del. J. Corp. L. 213

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT B**
**TO DEFENDANT KLA-TENCOR'S**
**APPENDIX OF OUT-OF-STATE**
**AUTHORITIES IN SUPPORT OF**
**DEMURRER**

Westlaw.

160 A.2d 731

39 Del.Ch. 153, 160 A.2d 731

**(Cite as: 39 Del.Ch. 153, 160 A.2d 731)**

▷

Supreme Court of Delaware.
M. Gould BEARD et al., who were sued with
American Airlines, Inc., et al.,
Defendants-below, Appellants,
v.
William ELSTER and Ray Wolf, Plaintiffs-below,
Appellees.

Feb. 11, 1960.
Petition for Reargument Denied May 13, 1960.

Stockholders' derivative suit challenging validity of employees' stock options for lack of consideration. The Court of Chancery, New Castle County, Marvel, Vice Chancellor, 148 A.2d 343, denied individual optionees' motion to dismiss suit and for summary judgment, and the optionees appealed. The Supreme Court, Wolcott, J., held that where independent and disinterested board of directors adopted an option plan which granted options that could be exercised by optionee only while in the employ of the company subject to certain minor exceptions, and the plan was ratified by stockholders, and employees, whose salaries were below the average of salaries of employees in comparable companies, had knowledge of plan prior to its actual adoption and such knowledge acted as an inducement to employees to remain in corporation's service as was intended by the directors who adopted the plan, stock options were valid.

Reversed and cause remanded with instructions

West Headnotes

**[1] Appeal and Error** ☞80(6)
30k80(6) Most Cited Cases
Where court ruled on defendants' motions for summary judgment that stock option contracts were invalid as a matter of law and he refused to reconsider former ruling that New York law governed, such rulings settled issues and adjudicated rights and Supreme Court had jurisdiction of appeal from such rulings although trial court reserved his decision on other questions.

**[2] Corporations** ☞116
101k116 Most Cited Cases
Issuance of stock option plans by Delaware corporations involves internal affairs of a Delaware corporation and is controlled by laws of Delaware, and New York Personal Property Law did not determine validity of stock option issued by Delaware corporation. Personal Property Law N.Y. § 33, subd. 5.

**[3] Corporations** ☞116
101k116 Most Cited Cases
All stock option plans must be tested against requirement that they contain conditions, or that surrounding circumstances are such, that corporation may reasonably expect to receive the contemplated benefit from grant of options, and there must be a reasonable relationship between value of benefits passing to corporation and value of options granted.

**[4] Corporations** ☞116
101k116 Most Cited Cases
Where independent and disinterested board of directors adopted stock option plan which granted options that could be exercised by optionee only while in employ of company subject to certain minor exceptions, and plan was ratified by stockholders, and employees, whose salaries were below average of salaries of employees in comparable companies, had knowledge of plan prior to its actual adoption and such knowledge acted as inducement to employees to remain in corporation's service as was intended by directors who adopted plan, stock options were valid.

**[5] Appeal and Error** ☞832(4)
30k832(4) Most Cited Cases

**[5] Appeal and Error** ☞1177(9)
30k1177(9) Most Cited Cases
Where stockholders opposing stock option plan sought to interject into the cause on reargument on appeal a new concept in support of contention of invalidity of option after elapse of over seven years, Supreme Court denied reargument and remanded matter with leave to determine the facts. 8 Del.C. §

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

160 A.2d 731
39 Del.Ch. 153, 160 A.2d 731
(Cite as: 39 Del.Ch. 153, 160 A.2d 731)

Page 2

141(b, c).

[6] Appeal and Error ☞893(1)
30k893(1) Most Cited Cases

[6] Pretrial Procedure ☞14.1
307Ak14.1 Most Cited Cases
(Formerly 307Ak14, 127k28 Discovery)
The Supreme Court does not conduct trials for the
determination of facts, and it has no procedure to
afford discovery.
**732 *154 Appeal from the Court of Chancery in
and for new Castle county.

E. N. Carpenter, II, and William E. Wiggin, of
Richards, Layton & Finger, Wilmington, for appel-
lants.

Richard F. Corroon, of Berl, Potter & Anderson,
Wilmington, for American Airlines, Inc.

William E. Taylor, Jr., Wilmington, Abraham L.
Pomerantz and William E. Haudek, of Pomerantz,
Levy & Haudek, New York City, of counsel, for
appellees.

SOUTHERLAND, Chief Justice, WOLCOTT,
Justice, and TERRY, President Judge, sitting.

WOLCOTT, Justice.

This is an appeal from a judgment of the Court of
Chancery of New Castle County denying the mo-
tions of the defendants for summary judgment. The
individual defendants, optionees under restricted
stock option plans, appeal.

At the annual stockholders meeting in 1950 of
American Airlines, Inc., a restricted stock option
plan for the benefit of employees covering 250,000
shares was approved. Pursuant to this approval op-
tions for the purchase of 143,000 shares were is-
sued in 1950.

At the annual stockholders meeting of American in
1951 the allocation of the remaining 107,000 shares
for option purposes was approved. Thereafter, in
1952, options covering the remaining shares of
American were issued to executive and supervisory

employees.

**733 In all, options were issued to 289 employees
of American. They fall into two classes, those of
1950 and those of 1952.

The notice to stockholders of the call of the annual
meeting of 1950 stated that the experience of the
Board of Directors of American had confirmed its
opinion that the issuance of stock options to em-
ployees furnished added incentives and induce-
ments which benefited the corporation. Accord-
ingly, the Board recommended to the stockholders
that the proposed options be exercisable in whole or
in part at any time up to June 1, 1955, provided the
optionee was at the time of exercise still performing
services for the corporation.

The notice to stockholders of the call of the annual
meeting of 1951 contained a statement that, in the
opinion of the Board of Directors of American, the
grant of options to employees was of substantial be-
nefit to the corporation, and that the options as to
the 107,000 shares should be made on the same
terms and conditions as were the 1950 options.

Fundamentally, the options granted, pursuant to the
approval of the Board of Directors and the stock-
holders, provide that an optionee could exercise the
options granted him at any time up to and including
June 1, 1955 if, at the time of exercise, the optionee
was then performing service for the corporation, or
if he was a member of the Armed Services of the
United States, or was employed in a period of *156
national emergency by the United States govern-
ment, provided that at the time he became a mem-
ber of the Armed Forces or became employed by
the Government he was then performing services
for the corporation, and further provided that the
options could be exercised by the legal representat-
ive of the estate of the optionholder at any time
within six months following the optionee's death if,
at the time of death, the optionee was performing
service for the corporation.

The Board of Directors of sixteen members approv-
ing the option plan and submitting the same to the
stockholders for approval was a completely disin-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

160 A.2d 731
39 Del.Ch. 153, 160 A.2d 731
(Cite as: 39 Del.Ch. 153, 160 A.2d 731)

Page 3

terested Board with the exception of two members who ultimately received grants of options under the plan. After the approval of the plan a committee of disinterested Directors was formed for the purpose of granting the options to eligible employees, and proceeded thereafter to allocate the options among the employees of American, including those to the two Directors.

This lawsuit was initially instituted in August, 1952, and named as the sole defendant American. It sought the cancelation of the option plans and the options issued thereunder as invalid gifts of corporate assets. The plaintiff in the original action was Elster who was not a stockholder of American in 1950 when the first group of options was granted. In March, 1953 an additional plaintiff named Cohen was added but, in October, 1953, the action was ordered dismissed as to Cohen because his stock had been voted in favor of the plan.

In June, 1954 the Vice-Chancellor ruled that the individual optionees were indispensable parties to the action. Thereafter, in July, 1956 a third plaintiff named Wolf was added whose stock presumably had not been voted in favor of the 1950 option plan, and who was thus in a position to attack its validity. Thereafter, in 1956, the individual optionees were brought into court by sequestration of their stock. By this time all the options issued under the plan had either been exercised by the optionees or had expired on June 1, 1955 for failure to exercise them.

One hundred and eighty-nine optionees appeared in response to the sequestration and moved for summary judgment in their favor. *157 One hundred and seventy-nine of the appearing optionees filed affidavits in support of the motions for summary judgment.

From the affidavits the following general factual background may be drawn. Some time in the spring of 1950 American's employees **734 were informed by American's expectation of putting into effect an option plan for key employees. Thereafter, options were in fact granted to and exercised by

these defendants. In order to take up the options about 150 of the defendants borrowed money. Following the exercise of the options by the individuals substantial sums of money traceable to the acquisition of the optioned stock have gone into a variety of things, including education bills, living expenses, purchases of homes, cars and other things. It is alleged that these expenditures would not have been made except in reliance upon the optioned stock. Finally, the affidavits assert that the grant and exercise of the options induced the defendants to remain in the employ of American.

Based upon this factual showing, the defendants moved for summary judgment in their favor. It was urged in support of the motions for summary judgment (1) that under the law of Delaware the stock option plans were valid; (2) that the validity of the options was governed by New York law and were valid under New York Personal Property Law, § 33, subd. 5; (3) laches; (4) estoppel; (5) acquiescence in the plan by the plaintiff, Wolf, and (6) statute of limitations.

The Vice-Chancellor held upon the authority of Kerbs v. California Eastern Airways, 33 Del.Ch. 69, 90 A.2d 652, 34 A.L.R.2d 839, that the options involved were invalidly granted, being lacking in consideration to the corporation.

With respect to the other defenses raised by the defendants, he ruled that the asserted defense of estoppel could not be segregated from the basic contention made that the options were, themselves, valid since, if the options were in fact invalid, no action taken by the defendants in reliance upon them could convert into binding contracts what were, at the time they were made, gifts of corporate assets.

With respect to the defense of laches and statute of limitations based upon the lapse of time in attacking the individual options, he *158 determined to hear evidence before deciding the question upon the theory that the critical fact to be determined was the knowledge of the plaintiff. With respect to the defense of estoppel based upon a change in status by the optionees in reliance upon the options, he held

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

160 A.2d 731

39 Del.Ch. 153, 160 A.2d 731

(Cite as: 39 Del.Ch. 153, 160 A.2d 731)

Page 4

that it was not clear that a holding of invalidity of the options, themselves, would lead to a situation incapable of equitable adjustment. In other words, he reserved decision on the point apparently in the belief that an accounting would be required between the corporation and the optionees at a later stage.

With respect to the defense based upon the New York Personal Property Law he refused to reconsider the former decision of the court, reported at Elster v. American Airlines, Del.Ch., 100 A.2d 219, that it did not govern the validity of the options in question.

[1] In their main brief, the plaintiffs suggest this court's lack of jurisdiction to hear this appeal. They base the suggestion upon our ruling in Sterling Drug, Inc. v. City Bank Farmers Trust Co., Del., 154 A.2d 156, to the effect that a motion for summary judgment which settles no issues or adjudicates no rights is not appealable. It is argued that the ruling of the Vice-Chancellor in this cause is similar. However, we do not agree.

Implicit in the opinion of the Vice-Chancellor is his ruling that the option contracts involved in this case are invalid as gifts of corporate assets for failure to comply with the rules laid down in the Kerbs case and in Gottlieb v. Heyden Chemical Corp., 33 Del.Ch. 82, 90 A.2d 660. We think it obvious that he held that these option contracts are invalid as a matter of law. Furthermore, his refusal to reconsider the former ruling that the New York law governed was an adjudication of a legal question affecting the rights of the defendants.

**735 We think it possible that his decision to reserve the other questions raised by the defendants in order to hear evidence might be argued, at least, to fall within the ban of Sterling Drug, but that does not affect the defendant's right to a review of the two referred-to rulings. Consequently, we refuse to note a lack of jurisdiction.

[2] Initially, defendants argue that the option contracts here involved are valid because, as New York contracts, they are governed by *159 New York Personal Property Law, § 33, which validates irrevocable contracts, irrespective of the presence or absence of consideration.

We think the point is without merit. The issuance of stock option plans by Delaware corporations involves the internal affairs of a Delaware corporation and is, therefore, controlled by the laws of Delaware. This question was decided against the defendants in this case by the then Vice-Chancellor in Elster v. American Airlines, Inc., 100 A.2d 219. Without further discussion, we hold that the New York Personal Property Law does not determine the validity of these stock options for the reasons appearing in that opinion.

Accordingly, we now turn to the fundamental question of the appeal, viz., the validity or invalidity of the stock options before us. Plaintiffs argue that the options constitute gifts of corporate assets by reason of the rule of the Kerbs case and Gottlieb v. Heyden Chemical Corp., 33 Del.Ch. 82, 90 A.2d 660, on limited reargument, 33 Del.Ch. 177, 91 A.2d 57. Defendants, on the other hand, argue that the options are not invalidated by the rule laid down in these two cases, and that, in any event, we should re-examine the holdings in the Kerbs and Gottlieb cases and overrule them.

We have considered the reasons advanced by the defendants which, it is argued, should lead us to disapproval of the Kerbs and Gottlieb cases, and are of the opinion that the reasons advanced are not compelling. We accordingly decline to overrule them. On the contrary, we reaffirm the rule announced in them.

The fundamental question for our decision, therefore, viz., the validity of the options granted by American, is to be determined in the light of the rule laid down by this court in the Kerbs and Gottlieb cases. This statement, however, apparently is not sufficient to dispose of the case since the plaintiffs and defendants hold diametrically opposed views as to the effect of the application of this rule to the facts of the case at bar. Under the circumstances, therefore, we think we must state

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

160 A.2d 731
39 Del.Ch. 153, 160 A.2d 731
(Cite as: 39 Del.Ch. 153, 160 A.2d 731)

Page 5

our understanding of what the rule of Kerbs and Gottlieb actually is, not only in order to decide the case now before us but for further cases as well.

*160 The Kerbs case involved the validity of a stock option plan. The plan provided that options granted pursuant to it could be exercised at any time within a period of five years from the date of issuance, but not later than six months after the termination of the employment of the optionee. In addition, each option could be exercised at any proper time for either the full number of shares subject to the option or any part thereof.

The option plan involved was adopted by a Board of Directors of eight, of whom five were ultimate beneficiaries under the plan. Thereafter, the plan was submitted to a stockholders meeting for approval and received the affirmative vote of a majority of outstanding shares.

The plan thus outlined was held invalid by reason of the fact that it was initially approved by an interested Board of Directors and, while it subsequently received the approval of a majority of the outstanding stock, nevertheless, did not within itself contain conditions insuring the ultimate receipt by the corporation of the contemplated benefit of the plan, viz., the retention of the services of the optionees.

We held that any option plan must contain consideration passing to the corporation, **736 which could take variable forms, such as the retention of services of a valued employee, or the gaining of services of a new employee. We further held that the plan, itself, or the surrounding circumstances, must be such as to insure that this consideration will in all reasonable probability be received by the corporation.

For lack of a better word we described the resultant benefit from a stock option plan to the corporation as consideration passing to the corporation. It now appears, however, that the choice of this word was possibly ill-advised since it is regarded, apparently, by some as a measurable *quid pro quo*. Cf. Lieberman v. Becker, Del., 155 A.2d 596. It, of course, by the very nature of things, cannot be that. It is incap-

able of measurement except in terms of business judgment that the plan will spur employees on to greater efforts which in the long run will benefit the corporation. However nebulous it may be, there must be some reasonable assurance in the plan, or the *161 circumstances of the particular case, which can reasonably be expected to make the corporation receive the contemplated benefit.

In discussing the nature of conditions or surrounding circumstances which would sufficiently insure the receipt by the corporation of the contemplated benefit, we said:

'In view of the different circumstances of each corporation and of the permissible variations in the objects sought to be accomplished by stock option plans, the validity of each plan, of necessity, can be ascertained only after a full consideration, not only of the terms of the plan itself, but of the surrounding facts and circumstances as well. No rule of thumb can be devised to test the sufficiency of the conditions which are urged as insurance that the corporation will receive the contemplated benefit. The most that can be said is that in each case there must be some element which, within reason, can be expected to lead to the desired end. What that element may be can well differ in each case.'

In the Gottlieb case we had before us a stock option plan also approved and adopted by an interested Board of Directors. This plan provided that an optionee could exercise his option only so long as he remained an employee of the corporation. This plan, too, was submitted for approval to a stockholders meeting, receiving the approval of a majority of the corporation's stock.

In the proceedings in the Court of Chancery prior to appeal to this court, the Chancellor initially refused to grant a motion by the defendants for summary judgment because of his inability to determine at that stage of the proceedings whether or not the objective behind the stock option plan was calculated 'to benefit the corporation to such an extent that it constitutes legal consideration.'

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

160 A.2d 731
39 Del.Ch. 153, 160 A.2d 731
(Cite as: 39 Del.Ch. 153, 160 A.2d 731)

Page 6

The parties thereupon stipulated that the Board of Directors believed at the time the plan was adopted that the interests of the corporation would be advanced by putting the plan into effect. Upon the filing of this stipulation, the Chancellor thereupon entered judgment in favor of the corporation, thus upholding the validity of the plan. From this judgment the case was appealed to this court.

*162 We held the plan to be defective on the ground that the unsupported belief of an interested Board of Directors could not supply lack of proof of the contemplated benefit to the corporation. We, accordingly, remanded the cause for trial on the ground that neither party was entitled to summary judgment on the question as to the presence or absence of consideration having a value reasonably related to the value of the options.

In the first Gottlieb opinion reference was made to the familiar sound business judgment rule concerning the acts of Directors, and to its inapplicability in a case **737 where the Directors are in fact conferring benefit upon themselves. In the Gottlieb case it appeared that the sole optionees under the plan were also members of the Board of Directors of which they were a majority. It thus followed, we held, that the sound business judgment rule had no application and that, accordingly, there was a 'necessity for the directors to prove that the bargain had in fact been at least as favorable to the corporation as they would have required if the deal had been made with strangers.' [33 Del.Ch. 82, 90 A.2d 663.]

Implicit in the ruling is, of course, that a different situation would have presented itself had the Board of Directors been in fact disinterested. It follows that in such cases the sound business judgment rule might well have come to the aid of the proponents of the plan.

In the Gottlieb case there was present, of course, the element of stockholder ratification of the plan. However, this factor, it was held, did not operate to invoke the sound business judgment rule in favor of that ratification by a majority of the stock, for the

reason that the possible indifference, or sympathy with the Directors, of a majority of the stockholders would not supply the necessary element of good faith exercise of business judgment by Directors in dealing with the corporate assets. The interested nature of the Directors' action therefore required the courts to examine the facts when a minority stockholder attacked the proposed corporate action. It was for the purpose of making such an examination that the remand was ordered upon the issue of the relationship of value between the options and the contemplated benefit to the corporation.

*163 Following the first opinion in the Gottlieb case certain aspects of the matter were further clarified by a supplemental opinion (reported at 33 Del.Ch. 177, 91 A.2d 57) on defendant's petition for reargument. One ground urged for reargument was that the first opinion had destroyed any distinction between cases where Directors vote themselves stock options without stockholder ratification and cases where stockholder ratification is obtained. In the second opinion we pointed out, as we had thought to do in the first opinion, that such was not the fact.

We again held the law on the subject to be in the case of Directors voting themselves stock options and later obtaining stockholder ratification of their act, that the duty of the court to examine the facts consisted solely in sufficient examination to determine whether the terms of the option plan were so unequal as to amount to waste, or whether the question was so close factually as to fall within the realm of the exercise of sound business judgment. We then stated: 'In the former case the court will reverse the decision of the stockholders; in the latter it will not.' If the question of value, which was the issue to be determined on remand, fell under the developed facts into a field in which reasonable men, fully informed, could well differ in opinion, then the sound business judgment rule required the court to approve the plan.

Both the Kerbs and Gottlieb cases dealt with stock option plans adopted by Boards of Directors, at least a majority of which were beneficiaries of the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

160 A.2d 731
39 Del.Ch. 153, 160 A.2d 731
(Cite as: 39 Del.Ch. 153, 160 A.2d 731)

plans. The opinions must therefore be read in the light of this fact. This is necessary in order to properly apply them to other sets of facts.

[3] It is true that Kerbs and Gottlieb lay down a fundamental rule governing all stock option plans, however adopted. At the risk of repetition, we again restate it. All stock option plans must be tested against the requirement that they contain conditions, or that surrounding circumstances are such, that the corporation may reasonably expect to receive the contemplated benefit from the grant of the options. Furthermore, there must be a reasonable relationship between the value of the benefits passing to the corporation and the value of the options granted.

**738 *164 Thus, in the Kerbs case, the fact that the Directors who voted in favor of the plan were permitted by the plan to leave the company's employ and, yet, have the right to exercise their options for six months thereafter impaled the plan upon the prong of failure to provide reasonable safeguards that the corporation would receive the contemplated benefit, i. e., the retention of the services of the optionee.

The option plan in the Gottlieb case fell upon the second prong that there had been no independent appraisal of the value of the services to be retained by means of the options and the value of the options granted. It was this lack, i. e., independent appraisal, that the remand in that case was designed to supply.

[4] What, then, is the result in the case at bar? The option plan now before us was adopted initially by an admittedly independent and disinterested Board of Directors. The plan subsequently received stockholder ratification. The options granted pursuant to the plan could be exercised by the optionee only while in the employ of the corporation, subject to two unimportant exceptions.

There are other circumstances surrounding the adoption of the plan itself which are bound to be considered. It thus appears that, compared with corporations of like size, the comparable salaries of this corporation's employees are below average. It further appears that the proposal to adopt a stock option plan was made known to the corporation's employees prior to its actual adoption and that this knowledge acted as an inducement to those employees to remain in the corporation's service.

Of prima importance is the fact that the adoption of the plan by the Directors was an exercise of independent business judgment that the plan would be of benefit to the corporation and would result in the retention of the services of valued employees. If it be objected that this is but surmise concerning the Directors' reasons, that objection is answered by the action of the Board at its regular meeting of September 16, 1953. At that meeting the Board fully reviewed and considered the benefits received and to be received by the corporation from the plan and reaffirmed its decision with respect thereto.

*165 Furthermore, it is certainly not without significance that of the employees of the defendant corporation granted options, who in turn exercised their option rights, the great majority have remained in the company's employ. This is, of course, hindsight in passing judgment on the plan but, hindsight though it may be, it is the fact of the working of the plan. If it does nothing else, it vindicates the business judgment of the Directors who adopted the plan as insuring the corporation the benefit of the continuation of the services of the optionees. If plaintiffs object, it must be remembered that the plaintiffs were in control of this action which has dragged on past the option expiration date.

We think the fact that a disinterested Board of Directors reached this decision by the exercise of its business judgment is entitled to the utmost consideration by the courts in passing upon the results of that decision. Such has long been the law of this State. Blish v. Thompson Automatic Arms, 30 Del.Ch. 538, 64 A.2d 581.

We have before us a plan which, in the judgment of a disinterested Board, is adequately designed to further the corporate purpose of securing the retention of key employees' services. It is theoretically pos-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

160 A.2d 731
39 Del.Ch. 153, 160 A.2d 731
(Cite as: 39 Del.Ch. 153, 160 A.2d 731)

Page 8

sible, we suppose, that some businessmen could be found who would hold the opinion that options exercisable at once were improvidently granted, but, on the other hand, there are businessmen who would hold a favorable view, as this Board of independent businessmen in fact did. At most, therefore, we find ourselves in the twilight zone where reasonable businessmen, fully informed, might differ. We think, therefore, we are precluded from substituting our uninformed opinion for that of experienced business managers of a corporation who have no personal interest in the **739 outcome, and whose sole interest is the furtherance of the corporate enterprise.

Finally, we think that the lapse of time between the grant and exercise of the options, and the fact that the corporation to date has retained the services of nearly all of its employees to whom it granted options, places this case somewhat in the nature of a stock purchase, the consideration for which is services to be performed in the future. While a contract to purchase stock to be paid for in the future will not withstand contemporaneous attack in the courts, nevertheless, lapse *166 of time and subsequent performance by the purchaser of all or part of the contemplated services will validate the purchase and will supply consideration for such portion of the contracted-for stock as is reasonably related to the value of the services performed. Cf. Scully v. Automobile Finance Co., 12 Del.Ch. 174, 109 A. 49.

For the foregoing reasons, the order of the Vice-Chancellor is reversed and the case remanded with instructions to enter judgment for the defendants.

On Petition for Reargument

Following the filing of the opinion in this appeal, appellees filed a petition for reargument containing Points I, II, III, IV and V. By order we denied reargument on Points II, III, IV and V. Point I, however, contained entirely new reasons why certain of the options--those of 1950 granted to the president and vice-president, respectively, of the corporation--were allegedly invalid. These reasons

were raised for the first time by the petition for reargument. They sought to interject into the cause a new concept in support of the contention of invalidity of the options. Neither this court nor opposing counsel had notice of the contention for it was not even framed by the pleadings in the cause. Under the circumstances, Point I may be fairly said to have raised on application for reargument an entirely different theory of the cause from that on which the appeal had been argued and decided. When such is the case ordinarily we summarily dismiss the petition on the authority of Kerbs v. California Eastern Airways, Inc., 33 Del.Ch. 174, 91 A.2d 62, 34 A.L.R.2d 839, no reasonable excuse for appellees' failure initially to present this new theory having been made.

[5] However, Point I on its face presented a serious question concerning the validity of the corporate action leading to the grant of certain of the options. This arose from the charge that the quorum requirements of the Delaware Corporation Law had been ignored by American Airlines, Inc., thus destroying the foundation of the opinion filed heretofore, viz., valid action by a disinterested Board of Directors. A careful search of the record before us demonstrated that because of the failure to raise the issue below, the facts necessary to decide the question thus presented for the first time were not before us.

*167 We were faced with a dilemma. The appellees had failed to present the argument in the orderly course of the litigation but, nevertheless, the question, if supported by the facts, would have required a new examination of the question of the validity of certain of the options. In other words, if the factual basis for our decision was in truth false, certain of the options were invalid. In view of the apparent seriousness of the question, and despite the extreme tardiness with which the question had been called to our attention, we requested that the appellants answer Point I.

That answer has now been filed, accompanied by a motion to supplement the record with facts which, it is argued, demonstrate the lack of substance of Point I.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

160 A.2d 731
39 Del.Ch. 153, 160 A.2d 731
**(Cite as: 39 Del.Ch. 153, 160 A.2d 731)**

Page 9

Point I charges that the option plan of 1950 and the options granted pursuant to it did not in fact receive the approval of a distinterested Board of Directors since it was proposed and approved at a meeting of the Board at which only eight (two of whom as ultimate optionees can hardly be **\*\*740** said to be disinterested) but of a total of eighteen Directors were present in violation of 8 Del.C. § 141(b) requiring a quorum of a majority of the whole Board, unless a by-law of the corporation provides a different number, which in no case shall be less than one-third of the total. The allegation gave us concern since, no copy of the corporate by-laws being in the record before us, it seemed on the face of things that, assuming the disinterested character of the six Directors present, still no valid Director action could have taken place.

Point I also charges that the committee of disinterested Directors, which assertedly granted certain of the options, was created in violation of 8 Del.C. § 141(c) which authorizes the Board of Directors by a majority of the whole Board to create committees to exercise designated powers of the Board. Point I points out that the committee in question, by resolution, was authorized to be appointed by the president, who later, on the recommendation of the committee, was the recipient of a large block of options. The resolution authorizing the committee was adopted at a Board meeting at which, again, only the same eight Directors were present. Thus, it is argued, that the committee **\*168** was invalidly created and therefore the grant of options by it cannot be held to be a valid corporate grant of the options.

The appellants have now filed an answer to Point I. In addition to attacking the timeliness of Point I, the appellants answer on the merits, admitting at the same time that the facts necessary to make their answer are not in the record. The reason for their absence is given as the failure of the appellees to put the question in issue. Because of the deficiency of the record in this respect, appellants move to supplement it.

Briefly, the answer to Point I is stated to be that Article 3, Section 1 of the corporate by-laws

provide for a minimum quorum of six Directors. If this is the fact, it destroys one phase of the argument made in Point I. With respect to the attack made in Point I on the validity of the committee created to allocate options, appellants say that the Directors' meeting authorizing the creation of the committee complied with the quorum provisions of the corporate by-laws and, furthermore, that the committee in any event was not empowered to grant options, but only to recommend to the Board the grant of options to employees. Thereafter, the Board in its discretion, and in the exercise of its business judgment, was required to approve the grant of options. Therefore, it is argued, the Options Committee was not the type of committee subject to the provisions of 8 Del.C. § 141(c) which governs the creation of committees authorized to exercise 'the powers of the board of directors in the management of the business and affairs of the corporation.'

Furthermore, by way of answer, it is alleged that at Board meetings of July 19, 1950 and of August 16, 1950, at which meetings ten of the members of the Board were present the Board by resolution adopted the report of the Options Committee and awarded the specified options to the recommended optionees. It is further alleged that the president and vice-president, named among the recommended optionees, left the meeting during the discussion and action by the Board on the grant of the proposed options.

Appellants' answer then alleges fundamentally the same facts in defense of the 1952 options, but we do not understand those options **\*169** to be questioned by Point I. As a matter of fact, of the 1950 options attacked in Point I, we conceive that only those granted to the president and vice-president, who were members of the Board at the time, are open to any possible attack at this late date.

We have carefully considered all of these circumstances and hold no doubt but that if they are in truth the facts, there is no foundation whatsoever to the argument made in Point I. We admit to a feeling of annoyance that after the lapse of over **\*\*741** sev-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

160 A.2d 731
39 Del.Ch. 153, 160 A.2d 731
(Cite as: 39 Del.Ch. 153, 160 A.2d 731)

en years since the commencement of this action an argument of desperation, which we will assume to be the product of ignorance of the facts, has required further delay in the ultimate disposition of a cause attacking stock options which have long since either been exercised or expired by their own terms.

It is no answer to the failure of the appellees, plaintiffs below, to raise the issue below to argue, as they do, that the appellants, defendants below, did not raise the issue at the trial. It approaches the realm of the unbelievable to argue seriously that defendants are responsible for the failure to urge on the trial court matter which would have won the plaintiffs' case, if true. Particularly is this so when the complaint, amended at least twice, makes no issue of what is now described in Point 1 as a 'particularly shocking' disregard of the statute and the corporate charter.

Furthermore, we point out, that the actual record before us contains voluminous excerpts from the minutes of Directors' meetings. Presumably, these were furnished plaintiffs by the corporate defendant. If these minutes were open for inspection it seems improbable to us that the minutes referred to avove were not also furnished. However, even if they were not furnished, the present liberality in the allowance of discovery would have made them available. For over seven years appellees have allowed this issue, if indeed it ever was an issue, to sleep. The supposition is that the decision to do so sprang, not from a willingness to have the issues of the case framed by the defendants' pleadings, but from a consciousness that the point was devoid of merit. Indeed, we point out it was only the voids of an incomplete factual record which allowed an argument plausible on its face to be constructed.

*170 We will, accordingly, refuse reargument, and at the same time, since we know of no way to supplement the record on appeal with matter in existence prior to the institution of the action below, we will deny appellants' motion to supplement the record.

The question still remains, however, what we should do with the case. The question arises because of an application the appellees made following the filing of the appellants' answer that they be permitted discovery of all pertinent and related papers concerning the Directors' meetings referred to.

[6] Appellees misconceive the nature of the forum they are in. This court does not conduct trials for the determination of facts, nor does it have any procedure to afford discovery. This court reviews decisions of trial courts on the basis of the records made in them. If this record is deficient, it is the fault of the appellees, who have been in control of the cause since its inception, and thus in a position to determine its course and to frame the issues to be decided.

However, since we have been drawn inadvertently into what seems to be legal shadow-boxing, we will remand the cause to the Vice-Chancellor with leave to determine the facts, including leave to take such discovery proceedings as, in his discretion, shall seem desirable concerning the quorum provisions of the corporate by-laws, and the validity of the grant of the 1950 options to the appellants Smith and Mosier, provided the appellees make application to him for that purpose within ten days of the receipt of this court's mandate, and provided further that if he finds that (1) the quorum requirement of this corporation is a minimum of six Directors; (2) that a valid quorum of Directors was present at the Board meetings of March 15, 1950, June 21, 1950, July 19, 1950, and August 16, 1950, and (3) that the Committee on Allocation of Stock Options was created solely to recommend to the Board for its action the issuance of stock options, and that the Board, itself, approved the issuance of the options, that he shall thereupon vacate the judgment heretofore entered for the plaintiffs and enter judgment for the defendants.

39 Del.Ch. 153, 160 A.2d 731

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT C
# TO DEFENDANT KLA-TENCOR'S
# APPENDIX OF OUT-OF-STATE
# AUTHORITIES IN SUPPORT OF
# DEMURRER

Westlaw.

748 A.2d 913 (Table)
748 A.2d 913 (Table), 2000 WL 383788 (Del.Supr.)
**Unpublished Disposition**
**(Cite as: 748 A.2d 913, 2000 WL 383788 (Del.Supr.))**

**H**

(The decision of the Court is referenced in the Atlantic Reporter in a 'Table of Decisions Without Published Opinions.')

Supreme Court of Delaware.
Timothy W. BRADLEY, individually and as Class representative for the non-moot claims of the certified class, Plaintiff Below, Appellant,
v.
FIRST INTERSTATE BANCORP, Edward M. Carson, William S. Randall, William E.B. Siart, John E. Bryson, Jewel Plummer Cobb, Ralph P. Davidson, Myron duBain, Don C. Frisbee, George M. Keller, Thomas L. Lee, William F. Miller, Steven B. Sample, Forrest N. Shumway, Richard J. Stegemeier, Daniel M. Tellep, and First Bank System, Inc., Defendants Below, Appellees.
No. 445, 1999.

Submitted March 14, 2000.
Decided March 21, 2000.

Court Below: Court of Chancery of the State of Delaware, in and for New Castle County, C.A. No. 14623.

Before VEASEY, Chief Justice, WALSH and BERGER, Justices.

ORDER

**1 This 21st day of March 2000, upon consideration of the briefs of the parties and oral argument, the Court concludes that, in ruling that Plaintiff Below-Appellant had pleaded derivative claims, the Court of Chancery correctly applied the standards announced by this Court in _Kramer v. Western Pacific Indus., Del.Supr., 546 A.2d 348, 354 (1988)_ and _Parnes v. Bally Entertainment Corp., Del.Supr., 722 A.2d 1243, 1245 (1999)_. Accordingly, Appellant lacks standing to assert those claims. _See Lewis v. Anderson, Del.Supr., 477 A.2d 1040 (1984)_. We further conclude that Appellant's California state law claims are exclusively con-

trolled by Delaware law under the internal affairs doctrine. _See McDermott, Inc. v. Lewis, Del.Supr., 531 A.2d 206, 215 (1987)_.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Court of Chancery be, and the same hereby is,

AFFIRMED.

748 A.2d 913 (Table), 2000 WL 383788 (Del.Supr.), Unpublished Disposition

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT D**
**TO DEFENDANT KLA-TENCOR'S**
**APPENDIX OF OUT-OF-STATE**
**AUTHORITIES IN SUPPORT OF**
**DEMURRER**

Westlaw.

102 S.Ct. 2629                                                                                          Page 1
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

▷

Supreme Court of the United States
James EDGAR, Appellant
v.
MITE CORPORATION and Mite Holdings, Inc.
No. 80-1188.

Argued Nov. 30, 1981.
Decided June 23, 1982.

Corporation sought preliminary injunction to pre-
vent issuance of a cease-and-desist order or notice
of hearing or other attempt to enforce Illinois Busi-
ness Takeover Act against the corporation.    The
United States District Court for the Northern Dis-
trict of Illinois, Eastern Division, John Powers
Crowley, J., issued the injunction and the Court of
Appeals, Seventh Circuit, affirmed, 633 F.2d 486.
The Supreme Court noted probable jurisdiction, and
the Supreme Court, Justice White, held that the
Illinois act is invalid as conflicting with the Willi-
ams Act and as conflicting with the commerce
clause.

Affirmed.

Justice Powell and Justice O'Connor filed opinions
concurring in part.

Justice Stevens filed opinion concurring in part and
concurring in judgment.

Justice Marshall dissented and filed opinion in
which Justice Brennan joined.

Justice Rehnquist dissented and filed opinion.

West Headnotes

[1] Federal Courts ☞455.1
170Bk455.1 Most Cited Cases
    (Formerly 170Bk455)
Where company making tender offer had with-
drawn same, and it did not appear whether such
company intended to make another tender offer, but
if Court of Appeals was to reverse judgment of dis-
trict court such company would face both criminal

and civil liability for making offer in violation of
Illinois statute, and intention to enforce act against
such company had been expressed, issues on review
were not moot. Ill.S.H.A. ch. 1211/2, ¶ ¶ 137.51 et
seq., 137.52- 9.

[2] States ☞18.5
360k18.5 Most Cited Cases
    (Formerly 360k4.13)
State statute is void to extent that it actually con-
flicts with valid federal statute, and conflict will be
found where compliance with both federal and state
regulations is physical impossibility or where state
law stands as obstacle to accomplishment and exe-
cution of full purposes and objectives of Congress
(per Justice White, with the Chief Justice and one
Justice concurring). Securities Exchange Act of
1934, § 28(a) as amended 15 U.S.C.A. § 78bb(a);
Va.Code 1950, § 131-528; U.S.C.A.Const.Art. 1, §
8, cl. 3; Art. 6, cl. 2; Ill.S.H.A. ch. 121 1/2 , ¶¶
137.51 et seq., 137.52-9.

[3] Securities Regulation ☞52.10
349Bk52.10 Most Cited Cases
    (Formerly 349Bk52)
Williams Act was congressional response to in-
creased use of cash tender offers in corporate ac-
quisitions, a device that had removed substantial
number of corporate control contests from reach of
existing disclosure requirements of federal securit-
ies laws, and, in imposing requirements of the Act,
Congress intended to protect investors, but major
aspect of effort to protect investor was to avoid fa-
voring either management or takeover bidder (per
Justice White, with the Chief Justice and one
Justice concurring). Securities Exchange Act of
1934, §§ 13(d)(1), 14(d)(1, 5-7), (e) as amended 15
U.S.C.A. §§ 78m(d)(1), 78n(d)(1, 5-7), (e).

[4] Securities Regulation ☞52.10
349Bk52.10 Most Cited Cases
    (Formerly 349Bk52)
In enacting Williams Act, Congress sought to pro-
tect investor not only by furnishing him with neces-
sary information but also by withholding from man-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629

Page 2

457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728

(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

agement or bidder any undue advantage that could frustrate exercise of an informed choice (per Justice White, with the Chief Justice and one Justice concurring). Securities Exchange Act of 1934, §§ 13(d)(1), 14(d)(1, 5-7), (e) as amended 15 U.S.C.A. §§ 78m(d)(1), 78n(d)(1, 5-7), (e).

**[5] Securities Regulation ⚖=52.10**
349Bk52.10 Most Cited Cases
    (Formerly 349Bk52)
In enacting Williams Act, Congress intended to strike balance between investor, management and takeover bidder, and although bidder was to furnish investor and target company with adequate information, there was no intention to do more than give incumbent management opportunity to express and explain its position, and when such opportunity was extended, it was anticipated that investor, if he
so chose, and takeover bidder should be free to move forward within time-frame provided by Congress (per Justice White, with the Chief Justice and one Justice concurring). Securities Exchange Act of 1934, §§ 13(d)(1), 14(d)(1, 5-7), (e) as amended 15 U.S.C.A. §§ 78m(d)(1), 78n(d)(1, 5-7), (e).

**[6] States ⚖=18.77**
360k18.77 Most Cited Cases
    (Formerly 360k4.13)
Precommencement notification provision of Illinois Business Takeover Act by providing company with additional time within which to take steps to combat offer furnishes incumbent management with powerful tool to combat tender offers, perhaps to detriment of stockholders who will not have offer before them during such period, and precommencement notification provision frustrates objectives of Williams Act. (Per Justice White with the Chief Justice and one Justice concurring). Securities Exchange Act of 1934, §§ 1 et seq., 12-14, 13(d, e), 14(d-f) as amended 15 U.S.C.A. §§ 78a et seq., 78l-78n, 78m(d, e), 78n(d-f); Ill.S.H.A. ch. 121 1/2 , ¶¶ 137.52-10, 137.54, subds. A, B, E, 137.57, subds. A, B, E.

**[7] States ⚖=18.77**
360k18.77 Most Cited Cases
    (Formerly 360k4.13)
Congress in enacting Williams Act anticipated that

investors and takeover offeror would be free to go forward without unreasonable delay, and hearing provisions of Illinois Business Takeover Act frustrate congressional purpose by introducing extended delay into tender offer process. (Per Justice White, with the Chief Justice and one Justice concurring). Securities Exchange Act of 1934, §§ 1 et seq., 12-14, 13(d, e), 14(d-f) as amended 15 U.S.C.A. §§ 78a et seq., 78l-78n, 78m(d, e), 78n(d-f); Ill.S.H.A. ch. 121 1/2 , ¶¶ 137.52-10, 137.54, subds. A, B, E, 137.57, subds. A-E; Clayton Act, § 1 et seq. as amended 15 U.S.C.A. § 12 et seq.

**[8] States ⚖=18.77**
360k18.77 Most Cited Cases
    (Formerly 360k4.13)
Illinois Business Takeover Act allows Illinois Secretary of State to pass upon substantive fairness of tender offer and thus offers investor protection at expense of investor autonomy, which is approach quite in conflict with that adopted by Congress in enactment of Williams Act (per Justice White, with the Chief Justice and one Justice concurring). Securities Exchange Act of 1934, §§ 1 et seq., 12-14, 13(d, e), 14(d-f) as amended 15 U.S.C.A. §§ 78a et seq., 78l-78n, 78m(d, e), 78n(d-f); Ill.S.H.A. ch. 121 1/2 , ¶¶ 137.52-10, 137.54, subds. A, E, 137.57, subds. A, E.

**[9] Commerce ⚖=13.5**
83k13.5 Most Cited Cases
State statute must be upheld if it regulates even-handedly to effectuate legitimate local public interest and its effects on interstate commerce are only incidental, unless burden imposed on such commerce is clearly excessive in relation to putative local benefits, but commerce clause permits only incidental regulation, and direct regulation is prohibited (per Justice White, with the Chief Justice and two Justices concurring). U.S.C.A.Const. Art. 1, § 8, cl. 3.

**[10] Commerce ⚖=62.4**
83k62.4 Most Cited Cases
Illinois Business Takeover Act conflicts with commerce clause by directly regulating and preventing,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629

457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728

(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

unless its terms are satisfied, interstate tender offers which in turn will generate interstate transactions, and also by imposing on interstate commerce an excessive burden in light of local interests which Act purports to further (per Justice White, with the Chief Justice and two Justices concurring). Securities Exchange Act of 1934, §§ 1 et seq., 12-14, 13(d, e), 14(d-f), 28(a) as amended 15 U.S.C.A. §§ 78a et seq., 78l-78n, 78m(d, e), 78n(d-f), 78bb(a); Ill.S.H.A. ch. 121 1/2 , ¶¶ 137.1 et seq., 137.5, 137.52-10, 137.54, subds. A, E, 137.57, subds. A, E; U.S.C.A.Const.Art. 1, § 8, cl. 3.

**[11] Commerce ⟨⟩8(1)**
83k8(1) Most Cited Cases
Commerce clause precludes application of state statute to commerce that takes places only outside state's borders, whether or not commerce has effects within the state. (Per Justice White, with the Chief Justice and two Justices concurring). U.S.C.A.Const.Art. 1, § 8, cl. 3; Ill.S.H.A. ch. 121 1/2 , ¶ 137.52-10(2).

**[12] Commerce ⟨⟩62.4**
83k62.4 Most Cited Cases

**[12] Securities Regulation ⟨⟩244**
349Bk244 Most Cited Cases
Illinois Business Takeover Act purports to regulate directly and to interdict interstate commerce, including commerce wholly outside state, and is thus invalid (per Justice White, with the Chief Justice and two Justices concurring). Securities Exchange Act of 1934, §§ 1 et seq., 12-14, 13(d, e), 14(d-f) as amended 15 U.S.C.A. §§ 78a et seq., 78l-78n, 78m(d, e), 78n(d-f); Ill.S.H.A. ch. 121 1/2 , ¶¶ 137.52-10, 137.54, subds. A, E, 137.57, subds. A, E; U.S.C.A.Const.Art. 1, § 8, cl. 3.

**[13] Securities Regulation ⟨⟩244**
349Bk244 Most Cited Cases
Protecting local investors is plainly legitimate state objective, but state has no legitimate interest in protecting nonresident shareholders. Ill.S.H.A. ch. 121 1/2 , § 137.52-9(4).

**[14] Commerce ⟨⟩62.4**

83k62.4 Most Cited Cases

**[14] Securities Regulation ⟨⟩244**
349Bk244 Most Cited Cases
In view of, inter alia, speculative nature of protections afforded by Illinois Business Takeover Act to resident security holders, Act by reason of imposing substantial burden on interstate commerce outweighing putative local benefits is invalid under commerce clause. Securities Exchange Act of 1934, §§ 1 et seq., 12-14, 13(d, e), 14(d-f) as amended 15 U.S.C.A. §§ 78a et seq., 78l-78n, 78m(d, e), 78n(d-f); Ill.S.H.A. ch. 121 1/2 , ¶¶ 137.52-9(4), 137.52-10, 137.54, subds. A, E, 137.57, subds. A, E, 137.63, 137.65; 70 Pa.P.S. § 71 et seq.; U.S.C.A.Const.Art. 1, § 8, cl. 3.

**[15] Securities Regulation ⟨⟩244**
349Bk244 Most Cited Cases
Illinois has no interest in regulating internal affairs of foreign corporations. Ill.S.H.A. ch. 121 1/2 , ¶¶ 137.52-10, 137.59, subds. C-E; Securities Exchange Act of 1934, § 14(d)(5-7) as amended 15 U.S.C.A. § 78n(d)(5-7).

**\*\*2631 Syllabus [FN*]**

> FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*624** The Illinois Business Take-Over Act requires a tender offeror to notify the Secretary of State and the target company of its intent to make a tender offer and the terms of the offer 20 days before the offer becomes effective. During that time the offeror may not communicate its offer to the shareholders, but the target company is free to disseminate information to its shareholders concerning the impending offer. The Act also requires any takeover offer to be registered with the Secretary of State. A target company is defined as a corporation of which Illinois shareholders own 10% of the class of securities subject to the takeover offer or for which any two of the following conditions are met: the corporation has its principal office in Illinois, is organized under Illinois laws, or has at least 10% of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

Page 4

its stated capital and paid-in surplus represented within the State. An offer becomes registered 20 days after a registration is filed with the Secretary of State unless he calls a hearing to adjudicate the fairness of the offer. Appellee MITE Corp., a corporation organized under Delaware laws with its principal office in Connecticut, initiated a tender offer for all outstanding shares of Chicago Rivet & Machine Co., an Illinois corporation, by filing with the Securities and Exchange Commission the schedule required by the Williams Act. MITE, however, did not comply with the Illinois Act, and brought an action in Federal District Court seeking **2632 a declaratory judgment that the Illinois Act was pre-empted by the Williams Act and violated the Commerce Clause, and also seeking injunctive relief. The District Court issued a preliminary injunction prohibiting enforcement of the Illinois Act against MITE's tender offer. MITE then published its offer. Subsequently, the District Court issued the requested declaratory judgment and a permanent injunction. Shortly, thereafter, MITE and Chicago Rivet entered into an agreement whereby both MITE's tender offer and an offer made by Chicago Rivet before the District Court entered its judgment were withdrawn and MITE was given a specified time to make another offer. Ultimately, MITE decided not to make another offer. The Court of Appeals affirmed the District Court.

*Held* : The judgment is affirmed.

633 F.2d 486, affirmed.

*625 Justice WHITE delivered the opinion of the Court with respect to Parts I, II, and V-B, concluding that:

1. The case is not moot. Because the Secretary of State has indicated his intention to enforce the Illinois Act against MITE, a reversal of the District Court's judgment would expose MITE to civil and criminal liability for making an offer in violation of the Act. P. 2635.

2. The Illinois Act is unconstitutional under the Commerce Clause, because it imposes burdens on interstate commerce that are excessive in light of

the local interests the Act purports to further. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174. Illinois' asserted interests in protecting resident security holders and regulating the internal affairs of companies incorporated under Illinois law are insufficient to outweigh such burdens. Pp. 2641-2643.

Russell C. Grimes, Jr., Chicago, Ill., for appellant.

Eugene D. Berman, New York City, for State of New York as *amicus curiae,* by special leave of Court.

Richard W. Hulbert, New York City, for appellees.

Stephen N. Shapiro, New York City, for S.E.C. as *amicus curiae,* by special leave of Court.

*626 Justice WHITE delivered an opinion, Parts I, II, and V-B of which are the opinion of the Court. [FN*]

> FN* THE CHIEF JUSTICE joins the opinion in its entirety; Justice BLACKMUN joins Parts I, II, III, and IV; Justice POWELL joins Parts I, and V-B; and Justice STEVENS and Justice O'CONNOR join Parts I, II, and V.

The issue in this case is whether the Illinois Business Take-Over Act, Ill.Rev.Stat., ch. 121 1/2 , ¶ 137.51 *et seq.* (1979), is unconstitutional under the Supremacy and Commerce Clauses of the Federal Constitution.

I

Appellee MITE Corp. and its wholly owned subsidiary, MITE Holdings, Inc., are corporations organized under the laws of Delaware with their principal executive offices in Connecticut. Appellant James Edgar is the Secretary of State of Illinois and is charged with the administration and enforcement of the Illinois Act. Under the Illinois Act any takeover offer [FN1] for the shares of a target company must be *627 registered with the Secretary of State. Ill.Rev.Stat., ch. 121 1/2 , ¶ 137.54.A (1979). A target company is defined as a corpora-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629

457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728

(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

tion or other issuer of securities of which shareholders located in Illinois own 10% of the class of equity securities subject to the **2633 offer, or for which any two of the following three conditions are met: the corporation has its principal executive office in Illinois, is organized under the laws of Illinois, or has at least 10% of its stated capital and paid-in surplus represented within the State. ¶ 137.52-10.  An offer becomes registered 20 days after a registration statement is filed with the Secretary unless the Secretary calls a hearing. ¶ 137.54.E.  The Secretary may call a hearing at any time during the 20-day waiting period to adjudicate the substantive fairness of the offer if he believes it is necessary to protect the shareholders of the target company, and a hearing must be held if requested by a majority of a target company's outside directors or by Illinois shareholders who own 10% of the class of securities subject to the offer. ¶ 137.57.A.   If the Secretary does hold a hearing, he is directed by the statute to deny registration to a tender offer if he finds that it "fails to provide full and fair disclosure to the offerees of all material information concerning the take-over offer, or that the take-over offer is inequitable or would work or tend to work a fraud or deceit upon the offerees...." ¶ 137.57.E.

> FN1.  The Illinois Act defines "take-over offer" as "the offer to acquire or the acquisition of any equity security of a target company, pursuant to a tender offer...." Ill.Rev.Stat., ch. 121 1/2 , ¶ 137.52- 9 (1979).  "A tender offer has been conventionally understood to be a publicly made invitation addressed to all shareholders of a corporation to tender their shares for sale at a specified price."  Note, The <u>Developing Meaning of "Tender Offer" Under the Securities Exchange Act of 1934, 86 Harv.L.Rev. 1250, 1251 (1973)</u> (footnotes omitted).   The terms "tender offer" and "takeover offer" are often used interchangeably.

On January 19, 1979, MITE initiated a cash tender offer for all outstanding shares of Chicago Rivet &

Machine Co., a publicly held Illinois corporation, by filing a Schedule 14D-1 with the Securities and Exchange Commission in order to comply with the Williams Act. [FN2] The Schedule 14D-1 indicatedthat *628 MITE was willing to pay $28 per share for any and all outstanding shares of Chicago Rivet, a premium of approximately *4 over the then-prevailing market price.   MITE did not comply with the Illinois Act, however, and commenced this litigation on the same day by filing an action in the United States District Court for the Northern District of Illinois.   The complaint asked for a declaratory judgment that the Illinois Act was preempted by the Williams Act and violated the Commerce Clause.  In addition, MITE sought a temporary restraining order and preliminary and permanent injunctions prohibiting the Illinois Secretary of State from enforcing the Illinois Act.

> FN2. The Williams Act, 82 Stat. 454, codified at 15 U.S.C. §§ 78m(d)-(e) and 78n(d)-(f), added new §§ 13(d), 13(e), and 14(d)-(f) to the Securities Exchange Act of 1934.   Section 14(d)(1) of the Securities Exchange Act requires an offeror seeking to acquire more than 5% of any class of equity security by means of a tender offer to first file a Schedule 14D-1 with the Securities and Exchange Commission.   The Schedule requires disclosure of the source of funds used to purchase the target shares, past transactions with the target company, and other material financial information about the offeror.   In addition, the offeror must disclose any antitrust or other legal problems which might result from the success of the offer.  17 CFR § 240.14d-100 (1981). Section 14(d)(1) requires the offeror to publish or send a statement of the relevant facts contained in the Schedule 14D-1 to the shareholders of the target company.
> In addition, § 13(d), added by the Williams Act, requires a purchaser of any equity security registered pursuant to § 12 of the Securities Exchange Act, 15 U.S.C. § 78l, to file a Schedule 13D with the Commis-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629

457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

Page 6

sion within 10 days after its purchases have exceeded 5% of the outstanding shares of the security.  Schedule 13D requires essentially the same disclosures as required by Schedule 14D-1.  Compare 17 CFR § 240.13d-101 (1981) with 17 CFR § 240.14d-100 (1981).

Chicago Rivet responded three days later by bringing suit in Pennsylvania, where it conducted most of its business, seeking to enjoin MITE from proceeding with its proposed tender offer on the ground that the offer violated the Pennsylvania Takeover Disclosure Law, Pa.Stat.Ann., Tit. 70, § 71 et seq. (Purdon Supp.1982-1983).  After Chicago Rivet's efforts to obtain relief in Pennsylvania proved unsuccessful, [FN3] both Chicago Rivet and the Illinois Secretary of State *629 took steps to invoke the Illinois Act. **2634 On February 1, 1979, the Secretary of State notified MITE that he intended to issue an order requiring it to cease and desist further efforts to make a tender offer for Chicago Rivet.  On February 2, 1979, Chicago Rivet notified MITE by letter that it would file suit in Illinois state court to enjoin the proposed tender offer.  MITE renewed its request for injunctive relief in the District Court and on February 2 the District Court issued a preliminary injunction prohibiting the Secretary of State from enforcing the Illinois Act against MITE's tender offer for Chicago Rivet.

> FN3. In addition to filing suit in state court, Chicago Rivet filed a complaint with the Pennsylvania Securities Commission requesting the Commission to enforce the Pennsylvania Act against MITE.  On January 31, 1979, the Pennsylvania Securities Commission decided that it would not invoke the Pennsylvania Takeover Disclosure Law.  The next day, the United States District Court for the Western District of Pennsylvania, to which MITE had removed the state-court action, denied Chicago Rivet's motion for a temporary restraining order.

MITE then published its tender offer in the Febru-

ary 5 edition of the Wall Street Journal.  The offer was made to all shareholders of Chicago Rivet residing throughout the United States.  The outstanding stock was worth over $23 million at the offering price.  On the same day Chicago Rivet made an offer for approximately 40% of its own shares at $30 per share. [FN4]  The District Court entered final judgment on February 9, declaring that the Illinois Act was preempted by the Williams Act and that it violated the Commerce Clause.  Accordingly, the District Court permanently enjoined enforcement of the Illinois statute against MITE.  Shortly after final judgment was entered, MITE and Chicago Rivet entered into an agreement whereby both tender offers were withdrawn and MITE was given 30 days to examine the books and records of Chicago Rivet.  Under the agreement MITE was either to make a tender offer of $31 per share before *630 March 12, 1979, which Chicago Rivet agreed not to oppose, or decide not to acquire Chicago Rivet's shares or assets.  App. to Brief for Appellees 1a-4a.  On March 2, 1979, MITE announced its decision not to make a tender offer.

> FN4. Chicago Rivet's offer for its own shares was exempt from the requirements of the Illinois Act pursuant to Ill.Rev.Stat., ch. 121 1/2 , ¶ 137.52-9(4) (1979).

The United States Court of Appeals for the Seventh Circuit affirmed sub nom. MITE Corp. v. Dixon, 633 F.2d 486 (1980).  It agreed with the District Court that several provisions of the Illinois Act are pre-empted by the Williams Act and that the Illinois Act unduly burdens interstate commerce in violation of the Commerce Clause.  We noted probable jurisdiction, 451 U.S. 968, 101 S.Ct. 2043, 68 L.Ed.2d 347 (1981), and now affirm.

II

[1] The Court of Appeals specifically found that this case was not moot, 633 F.2d, at 490, reasoning that because the Secretary has indicated he intends to enforce the Act against MITE, a reversal of the judgment of the District Court would expose MITE to civil and criminal liability [FN5] for making the February 5, 1979, offer in violation of the Illinois

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

Act. We agree. It is urged that the preliminary injunction issued by the District Court is a complete defense to civil or criminal penalties. While, as Justice STEVENS' concurrence indicates, that is not a frivolous question by any means; it is an issue to be decided when and if the Secretary of State initiates an action. That action would be foreclosed if we agree with the Court of Appeals that the Illinois Act is unconstitutional. Accordingly, the case is not moot.

> FN5. The Secretary of State may bring an action for civil penalties for violations of the Illinois Act, Ill.Rev.Stat., ch. 121 1/2 , ¶ 137.65 (1979), and a person who willfully violates the Act is subject to criminal prosecution. ¶ 137.63.

### III

[2] We first address the holding that the Illinois Takeover Act is unconstitutional under the Supremacy Clause. We note at the outset that in passing the Williams Act, which is *631 an amendment to the Securities Exchange Act of 1934, Congress did not also amend § 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a). [FN6] In pertinent part, § 28(a) provides as follows:

> FN6. There is no evidence in the legislative history that Congress was aware of state takeover laws when it enacted the Williams Act. When the Williams Act was enacted in 1968, only Virginia had a takeover statute. The Virginia statute, Va.Code § 13.1-528 (1978), became effective March 5, 1968; the Williams Act was enacted several months later on July 19, 1968. Takeover statutes are now in effect in 37 States. Sargent, On the Validity of State Takeover Regulation: State Responses to MITE and Kidwell, 42 Ohio St.L.J. 689, 690, n. 7 (1981).

**2635 "Nothing in this title shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar

as it does not conflict with the provisions of this title or the rules and regulations thereunder." 48 Stat. 903.

Thus Congress did not explicitly prohibit States from regulating takeovers; it left the determination whether the Illinois statute conflicts with the Williams Act to the courts. Of course, a state statute is void to the extent that it actually conflicts with a valid federal statute; and

> "[a] conflict will be found 'where compliance with both federal and state regulations is a physical impossibility ...,' *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248] (1963), or where the state 'law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' *Hines v. Davidowitz*, 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941); *Jones v. Rath Packing Co.*, 430 U.S. 519,] 526, 540-541 [97 S.Ct. 1305, 1310, 1317, 51 L.Ed.2d 604 (1977)]. Accord, *De Canas v. Bica*, 424 U.S. 351, 363 [96 S.Ct. 933, 940, 47 L.Ed.2d 43] (1976)." *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158 [98 S.Ct. 988, 994, 55 L.Ed.2d 179] (1978).

Our inquiry is further narrowed in this case since there is no contention that it would be impossible to comply with both the *632 the provisions of the Williams Act and the more burdensome requirements of the Illinois law. The issue thus is, as it was in the Court of Appeals, whether the Illinois Act frustrates the objectives of the Williams Act in some substantial way.

[3][4] The Williams Act, passed in 1968, was the congressional response to the increased use of cash tender offers in corporate acquisitions, a device that had "removed a substantial number of corporate control contests from the reach of existing disclosure requirements of the federal securities laws." *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 22 [97 S.Ct. 926, 939, 51 L.Ed.2d 124] (1977). The Williams Act filled this regulatory gap. The Act imposes several requirements. First, it requires that upon the commencement of the tender offer, the offeror file with the SEC, publish or send to the shareholders of the target company, and furnish to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629

457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

Page 8

the target company detailed information about the offer. 15 U.S.C. § 78n(d)(1); 17 CFR § 240.24d-3 (1981). The offeror must disclose information about its background and identity; the source of the funds to be used in making the purchase; the purpose of the purchase, including any plans to liquidate the company or make major changes in its corporate structure; and the extent of the offeror's holdings in the target company. 15 U.S.C. § 78m(d)(1) (1976 ed., Supp.IV); 17 CFR § 240.13d-1 (1981). See also n. 2, supra. Second, stockholders who tender their shares may withdraw them during the first 7 days of a tender offer and if the offeror has not yet purchased their shares, at any time after 60 days from the commencement of the offer. 15 U.S.C. § 78n(d)(5). [FN7] Third, all shares tendered must be purchased for the same price; if an offering price is increased, those who have already tendered receive the benefit of the increase. 15 U.S.C. § 78n(d)(7). [FN8]

> FN7. The 7-day withdrawal period contained in the Williams Act has been extended to 15 business days by the Commission. 17 CFR § 240.14d-7(a)(1) (1981).

> FN8. The Williams Act also provides that when the number of shares tendered exceeds the number of shares sought in the offer, those shares tendered during the first 10 days of the offer must be purchased on a pro rata basis. 15 U.S.C. § 78n(d)(6). The Act also contains a general antifraud provision, 15 U.S.C. § 78n(e), which has been interpreted to require disclosure of material information known to the offeror even if disclosure were not otherwise required. See, e.g., Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (CA2 1973).

*633 **2636 There is no question that in imposing these requirements, Congress intended to protect investors. Piper v. Chris-Craft Industries, Inc., supra, at 35, 97 S.Ct. at 946; Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975); S.Rep.No.550, 90th Cong., 1st

Sess., 3-4 (1967) (Senate Report). But it is also crystal clear that a major aspect of the effort to protect the investor was to avoid favoring either management or the takeover bidder. As we noted in Piper, the disclosure provisions originally embodied in S. 2731 "were avowedly pro-management in the target company's efforts to defeat takeover bids." 430 U.S., at 30, 97 S.Ct., at 943. But Congress became convinced "that takeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management." Senate Report, at 3. [FN9] It also became apparent that entrenched management was often successful in defeating takeover attempts. As the legislation evolved, therefore, Congress disclaimed any "intention to provide a weapon for management to discourage takeover bids," Rondeau v. Mosinee Paper Corp., supra, 422 U.S., at 58, 95 S.Ct., at 2075, and expressly embraced a policy of neutrality. As Senator Williams explained: "We have taken extreme care to avoid tipping the scales either in favor of management or in favor of the person making the takeover bids." 113 Cong.Rec. 24664 (1967). This policy of "evenhandedness," Piper v. Chris-Craft Industries, Inc., supra, 430 U.S., at 31, 97 S.Ct., at 944, represented a conviction that neither side in the contest should be extended additional advantages vis-á-vis the investor, who if furnished with adequate information would be in a position to make his *634 own informed choice. We, therefore, agree with the Court of Appeals that Congress sought to protect the investor not only by furnishing him with the necessary information but also by withholding from management or the bidder any undue advantage that could frustrate the exercise of an informed choice. 633 F.2d, at 496.

> FN9. Congress also did not want to deny shareholders "the opportunities which result from the competitive bidding for a block of stock of a given company," namely, the opportunity to sell shares for a premium over their market price. 113 Cong.Rec. 24666 (1967) (remarks of Sen. Javits).

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629                                                                                                    Page 9
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

[5] To implement this policy of investor protection while maintaining the balance between management and the bidder, Congress required the latter to file with the Commission and furnish the company and the investor with all information adequate to the occasion. With that filing, the offer could go forward, stock could be tendered and purchased, but a stockholder was free within a specified time to withdraw his tendered shares. He was also protected if the offer was increased. Looking at this history as a whole, it appears to us, as it did to the Court of Appeals, that Congress intended to strike a balance between the investor, management, and the takeover bidder. The bidder was to furnish the investor and the target company with adequate information but there was no "inten[tion] to do ... more than give incumbent management an opportunity to express and explain its position." *Rondeau v. Mosinee Paper Corp., supra,* 422 U.S., at 58, 95 S.Ct., at 2075. Once that opportunity was extended, Congress anticipated that the investor, if he so chose, and the takeover bidder should be free to move forward within the time frame provided by Congress.

IV

The Court of Appeals identified three provisions of the Illinois Act that upset the careful balance struck by Congress and which therefore stand as obstacles to the accomplishment and execution of the full purposes and objectives of Congress. We agree with the Court of Appeals in all essential respects.

**2637 A

The Illinois Act requires a tender offeror to notify the Secretary of State and the target company of its intent to make a *635 tender offer and the material terms of the offer 20 business days before the offer becomes effective. Ill.Rev.Stat., ch. 121 1/2 , ¶¶ 137.54.E, 137.54.B (1979). During that time, the offeror may not communicate its offer to the shareholders. ¶ 137.54.A. Meanwhile, the target company is free to disseminate information to its shareholders concerning the impending offer. The contrast with the Williams Act is apparent. Under that Act, there is no pre-commencement notification requirement; the critical date is the date a tender of-

fer is "first published or sent or given to security holders." 15 U.S.C. § 78n(d)(1). See also 17 CFR § 240.14d-2 (1981).

[6] We agree with the Court of Appeals that by providing the target company with additional time within which to take steps to combat the offer, the precommencement notification provisions furnish incumbent management with a powerful tool to combat tender offers, perhaps to the detriment of the stockholders who will not have an offer before them during this period. [FN10] These consequences are precisely what Congress determined should be avoided, and for this reason, the precommencement notification provision frustrates the objectives of the Williams Act.

FN10. See n. 11 and accompanying text, *infra.*

It is important to note in this respect that in the course of events leading to the adoption of the Williams Act, Congress several times refused to impose a precommencement disclosure requirement. In October 1965, Senator Williams introduced S. 2731, a bill which would have required a bidder to notify the target company and file a public statement with the Securities and Exchange Commission at least 20 days before commencement of a cash tender offer for more than 5% of a class of the target company's securities. 111 Cong.Rec. 28259 (1965). The Commission commented on the bill and stated that "the requirement of a 20-day advance notice to the issuer and the Commission is unnecessary for the protection of security holders...." 112 Cong.Rec. 19005 (1966). *636 Senator Williams introduced a new bill in 1967, S. 510, which provided for a confidential filing by the tender offeror with the Commission five days prior to the commencement of the offer. S. 510 was enacted as the Williams Act after elimination of the advance disclosure requirement. As the Senate Report explained:

"At the hearings it was urged that this prior review was not necessary and in some cases might delay the offer when time was of the essence. In view of the authority and responsibility of the Se-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

Page 10

curities and Exchange Commission to take appropriate action in the event that inadequate or misleading information is disseminated to the public to solicit acceptance of a tender offer, the bill as approved by the committee requires only that the statement be on file with the Securities and Exchange Commission at the time the tender offer is first made to the public." Senate Report, at 4. Congress rejected another precommencement notification proposal during deliberations on the 1970 amendments to the Williams Act. [FN11]

> FN11. H.R. 4285, 91st Cong., 2d Sess. (1970). The bill was not reported out of the Subcommittee. Instead, the Senate amendments to the Williams Act, which did not contain precommencement notification provisions, were adopted. Pub.L. 91-567, 84 Stat. 1497.

The Securities and Exchange Commission has promulgated detailed rules governing the conduct of tender offers. Rule 14d-2(b), 17 CFR § 240.14d-2(b) (1981), requires that a tender offeror make its offer effective within five days of publicly announcing the material terms of the offer by disseminating specified information to shareholders and filing the requisite documents with the Commission. Otherwise the offeror must announce that it is withdrawing its offer. The events in this litigation took place prior to the effective date of Rule 14d-2(b), and because Rule 14d-2(b) operates prospectively only, see 44 Fed.Reg. 70326 (1979), it is not at issue in this case.

**\*\*2638 B**

[7] For similar reasons, we agree with the Court of Appeals *637  that the hearing provisions of the Illinois Act frustrate the congressional purpose by introducing extended delay into the tender offer process. The Illinois Act allows the Secretary of State to call a hearing with respect to any tender offer subject to the Act, and the offer may not proceed until the hearing is completed. Ill.Rev.Stat., ch. 121 1/2 , ¶¶ 137.57.A and B (1979). The Sec-

retary may call a hearing at any time prior to the commencement of the offer, and there is no deadline for the completion of the hearing. ¶¶ 137.57.C and D. Although the Secretary is to render a decision within 15 days after the conclusion of the hearing, that period may be extended without limitation. Not only does the Secretary of State have the power to delay a tender offer indefinitely, but incumbent management may also use the hearing provisions of the Illinois Act to delay a tender offer. The Secretary is required to call a hearing if requested to do so by, among other persons, those who are located in Illinois "as determined by post office address as shown on the records of the target company and who hold of record or beneficially, or both, at least 10% of the outstanding shares of any class of equity securities which is the subject of the takeover offer." ¶ 137.57.A. Since incumbent management in many cases will control, either directly or indirectly, 10% of the target company's shares, this provision allows management to delay the commencement of an offer by insisting on a hearing. As the Court of Appeals observed, these provisions potentially afford management a "powerful weapon to stymie indefinitely a takeover." 633 F.2d. at 494. [FN12] In enacting the Williams Act, Congress itself "recognized that delay can seriously impede a tender offer" and sought to avoid it. *638 Great Western United Corp. v. Kidwell, 577 F.2d 1256, 1277 (CA5 1978); Senate Report, at 4. [FN13]

> FN12. Delay has been characterized as "the most potent weapon in a tender-offer fight." Langevoort, State Tender-Offer Legislation: Interests, Effects, and Political Competency, 62 Cornell L.Rev. 213, 238 (1977). See also Wachtell, Special Tender Offer Litigation Tactics, 32 Bus.Law. 1433, 1437-1442 (1977); Wilner & Landy, The Tender Trap: State Takeover Statutes and Their Constitutionality, 45 Ford.L.Rev. 1, 9-10 (1976).

> FN13. According to the Securities and Exchange Commission, delay enables a target company to:

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

"(1) repurchase its own securities;

"(2) announce dividend increases or stock splits;

"(3) issue additional shares of stock;

"(4) acquire other companies to produce an antitrust violation should the tender offer succeed;

"(5) arrange a defensive merger;

"(6) enter into restrictive loan agreements; and

"(7) institute litigation challenging the tender offer." Brief for Securities and Exchange Commission as *Amicus Curiae* 10, n. 8.

Congress reemphasized the consequences of delay when it enacted the Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub.L. 94-435, 90 Stat. 1397, 15 U.S.C. § 12 *et seq.*

"[I]t is clear that this short waiting period [the 10-day period for proration provided for by § 14(d)(6) of the Securities Exchange Act, which applies only after a tender offer is commenced] was founded on congressional concern that a longer delay might unduly favor the target firm's incumbent management, and permit them to frustrate many pro-competitive cash tenders. This ten-day waiting period thus underscores the basic purpose of the Williams Act--to maintain a neutral policy towards cash tender offers, by avoiding lengthy delays that might discourage their chances for success." H.R.Rep.No.94-1373, p. 12 (1976), [FN14] U.S.Code Cong. & Admin.News, pp. 2572, 2644.

FN14. Representative Rodino set out the consequences of delay in greater detail when he described the relationship between the Hart-Scott-Rodino Act and the Williams Act:

"In the case of cash tender offers, more so than in other mergers, the equities include time and the danger of undue delay. This bill in no way intends to repeal or reverse the congressional purpose underlying the 1968 Williams Act, or the 1970 amendments to that act.... Lengthier delays will

give the target firm plenty of time to defeat the offer, by abolishing cumulative voting, arranging a speedy defensive merger, quickly incorporating in a State with an antitakeover statute, or negotiating costly lifetime employment contracts for incumbent management. And the longer the waiting period, the more the target's stock may be bid up in the market, making the offer more costly--and less successful. Should this happen, it will mean that shareholders of the target firm will be effectively deprived of the choice that cash tenders give to them: Either accept the offer and thereby gain the tendered premium, or reject the offer. Generally, the courts have construed the Williams Act so as to maintain these two options for the target company's shareholders, and the House conferees contemplate that the courts will continue to do so." 122 Cong.Rec. 30877 (1976).

*639 **2639 As we have said, Congress anticipated that investors and the takeover offeror would be free to go forward without unreasonable delay. The potential for delay provided by the hearing provisions upset the balance struck by Congress by favoring management at the expense of stockholders. We therefore agree with the Court of Appeals that these hearing provisions conflict with the Williams Act.

C

[8] The Court of Appeals also concluded that the Illinois Act is pre-empted by the Williams Act insofar as it allows the Secretary of State of Illinois to pass on the substantive fairness of a tender offer. Under ¶ 137.57.E of the Illinois law, the Secretary is required to deny registration of a takeover offer if he finds that the offer "fails to provide full and fair disclosure to the offerees ... *or that the take-over offer is inequitable* ..." (emphasis added). [FN15] The Court of Appeals understood the Williams Act and its legislative history to indicate that Congress intended for investors to be free to make their own decisions. We agree. Both the House

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629

457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728

(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

Page 12

and Senate Reports observed that the Act was "designed to make the relevant facts known so that shareholders have a fair opportunity to make their decision." H.R.Rep.No.1711, 90th Cong., *640 2d Sess., 4 (1968), U.S.Code Cong. & Admin.News, pp. 2811, 2813; Senate Report, at 3. Thus, as the Court of Appeals said, "[t]he state thus offers investor protection at the expense of investor autonomy--an approach quite in conflict with that adopted by Congress." 633 F.2d, at 494.

FN15. Appellant argues that the Illinois Act does not permit him to adjudicate the substantive fairness of a tender offer. Brief for Appellant 21-22. On this state-law issue, however, we follow the view of the Court of Appeals that ¶ 137.57.E allows the Secretary of State "to pass upon the substantive fairness of a tender offer...." 633 F.2d 486, 493 (1980).

V

[9][10] The Commerce Clause provides that "Congress shall have Power ... [t]o regulate Commerce ... among the several States." U.S.Const., Art. I, § 8, cl. 3. "[A]t least since Cooley v. Board of Wardens, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1852), it has been clear that 'the Commerce Clause... even without implementing legislation by Congress is a limitation upon the power of the States.' " Great Atlantic & Pacific Tea Co. v. Cottrell, 424 U.S. 366, 370-371, 96 S.Ct. 923, 927, 47 L.Ed.2d 55 (1976), quoting Freeman v. Hewitt, 329 U.S. 249, 252, 67 S.Ct. 274, 276, 91 L.Ed. 265 (1946). See also Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 35, 100 S.Ct. 2009, 2014, 64 L.Ed.2d 702 (1980). Not every exercise of state power with some impact on interstate commerce is invalid. A state statute must be upheld if it "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental ... unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970), citing Huron Cement Co. v. Detroit, 362 U.S. 440, 443, 80 S.Ct. 813, 815, 4

L.Ed.2d 852 (1960). The Commerce Clause, however, permits only incidental regulation of interstate commerce by the States; direct regulation is prohibited. **2640 Shafer v. Farmers Grain Co., 268 U.S. 189, 199, 45 S.Ct. 481, 485, 69 L.Ed. 909 (1925). See also Pike v. Bruce Church, Inc., supra, 397 U.S., at 142, 90 S.Ct., at 847. The Illinois Act violates these principles for two reasons. First, it directly regulates and prevents, unless its terms are satisfied, interstate tender offers which in turn would generate interstate transactions. Second, the burden the Act imposes on interstate commerce is excessive in light of the local interests the Act purports to further.

*641 A

States have traditionally regulated intrastate securities transactions, [FN16] and this Court has upheld the authority of States to enact "blue-sky" laws against Commerce Clause challenges on several occasions. Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480 (1917); Caldwell v. Sioux Falls Stock Yards Co., 242 U.S. 559, 37 S.Ct. 224, 61 L.Ed. 493 (1917); Merrick v. N. W. Halsey & Co., 242 U.S. 568, 37 S.Ct. 227, 61 L.Ed. 498 (1917). The Court's rationale for upholding blue-sky laws was that they only regulated transactions occurring within the regulating States. "The provisions of the law ... apply to dispositions of securities within the State and while information of those issued in other States and foreign countries is required to be filed ..., they are only affected by the requirement of a license of one who deals with them within the State.... Such regulations affect interstate commerce in [securities] only incidentally." Hall v. Geiger-Jones Co., supra, 242 U.S., at 557-558, 37 S.Ct., at 223 (citations omitted). Congress has also recognized the validity of such laws governing intrastate securities transactions in § 28(a) of the Securities Exchange Act, 15 U.S.C. § 78bb(a), a provision "designed to save state blue-sky laws from pre-emption." Leroy v. Great Western United Corp., 443 U.S. 173, 182, n.13, 99 S.Ct. 2710, 2716, n.13, 61 L.Ed.2d 464 (1979).

FN16. For example, the Illinois blue-sky law, Ill.Rev.Stat. ch. 121 1/2 , ¶ 137.1 et

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

*seq.* (1979 and Supp.1980), provides that securities subject to the law must be registered "prior to sale in this State...." ¶ 137.5.

The Illinois Act differs substantially from state blue-sky laws in that it directly regulates transactions which take place across state lines, even if wholly outside the State of Illinois. A tender offer for securities of a publicly held corporation is ordinarily communicated by the use of the mails or other means of interstate commerce to shareholders across the country and abroad. Securities are tendered and transactions closed by similar means. Thus, in this case, MITE *642 Corp., the tender offeror, is a Delaware corporation with principal offices in Connecticut. Chicago Rivet is a publicly held Illinois corporation with shareholders scattered around the country, 27% of whom live in Illinois. MITE's offer to Chicago Rivet's shareholders, including those in Illinois, necessarily employed interstate facilities in communicating its offer, which, if accepted, would result in transactions occurring across state lines. These transactions would themselves be interstate commerce. Yet the Illinois law, unless complied with, sought to prevent MITE from making its offer and concluding interstate transactions not only with Chicago Rivet's stockholders living in Illinois, but also with those living in other States and having no connection with Illinois. Indeed, the Illinois law on its face would apply even if not a single one of Chicago Rivet's shareholders were a resident of Illinois, since the Act applies to every tender offer for a corporation meeting two of the following conditions: the corporation has its principal executive office in Illinois, is organized under Illinois laws, or has at least 10% of its stated capital and paid-in surplus represented in Illinois. Ill.Rev.Stat., ch. 121 1/2 , ¶ 137.52-10(2) (1979). Thus the Act could be applied to regulate a tender offer which would not affect a single Illinois shareholder.

[11] It is therefore apparent that the Illinois statute is a direct restraint on interstate commerce and that it has a sweeping extraterritorial effect. Furthermore, if Illinois **2641 may impose such regula-

tions, so may other States; and interstate commerce in securities transactions generated by tender offers would be thoroughly stifled. In *Shafer v. Farmers Grain Co., supra,* at 199, 45 S.Ct., at 485, the Court held that "a state statute which by its necessary operation directly interferes with or burdens [interstate] commerce is a prohibited regulation and invalid, regardless of the purpose with which it was enacted." See also *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 806, 96 S.Ct. 2488, 2496, 49 L.Ed.2d 220 (1976). The Commerce Clause also precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects *643 within the State. In *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 775, 65 S.Ct. 1515, 1523, 89 L.Ed. 1915 (1945), the Court struck down on Commerce Clause grounds a state law where the "practical effect of such regulation is to control [conduct] beyond the boundaries of the state...." The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts. In either case, "any attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power." *Shaffer v. Heitner,* 433 U.S. 186, 197, 97 S.Ct. 2569, 2576, 53 L.Ed.2d 683 (1977).

[12] Because the Illinois Act purports to regulate directly and to interdict interstate commerce, including commerce wholly outside the State, it must be held invalid as were the laws at issue in *Shaffer v. Farmers Grain Co.* and *Southern Pacific.*

### B

The Illinois Act is also unconstitutional under the test of *Pike v. Bruce Church, Inc.,* 397 U.S., at 142, 90 S.Ct., at 847, for even when a state statute regulates interstate commerce indirectly, the burden imposed on that commerce must not be excessive in relation to the local interests served by the statute. The most obvious burden the Illinois Act imposes on interstate commerce arises from the statute's previously described nationwide reach which purports to give Illinois the power to determine whether a tender offer may proceed anywhere.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

The effects of allowing the Illinois Secretary of State to block a nationwide tender offer are substantial. Shareholders are deprived of the opportunity to sell their shares at a premium. The reallocation of economic resources to their highest valued use, a process which can improve efficiency and competition, is hindered. The incentive the tender offer mechanism provides incumbent management to perform well so that stock prices remain high is reduced. See *644Easterbrook & Fischel, The Proper Role of a Target's Management in Responding to a Tender Offer, 94 Harv.L.Rev. 1161, 1173- 1174 (1981); Fischel, Efficient Capital Market Theory, the Market for Corporate Control, and the Regulation of Cash Tender Offers, 57 Texas L.Rev. 1, 5, 27-28, 45 (1978); H.R.Rep.No.94-1373, p. 12 (1976).

Appellant claims the Illinois Act furthers two legitimate local interests. He argues that Illinois seeks to protect resident security holders and that the Act merely regulates the internal affairs of companies incorporated under Illinois law. We agree with the Court of Appeals that these asserted interests are insufficient to outweigh the burdens Illinois imposes on interstate commerce.

[13] While protecting local investors is plainly a legitimate state objective, the State has no legitimate interest in protecting nonresident shareholders. Insofar as the Illinois law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law. We note, furthermore, that the Act completely exempts from coverage a corporation's acquisition of its own shares. Ill.Rev.Stat., ch. 121 1/2 , ¶ 137.52- 9(4) (1979). Thus Chicago Rivet was able to make a competing tender offer for its own stock without complying with the Illinois Act, leaving Chicago Rivet's **2642 shareholders to depend only on the protections afforded them by federal securities law, protections which Illinois views as inadequate to protect investors in other contexts. This distinction is at variance with Illinois' asserted legislative purpose, and tends to undermine appellant's justification for the burdens the statute imposes on interstate commerce.

[14][15] We are also unconvinced that the Illinois Act substantially enhances the shareholders' position. The Illinois Act seeks to protect shareholders of a company subject to a tender offer by requiring disclosures regarding the offer, assuring that shareholders have adequate time to decide whether to tender their shares, and according shareholders withdrawal, proration, and equal consideration rights. However, the Williams Act provides these same substantive protections, compare Ill.Rev.Stat., ch. 121 1/2 , ¶¶ 137.59.C, D, and E (1979) (withdrawal, *645 proration, and equal consideration rights), with 15 U.S.C. §§ 78n(d)(5), (6), and (7) and 17 CFR § 240.14d-7 (1981) (same). As the Court of Appeals noted, the disclosures required by the Illinois Act which go beyond those mandated by the Williams Act and the regulations pursuant to it may not substantially enhance the shareholders' ability to make informed decisions. 633 F.2d, at 500. It also was of the view that the possible benefits of the potential delays required by the Act may be outweighed by the increased risk that the tender offer will fail due to defensive tactics employed by incumbent management. We are unprepared to disagree with the Court of Appeals in these respects, and conclude that the protections the Illinois Act affords resident security holders are, for the most part, speculative.

Appellant also contends that Illinois has an interest in regulating the internal affairs of a corporation incorporated under its laws. The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs-- matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders--because otherwise a corporation could be faced with conflicting demands. See Restatement (Second) of Conflict of Laws § 302, Comment b, pp. 307-308 (1971). That doctrine is of little use to the State in this context. Tender offers contemplate transfers of stock by stockholders to a third party and do not themselves implicate the internal affairs of the target company. Great Western United Corp. v. Kidwell, 577 F.2d, at 1280, n.53; Restatement, supra, § 302, Comment e, p.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

310. Furthermore, the proposed justification is somewhat incredible since the Illinois Act applies to tender offers for any corporation for which 10% of the outstanding shares are held by Illinois residents, Ill.Rev.Stat., ch. 121 1/2 , ¶ 137.52-10 (1979). The Act thus applies to corporations that are not incorporated in Illinois and have their principal place of business in other States. Illinois has no interest *646 in regulating the internal affairs of foreign corporations.

We conclude with the Court of Appeals that the Illinois Act imposes a substantial burden on interstate commerce which outweighs its putative local benefits. It is accordingly invalid under the Commerce Clause.

The judgment of the Court of Appeals is

*Affirmed.*

Justice POWELL, concurring in part.

I agree with Justice MARSHALL that this case is moot. In view, however, of the decision of a majority of the Court to reach the merits, I join Parts I and V-B of the Court's opinion.

I join Part V-B because its Commerce Clause reasoning leaves some room for state regulation of tender offers. This period in our history is marked by conglomerate corporate formations essentially unrestricted by the antitrust laws. Often the offeror possesses resources, in terms of professional personnel experienced in takeovers as well as of capital, that vastly exceed those of the takeover target. This **2643 disparity in resources may seriously disadvantage a relatively small or regional target corporation. Inevitably there are certain adverse consequences in terms of general public interest when corporate headquarters are moved away from a city and State. [FN*]

FN* The corporate headquarters of the great national and multinational corporations tend to be located in the large cities of a few States. When corporate headquarters are transferred out of a city

and State into one of these metropolitan centers, the State and locality from which the transfer is made inevitably suffer significantly. Management personnel--many of whom have provided community leadership--may move to the new corporate headquarters. Contributions to cultural, charitable, and educational life--both in terms of leadership and financial support--also tend to diminish when there is a move of corporate headquarters.

The Williams Act provisions, implementing a policy of neutrality, seem to assume corporate entities of substantially equal resources. I agree with Justice STEVENS that the *647 Williams Act's neutrality policy does not necessarily imply a congressional intent to prohibit state legislation designed to assure--at least in some circumstances--greater protection to interests that include but often are broader than those of incumbent management.

Justice O'CONNOR, concurring in part.

I agree with the Court that the case is not moot, and that portions of the Illinois Business Take-Over Act, Ill.Rev.Stat., ch. 121 1/2 , ¶ 137.51 *et seq.* (1979), are invalid under the Commerce Clause. Because it is not necessary to reach the pre-emption issue, I join only Parts I, II, and V of the Court's opinion, and would affirm the judgment of the Court of Appeals on that basis.

Justice STEVENS, concurring in part and concurring in the judgment.

The question whether this case is moot depends on the effect of the preliminary injunction entered on February 2, 1979, restraining the Illinois Secretary of State from enforcing the Illinois Business Take-Over Act while the injunction remained in effect. If, as Justice MARSHALL contends in his dissenting opinion, the injunction granted the MITE Corp. a complete immunity from state sanctions for any acts performed while the injunction was outstanding, I would agree that the case is moot. On the other hand, if the injunction did no more than it purported to do, setting aside the injunction would

102 S.Ct. 2629

457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728

(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

remove its protection and MITE would be subject to sanctions in the state courts. Those courts might regard the fact that an injunction was outstanding at the time MITE violated the Illinois statute as a defense to any enforcement proceeding, but unless the federal injunction was tantamount to a grant of immunity, there is no federal rule of law that would require the state courts to absolve MITE from liability. I believe, therefore, that to resolve the mootness issue--which, of course, is jurisdictional--we must answer the question that Justice MARSHALL's dissent raises.

Justice MARSHALL advances various reasons for adopting a rule that will give federal judges the power to grant complete immunity to persons who desire to test the constitutionality of a state statute. His proposed rule would treat any federal judge's preliminary injunction restraining enforcement of a state statute on federal grounds as a grant of immunity with respect to any conduct undertaken while the injunction *648 was outstanding. Under the rule he proposes, "if the statute is later determined to be valid, the State will never be able to prosecute the individual that obtained the preliminary injunction for action taken while the injunction was in effect." *Post*, at 2649, n. 1. For me, the question is not whether such a rule would be wise; the question is whether federal judges possess the power to grant such immunity. In my opinion they do not.

I

The essential facts of this case are few and bear repeating. On February 2, 1979, MITE Corp. and MITE Holdings, Inc., obtained a preliminary injunction restraining the Illinois Secretary of State from invoking **2644 the provisions of the Illinois Business Take-Over Act to block MITE's intended takeover of Chicago Rivet & Machine Co. Three days later, without complying with the provisions of the Illinois statute, MITE published its offer in the Wall Street Journal. On February 9, 1979, the District Court entered a judgment declaring the Illinois statute unconstitutional; the court permanently enjoined the Secretary from enforcing the Illinois statute against MITE.

The State contends that the attempted takeover was subject to the provisions of the Illinois statute and that MITE violated the Act by failing to register with the Illinois Secretary of State. The State further argues that the Take-Over Act is consistent with federal law. For purposes of deciding the mootness issue, we must assume that these contentions are correct; a holding that this case is moot would mean that MITE is completely protected from any adverse action whether or not the statute is unconstitutional. Such a conclusion would be possible only if the District Court's preliminary injunction granted MITE absolute and permanent immunity from any prosecution-- civil or criminal--brought to enforce the Illinois statute.

Neither the terms of the preliminary injunction nor prior equity practice provides any support for an interpretation of *649 the District Court's order as a grant of total immunity from future prosecution. More fundamentally, federal judges have no power to grant such blanket dispensation from the requirements of valid legislative enactments.

A

An injunction restrains conduct. Its effect is normally limited to the parties named in the instrument. Since a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully. [FN1] The bond, in effect, is the moving party's warranty that the law will uphold the issuance of the injunction.

> FN1. As provided by Federal Rule of Civil Procedure 65(c):
>
> "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be re-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

quired of the United States or of an officer or agency thereof."
In Illinois damages apparently may be recovered for injuries caused by a preliminary injunction issued wrongfully by a state court even in the absence of an indemnity bond or abuse of process. See Ill.Rev.Stat., ch. 69, ¶ 12 (1979); Note, 73 Harv.L.Rev. 333, 347 (1959).

These features of injunctive relief are inconsistent with a blanket grant of immunity, as this case demonstrates. The preliminary injunction did not purport to provide permanent immunity for violations of the statute that occurred during its effective period. It merely provided that the Secretary of State was enjoined from "issuing any cease and desist order or notice of hearing or from otherwise invoking, applying, or enforcing the Illinois Business Take-Over Act" against MITE. Record 16. It did not enjoin other parties who are authorized by the Act to enforce its provisions. Ill.Rev.*650 121 1/2 , ¶¶ 137.62, 137.64 (1979). Moreover, the preliminary injunction was entered without any declaration that the Illinois statute was unconstitutional. There simply is no basis on which to conclude that the preliminary injunction issued by the District Court should be construed as having granted MITE permanent immunity from future proceedings brought under the Illinois statute.

In *Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505*, the Court unanimously held that an individual who wished to engage in "constitutionally protected activity" but was threatened with prosecution under a state criminal statute could obtain a declaratory judgment in federal court declaring the statute invalid. The Court **2645 did not suggest that, armed with such a judgment from a federal district court, the individual could violate the statute with impunity; indeed, it stated just the opposite:

" '[A] federal declaration of unconstitutionality reflects the opinion of the federal court that the statute cannot be fully enforced. If a declaration of total unconstitutionality is affirmed by this Court, it follows that this Court stands ready to

reverse any conviction under the statute.' " *Id.*, at 469- 470, 94 S.Ct., at 1220-1221 (quoting *Perez v. Ledesma*, 401 U.S. 82, 124, 91 S.Ct. 674, 696, 27 L.Ed.2d 701 (separate opinion of BRENNAN, J.)). [FN2]

> FN2. See also 415 U.S., at 480, 94 S.Ct., at 1226 (REHNQUIST, J., concurring) ("There is nothing in the [Declaratory Judgment] Act's history to suggest that Congress intended to provide persons wishing to violate state laws with a federal shield behind which they could carry on their contemplated conduct"); *id.*, at 482, 94 S.Ct., at 1227 ("A declaratory judgment is simply a statement of rights, not a binding order supplemented by continuing sanctions").

Justice WHITE attached possibly the greatest significance to a federal declaratory judgment, writing separately in *Steffel* that "I would anticipate that a final declaratory judgment entered by a federal court holding particular conduct of the federal plaintiff to be immune on federal constitutional grounds from prosecution under state law should be accorded res judicata effect in any later prosecution of that very conduct." *651 415 U.S., at 477, 94 S.Ct., at 1224 (concurring opinion). A declaratory judgment reversed on appeal, however, certainly would not have such res judicata effect.

An individual who is imminently threatened with prosecution for conduct that he believes is constitutionally protected should not be forced to act at his peril. One purpose of the federal declaratory judgment statute is to permit such an individual to test the legality of a state statute before engaging in conduct that is prohibited by its terms. See S.Rep.No.1005, 73d Cong., 2d Sess., 2-3 (1934). Recognition of this fact, however, does not determine the point at which an individual may act with absolute assurance that he may not be punished for his contemplated activity. The fact that a federal judge has entered a declaration that the law is invalid does not provide that assurance; every litigant is painfully aware of the possibility that a favorable

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629                                                                                                    Page 18
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

judgment of a trial court may be reversed on appeal. To repeat the words of this Court in *Steffel*, the most that can be said is: " 'If a declaration of total unconstitutionality is affirmed by this Court, it follows that this Court stands ready to reverse any conviction under the statute.' " 415 U.S., at 470, 94 S.Ct., at 1221 (quoting *Perez v. Ledesma, supra*, 401 U.S., at 124, 91 S.Ct., at 696 (separate opinion of BRENNAN, J.)). [FN3]

> FN3. The fact that an unreviewed judgment does not provide absolute protection does not render the declaratory judgment of a district court or a court of appeals meaningless. As stated in *Steffel*:
> " 'Even where a declaration of unconstitutionality is not reviewed by this Court, the declaration may still be able to cut down the deterrent effect of an unconstitutional state statute. The persuasive force of the court's opinion and judgment may lead state prosecutors, courts, and legislators to reconsider their respective responsibilities toward the statute. Enforcement policies or judicial construction may be changed, or the legislature may repeal the statute and start anew.' " 415 U.S., at 470, 94 S.Ct., at 1221 (quoting *Perez v. Ledesma*, 401 U.S., at 125, 91 S.Ct., at 697 (separate opinion of BRENNAN, J.)).

Since a final judgment declaring a state statute unconstitutional would not grant immunity for actions taken in reliance on the court's decision, certainly a preliminary injunction--which on its face does nothing more than temporarily restrain conduct--should not accomplish that result. Neither the *652 preliminary injunction nor the subsequent judgment declaring the statute unconstitutional can fairly be construed as a grant of absolute immunity from enforcement of the Illinois statute. [FN4]

> FN4. In *Liner v. Jafco, Inc.*, 375 U.S. 301, 84 S.Ct. 391, 11 L.Ed.2d 347, the respondent obtained an injunction from a state court that restrained picketing at a construction site. Petitioners moved to dis-

solve the injunction on the ground that the state court was without jurisdiction to adjudicate the controversy because the subject matter of the picketing was exclusively within the cognizance of the National Labor Relations Board. Petitioners' motion was denied by the state court and that decision was affirmed on appeal. This Court granted a petition for certiorari.

While the case was pending in the state appellate court, construction at the site was completed. This Court nevertheless held that the issue of whether the injunction had issued properly was not moot because the respondent remained liable on an indemnity bond if the injunction had issued wrongfully. The Court stated:

"The petitioners plainly have 'a substantial stake in the judgment ...,' *Fiswick v. United States*, 329 U.S. 211, 222, 67 S.Ct. 224, 230, 91 L.Ed. 196, which exists apart from and is unaffected by the completion of construction. Their interest derives from the undertaking of respondent Jafco, Inc., in the injunction bond to indemnify them in damages if the injunction was 'wrongfully' sued out. Whether the injunction was wrongfully sued out turns solely upon the answer to the federal question which the petitioners have pressed from the beginning. If the answer of the Tennessee Court of Appeals to that question may not be challenged here, the petitioners have no recourse against Jafco on the bond." *Id.*, 375 U.S., at 305-306, 84 S.Ct., at 394.

In this case it does not appear that MITE is liable on an injunction bond. The posting of an indemnity bond, however, merely creates a right of action--that may or may not otherwise exist--for damages caused during the period that a wrongfully issued injunction was in effect. In this case, such rights of action exist under an independent state law that we must presume to be valid. As in *Liner*, these rights of action may be pursued "if the injunction was 'wrong-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629

457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

Page 19

fully' sued out"; and "[w]hether the injunction was wrongfully sued out turns solely upon the answer to the federal question which the petitioners have pressed from the beginning."

**2646 B

My conclusions concerning the proper nature of injunctive and declaratory relief are not based upon arcane interpretations *653 of common law. Federal courts are courts of limited jurisdiction. [FN5] Before a federal court exercises any governmental power, it has a duty to determine its own jurisdiction to act. There simply is no constitutional or statutory authority that permits a federal judge to grant dispensation from a valid state law. [FN6]

FN5. As stated by Chief Justice Marshall in *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 93, 2 L.Ed. 554:

"As preliminary to any investigation of the merits of this motion, this court deems it proper to declare that it disdains all jurisdiction not given by the constitution, or by the laws of the United States.

"Courts which originate in the common law possess a jurisdiction which must be regulated by the common law, until some statute shall change their established principles; but courts which are created by written law, and whose jurisdiction is defined by written law, cannot transcend that jurisdiction. It is unnecessary to state the reasoning on which this opinion is founded, because it has been repeatedly given by this court; and with the decisions heretofore rendered on this point, no member of the bench has, even for an instant, been dissatisfied."

FN6. I do not suggest that, if the state law is valid, a federal court lacks jurisdiction to enter an injunction restraining state officials from enforcing the statute. Such an injunction may be appropriate--and would be binding on the parties--to permit the federal court to preserve its jurisdiction

pending final decision on the constitutionality of the statute. *United States v. Mine Workers*, 330 U.S. 258, 289-290, 67 S.Ct. 677, 693-94, 91 L.Ed. 884. "Although only temporary, the injunction does prohibit state and local enforcement activities against the federal plaintiff pending final resolution of his case in the federal court." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931, 95 S.Ct. 2561, 2567, 45 L.Ed.2d 648. Such an injunction does not *continue* to be binding on the parties, however, if it is vacated on appeal; "an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties *until it is reversed by orderly and proper proceedings." United States v. Mine Workers, supra*, 330 U.S., at 293, 67 S.Ct., at 695 (emphasis added).

As I have written before, the federal judiciary can continue to perform its vital function in our governmental structure only if it recognizes the limitations on its own legitimate authority. *United States v. New York Telephone Co.*, 434 U.S. 159, 178, 98 S.Ct. 364, 375, 54 L.Ed.2d 376 (STEVENS, J., dissenting in part). A belief that a particular result appears reasonable or wise is an insufficient predicate for the exercise of federal judicial power. *654 The District Court in this case entered both an injunction restraining certain conduct by the Illinois Secretary of State and a judgment declaring a state statute unconstitutional. It did not--because it could not--**2647 grant immunity from the requirements of a valid state law. [FN7] As a result, this Court has jurisdiction to consider whether the judgment and relief entered by the District Court were proper. [FN8]

FN7. A conflict between a federal rule of law and a state statute may nullify the state law. Although such invalidity may not be recognized or accepted until it is identified in litigation, in my opinion the conflict with a paramount rule of federal law nullifies a state law whether or not litigation is ever commenced. In other words, it is

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

federal rules of law--and not the actions of federal judges--that may render a state law invalid.

FN8. Justice REHNQUIST concludes that this case is moot because the injunction restrains an enforcement proceeding that has not yet begun. If his view were accepted, an injunction against a threatened criminal proceeding, see *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22, would never be appropriate, for the controversy between the parties would not yet be "ripe." MITE sought an injunction not only to prevent the Illinois Secretary of State from interfering with its attempted takeover of Chicago Rivet, but also to bar the Secretary from proceeding against MITE for actions taken in violation of the statute. What is critical to the mootness question in this case is not that MITE abandoned the takeover before it was completed, but that MITE engaged in conduct that violated the terms of the Illinois statute. The *extent* of MITE's violation of state law cannot be determinative of its interest in avoiding an enforcement proceeding based on what MITE believed was constitutionally protected activity. *Oil Workers v. Missouri,* 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373, relied on by Justice REHNQUIST, does not compel a contrary result. In that case, the party subject to the injunction terminated the activity that had been enjoined. As a result, this Court refused to consider whether the injunction had issued properly, even though a resolution of that question would also have resolved other matters--based on similar questions of law--pending in another proceeding between the same parties. In this case, the party subject to the injunction--the Illinois Secretary of State--has not abandoned his desire to do what the injunction currently restrains him from doing.

II

On the merits, I agree with the Court that the Illinois Take-Over Act is invalid because it burdens interstate commerce. *655 I therefore join Part V of its opinion. I am not persuaded, however, that Congress' decision to follow a policy of neutrality in its own legislation is tantamount to a federal prohibition against state legislation designed to provide special protection for incumbent management. Accordingly, although I agree with the Court's assessment of the impact of the Illinois statute, I do not join its pre-emption holding.

Justice MARSHALL, with whom Justice BRENNAN joins, dissenting.

The jurisdiction of this Court depends upon the existence of a live controversy. We may resolve a particular dispute only if the parties have a real interest in the outcome of that dispute. Otherwise, the case is moot, and must be dismissed. *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973); *SEC v. Medical Committee for Human Rights,* 404 U.S. 403, 407, 92 S.Ct. 577, 580, 30 L.Ed.2d 560 (1972). In my view, this case should have been dismissed. The parties to this appeal have no adversary interest in the outcome of this case. Their positions would be the same whether the Court approved the Illinois Business Take-Over Act or struck it down. Because the Court finds that the Illinois Act is unconstitutional, there will be no further litigation. However, even if the Court had held that the Illinois Act is constitutional, and had lifted the permanent injunction that now restrains enforcement of the Act against MITE, there would be no basis for continued litigation. The Secretary stated that if the decision below were reversed, he would initiate enforcement proceedings against MITE in *656 state court, seeking civil and criminal penalties for its failure to comply with the Illinois Act. But a preliminary injunction was in effect at the time the alleged violations occurred. As I explain below, I believe that this injunction would have barred the Secretary from seeking either civil or criminal penalties for violations of the Act that occurred during that period. MITE would have a complete defense to such

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

an action.

# I

The Secretary argues that the case is not moot because the preliminary injunction **2648 would not be a complete defense to a state enforcement action. He contends that the preliminary injunction merely barred him from commencing an enforcement action during the period the injunction was in effect. Thus, if this Court had decided that the statute is constitutional and had lifted the permanent injunction, the State would have been able to commence an action seeking penalties for any violations that occurred during the period the preliminary injunction was in effect. In other words, argues the Secretary, the preliminary injunction only provided temporary security. It enabled MITE to go forward with the tender offer--subject to the risk that at some later stage, the constitutionality of the statute would be upheld, and the State would commence enforcement proceedings.

Federal courts undoubtedly have the power to issue a preliminary injunction that restrains enforcement of a state statute, subject to the condition that if the statute is later found to be valid, the State is free to seek penalties for violations that occurred during the period the injunction was in effect. In my view, however, federal courts also have the power to issue a preliminary injunction that offers permanent protection from penalties for violations of the statute that occurred during the period the injunction was in effect. [FN1] Determining *657 whether a particular injunction provides temporary or permanent protection becomes a question of interpretation.

> FN1. Unless the federal courts can grant preliminary injunctions that provide permanent protection, challenges to questionable state statutes may be deterred. A state statute may be either repugnant to the Constitution, or preempted by some federal law. Parties who wish to engage in conduct proscribed by state statutes may be reluctant to challenge their validity unless they can obtain permanent immunity from

penalties. But there is a strong federal interest in encouraging such challenges: the Constitution itself provides that the Constitution and federal statutes shall be "the supreme Law of the Land." Grants of permanent immunity help ensure that federal law will remain paramount.

Holding that federal courts have power to grant permanent protection would not substantially limit state power. In fact, the impact on state power will be relatively insignificant. A federal court may grant a preliminary injunction prohibiting the enforcement of a state statute only when there is substantial doubt about the validity of the statute, and when the party seeking relief is able to show that he will suffer irreparable injury if an injunction is not granted. It is true that under the rule I propose, if the statute is later determined to be valid, the State will never be able to prosecute the individual that obtained the preliminary injunction for action taken while the injunction was in effect. However, the State will be free to prosecute him for actions occurring either before or after the injunction, and will also be able to prosecute other persons who violated the statute. In other words, the State will be barred only from prosecuting the particular individual who requested the injunction for conduct undertaken during the pendency of the injunction. Moreover, it will be barred from prosecuting that individual, only because there was serious doubt about the constitutionality of the statute, and because he was able to show that he would suffer irreparable injury if an injunction was not granted.

I believe that in the ordinary case, unless the order contains specific language to the contrary, it should be presumed that an injunction secures permanent protection from penalties for violations that occurred during the period it was in effect; the burden should be on the State to show that the injunction provided only temporary security. [FN2] A pre-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

sumption *658 in favor of permanent **2649 protection is likely to reflect the intentions of the court that granted the motion. In acting upon a request for an injunction, it will recognize that short-term protection is often only marginally better than no protection at all. Parties seek to restrain the enforcement of a state statute, not just because they want short-term protection, but because they desire permanent immunity for actions they take in reliance on the injunction. If they are contemplating action that might violate a state statute, they will take little solace from temporary immunity-- when they know that if they decide to act, enforcement proceedings might be initiated at some later stage. [FN3]

> FN2. It might be argued that because a party seeking a preliminary injunction must ordinarily post bond, there should be a presumption in favor of recovery of damages caused by a wrongfully issued preliminary injunction. However, the fact that an injunction bond is ordinarily required does not necessarily imply that the party against whom the injunction was issued is automatically entitled to damages. That party must still prove that damages are appropriate; the injunction bond merely provides security, when the party is able to make such a showing.

It is true that when an injunction bond has been posted, and when the party challenging the injunction has a right to recover damages on the bond, the question whether an injunction was properly issued is not moot. See _Liner v. Jafco, Inc._, 375 U.S. 301, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964). The District Court record does not reveal that a bond was posted in this case. Even if a bond had been posted, however, this case would probably be moot; I believe that the State would not have a cause of action for damages. If this Court had determined that the injunction was wrongfully entered, the State might argue that it was damaged because it was unable to recover penalties for violations of the Take-

Over Act that occurred during the period the preliminary injunction was in effect. Such an argument should not prevail. Lost penalties do not constitute the sort of damages recoverable on a bond. In any event, as I suggest in this dissent, I believe that the preliminary injunction should be interpreted as protecting MITE from penalties. Thus, it should also protect MITE from liability for "damages" sustained by the State because it could not bring an action for penalties.

If a bond had been posted, the State might be able to recover costs or nominal damages on the bond. However, where there is no other basis for challenging the validity of an injunction, the possibility of such recovery is not sufficient to keep a case alive. If it were, then almost no case challenging an injunction could become moot. See _Washington Market Co. v. District of Columbia_, 137 U.S. 62, 11 S.Ct. 4, 34 L.Ed. 572 (1890) (court costs); _Hernandez v. European Auto Collision, Inc._, 487 F.2d 378, 387 (CA2 1973) (nominal damages); _Kerrigan v. Boucher_, 450 F.2d 487 (CA2 1971) (nominal damages).

> FN3. Cf. _Steffel v. Thompson_, 415 U.S. 452, 462, 94 S.Ct. 1209, 1217, 39 L.Ed.2d 505 (1974) (federal-court intervention is appropriate where the applicant for relief is situated "between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding"). See also _Hygrade Provision Co. v. Sherman_, 266 U.S. 497, 500, 45 S.Ct. 141, 142, 69 L.Ed. 402 (1925); _Terrace v. Thompson_, 263 U.S. 197, 216, 44 S.Ct. 15, 18, 68 L.Ed. 255 (1923); _Salem Inn, Inc. v. Frank_, 501 F.2d 18, 21 (CA2 1974), aff'd in relevant part _sub nom. Doran v. Salem Inn, Inc._, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

\*659 Here, the preliminary injunction does not expressly state that it provides permanent immunity from penalties for violations of the Illinois Act that may occur during its effective period. The injunction provides only that the Secretary of State is enjoined from "issuing any cease and desist order or notice of hearing or from otherwise invoking, applying, or enforcing the Illinois Business Take-Over Act" against MITE. Record 16. However, I see no reason why the presumption in favor of permanent protection should not be applied here. In this context, as the District Court must have recognized, permanent protection was needed. MITE sought an injunction, not just because it desired protection from enforcement actions during the period it was actually making the tender offer, but also because it desired protection from such actions in the future. The Act provides for substantial civil and criminal penalties. MITE would have been reluctant to go forward with its offer, which entailed considerable expense, if there were some risk that it would be penalized later. Indeed, in the Schedule 14D-1 filed with the SEC, MITE expressly stated that it would not commence the tender offer unless it obtained injunctive relief. It also reserved the right to withdraw its offer if injunctive relief were initially granted, but later withdrawn. See Record, Plaintiff's Exhibit 14. [FN4]

> FN4. I also find it significant that the District Court's final order granting a permanent injunction declares that the Illinois Act is "null and void and of no force and effect." App. to Juris. Statement 41a. A reasonable construction of the order granting a preliminary injunction is that it was also intended to render the act "null and void" while the injunction was in effect.

\*660 Interpreting the injunction to provide permanent protection also ensures that MITE could never be penalized for acting in reliance on the injunction. [FN5] MITE went forward with the tender offer, reasonably believing \*\*2650 that the District Court's order provided complete immunity. Under the circumstances, it would be improper to permit the State to penalize action taken while the injunc-

tion was in effect. In the past, this Court has recognized that reasonable reliance on judicial pronouncements may constitute a valid defense to criminal prosecution. See, e.g., *Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). [FN6]

> FN5. It is relevant to note that although MITE sought injunctive relief prior to engaging in any action that could subject it to civil or criminal penalties, the State never sought a stay of the District Court's injunction either in that court or in the Court of Appeals, and never expressed an intent to do so.

> FN6. In *Marks*, a conviction for transporting obscene materials was overturned, where the materials were not obscene at the time of transportation, but were rendered obscene at the time of trial by an intervening decision of this Court. See also *Cox v. Louisiana*, 379 U.S. 559, 569-571, 85 S.Ct. 476, 483-484, 13 L.Ed.2d 487 (1965) (conviction for illegal picketing reversed where defendant had relied on permission from police officer); *Raley v. Ohio*, 360 U.S. 423, 437-439, 79 S.Ct. 1257, 1265-1267, 3 L.Ed.2d 1344 (1959) (conviction for refusal to testify before state commission reversed because witness had relied on opinion of commission chairman that he was privileged to remain silent); *United States v. Mancuso*, 139 F.2d 90 (CA3 1943) (defendant could not be held liable for ignoring induction notices issued while *ex parte* order staying induction was in effect).

In addition to arguing that the preliminary injunction should be interpreted to provide only temporary protection from a state enforcement action, the Secretary argues that resolution of the mootness issue in this case should be controlled by *Leroy v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979). In that case, Great Western announced its intention to make a

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

Page 24

tender offer to purchase stock in another corporation. Idaho officials responsible for administering an Idaho statute governing corporate takeovers, see Idaho Code § 30-1501 et seq. (1980), objected to the offer and delayed its effective date. Great Western brought an action in *661 Federal District Court, seeking a declaration that the Idaho takeover law was unconstitutional, and an injunction restraining Idaho officials from enforcing the statute. The District Court granted injunctive relief that enabled Great Western to complete the acquisition. This Court, in reviewing the case, held that the controversy was not moot. "[T]he question whether Great Western has violated Idaho's statute will remain open unless and until the District Court's judgment is finally affirmed." Id., at 178, 99 S.Ct., at 2714. [FN7]

> FN7. The Court did not reach the question whether the Idaho statute was unconstitutional. It concluded that the action should have been dismissed on grounds of improper venue.

Leroy v. Great Western United Corp. is easily distinguishable from this case. Unlike MITE, Great Western took actions that might have violated the state takeover statute before it obtained injunctive relief. If this Court had decided that the Idaho statute was valid, Idaho officials might have been able to seek penalties for those preinjunction violations. [FN8] Leroy v. Great Western United Corp. can also be distinguished on the ground that the takeover offer in that case was successful. If the Idaho statute had been found to be valid, then Idaho officials would have been able to seek a rescission of the takeover. [FN9] Here, since the acquisition was never completed, Illinois officials could not seek rescission. [FN10]

> FN8. See Idaho Code §§ 30-1502 to 30-1504, 30-1510 (1980).

> FN9. See Idaho Code § 30-1509 (1980) (allowing State to institute action for rescission). The Illinois Act also empowers the State to seek a court order rescinding

sales that are unlawful under the Act. Ill.Rev.Stat., ch. 121 1/2 , ¶ 137.62 (1979).

> FN10. It is true that a rescission action would have been predicated on acts that were taken under cover of the preliminary injunction. However, I believe that injunctions should ordinarily be interpreted only as providing permanent protection from *penalties*. The State should be barred from penalizing the offeror for acts that took place during the period the injunction was in effect. However, if a court determines that the state statute is valid, the State should be free to provide a remedy for the continuing effects of acts that violated the statute. In particular, a State should be permitted to dismantle a successful acquisition that violated a valid statute.

*662 Finally, this case does not fall within the exception to the mootness doctrine for cases that "are capable of repetition, yet evading review." Unless a class action is **2651 involved, that exception applies only when the challenged action is too short to be fully litigated before its cessation, and when there is a reasonable expectation or a demonstrated probability that the same complaining party will be subject to the same action in the future. Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 187, 99 S.Ct. 983, 991, 59 L.Ed.2d 230 (1979); Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975). The second requirement has not been satisfied here. MITE has agreed not to renew its efforts to acquire Chicago Rivet. Thus, unless MITE breaches its agreement, [FN11] the State will never again have occasion to prevent MITE from making a takeover offer for Chicago Rivet. In addition, there has been no showing that MITE plans to acquire another corporation with substantial connection to Illinois. Thus, there is no demonstrated probability that the State will have occasion to prevent MITE from making a takeover offer for some other corporation.

> FN11. The possibility that MITE will

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

breach its agreement does not bring this case within the "capable of repetition, yet evading review" exception. The likelihood that such a breach will occur is relatively small. The exception applies only when there is a reasonable expectation that the same action will occur in the future.

## II

The majority disposes of the mootness issue in a short paragraph. It concedes that the only possible basis for continued litigation in this case would be a state action for penalties. It further concedes that the preliminary injunction issued by the District Court may be a complete defense to an action for civil or criminal penalties. It argues, however, that the effect to be given the preliminary injunction should not be reached in this case. Rather, that question should be decided in a state enforcement action, if it is raised as a defense. Thus, contends the majority, the case is not moot.

**\*663** I am completely unpersuaded by the majority's facile analysis. In deciding whether a case is moot, the Court must determine whether there is a live controversy. There is a live controversy in this case only if the State could seek penalties from MITE. Here, the State could not seek penalties from MITE. It may be true that the State could file a complaint if this Court were to lift the permanent injunction. However, this fact is not enough to keep the case alive where, as a matter of federal law, the complaint *must* be dismissed. If the action that the State plans to commence in state court lacks any merit--if MITE has an automatic defense to that action--then there simply is no controversy.

This case is made more difficult because the Court has never before decided what effect should be given to preliminary injunctions. But the fact that we must decide a novel question does not make the case any less moot. Certainly, if the Court had already held that a preliminary injunction provides permanent immunity, the case would be moot even though the State could go into state court and seek penalties. Such a suit, which would be clearly frivolous, could not keep the dispute alive.

The Court's refusal to confront the question whether a preliminary injunction would provide a complete defense is particularly ironic, given its recent decision in *Lane v. Williams*, 455 U.S. 624, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982). Respondents in that case had pleaded guilty in unrelated Illinois state-court prosecutions for burglary, an offense punishable by imprisonment and a mandatory 3-year parole term. Neither respondent was informed during his plea acceptance hearing that the negotiated sentence included the mandatory parole term. Each respondent completed his prison sentence but was reincarcerated for parole violation. While in custody, they filed petitions for federal habeas corpus, alleging that their guilty pleas were invalid because they were not informed of the mandatory parole requirement. The District **2652** Court decided to enter an order declaring the parole term void, and the United States *664* Court of Appeals for the Seventh Circuit affirmed. By the time the cases reached this Court, both respondents had completed their sentences, and their parole terms had expired. This Court held that the claims for relief were moot. In reaching this conclusion, the Court determined that as a matter of Illinois law, no collateral consequences would flow from the parole revocations. Thus, there would be no point in declaring the parole terms void. In other words, the Court reached out to decide a question of state law in order to hold that the case was moot. Here, by contrast, the Court refuses to confront an important question of *federal* law--deciding instead that the question should be left to a state court--so that it can avoid holding that the case is moot.

## III

The parties to this appeal have no adversary interest in the resolution of the merits of this controversy. The majority acts without jurisdiction when it addresses the question whether the Illinois Business Take-Over Act is constitutional. Because I believe the case is moot, I would have vacated the judgment of the Court of Appeals, with instructions that it remand the case to the District Court with instructions to dismiss.

Justice REHNQUIST, dissenting.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

I agree with Justice MARSHALL that this case does not present a justiciable controversy, but for a different reason.

MITE obtained an injunction in order to effect a cash tender offer for the stock of Chicago Rivet. The injunction restrained the Illinois Secretary of State from interfering with the Chicago Rivet tender offer by enforcing the Illinois Business Take-Over Act against MITE. Three days after the District Court issued a permanent injunction, MITE and Chicago Rivet reached an agreement and MITE withdrew its extant offer. Approximately one month later, MITE announced its decision not to make any tender offer. MITE is *665 not presently engaging in activity that is regulated by the Illinois statute, and there is no indication that MITE intends to engage in any such activity in the future. Therefore, the facts that gave rise to *this controversy* over the constitutionality of Illinois' anti-takeover statutes no longer exist, and it is unlikely that they will be repeated in the future. As the tender offer has met its demise for reasons having nothing to do with the validity of the Illinois statute, the injunction is no longer necessary to accomplish the purposes for which it was obtained. MITE no longer needs an injunction in order to effect a tender offer for the shares of Chicago Rivet or any other corporation subject to the Illinois Act. Nor does MITE need the injunction in order to preclude the Secretary from rescinding a completed tender offer.

Despite these developments which have occurred after the District Court issued the injunction, the Court concludes that the present controversy between the Illinois Secretary of State and MITE over the constitutionality of the Illinois Business Take-Over Act is not moot. According to the Court, the Illinois Secretary of State's intention to bring an enforcement action against MITE keeps the present controversy alive. The possibility of a future enforcement action, however, is insufficient for me to conclude that the controversy that is before the Court is not moot. [FN1]

> FN1. This case is unlike those in which this Court has found justiciable an action

to enjoin a threatened criminal prosecution. The plaintiff in the present posture of this case no longer intends to engage in, or is presently engaging in, what is asserted to be federally protected activity.

This Court has no power over a suit not pending before it. " 'Our power only extends over and is limited by the conditions of the case now before us.' " **2653 *Oil Workers v. Missouri*, 361 U.S. 363, 370, 80 S.Ct. 391, 396, 4 L.Ed.2d 373 (1960), quoting *American Book Co. v. Kansas ex rel. Nichols*, 193 U.S. 49, 52, 24 S.Ct. 394, 396, 48 L.Ed. 613 (1904). A case pending in this Court may not be kept alive simply because similar or identical issues are currently ripe for decision in a controversy between the same parties in another court. See *666*Oil Workers v. Missouri*, 361 U.S. at 370-371, 80 S.Ct. at 396; *American Book Co. v. Kansas ex rel. Nichols, supra*, 193 U.S. at 51, 24 S.Ct. at 395. A fortiori, this case may not be kept alive simply because there may exist a presently unripened controversy between these same parties over the constitutionality of the same Act. This is so even if our resolution of the merits of the instant case will resolve certain defenses that MITE could raise in an enforcement action were one to be brought by the Secretary. It follows that this case is not alive simply because a decision on the merits in this case will determine whether or not the Secretary's threatened enforcement action may ever ripen into a live controversy.

If an enforcement action were brought by the Secretary, "there is no way to know what the outcome of such a proceeding in the [Illinois] courts might be." *Oil Workers v. Missouri, supra*, 361 U.S. at 371, 80 S.Ct. at 396. The Illinois courts may well conclude that the injunction constitutes a defense either on state law grounds or upon the grounds suggested by Justice MARSHALL in his dissent. The Illinois courts may also agree with MITE that the Business Take-Over Act is pre-empted by the Williams Act or that Illinois' regulation of interstate tender offers runs afoul of the Commerce Clause. The possibility that this Court might disagree with the Illinois courts' ultimate resolution of the issues

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

102 S.Ct. 2629                                                                Page 27
457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728
(Cite as: 457 U.S. 624, 102 S.Ct. 2629)

arising in a presently unripe, but threatened, enforcement action hardly justifies the Court's resolution of important constitutional issues in the abstract posture in which they are currently presented. [FN2]

> FN2. *Bus Employees v. Missouri,* 374 U.S. 74, 83 S.Ct. 1657, 10 L.Ed.2d 763 (1963), and *Super Tire Engineering Co. v. Mc-Corkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), are clearly distinguishable. In each case, subsequent developments did not moot the controversy because the challenged statute affected the *challenging party's* current or planned activities. There is no suggestion in the instant case that the Illinois Business Take-Over Act has such an effect on MITE. Nor do I believe that this case remains alive merely because it is the enjoined party who seeks appellate review. Otherwise, an enjoined party could always litigate the legal bases for the injunction even though the party who sought the injunction no longer needs the injunction for the purposes for which it was obtained. Cf. *University of Texas v. Camenisch,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).

*667 The Secretary and MITE dispute the propriety of the injunction issued by the District Court in this case only with respect to a controversy that may ripen in another court. Because the controversy that is before the Court is no longer alive, I would vacate the judgment of the Court of Appeals and order that court to remand this case to the District Court with instructions to dismiss the complaint. See *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975); *United States v. Munsingwear, Inc.,* 340 U.S. 36, 39, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950).

For U.S. Supreme Court Briefs See:

1981 WL 389715 (Appellant Brief), Brief for Appellant, (July 20, 1981)

1981 WL 389716 (Appellee Brief), Brief for Appellees, (August 19, 1981)

1981 WL 389714 (Amicus.Brief), Brief For the United States as Amicus Curiae, (April 10, 1981)

1981 WL 389718 (Amicus.Brief), Brief for the State of New York as Amicus Curiae, (July 20, 1981)

1981 WL 389719 (Amicus.Brief), Motion for Leave to File Brief and Brief for North American Securities Administrators Association, Inc. as Amicus Curiae, (October 1, 1981)

1981 WL 389720 (Amicus.Brief), Brief of the State of Ohio as Amicus Curiae, (July 18, 1981)

1981 WL 389721 (Amicus.Brief), Brief for the Securities and Exchange Commission as Amicus Curiae, (July 29, 1981)

1981 WL 389722 (Amicus.Brief), Brief for the Commonwealth of Virginia as Amicus Curiae in Support of Appellant's Position, (June 18, 1981)

457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269, Blue Sky L. Rep. P 71,747, Fed. Sec. L. Rep. P 98,728

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT E
# TO DEFENDANT KLA-TENCOR'S
# APPENDIX OF OUT-OF-STATE
# AUTHORITIES IN SUPPORT OF
# DEMURRER

Westlaw.

100 A.2d 219

34 Del.Ch. 94, 100 A.2d 219

**(Cite as: 34 Del.Ch. 94, 100 A.2d 219)**

Court of Chancery of Delaware, New Castle
County.
ELSTER et al.
v.
AMERICAN AIRLINES, Inc.

Oct. 14, 1953.

Action by stockholders against corporation seeking to enjoin corporation from honoring exercise of option rights to purchase shares of common stock and seeking relief relative to stock issued pursuant to option plans, wherein corporation moved to dismiss and for summary judgment. The Court of Chancery, Bramhall, V. C., held that where all facts pertinent to option plan had been placed in public records of New York Stock Exchange and had been forwarded to every stockholder of record, stockholder, whose stock had been voted in favor of option plans, had ample notice and, therefore, had no standing to attack options.

Order in accordance with opinion.

### West Headnotes

**[1] Corporations ⟲426(12)**
101k426(12) Most Cited Cases
A stockholder cannot complain of corporate action in which, with full knowledge of all facts, stockholder concurred.

**[2] Corporations ⟲316(5)**
101k316(5) Most Cited Cases
Where all facts pertinent to option plan of corporation had been placed upon public records of New York Stock Exchange and had been forwarded to every stockholder of record, stockholder, whose stock had been voted in favor of option plan for executives had ample notice, and therefore, had no standing to attack options issued according to the plan.

**[3] Corporations ⟲207.5**
101k207.5 Most Cited Cases

(Formerly 101k2071/2)
Where there is injury to corporation and also special injury to individual stockholder, stockholder may proceed on his claim for protection of his individual rights rather than in right of corporation and such action would not constitute a derivative action. Rules of Court of Chancery, rule 23(b), Del.C.Ann.

**[4] Corporations ⟲189(5)**
101k189(5) Most Cited Cases
Action against corporation, but not against directors, to enjoin corporation from issuing stock under option plan as well as to compel corporation to take proper action relative to stock already issued under plan on ground that value of plaintiff's stock would deteriorate by honoring of exercise of options was a derivative action which could not be brought by stockholder who acquired stock other than by devolution by operation of law subsequent to granting of options. Rules of Court of Chancery, rules 12(b)(6), 23(b), 56, Del.C.Ann.

**[5] Corporations ⟲189(5)**
101k189(5) Most Cited Cases
Stockholder who brought action against corporation to enjoin it from issuing stock under option plan providing for issuance of stock at price substantially less than market price and to compel it to take proper action relative to stock already issued under plan, but who acquired stock subsequent to granting of options was not entitled to bring such derivative action on ground that wrong complained of was a continuing one. Rules of Court of Chancery, rule 23(b), Del.C.Ann.

**[6] Corporations ⟲316(3)**
101k316(3) Most Cited Cases
Issuance of stock option plans under which stock would be sold to executive employees at price substantially less than market price and controversy resulting there from to effect that value of stock held by shareholders would deteriorate involved internal affairs of corporation and were, therefore, controlled by laws of state of corporation's origin and not the state where options were granted and

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

100 A.2d 219
34 Del.Ch. 94, 100 A.2d 219
(Cite as: 34 Del.Ch. 94, 100 A.2d 219)

Page 2

would be exercised.

**[7] Corporations** ⟾439
101k439 Most Cited Cases
New York statute relating to so-called "firm" offers which are assumed to be binding against offeror, even though he should receive no consideration for his offer, does not permit a corporation to give away assets without consent of all stockholders. Personal Property Law N.Y., § 33, subd. 5.

**[8] Injunction** ⟾12
212k12 Most Cited Cases
Equity generally has jurisdiction in a suit for injunction to restrain a threatened injury.

**[9] Equity** ⟾46
150k46 Most Cited Cases
A remedy at law must be as practical to the ends of justice and to its prompt administration as the remedy in equity.

**[10] Injunction** ⟾72
212k72 Most Cited Cases

**[10] Judgment** ⟾181(31)
228k181(31) Most Cited Cases
Where stock option plans of corporation applied to several hundred of its officers and employees and involved 248,000 shares of its stock; few, if any, of officers and employees resided in state; amount of damages to stockholders resulting from sale of stock at substantially less than market price would be difficult, if not impossible, of ascertainment; and options had substantial value which could not be intelligently determined in dollars and cents from point of view of either corporation or optionees, remedy at law was so inadequate as would prevent judgment against stockholder on motions for summary judgment and to dismiss stockholder's action to enjoin corporation from honoring exercise of option rights.

**220 *95 Complaint by plaintiffs William Elster and Anna F. Cohen against American Airlines, Inc., a corporation of the State of Delaware, in which plaintiffs seek to enjoin defendant from honoring the exercise of certain option rights to purchase shares of its common stock and also seek relief rel-

ative to common stock issued pursuant to these options. Motions to dismiss and for summary judgment.

Robert C. Barab, of Wilmington, for plaintiffs.

Richard F. Corroon, of the firm of Berl, Potter & Anderson, of Wilmington, and Malcolm A. MacIntyre and Harold M. Childers, of the firm of Debevoise, Plimpton & McLean, of New York City, for defendant.

BRAMHALL, Vice-Chancellor.

The amended complaint filed by plaintiffs alleges that plaintiff William Elster was the owner and holder of shares of common stock of defendant since June of 1951, and that plaintiff Anna F. Cohen was the holder of shares of defendant since February of 1950. It is further averred in the complaint that on or about September 12, 1950, defendant granted options to 30 of its executive employees to purchase a total of 143,000 shares of its common stock at a price of $11.70 per share, and that on or about May 21, 1952, the defendant granted further options to 289 of its executive and supervisory employees to purchase a total of 105,000 shares of its common stock at a price of $12.50 per share.

According to the complaint, plaintiffs' action is based upon the following facts: All of said options are exercisable immediately upon their issuance, with no requirement that the respective optionees remain in the employ of defendant for any specified time. The option plans and the issuance of the options, as adopted by the board of directors of defendant, were in each instance made subject to the approval of the stockholders. At the meeting of the stockholders at which the option plans were presented for approval a substantial minority thereof voted against the plan, the stock of plaintiffs not being voted in favor thereof.

It is also alleged in the complaint that the granting of these options constitutes a gift of valuable corporate assets in that the corporation did not receive from the respective optionees any valid or sufficient consideration in exchange therefor; that the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

100 A.2d 219
34 Del.Ch. 94, 100 A.2d 219
(Cite as: 34 Del.Ch. 94, 100 A.2d 219)

Page 3

market price of defendant's common stock at the time of the exercise of portions of these options substantially exceeded the option price; and, that no demand has been made upon the managing directors of defendant to rescind the outstanding options because such demand would have been futile, inasmuch as some of the options were issued to directors of defendant and said directors would not take action which might result in a declaration that their own earlier acts **221 were illegal. It is also averred in the complaint that failure to enjoin defendant will result in irreparable injury to defendant and its stockholders.

This court is asked to enjoin defendant from honoring the exercise of the option rights, to direct defendant to take appropriate steps *97 or institute appropriate proceedings to cancel or reacquire such shares of stock as have been issued pursuant to said options or to recover for defendant such profits as may have been made by any resale of stock acquired by the exercise of said options.

Defendant prays for an order, pursuant to Rules of Court of Chancery, Rule 56, Del.C.Ann., directing this court to order the dismissal of the complaint with respect to plaintiff Anna F. Cohen, on the ground that she has ratified the granting of the options of which she complains. Defendant further prays for an order pursuant to Rule 56 for summary judgment, determining that the options, even if granted without consideration, are valid and binding as between the defendant and the optionees under the laws of the State of New York, which defendant contends, are applicable to the enforcibility and validity of stock options as between defendant and the optionees.

Defendant under Rule 12(b)(6) of this court has moved to dismiss the amended complaint for failure to state a claim upon which relief can be granted upon the ground that the prayer of the complaint is solely for injunctive relief, whereas, any injury resulting from the exercise of these options can properly be the subject only of a claim for monetary damages from the directors authorizing the issuance of the options or from the optionees. Defendant further prays for an order pursuant to Rule 23(b), dismissing so much of the complaint on the part of the plaintiff William Elster as concerns the alleged grant of options by defendant on September 12, 1950, prior to the time plaintiff Elster became a stockholder.

I shall first consider the motion for summary judgment as to plaintiff Anna F. Cohen. It is now conceded by both plaintiffs that the stock of Anna F. Cohen was voted in favor of the option plans which she now seeks to attack.

[1][2] It is well established that a stockholder cannot complain of corporate action in which, with full knowledge of all the facts, he or she has concurred. Finch v. Warrior Cement Corporation, 16 Del.Ch. 44, 141 A. 54. There is no averment in the complaint of any failure on the part of defendant, or of any of those charged with its management, to make full disclosure of all the facts relating to the *98 option plans sought to be attacked. According to the affidavit offered by defendant, which is not disputed, all facts pertinent to the option plans had been placed upon the public records of the New York Stock Exchange and had been forwarded to every stockholder of record of defendant, as required by the regulations of the Securities and Exchange Commission. She therefore had ample notice of all pertinent facts surrounding the adoption of the option plans at the time the shares which she held were voted in favor thereof. Goldboss v. Reimann, D.C.S.D.N.Y., 55 F.Supp. 811.

I therefore conclude that plaintiff Anna F. Cohen has no standing to attack the options issued according to the stock option plan and that summary judgment must be entered against her. Hereafter in this opinion references to 'plaintiff' will refer solely to plaintiff William Elster.

I next consider the question of whether or not the present action is a stockholders' derivative action or an action for the protection of the individual rights of plaintiff. Defendant contends that as to the options granted in September of 1950 the complaint is insufficient on the ground that this is a derivative

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

100 A.2d 219
34 Del.Ch. 94, 100 A.2d 219
(Cite as: 34 Del.Ch. 94, 100 A.2d 219)

Page 4

action and since plaintiff acquired his stock subsequent to September, 1950, plaintiff is prevented under Rule 23(b) of this court from pressing this action as to that option plan. Plaintiff contends that the action is not a derivative action and that therefore Rule 23(b) does not apply. He further states that even if this court should decide that the action is derivative, he would not be prevented from proceeding **222 with his action as to the first option plan because, as he alleges, the wrong to plaintiff is a continuing one.

Certain aspects of the complaint will first be noted. The action is solely against the defendant and does not include the directors and officers of defendant. The injuries of which plaintiff complains, unless we except plaintiff's claim as to the dilution of his stock, consist entirely of injuries to the corporation and its stockholders as a class. Any injury which plaintiff may receive by reason of the dilution of his stock would be equally applicable to all the stockholders of defendant, since plaintiff holds such a small amount of stock in proportion *99 to the amount of stock outstanding that the control or management of defendant would not be affected by the granting of these options, and, further, since there is no averment that the pre-emptive rights of plaintiff as a stockholder are affected by their issuance.

Rule 23(b) of this court provides, in substance, that in any action which may be brought by a stockholder to enforce a secondary right in a corporation it shall be averred in the complaint that the plaintiff was a stockholder at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law. It is further provided therein that the complaint shall set forth with particularity the efforts of plaintiff to secure from the managing directors, and, if necessary, from the shareholders, such action as he desires and his reasons for his failure to obtain such action or for not making such effort.

[3][4] Plaintiff claims that the value of his stock will deteriorate and that his proportionate share of the stock will be decreased as a result of the granting and exercise of the stock options. Assuming plaintiff's contention is correct, this would apply to the stock of all other stockholders as well. There are cases, of course, in which there is injury to the corporation and also special injury to the individual stockholder. In such case a stockholder, if he should so desire, may proceed on his claim for the protection of his individual rights rather than in the right of the corporation. The action would then not constitute a derivative action. Witherbee v. Bowles, 201 N.Y. 427, 95 N.E. 27; Stinnett v. Paramount-Famous Lasky Corp., Tex.Com.App., 37 S.W.2d 145; Hammer v. Werner, 239 App.Div. 38, 265 N.Y.S. 172, 179. See Fletcher, Cyclopedia Corporations, (Perm.Ed.) Vol. 13, § 5921, p. 281. Under such circumstances, Rule 23(b) would not apply. Here the wrong of which plaintiff complains is not a wrong inflicted upon him alone or a wrong affecting any particular right which he is asserting,--such as his pre-emptive rights as a stockholder, rights involving the control of the corporation, or a wrong affecting the stockholders and not the corporation,--but is an indirect injury as a result of the wrong done to the corporation. Bennett v. Breuil Petroleum Corp., Del.Ch., 99 A.2d 236, opinion of Chancellor Seitz dated August 11, 1953; *100Ainscow v. Sanitary Co. of America, 21 Del.Ch. 35, 180 A. 614; Miller v. Loft, Inc., 17 Del.Ch. 301, 153 A. 861; Sohland v. Baker, 15 Del.Ch. 431, 141 A. 277, 58 A.L.R. 693; Fleer v. Frank H. Fleer Corporation, 14 Del.Ch. 277, 125 A. 411; Wyles v. Campbell, D.C.Del.1948, 77 F.Supp. 343.

Plaintiff distinguishes the cases above cited from the present case on the ground that they are actions for the cancellation of stock which has already been issued, whereas in the present case the prayer is to enjoin the defendant from issuing stock under the option plan as well as to compel the defendant to take proper action relative to the stock which has already been issued under these options. I fail to see that there is any difference between the type of action in a suit to cancel shares of stock already issued and one where the prayer is to enjoin the issuance of stock under a contract made by the corporation. In each case the wrong for which complaint is

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

100 A.2d 219
34 Del.Ch. 94, 100 A.2d 219
(Cite as: 34 Del.Ch. 94, 100 A.2d 219)

made is the action of the corporation in entering into the contract. See Gottlieb v. Heyden Chemical Corp., Del., 90 A.2d 660; Levitan v. Stout, D.C.W.D.Ky., 97 F.Supp. 105; Pergament v. Frazer, D.C.E.D.Mich., 93 F.Supp. 9. While it is true that in the cases **223 cited the prayer is for the cancellation of stock already issued and in the present case the prayer is for the cancellation of the option contract, the purpose is the same. Plaintiff claims that the options granted under the option contract have substantial value; there is no contention, as I understand plaintiff's complaint, that there is waste as far as the value of the stock as set forth in the option contracts relates to the actual value thereof. The loss in each instance is a loss to the corporation and to the stockholders as a whole. The fact that plaintiff has chosen to sue the corporation alone and not to include as parties defendant the managing directors and optionees does not in any manner change the nature of the cause of action or the substance of plaintiff's claim. See Selman v. Allen, Sup., 121 N.Y.S.2d 142.

The case of Rosenthal v. Burry Biscuit Corporation, 30 Del.Ch. 299, 60 A.2d 106, in which the action was brought for a declaration that stock options issued under an option contract were invalid, is very similar to the present case. While it is true that in that case the *101 question was not specifically discussed, it is at least significant that Chancellor Seitz in his opinion denoted the action as a derivative one.

Plaintiff relies upon the case of Horwitz v. Balaban, D.C.S.D.N.Y., 112 F.Supp. 99, and other New York cases. In that case the court held that the charter of the corporation purported to take away stockholders' pre-emptive rights as recognized in the New York cases. The Balaban case and the other New York cases upon which plaintiff relies is distinguished in the case of Selman v. Allen, supra [121 N.Y.S.2d 146]. In the latter case a stockholder alleged that the corporation, without consideration and solely by way of gift, granted to certain of the directors an option to purchase a large number of shares of the common stock of the corporation. The prayer was that the individual defendants be en-

joined from issuing stock of the corporation to the optionees. The court held that this was an action 'in the right of the corporation', saying that the wrong complained of was clearly a claim of waste and mismanagement of corporation assets, to be redressed by means of a suit by or on behalf of the corporation. That court went on to distinguish the cases relied upon by plaintiff by saying that those actions were brought to vindicate purely personal rights of stockholders to maintain their relative positions by being accorded their personal rights to acquire new stock to be issued. The court distinguished the Balaban case in particular by saying that in the latter case the shares involved were unissued shares, whereas in the Selman case the stock was stock of the corporation. Noting that plaintiff had made a studied attempt to show that her action was not instituted or maintained in the right of the corporation, the court said:

'I think it obvious, however, that if plaintiff be in truth complaining of and seeking to enjoin a wrong to the corporation, she can neither change the nature of the wrong nor avoid the operation and effect of § 61(b) by asserting in her complaint that she is not suing in the right of the corporation. The nature of the wrong alleged is what controls, not the pleader's assertion of an intention to sue as representative of the stockholders rather than in the right of the corporation; and as I find that the wrong here claimed is a wrong to the corporation, and not a wrong to the *102 stockholders personally or individually, I conclude that this action is brought in the right of the corporation * * *.'

It is true that in the present case the stock involved is unissued shares. Under the law of the State of New York, as set forth in the cases cited by plaintiff, the issuance of such shares under such conditions would be a violation of the stockholders' pre-emptive rights. In this case, there is no contention that the pre-emptive rights of stockholders are violated. Disregarding the question of pre-emptive rights, the law, as laid down in the Selman case, is that the action is a derivative one.

[5] Plaintiff says that, even if the court should hold

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

100 A.2d 219
34 Del.Ch. 94, 100 A.2d 219
(Cite as: 34 Del.Ch. 94, 100 A.2d 219)

that the action is a derivative **224 action, he is entitled to proceed because the wrong complained of is a continuing one. This contention is based upon the assertion that many of the options outstanding have not been exercised and that the damage or injury to plaintiff will not be suffered until the exercise of those options.

The wrong of which plaintiff complains is the option contract, not the purchase price and sale of stock pursuant thereto. See Gottlieb v. Heyden Chemical Corp., supra; Kerbs v. California Eastern Airways, Del., 90 A.2d 652, 656; Rosenthal v. Burry Biscuit Corporation, supra. Plaintiff does not complain that the sale of the stock at the option prices would constitute a waste of corporate assets; his complaint is lack of consideration in the granting of the options. This question was considered in the case of Levitan v. Stout, supra [97 F.Supp. 119], a stockholder's derivative action, in which mismanagement of the corporation on the part of the individual defendants was charged. On a motion of the individual defendants to strike certain allegations from the amended complaint on the ground that the allegedly wrongful acts were committed prior to the earliest sale on which any of the plaintiffs had acquired stock in the corporation, the court, in holding that the wrong was not a continuing one, said:

'Assuming that the individual defendants did wrong to the Corporation by entering into the contract it does not follow that they committed any wrong in carrying out the contract once it had been made. Indeed, had they not done so, the Corporation *103 would presumably have been subject to liability for breach of contract.'

See also Pergament v. Frazer, supra.

The wrong or injury of which plaintiff complains is the granting of the options, not the exercise thereof. The action is therefore not a continuing one.

I conclude that as to the options granted in September of 1950, defendant's motion for summary judgment under Rule 56 must be granted.

I next consider the applicability of New York stat-utory law as that law may apply to the stock option plans of defendant.

[6] Defendant contends that since the options were granted and will be exercised, if they should be exercised, in the State of New York, their legality must be determined by the laws of that state. Defendant relies on Subdivision 5 of Section 33, Article 3, Personal Property Law, Chapter 41, McKinney's Consolidated Laws of New York, which provides as follows:

'5. When hereafter an offer to enter into a contract is made in a writing signed by the offeror, or by his agent, which states that the offer is irrevocable during a period set forth or until a time fixed, the offer shall not be revocable during such period or until such time because of the absence of consideration for the assurance of irrevocability. When such a writing states that the offer is irrevocable but does not state any period or time of irrevocability, it shall be construed to state that the offer is irrevocable for a reasonable time.'

The New York statute quoted above was passed for the purpose of affording recognition of an existing and growing custom of business men to make so-called 'firm' offers, which are assumed to be binding against the offeror even though he should receive no consideration for his offer. Jarka Corporation v. Hellenic Lines, 2 Cir., 1950, 182 F.2d 916, 919.

*104 This action was instituted by plaintiff as one of the shareholders of the defendant. It relates to stock options granted to certain officers and personnel of defendant. It is not therefore an ordinary transaction for the sale of stock on the open market, but involves a matter lying entirely within the corporate structure of defendant. The stock certificate of plaintiff was issued in conformity with the laws of the State of Delaware. When the plaintiff became the owner of the corporate stock of defendant, the rights which he obtained by virtue thereof were rights granted to him under **225 the laws of this state. The issuance of the stock option plans by defendant arises out of their approval by its board of directors and its stockholders and the controversy

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

100 A.2d 219
34 Del.Ch. 94, 100 A.2d 219
(Cite as: 34 Del.Ch. 94, 100 A.2d 219)

Page 7

resulting therefrom involves the internal affairs of defendant and is therefore controlled by the laws of the state of its origin, namely, the State of Delaware. Rogers v. Guaranty Trust Co. of New York, 288 U.S. 123, 53 S.Ct. 295, 77 L.Ed. 652, 89 A.L.R. 720; Boyette v. Preston Motors Corporation, 206 Ala. 240, 89 So. 746, 18 A.L.R. 1376.

The case of Rogers v. Guaranty Trust Co. of New York, supra [288 U.S. 123, 53 S.Ct. 296], is in point. In that case The American Tobacco Co., a corporation of the State of New Jersey, doing business in the State of New York, by resolution of its board of directors, advised approval of its stockholders of a plan for the issuance and sale of its common stock B to certain employees and others actively engaged in the conduct of its business 'by way of additional compensation for services to be rendered' and allotted for subscription shares of its unissued stock. The plan was duly adopted by the stockholders and the board of directors authorized the sale of the stock. A stockholder's suit to enjoin defendants from carrying out the plan and to cancel the stock was instituted in the District Court for the Southern District of New York. That court, 60 F.2d 106, dismissed the complaint without prejudice to the enforcement of the rights of the plaintiff, if any, in the courts of New Jersey. The Circuit Court of Appeals, 2 Cir., 60 F.2d 114 held that the stock was lawfully issued under New Jersey statutes. Upon certiorari to the United States Supreme Court, that court remanded the case to the District Court with directions to reinstate its earlier judgment. *105 287 U.S. 586, 53 S.Ct. 80, 77 L.Ed. 512. In holding that the law of the State of New Jersey applied, the Supreme Court, Mr. Justice Butler, said:
'The authorization, allotment, and sale of the shares in question involved the proportionate ownership of stockholders and their rights inter sese. Unquestionably the steps taken and proposed to formulate and carry out the plan constitute the conduct and management of the internal affairs of the tobacco company. The controversy is solely between the plaintiff and other stockholders not participating in the distribution on one side and the purchasers of the new stock, the corporation, its directors and officers on the oth-

er. When, by acquisition of his stock, plaintiff became a member of the corporation he, like every other shareholder, impliedly agreed that, in respect of its internal affairs, the company was to be governed by the laws of the state in which it was organized. His rights, whatever the tribunal chosen for their vindication, are to be determined upon the ascertainment and proper application of New Jersey law.'

[7] Even assuming that the stock options issued in this case are to be determined under the laws of the State of New York, I find nothing in that statute, or in any other law or decision of that state which has come to my attention, permitting a corporation to give away its assets, or any substantial portion thereof, without the consent of all its stockholders. See Holst v. New York Stock Exchange, 252 App.Div. 233, 299 N.Y.S. 255; Selman v. Allen, supra.

The New York statute cited by defendant relates to the revocability of an otherwise valid offer; it cannot possibly validate an option which would be otherwise illegal. It is charged in plaintiff's complaint that the defendant, by the granting of the options, is giving away a substantial portion of its assets without receiving proper consideration therefor and without the unanimous approval of all its stockholders. This it cannot do, either in New York or in this state. As the record now stands, there is an allegation in the complaint alleging waste of corporate assets by reason of the issuance of these options. The question of the sufficiency of this allegation must necessarily **226 be determined by the trier of the facts as well as the law.

*106 I conclude that defendant's motion for summary judgment, pursuant to Rule 56, as far as that motion has any applicability to the New York law, should be dismissed.

It is asserted on behalf of defendant that the facts alleged in the complaint do not show irreparable injury to the plaintiff and that the only loss which plaintiff has sustained is a monetary one, for which he can secure full and complete relief in a court of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

100 A.2d 219
34 Del.Ch. 94, 100 A.2d 219
(Cite as: 34 Del.Ch. 94, 100 A.2d 219)

Page 8

law.

[8][9][10] Equity generally has jurisdiction in a suit for injunction to restrain a threatened injury. In this case the remedy at law, if there should be one, would undoubtedly be less complete and less effective than in a court of equity. The stock option plans of defendant apply to several hundred of its officers and employees, and involve 248,000 shares of its stock. Few, if any, of these officers and employees reside in this state. The amount of damages would be difficult, if not impossible, of ascertainment. The complaint alleges that the options have substantial value. Nevertheless, that value cannot be intelligently determined in dollars and cents from the point of view of either the defendant or the optionees. See Kaufman v. Shoenberg, Del.Ch., 91 A.2d 786; Gottlieb v. Heyden Chemical Corp., Del.Ch., 99 A.2d 507 opinion of Chancellor Seitz dated October 8, 1953. A remedy at law must be as practical to the ends of justice and to its prompt administration as the remedy in equity. City of Walla Walla v. Walla Walla Water Co., 172 U.S. 1, 19 S.Ct. 77, 43 L.Ed. 341. Injunctions relative to option contracts under similar circumstances have been granted by this court in a number of instances. I therefore conclude that plaintiff has shown such evidence of irrevocable injury as will prevent judgment against him on motions to dismiss and for summary judgment.

An order will be signed, on notice, in accordance with this opinion.

34 Del.Ch. 94, 100 A.2d 219

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT F
# TO DEFENDANT KLA-TENCOR'S
# APPENDIX OF OUT-OF-STATE
# AUTHORITIES IN SUPPORT OF
# DEMURRER

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Peter FELDMAN, Plaintiff,
v.
Rory J. CUTAIA, Steven J. Kumble, Jonathan
Lawrence, James T. Raymond,
Llewellen Werner, William Hitchcock, Leonard V.
Sessa, the Cutaia Group, LLC,
Keith J. Keenan, J. Todd Raymond, GI Partners
Fund II, L.P., GI Partners Side
Fund II, L.P., Defendants,
and
THE TELX GROUP, INC., a Delaware Corpora-
tion, Nominal Defendant.
No. Civ.A. 1656-VCL.

Submitted May 15, 2007.
Decided Aug. 1, 2007.

Matthew E. Fischer, Timothy R. Dudderar, Berton
W. Ashman, Jr., Potter Anderson & Corroon, LLP,
Wilmington, Delaware, for Peter Feldman.

Vernon R. Proctor, Proctor Heyman, LLP, Wilm-
ington, Delaware, for Steven J. Kumble, James T.
Raymond, Llewellyn Werner, William Hitchcock,
Leonard V. Sessa, and Keith J. Kennan.

Stephen E. Jenkins, Richard L. Renck, Andrew D.
Cordo, Ashby & Geddes, Wilmington, Delaware,
for Rory Cutaia, J. Todd Raymond, Jonathan
Lawrence, and the Cutaia Group, LLC.

Lewis H. Lazarus, Thomas E. Hanson, Jr., Morris
James, LLP, Wilmington, Delaware, for The Telx
Group, Inc.

Srinivas M. Raju, Brock E. Czeschin, Richards,
Layton & Finger, P . A., Wilmington, Delaware;
Luke J. Bergstrom, Latham & Watkins, Menlo
Park, California, for GI Partners Fund II, L.P. and
GI Partners Side Fund II, L.P.

*MEMORANDUM OPINION AND ORDER*
LAMB, Vice Chancellor.

*1 A co-founder and now former stockholder of a
Delaware corporation sues members of the com-
pany's management and its directors for alleged
breaches of fiduciary duty arising out of a number
of transactions, including a recapitalization scheme,
a stock repurchase, an issuance of stock options,
and ultimately a cash-out merger. The various de-
fendants move to dismiss the complaint, arguing
that the merger extinguished the plaintiff's standing
to bring derivative causes of action in the right of
the corporation. Because the complaint does not ad-
equately allege the presence of a controlling stock-
holder (which might allow the plaintiff to bring a
direct claim for unfair equity dilution), and since no
equitable exception to the continuous stock owner-
ship requirement operates here (which would allow
the plaintiff to continue asserting its derivative
claims), the defendants' motions will be granted.

I.

*A. The Parties*

The plaintiff, Peter Feldman, was a co-founder of
The Telx Group, Inc., a privately-held Delaware
corporation with a principal place of business in
New York. At all relevant times before an October
2006 merger, Feldman was a record and beneficial
owner of the company's common stock.

On October 3, 2006, the defendants GI Partners
Fund II, L.P. and GI Partners Side Fund II, L.P.
(collectively, "GI Partners") acquired all the out-
standing stock of Telx through an all-cash merger.
Before that merger occurred, the defendants Rory J.
Cutaia, Jonathan Lawrence, James T. Raymond
("J.Raymond"), Llewellen Werner, William Hitch-
cock, Leonard V. Sessa, and Steven J. Kumble sat
on the Telx board of directors. Cutaia served as the
company's chief executive officer, president, and
chairman of the board, while Lawrence acted as
chief financial officer and chief operating officer.
Defendant Keith J. Keenan served as a Telx direct-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

or until his resignation from the board in February 2005. Telx's former general counsel and controller, J. Todd Raymond ("T.Raymond"), is also a defendant in this lawsuit. These individuals are hereinafter referred to as the "Telx Defendants." [FN1]

> FN1. The Telx Defendants also include The Cutaia Group, LLC, an entity controlled by Cutaia.

B. *The Facts* [FN2]

> FN2. The facts herein are drawn from the well pleaded allegations in the complaint and certain documents that the complaint incorporates by reference. *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 69- 70 (Del.1995); *Bergstein v. Texas Int'l Co.,* 453 A.2d 467, 469 (Del.1982).

In August 2000, Cutaia, Feldman, and other investors formed Telx to provide interconnection facilities and services for telecommunications and internet service providers. Thereafter, Feldman served as the company's chief technology officer and as a director until he resigned in July 2002. In June and August 2004, Feldman sold the vast majority of his interest in Telx, approximately 148,000 shares of common stock, to Kumble in an arms'-length transaction at $3.36 per share. Feldman retained roughly 1,000 Telx shares following this sale, and, on August 6, 2004, filed an action to inspect the company's books and records pursuant to 8 *Del. C.* § 220. The parties settled that case in May 2005. Relying on the information he obtained in the section 220 action, Feldman filed this lawsuit in September 2005. The complaint now before the court is most efficiently analyzed by reviewing each of the four classes of transactions giving rise to Feldman's fourteen causes of action.

1. *The Dilutive Transactions*

*2 The Telx Defendants' alleged scheme of self-enrichment began in March 2002, while Feldman was still an officer and director of Telx. At that time, the company offered senior secured and convertible promissory notes at a 16% interest rate, due

in June 2005, in a private placement transaction. After the subscription period, Telx issued notes with a face value of $7.05 million in return for $5.08 million in cash. Many of the Telx Defendants or their affiliates participated in this transaction. [FN3] Feldman was unaware of the Telx Defendants' participation until he received documents in mid-2005 as a result of the section 220 action, but was aware of the private placement itself at the time of the offering. Notably, Feldman does not allege that he or any other stockholder was precluded from participating in the private placement.

> FN3. Specifically, it is alleged that the following defendants and their affiliates received the 16% notes in the private placement: (i) Hitchcock and affiliates Avalon Financial Group, Ltd., Rosalie B. Hitchcock, and Margaret M. Hitchcock Fanning; (ii) Sessa; (iii) Cutaia (through The Cutaia Group, LLC); (iv) Lawrence and affiliate Joseph S. Lawrence, Jr., IRA; (v) J. Raymond and affiliates Barbara K. Raymond, James F. Fitzgerald IRA, Mystic Island Corporation, Arthur & Elanor Foss, John E. Friend, II, M.D. & Kimberly K. Raymond, John Friend LLC, Kevin Lynch Trust and Friend Family Revocable Trust; (vi) T. Raymond; and, (vii) Keenan.

In April 2003, Telx offered an exchange transaction to the purchasers of the 16% notes. The company thereby exchanged nearly $5 .6 million in 16% notes for newly-issued 9% notes. Further, approximately $1.1 million in 16% notes were converted into 3.3 million shares of Telx common stock. Just as they participated in the private placement a year before, the same Telx Defendants exchanged their 16% notes in this transaction. [FN4] Feldman, who was no longer at the company, knew nothing of the exchange itself until December 2003, and did not learn details of the Telx Defendants' participation therein until mid-2005.

> FN4. Specifically, it is alleged that the following defendants and their affiliates participated in the exchange transaction: (i)

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                              Page 3
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

Hitchcock and affiliates Avalon Financial Group, Ltd., Rosalie B. Hitchcock, and Margaret M. Hitchcock Fanning; (ii) Sessa; (iii) Cutaia (through The Cutaia Group, LLC); (iv) Lawrence and affiliate Joseph S. Lawrence, Jr., IRA; (v) J. Raymond and affiliates Barbara K. Raymond, James F. Fitzgerald IRA, Mystic Island Corporation, Arthur & Elanor Foss, John E. Friend, II, M.D. & Kimberly K. Raymond, John Friend LLC, Kevin Lynch Trust and Friend Family Revocable Trust; (vi) T. Raymond; and, (vii) Keenan.

Finally, in August 2003, Telx engaged in a recapitalization whereby the company issued convertible Series A preferred stock to investors in exchange for $7.8 million of Telx's debt and $3.8 million in cash. [FN5] Holders of approximately $4.8 million in 9% notes converted their principal plus accrued interest into Series A preferred stock. [FN6] Yet again, Telx directors and officers, including a majority of the Telx Defendants and their affiliates, were significant participants in the recapitalization, [FN7] and, yet again, Feldman did not learn of this transaction or of the Telx Defendants' participation until long after the fact. [FN8]

FN5. The Series A preferred stock was convertible into Telx common stock on a ten-to-one basis.

FN6. The Series A preferred stock was issued at four different prices depending upon the level of seniority of the debt exchanged: $1.80 per share for new capital and accrued interest and past-due debt; $2 per share for the senior secured 16% notes and the 9% notes; $3.40 per share for the subordinated convertible 16% notes; and $4 per share for 12% and 10% junior subordinated debt.

FN7. Specifically, it is alleged that the following defendants and their affiliates received Series A preferred stock in the recapitalization: (i) Hitchcock and affiliates Avalon Financial Group, Ltd., Rosalie B. Hitchcock, and Margaret M. Hitchcock Fanning; (ii) Sessa; (iii) Cutaia (through The Cutaia Group, LLC); (iv) Lawrence and affiliate Joseph S. Lawrence, Jr., IRA; (v) J. Raymond and affiliates Barbara K. Raymond, James F. Fitzgerald IRA, Mystic Island Corporation, Arthur & Elanor Foss, John E. Friend, II, M.D. & Kimberly K. Raymond, John Friend LLC, Kevin Lynch Trust and Friend Family Revocable Trust; (vi) T. Raymond; and, (vii) Keenan.

FN8. Furthermore, in September 2003, Telx conducted a ten-to-one reverse stock split in which the preferred stock acquired in the exchange transaction and convertible into common stock on a ten-to-one basis became convertible into common stock on a one-to-one basis. These transactions indicated a value for the common stock ranging from $0.18 to $0.40 per share (or $1.90 to $4 per share assuming that the convertible feature was adjusted to one-to-one following the reverse stock split).

In Count V of his complaint, Feldman alleges that, as a result of the private placement, the exchange offer, and the recapitalization (the "Dilutive Transactions"), the Telx Defendants wrongfully increased their own equity stakes in Telx, while simultaneously diluting the equity ownership of non-insider stockholders like himself. Indeed, Feldman states that before the Dilutive Transactions, he owned roughly 10% of Telx; afterwards, however, his stake fell to 1.5%. The Telx Defendants, their family members and their affiliates, taken as a group, ended up with holdings of approximately 60% of Telx's equity. As a result of the Telx Defendants' breaches of their fiduciary obligations that caused this dilution, Feldman requests the court award him monetary damages.

2. The 2003 Employee Stock Option Plan Grants

In late 2003, the Telx board considered an Employee Stock Option Plan (the "ESOP") to allow key

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

employees to purchase an interest in the company. The board approved the ESOP on February 5, 2004, and a majority of the Telx stockholders considered and approved it at the company's 2004 annual meeting on April 13, 2004. Pursuant to the ESOP, Cutaia, Lawrence, and T. Raymond received options to purchase 1.279 million shares of Telx Series A preferred stock at $2 per share. [FN9] Due to the relative paucity of documentary evidence relating to these grants, Feldman alleges that these options were never validly issued and that the agreements which support their issuance are post-dated forgeries.

> FN9. Cutaia received 827,000 options, while Lawrence and T. Raymond received 326,000 and 126,000 options, respectively. A total of 1.75 million options were authorized under the ESOP.

*3 Counts VI through XII of Feldman's complaint allege multiple causes of action against the Telx Defendants predicated on the ESOP. Feldman claims that the Telx Defendants failed to disclose material information to the Telx stockholders in connection with the stockholder vote on the ESOP at the annual meeting-namely, the intended recipients of the options and the number of options to be granted to each such recipient. He also alleges that the option grants to Cutaia, Lawrence, and T. Raymond violated the express terms of the ESOP, and thus constitute a breach of that contract. Feldman further claims that the grants violated 8 Del. C. § 157(b), that Cutaia, Lawrence, and T. Raymond were unjustly enriched at the expense of Telx, and that the Telx board members breached a fiduciary duty of good faith in allowing the options to be issued. Finally, the complaint alleges that the option grants to Cutaia, Lawrence, and T. Raymond constitute corporate waste. In connection with these causes of action, Feldman asks the court to rescind the options, to award rescissory and compensatory damages to Telx, and to order Cutaia, Lawrence, and T. Raymond to disgorge all profits, benefits, and other compensation obtained from the grants. [FN10]

> FN10. The face of the complaint does not specifically allege that the option grants pursuant to the ESOP caused a wrongful dilution of Feldman's equity ownership in Telx. However, for purposes of this motion, the court assumes Count V applies to the option grants as well.

3. *A Failed Merger Followed By A Stock Repurchase*

At an October 5, 2004 board meeting, Cutaia advised the directors that an expansion strategy the company had attempted to implement was no longer viable and that an exit event might provide maximum value to Telx stockholders. Heeding this advice, the board instructed the Telx officers to begin an auction process. In the three months that followed, Telx identified a pool of possible suitors, but subsequently narrowed the search to five likely buyers. As exploratory negotiations progressed, Switch & Data, Inc. came to the fore. Discussions between representatives of the two companies ultimately resulted in the approval and execution of a merger agreement that provided for a cash price of about $10 per Telx share.

Just over a month later, Switch & Data terminated the merger, citing issues discovered during its due diligence review of Telx. At the next board meeting, despite the reason given by Switch & Data for the termination, Cutaia told the board that, in his opinion, the merger fell through because Switch & Data was unable to obtain appropriate financing. Despite the fact that a failure-to-finance termination triggered a $2 million termination fee payable to Telx under the merger agreement, the board did not pursue any remedial action against Switch & Data.

Following the collapse of the merger, Cutaia advised the board on July 8, 2005 that Telx should pursue a stock buyback program in order to provide stockholders with liquidity. He suggested that such a transaction be priced in the $10 per share range, since a third party, Switch & Data, had made a bid for the company at that level.

The Telx board next met on July 28, 2005. Follow-

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

Page 5

ing a brief discussion regarding the legal implications of the proposed transaction, but not the fairness of the repurchase price, the board voted to repurchase $5 million of the company's securities at $10 per share. The repurchase was announced on August 29, 2005 and was open to holders of common and preferred stock (including directors and management), as well as all option and warrant holders. [FN11] At that time, the directors' and executives' share of outstanding securities equaled 42% of Telx's outstanding common stock, 37% of the outstanding Series A preferred stock, and 88.7% of the company's outstanding options and warrants. The transaction was oversubscribed, and the amount of securities purchased from each holder was determined based on a proration formula which took into account the net equity value of the securities owned by a subscriber. [FN12]

> FN11. The offered price was $10 per option or warrant, less the applicable exercise price thereof.

> FN12. Telx would purchase from each tendering security holder securities having a net equity value equal to the lesser of (1) the net equity value of the securities tendered by such security holder, or (2) the proportionate net equity value represented by the tendered securities, as it related to the overall value of Telx's outstanding securities at the time. If some security holders elected to tender less than the proportionate net equity value of their securities, Telx would buy additional securities from those who tendered more than their proportionate net equity value on a pro rata basis. Furthermore, because the repurchase was oversubscribed, those who tendered securities, but who held more than one type, could designate which type of security Telx had to purchase first.

*4 In Counts I to IV of his complaint, Feldman alleges that every aspect of the repurchase-from the price, to the proration formula, to the classes of securities that were eligible to participate-was un-

fairly structured to favor the Telx Defendants. Allegedly, the $10 per security price was "severely inflated" because, up until the time of the repurchase, Telx stock had never sold for more than $4 per share. Feldman claims that the Telx Defendants breached their duty of loyalty to Telx in approving this self-interested transaction, and that they bear the burden of establishing the entire fairness of the repurchase. Furthermore, Feldman alleges that the repurchase violated the capital sufficiency requirements of 8 Del. C. § 160(a)(1), and that the Telx Defendants are jointly and severally liable to Telx for the full amount of the repurchase pursuant to 8 Del. C. § 174. Finally, Feldman alleges that the Telx Defendants breached their duty of candor by disseminating a disclosure document in connection with the repurchase that contained material misstatements and omissions. As relief, Feldman requests a damages award for the company, or rescission of the repurchase of any Telx securities once owned by the Telx Defendants.

### 4. The 2006 Merger With GI Partners

During the spring and summer of 2006, Telx revived the auction process, again gauging the market's interest in a sale transaction. GI Partners emerged as a potential candidate, and, on September 17, 2006, it entered into a merger agreement with Telx. Three days later, acting pursuant to written consents, approximately 92% of the holders of Telx common stock and Series A preferred stock approved the merger agreement. Notice of the transaction was sent to all Telx stockholders on September 29, 2006, and Feldman received this notification the following day. [FN13] On October 3, 2006, the merger closed, with Telx becoming a wholly-owned subsidiary of GI Partners.

> FN13. Although he received notice of the merger on September 30, 2006, the record shows that Feldman was aware of the imminent possibility of a transaction during this time frame. Motion practice dating back to at least early July 2006 placed Feldman on notice that Telx was actively engaged in an auction process and was ne-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

gotiating with potential bidders.

Under the terms of the agreement, Telx's stockholders received, in the aggregate, $213 million. All of the company's stock, option, and warrant holders were cashed out at approximately $14.87 per share (less the applicable exercise price for options and warrants). Cutaia received $4.7 million as a result of severance and bonus payments, as well as a $2 million per year consulting contract with GI Partners.

In Count XIII of his complaint, Feldman alleges that the materials disseminated in connection with the merger do not disclose the number of options held by Cutaia, Lawrence, and T. Raymond or the amount of the merger consideration they would receive by virtue of those holdings. Furthermore, the complaint states that, despite the Telx board's knowledge of certain facts demonstrating that the ESOP options held by these three individuals were invalid, the board members breached their fiduciary duty of loyalty by failing to prevent Cutaia, Lawrence, and T. Raymond from cashing out their options in the merger. Feldman alleges that this lack of oversight allowed these three defendants to wrongly receive about $16.6 million of the merger consideration. He asks the court to award monetary damages to him and all similarly-situated former stockholders of Telx based on this alleged impropriety.

*5 Count XIV of the complaint levels allegations at GI Partners. Feldman claims GI Partners aided and abetted the breaches of fiduciary duty committed by the members of the Telx board in connection with the merger, since GI Partners must have learned during the course of its due diligence that the options issued pursuant to the ESOP were invalid. Because it negotiated a merger agreement which provided for monetary compensation of these options, Feldman alleges that GI Partners should be held liable for money damages.

C. *The Procedural History Of This Litigation*

As previously mentioned, Feldman filed the original complaint in this action on September 21, 2005,

setting forth three counts relating to the repurchase transaction. Feldman amended his complaint for the first time on December 20, 2005, adding two more counts related to the repurchase and the Dilutive Transactions. The Telx Defendants moved to dismiss the amended complaint pursuant to Court of Chancery Rules 12(b)(6) and 23.1. In an April 5, 2006 memorandum opinion, the court denied that motion, holding that demand was excused and that the amended complaint stated claims for breach of the fiduciary duty of candor and for a violation of 8 *Del. C.* § 160. [FN14]

FN14. *See generally Feldman v. Cutaia,* 2006 WL 920420 (Del. Ch. Apr. 5, 2006).

Thereafter, Feldman moved for leave to file a second amended complaint, which included counts related to the ESOP grants. The Telx Defendants did not oppose the motion, and Feldman filed his second amended complaint on September 22, 2006. Following Telx's merger with GI Partners, the Telx Defendants again moved to dismiss all the claims against them, and Feldman again moved to amend. The court granted Feldman's motion, and the third amended complaint, which is operative for present purposes, was filed on January 9, 2007.

The Telx Defendants moved to dismiss the operative complaint on January 26, 2007, relying on Court of Chancery Rules 12(b)(6) and 23.1. GI Partners followed suit three days later, basing its motion on Rule 12(b)(6), while asserting that Feldman lacks standing to bring claims against it. After briefing by the parties, the court held oral argument on May 15, 2007.

II.

The Telx Defendants label Feldman as a frustrated former stockholder, bitter at the fact that, had he not chosen to sell 148,000 of his Telx shares in 2004 at $3.36 per share, he would have received over $2 million just two years later in the GI Partners merger that cashed out the company's equity holders at $14.87 per share. Substantively, they argue that all of Feldman's claims are derivative rather than direct, and now belong to GI Partners by

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

operation of law. This analysis applies, the Telx Defendants say, even in light of the Delaware Supreme Court's recent decisions in *Gentile v. Rosette* [FN15] and *Gatz v. Ponsoldt.* [FN16] Finally, the Telx Defendants contend that Count XI must be dismissed because Delaware law does not recognize an independent cause of action for violation of the fiduciary duty of good faith. According to GI Partners, Feldman's claim for aiding and abetting a breach of fiduciary duty in connection with the merger fails because the complaint does not establish that GI Partners knowingly participated in a breach of duty by the Telx board.

> FN15. 906 A.2d 91 (Del.2006).

> FN16. ___ A.2d ___, 2007 WL 1120338 (Del. Apr. 16, 2007).

\*6 Feldman responds that Count V, his allegation of wrongful dilution, and Count XIII, his allegation of a fiduciary breach in connection with the GI Partners merger, are both direct claims, and can be properly maintained regardless of the fact that he no longer owns Telx stock. In addition, Feldman says that his claim against GI Partners for aiding and abetting survives a motion to dismiss because the complaint adequately alleges all necessary elements for that cause of action. Finally, due to what he labels egregious conduct on the part of the Telx Defendants in stymying his efforts to gain information about the company's business, Feldman contends that the court should allow his remaining claims, which he admits are derivative in nature, to survive regardless of his technical lack of standing to prosecute them on behalf of Telx.

### III.

In considering a motion to dismiss under Court of Chancery Rule 12(b)(6), the court assumes the veracity of all well pleaded allegations in the complaint. [FN17] While specific allegations of fact, along with reasonable conclusions buttressed by specific allegations of fact, will sustain a compliant, [FN18] mere conclusions of law or fact are insufficient under this standard of review. [FN19] Indeed, a court should not "blindly accept as true all allega-

tions, nor must it draw all inferences from them in the plaintiff's favor unless they are reasonable inferences." [FN20] In the end, a court will dismiss a complaint only if it determines "with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiff would not be entitled to relief." [FN21]

> FN17. *In re General Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 168 (Del.2006); *Kohls v. Kenetech Corp.,* 791 A.2d 763, 767 (Del. Ch.2000).

> FN18. *White v. Panic,* 783 A.2d 543, 549 n.12 (Del.2001).

> FN19. *Bergstein,* 453 A.2d at 469.

> FN20. *Grobow v. Perot,* 539 A.2d 180, 187 n.6 (Del.1988).

> FN21. *Id.*

### IV.

As the Delaware Supreme Court made abundantly clear more than two decades ago in the seminal case of *Lewis v. Anderson,* [FN22] a corporate merger typically extinguishes a plaintiff's standing to maintain a derivative suit. In *Anderson,* while the plaintiff was litigating a derivative action, the defendant corporation merged with another company, and the plaintiff's stock was exchanged for that of the corporate defendant's new parent company. [FN23] The *Anderson* court affirmed the Court of Chancery's dismissal of the plaintiff's complaint for lack of standing, holding that 8 Del. C. § 327, [FN24] when read in conjunction with Court of Chancery Rule 23.1, [FN25] requires that a plaintiff not only be a stockholder at the time of the alleged wrongdoing, but that he maintain stockholder status in the corporate defendant throughout the litigation. [FN26] In so holding, the *Anderson* decision incisively observed that, at its base, a derivative claim is a property right owned by the nominal corporate defendant, and that such right flows to the acquiring corporation by operation of a merger. [FN27]

> FN22. 477 A.2d 1040, 1049 (Del.1984).

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

FN23. *Id.* at 1042.

FN24. Section 327 states:
In any derivative suit instituted by a stock-holder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockhold-er complains or that such stockholder's stock thereafter devolved upon such stock-holder by operation of law.

FN25. Rule 23.1 provides:
In a derivative action brought by 1 or more shareholders ... to enforce a right of the corporation ... the corporation ... having failed to assert a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder ... at the time of the transaction of which the plaintiff complains or that the plaintiff's share ... thereafter devolved on the plaintiff by operation of law.

FN26. *Anderson,* 477 A.2d at 1046.

FN27. *Id.* at 1044.

*Anderson* remains both theoretically and practically sound. [FN28] Thus, a plaintiff may avoid dis-missal of his claims following a merger in only two distinct circumstances: where the claims asserted are direct, rather than derivative, or where one of the equitable exceptions recognized in *Anderson* applies. Since Feldman ceased to be a Telx stock-holder following the merger with GI Partners, he faces dismissal of his complaint unless the court finds there is merit to his contention that one of those narrow escape hatches salvages his claims.

FN28. As Vice Chancellor Noble ob-served:
Delaware courts generally adhere to [the *Anderson* rule] because it is supported by important policy considerations. These considerations include theoretical under-pinnings (as derivative actions involve a plaintiff who is enforcing rights of a separ-ate entity; without ownership it is difficult to explain why a plaintiff has a right to bring a derivative claim) and practical un-derpinnings (namely, the court is attempt-ing (a) to ensure that the derivative plaintiff is representative of the sharehold-ers and has the incentive to pursue the lit-igation in the best interests of the share-holders and (b) to prevent "strike suits"). *Strategic Asset Mgmt., Inc. v. Nicholson,* 2004 WL 2847875, at *2 (Del. Ch. May 30, 2004) (internal footnote omitted).

### A. Count V. Feldman's Claim Of Wrongful Dilu-tion, Is A Derivative Cause Of Action [FN29]

FN29. At the outset, the court notes that the Telx Defendants' failure to argue in their prior motions that Count V is derivat-ive does not effect their ability to do so now. Waiver is the voluntary relinquish-ment of a known right, and may be express or implied. *TriState Courier & Carriage, Inc. v. Berryman,* 2004 WL 835886, at *9 n.123 (Del. Ch. Apr. 15, 2004). Given that equity dilution claims like Count V are or-dinarily derivative, the court cannot inter-pret the Telx Defendants' position in their prior briefing as a knowing waiver of the right to argue that the nature of a claim is what it normally is conceived as being. *See In re First Interstate Bancorp Consol. S'holder Litig.,* 729 A.2d 851, 859-60 (Del. Ch.1998) (declining to treat the defendants' stipulation to a class certification order pri-or to the closing of a merger as a waiver of the right to argue that the plaintiffs lacked standing to bring derivative claims follow-ing the merger's consummation). In any event, Feldman concedes he did not argue in his prior briefing that Count V was a direct claim.

*7 The case of *Tooley v. Donaldson, Lufkin & Jen-rette, Inc.* [FN30] laid out the comprehensive framework a court must apply in determining whether a given cause of action is direct or derivat-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

Page 9

ive. *Tooley* held that this determination is based solely on two questions: "Who suffered the alleged harm ... and who would receive the benefit of the recovery or other remedy?" [FN31] If the corporation alone, rather than the individual stockholder, suffered the alleged harm, the corporation alone is entitled to recover, and the claim in question is derivative. [FN32] Alternatively, if the stockholder suffered harm independent of any injury to the corporation that would entitle him to an individualized recovery, the cause of action is direct. [FN33]

> FN30. 845 A.2d 1031 (Del.2004).

> FN31. *Id.* at 1033.

> FN32. *Id.* at 1036 (citing with approval *Agostino v. Hicks,* 2004 WL 443987, at *7 (Del. Ch. Mar. 11, 2004) ("Looking at the body of the complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?")).

> FN33. *Id.* at 1039 ("The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.").

A claim for wrongful equity dilution is premised on the notion that the corporation, by issuing additional equity for insufficient consideration, made the complaining stockholder's stake less valuable. Equity dilution claims are typically viewed as derivative under Delaware law. In terms of a *Tooley* analysis, the alleged injury is to the corporation because "it falls upon all shareholders equally and falls only upon the individual shareholder in relation to his proportionate share of stock as a result of the direct injury being done to the corporation." [FN34] As the court recently observed:

> FN34. *In re Berkshire Realty Co., Inc.,* 2002 WL 31888345, at *4 (Del. Ch. Dec.

18, 2002). *See also Gentile,* 906 A.2d at 100 ("[Dilution] claims are not normally regarded as direct, because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction.").

Mere claims of dilution, without more, cannot convert a claim traditionally understood as derivative into a direct one. Clearly, a corporation is free to enter into ... numerous transactions, all of which may result legitimately in the dilution [of present equity holders]. Such a dilution is a natural and necessary consequence of investing in a corporation.... The only cognizable injuries, if any, would be a failure to act in the best interest of [the corporation].... These alleged harms [are] inflicted on the corporation itself and [can] be asserted only by or on behalf of the corporation. [FN35]

> FN35. *Oliver v. Boston Univ.,* 2006 WL 1064169, at *17 (Del. Ch. Apr. 14, 2006).

In Count V, Feldman alleges that the Dilutive Transactions and the ESOP grants resulted in Telx issuing equity for inadequate consideration, and that his equity holdings in the company were thereby diluted. Traditionally, then, the harm Feldman alleges from these transactions fell upon the corporation rather than any stockholder individually. [FN36]

> FN36. *See, e.g., Kramer v. W. Pac. Indus.,* 546 A.2d 348 (Del.1988) (holding the excessive issuance of stock options and payment of fees to executives to be derivative); *Noerr v. Greenwood,* 1997 WL 419633, at *2 (Del. Ch. Jul. 16, 1997) (characterizing suit based on self-interested option grants as derivative and cited with approval by *Benihana of Tokyo, Inc. v. Benihana, Inc.,* 891 A.2d 150, 155 n.3 (Del. Ch.2005)). *See also Winston v.*

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

_Mandor,_ 710 A .2d 835, 845 (Del. Ch.1997) (holding that a claim arising from the exchange of corporate stock for insufficient consideration was derivative because it equally harmed all of the corporation's stockholders); _Avacus Partners, L.P. v. Brian,_ 1990 WL 161909, at *6 (Del. Ch. Oct. 24, 1990) (characterizing an excessive exchange of stock as derivative).

Feldman argues, however, that his particular dilution claims can be brought directly based on recent Delaware precedent. In _Gentile,_ the Delaware Supreme Court recognized that a stockholder may bring a particular "species of corporate overpayment claim" either directly or derivatively. [FN37] To adequately plead this type of equity dilution claim, a plaintiff must allege facts showing that:

FN37. _Gentile,_ 906 A.2d at 99-100.

(1) a stockholder having majority or effective control [caused] the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange [caused] an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders. [FN38]

FN38. _Id._ at 100.

*8 In an extrapolation of _Gentile,_ the _Gatz_ case involved William Ponsoldt, a minority stockholder who, through entities owned or controlled by him, exercised _de facto_ control over Regency Affiliates, Inc. [FN39] Pursuant to an intricate two-step transaction, Ponsoldt increased his stock ownership of Regency to an absolute majority interest, while simultaneously selling that majority stake for cash to a third party. [FN40] The public stockholders, who owned approximately 62% of the Regency's stock before the transaction, received no valuable consideration as a result of the Ponsoldt scheme and found themselves owning just 40% of the company's equity in the aftermath. [FN41] Deconstructing the substance of the deal from its form, the

Delaware Supreme Court held that even though a third party, rather than Regency's _de facto_ controlling stockholder at the time of the transaction, was the ultimate recipient of the stock issued, the plaintiffs were entitled to bring their dilution claims as direct causes of action. [FN42]

FN39. 2007 WL 1120338, at *2-4.

FN40. _Id._ at *4-5.

FN41. _Id._ at *5.

FN42. _Id._ at *11-13.

_Gentile_ and _Gatz_ are predicated on the idea that transactions of this type result in an improper transfer of both economic value and voting power from the minority to the controlling stockholder. [FN43] Thus, it is clear from those decisions that the Delaware Supreme Court intended to confine the scope of its rulings to only those situations where a controlling stockholder exists. [FN44] Indeed, any other interpretation would swallow the general rule that equity dilution claims are solely derivative, and would cast great doubt on the continuing vitality of the _Tooley_ framework. Neither of these outcomes is warranted. Indeed, the harm _Gentile_ and _Gatz_ seek to remedy can only arise when a controlling stockholder, with sufficient power to manipulate the corporate processes, engineers a dilutive transaction whereby that stockholder receives an exclusive benefit of increased equity ownership and voting power for inadequate consideration. Because neither the Dilutive Transactions nor the ESOP grants conferred an exclusive benefit on any controlling stockholder of Telx, Feldman cannot bring Count V as a direct claim.

FN43. _Id._ at *10-11; _Gentile,_ 906 A.2d at 100

FN44. Two recent cases applying _Gentile_ support this interpretation. See _Bakerman v. Sidney Frank Importing Co., Inc.,_ 2006 WL 3927242, at *19 (Del. Ch. Oct. 16, 2006) (holding that a plaintiff's claims for deprivation of his voting rights and right to

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

consent to a transaction alleged "harm unique to [the plaintiff]" that allegedly be-nefitted certain controlling members of the LLC"); *Shamrock Holdings v. Arenson,* 456 F.Supp.2d 599, 607-08 (D.Del.2006) (requiring a majority stockholder to bring a direct claim for dilution under *Gentile* ).

Feldman suggests that the complaint alleges the presence of a controlling stockholder because "the Telx board, including [their] families and the entit-ies they control, collectively owned 60% of the company's equity." [FN45] As was recently recog-nized, such a contention fails to allege the presence of a controlling stockholder.

>    FN45. Plaintiff's Ans. Br. 28 n.19 (citing Compl. ¶ 1).

In *In re PNB Holding Co. Shareholders Litigation,* the court reiterated the well-established test for a controlling stockholder under Delaware law, noting that situation exists only when a stockholder: "(1) owns more than 50% of the voting power of a cor-poration; or (2) exercises control over the business and affairs of the corporation." [FN46] The *PNB* decision held that the test for control was not satis-fied because the combined stockholdings of the cor-poration's directors (33.5%) were less than a major-ity of the corporation's stock. [FN47] As import-antly, the court also rejected the suggestion that the stockholdings of those directors could be aggreg-ated, either amongst themselves or with their family members, to satisfy the control test absent a voting agreement among the group or a "blood pact to act together." [FN48] Directors, as a group, are charged by statute with a duty to manage the business and affairs of the corporation they serve, [FN49] but that simple fact does not make them, either singly or collectively, a controlling stockholder, no matter what their individual or collective stockholdings may be.

>    FN46. 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006).

>    FN47. *Id.* at *10.

>    FN48. *Id.*

>    FN49. 8 *Del. C.* § 141(a).

*9 The facts in this case are analogous to those in *PNB.* Feldman's complaint alleges that the individu-al director-defendants owned 40.55% of Telx's stock, less than an absolute majority, but does not allege any voting agreement or "blood pact" among them. Moreover, the defendants note that the re-maining percentage of stock owned by family mem-bers or familial investments of the individual dir-ector-defendants that purportedly placed them in majority control of Telx also is not alleged to be the subject of a voting agreement or any other pact that would allow the court to reasonably infer that those particular stockholders were ever acting in concert with the individual director-defendants. [FN50] For these reasons, the court, consistent with *PNB,* can-not aggregate the stockholdings of a company's dir-ectors to satisfy the controlling stockholder require-ment of *Gentile* and *Gatz.* Thus, Feldman cannot maintain a direct claim for equity dilution.

>    FN50. These holdings included: (i) 13.5% of Telx's stock owned by "familial, person-al and business investments" of twelve in-dividuals and entities allegedly controlled by J. Raymond; (ii) 2.8% of the stock held by "familial and business investments" al-legedly controlled by Hitchcock; (iii) 2.5% of the stock allegedly controlled by Wern-er, but held by an entity; and, (iv) 0.65% of the stock in a "familial investment" al-legedly controlled by Lawrence.

Count V also fails to allege that the Telx directors exclusively benefitted from the Dilutive Transac-tions. Notably, Feldman does not allege that he had no prior knowledge of the private placement. Nor does Feldman allege that he, or any other person who was a Telx stockholder at the time, was barred from participating in that transaction. Indeed, it is apparent that a great number of stockholders other than the Telx directors and their affiliates pur-chased notes in the private placement, and reason-able to infer that the same opportunity was avail-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

able to Feldman.

These same deficiencies in Feldman's pleading not only undermine his assertion of inequitable dilution in the private placement, they are fatal to his claims that the exchange transaction and the recapitalization were unfair as well. Those transactions were a byproduct of the private placement, and, naturally, only those individuals who held 16% notes issued in that first transaction were eligible to participate in the two later transactions undertaken to refinance those debt obligations. Indeed, Feldman does not challenge in their own right the final two events in this three-part series. Rather, he objects solely because the exchange transaction and the recapitalization derive from the private placement, a transaction for which, by his own admission, Telx received substantial monetary consideration. [FN51] The complaint, therefore, does not adequately allege that the Telx directors received an exclusive benefit from the Dilutive Transactions.

> FN51. Although Feldman claims that a "significant amount" of the 16% notes the Telx Defendants received in the private placement were for "grossly inadequate or no consideration," this assertion is conclusory, and is belied by other portions of his complaint wherein he admits that $5.08 million in cash was, in fact, tendered in exchange for the $7.05 million in notes. Although there is no qualitative standard for the amount of "excessive shares" that a controlling stockholder must receive for inadequate consideration in order to state a claim for equity dilution, the court observes that the allegations here stand in stark contrast to the allegations present in the *Gentile* line of cases. *See, e.g., In re Tri-Star Pictures, Inc. Litig.,* 634 A.2d 319, 322, 331 (Del.1993) (discussing a 44% equity dilution in which the corporation received subsidiaries of the majority stockholder that allegedly had been stripped of their assets and fraudulently overvalued); *Gatz,* 2007 WL 1120338, at *5 (alleging a 22% equity dilution for "no

financial or economic benefit" to the company); *Gentile,* 906 A.2d at 94-95 (discussing a 32% equity dilution where the defendant exchanged $2.2 million of debt into equity worth 110 times the amount of the debt).

This same analysis applies with equal effect to the ESOP grants. For Feldman to state a direct claim under *Gentile,* the court would have to infer that Cutaia and Lawrence, the only two Telx board members who received options, exerted enough pressure and influence over the remaining Telx directors that those two individuals should be considered a controlling stockholder for purposes of the ESOP grants. Not only has Feldman failed to include any facts in his complaint from which the court could draw such an inference, he fails to allege that Cutaia and Lawrence were the exclusive beneficiaries of the ESOP. Tellingly, Feldman does not challenge any of the options granted to other Telx employees under that plan. Thus, even under the rubric of *Gentile* and *Gatz,* the equity dilution claim embodied in Count V regarding the stock option grants under the ESOP is solely derivative in nature.

**B.** *Feldman's Claim That The Individual Defendants Breached Their Fiduciary Duties In Connection With The Merger Is Derivative* [FN52]

> FN52. Because the court finds that Count XIII is derivative, it is unnecessary to consider the substantive merits of that claim. Even so, it is worthwhile to mention that only two Telx directors (Cutaia and Lawrence) owned any of the options challenged by Feldman. Not only was a majority of the board independent and disinterested in making the decision to honor options granted under the 2003 ESOP, but, as a practical matter, the other directors' share of the merger proceeds (from their stock ownership) was decreased as a result of that decision. Thus, even if Count XIII could be construed as direct, Feldman has not rebutted the business judgment rule to

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

save that claim from dismissal on the merits.

**\*10** Count XIII alleges a breach of fiduciary duty by the Telx board for its purported failure to consider the validity of the options granted to Cutaia, Lawrence, and T. Raymond under the ESOP when it negotiated and approved the merger with GI Partners. Count XIII, based as it is on the premise that the Telx directors were under a fiduciary obligation (at the time of the merger) to reconsider the validity of options issued pursuant to the ESOP, is a derivative claim.

Pursuant to *Tooley*, the harm flowing from the Telx directors' purported breach of fiduciary duty in Count XIII is the same type of harm that allegedly resulted from the options grants in the first place, *i.e.* a harm generated by corporate overpayment. As discussed at length above, all of Feldman's claims with respect to the issuance of the options are derivative according to established Delaware law. [FN53] The corporation suffered a dilution in value as a result of the issuance of the options. In the absence of a controlling stockholder, "such equal 'injury' to the [company's] shares resulting from a corporate overpayment is not viewed as, or equated with, harm to specific shareholders individually." [FN54]

> FN53. *See, e.g., Gentile,* 906 A.2d at 99 (citing *Kramer* for the proposition that the excessive issuance of stock options, absent a controlling stockholder, is a derivative claim).

> FN54. *See id.* (analyzing a corporate overpayment claim within the *Tooley* framework).

This type of factual scenario--a plaintiff creatively attempting to recast a derivative claim by alleging the same fundamental harm in a slightly different way--is disfavored by Delaware courts. Affirming this court's decision, the Delaware Supreme Court in *In re J.P. Morgan Chase & Co. Shareholders Litigation* rejected a plaintiff's effort to bootstrap the harm and damages causatively linked to a deriv-

ative claim onto what, according to that plaintiff, was an independently arising direct cause of action. [FN55] Justice Jacobs stated that dismissal is appropriate in such a case "because 'the damages allegedly flowing from the [purportedly direct claim] are exactly the same as those suffered [by the corporation] in the underlying [derivative] claim, [and thus] the injury alleged in the complaint is properly regarded as injury to the corporation and not to the class." [FN56] That instruction resonates here, and supports the conclusion that Count XIII is derivative. [FN57]

> FN55. 906 A.2d 766, 771-774 (Del.2006).

> FN56. *Id.* at 770 (quoting *J.P. Morgan,* 2005 WL 1076069, at * 12).

> FN57. Although Feldman omits discussing it in his answering brief, Count XIII also alleges that the Telx board failed to disclose material information with respect to the merger--namely, the purported invalidity of the options. Directors of Delaware corporations are not required to disclose unproven allegations which they deny. *See, e.g., Loudon v. Archer-Daniels-Midland Co.,* 700 A.2d 135, 145 (Del.1997) ("[The] plaintiff's argument ... would have the board confess to wrongdoing prior to any adjudication of guilt. This is precisely the situation the self-flagellation rule was designed to prevent.").

*C. An Exception To The Contemporaneous Ownership Requirement Does Not Apply In This Case*

Having determined that Feldman may not bring Counts V and XIII directly, the court is faced with his admission that the remaining claims brought against the Telx Defendants are derivative. Thus, while the court need not analyze those claims under *Tooley* to test whether they can be sustained as direct causes of action, it must still decide whether Feldman should be allowed to proceed with his derivative claims despite his present lack of stock ownership.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

Page 14

As mentioned above, the continuous ownership rule, as embodied by section 327 and Rule 23.1, bars a former corporate stockholder, who lost that status as a result of a merger, from maintaining a derivative claim on behalf of the company. [FN58] This basic tenet of Delaware law exists, among other reasons, to ensure that a derivative plaintiff truly represents the interests of the corporation in bringing a lawsuit. [FN59]

> FN58. *Anderson,* 477 A.2d at 1046, 1049.

> FN59. *Nicholson,* 2004 WL 2847875, at *2.

**\*11** Although this requirement of continuous ownership is a "bright line rule" which is "adhered to closely" by Delaware courts, [FN60] narrow exceptions do exist to the general proposition that a merger extinguishes a derivative plaintiff's standing. As decisions interpreting *Anderson* have observed, a court will allow a former stockholder to proceed with a derivative case if the merger itself is fraudulent, "being perpetrated merely to deprive shareholders of ... standing," or if the merger is "in reality a reorganization which does not affect the plaintiff's ownership of the business enterprise." [FN61]

> FN60. *In re New Valley Corp. Deriv. Litig.,* 2004 WL 1700530, at * 3 (Del. Ch. Jun. 28, 2004); *Ash v. McCall,* 2000 WL 1370341, at *11 (Del. Ch. Sept. 15, 2000). See also *First Interstate,* 729 A.2d at 868 (noting that Anderson is "clear and controlling" as to extinguishment of a plaintiff's standing post-merger).

> FN61. *Lewis v. Ward,* 852 A.2d 896, 899 (Del.2004). These exceptions find their genesis in two decisions which predate *Anderson. See Bokat v. Getty Oil Co.,* 262 A.2d 246, 249 (Del.1970) (discussing the "sole purpose" exception to the postmerger standing rule later clarified in *Anderson* ); *Schreiber v. Carney,* 447 A.2d 17, 21-22 (Del. Ch.1982) (discussing what amounts to the "mere organization" excep-

tion in *Anderson* by noting that a derivative plaintiff whose shares of the nominal defendant were exchanged for equivalent stock ownership in a new company through a merger should be permitted to continue a derivative suit).

Feldman's argument that the first *Anderson* exception saves his derivative claims is without merit. [FN62] The facts alleged show that the merger was the culmination of a two-year process, beginning eleven months before Feldman filed this lawsuit, pursuant to which Telx sought to sell itself. [FN63] The court cannot infer that the Telx Defendants even considered, let alone were principally motivated by, the pendency of this case when they decided to sell the company to GI Partners. The fact that an unrelated third party agreed to pay nearly $15 per share for Telx's stock--a price that Feldman does not allege was inadequate and is several times greater than his own estimates of the company's value--supports the logical conclusion that the merger was neither fraudulent nor conducted merely to terminate this lawsuit.

> FN62. Feldman does not argue that the "mere reorganization" exception applies here.

> FN63. The board began the auction process in October 2004, and Feldman filed his complaint on September 21, 2005.

On the basis of a few quotations taken from opinions commenting on the sometimes harsh rigidity of the contemporaneous ownership rule, [FN64] Feldman argues for a new exception--if corporate defendants engage in conduct rising to the level of an abuse of the discovery process, a court should ignore the effects of a merger and allow a former stockholder to proceed with derivative claims. The court declines to recognize a new exception on these grounds as both unnecessary and unwise. Discovery abuses and other improper litigation tactics are properly remedied by sanction under the rules of the court. Such conduct is not a proper basis on which to continue litigation once standing is lost.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                Page 15
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

Thus, Feldman can no longer maintain Counts I through XIII because the merger terminated his standing to do so. [FN65]

> FN64. For example, Feldman says that Chancellor Chandler's recent decision in *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch.2007), stands for the proposition that the sole purpose of section 327 is to "prevent the purchasing of shares in order to maintain a derivative action attacking transactions that occurred before the purchase," and that the continuous stock ownership requirement is always applied leniently in cases not implicating this purpose. As other cases make clear, however, section 327 functions both to prevent strike suits, as well as to ensure that a derivative plaintiff is acting in the corporation's best interests by litigating a claim. *See, e.g., Nicholson*, 2004 WL 2847875, at *2 (discussing both purposes of section 327). The *Ryan* decision had no occasion to discuss this second purpose of section 327, and Feldman's intimation that strike suits are the lone evil section 327 seeks to remedy is disingenuous.

> FN65. The court need not address whether Count XI adequately states a duty of loyalty claim, because that cause of action is admittedly derivative in nature. However, the pleading of Count XI, given that it primarily alleges a breach of the duty of good faith, is suspect given the Delaware Supreme Court's recent decision in *Stone v. Ritter*, 911 A.2d 362 (Del.2006), which held that Delaware law does not recognize an independent cause of action for violation of the duty of good faith.

### D. *Count XIV Against GI Partners Fails For Lack Of Standing*

Before illustrating why Feldman lacks standing to bring an aiding and abetting claim against GI Partners, it is necessary to examine Feldman's conten-

tions on this point. He does not challenge the overall consideration paid by GI Partners in the merger. Nor does Feldman take issue with the allocation of the merger proceeds with respect to those options he believes were validly issued. Rather, Feldman only argues that GI Partners, who had no involvement in the actual granting of the ESOP options in the first place, must have known that the options given to Cutaia, Lawrence, and T. Raymond several years earlier were invalid. According to Feldman, it was simply GI Partners's decision to enter into a merger agreement allocating consideration to the options held by these three individuals which constituted aiding and abetting a fiduciary breach by the Telx board.

*12 Count XIV, then, essentially uses a secondary liability theory to deflect toward GI Partners the substantive claim brought in Count XIII against the Telx directors. The court has found that Count XIII is derivative. Prior decisions of this court have validated the unsurprising proposition that an aiding and abetting claim premised on a derivative cause of action is necessarily derivative itself. [FN66] Therefore, Feldman lacks standing to pursue Count XIV, and that claim must be dismissed. [FN67]

> FN66. *See, e.g., Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *6 (Del. Ch. Dec. 19, 2002) (dismissing an aiding and abetting claim because the plaintiff lacked standing to bring the breach of fiduciary duty claims on which it was premised), *aff'd by table decision*, 825 A.2d 239 (Del.2003); *First Interstate*, 729 A.2d at 864 ("If, as [the court has] found to be the case, the claims of primary liability against the defendant directors belong to the corporation and could only be maintained by [the plaintiff] in a derivative capacity, that finding logically applies with equal force to the alleged claims of secondary liability against [an alleged aider and abettor]."); *In re Rexene Corp. S'holders Litig.*, 1991 WL 77529, at *4 (Del. Ch. May 8, 1991) (dismissing aiding and abetting claims because of dismissal of breach of fiduciary

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)
(Cite as: 2007 WL 2215956 (Del.Ch.))

duty claims for lack of standing).

FN67. Count XIV is also substantively weak. GI Partners's knowledge that written board resolutions did not exist to document the exact dates of the option grants or the number of options granted to certain individuals cannot automatically translate into notice its part that the options issued to Cutaia, Lawrence, and T. Raymond were statutorily noncompliant under 8 Del. C. § 157(b). While airtight written documentation of a resolution granting options is a prudent course of action for directors who wish to avoid future legal challenges, section 157(b) does not expressly require that the resolution be included in the minutes of the board meeting at which it was adopted or that the resolution be in writing. Given the representation and warranty Telx provided to GI Partners in the merger agreement that the company was required to honor the options, and given that this court has, on previous occasions, considered extrinsic evidence in determining whether a grant of stock options complied with section 157(b), GI Partners could have believed that alternative documentation provided during due diligence (such as options agreements and written board minutes showing director approval of the ESOP itself) was sufficient under the statute. See Sai Man Jai, Ltd. v. Personal Computer Card Corp., 1991 WL 110458, at *1 (Del. Ch. June 18, 1991) (relying on testimony of the directors and the presence or absence of written stock option agreements to determine whether, in fact, the board ever passed a resolution granting stock options to the plaintiff). Thus, the complaint does not adequately allege knowing participation on the part of GI Partners, a *prima facie* requirement for an aiding and abetting claim. See Malpiede v. Townson, 780 A.2d 1075, 1096 (Del.2001) (listing the four substantive elements required for an aiding and abetting count to

survive a Rule 12(b)(6) challenge).

V.

For the foregoing reasons, the motions to dismiss of the Telx Defendants and GI Partners are GRANTED. IT IS SO ORDERED.

Not Reported in A.2d, 2007 WL 2215956 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT G
TO DEFENDANT KLA-TENCOR'S
APPENDIX OF OUT-OF-STATE
AUTHORITIES IN SUPPORT OF
DEMURRER**

Westlaw.

906 A.2d 91
906 A.2d 91
(Cite as: 906 A.2d 91)

▷

Supreme Court of Delaware.
John A. GENTILE, Victoria S. Cashman, Bradley
T. Martin, John Knight, and Dyad
Partners, LLC, Plaintiffs Below, Appellants,
v.
Pasquale David ROSSETTE, Douglas W. Bachelor,
and LeaseNet Group, Inc., an Ohio
Corporation, as successor by merger to LeaseNet
Group, Inc., a Delaware
corporation, Defendants Below, Appellees.
No. 573, 2005.

Submitted: April 26, 2006.
Decided: Aug. 17, 2006.

**Background:** Public minority shareholders brought breach of fiduciary duty action against corporation's directors and chief executive officer (CEO)/controlling shareholder for approving transaction in which CEO forgave corporation's debt to him that had a lesser value in exchange for stock that had a greater value. The Court of Chancery, New Castle County, granted defendants summary judgment on the debt conversion claim, and granted minority shareholders' motion to certify an interlocutory appeal.

**Holding:** After accepting the appeal, the Supreme Court, Jacobs, J., held that minority shareholders had a direct breach of fiduciary duty claim against corporate fiduciaries, though they held a minority interest both before and after the transaction, overruling *Behrens v. Aerial Communications, Inc.,* 2001 WL 599870.

Reversed and remanded.

West Headnotes

[1] Corporations ⊂⊃202
101k202 Most Cited Cases
Whether a claim is derivative or direct depends solely upon two questions: (1) who suffered the alleged harm, the corporation or the suing stockholders individually; and (2) who would receive the benefit of the recovery or other remedy, the corpora-

tion or the stockholders individually.

[2] Corporations ⊂⊃202
101k202 Most Cited Cases
Normally, claims of corporate overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative, because the corporation is both the party that suffers the injury, a reduction in its assets or their value, as well as the party to whom the remedy, a restoration of the improperly reduced value, would flow.

[3] Corporations ⊂⊃190
101k190 Most Cited Cases

[3] Corporations ⊂⊃320(4)
101k320(4) Most Cited Cases
In the typical corporate overpayment case, a claim against the corporation's fiduciaries for redress is regarded as exclusively derivative, irrespective of whether the currency or form of overpayment is cash or the corporation's stock, because any dilution in value of the corporation's stock is merely the unavoidable result, from an accounting standpoint, of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction, and such equal "injury" is not viewed as, or equated with, harm to specific shareholders individually.

[4] Corporations ⊂⊃190
101k190 Most Cited Cases
A breach of fiduciary duty claim arising from a corporate overpayment can be both derivative and direct where: (1) a stockholder having majority or effective control causes the corporation to issue excessive shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public, minority, shareholders.

[5] Corporations ⊂⊃190
101k190 Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

When a controlling stockholder receives excess shares of stock in exchange for assets of the controlling stockholder that have a lesser value, and resulting harm is not confined to an equal dilution of the economic and voting power of the corporation's outstanding shares but includes a extraction from the public shareholders of a portion of the economic value and voting power embodied in the minority interest, the public shareholders are entitled to recover the value represented by that overpayment, an entitlement that may be claimed by the public shareholders directly and without regard to any claim the corporation may have.

**[6]** Corporations ⬤➛190
101k190 Most Cited Cases

**[6]** Corporations ⬤➛320(4)
101k320(4) Most Cited Cases
Public minority shareholders suffered a harm unique to them that was independent of any injury to corporation, and thus had a direct breach of fiduciary duty claim against corporate fiduciaries, as a result of *Tri-Star* transaction in which chief executive officer (CEO)/controlling shareholder forgave corporation's debt to him that had a lesser value in exchange for stock that had a greater value, as transaction resulted in the diminishment of minority shareholders' voting power, from approximately 39% to approximately 7%, and, though minority shareholders had a minority interest both before and after the transaction, there was no requirement of a "material" reduction in voting power to occur in a *Tri-Star* transaction in order for minority shareholders to have a direct claim, overruling *Behrens v. Aerial Communications, Inc.,* 2001 WL 599870.
***93** Court Below: Court of Chancery of the State of Delaware in and for New Castle County, C.A. No. 20213.

Upon appeal from the Court of Chancery. **REVERSED and REMANDED.**

David A. Jenkins (argued), Joelle E. Polesky, Robert K. Beste, III, and Michele C. Gott, Esquires, of Smith, Katzenstein & Furlow LLP, Wilmington, Delaware; John L. Reed, Esquire, of Edwards &

Angell Palmer & Dodge, LLP, Wilmington, Delaware; for Appellants.

Jesse A. Finkelstein, Raymond J. DiCamillo and Michael R. Robinson, Esquires, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Of Counsel: Sean T. Carnathan (argued) and Alan J. Langton II, Esquires, of O'Connor, Carnathan and Mack LLC, Burlington, Massachusetts; for Appellees.

Before HOLLAND, BERGER and JACOBS, Justices.

JACOBS, Justice.

The plaintiffs, who are former minority shareholders of SinglePoint Financial, Inc. ("SinglePoint" or "the company"), appeal from a grant of summary judgment by the Court of Chancery dismissing their claim for breach of fiduciary duty against SinglePoint's former directors and its CEO/controlling stockholder. The claim arises from a self-dealing transaction in which the CEO/controlling stockholder forgave the corporation's debt to him, in exchange for being issued stock whose value allegedly exceeded the value of the forgiven debt. The transaction, it is claimed, wrongfully reduced the cash-value and the voting power of the public stockholders' minority interest, and increased correspondingly the value and voting power of the controller's majority interest. After the debt conversion, SinglePoint was later acquired by another company ("Cofiniti") in a merger. Shortly thereafter, the acquirer, Cofiniti, filed for bankruptcy and was liquidated. The plaintiffs then brought this action in the Court of Chancery, seeking to recover the value of which they claimed to have been wrongfully deprived in the debt conversion. The Court of Chancery dismissed the action on the ground that the claim was exclusively derivative, and that as a result of the Cofiniti merger the plaintiffs had lost standing to assert the claim on behalf of SinglePoint.

The issue presented on this appeal is one purely of law: can SinglePoint's former minority stockholders bring a direct claim against the fiduciaries respons-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

906 A.2d 91
906 A.2d 91
(Cite as: 906 A.2d 91)

ible for the debt conversion transaction complained of, or is such a claim exclusively derivative? We hold, for the reasons discussed herein, that the claim is not exclusively derivative and can be brought by the (former) minority shareholders directly. We must, therefore, reverse the contrary ruling of the Court of Chancery.

## *94 I. FACTS [FN1]

> FN1. The facts recited here, all supported by the record, are adopted primarily from the Court of Chancery's opinions in this action and an earlier statutory appraisal action.

In 1995, plaintiff John A. Gentile and defendant Douglas W. Bachelor, who were acquaintances and co-workers, discussed creating a new software company. Late that year, Gentile and Bachelor presented the idea to Pasquale David Rossette, a childhood friend of Gentile, who agreed to provide the initial investment. Ultimately, Gentile, Rossette, and Bachelor formed the company that came to be known as SinglePoint--a high technology financial services company that supported financial advisors and their clients with the ability to manage assets online. During its relatively short existence, Single-Point was unable to develop a commercially viable product or produce significant revenues. Faced with significant financial difficulties throughout its existence, SinglePoint turned to Rossette, who was the company's sole source of additional capital, for financial assistance on several occasions.

Gentile, Rossette and Bachelor served as Single-Point's initial directors. Gentile was SinglePoint's first President and Chief Executive Officer, and Bachelor was its Chief Technology Officer. When SinglePoint encountered difficulties, it relied on Rossette for more funding. In 1998, after providing several cash infusions for the company, Rossette insisted that Gentile be replaced as President before he (Rossette) would supply any more funding. Gentile's replacement, Christopher McGrath, resigned less than one year later, and Bachelor became the new CEO. SinglePoint's financial woes continued, however, and in April 1999, Rossette decided to

take over as CEO, a position he held for the remainder of SinglePoint's existence.

By March 2000, Rossette had advanced over $3 million to SinglePoint. As consideration for those loans, Rossette received promissory notes that were convertible into shares of SinglePoint common stock. As provided in the governing Stock Purchase Agreement, the original conversion rate was $1.33 of debt per share. On November 1, 1999, the conversion rate was reduced to $0.75 of debt per share, and on October 23, 1999, the conversion rate was reduced to $0.50 of debt per share.

Before March 2000, SinglePoint's capital structure consisted principally of almost 6 million outstanding shares of common stock, plus over $3 million of debt owed to Rossette. By March 2000, Rossette concluded that the level of the company's debt to him was deterring third party investment in Single-Point. Accordingly, Rossette decided to convert all but $1 million (about 2/3) of his SinglePoint debt into equity. The resulting debt conversion transaction is what gave rise to the plaintiffs' claim for breach of fiduciary duty.

At the time of the debt conversion, Rossette and Bachelor were SinglePoint's only two directors. Bachelor and Rossette negotiated the terms of the conversion, with Rossette purporting to represent himself individually, and Bachelor purporting to represent the company. Disregarding the contractual conversion rate of $0.50 of debt per share then in effect, Rossette and Bachelor agreed to a significantly lower conversion rate--$0.05 of debt per share. They next convened a board meeting (as the company's sole directors), and in that capacity they agreed that $2,220,951 of Rossette's debt would be converted into SinglePoint equity at the $0.05 per share rate. On that basis, Rossette would receive over 44 million shares of SinglePoint common stock--40 million shares more than he would have received under the *95 contractual conversion rate of $0.50 per share.

Because the proposed debt conversion required issuing more shares of common stock than were cur-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

906 A.2d 91
906 A.2d 91
(Cite as: 906 A.2d 91)

rently authorized, a special shareholders meeting was held to amend SinglePoint's certificate of incorporation. The shareholders were informed of the proposal to authorize additional shares, but were not informed of the underlying purpose--to convert over $2.2 million of the Rossette debt to equity. At the March 27, 2000 special shareholders meeting, the shareholders approved an increase of authorized shares of SinglePoint common stock from 10 million to 60 million shares, thereby enabling the conversion to occur. Before the conversion, Rossette held approximately 61.19% of the company's equity; after the conversion, he held 93.49%. [FN2] As a result, the minority shareholders' interest was reduced correspondingly, from 38.81% to 6.51%.

> FN2. In their briefing, the defendants note that the 93.49% figure is erroneous, and point out that Rossette actually held 95.45% of SinglePoint after the debt conversion. Because the error does not affect the analysis employed here and for consistency, we adopt the 93.49% figure used by the Court of Chancery.

After the debt conversion, SinglePoint began searching for an acquirer. In May 2000, only two months later, Rossette negotiated a merger with Cofiniti (SinglePoint's only direct competitor) in which Cofiniti would acquire SinglePoint. Under the agreed-upon merger terms, SinglePoint shareholders would receive approximately 0.49 shares of Cofiniti common stock for each share of Single-Point common stock, and SinglePoint would become a wholly-owned subsidiary of Cofiniti.

To secure Rossette's approval of the merger, Cofiniti offered Rossette unique benefits. That did not occur fortuitously. Rossette made it clear that "for me to accept the terms and conditions of the Merger as set forth they [Cofiniti] would have to provide me the proper inducement to do so." The side benefits offered to Rossette included a put agreement requiring Cofiniti, after one year, to repurchase 360,000 shares of Cofiniti stock that Rossette had received in the merger, at $5 a share, for a total of $1.8 million. That put agreement had significant

value, because Cofiniti's stock had no public market and, therefore, could not easily be sold. No other stockholder of SinglePoint was afforded similar "side benefit" treatment.

On October 13, 2000, SinglePoint issued an Information Statement informing shareholders of the upcoming merger with Cofiniti. The shareholders were told that "approval of the merger is assured because several of our large stockholders, representing in the aggregate approximately 96.8% of our outstanding common stock, have agreed to vote their shares in favor of the merger." The Information Statement further disclosed that Rossette had converted over $1 million of the debt the company owed him into SinglePoint stock. The Information Statement did not disclose that the actual amount of the converted debt was over $2.2 million, or the number of shares that were issued to Rossette in the debt conversion, or at what price. Nor did the Information Statement disclose the put agreement that Rossette had received from Cofiniti, or that the put agreement was what induced his approval of the merger, or that one year after the merger Rossette would receive $1.8 million. The merger was approved by a majority of the minority shareholders. The plaintiffs did not consent to, nor did they vote for, the merger, which closed on October 23, 2000.

Within 18 months of the merger, Cofiniti was fatally undone by many of the same *96 problems that had afflicted SinglePoint. On March 11, 2002, Cofiniti was forced to file for bankruptcy and, ultimately, to liquidate. [FN3]

> FN3. Rossette's put agreement was also canceled.

Almost one year earlier, on February 15, 2001, the plaintiffs brought an appraisal action in the Court of Chancery, seeking a determination of the fair value of their SinglePoint stock at the time of the Cofiniti merger. The Court of Chancery determined that the fair value of SinglePoint's common stock was $5.51 a share--110 times the per-share value ascribed to those SinglePoint shares in the debt conversion. The Court of Chancery refused, however, to enter-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

906 A.2d 91                                                    Page 5
906 A.2d 91
(Cite as: 906 A.2d 91)

tain the minority stockholders' claims that their shares had been improperly diluted by the issuance of excessive shares to Rossette in the debt conversion. That dilution claim, the Court held, was not cognizable in an appraisal proceeding, because the claim was not one for waste that belonged to (and thus would be treated as an asset of) the corporation:

> I also reject the Petitioners' arguments to the extent that they attempt to recharacterize the Share Dilution Claim as a claim for corporate waste, and thereby have the value of such a derivative claim added into the total enterprise value of SinglePoint as an asset of the Company.... The Petitioners cannot escape the rule and policy concerns set forth by the Supreme Court in *Cavalier Oil* by merely switching the label on what, in essence, is a claim for share dilution. [FN4]

> FN4. *Gentile v. SinglePoint Fin., Inc.*, 2003 WL 1240504, *5 n. 35 (Del.Ch.) (referring to *Cavalier Oil Corp. v. Harnett*, 1988 WL 15816 (Del. Ch.), *aff'd*, 564 A.2d 1137 (Del.1989)).

On March 27, 2003, the plaintiffs commenced this breach of fiduciary duty action in the Court of Chancery challenging (in Count I) the debt conversion as an improper extraction of the economic value and voting power from their minority interest, and (in Count II) the unique "put" benefits Rossette had received to induce his approval of the Cofiniti merger. The defendants moved for summary judgment on the ground that the plaintiffs' claims were derivative in nature, and that as a result of the Cofiniti merger the plaintiffs had lost standing to bring those claims. The defendants also argued that they were entitled to judgment as a matter of law on the substantive merits of the plaintiffs' claims. In a decision handed down on October 20, 2005, the Court of Chancery dismissed the plaintiffs' debt conversion claim (Count I). The Court held (somewhat inconsistently with its ruling in the appraisal action) that the claim was derivative and that the plaintiffs had lost standing to raise it. [FN5] Thereafter, the Court of Chancery granted the plaintiffs' motion to certify an interlocutory appeal

from its order dismissing the debt conversion claim. This Court accepted that interlocutory appeal.

> FN5. The Court did not address the merits of the Count I claims. It did, however, address the merits of the claims alleged in Count II, and denied summary judgment on those claims.

## II. THE COURT OF CHANCERY DECISION

In its October 20, 2005 opinion, [FN6] the Court of Chancery held that the debt conversion claim was derivative, and that as a result of the 2000 merger with Cofiniti, the plaintiffs were no longer Single-Point shareholders with standing to assert the corporation's claim. The Court held that the dilution claim was derivative, because "when a 'board of directors authorizes the issuance of stock for no or grossly inadequate *97 consideration, the corporation is directly injured and shareholders are injured derivatively ... [and that] mere claims of dilution, without more, cannot convert a claim traditionally understood as derivative, into a direct one.' " [FN7] Although the Court of Chancery acknowledged that a share dilution claim may be brought as a direct claim where voting rights are harmed because of the dilution, [FN8] it held that, to give rise to a direct claim, the dilution must result in a "material decrease" in voting power. Here, the Vice Chancellor held, there was no "material" decrease in voting power, because the plaintiffs were minority shareholders of SinglePoint both before and after the debt conversion.

> FN6. *Gentile v. Rossette*, 2005 WL 2810683 (Del.Ch.).

> FN7. *Id.* (quoting *In re J.P. Morgan Chase & Co. S'holders Litig.*, 2005 WL 1076069, at *6 (Del.Ch.)).

> FN8. *Id.* (citing *Oliver v. Boston Univ.*, 2000 WL 1091480 (Del.Ch.)).

The trial court reasoned that the gist of the plaintiffs' debt conversion claim was that Single-Point was caused to sell its shares too cheaply, and as a result was deprived of the opportunity to sell

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

906 A.2d 91                                                                    Page 6
906 A.2d 91
(Cite as: 906 A.2d 91)

those shares for a better price. [FN9] Because that loss of opportunity was suffered only by the company, and because any remedy--either to cancel the "excess" shares issued to Rossette or to require Rossette to restore their fair value--would benefit only the company, the claim was derivative under the analysis mandated by *Tooley v. Donaldson, Lufkin & Jenrette, Inc. ("Tooley")*, [FN10] Accordingly, the Court of Chancery granted summary judgment dismissing the plaintiffs' debt conversion claim. On appeal from a grant of summary judgment, our review is *de novo*. [FN11]

> FN9. *Id.* at *5.
>
> FN10. 845 A.2d 1031 (Del.2004).
>
> FN11. *Emerald Partners v. Berlin*, 726 A.2d 1215, 1219 (Del.1999); *Stroud v. Grace*, 606 A.2d 75, 81 (Del.1992).

### III. *THE PARTIES' CONTENTIONS*

This appeal concerns only the grant of summary judgment dismissing the claim for breach of fiduciary duty arising out of the debt conversion. [FN12] The issue that we must decide is whether that claim was *exclusively* derivative in character. If it was, then the summary judgment grant must be affirmed; if not, then the summary judgment must be reversed.

> FN12. The Court of Chancery held that the Count II claims alleging breach of fiduciary duty in connection with the Cofiniti merger were direct claims, but denied summary judgment, because the Court was unable to conclude that on the undisputed facts the defendants were entitled to judgment as a matter of law. No party has appealed from the Count II determinations.

[1] The defendant-appellees argue that the plaintiffs' debt conversion fiduciary duty claim is exclusively derivative, and that the Vice Chancellor correctly so held. Under *Tooley*, [FN13] whether a claim is derivative or direct depends solely upon two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders individu-

ally); and (2) who would receive the benefit of the recovery or other remedy (the corporation or the stockholders, individually)?" [FN14]

> FN13. 845 A.2d 1031 (Del.2004).
>
> FN14. *Id.* at 1033.

Here, the defendants maintain, the only harm arguably resulting from the debt conversion was to the corporation, because in essence, the debt conversion claim is that SinglePoint was caused to overpay for the debt forgiveness. More specifically, the claim is that the debt conversion rate **\*98** ($.05 per share) was unfair and resulted in SinglePoint issuing "vastly more stock [to Rossette] than it should have." [FN15] No harm from that overpayment resulted to any stockholder individually (defendants argue), because to the extent the overpayment invalidly increased the number of outstanding shares, the resulting dilution affected each and all of the pre-debt conversion shares identically--including the shares owned by Rossette. Moreover, defendants assert, whatever form any damages recovery or other remedy might take--whether it be to cancel the "excess" shares or to require the acquirer to pay their fair value--the only beneficiary of that remedy would be the company. Lastly, defendants contend that to the extent the plaintiffs' claim is for wrongful dilution of their voting power, restoration of that voting power is no longer possible because, as a result of the Cofiniti merger and the Cofiniti bankruptcy, for all practical purposes SinglePoint and Cofiniti no longer exist.

> FN15. *Gentile v. Rossette*, 2005 WL 2810683, at *4 (Del.Ch.) (quoting Pls.' Opening Br. at 12).

The defendants concede that a "stock dilution" claim may be brought as a direct claim if voting rights are harmed. They insist, however, that that can only occur where the loss of voting power is "material." The defendants conclude that the Court of Chancery correctly found that the plaintiffs never had any material voting power to lose, because both before and after the debt conversion, the public shareholders of SinglePoint held only a minority

906 A.2d 91
906 A.2d 91
(Cite as: 906 A.2d 91)

Page 7

interest.

The plaintiffs vigorously contest these arguments. They claim that under *Tooley* their claim is direct, for two alternative reasons. First, their debt conversion claim cannot be derivative because only the shareholder minority--but not the corporation--was injured. The reason (plaintiffs say) is that the company was insolvent, and therefore suffered no harm by issuing its valueless stock to expunge a sizeable portion of its debt to Rossette. [FN16] But, even if economically worthless, the SinglePoint stock did have voting power, and the debt conversion reduced the minority shareholders' ownership percentage, and voting power, from about 39% to 7%. Moreover, because of the significant (over 80%) reduction in their share ownership percentage, the minority stockholders also suffered a corresponding reduction of the proceeds they would have otherwise received in the Cofiniti merger. The plaintiffs contend that because SinglePoint no longer exists, only the former minority stockholders can benefit from a judicial remedy. The only remedy now available would be a recovery of the fair value of the Cofiniti merger proceeds the plaintiffs would have received but for the extraction of value resulting from the debt conversion. Any such recovery would benefit only the (former) SinglePoint minority.

FN16. To the extent the plaintiffs argue that SinglePoint was not harmed by the debt conversion, their position is at war with itself and fatally flawed. The plaintiffs cannot argue, for purposes of demonstrating a lack of harm to the corporation, that the SinglePoint stock was worthless, yet simultaneously contend that that same stock had value for purposes of establishing that the debt conversion at the $0.05 rate was unfair to the corporation. Indeed, the Court of Chancery's $5.50 per share appraisal award would appear to defeat that argument. Accordingly, we reject the plaintiffs' "no value" contention, and proceed from the premise that the Single-Point stock had value. From that premise it

follows that, to the extent SinglePoint was caused to issue an excessive amount of shares, the corporation was harmed by the debt conversion. Even so, we conclude, for the reasons set forth in Part IV, *infra*, of this Opinion, that the debt conversion claim is not exclusively derivative, and could have been brought either directly or derivatively.

**\*99** Second, and alternatively, the plaintiffs contend that their claim is direct under *In re Tri-Star Pictures, Inc. Litigation*. [FN17] Their argument runs as follows: even if the SinglePoint shares had value, the debt conversion was a self-dealing corporate transaction with a significant stockholder, that increased the voting power and economic value of that significant stockholder's interest in Single-Point, at the expense and to the corresponding detriment of the minority shareholders. The plaintiffs claim that the Court of Chancery erred by reading into *Tri-Star* a requirement that for such a transaction to give rise to a direct claim, the loss of voting power must be "material," *i.e.*, that it must reduce the public stockholders' voting power from majority to minority status. We conclude that the plaintiffs are correct and that *Tooley* and *Tri-Star*, properly applied, compel the conclusion that the debt conversion claim was both derivative and direct. It therefore was error to dismiss the claim on the basis that it was exclusively derivative.

FN17. 634 A.2d 319 (Del.1993) ("*Tri-Star* ").

## IV. *ANALYSIS*
### A. *The Applicable Principles of Law*

To analyze the character of the claim at issue, it is critical to recognize that it has two aspects. The first aspect is that the corporation (SinglePoint) was caused to overpay for an asset or other benefit that it received in exchange (here, a forgiveness of debt). The second aspect is that the minority stockholders lost a significant portion of the cash value and the voting power of their minority stock interest. Those separate harms resulted from the same

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

transaction, yet they are independent of each other.

[2][3] Normally, claims of corporate overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative. The reason (expressed in *Tooley* terms) is that the corporation is both the party that suffers the injury (a reduction in its assets or their value) as well as the party to whom the remedy (a restoration of the improperly reduced value) would flow. In the typical corporate overpayment case, a claim against the corporation's fiduciaries for redress is regarded as exclusively derivative, irrespective of whether the currency or form of overpayment is cash or the corporation's stock. [FN18] Such claims are not normally regarded as direct, because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction. In the eyes of the law, such equal "injury" to the shares resulting from a corporate overpayment is not viewed as, or equated with, harm to specific shareholders individually.

> FN18. *See In re J.P. Morgan Chase & Co. S'holders Litig.,* 2005 WL 1076069, at *7 (Del.Ch.), *aff'd,* 2006 WL 585606, (Del.Supr.); *Avacus Partners, L.P. v. Brian,* 1990 WL 161909, at *6 (Del.Ch.) (excessive exchange of stock); *Kramer v. W. Pac. Indus.,* 546 A.2d 348 (Del.1988) (excessive issuance of stock options and payment of fees to executives).

[4] There is, however, at least one transactional paradigm—a species of corporate overpayment claim—that Delaware case law recognizes as being both derivative and direct in character. [FN19] A breach of *100 fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corres-

ponding decrease in the share percentage owned by the public (minority) shareholders. [FN20] Because the means used to achieve that result is an overpayment (or "over-issuance") of shares to the controlling stockholder, the corporation is harmed and has a claim to compel the restoration of the value of the overpayment. That claim, by definition, is derivative.

> FN19. It is legally possible for a claim to have such a dual character. As this Court has held, "Courts have long recognized that the same set of facts can give rise to both a direct claim and a derivative claim." *Grimes v. Donald,* 673 A.2d 1207, 1212 (Del.1996).

> FN20. *See Turner v. Bernstein,* 1999 WL 66532, at *11 (Del.Ch.) (a direct cash value dilution claim "arises only in transactions where a significant stockholder sells its assets to the corporation in exchange for the corporation's stock, and influences the transaction terms so that the result is (i) a decrease (or 'dilution') of the asset value and voting power of the stock held by the public stockholders and (ii) a corresponding increase (or benefit) to the shares held by the significant stockholder."); *see also In re Paxson Commc'n Corp. S'holders Litig.,* 2001 WL 812028, at *5 (Del.Ch.); *Oliver v. Boston University,* 2000 WL 1091480 (Del.Ch.).

[5] But, the public (or minority) stockholders also have a separate, and direct, claim arising out of that same transaction. Because the shares representing the "overpayment" embody both economic value and voting power, the end result of this type of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder. For that reason, the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results: an extraction

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

906 A.2d 91
906 A.2d 91
(Cite as: 906 A.2d 91)

from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited. [FN21] In such circumstances, the public shareholders are entitled to recover the value represented by that overpayment--an entitlement that may be claimed by the public shareholders directly and without regard to any claim the corporation may have.

> FN21. Unlike the typical "overpayment" transaction, where the form of overpayment (cash or stock) does not matter, in this atypical type of transaction, the dual character of the harm, and of the claims resulting from that harm, arise where the overpayment takes the form of issued corporate stock.

The above-described type of transaction was held to give rise to a direct claim in *In re Tri-Star Pictures. Inc.* [FN22] In that case, the plaintiffs, who were a class of former minority stockholders of Tri-Star Pictures, challenged an assets-for-stock transaction between Tri-Star and its largest stockholder, the Coca-Cola Company. Before the transaction, Coca-Cola (voting in concert with other significant stockholders aligned with it) held 56.6% of Tri-Star's common stock; the minority stockholders (the plaintiff shareholder class) held 43.4%. The plaintiffs alleged that Coca-Cola had wrongfully caused Tri-Star to issue an excessive number of Tri-Star shares to Coca-Cola in exchange for Coca-Cola assets having less value. As a result, Coca-Cola increased its stock interest in Tri-Star to about 80%, which in turn reduced the public shareholders' interest to approximately *101 20%. This Court held that because Coca-Cola, as Tri-Star's largest stockholder, did not suffer a dilution of cash value, of voting power, or of ownership percentage to the same extent and in the same proportion as the minority shareholders, the plaintiffs had suffered an injury that was unique to them individually and that could be remedied in a direct claim against the con-

trolling stockholder and any other fiduciary responsible for the harm. [FN23]

> FN22. 634 A.2d 319 (Del.1993).

> FN23. *Id.*, at 332-333.

**B. Analysis of the Debt Conversion Claim**

[6] The plaintiffs contend that this case is functionally indistinguishable from, and thus is controlled by, *Tri-Star*. The defendants respond (and the Court of Chancery agreed) that *Tri-Star* does not control, because for a loss of voting power to give rise to a direct claim, the loss must be "material," meaning that the challenged transaction must reduce the holdings of the plaintiff class from majority to minority stockholder status [FN24]--a reduction that did not occur here.

> FN24. *Gentile v. Rossette*, 2005 WL 2810683, at *5 ("As minority shareholders to begin with, Plaintiffs' voting power was not materially changed.").

Because the defendants do not claim that this case is distinguishable from *Tri-Star* in any other respect, the issue is a narrow one that may be stated thusly: where a *Tri-Star* type transaction reduces the voting power of the corporation's public shareholders, must the reduction be from majority to minority stockholder status, for the public shareholders to have standing to assert a direct claim against the fiduciaries responsible? We hold that the answer is no. We so conclude for three separate reasons.

First, a requirement of a reduction from majority to minority status finds no support in our case law. The Court of Chancery cited no authority supporting that conclusion, [FN25] and nothing in *Tri-Star*, which created the analytical framework for this issue, compels it. In *Tri-Star*, Coca-Cola and the group of other stockholders with which Coca-Cola customarily voted as a bloc, were the corporation's majority stockholders. In *Tri-Star*, as here, the public stockholders held a minority interest, both before and after the challenged transaction. In both

cases what was reduced was a significant portion of the economic value and voting power of that minority interest. In _Tri-Star_ the minority interest was reduced from 43.4% to approximately 20%; here, the minority interest was reduced from approximately 39% to approximately 7%. None of the analysis in _Tri-Star_ relating to whether the claim was direct or derivative turned on the extent or degree of the reduction of the minority interest. This case is, therefore, functionally indistinguishable from _Tri-Star_, and _Tri-Star's_ governing rule should control.

> FN25. The Court of Chancery cites only to _Oliver v. Boston Univ., 2000 WL 1091480 (Del.Ch.)_ for the proposition that "dilution claims emphasizing the diminishment of voting power have been categorized as direct claims;" and to _Agostino v. Hicks, 845 A.2d 1110, 1124 (Del.Ch.2004),_ summarizing its relevance as "finding no cognizable loss of voting power where the plaintiffs held only a minority interest before the challenged transaction." Neither authority supports the "materiality" rule advanced by the Court of Chancery. The _Agostino_ Court explicitly noted that the claim presented in that case was not a _Tri-Star_ claim. And in _Oliver,_ as here, the plaintiffs were minority stockholders before and after the challenged transaction. _But see infra_ note 28 (discussing and overruling _Behrens v. Aerial Commc'ns, Inc., 2001 WL 599870 (Del.Ch.)_).

**\*102** Second, the requirement of a "material" reduction in voting power should play no part in any analysis of whether a claim is direct, derivative, or both. Such a requirement distracts from--and obscures--the nature of the harm inflicted upon the minority in a _Tri-Star_ transaction, and denigrates the seriousness of the breach of fiduciary duty causing that harm. The _Tri-Star_ type of transaction was found to be wrongful because it resulted in an improper extraction or expropriation, by the controlling shareholder, of economic value and voting power that belonged to the minority stockholders. The specific manner in which this was accom-

plished was causing the corporation to issue, to the controlling stockholder, shares having more value than the value of what the corporation received in exchange. The consequence was to increase the controlling stockholder's percentage of stock ownership at the expense of the minority. [FN26] The resulting reduction in economic value and voting power affected the minority stockholders uniquely, and the corresponding benefit to the controlling stockholder was the product of a breach of the duty of loyalty well recognized in other forms of self-dealing transactions. [FN27] A rule that focuses on the degree or extent of the expropriation, and requires that the expropriation attain a certain level before the minority stockholders may seek a judicial remedy directly, denigrates the gravity of the fiduciary breach and condones overreaching by fiduciaries--at least in cases where the resulting harm to the minority falls below the prescribed threshold for "materiality." No principle of fiduciary law or policy justifies any condonation of fiduciary misconduct, even where the resulting harm is not "material" in the sense used by the trial court.

> FN26. Our characterization of the harm giving rise to a direct claim in a _Tri-Star_ type transaction is somewhat different from the articulation used by the _Tri-Star_ Court itself. In _Tri-Star,_ this Court articulated the harm to the minority in terms of a "dilution" of the economic value and voting power of the stock held by the minority. In this case, we adopt a more blunt characterization--extraction or expropriation-- because that terminology describes more accurately the real-world impact of the transaction upon the shareholder value and voting power embedded in the (pre-transaction) minority interest, and the uniqueness of the resulting harm to the minority shareholders individually, than does a description framed in terms of "dilution."

> FN27. _See Weinberger v. UOP, Inc., 457 A.2d 701 (Del.1983)_ (discussing majority stockholder's duty of loyalty to minority in

a going-private merger).

Third, the result reached here fits comfortably within the analytical framework mandated by *Tooley.* [FN28] Although the corporation*103 suffered harm (in the form of a diminution of its net worth), the minority shareholders also suffered a harm that was unique to them and independent of any injury to the corporation. [FN29] The harm to the minority shareholder plaintiffs resulted from a breach of a fiduciary duty owed to them by the controlling shareholder, namely, not to cause the corporation to effect a transaction that would benefit the fiduciary at the expense of the minority stockholders. [FN30] Finally, in this specific case the sole relief that is presently available would benefit only the minority stockholders. Because SinglePoint no longer exists, there are no "overpayment" shares that a court of equity could cancel, and there is no corporate entity to which a recovery of the fair value of those shares could be paid. The only available remedy would be damages, equal to the fair value of the shares representing the overpayment by Single Point in the debt conversion. The only parties to whom that recovery could be paid are the plaintiffs. Hence, although under *Tooley* the claim could be brought derivatively or directly, as a practical matter, the only claim available after Cofiniti was liquidated is a direct action by the plaintiffs.

FN28. Although not cited by the trial court, the appellees draw our attention to a pre-*Tooley* decision by the Court of Chancery, *Behrens v. Aerial Communications, Inc.,* 2001 WL 599870 (Del.Ch.) which involved a transaction virtually identical to the one complained of here. In *Behrens,* a majority (80%) stockholder caused the corporation to exchange $420 million of debt that the corporation owed the majority stockholder, for newly issued common shares in an allegedly unfair and self-dealing debt exchange transaction. The claim was that the newly issued stock constituted an overpayment for the debt forgiveness. The debt exchange was followed by a merger in which the corporation was

acquired. The minority shareholders sued the majority stockholder and the corporation's former directors both directly and derivatively, claiming that the debt replacement transaction constituted a breach of fiduciary duty to the minority. The defendants moved to dismiss on the ground that that claim was derivative, and that its extinguishment by the merger deprived the (former) minority stockholders of standing to assert the claim. The Court of Chancery agreed, and dismissed the claim, ruling that (i) the claim was derivative, because any dilution resulting from the debt conversion overpayment affected all outstanding shares equally, and (ii) for that same reason the claim was not direct, because the plaintiffs did not plead any "special injury" to the minority shareholders distinct from any injury to the corporation or majority shareholder--a showing that under pre-*Tooley* case law was required to establish a direct claim.

Because the Court of Chancery's analysis of the debt reduction transaction focused solely upon its dilutive effect on the *shares,* rather than upon the quite separate injury to the *minority stockholders* (resulting from the increase in the majority stockholder's ownership interest at the minority's expense), that approach is inconsistent with the analysis we hold is required here. To the extent *Behrens* failed to take cognizance of the separate harm to the minority stockholders, it is overruled.

FN29. *Tooley,* 845 A.2d at 1039.

FN30. *Id.; Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del.1993) ("the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a ... controlling shareholder and not shared by the stockholders generally."); *Weinberger v. UOP,* 457 A.2d at 711 ("one may not mislead any stockholder

906 A.2d 91
906 A.2d 91
(Cite as: 906 A.2d 91)

by use of corporate information to which the latter is not privy.").

For these reasons, we conclude that the Court of Chancery committed reversible error in granting summary judgment dismissing the plaintiffs' debt conversion claim.

### V. *CONCLUSION*

The judgment of the Court of Chancery granting summary judgment dismissing Count I of the Complaint (the debt conversion claim) is reversed, and the case is remanded for proceedings consistent with this Opinion.

906 A.2d 91

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT H**
**TO DEFENDANT KLA-TENCOR'S**
**APPENDIX OF OUT-OF-STATE**
**AUTHORITIES IN SUPPORT OF**
**DEMURRER**

Westlaw.

126 S.Ct. 1503                                                                                    Page 1
547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179, 74 USLW 4167, Blue Sky L. Rep. P 74,569, Fed. Sec. L. Rep. P
93,723, 06 Cal. Daily Op. Serv. 2341, 2006 Daily Journal D.A.R. 3300, 19 Fla. L. Weekly Fed. S 131
**(Cite as: 547 U.S. 71, 126 S.Ct. 1503)**

▷

Supreme Court of the United States
MERRILL LYNCH, PIERCE, FENNER & SMITH,
INC., Petitioner,
v.
Shadi DABIT.
**No. 04-1371.**

Argued Jan. 18, 2006.
Decided March 21, 2006.

**Background:** Former broker at investment banking
firm and former retail customer of firm brought
class actions against firm in federal and state court,
respectively, alleging biased research and invest-
ment recommendations, and asserting only state-
law claims including breach of fiduciary duty and
breach of contract. After transfer of federal action,
and removal and transfer of state-court action, for
consolidated pretrial proceedings, the United States
District Court for the Southern District of New
York, Milton Pollack, Senior District Judge, 2003
WL 1872820, granted firm's motion to dismiss on
grounds of preemption by the Securities Litigation
Uniform Standards Act (SLUSA). Former broker
and customer appealed. The Court of Appeals for
the
Second Circuit, Sotomayor, Circuit Judge, 395 F.3d
25, affirmed in part and vacated and remanded in
part, concluding that, to the extent the complaint al-
leged that brokers were fraudulently induced to re-
tain or delay selling, it fell outside SLUSA's pre-
emptive scope. Certiorari was granted.

**Holding:** The Supreme Court, Justice Stevens, held
that SLUSA applies broadly to pre-empt state-law
class-action claims brought by holders of securities,
as well as by purchasers and sellers of securities,
alleging the fraudulent manipulation of stock
prices.
Vacated and remanded.

Justice Alito did not participate.

West Headnotes

**[1] Securities Regulation** 🔑**60.18**
349Bk60.18 Most Cited Cases
Rule 10b-5 broadly prohibits deception, misrepres-
entation, and fraud in connection with the purchase
or sale of any security. 17 C.F.R. § 240.10b-5.

**[2] Securities Regulation** 🔑**278**
349Bk278 Most Cited Cases

**[2] States** 🔑**18.77**
360k18.77 Most Cited Cases
Congress enacted the Securities Litigation Uniform
Standards Act (SLUSA) to stem the shift in private
securities class-action litigation from federal to
state courts and to prevent certain state private se-
curities class action lawsuits alleging fraud from
being used to frustrate the objectives of the Private
Securities Litigation Reform Act. Securities Ex-
change Act of 1934, §§ 21D, et seq., 28(f), 15
U.S.C.A. §§ 78u-4 et seq., 78bb(f).

**[3] Securities Regulation** 🔑**278**
349Bk278 Most Cited Cases

**[3] States** 🔑**18.77**
360k18.77 Most Cited Cases
For purposes of the Securities Litigation Uniform
Standards Act's (SLUSA's) class action limitations,
a "covered class action" is a lawsuit in which dam-
ages are sought on behalf of more than 50 people.
Securities Exchange Act of 1934, § 28(f)(5)(B), 15
U.S.C.A. § 78bb(f)(5)(B).

**[4] Securities Regulation** 🔑**278**
349Bk278 Most Cited Cases
For purposes of the Securities Litigation Uniform
Standards Act's (SLUSA's) class action limitations,
a "covered security" is one traded nationally and
listed on a regulated national exchange. Securities
Exchange Act of 1934, § 28(f)(5)(E), 15 U.S.C.A. §
78bb(f)(5)(E).

**[5] Securities Regulation** 🔑**278**
349Bk278 Most Cited Cases

**[5] States** 🔑**18.77**
360k18.77 Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

126 S.Ct. 1503                                                                                                          Page 2
547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179, 74 USLW 4167, Blue Sky L. Rep. P 74,569, Fed. Sec. L. Rep. P
93,723, 06 Cal. Daily Op. Serv. 2341, 2006 Daily Journal D.A.R. 3300, 19 Fla. L. Weekly Fed. S 131
**(Cite as: 547 U.S. 71, 126 S.Ct. 1503)**

Securities Litigation Uniform Standards Act (SLUSA), which provides that no covered class action based on state law and alleging a misrepresentation or omission of a material fact "in connection with the purchase or sale of a covered security" may be maintained in any state or federal court by any private party, applies broadly to pre-empt state-law class-action claims brought by holders of securities, as well as by purchasers and sellers of securities, alleging the fraudulent manipulation of stock prices. Securities Exchange Act of 1934, § 28(f)(1), 15 U.S.C.A. § 78bb(f)(1).

[6] Statutes ☞223.5(4)
361k223.5(4) Most Cited Cases
When judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well.

[7] Statutes ☞212.6
361k212.6 Most Cited Cases
Identical words used in different parts of the same statute generally are presumed to have the same meaning.

[8] States ☞18.11
360k18.11 Most Cited Cases
There is a general presumption that Congress does not cavalierly pre-empt state-law causes of action.

[9] Securities Regulation ☞278
349Bk278 Most Cited Cases

[9] States ☞18.77
360k18.77 Most Cited Cases
Identity of the plaintiffs does not determine whether a complaint alleges fraud "in connection with the purchase or sale" of securities, for purposes of Securities Litigation Uniform Standards Act (SLUSA) pre-emption. Securities Exchange Act of 1934, § 28(f)(1), 15 U.S.C.A. § 78bb(f)(1).
**\*\*1504 \*71 Syllabus [FN\*]**
FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v.*

*Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.
Respondent Dabit filed a private securities fraud class action in federal court, invoking diversity jurisdiction to advance his state-law claims that petitioner, his former employer, fraudulently manipulated stock prices, causing him and other brokers and their clients to keep their overvalued \*\*1505 securities. The District Court dismissed his amended complaint, finding his claims pre-empted by title I of the Securities Litigation Uniform Standards Act of 1998 (SLUSA), which provides that no "covered class action" based on state law and alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" "may be maintained in any State or Federal court by any private party." 15 U.S.C. § 78bb(f)(1)(A). Vacating the judgment, the Second Circuit concluded that, to the extent the complaint alleged that brokers were fraudulently induced, not to sell or purchase, but to retain or delay selling, it fell outside SLUSA's pre-emptive scope.

*Held:* The background, text, and purpose of SLUSA's pre-emption provision demonstrate that SLUSA pre-empts state-law holder class-action claims of the kind Dabit alleges. Pp. 1509-1515.

(a) The magnitude of the federal interest in protecting the integrity and efficiency of the national securities market cannot be overstated. The Securities Act of 1933 and the Securities Exchange Act of 1934 (1934 Act) anchor federal regulation of vital elements of this Nation's economy. Securities and Exchange Commission (SEC) Rule 10b-5, which was promulgated pursuant to § 10(b) of the 1934 Act, is an important part of that regulatory scheme, and, like § 10(b), prohibits deception, misrepresentation, and fraud "in connection with the purchase or sale" of a security. When, in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539, this Court limited the Rule 10b-5 private right of action to plaintiffs who were themselves purchasers or sellers, it relied on the widespread recognition that suits by nonpurchasers and nonsellers present a special risk of vexatious litigation that could "frustrate or delay normal business

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

126 S.Ct. 1503                                                                    Page 3
547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179, 74 USLW 4167, Blue Sky L. Rep. P 74,569, Fed. Sec. L. Rep. P
93,723, 06 Cal. Daily Op. Serv. 2341, 2006 Daily Journal D.A.R. 3300, 19 Fla. L. Weekly Fed. S 131
(Cite as: 547 U.S. 71, 126 S.Ct. 1503)

activity," *id., at 740, 95 S.Ct. 1917.* Pp. 1509-1510.

(b) Similar policy considerations prompted Congress to adopt legislation (Reform Act) targeted at perceived abuses of class actions--*e.g.,* *72 nuisance filings and vexatious discovery requests--but this effort prompted members of the plaintiffs' bar to avoid the federal forum altogether. To stem the shift of class actions from federal to state courts, Congress enacted SLUSA. Pp. 1510-1511.

(c) Both the class and the securities here are "covered" within SLUSA's meaning, and the complaint alleges misrepresentations and omissions of material facts. The only disputed issue is whether the alleged wrongdoing was "in connection with the purchase or sale" of securities. Dabit's narrow reading would pre-empt only those actions in which *Blue Chip Stamps'* purchaser-seller requirement is met. Insofar as that argument assumes that the *Blue Chip Stamps* rule stems from Rule 10b-5's text, it must be rejected, for the Court relied on "policy considerations" in adopting that limitation, and it purported to define the scope of a private right of action under Rule 10b-5, not to define "in connection with the purchase or sale." When this Court has sought to give meaning to that phrase in the § 10(b) and Rule 10b-5 context, it has broadly required that the alleged fraud "coincide" with a securities transaction, an interpretation that comports with the SEC's longstanding views. Congress can hardly have been unaware of this broad construction when it imported the phrase into SLUSA. Where judicial interpretations have settled a statutory provision's meaning, repeating the same language in a new statute indicates the intent to incorporate the judicial interpretations as well. That presumption is particularly apt here, because Congress not only used § 10(b)'s and Rule 10b-5's words, but used them in another provision appearing in the same statute as § 10(b). **1506 The presumption that Congress envisioned a broad construction also follows from the particular concerns that culminated in SLUSA's enactment, viz., preventing state private securities class-action suits from frustrating the Reform Act's objectives. A narrow construction also would give rise to wasteful, duplicative litiga-

tion in state and federal courts. The presumption that "Congress does not cavalierly pre-empt state-law causes of action," *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700, has less force here because SLUSA does not preempt any cause of action. It simply denies the use of the class-action device to vindicate certain claims. Moreover, tailored exceptions to SLUSA's pre-emptive command-- for, *e.g.,* state agency enforcement proceedings--demonstrate that Congress did not act cavalierly. Finally, federal, not state, law has long been the principal vehicle for asserting class-action securities fraud claims. Pp. 1511-1515.

(d) Dabit's holder class action is distinguishable from a typical Rule 10b-5 class action only in that it is brought by holders rather than sellers or purchasers. That distinction is irrelevant for SLUSA pre-emption purposes. The plaintiffs' identity does not determine whether *73 the complaint alleges the requisite fraud, and the alleged misconduct here--fraudulent manipulation of stock prices--unquestionably qualifies as a fraud "in connection with the purchase or sale" of securities as the phrase is defined in *SEC v. Zandford,* 535 U.S. 813, 820, 122 S.Ct. 1899, 153 L.Ed.2d 1, and *United States v. O'Hagan,* 521 U.S. 642, 651, 117 S.Ct. 2199, 138 L.Ed.2d 724. P. 1515.

395 F.3d 25, vacated and remanded.

STEVENS, J., delivered the opinion of the Court, in which all other Members joined, except ALITO, J., who took no part in the consideration or decision of the case.

Jay B. Kasner, Counsel of Record, Preeta D. Bansal, Edward J. Yodowitz, Scott D. Musoff, Joanne Gaboriault, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, for petitioner.

Thomas G. Hungar, for United States, as amicus curiae, by special leave of the Court, supporting the petitioner.

William B. Federman, Stuart W. Emmons, Federman & Sherwood, Oklahoma City, OK, Clell L. Cunningham, III, Dunn, Swan & Cunningham,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

126 S.Ct. 1503                                                                    Page 4
547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179, 74 USLW 4167, Blue Sky L. Rep. P 74,569, Fed. Sec. L. Rep. P
93,723, 06 Cal. Daily Op. Serv. 2341, 2006 Daily Journal D.A.R. 3300, 19 Fla. L. Weekly Fed. S 131
(Cite as: 547 U.S. 71, 126 S.Ct. 1503)

P.C., Oklahoma City, OK, David C. Frederick, Counsel of Record, Priya R. Aiyar, Brendan J. Crimmins, Patrick D. Curran, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., for respondent.

Justice STEVENS delivered the opinion of the Court.

*74 Title I of the Securities Litigation Uniform Standards Act of 1998 (SLUSA) provides that "[n]o covered class action" based on state law and alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" "may be maintained in any State or Federal court by any private party." § 101(b), 112 Stat. 3227 (codified at **1507 15 U.S.C. § 78bb(f)(1)(A)). In this case the Second Circuit held that SLUSA only pre-empts state-law class-action claims brought by plaintiffs who have a private remedy under federal law. 395 F.3d 25 (2005). A few months later, the Seventh Circuit ruled to the contrary, holding that the statute also pre-empts state-law class-action claims for which federal law provides no private remedy. *Kircher v. Putnam Funds Trust*, 403 F.3d 478 (C.A.7 2005). The background, the text, and the purpose of SLUSA's pre-emption provision all support the broader interpretation adopted by the Seventh Circuit.

I

Petitioner Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), is an investment banking firm that offers research and brokerage services to investors. Suspicious that the firm's loyalties to its investment banking clients had produced biased investment advice, the New York attorney general in 2002 instituted a formal investigation into Merrill *75 Lynch's practices. The investigation sparked a number of private securities fraud actions, this one among them. [FN1]

> FN1. Merrill Lynch eventually settled its dispute with the New York attorney general.

Respondent, Shadi Dabit, is a former Merrill Lynch broker. He filed this class action in the United States District Court for the Western District of Oklahoma on behalf of himself and all other former or current brokers who, while employed by Merrill Lynch, purchased (for themselves and for their clients) certain stocks between December 1, 1999, and December 31, 2000. See App. 27a-46a. Rather than rely on the federal securities laws, Dabit invoked the District Court's diversity jurisdiction and advanced his claims under Oklahoma state law.

The gist of Dabit's complaint was that Merrill Lynch breached the fiduciary duty and covenant of good faith and fair dealing it owed its brokers by disseminating misleading research and thereby manipulating stock prices. [FN2] Dabit's theory was that Merrill Lynch used its misinformed brokers to enhance the prices of its investment banking clients' stocks: The research analysts, under management's direction, allegedly issued overly optimistic appraisals of the stocks' value; the brokers allegedly relied on the analysts' reports in advising their investor clients and in deciding whether or not to sell their own holdings; and the clients and brokers both continued to hold their stocks long beyond the point when, had the truth been known, they would have sold. The complaint further alleged that when the truth was actually revealed (around the time the New York attorney general instituted his investigation), the stocks' prices plummeted.

> FN2. The complaint alleged, for example, that the prices of the subject stocks were "artificially inflated as a result of the manipulative efforts" of Merrill Lynch, and that Merrill Lynch, "acting as a central nerve center in the manipulation of various stocks ..., perpetrated this stock manipulation through a variety of deceptive devices, artifices, and tactics that are the hallmarks of stock manipulation." App. 28a-29a.

*76 Dabit asserted that Merrill Lynch's actions damaged the class members in two ways: The misrepresentations and manipulative tactics caused them to hold onto overvalued securities, and the brokers lost commission fees when their clients, now aware that they had made poor investments,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

126 S.Ct. 1503                                                                                    Page 5
547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179, 74 USLW 4167, Blue Sky L. Rep. P 74,569, Fed. Sec. L. Rep. P
93,723, 06 Cal. Daily Op. Serv. 2341, 2006 Daily Journal D.A.R. 3300, 19 Fla. L. Weekly Fed. S 131
(Cite as: 547 U.S. 71, 126 S.Ct. 1503)

took their business elsewhere.

In July 2002, Merrill Lynch moved to dismiss Dabit's complaint. It argued, first, that SLUSA pre-empted the action and, second, that the claims alleged were not cognizable under Oklahoma law. The **1508 District Court indicated that it was "not impressed by" the state-law argument, but agreed that the federal statute pre-empted at least some of Dabit's claims. *Id.*, at 49a-50a. The court noted that the complaint alleged both "claims and damages based on wrongfully-induced purchases" and "claims and damages based on wrongfully-induced holding." *Ibid.* While the "holding" claims, the court suggested, might not be pre-empted, the "purchasing" claims certainly were. The court dismissed the complaint with leave to amend to give Dabit the opportunity to untangle his "hopeless melange of purchase-related and holding-related assertions." *Ibid.* (punctuation added).

Dabit promptly filed an amended complaint that omitted all direct references to purchases. What began as a class of brokers who "purchased" the subject securities during the class period became a class of brokers who "owned and continued to own" those securities. See *id.*, at 52a.

Meanwhile, dozens of other suits, based on allegations similar to Dabit's, had been filed against Merrill Lynch around the country on both federal- and state-law theories of liability. The Judicial Panel on Multidistrict Litigation transferred all of those cases, along with this one, to the United States District Court for the Southern District of New York for consolidated pretrial proceedings. Merrill Lynch then filed its second motion to dismiss Dabit's complaint. Senior Judge Milton Pollack granted the motion on the ground that the claims alleged fell "squarely within SLUSA's ambit." *77 In re Merrill Lynch & Co., Inc.*, 2003 WL 1872820, *1 (Apr. 10, 2003).

The Court of Appeals for the Second Circuit, however, vacated the judgment and remanded for further proceedings. 395 F.3d, at 51. It concluded that the claims asserted by holders did not allege

fraud "in connection with the purchase or sale" of securities under SLUSA. Although the court agreed with Merrill Lynch that that phrase, as used in other federal securities laws, has been defined broadly by this Court, it held that Congress nonetheless intended a narrower meaning here--one that incorporates the "standing" limitation on private federal securities actions adopted in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Under the Second Circuit's analysis, fraud is only "in connection with the purchase or sale" of securities, as used in SLUSA, if it is alleged by a purchaser or seller of securities. Thus, to the extent that the complaint in this action alleged that brokers were fraudulently induced, not to sell or purchase, but to retain or delay selling their securities, it fell outside SLUSA's pre-emptive scope. [FN3]

> FN3. The Court of Appeals also concluded that Dabit's lost commission claims escaped pre-emption under SLUSA because they did not "allege fraud that 'coincide[s]' with the sale or purchase of a security." 395 F.3d, at 47 (quoting *SEC v. Zandford*, 535 U.S. 813, 825, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002)). That determination is not before this Court for review.

After determining that the class defined in Dabit's amended complaint did not necessarily exclude purchasers, the panel remanded with instructions that the pleading be dismissed without prejudice. The court's order would permit Dabit to file another amended complaint that defines the class to exclude "claimants who purchased in connection with the fraud and who therefore could meet the standing requirement" for a federal damages action, and to include only those "who came to hold [a Merrill Lynch] stock before any relevant misrepresentation." 395 F.3d, at 45-46. Under the Second Circuit's analysis, **1509 a class action so limited could be *78 sustained under state law. For the reasons that follow, we disagree.

.II

The magnitude of the federal interest in protecting

126 S.Ct. 1503                                                                                                      Page 6
547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179, 74 USLW 4167, Blue Sky L. Rep. P 74,569, Fed. Sec. L. Rep. P
93,723, 06 Cal. Daily Op. Serv. 2341, 2006 Daily Journal D.A.R. 3300, 19 Fla. L. Weekly Fed. S 131
**(Cite as: 547 U.S. 71, 126 S.Ct. 1503)**

the integrity and efficient operation of the market for nationally traded securities cannot be over-stated. In response to the sudden and disastrous collapse in prices of listed stocks in 1929, and the Great Depression that followed, Congress enacted the Securities Act of 1933 (1933 Act), 48 Stat. 74, and the Securities Exchange Act of 1934 (1934 Act), 48 Stat. 881. Since their enactment, these two statutes have anchored federal regulation of vital elements of our economy.

[1] Securities and Exchange Commission (SEC) Rule 10b-5, 17 CFR § 240.10b-5 (2005), promulgated in 1942 pursuant to § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), is an important part of that regulatory scheme. The Rule, like § 10(b) itself, [FN4] broadly prohibits deception, misrepresentation, and fraud "in connection with the purchase or sale of any security." [FN5] The *79 SEC has express statutory authority to enforce the Rule. See 15 U.S.C. § 78u (2000 ed. and Supp. III). Although no such authority is expressly granted to private individuals injured by securities fraud, in 1946 Judge Kirkpatrick of the United States District Court for the Eastern District of Pennsylvania, relying on "the general purpose" of the Rule, recognized an implied right of action thereunder. *Kardon v. National Gypsum Co.*, 69 F.Supp. 512, 514. His holding was adopted by an "overwhelming consensus of the District Courts and Courts of Appeals," *Blue Chip Stamps*, 421 U.S., at 730, 95 S.Ct. 1917, and endorsed by this Court in *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

> FN4. Section 10(b) provides as follows:
> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
> "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and

regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

> FN5. The text of the Rule is as follows:
> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> "(a) To employ any device, scheme, or artifice to defraud,
> "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
> "in connection with the purchase or sale of any security." 17 CFR § 240.10b-5 (2005).

A few years after *Kardon* was decided, the Court of Appeals for the Second Circuit limited the reach of the private right of action under Rule 10b-5. In *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (C.A.2 1952), a panel composed of Chief Judge Swan and Judges Augustus and Learned Hand upheld the dismissal of a suit brought on behalf of a corporation and a class of its stockholders alleging that fraud "in connection with" a director's sale of his controlling block of stock to third parties violated Rule 10b-5. The court held that the Rule could only be invoked by a purchaser or seller of securities to **1510 remedy fraud associated with his or her own sale or purchase of securities, and did not protect those who neither purchased nor sold the securities in question but were instead injured by corporate insiders' sales to third parties. *Id.*, at 464. While the *Birnbaum* court did not question the plaintiffs' "standing" to enforce Rule 10b-5, later cases treated its holding as a standing requirement. See *Eason v. General Motors Acceptance Corp.*,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

126 S.Ct. 1503                                                                          Page 7
547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179, 74 USLW 4167, Blue Sky L. Rep. P 74,569, Fed. Sec. L. Rep. P
93,723, 06 Cal. Daily Op. Serv. 2341, 2006 Daily Journal D.A.R. 3300, 19 Fla. L. Weekly Fed. S 131
(Cite as: 547 U.S. 71, 126 S.Ct. 1503)

490 F.2d 654, 657 (C.A.7 1973).

*80 By the time this Court first confronted the question, literally hundreds of lower court decisions had accepted "*Birnbaum's* conclusion that the plaintiff class for purposes of § 10(b) and Rule 10b-5 private damages actions is limited to purchasers and sellers." *Blue Chip Stamps,* 421 U.S., at 731-732, 95 S.Ct. 1917. Meanwhile, however, cases like *Bankers Life & Casualty Co.* had interpreted the coverage of the Rule more broadly to prohibit, for example, "deceptive practices *touching* [a victim's] sale of securities as an investor." 404 U.S., at 12-13, 92 S.Ct. 165 (emphasis added); see *Eason,* 490 F.2d, at 657 (collecting cases). The "judicial oak which ha[d] grown from little more than a legislative acorn," as then-Justice Rehnquist described the rules governing private Rule 10b-5 actions, *Blue Chip Stamps,* 421 U.S. at 737, 95 S.Ct. 1917, had thus developed differently from the law defining what constituted a substantive violation of Rule 10b-5. Ultimately, the Court had to decide whether to permit private parties to sue for any violation of Rule 10b-5 that caused them harm, or instead to limit the private remedy to plaintiffs who were themselves purchasers or sellers.

Relying principally on "policy considerations" which the Court viewed as appropriate in explicating a judicially crafted remedy, *ibid.,* and following judicial precedent rather than "the many commentators" who had criticized the *Birnbaum* rule as "an arbitrary restriction which unreasonably prevents some deserving plaintiffs from recovering damages," 421 U.S., at 738, 95 S.Ct. 1917, the Court in *Blue Chip Stamps* chose to limit the private remedy. The main policy consideration tipping the scales in favor of precedent was the widespread recognition that "litigation under Rule 10b-5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." *Id.,* at 739, 95 S.Ct. 1917. Even weak cases brought under the Rule may have substantial settlement value, the Court explained, because "[t]he very pendency of the lawsuit may frustrate or delay normal business activity." *Id.,* at 740, 95 S.Ct. 1917. Cabining the private cause of action by means of the pur-

chaser-seller limitation *81 would, in the Court's view, minimize these ill effects. The limitation of course had no application in Government enforcement actions brought pursuant to Rule 10b-5. See *id.,* at 751, n. 14, 95 S.Ct. 1917.

### III

Policy considerations similar to those that supported the Court's decision in *Blue Chip Stamps* prompted Congress, in 1995, to adopt legislation targeted at perceived abuses of the class-action vehicle in litigation involving nationally traded securities. While acknowledging that private securities litigation was "an indispensable tool with which defrauded investors can recover their losses," the House Conference Report accompanying what would later be enacted as the Private Securities Litigation Reform Act of 1995 (Reform Act), 109 Stat. 737 (codified at 15 U.S.C. §§ 77z-1 and 78u-4), identified ways in which the class action device was being used to injure "the entire U.S. economy." H.R.Rep. No. 104-369, p. 31 (1995). According to the Report, nuisance filings, targeting of **1511 deep-pocket defendants, vexatious discovery requests, and "manipulation by class action lawyers of the clients whom they purportedly represent" had become rampant in recent years. *Ibid.* Proponents of the Reform Act argued that these abuses resulted in extortionate settlements, chilled any discussion of issuers' future prospects, and deterred qualified individuals from serving on boards of directors. *Id.,* at 31-32.

Title 1 of the Reform Act, captioned "Reduction of Abusive Litigation," represents Congress' effort to curb these perceived abuses. Its provisions limit recoverable damages and attorney's fees, provide a "safe harbor" for forward-looking statements, impose new restrictions on the selection of (and compensation awarded to) lead plaintiffs, mandate imposition of sanctions for frivolous litigation, and authorize a stay of discovery pending resolution of any motion to dismiss. See 15 U.S.C. § 78u-4. Title 1 also imposes heightened pleading requirements in actions brought pursuant to § 10(b) and Rule 10b-5; it "insists that securities fraud complaints '*82 specify' each misleading statement; that they set forth

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

126 S.Ct. 1503                                                                                Page 8
547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179, 74 USLW 4167, Blue Sky L. Rep. P 74,569, Fed. Sec. L. Rep. P
93,723, 06 Cal. Daily Op. Serv. 2341, 2006 Daily Journal D.A.R. 3300, 19 Fla. L. Weekly Fed. S 131
(Cite as: 547 U.S. 71, 126 S.Ct. 1503)

the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

[2] The effort to deter or at least quickly dispose of those suits whose nuisance value outweighs their merits placed special burdens on plaintiffs seeking to bring federal securities fraud class actions. But the effort also had an unintended consequence: It prompted at least some members of the plaintiffs' bar to avoid the federal forum altogether. Rather than face the obstacles set in their path by the Reform Act, plaintiffs and their representatives began bringing class actions under state law, often in state court. The evidence presented to Congress during a 1997 hearing to evaluate the effects of the Reform Act suggested that this phenomenon was a novel one; state-court litigation of class actions involving nationally traded securities had previously been rare. See H.R.Rep. No. 105-640, p. 10 (1998); S.Rep. No. 105-182, pp. 3-4 (1998). To stem this "shif[t] from Federal to State courts" and "prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of" the Reform Act, SLUSA §§ 2(2), (5), 112 Stat. 3227, Congress enacted SLUSA.

### IV

The core provision of SLUSA reads as follows: [FN6]

> FN6. SLUSA amends the 1933 Act and the 1934 Act in substantially identical ways. For convenience and because they are more pertinent here, we quote the amendments to the 1934 Act.

"CLASS ACTION LIMITATIONS.--No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--

**\*83** "(A) a misrepresentation or omission of a

material fact in connection with the purchase or sale of a covered security; or

"(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." **\*1512** *Id.*, at 3230 (codified as amended at 15 U.S.C. § 78bb(f)(1)). [FN7]

> FN7. Another key provision of the statute makes all "covered class actions" filed in state court removable to federal court. 112 Stat. 3230 (codified at 15 U.S.C. § 78bb(f)(2)).

[3][4][5] A "covered class action" is a lawsuit in which damages are sought on behalf of more than 50 people. [FN8] A "covered security" is one traded nationally and listed on a regulated national exchange. [FN9] Respondent does not dispute that both **\*84** the class and the securities at issue in this case are "covered" within the meaning of the statute, or that the complaint alleges misrepresentations and omissions of material facts. The only disputed issue is whether the alleged wrongdoing was "in connection with the purchase or sale" of securities.

> FN8. "The term 'covered class action' means--
> "(i) any single lawsuit in which--
> "(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or
> "(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or
> "(ii) any group of lawsuits filed in or

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

126 S.Ct. 1503                                                                     Page 9
547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179, 74 USLW 4167, Blue Sky L. Rep. P 74,569, Fed. Sec. L. Rep. P
93,723, 06 Cal. Daily Op. Serv. 2341, 2006 Daily Journal D.A.R. 3300, 19 Fla. L. Weekly Fed. S 131
(Cite as: 547 U.S. 71, 126 S.Ct. 1503)

pending in the same court and involving common questions of law or fact, in which--

"(I) damages are sought on behalf of more than 50 persons; and

"(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose." 112 Stat. 3232 (codified at 15 U.S.C. § 78bb(f)(5)(B)).

FN9. "The term 'covered security' means a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933, at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred ... ." 112 Stat. 3232 (codified at 15 U.S.C. § 78bb(f)(5)(E)). Section 18(b) of the 1933 Act in turn defines "covered security" to include securities traded on a national exchange. § 77r(b).

Respondent urges that the operative language must be read narrowly *to* encompass (and therefore pre-empt) only those actions in which the purchaser-seller requirement of *Blue Chip Stamps* is met. Such, too, was the Second Circuit's view. But insofar as the argument assumes that the rule adopted in *Blue Chip Stamps* stems from the text of Rule 10b-5--specifically, the "in connection with" language, it must be rejected. Unlike the *Birnbaum* court, which relied on Rule 10b-5's text in crafting its purchaser-seller limitation, this Court in *Blue Chip Stamps* relied chiefly, and candidly, on "policy considerations" in adopting that limitation. 421 U.S., at 737, 95 S.Ct. 1917. The *Blue Chip Stamps* Court purported to define the scope of a private right of action under Rule 10b-5--not to define the words "in connection with the purchase or sale." *Id.,* at 749, 95 S.Ct. 1917 ("No language in either [§ 10(b) or Rule 10b-5] speaks at all to the contours of a private cause of action for their violation"). Any ambiguity on that score had long been resolved by the time Congress enacted SLUSA. See *United States v. O'Hagan,* 521 U.S. 642, 656, 664, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); *Holmes v.*

*Securities Investor Protection Corporation,* 503 U.S. 258, 285, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (O'Connor, J., concurring in part and concurring in judgment); *id.,* at 289-290, 112 S.Ct. 1311 (SCALIA, J., concurring in judgment); *United States v. Naftalin,* 441 U.S. 768, 774, n. 6, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979); see also **1513 395 F.3d, at 39 (acknowledging that "[t]he limitation on standing to bring [a] private suit for damages for fraud in connection with the purchase or sale of securities is unquestionably a distinct concept from the general statutory and regulatory prohibition on fraud in connection with the purchase or sale of securities").

*85 Moreover, when this Court *has* sought to give meaning to the phrase in the context of § 10(b) and Rule 10b-5, it has espoused a broad interpretation. A narrow construction would not, as a matter of first impression, have been unreasonable; one might have concluded that an alleged fraud is "in connection with" a purchase or sale of securities only when the plaintiff himself was defrauded into purchasing or selling particular securities. After all, that was the interpretation adopted by the panel in the *Birnbaum* case. See 193 F.2d, at 464. But this Court, in early cases like *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), and most recently in *SEC v. Zandford,* 535 U.S. 813, 820, 822, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002), has rejected that view. Under our precedents, it is enough that the fraud alleged "coincide" with a securities transaction--whether by the plaintiff or by someone else. See *O'Hagan,* 521 U.S., at 651, 117 S.Ct. 2199. The requisite showing, in other words, is "deception 'in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller." *Id.,* at 658, 117 S.Ct. 2199. Notably, this broader interpretation of the statutory language comports with the longstanding views of the SEC. See *Zandford,* 535 U.S., at 819-820, 122 S.Ct. 1899. [FN10]

FN10. In *Zandford,* we observed that the SEC has consistently "maintained that a broker who accepts payment for securities

126 S.Ct. 1503                                                                                        Page 10
547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179, 74 USLW 4167, Blue Sky L. Rep. P 74,569, Fed. Sec. L. Rep. P
93,723, 06 Cal. Daily Op. Serv. 2341, 2006 Daily Journal D.A.R. 3300, 19 Fla. L. Weekly Fed. S 131
**(Cite as: 547 U.S. 71, 126 S.Ct. 1503)**

that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates § 10(b) and Rule 10b-5." *535 U.S., at 819, 122 S.Ct. 1899.* Here, too, the SEC supports a broad reading of the "in connection with" language.

[6][7] Congress can hardly have been unaware of the broad construction adopted by both this Court and the SEC when it imported the key phrase--"in connection with the purchase or sale"--into SLUSA's core provision. And when "judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its ... judicial interpretations as well." *86Bragdon v. Abbott, 524 U.S. 624, 645, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998);* see *Cannon v. University of Chicago, 441 U.S. 677, 696-699, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).* Application of that presumption is particularly apt here; not only did Congress use the same words as are used in § 10(b) and Rule 10b-5, but it used them in a provision that appears in the same statute as § 10(b). Generally, " identical words used in different parts of the same statute are ... presumed to have the same meaning." *IBP, Inc. v. Alvarez, 546 U.S. 1144, ----, 125 S.Ct. 1292, 161 L.Ed.2d 104 (2005) (slip op., at 11).*

The presumption that Congress envisioned a broad construction follows not only from ordinary principles of statutory construction but also from the particular concerns that culminated in SLUSA's enactment. A narrow reading of the statute would undercut the effectiveness of the 1995 Reform Act and thus run contrary to SLUSA's stated purpose, viz., "to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives" of the 1995 Act. SLUSA § 2(5), 112 Stat. 3227. As the *Blue Chip Stamps* Court observed, class **1514 actions brought by holders pose a special risk of vexatious litigation. *421 U.S., at 739, 95 S.Ct. 1917.* It would be odd, to say the least, if SLUSA exempted that particularly troublesome subset of class actions from its pre-

emptive sweep. See *Kircher, 403 F.3d, at 484.*

Respondent's preferred construction also would give rise to wasteful, duplicative litigation. Facts supporting an action by purchasers under Rule 10b-5 (which must proceed in federal court if at all) typically support an action by holders as well, at least in those States that recognize holder claims. The prospect is raised, then, of parallel class actions proceeding in state and federal court, with different standards governing claims asserted on identical facts. That prospect, which exists to some extent in this very case, [FN11] squarely conflicts *87 with the congressional preference for "national standards for securities class action lawsuits involving nationally traded securities." SLUSA § 2(5), 112 Stat. 3227. [FN12]

> FN11. See *2003 WL 1872820, *1 (S.D.N.Y., Apr.10, 2003)* (observing that Dabit's holder claims rested "on the very same alleged series of transactions and occurrences asserted in the federal securities actions" filed against Merrill Lynch).

> FN12. See *H.R.Rep. No. 105-640, p. 10 (1998)* (the "solution" to circumvention of the Reform Act "is to make Federal court the exclusive venue for securities fraud class action litigation"); *S.Rep. No. 105-182, p. 3 (1998)* (identifying "the danger of maintaining differing federal and state standards of liability for nationally-traded securities").

[8] In concluding that SLUSA pre-empts state-law holder class-action claims of the kind alleged in Dabit's complaint, we do not lose sight of the general "presum[ption] that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).* But that presumption carries less force here than in other contexts because SLUSA does not actually pre-empt any state cause of action. It simply denies plaintiffs the right to use the class action device to vindicate certain claims. The Act does not deny any individu-

126 S.Ct. 1503                                                                                    Page 11
547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179, 74 USLW 4167, Blue Sky L. Rep. P 74,569, Fed. Sec. L. Rep. P
93,723, 06 Cal. Daily Op. Serv. 2341, 2006 Daily Journal D.A.R. 3300, 19 Fla. L. Weekly Fed. S 131
(Cite as: 547 U.S. 71, 126 S.Ct. 1503)

al plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist.

Moreover, the tailored exceptions to SLUSA's pre-emptive command demonstrate that Congress did not by any means act "cavalierly" here. The statute carefully exempts from its operation certain class actions based on the law of the State in which the issuer of the covered security is incorporated, actions brought by a state agency or state pension plan, actions under contracts between issuers and indenture trustees, and derivative actions brought by shareholders on behalf of a corporation. 15 U.S.C. §§ 78bb(f)(3)(A)-(C), (f)(5)(C). The statute also expressly preserves state jurisdiction over state agency enforcement proceedings. § 78bb(f)(4). The existence of these carve-outs both evinces congressional sensitivity to state prerogatives in this field *88 and makes it inappropriate for courts to create additional, implied exceptions.

Finally, federal law, not state law, has long been the principal vehicle for asserting class-action securities fraud claims. See, e.g., H.R. Conf. Rep. No. 105-803, p. 14 (1998) ("Prior to the passage of the Reform Act, there was essentially no significant securities class action litigation brought in State court"). [FN13] More importantly, **1515 while state-law holder claims were theoretically available both before and after the decision in _Blue Chip Stamps,_ the actual assertion of such claims by way of class action was virtually unheard of before SLUSA was enacted; respondent and his _amici_ have identified only _one_ pre-SLUSA case involving a state-law class action asserting holder claims. [FN14] This is hardly a situation, then, in which a federal statute has eliminated a historically entrenched state-law remedy. Cf. _Bates v. Dow Agrosciences LLC,_ 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) (observing that a "long history" of state-law tort remedy "add[ed] force" to the presumption against pre-emption).

FN13. Respondent points out that the Court in _Blue Chip Stamps v. Manor Drug Stores,_ 421 U.S. 723, 95 S.Ct. 1917, 44

L.Ed.2d 539 (1975), identified as a factor mitigating any unfairness caused by adoption of the purchaser-seller requirement that "remedies are available to nonpurchasers and nonsellers under state law." _Id.,_ at 738, n. 9, 95 S.Ct. 1917. He argues that this supports a narrow construction of SLUSA's pre-emption provision. But we do not here revisit the _Blue Chip Stamps_ Court's understanding of the equities involved in limiting the availability of private remedies under federal law; we are concerned instead with Congress' intent in adopting a pre-emption provision, the evident purpose of which is to limit the availability of remedies under state law.

FN14. See Brief for Respondent 5 (citing _Weinberger v. Kendrick,_ 698 F.2d 61, 78 (C.A.2 1982) (approving a settlement that included holder claims brought pursuant to New York law)); see also Tr. of Oral Arg. 34- 35.

V

[9] The holder class action that respondent tried to plead, and that the Second Circuit envisioned, is distinguishable from a *89 typical Rule 10b-5 class action in only one respect: It is brought by holders instead of purchasers or sellers. For purposes of SLUSA pre-emption, that distinction is irrelevant; the identity of the plaintiffs does not determine whether the complaint alleges fraud "in connection with the purchase or sale" of securities. The misconduct of which respondent complains here--fraudulent manipulation of stock prices-- unquestionably qualifies as fraud "in connection with the purchase or sale" of securities as the phrase is defined in _Zandford,_ 535 U.S., at 820, 822, 122 S.Ct. 1899, and _O'Hagan,_ 521 U.S., at 651, 117 S.Ct. 2199.

The judgment of the Court of Appeals for the Second Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

_It is so ordered._

126 S.Ct. 1503                                                              Page 12
547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179, 74 USLW 4167, Blue Sky L. Rep. P 74,569, Fed. Sec. L. Rep. P
93,723, 06 Cal. Daily Op. Serv. 2341, 2006 Daily Journal D.A.R. 3300, 19 Fla. L. Weekly Fed. S 131
**(Cite as: 547 U.S. 71, 126 S.Ct. 1503)**


Justice ALITO took no part in the consideration or
decision of this case.

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT I
# TO DEFENDANT KLA-TENCOR'S APPENDIX OF OUT-OF-STATE AUTHORITIES IN SUPPORT OF DEMURRER

Westlaw.

845 A.2d 1031                                                                    Page 1
845 A.2d 1031
**(Cite as: 845 A.2d 1031)**

▷

Supreme Court of Delaware.
Patrick TOOLEY and Kevin Lewis, Plaintiffs Be-
low, Appellants,
v.
DONALDSON, LUFKIN, & JENRETTE, INC.,
John Steele Chalsty, Henri De Castries,
Michael Hegarty, Edward D. Miller, Stanley B.
Tulin, Denis Duverne, Henri G.
Hottinguer, W. Edwin Jarmain, Joe L. Roby,
Hamilton E. James, Anthony F.
Daddino, David F. DeLucia, Stuart M. Robbins,
Francis Jungers, W.J. Sanders
III, Louis Harris, Jane Mack Gould and John C.
West, Defendants Below,
Appellees.
No. 84,2003.

Submitted: Sept. 23, 2003.
Decided: April 2, 2004.

**Background:** Minority stockholders brought pur-
ported class action alleging board of directors
breached their fiduciary duty by agreeing to a delay
in proposed merger. The Court of Chancery, New
Castle County, Chandler, Chancellor, granted de-
fendants' motion to dismiss, and stockholders ap-
pealed.

**Holdings:** The Supreme Court, Veasey, C.J., held
that:
(1) issue of whether stockholders' claims were de-
rivative or direct turned solely on who suffered the
alleged harm and who would receive the benefit of
any recovery or other remedy;
(2) minority stockholders did not have a direct
claim for the time-value of money lost due to delay
in merger;
(3) use of concept of "special injury" was not help-
ful to a proper analytical distinction between direct
and derivative actions, disapproving of *Elster v.
American Airlines, Inc.,* 100 A.2d 219; *Bokat v.
Getty Oil Co.,* 262 A.2d 246; *Moran v. Household
International Inc.,* 490 A.2d 1059; *Lipton v. News
International, Plc.,* 514 A.2d 1075; and *In re Tri-*

*Star Pictures, Inc. Litigation,* 634 A.2d 319; and
(4) minority stockholders did not have a derivative
claim for the time-value of money lost due to delay
in merger.
Affirmed in part, reversed in part and remanded.

West Headnotes

**[1] Corporations** ⟨⟩⟩**202**
101k202 Most Cited Cases
In determining whether a stockholder's claim is de-
rivative or direct, the issue must turn solely on the
following questions: (1) who suffered the alleged
harm, the corporation or the suing stockholders, in-
dividually; and (2) who would receive the benefit
of any recovery or other remedy, the corporation or
the stockholders, individually; disapproving of *El-
ster v. American Airlines, Inc.,* 100 A.2d 219; *Bokat
v. Getty Oil Co.,* 262 A.2d 246; *Moran v. House-
hold International Inc.,* 490 A.2d 1059; *Lipton v.
News International, Plc.,* 514 A.2d 1075; *In re Tri-
Star Pictures, Inc. Litigation,* 634 A.2d 319.

**[2] Corporations** ⟨⟩⟩**202**
101k202 Most Cited Cases
Minority stockholders of acquired corporation did
not have a direct claim for the time-value of money
lost as a result of 22 day extension of time, agreed
to by the corporations pursuant to the merger agree-
ment, in which acquiring corporation could accept
tendered stock, as stockholders' contractual right to
receive merger consideration had not yet ripened at
the time the extensions were entered into; merger
agreement specifically disclaimed any persons as
being third party beneficiaries to the contract, any
contractual shareholder right to payment of the
merger consideration did not ripen until the condi-
tions of the agreement were met, and merger agree-
ment only became binding and mutually enforce-
able at the time the tendered shares ultimately were
accepted for payment by acquiring corporation.

**[3] Corporations** ⟨⟩⟩**202**
101k202 Most Cited Cases
In actions brought by shareholders of corporations,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

845 A.2d 1031
845 A.2d 1031
**(Cite as: 845 A.2d 1031)**

the concept of "special injury" is not helpful to a proper analytical distinction between direct and derivative actions, and use of the concept of "special injury" as a tool in that analysis is disapproved; disapproving of *Elster v. American Airlines, Inc.*, 100 A.2d 219; *Bokat v. Getty Oil Co.*, 262 A.2d 246; *Moran v. Household International Inc.*, 490 A.2d 1059; *Lipton v. News International, Plc.*, 514 A.2d 1075; *In re Tri-Star Pictures, Inc. Litigation*, 634 A.2d 319.

**[4] Corporations ⟷207.5**
101k207.5 Most Cited Cases
A derivative suit enables a stockholder to bring suit on behalf of the corporation for harm done to the corporation.

**[5] Corporations ⟷207.5**
101k207.5 Most Cited Cases
Because a derivative suit is being brought on behalf of the corporation, the recovery, if any, must go to the corporation.

**[6] Corporations ⟷202**
101k202 Most Cited Cases
A stockholder who is directly injured retains the right to bring an individual action for injuries affecting his or her legal rights as a stockholder, and such a claim is distinct from an injury caused to the corporation alone.

**[7] Corporations ⟷207.5**
101k207.5 Most Cited Cases
In individual suits brought by stockholders setting forth direct injuries, the recovery or other relief flows directly to the stockholders, not to the corporation.

**[8] Compromise and Settlement ⟷53.1**
89k53.1 Most Cited Cases
**[8] Corporations ⟷206(2)**
101k206(2) Most Cited Cases
**[8] Corporations ⟷207**
101k207 Most Cited Cases
If an action is derivative, the stockholders are required to comply with the requirements that the stockholders: (1) retain ownership of the shares throughout the litigation; (2) make presuit demand on the board; and (3) obtain court approval of any settlement. Chancery Court Rule 23.1.

**[9] Corporations ⟷202**
101k202 Most Cited Cases
To bring an action for a direct injury, the stockholder's claimed direct injury must be independent of any alleged injury to the corporation; the stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

**[10] Corporations ⟷202**
101k202 Most Cited Cases
Minority stockholders of acquired corporation did not have a derivative claim for damages representing the time-value of money lost as a result of 22 day extension of time, agreed to by the corporations pursuant to the merger agreement, in which acquiring corporation could accept stock tendered by minority stockholders, as such claim did not assert injury to the corporate entity.

**\*1032** Court Below: Court of Chancery of the State of Delaware, in and for New Castle County, C.A. No. 18414.

Upon appeal from the Court of Chancery. AF-FIRMED IN PART, REVERSED IN PART AND REMANDED.

Joseph A. Rosenthal, and Herbert W. Mondros, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, DE; Arthur N. Abby (argued), of Abbey Gardy, LLP, New York City; Schiffrin & Barroway, LLP, Bala Cynwyd, PA, of counsel, for Appellants.

Robert K. Payson, and Donald J. Wolfe, Jr., of Potter Anderson & Corroon, Wilmington, DE; David C. McBride (argued), and John J. Paschetto, of Young Conaway Stargatt & Taylor, LLP, Wilmington, DE; Paul K. Rowe, of Wachtell, Lipton, Rosen & Katz, New York City; Alan S. Goudiss, of Sherman & Sterling, New York City, of counsel, for Appellees.

**\*1033** Before VEASEY, Chief Justice, HOLLAND,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

845 A.2d 1031
845 A.2d 1031
(Cite as: 845 A.2d 1031)

BERGER, STEELE and JACOBS, Justices, constituting the Court en Banc.

VEASEY, Chief Justice:

Plaintiff-stockholders brought a purported class action in the Court of Chancery, alleging that the members of the board of directors of their corporation breached their fiduciary duties by agreeing to a 22-day delay in closing a proposed merger. Plaintiffs contend that the delay harmed them due to the lost time-value of the cash paid for their shares. The Court of Chancery granted the defendants' motion to dismiss on the sole ground that the claims were, "at most," claims of the corporation being asserted derivatively. They were, thus, held not to be direct claims of the stockholders, individually. Thereupon, the Court held that the plaintiffs lost their standing to bring this action when they tendered their shares in connection with the merger.

[1] Although the trial court's legal analysis of whether the complaint alleges a direct or derivative claim reflects some concepts in our prior jurisprudence, we believe those concepts are not helpful and should be regarded as erroneous. We set forth in this Opinion the law to be applied henceforth in determining whether a stockholder's claim is derivative or direct. That issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?

To the extent we have concluded that the trial court's analysis of the direct vs. derivative dichotomy should be regarded as erroneous, we view the error as harmless in this case because the complaint does not set forth *any* claim upon which relief can be granted. In its opinion, the Court of Chancery properly found on the facts pleaded that the plaintiffs have no separate contractual right to the alleged lost time-value of money arising out of extensions in the closing of a tender offer. These extensions were made in connection with a merger

where the plaintiffs' right to any payment of the merger consideration had not ripened at the time the extensions were granted. No other individual right of these stockholders having been asserted in the complaint, it was correctly dismissed.

In affirming the judgment of the trial court as having correctly dismissed the complaint, we reverse only its dismissal with prejudice. [FN1] We remand this action to the Court of Chancery with directions to amend its order of dismissal to provide that: (a) the action is dismissed for failure to state a claim upon which relief can be granted; and (b) that the dismissal is without prejudice. Thus, plaintiffs will have an opportunity to replead, if warranted under Court of Chancery Rule 11.

> FN1. Since the order of dismissal here did not state that it was without prejudice, it is deemed to operate as an adjudication upon the merits. *See* Court of Chancery Rule 41(b)(2).

*Facts*

Patrick Tooley and Kevin Lewis are former minority stockholders of Donaldson, Lufkin & Jenrette, Inc. (DLJ), a Delaware corporation engaged in investment banking. DLJ was acquired by Credit Suisse Group (Credit Suisse) in the Fall of 2000. Before that acquisition, AXA Financial, Inc.(AXA), which owned 71% of DLJ stock, controlled DLJ. Pursuant to a stockholder agreement between AXA and Credit Suisse, AXA agreed to exchange with Credit Suisse its DLJ stockholdings for a mix of stock and cash. The consideration *1034 received by AXA consisted primarily of stock. Cash made up one-third of the purchase price. Credit Suisse intended to acquire the remaining minority interests of publicly-held DLJ stock through a cash tender offer, followed by a merger of DLJ into a Credit Suisse subsidiary.

The tender offer price was set at $90 per share in cash. The tender offer was to expire 20 days after its commencement. The merger agreement, however, authorized two types of extensions. First, Credit Suisse could unilaterally extend the tender

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

offer if certain conditions were not met, such as SEC regulatory approvals or certain payment obligations. Alternatively, DLJ and Credit Suisse could agree to postpone acceptance by Credit Suisse of DLJ stock tendered by the minority stockholders.

Credit Suisse availed itself of both types of extensions to postpone the closing of the tender offer. The tender offer was initially set to expire on October 5, 2000, but Credit Suisse invoked the five-day unilateral extension provided in the agreement. Later, by agreement between DLJ and Credit Suisse, it postponed the merger a second time so that it was then set to close on November 2, 2000.

Plaintiffs challenge the second extension that resulted in a 22-day delay. They contend that this delay was not properly authorized and harmed minority stockholders while improperly benefitting AXA. They claim damages representing the time-value of money lost through the delay.

### The Decision of the Court of Chancery

The order of the Court of Chancery dismissing the complaint, and the Memorandum Opinion upon which it is based, [FN2] state that the dismissal is based on the plaintiffs' lack of standing to bring the claims asserted therein. Thus, when plaintiffs tendered their shares, they lost standing under Court of Chancery Rule 23.1, the contemporaneous holding rule. The ruling before us on appeal is that the plaintiffs' claim is derivative, purportedly brought on behalf of DLJ. The Court of Chancery, relying upon our confusing jurisprudence on the direct/derivative dichotomy, based its dismissal on the following ground: "Because this delay affected all DLJ shareholders equally, plaintiffs' injury was not a special injury, and this action is, thus, a derivative action, at most." [FN3]

> FN2. *Tooley v. Donaldson Lufkin and Jenrette*, No. Civ. A. 18414- NC, 2003 WL 203060 (Del.Ch. Jan. 21, 2003).

> FN3. *Id.* at *4.

[2] Plaintiffs argue that they have suffered a "special injury" because they had an alleged contractual

right to receive the merger consideration of $90 per share without suffering the 22-day delay arising out of the extensions under the merger agreement. But the trial court's opinion convincingly demonstrates that plaintiffs had no such contractual right that had ripened at the time the extensions were entered into:

> *Here, it is clear that plaintiffs have no separate contractual right to bring a direct claim, and they do not assert contractual rights under the merger agreement.* First, the merger agreement specifically disclaims any persons as being third party beneficiaries to the contract. Second, any contractual shareholder right to payment of the merger consideration did not ripen until the conditions of the agreement were met. The agreement stated that Credit Suisse Group was not required to accept any shares for tender, or could extend the offer, under certain conditions--one condition of which included an extension or termination by agreement between *1035 Credit Suisse Group and DLJ. *Because Credit Suisse Group and DLJ did in fact agree to extend the tender offer period, any right to payment plaintiffs could have did not ripen until this newly negotiated period was over. The merger agreement only became binding and mutually enforceable at the time the tendered shares ultimately were accepted for payment by Credit Suisse Group.* It is at that moment in time, November 3, 2000, that the company became bound to purchase the tendered shares, making the contract mutually enforceable. *DLJ stockholders had no individual contractual right to payment until November 3, 2000, when their tendered shares were accepted for payment.* Thus, they have no contractual basis to challenge a delay in the closing of the tender offer up until November 3. *Because this is the date that the tendered shares were accepted for payment, the contract was not breached and plaintiffs do not have a contractual basis to bring a direct suit.* [FN4]

> FN4. *Id.* at *3 (footnotes omitted (emphasis added)).

Moreover, no other individual right of these stock-

845 A.2d 1031
845 A.2d 1031
**(Cite as: 845 A.2d 1031)**

Page 5

holder-plaintiffs was alleged to have been violated by the extensions.

That conclusion could have ended the case because it portended a definitive ruling that plaintiffs have no claim whatsoever on the facts alleged. But the defendants chose to argue, and the trial court chose to decide, the standing issue, which is predicated on an assertion that this claim is a derivative one asserted on behalf of the corporation, DLJ.

The Court of Chancery correctly noted that "[t]he Court will independently examine the nature of the wrong alleged and any potential relief to make its own determination of the suit's classification.... Plaintiffs' classification of the suit is not binding." [FN5] The trial court's analysis was hindered, however, because it focused on the confusing concept of "special injury" as the test for determining whether a claim is derivative or direct. The trial court's premise was as follows:

FN5. *Id.*

In order to bring a *direct* claim, a plaintiff must have experienced some "special injury." [citing *Lipton v. News Int'l, 514 A.2d 1075, 1079 (Del.1986)*]. A special injury is a wrong that "is separate and distinct from that suffered by other shareholders, ... or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation." [citing *Moran v. Household Int'l. Inc., 490 A.2d 1059, 1070 (Del.Ch.1985), aff'd 500 A.2d 1346 (Del.1986 [1985])*]. [FN6]

FN6. *Id.*

[3] In our view, the concept of "special injury" that appears in some Supreme Court and Court of Chancery cases is not helpful to a proper analytical distinction between direct and derivative actions. We now disapprove the use of the concept of "special injury" as a tool in that analysis.

**The Proper Analysis to Distinguish Between Direct and Derivative Actions**

The analysis must be based solely on the following questions: Who suffered the alleged harm--the corporation or the suing stockholder individually--and who would receive the benefit of the recovery or other remedy? This simple analysis is well imbedded in our jurisprudence, [FN7] but some cases have complicated it by injection of the amorphous and confusing concept of "special injury."

FN7. See, e.g., *Kramer v. Western Pacific Industries, Inc., 546 A.2d 348 (Del.1988)*.

**\*1036** The Chancellor, in the very recent *Agostino* case, [FN8] correctly points this out and strongly suggests that we should disavow the concept of "special injury." In a scholarly analysis of this area of the law, he also suggests that the inquiry should be whether the stockholder has demonstrated that he or she has suffered an injury that is not dependent on an injury to the corporation. In the context of a claim for breach of fiduciary duty, the Chancellor articulated the inquiry as follows: "Looking at the body of the complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?" [FN9] We believe that this approach is helpful in analyzing the first prong of the analysis: what person or entity has suffered the alleged harm? The second prong of the analysis should logically follow.

FN8. *Agostino v. Hicks*, No. Civ. A. 20020-NC, *2004 WL 443987 (Del.Ch. March 11, 2004)*.

FN9. *Agostino, 2004 WL 443987, at \* 7*. The Chancellor further explains that the focus should be on the person or entity to whom the relevant duty is owed. *Id.* at \*7 n. 54. As noted in *Agostino, id.,* this test is similar to that articulated by the American Law Institute (ALI), a test that we cited with approval in *Grimes v. Donald, 673 A.2d 1207 (Del.1996)*. The ALI test is as follows:
A direct action may be brought in the name

and right of a holder to redress an injury sustained by, or enforce a duty owed to, the holder. An action in which the holder can prevail without showing an injury or breach of duty to the corporation should be treated as a direct action that may be maintained by the holder in an individual capacity.

2 American Law Institute, PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS AND RECOMMENDATIONS § 7.01(b) at 17.

### A Brief History of Our Jurisprudence

[4][5][6][7] The derivative suit has been generally described as "one of the most interesting and ingenious of accountability mechanisms for large formal organizations." [FN10] It enables a stockholder to bring suit on behalf of the corporation for harm done to the corporation. [FN11] Because a derivative suit is being brought on behalf of the corporation, the recovery, if any, must go to the corporation. A stockholder who is directly injured, however, does retain the right to bring an individual action for injuries affecting his or her legal rights as a stockholder. Such a claim is distinct from an injury caused to the corporation alone. In such individual suits, the recovery or other relief flows directly to the stockholders, not to the corporation.

FN10. *Kramer v. Western Pacific Industries, Inc.,* 546 A.2d at 351 (quoting R. Clark, *Corporate Law* 639-40 (1986)).

FN11. *Id.*

[8] Determining whether an action is derivative or direct is sometimes difficult and has many legal consequences, some of which may have an expensive impact on the parties to the action. [FN12] For example, if an action is derivative, the plaintiffs are then required to comply with the requirements of Court of Chancery Rule 23.1, that the stockholder: (a) retain ownership of the shares throughout the litigation; (b) make presuit demand on the board; and (c) obtain court approval of any settlement. Further, the recovery, if any, flows only to the cor-

poration. The decision whether a suit is direct or derivative may be outcome-determinative. Therefore, it is necessary that a standard to distinguish such actions be clear, simple and consistently articulated and applied by our courts.

FN12. *Grimes v. Donald,* 673 A.2d at 1213 (Del.1996).

In *Elster v. American Airlines, Inc.,* [FN13] the stockholder sought to enjoin the grant and exercise of stock options because they *1037 would result in a dilution of her stock personally. In *Elster,* the alleged injury was found to be derivative, not direct, because it was essentially a claim of mismanagement of corporate assets. Then came the complication in the analysis: The Court held that where the alleged injury is to both the corporation *and* to the stockholder, the stockholder must allege a "special injury" to maintain a direct action. The Court did not define "special injury," however. By implication, decisions in later cases have interpreted *Elster* to mean that a "special injury" is alleged where the wrong is inflicted upon the stockholder alone or where the stockholder complains of a wrong affecting a particular right. Examples would be a preemptive right as a stockholder, rights involving control of the corporation or a wrong affecting the stockholder, qua individual holder, and not the corporation. [FN14]

FN13. 100 A.2d 219, 222 (Del.Ch.1953).

FN14. See *Lipton v. News International, Plc.,* 514 A.2d 1075, 1078 (Del.1986); *Moran v. Household International Inc.,* 490 A.2d 1059, 1069- 70 (Del.Ch.1985) (to distinguish a direct and derivative action, injury must be separate and distinct from that suffered by other stockholders or involve a contractual right independent of the corporation).

In *Bokat v. Getty Oil Co.,* [FN15] a stockholder of a subsidiary brought suit against the director of the parent corporation for causing the subsidiary to invest its resources wastefully, resulting in a loss to the subsidiary. [FN16] The claim in *Bokat* was es-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

845 A.2d 1031
845 A.2d 1031
(Cite as: 845 A.2d 1031)

sentially for mismanagement of corporate assets. Therefore, the Court held that any recovery must be sought on behalf of the corporation, and the claim was, thus, found to be derivative.

FN15. 262 A.2d 246 (Del.1970).

FN16. *Id.* at 249.

In describing how a court may distinguish direct and derivative actions, the *Bokat* Court stated that a suit must be maintained derivatively if the injury falls equally upon all stockholders. Experience has shown this concept to be confusing and inaccurate. It is confusing because it appears to have been intended to address the fact that an injury to the corporation tends to diminish each share of stock equally because corporate assets or their value are diminished. In that sense, the *indirect* injury to the stockholders arising out of the harm to the corporation comes about solely by virtue of their stockholdings. It does not arise out of any independent or direct harm to the stockholders, individually. That concept is also inaccurate because a direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative claim.

In *Lipton v. News International, Plc.,* [FN17] this Court applied the "special injury" test. There, a stockholder began acquiring shares in the defendant corporation presumably to gain control of the corporation. In response, the defendant corporation agreed to an exchange of its shares with a friendly buyer. Due to the exchange and a supermajority voting requirement on certain stockholder actions, the management of the defendant corporation acquired a veto power over any change in management.

FN17. *Lipton,* 514 A.2d at 1078.

The *Lipton* Court concluded that the critical analytical issue in distinguishing direct and derivative actions is whether a "special injury" has been alleged. There, the Court found a "special injury" because the board's manipulation worked an injury upon the plaintiff-stockholder unlike the injury suffered by other stockholders. That was because the plaintiff-stockholder was actively seeking to gain control of the *1038 defendant corporation. [FN18] Therefore, the Court found that the claim was direct. Ironically, the Court could have reached the same correct result by simply concluding that the manipulation directly and individually harmed the stockholders, without injuring the corporation.

FN18. *Id.*

In *Kramer v. Western Pacific Industries, Inc.,* [FN19] this Court found to be derivative a stockholder's challenge to corporate transactions that occurred six months immediately preceding a buy-out merger. The stockholders challenged the decision by the board of directors to grant stock options and golden parachutes to management. The stockholders argued that the claim was direct because their share of the proceeds from the buy-out sale was reduced by the resources used to pay for the options and golden parachutes. Once again, our analysis was that to bring a direct action, the stockholder must allege something other than an injury resulting from a wrong to the corporation. We interpreted *Elster* to require the court to determine the nature of the action based on the "nature of the wrong alleged" and the relief that could result. [FN20] That was, and is, the correct test. The claim in *Kramer* was essentially for mismanagement of corporate assets. Therefore, we found the claims to be derivative. That was the correct outcome. [FN21]

FN19. 546 A.2d 348, 352 (Del.1988).

FN20. *Id.*

FN21. In the *Tri-Star* case, however, this Court lapsed back into the "special injury" concept, which we now discard. *In re Tri-Star Pictures, Inc. Litigation,* 634 A.2d 319, 330 (1993).

In *Grimes v. Donald,* [FN22] we sought to distinguish between direct and derivative actions in the context of employment agreements granted to certain officers that allegedly caused the board to ab-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

dicate its authority. Relying on the *Elster* and *Kramer* precedents that the court must look to the nature of the wrong and to whom the relief will go, [FN23] we concluded that the plaintiff was not seeking to recover any damages for injury to the corporation. Rather, the plaintiff was seeking a declaration of the invalidity of the agreements on the ground that the board had abdicated its responsibility to the stockholders. [FN24] Thus, based on the relief requested, we affirmed the judgment of the Court of Chancery that the plaintiff was entitled to pursue a direct action.

> FN22. 673 A.2d 1207, 1213 (Del.1996).

> FN23. *Elster*, 100 A.2d at 221-23; *Kramer*, 546 A.2d at 351. *See also* John W. Welch, *Shareholder Individual and Derivative Actions: Underlying Rationales and the Closely Held Corporation*, 9 J. Corp. L. 147, 160 (1984) (stating that courts should analyze the rights involved to determine whether the action is direct or derivative).

> FN24. *Grimes*, 673 A.2d at 1213.

*Grimes* was followed by *Parnes v. Bally Entertainment Corp.*, which held, among other things, that the injury to the stockholders must be "independent of any injury to the corporation." [FN25] As the Chancellor correctly noted in *Agostino*, neither *Grimes* nor *Parnes* applies the purported "special injury" test. [FN26]

> FN25. 722 A.2d 1243, 1245 (Del.1999).

> FN26. *Agostino*, 2004 WL 443987, at *6 n. 49.

[9] Thus, two confusing propositions have encumbered our caselaw governing the direct/derivative distinction. The "special injury" concept, applied in cases such as *Lipton*, can be confusing in identifying the nature of the action. The same is true of the proposition that stems from *Bokat*--that an action cannot be direct if all stockholders are equally affected or unless the **1039** stockholder's injury is separate and distinct from that suffered by

other stockholders. The proper analysis has been and should remain that stated in *Grimes*; *Kramer* and *Parnes*. That is, a court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

### Standard to Be Applied in This Case

[10] In this case it cannot be concluded that the complaint alleges a derivative claim. There is no derivative claim asserting injury to the corporate entity. There is no relief that would go the corporation. Accordingly, there is no basis to hold that the complaint states a derivative claim.

But, it does not necessarily follow that the complaint states a direct, individual claim. While the complaint purports to set forth a direct claim, in reality, it states no claim at all. The trial court analyzed the complaint and correctly concluded that it does not claim that the plaintiffs have any rights that have been injured. [FN27] Their rights have not yet ripened. The contractual claim is nonexistent until it is ripe, and that claim will not be ripe until the terms of the merger are fulfilled, including the extensions of the closing at issue here. Therefore, there is no direct claim stated in the complaint before us.

> FN27. *Tooley*, 2003 WL 203060, at *3.

Accordingly, the complaint was properly dismissed. But, due to the reliance on the concept of "special injury" by the Court of Chancery, the ground set forth for the dismissal is erroneous, there being no derivative claim. That error is harmless, however, because, in our view, there is no direct claim either.

### Conclusion

For purposes of distinguishing between derivative and direct claims, we expressly disapprove both the concept of "special injury" and the concept that a claim is necessarily derivative if it affects all stockholders equally. In our view, the tests going for-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

845 A.2d 1031
845 A.2d 1031
(Cite as: 845 A.2d 1031)

Page 9

ward should rest on those set forth in this opinion.

We affirm the judgment of the Court of Chancery dismissing the complaint, although on a different ground from that decided by the Court of Chancery. We reverse the dismissal with prejudice and remand this matter to the Court of Chancery to amend the order of dismissal: (a) to state that the complaint is dismissed on the ground that it does not state a claim upon which relief can be granted; and (b) that the dismissal is without prejudice.

Because our determination that there is no valid claim whatsoever in the complaint before us was not argued [FN28] by the defendants and was not the basis of the ruling of the Court of Chancery, [FN29] the interests of justice will be best served if the dismissal is without prejudice, and plaintiffs have an opportunity to replead if they have a basis *1040 for doing so under Court of Chancery Rule 11. This result--permitting plaintiffs to replead--is unusual, but not unprecedented. [FN30]

>    FN28. As we have noted, the opinion of the trial court clearly stated that plaintiffs did not have a contractual right that had ripened. *Tooley,* 2003 WL 203060, at *3. On appeal, appellees cited twice to the trial court's conclusion that there was no contractual right, but it was in the context of the derivative/direct claim issue. (Appellees' Answering Brief at pp. 3, 17-18). On appeal, plaintiffs-appellants do not challenge the trial court's finding. Moreover, inexplicably, plaintiffs-appellants filed no reply brief in this Court.

>    FN29. See, *Unitrin, Inc. v. American General Corp.,* 651 A.2d 1361, 1390 (Del.1995) (decision of Supreme Court reversing trial court based on different grounds than that argued on appeal).

>    FN30. Compare *Brehm v. Eisner,* 746 A.2d 244, 267 (Del.1999) (permitting plaintiffs to proceed because of the unique circumstances noted there), with *White v. Panic,* 783 A.2d 543, 556 (Del.2001) (declining

to permit plaintiffs to replead, there being no circumstances justifying such action).

It is ordered that the time within which a motion for reargument may be timely filed under Supreme Court Rule 18 is shortened to five days from the date of this opinion. This is due to the impending change in the composition of the Supreme Court, arising from the retirement of the Chief Justice in April 2004.

845 A.2d 1031

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT J**
**TO DEFENDANT KLA-TENCOR'S**
**APPENDIX OF OUT-OF-STATE**
**AUTHORITIES IN SUPPORT OF**
**DEMURRER**

Westlaw.

Slip Copy                                                                                          Page 1
Slip Copy, 2007 WL 3461163 (N.D.Cal.)
(Cite as: 2007 WL 3461163 (N.D.Cal.))

Only the Westlaw citation is currently available.

NOT FOR CITATION

United States District Court, N.D. California,
San Jose Division.
Martin VOGEL and Kenneth Mahoney, on Behalf
of Themselves and All Others
Similarly Situated, Plaintiffs,
v.
Steven JOBS, et al., Defendants.
No. C 06-5208 JF.

Nov. 14, 2007.

Patrice L. Bishop, Stull, Stull & Brody, Los
Angeles, CA, Gary S. Graifman, Kantrowitz Gold-
hamer & Graifman PC, Chestnut Ridge, NY,
Howard T. Longman, Stull Stull & Brody, New
York, NY, for Plaintiffs.

ORDER [FN1] GRANTING MOTION TO DIS-
MISS

FN1. This disposition is not designated for
publication and may not be cited.

JEREMY FOGEL, District Judge.

I. BACKGROUND

1. Procedural Background

*1 On August 24, 2006, Plaintiffs Martin Vogel and
Kenneth Mahoney filed a class action complaint
against a number of officer and directors of Apple
Inc. ("Apple") alleging options backdating. On
January 19, 2007, the Court appointed New York
City Employees' Retirement System as the lead
plaintiff ("Lead Plaintiff") and approved its choice
of class counsel. On March 23, 2007, Lead Plaintiff
filed the operative consolidated class action com-
plaint ("the Complaint"). The Complaint names
Apple and fourteen individual defendants: Steven
P. Jobs; William V. Campbell; Millard S. Drexler;
Arthur D. Levinson; Jerome B. York; Fred D. An-
derson; Gareth C.C. Chang; Peter O. Crisp;
Lawrence J. Ellison; B. Jurgen Hintz; Katherine M.
Hudson; Delano E. Lewis; A.C. Markkula, Jr.; and

Edgar S. Wollard, Jr. The Complaint refers to Jobs,
Campbell, Drexler, Levinson, as the "Director De-
fendants," and to Chang, Crisp, Ellison, Hintz,
Hudson, Lewis, Markkula, and Wollard as the
"Former Director Defendants." Complaint ¶¶ 15,
25. The Complaint asserts three class claims: (1) vi-
olation of section 14(a) of the Securities Exchange
Act with respect to the 2005 Proxy Statement,
against the Director Defendants and Anderson; (2)
violation of section 20(a) of the Securities Ex-
change Act with respect to the 2005 Proxy State-
ment, against the Director Defendants and Ander-
son; and (3) breach of the duty of disclosure,
against all defendants.

On June 8, 2007, Defendants moved to dismiss the
Complaint. Defendants argue that the Complaint
does not allege loss causation, does not state a dir-
ect claim, is pre-empted by the Securities Litigation
Uniform Standards Act ("SLUSA"), does not satis-
fy applicable pleading standards, asserts claims that
are time-barred, and otherwise fails to state a claim.
Lead Plaintiff opposes the motion. The Court heard
oral argument on September 7, 2007.

II. LEGAL STANDARD

For purposes of a motion to dismiss, the plaintiff's
allegations are taken as true, and the Court must
construe the complaint in the light most favorable
to the plaintiff. Jenkins v. McKeithen, 395 U.S. 411,
421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). Leave
to amend must be granted unless it is clear that the
complaint's deficiencies cannot be cured by amend-
ment. Lucas v. Department of Corrections, 66 F.3d
245, 248 (9th Cir.1995). When amendment would
be futile, however, dismissal may be ordered with
prejudice. Dumas v. Kipp, 90 F.3d 386, 393 (9th
Cir.1996).

On a motion to dismiss, the Court's review is lim-
ited to the face of the complaint and matters judi-
cially noticeable. North Star International v. Ari-
zona Corporation Commission, 720 F.2d 578, 581
(9th Cir.1983); MGIC Indemnity Corp. v. Weisman,
803 F.2d 500, 504 (9th Cir.1986); Beliveau v.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                     Page 2
Slip Copy, 2007 WL 3461163 (N.D.Cal.)
(Cite as: 2007 WL 3461163 (N.D.Cal.))

*Caras,* 873 F.Supp. 1393, 1395 (C.D.Cal.1995). However, under the "incorporation by reference" doctrine, the Court also may consider documents which are referenced extensively in the complaint and which are accepted by all parties as authentic, which are not physically attached to the complaint. *In re Silicon Graphics, Inc. Securities Litigation,* 183 F.3d 970 (9th Cir.1999).

## III. DISCUSSION

### 1. Character of the Claims

*2 Lead Plaintiff alleges the following with respect to its claim under section 14(a):

> The false and misleading 2005 Proxy was an essential link in accomplishing the [backdating] transactions challenged hereby, and as a direct and proximate result, Lead Plaintiff and the Section 14(a) Class have been damaged because the value of their shares were improperly diluted through the issuance of these additional shares as a direct and proximate result of the defendants' breach of their duty of full disclosure.

Complaint ¶ 286. Defendants argue the injury suffered by the alleged class is derivative in nature.

The proper characterization of a claim as direct or derivative is governed by the law of the state of incorporation, which in this case is California. *See Kennedy v. Venrock Associates,* 348 F.3d 584, 589 (7th Cir.2003); *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.,* 38 F.3d 211, 221 (5th Cir.1994). California corporate law is functionally identical to Delaware corporate law. *See Oakland Raiders v. National Football League,* 93 Cal.App.4th 572, 586 n. 5, 113 Cal.Rptr.2d 255 (2001) ("The parties agree that we may properly rely on corporate law developed in the State of Delaware given that it is identical to California corporate law for all practical purposes."). The parties have not identified any difference between California and Delaware corporate law that affects the instant analysis.

Under Delaware law, the character of a claim is determined by answering two questions: "Who suffered the alleged harm--the corporation or the suing stockholder individually--and who would receive the benefit of the recovery or other remedy?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1036 (Del.2004). Under this test "a court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury must be *independent* of any alleged injury to the corporation." *Id.* (emphasis added). The plaintiff satisfies his burden of establishing that the claim is derivative if he can show that "he or she has suffered an injury that is *not dependent on an injury to the corporation.*" *Id.* (emphasis added).

Courts typically recognize claims of corporate overpayment as derivative. *Gentile v. Rossette,* 906 A.2d 91, 99 (Del.2006) ("Normally, claims of corporate overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative ."). "The reason (expressed in *Tooley* terms) is that the corporation is both the party that suffers the injury (a reduction in its assets or their value) as well as the party to whom the remedy (a restoration of the improperly reduced value) would flow." *Id.* This is true when the form of payment is corporate stock:

> In the typical corporate overpayment case, a claim against the corporation's fiduciaries for redress is regarded as exclusively derivative, irrespective of whether the currency or form of overpayment is cash or the corporation's stock. Such claims are not normally regarded as direct, because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction. In the eyes of the law, such equal "injury" to the shares resulting from a corporate overpayment is not viewed as, or equated with, harm to specific shareholders individually.

*3 *Id.* (footnote omitted referring to excessive issuance of stock options and payment of fees to executives as example of "typical overpayment").

However, there exists "at least one transactional paradigm--a species of corporate overpayment

claim--that Delaware case law recognizes as being both derivative and direct in character." *Id* . Such a claim arises where: (1) the majority shareholder causes the corporation to issue him "excessive" shares for inadequate compensation; and (2) the effect of the exchange is to simultaneously increase the shareholder's percentage of outstanding shares while decreasing the percentage owned by minority shareholders. *Id.* The *Gentile* Court explained:

> Because the means used to achieve that result is an overpayment (or "over-issuance") of shares to the controlling stockholder, the corporation is harmed and has a claim to compel the restoration of the value of the overpayment. That claim, by definition, is derivative.

> But, the public (or minority) stockholders also have a separate, and direct, claim arising out of that same transaction. Because the shares representing the "overpayment" embody both economic value and voting power, the end result of this type of transaction is an improper transfer--or expropriation--of economic value and voting power from the public shareholders to the majority or controlling stockholder. For that reason, the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefitted. In such circumstances, the public shareholders are entitled to recover the value represented by that overpayment--an entitlement that may be claimed by the public shareholders directly and without regard to any claim the corporation may have.

*Id.* at 99-100 (footnotes and internal citations omitted).

The alleged circumstances of the instant case do not fit within *Gentile'* s transactional paradigm. Lead Plaintiff does not allege that a controlling share-

holder exchanged Apple stock for assets of a lesser value. In fact, Lead Plaintiff alleges specifically that backdated options were issued to a large group of officers, rather than a single controlling stockholder. *See, e.g.,* Complaint ¶¶ 83-88. Treating such a broad group of executives as equivalent to the controlling shareholder described by *Gentile* would expand significantly the bounds of the "one transactional paradigm" recognized by that case.

It follows that Lead Plaintiff's allegations properly are analyzed as claims of corporate overpayment that must be treated as derivative under the *Tooley* test. *See Id.* at 99. The thrust of the allegations is that the recipients of the backdated options were overpaid, in violation of Apple's stock option plans. Such allegations necessarily involve an injury to the corporation in that overpayment entails a reduction in corporate assets. Here, as in *Gentile,* "any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the *entire corporate entity.*" *Gentile.* 906 A.2d at 100 (emphasis added); *see also In re J.P. Morgan Chase & Co. Shareholder Litig.,* 906 A.2d 808 (Del.Ch.2005) (observing that "[m]ere claims of dilution, without more, cannot convert a claim traditionally understood as derivative, into a direct one"). Lead Plaintiff has not identified a unique injury independent of any harm done to the corporation. [FN2]

> FN2. Lead Plaintiff relies on *In re Tri-Star Pictures, Inc. Litig.,* 634 A.2d 319 (Del.1993) and *Oliver v. Boston Univ.,* No. 16570, 2000 WL 1091480 (Del.Ch. July 25, 2000) to support the argument that the dilution of economic interests and voting power involved here constitute individual injuries sufficient to support a direct action. These cases are distinguishable. In *Tri-Star,* the plaintiffs were alleging that the majority shareholder "used its influence as controlling shareholder, and its domination of the self-dealing board of directors, to orchestrate a master plan fully knowing that the special injury would be

suffered by the non-controlling stockholders ...." 634 A.2d at 326-27; see also Gentile, 906 A.2d at 102 (noting that in Tri Star "what was reduced was a *significant portion* fo the economic value and voting power of theat minority interest." (emphasis added)). *Oliver* involved a claim that the defendants acted improperly to dilute votes for the purpose of effectuating a merger which was not supported by the minority shareholders. In each of these cases, individual shareholders allegedly suffered some unique injury. Indeed that injury (the dilution of their voting power) was the purpose of the acts of which they complained.

*4 At oral argument, counsel for Lead Plaintiff did not suggest that any further facts that could be pled that would render this dilution case exceptional. Thus, were Plaintiffs to file an amended complaint, their claims properly would be stated as derivative claims on behalf of Apple. However, any derivative claims on behalf of Apple arising from the facts alleged in the Complaint likely would be subject to consolidation with the pending derivative action, *In re Apple Computer Inc. Derivative Litig.*, Case No. C 06-4128 JF

**2. Loss Causation**

The Complaint also asserts a reputed direct claim based upon an allegedly fraudulent proxy statement under section 14(a) and a related claim for control liability under section 20(a). Rule 14a-9 provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject

matter which has become false or misleading. 17 C.F.R. § 240.14a-9(a). To state a claim under Rule 14a-9 and section 14(a), a plaintiff must allege that: (1) the defendant made a false or misleading statement or omission of material fact; (2) the misstatement or omission was made with the requisite level of culpability; and (3) the statement provided an essential link in the accomplishment of the transaction. *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir.2000). The Private Securities Litigation Reform Act places upon a plaintiff "the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). The Supreme Court has explained that this section requires a plaintiff to plead both economic loss and proximate causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

Pointing to the fact that Apple's stock price has not fallen as a result of the disclosure of backdating, Defendants argue that the Complaint does not include allegations of economic loss or of a connection between such loss and the alleged misconduct. Lead Plaintiff contends that it nonetheless has alleged causation of economic loss in the form of the dilution resulting from the issuance of more than 200 million shares that in turn was caused by the issuance of false and misleading proxy statements. Lead Plaintiff cites no authority to support its position.

If Lead Plaintiff were correct, any allegation of options backdating would satisfy the loss causation requirement, as every improper grant of a backdated option by definition dilutes the existing common stock. However, as Defendants note, such dilution is not necessarily accompanied by economic loss in the form of a fall in the stock price. For example, a company's stock might soar if it were to announce that it had secured the services of a leading executive by granting the executive a large number of options. While the subsequent disclosure that the options were backdated might require a restatement, without a discernible drop in the stock price there is no basis upon which to establish an

Slip Copy

Page 5

Slip Copy, 2007 WL 3461163 (N.D.Cal.)

(Cite as: 2007 WL 3461163 (N.D.Cal.))

injury to shareholders. *Dura* bars any suit brought solely on the basis that a misrepresentation caused an inflated share price, and Lead Plaintiff alleges no more here.

*5 In light of the foregoing analysis, the claim asserted under section 14(a) will be dismissed. Because a plaintiff must state a primary violation of the federal securities laws to prevail on a claim under section 20(a), that claim also is subject to dismissal. *See e.g., Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir.1996).*

**3. Additional Challenges to the Complaint**

Because the claims in the instant case properly should be asserted as derivative claims on behalf of Apple, and because the Complaint does not include adequate allegations of loss causation, the Court need not consider Defendants' additional challenges to the sufficiency of the Complaint.

**IV. ORDER**

Good cause therefor appearing, IT IS HEREBY ORDERED that the motion to dismiss is GRANTED, with leave to amend. Any amended complaint may assert only derivative claims and shall be filed within thirty (30) days of the date of this order. Should Lead Plaintiffs file an amended complaint, the parties shall, with twenty (20) days thereafter, file simultaneous letter briefs, not to exceed three (3) pages in length, addressing the question of whether the instant action should be consolidated with the related derivative action, Case No. C 06-4128 JF.

Slip Copy, 2007 WL 3461163 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT K**
**TO DEFENDANT KLA-TENCOR'S**
**APPENDIX OF OUT-OF-STATE**
**AUTHORITIES IN SUPPORT OF**
**DEMURRER**

Westlaw.

15 U.S.C.A. § 78bb

c

Effective: December 21, 2000

United States Code Annotated Currentness
  Title 15. Commerce and Trade
    Chapter 2b. Securities Exchanges (Refs & Annos)
      → § 78bb. Effect on existing law

(a) Addition of rights and remedies; recovery of actual damages; State securities commissions

Except as provided in subsection (f) of this section, the rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of. Except as otherwise specifically provided in this chapter, nothing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder. No State law which prohibits or regulates the making or promoting of wagering or gaming contracts, or the operation of "bucket shops" or other similar or related activities, shall invalidate any put, call, straddle, option, privilege, or other security subject to this chapter, or apply to any activity which is incidental or related to the offer, purchase, sale, exercise, settlement, or closeout of any such security. No provision of State law regarding the offer, sale, or distribution of securities shall apply to any transaction in a security futures product, except that this sentence shall not be construed as limiting any State antifraud law of general applicability.

(b) Modification of disciplinary procedures

Nothing in this chapter shall be construed to modify existing law with regard to the binding effect (1) on any member of or participant in any self-regulatory organization of any action taken by the authorities of such organization to settle disputes between its members or participants, (2) on any municipal securities dealer or municipal securities broker of any action taken pursuant to a procedure established by the Municipal Securities Rulemaking Board to settle disputes between municipal securities dealers and municipal securities brokers, or (3) of any action described in paragraph (1) or (2) on any person who has agreed to be bound thereby.

(c) Continuing validity of disciplinary sanctions

The stay, setting aside, or modification pursuant to section 78s(e) of this title of any disciplinary sanction imposed by a self-regulatory organization on a member thereof, person associated with a member, or participant therein, shall not affect the validity or force of any action taken as a result of such sanction by the self-regulatory organization prior to such stay, setting aside, or modification: *Provided,* That such action is not inconsistent with the provisions of this chapter or the rules or regulations thereunder. The rights of any person acting in good faith which arise out of any such action shall not be affected in any way by such stay, setting aside, or modification.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 U.S.C.A. § 78bb

Page 2

**(d) Physical location of facilities of registered clearing agencies or registered transfer agents not to subject changes in beneficial or record ownership of securities to State or local taxes**

No State or political subdivision thereof shall impose any tax on any change in beneficial or record ownership of securities effected through the facilities of a registered clearing agency or registered transfer agent or any nominee thereof or custodian therefor or upon the delivery or transfer of securities to or through or receipt from such agency or agent or any nominee thereof or custodian therefor, unless such change in beneficial or record ownership or such transfer or delivery or receipt would otherwise be taxable by such State or political subdivision if the facilities of such registered clearing agency, registered transfer agent, or any nominee thereof or custodian therefor were not physically located in the taxing State or political subdivision. No State or political subdivision thereof shall impose any tax on securities which are deposited in or retained by a registered clearing agency, registered transfer agent, or any nominee thereof or custodian therefor, unless such securities would otherwise be taxable by such State or political subdivision if the facilities of such registered clearing agency, registered transfer agent, or any nominee thereof or custodian therefor were not physically located in the taxing State or political subdivision.

**(e) Exchange, broker, and dealer commissions; brokerage and research services**

**(1)** No person using the mails, or any means or instrumentality of interstate commerce, in the exercise of investment discretion with respect to an account shall be deemed to have acted unlawfully or to have breached a fiduciary duty under State or Federal law unless expressly provided to the contrary by a law enacted by the Congress or any State subsequent to June 4, 1975, solely by reason of his having caused the account to pay a member of an exchange, broker, or dealer an amount of commission for effecting a securities transaction in excess of the amount of commission another member of an exchange, broker, or dealer would have charged for effecting that transaction, if such person determined in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such member, broker, or dealer, viewed in terms of either that particular transaction or his overall responsibilities with respect to the accounts as to which he exercises investment discretion. This subsection is exclusive and plenary insofar as conduct is covered by the foregoing, unless otherwise expressly provided by contract: *Provided, however,* That nothing in this subsection shall be construed to impair or limit the power of the Commission under any other provision of this chapter or otherwise.

**(2)** A person exercising investment discretion with respect to an account shall make such disclosure of his policies and practices with respect to commissions that will be paid for effecting securities transactions, at such times and in such manner, as the appropriate regulatory agency, by rule, may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(3)** For purposes of this subsection a person provides brokerage and research services insofar as he--

    **(A)** furnishes advice, either directly or through publications or writings, as to the value of securities, the advisability of investing in, purchasing, or selling securities, and the availability of securities or purchasers or sellers of securities;

    **(B)** furnishes analyses and reports concerning issuers, industries, securities, economic factors and trends, portfolio strategy, and the performance of accounts; or

    **(C)** effects securities transactions and performs functions incidental thereto (such as clearance, settlement, and custody) or required in connection therewith by rules of the Commission or a self-regulatory organization of which such person is a member or person associated with a member or in which such person is a participant.

**(4)** The provisions of this subsection shall not apply with regard to securities that are security futures products.

**(f) Limitations on remedies**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1) Class action limitations

(1) Class action limitations

No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--

   (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or

   (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

   (2) Removal of covered class actions

(2) Removal of covered class actions

Any covered class action brought in any State court involving a covered security, as set forth in paragraph (1), shall be removable to the Federal district court for the district in which the action is pending, and shall be subject to paragraph (1).

   (3) Preservation of certain actions--

   (A) Actions under State law of State of incorporation

   (i) Actions preserved

(i) Actions preserved

Notwithstanding paragraph (1) or (2), a covered class action described in clause (ii) of this subparagraph that is based upon the statutory or common law of the State in which the issuer is incorporated (in the case of a corporation) or organized (in the case of any other entity) may be maintained in a State or Federal court by a private party.

   (ii) Permissible actions

(ii) Permissible actions

A covered class action is described in this clause if it involves--

   (I) the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to holders of equity securities of the issuer; or

   (II) any recommendation, position, or other communication with respect to the sale of securities of an issuer that--

   (aa) is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and

   (bb) concerns decisions of such equity holders with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 U.S.C.A. § 78bb                                                          Page 4

(A) Actions under State law of State of incorporation

    (i) Actions preserved

(i) Actions preserved

Notwithstanding paragraph (1) or (2), a covered class action described in clause (ii) of this subparagraph that is based upon the statutory or common law of the State in which the issuer is incorporated (in the case of a corporation) or organized (in the case of any other entity) may be maintained in a State or Federal court by a private party.

    (ii) Permissible actions

(ii) Permissible actions

A covered class action is described in this clause if it involves--

    (I) the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to holders of equity securities of the issuer; or

    (II) any recommendation, position, or other communication with respect to the sale of securities of an issuer that--

    (aa) is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and

    (bb) concerns decisions of such equity holders with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights.

    (B) State actions

    (i) In general

(i) In general

Notwithstanding any other provision of this subsection, nothing in this subsection may be construed to preclude n State or political subdivision thereof or a State pension plan from bringing an action involving a covered security on its own behalf, or as a member of a class comprised solely of other States, political subdivisions, or State pension plans that are named plaintiffs, and that have authorized participation, in such action.

    (ii) State pension plan defined

(ii) State pension plan defined

For purposes of this subparagraph, the term "State pension plan" means a pension plan established and maintained for its employees by the government of a State or political subdivision thereof, or by any agency or instrumentality thereof.

    (B) State actions

    (i) In general

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(i) In general

Notwithstanding any other provision of this subsection, nothing in this subsection may be construed to preclude a State or political subdivision thereof or a State pension plan from bringing an action involving a covered security on its own behalf, or as a member of a class comprised solely of other States, political subdivisions, or State pension plans that are named plaintiffs, and that have authorized participation, in such action.

> (ii) State pension plan defined

(ii) State pension plan defined

For purposes of this subparagraph, the term "State pension plan" means a pension plan established and maintained for its employees by the government of a State or political subdivision thereof, or by any agency or instrumentality thereof.

> (C) Actions under contractual agreements between issuers and indenture trustees

(C) Actions under contractual agreements between issuers and indenture trustees

Notwithstanding paragraph (1) or (2), a covered class action that seeks to enforce a contractual agreement between an issuer and an indenture trustee may be maintained in a State or Federal court by a party to the agreement or a successor to such party.

> (D) Remand of removed actions

(D) Remand of removed actions

In an action that has been removed from a State court pursuant to paragraph (2), if the Federal court determines that the action may be maintained in State court pursuant to this subsection, the Federal court shall remand such action to such State court.

(3) Preservation of certain actions--

> (A) Actions under State law of State of incorporation

> (i) Actions preserved

(i) Actions preserved

Notwithstanding paragraph (1) or (2), a covered class action described in clause (ii) of this subparagraph that is based upon the statutory or common law of the State in which the issuer is incorporated (in the case of a corporation) or organized (in the case of any other entity) may be maintained in a State or Federal court by a private party.

> (ii) Permissible actions

(ii) Permissible actions

A covered class action is described in this clause if it involves--

> (I) the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to holders of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 U.S.C.A. § 78bb                                                          Page 6

equity securities of the issuer; or

(II) any recommendation, position, or other communication with respect to the sale of securities of an issuer that--

(aa) is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and

(bb) concerns decisions of such equity holders with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights.

(A) Actions under State law of State of incorporation

    (i) Actions preserved

(i) Actions preserved

Notwithstanding paragraph (1) or (2), a covered class action described in clause (ii) of this subparagraph that is based upon the statutory or common law of the State in which the issuer is incorporated (in the case of a corporation) or organized (in the case of any other entity) may be maintained in a State or Federal court by a private party.

    (ii) Permissible actions

(ii) Permissible actions

A covered class action is described in this clause if it involves--

    (I) the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to holders of equity securities of the issuer; or

(II) any recommendation, position, or other communication with respect to the sale of securities of an issuer that--

(aa) is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and

(bb) concerns decisions of such equity holders with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights.

    (B) State actions

    (i) In general

(i) In general

Notwithstanding any other provision of this subsection, nothing in this subsection may be construed to preclude a State or political subdivision thereof or a State pension plan from bringing an action involving a covered security on its own behalf, or as a member of a class comprised solely of other States, political subdivisions, or State pension plans that are named plaintiffs, and that have authorized participation, in such action.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(ii) State pension plan defined

**(ii) State pension plan defined**

For purposes of this subparagraph, the term "State pension plan" means a pension plan established and maintained for its employees by the government of a State or political subdivision thereof, or by any agency or instrumentality thereof.

**(B) State actions**

(i) In general

**(i) In general**

Notwithstanding any other provision of this subsection, nothing in this subsection may be construed to preclude a State or political subdivision thereof or a State pension plan from bringing an action involving a covered security on its own behalf, or as a member of a class comprised solely of other States, political subdivisions, or State pension plans that are named plaintiffs, and that have authorized participation, in such action.

(ii) State pension plan defined

**(ii) State pension plan defined**

For purposes of this subparagraph, the term "State pension plan" means a pension plan established and maintained for its employees by the government of a State or political subdivision thereof, or by any agency or instrumentality thereof.

(C) Actions under contractual agreements between issuers and indenture trustees

**(C) Actions under contractual agreements between issuers and indenture trustees**

Notwithstanding paragraph (1) or (2), a covered class action that seeks to enforce a contractual agreement between an issuer and an indenture trustee may be maintained in a State or Federal court by a party to the agreement or a successor to such party.

(D) Remand of removed actions

**(D) Remand of removed actions**

In an action that has been removed from a State court pursuant to paragraph (2), if the Federal court determines that the action may be maintained in State court pursuant to this subsection, the Federal court shall remand such action to such State court.

(4) Preservation of State jurisdiction

**(4) Preservation of State jurisdiction**

The securities commission (or any agency or office performing like functions) of any State shall retain jurisdiction under the laws of such State to investigate and bring enforcement actions.

(5) Definitions

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 U.S.C.A. § 78bb                                                                          Page 8

(5) Definitions

For purposes of this subsection, the following definitions shall apply:

(A) Affiliate of the issuer

The term "affiliate of the issuer" means a person that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with, the issuer.

(B) Covered class action

The term "covered class action" means--

(i) any single lawsuit in which--

(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or

(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or

(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which--

(I) damages are sought on behalf of more than 50 persons; and

(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

(C) Exception for derivative actions

Notwithstanding subparagraph (B), the term "covered class action" does not include an exclusively derivative action brought by one or more shareholders on behalf of a corporation.

(D) Counting of certain class members

For purposes of this paragraph, a corporation, investment company, pension plan, partnership, or other entity, shall be treated as one person or prospective class member, but only if the entity is not established for the purpose of participating in the action.

(E) Covered security

The term "covered security" means a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933 [15 U.S.C.A. § 77r(b)], at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred, except that such term shall not include any debt security that is exempt from registration under the Securities Act of 1933 [15 U.S.C.A. § 77a et seq.] pursuant to rules issued by the Commission under section 4(2) of that Act [15 U.S.C.A. § 77d(2)].

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 U.S.C.A. § 78bb                                                   Page 9

(F) Rule of construction

Nothing in this paragraph shall be construed to affect the discretion of a State court in determining whether actions filed in such court should be joined, consolidated, or otherwise allowed to proceed as a single action.

CREDIT(S)

(June 6, 1934, c. 404, Title I, § 28, 48 Stat. 903; June 4, 1975, Pub.L. 94-29, § 21, 89 Stat. 160; Oct. 13, 1982, Pub.L. 97-303, § 4, 96 Stat. 1409; Dec. 4, 1987, Pub.L. 100-181, Title III, §§ 327 to 329, 101 Stat. 1259; Oct. 11, 1996, Pub.L. 104-290, Title I, § 103(b), 110 Stat. 3422; Nov. 3, 1998, Pub.L. 105-353, Title I, § 101(b)(1), 112 Stat. 3230; Dec. 21, 2000, Pub.L. 106-554, § 1(a)(5) [Title II, §§ 203(a)(2), 210], 114 Stat. 2763, 2763A-421, 2763A-436.)

Current through P.L. 110-155 (excluding P.L. 110-140, 110-142 to 110-144, 110-148 to 110-151, and 110-154) approved 12-21-07

Copr. (C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1  JOHN H. HEMANN (SBN 165823)
2  JOSEPH E. FLOREN (SBN 168292)
   TERA M. HEINTZ (SBN 241414)
3  MATTHEW WEILER (SBN 236052)
   MORGAN, LEWIS & BOCKIUS LLP
4  One Market, Spear Street Tower
   San Francisco, CA  94105-1126
5  Tel:  415.442.1000
   Fax:  415.442.1001
6
   Attorneys for Defendant
7  KLA-Tencor Corporation

**E-FILED**

Jan 9, 2008 4:49 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6659
By R. Walker, Deputy

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF SANTA CLARA

10

11  CHRIS CRIMI, on Behalf of Himself and        Case No. 107CV093465
    All Others Similarly Situated,
12                                                **PROOF OF SERVICE**
                    Plaintiff,
13                                                Date: February 1, 2008
          vs.                                     Time: 9:00 a.m.
14                                                Department:  17C
    EDWARD W. BARNHOLT, H.                        Judge:  Hon. Jack Komar
15  RAYMOND BINGHAM, ROBERT T.
    BOND, RICHARD J. ELKUS, JR.,                  Date Filed:  September 4, 2007
16  STEPHEN P. KAUFMAN, KENNETH                   Trial Date:  None Set
    LEVY, MICHAEL E. MARKS, DEAN O.
17  MORTON, KENNETH L. SCHROEDER,
    JON D. TOMPKINS, RICHARD P.
18  WALLACE, KLA-TENCOR
    CORPORATION, and DOES 1 through 25,
19
                    Defendants.
20

21        **PROOF OF SERVICE BY ELECTRONIC TRANSMISSION**

22

23        I, the undersigned, declare:  that I am, and was at the time of service of the documents

    herein referred to, over the age of 18 years, and not a party to the action; and I am employed in
24
    the County of San Francisco, California.  My business address is One Market, Spear Street
25
    Tower, San Francisco, California 94105.
26
          On the date executed below, I electronically served the document(s) via the Santa Clara
27
    Superior Court's electronic filing system described as:
28

    7652065_1.TMP

─────────────────────────────────────────────
                    PROOF OF SERVICE

1  **DEFENDANT KLA-TENCOR'S APPENDIX OF OUT-OF-STATE AUTHORITIES IN**
2  **SUPPORT OF DEMURRER**

3  on the recipients designated on the Transaction Receipt located on the Santa Clara County

4  Superior Court's electronic filing website.  I declare under penalty of perjury pursuant to the laws

5  of the State of California that the foregoing is true and correct and was executed on January 9,

6  2008.

7

8  _____
                                    /s/

9                              Erika R. Eberline

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7652065_1.TMP

PROOF OF SERVICE

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

# E-FILED

Jan 9, 2008 4:49 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6659
By R. Walker, Deputy

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | Lead Case No.1-07-CV-093465 |
| vs. | Judge Jack Komar |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | |
| Defendant. | |
| AND RELATED ACTIONS | PROOF OF SERVICE Electronic Proof of Service |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Wed. January 9, 2008 at 4:37 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Wed. January 9, 2008 at 4:37 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on January 9, 2008 at Oakland, California.

Dated: January 9, 2008                    For WWW.SCEFILING.ORG

E-Filed: Jan 9, 2008 4:49 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6659

Andy Jamieson

E-Filed: Jan 9, 2008 4:49 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6659

1

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG

2

Electronic Proof of Service
Page 2

3

Document(s) submitted by Joseph Floren of Morgan, Lewis & Bockius LLP on Wed. January 9, 2008 at 4:37 PM PST

1. Proof of Svc: Proof of Service

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1  JOHN H. HEMANN (SBN 165823)
2  JOSEPH E. FLOREN (SBN 168292)
   TERA M. HEINTZ (SBN 241414)
3  MATTHEW WEILER (SBN 236052)
   MORGAN, LEWIS & BOCKIUS LLP
4  One Market, Spear Street Tower
   San Francisco, CA 94105-1126
5  Tel: 415.442.1000
   Fax: 415.442.1001
6
   Attorneys for Defendant
7  KLA-Tencor Corporation

**E-FILED**

Jan 9, 2008 4:49 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6659
By R. Walker, Deputy

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                     COUNTY OF SANTA CLARA

10

11  CHRIS CRIMI, on Behalf of Himself and          Case No. 107CV093465
    All Others Similarly Situated,
12                                                 **PROOF OF SERVICE**
                        Plaintiff,
13                                                 Date: February 1, 2008
                  vs.                              Time: 9:00 a.m.
14                                                 Department: 17C
    EDWARD W. BARNHOLT, H.                         Judge: Hon. Jack Komar
15  RAYMOND BINGHAM, ROBERT T.
    BOND, RICHARD J. ELKUS, JR.,                   Date Filed: September 4, 2007
16  STEPHEN P. KAUFMAN, KENNETH                    Trial Date: None Set
    LEVY, MICHAEL E. MARKS, DEAN O.
17  MORTON, KENNETH L. SCHROEDER,
    JON D. TOMPKINS, RICHARD P.
18  WALLACE, KLA-TENCOR
    CORPORATION, and DOES 1 through 25,
19
                        Defendants.
20

21          **PROOF OF SERVICE BY ELECTRONIC TRANSMISSION**

22

23       I, the undersigned, declare: that I am, and was at the time of service of the documents

24  herein referred to, over the age of 18 years, and not a party to the action; and I am employed in

25  the County of San Francisco, California. My business address is One Market, Spear Street

26  Tower, San Francisco, California 94105.

27       On the date executed below, I electronically served the document(s) via the Santa Clara

28  Superior Court's electronic filing system described as:

7652065_1.TMP

─────────────────────────────────────────────
                    PROOF OF SERVICE

E-Filed Jan 9, 2008 4:49 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6659

1

**DEFENDANT KLA-TENCOR'S APPENDIX OF OUT-OF-STATE AUTHORITIES IN SUPPORT OF DEMURRER**

2

3    on the recipients designated on the Transaction Receipt located on the Santa Clara County

4    Superior Court's electronic filing website.  I declare under penalty of perjury pursuant to the laws

5    of the State of California that the foregoing is true and correct and was executed on January 9,

6    2008.

7

8                                                    /s/
                                    _____

9                                          Erika R. Eberline

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &        7652065_1.TMP
  BOCKIUS LLP
ATTORNEYS AT LAWSAN
    FRANCISCO

PROOF OF SERVICE

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
**c/o Glotrans**
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

# E-FILED

Jan 9, 2008 4:49 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6659
By R. Walker, Deputy

1

2

3

4

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

5

## IN AND FOR THE COUNTY OF SANTA CLARA

6

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | Lead Case No.1-07-CV-093465 |
| vs. | |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | Judge Jack Komar |
| Defendant. | |
| AND RELATED ACTIONS | **PROOF OF SERVICE**<br>**Electronic Proof of Service** |

7

8

9

10

11

12

13

14    I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure

15    Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the

16    worldwide web on Wed. January 9, 2008 at 4:37 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and

17    am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described

18    document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Wed. January

19    9, 2008 at 4:37 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties

20    on the electronic service list maintained for this case. The message identified the document and provided

21    instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and

22    correct. Executed on January 9, 2008 at Oakland, California.

23    Dated: January 9, 2008                    For WWW.SCEFILING.ORG

E-Filed: Jan 9, 2008 4:49 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6659

Andy Jamieson

E-Filed: Jan 9, 2008 4:49 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6659

1

**THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG**

2

**Electronic Proof of Service**
**Page 2**

3

**Document(s) submitted by Joseph Floren of Morgan, Lewis & Bockius LLP on Wed. January 9, 2008 at 4:37 PM PST**

1. Proof of Svc: Proof of Service

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1  Patrice L. Bishop (182256)
    STULL, STULL & BRODY
2  10940 Wilshire Boulevard
    Suite 2300
3  Los Angeles, CA  90024
    Tel:   (310) 209-2468
4  Fax:  (310) 209-2087

5  Jules Brody
    Aaron L. Brody
6  STULL, STULL & BRODY
    6 East 45th Street
7  New York, NY 10017
    Tel:   (212) 687-7230
8  Fax:  (212) 490-2022

9  Counsel for Plaintiff

10

11           SUPERIOR COURT OF THE STATE OF CALIFORNIA

12               FOR THE COUNTY OF SANTA CLARA

13

| | |
|---|---|
| 14  CHRIS CRIMI, on Behalf of Himself and<br>All Others Similarly Situated, | CASE NO. 1:07-cv-093465 |
| 15 | **CLASS ACTION** |
| 16           Plaintiff, | **STIPULATION [AND] PROPOSED** |
| | **ORDER CONTINUING CASE** |
| 16     v. | **MANAGEMENT CONFERENCE AND** |
| 17  EDWARD W. BARNHOLT, | **HEARING DATES ON DEFENDANT'S** |
|     H. RAYMOND BINGHAM, | **MOTION TO STAY AND DEMURRER** |
| 18  ROBERT T. BOND, | |
|     RICHARD J. ELKUS, JR., | Date:  February 1, 2008 |
| 19  STEPHEN P. KAUFMAN, | Time:  9:00 a.m. |
|     KENNETH LEVY, | Dept:  17 |
| 20  MICHAEL E. MARKS, | |
|     DEAN O. MORTON, | |
| 21  KENNETH L. SCHROEDER, | Judge:         Hon. Jack Komar |
|     JON D. TOMPKINS, | Date Action Filed:  September 4, 2007 |
| 22  RICHARD P. WALLACE, | |
|     KLA-TENCOR CORPORATION, and | |
| 23  DOES 1 through 25, | |
| 24          Defendants. | |

25

26

27

28

1    WHEREAS, on November 14, 2007, defendant KLA-Tencor Corporation ("KLA-Tencor")

2    filed their Motion to Stay plaintiff's Complaint;

3    WHEREAS, the Court, on its own motion, continued defendant KLA-Tencor's Motion to

4    Stay and the scheduled Case Management Conference from January 18, 2008 to February 1, 2008;

5    WHEREAS, on January 8, 2007, defendant KLA-Tencor filed their Demurrer to plaintiff's

6    Complaint and noticed it for hearing on February 1, 2008, the same time as the Motion to Stay and

7    Case Management Conference;

8    WHEREAS, due to conflicts in counsel's schedule, KLA-Tencor has agreed to continue

9    their hearings, if the Court is so amenable, to February 22, 2008, at 9:00 a.m., with plaintiff's

10    oppositions due on February 8, 2008, and defendant's replies being due on February 15, 2008;

11    WHEREAS, the parties agree that it would judicially efficient to also continue the Case

12    Management Conference to February 22, 2008;

13

14

15

16

17

18

19

20

21

22

23

24

25    ///

26    ///

27    ///

28

1

**STIPULATION AND [PROPOSED] ORDER CONTINUING CMC AND HEARING DATES**
W:\STULL\KLA2\PLD\StipContHearings.001.wpd

1    IT IS HEREBY STIPULATED between the parties, by their counsel of record, that the Case

2    Management Conference and hearings on KLA-Tencor's Motion to Stay and Demurrer be continued

3    to February 22, 2008, at 9:00a.m., or another date thereafter which is convenient to the Court.

4

5    Dated: January 17, 2008                         Patrice L. Bishop
                                                      STULL, STULL & BRODY
6

7                                                     _Patrice Bishop_

8                                      By:    _____
                                              Patrice L. Bishop
9                                             10940 Wilshire Boulevard
                                              Suite 2300
10                                            Los Angeles, CA  90024
                                              Tel:    (310) 209-2468
11                                            Fax:    (310) 209-2087

12                                            Jules Brody
                                              Aaron L. Brody
13                                            STULL, STULL & BRODY
                                              6 East 45th Street
14                                            New York, NY 10017
                                              Tel:    (212) 687-7230
15                                            Fax:    (212) 490-2022

16

17                                            Counsel for Plaintiff

18   Dated: January 17, 2008                  John H. Hemann
                                              Joseph E. Floren
19                                            Matthew Weiler
                                              MORGAN LEWIS & BOCKIUS LLP
20

21                                            _MW_

22                                     By:    _____
                                              Matthew Weiler
23                                            One Market Spear Street Tower
                                              San Francisco, CA 94105-1126
24                                            Tel:    (415) 442-1000
                                              Fax:    (415) 442-1001
25
                                              Counsel for Defendant
26

27

28

                                             2

STIPULATION AND [PROPOSED] ORDER CONTINUING CMC AND HEARING DATES
W:\STULL\KLA2\PLD\StipContHearings.001.wpd

1

[Proposed] ORDER

2

3      Pursuant to the Stipulation of the Parties, the Case Management Conference and hearings on

4  defendant KLA-Tencor Corporation's Motion to Stay and Demurrer, currently scheduled for

5  February 1, 2008, at 9:00 a.m. are hereby continued to February 22, 2008.

6      IT IS SO ORDERED.

7

8  Dated: _____

                                              HONORABLE JACK KOMAR
9                                             JUDGE OF THE SUPERIOR COURT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

1

<div align="center">

**PROOF OF SERVICE**

</div>

2

STATE OF CALIFORNIA      )

3
                               )ss.:

COUNTY OF LOS ANGELES    )

4

5
     I am employed in the county of Los Angeles, State of California, I am over the age of 18 and
not a party to the within action; my business address is 10940 Wilshire Boulevard, Suite 2300, Los

6
Angeles, CA 90024.

7
     On January 17, 2008, I served the document(s) described as **STIPULATION [AND]**

8
**PROPOSED ORDER CONTINUING CASE MANAGEMENT CONFERENCE AND HEARING
DATES ON DEFENDANT'S MOTION TO STAY AND DEMURRER** by placing a true copy(ies)

9
thereof enclosed in a sealed envelope(s) addressed as follows:

10
Jules Brody                                 Joseph H. Weiss

11
Aaron L. Brody                            WEISS & LURIE
STULL, STULL & BRODY              551 Fifth Avenue

12
6 East 45th Street                           Suite 1600
New York, NY 10017               New York, NY 10176

13
Tel:   (212) 687-7230             Tel:   (212) 682-3025

14
Fax:   (212) 490-2022             Fax:   (212) 682-3010

15
I served the above document(s) as follows:

16
     BY MAIL. I am familiar with the firm's practice of collection and processing correspondence

17
for mailing. Under that practice it would be deposited with U.S. postal service on that same day with
postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware

18
that on motion of the party served, service is presumed invalid if postal cancellation date or postage
meter date is more than one day after date of deposit for mailing in an affidavit.

19

20
     I declare under penalty of perjury under the laws of the State of California that the above is true
and correct.

21

22
     Executed on January 17, 2008, at Los Angeles, California 90024.

23

24
<u>MELANIE JACOBS</u>

25
Type or Print Name                                Signature

26

27

28

# E-FILED

Jan 18, 2008 1:16 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-6784
By R. Walker, Deputy

1  Patrice L. Bishop (182256)
   STULL, STULL & BRODY
2  10940 Wilshire Boulevard
   Suite 2300
3  Los Angeles, CA 90024
   Tel:   (310) 209-2468
4  Fax:   (310) 209-2087

5  Jules Brody
   Aaron L. Brody
6  STULL, STULL & BRODY
   6 East 45th Street
7  New York, NY 10017
   Tel:   (212) 687-7230
8  Fax:   (212) 490-2022

9  Counsel for Plaintiff

10

11          SUPERIOR COURT OF THE STATE OF CALIFORNIA

12              FOR THE COUNTY OF SANTA CLARA

13

14  CHRIS CRIMI, on Behalf of Himself and        )   CASE NO. 1:07-cv-093465
    All Others Similarly Situated,               )
15                                               )   CLASS ACTION
                        Plaintiff,               )
16                                               )   STIPULATION [AND] ~~PROPOSED~~
        v.                                       )   ORDER CONTINUING CASE
17  EDWARD W. BARNHOLT,                          )   MANAGEMENT CONFERENCE AND
    H. RAYMOND BINGHAM,                          )   HEARING DATES ON DEFENDANT'S
18  ROBERT T. BOND,                              )   MOTION TO STAY AND DEMURRER
    RICHARD J. ELKUS, JR.,                       )
19  STEPHEN P. KAUFMAN,                          )   Date:   February 1, 2008
    KENNETH LEVY,                                )   Time:   9:00 a.m.
20  MICHAEL E. MARKS,                            )   Dept:   17
    DEAN O. MORTON,                              )
21  KENNETH L. SCHROEDER,                        )
    JON D. TOMPKINS,                             )
22  RICHARD P. WALLACE,                          )   Judge:         Hon. Jack Komar
    KLA-TENCOR CORPORATION, and                  )   Date Action Filed:   September 4, 2007
23  DOES 1 through 25,                           )
                                                 )
24                      Defendants.              )
                                                 )
25  ───────────────────────────────

26

27

28

STIPULATION AND [PROPOSED] ORDER CONTINUING CMC AND HEARING DATES
W:\STULL\KLA2\PLD\StipContHearings.001.wpd

E-Filed: Jan 18, 2008 1:16 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6784

1   WHEREAS, on November 14, 2007, defendant KLA-Tencor Corporation ("KLA-Tencor")

2 filed their Motion to Stay plaintiff's Complaint;

3   WHEREAS, the Court, on its own motion, continued defendant KLA-Tencor's Motion to

4 Stay and the scheduled Case Management Conference from January 18, 2008 to February 1, 2008;

5   WHEREAS, on January 8, 2007, defendant KLA-Tencor filed their Demurrer to plaintiff's

6 Complaint and noticed it for hearing on February 1, 2008, the same time as the Motion to Stay and

7 Case Management Conference;

8   WHEREAS, due to conflicts in counsel's schedule, KLA-Tencor has agreed to continue

9 their hearings, if the Court is so amenable, to February 22, 2008, at 9:00 a.m., with plaintiff's

10 oppositions due on February 8, 2008, and defendant's replies being due on February 15, 2008;

11   WHEREAS, the parties agree that it would judicially efficient to also continue the Case

12 Management Conference to February 22, 2008;

13

14

15

16

17

18

19

20

21

22

23

24

25 ///

26 ///

27 ///

28

1

**STIPULATION AND [PROPOSED] ORDER CONTINUING CMC AND HEARING DATES**
W:\STULL\KLA2\PLD\StipContHearings.001.wpd

E-Filed: Jan 18, 2008 1:16 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6784

1       IT IS HEREBY STIPULATED between the parties, by their counsel of record, that the Case

2  Management Conference and hearings on KLA-Tencor's Motion to Stay and Demurrer be continued

3  to February 22, 2008, at 9:00a.m., or another date thereafter which is convenient to the Court.

4

5  Dated: January 17, 2008          Patrice L. Bishop
                            STULL, STULL & BRODY

6

7

8                   By:                   
                            Patrice L. Bishop

9                       10940 Wilshire Boulevard
                       Suite 2300

10                    Los Angeles, CA 90024
                      Tel:   (310) 209-2468

11                    Fax:  (310) 209-2087

12                    Jules Brody
                      Aaron L. Brody

13                    STULL, STULL & BRODY
                      6 East 45th Street

14                    New York, NY 10017
                      Tel:   (212) 687-7230

15                    Fax:  (212) 490-2022

16

17                    Counsel for Plaintiff

18  Dated: January 17, 2008          John H. Hemann
                      Joseph E. Floren

19                    Matthew Weiler
                    MORGAN LEWIS & BOCKIUS LLP

20

21

22                 By:                 
                      Matthew Weiler

23                    One Market Spear Street Tower
                    San Francisco, CA 94105-1126

24                    Tel:   (415) 442-1000
                      Fax:  (415) 442-1001

25                    Counsel for Defendant

26

27

28

2

E-Filed: Jan 18, 2008 1:16 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6784

1

[Proposed] ORDER

2

3      Pursuant to the Stipulation of the Parties, the Case Management Conference and hearings on

4  defendant KLA-Tencor Corporation's Motion to Stay and Demurrer, currently scheduled for

5  February 1, 2008, at 9:00 a.m. are hereby continued to February 29, 2008.

6      IT IS SO ORDERED.

7

8  Dated:    JAN 18 2008    _____

9                          HONORABLE JACK KOMAR
                           JUDGE OF THE SUPERIOR COURT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

STIPULATION AND [PROPOSED] ORDER CONTINUING CMC AND HEARING DATES
W:\STULL\KLA2\PLD\StipConfHearings.001.wpd

E-Filed: Jan 18, 2008 1:16 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-6784

**PROOF OF SERVICE**

STATE OF CALIFORNIA          )
                             )ss.:
COUNTY OF LOS ANGELES        )

    I am employed in the county of Los Angeles, State of California, I am over the age of 18 and not a party to the within action; my business address is 10940 Wilshire Boulevard, Suite 2300, Los Angeles, CA 90024.

    On January 17, 2008, I served the document(s) described as **STIPULATION [AND] PROPOSED ORDER CONTINUING CASE MANAGEMENT CONFERENCE AND HEARING DATES ON DEFENDANT'S MOTION TO STAY AND DEMURRER** by placing a true copy(ies) thereof enclosed in a sealed envelope(s) addressed as follows:

Jules Brody                      Joseph H. Weiss
Aaron L. Brody                   WEISS & LURIE
STULL, STULL & BRODY             551 Fifth Avenue
6 East 45th Street               Suite 1600
New York, NY 10017               New York, NY 10176
Tel:   (212) 687-7230            Tel:   (212) 682-3025
Fax:   (212) 490-2022            Fax:   (212) 682-3010

I served the above document(s) as follows:

    BY MAIL. I am familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in an affidavit.

    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

    Executed on January 17, 2008, at Los Angeles, California 90024.


MELANIE JACOBS
Type or Print Name                          Signature

ATTACHMENT CV-5012

# CIVIL LAWSUIT NOTICE

CASE NUMBER: **107CV093465**

Superior Court of California, County of Santa Clara
191 N. First St., San Jose, CA 95113

---

## READ THIS ENTIRE FORM

---

*PLAINTIFFS* (the person(s) suing): Within 60 days after filing the lawsuit, you must serve each defendant with the *Complaint, Summons,* an *Alternative Dispute Resolution (ADR) Information Sheet,* and a copy of this *Civil Lawsuit Notice,* and you must file written proof of such service.

---

*DEFENDANTS* (The person(s) being sued): You must do each of the following to protect your rights:

1. You must file a written response to the *Complaint,* in the Clerk's Office of the Court, within 30 days of the date the *Summons* and *Complaint* were served on you;
2. You must send a copy of your written response to the plaintiff; and
3. You must attend the first Case Management Conference.

Warning: If you do not do these three things, you may automatically lose this case.

---

*RULES AND FORMS:* You must follow the California Rules of Court (CRC) and the Santa Clara County Superior Court Local Civil Rules and use proper forms. You can get legal information, view the rules and get forms, free of charge, from the Self-Service Center at 99 Notre Dame Avenue, San Jose (408-882-2900 x-2926), or from:

- State Rules and Judicial Council Forms: www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms: http://www.sccsuperiorcourt.org/civil/rule1toc.htm
- Rose Printing: 408-293-8177 or becky@rose-printing.com (there is a charge for forms)

For other local legal information, visit the Court's Self-Service website www.scselfservice.org and select "Civil."

---

*CASE MANAGEMENT CONFERENCE (CMC):* You must meet with the other parties and discuss the case, in person or by telephone, at least 30 calendar days before the CMC. You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC.

You or your attorney must appear at the CMC. You may ask to appear by telephone – see Local Civil Rule 8.

---

Your Case Management Judge is: **Kevin McKenney**          Department: **16**

The 1st CMC is scheduled for: (Completed by Clerk of Court)

Date: **JAN 2 9 2008**      Time: **2:15pm**     in Department **16**

The next CMC is scheduled for: (Completed by party if the 1st CMC was continued or has passed)

Date:               Time:          in Department

---

*ALTERNATIVE DISPUTE RESOLUTION (ADR):* If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

*WARNING:* Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

---

Andy Jamieson

1  THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
   ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG

2  Electronic Proof of Service
   Page 2

3  Document(s) submitted by Rowena Walker of Santa Clara County Superior Court on Fri. September 7, 2007 at 3:53
   PM PDT

4  1. Civil Lawsuit Notice: Civil Lawsuit Notice (Issued September 4, 2007)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1  Patrice L. Bishop (182256)
   service@ssbla.com

2  STULL, STULL & BRODY
   10940 Wilshire Boulevard

3  Suite 2300
   Los Angeles, CA 90024

4  Tel:    (310) 209-2468
   Fax:    (310) 209-2087

5

6  Jules Brody
   Aaron L. Brody

7  SSBNY@aol.com
   STULL, STULL & BRODY

8  6 East 45th Street
   New York, NY 10017

9  Tel:    (212) 687-7230
   Fax:    (212) 490-2022

10  Counsel for Plaintiff

11

**E-FILED**

Feb 8, 2008 5:00 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7069
By S. Gancayco, Deputy

12          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13               **FOR THE COUNTY OF SANTA CLARA**

14

| | |
|---|---|
| 15  CHRIS CRIMI, on Behalf of Himself and<br>All Others Similarly Situated, | CASE NO. 1:07-cv-093465 |
| 16                          Plaintiff, | **CLASS ACTION** |
| 17          v. | **OPPOSITION TO DEFENDANT**<br>**KLA-TENCOR'S DEMURRER AND**<br>**MOTION TO STAY** |
| 18  EDWARD W. BARNHOLT,<br>H. RAYMOND BINGHAM, | |
| 19  ROBERT T. BOND,<br>RICHARD J. ELKUS, JR., | Date:  February 1, 2008 |
| 20  STEPHEN P. KAUFMAN,<br>KENNETH LEVY, | Time:  9:00 a.m.<br>Dept:  17C |
| 21  MICHAEL E. MARKS,<br>DEAN O. MORTON, | Judge: Hon. Jack Komar |
| 22  KENNETH L. SCHROEDER,<br>JON D. TOMPKINS, | |
| 23  RICHARD P. WALLACE,<br>KLA-TENCOR CORPORATION, and | |
| 24  DOES 1 through 25, | Complaint Filed:    September 4, 2007 |
| 25                          Defendants. | Trial Date:          None Set |

26

27

28

E-Filed Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

1

## TABLE OF CONTENTS

2
                                                                                PAGE NO.

3

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4

II.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6
      A.    Plaintiff's Complaint is Properly Pled as a Direct Action . . . . . . . . . . . . . . . . . . . . 7
7
            1.    The Standard for Distinguishing that Plaintiff's Claims are Direct . . . . . . . . 7
8           2.    Plaintiff's Claims are Direct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

9     B.    If the Court Sustains KLA's De murrer, Leave to Amend is Appropriate . . . . . . . 10

10    C.    This Action Should Not be Stayed Because Plaintiff's Complaint is the Only
            Complaint Filed Solely on Beha lf of a Holder Class . . . . . . . . . . . . . . . . . . . . . . . 12
11
      III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

E-Filed Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

1

## TABLE OF AUTHORITIES

2
                                                                                                PAGE NO.

3 **FEDERAL CASES**

4 *Vogel v. Jobs,*
  2007 U.S. Dist. LEXIS 86996 (N.D. Cal. November 14, 2007) . . . . . . . . . . . . . . . . . . . . . . . . 7

5                                        **STATE CASES**

6 *Aquila, Inc. v. Superior Court,*
7 148 Cal. App. 4th 556 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

8 *Caiafa Prof. Law Corp. v. State Farm Fire & Cas. Co.,*
  15 Cal. App. 4th 800 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11
9
  *Elster v. Am. Airlines, Inc.,*
10 100 A.2d 219 (Del. Ch. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

11 *Morgan v. Sup. Ct.,*
   172 CA2d 527, 530 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
12
   *Nestle v. Santa Monica,*
13 6 Cal. 3d 920, 939 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

14 *Schuster v. Superior Court,*
   127 Cal. App. 4th 305 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10
15
   *StorMedia Inc. v. Superior Court,*
16 20 Cal. 4th 449 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

17 *Thomas v. Continental Insurance Co.,*
   66 Cal. 2d 738 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
18
   *Thorpe v. CERBCO, Inc.,*
19 1993 Del. Ch. LEXIS 16 (Del. Ch. Jan. 26, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

20 *Tooley v. Donaldson, Lufkin & Jenrette, Inc.,*
   845 A.2d 1031 (Del 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
21

22

23

24

25

26

27

28

ii

---

**OPPOSITION TO DEFENDANT KLA-TENCOR'S DEMURRER AND MOTION TO STAY**
Z:\STULL\KLA2\PLD\DemurrerOpp.wpd

E-Filed Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

1    Plaintiff Chris Crimi ("Plaintiff"), hereby opposes defendant KLA-Tencor Corporation's

2  ("KLA" or the "Company") Demurrer to the Complaint and its Motion to Stay this action. Plaintiff

3  respectfully requests this Court overrule KLA's Demurrer and deny its Motion to Stay in their

4  entirety.[1]

5  **I.    INTRODUCTION**

6    Simply put, defendants interfered with plaintiff's right to vote. Because only a shareholder

7  can vote on an issue presented in a proxy, the shareholder, and not the corporation he invested in, is

8  owed a fiduciary duty with regards to that vote. When a company and its directors, such as

9  defendants herein, issues false and misleading information in a definitive proxy it issued to its

10  shareholders and filed with the Securities and Exchange Commission ("SEC"), that company and

11  those directors interfere with its shareholders' vote. This is especially heinous when a company and

12  its directors, such as defendants herein, are asking a shareholder to vote his proxy in favor of issues

13  which directly affect the directors: *i.e.* the right to be appointed a director based on false and

14  misleading information concerning options the defendants granted to themselves and other

15  Company insiders. Because only a shareholder can hold the right to vote, any favorable measure

16  remedying defendants' interference must flow to that shareholder, and not the Company.

17    In this case, defendants, as outlined *infra*, have admitted that they issued backdated stock

18  options to all employees who received grants between from July 1, 1997 and June 30, 2002. ¶¶1,

19  54.[2] Thereafter, defendants continued to request that shareholders, on a yearly basis, vote

20  defendants into the same positions of power which allowed the defendants to issue backdated stock

21  options in the first place. Each time defendants issued and filed, with the SEC, one of their

---

23    [1] Plaintiff also objects to KLA's request for judicial notice to the extent that KLA requests
24  the Court take notice the truth of the matters asserted in KLA's filings with the Securities and
     Exchange Commission ("SEC") and/or the complaints filed in support of the Company's Motion to
25  Stay this action. *See, e.g., Aquila, Inc. v. Superior Court*, 148 Cal. App. 4th 556, 569 (2007);
     *StorMedia Inc. v. Superior Court*, 20 Cal. 4th 449, 457 (1999). Judicial notice of KLA's SEC
26  filings and the pleadings should be limited to the Court taking notice of the document existing, "the
     truthfulness and proper interpretation of the document are disputable." *StorMedia*, 20 Cal. 4th at
27  457.

28    [2] All "¶" references are to the Complaint for Breaches of Fiduciary Duty (the "Complaint").

1

E-Filed Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

1  definitive proxies, requesting the appointment of themselves as directors and the issuance of more

2  shares as incentive for defendants to retain their possession of power, they interfered with

3  plaintiff's, and others situated similarly to him, right to vote based on accurate information. Indeed,

4  each time defendants issued another definitive proxy, they violated the fiduciary duty of disclosure

5  they owed to each of the Company's shareholders.

6           Because this claim is a direct claim brought on behalf of shareholders, this case should not

7  be stayed in favor of a derivative case pending in Delaware. For the reasons outlined herein, in

8  plaintiff's Complaint, and in any oral argument allowed by this Court, plaintiff respectfully requests

9  this Court overrule KLA's demurrer and deny its Motion to Stay.

10  **II.     STATEMENT OF FACTS**

11           This is a shareholders' action on behalf of all individuals who owned KLA-Tencor common

12  stock between September 20, 2002 and September 27, 2006,[3] alleging that certain current and

13  former officers and members of its Board of Directors (the "Board") breached their fiduciary duties

14  when they failed to inform shareholders that they had issued backdated KLA-Tencor stock options

15  to certain senior executives. ¶1. KLA-Tencor, a publicly traded company whose common stock is

16  traded on Nasdaq under the ticker symbol "KLAC," was formed in May 1997 pursuant to merger of

17  KLA Instruments and Tencor Instruments. The Company supplies management solutions for the

18  semiconductor and related microelectronics industries. ¶2.

19           On May 22, 2006, *The Wall Street Journal* published an article entitled "Five More

20  Companies Show Questionable Options Patterns." The first company addressed by the article was

21  KLA-Tencor and, in fact, this was the first time the public had any idea that KLA-Tencor was

22  allegedly backdating stock options to top executives. The article alleged that KLA had "granted its

23

24  ───────────────────

25  [3] Contrary to defendant's repeated assertions throughout their Demurrer, plaintiff has not
    admitted "that he is no longer a shareholder of KLA." *See, e.g.,* KLA's Demurrer at 13:21-22. As
    stated in the first paragraph of plaintiff's Complaint, this is an action behalf of all individuals who
26  owned KLA-Tencor common stock between September 20, 2002 and September 27, 2006. Plaintiff
    is one of those individuals. Just because he "owned" stock between those dates, doesn't mean he no
27  longer owns the stock. Defendant's analysis in this instance, as throughout the brief, is short-
    sighted and incomplete.
28

                                                    2

**OPPOSITION TO DEFENDANT KLA-TENCOR'S DEMURRER AND MOTION TO STAY**
Z:\STULL\KLA2\PLD\DemurrerOpp.wpd

E-Filed Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

1    top executives, including Chairman Ken Levy, two batches of stock options . . . [t]he first dated at

2    the share price's first-half low; the second at its second-half low" ¶47.  More specifically, the

3    article, "KLA-Tencor's 2001 stock chart looks a bit like a 'W,' with sharp drops in April and

4    October. Mr. Levy and other top executives were granted options dated at the very bottom of each

5    dip. One grant carried an exercise price of $29.31; the other, $32.75. KLA-Tencor shares now trade

6    around $45, which means the options could be yielding millions in gains." *Id.*

7        According to the article, "[i]n all, Mr. Levy received 10 grants from KLA-Tencor and its

8    predecessor company between 1994 and 2001 -- all preceding quick runups in the share price; an

9    analysis by The Wall Street Journal found the probability that that pattern occurred merely by

10    chance is tiny -- around one in 20 million."  The article also claimed that former CEO Kenneth

11    Schroeder and Richard Wallace, the Company's CEO since 2006, also received "options dated at

12    the very bottom of each dip" in the years 1998 and 2000. ¶47.

13        At their best, stock options give employees of a publicly traded company the right to

14    purchase company stock at a fixed price in the future.  The general policy behind a grant of stock

15    options is to link employees' compensation to the value of the company's shares and, therefore, to

16    the wealth of the company's shareholders.  Typically, the options' fixed price is aligned with the

17    price of the stock on the day of the grant.  If the stock price rises from the fixed grant price the

18    employee profits by exercising the options and selling the shares.  At their worst, backdated stock

19    options allow the employees of a publicly traded company, such as KLA, to maximize their

20    wealth at the expense of the Company's shareholders.

21        Information concerning KLA's stock option grants, and the plans under which those options

22    were issued, was disseminated to KLA shareholders in its definitive proxies filed with the SEC on

23    Form(s) DEF 14A on October 6, 1997, September 28, 1998, October 15, 1999, October 6, 2000,

24    September 28, 2001, September 20, 2002, September 23, 2003, September 9, 2004, October 13,

25    2005, and February 27, 2007 (collectively, the "Definitive Proxies"). ¶67. Each of these Definitive

26    Proxies requested shareholders vote to approve, *inter alia*, the appointment and/or reappointment of

27    directors and the institution of various stock option plans. ¶68

28

<div align="center">3</div>

E-Filed Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

1    According to the Definitive Proxy filed with the SEC on October 6, 1997 (the "1997

2    Proxy"), options were granted to eligible KLA employees through the 1982 Stock Option Plan and

3    to directors through the Director Plan with "exercise price of the options is the fair market value of

4    Common Stock as of the date of grant." ¶30.  The 1982 Stock Option Plan,  initially adopted by

5    KLA Instruments Corporation in 1981 and restated on November 18, 1996, was the Company's

6    operative stock option plan until October 18, 2004.  Pursuant to the terms of the 1982 Stock Option

7    Plan, as restated, the "Plan shall be administered by the Board, including any duly appointed

8    Committee of the Board."  ¶31.

9    In its power as administrator of the plan, "the Board shall have the full and final power and

10   authority, in its sole discretion . . . to determine the persons to whom, and the time or times at

11   which, Options shall be granted and the number of shares of Stock to be subject to each Option . . .

12   [and] . . . to determine the Fair Market Value of shares of Stock or other property".  Moreover, the

13   "exercise price for each Option shall be established in the sole discretion of the Board; provided,

14   however, that [] no Option shall have an exercise price per share less than the Fair Market Value of

15   a share of Stock on the effective date of grant of the Option."  ¶31.  The 1982 Stock Option Plan

16   also had an "evergreen" automatic annual share replenishment feature which provided for, on the

17   first day of the next fiscal year, the addition to the Plan an amount of shares equal to 3% of KLA-

18   Tencor's outstanding shares of common stock on the last day of each fiscal year (the "Evergreen

19   Provision").  ¶32.

20   In addition, the Definitive Proxy filed with the SEC on September 28, 1998 ("the 1998

21   Proxy") also requested shareholders approve a 1998 Outside Director Option Plan (the "1998

22   Director Plan") and to reserve for issuance 1,000,000 shares of the KLA-Tencor common stock for

23   distribution to the directors under that plan.  ¶33-34.  On November 10, 2000, the Board also

24   approved the 2000 Nonstatutory Stock Option Plan which provided for the issuance of stock

25   options to employees and consultants, other than officers and directors, of the Company or any

26   parent or subsidiary corporation.  ¶37.  That plan was amended on November 6, 2002.  ¶40.  Over

27   the years, defendants continued to file definitive proxies with the SEC which claimed that the

28

<div align="center">4</div>

**OPPOSITION TO DEFENDANT KLA-TENCOR'S DEMURRER AND MOTION TO STAY**
Z:\STULL\KLA2\PLD\DemurrerOpp.wpd

E-Filed Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

1  "exercise price of the options is the fair market value of Common Stock as of the date of grant."

2  See, e.g., ¶¶33-36, 38-39, 41, 43, 45-46.

3      In a definitive proxy filed with the SEC on September 9, 2004 (the "2004 Proxy"),

4  defendants requested shareholders vote in favor of the director approved 2004 Equity Incentive Plan

5  which was developed to replace the 1982 Stock Option Plan and 2000 Nonstatutory Stock Option

6  Plan, and supplement the 1998 Outside Director Option Plan."   Under the terms of the 2004 Equity

7  Incentive Plan, shareholders were requested to reserve 11,000,000 shares of KLA-Tencor common

8  stock for issuance under the terms of the 2004 Equity Incentive Plan.  In addition, up to an

9  additional 1,500,000 shares remaining for grant under the 1982 Stock Option Plan and 2000

10  Nonstatutory Stock Option Plan would be transferred into the 2004 Equity Incentive Plan.  ¶¶43-44.

11      Similar to the administration of the 1982 Stock Option Plan, the 2004 Equity Incentive Plan

12  was to "be administered by [the Company's] Board of Directors or a committee, which our Board of

13  Directors may appoint from among its members (the 'Administrator')."  The "Administrator has the

14  authority to . . . select the persons to whom awards are to be granted."  Once again, options granted

15  under the Plan "may not be granted with an exercise price lower than 100% of the fair market value

16  of the underlying shares."  ¶45.

17      Regrettably for shareholders, at the time they voted to approve and keep each of the above

18  outlined stock option plans, they did not know the information uncovered and published by The

19  Wall Street Journal on May 22, 2006.  ¶47.  On May 24, 2006, as a result of the article, the

20  Company, in a 8-K filed with the SEC, announced that KLA's Board had appointed a Special

21  Committee to investigate past option grants.  In addition, KLA announced that it had "received

22  subpoenas from the U.S. Attorney's Offices for the Eastern District of New York and Northern

23  District of California requesting information relating to its past stock option grants."  ¶48.  On May

24  20, 2006, in another 8-K filing, the Company announced that the SEC was also inquiring into

25  KLA's past stock option grants. ¶49

26      On June 30, 2006, the Company announced that its Special Committee had "reached a

27  preliminary conclusion that the actual measurement dates for financial accounting purposes of

28  certain stock option grants issued in prior years likely differ from the recorded grant dates of such

OPPOSITION TO DEFENDANT KLA-TENCOR'S DEMURRER AND MOTION TO STAY
Z:\STULL\KLA2\PLD\DemurrerOpp.wpd

E-Filed Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

1  awards." ¶50.  As a result of the Company's unresolved issues, it was unable to file with the SEC

2  its annual report on Form 10-K for the year ended June 30, 2006, or its quarterly reports on Form

3  10-Q for the quarters ended September 30, 2006 and December 31, 2006. ¶¶51-52, 58.  As a result

4  of these late filings, the Company repeatedly received notices that it faced delisting from the

5  NASDAQ National Market. ¶¶53, 59.

6          Finally, on September 27, 2006, the Company filed an 8-K with the SEC admitting that

7  stock options had been granted to KLA-Tencor executives at backdated prices.  The related press

8  release stated, in part, that the Company had used "incorrect measurement dates . . .for certain stock

9  option grants made principally during the period from July 1, 1997 through July 30, 2002." ¶54.  As

10  a result, the Board had "concluded that financial statements and all earnings and press releases and

11  similar communications issued by the Company relating to periods beginning on or after July 1,

12  1997, should no longer be relied upon, including the Company's financial statements for fiscal

13  years 1998 through 2005, the interim periods contained therein, and the fiscal quarters ended

14  September 30, 2005, December 31, 2005 and March 31, 2006." *Id.*[4]

15  **III.    ARGUMENT**

16          **A.    Plaintiff's Complaint is Properly Pled as a Direct Action**

17                  **1.    The Standard for Distinguishing that Plaintiff's Claims are Direct**

18          An injured shareholder "retain[s] the right to bring an individual action for injuries affecting

19  his or her legal rights as a stockholder." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d

20  1031, 1036 (Del 2004).  When assessing whether plaintiff has properly pled his claims in a direct

21  action, this Court must answer two questions.  First, "[w]ho suffered the alleged harm -- the

22  corporation or the suing stockholder individually?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,

23  845 A.2d 1031, 1035 (Del 2004).  Second, "who would receive the benefit of the recovery or other

24  remedy?" *Id.*

25

26

27

28

---

[4]    On October 3, 2007, KLA-Tencor filed an 8-K announcing that the Company would need restate its financials for dates between July 1, 1997 through March 31, 2006. ¶55.

OPPOSITION TO DEFENDANT KLA-TENCOR'S DEMURRER AND MOTION TO STAY
Z:\STULL\KLA2\PLD\DemurrerOpp.wpd

E-Filed Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

1    In this action, defendants, including the Company, interfered with plaintiff's right to vote by

2    directly issuing to him, and others similarly situated, false and misleading information regarding

3    defendants and their decisions regarding themselves and fellow employees. This right to vote was a

4    legal right of each shareholder, and not the Company. Defendants' actions amounted to undue

5    influence and a breach of their duty of disclosure, resulting in their interference and/or impairment

6    of plaintiff's right to vote.

7    **2.    Plaintiff's Claims are Direct**

8    Plaintiff's claims are direct because the "right to vote stock is the individual right of the

9    legal owner of stock. When the board of directors wrongfully interferes with or wrongfully impairs

10    that right it violates the individual rights of stockholders." *Thorpe v. CERBCO, Inc.*, 1993 Del. Ch.

11    LEXIS 16, *5-6 (Del. Ch. Jan. 26, 1993), citations omitted. Accordingly, "[t]he wrong is one

12    suffered by all those who vote, but it is not a derivative wrong for that reason, but a direct one." *Id.*,

13    1993 Del. Ch. LEXIS 16, *5.

14    The issues to be voted on by the Class, as outlined in the yearly Definitive Proxies,

15    concerned the appointment of certain directors (defendants herein) and approval of new stock

16    option plans which would benefit the directors and other Company insiders. As alleged in

17    plaintiff's Complaint, each time defendants issued a definitive proxy, defendants provided plaintiff,

18    and those similarly situated, with false and misleading information. In so doing, defendants made it

19    impossible for plaintiff and the Class to vote in a meaningful manner by misleading the

20    shareholders regarding information that was only in the possession of defendants.

21    The cases cited by defendants are distinguishable from this one. For example, in *Vogel v.*

22    *Jobs*, 2007 U.S. Dist. LEXIS 86996 (N.D. Cal. November 14, 2007), the plaintiff's claims

23    apparently focused on a corporate overpayment claim which the Court found to be derivative in

24    nature unless a shareholder was a controlling shareholder who exchanged their stock for assets of a

25    lesser value. *Vogel*, 2007 U.S. Dist. LEXIS 86996, *10-11, *citing Gentile v. Rossette*, 906 A.2d 91,

26    99-100 (Del. 2006). In contrast, the focus of plaintiff's claims herein were defendants' requests that

27    plaintiff vote in favor of certain measures based on information contained in false and misleading

28

7

**OPPOSITION TO DEFENDANT KLA-TENCOR'S DEMURRER AND MOTION TO STAY**
Z:\STULL\KLA2\PLD\DemurrerOpp.wpd

E-Filed Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

1   proxies. That right to vote, and the remedial measure remedying the impairment of that right to

2   vote, is direct in nature.

3       Similarly, *Schuster v. Superior Court*, 127 Cal. App. 4th 305 (2005), is unlike this action

4   because Schuster focused on the dilution to the value of the plaintiff shares due the defendants'

5   actions. The Court found that this diminution in stock value was the gravamen of the complaint and

6   a harm to the Company, not the shareholder. *Schuster*, 127 Cal. App. 4th at 313-14. Moreover,

7   while defendants solicited shareholder approval to increase the authorized number of Peregrine

8   shares from 200 million to 500 million, the subject of that solicitation was not specifically related to

9   the defendants' own personal appointment as directors and receipt of shares of company stock, as in

10  this action. In this action, the harm was to the plaintiff's ability to vote on a subject that directly

11  benefitted defendants.

12      *Elster v. Am. Airlines, Inc.*, 100 A.2d 219 (Del. Ch. 1953), also focused not on the plaintiff's

13  vote, but dilution of the value of plaintiff's stock, which the Court found was not a "special injury"

14  to plaintiff, and therefore a derivative claim. Importantly, the *Tooley* court specifically rejected the

15  "special injury" analysis use in *Elster*. *Tooley*, 845 A.2d 1038-39 (In analyzing the

16  direct/derivative distinction, "a count should look to the nature of the wrong and to whom the relief

17  should go.")

18      In contrast, the focus of plaintiff's claims is the fact that on a yearly basis the defendants'

19  requested the plaintiff vote on certain issues based on false and misleading information. This is a

20  direct claim and defendant's Demurrer should be overruled.

21      **B.**    **If the Court Sustains KLA's Demurrer, Leave to Amend is Appropriate**

22      If this Court is inclined to sustain any part of KLA's Demurrer, plaintiff respectfully

23  requests leave to amend. Pursuant to the California Code of Civil Procedure §473, it is well within

24  this Court's liberal discretion to grant leave to amend the Complaint. *See, e.g., Nestle v. Santa*

25  *Monica*, 6 Cal. 3d 920, 939 (1972). Indeed, "[i]f the motion to amend is timely made and the

26  granting of the motion will not prejudice the opposing party, it is error to refuse permission to

27  amend where the refusal also results in a party being deprived of the right to assert a meritorious

28  cause of action or meritorious defense, it is not only error, but an abuse of discretion." *Morgan v.*

8

E-Filed Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

1    *Sup. Ct.*, 172 CA2d 527, 530 (1959). If this Court sustains defendant's Demurrer and grants leave

2    to amend, plaintiff can bolster his claim that only shareholder's own their right to vote, and any

3    measure remedying defendants' breach would flow to he and the Class he seeks to represent.

**C.    This Action Should Not be Stayed Because Plaintiff's Complaint is the Only
Complaint Filed Solely on Behalf of a Holder Class**

6    Contrary to defendant's argument, this action should not be stayed in favor of other cases

7    pending against KLA because none of those case provides relief to all of the same individuals who

8    would be beneficiaries of a favorable result in this action. While defendants are correct, the

9    litigation of this action will require this Court to, at many points in the litigation, apply Delaware

10    law, this Court is obviously qualified, able and experienced in applying it. Moreover, a case

11    concerning defendants' alleged backdating of stock options is already pending in this Court. As a

12    result, defendants are not being burdened with litigation in an additional courthouse. *See* Exh. C to

13    Floren Declaration in Support of Motion to Stay ("Floren Decl."). Finally, while KLA is

14    incorporated in Delaware, to the convenience of witnesses and document production, the Company

15    is headquartered in the same City as this Court. For these reasons, *inter alia*, plaintiff respectfully

16    requests this Court deny defendant's Motion to Stay this action.

17    This Court has no obligation to stay this action in favor of an action pending in Delaware.

18    The decision whether to stay or not stay an action "is a matter addressed to the sound discretion of

19    the trial court." *Thomas v. Continental Insurance Co.*, 66 Cal. 2d 738, 746 (1967). "In exercising

20    its discretion the court should consider the importance of discouraging multiple litigation designed

21    solely to harass an adverse party, and of avoiding unseemly conflicts with the courts of other

22    jurisdictions. It should also consider whether the rights of the parties can best be determined by the

23    court of the other jurisdiction because of the nature of the subject matter, the availability of

24    witnesses, or the stage to which the proceedings in the other court have already advanced." *Caiafa*

25    *Prof. Law Corp. v. State Farm Fire & Cas. Co.*, 15 Cal. App. 4th 800, 804 (1993), *citing Farmland*

26    *Irrigation Co., Inc. v. Dopplmaier*, 28 Cal. 2d 208, 215 (1957).

27    An analysis of the *Caifa* factors supports an order allowing this action, which was not filed

28    to "solely to harass an adverse party," to go forward. First, as outlined *supra*, this is a direct action.

9

E-Filed Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

1  In contrast, *Langford v. Barnholt, et al.*, Case No. 2295-N (Del. Ch.), alleges both derivative and

2  direct causes of action. *See* Exh. A to Floren Decl. Accordingly, and contrary to defendant's

3  arguments, resolution of this action would not result in a conflict with the court resolving the

4  *Langford* action because the two cases do not request the same relief or benefit the same plaintiffs.

5          More importantly, the *Langford* complaint contains inherent contradictions because it

6  requests relief for two disparate groups, the corporation and its shareholders. As recognized in

7  *Schuster*, direct and derivative actions "are mutually exclusive: i.e., the right of action and recovery

8  belongs either to the *shareholders* (direct action) or to the *corporation* (derivative action)."

9  *Schuster*, 127 Cal. App. 4th at 312. Despite this, the *Langford* plaintiff has chosen to file an action

10  which, if resolved, will pit two co-plaintiffs against each other. In contrast, a favorable resolution

11  of this action will only flow to those holders of KLA shares who had the right to vote during times

12  relevant herein.

13          Second, while KLA is incorporated in Delaware, it is headquartered in California in this

14  County, in the City of San Jose. ¶17. Clearly, the location of KLA, and its employees and

15  documents, favors litigation in California over Delaware. Contrary to defendant's assertion, this

16  Complaint should not be stayed. While plaintiff concedes that there are several other cases filed

17  against defendants with regard to their alleged backdating of stock options, none of those case

18  provides relief to all of the same individuals who would be beneficiaries of a favorable result in this

19  action. Moreover, contrary to defendant's assertion, this Court is more than capable of applying

20  Delaware law regarding direct versus derivative claims. *See* Motion to Stay at 8:24-27. Indeed, as

21  defendant should know, the California state courts have already analyzed Delaware law on this

22  subject. *See Schuster*, 127 Cal. App. 4th, cited in defendant's Demurrer at 8:5.

23          Third, a Northern California courthouse is clearly not an inconvenient place to litigate an

24  action concerning KLA's alleged backdating. Indeed, a derivative action against KLA is already

25  pending in this Court. In addition, two other cases concerning KLA's backdating are pending

26  before the United States District Court for the Northern District of California, San Jose Division (in

27  two different courtrooms). *See* Exhs. B-D to Floren Decl. The fact that these three cases have

28  been allowed to remain in three different courtrooms supports plaintiff's position that this case can

<center>10</center>

---

**OPPOSITION TO DEFENDANT KLA-TENCOR'S DEMURRER AND MOTION TO STAY**
Z:\STULL\KLA2\PLD\DemurrerOpp.wpd

E-Filed Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

1    remain in this courtroom, the same courtroom as one of the other three cases, without

2    overburdening defendants.

3       Finally, defendant has offered absolutely **no** evidence regarding what has occurred, if

4    anything, since the *Langford* plaintiff filed their action. As a result, there is no evidence that the

5    *Langford* action is at a more advanced stage in its proceedings than this action. *See Caiafa,* 15 Cal.

6    App. 4th at 804. For each of these reasons, this Court should not be stayed.

7    **IV.**    <u>**CONCLUSION**</u>

8       For the foregoing reasons, Plaintiff respectfully requests this Court both overrule KLA's

9    Demurrer and deny its Motion to Stay. In the alternative, if the Court is inclined to sustain KLA's

10    Demurrer, Plaintiff respectfully requests leave to amend.

11

12    Dated: February 8, 2008           Patrice L. Bishop
                                      STULL, STULL & BRODY

13

14                By:          _____ /s/ _____

15                            Patrice L. Bishop
                                      10940 Wilshire Boulevard

16                            Suite 2300
                                      Los Angeles, CA 90024
                                      Tel:     (310) 209-2468

17                            Fax:     (310) 209-2087

18                            Jules Brody

19                            Aaron L. Brody
                                        STULL, STULL & BRODY

20                            6 East 45th Street
                                      New York, NY 10017
                                      Tel:     (212) 687-7230

21                            Fax:     (212) 490-2022

22                            Counsel for Plaintiff

23

24

25

26

27

28

**OPPOSITION TO DEFENDANT KLA-TENCOR'S DEMURRER AND MOTION TO STAY**
Z:\STULL\KLA2\PLD\DemurrerOpp.wpd

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
**c/o Glotrans**
2915 McClure Street
Oakland, CA94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

# E-FILED

Feb 8, 2008 5:00 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7069
By S. Gancayco, Deputy

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | Lead Case No.1-07-CV-093465 |
| vs. | Judge Jack Komar |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | |
| Defendant. | **PROOF OF SERVICE** **Electronic Proof of Service** |
| AND RELATED ACTIONS | |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Fri. February 8, 2008 at 4:56 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Fri. February 8, 2008 at 4:56 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on February 8, 2008 at Oakland, California.

Dated: February 8, 2008                          For WWW.SCEFILING.ORG

E-Filed: Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

Andy Jamieson

E-Filed: Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

1

**THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG**

2

**Electronic Proof of Service
Page 2**

3

Document(s) submitted by Patrice Bishop of STULL, STULL & BRODY on Fri. February 8, 2008 at 4:56 PM PST

1. Opposition: OPPOSITION TO DEFENDANT KLA-TENCOR?S DEMURRER AND MOTION TO STAY

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1   Patrice L. Bishop (182256)
    service@ssbla.com
2   STULL, STULL & BRODY
    10940 Wilshire Boulevard
3   Suite 2300
    Los Angeles, CA 90024
4   Tel:    (310) 209-2468
    Fax:    (310) 209-2087
5
    Jules Brody
6   Aaron L. Brody
    SSBNY@aol.com
7   STULL, STULL & BRODY
    6 East 45th Street
8   New York, NY 10017
    Tel:    (212) 687-7230
9   Fax:    (212) 490-2022

10  Counsel for Plaintiff

11

12              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13                 **FOR THE COUNTY OF SANTA CLARA**

14

15  CHRIS CRIMI, on Behalf of Himself and      )    CASE NO. 1:07-cv-093465
    All Others Similarly Situated,              )
16                                              )    **CLASS ACTION**
                    Plaintiff,                  )
17                                              )    **PLAINTIFF'S APPENDIX OF OUT-OF-**
         v.                                     )    **STATE AUTHORITY IN SUPPORT OF**
18  EDWARD W. BARNHOLT,                         )    **OPPOSITION TO DEFENDANT**
    H. RAYMOND BINGHAM,                         )    **KLA-TENCOR'S DEMURRER AND**
19  ROBERT T. BOND,                            )    **MOTION TO STAY**
    RICHARD J. ELKUS, JR.,                      )
20  STEPHEN P. KAUFMAN,                         )
    KENNETH LEVY,                               )
21  MICHAEL E. MARKS,                           )    Date:   February 1, 2008
    DEAN O. MORTON,                             )    Time:   9:00 a.m.
22  KENNETH L. SCHROEDER,                       )    Dept:   17C
    JON D. TOMPKINS,                            )    Judge:  Hon. Jack Komar
23  RICHARD P. WALLACE,                         )
    KLA-TENCOR CORPORATION, and                 )
24  DOES 1 through 25,                          )
                                                )
25                  Defendants.                 )    Complaint Filed:  September 4, 2007
                                                )    Trial Date:       None Set
26  _____     )

27

28

E-FILED
Feb 8, 2008 5:00 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7069
By S. Gancayco, Deputy

E-Filed Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

1    TO THE COURT AND ALL PARTIES OF RECORD:

2        Plaintiff Chris Crimi hereby submits the following out-of-state authority in support of his

3    Opposition to Defendant KLA-Tencor's Demurrer and Motion to Stay:

4

5                   *Thorpe v. CERBCO*, 1993 Del. Ch. LEXIS 16 (Del. Ch. 1993)

6

7                            Respectfully submitted,

8    Dated:  February 8, 2008               Patrice L. Bishop
                             STULL, STULL & BRODY

9

10                By:        /s/
                             Patrice L. Bishop
11                           10940 Wilshire Boulevard
                             Suite 2300
12                           Los Angeles, CA  90024
                             Tel:    (310) 209-2468
13                           Fax:    (310) 209-2087

14                           Jules Brody
                             Aaron L. Brody
15                           STULL, STULL & BRODY
                             6 East 45th Street
16                           New York, NY 10017
                             Tel:    (212) 687-7230
17                           Fax:    (212) 490-2022

18                           Counsel for Plaintiff

19

20

21

22

23

24

25

26

27

28

                                  1

**PLTF'S APPENDIX OF OUT-OF-STATE AUTHORITY ISO OPPOSITION TO DEFENDANT KLA-TENCOR'S DEMURRER AND MOTION TO STAY**
Z:\STULL\KLA2\PLD\AppndxOpp.wpd

LEXSEE 1993 DEL. CH. LEXIS 16

**MERLE THORPE, JR. and FOUNDATION FOR MIDDLE EAST PEACE, a District of Columbia Corporation, Plaintiffs, v. CERBCO, INC., a Delaware Corporation, ROBERT W. ERIKSON, and GEORGE WM. ERIKSON, Defendants.**

Civil Action No. 11713

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1993 Del. Ch. LEXIS 16; Fed. Sec. L. Rep. (CCH) P97,447*

**September 29, 1992, Submitted
January 26, 1993, Decided**

**NOTICE:**

THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**COUNSEL:** [*1] Lawrence C. Ashby, Esquire, Stephen E. Jenkins, Esquire, Keith R. Sattesahn, Esquire and Richard D. Heins, Esquire, of ASHBY & GEDDES, Wilmington, Delaware; OF COUNSEL: Joseph M. Hassett, Esquire, George H. Mernick, III, Esquire, Albert W. Turnbull, Esquire and Christopher P. Gilkerson, Esquire, of HOGAN & HARTSON, Washington, D.C.; Attorneys for Plaintiffs.

Howard M. Handelman, Esquire and John H. Newcomer, Jr., Esquire, of BAYARD, HANDELMAN & MURDOCH, P.A., Wilmington, Delaware; Attorneys for CERBCO, Inc.

Michael Hanrahan, Esquire and April Caso Ishak, Esquire, of PRICKETT, JONES, ELLIOTT, KRISTOL & SCHNEE, Wilmington, Delaware; Attorneys for Defendants Robert W. Erikson and George Wm. Erikson.

**JUDGES:** ALLEN

**OPINION BY:** ALLEN

**OPINION**

*MEMORANDUM OPINION*

ALLEN, Chancellor

This is a stockholders' action brought originally to enjoin the alleged usurpation of a corporate opportunity of CERBCO, Inc. The transaction attacked was one in which defendants Robert and George Erikson were to sell their CERBCO stock, which carried with it voting control of the company, for a 700% premium over the market price of the company's traded stock. It was alleged that the buyer did not in fact seek control over CERBCO [*2] but had originally sought to buy CERBCO's asset control over another entity. After the suit was initiated, the transaction was abandoned. Plaintiffs continue to litigate this central claim, asserting that the failure of defendants to seek to achieve for CERBCO itself the sale of the asset of CERBCO that the potential buyer was allegedly motivated to acquire, was injurious to CERBCO and all of its stockholders. *See Thorpe v. CERBCO, Inc., Del. Ch., 611 A.2d 5 (1991).*

The pending motion for summary judgment is not addressed to this central claim, however. Rather it is addressed to a second claim purportedly asserted in Count II of the Second Amended and Supplemental Complaint. That claim alleges that the defendants were enabled to acquire voting control over CERBCO as a result of a 1982 stockholder vote held after the dissemination of false and misleading proxy solicitation materials. The 1982 vote amended the certificate of incorporation to authorize a recapitalization that permitted shareholders to exchange their voting stock for either new Class A or new Class B voting stock. Class A stock carries relatively weaker voting rights but greater rights [*3] to dividends than does the Class B stock. The Class B shares have the power to elect three of the four members of the CERBCO board of directors. As was

expected (and the expectation was disclosed in the 1982 Proxy Statement) most shareholders accepted Class A shares, while Robert and George Erikson accepted Class B shares. On the completion of the recapitalization the Eriksons did not own a majority of the Class B shares, but over the intervening years, through the conversion of other Class B shares to Class A stock, they have come to do so.

The claim that is the subject of this motion is the claim that the 1982 Proxy Statement was materially incomplete and misleading in that it, allegedly, failed:

to inform [shareholders] in the proxy statement that the Eriksons apparently believed they had no fiduciary obligation to exercise their control for the benefit of CERBCO and all of its shareholders, but instead intended to grant themselves the right to use that control for their personal benefit.

Second Am. Cplt. P 20. Plaintiffs seek to have the 1982 recapitalization rescinded. They allege that CERBCO shareholders could not have known until 1990, when the Eriksons allegedly used [*4] their control of CERBCO to attempt to seize the economic value of CERBCO's assets, of the alleged failure in 1982 to disclose their intention "to use control for their personal benefit. Thus, their suit is, they say, timely.

Defendants have now moved for summary judgment on this claim. Their theory is predicated upon the uncontested fact that plaintiffs were not shareholders of CERBCO in 1982. They assert that this fact disables plaintiffs from litigating the propriety of disclosures made to stockholders at that time. [1] Plaintiffs answer that this fact will not alone support the relief that defendants' motion seeks because: (1) they have been injured and are threatened with future injury as a result of the alleged failure to disclose and that fact accords them standing; and (2) the wrong itself is a continuing one, in all events and they have a current interest in the continuing, planned effect of the 1982 fraud.

1    The parties have not raised and I do not address the question whether this allegation states a claim upon which relief could be granted. *See Weinberger v. United Financial Corp., 1983 Del. Ch. LEXIS 443, *27, Del. Ch., C.A. 5915, Hartnett, V.C. (Oct. 13, 1983), (complete candor does not require fiduciary to admit corrupt mental state; "self flagellation" not required). Accord Ash*

v. LFE Corp., 525 F.2d 215, 220 (3rd Cir. 1975); Missouri-Portland Cement Co. v. Cargill, Inc., 498 F.2d 851, 873 (2d Cir. 1974); Bertoglio v. Texas International Co., 488 F. Supp. 630, 649 (D. Del. 1980).

[*5] I.

At the outset the parties disagree on the question whether the claim that the 1982 proxy materials were false or misleading is a derivative or class claim. Defendants, originally at least, premised their argument that plaintiffs have no standing on the assertion that this claim was derivative in nature. In the event that it were so considered, the contemporaneous stockholding requirement of Section 327 of the Delaware General Corporation Law would appear to preclude these plaintiffs from litigating Count II of their complaint. *See Newkirk v. W.J. Rainey, Inc., Del. Ch., 31 Del. Ch. 433, 76 A.2d 121 (1950).* The argument that the claim is a derivative one is premised on the assertion that what was allegedly not disclosed was an intention to use the power that the certificate amendment and recapitalization made possible, to deprive CERBCO of a corporate opportunity. Asserting that such a diversion would itself constitute a derivative wrong, plaintiffs invite the court to regard the voting allegations as extensions of that same type of claim. This reasoning is, in my opinion, mistaken.

The right to vote stock is the individual right of the legal owner of stock. When [*6] the board of directors wrongfully interferes with or wrongfully impairs that right it violates individual rights of stockholders. *See Lipton v. News International, Del. Supr., 514 A.2d 1075, 1079 (1986); Rosenblatt v. Getty Oil Co., Del. Supr., 493 A.2d 929 (1985); In Re Anderson Clayton Stockholders Litigation, Del. Ch., 519 A.2d 680 (1986); Freedman v. Restaurant Associates, 1987 Del. Ch. LEXIS 498, Del. Ch., C.A. 9212, Allen, C. (Oct. 16, 1987), [1987-88 Transfer Binder]Fed. Sec. L. Rep. (CCH) at 97,221.* The wrong is one suffered by all those who vote, but it is not a derivative wrong for that reason, but a direct one. It is analogous to the violation of a contract right. *Cf. Moran v. Household International Inc. Del. Del. A.2d 1059, 1070 aff'd, Del. Supr., 500 A.2d 1346 (1985).*

Thus, I conclude that, since the claim of proxy non-disclosure is itself not a derivative claim, Section 327 of title 8 has no direct bearing on this motion. I turn then to consider defendants' further argument that plaintiffs have no standing [*7] to assert or litigate the

existence of a disclosure wrong that may have occurred several years before plaintiffs acquired an interest in the company.

II.

Plaintiffs claim first that they have rights of their own to litigate this claim as persons who will be injured by the final step in the asserted scheme that started with the 1982 vote. I conclude that while plaintiffs may have standing to complain about any breach of duty that occurs while they are shareholders, they have no direct right to be awarded judicial relief for these 1982 acts. [2] I conclude as well that plaintiffs have no standing to assert this claim as successors in interest to whomever owned their stock at the time of the vote on the 1982 certificate amendment.

> 2    This holding does not, of course, address questions of what constitutes relevant and admissible evidence of such legal claims as plaintiffs do have standing to assert. Rather I here hold that plaintiffs have no standing to prove a violation of a duty in 1982 as a premise for the granting of relief for such breach.

[*8] In support of their assertion that, as present stockholders, plaintiffs have standing to litigate the quality of the 1982 proxy solicitation materials, they offer a theory that they characterize as "continuing wrong." The idea is that the 1982 failure to disclose defendants' subjective intent or understanding was part of a continuing scheme that has (only recently) resulted in injury to CERBCO and thus is a matter that impacts upon plaintiffs, as current shareholders.

This theory is unavailing to confer standing upon plaintiffs to litigate a class action claim seeking relief for a 1982 proxy wrong, since what is at issue on this motion to dismiss that claim is not the capacity of the corporation to recover any loss that may (recently) have been occasioned by defendants' actions. That is the derivative claim. What is at issue here is the ability of the shareholders individually to enforce rights allegedly violated in 1982. Insofar as 1982 acts may in fact be relevant in some way to the claimed derivative injury, evidence of them should, other considerations of evidence law aside, be admissible. See n. 2 supra. But to admit that those acts might have evidentiary value with [*9] respect to a derivative claim is quite different from saying that those 1982 acts can themselves be a source of

liability to these plaintiffs.

Nor is there authority to accord stockholders' standing to plaintiffs in their capacity as successors to the earlier holders of the stock. It has been held that those owning shares at the time of the proxy wrong are the persons who possess rights arising from any disclosure violations and that their successors do not. See Schwartzman v. Tenneco Mfg. Co., 319 F. Supp. 1278 (D. Del. 1970).

Indeed, regardless of the theory asserted, plaintiffs are able to cite no case under the law defining the duties of corporate directors, or under Section 14(a) of the Securities Exchange Act of 1934, 15 USCA § 78n (1991), in which one who has become a shareholder after allegedly defective proxy solicitation materials were distributed and the vote taken, has been accorded standing to litigate the quality of the disclosures in that proxy statement. Nor has our own research uncovered such a case. [3]

> 3    In one case a representative plaintiff who was a shareholder at the time of the distribution of one of two proxy statements, both of which "allegedly suffered from the same material omissions" was permitted to attack the adequacy of both. See Zell v. Intercapital Income Securities, Inc., 459 F. Supp. 819 (N.D. Cal. 1978); rev'd on other grounds, 675 F.2d 1041 (9th Cir. 1982).

[*10] But our search has uncovered a number of instances in which courts have declined to permit one who acquires ownership of shares after a corporate vote has been taken, to challenge the quality of the disclosures made in soliciting proxies for that vote. For example, in the case of Smillie v. Park Chemical Co., 466 F. Supp. 572 (E.D. Mich. 1979), a shareholder plaintiff brought an action seeking to rescind corporate action taken in the years 1973-1976, on the grounds that the proxy solicitations in these actions violated Section 14(a) by failing to disclose certain material facts regarding the company. The district court stated: "It is undisputed that plaintiff . . . did not even own voting stock in 1973, 1974, or 1975. Clearly, she lacks standing to sue for alleged proxy violations occurring during those years. See, Wulc v. Gulf Western Industries Inc., 400 F. Supp. 99, 103-04 (E.D. Pa. 1975)." Smillie, at 575. The Wulc case involved a suit under Section 14(a) brought by the holder of stock options. In denying the plaintiff standing to pursue the proxy disclosure claim, the court explained:

As the Court stressed [*11] in *Mills [v. Electric Auto-Lite, 396 U.S. 375, 381, 24 L. Ed. 2d 593, 90 S. Ct. 616 (1964)]*, § 14(a) was intended to protect corporate suffrage and thus "promote the free exercise of the voting rights of stockholders." Thus, to have standing under § 14(a), the plaintiff is required to be a shareholder with voting rights in order to establish a nexus with the statute.

*Wulc, 400 F. Supp. at 104.* [4]

    4    The decided cases all go the same way: a shareholder plaintiff must have owned shares at the time of alleged proxy violations in order to have standing to sue under Section 14(a). *See, e.g., In re Penn Central Sec. Lit., 347 F. Supp. 1327, 1342 (E.D. Pa. 1972); Murray v. Hospital Corp. of America, 682 F. Supp. 343, 348 (M.D. Tenn. 1988)* ("plaintiffs who are not shareholders with voting rights at time of alleged violation lack standing . . . under § 14(a)"); *Werfel v. Kramarsky, 61 F.R.D. 674, 677-78 (S.D.N.Y. 1974)* (denying holder of warrants standing because plaintiff had no voting rights); *District 65, UAW v. Harper & Row Publishers, 576 F. Supp. 1468, 1486 (S.D.N.Y. 1983)* (claim dismissed because plaintiffs not shareholders at the time of purported solicitation); *Daly v. Neworld Bank for Savings,* C.A. No. 87-0996-Mc, *1988 U.S. Dist. LEXIS 15642* (D.Mass. July 19, 1988) (dismissing claim because plaintiff failed to adequately plead that proposed class members owned stock at time of solicitation); *Gabrielsen v. BancTexas Group, Inc., 675 F. Supp. 367 (N.D. Tex. 1987)* (stating in dicta that "14(a) was intended to benefit only . . . individuals whose proxies were actually solicited to approve . . . a particular transaction"); *See also,* Louis Loss, Fundamentals of Securities

Regulation, at 297 (2d ed. Supp. 1992); 1 Thomas Hazen, The Law of Securities Regulation, at 659 (Prac. Ed. 1990).

    [*12] A similar result obtains under Section 12 of The Securities Act of 1933, *15 USCA 771 (1991)*, where plaintiffs who have acquired stock from one who bought pursuant to a prospectus are not accorded a right to assert a claim that the prospectus was in some respect false or misleading. *See, e.g., Collins v. Signetics Corp., 605 F.2d 110, 113-14 (3rd Cir. 1979).*

I find this absence of precedent, in the circumstance, to be fatal to plaintiffs' ability to litigate a claim that arose years before they became stockholders. The Delaware precedents that plaintiffs do cite *(e.g., Maclary v. Pleasant Hills, Inc., Del. Ch., 35 Del. Ch. 39, 109 A.2d 830 (1954); Elster v. American Airlines, Inc., Del. Ch., 34 Del. Ch. 94, 100 A.2d 219 (1953))* are not helpful to them. Those cases deal with the question when does a transaction occur or close for Section 327 purposes. Plainly under the reasoning they employ the relevant "transaction" here was completed when the vote was held or, at the latest, when the recap was effectuated. The effects of an act can ripple through decades. But that fact does not mean [*13] that the act itself continues for Section 327 purposes so as to entitle later purchasers of the stock to sue on earlier wrongs. Therefore, plaintiffs can draw no comforting analogy to these cases. In no sense were plaintiffs shareholders when the wrongs they purport to allege in Count II occurred.

Plaintiffs' rights are fully protected if the claims that they bring relating to the alleged misuse of power are fairly adjudicated. Their claim, in addition, to change through rescission the nature or structure of the enterprise in which they invested, however, is one that has not been recognized by the law. The motion to dismiss this claim will therefore be granted.

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

# E-FILED

Feb 8, 2008 5:00 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7069
By S. Gancayco, Deputy

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | Lead Case No.1-07-CV-093465 |
| vs. | Judge Jack Komar |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | |
| Defendant. | **PROOF OF SERVICE**<br>**Electronic Proof of Service** |
| AND RELATED ACTIONS | |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Fri. February 8, 2008 at 4:56 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Fri. February 8, 2008 at 4:56 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on February 8, 2008 at Oakland, California.

Dated: February 8, 2008                    For WWW.SCEFILING.ORG

E-Filed: Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

Andy Jamieson

E-Filed: Feb 8, 2008 5:00 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7069

**THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG**

**Electronic Proof of Service**
**Page 2**

**Document(s) submitted by Patrice Bishop of STULL, STULL & BRODY on Fri. February 8, 2008 at 4:56 PM PST**

1. Appendix: PLAINTIFF?S APPENDIX OF OUT-OF STATE AUTHORITY IN SUPPORT OF OPPOSITION TO DEFENDANT KLA-TENCOR?S DEMURRER AND MOTION TO STAY

1   JOHN H. HEMANN (SBN 165823)
  JOSEPH E. FLOREN (SBN 168292)
2   TERA M. HEINTZ (SBN 241414)
  MATTHEW WEILER (SBN 236052)
3   MORGAN, LEWIS & BOCKIUS LLP
  One Market, Spear Street Tower
4   San Francisco, CA 94105-1126
  Tel: 415.442.1000
5   Fax: 415.442.1001

6   Attorneys for Defendant
  KLA-Tencor Corporation

7

**E-FILED**

Feb 15, 2008 4:32 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7155
By R. Walker, Deputy

8       SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            COUNTY OF SANTA CLARA

10

11   CHRIS CRIMI, on Behalf of Himself and
  All Others Similarly Situated,

12           Plaintiff,

13       vs.

14   EDWARD W. BARNHOLT, H.
  RAYMOND BINGHAM, ROBERT T.
15   BOND, RICHARD J. ELKUS, JR.,
  STEPHEN P. KAUFMAN, KENNETH
16   LEVY, MICHAEL E. MARKS, DEAN O.
  MORTON, KENNETH L. SCHROEDER,
17   JON D. TOMPKINS, RICHARD P.
  WALLACE, KLA-TENCOR
18   CORPORATION, and DOES 1 through 25,

19          Defendants.

20

Case No. 107CV093465

**REPLY MEMORANDUM IN SUPPORT
OF DEFENDANT KLA-TENCOR'S
DEMURRER**

Date: February 22, 2008
Time: 9:00 a.m.
Department: 17C
Judge: Hon. Jack Komar

Date Filed: September 4, 2007
Trial Date: None Set

21

22

23

24

25

26

27

28

Case No. 107CV093465

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1     Plaintiff's Opposition attempts to sidestep Defendant KLA-Tencor Corporation's

2    ("KLA's") demurrer by mischaracterizing his own Complaint, which seeks to recover for alleged

3    dilution of ownership and voting rights resulting from this issuance of shares under two stock

4    options plans.  Ignoring the defects of his derivative claims, Plaintiff conjures up a new argument

5    that purported failures to disclose prior stock options backdating "interfered with plaintiff's right

6    to vote" by supposedly depriving him of material information.  Opp. at 1.  Plaintiff argues that his

7    cause of action is direct and not derivative because "only a shareholder can hold the right to vote"

8    and thus "any favorable measure remedying defendants' interference must flow to that

9    shareholder, and not to the Company."  *Id.*  Plaintiff bases violation of the right to vote on

10    election of directors and approval of the issuance of shares pursuant to KLA stock option plans.

11    *Id.* at 7.  However, the purported interference with the election of KLA directors is not pled:

12    Plaintiff seeks no relief for any omission relating to election of KLA directors, and his causes of

13    action assert claims solely related to dilution.  More significantly, Plaintiff could not possibly

14    assert such a cause of action, because the underlying backdating allegations have yet to be

15    adjudicated, and there could be no duty to disclose any individual director's involvement therein

16    at the time of solicitation for approval of two stock options plans.  The gravaman of Plaintiff's

17    Complaint is dilution because he alleges he was misled in (1) "allowing the Evergreen Provision"

18    in the 1982 Stock Option Plan 'to go forward' and (2) approving the 2004 Equity Incentive Plan.

19    *See* Compl. ¶¶ 78, 81, 83, 84, 86.  Thus, the fundamental harm alleged in Plaintiff's Complaint is

20    the dilution that resulted from the issuance of KLA shares pursuant to the stock options plans.

21    Plaintiff's Opposition rests on the faulty assumption that interference with the right to

22    vote, without being tethered to some unique harm to a class of shareholders, constitutes a direct

23    cause of action for breach of fiduciary duty.  As an initial matter, Plaintiff cannot prevail on his

24    cause of action related to failure to disclose in seeking "approval" of the stock option plans

25    without showing harm to KLA.  Rather, rather his causes of action relating to dilution are

26    premised on KLA receiving less-than-market consideration for stock issued pursuant to exercise

27    of certain options.  Moreover, Plaintiff's causes of action are fundamentally derivative under

28    Delaware law, which recognizes a direct action for dilution only when a plaintiff can plead that

<div align="center">1      Case No. 107CV093465</div>

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1  his voting rights were diluted to the detriment of him and the benefit of a controlling shareholder

2  or shareholders. Merely pleading dilution of voting rights does not transform an otherwise

3  derivative action into a direct one. Thus, the causes of action Plaintiff pleads are derivative

4  because any resultant dilution would impact *all* of KLA shareholders equally.

5  <u>**ARGUMENT**</u>

6  **I.    PLAINTIFF HAS NOT PLED OMISSIONS WITH RESPECT TO VOTING FOR**
7       **KLA DIRECTORS, AND SUCH A CLAIM WOULD BE WITHOUT MERIT**

8        Plaintiff's Complaint does not even assert a cause of action related to interference with

9  election of KLA directors. Even if it did, such allegations would be insufficient as a matter of

10  law to state a cause of action under controlling Delaware law. Plaintiff has not alleged, and

11  cannot allege, any violation of a fiduciary duty of disclosure here in relation to the election of

12  KLA directors, because there had been no adjudication as to any director candidate's purported

13  involvement in backdating at the time of the alleged failures to disclose (and there is no

14  adjudication today).

15        Plaintiff's Opposition alludes to supposed interference in the election of KLA directors.

16  *See* Opp. at 7-8. But misstatements or omissions related to the election of KLA directors is not

17  the gravamen of Plaintiff's complaint. Plaintiff nowhere asks that the election of the directors be

18  deemed invalid; nor does he otherwise seek to recall the KLA directors elected during the period

19  Plaintiff was a shareholder. Instead, Plaintiff merely alleges that "[t]he Definitive Proxies were

20  each false and misleading because they failed to correct prior information regarding the issuance

21  of backdated stock options and caused the Class to approve the Individual Defendants' request to

22  be appointed as directors of the Company based on that false and misleading information."

23  Compl. ¶ 68. There can be no question that the Complaint does not seek relief related to any

24  misstatements affecting director election, but instead alleges harm through dilution that resulted

25  from approval of stock options plans. *See* Compl. ¶ 79 ("The Class was harmed as a result of the

26  **dilution of its voting power and proportionate share of the Company** due to the dedication of

27  over millions of KLA-Tencor shares as a result of the addition of stock pursuant to Evergreen

28  Provision and adoption of the 2004 Equity Incentive Plan."); *id.* ¶ 85 ("The Class was also

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

2    Case No. 107CV093465

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1  harmed as a result of **the dilution of its voting power and proportionate share of the**

2  **Company** due to the dedication of millions [of] KLA-Tencor shares as a result of the

3  amendments to [the] 1982 Stock Option Plan and adoption of the 2004 Equity Incentive Plan.")

4  (emphasis added). The relief Plaintiff seeks relates solely to these stock options plans. *See*

5  Compl. ¶ 86 (seeking to rescind the 1982 Stock Options Plan and 2004 Equity Incentive Plan and

6  options issued thereunder). Since Plaintiff asserts no cause of action related to the election of

7  directors, the Court should disregard his argument on this issue and sustain the demurrer.

8  　　　　Even if Plaintiff had asserted a cause of action based on director election, however, it

9  would fail as a matter of law because Plaintiff does not allege *which* directors and *which* proxies

10  are at issue and, most glaringly, *what* allegedly misstated or omitted information (if any) was

11  material to their election. Under Delaware law, which Plaintiff concedes governs this dispute, a

12  plaintiff seeking to challenge proxy misstatements must plead "some basis for a court to infer that

13  the alleged violations were material. For example, a **pleader must allege that facts are missing**

14  **from the proxy statement, identify those facts, state why they meet the materiality standard**

15  **and how the omission caused injury.**" *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135,

16  141 (Del. 1997) (complaint states no claim for breach of fiduciary duty of disclosure unless it

17  specifically alleges the substance of and circumstances surrounding the alleged misstatement)

18  (emphasis added). Plaintiff has not done this.

19  　　　　Any fiduciary duty cause of action based on director election would suffer from an even

20  more fundamental flaw, however, because Defendants indisputably **had no fiduciary duty to**

21  disclose during the time period in question – long before stock option backdating became an issue

22  at any company and without any formal adjudication of the matter – that any individual director

23  candidate was supposedly involved in historic backdating practices in earlier years. Directors

24  standing for election are not required to "confess to wrongdoing prior to any adjudication of

25  guilt," nor must any defendant in soliciting proxies "draw legal conclusions implicating itself in a

26  breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication

27  of the matter." *Louden*, 700 A.2d at 145. Here, as in *Louden*, Plaintiff would ask the Court to

28  extend the fiduciary duty of disclosure so as to require that KLA disclose in proxy statements that

MORGAN, LEWIS &
BOCKIUS LLP.
ATTORNEYS AT LAW SAN
FRANCISCO

3　　　　Case No. 107CV093465

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1   certain director candidates supposedly were involved in wrongdoing at the Company, even

2   though there had been no adjudication such facts (or even any litigation or hint of such an issue).

3   In *Louden*, for example, the underlying allegations were that directors of ADM had led and

4   approved a massive antitrust conspiracy, including price-fixing and other wrongdoing. A

5   shareholder brought suit seeking to overturn an election of ADM directors that had occurred after

6   the price-fixing at ADM had come to light, and ADM had made certain disclosures regarding the

7   involvement of some directors. Plaintiff alleged that the disclosures in the proxy solicitation

8   failed to implicate all responsible defendants, and thus that the defendants had breached the

9   fiduciary duty of disclosure. *Id.* at 139-40. In a definitive opinion, the Delaware Supreme Court

10  squarely rejected the possibility that any shareholder voting rights or fiduciary duty claim could

11  exist for failure to disclose wrongdoing that had not been adjudicated:

12  > Under Delaware law, **there could be no duty to disclose until such time as these determinations were adjudicated.** Nowhere does the complaint allege
13  > that, at the time the complaint was filed, an adjudication of these activities had occurred. Nevertheless, plaintiff's argument would have the ADM Board confess
14  > to wrongdoing prior to any adjudication of guilt. This is precisely the situation the self-flagellation rule was designed to prevent.

15  *Louden*, 700 A.2d at 145.

16

17      The case even more clearly requires application of the rule against "self-flagellation."

18  Here the Complaint itself claims that allegations regarding stock option backdating against KLA

19  directors first came to light in mid-2006, and there is no claim that KLA failed to disclose such

20  allegations in connection with a director election or proxy solicitation occurring before then.

21  **II.     THE CAUSES OF ACTION PLAINTIFF *DOES* PLEAD ARE DERIVATIVE AND MUST BE DISMISSED**

22          **A.     Plaintiff Can Plead No Harm "Independent" of Harm to KLA**

23      Plaintiff's attempt to allege a direct shareholder claim for omission in proxy disclosures

24  "approving" KLA's stock options plans fails because Plaintiff cannot prevail on this claim

25  without pleading harm to KLA. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031,

26  1045 (2004) ("The stockholder's claimed direct injury **must be independent of any alleged

27  injury to the corporation.** The stockholder must demonstrate that the duty breached was owed to

28  the stockholder and that he or she can prevail without showing an injury to the corporation.").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

4       Case No. 107CV093465

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1    The essence of Plaintiff's claim is for improper dilution – that Defendants diluted Plaintiff's

2    ownership interests and proportional voting rights through improper stock option issuances, with

3    the result that KLA issued stock for insufficient consideration and failed to disclose it.  Under

4    Delaware law, "[a] claim for wrongful equity dilution is premised on the notion that the

5    corporation, by issuing additional equity for insufficient consideration, made the complaining

6    stockholder's stake less valuable." *Feldman v. Cutaia*, 2007 WL 2215956 at *8 (Del .Ch. Aug. 1,

7    2007) (holding that equity dilution claims are derivative).  Plaintiff can allege no harm

8    independent of the corporation because here nothing distinguishes Plaintiff's interests from those

9    of shareholders at large or the company itself.  Claims for improper dilution have been widely

10   recognized by Delware courts to be derivative, because "it falls upon all shareholders equally and

11   falls only upon the individual shareholder in relation to his proportionate share of stock as a result

12   of the direct injury being done to the corporation." *Feldman*, 2007 WL 2215956 at *8.  Plaintiff

13   makes no serious attempt to contest this dispositive point.

**B.    Plaintiff's Attempt to Fashion a Direct Cause of Action from Voting on the Stock Option Plans Must Fail**

14

15            Contrary to Plaintiff's argument in Opposition, there is no direct cause of action for

16   interference with the right to vote, standing alone.[1]  Delaware law looks to the harm alleged to

17   determine whether a claim is direct or derivative. *Tooley*, 845 A.2d at 1045.  The harm alleged in

18   Plaintiff's two causes of action is dilution. *See* Compl. ¶¶ 79, 85.  Unless a claim for voting

19   dilution is coupled with allegations of entrenchment or control by the board of directors or a

20

21   _____

[1]    Although Plaintiff's causes of action for dilution are plainly derivative, they would fail
22       even if deemed direct.  Plaintiff has not alleged which statements in which proxies were
         material to his "approval" of the issuance of any KLA shares.  Thus, Plaintiff has not pled
23       his claims for breach of fiduciary duty with the specificity required under Delaware law.
         *See Loudon*, 700 A.2d at 141.  Moreover, Plaintiff cannot make such allegations regarding
24       the stock option plans at issue.  As argued in the Demurrer, Plaintiff's allegation that he
         approved the issuance of any shares pursuant to the 1982 Stock Option Plan is absurd, as
25       he was not actually asked to approve the issuance of such shares, but the shares were
         automatically added by an "Evergreen Provision." *See* Compl. ¶ 32.  Although Plaintiff
26       alleges that he voted to approve the 2004 Equity Incentive Plan, under which shares were
         later issued, he also alleges that the backdating at KLA occurred from July 1997 to
27       June 30, 2002. *See* Compl. ¶ 62.  Plaintiff does not plead that any backdating took place
         subsequent to the approval of the 2004 Equity Incentive Plan or that the new plan had
28       anything to do with backdating.  Thus, Plaintiff clearly cannot plead facts showing that he
         was misled regarding solicitation of approval of issuance of any shares of KLA stock.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

5        Case No. 107CV093465

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1  controlling shareholder group, such a claim is inherently derivative.  Delaware law permits a

2  direct cause of action **only** when a particular class of shareholders is uniquely impaired by the

3  dilution; when all shareholders are harmed in the same way, the claim is derivative.  Allegation of

4  interference with the right to vote, like diminution in value of stock, is derivative if it would result

5  in "**equal dilution of . . . voting power of each of the corporation's outstanding shares.**"

6  *Gentile v. Rossette*, 906 A.2d 91, 99-100 (Del. 2006) (emphasis added).  Plaintiff's allegation that

7  he was misled regarding approval of issuance of stock pursuant to two stock option plans is a

8  claim for dilution, and thus derivative under Delaware law.

9        Plaintiff cites no authority for his position that the supposed interference with voting

10  rights, standing alone, can be a maintained as a direct action.  Plaintiff's reliance on *Thorpe v.*

11  *CERBCO*, No. A. Civ. No. 11713, 1993 WL 35967 (Del. Ch. Jan. 26, 1993), actually supports

12  dismissal, because that case involved allegations that certain shareholders wrested control of the

13  corporation from plaintiffs using misleading proxies that allowed a change in classification of

14  voting shares.  *Thorpe*, 1993 WL 35967 at *1.  In *Thorpe*, the plaintiff minority shareholders sued

15  the defendant controlling shareholders who allegedly usurped control of the corporation in order

16  to engage in conduct that allowed defendants to enter into business opportunities that benefited

17  defendants at the expense of the corporation.  The crucial allegation in *Thorpe* was that a false or

18  misleading proxy statement allowed defendants to usurp voting control:

19        The 1982 vote amended the certificate of incorporation to authorize a

20        recapitalization that permitted shareholders to exchange their voting stock for
either new Class A or new Class B voting stock. Class A stock carries relatively

21        weaker voting rights but greater rights to dividends than does the Class B stock.
The Class B shares have the power to elect three of the four members of the

22        CERBCO board of directors. As was expected (and the expectation was disclosed
in the 1982 Proxy Statement) most shareholders accepted Class A shares, while

23        Robert and George Erikson accepted Class B shares. On the completion of the
recapitalization the Eriksons did not own a majority of the Class B shares, but

24        over the intervening years, through the conversion of other Class B shares to
Class A stock, they have come to do so.

25  *Thorpe*, 1993 WL 35967 at *1.  In that case, defendants allegedly misled plaintiffs regarding their

26  intentions in amending the certificate of incorporation, which enabled defendants to procure

27  voting control.  As another court wrote in recently rejecting a similar argument, "*Thorpe* involved

28  allegations that false and misleading information in proxy disclosures resulted in shareholder

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FRANCISCO

6                Case No. 107CV093465

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1  approval of an amendment to CERBCO, Inc.'s certificate of incorporation authorizing a

2  recapitalization that **ultimately gave defendants voting control over the company.**" *Indiana*

3  *Elec. Workers Pension Trust Fund, IBEW v. Dunn*, No. C-06-0177 RMW, 2007 WL 1223220

4  (N.D. Cal. March 7, 2007) (distinguishing *Thorpe* and granting dismissal on the grounds that

5  plaintiff's allegations were derivative in nature). Plaintiff has not alleged, and cannot allege, any

6  similar manipulation of control on behalf of KLA or any of the Defendants.

7       The rule the Delaware Court of Chancery followed in *Thrope* is in line with controlling

8  Delaware law, which recognizes a direct cause of action only under a narrow fact pattern that is

9  not, and cannot, be alleged here. *Feldman* , 2007 WL 2215956 at *8 (Del .Ch. Aug. 1, 2007) (a

10  direct action for dilution **"can only arise when a controlling stockholder, with sufficient power**

11  **to manipulate the corporate process, engineers a dilutive transaction whereby the**

12  **stockholder receives an exclusive benefit of increased equity ownership and voting power**

13  **for inadequate consideration."**). Even in Opposition, Plaintiff does not allege that the

14  interference ultimately gave Defendants voting control over the company. Rather, Plaintiff's

15  Opposition brief, like his Complaint, addresses harm to *all* shareholders, collectively. For

16  example, Plaintiff argues that "each time defendants issued a definitive proxy, defendants

17  provided plaintiff, and those similarly situated, with false and misleading information." Opp. at

18  7. Plaintiff clarifies that by "those similarly situated" refers to "all shareholders": "defendants

19  made it impossible for plaintiff and the Class to vote in a meaningful manner by misleading the

20  **shareholders** regarding information that was only in the possession of defendants." *Id.*

21  (emphasis added). In short, Plaintiff has not identified anything other than a generalized harm

22  that led to issuance of shares that diluted the voting power of all KLA shares.

23       Plaintiff unsuccessfully attempts to distinguish *Vogel v. Jobs*, a case where Plaintiff's

24  counsel was counsel of record, on the ground that "plaintiff's claims apparently focused on a

25  corporate overpayment claim." Opp. at 7. However, *Vogel* considered substantially identical

26.  allegations -- that that officers and directors of Apple, Inc. breached their fiduciary duties of

27  disclosure by issuing false and misleading proxies that failed to disclose historic backdating. *See*

28  *Vogel v. Jobs*, No. 06-5208 JF, 2007 WL 3461163 *2 (N.D. Cal. Nov. 14, 2007). Contrary to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

7       Case No. 107CV093465

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1    Plaintiff's characterization, the decision did not solely pertain to overpayment. In the opinion, the

2    District Court recognized that voting dilution, like equity dilution, requires that plaintiffs suffer a

3    unique harm in that their interests are impaired to the benefit of controlling shareholders. *See*

4    *Vogel*, 2007 WL 3461163 at *3 n.2 (distinguishing cases cited by Plaintiff's counsel on the

5    grounds that in those cases "defendants acted improperly to dilute votes" and "individual

6    shareholders allegedly suffered some unique injury.").[2] Here, the alleged harm of which Plaintiff

7    complains, failure to disclose that led to dilution, impacts all KLA shareholders equally, and thus

8    is a harm to the corporation under *Gentile* that cannot be alleged in a direct action.

9         Plaintiff's attempts to distinguish *Schuster* and *Elster* are similarly unavailing. Plaintiff

10   argues that "the *Tooley* court specifically rejected the 'special injury' analysis use [sic] in *Elster*."

11   Opp. at 8. Although *Tooley* disapproved a "special injury test," the Delaware Supreme Court has

12   subsequently affirmed that a claim is derivative where, as here, a plaintiff alleges a harm that

13   affects all shareholders equally. *Gentile*, 906 A.2d at 99-100. Likewise Plaintiff's

14   characterization of *Schuster* is counter-factual. First, Plaintiff argues that in *Schuster* "the

15   solicitation was not specifically related to the defendants' own personal appointment as directors

16   and receipt of shares of company stock." Opp. at 8. To the contrary, the plaintiff in that case also

17   alleged that the subject of votes benefited defendants. In *Schuster*, it was alleged that "in '*an*

18   *effort to benefit themselves*, certain [d]efendants … solicited stockholder approval to increase the

19   number of authorized shares of common stock from 200 million to 500 million shares.'" *Schuster*

20   *v. Superior Court*, 127 Cal. App. 4th 305, 313 (2005) (emphasis added). Second, in *Schuster* the

21   plaintiff alleged dilution of voting power, not solely diminution in value or equity. The crux of

22   the voting-related allegations there was that defendants had solicited a vote "to increase the

23   number of outstanding shares by 150%, *diluting the ownership interest of plaintiff and the*

24   *[c]lass members* while defendants and other persons who participated [in] Peregrine's stock

---

[2]    In a footnote, the *Vogel* court made it even more clear that its opinion pertains to dilution of voting rights: "Lead Plaintiff relies on *In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319 (Del.1993) and *Oliver v. Boston Univ.*, No. 16570, 2000 WL 1091480 (Del.Ch. July 25, 2000) to support the argument that the **dilution of economic interests and voting power** involved here constitute individual injuries sufficient to support a direct action. These cases are distinguishable." *Vogel*, 2007 WL 3461163 at *3 n.2. (emphasis added).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FRANCISCO

8       Case No. 107CV093465

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1    option or restricted share awards plans received proportionate increases to their positions at this

2    time." *Id.* at 311.  Similar dilution allegations are at issue here.  *See* Compl. ¶¶ 79, 85.

3         A claim *identical* to that asserted by Plaintiff is proceeding *as a derivative action* in

4    another court.  *See City of Ann Arbor Employees' Retirement System v. Gecht*, No. C-06-7453

5    EMC, 2007 WL 760568, *1 (N.D. Cal. March 9, 2007).  The plaintiff in *Gecht* alleges that

6    "[d]efendants breached their fiduciary duty by failing to disclose in EFI's 2006 proxy statement

7    their practice of backdating stock options to their benefit and to shareholders' detriment."  The

8    thrust of the complaint there, as here, is that shareholders would not have approved a new stock

9    option plan and other stock option-related compensation if they had known of prior stock option

10   backdating.  *Id.*

11        **C.    Plaintiff's Claims are Derivative Because They Seek Rescission of the Stock
              Options Plan**

12

13        Moreover, Plaintiff does not address an important aspect of the *Elster* decision, where the

14   Delaware Court of Chancery found that relief substantially identical to the relief sought here

     would benefit the corporation.  In *Elster*, like in the instant action, Plaintiff sought to enjoin

15   issuance of stock issued under a stock options plan.  Since it was the corporation "entering into

16   the contract" to issue stock options, the corporation, and not plaintiffs, would benefit from the

17   cancellation of that agreement.  *Elster*, 845 A.2d at 222.  It is well-established that under

18   Delaware law "[t]he elimination of [improperly issued] stock restore[s] equal voting rights to all

19   [a corporation's] stockholders and remedie[s] an arguable breach of fiduciary duty by defendants.

20   Those are *corporate benefits*..."  *Bray v. Oklahoma Pub. Co.*, Civ. A. No. 10793, 1991 WL

21   189136 (Del. Ch. Sept. 24, 1991) (emphasis added).

22

23   **III.   LEAVE TO AMEND SHOULD BE DENIED.**

24        The Court properly denies leave to amend where, as here, no set of facts can entitle the

25   Plaintiff to the relief sought in the Complaint.  *Schuster*, 127 Cal. App. 4th at 318 (affirming trial

     court order sustaining demurrer without leave to amend where claim was derivative in nature).

26   Plaintiff's Opposition offers only flawed legal arguments, and no proposed allegations that could

27   cure the defects in the Complaint.  *See* Opp. at 9.  As set forth above, these are not specific facts

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

9        Case No. 107CV093465
REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1    Plaintiff seeks to plead that could support a cause of action.

2         Plaintiff cannot "bolster his claim" that his right to vote for the issuance of shares was

3    impeded, because he cannot allege that the stock option grants which he seeks to rescind were

4    granted to benefit a controlling shareholder. Plaintiff apparently concedes he cannot allege that

5    his interest in KLA was diluted to the benefit of a controlling shareholder (which is not surprising

6    given that KLA has hundreds of millions of outstanding shares and does not have any controlling

7    shareholders). Indeed, the proxy statements incorporated by reference in Plaintiff's own

8    Complaint plainly demonstrate that there has been and is no controlling shareholder of KLA. *See*

9    Request for Judicial Notice ("RJN"), Ex. 1 (disclosing that "[a]ll directors and executive officers

10   as a group" owned only 3.16% of the shares of KLA in 2004); RJN, Ex. 2 (disclosing that "[a]ll

11   directors and executive officers as a group" owned only 4.99% of KLA's shares in 1998).

12   Additionally, regardless of what verbiage Plaintiff might add regarding damages, the fact that he

13   seeks to rescind KLA stock option plans and cancel millions of shares can only be a remedy that

14   primarily benefits KLA under *Elster* and thus cannot be asserted in this action. Since Plaintiff

15   cannot show that the defendants increased their voting power at the expense of other shareholders

16   through the option issuances in question, his claim is destined to be derivative under *Gentile* and

17   must be dismissed. Moreover, as set forth above, Plaintiff could not allege a direct cause of

18   action for breach of fiduciary duty related to the election of KLA directors.

19                              **CONCLUSION**

20        This Court should sustain KLA's demurrer to Plaintiff's complaint because it cannot be

21   maintained as an individual action. Moreover, because it is clear from Plaintiff's Opposition that

22   he cannot allege facts showing any distinct harm suffered by him or any class of shareholders,

23   this Court should deny leave to amend the Complaint.

24   DATED: February 15, 2008                Respectfully submitted,

25                                           MORGAN LEWIS & BOCKIUS, LLP

26

27                                           By:_____/s/_____
                                                  JOSEPH E. FLOREN
28                                           *Attorneys for Defendant KLA-Tencor Corporation*

Morgan, Lewis &
Bockius LLP
Attorneys At Law San
Francisco

10        Case No. 107CV093465

REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEMURRER

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1

2

*Chris Crimi, et al. v. Edward W. Barnholt, et al.*
**Santa Clara County Superior Court Case No. 107CV093465**

3

4        I, the undersigned, declare:  that I am, and was at the time of service of the documents
herein referred to, over the age of 18 years, and not a party to the action; and I am employed in

5    the County of San Francisco, California.  My business address is One Market, Spear Street
Tower, San Francisco, California 94105.

6

7        On the date executed below, I electronically served the document(s) via the Santa Clara
Superior Court's electronic filing system described as:

8

9    **REPLY MEMORANDUM OF POINTS IN SUPPORT OF DEFENDANT KLA-
TENCOR'S DEMURRER**

10   on the recipients designated on the Transaction Receipt located on the Santa Clara County
Superior Court's electronic filing website.  I declare under penalty of perjury pursuant to the laws

11   of the State of California that the foregoing is true and correct and was executed on February 15,
2008.

12

13

14                                              _____/s/_____
                                                  Laura Walker

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

1-SF/7666882.1

1    MORGAN, LEWIS & BOCKIUS LLP
     JOSEPH E. FLOREN (SBN 168292)
2    TERA M. HEINTZ (SBN 241414)
     MATTHEW S. WEILER (SBN 236052)
3
     One Market, Spear Street Tower
4    San Francisco, CA 94105-1126
     Tel: 415.442.1000
5    Fax: 415.442.1001
6    Attorneys for Defendant KLA-Tencor Corporation
7
8              SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                   COUNTY OF SANTA CLARA
10
11   CHRIS CRIMI, on Behalf of Himself and       Case No. 107CV093465
     All Others Similarly Situated,
12                                               **APPENDIX OF OUT-OF-STATE**
                  Plaintiff,                     **AUTHORITIES IN SUPPORT OF KLA**
13                                               **TENCOR CORPORATION'S REPLY**
           vs.                                   **MEMORANDUM OF LAW IN FURTHER**
14                                               **SUPPORT OF ITS DEMURRER**
     EDWARD W. BARNHOLT, H.
15   RAYMOND BINGHAM, ROBERT T.                  Hearing Date: February 22, 2008
     BOND, RICHARD J. ELKUS, JR.,                Hearing Time: 9:00 A.M.
16   STEPHEN P. KAUFMAN, KENNETH                 Department: 17C
     LEVY, MICHAEL E. MARKS, DEAN O.             Judge: Hon. Jack Komar
17   MORTON, KENNETH L. SCHROEDER,
     JON D. TOMPKINS, RICHARD P.                 Date Filed: September 4, 2007
18   WALLACE, KLA-TENCOR
     CORPORATION, and DOES 1 through 25,
19
                  Defendants.
20
21
22
23
24
25
26
27
28

APPENDIX OF OUT-OF-STATE AUTHORITIES

1    **TO THE COURT AND ALL PARTIES OF RECORD:**

2         Please take notice that Defendant KLA-Tencor Corporation hereby submits the following

3    out-of-state authorities in support of its reply memorandum of law in further support of its

4    demurrer:

5

6    *Bray v. Oklahoma Pub. Co.*,

7         Civ. A. No. 10793, 1991 WL 189136 (Del. Ch. Sept. 24, 1991) ........................................Tab 1

8    *City of Ann Arbor Employees' Retirement System v. Gecht*,

9         No. C-06-7453 EMC, 2007 WL 760568  (N.D. Cal. March 9, 2007) ................................Tab 2

10   *Indiana Elec. Workers Pension Trust Fund, IBEW v. Dunn*,

11        No. C-06-0177 RMW,  2007 WL 1223220 (N.D. Cal. March 7, 2007) .............................Tab 3

12   *Loudon v. Archer-Daniels-Midland Co.*,

13        700 A.2d 135 (Del. 1997) ...................................................................................................Tab 4

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

APPENDIX OF OUT-OF-STATE AUTHORITIES

1

**PROOF OF SERVICE BY ELECTRONIC TRANSMISSION**

2

*Chris Crimi, et al. v. Edward W. Barnholt, et al.*
**Santa Clara County Superior Court Case No. 107CV093465**

3

4

        I, the undersigned, declare:  that I am, and was at the time of service of the documents
herein referred to, over the age of 18 years, and not a party to the action; and I am employed in
the County of San Francisco, California.  My business address is One Market, Spear Street
Tower, San Francisco, California 94105.

5

6

7

        On the date executed below, I electronically served the document(s) via the Santa Clara
Superior Court's electronic filing system described as:

8

9

**APPENDIX OF OUT-OF-STATE AUTHORITIES**

10

on the recipients designated on the Transaction Receipt located on the Santa Clara County
Superior Court's electronic filing website.  I declare under penalty of perjury pursuant to the laws
of the State of California that the foregoing is true and correct and was executed on February 15,
2008.

11

12

13

14

                                                    _____/s/_____

15

                                                            Laura Walker

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Westlaw.

Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 1991 WL 189136 (Del.Ch.), 17 Del. J. Corp. L. 1093
(Cite as: 1991 WL 189136 (Del.Ch.), 17 Del. J. Corp. L. 1093)

**H**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle
County.
Jim G. BRAY, Jr., Plaintiff,
and
R. Scott Neely, Intervenor-Plaintiff and Counter-
Defendant
v.
The OKLAHOMA PUBLISHING COMPANY, De-
fendant and Counter-Claimant
and
Edward L. Gaylord, Donald C. Dickinson, Thelma
F. Gaylord, Christine Gaylord
Everest, Edward K. Gaylord, II, Edith Gaylord
Harper, Martin C. Dickinson,
Eugene Katz, William F. Wetmore, Jr., G.M.
Stinchcomb, E.W. Wendell and James
R. Terrell, Defendants.
Civ. A. No. 10793.

Submitted: July 17, 1991.
Decided: Sept. 24, 1991.

**1094 Joseph A. Rosenthal of Rosenthal, Monhait
& Gross, P.A., Wilmington, for plaintiff.

Allen M. Terrell, Jr. of Richards, Layton & Finger,
Wilmington, for intervenor.

Edward B. Maxwell, 2nd of Young, Conaway, Star-
gatt & Taylor, Wilmington, and Mark H. Tuohey,
III, Frederic T. Spindel, George R. Clark, and
Daniel K. Steen, of Reed, Smith, Shaw & McClay,
Washington, D.C., for defendants.

MEMORANDUM OPINION
BERGER, Vice Chancellor.

*1 This is the decision on a motion for attorneys'
fees in an action challenging the creation of a class
of super-voting common stock (the "Class B
Stock") of defendant, The Oklahoma Publishing
Company ("OPUBCO"). Jim G. Bray, Jr., a

"friendly" stockholder, commenced this litigation in
1989 with a complaint seeking a declaratory judg-
ment upholding the validity of a 1987 recapitaliza-
tion plan pursuant to which the Class B Stock was
created and **1095 issued as a stock dividend.
Defendants, OPUBCO and its directors, immedi-
ately filed an answer admitting all of the allegations
in the complaint and moved for an order providing
OPUBCO stockholders with notice and an oppor-
tunity to intervene.

R. Scott Neely intervened and filed a complaint
challenging the recapitalization plan on several
grounds. Specifically, intervenor alleges that he,
his sisters and his mother are beneficial owners of
OPUBCO common stock through irrevocable trusts
set up by intervenor's maternal grandparents, Ed-
ward K. and Inez K. Gaylord (the "Family
Trusts"). Intervenor's uncle, Edward L. Gaylord
("Gaylord"), is a controlling stockholder, officer
and director of OPUBCO and was, until they ter-
minated in 1989, the sole trustee of the Family
Trusts. In the summer of 1987, Gaylord and the
other individual defendants, acting by written con-
sent, adopted an amendment creating the Class B
Stock. The new class of common stock carried ten
votes per share and was issued as a dividend to all
OPUBCO stockholders, including the Family
Trusts. However, because intervenor and members
of his immediate family were only beneficial hold-
ers of OPUBCO stock as of July, 1987, they did not
meet the definition of "permitted transferees" under
the terms of the Class B Stock. Thus, when the
Family Trusts terminated in 1989, neither interven-
or nor certain of his relatives received any Class B
Stock. Instead, they received ordinary common
stock and their relative voting power was dimin-
ished.

Intervenor's complaint alleges that, in adopting the
recapitalization plan, defendants manipulated the
corporate machinery to entrench Gaylord and viol-
ated Delaware law by creating "manifestly unreas-
onable" stock transfer restrictions. In addition,

Not Reported in A.2d                                                                Page 2
Not Reported in A.2d, 1991 WL 189136 (Del.Ch.), 17 Del. J. Corp. L. 1093
(Cite as: 1991 WL 189136 (Del.Ch.), 17 Del. J. Corp. L. 1093)

Gaylord is charged with having breached his fiduciary duty as trustee of the Family Trusts. According to the complaint, the restriction on permitted transferees was specifically intended to keep intervenor and certain members of his family from receiving Class B Stock. Those same restrictions were carefully worded to avoid the transfer problem for Gaylord's children. Gaylord allegedly devised this discriminatory plan in order to increase his family's voting power and reduce that of intervenor's family. The remedies sought by intervenor include cancellation of the Class B Stock; a declaration that the definition of permitted transferees is invalid; or an order requiring OPUBCO to issue Class B Stock to intervenor and the other excluded members of his family.

**\*2** The parties engaged in discovery, including depositions and document production, for approximately one year. In September, 1990, while intervenor was still pressing for discovery, the OPUBCO **\*\*1096** board voted to rescind the Class B Stock. That decision was approved by the OPUBCO stockholders on November 29, 1990. At about the same time that the Class B Stock was eliminated, Gaylord entered into a voting trust pursuant to which he obtained voting control of over 50% of OPUBCO's common stock. In a status report filed with this Court in February, 1991, OPUBCO indicated that this action had become moot.

The most recent statement of the law governing an application such as this may be found in *Tandycrafts, Inc. v. Initio Partners,* Del.Supr., 562 A.2d 1162 (1989). In that case, the Delaware Supreme Court reviewed those circumstances under which this Court may order defendants to pay plaintiffs' attorneys' fees at the conclusion of corporate litigation. Such an award is appropriate where a derivative or class action suit results in the creation of a common fund or confers a corporate benefit. The "corporate benefit" need not be measurable in dollars. "Changes in corporate policy or ... a heightened level of corporate disclosure, if attributable to the filing of a meritorious suit, may justify

an award of counsel fees." *Id.* at 1165. If defendants take action that benefits the corporation after the filing of a meritorious lawsuit, the burden is on them to show that there was no causal relationship between the beneficial action and the lawsuit. *Tandycrafts* at 1165, citing *Allied Artists Picture Corp. v. Baron,* Del.Supr., 413 A.2d 876, 880 (1980). Finally, a plaintiff will not be denied attorneys' fees simply because the corporate lawsuit was brought individually rather than as a class or derivative action. "[T]he critical inquiry is not the status of the plaintiff but the nature of the corporate or class benefit which is causally related to the filing of suit." *Tandycrafts* at 1166.

Defendants oppose the fee application on several grounds. They argue that the complaint is not meritorious; the decision to rescind the Class B Stock was not related to the litigation; and the lawsuit is an individual action that conferred no benefit on OPUBCO. For a complaint to be "meritorious" for purposes of the award of attorneys' fees, it must be able to withstand a motion to dismiss and plaintiff must possess "knowledge of provable facts which hold out some reasonable likelihood of ultimate success." *Chrysler Corp. v. Dann,* Del.Supr., 223 A.2d 384, 387 (1966). Defendants argue that the complaint is not meritorious because, as intervenor well knew, Gaylord had voting control before the Class B Stock was created. Thus, he had no need to create a super-voting stock that would not be distributed to intervenor's family. Moreover, according to defendants, intervenor acknowledged that his claims were **\*\*1097** baseless by withdrawing virtually identical claims that had been asserted in an Oklahoma action.

**\*3** I am satisfied that intervenor's complaint is meritorious for present purposes. Defendants tacitly acknowledge that the alleged adoption of the Class B Stock for the improper purpose of entrenching Gaylord states a claim sufficient to withstand a motion to dismiss. Defendants focus, instead, on intervenor's purported knowledge that his claim had no reasonable likelihood of ultimate success. I

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

find to the contrary.

Apparently there has been long standing hostility between Gaylord and the Neelys. This fact, combined with the fact that only the Neelys and a few other beneficial stockholders were excluded from receiving the super-voting stock suggests that the creation of the Class B Stock was improperly motivated. In addition, Gaylord and the other defendants did not reveal the impact of the restrictions on transfer to the Neelys. The 1987 notice of the creation of the Class B Stock did not describe the transfer restriction applicable to the Neelys. Approximately one year later, when one of intervenor's siblings wrote to Gaylord asking, among other things, how many shares of each class of stock she would be receiving upon distribution of the Family Trusts, Gaylord's response did not include an answer to that question.

These facts are sufficient to hold out some reasonable likelihood of success on a claim that the Class B Stock was created to increase Gaylord's voting control and diminish the voting power of the Neely family. The fact that a similar claim was abandoned in Oklahoma does not alter my conclusion. It appears that the Neelys are pursuing a claim for attorneys' fees in Oklahoma and that the litigation decisions made in that action are not a reflection of the Neely's belief in the validity of their Delaware claims.

Defendants next argue that their decision to rescind the Class B Stock was totally unrelated to this litigation. They point to minutes of board of directors meetings conducted in June and September, 1990, at which that decision was considered. The board minutes indicate that the directors thought it sensible to return to one class of stock since OPUBCO no longer had plans to go public in the foreseeable future and a recent court decision striking down an SEC Rule meant that OPUBCO probably would be able to establish two classes of stock in the future if it so desired.

The reasons offered by defendants may well have

contributed to their decision to rescind the Class B Stock. However, there is other evidence to suggest that this litigation also played a role in **1098 the decision. At about the same time that the directors first considered this subject, in June, 1990, the parties were engaged in settlement discussions. By the time of the September board meeting, when the directors voted to rescind the stock, settlement discussions had broken down and intervenor was attempting to schedule the deposition of Gaylord, among other defendants. It seems more than coincidental that the OPUBCO board considered rescission of the Class B Stock at two points in time when this litigation was the focus of some attention. Moreover, there is some evidence that OPUBCO never had any specific plans to go public. It would follow, if the company did not create the Class B Stock in connection with a plan to go public, that it would not have rescinded the Class B Stock because it abandoned the purported plan. In sum, I conclude that defendants have not shown that the litigation did not contribute to their decision to rescind the Class B Stock.

*4 Finally, defendants object to the request for attorneys' fees on the ground that intervenor brought an individual action and the rescission of the Class B Stock created no benefit for a class of stockholders or the corporation. First, the fact that Neely brought an individual action is not dispositive, as noted earlier. The issue is whether that individual action provided a consequential benefit to the corporation or a class of its stockholders. Defendants argue that there was no benefit because, they say, there was no wrong to be corrected. I am not persuaded by this argument. I have already found that the claim is meritorious for purposes of an award of attorneys' fees. Thus, the Class B Stock was of questionable validity. The elimination of that stock restored equal voting rights to all OPUBCO stockholders and remedied an arguable breach of fiduciary duty by defendants. Those are corporate benefits that support an award of attorneys' fees.

The parties did not address the reasonableness of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                    Page 4
Not Reported in A.2d, 1991 WL 189136 (Del.Ch.), 17 Del. J. Corp. L. 1093
**(Cite as: 1991 WL 189136 (Del.Ch.), 17 Del. J. Corp. L. 1093)**

the amount of fees being sought by intervenor and I
will not decide that question before giving defend-
ants an opportunity to to be heard.    I request that
the attorneys consult and advise the Court within 30
days as to what, if any, additional proceedings are
necessary in that regard.

*IT IS SO ORDERED.*

Not Reported in A.2d, 1991 WL 189136 (Del.Ch.),
17 Del. J. Corp. L. 1093

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 2**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760568 (N.D.Cal.)
(Cite as: 2007 WL 760568 (N.D.Cal.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
CITY OF ANN ARBOR EMPLOYEES' RETIRE-
MENT SYSTEM, et al., Plaintiffs,
v.
Guy GECHT, et al., Defendants.
and
Electronics for Imaging, Inc., a Delaware Corpora-
tion, Nominal Defendant.
No. C-06-7453 EMC.
Docket No. 7.

March 9, 2007.

Ignacio E. Salceda, David L. Lansky, Douglas John
Clark, John Douglas Cooke, Wilson Sonsini
Goodrich & Rosati Professional Corporation, Palo
Alto, CA, for Defendants.

**ORDER DENYING PLAINTIFF'S MOTION
TO REMAND**
EDWARD M. CHEN, United States Magistrate
Judge.

*1 Having considered the parties' briefing and ac-
companying submissions, as well as the oral argu-
ment of counsel, the Court hereby **DENIES**
Plaintiff City of Ann Arbor Employees' Retirement
System's motion to remand. The Court also
**DENIES** Plaintiff's request for attorney's fees pur-
suant to 28 U.S.C. § 1447(c).

**I. FACTUAL & PROCEDURAL BACKGROUND**
Plaintiff, a retirement system for employees of the
City of Ann Arbor, is a shareholder of a company
by the name of Electronics for Imaging, Inc.
("EFI"). Plaintiff filed a derivative suit and class
action against various officers and directors of EFI,
alleging, *inter alia,* that Defendants breached their
fiduciary duty by failing to disclose in EFI's 2006
proxy statement their practice of backdating stock
options to their benefit and to shareholders' detri-

ment. EFI's 2006 proxy statement sought sharehold-
er approval for (a) amendments to the 2004 Equity
Incentive Plan and (b) an amendment to the 2000
Employee Stock Purchase Plan. *See* Compl. ¶ 43;
*see also* Ignacio Decl. ISO Mot. to Dismiss, Ex. A
(2006 proxy statement). One of the amendments to
the 2004 Equity Incentive Plan was to increase the
number of shares of common stock authorized for
issuance thereunder by an aggregate 4.5 million
shares. The amendment to the 2000 Employee
Stock Purchase Plan was to extend and increase a
provision providing an automatic share increase in
the number of shares authorized for issuance from
2006 through 2012. *See* Compl. ¶ 1. The complaint
alleges that the proxy solicitations were misleading
because they did not disclose that, from at least
1996 through 2003, the Board improperly back-
dated options to certain current or former directors,
senior officers, and other employees in violation of
previously shareholder approved stock option
plans. *See id.* ¶ 2. The thrust of Plaintiff's complaint
is that "[a] shareholder who knew that Company
executives backdated options granted under prior
plans (thereby providing not only improper com-
pensation to EFI directors and employees but also
artificially inflating net income and rendering cer-
tain tax deductions unavailable) would not have
voted in favor of expanding the Compensation
Committee's ability to issue stock options under the
2004 Plan or other forms of compensation under the
2000 Employee Stock Purchase Plan." Compl. ¶ 56.

Plaintiff initially filed suit in state court on Novem-
ber 22, 2006. Before Plaintiff could serve the sum-
mons and complaint on any of the Defendants in
the case, one of the Defendants--namely, Thomas
Unterberg--made a general appearance in state
court on December 5, 2006, and promptly removed
to federal court on the same day. *See* Barry Decl.,
Exs. C-D. Plaintiff has moved to remand the case
back to state court.

**II. DISCUSSION**
Mr. Unterberg argues that removal is appropriate in

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2007 WL 760568 (N.D.Cal.)
(Cite as: 2007 WL 760568 (N.D.Cal.))

the instant case pursuant to the removal provision of the Securities Litigation Uniform Standards Act ("SLUSA"), as well as the general removal statute. *See* 28 U.S.C. § 1441(b). There is a strong presumption against removal jurisdiction. Mr. Unterberg has the burden of establishing that removal is proper. *See Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir.1992).

A. *SLUSA*

*2 In 1995, Congress passed the Private Securities Litigation Reform Act ("PSLRA") to curtail perceived abuses of the class-action vehicle in litigation involving nationally traded securities. *See Merrill Lynch, Pierce, Fenner & Smith v. Dabit*, 547 U.S. 71, 126 S.Ct. 1503, 1510, 164 L.Ed.2d 179 (2006). Among other things, the PSLRA imposed heightened pleading requirements in actions brought pursuant to § 10(b) of the Securities Exchange Act of 1934 and Rule 10-b(5). *See id.* at 1511. However, the PSLRA

had an unintended consequence. It prompted at least some members of the plaintiffs' bar to avoid the federal forum altogether. Rather than face the obstacles set in their path by the Reform Act, plaintiffs and their representatives began bringing class actions under state law, often in state court. The evidence presented to Congress during a 1997 hearing to evaluate the effects of the Reform Act suggested that this phenomenon was a novel one; state-court litigation of class actions involving nationally traded securities had previously been rare. To stem this "shif[t] from Federal to State courts" and "prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of" the Reform Act, Congress enacted SLUSA. *Id.*

The core provision of SLUSA is as follows:
(1) Class action limitations. No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--

(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.
(2) Removal of covered class actions. Any covered class action in any State court involving a covered security, as set forth in paragraph (1), shall be removable to the Federal district court for the district in which the action is pending, and shall be subject to paragraph (1).
15 U.S.C. § 78bb(f)(2). In short, SLUSA provides for the removal and preemption of certain securities class actions filed in state court. However, certain types of class actions are exempted under SLUSA if based on the statutory or common law of the issuer's state of incorporation. *See* 15 U.S.C. § 78bb(f)(3). The exemptions are known as the Delaware carve-outs.

In its motion to remand, Plaintiff does not dispute that its class action--the first cause of action in its complaint--falls within the scope of SLUSA. Plaintiff's only contention is that its class action cannot be removed or preempted pursuant to SLUSA because the class action is covered by one of the Delaware carve-outs, namely, the second carve-out. [FN1] *See also Greaves v. McAuley*, 264 F.Supp.2d 1078, 1085 (N.D.Ga.2003) ("Once a 'covered class action' has been removed to a federal court, if the Delaware carve-out applies, the federal court is required to 'remand such action'... to state court.").

> FN1. The Court acknowledges that, in opposition to Mr. Unterberg's motion to dismiss, Plaintiff claims that both Delaware carve-outs are applicable. However, because Plaintiff failed to raise the applicability of the first carve-out in its motion to remand, the Court addresses only the second carve-out.

*3 Under the second Delaware carve-out, a class

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 760568 (N.D.Cal.)
(Cite as: 2007 WL 760568 (N.D.Cal.))

action is exempt from SLUSA's removal and pree-
mption rules

    if it involves--

    ....

    (II) any recommendation, position, or other com-
munication with respect to the sale of securities
of an issuer that--

    (aa) is made by or on behalf of the issuer or an
affiliate of the issuer to holders of equity securit-
ies of the issuer; and

    (bb) concerns decisions of such equity holders
with respect to voting their securities, acting in
response to a tender or exchange offer, or exer-
cising dissenters' or appraisal rights.

*Id.* § 78bb(f)(3)(A)(ii). According to Plaintiff, its
class action "involve [s] 'recommendations' or 'com-
munications with respect to the sale of securities of
an issuer' because EFI was requesting shareholder
approval to increase the amount of authorized EFI
shares and transfer certain of these shares under
certain stock option plans." Mot. at 9. Plaintiff con-
tinues that "the communications were made 'by or
on behalf of the issuer or an affiliate of the issuer to
holders of equity securities' because EFI made the
communications to EFI shareholders." *Id.* Finally,
Plaintiffs asserts that "the communications involved
'decisions of such equity holders with respect to
voting their securities' because EFI asked its share-
holders to vote their securities to increase the au-
thorized shares and increase the stock options." *Id.*

In opposition to the motion to remand, Mr. Unter-
berg argues that the above carve-out does not apply
to Plaintiff's class action because the Supreme
Court indicated in *Merrill Lynch* that SLUSA is in-
tended to have a broad preemptive/removal effect.
*See Merrill Lynch,* 126 S.Ct. at 1513 (stating that
"Congress envisioned a broad construction [of
SLUSA]" and that "[a] narrow reading of the statute
would undercut the effectiveness of the 1995 Re-
form Act"). However, *Merrill Lynch* is of limited
support to Mr. Unterberg's position since, as
Plaintiff points out, it does not directly address the
scope of the Delaware carve-outs, and in particular,
the second carve-out.

Mr. Unterberg further argues that the second
Delaware carve-out is not applicable in the instant
case because it "is limited to misrepresentations
made in connection with proposed mergers or ac-
quisitions." Opp'n at 11. But, as Plaintiff points out,
the carve-out contains no such restriction. In fact,
the carve-out expressly states that exempted class
actions are those that involve communications with
respect to the sale of securities that concern de-
cisions of equity holders with respect to voting their
securities *or* acting in response to a tender or ex-
change offer *or* exercising dissenters' or appraisal
rights. *See* 15 U.S.C. § 78bb(f)(3). The statute's use
of the disjunctive negates Mr. Unterberg's narrow
interpretation of the carve-out. Furthermore, courts
have applied the carve-out outside the context of a
merger or acquisition. *See, e.g., In re Metlife De-
mutualization Litig.,* No. CV 00-2258(TCP)(AKT),
2006 U.S. Dist. LEXIS 60104, at *21 (E.D.N.Y.
Aug. 7, 2006) (finding that second Delaware carve-
out applied in case involving reorganization).

*4 Finally, Mr. Unterberg contends that the second
Delaware carve-out is not applicable because
Plaintiff has not alleged that the shareholder vote at
issue was sufficiently related to the sale of securit-
ies. *See* Opp'n at 12. Mr. Unterberg does not dis-
pute that the act of granting stock options consti-
tutes the sale of securities. *See Falkowski v. Imation
Corp.,* 309 F.3d 1123, 1129- 30 (9th Cir.2002)
("The grant of an employee stock option is ... a 'sale'
of that covered secur-
ity."). Rather, according to Mr. Unterberg, the prob-
lem for Plaintiff is that, in the 2006 proxy state-
ment, Defendants did not seek shareholder approval
for the actual granting of stock options. Instead,
Defendants sought, *inter alia,* approval to increase
the shares *authorized* for issuance under the 2004
Equity Incentive Plan. The question therefore, as
posed by Mr. Unterberg, boils down to whether a
proxy statement seeking authorization for issuance
of more stock options, rather than authorization of
actual grant of options, is related enough to consti-
tute a communication "with respect to" the sale of
securities of an issuer.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                     Page 4
Not Reported in F.Supp.2d, 2007 WL 760568 (N.D.Cal.)
(Cite as: 2007 WL 760568 (N.D.Cal.))

Resolution of this issue turns on the phrase "with respect to" as used in the second Delaware carve-out. There is no case law addressing the interpretation of "with respect to," but there are cases addressing the interpretation of the similar phrase "in connection with" (as used in SLUSA), and neither party has pointed to any provision in SLUSA, its legislative history, or case law suggesting that Congress's use of the two different phrases was intended to imply a difference in scope. Certainly there is nothing obvious or inherent in the plain meaning of these phrases that would so suggest. Accordingly, the Court finds the construction of the phrase "in connection with" given by the Supreme Court and the Ninth Circuit persuasive in interpreting "with respect to." [FN2]

> FN2. While it may be argued that the policy of applying SLUSA broadly could imply the threshold requisites for SLUSA should be more liberally construed than the carve-out, there is a countervailing concern, apparently reflected in the Delaware carve-out, that the legislation should not be construed so as to foster the federalization of corporate law. *Cf. Ketchum v. Green,* 557 F.2d 1022, 1029 (3d Cir.1977). In any event, Mr. Unterberg has failed to cite any authority for imparting different definitions here.

In *Merrill Lynch,* the Supreme Court held that, in determining whether an alleged fraud is "in connection with" a purchase or sale of securities so as to trigger the application of SLUSA, "it is enough that the fraud alleged 'coincide' with a securities transaction." *Merrill Lynch,* 126 S.Ct. at 1513. The Ninth Circuit has similarly held that, pursuant to SLUSA, a fraud is "in connection with" a securities transaction if it "coincides" with the transaction or is "more than tangentially related." *Falkowski,* 309 F.3d at 1130-1131.

In *Falkowski,* the Ninth Circuit held that state law fraud claims relating to employee stock options were preempted by SLUSA because the alleged fraud took place "in connection with the purchase or sale of a covered security." *See Falkowski,* 309 F.3d at 1126. The court explained first that the granting of a stock option is a "purchase or sale" of a security for purposes of SLUSA: "The option is a contractual duty to sell security at a later date for a sum of money, should the employee choose to buy it out. Whether or not the employee ever exercises the option, it is a 'sale' under Congress's definition." *Id.* at 1130. The court then concluded that the alleged fraud was sufficiently related to the contract to sell stock to meet the "in connection with" requirement.

*5 The claim that defendant concealed [an] impending accounting write-off sufficiently alleges fraud "in connection" with a contract to sell [company] shares because it involves a misrepresentation about the value of the options. The claim that defendants concealed their plan to force early exercise of the options is also sufficient because it relates to the time period during which the Employees could exercise their rights to purchase. These allegations both "coincide" with the securities transaction and area easily characterized as having "more than some tangential relation to" the securities themselves. *Id.* at 1131.

While the Ninth Circuit has not further elaborated on what constitutes "more than tangentially related," it has held--consistent with *Merrill Lynch*--that the meaning of "in connection with" in the context of § 10(b) and Rule 10b-5 claims is instructive in construing SLUSA. *See id.* at 1129; *see also Merrill Lynch,* 126 S.Ct. at 1513 (looking to how the Supreme Court has construed "in connection with" in the § 10(b) and 10b-5 context); *Sofonia v. Principal Life Ins. Co.,* 465 F.3d 873, 877-78 (8th Cir.2006) ("constru[ing] the phrase 'in connection with the purchase or sale of a covered security' as used in SLUSA by looking to interpretations of identical language used in § 10(b) of the Securities Exchange Act of 1934 and in Securities and Exchange Commission (SEC) Rule 10b-5"); *Strigliabotti v. Franklin Res., Inc.,* 398 F.Supp.2d

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2007 WL 760568 (N.D.Cal.)
(Cite as: 2007 WL 760568 (N.D.Cal.))

1094, 1100 (N.D.Cal.2005) (taking note of the above standard in *Falkowski* and also noting that, in a case dealing with § 10(b) and 10b-5 claims, the Supreme Court concluded that there is a connection between an alleged fraud and a securities transaction where the fraudulent scheme and securities transaction " 'coincide' "). Thus, cases which address the "in connection with" requirement of § 10(b) and Rule 10(b)-5 are illuminating to the issue at bar.

In *In re Financial Corporation of America Shareholder Litigation, 796 F.2d 1126 (9th Cir.1986)*, the Ninth Circuit held that, in the context of § 10(b),

[o]ne factor to be considered in determining whether the "in connection with" requirement has been met is whether a causal connection between the fraud and the transaction has been shown. *Boffo v. Graddick, 742 F.2d 592, 596 (11th Cir.1984)* (citing *Ketchum v. Green, 557 F.2d 1022, 1025-30 (3d Cir.), cert. denied, 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977)*. This "transactional nexus requirement is a species of causation [in fact]. Consistent with § 10(b)'s 'in connection with' limitation on liability, it prohibits claims based on the extremely attenuated links between plaintiff's injury and defendant's conduct [as alleged]." *Hudson v. Capital Management International, Inc., 565 F.Supp. 615, 622 (N.D.Cal.1983)*.

*Id.* at 1130.

In *Ketchum*, cited by the Ninth Circuit, the Third Circuit amplified the analysis of the nexus required to satisfy the "in connection with" requirement, holding that the "connection" element of § 10(b) concerns "the degree of proximity" between the securities transaction and the claimed fraud. *Ketchum, 557 F.2d at 1028*. The court gave as an example the "fairly tight linkage" in the Supreme Court's decision in *Superintendent of Insurance v. Bankers Life and Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)*, where the misrepresentation "was only one step removed" from the bond transaction and the transaction was "undertaken for the

purpose of making possible the practices alleged to be deceptive." *Ketchum, 557 F.2d at 1028*.

*6 Here, there is more than a "tangential" relationship between Defendants' allegedly fraudulent communications to shareholders and the prospective sale of securities at issue (*i.e.*, stock option grants). [FN3] *Falkowski, 309 F.3d at 1130-31*. The authorization sought by the allegedly misleading proxy statement has a "transactional nexus" with any further option grants. *In re Financial Corp. of Am. Shareholder Litig., 796 F.2d at 1130*. The shareholder authorization was a necessary predicate to any further grants of backdated options, options contemplated by the complaint. [FN4] The complaint fairly implies the purpose of the misleading proxy solicitation was to facilitate further backdated options. There is thus clear causal connection between the proxy statement and the anticipated transaction.

FN3. Although not briefed by either party, the fact that the allegedly misleading communication concerned past sale of securities (backdated options granted in 1996-2003) makes this case somewhat unique. Plaintiff alleges that these misleading disclosures and omissions about these grants were "essential links" in obtaining shareholder approval. It could therefore be argued that, at least *retrospectively*, the misleading proxy solicitation literally constituted a "communication with respect to the sale of securities" which was made by the issuer to shareholders and which concerned shareholder decisions with respect to voting their securities. However, in light of the Court's holding herein, this issue need not be resolved.

FN4. The complaint alleges that the Board is controlled by Defendants, *see* Compl. ¶ 71, and that Defendants "improperly extracted from the public shareholders a portion of the economic value and voting power of the public shareholder's shares

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                              Page 6
Not Reported in F.Supp.2d, 2007 WL 760568 (N.D.Cal.)
(Cite as: 2007 WL 760568 (N.D.Cal.))

and redistributed the economic value and voting power to themselves and to the EFI employees under their control." *Id.* ¶ 19. The complaint seeks a preliminary and permanent injunction barring issuance of any shares of common stock pursuant to the exercise of backdated options or the granting of any options under the 2004 Equity Incentive Plan. *See id.* ¶ 113. The complaint thus fairly implies the proxy solicitation intended to facilitate further grants of improper stock options. *See Fed. Ins. Co. v. Tyco Int'l Ltd., 422 F.Supp.2d 357, 391 (S.D.N.Y.2006)* ("When considering a motion to remand, the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff."); *Jamison v. Purdue Pharma Co., 251 F.Supp.2d 1315, 1318 (S.D.Miss.2003)* ("When considering a motion to remand the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff."); *Clancy v. Bay Area Bank,* Nos. C97-0077 FMS, C96-4376 FMS, 1997 U.S. Dist. LEXIS 4914, at *9 (N.D.Cal. Apr. 7, 1997) ("Because a motion to remand is analogous to a motion to dismiss, the Court accepts the allegations of plaintiff's complaint as true.").

Moreover, there is a high degree of proximity in the causal chain. Defendants would not need to make any further communications with shareholders before granting the options: no further shareholder approval is necessary once the authorization was obtained. The proxy statement was the last necessary "communication with respect to the sale of securities" which concerns "decision of such equity holders with respect to voting their securities." *Compare Superintendent of Ins. v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)* (case in which the misrepresentation in obtaining shareholder authorization was only one step

away from the granting of the options), *with Ketchum, 557 F.2d at 1028* (noting that "there are a substantial number of intermediate steps between the fraud and the accomplishment of the forced sale of plaintiffs' shares: the shareholders' vote subsequent to the misrepresentation; the ensuing meeting of the company directorate during which the plaintiffs were removed as officers; and the adoption of the resolution terminating the plaintiffs' status as company employees."). *See also Brown v. Ivie, 661 F.2d 62, 65-66 (5th Cir.1981)* (finding causal connection where defendants fraudulently induced plaintiff to sign agreement requiring him to sell stock at less than fair value upon termination and where, after obtaining agreement, defendants terminated plaintiff); *Dalicandro v. Legalgard, Inc.,* No. 99-3778, 2000 U.S. Dist. LEXIS 3089, at *8-9 (E.D.Pa. Mar. 16, 2000) (finding a sufficient connection where there was only one intermediate step between the fraud and the sale of stock).

The Court notes that, at the hearing on the motion to remand, it asked the parties to comment on the relevance of *Wilson v. First Houston Inv. Corp., 566 F.2d 1235 (5th Cir.1978)*. There, the plaintiff filed a 10b-5 suit against his investment advisor, arguing that the transfer of control over his stock portfolio to the advisor satisfied the requirement that the alleged fraud be "in connection with the purchase and sale of securities." The Fifth Circuit concluded that "any purchase and sale which took place incident to this arrangement was too remote to satisfy the 'in connection with the purchase and sale' requirement as contemplated by *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)*." *Id.* at 1243. Given *Wilson,* it could be argued that, in the instant case, the mere authorization for issuance of more stock options is too remote or speculative to satisfy the requirement that the recommendation, position, or communication be "with respect to the sale of securities."

*7 The Court, however, finds *Wilson* inapposite. First, *Wilson* is in tension with the more recent Su-

Not Reported in F.Supp.2d                                                                          Page 7
Not Reported in F.Supp.2d, 2007 WL 760568 (N.D.Cal.)
(Cite as: 2007 WL 760568 (N.D.Cal.))

preme Court decision *Merrill Lynch* and its progeny which have construed "in connection with." Also, at least one district court has found *Wilson* unconvincing because it does not contain a substantive analysis of the required "connection" for a 10b-5 claim. *See In re Catanella & E.F. Hutton & Co., Sec. Litigation, 583 F.Supp. 1388, 1411 & n. 32 (E.D.Pa.1984)* ("Without analysis, the [*Wilson* ] court simply declared the fraud too remote from the transactions. Thus, *Wilson* lends little guidance."). More important, *Wilson* is factually distinguishable. In contrast to the general transfer of authority at issue in *Wilson,* here, it is alleged that the proxy solicitation was directly related to the option grants: shareholder authorization was a necessary predicate to further option grants and was intended to facilitate such grants, and it was only one step away from any further grants. *See also Ambassador Hotel v. Wei-Chuan Inv., 189 F.3d 1017 (9th Cir.1999)* (finding a sufficient connection where the fraudulent solicitation concerned a joint venture agreement that did not mention stock but gave the newly formed corporation the ability to later issue stock).

Accordingly, the Court concludes that Mr. Unterberg's attempt to remove pursuant to SLUSA was not justified because Plaintiff's class action falls within the scope of the second Delaware carve-out.

**B. *28 U.S.C. § 1441(b)***

Although the Court concludes that removal pursuant to SLUSA was not warranted, Mr. Unterberg has articulated another basis for removal pursuant to 28 U.S.C. § 1441(b).

There is no dispute that Plaintiff could have filed suit in federal court based on diversity jurisdiction. Plaintiff is a citizen of Michigan and none of the Defendants are citizens of Michigan. Plaintiff, however, chose to file suit in state court. The question is whether removal under 28 U.S.C. § 1441(b) is proper.

Under 28 U.S.C. § 1441(b), a case in which the parties are completely diverse "shall be removable

only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b). Thus, in the instant case, if any Defendant who is properly joined and served were a citizen of California, the case would not be removed. The parties agree that at least some of the Defendants in this case--including nominal Defendant EFI--are citizens of California. However, none of these California Defendants had been served at the time of removal. Mr. Unterberg argues, therefore, that removal is proper because he is the only Defendant served (by virtue of his entering a general appearance) in the case, and he is not a citizen of California.

Plaintiff asserts that the strict language of § 1441(b) should not be applied to the instant case because doing so would not serve the purpose of § 1441(b) and in fact would reward gamesmanship on the part of Mr. Unterberg and the other Defendants. Plaintiff relies on *Holmstrom v. Harad,* No. 05 C 2714, 2005 U.S. Dist. LEXIS 16694 (N.D.Ill. Aug. 11, 2005) in which the district court explained:

> *8 The purpose of the 'joined and served' requirement is to prevent a plaintiff from blocking removal by joining as a defendant a resident party *against whom it does not intend to proceed,* and whom it does not even serve. Defendants are entitled to act to remove a case based on circumstances at the time they are sued, and are not required to guess whether a named resident defendant will ever be served.

*Id.* at *6 (emphasis added).

In the instant case, there is no dispute that all of the California Defendants named in the case are parties against whom Plaintiff does intend to proceed. Indeed, for the derivative suit, Plaintiff must proceed against EFI, a citizen of California. As in *Holmstrom,* the apparent purpose of the "joined and served" requirement is not served here. In fact, Mr. Unterberg, not Plaintiff, engaged in gamesmanship by acting preemptively to remove before Plaintiff effectuated service on the California Defendants (in

Not Reported in F.Supp.2d                                                                Page 8
Not Reported in F.Supp.2d, 2007 WL 760568 (N.D.Cal.)
(Cite as: 2007 WL 760568 (N.D.Cal.))

particular, EFI). The gamesmanship by the Defend-ants, according to Plaintiff, is especially clear from the fact that, in one of the cases which was related to the instant case, *see* Case No. 06-7274, *all* of the California Defendants made appearances, not just Mr. Unterberg, even though the same counsel rep-resents those Defendants as well as Mr. Unterberg. The decision to have only Mr. Unterberg enter an appearance in this case was deliberate.

Plaintiff's argument is not without merit--indeed, has a great deal of appeal. The difficulty for Plaintiff is that the language of § 1441(b) is clear, and a court may depart from the plain language of a statute only under, "rare and exceptional circum-stances." *Demarest v. Manspeaker,* 498 U.S. 184, 190, 111 S.Ct. 599, 112 L.Ed.2d 608, (1991) ("When we find the terms of a statute unambiguous, judicial inquiry is complete except in rare and ex-ceptional circumstances."), *superseded by statutory amendment on other grounds,* 28 U.S.C.A. § 1821. A court "look[s] beyond the express language of a statute where a literal interpretation would thwart the purpose of the overall statutory scheme or lead to an absurd or futile result." *Albertson's, Inc. v. Commissioner of Internal Revenue,* 42 F.3d 537, 545 (9th Cir.1994) (internal quotation marks omit-ted).

The Court cannot say that, in the instant case, strict adherence to the language of § 1441(b) would lead to absurd or futile results. Plaintiff suggests that re-warding Mr. Unterberg's gamesmanship would render an absurd result. However, the Court notes that the gamesmanship of Mr. Unterberg is some-what overstated. Mr. Unterberg did not make a gen-eral appearance and remove the case to federal court until approximately two weeks after Plaintiff filed the complaint. Plaintiff therefore had an op-portunity to serve the complaint on any of the Cali-fornia Defendants, including the corporate defend-ants. Plaintiff should have been cognizant of the fact that a nonresident defendant could remove a case without having been served. *See Delgado v. Shell Oil Co.,* 231 F.3d 165, 177 (5th Cir.2000)

("Generally, service of process is not an absolute prerequisite to removal.").

**\*9** Plaintiff points out that, "even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole,' [the Supreme Court] has followed that purpose, rather than the literal words." *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940) (finding that a literal interpretation of the Motor Carrier Act would give the Commission power to make employment decisions that were broader than intended by Congress); *see also Al-bertson's.,* 42 F.3d at 537. Even under the *American Trucking* standard, the Court cannot conclude that strict adherence to the language of § 1441(b) would be plainly at variance with the policy behind the statute. While *Holmstrom* articulates a logical ana-lysis of the purpose of the joined and served re-quirement, if Congress had wanted to ensure that removal would not be appropriate until it was clear that Plaintiff was trying to prevent removal by spe-ciously naming resident defendants, Congress could have provided that no removal petition could be filed until one or more nonresident defendant had been joined and served. The statute also could have been written to give a plaintiff, *e.g.,* 30 or 60 days to effect service before permitting a defendant to remove. In any event, Plaintiff has not cited any-thing in the legislative history of § 1441(b) to sup-port its assertion that the plain language of the stat-ute should be disregarded. And, significantly, *Holmstrom's* decision to disregard the plain lan-guage of § 1441(b) has been disapproved by other courts. *See Massey v. Cassens & Sons, Inc.,* No. 05-CV-598-DRH, 2006 U.S. Dist. LEXIS 9675, at \*10 (S.D.Ill. Feb. 16, 2006) ("While an argument can be made that the likely policy underlying the 'joined-and-served' requirement is not implicated by the current facts, the Court is constrained by the language of 28 U.S.C. § 1441. That language is clear and unambiguous: where complete diversity is present--as it is in this case--only the presence of a 'joined-and-served' resident defendant defeats re-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2007 WL 760568 (N.D.Cal.)
(Cite as: 2007 WL 760568 (N.D.Cal.))

moval."); *see also Davis v. Cash,* No.          END OF DOCUMENT
3:01-CV-1037-H, 2001 U.S. Dist. LEXIS 15546
(N.D.Tex. Sept. 27, 2001) (granting removal where
individual nonresident defendant entered a general
appearance by filing an answer before any defend-
ants had been served).

Finally, whether Mr. Unterberg had been "served"
by virtue of his voluntary general appearance in
state court, Cal.Code Civ. Proc. § 410.50(a)
(providing that "[a] general appearance by a party is
equivalent to personal service of summons on such
party"), is immaterial. Procedurally, Mr. Unterberg
could remove whether or not he had been "served."
*See Delgado,* 231 F.3d at 177 (5th Cir.2000)
("Generally, service of process is not an absolute
prerequisite to removal."); *Massey,* 2006 U.S. Dist.
LEXIS 9675, at *6 ("Nothing in 28 U.S.C. § 1441
or any other statute requires defendants to have
been served themselves prior to removing a case to
federal court"). Substantively, § 1441(b)'s "joined
and served" requirement focuses on resident de-
fendants, not nonresident defendants like Mr. Un-
terberg.

*10 Accordingly, the Court, constrained by the
plain language of § 1441(b), concludes that remov-
al by Mr. Unterberg was appropriate.

C. *Attorney Fees and Costs*

Because the Court denies Plaintiff's motion to re-
mand, Plaintiff's request for attorney fees and costs
is likewise denied.

### III. *CONCLUSION*

For the foregoing reasons, the Court concludes that
removal pursuant to SLUSA was not appropriate
but that removal pursuant to § 1441(b) was proper.
Accordingly, Plaintiff's motion to remand is denied.

This order disposes of Docket No. 7.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2007 WL 760568
(N.D.Cal.)

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**Westlaw Attached Printing Summary Report for WEILER, MATTHEW 6026526**

| | |
|---|---|
| Date/Time of Request: | Friday, February 15, 2008 16:39:00 Central |
| Client Identifier: | 71095-066596-0002 |
| Database: | DE-CS |
| Citation Text: | Not Reported in A.2d |
| Lines: | 196 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

# EXHIBIT 3

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2007 WL 1223220 (N.D.Cal.)
(Cite as: 2007 WL 1223220 (N.D.Cal.))

C
Only the Westlaw citation is currently available.

United States District Court, N.D. California,
San Jose Division.
INDIANA ELECTRICAL WORKERS PENSION
TRUST FUND, IBEW; Seiu Affiliates' Officers
and Employees Pension Plan; Seiu National In-
dustry Pension Plan; and Pension
Plan for Employees of Seiu, on behalf of them-
selves and all others similarly
situated, and derivatively on behalf of Hewlett-
Packard Company, Plaintiffs,
v.
Patricia C. DUNN, Lawrence T. Babbio, Richard
A. Hackborn, George A. Keyworth
II, Robert E. Knowling, Jr., Thomas Perkins,
Robert L. Ryan, Lucille Salhany,
and Carleton S. Fiorina, Defendants,
and
Hewlett-Packard Company, Nominal Defendant.
No. C-06-01711 RMW.

March 1, 2007.
Merrill G. Emerick, for Plaintiffs.

Jonathan C. Dickey, Jayesh Sanatkumar Hines-
Shah, Jeffrey A Minnery, Christopher C. Kearney,
Laurie Carr Mims, Boris Feldman, Steven M.
Schatz, Bahram Seyedin-Noor, for Defendants.

ORDER GRANTING DEFENDANTS' MOTIONS
TO DISMISS
RONALD M. WHYTE, United States District
Judge.

*1 Plaintiffs bring this action alleging that the sev-
erance package given to Carleton S. Fiorina
("Fiorina"), former chief executive officer of Hew-
lett-Packard Company ("HP"), violated HP's plans
and policies. Defendants Patricia C. Dunn,
Lawrence T. Babbio, Richard A. Hackborn, George
A. Keyworth II, Robert E. Knowling, Jr., Thomas
Perkins, Robert L. Ryan and Lucille Salhany

("Director Defendants") move to dismiss plaintiffs'
Verified Amended Complaint ("AC") for failure to
state a claim and failure to comply with the demand
requirements under Fed.R.Civ.P. 23.1 for derivative
claims. Defendant Fiorina moves to dismiss
plaintiffs' request to place a constructive trust on
$21.4 million of cash payments she received upon
termination of her employment from HP. Nominal
defendant HP moves to dismiss plaintiffs' derivat-
ive counts for failure to make a demand in accord-
ance with Fed. Rule Civ. P. 23.1. The court has
read the moving and opposing briefs and con-
sidered the arguments of counsel. For the reasons
set forth below, the court GRANTS defendants' mo-
tions to dismiss as follows: (1) count one is dis-
missed with prejudice; (2) counts two through ten
are dismissed with leave to amend; and (3)
plaintiffs have twenty days from the date of this or-
der to amend those claims not dismissed with preju-
dice.

I. BACKGROUND
A. Factual Allegations

Upon the completion of the merger of Compaq
Computer Corporation ("Compaq") with HP on
May 3, 2002, Compaq's former chief executive of-
ficer, Michael Capellas joined HP as president. AC
¶ 25. In November of 2002 Capellas left HP and re-
ceived approximately $16 million in severance pay-
ments. Id. ¶ 26. In response, HP's shareholders sub-
mitted a shareholder proposal pursuant to SEC Rule
14a-8 for inclusion in HP's 2003 proxy statement.
Id. ¶ 27. The proposal urged HP to seek shareholder
approval for any future severance agreements with
senior executives that provide for payments in ex-
cess of 2.99 times the sum of the executive's annual
salary plus bonus. Id. HP shareholders voted to ap-
prove the proposal over HP's urging to reject it. Id.
¶ 29.

In May 2003 HP adopted the Long Term Perform-
ance Cash Program (the "LTPC Program"). Under
this program, senior management could earn cash

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1223220 (N.D.Cal.)
(Cite as: 2007 WL 1223220 (N.D.Cal.))

payments if HP met certain financial targets over a three year period from the grant date of an award. *Id.* ¶ 30. According to the complaint, the earned payments do not vest until three years from the grant date, and continued employment is a requirement for the payments to vest: "the Employee must remain in the employ of the Company on a continuous, full-time basis through the close of business on the third anniversary of the Grant Date, for such Cash Award to vest, subject to paragraphs 6-9 of this Agreement." [FN1] *Id.* ¶ 31. HP retained discretion under the LTPC Program to increase or decrease the cash payout for an employee whose employment was terminated prior to vesting due to retirement, disability, death, or a reduction in workforce, "and for exceptional circumstances, except that such payout cannot be increased for Covered Employees as defined in Section 162(m) of the Internal Revenue Code of 1986, as amended." *Id.* ¶ 33 (citing LTPC ¶ 14(c)).

> FN1. Paragraphs 6-9 address termination of employment due to retirement, disability, death, or a reduction in workforce. *See* Jonathan C. Dickey Decl. Supp. Defs.' Request for Judicial Notice ("Defs.' RJN"), Ex. A at 4-5 (HP Form of Cash Award Agreement). The court takes judicial notice of the HP Form of Cash Award Agreement, which appears to be the form agreement used to grant awards under the LTPC Program, which terms are alleged in the complaint and form in part the basis of plaintiffs' claims. *See Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th Cir.2001) (A court may consider documents whose authenticity is not contested and on which plaintiff's complaint necessarily relies.).

*2 HP's 2004 proxy statement described the LTPC Program as follows: "Generally, if a participant is no longer employed by HP due to being placed in a workplace reduction program, disability, retirement or death, then targeted cash amounts are prorated. In the event of other terminations, any banked

amount will be forfeited." *Id.* ¶ 37 (citing HP 2004 proxy statement at 35). Plaintiffs allege that HP changed the description of the LTPC Program in its 2005 proxy statement, after termination of Fiorina's employment, and further allege that the new description directly contradicted the terms of the LTPC. *Id.* ¶ 61. As described in HP's 2005 proxy statement, under the LTPC Program, "if a participant is no longer employed by HP due to involuntary termination, disability, retirement or death, targeted awards are paid subject to certain adjustments. In the event of voluntary terminations, any banked amounts will be forfeited and no payment is made." *Id.* ¶ 60.

On July 18, 2003 HP adopted a Severance Policy that provides:

> HP will seek shareholder approval for future severance agreements, if any, with senior executives that provide specific benefits if any amount exceeding 2.99 times the sum of the executive's current annual base salary plus annual target bonus, in each case as in effect immediately prior to the time of such executive's termination.

*Id.* ¶ 38. This policy was disclosed in HP's 2004, 2005, and 2006 proxy statements.

Effective October 31, 2003 HP adopted a Severance Program for executive officers pursuant to which the chief executive officer would receive severance equal to 2.50 the sum of her annual base salary and annual target cash bonus, as in effect just prior to termination of employment. *Id.* Plaintiffs allege that the terms of this Severance Program were described in HP's 2004 and 2005 proxy statements. *Id.* ¶ 42. Under the Severance Program:

> Any payments under the severance program will be reduced by any cash severance benefit payable to the participant under any other HP plan, program or agreement, including cash amounts payable for the uncompleted portion of employment agreements and prorated cash bonuses under the applicable short-term bonus plan.

*Id.* (citing HP 2005 proxy statement at 40; HP 2006 proxy statement at 50). However, certain payments,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2007 WL 1223220 (N.D.Cal.)
(Cite as: 2007 WL 1223220 (N.D.Cal.))

including prorated payments under long-term incentive programs, are not subject to the Severance Program "either because they have been previously earned or accrued or because they are consistent with Company Practices." *Id.* ¶ 72.

On February 8, 2005 HP terminated Fiorina's employment as chief executive officer. As disclosed in HP's 2005 proxy statement filed February 11, 2005, a severance agreement was negotiated in exchange for a signed release of claims against HP by Fiorina. *Id.* ¶ 50. As part of the severance agreement Fiorina received, *inter alia,* $21.4 million consisting of (1) a cash payment of $14,000,000 pursuant to the Severance Program; (2) a cash payment of $5,880,000, representing "Fiorina's award for the 2003-2004 program year of the LTPC Program"; and (3) a cash payment of $1,503,700, representing "Fiorina's award for the 2004-2005 program year of the LTPC Program." *Id.* ¶ 51. Prior to termination of her employment, Fiorina had an annual base salary of $1.4 million and a targeted bonus of $4.2 million. *Id.* ¶ 68. Therefore, the $14 million cash payment represented 2.5 times her base salary and targeted bonus. *Id.* ¶ 69. On February 22, 2005 HP disclosed the specific terms of Fiorina's severance agreement in a Form 8-K filed with the Securities and Exchange Commission ("SEC"), with a copy of the severance agreement attached.

**B. Counts One through Eleven**

*3 Plaintiffs' main complaint is that the $7.4 million payment to Fiorina under the LTPC Program was actually a severance payment. Plaintiff contends this payment was severance because neither the LTPC Program nor "Company Practices" permits any *pro rata* payout prior to the vest date for employees whose employment is terminated involuntarily. Therefore, the total severance paid to Fiorina total $21.4 million, which exceeds 2.99 times her base salary and targeted bonus. Plaintiffs allege that HP violated its severance policy because it did not seek prior shareholder approval for Fiorina's severance package, violated the terms of the LTPC Program by granting Fiorina *pro rata* payouts prior

to her vest date, and violated the provisions of the Severance Program by not deducting the purported LTPC payments from the severance computed under the Severance Program.

Plaintiffs allege that all counts, except for counts two, three, and four, are brought derivatively on behalf of HP. The derivative claims involve an alleged violation of § 14(a) of the Securities Exchange Act of 1934 (count one), a breach of the duty of disclosure (count five), *ultra vires* acts in violation of the LTPC, the Severance Program, and the Severance Policy (counts six through eight), *ultra vires* acts resulting in director actions being voidable (count nine), corporate waste (count ten), and imposition of a constructive trust against Fiorina (count eleven).

Plaintiffs allege that although these counts are brought derivatively, they are excused from the demand requirements of Fed.R.Civ.P. 23.1 because demand would be futile. Specifically, plaintiffs allege that five of the ten directors at the time the complaint was filed were not independent and, additionally, the alleged acts of the directors were *ultra vires* and therefore not a proper exercise of business judgment.

Plaintiffs' purported direct claims are for breach of contract (count two), promissory fraud (count three), and breach of the duty of disclosure (count four).

**II. ANALYSIS**
**A. Statute of Limitations**

Plaintiffs' first count alleges a derivative claim for violation of section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a). [FN2] Plaintiffs argue that HP's proxy statements, filed January 23, 2004, February 11, 2005, and January 23, 2006 contain false and misleading statements because HP never intended to honor its disclosed policies to seek shareholder approval for severance payments in excess of 2.99 times base salary plus bonus and to reduce any payments under the Sever-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2007 WL 1223220 (N.D.Cal.)
(Cite as: 2007 WL 1223220 (N.D.Cal.))

ance Program by cash severance benefit payments under any other HP plans. Plaintiffs also allege that HP's proxy statements failed to disclose that severance payments to Fiorina totaled $21.4 million, not $14 million, and included *pro rata* LTPC Program payments in violation of earlier disclosed HP policies that provided for such LTPC Program payments only if employment terminated due to retirement, disability, death, or a reduction in workforce. AC ¶¶ 107(a), 107(b); ¶¶ 110(a), 110(b); ¶ 112. Plaintiffs contend that defendants made these misstatements in order to get the shareholders to elect or reelect them as directors, and to approve certain compensation plans presented to the shareholders in connection with those proxy statements.

> FN2. Section 14(a) prohibits the solicitation of proxies in violation of any rules and regulations promulgated under the Act. 15 U.S.C. § 78n(a). Rule 14a-9, which was promulgated pursuant to Section 14(a), further provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

*4 The director defendants argue that plaintiffs' § 14(a) claims are barred by the statute of limitations because the claims were first filed more than one year after HP's first public disclosures of the terms of Fiorina's severance agreement. "Litigation instituted pursuant to § 10(b) and Rule 10b-5 ... must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Courts have adopted this same limitations period for claims under § 14(a). *See Westinghouse Elec. Corp. v. Franklin,* 993 F.2d 349, 353 (3d Cir.1993);

*Ceres Partners v. GEL Assocs.,* 918 F.2d 349, 353 (2d Cir.1990). The basis for plaintiffs' § 14(a) claims is that the severance agreement negotiated with Fiorina contained a severance payout that renders HP's disclosures in its 2004, 2005, and 2006 proxy statements false and misleading. HP terminated Fiorina's employment on February 8, 2005, filed its proxy statement containing details of Fiorina's severance and benefits package on February 11, 2005, and filed SEC form 8-K with a copy of the severance agreement and release attached on February 22, 2005. Plaintiffs filed their complaint on March 6, 2006. Plaintiffs argue that they did not discover their § 14(a) claim until March 16, 2005 when Patricia Dunn, in responding to a shareholder question at HP's 2005 annual meeting, referred to the entire $21.4 million payment to Fiorina as "severance." AC ¶ 50. [FN3]

> FN3. Specifically, plaintiffs allege that they first learned that the cash payments under the LTPC Program were "severance" payments during the March 16, 2005 annual shareholders meeting during which defendant Dunn, in responding to a shareholder question, stated: "The first [question] was on severance and what was the basis for--the number--$21.4 million payment to Carly Fiorina as severance." AC ¶ 50.

The statute of limitations for claims is triggered "when the plaintiff has actual knowledge of the fraud or knowledge of facts sufficient to put a reasonable person on notice." *In re Syntex Corp. Securities Litig.,* 855 F.Supp. 1086, 1099 (N.D.Cal.1994) (referring to the statute of limitations for claims under section 10b-5) (citing *Davis v. Birr, Wilson & Co., Inc.,* 839 F.2d 1369, 1370 (9th Cir.1988)) (additional citations omitted). Here, the premise of plaintiffs' argument is that the $7.4 million paid under the LPTC Program is really severance because HP manipulated and violated the policies of the LPTC Program and the Severance Program in order to give Fiorina a payout under the LPTC Program.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2007 WL 1223220 (N.D.Cal.)

**(Cite as: 2007 WL 1223220 (N.D.Cal.))**

Page 5

Plaintiffs' argument that they were not put on inquiry notice until defendant Dunn referred to the $7.4 million as "severance" in responding to a shareholder question is unpersuasive. A reading of plaintiffs' complaint indicates that all of the facts that form the basis of plaintiffs' argument were disclosed in the 2004 proxy statement, 2005 proxy statement, and the February 22, 2005 form 8-K, which included a copy of the severance agreement and Fiorina's release of claims.

Plaintiffs allege that the 2004 proxy statement described the LPTC Program as precluding *pro rata* payout from the LPTC program except where employment is terminated due to retirement, death, disability, or a reduction in workforce. The 2005 proxy statement disclosed that Fiorina was being paid prior to the completion of the applicable three year vesting period. Specifically, HP disclosed that Fiorina received $5,880,000 for the 2003-2004 program year and $1,503,700 for the 2004-2005 program year. The detailed terms of Fiorina's severance agreement were described in the 2005 proxy statement and a copy of the severance agreement was publicly disclosed on February 22, 2005. These filings together disclosed facts sufficient to place a reasonable person on notice that Fiorina received *pro rata* payments under the LPTC Program even though the termination of her employment was involuntary. In other words, assuming the truth of plaintiffs' allegations, the disclosure of payments to Fiorina under the LPTC Program itself gave notice that HP had violated the terms of the LPTC Program, as previously disclosed by HP. Because plaintiffs' § 14(a) claim was filed more than one year after these disclosures, it is time barred. [FN4]

> FN4. Defendants also argue that plaintiffs' § 14(a) claim should be dismissed for failure to satisfy the demand requirements of Rule 23.1 and for failure to state a claim. Rule 23.1's requirements as to plaintiffs' derivative claims are discussed in section B, *infra*. Because the court finds that plaintiffs' § 14(a) claim is time barred, it

does not reach defendants' Rule 12(b)(6) contentions.

**B. Demand Requirement**

**\*5** Defendants argue that plaintiffs' derivative claims (counts one and counts five through eleven) should be dismissed for failure to make demand on the 2006 board of directors or on HP, or to allege futility of demand pursuant to Rule 23.1. "A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." *In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 989-90 (9th Cir.1999) (citing Fed.R.Civ.P. 23.1). The circumstances which make a demand futile are established by the laws of the state in which the corporation is incorporated. *Id.* at 990. HP is incorporated in Delaware. Under Delaware law, there is a presumption of independence. *Aronson v. Lewis*, 473 A.2d 805, 815 (Del.1984) (overruled on other grounds). "To show futility under Delaware law, a plaintiff must allege particularized facts creating a reasonable doubt that (1) the directors are disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *In re Silicon Graphics*, 183 F.3d at 990 (citation omitted). Essentially, "where officers and directors are under an influence which sterilizes their discretion, they cannot be considered proper persons to conduct litigation on behalf of the corporation." *Aronson*, 473 A.2d at 814. However, "[s]peculation on motives for undertaking corporate action are [sic] wholly insufficient to establish a case of demand dismissal." *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 356 (Del.Ch.1998) (reversed on other grounds by *Brehm v. Eisner*, 746 A.2d 244, 248 (Del.2000)).

**1. Disinterested and Independent**

Plaintiffs allege that reasonable doubt exists as to the independence of five of the ten directors of the board at the time the complaint was filed. In de-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2007 WL 1223220 (N.D.Cal.)
(Cite as: 2007 WL 1223220 (N.D.Cal.))

termining whether directors are disinterested and independent, the question is "were they incapable, due to personal interest or domination and control, of objectively evaluating a demand, if made, that the Board assert the corporation's claims that are raised by plaintiffs or otherwise remedy the alleged injury?" *Brehm,* 746 A.2d at 257. The issue of independence is "a fact-specific determination made in the context of a particular case." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 845 A.2d 1040, 1049- 50 (Del.2004). A court considers the answer to two questions: "independent from whom and independent for what purpose?" *Id.* "In order to show lack of independence, the complaint of a stockholder-plaintiff must create a reasonable doubt that a director is not so beholden to an interested director ... that his or her discretion would be sterilized." *Id.* (citation and internal quotations omitted). In addition, as the *Brehm* court noted, "[i]t is no answer to say that demand is necessarily futile because (a) the directors would have to sue themselves, thereby placing the conduct of the litigation in hostile hands, or (b) that they approved the underlying transaction. 746 A.2d at 257 n. 34 (citation and internal quotations omitted).

*6 In *Brehm,* the Delaware Supreme Court affirmed that as a matter of law Michael Eisner, chairman and chief executive officer of Walt Disney Co. ("Disney"), was disinterested when he approved a lucrative employment agreement for his long-time friend, Michael S. Ovitz, incoming president of Disney. *Id.* at 257. The plaintiffs alleged that the compensation and termination provisions were extravagant and wasteful and that the directors' approval was a breach of fiduciary duty. *Id.* at 248-49. The court reasoned that plaintiffs' allegations did not create a reasonable doubt that Eisner was interested in maximizing Ovitz's compensation at Disney's and its shareholder's expense. *Id.* at 257. Eisner owned several million options to purchase Disney stock, and therefore it would not be in his economic interest to cause Disney to unnecessarily issue millions of additional options to Ovitz diluting his holdings. *Id.* In addition, the approval of Ovitz's

lucrative compensation package would and did draw negative attention to Eisner's own performance and compensation. *Id.* Similarly, the court concluded that "[n]othing alleged by [p]laintiffs generates a reasonable inference that Eisner would benefit personally from allowing Ovitz to leave Disney without good cause." *Id.* at 257-58.

Plaintiffs allege only that the five directors lack independence. Plaintiffs make no allegations as to how the directors were other than disinterested in Fiorina's severance package. As noted above, plaintiffs bear the burden of setting forth particularized allegations that create a reasonable doubt as to the directors' independence *and* disinterestedness. Here, plaintiffs have made no allegations that any of the directors has any personal interest in or may derive any personal benefit from approval of Fiorina's severance agreement or any payments under the LTPC Program. *See, e.g., Bergstein v. Texas Internat'l Co.,* 453 A.2d 467, 471 (Del.Ch.1982) (finding that directors were not disinterested because they would benefit financially from the plan approved by them). Moreover, as discussed below, plaintiffs' allegations purporting to create a reasonable doubt as to the independence of certain directors are insufficient under Delaware law.

The *Brehm* court's reasoning is instructive in considering plaintiffs' allegations that certain directors lack independence. Here, plaintiffs allege that directors Hurd and Wayman are both employees of HP and, therefore, are not independent. Plaintiffs' lone allegation that Hurd and Wayman lack independence because they are employees of HP is insufficient to create a reasonable doubt that Hurd and Wayman would approve an excessive severance package to Fiorina in violation of HP policies. *Compare Stewart,* 845 A.2d at 1044-45 (a director's "position as an officer and inside director, *together with the substantial compensation she receives from the company,* raised a reasonable doubt as to her ability objectively to consider demand") (emphasis added). Approval of an excessive severance package would not be in HP's economic in-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                Page 7
Not Reported in F.Supp.2d, 2007 WL 1223220 (N.D.Cal.)
(Cite as: 2007 WL 1223220 (N.D.Cal.))

terest, although it might be in Fiorina's interest. Plaintiffs make no allegations that Hurd and Wayman are dependent on Fiorina or subject to her domination and control such that would cause them to be unable to objectively evaluate a demand regarding the propriety of Fiorina's severance agreement. *See, e.g., Stewart,* 845 A.2d at 1050 ("[S]ome professional or personal friendships, which may border on or even exceed familial loyalty and closeness, may raise a reasonable doubt whether a director can appropriately consider demand.") (citing and adopting the lower court's conclusion).

*7 Similarly, plaintiffs' allegations that directors Babbio, Keyworth, and Ryan have relationships with companies that do business with HP is insufficient. Specifically, plaintiffs allege that director Babbio has been Verizon's Vice Chairman and President since 2000. Babbio receives several million in annual compensation and bonuses and holds performance shares and restricted shares in Verizon worth approximately $6.5 million. AC ¶ 96. Plaintiffs further allege that HP and Verizon have an ongoing business relationship because Verizon partners with HP "for certain critical aspects of its business, including providing the infrastructure necessary for its business customers to create and operate call centers." *Id.* ¶ 97. Plaintiffs allege that "HP's continued assistance to Verizon enables Babbio to continue to earn his lavish compensation" and Babbio "is unlikely to take actions that impede this success." *Id.* Plaintiffs contend there is reasonable doubt as to director Ryan's independence because until March 2005 he was the chief financial officer and senior vice president of Medtronic, a company that "has provided services to HP." *Id.* ¶ 99. Plaintiffs contend that because Ryan continues to hold significant amounts of Medtronic stock, he "is unlikely to take any actions that could impede Medtronic's continued ability to do business with HP." *Id.* In addition, plaintiffs assert that because Ryan is on the board of General Mills, and General Mills does substantial business with HP, including operating its entire global enterprise on HP systems, Ryan's independence is further compromised.

However, plaintiffs' allegations are not particularized. For example, although plaintiffs allege generally that Ryan has a relationship as a shareholder and former executive of Medtronic, they do not allege how this relationship creates an influence that would affect Ryan's ability to exercise his directorial discretion objectively as to plaintiffs' demand. "[I]n the demand-futile context a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." *Aronson,* 473 A.2d at 816. Taken together, plaintiffs' allegations do not show, or even create a reasonable doubt, that Babbio and Ryan would be unable to objectively evaluate a demand asserting that the payments to Fiorina exceed what is permitted under HP's plans. *See also Stewart,* 845 A.2d at 1050 ("[T]o render a director unable to consider demand, a relationship must be of a bias-producing nature. Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."). If anything, these relationships tend to support a conclusion that Babbio and Ryan would be likely to act in the best interest of HP to further HP's success, and thereby the success of the other companies they serve. Further, although directors Babbio, Keyworth, and Ryan are also defendants in this action, as the *Aronson* court noted, it is not the case that "any board approval of a challenged transaction automatically connotes 'hostile interest' and 'guilty participation' by directors, or some other form of sterilizing influence upon them." *473 A.2d at 814.*

*8 Finally, plaintiffs allege that there is reasonable doubt as to Keyworth's independence because he is the chairman and a senior fellow of a non-profit entity which depends in part on donations from HP for its continued success. AC ¶ 98. However, this general allegation does not create reasonable doubt that Keyworth is subject to personal interest or dominion and control that would affect his ability

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 8
Not Reported in F.Supp.2d, 2007 WL 1223220 (N.D.Cal.)
(Cite as: 2007 WL 1223220 (N.D.Cal.))

to consider plaintiffs' demand that the payments to Fiorina exceed what is permitted under HP's plans. As is the case with Babbio and Ryan, Keyworth's relationship with the non-profit entity would suggest that Keyworth would act in the best interest of HP rather than Fiorina.

## 2. The Business Judgment Rule

The second prong of the *Aronson* test considers whether the challenged transaction was the product of an otherwise valid exercise of business judgment. *In re Silicon Graphics,* 183 F.3d at 990. It is an inquiry into "the substantive nature of the challenged transaction and the board's approval thereof." *Aronson,* 473 A.2d at 814. The review is a fact-based one. *Id.* at 815. Plaintiffs must allege facts sufficient to rebut a presumption that the decision was a result of a valid exercise of business judgment. *Id.* at 812. Board actions that are deemed *ultra vires* are not entitled to the protection of the business judgment rule. *Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 WL 31888343, *11 (Del.Ch.2002)* ("*Coulter*" ). Here, plaintiffs assert the directors acted *ultra vires* because pursuant to the terms of the LTPC, the directors did not have the authority to pay cash awards to an involuntarily terminated employee prior to her vest date. *Ultra vires* acts are those acts which a corporation cannot, in any case, lawfully accomplish. *Harbor Finance Partners v. Huizenga,* 751 A.2d 879, 896 (Del.Ch.1999). It is unclear whether corporate acts that are merely voidable, *i.e.,* acts that may be ratified by subsequent shareholder approval, may nevertheless be considered *ultra vires* acts. In the 2002 *Coulter* opinion, the Delaware Chancery Court concluded that the board's repricing of options without shareholder approval was *ultra vires* because the stock option plan provided that any change in exercise price of options required shareholder approval. 2002 WL 31888343 at *11. The court concluded the act was *ultra vires* even though it might be considered voidable rather than void. However, in a 2005 decision, the Delaware Chancery Court held that *ultra vires* acts are "illegal acts or acts beyond

the authority of the corporation" or, in other words, not merely voidable acts, but void acts. *Nevins v. Bryan,* 885 A.2d 233, 245 (Del.Ch.2005).

Regardless, plaintiffs have not alleged that HP's award of LTPC payments to Fiorina prior to her vest date constitutes an *ultra vires* act under either the standard in *Nevins* or in *Coulter* because the alleged facts do not support the conclusion that the directors acted beyond their authority. Plaintiffs' claims rely on their assertion that a pay out of any LTPC amounts to an employee whose employment is involuntarily terminated prior to the vest date violates the express provisions of the LTPC Program to. However, plaintiffs do not allege that there is no corporate authority permitting adjustment of payouts under the LTPC Program, notwithstanding that the Program terms indicate that in general, involuntary termination of employment prior to the vest date results in forfeiture of the award. The LTPC provides that HP may in its discretion increase or decrease payouts under the LTPC for "exceptional circumstances." [FN5] In addition, HP's 2000 Stock Plan permits the Plan Administrator to accelerate the vesting and to waive forfeiture restrictions of any award under the plan, including Cash Awards. Defs.' RJN, Ex. B at 1, 5, 14. [FN6] Plaintiffs also do not allege that shareholder approval is needed to exercise such corporate discretion under the Stock Plan or the LTPC Program. [FN7] Thus, the act of awarding Fiorina LTPC payments prior to her vest date is within corporate authority and not *ultra vires.*

> FN5. Although plaintiffs contend that the LTPC expressly excludes any increase or decrease in payouts to a "Covered Employee" as defined in § 162(m) of the Internal Revenue Code of 1986, as amended, Fiorina does not appear to be a "Covered Employee" as defined in § 162(m) at the time of the payout. Under § 162(m), a "Covered Employee" includes "any individual who, on the last day of the taxable year is ... the chief executive officer of the corporation

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2007 WL 1223220 (N.D.Cal.)
(Cite as: 2007 WL 1223220 (N.D.Cal.))

or acting in such capacity." 26 C.F.R. § 1.162-27(c) (2)(i). Because "Covered Employee" status under § 162(m) is measured as of the last day of the taxable year and the payout to Fiorina was made in connection with termination of her services as chief executive officer prior to October 31, 2005, the last day of the applicable tax year, Fiorina could not be a "Covered Employee."

FN6. The court grants defendants' request for judicial notice of the HP 2000 Stock Plan. Defendants assert that provisions in the HP 2000 Stock Plan, which also applies to HP LTPC Cash Awards, refute plaintiffs' argument that pre-vesting payouts of LTPC awards are limited to situations where employment is terminated due to retirement, disability, death, or reduction in workforce. The court agrees that the 2000 Stock Plan includes a provision that describes the Plan Administrator's discretion with respect to Cash Awards, including acceleration of vesting and waiver of forfeiture restrictions. See Hotel Employees and Restaurant Employees Local 2 v. Vista Inn Management Co., 393 F.Supp.2d 972, 979 (N.D.Cal.2005) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir.1993) (holding that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if it is dispositive of plaintiff's claims)).

FN7. There is also no allegation that the LTPC Program itself required shareholder approval.

*9 Similarly, plaintiffs' allegation that HP failed to deduct Fiorina's LTPC payments from the severance amount under the Severance Program does not constitute an action outside HP's corporate authority. As disclosed by HP, certain payouts are not subject to HP's Severance Policy, "either because they have been previously earned or accrued by the employee or because they are consistent with Company Practices," including "payments of prorated portions of bonuses or prorated portions of long-term incentive payments that are consistent with Company Practices." See Defs.' RJN, Ex. D at 41 (2004 Proxy Statement). Because HP has discretion to exclude certain payments from its Severance Policy, the act of excluding such payments cannot be considered ultra vires.

Moreover, plaintiffs' allegations do not otherwise rebut the presumption that defendants' authorization of Fiorina's severance and benefits package was other than an exercise of business judgment. Under the second prong, demand may be excused if plaintiffs' allegations "raise a reasonable doubt that the [b]oard was well-informed, careful and rational" in approving Fiorina's severance and benefit package. See In re Walt Disney Co. Deriv. Litig., 731 A.2d at 361 (reversed on other grounds). Under Delaware law, absent allegations of fraud, the "deference to directors' business judgment is particularly broad in matters of executive compensation." Id. at 362 (citing Haber v. Bell, 465 A.2d 353, 359 (Del.Ch.1983)). In sum, plaintiffs' allegations are insufficient to rebut the presumption of the business judgment rule under Delaware law.

C. Direct Claims

Plaintiffs aver that their second, third, and fourth claims are "direct claims." Compl. ¶¶ 126, 131, 138. Defendants argue that these claims are really derivative claims and should be dismissed for failure to make demand or allege futility of demand.

1. Counts Two and Three

Counts two and three allege breach of contract and promissory fraud, respectively. The underlying premise for both of these counts is that defendants' Severance Policy represents a promise that shareholders would be entitled to approve any proposed severance payment that exceeds 2.99 times the em-

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2007 WL 1223220 (N.D.Cal.)
(Cite as: 2007 WL 1223220 (N.D.Cal.))

ployee's annual base salary plus bonus. The distinction of whether a claim is derivative or direct "depends upon the nature of the wrong alleged and the relief, if any, which could result if plaintiff were to prevail." *Grimes v. Donaldson, Lufkin, & Jenrette, Inc.,* 673 A.2d 1207, 1213 (Del.1996) (overruled on other grounds by *Brehm,* 746 A.2d at 253-54) (citations and internal quotation marks omitted). The Delaware Supreme Court clarified the proper test for determining whether a claim is direct or derivative in *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.,* 845 A.2d 1031 (Del.2004). Specifically, the court disapproved of the so called "special injury" test articulated in prior Delaware case law. [FN8] The court held that "[t]he analysis must be based solely on the following questions: Who suffered the alleged harm--the corporation or the suing stockholder individually--and who would receive the benefit of the recovery or other remedy?" *Id.* at 1035. In determining whether it is the corporation or the suing stockholder who suffered the alleged harm, the court is to "look[ ] at the body of the complaint and consider[ ] the nature of the wrong alleged and the relief requested" and ask "has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?" *Id.* at 1036.

> FN8. *See Elster v. Am. Airlines, Inc.,* 100 A.2d 219 (1953); *Bokat v. Getty Oil Co.,* 262 A.2d 246 (1970); *Moran v. Household Intern. 'l Inc.,* 490 A.2d 1059 (1985); *Lipton v. News Intern'l Plc.,* 514 A.2d 1075 (1986); *In re Tri-Star Pictures, Inc. Litig.,* 634 A.2d 319 (1993).

*10 At oral argument, plaintiffs argued that, under *Tooley,* their second and third claims for relief are direct claims. Applying the test set forth in *Tooley,* this court looks to the body of plaintiffs' complaint in order to consider the nature of the wrong alleged and the relief requested. Plaintiffs' basic contention underlying their second and third claim is that defendants promised HP shareholders that they would be given a vote on any proposed severance payment that exceeds 2.99 times the employees annual base

salary plus bonus, but failed to honor such promise when they awarded Fiorina her severance package without first seeking or obtaining shareholder approval. [FN9] Compl. ¶¶ 127, 129, 132, 134,135. Plaintiffs allege that defendants made such promise to induce the shareholders to elect them to the board, vote in favor of other compensation and benefits proposals by the board, and vote against proposals opposed by the board and, had plaintiffs known that defendants did not intend to honor their promise, plaintiffs would not have voted in favor of electing such board members, voted in favor of board proposals, or voted against proposals opposed by the board. Compl. ¶¶ 127-128, 136.

> FN9. Plaintiffs also contend that defendants falsely promised plaintiffs and other shareholders that it would not award a CEO severance package in excess of 2.5 times the base salary plus bonus in order to induce them to elect defendants as directors, vote for compensation and benefits related proposals proposed by them, and vote against shareholder proposals. Compl. ¶ 133. However, as plaintiffs' allegations show, HP only announced that it had adopted a Severance Plan under which the CEO is *entitled* to 2.5 times her annual base salary plus target cash bonus. *Id.* ¶ 39. This alleged promise cannot be reasonably read to mean that the CEO may not receive any severance in addition to the amount she is entitled to under the Severance Plan.

Accepting plaintiffs' allegations as true for purposes of this motion to dismiss, the purported wrong nevertheless appears to be one that injures the corporation. Although plaintiffs argue that they have been injured because they were not given their right to vote, the nature of their claims is essentially mismanagement of corporate assets and derivative in nature. "Suits against management for waste resulting from excessive payments of corporate funds (whether made to individual defendants or to third parties) do not affect contractual rights of share-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1223220 (N.D.Cal.)
(Cite as: 2007 WL 1223220 (N.D.Cal.))

Page 11

holders associated with the ownership of common stock ...." *Kramer v. W. Pacific Indus., Inc.*, 546 A.2d 348, 353 (Del.1988); *see also Tooley,* 845 A.2d at 1038 ("The claim in *Kramer* was essentially for mismanagement of corporate assets. Therefore, we found the claims to be derivative. That was the correct outcome.").

Plaintiffs cite *Thorpe v. CERBCO,* 1993 WL 35967, *2 (Del.Ch.1993), for the proposition that Delaware law "recognize[s] that a shareholder who has been denied his right to corporate suffrage has suffered an independent injury for purposes of determining whether an action is direct or derivative." [FN10] Interference with the shareholders' right to vote may represent a separate contractual injury in certain instances. *See Lipton,* 514 A.2d at 1079 (disapproved of on other grounds by *Tooley,* 845 A.2d at 1038-39). However, the present action is distinguishable from both *Thorpe* and *Lipton. Tharpe* involved allegations that false and misleading information in proxy disclosures resulted in shareholder approval of an amendment to CER-BCO, Inc.'s certificate of incorporation authorizing a recapitalization that ultimately gave defendants voting control over the company. 1993 WL 35967 at *1. In *Lipton,* 514 A.2d at 1078, management of the defendant corporation acquired veto power over any change in management, thereby effectively removing the shareholders' right to vote. The court concluded that the shareholders could bring a direct claim for the board's actions. [FN11] *Id.* Here, plaintiffs have not alleged that defendants acted to infringe on their right to vote. Instead, they allege that the LTPC payments to Fiorina should have been characterized as severance such that a shareholders' right to vote would have been triggered. In addition, even if defendants' alleged acts were construed as a denial of HP shareholders' right to vote, plaintiffs' allegations do not satisfy the second *Tooley* prong.

> FN10. Although *Tharpe* is an unpublished opinion, it appears that the Delaware Supreme Court Rules and the Delaware

Chancery Court Rules permit citation to unpublished opinions. *See* Del.Supr. Ct. R. 93(c); Del. Ch. Ct. R. 171(h).

> FN11. Although *Tooley* expressly disapproved of the special injury test utilized by the *Lipton* court in concluding that the shareholders had a direct claim, the *Tooley* court noted that the *Lipton* court "could have reached the same correct result by simply concluding that the manipulation directly and individually harmed the stockholders, without injuring the corporation." 845 A.2d at 1038.

*11 Under the second prong of *Tooley,* in order to maintain a direct claim, stockholders must show that they will receive the benefit of any recovery or other remedy. *Tooley,* 845 A.2d at 1033; *see also In re J.P. Morgan Chase & Co. Shareholder Litig.,* 906 A.2d 808, 819 (Del.Ch.2005). Here, plaintiffs do not allege facts showing that they will benefit from the remedy. Rather, the nature of any relief that might be granted for these claims supports the conclusion that these claims are derivative and not direct. "Delaware courts have long recognized that actions charging mismanagement which depress[ ] the value of stock [allege] a wrong to the corporation; i.e., the stockholders collectively, to be enforced by a derivative action." *Kramer,* 546 A.2d at 353. Had the shareholders voted against any of the severance or benefits given to Fiorina, the denied amounts would accrue to the corporation, not directly to any shareholder. Here, plaintiffs seek, *inter alia,* imposition of a constructive trust on the alleged improper $21.4 million payment to Fiorina. Such relief, if granted, would result in the return of the $21.4 million to HP, not directly to any shareholder. Likewise, if plaintiffs were successful in a claim that certain HP compensation and benefits plans should be rescinded because HP shareholders would not have voted to approve those plans had they known HP would not seek shareholder approval for Fiorina's package, any remedy would be directed to the corporation. Because plaintiffs' allega-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 12
Not Reported in F.Supp.2d, 2007 WL 1223220 (N.D.Cal.)
(Cite as: 2007 WL 1223220 (N.D.Cal.))

tions for their second and third claims do not meet the test set forth in *Tooley*, the court concludes that counts two and three do not state direct claims.

## 2. Count Four

Plaintiffs' fourth count alleges that defendants breached their fiduciary duty to disclose because HP did not disclose in its 2004, 2005, and 2006 proxy statements that it never intended to honor the Severance Policy or provisions of the Severance Program and that an employee's whose employment is involuntarily terminated does not always forfeit her unvested LTPC award. " '[D]irectors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action.' " *Abrons v. Maree*, 911 A.2d 805, 812 (Del.Ch.2006) (quoting *Shell Petroleum, Inc. v. Smith*, 660 A.2d 112, 114 (Del.1992)). The directors' have a duty to disclose "in a non-misleading manner all material facts that bear on" the matters for which the shareholders' vote is sought. *In re PNB Holding Co. Shareholders Litig.*, 2006 WL 2403999, *15 (Del.Ch.2006). "A fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Abrons*, 911 A.2d at 813 (citation and internal quotations omitted). "Consistent and redundant facts do not alter the total mix of information, nor are insignificant details and reasonable assumptions material." *Id.*

*12 Here, plaintiffs allege that HP shareholders were harmed because they were "deprived of the opportunity to cast a fully informed vote on the matters considered at [HP's] 2004, 2005 and 2006 annual meetings." Compl. ¶ 146. Essentially, they contend that they would not have elected directors nominated by the board, approved HP proposals recommended by the board, or agreed with the board's recommendations to vote against certain shareholder proposals had they known of the alleged misstatements and omissions in the proxy statements. Plaintiffs contend that the affected shareholder votes relate to (1) the election of the

directors nominated by HP, (2) the approval of the 2004 Stock Incentive Plan and the issuance of additional shares for the HP Employee Stock Purchase Plan, (3) the approval of the HP 2005 Pay-for-Results Plan, and (4) the rejection of shareholder proposals requiring election of directors by affirmative vote of the majority of cast votes and requesting adoption of a corporate policy to recoup bonuses and performance pay based on financials that are later restated. AC ¶¶ 43-47.

However, plaintiffs' factual allegations do not show that the shareholders' right to vote have been denied or impaired as required by *Tooley*. Plaintiffs' allegations do not support a finding that the purported misstatements and omissions were material to the particular matters on which shareholders voted. In particular, plaintiffs have not sufficiently alleged how the matters voted on involve the LTPC Program, the Severance Policy, or the Severance Program to which the purported misstatements and omissions relate. [FN12] Plaintiffs' allegations do not show how the alleged misrepresentations and omissions are material facts that bear on the particular matters for which the shareholders' vote was sought. Thus, plaintiffs have failed to allege a claim that the purported misstatements and omissions constitute a separate and independent injury to the shareholders' right to vote under the first prong in *Tooley*. In addition, it is unclear from plaintiffs' allegations what relief is sought and that any relief sought would benefit the shareholders directly rather than the corporation.

> FN12. Plaintiffs allege that proxy statements (1) failed to disclose that HP retained discretion to authorize payments that are otherwise precluded under the LTPC Program, (2) failed to disclose that HP never intended to follow its Severance Policy, (3) failed to disclose that it never intended to be restricted by the limits set in its Severance Program, (4) concealed that the LTPC payments to Fiorina were expressly barred by the LTPC Program

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

terms, (5) concealed that the LTPC payments were actually severance payments, and (6) falsely disclosed in the 2005 proxy statement that LTPC payments that are unvested would be forfeited only if an employee left voluntarily. AC ¶¶ 137-140.

## D. Fiorina's Motion to Dismiss

Defendant Fiorina moves to dismiss plaintiffs' request to place a constructive trust on the $21.4 million paid by HP to her and in her possession. Fiorina argues that because plaintiffs' substantive claims fail for the reasons set forth in the motions filed by the director defendants and HP, in which Fiorina joins, there cannot be any imposition of a constructive trust remedy. Because the court dismisses plaintiffs' substantive claims in counts one through ten, there is no basis to impose a constructive trust.

## E. Leave to Amend

As defendants note, plaintiffs have amended their complaint once. Nevertheless, Fed.R.Civ.P. 15(a)'s edict that "leave shall be freely given when justice so requires" is "to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1051 (9th Cir.2003) (quoting *Owens v. Kaiser Found. Health Plan, Inc.,* 244 F.3d 708, 712 (9th Cir.2001) (citations omitted)). Absent prejudice or a strong showing of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by amendment, or futility of amendment, "there exists a presumption under Rule 15(a) in favor of granting leave to amend." *Eminence Capital,* 316 F.3d at 1052. Plaintiffs have twenty days from the date of this order to amend those claims that have not been dismissed with prejudice.

## III. ORDER

*13 For the foregoing reasons, the court GRANTS defendants' motions to dismiss as follows:

1. Count one is dismissed with prejudice;

2. Counts two through ten are dismissed with leave to amend; and

3. Plaintiffs have twenty days from the date of this order to amend counts two through ten.

Not Reported in F.Supp.2d, 2007 WL 1223220 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 4**

Westlaw.

700 A.2d 135                                                          Page 1
700 A.2d 135
(Cite as: 700 A.2d 135)

▷

Supreme Court of Delaware.
Donald H. LOUDON, Jr., Plaintiff Below, Appel-
lant,
v.
ARCHER-DANIELS-MIDLAND COMPANY,
Dwayne O. Andreas, Michael D. Andreas, Lowell
W. Andreas, Martin L. Andreas, Ralph Bruce, John
H. Daniels, H.D. Hale, John K.
Vanier, M. Brian Mulroney, Margaritta Rocke-
feller, James R. Randall, O. Glenn
Webb, F. Ross Johnson, Shreve M. Archer, Jr., Ray
A. Goldberg, Robert S.
Strauss, and Gaylord O. Coan, Defendants Below,
Appellees.
No. 88, 1996.

Submitted: June 17, 1997. [FN*]
FN* This matter was argued before the
Court *en Banc* on June 4, 1996. Shortly
thereafter, these proceedings were stayed
pending the outcome of a related proceed-
ing in the United States Court of Appeals
for the Seventh Circuit. *Loudon v. Archer-
Daniels-Midland Co.*, Del.Supr., No. 88,
1996, Veasey, C.J. (July 19, 1996)
(Order). The Seventh Circuit dismissed
the federal action as moot on April 14,
1997. *See* n. 18 *infra*. After further brief-
ing herein, the stay was lifted and the mat-
ter was submitted to this Court for decision
as of June 17, 1997. *Loudan v. Archer-
Daniels-Midland Co.*, Del.Supr., No. 88,
1996, Veasey, C.J. (June 13, 1997)
(Order).

Decided: Sept. 17, 1997.
Revised: Sept. 18, 1997.

Stockholder of agricultural corporation brought ac-
tion against corporation and individual board mem-
bers, alleging breaches of directors' fiduciary duty
of disclosure in connection with solicitation of
proxies for election of board of directors, and seek-

ing to unseat elected board. The Court of Chan-
cery, New Castle County, dismissed action, and
stockholder appealed. The Supreme Court,
Veasey, C.J., held that: (1) there is no per se rule
under Delaware law that would allow damages for
all breaches of fiduciary duty of disclosure by cor-
porate directors; (2) allegation that board failed to
disclose reasons for board member's resignation
failed to state claim for breach of fiduciary duty of
disclosure; (3) allegations that board failed to dis-
close details regarding activities of special litiga-
tion committee did not state claim; (4) allegation
that proxy statement failed to disclose various al-
legedly improper bonuses approved by directors
and illegal price-fixing activities of corporate in-
sider did not state claim; (5) conclusory allegation
that proxy statement failed to disclose material
facts concerning board's conflict of interest and
lack of independence failed to state cognizable
claim; (6) allegations that chairman conducted
stockholder meeting in autocratic and authoritarian
manner did not state disclosure claim; and (7) ac-
tion to determine outcome of board election was
moot, as board members' terms had expired.

Affirmed and remanded.

West Headnotes

**[1] Corporations** ⊂⟩211(6)
101k211(6) Most Cited Cases
In asserting direct claims, as distinct from stock-
holder derivative claims, complaint need give only
general notice of claim asserted.

**[2] Pretrial Procedure** ⊂⟩624
307Ak624 Most Cited Cases
Motion to dismiss complaint requires court to de-
termine with reasonable certainty that plaintiff
could prevail on no set of facts that can be inferred
from pleadings.

**[3] Pleading** ⊂⟩36(2)
302k36(2) Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

700 A.2d 135                                                                          Page 2
700 A.2d 135
**(Cite as: 700 A.2d 135)**

Conclusions contained in complaint will not be accepted as true without specific allegations of fact to support them.

**[4] Corporations ☞201**
101k201 Most Cited Cases
Breach of fiduciary duty claim based on disclosure violations by board of directors in proxy statements must provide some basis for court to infer that alleged violations were material.

**[5] Corporations ☞320(12)**
101k320(12) Most Cited Cases
There is no per se rule under Delaware law that would allow damages for all breaches of fiduciary duty of disclosure by corporate directors.

**[6] Corporations ☞310(1)**
101k310(1) Most Cited Cases
Fact that board member resigned in response to perceived wrongdoing of other board members was not material, and therefore, stockholders' allegation that board of directors failed to disclose such fact prior to election of board did not state actionable claim for breach of fiduciary duty.

**[7] Corporations ☞310(1)**
101k310(1) Most Cited Cases
Directors of Delaware corporations are under fiduciary duty to disclose fully and fairly all material information within board's control when it seeks shareholder action.

**[8] Corporations ☞310(1)**
101k310(1) Most Cited Cases
Omitted fact is "material," for purposes of determining whether corporate directors have fiduciary duty to disclose it, if there is substantial likelihood that reasonable stockholder would consider it important in deciding how to vote.

**[9] Corporations ☞198(3)**
101k198(3) Most Cited Cases
To prevail on claim that omitted fact in proxy statement was material, as would constitute breach of director's fiduciary duty of disclosure, plaintiff must demonstrate substantial likelihood that, under

all the circumstances, omitted fact would have assumed actual significance in deliberations of reasonable stockholder; there must be substantial likelihood that disclosure of omitted fact would have been viewed by reasonable stockholder as having significantly altered "total mix" of information made available.

**[10] Corporations ☞310(1)**
101k310(1) Most Cited Cases
Board of directors' duty of disclosure does not oblige them to characterize their conduct in such a way as to admit wrongdoing; board is not required to engage in self-flagellation and draw legal conclusions implicating itself in breach of fiduciary duty from surrounding facts and circumstances prior to formal adjudication of the matter.

**[11] Corporations ☞320(7)**
101k320(7) Most Cited Cases
Allegations that proxy statement in connection with board election failed to disclose details regarding activities of special litigation committee did not state claim against directors for breach of fiduciary duty of disclosure, especially where complaint failed to identify any material fact that board failed to disclose.

**[12] Corporations ☞310(1)**
101k310(1) Most Cited Cases
Allegations that proxy statement in connection with board election failed to disclose various allegedly improper bonuses approved by directors and illegal price-fixing activities of corporate insider did not state claim for breach of fiduciary duty against directors; no adjudication of such activities had occurred, and disclosure would amount to confession to wrongdoing prior to adjudication of guilt.

**[13] Corporations ☞320(7)**
101k320(7) Most Cited Cases
Conclusory allegation that proxy statement in connection with board election failed to disclose material facts concerning board's conflict of interest and lack of independence failed to state cognizable claim against directors for breach of fiduciary duty

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

700 A.2d 135
700 A.2d 135
(Cite as: 700 A.2d 135)

of disclosure.

**[14] Corporations ☞310(1)**
101k310(1) Most Cited Cases
Allegations that chairman conducted stockholder
meeting in autocratic and authoritarian manner by
refusing to answer stockholder questions did not
state claim against directors for breach of fiduciary
duty of disclosure.

**[15] Action ☞6**
13k6 Most Cited Cases
Action to determine outcome of contested board
election was moot, as terms of elected board mem-
bers had expired. 8 Del.C. § 225.
*137 Upon appeal from the Court of Chancery.
**AFFIRMED and REMANDED.**

Court Below: Court of Chancery of the State of
Delaware, in and for New Castle County, C.A. No.
14638.

William Prickett (argued), Ronald A. Brown, Jr., of
Prickett, Jones, Elliott, Kristol & Schnee, Wilming-
ton; Arthur T. Susman, Terrence Buehler, Robert E.
Williams, of Susman, Buehler & Watkins, of coun-
sel, Chicago, IL, for Appellant.

R. Franklin Balotti, Todd C. Schiltz, Richards,
Layton & Finger, Wilmington, for Appellee Archer
Daniels Midland Company.

Lawrence C. Ashby, Amy A. Quinlan, of Ashby &
Geddes, Wilmington; Aubrey M. Daniel, III,
Nancy F. Lesser (argued), George A. Borden, of
counsel, Williams & Connolly, Washington, DC,
for Individual Defendants-Appellees.

Before VEASEY, C.J., WALSH, HOLLAND,
HARTNETT and BERGER, JJ., constituting the
Court en Banc.

VEASEY, Chief Justice:

In this appeal we affirm the judgment of the Court
of Chancery dismissing a complaint in a stockhold-
er suit challenging the disclosures in a proxy state-

ment for the 1995 annual meeting to elect direct-
ors. The terms of the directors elected at that
meeting have come and gone, but the issues we ad-
dress now relate to the availability of a damages
remedy arising out of the allegedly defective proxy
statement.

In agreeing with the Court of Chancery that this
complaint does not state a claim upon which relief
can be granted, we recognize that the Delaware law
of the fiduciary duties of directors, as developed in
our judicial decisions, establishes a general duty of
directors to disclose to stockholders all material in-
formation reasonably available when seeking stock-
holder action. Whether or not a failure to fulfill that
duty will result in personal liability for damages
against directors *138 depends upon the nature of
the stockholder action that was the object of the so-
licitation of stockholder votes and the misstated or
omitted disclosures in connection with that solicita-
tion.

A timely complaint, properly pleaded and suppor-
ted by proof sufficient to invoke preliminary equit-
able relief, could result in an early injunction or the
imposition of corrective disclosures before the
complained-of corporate activity had been consum-
mated. There may also be a potential damage rem-
edy where the misstatement or omission implicates
the stockholders' economic or voting rights. But
there is no *per se* doctrine imposing damage liabil-
ity on directors in a disclosure case absent these
elements. Since the claim here, as presently
pleaded, does not set forth circumstances that
would warrant an award of damages, it is subject to
dismissal.

Although we affirm the judgment of the Court of
Chancery, we will, because of the unique circum-
stances of this case, remand for the sole purpose of
allowing plaintiff a reasonable opportunity to state
a claim consistent with this opinion.

*Facts*
The following facts are derived from the complaint
dismissed by the Court of Chancery for failure to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

state a claim upon which relief can be granted under Court of Chancery Rule 12(b)(6).

The defendant below-appellee, Archer Daniels Midland Co. (ADM), portrays itself as "the super-market to the world."    It is a publicly held Delaware corporation engaged in the business of procuring, storing, transporting and merchandising agricultural commodities and products.    The named individual defendants were the members of ADM's Board of Directors in 1995. [FN1] Plaintiff Loudon is now, and at all relevant times has been, a stock-holder of ADM and was therefore entitled to vote in the uncontested 1995 directorial election.    Plaintiff originally brought this action as an individual and putative class action seeking to overturn that election.    That issue is now moot.    But since plaintiff also seeks monetary damages against the defendant directors, we focus on that issue, which is not moot.

> FN1. The ADM Board of Directors con-sists of the following individuals: Dwayne O. Andreas, ADM's Chief Executive Of-ficer and Chairman of the ADM Board; Michael D. Andreas, vice chair-man of the ADM Board; Lowell W. An-dreas, a retired president of ADM;  Martin L. Andreas, ADM's senior vice presid-ent;  H.D. Hale, Chairman of the Board and CEO of ADM Milling Co., an ADM subsidiary;  James R. Randall, ADM's President; Ralph Bruce, a retired execut-ive vice president of ADM;    John H. Daniels, a retired chairman of ADM; John K.  Vanier;     M.   Brian   Mul-roney;  Marguaritta Rockefeller;  O. Glenn Webb;  F. Ross Johnson;  Shreve M. Arch-er, Jr.;   Ray A. Goldberg;   Robert S. Strauss;  and Gaylord O. Coan.  All of the aforementioned directors are named de-fendants in this lawsuit.    As discussed *in-fra,* Gaylord O. Coan replaced former ADM director Howard M. Buffet who resigned shortly before the proxy statement was issued for ADM's 1995 Annual Meet-ing.

The events giving rise to this litigation stem from a series of allegations of wrongdoing.    On June 28, 1995, ADM announced in a press release that it was the subject of a federal criminal investigation into possible antitrust violations.    This investigation had focused primarily on ADM's activities in the food additives industry, particularly the company's sales of citric acid, lycine and high fructose corn syrup.   In July of 1995, it was disclosed that Mark E. Whitacre (then president of ADM's BioProducts division) had been acting at the behest of the Feder-al Bureau of Investigation (FBI), covertly videotap-ing and sound recording various ADM meetings and conferences. The FBI investigation, with the assistance of Whitacre's espionage, allegedly re-vealed an extensive pattern of market manipulation and price-fixing engaged in by certain employees and senior executives of ADM.

On July 19, 1995, ADM issued a press release an-nouncing that it had formed a Special Litigation Committee to oversee the Company's response to the federal investigation and various lawsuits that had been filed in response thereto. The release dis-closed the Board's election of Gaylord O. Coan to the ADM Board.    The release made no mention, however, of the resignation of Howard M. Buffet, whom Coan replaced on the Board and on the man-agement slate presented to *139 the stockholders for election.   Prior to his resignation, Mr. Buffet had been an employee of the company as well as a director, having served as a corporate vice presid-ent, assistant to ADM Chairman Andreas, and ADM's corporate spokesperson.

On August 7, 1995, ADM fired Mr. Whitacre and publicly announced that he had misappropriated some $2.5 million while acting as an FBI operat-ive.   Mr. Whitacre has repeatedly professed his in-nocence and continues to claim that the $2.5 mil-lion was a portion of the purported $6 million in improper bonuses paid by ADM to its officers and directors.   On September 13, 1995, while address-ing the Emory University Business School, ADM

director F. Ross Johnson commented on the FBI's investigation, the activities of the Committee and the termination of Whitacre. Mr. Johnson's comments reflected a general distaste for the FBI and expressed uncertainty about the future course of ADM's antitrust and civil litigation difficulties.

Also on September 13, 1995, ADM issued its Proxy Statement in connection with the company's upcoming Annual Stockholder Meeting. The Proxy Statement contained disclosures concerning: (1) the FBI antitrust investigation; (2) the existence of certain class actions and derivative suits naming various corporate insiders as defendants; and (3) the existence of the Special Litigation Committee. Like the July 19, 1995 press release, the Proxy Statement made no mention of the circumstances surrounding the resignation of former ADM director Howard M. Buffet and the replacement of Mr. Buffet by Mr. Coan on the Board.

On October 19, 1995, ADM held its annual meeting. ADM's proposed slate of directors ran unopposed and was overwhelmingly re-elected. According to the complaint, Dwayne Andreas presided over the meeting in an extremely autocratic and domineering manner. Mr. Andreas refused to allow stockholders to ask questions and abruptly dismissed any efforts by stockholders to comment or question the current affairs of ADM. When one stockholder persisted in his efforts to comment on ADM policy, Mr. Andreas directed that the stockholder's microphone be turned off.

### Disposition in the Court of Chancery

On October 20, 1995, the day immediately following the annual meeting, plaintiff filed this action in the Court of Chancery. The complaint is based on alleged breaches of the directors' fiduciary duty of disclosure in connection with the solicitation of proxies for the election. Plaintiff also seeks damages.

The complaint contended that the ADM Board had failed to disclose or had misstated the following, allegedly material facts: (1) certain statements made by ADM director, Johnson, in his speech before the Emory University Business School concerning the status of the federal antitrust investigation and related matters; (2) the resignation of ADM director Buffet and the reasons advanced by Mr. Buffet for tendering that resignation; (3) details concerning the selection of members to serve on the Special Litigation Committee and the specific mandate of the Committee; (4) the details of Michael Andreas' involvement in alleged price-fixing and other illegal activities and whether or not videotape or other evidence existed to substantiate those allegations; (5) whether or not James R. Randall and other ADM directors approved the distribution of bonuses to ADM insiders based on the use of false invoices; and (6) other material facts concerning "the Board's conflicts of interest and lack of independence."

Based on the preceding claims, the complaint sought to unseat the purportedly elected Board, pursuant to both 8 *Del.C.* § 225 and the Court of Chancery's general equity jurisdiction. The complaint also seeks damages against the directors. The Court of Chancery granted ADM's motion pursuant to Court of Chancery Rule 12(b)(6) and dismissed all of plaintiffs' claims for failure to state a claim upon which relief can be granted. [FN2] First, the Court of Chancery held that the claims could not properly be considered *140 under the framework of 8 *Del.C.* § 225. The court then concluded that equitable relief was also unavailable because disclosure of the facts enumerated in the complaint was either unnecessary (*i.e.,* the facts were immaterial) or would amount to self-flagellation. From this dismissal, plaintiff appeals. [FN3]

> FN2. *Loudon v. Archer-Daniels-Midland Co.,* Del.Ch., C.A. No. 14638, 1996 WL 74730, mem. op. (Feb. 20, 1996) ("Mem.Op.")

> FN3. In his opening brief before this Court, plaintiff did not raise the claim set forth in the original complaint concerning statements made by ADM director Johnson

before the Emory University Business School. We therefore consider that claim waived and will not review it here. *See Turnbull v. Fink,* Del.Supr., 644 A.2d 1322 (1994).

### The Proper Pleading Standard

Plaintiff contends that the trial court erred by imposing an unduly severe pleading requirement, thereby erecting an unwarranted hurdle for plaintiff to overcome. In particular, plaintiff points to language in the trial court's opinion stating that "plaintiff has the burden to plead specific facts sufficient to state an actionable disclosure claim" and requiring that the plaintiff's complaint contain "particularization of the omitted facts." [FN4] Based on this language, plaintiff argues that the trial court erroneously required plaintiff to plead with particularity the disclosure violations alleged. We agree that this language in the trial court's opinion, if taken literally, was erroneous. At best, it was simply an unfortunate choice of words. At worst, it was harmless error because we have concluded that, even under the proper pleading standard, the complaint fails to state a claim for damages.

FN4. Mem.Op. at 9, 14.

[1] In asserting direct claims, as distinct from stockholder derivative claims, the complaint need give only general notice of the claim asserted. [FN5] To state a claim upon which relief may be granted, plaintiff need only provide a well-pleaded "short and plain statement of the claim showing that the pleader is entitled to relief." [FN6] A requirement that the pleader state facts "with particularity" is reserved for derivative stockholder claims under Chancery Rule 23.1 and for fraud or mistake claims under Rule 9(b). [FN7] We see no reason to depart from the general pleading rules when alleging duty of disclosure violations. [FN8] Nevertheless, it is inherent in disclosure cases that the misstated or omitted facts be identified and that the pleading not be merely conclusory.

FN5. *Rabkin v. Philip A. Hunt Chemical*

*Corp.,* Del.Supr., 498 A.2d 1099, 1104 (1985).

FN6. Ch.Ct.R. 8(a).

FN7. Superior Court Civil Rule 9(b) requires also that negligence be stated with particularity.

FN8. *See Solomon v. Pathe Communications Corp.,* Del.Supr., 672 A.2d 35, 39 (1996).

[2][3] In evaluating ADM's motion to dismiss, therefore, the Court of Chancery was required to assume the truthfulness of all well-pleaded (i.e., non-conclusory) allegations of the complaint for purposes of the motion. [FN9] The trial court also was required to extend to the complaint "the benefit of all reasonable inferences that can be drawn from ... [the] pleading." [FN10] Moreover, as we held in *Solomon,* "a motion to dismiss, at such a preliminary stage, requires the court to determine with 'reasonable certainty' that a plaintiff could prevail on no set of facts that can be inferred from the pleadings." [FN11] It is well established, however, that "conclusions ... [contained in the complaint] will not be accepted as true without specific allegations of fact to support them." [FN12] This premise is embodied in our 1995 decision in *Santa Fe.* [FN13]

FN9. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6 (1988).

FN10. *In re USACafes, L.P.Litig.,* Del.Ch., 600 A.2d 43, 47 (1991).

FN11. *Solomon,* 672 A.2d at 38.

FN12. *In re Tri-Star Pictures, Inc. Litig.,* Del.Supr., 634 A.2d 319, 326 (1993).

FN13. *In re Santa Fe Pac. Corp. Shareholder Litig.,* Del.Supr., 669 A.2d 59, 65-66 (1995).

Plaintiff's argument seems to be that a plaintiff

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

700 A.2d 135
700 A.2d 135
(Cite as: 700 A.2d 135)

need provide only a conclusory statement of his claims in order to shift to the defendant the burden of proving full disclosure. In advancing this theory, plaintiff mistakenly relied on cases that involved the affirmative defense of ratification. In such a *141 case, the party relying on ratification as a defense has the burden of demonstrating full and fair disclosure. [FN14] The trial court correctly held that ratification is not implicated in this case. Nevertheless, the trial court's opinion may be read as requiring that plaintiff plead "with particularity" the facts underlying the allegations in the complaint.

> FN14. See, e.g., *Yiannatsis v. Stephanis,* Del.Supr. 653 A.2d 275 (1995).

The trial court quoted a passage from this Court's *Santa Fe* opinion that "[n]on-disclosure claims must provide some basis for a court to infer that the alleged omissions were material." [FN15] *Santa Fe* did not purport to establish a pleading standard for disclosure cases that went beyond the requirements of Chancery Rule 8(a). Our 1996 decision in *Solomon* makes clear that Rule 8(a) applies to a complaint that is not derivative or does not allege fraud or mistake. [FN16]

> FN15. *Santa Fe,* 669 A.2d at 66.

> FN16. *Solomon,* 672 A.2d at 39.

[4] There may sometimes be a fine line between the obligation to set forth well-pleaded allegations of ultimate fact under Rule 8(a) and the requirement in derivative or fraud cases to set forth facts with particularity. A claim based on disclosure violations must provide some basis for a court to infer that the alleged violations were material. [FN17] For example, a pleader must allege that facts are missing from the proxy statement, identify those facts, state why they meet the materiality standard and how the omission caused injury. Here we find independently that, even under a proper pleading standard, the complaint fails to state a claim upon which relief can be granted.

> FN17. *Santa Fe,* 669 A.2d at 66.

### Claim for Damages

As we have noted, much of this case is moot. [FN18] The 1995 Annual Meeting of stockholders is ancient history. The terms of the directors elected at that meeting have come and gone. So the opportunity for injunctive or section 225 relief has come and gone. There is, however, a theoretical claim for damages, which we now take up.

> FN18. See *Buckley v. Archer-Daniels-Midland Co.,* 111 F.3d 524 (7th Cir.1997) (dismissing as moot a class action suit against ADM alleging federal disclosure violations in the proxy statement issued for the 1995 annual meeting where, at the time of the suit, officers elected at that meeting had completed their one-year terms and another election had already taken place). We pause to observe here that the federal scheme of disclosure is not replicated in Delaware law. *Arnold v. Society for Sav. Bancorp., Inc.,* 678 A.2d 533, 539 (1996) ("*Arnold II*").

There may be circumstances under which a proxy statement soliciting votes for the election of directors is actionable under Delaware law for material misstatements or omissions. Injunctive relief in the form of corrective disclosures and resolicitation may be appropriate if the matter is addressed in time by a court of equity. [FN19] It is difficult to see how damages may also be available in such a case. [FN20] Construing the complaint most favorably to plaintiff, we find that no cause of action for damages is stated.

> FN19. See *Arnold II,* 678 A.2d at 537 n. 9.

> FN20. Even if damages are theoretically available, ADM's certificate of incorporation may eliminate the availability of monetary damages against ADM directors under the authority of 8 *Del.C.* 102(b)(7). *Zirn v. VLI Corp.,* Del.Supr., 681 A.2d

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

700 A.2d 135
700 A.2d 135
(Cite as: 700 A.2d 135)

Page 8

1050, 1061-62 (1996) (disclosure violations resulting from good faith errors fell within the protection of section 102(b)(7)); *Arnold v. Society for Savs. Bancorp., Inc.*, Del.Supr., 650 A.2d 1270, 1287 (1994) (same). Because we hold that the plaintiff has failed to state a claim that would warrant an award of damages for directors' breach of disclosure duties, we do not reach the issue of whether ADM's exculpatory charter provision applies in this case.

[5] Plaintiff seeks to invoke a *per se* rule of damages, relying on the following dictum in this Court's 1993 opinion in *Tri-Star*: [FN21] "In Delaware existing law and policy have evolved into a virtual *per se* rule of damages for breach of the fiduciary duty of disclosure." [FN22]

  FN21. *In re Tri-Star Pictures, Inc. Litig.*, Del.Supr., 634 A.2d 319 (1993).

  FN22. *Id.* at 333. This Court mentioned the *Tri-Star* dictum in *Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 663 A.2d 1156 (1995). In *Cinerama*, however, the Court agreed with the Court of Chancery's conclusion that the directors had complied with their disclosure duties and did not reach the issue of whether damages would have been warranted. *Id.* at 1176.

*142 *Tri-Star* was a stockholder class action that involved the entire fairness of a complex business combination. The Court held that the pleadings alleged sufficient individual monetary injury to stockholders resulting from the defendants' alleged manipulation of the combination so as to dilute the cash value and impinge on the voting rights of the minority's shares. [FN23] Disclosure violations were only one aspect of the case, and all that we address here. There, the trial court had held that proof of special damages was required for breach of the duty of disclosure and granted summary judgment because there was a failure of proof according to that standard. In reversing the trial court, the

*Tri-Star* Court held that, under the circumstances of that case involving stockholder approval of an improperly manipulated transaction implicating cash values and voting rights, there should be some damage award. [FN24] The Court cautioned, however, that if plaintiff sought more than nominal damages, proof (including expert testimony) would have to replace "hypothetical estimates." [FN25]

  FN23. *Tri-Star*, 634 A.2d at 321.

  FN24. *Id.* at 333; *see also Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985) (holding directors liable for damages where there had been dual breaches of the duties of care and disclosure so that the transaction could not withstand an entire fairness analysis).

  FN25. *Tri-Star*, 634 A.2d at 334 n. 18.

The Court in *Tri-Star* explained the context of the *per se* dictum quoted above. Citing cases involving breaches of disclosure duties where stockholders had approved economically injurious transactions, the Court recognized a discrete set of conditions in which a damage remedy for nondisclosure would be appropriate. [FN26] The particular facts of *Tri-Star* placed the case squarely within that context. Therefore, *Tri-Star* stands only for the narrow proposition that, where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must at least be an award of nominal damages. [FN27] *Tri-Star* should not be read to stand for any broader proposition.

  FN26. The Court in *Tri-Star* relied on *Weinberger v. UOP, Inc.*, Del.Ch., C.A. No. 5642, Brown, C., slip op., 1985 WL 11546 (Jan. 30, 1985), *aff'd*, Del.Supr. 497 A.2d 792 (1985) (awarding damages of $1 per share where incomplete disclosure by interested directors in a cash-out merger caused economic injury to stockholders);

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

700 A.2d 135                                                                    Page 9
700 A.2d 135
(Cite as: 700 A.2d 135)

*Smith v. Shell Petroleum, Inc.*, Del.Ch., C.A. No. 8395, Hartnett, V.C., slip op., 1990 WL 186446 (Nov. 26, 1990), *aff'd*, Del.Supr. 606 A.2d 112 (1992) (holding that award of $2 per share in monetary damages was justified where failure, through both error and intent, to disclose in a cash-out merger induced stockholders to accept an inadequate price); and *Gaffin v. Teledyne, Inc.*, Del.Ch., C.A. No. 5786, Hartnett, V.C., slip op., 1990 WL 195914 (Dec. 4, 1990) (awarding damages arising from alleged equitable fraud in connection with a stock repurchase), *aff'd in part and rev'd in part*, Del.Supr. 611 A.2d 467 (1992) (leaving intact an award of $1 per share to individual plaintiff because there had been no cross-appeal as to the damages finding).

FN27. In the past, we have exempted directors from liability for good faith, unselfish breaches of fiduciary disclosure obligations pursuant to exculpatory charter provisions authorized by 8 Del.C. § 102(b)(7). *Arnold v. Society for Savings Bancorp*, Del.Supr. 650 A.2d 1270 (1994) ( "*Arnold I*" ); *Arnold v. Society for Savings Bancorp*, Del.Supr. 678 A.2d 533 (1996) ("*Arnold II*" ); *Zirn v. VLI Corp.*, Del.Supr. 621 A.2d 773 (1993) ("*Zirn I*" ); *Zirn v. VLI Corp.*, Del.Supr. 681 A.2d 1050 (1996) ("*Zirn II*" ). It was not necessary in those cases to reach the issue of whether, in the absence of a charter provision, directors would be held liable for such breaches.

The plaintiff asserts here that the Proxy Statement issued by ADM in connection with the company's 1995 Annual Stockholder Meeting failed to disclose material facts. Plaintiff's damages claim therefore rests solely on the issue of election of directors. The circumstances recognized in *Tri-Star*--disclosure violations and deprivation of stockhold-

ers' economic or voting rights--that would give rise to a damages remedy are absent here. [FN28] In claiming damages for directors' *143 breach of the duty of disclosure in this instance, plaintiff takes out of context and would stretch too far the *Tri-Star* Court's dictum referred to above. [FN29]

FN28. We do not decide whether or not a pleader must also allege any other elements (*e.g.*, negligence, gross negligence, intentional misconduct or reliance) to state a claim for damages based on disclosure violations. Those issues are not before us, and we decide only the case before us. *See Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr. 637 A.2d 34, 51 (1994).

FN29. *See* Lawrence A. Hamermesh, *Calling Off The Lynch Mob: The Corporate Director's Fiduciary Disclosure Duty*, 49 Vanderbilt L.Rev. 1087, 1170-72 (1996).

We now turn *seriatim* to the alleged disclosure violations.

### Disclosures Concerning the Resignation of Howard Buffet

[6] Plaintiff contends that the ADM Board breached its fiduciary duty by failing to disclose the facts surrounding former director Howard Buffet's resignation. The complaint averred, in conclusory terms, that Mr. Buffet resigned because he "refused to participate in Dwayne Andreas's plan to stonewall ADM stockholders, the media and Wall Street and did not believe the information he was receiving from ADM officials about the government's probe and related litigation." The trial court concluded that: (1) this information was not material; (2) even assuming *arguendo* that the information was material, pursuant to the rule relieving directors from the obligation to engage in self-flagellation, the ADM directors were not required to disclose the reasons for Buffet's resignation; and (3) any effort by a Delaware court to force disclosure of this information would conflict with federal

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

700 A.2d 135
700 A.2d 135
(Cite as: 700 A.2d 135)

proxy rules.

[7][8][9] It is well established that "directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." [FN30] An omitted fact is material if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote. [FN31] To prevail on a claim of material omission, therefore, a plaintiff must demonstrate a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable stockholder. There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable stockholder as having significantly altered the "total mix" of information made available. [FN32]

> FN30. *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 84 (1992).

> FN31. *Arnold v. Society for Savs. Bancorp, Inc.,* Del.Supr., 650 A.2d 1270, 1277 (1994) (quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985) (adopting *Northway* standard as law of Delaware)).

> FN32. *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. at 2132.

[10] The directors' duty of disclosure does not oblige them to characterize their conduct in such a way as to admit wrongdoing. As this Court held in *Stroud,* "a board is not required to engage in 'self-flagellation' and draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter." [FN33] Thus, even where material facts must be disclosed, negative inferences or characterizations of misconduct or breach of fiduciary duty need not be articulated. [FN34]

> FN33. *Stroud,* 606 A.2d at 84 n. 1; *see also Michelson v. Duncan,* Del.Ch., 386 A.2d 1144, 1155 (1978), *aff'd in part,* Del.Supr., 407 A.2d 211, 222 (1979).

> FN34. See *Warner Communications, Inc. v. Murdoch,* D.Del., 581 F.Supp. 1482, 1490 (1984) ("The rule limits only the duty to publicly admit to misconduct; it does not limit a party's duty to disclose all material facts relating to the party's actions, including those that might relate to misconduct.").

Plaintiff contends that it is material that ADM Board member Buffet allegedly tendered his resignation in response to the perceived wrongdoing of other Board members, and, if true, that is a fact that a reasonable ADM stockholder would want to know in deciding how to vote. Plaintiff contends that disclosure of Mr. Buffet's alleged views does not amount to self-flagellation because all that needed to be disclosed were the objective facts surrounding his resignation and the reasons he advanced for tendering that resignation. Plaintiff argues that the Board was free to state its disagreement with the allegations made by Mr. Buffet. Moreover, plaintiff claims that all that ADM was required to *144 disclose was Mr. Buffet's opinion and belief that the Board was engaged in misconduct, which the Board would have been free to comment upon in the Proxy Statement.

This argument presents a novel disclosure theory. To be sure, it might be "better practice" for directors of a public corporation to be more candid and forthcoming in their communications to stockholders when presenting a slate for election to the board. It is a leap of logic, however, for this Court, applying a form of "common law" of corporate disclosure, to fashion a rule that attempts to draw--in a liability context--a bright line of disclosure for directorial elections. How much information must be imparted to the stockholders concerning positions previously taken by directors who have been dropped from the management slate?

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

700 A.2d 135                                                        Page 11
700 A.2d 135
(Cite as: 700 A.2d 135)

[FN35] When can it be said that omitted informa-
tion about a former director's disagreement with
management rises to the level of a "substantial like-
lihood that, under all the circumstances, the omitted
fact would have assumed actual significance in the
deliberations of a reasonable shareholder"?
[FN36] What is plaintiff's theory of causation and
economic damage to him and other stockholders?
The complaint before us does not state a well-
pleaded claim that the nondisclosure of the back-
ground of Mr. Buffet's omission from the manage-
ment slate was material or actionable.

> FN35. One glaring omission in the com-
> plaint is the absence of any allegation that
> the directors knew why Buffet resigned
> and knowingly suppressed that informa-
> tion.

> FN36. *TSC Indus.*, 426 U.S. at 449, 96
> S.Ct. at 2132.

### Disclosures Concerning the Special Litigation Committee

[11] Plaintiff next contends that the Proxy State-
ment omitted material facts concerning the ADM
Special Litigation Committee established in re-
sponse to the then recent allegations of corporate
wrongdoing. The complaint asserts that the Proxy
Statement failed to disclose: (1) the selection pro-
cess for members of the Committee; (2) the activit-
ies and goals of the Committee; (3) the mandate of
the Committee and its plans, if any, to retain out-
side counsel; and (4) the Committee's intended re-
sponse to pending derivative litigation. The trial
court correctly found that plaintiff failed to "identi-
fy any specific fact that should have been dis-
closed."

There is no support for the view that the particular
details of a special litigation committee's activities
must be disclosed. Moreover, the complaint fails
to identify any material fact that the Board failed to
disclose. The details of a corporation's inner work-
ings and its day-to-day functioning are not the
proper subject of disclosure. The allegations of the

complaint amount to no more than conclusory state-
ments that lack factual or inferential support suffi-
cient for a court to determine materiality. [FN37]
The trial court was correct in dismissing this claim.

> FN37. *Santa Fe,* 669 A.2d at 65-66.

On appeal, plaintiff attempts to cast his claim as
one of material misstatement rather than omission.
[FN38] Plaintiff alleges that the Proxy Statement
indicated that the Special Litigation Committee was
appointed to "oversee the Company's response to
the investigation and related civil antitrust and se-
curities litigation." This contention argues that this
statement is materially misleading in light of the
subsequent comment by ADM director and Com-
mittee member Brian Mulroney that "the Commit-
tee is not charged with the conduct of an independ-
ent investigation...." Plaintiff argues that ADM
stockholders were left with the erroneous impres-
sion that the Committee was taking a proactive
stance and actively investigating the alleged wrong-
doing.

> FN38. ADM correctly points out that the
> complaint did not allege any material mis-
> statements and nowhere mentioned the
> facts now included in plaintiff's opening
> brief in support of this claim. Since we
> reject this claim, however, and plaintiff
> will be permitted to replead, the question
> of whether or not it is properly before the
> Court is of no moment.

This contention fails, however, in light of the clear
language of the Proxy Statement, which did not
state that the Committee would investigate. On the
contrary, it indicated that the Committee was
charged with oversight of ADM's response to the
investigation *145 conducted by the FBI. Further,
subsequent comments made by ADM director John-
son bolster the view that, at the time the Proxy
Statement was issued, ADM was adopting a wait-
and-see posture. [FN39] Since ADM had professed
its belief that the FBI investigation and various
civil actions were without merit, the failure to dis-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

close further the mandate of the Committee cannot be deemed materially misleading.

> FN39. According to the complaint, in discussing ADM's attitude toward the FBI investigation during his speech before the graduating class of Emory University Business School, Director Johnson stated, "Well, we don't know.... We just have to wait."

In a related claim, plaintiff takes issue with the Committee's decision to seek dismissal of the various derivative actions on the basis that a pre-suit demand was not made. In light of the Committee's decision to seek dismissal, the argument goes, the fact that the Committee is not charged with conducting an investigation becomes material. Defendants correctly argue that it is the Committee's right to seek dismissal for failure to serve a pre-suit demand on the Board. [FN40] The absence of any intention to conduct an independent investigation at this time does not vitiate this right. Such a disclosure requirement would oblige the Committee to speculate about its future plans. Speculation is not an appropriate subject for a proxy disclosure.

> FN40. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984).

### Disclosures Concerning Price-Fixing and Improper Bonuses

[12] Plaintiff contends that the trial court improperly dismissed his claims concerning ADM's failure to disclose various allegedly improper bonuses and illegal price-fixing activities. The complaint stated, in pertinent part, that the Proxy Statement failed to disclose: (1) "*whether* ... Michael Andreas was captured on video tape by the FBI discussing and agreeing to prices, production volumes and market share goals with officials from other companies;" and (2) "*whether* James R. Randall and other ADM directors ... approved bonuses to ADM officers ... through the use of false invoices...." (emphasis supplied). The trial court correctly concluded that these portions of the complaint do not

state the omission of a material fact. Rather, they pose a question, the answer to which would seem to require the ADM Board to engage in self-flagellation. Nowhere does the complaint allege that, at the time the complaint was filed, an adjudication of these activities had occurred. Nevertheless, plaintiff's argument would have the ADM Board confess to wrongdoing prior to any adjudication of guilt. This is precisely the situation the self-flagellation rule was designed to prevent. [FN41]

> FN41. *Stroud,* 606 A.2d at 84 n. 1.

Plaintiff attempts to skirt the self-flagellation rule by stating that the ADM Board was not required to characterize the activities as wrongful or improper. In the absence of such a qualifying statement, however, these activities would not be material to a reasonable stockholder's determination of how to vote in the directorial election. Absent any adjective describing the activity in a pejorative light, the relatively uncontroversial act of meeting with representatives of other market participants would not be of any importance to a stockholder faced with the directorial ballot. Similarly, the payment of bonuses to ADM officers is not particularly noteworthy, absent well-pleaded facts alleging that the bonuses were improper. Thus, the trial court correctly concluded that this portion of the complaint failed to state a legally cognizable claim.

### Disclosures Concerning the Board's Lack of Independence and Conflicts of Interest

[13] Plaintiff asserts that the complaint's vague allegations concerning director disinterest and independence were sufficient to withstand dismissal and that the trial court erred by finding to the contrary. The complaint simply stated that "[t]he Proxy Statement failed to disclose all of the material facts concerning the Board's conflicts of interest and lack of independence." The trial court properly concluded, however, that this *146 conclusory allegation had failed to state a cognizable claim.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

The conclusory allegations of non-disclosure fall precisely within the purview of *Santa Fe.* [FN42] Plaintiff's allegations need not be pleaded with particularity. Nevertheless, some factual basis must be provided from which the Court can infer materiality of an identified omitted fact. This is inherently a requirement for a disclosure claim.

FN42. *Santa Fe,* 669 A.2d at 65-66.

### *Conduct of the Stockholder Meeting*

[14] Plaintiff asserts that the trial court erred in dismissing his disclosure claims pertaining to the conduct of the stockholder meeting, pointing to the autocratic and authoritarian manner in which Chairman Andreas ran the meeting and refused to answer stockholder questions. The claim is that this conduct was tantamount to a disclosure violation and constituted stockholder disenfranchisement. This is a rather far-fetched contention. The trial court correctly held that the complaint does not properly allege that ADM failed to disclose that, as a result of Andreas' draconian handling of the stockholder meeting, a violation occurred. Further, the trial court correctly concluded that the complaint furnishes no support for the notion that stockholders at an annual meeting have a right to ask questions independent of their right to full disclosure.

Plaintiff argues that the conduct of Andreas made a "sham" of the meeting and eviscerated a meaningful exercise of the stockholder franchise. Plaintiff's allegation is couched in terms of a disclosure breach [FN43] rather than a disenfranchisement claim. [FN44] The issue is whether or not the disclosures provided to stockholders in ADM's disclosure materials were materially misleading, not how the stockholders' meeting was conducted. For the complaint to survive a motion to dismiss pursuant to Rule 12(b)(6), it must provide some plausible connection, consistent with the standards set forth in this opinion, between the disclosures *ex ante* and Mr. Andreas' *ex post* conduct of the stockholder meeting. [FN45]

FN43. The complaint simply states that

"[t]he board also breached its fiduciary duty of disclosure by failing to answer stockholders' questions at the annual meeting."

FN44. *Cf. Blasius Indus., Inc. v. Atlas Corp.,* Del.Ch., 564 A.2d 651, 663 (1988).

FN45. *Santa Fe,* 669 A.2d at 66 ("The materiality standard requires that directors disclose all facts which, 'under all the circumstances, ... would have assumed actual significance in the deliberations of the reasonable shareholder.' ").

### *The Section 225 Action is Moot*

[15] The complaint sought to invoke the Court of Chancery's general equity jurisdiction and its statutory authority to determine the outcome of a contested election under 8 *Del.C.* § 225. The trial court refused to consider these claims under the alternative statutory basis, holding that the claims were not a proper subject for consideration under section 225, which provides as follows:

§ 225. Contested election of directors; proceedings to determine validity.

(a) Upon application of any stockholder or director, or any officer whose title to office is contested ... the Court of Chancery may hear and determine the validity of any election of any director, member of the governing body, or officer of any corporation, and the right of any person to hold such office, and, in case any such office is claimed by more than 1 person, may determine the person entitled thereto....

Since the terms of the board members elected in 1995 have expired, this issue is moot.

### *Conclusion*

This Court has observed in the past that policy concerns place an important qualification on the maxim that every wrong must have a correlative remedy. [FN46] Injunctive relief or corrective disclosures may or may not have been an appropriate early remedy here. That issue is moot, and we express no opinion on it.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

FN46. *Arnold II,* 678 A.2d at 541.

We hold that under Delaware law there is no *per se* rule that would allow damages for all director breaches of the fiduciary duty of disclosure. The dictum in *Tri-Star* is confined to the facts of that case. Damages will be available only in circumstances where disclosure violations are concomitant with deprivation to stockholders' economic interests or impairment of their voting rights. [FN47] In every case, a plaintiff stating a claim against directors for violation of the duty of disclosure must set forth in a well-pleaded complaint allegations sufficient to warrant the remedy sought.

> FN47. There is an analytical distinction between "ownership claim issues" and "enterprise issues" facing a board of directors. "Enterprise issues" are usually those involving management decisions affecting the enterprise and do not go to the heart of the individual stockholder's personal property interests. "Ownership claim issues" involve board decisions that have an immediate and profound impact on stockholders' rights. Included in the latter category would be deprivation to stockholders' financial investments, as the economic rights affected exist at the very core of stockholders' identity and purpose as stockholders. *See* Bayless Manning, *Reflections and Practical Tips on Life in the Boardroom After Van Gorkom,* 41 BUS.LAW. 1, 5-6 (1985); *see also* E. Norman Veasey, *The Defining Tension in Corporate Governance in America,* 52 BUS.LAW. 393, 394 (1997).

Accordingly, we affirm the judgment of the Court of Chancery. Because of the unique circumstances of this case, where we have been called upon to explicate pleading standards and the limited principles applicable to damages in a disclosure case, we remand for the sole purpose of allowing the plaintiff a reasonable opportunity to replead in a manner consistent with this opinion.

700 A.2d 135

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

| | | |
|---|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | ) ) ) | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | ) ) | Lead Case No.1-07-CV-093465 |
| vs. | ) ) | Judge Jack Komar |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendant. | ) ) | PROOF OF SERVICE Electronic Proof of Service |
| AND RELATED ACTIONS | ) ) | |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Fri. February 15, 2008 at 4:17 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Fri. February 15, 2008 at 4:17 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on February 15, 2008 at Oakland, California.

Dated: February 15, 2008                    For WWW.SCEFILING.ORG

Andy Jamieson

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG

Electronic Proof of Service
Page 2

Document(s) submitted by Matthew Weiler of Morgan Lewis & Bockius LLP on Fri. February 15, 2008 at 4:17 PM PST

1. Appendix: APPENDIX OF OUT-OF-STATE AUTHORITIES IN SUPPORT OF KLA TENCOR CORPORATION'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS DEMURRER

The Superior Court of California, County of Santa Clara

• SCEFiling Home
• Help • FAQ • Cases • My Home • Resources • Log Off

**Matthew Weiler – Morgan Lewis & Bockius LLP**
**1-07-CV-093465: Crimi v. Barnholt, et al. (KLA-Tencor Corporation)**

## Document filing results:

Submit date: Fri. 2/15/08 4:17 PM
Clerk review date: Fri. 2/15/08 4:32 PM

| Submitted by: | Matthew Weiler | Morgan Lewis & Bockius LLP |
|---|---|---|
| Case Info: | 1-07-CV-093465 | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |

| Document 1: | Reply Brief – Title: REPLY MEMORANDUM IN SUPPORT OF DEFENDANT KLA-TENCOR'S DEMURRER<br>a. Proof of Electronic Service | |
|---|---|---|
| | • Document Accepted | |

| Document 2: | Reply Brief – Title: REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF MOTION TO STAY<br>a. Exhbit A<br>b. Proof of Electronic Service | |
|---|---|---|
| | • Document Accepted | |

| Document 3: | Appendix – Title: APPENDIX OF OUT-OF-STATE AUTHORITIES IN SUPPORT OF KLA TENCOR CORPORATION'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS DEMURRER<br>a. Exhibit 1<br>b. Exhibit 2<br>c. Exhibit 3<br>d. Exhibit 4<br>e. Proof of Electronic Service | |
|---|---|---|
| | • Document Accepted | Lodged only. |

| Parties: | KLA-Tencor Corporation | Defendant |
|---|---|---|
| Filing fee: | $46.80 | |
| Hard copy | Hard Copy Cover Sheet | |

Duplicate this Filing        Done

MEMORANDUM

# Morgan Lewis
COUNSELORS AT LAW

TO:        Complex Filings Clerk

FROM:     Laura Walker

DATE:      February 19, 2008

SUBJECT:   2/15/08 E-Filing Re: 1-07-CV-093465

Enclosed please find two (2) copies of documents that were e-filed in the above-referenced case on Friday, February 15, 2008 along with the Document Cover Sheet and the Electronic Proofs of Service.

I can be reached directly at 415.442.1467 if you should have any questions.

Thank you.

*Laura Walker*

Laura Walker
for Matthew S. Weiler

Morgan, Lewis & Bockius LLP

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

# E-FILED

Feb 15, 2008 4:32 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7155
By R. Walker, Deputy

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | Lead Case No.1-07-CV-093465 |
| vs. | |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | Judge Jack Komar |
| Defendant. | |
| AND RELATED ACTIONS | PROOF OF SERVICE Electronic Proof of Service |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Fri. February 15, 2008 at 4:17 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Fri. February 15, 2008 at 4:17 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on February 15, 2008 at Oakland, California.

Dated: February 15, 2008                    For WWW.SCEFILING.ORG

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

Andy Jamieson

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG

2

Electronic Proof of Service
Page 2

3

Document(s) submitted by Matthew Weiler of Morgan Lewis & Bockius LLP on Fri. February 15, 2008 at 4:17 PM PST

1. Reply Brief: REPLY MEMORANDUM IN SUPPORT OF DEFENDANT KLA-TENCOR'S DEMURRER

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**E-FILED**

Feb 15, 2008 4:32 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7155
By R. Walker, Deputy

1  JOHN H. HEMANN (SBN 165823)
   JOSEPH E. FLOREN (SBN 168292)
2  TERA M. HEINTZ (SBN 241414)
   MATTHEW WEILER (SBN 236052)
3  MORGAN, LEWIS & BOCKIUS LLP
   One Market, Spear Street Tower
4  San Francisco, CA 94105-1126
   Tel: 415.442.1000
5  Fax: 415.442.1001

6  Attorneys for Defendant
   KLA-Tencor Corporation

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF SANTA CLARA

10

11  CHRIS CRIMI, on Behalf of Himself and      Case No. 107CV093465
    All Others Similarly Situated,
12                                             **REPLY MEMORANDUM OF POINTS**
                    Plaintiff,                 **AND AUTHORITIES IN FURTHER**
13                                             **SUPPORT OF MOTION TO STAY**
             vs.
14                                             Time: February 22, 2008, at 9:00 a.m.
    EDWARD W. BARNHOLT, H.                     Department: 17
15  RAYMOND BINGHAM, ROBERT T.                 Judge: Hon. Jack Komar
    BOND, RICHARD J. ELKUS, JR.,
16  STEPHEN P. KAUFMAN, KENNETH                Date Filed: September 4, 2007
    LEVY, MICHAEL E. MARKS, DEAN O.            Trial Date: None Set
17  MORTON, KENNETH L. SCHROEDER,
    JON D. TOMPKINS, RICHARD P.
18  WALLACE, KLA-TENCOR
    CORPORATION, and DOES 1 through 25,
19
                    Defendants.
20

21

22

23

24

25

26

27

28

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

**INTRODUCTION**

Plaintiff's Opposition to KLA-Tencor Corporation's ("KLA's") Motion to Stay offers no basis for this action to proceed independently of the other litigation (filed over one year previously) on the same facts in this and other courts, and fails to rebut the showing made in KLA's motion that (1) Delaware is a suitable place to resolve Plaintiff's purported voting dilution claim, and (2) public and private interests favor a stay. It is undisputed that there is an action pending in Delaware, and several actions in California, covering the subject matter of Plaintiff's complaint. Nor is it disputed that Delaware law applies to this action. Plaintiff's argument in Opposition – to the effect that KLA is headquartered in California and it would not be impossible to litigate his dilution claims before this Court – is insubstantial and cannot outweigh the uncontested fact that allowing this action to proceed would result in multiplicity of litigation covering the same subject matter, including an action in Delaware that covers the identical defective dilution allegations.

KLA respectfully requests that this Court rule on its Motion to Stay, and reach the Demurrer only if the Motion to Stay is denied.

**ARGUMENT**

A stay pursuant to C.C.P. § 410.30(a) is warranted under the circumstances because Delaware is a suitable place for trial, and the balance of public and private interests favors a stay. *Stangvik v. Shiley Inc.*, 54 Cal. 3d 744, 751 (1991). Plaintiff does not dispute that Delaware is a suitable place for trial, and he has identified no countervailing interest that overcomes the litany of public and private interests to stay this action.

**A.     Public Interests Favor a Stay**

By citing pending actions against KLA arising from allegations of historic backdating, Plaintiff's Opposition brief recognizes that there is a multiplicity of litigation arising from the same set of underlying allegations. Opposition at 10-11. Thus, Plaintiff effectively concedes that a stay would prevent a multiplicity of litigation. *See Century Indemnity Co. v. Bank of America*, 58 Cal. App. 4th 408, 413 (1998) (granting a stay in "discouraging multiple litigation designed solely to harass an adverse party"). Similarly, Plaintiff tacitly concedes that his action covers no

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW·SAN
FRANCISCO

1

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1   subject matter distinct from the *Langford* action.  Instead, Plaintiff argues that the *Langford*

2   matter "contains inherent contradictions" because it is apparently pled in the alternative as direct

3   and derivative.  Opp. at 11.  As noted in KLA's Demurrer, however, voting dilution claims are

4   derivative in nature and cannot be maintained directly.  Thus, merely because the *Langford*

5   plaintiff pleads such claims in the alternative does not mean that the action will proceed as it is

6   currently pled.

7       A stay would advance the Delaware courts' interest in determining questions of Delaware

8   law in Delaware courts.  Plaintiff does not disagree that Delaware law governs his cause of

9   action, but instead argues that California courts can competently apply Delaware law.  Opp. at 10.

10  While this is true, granting a stay in this instance would advance Delaware's strong interest in

11  having its courts determine questions of Delaware law.  *See In re Topps Co. S'holders Litig.*, 924

12  A.2d 951, 953-54 (Del. Ch. 2007) ("[w]hen new issues arise, the state of incorporation has a

13  particularly strong interest in addressing them, and providing guidance.").  Where, as here, there

14  are no countervailing public interest factors favoring proceeding with this case in California,

15  public interest factors favor a stay.

16      **B.    Private Interests Favor a Stay**

17      Plaintiff argues that that litigating in California would not inconvenience defendants

18  because there are several actions pending against KLA in California, and because the company is

19  located in California.  Yet whatever benefit there may be to the parties due to the fact that KLA's

20  headquarters are located in California is offset by the legal fees, among other costs, the company

21  will incur defending an essentially duplicative litigation where there are several actions that cover

22  the same subject matter.  *See Hart*, 517 N.Y.S..2d at 495 (finding that litigating in parallel

23  jurisdictions burdened defendants because the action "subject[ed] GM and its twenty individual

24  directors to the expense of litigating the same claims in separate forums, as well as exposing them

25  to the possibility of inconsistent judgments" as to the ownership of GM stock).

26      Plaintiff's argument that his action furthers unique private interests in that it seeks

27  compensation for different plaintiffs lacks merit.  Opp. at 11.  As this action is derivative in

28  nature, and improperly brought as a direct action, this distinction is meaningless.  Moreover,

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1    Plaintiff would be putatively covered by the *Langford* action, which also purports to be brought

2    on behalf of "all shareholders" from 1997 to present. *Langford* Compl. ¶¶ 1, 39; Floren Decl.,

3    Ex. A. Notably, Plaintiff does not allege that he is a resident of California, thus there is no private

4    interest identified by Plaintiff with respect to obtaining a California forum. *Stangvik v. Shiley*

5    *Inc.*, 54 Cal.3d 744, 753 (1991) (level of deference that is traditionally accorded a plaintiff's

6    choice of forum is diminished when plaintiff is not a resident of California). Moreover, as

7    recognized by the Delaware Chancery Court, "representative plaintiffs seeking to wield the

8    cudgel for all stockholders of a Delaware corporation have no legitimate interest in obtaining a

9    ruling from a non-Delaware court." *In re Topps*, 924 A. 2d at 961.

10       Plaintiff does address KLA's argument regarding the unique benefits to the parties of a

11   Delaware forum, and thus apparently concedes its wisdom. Delaware courts "provide[s] litigants

12   the timely opportunity to seek review from the state's highest court, the Delaware Supreme Court,

13   by way of requesting an expedited and direct interlocutory appeal." *In re Topps Co. S'holders*

14   *Litig.*, 924 A.2d at 954. Further, this "opportunity for prompt definitive guidance is obviously

15   unavailable in the courts of another state." *Id.*

16       Plaintiff's Opposition articulates no other countervailing private interest in adjudicating

17   this case in California rather than Delaware. As the alleged convenience to KLA in litigating in

18   proximity to its headquarters is more than offset by the inefficiency of litigating several actions

19   covering the same subject matter, Plaintiff has identified no private interest that favors litigating

20   his dilution claims in California.

21       **C.    Comity and Efficiency Favor a Stay Under this Court's Inherent Power to
22              Control its Own Docket**

23       Notwithstanding C.C.P. § 410.30(a), a stay is appropriate here for the simple reason that

24   the *Langford* action involves the same substantive allegations, includes ten of the twelve

25   defendants, and was filed prior to the initiation of the instant action. Thus, a stay is warranted "to

26   prevent two actions between the same parties involving the same subject matter from proceeding

27   independently of each other." *Simmons v. Superior Court*, 96 Cal. App. 2d 119, 124-25 (1950).

28   Additionally, the consolidated federal securities class action, the consolidated federal derivative

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1   class action, and the *Rabin* action all concern substantially the same allegations against the same

2   defendants arising out of the same events.  A stay is further warranted under comity traditionally

3   due to federal courts.  *See Morrow v. Superior Court*, 9 Cal. App. 2d 16, 22 (1935) (granting a

4   stay on the grounds that comity was owed a California federal court); *Celotex*, 199 Cal. App. 3d

5   at 685 (granting a stay on the grounds of *forum non conveniens* where, as here, parallel actions

6   were pending in federal court).

7          Although Plaintiff's action is improperly maintained as a direct cause of action, the recent

8   settlement of the federal consolidated federal securities class action also justifies a stay here.  *See*

9   "$65 Million Settlement Reached in Stock Options Backdating Shareholder Lawsuit Against

10  KLA-Tencor", CNNMoney.com,

11  http://money.cnn.com/news/newsfeeds/articles/prnewswire/DC1257128012008-1.htm (last

12  accessed February 13, 2008) (attached hereto as **Exhibit A**).  The settlement, which covers

13  shareholders who purchased KLA stock between June 30, 2001 and January 29, 2007,

14  encompasses a class that completely subsumes Plaintiff's putative class identified here.  Thus, a

15  substantial number of plaintiffs, perhaps all but Plaintiff Chris Crimi himself (who will have to

16  opt out), will be dismissed following the approval of this settlement.

17                              **CONCLUSION**

18          For the foregoing reasons, KLA asks for a stay of the instant action.

19

20  DATED:  February 15, 2008

Respectfully submitted,

21

MORGAN LEWIS & BOCKIUS, LLP

22

23  By:_____/s/_____

JOSEPH E. FLOREN
*Attorneys for Defendant KLA-Tencor Corporation*

24

25

26

27

28

4

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1

2

*Chris Crimi, et al. v. Edward W. Barnholt, et al.*
Santa Clara County Superior Court Case No. 107CV093465

3

4

I, the undersigned, declare: that I am, and was at the time of service of the documents herein referred to, over the age of 18 years, and not a party to the action; and I am employed in the County of San Francisco, California. My business address is One Market, Spear Street Tower, San Francisco, California 94105.

5

6

7

On the date executed below, I electronically served the document(s) via the Santa Clara Superior Court's electronic filing system described as:

8

9

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF MOTION TO STAY**

10

11

12

on the recipients designated on the Transaction Receipt located on the Santa Clara County Superior Court's electronic filing website. I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct and was executed on February 15, 2008.

13

14

_____/s/_____
Laura Walker

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1-SF/7666882.1

# EXHIBIT A





| Symbol | Get Quote | Keyword |

Home    Business News    Markets    Personal Finance    Real Estate    Technology    Small Business    Luxury

TRADING
CENTER







# $65 Million Settlement Reached in Stock Options Backdating Shareholder Lawsuit Against KLA-Tencor

January 28, 2008: 03:43 PM EST



City of Philadelphia Board of Pensions and Retirement was co-lead plaintiff

Three Philadelphia law firms were among co-lead counsel

PHILADELPHIA, Jan. 28 /PRNewswire/ – The Philadelphia law firms of Berger & Montague, P.C., Trujillo Rodriguez & Richards LLC, and Kohn, Swift & Graf, P.C., along with the San Francisco office of Berman DeValerio Pease Tabacco Burt & Pucillo are pleased to announce the resolution of a class action securities fraud lawsuit against KLA-Tencor Corporation ("KLA-Tencor" or the "Company") . KLA-Tencor has agreed in principle to pay $65 million in cash to settle a shareholder lawsuit, which alleged that the Company and certain of its officers illegally backdated stock option grants.

The agreement in principle, which is subject to court approval, documentation, and notice, would settle all claims against KLA-Tencor and the individual defendants.

"This settlement is an extraordinary achievement and is a highly significant recovery for the Class," said Sherrie R. Savett of Berger & Montague. "It resolves fraud claims against all defendants, eliminates all risks to the Class, and ensures that Class members will enjoy the proceeds in the not too distant future," said Savett. "These are exactly the kinds of claims institutional investors should pursue," added Kenneth I. Trujillo of Trujillo Rodriguez & Richards LLC. Joseph C. Kohn of Kohn Swift & Graf, P.C. noted that the complex case was resolved in an expeditious manner and added that "the settlement is an excellent result that will compensate KLA shareholders and allow KLA to move forward."

The City of Philadelphia and the other Lead Plaintiffs played prominent roles in achieving this settlement. In addition to the three Philadelphia based law firms, the City of Philadelphia's Board of Pensions and Retirement served as a Co-Lead plaintiff in the case, along with the Louisiana Municipal Police Employees' Retirement System, and the Police and Fire Retirement System of the City of Detroit.

The action, captioned In re KLA-Tencor Securities Litigation, 06-cv-04065 (N.D. Cal.) was pending in San Francisco, where KLA-Tencor is headquartered. Lead attorneys for the Class included Ms. Savett, Mr. Trujillo and Ira Neil Richards (co-counsel for the City of Philadelphia), Mr. Kohn, and Joseph J. Tabacco, Jr.

The proposed settlement provides that investors who purchased KLA-Tencor securities from June 30, 2001, through and including January 29, 2007 (the "Settlement Class Period"), may be eligible to file proofs of claim.

The lawsuit, which was brought in U.S. District Court for the Northern District of California, alleged that the Company backdated stock option grants to the individual defendants and/or other directors or executives to provide the recipients with a more profitable exercise price. In particular, the complaint says that: (a) contrary to statements made by the Company, the option grants were not made at the fair market value or the NASDAQ closing price on the date of the grant; (b) KLA-Tencor improperly understated its expenses and overstated its earnings as a result of improper option backdating; and (c) KLA-Tencor failed to prepare its financial statements in accordance with Generally Accepted Accounting Principles. The defendants denied the allegations in the lawsuit and, as part of the proposed terms of settlement, continue to deny all claims and liability.

Berger & Montague, P.C., Trujillo Rodriguez & Richards LLC, Kohn, Swift & Graf, P.C., and Berman DeValerio Pease Tabacco Burt & Pucillo each prosecute class actions nationwide on behalf of institutions and individuals, primarily in the areas of securities fraud and antitrust.

■

**Sponsored Links**

**Mortgage Rates at 4.65%**
$170,000 loan for $656/month. See New Payment - No SSN Rqd. Save Now!
Refinance.LeadSteps.com

**Alternative to Open Back Surgery**
The World Leader of Arthroscopic Procedures for Back and Neck Conditions
www.laserspineinstitute.com

**Trade Currencies w/ GFT**
Dow Jones news, analytics & charts. Available in our free software.
www.GFTforex.com

Buy a link here

| More Markets |
| --- |
| Wall Street's mixed day, up week |
| Stocks heartbroken over economy |
| Bond insurer FGIC seeks break up |
| **The Hot List** |
| Blue chips that can ride out a recession |
| 50 years of bear markets and recessions |
| A recession won't wreck your retirement |

$65 Million Settlement Reac.   in Stock Options Backdating Shareholc    .awsuit Again...   Page 3 of 3

© 2008 Cable News Network. A Time Warner Company. All Rights Reserved. Terms under which this s

Home    Portfolio    Calculators    Contact us    Newsletters    Podcasts    RSS    Mobile
Advertise with Us    Magazine Customer Service    Download Fortune Lists    Reprints    Career Opportunities    Sp

Live Quotes automatically refresh, but individual equities are delayed 15 minutes for Nasdaq, and 20 minutes for other exch.
DJIA, which is delayed by two minutes. All times are ET.
* : Time reflects local markets trading time. † - Intraday data delayed 15 minutes for Nasdaq, and 20 m
Copyright © 2008 BigCharts.com Inc. All rights reserved. Please see our Terms of Use.MarketWatch, the MarketWatch lo
Inc.Intraday data delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges. All Times are ET.Intraday data prov
the Terms of Use.Historical, current end-of-day data, and splits data provided by FT Interactive Data.Fundamental data pro
Inc..Earnings data provided by FactSet CallStreet, LLC.

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

**E-FILED**

Feb 15, 2008 4:32 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7155
By R. Walker, Deputy

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff,<br>vs. | Lead Case No.1-07-CV-093465 |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | Judge Jack Komar |
| Defendant. | **PROOF OF SERVICE**<br>**Electronic Proof of Service** |
| AND RELATED ACTIONS | |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Fri. February 15, 2008 at 4:17 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Fri. February 15, 2008 at 4:17 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on February 15, 2008 at Oakland, California.

Dated: February 15, 2008                    For WWW.SCEFILING.ORG

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

Andy Jamieson

E-Filed: Feb 15, 2008 4:32 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7155

1

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG

2

Electronic Proof of Service
Page 2

3

Document(s) submitted by Matthew Weiler of Morgan Lewis & Bockius LLP on Fri. February 15, 2008 at 4:17 PM PST

4

1. Reply Brief: REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF MOTION TO STAY

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1  JOHN H. HEMANN (SBN 165823)
   JOSEPH E. FLOREN (SBN 168292)
2  TERA M. HEINTZ (SBN 241414)
   MATTHEW WEILER (SBN 236052)
3  MORGAN, LEWIS & BOCKIUS LLP
   One Market, Spear Street Tower
4  San Francisco, CA 94105-1126
   Tel: 415.442.1000
5  Fax: 415.442.1001

6  Attorneys for Defendant
   KLA-Tencor Corporation
7

**E-FILED**

Feb 21, 2008 8:00 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7217
By R. Walker, Deputy

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   COUNTY OF SANTA CLARA

10

11  CHRIS CRIMI, on Behalf of Himself and      Case No. 107CV093465
    All Others Similarly Situated,
12                                             **DEFENDANT KLA-TENCOR'S NOTICE**
                     Plaintiff,                **OF ERRATA ON REPLY BRIEFS IN**
13                                             **SUPPORT OF DEMURRER AND MOTION**
              vs.                              **TO STAY**
14
    EDWARD W. BARNHOLT, H.                      Date: February 29, 2008
15  RAYMOND BINGHAM, ROBERT T.                  Time: 9:00 a.m.
    BOND, RICHARD J. ELKUS, JR.,               Department: 17C
16  STEPHEN P. KAUFMAN, KENNETH                 Judge: Hon. Jack Komar
    LEVY, MICHAEL E. MARKS, DEAN O.
17  MORTON, KENNETH L. SCHROEDER,              Date Filed: September 4, 2007
    JON D. TOMPKINS, RICHARD P.                 Trial Date: None Set
18  WALLACE, KLA-TENCOR
    CORPORATION, and DOES 1 through 25,
19
                     Defendants.
20

21

22

23

24

25

26

27

28

1-SF/7631627.2

E-Filed Feb 21, 2008 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7217

1    **TO THE COURT AND ALL COUNSEL OF RECORD:**

2        Defendant KLA-Tencor Corporation ("KLA") hereby submits a Notice of Errata

3    regarding the memoranda of law in further support of KLA's demurrer and motion to stay, filed

4    on February 15, 2008.  The caption in the reply memoranda filed by counsel for KLA incorrectly

5    listed the hearing date on these matters as February 22, 2008.  The correct hearing date on KLA's

6    motion to stay and demurrer is February 29, 2008.

7

8

9

10   DATED:  February 20, 2008                    Respectfully submitted,

11                                                MORGAN LEWIS & BOCKIUS, LLP

12

13                                                By:_____/s/_____
                                                       JOSEPH E. FLOREN
14                                                *Attorneys for Defendant KLA-Tencor Corporation*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1-SF/7631627.2                              1

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA 94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

# E-FILED

Feb 21, 2008 8:00 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7217
By R. Walker, Deputy

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, vs. | Lead Case No.1-07-CV-093465 |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | Hon. Jack Komar |
| Defendant. | PROOF OF SERVICE Electronic Proof of Service |
| AND RELATED ACTIONS | |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Wed. February 20, 2008 at 5:03 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Wed. February 20, 2008 at 5:03 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on February 20, 2008 at Oakland, California.

Dated: February 20, 2008                    For WWW.SCEFILING.ORG

E-Filed: Feb 21, 2008 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7217

Andy Jamieson

E-Filed: Feb 21, 2008 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7217

1   **THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
    **ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG**

2   **Electronic Proof of Service**
    **Page 2**

3   **Document(s) submitted by Matthew Weiler of Morgan Lewis & Bockius LLP on Wed. February 20, 2008 at 5:03 PM PST**

4   1. Reply Brief: DEFENDANT KLA-TENCOR?S NOTICE OF ERRATA ON REPLY BRIEFS IN SUPPORT OF DEMURRER AND MOTION TO STAY

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**E-FILED**

*Chris Crimi, et al. v. Edward W. Barnholt, et al.* Feb 21, 2008 8:00 AM
Santa Clara County Superior Court Case No. 107CV093465 RRE

Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7217
By R. Walker, Deputy

1   |   I, the undersigned, declare: that I am, and was at the time of service of the documents
herein referred to, over the age of 18 years, and not a party to the action; and I am employed in
the County of San Francisco, California. My business address is One Market, Spear Street
Tower, San Francisco, California 94105.

        On the date executed below, I electronically served the document(s) via the Santa Clara
Superior Court's electronic filing system described as:


**DEFENDANT KLA-TENCOR'S NOTICE OF ERRATA ON REPLY BRIEFS IN
SUPPORT OF DEMURRER AND MOTION TO STAY**


on the recipients designated on the Transaction Receipt located on the Santa Clara County
Superior Court's electronic filing website. I declare under penalty of perjury pursuant to the laws
of the State of California that the foregoing is true and correct and was executed on February 20,
2008.



                                                    _____/s/_____
                                                    Laura Walker

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
NEW YORK

1-SF/7668069.1

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

# E-FILED

Feb 21, 2008 8:00 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7217
By R. Walker, Deputy

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | Lead Case No.1-07-CV-093465 |
| vs. | Hon. Jack Komar |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | |
| Defendant. | PROOF OF SERVICE |
| AND RELATED ACTIONS | Electronic Proof of Service |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Wed. February 20, 2008 at 5:03 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Wed. February 20, 2008 at 5:03 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on February 20, 2008 at Oakland, California.

Dated: February 20, 2008                    For WWW.SCEFILING.ORG

E-Filed: Feb 21, 2008 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7217

Andy Jamieson

E-Filed: Feb 21, 2008 8:00 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7217

1    THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
      ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG

2    Electronic Proof of Service
      Page 2

3    Document(s) submitted by Matthew Weiler of Morgan Lewis & Bockius LLP on Wed. February 20, 2008 at 5:03 PM
      PST

4    1. Proof of Svc: Proof of Service Re DEFENDANT KLA-TENCOR?S NOTICE OF ERRATA ON REPLY BRIEFS IN
      SUPPORT OF DEMURRER AND MOTION TO STAY

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**E-FILED**

CM-110

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Patrice L. Bishop (182256)
STULL, STULL & BRODY
10940 Wilshire Boulevard, Suite 2300
Los Angeles, CA  90024
TELEPHONE NO.: 310-209-2468    FAX NO. *(Optional):*  310-209-2087
E-MAIL ADDRESS *(Optional):* service@ssbla.com
ATTORNEY FOR *(Name):* Plaintiff Chris Crimi

FOR COURT USE ONLY
Feb 27, 2008 2:24 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7307
By G. Duarte, Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SANTA CLARA
STREET ADDRESS: 161 North First Street
MAILING ADDRESS: same
CITY AND ZIP CODE: San Jose, CA  95113
BRANCH NAME: Downtown Superior - Old Courthouse

PLAINTIFF/PETITIONER: CHRIS CRIMI, etc.

DEFENDANT/RESPONDENT: EDWARD W. BARNHOLT

| CASE MANAGEMENT STATEMENT | CASE NUMBER: |
|---|---|
| (Check one): ☑ **UNLIMITED CASE** (Amount demanded exceeds $25,000) ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | 1:07CV093465 |

A CASE MANAGEMENT CONFERENCE is scheduled as follows:

Date:  February 29, 2008    Time:  10:00 a.m.    Dept.:  17C    Div.:    Room:

Address of court *(if different from the address above):*

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one):*
   a. ☑ This statement is submitted by party *(name):*  Plaintiff Chris Crimi
   b. ☐ This statement is submitted jointly by parties *(names):*

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ The complaint was filed on *(date):*  September 4, 2007
   b. ☐ The cross-complaint, if any, was filed on *(date):*

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☑ The following parties named in the complaint or cross-complaint
      (1) ☑ have not been served *(specify names and explain why not):*
         See Attachment 3(b)(1)
      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names):*
      (3) ☐ have had a default entered against them *(specify names):*
   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served):*

4. **Description of case**
   a. Type of case in  ☑ complaint  ☐ cross-complaint    *(describe, including causes of action):*
      Class claim for breach of the duty of disclosure and rescission.

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. January 1, 2007]

**CASE MANAGEMENT STATEMENT**

Cal. Rules of Court,
rules 3.720–3.730
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

E-Filed: Feb 27, 2008 2:24 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7307

CM-110

| PLAINTIFF/PETITIONER:  CHRIS CRIMI, etc. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT:  EDWARD W. BARNHOLT | 1:07CV093465 |

4.  b.  Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

This is a shareholders' action on behalf of all individuals who owned KLA-Tencor common stock between September 20, 2002 and September 27, 2006, alleging that certain current and former officers and members of its Board of Directors breached their fiduciary duties when they failed to inform shareholders that they had issued backdated KLA-Tencor stock options to certain senior executives.

☐   *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request   ☑ a jury trial   ☐ a nonjury trial   *(if more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**
a.  ☐  The trial has been set for *(date):*
b.  ☑  No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a.  ☑  days *(specify number):*  Ten
b.  ☐  hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial   ☑ by the attorney or party listed in the caption   ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:
e.  Fax number:
f.  E-mail address:
g.  Party represented:
☐  Additional representation is described in Attachment 8.

9.  **Preference**
☐  This case is entitled to preference *(specify code section):*

10.  **Alternative Dispute Resolution (ADR)**
a.  Counsel   ☐ has   ☑ has not   provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
b.  ☐  All parties have agreed to a form of ADR. ADR will be completed by *(date):*
c.  ☐  The case has gone to an ADR process *(indicate status):*

E-Filed: Feb 27, 2008 2:24 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7307

CM-110

| PLAINTIFF/PETITIONER: CHRIS CRIMI, etc. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: EDWARD W. BARNHOLT | 1:07CV093465 |

10. d.    The party or parties are willing to participate in (check all that apply):

    (1) [✓] Mediation

    (2) [ ] Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)

    (3) [ ] Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)

    (4) [ ] Binding judicial arbitration

    (5) [ ] Binding private arbitration

    (6) [ ] Neutral case evaluation

    (7) [ ] Other (specify):

  e. [ ] This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.

  f. [ ] Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

  g. [ ] This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court (specify exemption):

**11. Settlement conference**

  [ ] The party or parties are willing to participate in an early settlement conference (specify when):

**12. Insurance**

  a. [ ] Insurance carrier, if any, for party filing this statement (name):

  b. Reservation of rights: [ ] Yes [ ] No

  c. [ ] Coverage issues will significantly affect resolution of this case (explain):

**13. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.

[ ] Bankruptcy  [ ] Other (specify):

Status:

**14. Related cases, consolidation, and coordination**

  a. [✓] There are companion, underlying, or related cases.

    (1) Name of case: In re KLA-Tencor Corporation Shareholder Derivative Litigation

    (2) Name of court: United States District Court for the Northern District of California -

    (3) Case number: C-06-03445 JW

    (4) Status: Pending

  [✓] Additional cases are described in Attachment 14a.

  b. [ ] A motion to [ ] consolidate [ ] coordinate will be filed by (name party):

**15. Bifurcation**

  [ ] The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action (specify moving party, type of motion, and reasons):

**16. Other motions**

  [ ] The party or parties expect to file the following motions before trial (specify moving party, type of motion, and issues):

---

CM-110 [Rev. January 1, 2007]       **CASE MANAGEMENT STATEMENT**       Page 3 of 4

E-Filed: Feb 27, 2008 2:24 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7307

**CM-110**

| PLAINTIFF/PETITIONER: CHRIS CRIMI, etc. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: EDWARD W. BARNHOLT | 1:07CV093465 |

**17. Discovery**

    a. ☐ The party or parties have completed all discovery.

    b. ☑ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

| Party | Description | Date |
|---|---|---|

    Plaintiff has prepared discovery and anticipates serving it upon resolution of defendant KLA-Tencor Corporation's pending motions.

    c. ☐ The following discovery issues are anticipated *(specify)*:

**18. Economic Litigation**

    a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.

    b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case)*:

**19. Other issues**

    ☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify)*:

**20. Meet and confer**

    a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain)*:

    b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify)*:

**21. Case management orders**

    Previous case management orders in this case are *(check one)*: ☑ none ☐ attached as Attachment 21.

**22. Total number of pages attached** *(if any)*:   2

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date: February 27, 2008

| Patrice L. Bishop, Esq. | ▶ *signature* |
|---|---|
| (TYPE OR PRINT NAME) | (SIGNATURE OF PARTY OR ATTORNEY) |

| | ▶ |
|---|---|
| (TYPE OR PRINT NAME) | (SIGNATURE OF PARTY OR ATTORNEY) |

    ☐ Additional signatures are attached

CM-110 (Rev. January 1, 2007)        **CASE MANAGEMENT STATEMENT**        Page 4 of 4

E-Filed: Feb 27, 2008 2:24 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7307

MC–025

| SHORT TITLE: CRIMI, etc. v. BARNHOLT, et al. | CASE NUMBER: 1:07CV093465 |
|---|---|

ATTACHMENT *(Number):*    3(b)(1)    Page  5  of  6

*(This Attachment may be used with any Judicial Council form.)*    *(Add pages as required)*

Individual defendants Edward W. Barnholt, H. Raymond Bingham, Robert T. Bond, Richard J. Elkus, Jr., Stephen P. Kaufman, Kenneth Levy, Michael E. Marks, Dean O. Morton, Kenneth L. Schroeder, Jon D. Tompkins and Richard P. Wallace have not been served, although counsel for said defendants, Morgan Lewis & Bockius LLP, agreed to accept served on their behalf pursuant to an e-mail dated November 13, 2007.  On November 19, 2007 Notices and Acknowledgments of Receipt were sent via Fedex to Joseph E. Floren, Esq. of Morgan Lewis & Bockius LLP.  Despite requests, to date Mr. Floren has yet to return the executed Acknowledgments.  Plaintiff anticipates initiating personal service on the individual defendants during the first week of March, 2008.

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. January 1, 2007]

**ATTACHMENT**
to Judicial Council Form

www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

E-Filed: Feb 27, 2008 2:24 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7307

MC–025

| SHORT TITLE: CRIMI, etc. v. BARNHOLT, et al. | CASE NUMBER: 1:07CV093465 |
|---|---|

ATTACHMENT *(Number):* ___14(a)___          Page __6__ of __6__

*(This Attachment may be used with any Judicial Council form.)*          *(Add pages as required)*

Name of case: In re KLA-Tencor Corp. Securities Litigation
Name of Court: United States District Court for the Northern District of California
Case Number: C-06-04065 CRB
Status: Pending

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. January 1, 2007]

**ATTACHMENT**
**to Judicial Council Form**

www.courtinfo.ca.gov
American LegalNet, Inc.
www.FormsWorkflow.com

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

**E-FILED**

Feb 27, 2008 2:24 PM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7307
By G. Duarte, Deputy

1
2
3
4
5

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

| | | |
|---|---|---|
| 6 | CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | ) ) | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| 7 | Plaintiff, vs. | ) ) ) | Lead Case No.1-07-CV-093465 |
| 8 | EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT | ) ) | Hon. Jack Komar |
| 9 | T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. | ) ) | |
| 10 | MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, | ) | |
| 11 | RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | ) ) ) | |
| 12 | Defendant. | ) ) | **PROOF OF SERVICE** |
| 13 | AND RELATED ACTIONS | ) ) ) | **Electronic Proof of Service** |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Wed. February 27, 2008 at 2:18 PM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Wed. February 27, 2008 at 2:18 PM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on February 27, 2008 at Oakland, California.

Dated: February 27, 2008                    For WWW.SCEFILING.ORG

E-Filed: Feb 27, 2008 2:24 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7307

Andy Jamieson

E-Filed: Feb 27, 2008 2:24 PM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7307

1

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG

2

Electronic Proof of Service
Page 2

3

Document(s) submitted by Patrice Bishop of STULL, STULL & BRODY on Wed. February 27, 2008 at 2:18 PM PST

1. Case Mgmt Statement

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**191 N. FIRST STREET**
**SAN JOSE, CA 95113-1090**

# E-FILED

Mar 7, 2008 8:36 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7474
By R. Walker, Deputy

TO:     FILE COPY

RE:             **Crimi v. Barnholt, et al. (KLA-Tencor Corporation)**
CASE NUMBER:     **1-07-CV-093465**

### NOTICE OF FURTHER CASE MANAGEMENT CONFERENCE

A Further Case Management Conference for the above entitled case has been scheduled, and you are directed to appear in court on:

**Date: May 30, 2008**          **At: 10:00 a.m.**          **In: Department 17C**

Superior Court, 191 North First Street, San Jose, CA 95113.

For further information, contact the Complex Civil Litigation Department, (408) 882-2286.

Date: March 7, 2008                              /s/    Jack Komar
                                                 Judge of the Superior Court

---

If you, a party represented by you, or a witness to be called on behalf of that party need an accommodation under the American with Disabilities Act, please contact the Court Administrator's office at (408) 882-2700, or use the Court's TDD line, (408) 882-2690 or the Voice/TDD California Relay Service, (800) 735-2922.

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

# E-FILED

Mar 7, 2008 8:36 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-093465 Filing #G-7474
By R. Walker, Deputy

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| CHRIS CRIMI, on behalf of himself and all others similarly situated, Plaintiff, | Crimi v. Barnholt, et al. (KLA-Tencor Corporation) |
| Plaintiff, | Lead Case No.1-07-CV-093465 |
| vs. | Hon. Jack Komar |
| EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR. STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, Defendants. | |
| Defendant. | PROOF OF SERVICE |
| AND RELATED ACTIONS | Electronic Proof of Service |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Fri. March 7, 2008 at 8:36 AM PST and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Fri. March 7, 2008 at 8:36 AM PST

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on March 7, 2008 at Oakland, California.

Dated: March 7, 2008                    For WWW.SCEFILING.ORG

E-Filed: Mar 7, 2008 8:36 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7474

Andy Jamieson

E-Filed: Mar 7, 2008 8:36 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-093465 Filing #G-7474

1

**THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG**

2

**Electronic Proof of Service**
**Page 2**

3

**Document(s) submitted by Rowena Walker of Santa Clara County Superior Court on Fri. March 7, 2008 at 8:36 AM PST**

4

1. Clerk's Notice: Notice of Further Case Management Conference (May 30, 2008)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

☙ JS 44  (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| CHRIS CRIMI, on Behalf of Himself and All Others Similarly Situated | EDWARD W. BARNHOLT, et al. |

| **(b)** County of Residence of First Listed Plaintiff<br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE<br>LAND INVOLVED. |
|---|---|

| **(c)** Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| Stull, Stull & Brody<br>10940 Wilshire Boulevard, Suite 2300<br>Los Angeles, CA  90024<br>310.209.2468 | Morgan Lewis & Bockius LLP<br>One Market, Spear Street Tower<br>San Francisco, CA  94105-1126<br>415.442.1000 |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government<br>Plaintiff | ☒ 3  Federal Question<br>(U.S. Government Not a Party) |
| ☐ 2  U.S. Government<br>Defendant | ☐ 4  Diversity<br>(Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                  and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>   & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>   Student Loans<br>   (Excl. Veterans)<br>☐ 153 Recovery of Overpayment<br>   of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>   Liability<br>☐ 320 Assault, Libel &<br>   Slander<br>☐ 330 Federal Employers'<br>   Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>   Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>   Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury—<br>   Med. Malpractice<br>☐ 365 Personal Injury —<br>   Product Liability<br>☐ 368 Asbestos Personal<br>   Injury Product<br>   Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>   Property Damage<br>☐ 385 Property Damage<br>   Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure<br>   of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational<br>   Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>   28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>   Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☒ 850 Securities/Commodities/<br>   Exchange<br>☐ 875 Customer Challenge<br>   12 USC 3410 |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR**<br>☐ 710 Fair Labor Standards<br>   Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting<br>   & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc.<br>   Security Act | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information<br>   Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>   Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities—<br>   Employment<br>☐ 446 Amer. w/Disabilities—<br>   Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate<br>   Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus –<br>   Alien Detainee<br>☐ 465 Other Immigration<br>   Actions | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff<br>   or Defendant)<br>☐ 871 IRS—Third Party<br>   26 USC 7609 | ☐ 900Appeal of Fee<br>   Determination<br>   Under Equal Access<br>   to Justice<br>☐ 950 Constitutionality of<br>   State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ 1 Original<br>Proceeding | ☒ 2 Removed from<br>State Court | ☐ 3 Remanded from<br>Appellate Court | ☐ 4 Reinstated or<br>Reopened | ☐ 5 Transferred from<br>another district<br>(specify) | ☐ 6 Multidistrict<br>Litigation | ☐ 7 Appeal to District<br>Judge from<br>Magistrate<br>Judgment |

| VI.  CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):<br>15 U.S.C. § 78bb(f) et seq.<br>Brief description of cause:<br>putative securities class action |
|---|---|

| VII. REQUESTED IN<br>COMPLAINT: | ☒ CHECK IF THIS IS A CLASS ACTION<br>UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint:<br>JURY DEMAND:  ☐ Yes ☒ No |
|---|---|---|---|

| VIII. RELATED CASE(S)<br>IF ANY | PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE<br>"NOTICE OF RELATED CASE".   In re KLA-Tencor Corp. Sec. Litig., 06-03445 CRB, pending before Judge Breyer |
|---|---|

| IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)<br>(PLACE AND "X" IN ONE BOX ONLY) | ☒ SAN FRANCISCO/OAKLAND | ☐ SAN JOSE |
|---|---|---|

| DATE<br>April 30, 2008 | SIGNATURE OF ATTORNEY OF RECORD<br>*MSW* |
|---|---|