1  JOHN H. HEMANN (SBN: 165823)
   JOSEPH E. FLOREN (SBN 168292)
2  THOMAS R. GREEN (SBN: 203480))
   MATTHEW S. WEILER (SBN 236052)
3  MORGAN, LEWIS & BOCKIUS LLP
   One Market, Spear Street Tower
4  San Francisco, CA  94105-1126
   Tel:  415.442.1000
5  Fax:  415.442.1001
   E-mail:  jhemann@morganlewis.com
6            jfloren@morganlewis.com
             tgreen@morganlewis.com
7            mweiler@morganlewis.com

8

   Attorneys for KLA-Tencor Corporation
9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12  CHRIS CRIMI, on Behalf of Himself and All       Case No. CV-08-2249 CRB
    Others Similarly Situated,
13                                                  **REQUEST FOR JUDICIAL
                    Plaintiff,                      NOTICE IN SUPPORT OF
14                                                  DEFENDANT KLA-TENCOR'S
                    vs.                             MOTION TO DISMISS;
15                                                  DECLARATION OF MATTHEW S.
    EDWARD W. BARNHOLT, H. RAYMOND                  WEILER**
16  BINGHAM, ROBERT T. BOND, RICHARD J.
    ELKUS, JR., STEPHEN P. KAUFMAN,                 DATE:  June 13, 2008
17  KENNETH LEVY, MICHAEL E. MARKS,                 TIME: 10 A.M.
    DEAN O. MORTON, KENNETH L.                      DEP'T: Courtroom 8
18  SCHROEDER, JON D. TOMPKINS,
    RICHARD P. WALLACE, KLA-TENCOR                  Hon. Charles R. Breyer
19  CORPORATION, and DOES 1 through 25,

20                  Defendants.

21

22

23

24

25

26

27

28

1-SF/7701082.1

REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF MATTHEW S. WEILER

1

**REQUEST FOR JUDICIAL NOTICE**

2    In accordance with Federal Rule of Evidence 201, defendant KLA-Tencor Corporation

3    ("KLA") respectfully request that this Court take judicial notice of each of the following exhibits

4    accompanying this Request for Judicial Notice.

5    Federal Rule of Evidence 201 allows a court to take judicial notice of facts that are "not

6    subject to reasonable dispute in that [they are] either (1) generally known within the territorial

7    jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to

8    sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

9    This Court can take judicial notice of pleadings filed in other cases. *Egan v. Teets*, 251

10   F.2d 571 (9th Cir. 1957) (District Court can take judicial notice of pleadings filed involving same

11   party); *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir.1988) (judicial notice was

12   taken of complaints in related actions). Here, the complaints sought to be judicially noticed

13   involve many of the same defendants, and substantially similar factual allegations. Accordingly,

14   the following complaints are the proper subject of judicial notice: <u>Benjamin Langford v. Edward</u>

15   <u>W. Barnholt, et al.</u> (Del. Ch.); <u>In re KLA-Tencor Corporation Shareholder Derivative Litigation</u>,

16   No. C-06-03445-JW (N.D. Cal.); <u>Jeffrey A. Rabin v. Edward W. Barnholt, et al.</u>. No.

17   106CV064841 (Cal. Super.); <u>In re KLA-Tencor Corporation Securities Litigation</u>, No. 06-CV-

18   04065 MJJ (N.D. Cal.).

19   Public filings, such as filings made with the U.S. Securities and Exchange Commission

20   (the "SEC"), are the proper subject of judicial notice. *See, e.g., In re Calpine Corp. Sec. Litig.*,

21   288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003) (court may take judicial notice of documents filed

22   with the SEC); *Yuen v. U.S. Stock Transfer Co.*, 966 F. Supp. 944, 945 n.1 (C.D. Cal. 1997)

23   (court may take judicial notice of the contents of SEC filings). Accordingly, the contents of

24   Forms 10-K and Forms 14A Definitive Proxy Statements, cited in Plaintiff's FAC, are thereby

25   incorporated by reference, and can be considered for purposes of this motion to dismiss. *See In re*

26   *Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) ("[C]onsideration [of other portions

27   of a document referenced in a complaint] is appropriate in the context of a motion to dismiss, and

28   does not cover the motion into one for summary judgment"); *In re Computer Sciences Corp.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FRANCISCO
1-SF/7701082.1                                    2
REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF MATTHEW S. WEILER

1    *Derivative Litig.*, 244 F.R.D. 580, 587 n.8 (C.D. Cal. 2007) ("The Court therefore takes judicial

2    notice of [Forms 14-A Definitie Proxy Statements] under Federal Rule of Evidence 201, as they

3    are: 1) public records filed with the SEC; 2) documents whose contents are alleged in Plaintiffs'

4    Complaint; or 3) documents that are "capable of accurate and ready determination by resort to

5    sources whose accuracy cannot reasonably be questioned."). Thus, the Court can take judicial

6    notice of the 1998 and 2004 Definitive Proxy Statements attached hereto.

7

8

9

10   DATED: May 7, 2008                          MORGAN LEWIS & BOCKIUS, LLP

11

12                                               By:_____/s/_____

13                                                          Matthew S. Weiler

14

15                                               *Attorneys for Defendant KLA-Tencor Corporation*

16

17

18

19

20

21

22

23

24

25

26

27

28

1-SF/7701082.1                                   3

REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF MATTHEW S. WEILER

## DECLARATION OF MATTHEW S. WEILER

I, Matthew S. Weiler, declare as follows:

1.        I am an attorney at law, licensed to practice before the courts of the State of California and before this Court.  I am an associate of the law firm Morgan, Lewis & Bockius LLP, attorneys of record for defendant KLA-Tencor Corporation.  I am making this declaration in support of Defendant KLA-Tencor Corporation's Motion to Dismiss.  I know the following to be true of my own personal knowledge and if called as a witness could and would testify competently thereto.

2.        On or about July 21, 2006, a complaint entitled <u>Benjamin Langford v. Edward W. Barnholt, et al.</u> was filed in the Delaware Court of Chancery, New Castle County.  A true and correct copy of an amended complaint in this action, filed on or about March 5, 2007, is attached hereto as Exhibit 1.

3.        On or about June 2, 2006, a verified shareholder derivative complaint entitled <u>Jeffrey A. Rabin v. Edward W. Barnholt, et al.</u>. No. 106CV064841, was filed in the Superior Court of California for the County of Santa Clara.  A true and correct copy of this complaint is attached hereto as Exhibit 2.

4.        On or about May 22, 2006, the first of four shareholder derivative actions was filed in the United States District Court for the Northern District of California.  These actions were later consolidated under the caption <u>In re KLA-Tencor Corporation Shareholder Derivative Litigation</u>, No. C-06-03445-JW.  A true and correct copy of the operative consolidated complaint, filed on February 20, 2007, is attached hereto as Exhibit 3.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAWSAN
FRANCISCO

1-SF/7701082.1                    4

REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF MATTHEW S. WEILER

5.    On or about June 29, 2006, <u>Garber v. KLA-Tencor Corp., et al.</u>, 06-CV-4065 MJJ, was filed in the United States District Court for the Northern District of California; it was the first of three class action complaints to be filed concerning alleged stock option backdating.    On March 6, 2007, a consolidated class action complaint encompassing it entitled <u>In re KLA-Tencor Corporation Securities Litigation</u>, No. 06-CV-04065 MJJ, was filed in the United States District Court for the Northern District of California.  A true and correct copy of this complaint is attached hereto as Exhibit 4.

6.    Attached hereto as Exhibit 5 is a true and correct copy of a Definitive Proxy Statement filed on behalf of KLA with the SEC on or about September 28, 1998.

7.    Attached hereto as Exhibit 6 is a true and correct copy of a Definitive Proxy Statement filed on behalf of KLA with the SEC on or about September 9, 2004.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

By _____<u>/s/</u>_____
            Matthew S. Weiler

Morgan, Lewis &
Bockius LLP
Attorneys At LawSan
Francisco

1-SF/7701082.1                                     5

REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF MATTHEW S. WEILER

# EXHIBIT 1

IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | |
|---|---|
| BENJAMIN LANGFORD, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| - against - | ) Case Number: 2295-N |
| | ) |
| EDWARD W. BARNHOLT, H. RAYMOND | ) |
| BINGHAM, ROBERT J. BOEHLKE, ROBERT | ) |
| T. BOND, GARY E. DICKERSON, RICHARD J | ) |
| ELKUS, JR., DENNIS J. FORTINO, STEPHEN | ) |
| P. KAUFMAN, JOHN H. KISPERT, KENNETH | ) |
| LEVY, MICHAEL E. MARKS, ARTHUR P. | ) |
| SCHNITZER, KENNETH L. SCHROEDER, | ) |
| JON D. TOMPKINS, LIDA URBANEK, and | ) |
| KLA-TENCOR CORPORATION | ) |
| | ) |
| Defendants. | ) |
| | ) |

AMENDED COMPLAINT[1]

Plaintiff brings this action as a derivative action on behalf of KLA-TENCOR

CORPORATION ("KLA" or the "Company") and as a class action on behalf of the

shareholders of KLA because their stockholding interests were diluted and affected

as a result of the issuance of void stock options and their subsequent exercise.

Plaintiff alleges, upon information and belief, the following, except upon personal

knowledge as to his ownership of KLA stock.

I.    **PRELIMINARY ALLEGATIONS**

---

1 Pursuant to Chancery Court Rule 15(aa) matter added to the original complaint is shown in underline
and deleted matter is shown in cross-out.

1.    Plaintiff is a shareholder of KLA as a result of its merger with Tencor Instruments in 1997. He continues to own these shares since its acquisition.

2.    KLA is a corporation organized and existing under the laws of the State of Delaware. It is a supplier of process control and yield management solutions for the semi conductor and related microelectronics industries.

3.    Defendant Kenneth L. Schroeder ("Schroeder") has served as a director of KLA and as Chief Executive Officer of the Company since July 1999. Schroeder served as President of the Company from November 1991 to July 2002 and again from May 2004 to July 2005.

4.    Defendant Kenneth Levy ("Levy"), a founder of KLA, has served as a director of KLA since 1975 and as Chairman of the Board of Directors ("Board") since July 1999. Levy served as Chief Executive Officer of the Company from July 1998 to June 1999.

5.    Defendant Jon D. Tompkins ("Tompkins") has served as a director of KLA since April 1997. Tompkins served as Chairman of the Board from July 1998 to June 1999 and as Chief Executive Officer of the Company from May 1997 to July 1998.

6.    Defendant Robert J. Boehlke ("Boehlke") served as Executive Vice President and Chief Financial Officer of the Company from 1992 to 2000.

7.    Defendant Stephen P. Kaufman ("Kaufman") has been a director since November 2002.

2

8.     Defendant Michael E. Marks ("Marks") has been a director since November 2003.

9.     Defendant Gary E. Dickerson ("Dickerson") served as Executive Vice President of the Company from 1995 to 1999 and as President and Chief Operating Officer of the Company from 1999 to 2004.

10.     Defendant Arthur P. Schnitzer ("Schnitzer") served as Executive Vice President of the Company at all times relevant hereto.  Schnitzer is a citizen of the State of California.

11.     Defendant John H. Kispert ("Kispert") has served as Executive Vice President and Chief Financial Officer of the Company since 2000.

12.     Defendant Dennis J. Fortino ("Fortino") has served as Executive Vice President of the Company since 1999.

13.     Collectively, defendants Schroeder, Levy, Tompkins, Boehlke, Dickerson, Schnitzer, Kispert, and Fortino are referred to herein as the "Officer Defendants".

14.     Defendant Lida Urbanek ("Urbanek") has served as a director of KLA and as a member of the Compensation Committee of the Board (the "Compensation Committee") since 1997.

15.     Defendant Edward W. Barnholt ("Barnholt") has served as a director of KLA since 1995 and as a member of the Compensation Committee since 2000.

3

16.   Defendant Robert T. Bond ("Bond") has served as a director of KLA and as a member of the Compensation Committee since 2000. Bond has also served as a member of the Audit Committee of the Board (the "Audit Committee") since 2002.

17.   Collectively, defendants Urbanek, Barnholt, and Bond are referred to herein as the "Compensation Committee Defendants".

18.   Defendant Richard J. Elkus, Jr. ("Elkus") has served as a director of KLA since 1997 and as a member of the Audit Committee since 1999.

19.   Defendant H. Raymond Bingham ("Bingham") has served as a director of KLA since 1999 and as a member of the Audit Committee since 2000.

20.   Collectively, defendants Bond, Elkus, and Bingham are referred to herein as the "Audit Committee Defendants".

21.   KLA had adopted stock option plans which were shareholder approved. Under such plans, the exercise price of the stock options granted cannot be less than the closing price of KLA stock on the date of grant.

22.   The Compensation Committee, determined, among other things, the stock option awards, for executive officers of KLA and administered the Company stock option plans.

23.   From 1997 to 2001 the Compensation Committee granted stock options to various defendants (adjusted for KLA's two-for-one stock splint effective January 19, 2000) as follows:

4

| Officer | Purported Date Of Grant | Exercise Price | No. Of Options |
|---|---|---|---|
| Schroeder | 7-31-97 | $30.2813 | 125,000 |
| | 8-31-98 | 10.625 | 204,272 |
| | 10-23-98 | 16.9688 | 220,728 |
| | 10-27-99 | 16.875 | 300,000 |
| | 8-13-00 | 44.6875 | 75,800 |
| | 11-10-00 | 26.25 | 37,900 |
| | 4-4-01 | 32.75 | 37,900 |
| | 10-2-01 | 29.31 | 341,100 |
| Levy | 7-31-97 | $30.2813 | 125,000 |
| | 8-31-98 | 10.625 | 204,272 |
| | 10-23-98 | 16.9688 | 220,728 |
| | 10-27-99 | 16.875 | 180,000 |
| | 8-13-00 | 44.6875 | 37,901 |
| | 11-10-00 | 26.25 | 18,951 |
| | 4-4-01 | 32.75 | 18,951 |
| | 10-2-01 | 29.31 | 28,425 |
| Dickerson | 7-31-97 | $30.2813 | 85,000 |
| | 8-31-98 | 10.625 | 125,764 |
| | 10-23-98 | 16.9688 | 139,236 |
| | 10-27-99 | 16.875 | 200,000 |
| | 8-13-00 | 44.6875 | 65,800 |
| | 11-10-00 | 26.25 | 32,500 |
| | 4-4-01 | 32.75 | 32,500 |
| | 10-2-01 | 29.31 | 105,000 |
| Tompkins | 8-31-98 | $10.625 | 101,618 |
| | 10-23-98 | 16.9688 | 148,382 |
| | 10-27-99 | 16.875 | 20,000 |
| | 11-10-00 | 26.25 | 10,000 |
| Boehlke | 7-31-97 | $10.625 | 667,000 |
| | 8-31-98 | 16.9688 | 108,870 |
| | 10-23-98 | 33.9375 | 99,300 |
| | 10-27-99 | 16.875 | 120,000 |

5

| | | | |
|---|---|---|---|
| Schnitzer | 8-31-98 | $10.625 | 108,870 |
| | 10-23-98 | 16.9688 | 99,300 |
| | 10-27-99 | 33.75 | 100,000 |
| Kispert | 10-2-01 | $29.31 | 60,000 |
| Fortino | 10-2-01 | $29.31 | 45,000 |

24.     Despite the express requirements of the stock option plans and in violation

thereof, each and every one of the stock option grants was back dated, at the date of grant,

after a sharp drop in the stock price, and just before a substantial rise in KLA's stock price,

to enable the recipients to be able to cash in on substantial profits.

25.     On October 31, 1998, KLA announced that certain executive officers were

granted the opportunity to surrender options and receive a reduced number of options

having an exercise price of $33.94 the market price on that date, pre-split.  However,

October 31, 1998 fell on a Saturday, and the closing pre-split price on Friday, October 30,

1998, was $36.87.

26.     Certain KLA executives took advantage of the opportunity and surrendered

their options and received the following pre-split:

| | |
|---|---|
| Kenneth Levy | 110,364 |
| Kenneth L. Schroeder | 110,364 |
| Gary E. Dickerson | 69,618 |
| Jon D. Tompkins | 74,191 |
| Robert J. Boehlke | 49,065 |
| Arthur P. Schnitzer | 49,065 |
| Edward C. Grady | 26,745 |
| Samuel A. Harrell | 57,338 |
| Neil Richardson | 46,184 |

6

KLA reported that the date of grant in each instance for the above was October 23, 1998, and that the option exercise price was $33.94. All of the above transactions were not adjusted for the split.

27.     Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

28.     Pursuant to § 162(m) of the Tax Code, 26 U.S.C. §162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors; (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation; and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

29.     Various of the defendants exercised their options as follows:

(a)     Defendant Schroeder exercised options received between July 1997 and October 2001. He obtained 550,000 shares upon such exercise;

7

(b)    Defendant Levy exercised options received between July 1997 and October 2001. He obtained 275,000 shares upon such exercise;

(c)    Defendant Tompkins exercised options received between 1998 and 2000. He obtained 280,000 shares upon such exercise;

(d)    Defendant Dickerson exercised options received between 1997 and 2001. He obtained 327,535 shares upon such exercise;

(e)    Defendant Kispert exercised options received in 2001. He obtained 46,000 shares upon such exercise;

(f)    Defendant Fortino exercised options granted to him in October 2001. He obtained 20,250 shares upon such exercise.

30.    Other defendants and officers and directors similarly received options that were void because they were not priced on the grant date and exercised, and continue to exercise those options and receive stock therefor. The names and amounts are still unknown and will be ascertained upon complete discovery.

31.    To conceal the issuance of the improperly priced and thus void options, and the violation of the stock option plans, KLA was caused to claim deductions under the aforesaid tax code, to state improperly its financial results, and never disclosed to shareholders that the options had been improperly priced and back dated. Indeed, KLA falsely reported the option grant dates in their annual reports and disseminated the false

8

information to the shareholders and in the SEC filings. Shareholders never learned the truth until now.

32.    Thereafter, as a result of publicity regarding a number of public companies having "back dated" options, KLA examined the circumstance and conceded in press releases that it had improperly priced its options. This publicity was the first time and first indication that such "back dating" had occurred, in violation of the stock option plans.

33.    After the conclusion of the investigation, KLA determined that particular options had indeed, fair market prices below those on the date they were granted.

34.    During December 26, 2006 to December 28, 2006, KLA entered into Agreements with Richard Wallace, Neil Richardson and defendant Dennis Fortino whereby the exercise price of their respective options were raised as follows:

| Name | Prior Exercise Price | Increased Exercise Price |
|------|---------------------|--------------------------|
| Richard Wallace | $26.26 | $32.88 |
| Neil Richardson | $32.75 | $50.82 |
| Dennis Fortino | $29.31 | $45.25 |

35.    As part of their agreement, each of the foregoing recipients will receive a special cash bonus from KLA equal to the amount of the aggregate increase in the exercise price. Thus, Mr. Wallace would receive or has received a cash payment of $21,275.67. Mr. Richardson would receive or has received a cash payment of $84,332.69 and defendant Fortino would receive or has received a cash payment of $263,010.00.

9

~~33~~36.  KLA and its shareholders have been damaged as a direct result of the foregoing misconduct. There will be substantial tax liabilities and possible damages to be paid to potential class action suits already commenced and to be commenced. In addition to the said cash payments, there will be the loss of funds to be paid upon the exercise of the options and damage to KLA's good name and good will.  The cash payment alleged above were improper and designed to enable the recipients to offset the increased option prices.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Derivative)

~~34~~37.  Plaintiff brings this suit as a derivative action in the right and for the benefit of KLA to address the injuries suffered and to be suffered by KLA as a result of the breached of fiduciary duty and commission of waste by the individual defendants.

~~35~~38.  As a result of the facts set forth above, plaintiff has not made any demand on KLA's board of directors to institute this action against the individual defendants for the following reasons:

(a)    Schroeder, Levy and Tompkins, are directly interested in the improperly backdated stock option grants complained of herein;

(b)    Urbanek, Barholt and Bond, members of the Compensation Committee, directly participated in and approved the improper backdating of stock options, as alleged herein. Moreover, by colluding with the Officer Defendants and others, as

10

alleged herein, Urbanek, Barnholt, and Bond have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

(c)    Bond, Elkus, and Bingham, members of the Audit Committee directly participated in and approved the Company's violations of GAAP and the Tax Code as alleged herein. Moreover, by colluding with the Officer Defendants and others, as alleged herein, Bond, Elkus, and Bingham have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

(d)    Urbanek, Barnholt, Bond, Elkus, and Bingham, directors of the Company directly participated in and approved the Company's filing of false financial statements and other SEC filings, as alleged herein. Moreover, by colluding with the Officer Defendant and others, as alleged herein, Bond, Elkus, and Bingham have demonstrated that they are unable or unwilling to act independently of the Officer Defendants.

(e)    The acts complained of herein resulted from failure to follow the stockholder approved option plans and the resulting exercise of those options and the issuance of the stock thereunder constituted acts of *ultra vires*, for which demand is excused;

(f)    The Board of directors currently consists of ten directors, of which eight were involved, either in receiving the options as set forth above, or being aware of the granting, and overlooking the back dating of said options;

11

(g)    The acts complained of herein constitute waste, if nothing else and are thus incapable of being considered the exercise of business judgment;

(h)    The Board is incapable of exercising an independent and disinterested decision to institute and prosecute this action and the complained of acts could not be, and were not the result of any exercise of good faith business judgment.

(i)    Moreover, the Board will itself become defendants in any pending action or other litigations to be instituted for the aforesaid misconduct.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Class)

~~36~~39.    This claim is asserted as an individual and class claim on behalf of all KLA shareholders.

~~37~~40.    Defendants caused the shareholders' equity and holdings to be diluted and wasted by allowing void options to be granted on a date other than the grant date and at an exercise price lower than the grant date exercise price, in violation of the stockholder approved option plans and upon the exercise of said options, causing KLA to receive less than the required consideration. Thus, the equity of all KLA shareholders were improperly diluted.

~~38~~41.    Plaintiff will fairly and adequately represent the shareholders in this litigation.

WHEREFORE, plaintiff demands judgment as follows:

12

A.    Against all of the individual defendants and in favor of KLA for the

damages sustained by KLA and/or its shareholders as a result of the actions

complained of herein;

B.    Ordering the recipients to disgorge to KLA all of the back dated options

they received, including the proceeds of any such options that have been

exercised, sold, pleged or otherwise monetized;

C.    Granting such other and appropriate equitable relief to remedy the wrongs

complained of herein;

D.    Awarding to plaintiff the costs and disbursements of this action, including

reasonable attorneys' fees, accountants' and experts' fees, costs and

disbursements; and

E.    Such other and further relief as the Court deems just and proper.

Dated: ~~7/21/2006~~ March 5, 2007

BIGGS AND BATAGLIA

By: /s/ Robert Goldberg
       Robert Goldberg (I.D. No. 631)
       Biggs and Bataglia
       921 North Orange Street
       P.O. Box 1489
       Wilmington, DE 19899
       (302) 655-9677
       Attorney for Plaintiff

Of Counsel:

13

Of Counsel:

Irving Bizar, Esq.
Ballon Stoll Bader & Nadler, P.C.
1450 Broadway, 14th floor
New York, NY 10018
T: (212) 575-7900
F: (212) 764-5060

14

## CERTIFICATE OF SERVICE

I, Robert D. Goldberg, undersigned counsel of record, hereby certify that on

March 5, 2007, I caused a copy of the Amended Complaint of Benjamin Langford to be

served on the following in the manner indicated:

**VIA ELECTRONIC FILING**
Michael D. Goldman (ID #268)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899-0951


                                        /s/ Robert D. Goldberg
                                        Robert D. Goldberg (I.D. #631)

# EXHIBIT 2

A & A LEGAL SERVICE 6506974640                    NO.8659  P. 1

1  WEISS & LURIE
   Jordan L. Lurie (130013)
2  Leigh A. Parker (170565)
   Zev B. Zysman (176805)
3  10940 Wilshire Boulevard, 23rd Floor
   Los Angeles, CA 90024
4  Telephone:    310/208-2800
   Facsimile:    310/209-2348
5  jlurie@weisslurie.com

6  Counsel for Plaintiff

7

8                                                    FILED  Santa Clara Co
                                                     06/02/06   2:10PM
9           SUPERIOR COURT OF THE STATE OF CALIFORNIA
                                                     Kiri Torre
                                                     Chief Executive Offic
                                                     By: shannonc distclerk
                                                     R#2006000043/0
                                                     EX        $870.00
                                                     IL        $870.00
10            FOR THE COUNTY OF SANTA CLARA          Case: 1-06-CV-06841

11 JEFFREY A. RABIN, Derivatively on Behalf of )  Case No.  106CV064841
   Nominal Defendant KLA-TENCOR               )
12 CORPORATION,                               )   CLASS ACTION    FILE VIA FAX
                                              )
13         Plaintiff,                         )
                                              )   VERIFIED SHAREHOLDER
14      v.                                    )   DERIVATIVE COMPLAINT
                                              )
15 EDWARD W. BARNHOLT, H. RAYMOND             )
   BINGHAM, ROBERT J. BOEHLKE, ROBERT         )
16 T. BOND, GARY E. DICKERSON, RICHARD        )
   J. ELKUS, JR., DENNIS J. FORTINO, JOHN     )
17 H. KISPERT, KENNETH LEVY, ARTHUR P.        )
   SCHNITZER, KENNETH L. SCHROEDER,           )
18 JON D. TOMPKINS, and LIDA URBANEK,         )
                                              )
19         Defendants,                        )
                                              )
20      and                                   )
                                              )
21 KLA-TENCOR CORPORATION,                    )
                                              )
22         Nominal Defendant.                 )

23

24

25

26

27

28

DERIVATIVE COMPLAINT

1    Plaintiff, by his attorneys, submits this Derivative Complaint (the "Complaint") against

2    the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

4    1.    This is a shareholder's derivative action brought for the benefit of nominal

5    defendant KLA-Tencor Corporation ("KLA" or the "Company") against certain members of its

6    Board of Directors (the "Board"), including members of the Company's Compensation

7    Committee and the Company's Audit Committee, and certain of the Company's executive

8    officers.

9    2.    When stock options are awarded, the strike price of the options ordinarily is set

10   equal to or below the share price on the day of the award.  In this way, the executives of a

11   company are supposed to have their interests aligned with the shareholders, whose holdings are

12   diluted each time an option is exercised.

13   3.    As further alleged below, Defendants improperly backdated stock option grants to

14   make it appear as though the grants were made on dates when the market price of KLA stock was

15   lower than the market price on the actual grant dates. This improper backdating resulted in option

16   grants with lower exercise prices and thereby improperly increased the value of the options to the

17   Officer Defendants, improperly reduced the amounts the Officer Defendants had to pay the

18   Company upon exercise of the options, and unfairly transferred shareholder equity to Defendants.

19   Defendants' conduct also violated the Company's shareholder-approved stock option plans, the

20   Company's corporate governance guidelines, the Company's standards of business conduct and

21   the Company's conflicts of interest policy.

22   4.    Defendants' backdating scheme also rendered the Company's proxy materials

23   false and misleading, as the proxy materials falsely reported the dates of the stock option grants

24   and falsely represented that options were granted at fair market value; if the option grant is

25   backdated, the options value is not fair from the vantage point of the Company and its

26   shareholders.  Further, Defendants' backdating of options grants violated provisions of the

27   Internal Revenue Code relating to deduction of option payments and thereby rendered the

28



1   Company's financial statements in Form 10-K filings for the years 1998, 1999, 2000, 2001, and

2   2002 false and misleading.

3       5.     In addition, KLA and its shareholders were further injured in that Defendants'

4   illegal conduct caused KLA to overpay to acquire ADE Corporation, a maker of silicon wafer

5   inspection equipment, as further described below.

6       6.     On May 24, 2006, KLA announced the formation of a Special Committee to

7   investigate the Company's stock option practices from 1995 to 2001. The Company also

8   announced that it received subpoenas from the U.S. Attorney's Office for the Eastern District of

9   New York and the Northern District of California requesting information relating to the

10   Company's past stock option grants.

11      7.     As a result of Defendants' conduct, the Company's stock price has declined and

12   the Company has sustained millions of dollars in damages, including additional compensation

13   expenses and tax liabilities and loss of funds paid to the Company upon exercise of options, and

14   the recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

15                   **JURISDICTION AND VENUE**

16       8.     This Court has jurisdiction over all causes of action asserted herein because this

17   case is a cause not given by statute to other trial courts.

18       9.     The jurisdiction of this Court arises under §410.10 of the Code of Civil Procedure.

19   This Court has jurisdiction over each of the Defendants in this action because they conduct

20   business in, reside in or are citizens of this State. The conduct alleged herein took place in and/or

21   was directed at residents of this State.

22      10.     The amounts in controversy exceed the jurisdictional minimum of this Court.

23      11.     Venue is proper in this Court because a substantial portion of the transactions and

24   wrongs complained of herein, including the Defendants' primary participation in the wrongful

25   acts detailed herein, occurred in this district, because Defendants have received substantial

26   compensation in this district by engaging in numerous activities and conducting business here,

27   which had an effect in this district, and because KLA maintains its principal place of business in

28



1  this County. Defendant KLA maintains its principal place of business at 160 Rio Robles, San

2  Jose, California 95134.

3  <center>**PARTIES**</center>

4    12.  Plaintiff Jeffrey A. Rabin, a citizen of the State of California, is, and was at all

5  relevant times, a shareholder of KLA.

6    13.  Nominal defendant KLA is a Delaware corporation with its principal executive

7  offices located at 160 Rio Robles, San Jose, California 95134. According to its public filings,

8  KLA is a supplier of process control and yield management solutions for the semiconductor

9  manufacturing and related microelectronics industries. KLA's stock is publicly traded on the

10  Nasdaq under the ticker symbol KLAC.

11    14.  Defendant Kenneth L. Schroeder ("Schroeder") has served as a director of KLA

12  and as Chief Executive Officer of the Company since July 1999. Schroeder served as President

13  of the Company from November 1991 to July 2002 and again from May 2004 to July 2005.

14    15.  Defendant Kenneth Levy ("Levy"), a founder of KLA, has served as a director of

15  KLA since 1975 and as Chairman of the Board since July 1999. Levy served as Chief Executive

16  Officer of the Company from July 1998 to June 1999.

17    16.  Defendant Jon D. Tompkins ("Tompkins") has served as a director of KLA since

18  April 7, 1997. Tompkins served as Chairman of the Board from July 1998 to June 1999 and as

19  Chief Executive Officer of the Company from May 1997 to July 1998.

20    17.  Defendant Robert J. Boehlke ("Boehlke") served as Executive Vice President and

21  Chief Financial Officer of the Company from 1992 to 2000.

22    18.  Defendant Gary B. Dickerson ("Dickerson") served as Executive Vice President of

23  the Company from 1995 to 1999 and as President and Chief Operating Officer of the Company

24  from 1999 to 2004.

25    19.  Defendant Arthur P. Schnitzer ("Schnitzer") served as Executive Vice President of

26  the Company at all times relevant hereto.

27    20.  Defendant John H. Kispert ("Kispert") has served as Executive Vice President and

28  Chief Financial Officer of the Company since 2000.



21.   Defendant Dennis J. Fortino ("Fortino") has served as Executive Vice President of the Company since 1999.

22.   Collectively, defendants Schroeder, Levy, Tompkins, Boehlke, Dickerson, Schnitzer, Kispert, and Fortino are referred thereon as the "Officer Defendants."

23.   Defendant Lida Urbanek ("Urbanek") has served as a director of KLA and as a member of the Compensation Committee of the Board (the "Compensation Committee") since 1997.

24.   Defendant Edward W. Barnholt ("Barnholt") has served as a director of KLA since 1995 and as a member of the Compensation Committee since 2000.

25.   Defendant Robert T. Bond ("Bond") has served as a director of KLA and as a member of the Compensation Committee since 2000. Bond has also served as a member of the Audit Committee of the Board (the "Audit Committee") since 2002.

26.   Collectively, defendants Urbanek, Barnholt, and Bond are referred to herein as the "Compensation Committee Defendants." At all times relevant hereto, the Compensation Committee determined the salaries, incentive compensation, and stock option awards for executive officers of KLA and administered the Company's stock option plans.

27.   Defendant Richard J. Elkus, Jr. ("Elkus") has served as a director of KLA since 1997 and as a member of the Audit Committee since 1999.

28.   Defendant H. Raymond Bingham ("Bingham") has served as a director of KLA since 1999 and as a member of the Audit Committee since 2000.

29.   Collectively, defendants Bond, Elkus, and Bingham are referred to herein as the "Audit Committee Defendants." At all times relevant hereto, the Audit Committee supervised the preparation, filing and/or dissemination of the Company's financial statements, including the treatment of stock option awards for executive officers of KLA.

30.   At all relevant times, defendants Barnholt and Elkus also served on the Company's Nominating and Governance Committee which is charged with reviewing the Company's corporate governance policies and procedures.



31.    Collectively, the Officer Defendants, Compensation Committee Defendants, and Audit Committee Defendants are referred to herein as the "Individual Defendants" or as "Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

32.    Each Individual Defendant owed and owes KLA  and its shareholders fiduciary obligations and were and are required by law to: (1) use their ability to control and manage KLA in a fair, just and equitable manner; (2) act in furtherance of the best interests of KLA and its shareholders; (3) act to maximize shareholder value in connection with any transaction; (4) govern KLA in such a manner as to heed the expressed views of its public shareholders; (5) refrain from abusing their positions of control; and (6) not favor their own interests or the interests of any Individual Defendants at the expense of KLA and its public shareholders.

33.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein and did control and influence and cause KLA to engage in the practices complained of herein.

35.    Each defendant herein is sued individually as a conspirator and aider and abettor, as well as in his capacity as a director of KLA, and the liability of each arises from the fact that

1  each engaged in and/or aided and abetted all or part of the unlawful acts, plans or transactions

2  complained of herein.

3      36.    To discharge their duties, the officers and directors of the Company were required

4  to exercise reasonable and prudent supervision over the management policies, practices and

5  controls of the Company.   By virtue of such duties, the officers and directors of the Company

6  were required to, among other things:

7          a.    exercise good faith in ensuring that the affairs of the Company were
8              conducted in an efficient, business-like manner so as to make it possible to
              provide the highest quality performance of their business;

9          b.    exercise good faith in ensuring that the Company was operated in a
10             diligent, honest and prudent manner and complied with all applicable
              federal and state laws, rules, regulations and requirements, including acting
11             only within the scope of its legal authority;

12         c.    exercise good faith in supervising the preparation, filing and/or
              dissemination of financial statements, press releases, audits, reports or
13             other information required by law, and in examining and evaluating any
              reports or examinations, audits, or other financial information concerning
14             the financial condition of the Company;

15         d.    exercise good faith in ensuring that the Company's financial statements
              were prepared in accordance with Generally Accepted Accounting
16             Principles ("GAAP"); and

17         e.    refrain from unduly benefitting themselves and other Company insiders at
              the expense of the Company.

18     37.    The Individual Defendants also were responsible for maintaining and establishing

19  adequate internal accounting controls for the Company and to ensure that the Company's financial

20  statements were based on adequate accurate financial information.  According to GAAP, to

21  accomplish the objectives of accurately recording, processing, summarizing, and reporting

22  financial data, a corporation must establish an internal accounting control structure. Among other

23  things, the Individual Defendants were required to:

24         (1)    make and keep books, records, and accounts, which, in reasonable detail,
25             accurately and fairly reflect the transactions and dispositions of the assets
              of the issuer; and

26         (2)    devise and maintain a system of internal accounting controls sufficient to
27             provide reasonable assurances that --

28             (a)    transactions are executed in accordance with management's general
                  or specific authorization;

---

(b)     transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

38.    Further, KLA's Audit Committee Charter provides that the Audit Committee shall be responsible for, among other things:

a.    Reviewing on a continuing basis the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the a Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure; and

b.    Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited Financial Statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition" and "Results of Operations" to be included in the Company's Annual Report on Form 10K (or the Annual Report to Shareholders if distributed prior to the filing of Form 10K) and Quarterly Reports on Form 10-Q, respectively, prior to their filing with the SEC.

## SUBSTANTIVE ALLEGATIONS

39.    From 1997 to 2001, the Compensation Committee granted certain KLA stock options to the Officer Defendants as set forth in Exhibit A hereto.   All of the grants were dated just after a sharp drop in the Company's stock price and just before a substantial rise in the Company's stock price.   An analysis conducted by the *Wall Street Journal* and initially reported on March 18, 2006 found the probability that such a pattern occurred merely by chance to be around one in 20 million.

40.    The reason for the extraordinary pattern of stock option grants as alleged herein is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.   Rather, at the behest of the Officer Defendants and /or other Individual Defendants, the Compensation Committee Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of KLA stock was lower than the market price on the actual grant dates.



41.    This improper backdating violated the terms of the Company's shareholder-approved stock option plans. Pursuant to the terms of the Company's shareholder-approved stock option plans, the exercise price of options must be no less than the closing price of KLA stock on the date of grant. In this way, the executives of a company are supposed to have their interests aligned with the shareholders, whose holdings are diluted each time an option is exercised. Backdating improperly increased the value of the options to the Officer Defendants and gave them an immediate paper profit which undermined the incentive purpose of such options, improperly reduced the amounts the Officer Defendants had to pay the Company upon exercise of the options, and unfairly transferred shareholder equity to Defendants.

42.    Defendants' conduct also violated the terms of the Company's own corporate governance guidelines, the Company's standards of business conduct and the Company's conflicts of interest policy. For example, the Company's Corporate Governance Standards provides that "each director owes a duty of loyalty to the Company and is expected to act in the best interests of the Company and its stockholders as a whole." Similarly, the Company's Standards of Business Conduct states, in part, that "KLA-Tencor insists that all records maintained by employees are an accurate, honest and forthright presentation of the facts." KLA's conflict of interest policy, as set forth in the Company's proxy statement states that "KLA-Tencor expects its Directors, executives and employees to conduct themselves with the highest degree of integrity, ethics and honesty."

43.    Defendants' backdating scheme also rendered the Company's proxy materials from 1997 to 2005 false and misleading, as the proxy materials falsely reported the dates of the stock option grants and falsely represented that the options were granted at fair market value; if the option grant is backdated, the options value is not fair from the vantage point of the Company and its shareholders. For example, a report of the Compensation Committee contained in KLA's 2002 proxy statement falsely stated that "Stock options are granted at market prices on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price." Defendants also filed with the SEC Form 4 filings that falsely reported the dates of stock option grants to the Officer Defendants.



44.    Defendants' backdating scheme also rendered the Company's financial statements in Form 10-K filings for the years 1998, 1999, 2000, 2001, and 2002 false and misleading.

45.    Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense, reducing the company's net income.

46.    In addition, as set forth in the Company's proxy statement, the Company has adopted the IRS§162(m) (Section 162(m) of the Tax Code, 26 U.S.C. §162) Performance Bonus Plan which permits the Company to deduct for federal income taxes purposes compensation paid under the Bonus Plan.  Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

47.    As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted; violated §162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and produced and disseminated to KLA shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants, rendering the Company's financial statements false and misleading.



48.    As a result of all of the foregoing, KLA has been damaged. KLA's stock price has declined over 20% or over $10 per share since news of the scandal first surfaced, and it will likely cost the Company millions of dollars to resolve the multiple stock option investigations and lawsuits.

49.    In addition, the Company and its shareholders were further injured in that Defendants' illegal conduct caused KLA to alter the terms of its offer to buy ADE, a maker of silicon wafer inspection equipment and to overpay for the acquisition.

50.    On February 23, 2006, KLA announced it was buying ADE in a stock-for-stock transaction. As KLA shares wilted over the investigation of improprieties concerning KLA's stock option grants, KLA was forced to change its purchase agreement from all stock to an all cash offer as announced on May 26, 2006 . As one commentator has noted, "I have to wonder whether the latest decline [in KLA's stock price] caused by that [Wall Street Journal] column finally pushed ADE's board to ask for a better deal. . . [KLA's offer] may be a higher price than it had to be."

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

51.    The Officer Defendants breached their fiduciary duties by, *inter alia*:

    a.    colluding with the Compensation Committee Defendants to improperly backdate dozens of grants of KLA stock options to KLA Chief Executive Officer Kenneth L. Schroeder and several other KLA executives, in violation of the Company's shareholder-approved stock option plans;

    b.    colluding with the Audit Committee Defendants to improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles and improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Tax Code;

    c.    colluding with the other Individual Defendants to produce and disseminate to KLA shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.    colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.



52.    The Officer Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

53.    The Compensation Committee Defendants breached their fiduciary duties by, *inter alia*:

    a.    colluding with the Officer Defendants to backdate stock option grants;

    b.    colluding with the Officer Defendants and Audit Committee Defendants to violate GAAP and Section 162(m);

    c.    colluding with the other Individual Defendants to produce and disseminate to KLA shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.    colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

54.    The Compensation Committee Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

55.    The Audit Committee Defendants breached their fiduciary duties by, *inter alia*:

    a.    colluding with the Officer Defendants to violate GAAP and Section 162(m);

    b.    colluding with the other Individual Defendants to produce and disseminate to KLA shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    c.    colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

56.    The Audit Committee Defendants' foregoing misconduct was not and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

57.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not

limited to, the additional compensation expenses and tax liabilities the Company was required to

incur and loss of funds paid to the Company upon exercise of options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

58.     Plaintiff brings this action derivatively in the right and for the benefit of the

Company to redress Defendants' breaches of fiduciary duties and unjust enrichment.

59.     Plaintiff is an owner of KLA common stock and was an owner of KLA common

stock at all times relevant hereto.

60.     Plaintiff will adequately and fairly represent the interests of the Company and its

shareholders enforcing and prosecuting its rights.

61.     As a result of the facts set forth herein, plaintiff has not made any demand on the

KLA Board of Directors to institute this action against the Individual Defendants. Such demand

would be a futile and useless act because the Board is incapable of making an independent and

disinterested decision to institute and vigorously prosecute this action.

62.     The Board currently consists of 10 directors: defendants Schroeder, Levy,

Tompkins, Barnholt, Bingham, Bond, Elkus, and Urbanek, and directors Michael E. Marks and

Stephen P. Kaufman. The following directors are incapable of independently and disinterestedly

considering a demand to commence and vigorously prosecute this action:

a.      Schroeder, Levy, and Tompkins, because they are directly interested in the
        improperly backdated stock option grants complained of herein;

b.      Urbanek, Barnholt, and Bond, because as members of the Compensation
        Committee they directly participated in and approved the improper
        backdating of stock options, as alleged herein, and face substantial
        likelihood of liability for their conduct. Moreover, by colluding with the
        Officer Defendants and others, as alleged herein, Urbanek, Barnholt, and
        Bond have demonstrated that they are unable or unwilling to act
        independently of the Officer Defendants;

c.      Bond, Elkus, and Bingham, because as members of the Audit Committee
        they directly participated in and approved the Company's violations of
        GAAP and Section 162(m), as alleged herein. Moreover, by colluding with
        the Officer Defendants and others, as alleged herein, Bond, Elkus, and
        Bingham have demonstrated that they are unable or unwilling to act
        independently of the Officer Defendants;

d.      Urbanek, Barnholt, Bond, Elkus, and Bingham, because as directors of the
        Company they directly participated in and approved the Company's filing
        of false financial statements and other SEC filings, as alleged herein.



Moreover, by colluding with the Officer Defendants and others, as alleged herein, Bond, Elkus, and Bingham have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

e.  If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which may underlie allegations against them in class action complaints for violations of the securities law, which admissions would impair their defense of any class actions filed and greatly increase any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defense they will likely assert in any securities class actions. This they will not do. Thus, demand is futile.

63.  Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.

64.  A true and correct copy of this complaint was delivered to KLA before being filed with this Court.

**FIRST CAUSE OF ACTION**
**(Against All Individual Defendants for Breach of Fiduciary Duty)**

65.  Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

66.  As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to refrain from unduly benefitting themselves and other Company insiders at the expense of the Company.

67.  As alleged in detail herein, the Officer Defendants, Compensation Committee Defendants, and the Audit Committee Defendants breached their fiduciary duties by:

a.  colluding to backdate stock option grants;

b.  colluding to violate GAAP and Section 162(m);

c.  colluding to produce and disseminate to KLA shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options;

d.  colluding to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options; and

e.  violating the provisions of the Company's own internal corporate governance guidelines, the Company's standards of business conduct and the Company's conflicts of interest policy.

68. Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Officer Defendants at the expense of the Company.

69. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

**SECOND CAUSE OF ACTION**
**(Against All Individual Defendants)**
**For Negligent Breaches of Fiduciary Duty**

70. Except to the extent plaintiff alleges intentional or reckless misconduct by any Defendant, plaintiff incorporates by reference all preceding and subsequent paragraphs if set forth fully herein.

71. The Individual Defendants engaged in the aforesaid conduct without exercising the reasonable and ordinary care owed to the Company by directors, officers, managing agents and employees of a company.

72. The Company and its shareholders have been injured by reason of the Individual Defendants' negligent breaches of their fiduciary duty.

**THIRD CAUSE OF ACTION**
**(Against the Officer Defendants for Unjust Enrichment)**

73. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

74. The Officer Defendants were unjustly enriched by their receipt and retention of backdated stock option grants, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

75. To remedy the Officer Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

**FOURTH CAUSE OF ACTION**
(Against All Individual Defendants for Abuse of Control)

76.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

77.    Defendants' conduct constituted an abuse of their ability to control and influence KLA for which they are legally responsible.

78.    By reason of the foregoing, KLA has been damaged.

**FIFTH CAUSE OF ACTION**
(Against All Individual Defendants for Constructive Fraud)

79.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

80.    As a result of the conduct described above, Defendants have committed, or aided and abetted the commission of numerous representations to and concealed material facts from KLA despite Defendants' fiduciary duties to, *inter alia*, disclose the true facts regarding their stewardship of and their true intentions, and thus have committed and/or aided and abetted constructive fraud.

81.    For the purpose of maintaining and further entrenching themselves in their positions of power and control at KLA and to attempt to conceal their wrongdoing and continue to receive the substantial benefits and salaries associated with their positions, and with the intent to injure KLA, Defendants employed the above-detailed scheme and conspiracy to defraud. As a part of this scheme and conspiracy, Defendants actively made or concealed and/or participated in the making of or aided and abetted the making or perpetration of the concealment, numerous omissions and misrepresentations of facts to KLA. Said representations and statements were untrue and Defendants did not believe them to be true when made, or knowingly, willfully, and/or intentionally made them without regard to their truthfulness or aided and abetted the making of said misrepresentations. Said acts by these Defendants were fraudulent, oppressive, despicable and malicious.



82. By reason of the foregoing, KLA has sustained, and will continue to sustain, irreparable injury for which it has no adequate remedy at law, and is also entitled to an award of punitive damages against Defendants.

83. By reason of the foregoing, KLA has been damaged.

### SIXTH CAUSE OF ACTION
(Against All Defendants for Gross Mismanagement)

84. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

85. As detailed more fully herein, Defendants had a duty to KLA to prudently supervise, manage and control KLA's operations.

86. Defendants by their actions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing the assets of KLA in a manner consistent with the operations of a publicly-held corporation.

87. By acting as alleged herein, Defendants breached their duties of due care and diligence in the management and administration of KLA's affairs and in the use and preservation of KLA's assets.

88. As a proximate result thereof, KLA has been damaged.

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and statutory violations;

B. Ordering the Officer Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized;

C. Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

D. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and



E.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury as to all issues so triable.

Dated: June 1, 2006

WEISS & LURIE

Jordan L. Lurie
Leigh A. Parker
Zev B. Zysman

By: _____
Jordan L. Lurie
10940 Wilshire Boulevard, 23rd Floor
Los Angeles, CA 90024
Telephone: 310/208-2800
Facsimile:  310/209-2348

*Attorneys for Plaintiff*

DERIVATIVE COMPLAINT                    -17-



## EXHIBIT A

| KLA-Tencor Stock Options (1997 thru 2001) | | |
|---|---|---|
| Purported Grant Date | Number of Options[1] | Exercise Price |
| **SCHROEDER** | | |
| 07/31/97 | 62,500 | $60.5625 |
| 08/31/98 | 102,136 | $21.2500 |
| 10/23/98 | 110,364 | $33.9375 |
| 10/27/99 | 150,000 | $33.7500 |
| 08/13/00 | 75,800 | $44.6875 |
| 11/10/00 | 37,900 | $26.2500 |
| 04/04/01 | 37,900 | $32.7500 |
| 10/02/01 | 341,100 | $29.3100 |
| **LEVY** | | |
| 07/31/97 | 62,500 | $60.5625 |
| 08/31/98 | 102,136 | $21.2500 |
| 10/23/98 | 110,364 | $33.9375 |
| 10/27/99 | 90,000 | $33.7500 |
| 08/13/00 | 37,901 | $44.6875 |
| 11/10/00 | 18,951 | $26.2500 |
| 04/04/01 | 18,951 | $32.7500 |
| 10/02/01 | 28,425 | $29.3100 |
| **TOMPKINS** | | |
| 08/31/98 | 50,809 | $21.2500 |
| 10/23/98 | 74,191 | $33.9375 |
| 10/27/99 | 10,000 | $33.7500 |
| 11/10/00 | 10,000 | $26.2500 |
| **BOEHLKE** | | |
| 07/31/97 | 33,500 | $60.5625 |
| 08/31/98 | 54,435 | $21.2500 |

[1] Exercise prices and numbers of options are not adjusted for the Company's 2-for-1 stock split effective January 19, 2000.



| KLA-Tencor Stock Options (1997 thru 2001) | | | |
|---|---|---|---|
| | 10/23/98 | 49,065 | $33.9375 |
| | 10/27/99 | 60,000 | $33.7500 |
| | | | |
| DICKERSON | 07/31/97 | 42,500 | $60.5625 |
| | 08/31/98 | 62,882 | $21.2500 |
| | 10/23/98 | 69,618 | $33.9375 |
| | 10/27/99 | 100,000 | $33.7500 |
| | 08/13/00 | 65,000 | $44.6875 |
| | 11/10/00 | 32,500 | $26.2500 |
| | 04/04/01 | 32,500 | $32.7500 |
| | 10/02/01 | 105,000 | $29.3100 |
| | | | |
| SCHNITZER | 08/31/98 | 54,435 | $21.2500 |
| | 10/23/98 | 49,065 | $33.9375 |
| | 10/27/99 | 50,000 | $33.7500 |
| | | | |
| KISPERT | 10/02/01 | 60,000 | $29.3100 |
| | | | |
| FORTINO | 10/02/01 | 45,000 | $29.3100 |



A & A LEGAL SERVICE 6506974640                    NO. 8658    P 2

1                          **VERIFICATION**

2        I, JEFFREY A. RABIN, hereby verify that I have reviewed the Complaint and authorized

3   its filing and that the foregoing is true and correct to the best of my knowledge, information and

4   belief.

5

6

7   Dated: June ____1____, 2006

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

# EXHIBIT 3
# Part 1 of 3

1  LERACH COUGHLIN STOIA GELLER
       RUDMAN & ROBBINS LLP
2  SHAWN A. WILLIAMS (213113)
   MONIQUE C. WINKLER (213031)
3  AELISH M. BAIG (201279)
   100 Pine Street, Suite 2600
4  San Francisco, CA  94111
   Telephone:  415/288-4545
5  415/288-4534 (fax)
   swilliams@lerachlaw.com
6  mwinkler@lerachlaw.com
   abaig@lerachlaw.com
7
   Lead Counsel for Plaintiffs
8
   [Additional counsel appear on signature page.]
9                      UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF CALIFORNIA
10                         SAN JOSE DIVISION

11  In re KLA-TENCOR CORP. SHAREHOLDER )   No. C-06-03445-JW
    DERIVATIVE LITIGATION              )
12  _____)   AMENDED CONSOLIDATED VERIFIED
                                       )   SHAREHOLDER DERIVATIVE
13  This Document Relates To:          )   COMPLAINT FOR VIOLATION OF THE
                                       )   FEDERAL SECURITIES LAWS AND
14      ALL ACTIONS.                   )   STATE LAW CLAIMS FOR BREACH OF
                                       )   FIDUCIARY DUTY, ABUSE OF
15  _____)   CONTROL, CONSTRUCTIVE FRAUD,
    ALASKA ELECTRICAL PENSION FUND,    )   CORPORATE WASTE, UNJUST
16  Derivatively on Behalf of KLA-TENCOR)   ENRICHMENT, GROSS
    CORPORATION,                       )   MISMANAGEMENT, ACTION FOR
17                        Plaintiff,   )   ACCOUNTING AND VIOLATION OF
                                       )   CALIFORNIA CORPORATIONS CODE
18      vs.                            )
                                       )
19  KENNETH LEVY, KENNETH L.           )
    SCHROEDER, RICHARD P. WALLACE,     )
20  JOHN H. KISPERT, JEFFREY L. HALL, JON )
    D. TOMPKINS, LIDA URBANEK, H.      )
21  RAYMOND BINGHAM, ROBERT J.         )
    BOEHLKE, ROBERT T. BOND, EDWARD    )
22  W. BARNHOLT, STEPHEN P. KAUFMAN,   )
    RICHARD J. ELKUS, JR., ARTHUR      )
23  SCHNITZER, GARY DICKERSON, STUART  )
    NICHOLS and LEO CHAMBERLAIN,       )
24                        Defendants,  )
                                       )
25      – and –                        )
                                       )
26  KLA-TENCOR CORPORATION, a Delaware )
    corporation,                       )
27                   Nominal Defendant.)
    _____)   DEMAND FOR JURY TRIAL
28

1

## NATURE OF THE ACTION

2      1.      This is a shareholder derivative action brought by Alaska Electrical Pension Fund, a

3  shareholder of KLA-Tencor Corporation ("KLA-Tencor" or the "Company"), on behalf of the

4  Company against its Board of Directors ("Board") and certain of its current and former senior

5  executives (collectively, "Defendants").[1]  This action seeks to remedy Defendants' violations of

6  federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud,

7  corporate waste, unjust enrichment and gross mismanagement, arising out of a scheme and wrongful

8  course of business whereby Defendants allowed senior KLA-Tencor insiders to divert hundreds of

9  millions of dollars of corporate assets to themselves via the manipulation of grant dates associated

10 with hundreds of thousands of stock options granted to KLA-Tencor insiders.  During the period

11 between 1995 and the present (the "Relevant Period"), each of the Defendants also participated in

12 the concealment of the option backdating scheme complained of herein and/or refused to take

13 advantage of the Company's legal rights to require these senior insiders to disgorge the hundreds of

14 millions of dollars in illicitly obtained incentive compensation and proceeds diverted to them since

15 1995.

16     2.      During the Relevant Period, Defendants also caused KLA-Tencor to issue and file

17 false and misleading statements with the Securities and Exchange Commission ("SEC"), including

18 Proxy Statements filed with the SEC.

19     3.      The action seeks to remedy Defendants' violations of federal and California state law,

20 including the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), §10(b) of the Securities Exchange

21 Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated therein and §14(a) of the Exchange Act,

22 Cal. Corp. Code §§25402 and 25502.5, as well as breaches of fiduciary duties, abuse of control,

23

24  [1]     The "Individual Defendants" are Kenneth Levy ("Levy"), Kenneth L. Schroeder
25  ("Schroeder"), Richard P. Wallace ("Wallace"), John H. Kispert ("Kispert"), Jeffrey L. Hall
    ("Hall"), Jon D. Tompkins ("Tompkins"), Lida Urbanek ("Urbanek"), H. Raymond Bingham
26  ("Bingham"), Robert J. Boehlke ("Boehlke"), Robert T. Bond ("Bond"), Edward W. Barnholt
    ("Barnholt"), Stephen P. Kaufman ("Kaufman"), Richard J. Elkus, Jr. ("Elkus"), Arthur Schnitzer
27  ("Schnitzer"), Gary Dickerson ("Dickerson"), Stuart Nichols ("Nichols") and Leo Chamberlain
    ("Chamberlain").

28

1  gross mismanagement, constructive fraud, waste of corporate assets, and unjust enrichment between

2  1995 and the present.

3         4.     Plaintiffs demand an accounting of all stock option grants made to Defendants during

4  times relevant hereto, the rescission of all contracts which provide for stock option grants between

5  any of the Defendants and KLA-Tencor, which were entered into during times relevant hereto, and a

6  declaration that the illicit stock options, and all proceeds derived from exercise thereof, are and have

7  been held in constructive trust for the Company's benefit.

8         5.     During the Relevant Period, the Company's executives and its non-employee

9  directors were compensated in large part through the issuance of stock options. A stock option

10  granted to an employee and/or director of a corporation allows the employee and/or director to

11  purchase company stock at a specified price – referred to as the "exercise price," typically the fair

12  market value of the stock on the date the option is granted.  When properly issued, stock options

13  serve as a valuable part of employee and/or director compensation packages as a means to create

14  incentives to boost profitability and stock value.  When the employee and/or director exercises the

15  option, he or she purchases the stock from the company at the exercise price, regardless of the

16  stock's price at the time the option is exercised.

17         6.     Dating back to at least 1996, the Defendants engaged in a scheme and course of

18  conduct designed to manipulate KLA-Tencor stock option grant dates so as to secretly maximize

19  profits to themselves and other Company executives at the expense of the Company and its

20  shareholders. Specifically, the Defendants, the Board and senior officers at the Company approved

21  the granting of backdated/misdated stock options in abdication of their fiduciary duties.

22         7.     "Backdating"[2] is a practice by which a stock option is reported as having been

23  granted on one date, but is actually backdated weeks or months to a date where the stock price was

24  trading at a lower price. Such backdating allows company executives and stock option grantees to

25  _____

26  [2]   Plaintiffs' use of the terms "backdating," "misdating," "backdated" and "misdated"
27  throughout this Complaint may also refer to other forms of related stock option manipulation
    perpetrated by Defendants alleged in this action.

28

1   realize immediate unearned and undisclosed financial gains at the expense of the company's

2   shareholders. Backdating of stock option grants has been compared to picking lottery numbers on

3   the day after the winning numbers are announced, or betting on a horse after the race has finished.

4   Arthur Levitt, a former chairman of the SEC was quoted as stating that stock option backdating

5   "represents the ultimate in greed." Further, Levitt stated, "It is stealing, in effect. It is ripping off

6   shareholders in an unconscionable way." On May 5, 2006, President George W. Bush stated in an

7   interview on the Kudlow & Company show airing on CNBC that "overcompensating or trying to

8   backdate things is bad for America, and there ought to be consequences when people don't tell the

9   truth and are not transparent."

10         8.     In addition, former SEC Chairman Harvey Pitt recently opined that the backdating of

11  stock options often involves the falsification of documents for personal gain:

12         Many discussions of backdating options start with the observation that backdating is
           not, per se, illegal. That is wrong. ***Options backdating frequently involves***
13         ***falsification of records used to gain access to corporate assets. That conduct***
           ***violates the Foreign Corrupt Practices Act and its internal controls requirements.***
14         ***If corporate directors were complicit in these efforts, state law fiduciary obligations***
           ***are violated.*** Backdating is not only illegal and unethical, it points to a lack of
15         integrity in a company's internal controls.

16         9.     Furthermore, backdating stock options creates an instant paper gain to grantees who

17  receive them because the options were priced below the stock's fair market value when they were

18  actually awarded. Under Generally Accepted Accounting Principles ("GAAP"), this instant paper

19  gain is equivalent to paying extra compensation and thus is a cost to KLA-Tencor. Accordingly,

20  KLA-Tencor was required to record an expense to its financial statements for any options granted

21  below the fair market value on the grant date of the option, or "in the money" options. However, the

22  Defendants did not properly record these known costs on KLA-Tencor's financial statements,

23  causing KLA-Tencor's financial statements throughout the Relevant Period to be issued in violation

24  of GAAP. Specifically, these financial statements overstated reported earnings and understated

25  reported expenses.

26         10.    In addition to Defendants' clear breach of fiduciary duty and violation of accounting

27  rules, Defendants' backdating of stock options may have extremely serious tax consequences for the

28  Company. While stock options generally qualify for favorable tax treatment, options issued at a

1   discount to the market price do not qualify for that treatment. Accordingly, backdated stock options

2   are automatically disqualified from that favorable tax relief, and KLA-Tencor has now

3   acknowledged that it may owe millions of dollars in unpaid taxes.

4       11.    Defendants' conduct has already had severe consequences on the Company's

5   available assets and the credibility of its Board and executive leadership. The disruption to the

6   Company's business is and will continue to be immeasurable until the ongoing regulatory

7   investigations are complete, and the Company restates its many false and misleading financial

8   statements. Further, the Company is now the target of investigations by the SEC and the Department

9   of Justice ("DOJ") and is exposed to severe civil and criminal liability, including Internal Revenue

10  Service ("IRS") fines and back taxes.

11      12.    Apart from the knowing issuance of false and misleading representations in financial

12  reports, Defendants misrepresented facts presented in Form 14-A Proxy Statements soliciting action

13  by Company shareholders, and in press releases and documents filed with the SEC, specifically

14  quarterly and year-end reports.

15      13.    For example, throughout the Relevant Period, the Company described the purpose

16  and philosophy of the stock option and incentive program as necessary to align the long term

17  interests of executives with the that of the stockholders:

18          The goals of the Company's compensation policy are to attract, retain and reward
            executive officers who contribute to the overall success of the Company by offering
19          compensation that is competitive in the industry, to motivate executives to achieve
            the Company's business objectives and to align the interests of officers with the long
20          term interests of stockholders. The Company currently uses salary, a management
            incentive plan, and stock options to meet these goals.
21
22      14.    The Company also repeatedly and falsely represented that because stock options were

23  granted at market price on the date of the grant or fair market value on the date of the stock option

24  grants, the options only became valuable as the share price increased from the price on the date of

25  the grant:

26

27

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 4 -

1    *Stock options are granted at market price on the date of grant and will provide*
     *value to the executive officers only when the price of the Company's Common*
2    *Stock increases over the exercise price.*[3]

3    15.    During the Relevant Period, Defendants also caused the Company to falsely state that

4    it properly accounted for stock option issuance in accordance with Accounting Principles Board

5    ("APB") Opinion No. 25 as follows:

6    Stock-Based Compensation Plans

7    *The Company accounts for its stock option plans and employee stock purchase*
     *plan in accordance with provisions of the Accounting Principles Board's Opinion*
8    *No. 25 (APB OPINION NO. 25), "Accounting for Stock Issued to Employees."*
     *The Company's policy is to grant options at the fair market value on the date of*
9    *grant. Accordingly no compensation expense has been recorded.*

10    16.    Defendants also assured shareholders that the issuance of stock options and their

11    exercise would be in compliance with all applicable federal, state and foreign law with respect to the

12    securities at issue:

13    COMPLIANCE WITH SECURITIES LAW. The grant of Options and the issuance
      of shares of Stock upon exercise of Options shall be subject to compliance with all
14    applicable requirements of federal, state or foreign law with respect to such
      securities.
15
      17.    At the same time that Defendants knowingly caused the Company to make these false
16
      and misleading statements, Defendants knew but failed to disclose that the practices employed by the
17
      Board allowed the stock option grants to be manipulated or *backdated* to dates when the Company's
18
      shares were trading at or near the lowest price for that Relevant Period. By May 2006, Defendants'
19
      backdating scheme had yielded stock option grants to the Company's executive officers worth
20
      millions of dollars.
21
      18.    In order to conceal the falsity of the Company's financial statements, representations
22
      of the adequacy of its internal controls, and the fraudulent issuance and manipulation of the
23
      Company's stock option grants, Defendants, through key executives and the Board's Compensation
24

25

26    [3]    During the Relevant Period the Company issued stock options under several different stock
      option plans, including the 1982 Stock Option Plan, the 1990 Stock Option Plan, the 1993 Employee
27    Incentive Stock Option Plan, the 1998 Outside Director Stock Option Plan, the 2004 Equity
      Incentive Plan and the 2000 Non-Statutory Plan (hereinafter "Stock Option Plans").

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 5 -

1    and Audit Committees, falsely assured shareholders that financial statements and associated

2    representations were accurate.    Indeed, during the Relevant Period, Defendants Schroeder and

3    Kispert each claimed that they had investigated and reviewed the Company's financial statements

4    and internal control processes and authorized their inclusion in the Company's public filings.

5    Between 2002 and 2005, both Schroeder and Kispert signed false certifications pursuant to

6    Sarbanes-Oxley §§302 and 906.    For example, Schroeder's Sarbanes-Oxley certification filed with

7    the Company's 2004 Form 10-K affirms:

8        I, Kenneth L. Schroeder certify that:

9        1.    I have reviewed this annual report on Form 10-K of KLA-Tencor
     Corporation;

10

11       2.    Based on my knowledge, *this report does not contain any untrue statement
     of a material fact or omit to state a material fact necessary to make the statements
     made, in light of the circumstances under which such statements were made, not
12   misleading with respect to the period covered by this report*;

13       3.    *Based on my knowledge, the financial statements*, and other financial
     information included in this report, *fairly present in all material respects the
14   financial condition, results of operations* and cash flows of the registrant as of, and
     for, the periods presented in this report;

15
         4.    *The registrant's other certifying officer and I are responsible for
16   establishing and maintaining disclosure controls and procedures (as defined in
     Exchange Act Rules* 13a-15(e) and 15d-15(e)) for the registrant *and have*:

17
         a.    *designed such disclosure controls and procedures, or caused
18   such disclosure controls and procedures to be designed under our
     supervision, to ensure that material information relating to the
19   registrant, including its consolidated* subsidiaries, is made known to
     us by others within those entities, particularly during the period in
20   which this report is being prepared;

21       b.    evaluated the effectiveness of the registrant's disclosure
     controls and procedures and presented in this report our conclusions
22   about the effectiveness of the disclosure controls and procedures, as
     of the end of the period covered by this report based on such
23   evaluation; and

24       c.    disclosed in this report any change in the registrant's internal
     control over financial reporting that occurred during the registrant's
25   most recent fiscal quarter (the registrant's fourth fiscal quarter in the
     case of an annual report) that has materially affected, or is reasonably
26   likely to materially affect, the registrant's internal control over the
     financial reporting; and

27
         5.    *The registrant's other certifying officer and I have disclosed, based on our
28   most recent evaluation of internal control over financial reporting, to the*

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 6 -

1    ***registrant's auditors and the audit committee*** of the registrant's board of directors
     (or persons performing the equivalent functions):

2

         a.    all significant deficiencies and material weaknesses in the
3        design or operation of internal control over financial reporting which
         are reasonably likely to adversely affect the registrant's ability to
4        record, process, summarize and report financial information; and

5        b.    any fraud, whether or not material, that involves management
         or other employees who have a significant role in the registrant's
6        internal control over financial reporting.

7        19.    In fact, however, Defendants knew and failed to disclose that for years, the Company,

8    its senior executives and members of the Board, had been engaging in a continuing scheme and

9    course of conduct of backdating or misdating stock option grants to themselves and other executives

10   in a manner designed to create immediate and risk free profits in direct contravention of the

11   Company's stated and shareholder approved stock option plans and Proxy Statements.

12       20.    Furthermore, Defendants knew that because the Company had not taken a

13   compensation expense for backdated options required by APB Opinion No. 25, KLA-Tencor

14   reported earnings and expenses were false and misleading and not in compliance with GAAP. Thus,

15   by falsifying the date on which options were granted, Defendants materially understated KLA-

16   Tencor expenses, overstated its income and falsely represented that it had not incurred any expenses

17   for option grants.

18       21.    Defendants' misrepresentations and wrongful course of conduct violated the

19   Exchange Act, as well as California and Delaware law. By authorizing and/or acquiescing in the

20   stock option backdating scheme, Defendants: (a) caused KLA-Tencor to issue false statements; (b)

21   diverted hundreds of millions of dollars of corporate assets to themselves and KLA-Tencor

22   executives; and (c) subjected KLA-Tencor to liability from regulators including the SEC, the IRS

23   and federal prosecutors.

24       22.    Throughout the Relevant Period, however, Defendants knew but failed to disclose

25   that stock option grants had been manipulated in order to create secret and risk-free profits to grant

26   recipients, and that as a result, the Company repeatedly and materially overstated its net income and

27   understated its expenses.

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 7 -

1    23.    Further, throughout the Relevant Period, Defendants knowingly and falsely assured

2    shareholders that in addition to the certified internal controls, the Board had Compensation, Audit,

3    and Nominating and Governance Committees in place to oversee the Company's compensation

4    practices including stock option issuances, accounting practices and overall corporate governance

5    policies.

### Compensation Committee

7    24.    During the Relevant Period, the Company made the following representations

8    regarding the responsibilities of the Compensation Committee of the Board:

9    Compensation Committee

10    The Committee is comprised of three of the *independent*, non-employee members of
    the Board of Directors, none of whom have interlocking relationships as defined by
11    the Securities and Exchange Commission. The Committee is responsible for setting
    and administering the policies governing annual compensation of executive officers,
12    considers their performance and *makes recommendations regarding their cash
    compensation and stock options to the full Board of Directors*. The Committee
13    periodically reviews its approach to executive compensation and makes changes as
    appropriate.

### Audit Committee

15    25.    During the Relevant Period, Defendants gave assurances with regard to the Audit

16    Committee's practices in evaluating the Company's financial statements and that its outside auditors

17    did a comprehensive review of the Company's audit practices before authorizing them to be included

18    in public financial statements.  For example, set forth below is the Company's September 25, 2002

19    Audit Committee Report:

20
21    *During fiscal year 2002, the Audit Committee met with the senior members of the
    Company's financial management team, the Company's independent auditors and
    the Company's General Counsel when appropriate. The Audit Committee also met
22    separately with the Company's independent auditors and separately with the
    Company's Chief Financial Officer.  The parties candidly discussed financial
23    management, accounting and internal controls.*

24                    *            *            *

25    *The Audit Committee reviewed and discussed the audited financial statements
    included in the Company's Annual Report with the Companies management
26    including, without limitation, a discussion of the quality and not just the
    acceptability of the accounting principles, the reasonableness of significant
27    judgments, and the clarity of disclosures in the financial statements as well as in
    Management's Discussion and Analysis of Results of Operations and Financial
28    Condition. . . .*

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW        - 8 -

*     *     *

Based on the reviews and discussions referred to above, the Audit Committee recommended to the Board of Directors, and the Board of Directors approved, the audited financial statements included in the Company's Annual Report for the fiscal year ended June 30, 2002, filed with the Securities and Exchange Commission on September 20, 2002.

26.    The following chart illustrates the Board committee memberships between 1998-2005:

### Members of the Committees of the Board of Directors

| Year | Compensation | Audit | Nominating and Governance |
|------|--------------|-------|---------------------------|
| 1998 | James Bagley<br>Leo Chamberlain<br>Lida Urbanek | Dean Morton<br>Dag Tellefsen<br>Samuel Rubinovitz | Edward Barnholt<br>Kenneth Levy<br>Jon Tompkins |
| 1999 | James Bagley<br>Leo Chamberlain<br>Lida Urbanek | Richard Elkus, Jr.<br>Samuel Rubinovitz<br>Dag Tellefsen | Edward Barnholt<br>Kenneth Levy<br>Dean Morton |
| 2000 | Edward Barnholt<br>Robert Bond<br>Lida Urbanek | Dean Morton<br>Richard Elkus, Jr.<br>Leo Chamberlain | Dean Morton<br>Kenneth Levy<br>Kenneth Schroeder<br>Edward Barnholt |
| 2001 | Edward Barnholt<br>Robert Bond<br>Lida Urbanek | Raymond Bingham<br>Richard Elkus, Jr.<br>Dean Morton | Dean Morton<br>Kenneth Levy<br>Kenneth Schroeder<br>Edward Barnholt |
| 2002 | Edward Barnholt<br>Robert Bond<br>Lida Urbanek | Raymond Bingham<br>Richard Elkus, Jr.<br>Dean Morton | Edward Barnholt<br>Kenneth Levy<br>Kenneth Schroeder |
| 2003 | Edward Barnholt<br>Robert Bond<br>Lida Urbanek | Raymond Bingham<br>Robert Bond<br>Richard Elkus, Jr.<br>Stephen Kaufman | Edward Barnholt<br>Richard Elkus |
| 2004 | Edward Barnholt<br>Robert Bond<br>Michael Marks<br>Lida Urbanek | Raymond Bingham<br>Robert Bond<br>Richard Elkus, Jr.<br>Stephen Kaufman | Edward Barnholt<br>Kenneth Levy<br>Kenneth Schroeder |
| 2005 | Edward Barnholt<br>Robert Bond<br>Michael Marks<br>Lida Urbanek | Raymond Bingham<br>Robert Bond<br>Richard Elkus, Jr.<br>Stephen Kaufman | Edward Barnholt<br>Richard Elkus<br>Stephen Kaufman |

27.    Finally, at the same time that Defendants were secretly issuing themselves and other KLA-Tencor executives backdated stock options and falsifying the Company's financial statements,

the Insider Selling Defendants unloaded millions of shares of KLA-Tencor stock for a total of more than *$246 million* in insider trading proceeds:[4]

| DEFENDANT | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
|---|---|---|---|
| BARNHOLT | 12/10/04 – 11/18/05 | 29,000 | $1,432,675 |
| BINGHAM | 11/22/05 | 5,000 | $263,100 |
| BOEHLKE | 8/1/97-3/3/00 | 352,400 | $14,136,330 |
| BOND | 09/13/05 | 5,000 | $253,050 |
| CHAMBERLAIN | 12/14/95 – 1/18/00 | 81,764 | $4,839,107 |
| ELKUS | 8/6/99 – 11/29/05 | 155,416 | $7,022,474 |
| HALL | 12/03/04 – 11/18/05 | 12,300 | $607,060 |
| KISPERT | 01/18/00 – 09/15/05 | 341,500 | $20,156,845 |
| LEVY | 04/30/96 – 02/27/06 | 2,285,651 | $111,476,225 |
| NICHOLS | 4//24/01 – 4/30/02 | 21,614 | $1,155,276 |
| SCHROEDER | 05/08/97 – 02/08/06 | 1,249,800 | $64,336,289 |
| SCHNITZER | 5/28/97-3/10/00 | 471,644 | $26,807,656 |
| TOMPKINS | 07/31/97 – 08/29/05 | 670,049 | $31,565,583 |
| URBANEK | 12/14/01 – 02/27/06 | 9,149 | $448,324 |
| WALLACE | 08/05/99 – 12/03/03 | 292,499 | $15,547,430 |
| TOTAL | | 5,003,326 | $259,103,438 |

**Illegal Backdating Forces KLA-Tencor to Restate Years of Financial Statements**

28.    On May 16, 2006, the Center for Financial Research and Analysis issued a report: "Options Backdating – Which Companies Are at Risk?"  The report also identified the risks for companies that have taken part in options backdating:

• SEC investigation risk – The SEC has begun informal investigations at many companies in recent months and has also begun to call for improved disclosure around all areas of executive compensation.

• Accounting restatement risk – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

• Tax/Cash implications – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

• Management credibility risk – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholders, the reputation of management (and the related stock premium for superior management) could take a hit.

---

[4]    The "Insider Selling Defendants" are Barnholt, Bingham, Boehlke, Bond, Chamberlain, Elkus, Hall, Kispert, Levy, Nichols, Schroeder, Schnitzer, Tompkins, Urbanek, and Wallace.

1    29.    On May 22, 2006, *The Wall Street Journal* reported that KLA-Tencor had shown

2    questionable patterns surrounding the timing of option grants to its executives.  Later the same day,

3    it was disclosed that U.S. federal prosecutors were investigating executive stock option grants at

4    KLA-Tencor.  These disclosures caused KLA-Tencor's stock to close down $4.70 per share on

5    extremely high volume at $40.54 on May 22, 2006 – a one day decline of 10.4%.

6    30.    On May 24, 2006, the Company announced that it had received subpoenas from the

7    United States Attorneys' Offices in New York and California.  In addition, the Company had formed

8    a Special Committee of "independent" directors to investigate the timing of stock option grants

9    between 1995-2001:

10    **KLA-Tencor Announces Formation of Special Committee to Investigate Stock**
    **Option Practices**

11

12    SAN JOSE, Calif., May 24, 2006 – KLA/Tencor Corporation (NASDAQ: KLAC)
    today announced that its Board of Directors has appointed a special committee of
    independent directors to conduct an internal investigation relating to past stock

13    options granted to employees during the 1995 to 2001 timeframe.  The special
    committee is investigating the timing of such grants and related accounting and

14    documentation and will be assisted by outside legal counsel and accounting experts.

15    KLA-Tencor also said that it has received subpoenas from the U.S. Attorney's
    Offices for the Eastern District of New York and Northern District of California

16    requesting information related to its past stock option grants. . . .

17    31.    As a result of the sharp decline in KLA-Tencor's stock price due to its involvement in

18    the ongoing option granting scandal, KLA-Tencor was forced to renegotiate its deal to acquire ADE

19    Corporation ("ADE").  On May 26, 2006, the Company announced that it had amended a merger

20    agreement it had previously entered into with ADE to acquire ADE in a stock-for-stock transaction

21    valued at approximately $488 million.  Under the agreement, KLA-Tencor would issue 0.64 share of

22    KLA-Tencor per one share of ADE.  This calculation was based upon the closing price of KLA-

23    Tencor stock for February 22, 2006 of $51.73.  Due to the sharp decline in the value of KLA-

24    Tencor's stock, KLA-Tencor was forced to change the terms of its agreement with ADE into an all-

25    cash transaction instead of a stock-for-stock transaction.  On May 26, 2006, KLA-Tencor announced

26    that it had amended its agreement with ADE from a stock-for-stock transaction to an all-cash

27    transaction and that it had agreed to pay $32.50 *in cash* per share of ADE stock.  KLA-Tencor's

28    stock closed at $40.62 per share on May 26, 2006 – a 21.5% decline from February 22, 2006.

1          32.    On May 30, 2006, KLA-Tencor announced that it received notice from the SEC of an

2    informal inquiry relating to past stock option grants.

3          33.    On June 30, 2006, KLA-Tencor issued a press release to report the preliminary

4    conclusion of its Special Committee with respect to its ongoing internal investigation relating to past

5    stock option grants, the timing of such grants and related accounting and documentation.  The

6    preliminary report found that the measurement date for certain option grants indeed likely differed

7    from the recorded date of the grants.  The Company further indicated that it would likely have to

8    restate its financials to correct improperly reported compensation expenses.

9          [A] *Special Committee of the Company's Board of Directors has reached a*
           *preliminary conclusion that the actual measurement dates for financial accounting*
10         *purposes of certain stock option grants issued in prior years likely differ* from the
           recorded grant dates of such awards.  The Special Committee has not completed its
11         investigation and is continuing its review of these matters.  The Special Committee
           has not yet determined whether any resulting compensation charges are material or
12         whether the Company ultimately will restate previously issued financial statements.

13         The Company previously announced that its Board of Directors has appointed a
           Special Committee of independent directors to conduct an internal investigation
14         relating to stock options granted to members of senior management and the
           employees of the Company.  The Special Committee, assisted by independent legal
15         counsel and accounting experts, is investigating the timing of such grants, as well as
           their related accounting treatment.

16
           *Based on the Special Committees investigation to date, the Company now*
17         *anticipates that it may record additional non-cash charges for stock-based*
           *compensation expense.*  The Company has not yet determined the amount of such
18         charges or the resulting tax impact of these actions.  *In the event that the Company*
           *determines that these items are material, KLA-Tencor may be required to restate its*
19         *financial statements for the relevant prior fiscal periods*.

20         34.    On July 27, 2006, KLA-Tencor issued a press release announcing that as a result of

21   the on-going internal investigation relating to stock option grants previously disclosed on May 24,

22   2006, the Company would be unable to provide detailed GAAP financials for items other than

23   revenue and bookings for the quarter or year ended June 30, 2006.  The Company also disclosed that

24   it would not file its annual report on Form 10-K.

25         35.    On September 14, 2006, the Company announced that it received a NASDAQ Staff

26   Determination notice indicating that the Company is not in compliance with the filing requirements

27   for continued listing as set forth in NASDAQ Marketplace Rule 4310(c)(14) and that its common

28   stock is subject to delisting from the NASDAQ Global Select Market:

1

**KLA-Tencor Delays Filing Form 10-K and Receives Notice from Nasdaq**

2                                    *     *     *

3      As a result of the delayed filing of the Company's Form 10-K, the Company today
       received a NASDAQ Staff Determination notice indicating that the Company is not
4      in compliance with the filing requirements for continued listing as set forth in
       NASDAQ Marketplace Rule 4310(c)(14) and that its common stock is subject to
5      delisting from the NASDAQ Global Select Market. . . .

6          36.    On September 28, 2006, the Company issued a press release stating that it would

7   restate publicly reported financial statements due to the backdating/misdating of stock options and

8   that all of its financial statements issued since July 1997 should no longer be relied upon. Moreover,

9   the Company stated that its restatement could reduce previously reported net income and increase

10  previously reported losses during the Relevant Period:

11     **KLA-Tencor Will Restate Financial Statements Related to Stock Options**

12     *SAN JOSE, Calif., September 28, 2006 -- KLA-Tencor Corporation (NASDAQ:
       KLAC) today announced that it will restate* previously issued financial statements to
13     correct the Company's past accounting for stock options. Based on a report received
       from a Special Committee of the Board of Directors, *the Board concluded that
14     incorrect measurement dates for certain stock option grants were used for
       financial accounting purposes, principally during the periods July 1, 1997 through
15     June 30, 2002. As a result, the Company will be required to record non-cash
       charges for compensation expenses relating to those past stock option grants.*
16
       The Company has not determined the exact amount of such charges, the resulting tax
17     and accounting impact, or which specific reporting periods may require restatement.
       *Accordingly, the Company is filing a Form 8-K today stating that the financial
18     statements and all earnings and press releases and similar communications issued
       by the Company relating to periods beginning on or after July 1, 1997, should no
19     longer be relied upon. KLA-Tencor intends to file its restated financial results and
       Annual Report on Form 10-K as quickly as practicable.*
20
       KLA-Tencor does not anticipate that the restatement will have any impact on the
21     Company's historical revenues. *Any stock-based compensation charges incurred as
       a result of the restatement would have the effect of decreasing reported income or
22     increasing reported loss from operations, and decreasing reported net income or
       increasing reported net loss, and decreasing reported retained earnings amounts
23     contained in the Company's historical financial statements for the affected
       periods.*
24
           37.    On October 3, 2006, the Company filed a Form 8-K with the SEC further detailing
25
26  the findings of the Special Committee and specifically stating that the measurement dates and the

27  grant dates for stock options issued during the Relevant Period materially differed and the Company

    would indeed restate seven years of financial statements:
28

1

2     A Special Committee of the Board of Directors of KLA-Tencor Corporation (the "Company") has delivered a report to the Board of Directors, which concluded that incorrect measurement dates were used for certain stock option grants made principally during the period from July 1, 1997 through July 30, 2002. The Board of Directors of the Company has not concluded its evaluation of the factors that led to the use of incorrect measurement dates of stock options. The Board of Directors has concluded that the Company will need to restate certain of its historical financial statements to record non-cash charges for compensation expenses relating to past stock option grants. *The Company has not determined the amount of such charges, the resulting tax and accounting impacts, the impact on internal control over financial reporting, or which specific periods may require restatement. However, the effects on previously reported financial statements are expected to be material.* The Special Committee and the Board of Directors will continue to be actively involved in reviewing information and determining the appropriate actions to be taken by the Company with respect to this matter.

3

4

5

6

7

8

9     *Accordingly, on September 27, 2006, the Board of Directors concluded that financial statements and all earnings and press releases and similar communications issued by the Company relating to periods beginning on or after July 1, 1997*, should no longer be relied upon, including the Company's financial statements for fiscal *years 1998 through 2005, the interim periods contained therein, and the fiscal quarters ended* September 30, 2005, December 31, 2005 and March 31, 2006. The Company's management and the Special Committee have discussed this matter with PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm.

10

11

12

13

14        38.    The same Form 8-K stated that the Company had taken steps to restrict or freeze the

15    exercise and sale of any stock options during the period that the investigation was ongoing and

16    imposing a "blackout" period on the acquisition of any shares under the stock option plans.

17        On September 27, 2006, KLA-Tencor Corporation (the "Company") determined that its historical financial statements for one or more prior fiscal years will have to be restated as a result of improper accounting for option grants made to officers and employees. *The specific fiscal years which will need to be restated has yet been determined. However, the Company has decided to suspend temporarily employee participation in several equity incentive programs because the S-8 registration statements covering the shares of common stock issuable under those programs incorporate one or more financial statements that will likely have to be restated.* As part of such suspension, participants in the Company's 401(k) Plan (the "401(k) Plan") will be subject to a blackout period during which they will be precluded from acquiring shares of the Company's common stock under that plan.

18

19

20

21

22

23        39.    On October 16, 2006, the Company announced that the Special Committee's

24    investigation had concluded that the Company would have to restate a *whopping $400 million in*

25    *compensation expense*. Moreover, the Company specifically implicated defendant Schroeder in the

26    scheme, terminating all relationships with Schroeder immediately.   Schroeder had been the

27    Company's President and Chief Operating Officer ("COO"), Chief Executive Officer ("CEO") and a

28    member of the Board between 1995-2005. The Company also fired its General Counsel, defendant

1    Nichols.   In addition, the Company canceled all backdated stock options held by defendant

2    Schroeder and repriced options held by Nichols:

3        **KLA-Tencor Announces Results of Special Committee Investigation of Historical Stock Option Practices**

4

5        Stock-Based Compensation Expenses Not Expected to Exceed $400 Million

6        SAN JOSE, California, October 16, 2006 KLA -- Tencor Corporation (NASDAQ: KLAC) today announced that the Special Committee investigation of the Company's historical stock option practices has been substantially completed.  As previously announced, the Company's Board of Directors concluded that incorrect measurement dates for certain stock option grants were used for financial accounting purposes, principally during the period July 1, 1997 through June 30, 2002, and as a result, the Company will restate its financial statements to correct the accounting for retroactively priced stock options.  *The Company now anticipates that the total additional non-cash charges for stock-based compensation expenses will not exceed $400 million.*

7

8

9

10

11       *As a result of the investigation, the Company has terminated all aspects of its employment relationship with Kenneth L. Schroeder, effective immediately. Mr. Schroeder was President and Chief Operating Officer of the Company from 1991 to 1999 and Chief Executive Officer and a member of the Board of Directors from 1999 through 2005.*

12

13

14       *The Company also announced that its General Counsel, Stuart J. Nichols, has resigned, effective immediately.  Mr. Nichols had been Vice President and General Counsel of the Company since 2000. . . .*

15

16       *The Company further announced its intention to cancel all outstanding retroactively priced stock options held by Mr. Schroeder and to re-price all outstanding retroactively priced stock options held by Mr. Nichols.  The exercise price of each re-priced option will be increased to the fair market value on the corrected measurement date.*

17

18

19       40.    The Company also indicated that it had found no wrongdoing by current members of

20    management (though Levy simultaneously "retired"), but repriced options held by Kispert because

21    he was the Chief Financial Officer ("CFO") during the Relevant Period and likely received

22    backdated stock options.

23       Based on the Special Committee's investigation, the Board of Directors concluded that there was no involvement in the improper stock option practices by any current members of Company management, including Richard P. Wallace, John H. Kispert and Jeffrey L. Hall, who became Chief Executive Officer, Chief Operating Officer and Chief Financial Officer, respectively, in early 2006.  *Although the Board of Directors concluded that Mr. Kispert was not involved in the improper stock option practices, based on the Special Committee's recommendation, his outstanding retroactively priced options will be re-priced* (in the manner described above) because he served as Chief Financial Officer during part of the period in question. While the Company is evaluating whether the factors that led to the restatement constituted a material weakness as of June 30, 2006, *the Company believes that it*

24

25

26

27

28

1    *has in place the necessary internal controls to ensure proper accounting for stock*
2    *options going forward.*

3    The Special Committee will now concentrate its efforts on assisting the Company's
     management with the restatement of the Company's affected financial statements.
     The restatement process is well underway, and the Company will continue to work
4    diligently to determine the exact amount of additional non-cash charges for stock-
     based compensation expenses, the resulting accounting and tax impact, and the
5    specific prior periods requiring restatement, and to file its Annual Report on Form
     10-K for the fiscal year ended June 30, 2006, as well as other required reports, as
6    soon as practicable.

7        41.    On October 17, 2006, the Company announced additional executive departures due to

8    the options backdating scandal, specifically, the Company's long-time Chairman of the Board and

9    founder, defendant Levy.  The Company further admitted that defendant Levy also received

10   backdated stock options and that the Company would reprice stock options that he received as part

11   of the scheme:

12   **KLA-Tencor Announces Retirement of Board Chairman Kenneth Levy**

13                                *    *    *

14   SAN JOSE, California, October 17, 2006 -- KLA-Tencor Corporation (NASDAQ:
     KLAC) today announced that Kenneth Levy, Founder and Chairman of the Board,
15   has informed the Company that he is retiring as a Director and employee, effective
     immediately.  Mr. Levy was a member of the Board of Directors of the Company
16   since 1975, Chairman of the Board since 1999, and Chief Executive Officer from
     1975 to 1997 and from mid 1998 to mid 1999.

17                                *    *    *

18
     *The Company separately announced results of the investigation by the Special*
19   *Committee of the Board of Directors of the Company's historical stock option*
     *practices.  Based upon that investigation, the Company intends to re-price all*
20   *outstanding retroactively priced options by Mr. Levy and certain other former and*
     *current executives of the Company.  The exercise price of each re-priced option*
21   *will be increased to the fair market value on the corrected measurement date.*

22       42.    On November 15, 2006, the Company announced that it was still unable to file its

23   financial statements and had received yet another notice from NASDAQ of its non-compliance.

24       43.    On January 29, 2007, the Company filed its form 10-K for the fiscal year ending

25   June 30, 2006 with the SEC. The form 10- K included restated financials statement covering 1994-

26   2006. In addition, the Company admitted that the during the Special Committee's investigation they

27   indeed discovered that stock options had been retroactively priced for all employees who received

28   grants:

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 16 -

1
2
3
4

*As a result of an investigation of our historical stock option practices by a Special Committee of our Board of Directors . . . we discovered that certain of our stock options, primarily those granted from July 1, 1997 to June 30, 2002, had been retroactively priced for all employees who received these grants (less than 15% of these options were granted to executive officers). This means that the option exercise price was not the market price of the option shares on the actual grant date of the option, but instead was a lower market price on an earlier date.*

5
6
7
8

*The actual grant date—when the essential actions necessary to grant the option were completed, including the final determination of the number of shares to be granted to each employee and the exercise price—is the correct measurement date to determine the market price of the option shares under the accounting rules in effect at the time. More than 95% of the total in-the-money value (market price on the actual grant date minus exercise price) of all of our retroactively priced options was attributable to those granted from July 1, 1997 to June 30, 2002.*

9      44.    In addition to admitting that option grants had been backdated during the Relevant

10   Period, the Company, in its January 29, 2007 form 10- K, admitted that the Company had failed to

11   properly apply APB Opinion No. 25 which requires that a compensation expense be taken for

12   options whose exercise price is lower that the market price on the date of the grant, thus requiring

13   restatement of $348 million for the period of 1994-2005 compensation expense:

14
15
16
17
18
19
20

*Because each of our retroactively priced options had an exercise price below the market price on the actual grant date, there should have been a charge for each of these options under APB Opinion No. 25 equal to the number of option shares, multiplied by the difference between the exercise price and the market price on the actual grant date. That expense should have been amortized over the vesting period of the option. Starting in our fiscal year ended June 30, 2006, we adopted SFAS No. 123(R), "Share-Based Payment." As a result, for fiscal year 2006, the additional stock-based compensation expense required to be recorded for each retroactively priced option was equal to the incremental fair value of these options on the actual grant date over the remaining vesting period of the option. We did not record these stock-based compensation expenses under APB Opinion No. 25 or SFAS No. 123(R) related to our retroactively priced options in our previously issued financial statements, and that is why we are restating them in this filing.*

21
22
23
24

*To correct our past accounting for stock options, we recorded additional pre-tax, non-cash, stock-based compensation expense of (a) $348 million for the periods July 1, 1994 to June 30, 2005 under APB Opinion No. 25 and (b) $22 million for the year ended June 30, 2006 under SFAS No. 123(R). We expect to amortize an additional $6 million of such pre-tax charges under SFAS No. 123(R) in future periods to properly account for past retroactively priced option grants.*

25     45.    The Company further detailed the Special Committee's findings, including its

26   findings that the retroactive price of stock options was intentional and involved the falsification of

27   Company records, and the 10-K revealed that "Management reviewed the findings of the Special

28   Committee and conducted its own internal review of our past stock option grants and other aspects

1  of our historical financial statements.  Management agrees with the Special Committee . . . ."  The

2  10K detailed their findings as follows:

3      *By October 16, 2006, the Special Committee had substantially completed its investigation. The Special Committee concluded that*

4

5      *(1) there was retroactive pricing of stock options granted to all employees who received options, primarily during the periods from July 1, 1997 to June 30, 2002 (less than 15% of these options were granted to executive officers),*

6

7      *(2) the retroactively priced options were not accounted for correctly in our previously issued financial statements,*

8      *(3) the retroactive pricing of options was intentional, not inadvertent or through administrative error,*

9

10      *(4) the retroactive pricing of options involved the selection of fortuitously low exercise prices by certain former executive officers, and other former executives may have been aware of this conduct,*

11

12      *(5) the retroactive pricing of options involved the falsification of Company records, resulting in erroneous statements being made in financial and other reports previously filed with the SEC, as well as in information previously provided to our independent registered public accounting firm, and*

13

14      *(6) in most instances, the retroactive pricing of options violated the terms of our stock option plans.  Because virtually all holders of retroactively priced options issued by the Company were not involved in or aware of the retroactive pricing, the Board of Directors decided that we should continue to honor the options that violated the terms of our stock option plans, except in certain individual cases as described below.*

15

16

17

18      *The Special Committee concluded that, with a few immaterial exceptions, the retroactive pricing of stock options stopped after June 30, 2002.  After that time, there were procedures in place designed to provide reasonable assurance that stock options were priced on the grant date.  The Special Committee also concluded that none of our independent Directors was involved in or aware of the retroactive pricing of stock options.  Based on the Special Committee's report, our Board of Directors concluded that no current members of management were involved in the retroactive pricing of stock options.  During its investigation* of our historical stock option practices, the Special Committee did not find evidence of any other financial reporting or accounting issues.

19

20

21

22

23      46.      With respect to certain individuals alleged herein to have either participated in the

24  issuance of or received backdated stock options, the Company made the following disclosures with

25  respect to Defendants Levy, Schroeder, Nichols, Kispert, Tomkins and Wallace.  More specifically,

26  the Company cancelled all outstanding stock options to held by Schroeder and repriced stock options

27  that were issued to defendants Levy, Nichols, Tomkins, Wallace and Kispert:

28

Schroeder

*As a result of the Special Committee investigation, on October 16, 2006, we terminated our employment relationship and agreement with Kenneth L. Schroeder, and we announced our intent to cancel all outstanding stock options held by Mr. Schroeder that were retroactively priced or otherwise improperly granted. Those options [596, 740] were canceled in December 2006. . . .*

. . . Accordingly, in the second quarter of fiscal 2007 we will reverse approximately $20 million of the non-cash, stock-based compensation charge recorded in prior periods. In December 2006, we canceled 596,740 vested option shares held by Mr. Schroeder as of the time of termination, representing those shares that had been retroactively priced or otherwise improperly granted.

Nichols

Also on October 16, 2006, Stuart J. Nichols, Vice President and General Counsel, resigned. Mr. Nichols and we entered into a Separation Agreement and General Release under which *Mr. Nichols' outstanding retroactively priced stock options have been re-priced by increasing the exercise price to the market price of the option shares on the actual grant date.*

Levy

On October 16, 2006, Kenneth Levy, Founder and Chairman of the Board of Directors of the Company, retired as a director and employee, and was named Chairman Emeritus by our Board of Directors. *Mr. Levy and we entered into a Separation Agreement and General Release under which Mr. Levy's outstanding retroactively priced stock options have been re-priced by increasing the exercise price to the market price of the option shares on the actual grant date.*

Tompkins

On December 21, 2006, Jon D. Tompkins resigned as a director of the Company, and we agreed to modify the outstanding options held by Mr. Tompkins (all of which were fully vested) to extend the post-termination exercisability period to December 31, 2007, which is the last day of the calendar year in which those options would have terminated in the absence of such extension. . . .

Kispert

Although the Board of Directors concluded that John H. Kispert, our President and Chief Operating Officer, was not involved in and was not aware of the improper stock option practices, *based on the Special Committee's recommendation, his outstanding retroactively priced options have been re-priced because he served as Chief Financial Officer during part of the period in question. This re-pricing involved increasing the exercise price to the market price of the option shares on the actual grant date.*

47.     Finally, with respect to the some of the tax implications caused by the backdated stock options and the Company's failure to properly account for them, the Company stated that it

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW     - 19 -

1  will pay bonuses to defendant Wallace and to non officers to address adverse consequences of

2  backdated stock options:

> Three of the Company's option holders were subject to the December 31, 2006
> deadline described above. Accordingly, in December 2006, the Company offered to
> amend the 409A Affected Options held by Mr. Wallace, the Company's Chief
> Executive Officer, and two former executive officers to increase the exercise price so
> that these options will not subject the option holder to a penalty tax under IRC
> Section 409A. All three individuals accepted the Company's offer. In addition, the
> Company agreed to pay each of the three individuals a cash bonus in January 2008
> equal to the aggregate increase in the exercise prices for his amended options. For
> Mr. Wallace, the amount of this bonus is $0.4 million. The Company plans to take
> similar actions with respect to the outstanding 409A Affected Options granted to
> non-officers as soon as possible after the filing of this Report. The Company
> estimates that the total cash payments needed to deal with the adverse tax
> consequences of retroactively priced options granted to non-officers will be
> approximately $30 million.

> With respect to the individuals whose options were canceled or re-priced by the
> Company following the Special Committee investigation, no bonuses of the type
> described above will be paid.

48.    Defendants' gross mismanagement and malfeasance over the past decade has exposed

KLA-Tencor and its senior executives to criminal and civil liability for issuing false and misleading

financial statements.  Specifically, Defendants caused or allowed KLA-Tencor to issue statements

that failed to disclose or misstated the following: (a) that the Company had material weaknesses its

internal controls that prevented it from issuing accurate financial reports and projections; (b) that

because of improperly recorded stock-based compensation expenses, the Company's financial results

violated GAAP; and (c) that the Company's public disclosures presented an inflated view of KLA-

Tencor's earnings and earnings per share ("EPS").

49.    Defendants' malfeasance and mismanagement during the Relevant Period has

wreaked millions of dollars of damages on KLA-Tencor.  The Company's senior executives were

incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced

stock options and to issue false financial statements to cover up their misdeeds.  Defendants' breach

of fiduciary duties in the administration of the Company's stock option plans so polluted the plans

with grant date manipulations as to void all grants made pursuant to the plans.  Meanwhile, certain of

the Defendants, who received under-priced stock options and/or knew material non-public

information regarding KLA-Tencor's internal control problems, abused their fiduciary relationship

1   with the Company by selling over $259 million worth of their personally held shares at artificially

2   inflated prices during the Relevant Period. This action seeks recovery for KLA-Tencor against these

3   faithless fiduciaries, as KLA-Tencor's Board, as currently composed, is simply unable or unwilling

4   to do so as more fully set in the Derivative Demand Futility Allegations, *infra*, ¶¶165-169.

5       50.    At the time the first derivative action was commenced, the KLA-Tencor Board

6   consisted of nine directors: Levy, Barnholt, Wallace, Kaufman, Urbanek, Bond, Tompkins, David

7   Wang ("Wang") and Bingham.    Eight of these directors are incapable of independently and

8   disinterestedly considering a demand to commence and vigorously prosecute the derivative actions:

9           (a)    Defendants Levy, Tompkins and Wallace are incapable because they received

10  backdated stock options, and they are directly interested in the improperly backdated stock option

11  grants complained of herein, as recipients thereof. These defendants also sold hundreds of thousands

12  of shares of KLA-Tencor stock for millions of dollars in insider trading proceeds (*see supra*, ¶27);

13          (b)    Bond, Barnholt and Urbanek are incapable because, as members of the

14  Compensation Committee, each directly participated in and approved the improper backdating of

15  stock options, as alleged herein, or misrepresented and falsely assured the Company shareholders

16  that KLA-Tencor stock options were issued at fair market value on the date of the grant. They

17  indeed were the Board members who purported but failed to *"review[] . . . the Company's executive*

18  *compensation policy and administer[] the Company's . . . equity benefit plan"* under which stock

19  options were granted. Moreover, by colluding with Defendants and others, as alleged herein, Bond,

20  Barnholt and Urbanek have demonstrated that they are unable and unwilling to act independently of

21  Defendants; and

22          (c)    All of the members of the Audit Committee, including Bingham, Bond and

23  Kaufman, are incapable because as veteran members of the Audit Committee, they directly

24  participated in and approved the Company's knowing violations of GAAP and IRS Code §162(m),

25  as alleged herein. Defendant Bingham was represented to shareholders as being a "financial expert,"

26  and has been Chairman of the Audit Committee for the last five years. Moreover, by colluding with

27  Defendants and others, as alleged herein, Bingham, Bond and Kaufman have demonstrated that they

28  are unable and unwilling to act independently of Defendants.

1

**INTRADISTRICT ASSIGNMENT**

2          51.      A substantial part of the events or omissions which give rise to the claims in this

3   action occurred in the county of Santa Clara, and as such this action is properly assigned to the San

4   Jose division of this Court.

5

**JURISDICTION AND VENUE**

6          52.      The claims asserted herein arise under §§10(b), 14(a) and 20(a) of the Exchange Act,

7   15 U.S.C. §§78j(b), 78n(a) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated

8   thereunder, and under California and Delaware law for violations of breach of fiduciary duty, abuse

9   of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement. In

10   connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or

11   indirectly, used the means and instrumentalities of interstate commerce, the United States mail and

12   the facilities of a national securities market.

13          53.      This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15

14   U.S.C. §78aa, as well as 28 U.S.C. §§1331 and 1337. This Court also has supplemental jurisdiction

15   over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

16          54.      This action is not a collusive one to confer jurisdiction on a court of the United States

17   which it would not otherwise have.

18          55.      Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa,

19   as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and

20   dissemination of materially false and misleading information, occurred in substantial part in this

21   District. KLA-Tencor is located in and conducts its business in this District. Further, Defendants

22   conduct business in this District, and are citizens of California and reside in this District.

23

**PARTIES**

24          56.      Plaintiff Alaska Electrical Pension Fund is, and at times relevant hereto was, a

25   shareholder of nominal party KLA-Tencor. During the Relevant Period, the Company had more

26   than 500 shareholders of record.

27          57.      Nominal party KLA-Tencor is a supplier of process control and yield management

28   solutions for the semiconductor and related microelectronics industries. The Company's portfolio of

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 22 -

1  products, software, analysis, services and expertise is designed to help integrated circuit

2  manufacturers manage yield throughout the entire fabrication process, from research and

3  development to final mass-production yield analysis. The Company was founded in July 1975 as

4  KLA Instruments Corporation. In May 1997, KLA Instruments merged with Tencor Instruments –

5  another longtime leader in semiconductor industry – and changed its name to KLA-Tencor.

6      58.    Defendant Levy has been Chairman of the Board of KLA-Tencor since July 1999.

7  Levy is the founder of KLA Instruments and at all times has served as a director of the Company.

8  Levy served as the CEO of KLA Instruments from its inception until its merger with Tencor

9  Instruments in May 1997. From July 1998 to June 1999, Levy served as CEO of KLA-Tencor. At

10  all relevant times, Levy actively participated in the management of KLA-Tencor's daily business

11  affairs and finances. He also actively participated in the preparation, review and approval of KLA-

12  Tencor's publicly reported financial results and financial statements for Fiscal Years ("FY")[5] 1995-

13  2005, as well as the corresponding reports on SEC Form 10-K and press releases. By reason of his

14  executive positions with the Company, Board membership and ownership of KLA-Tencor stock,

15  Levy was a controlling person of KLA-Tencor and had the power and influence, and exercised the

16  same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein. Based on his

17  knowledge of material non-public information regarding the Company, defendant Levy violated Cal.

18  Corp. Code §§25402 and 25502.5 by selling 2.28 million KLA-Tencor shares for insider trading

19  proceeds of more than $111 million.

20      59.    Defendant Schroeder was from 1991 to 1999 President and COO of the Company.

21  He was a CEO of the Company. During the Relevant Period, Schroeder was also a director of KLA-

22  Tencor from July 1, 1999, until he retired from the Company effective January 1, 2006. Schroeder

23  initially joined KLA Instruments in 1979 and left in 1987. Schroeder returned to KLA Instruments

24  in 1991. From November 1991 to July 2002 Schroeder held the position of President of the

25  Company. He again held the position of President from May 2004 to July 2005. At all relevant

26  

27  [5]    KLA-Tencor's fiscal year ends June 30. Accordingly, the Company's FY 1995 started July 1, 1994 and ended June 30, 1995.

28  

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 23 -

1    times, Schroeder actively participated in the management of KLA-Tencor's daily business affairs

2    and finances. He also actively participated in the preparation, review and approval of KLA-Tencor's

3    publicly reported financial results and financial statements for FY 1995-2005, as well as the

4    corresponding reports on SEC Form 10-K and press releases. By reason of his executive positions

5    with the Company, Board membership and ownership of KLA-Tencor stock, Schroeder was a

6    controlling person of KLA-Tencor and had the power and influence, and exercised the same, to

7    cause KLA-Tencor to engage in the conduct detailed with particularity herein. Based on his

8    knowledge of material non-public information regarding the Company, defendant Schroeder violated

9    Cal. Corp. Code §§25402 and 25502.5 by selling 1.25 million KLA-Tencor shares for insider trading

10    proceeds of more than $64 million.

11        60.    Defendant Wallace is the current CEO and a director of KLA-Tencor. Defendant

12    Wallace, during the Relevant Period and since 2000, was Executive Vice President ("EVP") of the

13    Company. He was appointed to his current position effective January 1, 2006. Wallace joined

14    KLA-Tencor in 1988 serving in a variety of senior management positions – most recently serving as

15    President and COO from July 2005 to January 2006. Wallace also actively participated in the

16    preparation, review and approval of KLA-Tencor's publicly reported financial results and financial

17    statements for FY 1995-2005, as well as the corresponding reports on SEC Form 10-K and press

18    releases. By reason of his executive positions with KLA-Tencor, Board membership and ownership

19    of KLA-Tencor stock, Wallace was a controlling person of KLA-Tencor and had the power and

20    influence, and exercised the same, to cause KLA-Tencor to engage in the conduct detailed with

21    particularity herein. Based on his knowledge of material non-public information regarding the

22    Company, defendant Wallace violated Cal. Corp. Code §§25402 and 25502.5 by selling 292,499

23    KLA-Tencor shares for insider trading proceeds of more than $15.5 million during the Relevant

24    Period.

25        61.    Defendant Kispert is the current President and COO of KLA-Tencor. He was

26    appointed to his current position effective January 1, 2006. Previously, Kispert served as CFO of

27    KLA-Tencor from July 2000 until his promotion to President and COO. Kispert joined KLA-Tencor

28    in 1995 serving in a variety of senior management positions. Kispert actively participated in the

1 preparation, review and approval of KLA-Tencor's publicly reported financial results and financial

2 statements for FY 1995-2005, as well as the corresponding reports on SEC Form 10-K and press

3 releases. By reason of his executive positions at the Company and ownership of KLA-Tencor stock,

4 Kispert was a controlling person of KLA-Tencor and had the power and influence, and exercised the

5 same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein. Based on his

6 knowledge of material non-public information regarding the Company, defendant Kispert violated

7 Cal. Corp. Code §§25402 and 25502.5 by selling 341,500 KLA-Tencor shares for insider trading

8 proceeds of more than $20.1 million during the Relevant Period.

9       62.    Defendant Hall is the CFO of KLA-Tencor. He was appointed to his current position

10 effective January 1, 2006. Hall joined the Company in 2000 acting as the Vice President ("VP") of

11 Finance, Mergers and Acquisitions. During the Relevant Period, Hall actively participated in the

12 preparation, review and approval of KLA-Tencor's publicly reported financial results and financial

13 statements for FY 2000-2005, as well as the corresponding reports on SEC Form 10-K and press

14 releases. By reason of his executive positions at the Company and ownership of KLA-Tencor stock,

15 Hall was a controlling person of KLA-Tencor and had the power and influence, and exercised the

16 same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein. Based on his

17 knowledge of material non-public information regarding the Company, defendant Hall violated Cal.

18 Corp. Code §§25402 and 25502.5 by selling 12,300 KLA-Tencor shares for insider trading proceeds

19 of $607,060 during the Relevant Period.

20      63.    Defendant Boehlke was, from April 1997 to 2000, EVP and CFO. Defendant

21 Boehlke joined KLA-Tencor in April 1983 as VP and General Manager of the RAPID Division.

22 During the next seven years he became Senior VP and then EVP in charge of several operating

23 divisions, including RAPID, WISARD and ATS. He was COO from August 1989 until July 1990,

24 when he became CFO. Because of Boehlke's position and history with the Company, he knew

25 adverse non-public information about the business of KLA-Tencor, as well as its finances, markets

26 and present and future business prospects, via access to internal corporate documents, conversations

27 and connections with other corporate officers and employees, attendance at management meetings,

28 and via reports and other information provided to him in connection therewith. Boehlke actively

1   participated in the preparation, review and approval of KLA-Tencor's publicly reported financial

2   results and financial statements as well as the corresponding reports on SEC Form 10-K and press

3   releases. During the Relevant Period, Boehlke received backdated stock options. In addition, during

4   the Relevant Period between August 1, 1997 and March 3, 2000, Boehlke sold 352,400 shares of

5   KLA-Tencor stock for insider trading proceeds of $14,136,130.

6        64.    Defendant Tompkins has been a director of the Company since April 1997.

7   Previously, Tompkins served as CEO from May 1997 until July 1998 and as Chairman of the Board

8   from July 1998 to June 1999. Tompkins was President, CEO and Chairman of the Board of Tencor

9   Instruments. During the Relevant Period, Tompkins actively participated in the preparation, review

10  and approval of KLA-Tencor's publicly reported financial results and financial statements for FY

11  1997-2005, as well as the corresponding reports on SEC Form 10-K and press releases. By reason of

12  his Board membership and ownership of KLA-Tencor stock, Tompkins was a controlling person of

13  KLA-Tencor and had the power and influence, and exercised the same, to cause KLA-Tencor to

14  engage in the conduct detailed with particularity herein. Based on his knowledge of material non-

15  public information regarding the Company, defendant Tompkins violated Cal. Corp. Code §§25402

16  and 25502.5 by selling 670,049 KLA-Tencor shares for insider trading proceeds of $31.5 million

17  during the Relevant Period.

18       65.    Defendant Urbanek has been a director of the Company since April 1997. From

19  August 1991 until April 1997, Urbanek was a director of Tencor Instruments prior to its merger with

20  KLA Instruments. During the Relevant Period, Urbanek actively participated in the preparation,

21  review and approval of KLA-Tencor's publicly reported financial results and financial statements for

22  FY 1997-2005, as well as the corresponding reports on SEC Form 10-K and press releases. By

23  reason of her Board membership and ownership of KLA-Tencor stock, Urbanek was a controlling

24  person of KLA-Tencor and had the power and influence, and exercised the same, to cause KLA-

25  Tencor to engage in the conduct detailed with particularity herein. Based on her knowledge of

26  material non-public information regarding the Company, defendant Urbanek violated Cal. Corp.

27  Code §§25402 and 25502.5 by selling 9,149 KLA-Tencor shares for insider trading proceeds of

28  $448,324 during the Relevant Period.

**EXHIBIT 3**
**Part 2 of 3**

1    66.    Defendant Bingham has been a director of the Company since October 1999. During

2  the Relevant Period, Bingham actively participated in the preparation, review and approval of KLA-

3  Tencor's publicly reported financial results and financial statements for FY 2000-2005, as well as

4  the corresponding reports on SEC Form 10-K and press releases. By reason of his Board

5  membership and ownership of KLA-Tencor stock, Bingham was a controlling person of KLA-

6  Tencor and had the power and influence, and exercised the same, to cause KLA-Tencor to engage in

7  the conduct detailed with particularity herein. Based on his knowledge of material non-public

8  information regarding the Company, defendant Bingham violated Cal. Corp. Code §§25402 and

9  25502.5 by selling 5,000 KLA-Tencor shares for insider trading proceeds of $263,100 during the

10  Relevant Period.

11    67.    Defendant Bond has been a director of the Company since August 2000. During the

12  Relevant Period, Bond actively participated in the preparation, review and approval of KLA-

13  Tencor's publicly reported financial results and financial statements for FY 2000-2005, as well as

14  the corresponding reports on SEC Form 10-K and press releases. By reason of his Board

15  membership and ownership of KLA-Tencor stock, Bond was a controlling person of KLA-Tencor

16  and had the power and influence, and exercised the same, to cause KLA-Tencor to engage in the

17  conduct detailed with particularity herein. Based on his knowledge of material non-public

18  information regarding the Company, defendant Bond violated Cal. Corp. Code §§25402 and 25502.5

19  by selling 5,000 KLA-Tencor shares for insider trading proceeds of $253,050 during the Relevant

20  Period.

21    68.    Defendant Barnholt has been a director of the Company since 1995. During the

22  Relevant Period, Barnholt actively participated in the preparation, review and approval of KLA-

23  Tencor's publicly reported financial results and financial statements for FY 1995-2005, as well as

24  the corresponding reports on SEC Form 10-K and press releases. By reason of his Board

25  membership and ownership of KLA-Tencor stock, Barnholt was a controlling person of KLA-

26  Tencor and had the power and influence, and exercised the same, to cause KLA-Tencor to engage in

27  the conduct detailed with particularity herein. Based on his knowledge of material non-public

28  information regarding the Company, defendant Barnholt violated Cal. Corp. Code §§25402 and

1   25502.5 by selling 29,000 KLA-Tencor shares for insider trading proceeds of $1.4 million during the

2   Relevant Period.

3       69.    Defendant Kaufman has been a director of the Company since November 2002.

4   During the Relevant Period, Kaufman actively participated in the preparation, review and approval

5   of KLA-Tencor's publicly reported financial results and financial statements for FY 2003-2005, as

6   well as the corresponding reports on SEC Form 10-K and press releases.  By reason of his Board

7   membership and ownership of KLA-Tencor stock, Kaufman was a controlling person of KLA-

8   Tencor and had the power and influence, and exercised the same, to cause KLA-Tencor to engage in

9   the conduct detailed with particularity herein.

10      70.    Defendant Elkus, during the Relevant Period and since April 1997, was a director of

11   the Company and during the Relevant Period sat on the Company's Audit Committee which was

12   responsible for overseeing the accounting and financial reporting processes.  Elkus actively

13   participated in the preparation, review and approval of KLA-Tencor's publicly reported financial

14   results and financial statements for FY 1999-2005, as well as the corresponding reports on SEC

15   Form 10-K and press releases.  Elkus also sat on the Company's Nominating and Governance

16   Committee in 2003.  By reason of his Board membership and ownership of KLA-Tencor stock,

17   Elkus was a controlling person of KLA-Tencor and had the power and influence, and exercised the

18   same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein.  During the

19   Relevant Period, Elkus violated Cal. Corp. Code §§25402 and 25502.5 by selling 155,416 shares of

20   KLA stock for proceeds of more than $7 million.

21      71.    Defendant Nichols was, during the Relevant Period, VP and General Counsel for the

22   Company. Because of Nichols' position with KLA-Tencor, he knew adverse non-public information

23   about the business of KLA-Tencor, as well as its finances, markets and present and future business

24   prospects, via access to internal corporate documents, conversations and connections with other

25   corporate officers and employees, attendance at management meetings, and via reports and other

26   information provided to him in connection therewith. Defendant Nichols actively participated in the

27   preparation, review and approval of KLA-Tencor's publicly reported financial results and financial

28   statements, as well as the corresponding reports on SEC Form 10-K and press releases.

1    72.    Defendant Chamberlain was, during the Relevant Period, a director of the Company

2    and had been a director since 1982. Chamberlain sat on the Company Compensation Committee

3    from 1995-1999, and was a member of the Company's Audit Committee in 2000. During the

4    Relevant Period, defendant Chamberlain violated Cal. Corp. Code §§25402 and 25502.5 by selling

5    81,764 shares for proceeds of $4,839,107. Because of defendant Chamberlain's position with KLA-

6    Tencor, he knew adverse non-public information about the business of KLA-Tencor, as well as its

7    finances, markets and present and future business prospects, via access to internal corporate

8    documents, conversations and connections with other corporate officers and employees, attendance

9    at management meetings, and via reports and other information provided to him in connection

10   therewith. Defendant Chamberlain actively participated in the preparation, review and approval of

11   KLA-Tencor's publicly reported financial results and financial statements during the Relevant

12   Period, as well as the corresponding reports on SEC Form 10-K and press releases.

13   73.    Defendant Schnitzer was, during the Relevant Period, EVP of the Company. From

14   June 1997 to October 1998 he was EVP, Human Resources. From July 1993 to June 1997 he was

15   Group VP responsible for RAPID, SEMSpec, Prism and manufacturing for WISARD and RAPID.

16   From 1989 to July 1993 he was VP and General Manager of the WISARD Division. Defendant

17   Schnitzer joined KLA-Tencor in July 1978 and held a series of other management positions.

18   Because of Schnitzer's position with KLA-Tencor, he knew adverse non-public information about

19   the business of KLA-Tencor, as well as its finances, markets and present and future business

20   prospects, via access to internal corporate documents, conversations and connections with other

21   corporate officers and employees, attendance at management meetings, and via reports and other

22   information provided to him in connection therewith. During the Relevant Period, defendant

23   Chamberlain violated Cal. Corp. Code §§25402 and 25502.5 by selling 471,664 shares of KLA-

24   Tencor stock for insider trading proceeds of $26,807,656.

25   74.    Defendant Dickerson, during the Relevant Period and since 1999, served as COO of

26   the Company, and President of the Company since 2002. Dickerson has held management or

27   executive management positions at the Company since 1994, including EVP of the Customer Group

28   and Group VP of the Wafer Inspection Division. Because of Dickerson's position with KLA-

1   Tencor, he knew adverse non-public information about the business of KLA-Tencor, as well as its

2   finances, markets and present and future business prospects, via access to internal corporate

3   documents, conversations and connections with other corporate officers and employees, attendance

4   at management meetings, and via reports and other information provided to him in connection

5   therewith. Defendant Dickerson actively participated in the preparation, review and approval of

6   KLA-Tencor's publicly reported financial results and financial statements, as well as the

7   corresponding reports on SEC Form 10-K and press releases. During the Relevant Period,

8   Dickerson violated Cal. Corp. Code §§25402 and 25502.5 by selling 574,000 KLA-Tencor shares

9   for more than $27 million in insider trading proceeds.

10                              **DEFENDANTS' DUTIES**

11          75.     Each officer and director of KLA-Tencor named herein owed the Company and

12   KLA-Tencor shareholders the duty to exercise a high degree of care, loyalty and diligence in the

13   management and administration of the affairs of the Company, as well as in the use and preservation

14   of its property and assets. The conduct of KLA-Tencor's directors and officers complained of herein

15   involves knowing, intentional and culpable violations of their obligations as officers and directors of

16   KLA-Tencor. Further, the misconduct of KLA-Tencor's officers has been ratified by KLA-Tencor's

17   Board, which has failed to take any legal action on behalf of the Company against them.

18          76.     By reason of their positions as officers, directors and fiduciaries of KLA-Tencor and

19   because of their ability to control the business and corporate affairs of the Company, the Defendants

20   owed KLA-Tencor and its shareholders fiduciary obligations of candor, trust, loyalty and care, and

21   were required to use their ability to control and manage KLA-Tencor in a fair, just, honest and

22   equitable manner, and to act in furtherance of the best interests of KLA-Tencor and its shareholders

23   so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. In

24   addition, as officers and/or directors of a publicly held company, the Defendants had a duty to

25   refrain from utilizing their control over KLA-Tencor to divert assets to themselves via improper

26   and/or unlawful practices. Defendants also had a duty to promptly disseminate accurate and truthful

27   information with respect to the Company's operations, earnings and compensation practices.

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 30 -

1      77.    Because of their positions of control and authority as directors or officers of KLA-

2  Tencor, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts

3  complained of herein.  As to the Defendants who served as directors, these acts include: (a)

4  agreement to and/or acquiescence in Defendants' option backdating scheme; and (b) willingness to

5  cause KLA-Tencor to disseminate false Proxy Statements for FY 1995-2005, which Proxy

6  Statements failed to disclose Defendants' option backdating scheme and omitted the fact that

7  executive officers were allowed to backdate their stock option grants in order to manipulate the

8  strike price of the stock options they received.  Because of their positions with KLA-Tencor, each of

9  the Defendants was aware of these wrongful acts, had access to adverse non-public information and

10  was required to disclose these facts promptly and accurately to KLA-Tencor shareholders and the

11  financial markets but failed to do so.

12      78.    Between FY 1995 and 2005, Defendants repeated in each Proxy Statement that the

13  stock option grants made during that period carried an exercise price that was *not less than* the fair

14  market value of KLA-Tencor stock on the date granted, as calculated by the public trading price of

15  the stock at the market's close on that date.  However, Defendants concealed until 2006 that the

16  stock option grants were repeatedly and consciously *backdated* to ensure that the strike price

17  associated with the option grants was at or near the lowest trading price for that fiscal period.  Due to

18  Defendants' breach of their fiduciary duty in the administration of the stock option plans, plaintiffs

19  seek to have the directors' and officers' plans voided and gains from those plans returned to the

20  Company.  In the alternative, plaintiffs seek to have all of the unexercised options granted to

21  Defendants between 1994 and 2002 cancelled, the financial gains obtained via the exercise of such

22  options returned to the Company and to have Defendants revise the Company's financial statements

23  to reflect the truth concerning these option grants.

24      79.    To discharge their duties, the directors of KLA-Tencor were required to exercise

25  reasonable and prudent supervision over the management, policies, practices and controls of the

26  business and financial affairs of KLA-Tencor.  By virtue of such duties, the officers and directors of

27  KLA-Tencor were required, among other things, to:

28

1        (a)     Manage, conduct, supervise and direct the business affairs of KLA-Tencor in

2 accordance with all applicable law (including federal and state laws, government rules and

3 regulations and the charter and bylaws of KLA-Tencor);

4        (b)     Neither engage in self-dealing nor knowingly permit any officer, director or

5 employee of KLA-Tencor to engage in self-dealing;

6        (c)     Neither violate nor knowingly permit any officer, director or employee of

7 KLA-Tencor to violate applicable laws, rules and regulations;

8        (d)     Remain informed as to the status of KLA-Tencor's operations, including its

9 practices in relation to the cost of allowing the pervasive backdating and improperly accounting for

10 such, and upon receipt of notice or information of imprudent or unsound practices, to make a

11 reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices

12 and make such disclosures as are necessary to comply with federal securities laws and their duty of

13 candor to the Company's shareholders;

14        (e)     Prudently protect the Company's assets, including taking all necessary steps

15 to recover corporate assets (cash, stock options) improperly paid to Company executives and

16 directors together with the related costs (professional fees) proximately caused by the illegal conduct

17 described herein;

18        (f)     Establish and maintain systematic and accurate records and reports of the

19 business and affairs of KLA-Tencor and procedures for the reporting of the business and affairs to

20 the Board and to periodically investigate, or cause independent investigation to be made of, said

21 reports and records;

22        (g)     Maintain and implement an adequate, functioning system of internal legal,

23 financial and accounting controls, such that KLA-Tencor's financial statements – including its

24 expenses, accounting for stock option grants and other financial information – would be accurate and

25 the actions of its directors would be in accordance with all applicable laws;

26        (h)     Exercise control and supervision over the public statements to the securities

27 markets and trading in KLA-Tencor stock by the officers and employees of KLA-Tencor; and

28

1          (i)    Supervise the preparation and filing of any financial reports or other

2    information required by law from KLA-Tencor and to examine and evaluate any reports of

3    examinations, audits or other financial information concerning the financial affairs of KLA-Tencor

4    and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the

5    subjects and duties set forth above.

6          80.    Each Defendant, by virtue of his or her position as a director and/or officer, owed to

7    the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of

8    due care and diligence in the management and administration of the affairs of the Company, as well

9    as in the use and preservation of its property and assets. The conduct of the Defendants complained

10   of herein involves a knowing and culpable violation of their obligations as directors and/or officers

11   of KLA-Tencor, the absence of good faith on their part, and a reckless disregard for their duties to

12   the Company and its shareholders, which Defendants were aware or should have been aware posed a

13   risk of serious injury to the Company. The conduct of the Defendants who were also officers and/or

14   directors of the Company during the Relevant Period has been ratified by the Defendants who served

15   as directors who comprised KLA-Tencor's entire Board during the Relevant Period.

16         81.    Defendants breached their duties of loyalty and good faith by allowing or by

17   themselves causing the Company to misrepresent its financial results and prospects, as detailed

18   herein *infra*, and by failing to prevent the Defendants from taking such illegal actions. In addition,

19   as a result of Defendants' illegal actions and course of conduct during the Relevant Period, the

20   Company is now the subject of an SEC investigation. As a result, KLA-Tencor has expended and

21   will continue to expend significant sums of money. Such expenditures include, but are not limited

22   to:

23         (a)    Improvidently paid executive compensation;

24         (b)    Increased capital costs as a result of the loss of market capitalization and the

25   Company's damaged reputation in the investment community;

26         (c)    Professional costs associated with the SEC's inquiry and the U.S. Attorney's

27   investigation;

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 33 -

1           (d)     Costs incurred to carry out internal investigations, including legal fees paid to

2  outside counsel; and

3           (e)     Incurring possible IRS penalties for improperly reporting compensation.

4      82.    These actions have irreparably damaged KLA-Tencor's corporate image and

5  goodwill.  For at least the foreseeable future, KLA-Tencor will suffer from what is known as the

6  "liar's discount," a term applied to the stocks of companies who have been implicated in illegal

7  behavior and have misled the investing public, such that KLA-Tencor's ability to raise equity capital

8  or debt on favorable terms in the future is now impaired.

9                   **AIDING AND ABETTING AND CONCERTED ACTION**

10     83.    In committing the wrongful acts alleged herein, Defendants have pursued or joined in

11  the pursuit of a common course of conduct, and have acted in concert with one another in

12  furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as

13  giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in

14  breach of their respective duties.

15     84.    At relevant times, Defendants collectively and individually initiated a course of

16  conduct which was designed to and did: (a) conceal the fact that the Company was over-paying its

17  directors, officers and employees and improperly misrepresenting its financial results, in order to

18  allow Defendants to artificially inflate the price of the Company's shares; (b) maintain Defendants'

19  executive and directorial positions at KLA-Tencor and the profits, power and prestige which

20  Defendants enjoyed as a result of these positions; (c) deceive the investing public, including

21  shareholders of KLA-Tencor, regarding Defendants' management of KLA-Tencor's operations, the

22  Company's financial health and stability, and future business prospects, which had been

23  misrepresented by Defendants throughout the Relevant Period; and (d) allow several of the

24  Company's officers and directors to sell millions of dollars worth of Company stock at inflated

25  prices.  In furtherance of this course of conduct, Defendants collectively and individually took the

26  actions set forth herein.

27     85.    Defendants engaged in a common course of conduct commencing by at least 1995

28  and continuing thereafter. During this time, Defendants caused the Company to conceal the true fact

1   that KLA-Tencor was over-compensating its directors, officers and employees and misrepresenting

2   its financial results.  In addition, Defendants also made other specific, false statements about KLA-

3   Tencor's financial performance and future business prospects, as alleged herein.

4          86.     The purpose and effect of Defendants' common enterprise and/or common course of

5   conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary

6   duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to

7   conceal adverse information concerning the Company's operations, financial condition, and future

8   business prospects; and to artificially inflate the price of KLA-Tencor common stock so they could:

9   (a) dispose of millions of dollars of their own stock, and (b) protect and enhance their executive and

10  directorial positions and the substantial compensation and prestige they obtained as a result thereof.

11         87.     Defendants accomplished their common enterprise and/or common course of conduct

12  by causing the Company to purposefully, recklessly or negligently grant under-priced stock options

13  and to misrepresent its financial results.  Because the actions described herein occurred under the

14  authority of the Board, each of the Defendants was a direct, necessary, and substantial participant in

15  the common enterprise and/or common course of conduct complained of herein.

16         88.     Each of the Defendants aided and abetted and rendered substantial assistance in the

17  wrongs complained of herein.  In taking such actions to substantially assist the commission of the

18  wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary

19  wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or

20  her overall contribution to and furtherance of the wrongdoing.

21                            **FACTUAL ALLEGATIONS**

22         89.     KLA-Tencor is a supplier of process control and yield management solutions for the

23  semiconductor and related microelectronics industries.  The Company's portfolio of products,

24  software, analysis, services and expertise is designed to help integrated circuit manufacturers

25  manage yield throughout the entire fabrication process, from research and development to final

26  mass-production yield analysis. The Company provides inline wafer defect monitoring; reticule and

27  photomask defect inspection; critical dimension metrology; wafer overlay; film and surface

28  measurement; and overall yield and fab-wide data analysis.

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW     - 35 -

1    90.    By law, Defendants owed KLA-Tencor a duty to ensure that the Company's financial

2  reporting fairly presented, in all material respects, the operations and financial condition of the

3  Company.   To adequately carry out these duties, it is necessary for Defendants to know and

4  understand the material non-public information to be either disclosed or omitted from the

5  Company's public statements.  This material non-public information included the problems KLA-

6  Tencor faced because of its deficient internal controls.  Furthermore, Defendants Bingham, Bond,

7  Elkus and Kaufman, as members of the Audit Committee of KLA-Tencor's Board, had a special

8  duty to know and understand this material information as set out in the Audit Committee's charter,

9  which provides that the Audit Committee is responsible for reviewing, in conjunction with

10  management, the Company's policies generally with respect to the Company's earnings press

11  releases and with respect to financial information and earnings guidance provided to Defendants as

12  KLA-Tencor's directors and officers.  In addition, Defendants Barnholt, Urbanek, and Bond, as

13  members of the Compensation Committee had a special duty to know and execute its oversight and

14  execution of the Company's stock option issuance policies.

15    91.    Moreover, Defendants had ample opportunity to discuss this material information

16  with management and fellow directors at any of the scores of Board meetings that occurred during

17  the Relevant Period as well as at committee meetings of the Board.  Despite these duties, Defendants

18  negligently, recklessly, and/or intentionally caused or allowed, by their actions or conscious

19  inactions, the misleading statements to be disseminated by KLA-Tencor to the Company's

20  shareholders.

21    92.    Specifically, the reported dates KLA-Tencor stock options were granted differed from

22  the dates on which the options were actually granted.  The practice applied to stock option grants

23  made between 1995 and 2002, which allowed directors, officers and employees to make more

24  money on their options because it set a lower "strike price" at which the options could be exercised,

25  allowing employees to pocket larger profits.

26    93.    By manipulating the grant dates, KLA-Tencor was able to provide executives and

27  employees with the lowest possible exercise price.  The lower the exercise price, the worse off KLA-

28  Tencor was because it would receive less cash for the option purchased.   However, such

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW      - 36 -

1   manipulation would allow the director, officer or other employee to increase the amount he or she

2   would pocket by a commensurate amount.  So, as insiders, Defendants were motivated to "cherry

3   pick" the dates on which the prices would be set.  Certain of KLA-Tencor's grants are described

4   below (adjusted for stock splits).

5                              **1995 False Proxy Statement**

6          94.    On October 17, 1995, the Company filed it Form 14-A Proxy Statement with the

7   SEC.  In the Proxy Statement the Company described its Stock Option Plan and administration of

8   the plan by the Board or a committee of the Board, and that generally, stock options are issued at the

9   market price on the date of the grant:

10              Grants of stock options to executive officers are based upon each officer's relative
                position, responsibilities, historical and expected contributions to the Company, and
11              the officer's existing stock ownership and previous option grants, with primary
                weight given to the executive officer's relative rank and responsibilities.  Initial stock
12              option grants designed to recruit an executive officer to join the Company may be
                based on negotiations with the officer and with reference to historical option grants
13              to existing officers.  *Stock options are granted at market price on the date of grant
                and will provide value to the executive officers only when the price of the
14              Company's Common Stock increases over the exercise price.*

15                             **1996 False Proxy Statement**

16         95.    On October 11, 1996, the Company filed its Form 14-A Proxy Statement with the

17  SEC.  The Proxy Statement made the following false and misleading statements regarding the

18  administration of the Stock Option Plan while at the same time soliciting shareholder votes for

19  amendments thereto:

20              Terms and Conditions of Options.  Each option granted under the Option Plan is
                evidenced by a written agreement between the Company and the optionee specifying
21              the number of shares subject to the option and the other terms and conditions of the
                option, consistent with the requirements of the plan.  *The exercise price of each
22              option granted under the Option Plan must equal at least the fair market value of a
                share of the Company's Common Stock on the date of grant.*

23                             **1997 False Proxy Statement**

24         96.    On October 6, 1997, the Company filed its Form 14-A Proxy Statement with the SEC

25  and distributed the same to the Company shareholders.  The Proxy Statement made the following

26  false and misleading statements regarding the administration of the Company's Stock Option Plans

27  and grants to executive officers:

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW     - 37 -

1   Grants of stock options to executive officers are based upon each executive officer's
    relative position, responsibilities, historical and expected contributions to the
2   Company, and the executive officer's previous option grants, with primary weight
    given to the executive officer's relative rank and responsibilities. *Stock options are*
3   *granted at market price on the date of grant and will provide value to the executive*
    *officers only when the price of the Company's Common Stock increases over the*
4   *exercise price.*

5                       **September 28, 1998 Proxy and 1998 Option Grants**

6       97.    On September 28, 1998, the Company filed a Form 14-A Proxy Statement with the

7   SEC.  The Proxy Statement made the following false and misleading statements regarding the

8   Company Stock Option Plans:

9   COMPENSATION OF DIRECTORS

10  . . . . The Company's Outside Directors Stock Option Plan (the "Director Plan") as
    adopted by the Board of Directors and approved by the stockholders, provides for the
11  grant of an option to purchase 2,500 shares of Common Stock of the Company to
    each of the Company's non-employee directors on the date on which such person is
12  elected a director. . . . *The Director Plan provides that the exercise price shall be*
    *equal to the fair market value of the Common Stock on the date of grant of the*
13  *option. . . .*

14          . . . *The 1998 Director Plan provides that the exercise price shall be equal to*
    *the fair market value of the Common Stock on the date of grant of the option.*
15  *Options granted under the 1998 Director Plan shall become exercisable*
    *immediately upon the date of grant.*
16
                                    *           *           *
17
    *Grants of stock options to executive officers* are based upon each executive officer's
18  relative position, responsibilities, historical and expected contributions to the
    Company, and the executive officer's existing stock ownership and previous option
19  grants, with primary weight given to the executive officer's relative rank and
    responsibilities. *Stock options are granted at market price on the date of grant and*
20  *will provide value to the executive officers only when the price of the Company's*
    *Common Stock increases over the exercise price.*
21
        98.    Defendants dated many of KLA-Tencor's 1998 option grants as of August 31, 1998,
22
    at $10.625 per share – *not only the low for the month but also for the year.*  The stock traded
23
    between $10.625 and $16.1563 per share during August 1998.  The stock traded between $10.625
24
    and $24.00 per share during 1998.  Defendants Levy and Schroeder each received 204,272 options at
25
    $10.625 per share.  Also, on August 31, 1998, defendant Tompkins received 50,809 options,
26
    defendant Boehlke received 54,436 options, defendant Schnitzer received 54,436 options and
27
    defendant Dickerson received 62,882 options.
28

1
2
3
4
5
6
7
8
9
10
11
12
13



14 <center>**October 15, 1999 Proxy and 1999 Option Grants**</center>

15      99.     On October 15, 1999, the Company filed its Form 14-A Proxy Statement. The Proxy

16 Statement reiterated the material terms of stock option grants, including the statement that the

17 "exercise price of the options is the fair market value of the common stock on the date of grant."

18 Grants of stock options to executive officers are based upon each executive officer's responsibilities,

19 historical and expected contributions to the Company, and the executive officer's existing stock

20 ownership and previous option grants, with primary weight given to the executive officer's relative

21 rank and responsibilities.

22          Stock options are granted at market price on the date of grant and provide value to
            the executive officers only when the price of the Company's Common Stock
23          increases over the exercise price.

24      100.     Defendants dated KLA-Tencor's 1999 option grants as of October 27, 1999, at $33.75

25 per share – nearly the lowest price at which the stock traded that month, when the stock traded

26 between $33.125 and $39.5938 per share.  Defendants Levy and Schroeder received 90,000 and

27 150,000 options, respectively, at this price.  In addition, on October 27, 1999, defendants Tompkins

28

1  received 10,000 options, Boehlke received 60,000 options, Dickerson received 100,000 options and

2  Schnitzer received 50,000 options.



**October 6, 2000 Proxy Statement and 2000 Option Grants**

101.    The October 6, 2000 Proxy Statement made the following false and misleading

statements regarding the administration and issuance of stock option grants to executive officers:

> Grants of stock options to executive officers are based upon each executive officer's
> relative position, . . . ***Stock options are granted at market price on the date of grant
> and will provide value to the executive officers only when the price of the
> Company's Common Stock increases over the exercise price***.

102.    Defendants dated KLA-Tencor's 2000 option grants on several dates, including one

which was the lowest price for the year. Defendants Levy and Schroeder received 37,901 and

75,800 options, respectively, at $44.69 per share on August 11, 2000, nearly the lowest price at

which the stock traded that month, when the stock traded between $42.375 and $65.625 per share.

Defendants Levy and Schroeder received 18,951 and 37,900 options, respectively, at $26.25 per

share on November 10, 2000; defendant Tompkins (10,000) and defendant Dickerson (32,500) also

received grants on November 10, 2000 – ***not only the low for the month but also the low for the

year***. The stock traded as high as $33.50 during the month and as high as $97.4375 during the year:





**September 28, 2001 Proxy Statement and 2001 Option Grants**

     103.   On September 28, 2001, the Company filed its Form 14-A Proxy Statement with the SEC. The Proxy Statement made the following false and misleading statement regarding the issuance of stock options to executive officers:

> Grants of stock options to executive officers are based upon each executive officers' relative position, responsibilities, historical and expected contributions to the

1    Company, and the executive officer's existing stock ownership and previous option
     grants, with primary weight given to the executive officer's relative rank and
2    responsibilities. *Stock options are granted at market price on the date of grant and
     will provide value to the executive officers only when the price of the Company's
3    Common Stock increases over the exercise price*.

4        104.    On the same September 28, 2001 Proxy Statement, the Company's Audit Committee

5    issued a report providing substantial assurances that it had comprehensively reviewed and discussed

6    the Company's financial statements and internal controls prior to approving the financial statements.

7        During each of its five meetings during fiscal year 2001, the Audit Committee met
         with the senior members of the Company's financial management team, the
8        independent auditors and the Company's General Counsel when appropriate. The
         Audit Committee's chairman was responsible for preparing an agenda for each
9        meeting. *During the Committee's private sessions, the Audit Committee met with
         the Company's independent auditors and separately with the Company's Chief
10       Financial Officer. The parties candidly discussed financial management,
         accounting and internal controls*.

11

12       105.    Further, Defendants dated KLA-Tencor's 2001 option grants on several dates,

13   including two which were at the lowest price of the month in which the options were granted.

14   Defendants Levy, Schroeder and Dickerson received 18,951, 37,900 and 32,500 options,

15   respectively, at $32.75 per share on April 4, 2001 – *the low of the month*. The stock traded as high

16   as $54.96 per share in April 2001. Defendants Levy, Schroeder, Kispert and Dickerson received

17   28,425, 341,100, 60,000 and 105,000 options, respectively, at $29.31 per share dated October 2,

18   2001 – *again the low for the month*. The stock traded as high as $45.25 per share in October 2001:

19

20

21

22

23

24

25

26

27

28





106.    On September 25, 2002, the Company filed its Form 14-A Proxy Statement with the SEC. The Proxy Statement made the following false and misleading statements regarding issuance of stock options to executive officers:

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 43 -

Grants of stock options to executive officers . . . ***Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price.***

107.    Defendants dated KLA-Tencor's 2002 option grants as of November 8, 2002, at $37.05 per share – nearly the lowest price at which the stock traded that month, when the stock traded between $34.97 and $45.80 per share. Defendants Schroeder, Kispert and Wallace received 31,450, 12,500 and 12,500 options, respectively, at this price:



**KLA-Tencor**
**October 8, 2002 - December 9, 2002**

## THE STOCK OPTION BACKDATING SCHEME AND ITS IMPACT ON KLA-TENCOR'S FINANCIAL STATEMENTS

108.    Since FY 1995, Defendants caused KLA-Tencor to report false and misleading financial results which materially understated its compensation expenses and thus overstated its earnings as follows:

| Fiscal Year | Reported Earnings (in millions) | Reported Diluted EPS |
|---|---|---|
| 1995 | $105 | $1.34 |
| 1996 | $197 | $1.17 |
| 1997 | $105 | $0.62 |
| 1998 | $134 | $0.76 |
| 1999 | $39 | $0.22 |
| 2000 | $253 | $1.32 |
| 2001 | $67 | $0.34 |
| 2002 | $216 | $1.10 |
| 2003 | $137 | $0.70 |
| 2004 | $244 | $1.21 |
| 2005 | $467 | $2.32 |
| 1Q-3Q 2006 | $251 | $1.23 |

109.    In effect, between 1995 and 2006, Defendants caused KLA-Tencor shares to trade at artificially inflated levels by issuing a series of materially false and misleading statements regarding the Company's financial results. These financial results misrepresented and omitted to disclose that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and that because of improperly recorded stock-based compensation expenses the Company's publicly reported financial statements and results presented an inflated view of KLA-Tencor's earnings and EPS.

**The FY 1995 Form 10-K**

110.    On September 27, 1995, the Company filed its FY 1995 Form 10-K with the SEC signed by William Turner ("Turner"), Levy, Schroeder, Boehlke, Barnholt, Chamberlain, Samuel Rubinovitz ("Rubinovitz") and Yoshio Nishi ("Nishi"). The FY 1995 Form 10-K was simultaneously distributed to shareholders and the public. The FY 1995 Form 10-K included KLA-Tencor's FY 1995 financial statement which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, KLA-Tencor's compensation expense was understated and its net earnings were overstated.

111.    The September 27, 1995 Form 10-K falsely stated that the Company issued stock options in compliance with the Company's 1982 Stock Option Plan and that options issued under said plan were issued by the Board Of Directors at "not less than fair market value on the date of the grant" as follows:

Under the 1982 Stock Option Plan, as amended, 6,350,000 shares have been reserved for issuance to eligible employees and directors as either Incentive Stock Options

1    (ISO's) or nonqualified options. ***Options under this plan are granted at prices***
2    ***determined by the Board of Directors, but not less than the fair market value on***
     ***the date of grant . . . .***

3                                    **The FY 1996 Form 10-K**

4           112.    On September 27, 1996, the Company filed its FY 1996 Form 10-K with the SEC

5    signed by Turner, Levy, Schroeder, Boehlke, Barnholt, Chamberlain, Robert Lorenzini, Nishi,

6    Rubinovitz and Dag Tellefsen ("Tellefsen").   The FY 1996 Form 10-K was simultaneously

7    distributed to shareholders and the public. The FY 1996 Form 10-K included KLA-Tencor's FY

8    1996 financial statements which were materially false and misleading and presented in violation of

9    GAAP, due to improper accounting for the backdated stock options.   As a result, KLA-Tencor's

10   compensation expense was understated and its net earnings were overstated.

11          113.    The September 27, 1996 Form 10-K made the following false and misleading

12   statement regarding the issuance of stock options under the Company's 1982 Stock Option Plan and

13   specifically and falsely stated that options were issued at not less than fair market value on the date

14   of the grant:

15          Under the 1982 Stock Option Plan, as amended, 14,900,000 shares have been
            reserved for issuance to eligible employees and directors as either Incentive Stock
16          Options (ISO's) or nonqualified options. ***Options under this plan are granted at***
            ***prices determined by the Board of Directors, but not less than the fair market value***
17          ***on the date of grant, and expire ten years after the date of grant***.

18                                   **The FY 1997 Form 10-K**

19          114.    On September 29, 1997, the Company filed its FY 1997 Form 10-K with the SEC

20   signed by Levy, Tompkins, Schroeder, Boehlke, James Bagley ("Bagley"), Barnholt, Chamberlain,

21   Elkus, Dean Morton ("Morton"), Nishi, Rubinovitz, Urbanek and Tellefsen. The FY 1997 Form 10-

22   K was simultaneously distributed to shareholders and the public. The FY 1997 Form 10-K included

23   KLA-Tencor's FY 1997 financial statements which were materially false and misleading and

24   presented in violation of GAAP, due to improper accounting for the backdated stock options. As a

25   result, KLA-Tencor's compensation expense was understated and its net earnings were overstated.

26          115.    The September 29, 1997 Form 10-K made the following false and misleading

27   statement regarding the Company's issuance of employee stock options in compliance with the

28   applicable Stock Option Plan stating that stock options were granted at fair market value on the grant

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 46 -

1    date, and that the Company properly accounted for stock options under APB Opinion No. 25 as

2    follows:

3        Stock-Based Compensation Plans

4        *The Company accounts for its stock option plans and employee stock purchase*
         *plan in accordance with provisions of the Accounting Principles Board's Opinion*
5        *No. 25 (APB OPINION NO. 25), "Accounting for Stock Issued to Employees."*
         *The Company's policy is to grant options at the fair market value on the date of*
6        *grant. Accordingly no compensation expense has been recorded.*

7                              **The FY 1998 Form 10-K**

8        116.    On September 29, 1998, the Company filed its FY 1998 Form 10-K with the SEC.

9    The FY 1998 Form 10-K was simultaneously distributed to shareholders and the public.  The

10   September 29, 1998 Form 10-K was signed by Levy, Tompkins, Schroeder, Boehlke, Bagley,

11   Barnholt, Chamberlain, Elkus, Morton, Nishi, Rubinovitz and Urbanek. The FY 1998 Form 10-K

12   included KLA-Tencor's FY 1998 financial statements which were materially false and misleading

13   and presented in violation of GAAP, due to improper accounting for the backdated stock options.

14   As a result, KLA-Tencor's compensation expense was understated and its net earnings were

15   overstated.  The Form 10-K also falsely stated that the Company properly accounted for stock

16   options under APB Opinion No. 25:

17       STOCK-BASED COMPENSATION PLANS

18       *The Company accounts for its employee stock option plans and employee stock*
         *purchase plan in accordance with provisions of the Accounting Principles Board's*
19       *Opinion No. 25 (APB OPINION NO. 25),* "Accounting for Stock Issued to
         Employees."
20
                              **The FY 1999 Form 10-K**
21
         117.    On September 28, 1999, the Company filed its FY 1999 Form 10-K with the SEC.
22
     The FY 1999 Form 10-K was simultaneously distributed to shareholders and the public signed by
23
     Levy, Schroeder, Boehlke, Bagley, Barnholt, Chamberlain, Elkus, Morton, Rubinovitz and
24
     Tompkins. The FY 1999 Form 10-K included KLA-Tencor's FY 1999 financial statements which
25
     were materially false and misleading and presented in violation of GAAP, due to improper
26
     accounting for the backdated stock options. As a result, KLA-Tencor's compensation expense was
27
     understated and its net earnings were overstated.
28

1       118.    The Form 10-K also made the specific false and misleading statement that the

2 Company properly accounted for stock options in accordance with APB Opinion No. 25:

3       STOCK-BASED COMPENSATION PLANS

4       ***The Company accounts for its employee stock option plans and employee stock***

      ***purchase plan in accordance with provisions of the Accounting Principles Board's***

5       ***Opinion No. 25***, "Accounting for Stock Issued to Employees." The Company

      provides additional proforma disclosure required by Financial Accounting Standard

6       (SFAS) No. 123, "Accounting for Stock-Based Compensation" (*see* Note 6).

7                        **The FY 2000 Form 10-K**

8       119.    On September 28, 2000, the Company filed its FY 2000 Form 10-K with the SEC

9 signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Morton, Tompkins and

10 Urbanek. The FY 2000 Form 10-K was simultaneously distributed to shareholders and the public.

11 The FY 2000 Form 10-K included KLA-Tencor's FY 2000 financial statements which were

12 materially false and misleading and presented in violation of GAAP, due to improper accounting for

13 the backdated stock options. As a result, KLA-Tencor's compensation expense was understated and

14 its net earnings were overstated.

15       120.    The 2000 Form 10-K falsely represented that the Company issued stock options at

16 prices not less than fair market value of the Company's common stock on the grant date:

17       STOCK OPTION AND INCENTIVE PLANS

18       The Company has authorized various stock option and management incentive plans

      for selected employees, officers, directors, and consultants. . . .

19

20       ***Under the Company's stock option plans, options generally have vesting periods of***

      ***four years, are exercisable for a period not to exceed ten years from the date of***

21       ***issuance and are granted at prices not less than the fair market value of the***

      ***Company's common stock at the grant date.***

22                        **The FY 2001 Form 10-K**

23       121.    On September 21, 2001, the Company filed its FY 2001 Form 10-K with the SEC

24 signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Morton, Tompkins and

25 Urbanek. The FY 2001 Form 10-K was simultaneously distributed to shareholders and the public.

26 The FY 2001 Form 10-K included KLA-Tencor's FY 2001 financial statements which were

27 materially false and misleading and presented in violation of GAAP, due to its improper accounting

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 48 -

1   for the backdated stock options. As a result, KLA-Tencor's compensation expense was understated

2   and its net earnings were overstated.

3         122.   The September 21, 2001 Form 10-K falsely represented that stock options issued

4   under the Company Incentive Stock Option Plan were issued at the fair market value of the stock on

5   the date of the grant:

6             Under KLA-Tencor's stock option plans, options generally have vesting periods of
              four or five years, are exercisable for a period not to exceed ten years from *the date*

7             *of issuance and are granted at prices not less than the fair market value of KLA-*
              *Tencor's common stock at the grant date.*

8

                                      **The FY 2002 Form 10-K**

9

10        123.   On September 20, 2002, the Company filed its FY 2002 Form 10-K with the SEC

    signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Tompkins and Urbanek. The
11

    FY 2002 Form 10-K was simultaneously distributed to shareholders and the public. The 2002 Form
12

    10-K also included the false Sarbanes-Oxley certifications of Kispert and Schroeder. The FY 2002
13

    Form 10-K included KLA-Tencor's FY 2002 financial statements which were materially false and
14

    misleading and presented in violation of GAAP, due to its improper accounting for the backdated
15

    stock options. As a result, KLA-Tencor's compensation expense was understated and its net
16

    earnings were overstated.
17

18        124.   The September 20, 2002 Form 10-K falsely represented that option grants under its

    Incentive Stock Option Plan were issued at no less than fair market value on the date of the grant:
19

20             Stock Option and Incentive Plans KLA-Tencor's stock option program is a broad-
              based, long-term retention program that is intended to attract and retain qualified
              management and technical employees ("knowledge employees"), and align
21             stockholder and employee interests. . . . *Under KLA-Tencor's stock option plans,*
              *options generally have vesting periods of four or five years, are exercisable for a*
22             *period not to exceed ten years from the date of issuance and are granted at prices*
              *not less than the fair market value of KLA-Tencor's common stock at the grant*
23             *date.*

24        125.   The same Form 10-K reported that in 2002 the Company granted an additional

25   227,000 options to defendant Schroeder to incentivize him as a future leader of the Company:

26             Options granted to the top five officers as a percentage of the total options granted to
              all employees vary from year to year. In 2002, they were a higher percentage of the
27             total grants than in the other years shown as they included Board of Director
              approved additional grants to *Mr. Schroeder in recognition of his future potential to*

28

1    *lead the corporation. The additional grants to Mr. Schroeder total 227,400 options
     with vesting on said grants . . . .*

2
                    **The FY 2003 Form 10-K Amended September 29, 2003**
3
     126.    On or about September 16, 2003 (amended September 29, 2003), the Company filed
4
     its FY 2003 Form 10-K with the SEC. The Form 10-K was signed by Kispert and included false
5
     Sarbanes-Oxley certifications of Schroeder and Kispert.  The FY 2003 Form 10-K was
6
     simultaneously distributed to shareholders and the public. The FY 2003 Form 10-K included KLA-
7
     Tencor's FY 2003 financial statements which were materially false and misleading and presented in
8
     violation of GAAP, due to improper accounting for the backdated stock options. As a result, KLA-
9
     Tencor's compensation expense was understated and its net earnings were overstated. The Form 10-
10
     K also falsely represented that it properly accounted for stock options under APB Opinion No. 25
11
     and that all stock options granted under the Plan were equal in value to the common stock on the
12
     grant date:
13
           **Accounting for Stock-Based Compensation Plans** *KLA-Tencor accounts for its*
14         *employee stock option and employee stock purchase plans under the recognition*
           *and measurement principles of APB Opinion No. 25, Accounting for Stock Issued*
15         *to Employees, and related Interpretations. No stock-based employee compensation*
           *is reflected in net income, as all options granted under those plans had an exercise*
16         *price equal to the market value of the underlying common stock on the date of*
           *grant. . . . Since KLA-Tencor continues to account for stock-based compensation*
17         *according to APB OPINION NO. 25, its adoption of SFAS No. 148 required the*
           *Company to provide prominent disclosures about the effects of SFAS 123 on*
18         *reported income and required the Company to disclose these affects in the*
           *financial statements as well.*
19
     127.    The September 16, 2003 Form 10-K also falsely represented that the Company's
20
     stock options were issued at prices "not less than the fair market value . . . on the date of the grant."
21
           Stock Option and Incentive Plans KLA-Tencor's stock option program is a
22         broad-based, long-term retention program that is intended to attract and retain
           qualified management and technical employees ("knowledge employees"), and align
23         stockholder and employee interests. *Under KLA-Tencor's stock option plans,*
           *options generally have a vesting period of five years, are exercisable for a period*
24         *not to exceed ten years from the date of issuance and are granted at prices not less*
           *than the fair market value of KLA-Tencor's common stock at the grant date.*
25
                              **The FY 2004 Form 10-K**
26
     128.    On August 30, 2004, the Company filed its FY 2004 Form 10-K with the SEC signed
27
     by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Kaufman, Michael Marks, Tompkins
28

1    and Urbanek. The Form 10-K also attached the Sarbanes-Oxley certifications of Schroeder and

2    Kispert. The FY 2004 Form 10-K was simultaneously distributed to shareholders and the public.

3    The FY 2004 Form 10-K included KLA-Tencor's FY 2004 financial statements which were

4    materially false and misleading and presented in violation of GAAP, due to improper accounting for

5    the backdated stock options. As a result, KLA-Tencor's compensation expense was understated and

6    its net earnings were overstated.

7          129.    Further, the August 30, 2004 Form 10-K made the following false representations

8    regarding the way in which options were granted and accounted for:

9          **Accounting for Stock-Based Compensation Plans** *KLA-Tencor accounts for its*
      *employee stock option and employee stock purchase plans under the recognition*

10          *and measurement principles of APB Opinion No. 25,* Accounting for Stock Issued
      to Employees, and related Interpretations. *No stock-based employee compensation*

11          *is reflected in net income, as all options granted under those plans had an exercise*
      *price equal to the market value of the underlying common stock on the date of*

12          *grant.*

13                                 *        \*        \*        \**

14          **Stock Option and Incentive Plans** KLA-Tencor's stock option program is a broad-
      based, long-term retention program that is intended to attract and retain qualified

15          management and technical employees ("knowledge employees"), and align
      stockholder and employee interests. Under KLA-Tencor's stock option plans, options

16          generally have a vesting period of five years, are exercisable for a period not to
      exceed ten years from the date of *issuance and are granted at prices not less than*

17          *the fair market value of KLA-Tencor's common stock at the grant date.* . . .

18                                *        \*        \*        \**

19          *All stock option grants to officers are approved by the Compensation Committee of*
      *the Board of Directors. All members of the Compensation Committee are*

20          *independent directors, as defined in the applicable rules for issuers traded on the*
      *NASDAQ Stock Market.*

21                                       **The FY 2005 Form 10-K**

22    
23          130.    On September 2, 2005, the Company filed its FY 2005 Form 10-K with the SEC.

24    The FY 2005 Form 10-K was simultaneously distributed to shareholders and the public. The FY

25    2005 Form 10-K included KLA-Tencor's FY 2005 financial statements which were materially false

26    and misleading and presented in violation of GAAP, due to its improper accounting for the

27    backdated stock options. As a result, KLA-Tencor's compensation expense was understated and its

28    net earnings were overstated.

1        131.    The September 2, 2005 Form 10-K also attached false Sarbanes-Oxley certifications

2 of defendants Schroeder and Kispert, falsely assuring shareholders, and made the following

3 representations:

> 4 Our equity incentive program is a broad-based, long-term retention program that is
> intended to attract and retain qualified management and technical employees
> 5 ("Knowledge Employees"), and align stockholder and employee interests. The
> equity incentive program consists of two plans: one under which non-employee
> 6 directors may be granted options to purchase shares of our stock, and another in
> which non-employee directors, officers, key employees, consultants and all other
> 7 employees may be granted options to purchase shares of our stock, restricted stock
> units and other types of equity awards. *Under our equity incentive program, stock*
> 8 *options generally have a vesting period of five years, are exercisable for a period*
> *not to exceed ten years from the date of issuance and are generally granted at*
> 9 *prices not less than the fair market value of our common stock at the grant*
> *date.* . . .
>
> 10
> On October 18, 2004, the Company's stockholders approved the 2004 Equity
> 11 Incentive Plan (the "Omnibus Plan") which provides for the grant of options to
> purchase shares of the Company's Common Stock, stock appreciation rights,
> 12 restricted stock, performance shares, performance units and deferred stock units to
> our employees, consultants and members of our Board of Directors. This new Plan
> 13 replaces future grants under the 1982 Stock Option Plan and 2000 Nonstatutory
> Stock Option Plan and supplements the 1998 Outside Director Option Plan. The
> 14 shareholder approval included the creation of a reserve establishment of 11,000,000
> shares of common stock for use under the plan and the ability to transfer up to an
> 15 additional 1,500,000 shares of forfeited or expired stock under the 1982 Stock Option
> Plan and the 2000 Nonstatutory Plan.
>
> 16
> During the fiscal year ended June 30, 2005, the following actions were taken with
> 17 regard to the New Equity Incentive Plan: a) a reserve of 11,000,000 shares was
> established, b) 1,465,853 shares were added to the reserve from the 1982 Stock
> 18 Option Plan and the 2000 Nonstatutory Plan due to forfeitures or expiration, c) the
> 1982 Stock Option Plan was terminated; as a result, 12,358,625 shares expired, d) the
> 19 2000 Nonstatutory Plan was terminated; and, as a result, 3,447,748 shares expired, e)
> the 1993 Stock Option Plan was terminated, as a result, 3,500 shares expired and f)
> 20 The Metrology Stock Option Plan was terminated, as a result 4,238 shares expired.

21        132.    The materially false and misleading FY 1995-2005 Form 10-Ks described above were

22 reviewed, prepared and/or endorsed by the Defendants. The following chart illustrates the Form 10-

23 Ks signed by the Defendants:[6]

24

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Boehlke* | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | |
| Chamberlain | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | |

26

27 ────────────

[6]    Unless otherwise noted, these Defendants served as directors of the Company.

28

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tompkins | ■ | ■ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Elkus | ■ | ■ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Urbanek | ■ | ■ | ✓ | ✓ | ■ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Kispert* | ■ | ■ | ■ | ■ | ■ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Bingham | ■ | ■ | ■ | ■ | ■ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Bond | ■ | ■ | ■ | ■ | ■ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Kaufman | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ✓ | ✓ | ✓ |
| Barnholt | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Schroeder** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Levy** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

** = Directors and Officers
* = Officers

The Form 10-Ks also incorporated by reference Form S-8 of December 4, 1998, the 1998 Outside Director Option Plan, Restated 1982 Stock Option Plan (filed March 1997), and the March 11, 1997 Form S-4.

## KLA-TENCOR'S FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP

133.   As a result of Defendants' improper backdating of stock options, Defendants caused KLA-Tencor to violate GAAP, SEC regulations and IRS rules and regulations.

134.   KLA-Tencor financial results for 1996-2006 were included in reports filed with the SEC and in other shareholder reports.  In these reports, Defendants represented that KLA-Tencor financial results were presented in a fair manner and in accordance with GAAP.

135.   Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

136.   GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time.  Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW     - 53 -

1   C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared

2   in compliance with GAAP, are presumed to be misleading and inaccurate.

3                                    **Violations of GAAP**

4          137.   During the Relevant Period, Defendants caused the Company to understate its

5   compensation expense by not properly accounting for its stock options under GAAP and thus

6   overstated the Company's net earnings.

7          138.   Under well-settled accounting principles in effect throughout the Relevant Period,

8   KLA-Tencor did not need to record an expense for options granted to employees at the then-current

9   market price ("at the money").  The Company was, however, required to record an expense in its

10  financial statements for any options granted below the then-current market price ("in the money").

11  In order to provide KLA-Tencor executives and employees with far more lucrative "in the money"

12  options, while avoiding having to inform shareholders about millions of dollars incurred by the

13  Company in compensation expenses (and without paying the IRS millions of dollars in employment

14  taxes), Defendants systematically falsified Company records to create the false appearance that

15  options had been granted at the market price on an earlier date.

16         139.   Throughout the Relevant Period, KLA-Tencor accounted for stock options using the

17  intrinsic method described in APB Opinion No. 25, Accounting for Stock Issued to Employees.

18  Under APB Opinion No. 25, employers were required to record as an expense on their financial

19  statements the "intrinsic value" of a fixed stock option on its "measurement date." An option that is

20  "in the money" on the measurement date has intrinsic value, and the difference between its exercise

21  price and the quoted market price must be recorded as compensation expense to be recognized over

22  the vesting period of the option.  Options that are "at the money" or "out of the money" on the

23  measurement date need not be expensed. Excluding non-employee directors, APB Opinion No. 25

24  required employers to record compensation expenses on options granted to non-employees

25  irrespective of whether they were "in the money" or not on the date of grant.

26

27

28

**KLA-Tencor's Forthcoming Restatement Is an Admission of Falsity**

140.   As detailed above, the fact that KLA-Tencor will need to revise and restate downward its net income is an admission that the financial statements originally issued were false when they were reported and that the misstatements were material.

141.   Pursuant to GAAP, as set forth in APB Opinion No. 20, the type of restatements and revisions announced by KLA-Tencor were to correct for material errors in previously issued financial statements. APB Opinion No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when the restatement occurs. *Id.*, ¶14. Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used, or to correct an error in previously issued financial statements. KLA-Tencor's restatements and revisions were not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements. Thus, the restatements and revisions were an admission by KLA-Tencor that its previously issued financial results and its public statements regarding those results were false and misleading.

**KLA-Tencor's GAAP Violations Were Material**

142.   KLA-Tencor's false and misleading Relevant Period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality. SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality. Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important." It also stresses that materiality requires qualitative, as well as quantitative, considerations. For example, if a known misstatement would cause a significant market reaction that reaction should be taken into account in determining the materiality of the misstatement.

143.   SAB Topic 1M further states:

1     Among the considerations that may well render material a quantitatively small
      misstatement of a financial statement item are –
2
                                    *       *       *
3
              • whether the misstatement masks a change in earnings or other trends
4
                      • whether the misstatement hides a failure to meet analysts' consensus
5     expectations for the enterprise

6                                   *       *       *

7                     • whether the misstatement concerns a segment or other portion of the
      registrant's business that has been identified as playing a significant role in the
8     registrant's operations or profitability.

9             144.    SAB Topic 1M also says that an intentional misstatement of even immaterial items

10    may be illegal and constitute fraudulent financial reporting.

11            145.    KLA-Tencor's misstatements, by its own admissions, satisfy these criteria and thus

12    were material from both a quantitative and qualitative perspective.

13    **KLA-Tencor's Financial Statements Violated Fundamental Concepts of GAAP**

14            146.    Due to these accounting improprieties, the Company presented its financial results

15    and statements in a manner that violated GAAP, which are described by the following statements:

16                    (a)     The principle that interim financial reporting should be based upon the same

17    accounting principles and practices used to prepare annual financial statements (APB Opinion No.

18    28, 10);

19                    (b)     The principle that financial reporting should provide information that is useful

20    to existing and potential investors and creditors and other users in making rational investment, credit

21    and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No.

22    1, 34);

23                    (c)     The principle that financial reporting should provide information about the

24    economic resources of an enterprise, the claims to those resources, and the effects of transactions,

25    events and circumstances that change resources and claims to those resources (FASB Statement of

26    Concepts No. 1, 40);

27                    (d)     The principle that financial reporting should provide information about how

28    management of an enterprise has discharged its stewardship responsibility to stockholders for the use

**EXHIBIT 3**
**Part 3 of 3**

1   of enterprise resources entrusted to it.  To the extent that management offers securities of the

2   enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective

3   investors and to the public in general (FASB Statement of Concepts No. 1, 50);

4           (e)      The principle that financial reporting should be reliable in that it represents

5   what it purports to represent (FASB Statement of Concepts No. 2, 58-59);

6           (f)      The principle of completeness, which means that nothing material is left out of

7   the information that may be necessary to insure that it validly represents underlying events and

8   conditions (FASB Statement of Concepts No. 2, 79); and

9           (g)      The principle that conservatism be used as a prudent reaction to uncertainty to

10  try to ensure that uncertainties and risks inherent in business situations are adequately considered

11  (FASB Statement of Concepts No. 2, 95, 97).

12          147.    Further, the undisclosed adverse information concealed by Defendants during the

13  Relevant Period is the type of information which, because of SEC regulations, regulations of the

14  national stock exchanges and customary business practice, is expected by investors and securities

15  analysts to be disclosed, and is known by corporate officials and their legal and financial advisors to

16  be the type of information which is expected to be and must be disclosed.

17                          **Violations of the SEC Regulations**

18          148.    During the Relevant Period, Defendants caused KLA-Tencor to violate SEC

19  regulations by failing to disclose that the Company's senior executives had been granted backdated

20  stock options.

21          149.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer

22  must furnish information required by Item 402 of Regulation S-K (17 C.F.R. §229.402).  Item

23  402(b) and (c) require a company to provide both a summary compensation table and an option/SAR

24  ("stock appreciation right") grants table identifying the compensation of the named executive

25  officers – the Company's CEO and its next four most highly paid executives.  Item 402 requires

26  particularized disclosures involving a company's stock option grants in the last fiscal year.  In the

27  summary compensation table, the issuer must identify in a column "other annual compensation"

28  received by the named executives that is not properly categorized as salary or bonus, including any

1  "[a]bove-market or preferential earnings on restricted stock, options, SARs or deferred

2  compensation" paid to the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option grants

3  table, the issuer must identify in a column "[t]he per-share exercise or base price of the options . . . .

4  If such exercise or base price is less than the market price of the underlying security on the date of

5  grant, a separate, adjoining column shall be added showing market price on the date of grant." Item

6  402(c)(2)(iv).

7      150.  Defendants caused KLA-Tencor to violate SEC Regulations by failing to disclose that

8  the Company's named executive officers had been granted options with exercise prices below the

9  market value on the date the Board or Compensation Committee approved the grant.

10                    **Violations of IRS Rules and Regulations**

11     151.  During the Relevant Period, Defendants further caused KLA-Tencor to violate IRS

12  rules and regulations due to its improper accounting for the backdated stock options. As a result, the

13  Company's tax liabilities were understated exposing KLA-Tencor to potential amounts owed for

14  back taxes, penalties and interest to the IRS for improperly reporting compensation.

15     152.  Defendants caused the Company to violate IRS Code §162(m) which generally limits

16  a publicly traded company's tax deductions for compensation paid to each of its named executive

17  officers to $1 million unless the pay is determined to be "performance-based." In order for

18  compensation to be performance-based, the Compensation Committee must have set pre-established

19  and objective performance goals. The goals must then be approved by the shareholders.

20  Section 162(m) defines stock options as performance-based, provided they are issued at an exercise

21  price that is no less than the fair market value of the stock on the date of the grant. Accordingly,

22  properly issued stock options do not have to be taken into account in calculating whether an

23  executive's compensation has exceeded the $1 million compensation cap.

24     153.  Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top

25  executives' soaring pay packages more closely to a company's performance. This change in the tax

26  law turned compensation practices for a company's top executives away from straight salary-based

27  compensation to performance-based compensation, including stock options. According to former

28

1 SEC Chairman Harvey Pitt: "What [§162(m)] did was create incentives to find other forms of

2 compensation so people could get over the $1 million threshold without running afoul of the code."

3     154.    Defendants caused KLA-Tencor to violate IRS Code §162(m) by providing

4 backdated options to the Company's named executive officers, which were granted with exercise

5 prices that were less than the fair market value of the stock on the date of the grant. As a result, all

6 of the income resulting from the exercise of the options must be included for purposes of calculating

7 whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

8     155.    Defendants further caused the Company to violate IRS rules and regulations in order

9 to avoid having to withhold income and FICA ("Federal Insurance Contributions Act") tax from its

10 executives and employees upon the exercise of KLA-Tencor's stock options by improperly

11 accounting for its Non-Qualified Stock Options ("NQSOs") as Incentive Stock Options ("ISOs").

12     156.    ISOs are a form of equity compensation that may be provided to a company's

13 employees. ISOs are required to be granted at an exercise price that is no less than the fair market

14 value of the stock on the date of the grant, and are entitled to preferential tax treatment as they are

15 not subject to income tax upon exercise of the options but only upon sale of the stock (except for the

16 possible imposition of alternative minimum tax on the option spread at the time of exercise). Stock

17 options that do not qualify as ISOs are considered to be NQSOs. NQSOs are not entitled to

18 preferential treatment as they are subject to income tax and FICA withholding upon exercise. As a

19 result, a company that fails to withhold income tax and/or FICA upon the exercise of NQSOs by its

20 employees would be liable for the amount of the income tax and FICA that the company failed to

21 withhold upon exercise of the options, in addition to interest and penalties.

22     157.    By improperly treating its backdated options as ISOs, Defendants failed to provide

23 proper income tax and FICA withholdings upon the exercise of its options by its executives and

24 employees in violation of IRS rules and regulations.

25 <div align="center">**THE COMPANY REVELATIONS AND ADMISSIONS OF**
**STOCK OPTION BACKDATING**</div>

26

27     158.    The FY 1995-2005 Proxy Statements concealed Defendants' option backdating

scheme. Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when

28

1    voting on proxy proposals between 1994 and 2005. In fact, it was not until *The Wall Street Journal*

2    article that shareholders learned that the Proxy Statements which they had relied upon for nearly a

3    decade were false and misleading.

4         159.    On May 22, 2006, KLA-Tencor's stock dropped when it was mentioned in *The Wall*

5    *Street Journal* article on companies at risk for being involved in the backdating scandal.

6         160.    On May 24, 2006, the Company confirmed that it was a target of DOJ investigations

7    and announced that it had received subpoenas from the U.S. Attorneys' Offices in New York and

8    California.    That same day the Company announced the formation of a Special Committee to

9    investigate stock option practices. The Form 8-K provided:

10            KLA-Tencor Corporation announced today that its Board of Directors has appointed
              a Special Committee of independent directors to conduct an internal investigation
11            relating to past stock option grants, the timing of such grants and related accounting
              and documentation. The Special Committee will be assisted by outside legal counsel
12            and accounting experts. KLA-Tencor also said that it has received subpoenas from
              the U.S. Attorney's Offices for the Eastern District of New York and Northern
13            District of California requesting information relating to its past stock option grants.
              KLA-Tencor said that it will cooperate fully with any government or regulatory
14            investigation into these matters.    KLA-Tencor further disclosed that on May 22,
              2006, it was served with a complaint relating to a lawsuit filed in the United States
15            District Court for the Northern District of California filed by the Theodore R.
              Kornreich Revocable Trust, derivatively on behalf of KLA-Tencor.
16
        161.    Additionally, as a result of the sharp decline in KLA-Tencor's stock due to its
17
     involvement in the ongoing option granting scandal, KLA-Tencor has been forced to renegotiate its
18
     deal to acquire ADE.  Initially, on February 23, 2006, KLA-Tencor announced that it had entered
19
     into an agreement with ADE to acquire ADE in a stock-for-stock transaction valued at
20
     approximately $488 million.  Under the agreement, KLA-Tencor would issue 0.64 share of KLA-
21
     Tencor per one share of ADE.  This calculation was based upon the closing price of KLA-Tencor
22
     stock for February 22, 2006 of $51.73.  Due to the recent sharp decline of the value of KLA-
23
     Tencor's stock, KLA-Tencor was forced to change the terms of its agreement with ADE into an all-
24
     cash transaction instead of a stock-for-stock transaction.  On May 26, 2006, KLA-Tencor announced
25
     that it had amended its agreement with ADE from a stock-for-stock transaction to an all-cash
26
     transaction and that it had agreed to pay $32.50 in cash per share of ADE stock in a transaction
27

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW     - 60 -

1    valued at approximately $478 million.  KLA-Tencor's stock closed at $40.62 per share on May 26,

2    2006 – a 21.5% decline from February 22, 2006.

3         162.    On September 28, 2006, the Company announced an impending restatement of

4    publicly reported financial statements due to the backdating/misdating of stock options:

5    **KLA-Tencor Will Restate Financial Statements Related to Stock Options**

6    *SAN JOSE, Calif., September 28, 2006 – KLA-Tencor Corporation (NASDAQ:*
     *KLAC) today announced that it will restate previously issued financial statements*
7    *to correct the Company's past accounting for stock options.*  Based on a report
     received from a Special Committee of the Board of Directors, ***the Board concluded***
8    ***that incorrect measurement dates for certain stock option grants were used for***
     ***financial accounting purposes, principally during the periods July 1, 1997 through***
9    ***June 30, 2002.  As a result, the Company will be required to record non-cash***
     ***charges for compensation expenses relating to those past stock option grants.***
10
     The Company has not determined the exact amount of such charges, the resulting tax
11   and accounting impact, or which specific reporting periods may require restatement.
     ***Accordingly, the Company is filing a Form 8-K today stating that the financial***
12   ***statements and all earnings and press releases and similar communications issued***
     ***by the Company relating to periods beginning on or after July 1, 1997, should no***
13   ***longer be relied upon. KLA-Tencor intends to file its restated financial results and***
     ***Annual Report on Form 10-K as quickly as practicable.***
14
     KLA-Tencor does not anticipate that the restatement will have any impact on the
15   Company's historical revenues. ***Any stock-based compensation charges incurred as***
     ***a result of the restatement would have the effect of decreasing reported income or***
16   ***increasing reported loss from operations, and decreasing reported net income or***
     ***increasing reported net loss, and decreasing reported retained earnings amounts***
17   ***contained in the Company's historical financial statements for the affected***
     ***periods.***
18
19        163.    Thereafter, on October 16, 2006, the Company announced that it was immediately

20   terminating all relationships with Schroeder and that it fired its General Counsel, defendant Nichols.

21   On October 17, 2006, the Company announced the retirement of defendant Levy along with the fact

22   that Levy received backdated options and that his options would be repriced.

23        164.    Finally, as discussed above in ¶¶43-47, on January 29, 2007, the Company filed its

24   Form 10-K for the period ending June 30, 2006 detailing restated financials between 1994-2006 and

25   the specific findings of the Special Committee.

     **DERIVATIVE DEMAND FUTILITY ALLEGATIONS**

26        165.    At the time the first derivative action was commenced, the KLA-Tencor Board

27   consisted of nine directors: Levy, Barnholt, Wallace, Kaufman, Urbanek, Bond, Tompkins, Wang

28

1  and Bingham. Eight of these directors are incapable of independently and disinterestedly

2  considering a demand to commence and vigorously prosecute the derivative actions:

3          (a)    Defendants Levy, Tompkins and Wallace are incapable because they received

4  backdated stock options, and they are directly interested in the improperly backdated stock option

5  grants complained of herein, as recipients thereof. These defendants also sold hundreds of thousands

6  of shares of KLA-Tencor stock for millions of dollars in insider trading proceeds (*see supra*, ¶27);

7          (b)    Bond, Barnholt and Urbanek are incapable because as members of the

8  Compensation Committee, each directly participated in and approved the improper backdating of

9  stock options, as alleged herein or misrepresented and falsely assured the Company shareholders that

10 KLA-Tencor stock options were issued at fair market value on the date of the grant. They indeed

11 were the Board members who purported but failed to "*review[]. . . the Company's executive*

12 *compensation policy and administer[] the Company's . . . equity benefit plan*" under which stock

13 options were granted. Moreover, by colluding with Defendants and others, as alleged herein, Bond,

14 Barnholt and Urbanek have demonstrated that they are unable and unwilling to act independently of

15 Defendants; and

16         (c)    All of the members of the Audit Committee, including Bingham, Bond and

17 Kaufman are incapable because as veteran members of the Audit Committee, they directly

18 participated in and approved the Company's knowing violations of GAAP and IRS Code §162(m),

19 as alleged herein. Defendant Bingham was represented to shareholders as being a "financial expert,"

20 and has been Chairman of the Audit Committee for the last five years. Moreover, by colluding with

21 Defendants and others, as alleged herein, Bingham, Bond and Kaufman have demonstrated that they

22 are unable and unwilling to act independently of Defendants.

23       166.    The instant Complaint includes federal securities claims brought under the Exchange

24 Act for violations of §10(b) and Rule 10b-5 promulgated thereunder, and for violations of proxy

25 disclosure requirements under §14(a) of the Exchange Act and Cal. Corp. Code §25402. Under both

26 federal and Delaware law, proxy disclosure claims are not subject to the pre-suit demand

27 requirement because imposing such a requirement would enable a Board to override federal and

28

1    Delaware policy requiring full disclosure in all Proxy Statements.  Indeed, the business judgment

2    rule does not apply to proxy disclosure claims.

3         167.    In relation to plaintiffs' other claims, prior demand upon a Board of Directors is

4    excused if plaintiffs allege facts that, if accepted as true, raise a reasonable doubt that: (a) the

5    challenged transaction was the product of a valid business judgment; or (b) a majority of the

6    directors are disinterested and independent.  If either prong of this test is satisfied, demand is

7    excused.

8         168.    By reason of their corporate positions and their ability to control the business and

9    corporate affairs of KLA-Tencor at all relevant times, the directors of KLA-Tencor owed KLA-

10   Tencor and its stockholders fiduciary duties of candor, fidelity, trust, and loyalty, and are and were

11   required to use their ability to control KLA-Tencor in a fair, just and equitable manner, as well as to

12   act in furtherance of the best interests of KLA-Tencor and its stockholders.  In addition, the directors

13   owed KLA-Tencor the fiduciary duty to exercise due care and diligence in the management and

14   administration of the affairs of KLA-Tencor and in the use and prevention of its property and assets.

15   In violation of their fiduciary duties, Defendants approved of and/or caused KLA-Tencor to issue

16   illegally backdated stock options to many of its employees for a period beginning in at least 1995

17   and continuing through 2005.

18   **A Majority of KLA-Tencor's Directors Are Not Independent and Disinterested**

19        169.    A majority of KLA-Tencor's Board are interested and/or incapable of independently

20   evaluating the claims in this lawsuit.  Of the nine members of the Board at the time this action was

21   filed, a majority of them have significant conflicts which would make a demand on the Board futile

22   and useless.  In particular:

23             (a)    Defendant Levy founded KLA Instruments in 1976 and was both Chairman of

24   the Board and CEO of the Company.  Because of these dual roles, Levy is incapable of exercising

25   independent judgment regarding this action.  Levy was Chair of KLA-Tencor's Nominating and

26   Governance Committee from 1997 and continued to serve on the Committee until October 17, 2006.

27   As the Chairman and/or member of the Nominating and Governance Committee, Levy had a

28   responsibility to oversee the Company's nomination of directors and developing and leading

1  corporate governance policies and principles at the Company.  As former Chairman and CEO of

2  KLA-Tencor, Levy stands to earn millions of dollars in retirement and severance compensation, all

3  of which must be approved by the current members of the Compensation Committee.  Though the

4  Company has repriced Levy's backdated options, it has not indicated that it will recover bonuses and

5  insider trading proceeds obtained in part by falsifying the Company's financial statements.  Indeed,

6  through the falsification of the Company's financial statements and, based upon his knowledge of

7  material non-public information regarding the Company, Levy has made over **$111 million** through

8  his sales of Company stock.  In addition, Levy is a director and a named defendant in *In re Juniper*

9  *Derivative Actions*, No. 5:06-cv-03396-JW, wherein he is alleged to have backdated stock options.

10  Juniper admitted on December 21, 2006 that it will restate **$900 million** in compensation expenses

11  due to improperly backdated stock options between 1997 and 2003.  Levy grossly abandoned his

12  fiduciary duties and betrayed KLA-Tencor and its shareholders by knowingly approving and/or

13  directing that Company directors and officers manipulate the grant date of stock options.

14  Accordingly, Levy is incapable of independently and disinterestedly considering a demand to

15  commence and vigorously prosecute the above-captioned action against Defendants;

16          (b)     Defendant Levy himself received backdated/misdated option grants.  Further,

17  Levy faces a significant likelihood of criminal and/or civil prosecution from his participation in, and

18  direction of, this fraudulent and illegal scheme.  There can be no doubt that these conflicts make

19  Levy interested in these transactions, and completely incapable of exercising independent judgment

20  regarding this lawsuit;

21          (c)     Defendant Bond has served as a director of the Company since 1997.

22  Between 2000 and 2005, Bond was a member of the Compensation Committee responsible for

23  reviewing and making recommendations to the Board concerning stock option issuances for certain

24  executive officers and certain employees.  During the Relevant Period, Bond represented that the

25  Compensation Committee reviewed and recommended individual options grants to the Board, taking

26  into account the officer's scope of responsibility and specific assignments, strategic and operational

27  goals applicable to the officer, anticipated performance requirements and contributions of the officer,

28  and the number of options previously granted to the officer.  Moreover, Bond falsely confirmed in

1   Compensation Committee reports that stock option grants were made at the fair market value on the

2   date of the grant. These statements and assertions were knowingly false because Bond either: (i)

3   knew that KLA-Tencor granted options inconsistent with publicly disclosed policies or without any

4   approval or review by the Compensation Committee or the Board; or (ii) knew that KLA-Tencor's

5   Compensation Committee had illegally backdated option grants to increase their value to the

6   grantees contrary to the requirements of KLA-Tencor's Stock Option Plans. Accordingly, Bond

7   ignored his fiduciary duties to KLA-Tencor, and deliberately or recklessly materially misrepresented

8   the level of review and oversight that the Compensation Committee provided. Further, Bond also

9   has served on KLA-Tencor's Audit Committee from at least 2003 to 2005 and represented that the

10   Audit Committee provided oversight regarding the integrity of the Company's financial statements,

11   the Company's compliance with legal and regulatory requirements, and the Company's internal

12   accounting and financial controls. As a member of the Audit Committee, Bond had a special duty to

13   know and understand the material information regarding the stock option grants as it affected the

14   Company's financial statements as provided for in the Audit Committee's charter. Accordingly,

15   Bond knew or should have known that KLA-Tencor's financial statements were inaccurate and that

16   certain stock option grants were improperly accounted for. Nonetheless, Bond permitted and/or

17   condoned the unlawful practices described herein, including preparing false reports in the

18   Company's Proxy Statements and annual reports and interim financial reports which did not disclose

19   this egregious practice. Bond knew or deliberately disregarded that the Company had failed to

20   disclose material weaknesses in its financial statements and internal controls and specifically

21   misrepresented the Company's compliance with GAAP and APB Opinion No. 25. Because Bond

22   either knew that KLA-Tencor had (a) backdated options without reporting the cost of such options in

23   KLA-Tencor's Proxy Statements or financial filings; or (b) allowed the backdating of options to

24   occur unchecked by failing to exercise adequate oversight over KLA-Tencor's financial reporting,

25   Bond ignored his fiduciary duties to KLA-Tencor, and deliberately misrepresented the level of

26   review and oversight that the Audit Committee provided.

27          (d)     Because of Bond's lack of due care with respect to his duties on the Audit

28   Committee, KLA-Tencor has suffered tremendous damages from this scandal. Bond either knew

1   that backdating was occurring on a systematic basis, or allowed for the waste of millions of dollars

2   of corporate assets by failing to provide the necessary oversight that could have prevented the

3   widespread manipulation of KLA-Tencor's Stock Option Plans.  As a result, Bond could not

4   objectively consider a demand in this matter.

5           (e)     Defendant Kaufman has been a director of KLA-Tencor since 2002. Kaufman

6   has served on KLA-Tencor's Audit Committee since 2003.  During the Relevant Period, Kaufman

7   represented that the Audit Committee provided oversight regarding the integrity of the Company's

8   financial statements, the Company's compliance with legal and regulatory requirements, and the

9   Company's internal accounting and financial controls.  As a member of the Audit Committee,

10  Kaufman had a special duty to know and understand the material information regarding the stock

11  option grants as it affected the Company's financial statements as provided for in the Audit

12  Committee's charter.  Accordingly, Kaufman knew or should have known that KLA-Tencor's

13  financial statements were inaccurate and that certain stock option grants were improper.

14  Nonetheless, Kaufman permitted and/or condoned the unlawful practices described herein, including

15  preparing false reports in the Company's Proxy Statements and annual reports and interim financial

16  reports which did not disclose this egregious practice. Accordingly, Kaufman knew or should have

17  known that KLA-Tencor's financial statements were false and certain stock options granted were

18  improperly accounted for.  Kaufman knew or deliberately disregarded that the Company had failed

19  to disclose material weaknesses in its financial statements and internal controls and specifically

20  misrepresented the Company's compliance with APB Opinion No. 25 and that KLA-Tencor had

21  backdated options without reporting the cost of such options in KLA-Tencor's Proxy Statements or

22  financial filings. Alternatively, Kaufman allowed the backdating of options to occur unchecked by

23  failing to exercise adequate oversight over KLA-Tencor's financial reporting.  In either respect,

24  Kaufman ignored his fiduciary duties to KLA-Tencor, and deliberately misrepresented the level of

25  review and oversight that the Audit Committee provided.

26          (f)     Because of Kaufman's lack of due care with respect to his duties on the Audit

27  Committee, KLA-Tencor has suffered tremendous damages from this scandal. Kaufman either knew

28  that backdating was occurring on a systematic basis, or allowed for the waste of millions of dollars

1   of corporate assets by failing to provide the necessary oversight that could have prevented the blatant

2   and widespread manipulation of KLA-Tencor's Stock Option Plans. As a result Kaufman could not

3   objectively consider a demand in this matter;

4           (g)     Defendant Barnholt has been a director of KLA-Tencor since 2001. Barnholt

5   has served on KLA-Tencor's Compensation Committee since 2003. During the Relevant Period,

6   Barnholt represented that the Compensation Committee reviewed option grants to KLA-Tencor

7   officers, and that the Compensation Committee approved and made recommendations to the Board

8   concerning incentive compensation for executive officers and employees. These statements and

9   assertions were false because Barnholt either knew that KLA-Tencor had granted options

10  inconsistent with the Stock Option Plans and/or knew that the KLA-Tencor Compensation

11  Committee or the Board was illegally backdating option grants to increase their value to the grantees

12  contrary to the requirements of KLA-Tencor's Stock Option Plans. In either respect, Barnholt

13  ignored fiduciary duties to KLA-Tencor and deliberately misrepresented the level of review and

14  oversight that the Compensation Committee provided. Barnholt cannot be independent and

15  disinterested in litigation that so directly implicates his abdication of his fiduciary duties. Because of

16  Barnholt's lack of due care with respect to his duties on the Compensation Committee, KLA-Tencor

17  has suffered tremendous damages from this scandal. Barnholt either knew that backdating was

18  occurring on a systematic basis, or allowed for the waste of millions of dollars of corporate assets by

19  failing to provide the necessary oversight that could have prevented the blatant and widespread

20  manipulation of KLA-Tencor's Stock Option Plans;

21          (h)     Defendant Bingham has been a director since 1999 and has served on KLA-

22  Tencor's Audit Committee from at least 2001 through 2005. During the Relevant Period, Bingham

23  represented that the Audit Committee provided oversight as provided in the Audit Committee

24  Charter regarding the integrity of the Company's financial statements, the Company's compliance

25  with legal and regulatory requirements, and the Company's internal accounting and financial

26  controls. As a member of the Audit Committee, Bingham had a special duty to know and understand

27  the material information regarding the stock option grants as it affected the Company's financial

28  statements as provided for in the Audit Committee's charter. Accordingly, Bingham knew or should

1    have known that KLA-Tencor's financial statements were inaccurate and that certain stock option

2    grants were improperly accounted for.    Nonetheless, Bingham permitted and/or condoned the

3    unlawful practices described herein, including preparing false reports in the Company's Proxy

4    Statements and annual reports and interim financial reports which did not disclose this egregious

5    practice. These statements and assertions were false because Bingham either: (i) knew that KLA –

6    Tencor had in fact awarded backdated options without reporting the cost of such options in KLA-

7    Tencor's Proxy Statements or financial filings; or (ii) allowed the backdating of options to occur

8    unchecked by failing to exercise adequate oversight over KLA-Tencor's financial reporting.    In

9    either respect, Bingham ignored his fiduciary duties to KLA-Tencor, and deliberately misrepresented

10    the level of review and oversight that the Audit Committee provided;

11            (i)    Defendant Wallace has been a director of KLA-Tencor since November 16,

12    2005. Defendant Wallace served as the Company's President and COO in 2005 and 2006. Further,

13    during the Relevant Period, apart from receiving backdated stock options, Wallace sold 292,449

14    shares of KLA-Tencor stock for insider trading proceeds of $15.5 million.

15            (j)    Defendant Urbanek has been a director of KLA-Tencor since 1997 and has

16    served on KLA-Tencor's Compensation Committee since 1997.    During the Relevant Period

17    Urbanek represented that the Compensation Committee reviewed option grants to KLA-Tencor

18    officers, and made recommendations to the Board concerning incentive compensation for executive

19    officers and employees. These statements and assertions were false because Urbanek either: (i)

20    knew that KLA-Tencor had issued stock options inconsistent with the Stock Option Plans which

21    provided that stock options were granted at fair market value on the grant date; or (ii) knew that the

22    Company's Board was backdating option grants to increase their value to the grantees contrary to the

23    requirements of KLA-Tencor's Stock Option Plans. In either respect, she ignored her fiduciary

24    duties to KLA-Tencor, and deliberately or recklessly misrepresented the level of review and

25    oversight that the Compensation Committee provided.    Urbanek cannot be independent and

26    disinterested in litigation that so directly implicates her abdication of her fiduciary duties. Because

27    of Urbanek's lack of due care with respect to her duties on the Compensation Committee, KLA-

28    Tencor has suffered tremendous damages from this scandal. Urbanek either knew that backdating

1    was occurring on a systematic basis, or allowed for the waste of millions of dollars of corporate

2    assets by failing to provide the necessary oversight that could have prevented the blatant and

3    widespread manipulation of KLA-Tencor's Stock Option Plans.

4           (k)    Defendant Tompkins has served as a director since 1997 and served as

5    Chairman of the Board from July 1997 to June 1999. He also served as CEO of the Company from

6    May 1997 to July 1998. He was a member of KLA-Tencor's Nominating and Governance

7    Committee in 1998, and as a member, he had a duty to oversee the Company's nomination of

8    directors, and a duty to develop corporate governance polices and lead with respect to those policies.

9    Because of Tompkins' positions, he knew the adverse non-public information about the business of

10   the Company, as well as its finances, markets and present and future business prospects, via access

11   to internal corporate documents, conversations and connections with other corporate officers and

12   employees, attendance at Board meetings and committees thereof and via reports and other

13   information provided to him in connection therewith. Tompkins received backdated/misdated

14   options and based on his knowledge of material non-public information regarding the Company,

15   Tompkins violated Cal. Corp. Code §§25402 and 25502.5 by selling shares of KLA-Tencor stock for

16   proceeds of $31.5 million during the Relevant Period.

17   **Options Backdating Is Not the Product of Business Judgment Because It Is *Ultra Vires*,**
     **Illegal, and Contrary to the Stated Purpose of the Stock Option Plans**

18

19   170.    The practice of granting illegal and backdated stock options is not protected by the

20   business judgment rule because it is *ultra vires*. The various stock option plans under which these

21   options were purportedly given, and the Proxy Statements disclosing grants to senior executives and

22   directors during this time period, all represented and required that the stock grants in question be

23   priced based on the fair market value of KLA-Tencor stock on the day of the grant.

24   171.    However, contrary to this limited authority given to the Board by KLA-Tencor's

25   Stock Option Plans, and contrary to KLA-Tencor's representations in the proxy filings, by KLA-

26   Tencor's own admission, *most* of KLA-Tencor's option grants between 1997 and 2002 were priced

27   at a date earlier than the actual date on which they were granted. Further, such conduct caused the

28   Company's financial statements for nearly a decade to be false and misleading. Because granting

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 69 -

1   options using manipulated grant dates to lower the strike price of the options is not permitted by the

2   Stock Option Plans, this conduct is *ultra vires* and void on its face. *Ultra vires* acts are not protected

3   by the business judgment rule, and thus demand is excused.

4       172.    Additionally, Defendants' conduct caused KLA-Tencor to issue materially false

5   financial reports and Proxy Statements for the entirety of the period in question, in violation of

6   numerous provisions of the federal securities laws. Each Defendant violated §10(b) and Rule 10b-5

7   of the Exchange Act by participating in this fraudulent scheme. Each director violated §14(a) of the

8   Exchange Act by issuing false and misleading Proxy Statements from 1995 to 2005. And each

9   director violated §20(a) of the Exchange Act by being controlling persons of KLA-Tencor and

10  engaging in the purchase and/or sale of KLA-Tencor stock while in the possession of material non-

11  public information regarding KLA-Tencor's backdating scheme. Demand is excused because these

12  are illegal acts that are not protected by the business judgment rule.

13      173.    Even if stock option backdating was not illegal, *ultra vires*, and void, there would be

14  no plausible argument that backdating stock options was a valid exercise of business judgment. As

15  represented in KLA-Tencor's Proxy Statements, the stated purpose of KLA-Tencor's Stock Option

16  Plans is to encourage the productivity of KLA-Tencor employees by providing compensation that is

17  proportional to gains in KLA-Tencor's stock price. However, by granting options with backdated

18  strike prices, Defendants undermined the purpose of the Stock Option Plans which was to incentivize

19  grant recipients to commit to the advancement of the Company's stock price thereby aligning the

20  interest of the employees with that of the Company. In effect, this practice was nothing more than

21  secret handouts to executives and employees at the expense of unsuspecting shareholders and the

22  market at large.

23      174.    Defendants could have achieved the stated purpose of attracting and retaining

24  qualified employees by granting those employees additional options under their incentive plans, or

25  by granting options at a price less than the fair market value on the day of the grant and simply

26  disclosing and expensing these grants. Instead, Defendants intentionally concealed these known

27  grants and illegally reported these grants in their financial disclosures to improve their bottom line.

28

1    175.    Further, the practice of backdating stock options could not have been a valid exercise

2  of business judgment because it has subjected KLA-Tencor to potentially massive liability.  KLA-

3  Tencor has disclosed that it will have to restate financial statements for several past periods.  The

4  Company's practices are being investigated by the SEC and DOJ.  The Company will likely suffer

5  tax liabilities for the additional compensation they will have to expense, and they have tarnished

6  their reputation in the investment community through this deliberate and calculated conduct.  In

7  addition, the Company has already had to pay millions of dollars to keep their creditors at bay until

8  they are able to file their most recent Form 10-Q.

9    176.    In particular, demand would be a futile and useless act for the following reasons:

10    (a)    A majority of the current KLA-Tencor Board participated in or approved

11  many of the acts and omissions or were on notice of and/or recklessly disregarded the wrongs

12  complained of herein;

13    (b)    KLA-Tencor's Board ultimately had to approve all option grants.  Some of the

14  directors themselves received options by virtue of their employment at KLA-Tencor that were likely

15  backdated;

16    (c)    Regardless of whether any individual director received a backdated grant, all

17  of KLA-Tencor's directors benefited from the option backdating because it allowed KLA-Tencor to

18  overstate its profits and understate its compensation expenses for the years in question.  Thus, every

19  time the directors exercised KLA-Tencor stock options – backdated or not – they were doing so with

20  knowledge that KLA-Tencor's stock price was illegally overstated because of their approval of, or

21  acquiescence to, these fraudulent practices.  They have thus benefited from the wrongdoing herein

22  alleged, and are incapable of exercising independent objective judgment in deciding whether to bring

23  this action;

24    (d)    The acts complained of herein constitute violations of law and breaches of the

25  fiduciary duties owed by KLA-Tencor's Board, and these acts are incapable of ratification;

26    (e)    In order to bring this action for breaching their fiduciary duties, the members

27  of the KLA-Tencor Board would have been required to sue themselves and/or their fellow directors

28  and allies in the top ranks of the Company, who are their good friends and with whom they have

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 71 -

1  entangling financial alliances, interests and dependencies, which they would not do. Therefore,

2  Defendants would not be able to vigorously prosecute any such action;

3        (f)    The composition of KLA-Tencor's Board is designed to (and does) make

4  them dependent on and deferential to the top officers of the Company and Chairman of the Board

5  who, as a practical matter, control and dominate the process by which directors are selected for

6  nomination or renomination to the Board;

7        (g)    If KLA-Tencor's current and past officers and directors are protected against

8  personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this

9  Complaint by directors' and officers' liability insurance, they caused the Company to purchase that

10 insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of

11 KLA-Tencor. However, due to certain changes in the language of directors' and officers' liability

12 insurance policies in the past several years, the directors' and officers' liability insurance policies

13 covering Defendants in this case contain provisions which eliminate coverage for any action brought

14 directly by KLA-Tencor against these Defendants, known as, *inter alia*, the "insured versus insured

15 exclusion." As a result, if these directors were to sue themselves or certain of the officers of KLA-

16 Tencor, there would be no directors' and officers' insurance protection and thus, this is a further

17 reason why they would not bring such a suit. On the other hand, if the suit is brought derivatively, as

18 this action is brought, such insurance coverage exists and will provide a basis for the Company to

19 effectuate a recovery. If there is no directors' and officers' liability insurance at all, then Defendants

20 will not cause KLA-Tencor to sue them, since they will face a large uninsured liability.

21       177.   Because plaintiffs can show a reasonable doubt that a majority of KLA-Tencor's

22 directors at the time of suit were disinterested and independent at the time of suit, and because the

23 challenged transaction was clearly not the product of a valid business judgment, a demand upon

24 KLA-Tencor's Board would be futile and is excused.

25       178.   Plaintiffs have not made any demand on shareholders of KLA-Tencor to institute this

26 action since such demand would be a futile and useless act for the following reasons:

27       (a)    KLA-Tencor is a publicly traded Company with approximately 199 million

28 shares outstanding, and thousands of shareholders;

1          (b)     Making a demand on such a number of shareholders would be impossible for

2    plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders;

3    and

4          (c)     Making a demand on all shareholders would force plaintiffs to incur huge

5    expenses, assuming all shareholders could be individually identified.

6                        **TOLLING OF THE STATUTE OF LIMITATIONS**

7          179.     The Counts alleged herein are timely.  As an initial matter, Defendants wrongfully

8    concealed their manipulation of the stock option plans, through strategic timing and fraudulent

9    backdating, by issuing false and misleading Proxy Statements, by falsely reassuring KLA-Tencor's

10   public investors that KLA-Tencor's option grants were being administered by a committee of

11   independent directors, and by failing to disclose that backdated options were, in fact, actually issued

12   on dates other than those disclosed, and that strategically timed option grants were issued based on

13   the manipulation of insider information that ensured that the true fair market value of the Company's

14   stock was, in fact, higher than the publicly traded price on the date of the option grant.

15         180.     KLA-Tencor's public investors had no reason to know of the Defendants' breach of

16   their fiduciary duties until May 2006, when *The Wall Street Journal* published its article detailing

17   the option practices of KLA-Tencor and other companies.

18         181.     Finally, as fiduciaries of KLA-Tencor and its public shareholders, the Defendants

19   cannot rely on any limitations defense where they withheld from KLA-Tencor's public shareholders

20   the facts that give rise to the claims asserted herein, *i.e.,* that the KLA-Tencor Board had abdicated

21   its fiduciary responsibilities to oversee the Company's executive compensation practices, and that

22   the option grant dates had been manipulated to maximize the profit for the grant recipients and,

23   accordingly, to maximize the costs for the Company.

24                                    **COUNT I**

25              **Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**
                                **Against All Defendants**
26

27         182.     Plaintiffs incorporate by reference and reallege each and every allegation set forth

     above, as though fully set forth herein.
28

1        183.    Throughout the Relevant Period, Defendants individually and in concert, directly and

2  indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails,

3  engaged and participated in a continuous course of conduct designed to divert hundreds of millions

4  of dollars to Defendants via improper option grants.

5        184.    Defendants employed devices, schemes and artifices to defraud while in possession of

6  material, adverse non-public information and engaged in acts, practices and a course of conduct that

7  included the making of, or participation in the making of, untrue and/or misleading statements of

8  material facts and/or omitting to state material facts necessary in order to make the statements made

9  about KLA-Tencor not misleading.

10        185.    Defendants, as top executive officers and directors of the Company, are liable as

11  direct participants in the wrongs complained of herein.  Through their positions of control and

12  authority as officers of the Company, each of the Defendants was able to and did control the conduct

13  complained of herein and the content of the public statements disseminated by KLA-Tencor.

14        186.    Defendants acted with scienter throughout the Relevant Period, in that they either had

15  actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or

16  acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true

17  facts, even though such facts were available to them.  Defendants were among the senior

18  management of the Company, and were therefore directly responsible for the false and misleading

19  statements and/or omissions disseminated to the public through press releases, news reports and

20  filings with the SEC.

21        187.    Each of the Defendants participated in a scheme to defraud with the purpose and

22  effect of defrauding KLA-Tencor.

23        188.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act, and

24  Rule 10b-5 promulgated thereunder.

25

26

27

28

**COUNT II**

**Violations of Section 14(a) of the Exchange Act Against
All Defendants**

189.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

190.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no Proxy Statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

191.    The FY 1995-2005 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were causing KLA-Tencor to engage in an options backdating scheme, a fact which Defendants were aware of and participated in from at least 1994.

192.    In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

193.    The misrepresentations and omissions in the Proxy Statements were material to plaintiffs in voting on each Proxy Statement. The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

194.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 75 -

1

**COUNT III**

2

**Violations of Section 20(a) of the Exchange Act Against
Defendants Levy, Schroeder, Wallace, Kispert, Hall, Tompkins,
Urbanek, Bingham, Bond, Barnholt and Kaufman**

3

4        195.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

5    above, as though fully set forth herein.

6        196.    Plaintiffs bring this claim against defendants Levy, Schroeder, Wallace, Kispert, Hall,

7    Tompkins, Urbanek, Bingham, Bond, Barnholt and Kaufman.

8        197.    Defendants named in this Count, by virtue of their positions with KLA-Tencor and

9    their specific acts, were, at the time of the wrongs alleged herein, controlling persons of KLA-

10   Tencor within the meaning of §20(a) of the Exchange Act. They had the power and influence and

11   exercised the same to cause KLA-Tencor to engage in the illegal conduct and practices complained

12   of herein.

13

**COUNT IV**

14

**Accounting**

15       198.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

16   above, as though fully set forth herein.

17       199.    At all relevant times, Defendants, as directors and/or officers of KLA-Tencor, owed

18   the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

19       200.    In breach of their fiduciary duties owed to KLA-Tencor and its shareholders, the

20   Defendants caused KLA-Tencor, among other things, to grant backdated stock options to themselves

21   and/or certain other officers and directors of KLA-Tencor. By this wrongdoing, Defendants

22   breached their fiduciary duties owed to KLA-Tencor and its shareholders.

23       201.    Defendants possess complete and unfettered control over their improperly issued

24   stock option grants and the books and records of the Company concerning the details of such

25   improperly backdated stock option grants to Defendants.

26       202.    As a result of Defendants' misconduct, KLA-Tencor has been substantially injured

27   and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of

28   those improperly granted options which have been exercised and sold.

1    203.    Plaintiffs demand an accounting be made of all stock options grants made to

2    Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the

3    value of the grants, the recipients of the grants, the exercise date of stock options granted to

4    Defendants, as well as the disposition of any proceeds received by Defendants via sale or other

5    exercise of backdated stock option grants received by Defendants.

6                                    **COUNT V**

7    **Breach of Fiduciary Duty and/or Aiding and Abetting Against All Defendants**

8    204.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

9    above, as though fully set forth herein.

10    205.    Each of Defendants agreed to and did participate with the other Defendants and/or

11    aided and abetted one another in a deliberate course of action designed to divert corporate assets in

12    breach of the fiduciary duties Defendants owed to the Company.

13    206.    Defendants have violated fiduciary duties of care, loyalty, candor and independence

14    owed to KLA-Tencor and its public shareholders, have engaged in unlawful self-dealing and have

15    acted to put their personal interests and/or their colleagues' interests ahead of the interests of KLA-

16    Tencor and its shareholders.

17    207.    As demonstrated by the allegations above, Defendants failed to exercise the care

18    required, and breached their duties of loyalty, good faith, candor and independence owed to KLA-

19    Tencor and its public shareholders, and they failed to disclose material information and/or made

20    material misrepresentations to shareholders regarding Defendants' options backdating scheme.

21    208.    By reason of the foregoing acts, practices and course of conduct, Defendants have

22    failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward

23    KLA-Tencor and its public shareholders.

24    209.    As a proximate result of Defendants' conduct, KLA-Tencor has been injured and is

25    entitled to damages.

26

27

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 77 -

1

**COUNT VI**

2

**Abuse of Control Against All Defendants**

3      210.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

4    above, as though fully set forth herein.

5      211.    Defendants employed the alleged scheme for the purpose of maintaining and

6    entrenching themselves in their positions of power, prestige and profit at, and control over, KLA-

7    Tencor, and to continue to receive the substantial benefits, salaries and emoluments associated with

8    their positions at KLA-Tencor.    As a part of this scheme, Defendants actively made and/or

9    participated in the making of or aided and abetted the making of, misrepresentations regarding KLA-

10   Tencor.

11     212.    Defendants' conduct constituted an abuse of their ability to control and influence

12   KLA-Tencor.

13     213.    By reason of the foregoing, KLA-Tencor has been damaged.

14

**COUNT VII**

15

**Gross Mismanagement Against All Defendants**

16     214.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

17   above, as though fully set forth herein.

18     215.    Defendants had a duty to KLA-Tencor and its shareholders to prudently supervise,

19   manage and control the operations, business and internal financial accounting and disclosure controls

20   of KLA-Tencor.

21     216.    Defendants, by their actions and by engaging in the wrongdoing described herein,

22   abandoned and abdicated their responsibilities and duties with regard to prudently managing the

23   businesses of KLA-Tencor in a manner consistent with the duties imposed upon them by law.    By

24   committing the misconduct alleged herein, Defendants breached their duties of due care, diligence

25   and candor in the management and administration of KLA-Tencor's affairs and in the use and

26   preservation of KLA-Tencor's assets.

27     217.    During the course of the discharge of their duties, Defendants knew or recklessly

28   disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 78 -

1  caused KLA-Tencor to engage in the scheme complained of herein which they knew had an

2  unreasonable risk of damage to KLA-Tencor, thus breaching their duties to the Company. As a

3  result, Defendants grossly mismanaged KLA-Tencor.

4      218.    By reason of the foregoing, KLA-Tencor has been damaged.

## COUNT VIII

### Constructive Fraud Against All Defendants

7      219.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

8  above, as though fully set forth herein.

9      220.    As corporate fiduciaries, Defendants owed to KLA-Tencor and its shareholders a duty

10  of candor and full accurate disclosure regarding the true state of KLA-Tencor's business and assets

11  and their conduct with regard thereto.

12      221.    As a result of the conduct complained of, Defendants made, or aided and abetted the

13  making of, numerous misrepresentations to and/or concealed material facts from KLA-Tencor's

14  shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of

15  KLA-Tencor. Thus they have committed constructive fraud and violated their duty of candor.

16      222.    By reason of the foregoing, KLA-Tencor has been damaged.

## COUNT IX

### Corporate Waste Against All Defendants

19      223.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

20  above, as though fully set forth herein.

21      224.    By failing to properly consider the interests of the Company and its public

22  shareholders, by failing to conduct proper supervision, by giving away millions of dollars to

23  Defendants via the options backdating scheme, Defendants have caused KLA-Tencor to waste

24  valuable corporate assets.

25      225.    As a result of Defendants' corporate waste, they are liable to the Company.

<div align="center">

**COUNT X**

**Unjust Enrichment Against All Defendants**

</div>

226.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

227.    As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of KLA-Tencor, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

228.    Certain Defendants also obtained severance benefits that were not earned or justified but were instead paid as part of a scheme to cover up Defendants' complicity in the scheme.

229.    All the payments and benefits provided to Defendants were at the expense of KLA-Tencor. The Company received no benefit from these payments. KLA-Tencor was damaged by such payments.

230.    Certain of the Defendants sold KLA-Tencor stock for a profit during the period of deception, misusing confidential non-public corporate information. These Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of KLA-Tencor. A constructive trust for the benefit of the Company should be imposed thereon.

<div align="center">

**COUNT XI**

**Against the Officer Defendants for Rescission**

</div>

231.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

232.    As a result of the acts alleged herein, the stock option contracts between the Officer Defendants and KLA-Tencor entered into during the Relevant Period were obtained through Defendants' fraud, deceit, and abuse of control. Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding the Officer Defendants' employment agreements and the Company's Stock Option Plan which was also approved by KLA-Tencor shareholders and filed with the SEC.

233.    All contracts which provide for stock option grants between the Officer Defendants and KLA-Tencor and were entered into during the Relevant Period should, therefore, be rescinded,

1  with all sums paid under such contracts returned to the Company, and all such executory contracts

2  cancelled and declared void.

3  <div align="center">**COUNT XII**</div>

4  <div align="center">**Against the Insider Selling Defendants for Violation of
California Corporations Code Section 25402**</div>

5

6  234.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

above, as though fully set forth herein.

7

8  235.    At the time that the Insider Selling Defendants sold their KLA-Tencor common stock

as set forth herein at ¶27, by reason of their high executive and/or directorial positions with KLA-

9  Tencor, the Insider Selling Defendants had access to highly material information regarding the

10  Company, including the information set forth herein regarding the true adverse facts of KLA-

11  Tencor's improper accounting.

12  236.    At the time of such sales, that information was not generally available to the public or

13  the securities markets. Had such information been generally available, it would have significantly

14  reduced the market price of KLA-Tencor shares at that time.

15  237.    The Insider Selling Defendants, and each of them, had actual knowledge of material,

16  adverse non-public information and thus sold their KLA-Tencor common stock in California in

17  violation of Cal. Corp. Code §25402.

18  238.    Pursuant to California Corporations Code §25502.5, the Insider Selling Defendants,

19  and each of them, are liable to KLA-Tencor for damages in an amount up to three times the

20  difference between the price at which KLA-Tencor common stock was sold by these Defendants,

21  and each of them, and the market value which KLA-Tencor common stock would have had at the

22  time of the sale if the information known to these Defendants, and each of them, had been publicly

23  disseminated prior to that time and a reasonable time had elapsed for the market to absorb the

24  information.

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT XIII**

**Against the Insider Selling Defendants for Breach of Fiduciary
Duties for Insider Selling and Misappropriation of Information**

239.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

240.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold KLA-Tencor common stock on the basis of such information.

241.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.    It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold KLA-Tencor common stock.

242.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.    The Insider Selling Defendants' sales of KLA-Tencor common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

243.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs demand judgment as follows:

A.    Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

B.    Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW      - 82 -

1        C.      Directing KLA-Tencor to take all necessary actions to reform and improve its

2 corporate governance and internal control procedures to comply with applicable law, including, but

3 not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's

4 By-Laws or Articles of Incorporation and taking such other action as may be necessary to place

5 before shareholders for a vote adoption of the following Corporate Governance Policies:

6            (i)      a proposal requiring that the office of CEO of KLA-Tencor and

7 Chairman of the KLA-Tencor Board be permanently held by separate individuals and that the

8 Chairman of the KLA-Tencor Board meets rigorous "independent" standards;

9           (ii)     a proposal to strengthen the KLA-Tencor Board's supervision of

10 operations and develop and implement procedures for greater shareholder input into the policies and

11 guidelines of the Board;

12          (iii)    appropriately test and then strengthen the internal audit and control

13 functions;

14          (iv)    rotate independent auditing firms every five years;

15          (v)     control and limit insider stock selling and the terms and timing of

16 stock option grants; and

17          (vi)    reform executive compensation.

18        D.     Ordering the imposition of a constructive trust over Defendants' stock options and

19 any proceeds derived therefrom;

20        E.     Awarding punitive damages;

21        F.     Awarding costs and disbursements of this action, including reasonable attorneys',

22 accountants', and experts' fees; and

23        G.     Granting such other and further relief as this Court may deem just and proper.

24

25

26

27

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 83 -

1                                     **JURY DEMAND**

2       Plaintiffs demand a trial by jury.

3 DATED: February 20, 2007              LERACH COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP

4                                  SHAWN A. WILLIAMS
                                 MONIQUE C. WINKLER

5                                  AELISH M. BAIG

6

7                                        /s/Shawn A. Williams
                                     SHAWN A. WILLIAMS

8

9                              100 Pine Street, Suite 2600
                             San Francisco, CA  94111
                             Telephone:  415/288-4545

10                             415/288-4534 (fax)

11                              LERACH COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP

12                              TRAVIS E. DOWNS III
                             BENNY C. GOODMAN III

13                              655 West Broadway, Suite 1900
                             San Diego, CA  92101-3301

14                              Telephone: 619/231-1058
                             619/231-7423 (fax)

15

16                              LERACH COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP

17                              THOMAS WILHELM
                             9601 Wilshire Blvd., Suite 510

18                              Los Angeles, CA  90210
                             Telephone: 310/859-3100

19                              310/278-2148 (fax)

20                              Lead Counsel for Plaintiffs

T:\CasesSF\KLA-Tencor Derivative\CPT00039317.doc

21

22

23

24

25

26

27

28

1                                 <u>VERIFICATION</u>

2        I, SHAWN A. WILLIAMS, hereby declare as follows:

3        2.     I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins,

4 LLP, counsel for plaintiff in the above-entitled action. I have read the foregoing Complaint and

5 know the contents thereof. I am informed and believe the matters therein are true and on that ground

6 allege that the matters stated therein are true.

7        3.     I make this Verification because plaintiff is absent from the County of San Francisco

8 where I maintain my office.

9        Executed this 20th day of February 2007 at San Francisco, California.

10

11                                             /s/Shawn A. Williams

                                         SHAWN A. WILLIAMS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 20, 2007 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

<u>/s/Shawn A. Williams</u>
SHAWN A. WILLIAMS

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)
E-mail:ShawnW@lerachlaw.com

# Mailing Information for a Case 5:06-cv-03445-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Christopher J. Banks**
  cbanks@morganlewis.com

- **Paul F. Bennett**
  pfb@gbcslaw.com cgw@gbcslaw.com

- **Miles F. Ehrlich**
  miles@ramsey-ehrlich.com milesmf@yahoo.com

- **Joseph Edward Floren**
  jfloren@morganlewis.com rluke@morganlewis.com

- **Geoffrey M. Johnson**
  gjohnson@scott-scott.com aslaughter@scott-scott.com

- **Craig D Martin**
  cmartin@mofo.com

- **Leigh A. Parker**
  info@wllawca.com lparker@wllawca.com

- **Warrington S. Parker, III**
  wparker@hewm.com
  tchurch@hewm.com;kim.sydorak@hellerehrman.com

- **David Priebe**
  david.priebe@dlapiper.com stacy.murray@dlapiper.com

- **Patrick David Robbins**
  probbins@shearman.com

- **David R. Scott**

drscott@scott-scott.com

- **Arthur L. Shingler, III**
  ashingler@scott-scott.com ssawyer@scott-scott.com

- **Benjamin P. Smith**
  bpsmith@morganlewis.com ewoodward@morganlewis.com

- **Robert P. Varian**
  rvarian@orrick.com

- **Shirli Fabbri Weiss**
  shirli.weiss@dlapiper.com

- **Shawn A. Williams**
  shawnw@lerachlaw.com
  e_file_sd@lerachlaw.com;e_file_sf@lerachlaw.com;aelishb@lerachlaw.c

- **Denise V. Zamore**
  dzamore@scott-scott.com cmcgowan@scott-scott.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

**EXHIBIT 4**
**Part 1 of 5**

Joseph J. Tabacco, Jr. (SBN 75484)
Email: jtabacco@bermanesq.com
Christopher T. Heffelfinger (SBN 118058)
Email: cheffelfinger@bermanesq.com
Nicole Lavallee (SBN 165755)
Email: nlavallee@bermanesq.com
Lesley Ann Hale (SBN 237726)
Email: lhale@bermanesq.com
**BERMAN DeVALERIO PEASE TABACCO
BURT & PUCILLO**
425 California Street, Suite 2100
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382

Member of Plaintiffs' Executive Committee and Liaison Counsel

[Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE KLA-TENCOR CORP. SECURITIES LITIGATION | Master File No. 06-cv-04065-MJJ |
| | CLASS ACTION |
| | **CONSOLIDATED FEDERAL SECURITIES CLASS ACTION COMPLAINT** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |
| | **JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ............................................................................. 1

II.   JURISDICTION AND VENUE ........................................................................ 7

III.  THE PARTIES................................................................................................... 7

      A.    THE LEAD PLAINTIFFS ................................................................... 7

      B.    THE DEFENDANTS ............................................................................ 8

            (i)    The Company...................................................................... 8

            (ii)   The Officer Defendants: Wallace, Schroeder, Dickerson, Kispert, Hall, Boehlke and Nichols.................................... 8

            (iii)  The Compensation Committee Defendants: Urbanek, Marks, Barnholt and Bond ........................................... 13

            (iv)   The Audit Committee Defendants: Bingham, Elkus, Morton Kaufman And Bond ...................................... 15

            (v)    The Nominating and Governance Committee Defendants: Levy, Morton, Barnholt, Schroeder, Elkus, Bingham and Kaufman ........................ 18

            (vi)   The Additional Outside Director Defendant: Tompkins ................................ 21

IV.   CLASS ACTION ALLEGATIONS ............................................................... 23

V.    BACKGROUND ............................................................................................ 26

      A.    CONFIDENTIAL WITNESSES ...................................................... 26

      B.    KLA'S STOCK OPTION PLANS .................................................... 27

            1.    The Restated 1982 Stock Option Plan ........................... 28

            2.    The 1998 Outside Director Option Plan ......................... 29

            3.    The 2004 Equity Incentive Plan...................................... 30

VI.   SUBSTANTIVE ALLEGATIONS................................................................. 31

      A.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ........................... 31

            1.    False and Misleading Financial Statements.................... 32

                  (a)   The Misleading Financials ................................... 32

                  (b)   The Reasons Why The Financial Statements Were False And Misleading.................................. 60

                        (i)    Improper Accounting For Stock Options....................................... 61

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    i

(ii)    Improper Tax Reporting For Stock Options ................................. 64

(iii)   The Misleading Statements In The Management
        Discussion And Analysis Section Of The Financial Statements ... 66

2.   The False and Misleading Statements Regarding the Option Grants ............. 69

     (a)    The Misleading Statements ..................................................... 69

     (b)    The Reasons Why The Statements Were False And Misleading ........... 81

3.   The False and Misleading Statements Regarding Internal Controls ............... 82

     (a)    The Misleading Statements ..................................................... 82

     (b)    The Reasons Why These Statements Were False and Misleading ......... 88

B.   DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD ............................... 90

     1.   Defendants' Manipulation of Option Grants and KLA's
          Stock Purchase Plan .................................................................. 91

     2.   Defendants' Manipulative And Deceptive Exercise Of Backdated Options ... 94

     3.   Defendants' Manipulative And Deceptive Understating of Expenses,
          Improper Tax Treatment Of Options And Misrepresentation Of The
          Company's Financial Results ...................................................... 94

     4.   Defendants' Participation In The Understating And Misrepresentation Of
          Officer And Director Compensation ............................................. 96

     5.   Defendants' Manipulative And Deceptive Acts Regarding The
          Company's Tax Withholding Obligations ...................................... 96

     6.   Defendants' Failure To Establish Sound Internal Controls And Allow
          Deficiencies And Material Weaknesses ......................................... 99

C.   THE TRUTH BEGINS TO EMERGE .............................................................. 100

D.   ADDITIONAL *SCIENTER* ALLEGATIONS ..................................................... 113

     1.   The Company's Own Admissions And Recent Actions Establish
          Defendants' *Scienter* ................................................................ 114

     2.   Defendants' Specific Participation In The Backdating Establish
          Their *Scienter* ........................................................................ 115

     3.   Defendants' Efforts To Recruit And Retain Executives And Employees
          Supports A Strong Inference Of *Scienter* ..................................... 116

     4.   Defendants' Personal Enrichment Through Lucrative Stock Option
          Grants And Insider Trading Further Supports A Finding Of *Scienter* .......... 118

     5.   The Pervasiveness Of The Fraudulent Conduct And The Nature

Of The Accounting Rules At Issue Further Support A Strong
Inference Of *Scienter* .................................................................................. 160

E.    LOSS CAUSATION.......................................................................... 164

F.    PRESUMPTION OF RELIANCE ..................................................... 166

G.    NO SAFE HARBOR .......................................................................... 166

CLAIMS FOR RELIEF .......................................................................................... 167

COUNT I .................................................................................................................. 167

COUNT II ................................................................................................................. 170

COUNT III ............................................................................................................... 171

COUNT IV ................................................................................................................ 173

COUNT V .................................................................................................................. 175

PRAYER  FOR RELIEF .......................................................................................... 176

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    Lead Plaintiffs Police and Fire Retirement System of the City of Detroit ("PFRS"),
2   Louisiana Municipal Police Employees' Retirement System ("MPERS") and the City of
3   Philadelphia Board of Pensions and Retirement ("CPBPR"), by their attorneys, on behalf of
4   themselves and all others similarly situated, allege the following based upon the investigation of
5   Lead Plaintiffs' counsel, except as to the allegations specifically pertaining to Lead Plaintiffs,
6   which are based upon personal knowledge. The investigation of counsel included, among other
7   things, a review of KLA-Tencor Corporation's ("KLA" or the "Company") public filings with
8   the United States Securities and Exchange Commission ("SEC"), press releases issued by the
9   Company, media and news reports about the Company, publicly available trading data for
10  KLA's securities and interviews with former employees of the Company ("Confidential
11  Witnesses").

12  **I.      NATURE OF THE ACTION**

13          1.      This is a class action brought on behalf of a class consisting of all persons who
14  purchased publicly traded securities of KLA between June 30, 2001 and May 21, 2006,
15  inclusive ("Class Period").  The following are named as defendants in this action: KLA,
16  Richard P. Wallace, Kenneth L. Schroeder, Kenneth Levy, Jon D. Tompkins, Stephen P.
17  Kaufman, Gary E. Dickerson, Jeffrey L. Hall, John H. Kispert, Lida Urbanek, Michael E.
18  Marks, Edward W. Barnholt, Robert T. Bond, Richard J. Elkus, Jr., H. Raymond Bingham,
19  Dean O. Morton, Stuart J. Nichols and Robert J. Boehlke.

20          2.      This action involves an ***admitted intentionally*** fraudulent scheme that spanned
21  nearly a decade.  At the crux of the fraudulent scheme was a practice whereby defendants
22  intentionally manipulated stock option grants to the Company's officers, directors and
23  employees in order to provide the recipients with a more profitable exercise price.   The
24  Company has ***admitted*** that some of its executives had engaged in this scheme knowingly.  As a
25  result of this scheme, ***the Company has been forced to restate its previously filed financial***
26  ***statements*** for fiscal years ended June 30, 2005 and 2004 and selected consolidated financial
27  data for fiscal years ended June 30, 2005, 2004, 2003 and 2002 ***by over $375 million***.  This

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                              1

restatement represents *one of the largest restatements (or projected restatement) of any company that has admitted to options backdating.* According to the scorecard kept by *The Wall Street Journal*, approximately 62 companies have announced restatements and KLA is in the top five in terms of dollar value of the projected or announced restatements.

3.    Publicly traded companies routinely award stock options to their officers, directors and employees. Stock options are granted as part of compensation packages to create incentives to boost profitability and stock value. Such stock options allow the officer, director or employee to purchase company stock at a specified price ("exercise price" or "strike price") for a specific period of time. When an officer, director or employee exercises the option, he or she purchases the stock from the company at the exercise price, regardless of the stock's price at the time the option is exercised. The lower the exercise price, the more profit the officer, director or employee can potentially make and the less money the company gets when the stock option is exercised. When the exercise price of an option grant is set at the market price on the date of the grant, *i.e.*, "at-the-money," the option holder will profit only if the stock price goes up over time. Thus, one of the benefits of such stock options is that they align the interests of the officers, directors and employees with the interests of the company's shareholders because the value of the options only increases if the company's stock price increases. When, however, the option is set below the market price on the date of the grant, *i.e.*, "in-the-money," the option holder receives options that immediately have value.

4.    In early 2006, it came to light that a number of publicly traded companies had been manipulating the exercise price of option grants to officers, directors and employees in improper ways and for improper purposes. The main type of price manipulation is referred to as "backdating." Backdating is the process of retroactively cherry picking an earlier date – when the underlying stock price was lower – as the grant date in order to assign a lower exercise price to the option.

5.    Here, defendants manipulated the stock option grants to officers, directors and employees from the late 1990s through the entire Class Period in a number of ways. Most

1    notably, *the Company has admitted that "certain of our stock options primarily those granted*

2    *from July 1, 1997 to June 30, 2002, had been retroactively priced for all employees who*

3    *received these grants.... This means that the option exercise price was not the market price*

4    *of the option shares on the actual grant date of the option, but instead was a lower market*

5    *price on an earlier date. The actual grant date – when the essential actions necessary to*

6    *grant the option were completed, including the final determination of the number of shares to*

7    *be granted to each employee and the exercise price – is the correct measurement date to*

8    *determine the market price of the option shares under the accounting rules in effect at the*

9    *time."* (Emphasis added.)

10        6.    Stock option manipulation and, in particular, the practice of granting an option

11    with an exercise price tied to a date prior to the actual grant date is fraudulent where, for

12    example, (a) the backdating of grant dates violates the terms of the company's stock option

13    plan; (b) the company misrepresents how the options are priced; or (c) the company fails to

14    properly record expenses associated with these option grants under Generally Accepted

15    Accounting Principles ("GAAP").    All three of these circumstances existed here.

16        7.    Defendants' manipulation of – and, in particular, the backdating of – stock

17    option grants was not a legitimate exercise of their discretion to grant options.  Rather, it was

18    the linchpin of a broader fraudulent scheme to profit from increases in the Company's stock

19    price with the benefit of hindsight and to misrepresent and withhold truthful material

20    information from the public about this scheme.  In furtherance of this fraudulent scheme,

21    defendants engaged in the following misconduct:

22        (a)    Defendants failed to report expenses associated with the backdated

23    options and thereby materially understated KLA's expenses and materially overstated its net

24    income and earnings per share in direct contravention of the most basic GAAP principles.  If the

25    options are priced below a stock's fair market value when they are awarded, there is an instant

26    paper gain.  Pursuant to Accounting Principles Board ("APB") Opinion No. 25 "Accounting for

27    Stock Issued to Employees" ("APB No. 25"), which was in effect through June 2005, the

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                            3

1    Company was obligated to recognize this gain as compensation expense over the vesting period

2    of the option.  After June 2005, Statement of Financial Accounting Standards ("SFAS") 123,

3    "Accounting For Stock-Based Compensation" ("SFAS 123"), required that the Company

4    recognize the entire value of the options on the grant date over the vesting period of the option.

5    However, as the Company just recently admitted, *"the retroactively priced options were not*

6    *accounted for correctly in our previously issued financial statements" under either of these*

7    *two GAAP principles.  Accordingly, the Company was forced to restate its prior financial*

8    *results by recording additional pre-tax, non-cash, stock-based compensation expense of (i)*

9    *$348 million for the periods July 1, 1994 to June 30, 2005 under APB Opinion No. 25"; and*

10    *(ii) "$28 million for the period from July 1, 2005 through December 31, 2006 under SFAS*

11    *No. 123(R)" in order "[to] correct our past accounting for stock options." ("Restatement")*

12    (Emphasis added.).  A further restatement for the third quarter of fiscal year 2006 ("Q3FY06")

13    is still pending.

14            (b)    By retroactively pricing the options, defendants also caused the Company

15    to issue options with terms that violated the express requirements of the Company's stock

16    option plans, which rendered the Company's public representations that options were issued in

17    compliance with the Company's stock option plans false and misleading.  Specifically, three of

18    the Company's stock option plans – the Restated 1982 Stock Option Plan, the 1998 Outside

19    Director Option Plan and the 2004 Equity Incentive Plan – expressly state that the exercise

20    price of the options shall not be less than 100% of the fair market value of the stock on the date

21    of the grant.  However, where, as here, options are backdated, the exercise price of the stock

22    options is lower than the fair market value on the true date of the grant.

23            (c)    Defendants also repeatedly misled investors by affirmatively representing

24    in Company filings that, since it was the Company's philosophy to "motivate executive officers

25    to achieve the Company's business objectives and to align the interests of executive officers

26    with the long term interests of stockholders," "the exercise price of the options shall not be less

27    than 100% of the fair market value of the stock on the date of the grant."

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                    4

1          (d)    Defendants also expressly misrepresented the value of officer and

2   director compensation in various Company filings, particularly the proxy statements

3   disseminated to investors in connection with the annual shareholder meetings. Specifically, in

4   identifying specific options granted to the officers and directors, defendants falsely stated that

5   such options were granted with an exercise price equal to the fair market value of the stock on

6   the grant date when, in fact, the options granted were backdated and thus "in-the-money" when

7   granted.

8          8.    By issuing its Restatement, KLA *conceded that its prior financial statements*

9   *about its financial results were materially false and misleading when made* because such

10  statements omitted material facts regarding the fact and financial effect of the backdated option

11  grants. Moreover, *the Company has expressly admitted* in its annual report on Form 10-K for

12  the period ended June 30, 2006 ("2006 Form 10-K") *that the fraud has had a material impact*

13  *on the Company and its shareholders* in a number of ways:

14  - "The discovery that *we had retroactively priced stock options* (primarily from July 1,
15    1997 to June 30, 2002) *and had not accounted for them correctly* has had, and may
      continue to have, a material adverse effect on our financial results." (Emphasis added.)

16  - "The ongoing government inquiries relating to our historical stock option practices are
17    time consuming and expensive and *could result in injunctions, fines and penalties that*
      *may have a material adverse effect on our financial condition and results of*
18    *operations*." (Emphasis added.)

19  - "The Special Committee investigation and restatement activities have required us to
      expend significant management time and incur significant accounting, legal, and other
20    expenses. *The resulting restatements have had a material adverse effect on our*
      *results of operations.*" (Emphasis added.)

21         9.    There is no doubt that the backdating of the option grants and corresponding

22  public misrepresentations were the result of intentional and opportunistic acts. Indeed, the

23  Company has made the following additional key admissions in its 2006 Form 10-K:

24  - "*There was retroactive pricing of stock options granted* to *all employees* who received
25    options, primarily during the periods from July 1, 1997 to June 30, 2002." (Emphasis
      added.)

26  - "*[T]he retroactive pricing of options involved the falsification of Company records*,
      *resulting in erroneous statements* being made in financial and other reports previously
27    filed with the SEC, as well as in information previously provided to our independent
      registered public accounting firm." (Emphasis added.)

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT           5

- *"[T]he retroactive pricing of options was intentional, not inadvertent or through administrative error."* (Emphasis added.)

- *"[T]he retroactive pricing of options involved the selection of fortuitously low exercise prices by certain former executive officers, and other former executives may have been aware of this conduct."* (Emphasis added.)

- *"The individual who served as the Company's Chief Executive Officer during part of that time period and continuing until midway through the last fiscal year, was involved in the past retroactive pricing of stock options."* (Emphasis added.) Based on public filings, the individual who held these positions was *Schroeder*.

- Under the "Findings and Remedial Actions" section of the 2006 Form 10-K, the Company stated that, "[a]s result of the Special Committee investigation, on October 16, 2006, *we terminated our employment relationship and agreement with Kenneth L. Schroeder,* and *we announced our intent to cancel all outstanding stock options held by Mr. Schroeder that were retroactively priced or otherwise improperly granted*. Those options were canceled in December 2006.... Accordingly, in the second quarter of fiscal 2007 the Company will reverse approximately $20 million of the non-cash, stock-based compensation recorded in prior periods...." (Emphasis added.)

- Under the "Findings and Remedial Actions" section of the 2006 Form 10-K, the Company also stated that *Nichols and Levy had resigned* in fall 2006 and that the Company had entered into agreements with both Nichols and Levy whereby the Company *re-priced their outstanding retroactively priced stock options by increasing the exercise price to the market price of the option shares on the actual grant date*. While the Company attempted to shield others whose backdated options were re-priced by including a caveat regarding their alleged lack of involvement in the scheme, it provided no such caveat for Nichols and Levy, thereby acknowledging their involvement.

10.    There is no doubt that this extensive fraud injured Lead Plaintiffs and members of the Class. From the very first published announcement of potential backdating at KLA on May 22, 2006, the market has reacted to the news and the stock price has fallen as the prior artificial inflation was removed from the value of KLA's securities. Specifically, after *The Wall Street Journal* issued the first article raising the strong possibility of backdating at KLA and the Company revealed that the Department of Justice ("DOJ") was investigating possible backdating, the price of KLA common stock plummeted from a closing price of $45.24 per share on May 19, 2006 to a closing price of $40.54 on May 22, 2006, *on heavy volume of 13,615,220 shares traded - which was three times the average trading volume for the prior three months*. This one-day drop alone amounted to a *market capitalization loss of approximately $935 million*.

11.    Moreover, by issuing false and misleading statements regarding officer and director compensation as well as the terms of a new option plan in the proxy statements, defendants deprived Lead Plaintiffs and other Class members of their basic corporate suffrage rights in connection with their voting rights at the annual shareholder meetings.

## II.    JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78aa, and 28 U.S.C. §1331.  The claims asserted herein arise under Sections 10(b), 14(a), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78n(a), 78t(a) and 78t-1, and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC, 17 C.F.R. §§240.10b-5 and 240.14a-9.

13.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  KLA's principal executive offices are located in this District, defendants transacted business in this District and many of the acts and transactions constituting the violations of law alleged herein, including the preparation, issuance and dissemination of materially false and misleading statements to the investing public, occurred in this District.

14.    In connection with the acts, conduct and other wrongs alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and national securities markets.

## III.    THE PARTIES

### A.    THE LEAD PLAINTIFFS

15.    Plaintiff PFRS purchased KLA securities during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the wrongful acts of defendants alleged herein.  Moreover, PFRS had standing to vote in connection with each of the proxy statements alleged herein, as it held shares on the requisite dates.

16.    Plaintiff MPERS purchased KLA securities during the Class Period, as set forth in the certification previously filed with the Court, and suffered damages as a result of the

1    wrongful acts of defendants alleged herein. Moreover, MPERS had standing to vote in

2    connection with each of the proxy statements alleged herein, as it held shares on the requisite

3    dates.

4          17.     Plaintiff CPBPR purchased KLA securities during the Class Period, as set forth

5    in the certification previously filed with the Court, and suffered damages as a result of the

6    wrongful acts of defendants alleged herein. Moreover, CPBPR had standing to vote in

7    connection with each of the proxy statements alleged herein, as it held shares on the requisite

8    dates.

9          18.     By Order dated October 13, 2006, PFRS, MPERS and CPBPR were appointed

10   Lead Plaintiffs in this action.

11        **B.**      **THE DEFENDANTS**

12             **(i)**      **The Company**

13          19.     KLA maintains its principal executive offices at 160 Rio Robles, San Jose,

14   California 95134. The Company purports to be the world's leading supplier of process control

15   and yield management solutions for the semiconductor and related microelectronics industries.

16   KLA's portfolio of products, software, analysis and services is designed to help integrated

17   circuit ("IC") manufacturers manage yield throughout the entire fabrication process – from

18   research and development to final mass-production yield analysis. According to the Company,

19   virtually every major wafer, IC and photomask manufacturer in the world uses KLA's products

20   and services. These customers use KLA's products and services for (a) inline wafer defect

21   monitoring; (b) reticle and photomask defect inspection; (c) critical dimension metrology; (d)

22   wafer overlay; (e) film and surface measurement; and (f) overall yield and fab-wide data

23   analysis. The Company acts by and through its officers and directors, including defendants.

24             **(ii)**      **The Officer Defendants: Wallace, Schroeder,**
                         **Dickerson, Kispert, Hall, Boehlke and Nichols**

25

26          20.     Richard P. Wallace ("Wallace") is the current Chief Executive Officer ("CEO")

27   and is a director of the Company. He was appointed CEO of the Company on January 1, 2006

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                  8

1  and has served as a director since January 2006. Wallace was President and Chief Operating

2  Officer ("COO") from July 2005 through December 2005. He was Executive Vice President of

3  the Customer Group from May 2004 to July 2005 and Executive Vice President of the Wafer

4  Inspection, Review & Analysis Group from July 2000 to May 2004. Wallace signed false and

5  misleading KLA filings during the Class Period, including the Company's quarterly reports on

6  Form 10-Q for the period ended December 31, 2005 ("Q2FY06") and for Q3FY06. Wallace

7  also certified the Form 10-Qs filed for Q2FY06 and Q3FY06. Wallace is a citizen of the State

8  of California.

9       21.    Kenneth L. Schroeder ("Schroeder") served as a director and CEO of the

10  Company from July 1999 until January 1, 2006. Schroeder also served as President of the

11  Company from November 1991 to July 2002 and again from May 2004 to July 2005. He was

12  COO of the Company from November 1991 until June 1999. Schroeder served on the

13  Nominating and Governance Committee of the Board of Directors during fiscal years 2001 and

14  2002. According to the Company's 2006 Form 10-K, Schroeder was a member of the

15  Company's Stock Option Committee from 1994 until December 31, 2005 and was employed as

16  a Senior Advisor to the Company from January 1, 2006 through October 16, 2006. Schroeder

17  signed false and misleading KLA filings during the Class Period, including the Company's

18  quarterly reports on Form 10-Q for the periods ended September 30, 2002 ("Q1FY03"),

19  December 31, 2002 ("Q2FY03"), March 31, 2003 ("Q3FY03"), September 30, 2003

20  ("Q1FY04"), December 31, 2003 ("Q2FY04"), March 31, 2004 ("Q3FY04"), September 30,

21  2004 ("Q1FY05"), December 31, 2004 ("Q2FY05"), March 31, 2005 ("Q3FY05") and

22  September 30, 2005 ("Q1FY06") and the Form 10-Ks filed for fiscal years ended June 30, 2001

23  ("2001 Form 10-K"), June 30, 2002 ("2002 Form 10-K"), June 30, 2003 ("2003 Form 10-K"),

24  June 30, 2004 ("2004 Form 10-K") and June 30, 2005 ("2005 Form 10-K"). Schroeder also

25  certified the Form 10-Qs filed for Q1FY03, Q2FY03, Q3FY03, Q1FY04, Q2FY04, Q3FY04,

26  Q1FY05, Q2FY05, Q3FY05 and Q1FY06 and the 2001, 2002, 2003, 2004 and 2005 Form 10-

27  Ks. Schroeder is a citizen of the State of California.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    9

1       22.    Gary E. Dickerson ("Dickerson") served as President of the Company from July

2   2002 to April 2004 and as COO of the Company from July 1999 to April 2004.  He served as

3   Executive Vice President of the Customer Group from July 1997 to June 30, 1999.  He was also

4   named Senior Vice President, New Business Operations in May 2004.    According to a

5   Confidential Witness, Dickerson was also a member of KLA's Stock Option Committee.

6   Dickerson is a citizen of the State of California.

7       23.    Jeffrey L. Hall ("Hall") is the current Chief Financial Officer ("CFO") of the

8   Company. He was appointed Senior Vice President and CFO in January 2006. From July 2004

9   until his appointment as CFO on January 1, 2006, Hall was Vice President of Finance, Tax and

10   Treasury.  From July 2003 though July 2004, Hall served as Vice President, Finance and

11   Accounting and, from April 2001 to July 2003, he was Vice President, Mergers and

12   Acquisitions and Corporate Planning.  As CFO and VP of Finance during the Class Period,

13   defendant Hall was responsible for the preparation of the Company's financial statements and

14   for ensuring that the periodic reports filed with the SEC containing such financial statements

15   complied fully with the disclosure requirements of the federal securities laws.  According to a

16   Confidential Witness, Hall was also a member of KLA's Stock Option Committee.  Hall signed

17   false and misleading KLA filings during the Class Period, including the Company's quarterly

18   reports on Form 10-Q for the periods ended Q2FY06 and Q3FY06.  Hall also certified the Form

19   10-Qs filed for Q2FY06 and Q3FY06.  Hall earned his bachelor's degree in finance from

20   Indiana University and his master's degree in business administration from the University of

21   Dayton.  Hall is a citizen of the State of California.

22       24.    John H. Kispert ("Kispert") is the current President and COO of the Company.

23   He was appointed President and COO on January 1, 2006.  From July 2000 until his

24   appointment as President and COO, he served as Executive Vice President and CFO of the

25   Company. As CFO during the Class Period, Kispert was responsible for the preparation of the

26   Company's financial statements and for ensuring that the periodic reports filed with the SEC

27   containing such financial statements complied fully with the disclosure requirements of the

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                   10

1    federal securities laws.  According to a Confidential Witness, Kispert was a member of the

2    KLA's Stock Option Committee.  Kispert signed false and misleading KLA filings during the

3    Class Period, including the Company's quarterly reports on Form 10-Q for the periods ended

4    March 31, 2001 ("Q3FY01"), September 30, 2001 ("Q1FY02"), December 31, 2001

5    ("Q2FY02"), March 31, 2002 ("Q3FY02"), Q1FY03, Q2FY03, Q3FY03, Q1FY04, Q2FY04,

6    Q3FY04, Q1FY05, Q2FY05, Q3FY05 and Q1FY06 and the 2001, 2002, 2003, 2004 and 2005

7    Form 10-Ks.  Kispert also certified the Form 10-Qs filed for Q1FY03, Q2FY03, Q3FY03,

8    Q1FY04, Q2FY04, Q3FY04, Q1FY05, Q2FY05, Q3FY05 and Q1FY06 and the 2001, 2002,

9    2003, 2004 and 2005 Form 10-Ks.    Kispert obtained his master's degree in business

10   administration from the University of California, Los Angeles.  Kispert is a citizen of the State

11   of California.

12       25.     Robert J. Boehlke ("Boehlke") served as Executive Vice President and CFO of

13   the Company from 1990 until his retirement in 2000.  Between 1983 and 1990, he held various

14   management positions at KLA.  As CFO, Boehlke was responsible for the preparation of the

15   Company's financial statements and for ensuring that the periodic reports filed with the SEC

16   containing such financial statements complied fully with the disclosure requirements of the

17   federal securities laws.   Boehlke received his master's degree in business administration from

18   Harvard University.  Boehlke is a citizen of the State of California.

19       26.     Stuart J. Nichols ("Nichols") was Vice President and General Counsel of KLA

20   from 2000 until his resignation on October 16, 2006.  According to a Confidential Witness,

21   Nichols was a member of KLA's Stock Option Committee.   Nichols signed false and

22   misleading KLA filings during the Class Period, specifically the Notice of Annual Meeting of

23   Stockholders for the 2002, 2003, 2004 and 2005 Schedule 14A Proxy Statements.   Nichols is a

24   citizen of the state of California.

25       27.     Wallace, Schroeder, Dickerson, Kispert, Hall Boehlke and Nichols are

26   collectively referred to hereinafter as the "Officer Defendants."  By virtue of their high-level

27   positions with the Company, each of the Officer Defendants directly participated in the

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                11

1  management of the Company, was directly involved in the day-to-day operations of the

2  Company at the highest levels and was privy to confidential proprietary information concerning

3  the Company and its business, operations, growth, financial statements and financial condition.

4      28.     As officers of the Company, defendants Wallace, Schroeder, Dickerson, Hall,

5  Kispert and Nichols had extensive duties to ensure the accuracy of information disseminated to

6  investors:

7          (a)     As noted in American Institute of Certified Public Accountants

8  ("AICPA") auditing standard, Section 110.03, a public company's management is responsible

9  for preparing financial statements in accordance with GAAP:

10         The financial statements are management's responsibility.... Management is
           responsible for adopting sound accounting policies and for establishing and
11         maintaining internal controls that will, among other things, initiate, record,
           process, and report transactions (as well as events and conditions) consistent with
12         management's assertions embodied in the financial statements. The entity's
           transactions and the related assets, liabilities, and equity are within the direct
13         knowledge and control of management. The auditor's knowledge of these matters
           and internal controls is limited to that acquired through the audit. Thus, the fair
14         presentation of financial statements in conformity with generally accepted
           accounting principles is an implicit and integral part of management's
15         responsibility.

16         (b)     In Accounting Series Release 173 (July 2, 1975), the SEC reiterated the

17  duty of management to present a true representation of a company's operations:

18         [I]t is important that the overall impression created by the financial statements be
           consistent with the business realities of the company's financial position and
19         operations.

20         (c)     Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and SEC rules

21  promulgated thereunder, the CEO and CFO of reporting corporations are required to certify as

22  to the accuracy and completeness of the company's financial statements.    In addition,

23  companies are required to make extensive disclosures in their Proxy Statements and annual

24  reports regarding officer and director compensation, including stock holdings and exercised and

25  unexercised stock options.

26      29.     As the Company's own filings also state, "KLA-Tencor's management is

27  responsible for establishing and maintaining a system for internal controls and the financial

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              12

1   reporting process."

2                 (iii)    **The Compensation Committee Defendants: Urbanek, Marks,**

3                             **Barnholt and Bond**

4         30.    Lida Urbanek ("Urbanek") has served as a director of KLA and as a member of

5 the Compensation Committee of the Board of Directors ("Compensation Committee") since

6 April 1997. Urbanek signed false and misleading KLA filings during the Class Period,

7 including the 2001, 2002, 2003, 2004 and 2005 Form 10-Ks. Urbanek is a citizen of the State

8 of California.

9         31.    Michael E. Marks ("Marks") was a director of KLA and a member of the

10 Compensation Committee from November 2003 until May 2006. Marks signed false and

11 misleading KLA filings during the Class Period, including the 2004 and 2005 Form 10-Ks.

12 Marks is a citizen of the State of California.

13         32.    Edward W. Barnholt ("Barnholt") has served as a director of KLA since 1995

14 and was named Chairman of the Board of Directors of KLA in October 2006. He has served as

15 a member of the Compensation Committee since 2000 and of the Nominating and Governance

16 Committee since fiscal 2000. Barnholt signed false and misleading KLA filings during the

17 Class Period, including the 2001, 2002, 2003, 2004 and 2005 Form 10-Ks. Barnholt is a citizen

18 of the State of California.

19         33.    Robert T. Bond ("Bond") has served as a director of KLA since August 2000.

20 He has served as a member of the Compensation Committee since 2000 and as Chair of this

21 Committee since 2004. He also has served as a member of the Audit Committee since 2002.

22 Bond signed false and misleading KLA filings during the Class Period, including the 2001,

23 2002, 2003, 2004 and 2005 Form 10-Ks. Bond is a citizen of the State of California.

24         34.    Defendants Urbanek, Marks, Barnholt and Bond are collectively referred

25 hereinafter as the "Compensation Committee Defendants." As members of the Compensation

26 Committee, the Compensation Committee Defendants were responsible for the Company's

27 public representations regarding options. KLA's proxy statements generally provide that "the

28

1    Compensation Committee reviews and approves, subject to ratification by the Board of

2    Directors, the Company's executive compensation policy and administers the Company's

3    employee equity award plans."   According to KLA's Compensation Committee Charter, the

4    Compensation Committee Defendants participated in decisions regarding the options grants

5    including the setting of option grant dates and exercise prices.   More specifically, the

6    Company's Charter for the Compensation Committee states that the purpose of the

7    Compensation Committee is to, *inter alia*, "review and make recommendations to the Board of

8    Directors regarding all forms of compensation to be provided to the executive officers and

9    directors…including…stock compensation to all employees" of the Company.   The charter

10   further describes the Compensation Committee's responsibilities as follows:

11           (a)      "Two weeks prior to the Compensation Committee meeting, each

12   member of the committee will receive information regarding compensation, option grants,

13   bonuses…."

14           (b)      The "Compensation Committee will make a recommendation to the

15   Board on the range of option grants for each level of employee; the compensation, option grants

16   and bonus goals for each officer of at least Vice President…."

17           (c)      The Compensation Committee "review[s] and mak[es] recommendations

18   to the Board of Directors regarding the compensation policy for executive officers of and

19   directors of the Company, and such other officers of the Company as directed by the Board."

20           (d)      The Compensation Committee "review[s] and mak[es ] recommendations

21   to the Board of Directors regarding all forms of compensation (including all 'plan'

22   compensation, as such term is defined in Item 402(a)(7) of Regulation S-K promulgated by the

23   Securities and Exchange Commission, and all non-plan compensation) to be provided to the

24   executive officers of the Company."

25           (e)      Members act as administrators for the Company's Option Plans by,

26   among other things, granting stock options or stock purchase rights to eligible individuals.

27           (f)      Members prepare a report for inclusion in the Company's proxy

28

1   statements, "which describes (a) the criteria on which compensation paid to the Chief Executive

2   Officer for the last completed fiscal year is based; (b) the relationship of such compensation to

3   the Company's performance; and (c) the Compensation Committee's executive compensation

4   policies applicable to executive officers."

5           (g)     Members review and make recommendations to the Board regarding

6   compensation of the independent board members, including option grants.

7           (h)     Members prepare written reports to the Board regarding

8   recommendations of the Compensation Committee submitted to the Board for action and

9   provide the Board with copies of written minutes of its meetings.

10      35.     During fiscal years 2001, 2002, 2003, 2004, 2005 and 2006, the Compensation

11  Committee met four, two, two, three, four and six times, respectively.   The Compensation

12  Committee was required to provide to the Board of Directors its schedule of meetings.

13      36.     The Company has expressly represented that, during the Class Period, "all stock

14  option grants to officers are made with a review by, and with the approval of the Compensation

15  Committee of the Board of Directors." *See* 2002 Form 10-K, Q1FY03 Form 10-Q, 2QFY03

16  Form 10-Q, 3QFY03 Form 10-Q. *See also* 2003 Form 10-K and 2004 Form 10-K stating that

17  "[a]ll stock option grants to officers are approved by the Compensation Committee of the Board

18  of Directors."

19      37.     During the Class Period, the Compensation Committee also prepared reports on

20  executive compensation, which were included in the proxy statements disseminated to

21  shareholders in connection with the annual shareholder meetings.

22          (iv)    **The Audit Committee Defendants: Bingham, Elkus, Morton**
                    **Kaufman And Bond**
23

24      38.     H. Raymond Bingham ("Bingham") has served as a director of KLA since

25  October 1999.  He has served as a member of the Audit Committee since 2000 and as Chairman

26  of the Audit Committee since 2003.  According to KLA's 2004 and 2005 Proxy Statements, the

27  Board determined that Bingham was an "'audit committee financial expert' within the meaning

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    15

1  of the rules promulgated by the [SEC]." Bingham has also been a member of the Nominating

2  and Governance Committee since fiscal year 2006. Bingham signed false and misleading KLA

3  filings during the Class Period, including the 2001, 2002, 2003, 2004 and 2005 Form 10-Ks.

4  Bingham is a citizen of the State of California.

5       39.    Richard J. Elkus, Jr. ("Elkus") has served as a director of KLA from April 1997

6  until November 4, 2005 (fiscal 2006) and was a member of the Audit Committee from 1999

7  until November 4, 2005. He also served on the Nominating and Governance Committee from

8  fiscal 2003 to November 4, 2005. Elkus signed false and misleading KLA filings during the

9  Class Period including the 2001, 2002, 2003, 2004 and 2005 Form 10-Ks. Elkus is a citizen of

10  the State of California.

11       40.    Dean O. Morton ("Morton") served as a director of KLA from April 1997 until

12  July 31, 2002. Morton was a member of the Audit Committee and the Nominating and

13  Governance Committee during fiscal year 2001. Morton received an M.B.A. from Harvard

14  Business School. Morton signed false and misleading KLA filings during the Class Period -

15  specifically, the 2001 Form 10-K. Morton is a citizen of the State of California.

16       41.    Stephen P. Kaufman ("Kaufman") has served as a director of KLA since

17  November 2002. He has been a member of the Audit Committee since November 2002 (fiscal

18  2003). Kaufman has also served as a member of the Nominating and Governance Committee

19  since fiscal year 2005. Kaufman signed false and misleading KLA filings during the Class

20  Period, including the 2003, 2004 and 2005 Form 10-Ks. Kaufman is a citizen of the State of

21  California.

22       42.    Bond has also served as a member of the Audit Committee since fiscal year

23  2002.

24       43.    Defendants Bingham, Elkus, Morton, Kaufman and Bond are collectively

25  referred to hereinafter as the "Audit Committee Defendants." KLA's own reports state that the

26  "Audit Committee is responsible for overseeing KLA-Tencor's auditing, accounting and

27  financial reporting processes, its system of internal controls, and legal and ethical compliance."

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                    16

1   According to KLA's Audit Committee Charter, the purpose of the Audit Committee is to, *inter*

2   *alia*:

3              (a)     "[O]versee the accounting and financial reporting processes of the

4   Company and the audits of the financial statements of the Company."

5              (b)     "Assist the Board of Directors in oversight and monitoring of (i) the

6   integrity of the Company's financial statements; (ii) Company's compliance with legal and

7   regulatory requirements; (iii) the independent auditor's qualifications, independence and

8   performance; and (iv) the Company's internal accounting and financial controls."

9              (c)     "Prepare the report that the rules of the [SEC] required to be included in

10  the Company's annual proxy statement."

11             (d)     "[P]rovide the Board with the results of its monitoring and

12  recommendations derived therefrom."

13             (e)     "[P]rovide to the Board such additional information and materials as it

14  may deem necessary to make the Board aware of significant financial matters that require the

15  attention of the Board."

16        44.     The Audit Committee Charter further states that the responsibilities of the Audit

17  Committee include:

18             (a)     "Reviewing on a continuing basis the adequacy of the Company's system

19  of internal controls, including meeting periodically with the Company's management and the

20  independent auditors to review the adequacy of such controls and to review before release the

21  disclosure regarding such system of internal controls required under SEC rules to be contained

22  in the Company's periodic filings and the attestations or reports by the independent auditors

23  relating to such disclosure."

24             (b)     "Reviewing and discussing with management and independent auditors

25  the annual audited financial statements and quarterly unaudited Financial Statements, including

26  the Company's disclosures under 'Management's Discussion and Analysis of Financial

27  Condition and Results of Operations' to be included in the Company's Annual Report on Form

28

1   10K… and Quarterly Reports on Form 10-Q, respectively, prior to their filing with the SEC."

2         (c)    "Conducting a post-audit review of the financial statements and audit

3   findings."

4         (d)    "Reviewing before release the unaudited quarterly operating results in the

5   Company's quarterly earnings release."

6         (e)    "Overseeing compliance with the requirements of the SEC for disclosure

7   of auditor's services and audit committee members, member qualifications and activities."

8         (f)    "Reviewing, approving and monitoring the Company's code of ethics for

9   its senior financial officers."

10         (g)    "Reviewing, in conjunction with counsel, any legal matters that could

11   have a significant impact on the Company's financial statements."

12         (h)    "Providing a report in the Company's proxy statement in accordance

13   with the rules and regulations of the SEC."

14         45.    The Audit Committee Charter further provides that "[e]ach member [of the Audit

15   Committee] will be able to read and understand fundamental financial statements in accordance

16   with the Nasdaq National Market Audit Committee Requirements."  During fiscal years 2001,

17   2002, 2003, 2004, 2005 and 2006, the Audit Committee met five, four, twelve, ten, eleven and

18   six times, respectively.

19         46.    In substantially identical language, each of KLA's Proxy Statements for 2001

20   through 2006 included an Audit Committee report, which stated that, "[b]ased on the reviews

21   and discussions referred to above, the Audit Committee recommended to the Board of

22   Directors, and the Board of Directors approved, the inclusion of the audited financial statements

23   in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, [2001-2006]

24   filed with the [SEC]."

25         (v)    **The Nominating and Governance Committee Defendants:  Levy,**
              **Morton, Barnholt, Schroeder, Elkus, Bingham and Kaufman**
26

27         47.    Kenneth Levy ("Levy"), a founder of KLA, served as a director of the Company

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              18

1   from 1975 through October 16, 2006 and as Chairman of the Board from July 1999 through

2   October 2006, when he retired amidst the Special Committee investigation. Levy also served as

3   CEO of the Company from July 1998 to June 1999 and as a member of the Nominating

4   Committee in at least 2000 and 2001. Levy signed false and misleading KLA filings during the

5   Class Period, including the 2001, 2002, 2003, 2004 and 2005 Form 10-Ks. Levy is a citizen of

6   the State of California.

7       48.    Morton was a member of the Nominating and Governance Committee during

8   fiscal year 2001.

9       49.    Barnholt has been a member of the Nominating and Governance Committee

10  since fiscal year 2000 and served as chairman of the Nominating and Governance Committee

11  during fiscal years 2004, 2005 and 2006.

12      50.    Schroeder was a member of the Nominating and Governance Committee during

13  at least fiscal years 2001 and 2002.

14      51.    Elkus was a member of the Nominating and Governance Committee from fiscal

15  year 2003 to November 4, 2005.

16      52.    Bingham has been a member of the Nominating and Governance Committee

17  since fiscal year 2006.

18      53.    Kaufman has been a member of the Nominating and Governance Committee

19  since fiscal year 2005.

20      54.    Defendants Levy, Morton, Barnholt, Schroeder, Elkus, Bingham and Kaufman

21  are collectively referred to hereinafter as the "Nominating and Governance Committee

22  Defendants."    According to KLA's Nominating and Governance Committee Charter, the

23  purpose of the Nominating and Governance Committee is to, *inter alia*, "provide assistance to

24  the Board of Directors in fulfilling its responsibility to its stockholders, potential stockholders

25  and investment community by":

26          a.    "Identifying individuals qualified to become directors and
                  selecting, or recommending that the Board of Directors select, the
27                candidates for all directorships to be filled by the Board of
                  Directors or by the stockholders."
28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              19

b. "Developing and recommending to the Board of Directors a set of corporate governance principles applicable to the KLA-Tencor Corporation."

c. "Overseeing the evaluation of the Board of Directors and ensuring that the Board of Directors is properly constituted to meet its fiduciary obligations to the Corporation and its stockholders and that the Corporation has and follows appropriate governance standards."

d. "Otherwise taking a leadership role in shaping the corporate governance of the Corporation."

55. The Nominating and Governance Committee Charter states that the responsibilities and duties of the Nominating and Governance Committee include the duties to:

a. "Evaluate the current composition, organization and governance of the Board of Directors and its committees, determine future requirements and make recommendations to the Board of Directors for approval."

b. "Identify individuals believed to be qualified as candidates to serve on the Board of Directors and select, or recommend that the Board of Directors select, the candidates for all directorships to be filled by the Board of Directors or by the stockholders at an annual or special meeting."

c. "Review and make recommendations to the full Board of Directors, or determine, whether members of the Board should stand for re-election."

d. "Conduct all necessary and appropriate inquiries into the backgrounds and qualifications of possible candidates."

e. "Consider questions of independence and possible conflicts of interest of members of the Board of Directors and executive officers."

f. "Review and make recommendations, as the Committee deems appropriate, regarding the composition and size of the Board of Directors in order to ensure the Board has the requisite expertise and its membership consists of persons with sufficiently diverse and independent backgrounds."

g. "Evaluate and recommend termination of membership of individual directors in accordance with the Board of Directors' governance principles, for cause or for other appropriate reasons."

h. "Recommend members of the Board of Directors to serve on the committees of the Board, giving consideration to the criteria for service on each committee as set forth in the charter for such committee, as well as to any other factors the Committee deems relevant, and where appropriate, make recommendations regarding

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                        20

the removal of any member of any committee."

i.    "Develop and recommend to the Board of Directors a set of corporate governance principles and keep abreast of developments with regard to corporate governance to enable the Committee to make recommendations to the Board of Directors in light of such developments as may be appropriate."

j.    "Report regularly to the Board of Directors (i) following meetings of the Committee, (ii) with respect to such other matters as are relevant to the Committee's discharge of its responsibilities and (iii) with respect to such recommendations as the Committee may deem appropriate."

56.    The Nominating and Governance Committee did not meet during the 2001 and 2002 fiscal years. During fiscal years 2003, 2004, 2005 and 2006, the Nominating and Governance Committee met two, three, five and four times, respectively.

(vi)    **The Additional Outside Director Defendant: Tompkins**

57.    Jon D. Tompkins ("Tompkins") served as a director of KLA from April 1997 with his resignation on December 21, 2006. Tompkins served as Chairman of the Board from July 1998 to June 1999 and as CEO of the Company from May 1997 to July 1998. According to the Company's 2006 Form 10-K, Tompkins also served as a member of the Stock Option Committee from mid-1997 until mid-1999. Tompkins signed KLA's false and misleading SEC filings during the Class Period, including the 2001, 2002, 2003, 2004 and 2005 Form 10-Ks. Tompkins is a citizen of the State of California.

58.    Defendants Wallace, Schroeder, Urbanek, Marks, Barnholt, Bond, Bingham, Elkus, Morton, Kaufman, Levy and Tompkins are collectively referred hereinafter as the "Director Defendants." During the Class Period, KLA's Board of Directors was responsible for the oversight and monitoring of (a) the integrity of the financial statements; (b) the Company's compliance with legal and regulatory requirements; (c) the independent auditor's qualifications, independence and performance; and (d) the Company's internal accounting and financial controls. The Board had final decision-making authority regarding compensation and determined the compensation to be provided to executive officers and directors of the Company, including salaries, retainers, stock compensation and loans, and all salary, bonus and

1  stock compensation to all employees. In addition, the Board was the administrator of KLA's

2  stock option plans. In that capacity, the Board had the authority, among other things, to

3  determine the terms and conditions of the awards granted under the stock option plans, which

4  includes establishing the exercise price of the stock options, deciding who will receive stock

5  options and determining number of stock options awarded to each recipient. Members of the

6  Board committees, including the Audit Committee, Compensation Committee and Nominating

7  Governance Committee, reported to the Board. In addition to its responsibilities to KLA, the

8  Board had fiduciary responsibilities to its stockholders, potential stockholders and the

9  investment community.

10  　　　59.　　Wallace, Schroeder, Dickerson, Kispert, Hall, Boehlke, Nichols, Urbanek,

11  Marks, Barnholt, Bond, Bingham, Elkus, Morton, Kaufman, Levy and Tompkins are

12  collectively referred to herein as the "Individual Defendants." Because of the Individual

13  Defendants' positions within the Company, they had access to adverse undisclosed material

14  information about KLA's financial condition, earnings and expenses, officer and director

15  compensation, stock option grants and management integrity. They were privy to such

16  undisclosed information from internal corporate documents, communications with other officers

17  and employees of the Company and attendance at, and documents received during, meetings of

18  management, the Board of Directors, the Stock Option Committee, the Compensation

19  Committee, the Audit Committee and/or the Nominating Committee. They each knew or were

20  deliberately reckless in not knowing of the adverse material facts which rendered the statements

21  alleged herein false and misleading.

22  　　　60.　　The Individual Defendants, as officers and/or directors of the Company, had a

23  duty to disseminate complete, accurate and truthful information about KLA's financial

24  condition, earnings and expenses, stock option grants, officer and director compensation and

25  management integrity. The Individual Defendants had a duty to promptly correct any public

26  statements issued by KLA that had become false and misleading. The Individual Defendants

27  were involved in the drafting, producing, reviewing and/or dissemination of the false and

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT　　　　　　　　　　　　　　　　22

1  misleading statements alleged herein.

2      61.    Because of their positions, their ability to exercise power and influence with

3  respect to KLA's course of conduct and their access to material inside information about KLA,

4  the Individual Defendants were, at the time of the wrongs alleged herein, controlling persons

5  within the meaning of Section 20(a) of the Exchange Act.

6      62.    It is appropriate to treat the Individual Defendants as a group for pleading

7  purposes and to presume that the false, misleading and/or incomplete information conveyed in

8  the Company's public filings, press releases and other publications as alleged herein are the

9  collective action of the Individual Defendants identified above.

10 **IV.    CLASS ACTION ALLEGATIONS**

11     63.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23(a) and

12 (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and

13 entities who purchased KLA securities during the Class Period and were damaged thereby

14 ("Class").  Excluded from the Class are defendants herein, officers and directors of KLA,

15 members of their immediate families and the heirs, successors or assigns of any of the

16 foregoing.

17     64.    The members of the Class are so numerous that joinder of all members is

18 impracticable.  While the exact number of Class members is unknown to Lead Plaintiffs at this

19 time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe there

20 are, at a minimum, thousands of members of the Class.  According to the 2006 Form 10-K,

21 there were 199,725,957 shares of common stock outstanding as of December 31, 2006, which

22 securities traded actively in an open and efficient market on the NASDAQ National Market

23 under the symbol "KLAC."

24     65.    Common questions of law and fact exist as to all members of the Class and

25 predominate over any questions affecting solely individual members of the Class.  The

26 following are questions of law and fact common to the Class:

27         •  whether defendants engaged in acts or conduct in violation of federal securities

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                    23

1     laws as alleged herein;

2     • whether the misrepresentations were material;

3     • whether the misrepresentations contained in the proxy statements were

4     essentially linked to the votes sought by the proxy;

5     • whether KLA issued false and misleading financial statements and information

6     about stock option expenses, officer and director compensation and KLA

7     financial condition during the Class Period;

8     • whether the Individual Defendants caused KLA to issue false and misleading

9     financial statements and information about stock options, officer and director

10     compensation and KLA financial condition during the Class Period;

11     • whether the Individual Defendants falsified or permitted the falsification of

12     documents relating to stock option grants;

13     • whether defendants acted knowingly or with deliberate recklessness in issuing

14     false and misleading financial statements and information about stock options,

15     officer and director compensation and KLA financial condition;

16     • whether defendants improperly manipulated the terms of the stock options

17     granted to the Individual Defendants and others and misled investors regarding

18     such terms and KLA's financial condition;

19     • whether defendants engaged in a scheme to defraud by manipulating the terms of

20     stock options granted to the Individual Defendants and others;

21     • whether the market prices of KLA securities during the Class Period were

22     artificially inflated because of defendants' conduct complained of herein;

23     • whether the members of the Class have sustained damages and, if so, what is the

24     proper measure of damages; and

25     • what form of equitable relief should be awarded.

26     66.    Lead Plaintiffs' claims are typical of the claims of the other members of the

27     Class and the other members of the Class sustained damages arising out of defendants'

28

1  wrongful conduct in violation of federal law as complained of herein.

2      67.    Lead Plaintiffs will fairly and adequately protect the interests of the members of

3  the Class and have retained counsel competent and experienced in class actions and securities

4  litigation.  Lead Plaintiffs have no interests antagonistic to, or in conflict with, those of the

5  Class.

6      68.    A class action is superior to other available methods for the fair and efficient

7  adjudication of the controversy since joinder of all the members of the Class is impracticable.

8  Furthermore, because the damages suffered by the individual Class members may be relatively

9  small, the expense and burden of individual litigation makes it impracticable for the Class

10  members individually to redress the wrongs done to them.  There will be no difficulty in the

11  management of this action as a class action.

12      69.    Lead Plaintiffs will rely, at least in part, upon the presumption of reliance

13  established by the fraud-on-the-market doctrine in that:

14      •  defendants made public misrepresentations and omissions during the Class

15         Period;

16      •  the omissions and misrepresentations were material;

17      •  the Company's securities traded on the NASDAQ, an efficient and open

18         exchange;

19      •  the misrepresentations and omissions alleged would tend to induce a reasonable

20         investor to misjudge the value of the Company's securities;

21      •  Lead Plaintiffs and the other members of the Class purchased their KLA stock

22         between the time defendants failed to disclose or misrepresented material facts

23         and the time the true facts were disclosed, without knowledge of the omitted or

24         misrepresented facts;

25      •  as a regulated issuer, KLA submitted regular public filings to the SEC, such as

26         on Forms 10-K and 10-Q; and

27      •  the Company's stock was followed by numerous financial analysts, including

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                    25

1         Cowen & Company and Goldman Sachs & Co. Thus, the Company's stock

2         reflected the effect of information disseminated into the market.

3      70.    Based upon the foregoing, all purchasers of KLA securities during the Class

4 Period suffered similar injury, including injury through their purchase of the securities at

5 artificially inflated prices, and a presumption of reliance applies.

6 **V.    BACKGROUND**

7     **A.    CONFIDENTIAL WITNESSES**

8      71.    The allegations are supported by, among other things, the information provided

9 by Confidential Witnesses who worked in various positions within the Company organization

10 prior to and/or during the Class Period:

11         (a)    Lead Plaintiffs are informed and believe that Confidential Witness No. 1

12 ("CW #1") worked for the Company from 1995 to early 2003 as a financial analyst, director of

13 finance and division controller. As division controller, CW #1 often had to prepare documents

14 for the Board of Directors and would "occasionally prepare the CFO's presentation to the

15 Operating Committee and the Board of Directors."

16         (b)    Lead Plaintiffs are informed and believe that Confidential Witness No. 2

17 ("CW #2") worked as director of staffing and reported to Tom Coffey during 2002.

18         (c)    Lead Plaintiffs are informed and believe that Confidential Witness No. 3

19 ("CW #3") worked as a senior director of finance from 2001 until 2002.

20         (d)    Lead Plaintiffs are informed and believe that Confidential Witness No. 4

21 ("CW #4") worked for the Company from 1993 to 2004 in various human resources positions.

22 CW #4 assisted with the preparation of data for obtaining the approval of new hire or

23 promotion-related stock option grants. In this capacity, CW #4 helped prepare quarterly

24 spreadsheets containing information such as the type of grant (*i.e.*, new hire, employee

25 promotion, annual (focal) performance review or retention), employee name, employee hire

26 date, employee title and number of shares being recommended.

27         (e)    Lead Plaintiffs are informed and believe that Confidential Witness No. 5

28

1    ("CW #5") worked for the Company as an executive assistant until late 2004 and participated in

2    preparing agendas for executive meetings, inviting attendees to such meetings and reviewing

3    meeting minutes.  CW #5 stated that he/she prepared agendas for some of the Stock Option

4    Committee meetings.

5              (f)      Lead Plaintiffs are informed and believe that Confidential Witness No. 6

6    ("CW #6") worked for the Company from 1999 to 2005 as a director of stock and retirement

7    services, as a staff benefits analyst and as a benefits manager.  CW #6 reported to Joy Nyberg

8    ("Nyberg"), the director of Compensation and Benefits.

9              (g)      Lead Plaintiffs are informed and believe that Confidential Witness No. 7

10   ("CW #7") worked for the Company from 2001 to 2002 as compensation manager.  CW #7 was

11   responsible for benefits and pay for all U.S. employees of the Company and reported directly to

12   Nyberg, the director of Compensation and Benefits.

13             (h)      Lead Plaintiffs are informed and believe that Confidential Witness No. 8

14   ("CW #8") worked for the Company from late 2003 through summer 2005 in operations and

15   later in finance.

16       **B.    KLA'S STOCK OPTION PLANS**

17       72.      Companies may grant stock options to its officers, directors and employees only

18   under a written stock option plan filed with the SEC and disclosed to the public.  Companies

19   must comply with the terms of their written stock option plans.

20       73.      According to KLA's filings with the SEC, it appears that KLA granted stock

21   options during the Class Period pursuant to at least the following four plans: (a) the Restated

22   1982 Stock Option Plan, which applies to employees, consultants, officers and inside directors;

23   (b) the 1998 Outside Director Option Plan, which applies to outside directors, (c) the 2000

24   Nonstatutory Stock Option Plan, which applies to employees and consultants; and (d) the 2004

25   Equity Incentive Plan, which applies to employees, including officers and directors.  ***The***

26   ***backdated option grants violated the terms of at least three of these plans.***

27

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                27

1          **1.    The Restated 1982 Stock Option Plan**

2          74.    The Restated 1982 Stock Option Plan ("1982 Plan"), as amended on November

3    18, 1996, was originally adopted by KLA Instruments Corporation in 1981. *See* KLA

4    Instrument Corporation's SEC Form S-8, filed on March 7, 1997. The 1982 Plan was attached

5    as Exhibit 10.10 to KLA's Form 10-K for the fiscal year ended June 30, 2001 and was operative

6    through October 18, 2004. *See* Form 10-Q filed November 3, 2004.

7          75.    Pursuant to Section 3.1 ("Administration by the Board") of the 1982 Plan, the

8    Plan is administered by the "Board" or "any duly appointed Committee of the Board." Section

9    3.4 ("Powers of the Board") of the 1982 Plan provides, in part, that, "***subject to the provisions***

10   ***of the Plan***, the Board shall have the full and final power and authority, in its sole discretion"

11   (a) to determine who is awarded an option and the time at which the person is awarded an

12   option; (b) to determine the number of shares of stock awarded pursuant to each option; (c) to

13   designate options as Incentive Stock Options or Nonstatutory Stock Options; (d) to determine

14   the fair market value of shares of stock; and (e) to determine the terms, conditions and

15   restrictions of each option and any shares acquired upon exercise of an option, including, but

16   not limited to, the exercise price of the option. (Emphasis added.)

17         76.    Section 5.1 ("Persons Eligible for Options") states that employees, consultants

18   and directors are the only persons eligible to receive options under the 1982 Plan. This section

19   also states that directors who are not employees **are** ineligible to be granted options under the

20   1982 Plan.

21         77.    In addition, Section 5.2 ("Option Grant Restrictions") states that "[a]n Option

22   granted to a prospective Employee, Consultant or Director upon condition that such person

23   commence Service with the Participating Company Group shall be deemed granted effective on

24   the date such person's Service commences, with an exercise price determined as of such date in

25   accordance with Section 6.1."

26         78.    Section 6.1 ("Exercise Price") of the 1982 Plan states that "[t]he exercise price

27   for each Option shall be established in the sole discretion of the Board; provided, however, that

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                            28

1   (a) *no Option shall have an exercise price per share less than the Fair Market Value of a*

2   *share of Stock on the effective date of grant of the Option* and (b) no Incentive Stock Option

3   granted to a Ten Percent Owner Optionee shall have an exercise price per share less than one

4   hundred ten percent (110%) of the Fair Market Value of a share of Stock on the effective date

5   of grant of the Option." (Emphasis added.)

6                    **2.    The 1998 Outside Director Option Plan**

7            79.    On November 17, 1998, KLA's shareholders approved the 1998 Outside

8   Director Option Plan ("1998 Outside Director Plan"). The 1998 Outside Director Plan was

9   attached as Exhibit 10.1 to KLA's Form 10-K for the fiscal year ended June 30, 2001 and was

10  operative at all times during the Class Period.

11          80.    Under Section 1 ("Purposes of the Plan") of the 1998 Outside Director Plan,

12  options granted under the Plan are nonstatutory stock options.

13          81.    Section 4(a) ("Discretionary Plan") of the 1998 Outside Director Plan states that

14  "[t]he Board (or its committee) shall have the authority, in its discretion, to make discretionary

15  grants of Options hereunder to Outside Directors and to specify the terms and conditions of

16  such discretionary Option grants." "Outside Directors" is defined under Section 2(n) as a

17  "Director who is not an employee." Section 4(b) ("Automatic Grants") provides for automatic

18  grants on the date on which such person first becomes an Outside Director ("First Option") and

19  thereafter annually on the day of the Company's annual shareholder meetings ("Subsequent

20  Option").

21          82.    Section 4(b)(iii)(C) of the 1998 Outside Director Plan provides that "the exercise

22  price per Share shall be 100% of the Fair Market Value per Share on the date of the grant of the

23  First Option." Similarly, Section 4(b)(iv)(C) states that "the exercise price per Share shall be

24  100% of the Fair Market Value per Share on the date of the grant of the Subsequent Option."

25  Section 4(b)(iv)(D) provides that the "Subsequent Option shall become exercisable as to 100%

26  of the Shares on the date of the grant."

27

28

### 3.    The 2004 Equity Incentive Plan

83.    On October 18, 2004, KLA's shareholders approved the Company's 2004 Equity Incentive Plan ("2004 Equity Incentive Plan"), which replaced the 1982 Plan and the 2000 Nonstatutory Stock Option Plan, and supplemented the 1998 Outside Director Plan. *See* Appendix A to KLA's September 9, 2004 Schedule 14A Proxy Statement. *See* Q1FY05 Form 10-Q filed November 3, 2004.

84.    According to Section 1 ("Purposes of the Plan") of the 2004 Equity Incentive Plan, the 2004 Equity Incentive Plan provides for the grant of Incentive Stock Options, Nonstatutory Stock Options, Restricted Stock, Stock Appreciation Rights, Performance Shares, Performance Units and Deferred Stock Units.

85.    Pursuant to Section 5 ("Eligibility") of the 2004 Equity Incentive Plan, "Restricted Stock, Performance Shares, Performance Units, Stock Appreciation Rights, Deferred Stock Units and Non Statutory Stock Options may be granted to Service Providers. Incentive Stock Options may be granted only to Employees." "Service Providers" are defined in Section 2(rr) of the Plan as "an Employee, Consultant or Director."

86.    Section 2(a) ("Definitions") of the 2004 Equity Incentive Plan defines the Plan "Administrator" as "the Board or any of its Committees as shall be administering the Plan, in accordance with Section 4 of the Plan." Pursuant to Section 4(a)(i) ("Administration of the Plan") of the 2004 Equity Incentive Plan, "[t]he Plan may be administered by different Committees with respect to different groups of Service Providers." In addition, Section 4(a)(iv) states that "the Plan shall be administered by (A) the Board or (B) a Committee, which committee shall be constituted to satisfy Applicable Laws."

87.    Under Section 4(b) ("Powers of the Administrator") of the 2004 Equity Incentive Plan, the Board or its Committee has the authority, *subject to the provisions of the plan,*" among other things, (a) "to determine the Fair Market Value of the Common Stock, in accordance with Section 2(u) of the Plan"; (b) "to select Service Providers to whom Awards may be granted;" (c) "to determine the number of shares of Common Stock or equivalent units

1    to be covered by each Award granted;" and (d) "to determine the terms and conditions, *not*

2    *inconsistent with the terms of the Plan*, of any award grant… [including] the exercise price."

3         88.    Section 9(b) ("Option Exercise Price") of the 2004 Equity Incentive Plan states

4    that *"[t]he per share exercise price for the Shares to be issued pursuant to exercise of an*

5    *Option shall be determined by the Administrator and shall be no less than 100% of the Fair*

6    *Market Value per share on the date of the grant.*" (Emphasis added.)

7         89.    Section 9(c) ("No Repricing") of the 2004 Equity Incentive Plan provides that

8    "[t]he exercise price for an Option may not be reduced without the consent of the Company's

9    stockholders. This shall include, without limitation, a repricing of the Option as well as an

10   Option exchange program whereby the Participant agrees to cancel an existing Option in

11   exchange for an Option, SAR or other Award."

12   **VI.**    **SUBSTANTIVE ALLEGATIONS**

13         90.    Defendants violated the federal securities laws in several ways. First, defendants

14   issued false and misleading statements and controlled persons who issued false and misleading

15   statements in violation of Rule 10b-5(b), 14(a) and 20(a) of the Exchange Act. The false and

16   misleading statements are summarized in ¶¶91-140, 165-213, 221-235 below. Second,

17   defendants each committed manipulative or deceptive acts in furtherance of the fraudulent

18   scheme in violation of Rule 10b-5(a) and (c) and 20(a). These manipulative and deceptive acts

19   are summarized in ¶¶242-265 below. Third, defendants engaged in insider trading in violation

20   of Sections 10(b) and 20A. This trading is summarized in ¶¶309-313.

21        **A.**    **DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

22         91.    During the Class Period, defendants issued a series of false and misleading

23   statements in violation of Sections 10(b), 14(a) and 20(a) of the Exchange Act and Rule 10b-5.

24   These statements fall within several categories, discussed more fully below. First, defendants

25   issued false and misleading statements regarding the Company's financials. Second, defendants

26   issued false and misleading statements regarding the terms and value of the options granted to

27   officers, directors and employees. Third, defendants issued false and misleading statements

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                 31

1  regarding the Company's internal controls relating to stock option grants and related financial

2  reporting.

3              1.      **False and Misleading Financial Statements**

4                   (a)      **The Misleading Financials**

5          92.    On April 18, 2001, the Company issued a press release entitled "KLA-Tencor

6  Reports Operating Results for Third Fiscal Quarter 2001," which ended March 31, 2001.  The

7  press release, which quotes Schroeder, states in part:

8          SAN JOSE, Calif., Apr. 18, 2001 - KLA-Tencor Corporation today announced its
            operating results for the third fiscal quarter ended March 31, 2001. Revenues
9          were $529 million, a 28 percent increase from $413 million in the March 2000
            quarter, and an 8 percent decrease from the previous quarter. Compared to the
10         March 2000 quarter, net income increased 25 percent to $91 million and earnings
            per share increased from $0.38 to $0.48. On a quarter-to-quarter basis, net income
11         declined 16 percent compared to $109 million, or $0.57 per share, in the
            December 2000 quarter.
12                                        * * *
            The Company ended the quarter with over six months backlog at current shipping
13         levels. Gross margins declined from 57 percent last quarter to 54 percent, due
            primarily to lower production volumes and new product introduction costs. Total
14         fixed costs decreased to $174 million from $191 million in the last fiscal quarter.
            Cash and investments increased by $119 million during the quarter to $936
15         million due to income from operations and reduced working capital requirements.

16         93.    On May 14, 2001, the Company filed its quarterly report on Form 10-Q for its

17  third quarter of fiscal 2001 with the SEC ("Q3FY01 Form 10-Q"), which was signed by

18  Kispert.  The Q3FY01 Form 10-Q contained the following false and misleading statements:

19  For the three-month period ended March 31, 2001, the Company reported net income of

20  $91,410,000 ($0.48 per diluted share) and expenses of $416,437,000.

21         94.    On July 31, 2001, the Company issued a press release entitled "KLA-Tencor

22  Reports Operating Results For Fiscal Year 2001," which ended on June 30, 2001.  The press

23  release, which quotes Schroeder, states in relevant part:

24         KLA-Tencor Corp. (Nasdaq: KLAC) today announced its operating results for the
            fourth quarter and fiscal year ended June 30, 2001. The company also reported its
25         fourth quarter transition from historical accounting methods to the new methods
            required by the Securities and Exchange Commission Staff Accounting Bulletin
26         No. 101 (SAB 101). Reflecting this transition, historical results are provided first,
            followed by the SAB 101 results.

27         On an historical basis, revenues for the June 2001 quarter were $462 million, a 4

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                      32

percent decrease from the June 2000 quarter and a 13 percent decrease from the March 2001 quarter. On the same basis, net income was $56 million or $0.29 per share versus $92 million or $0.47 per share in the June 2000 quarter, and $91 million or $0.48 per share for the March 2001 quarter.

For fiscal 2001, historical basis revenue reached a record $2.1 billion, a 40 percent increase over fiscal 2000 revenue of $1.5 billion. Net income before applying SAB 101 also reached record levels of $363 million or $1.87 per share-a 43 and 42 percent increase respectively over last year's net income of $254 million or $1.32 per share.

* * *

On a SAB 101 basis, fourth quarter revenue for fiscal 2001 was $603 million and net income was $130 million or $0.67 per share. SAB 101 revenue for fiscal 2001 was $2.1 billion, while net income for the year was $373 million or $1.93 per share before a cumulative impact of $306 million or $1.59 per share from the transition to SAB 101 accounting principles. This change further resulted in cumulative deferred revenue of $655 million as of June 30, 2001 versus $661 million as of June 30, 2000.

95.     On September 21, 2001, the Company filed its 2001 Form 10-K, which was signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Tompkins and Urbanek. The 2001 Form 10-K included (a) certifications by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Morton, Tompkins and Urbanek stating that, "[p]ursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated;" and (b) a certification by Levy stating that, "[p]ursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on September 21, 2001." This 2001 Form 10-K contained the following statements, which were false and misleading:

(a)     For fiscal 2001, the Company reported net income of $66,683,000 ($0.34 per diluted share) and expenses of $1,645,289,000.

(b)     For the three-month period ended June 30, 2001, KLA reported net income of $116,104,000 ($0.47 per diluted share).

(c)     "Stock-Based Compensation Plans KLA-Tencor accounts for its employee stock option plans and employee stock purchase plan in accordance with provisions of APB 25, 'Accounting for Stock Issued to Employees.' KLA-Tencor provides additional *pro forma* disclosures required by SFAS 123, 'Accounting for Stock-Based Compensation' (see

1   Note 6)." The 2001 Form 10-K reported a *pro forma* net loss for fiscal 2001 of $27,013,000

2   (loss of $0.15 per diluted share).[1]

3        96.    On October 18, 2001, the Company issued a press release entitled "KLA-Tencor

4   Reports First Quarter Operating Results for Fiscal 2002," which ended September 30, 2001.

5   The press release, which quotes Schroeder, states in part:

6         KLA-Tencor Corp. (Nasdaq: KLAC) today announced its operating results for the
        first quarter of fiscal 2002, ended September 30, 2001. Revenue was $503

7         million, down 17 percent from the previous quarter's revenue of $603 million.
        This was a 31 percent increase from the $383 million in revenue for the

8         September 2000 fiscal quarter. Income after tax for the September 2001 quarter
        was $86 million, or $0.44 per share, compared to $29 million, or $0.15 per share

9         in the corresponding quarter a year ago before the cumulative effect of a change
        in accounting principles.

10                           * * *
        Gross margins for the current quarter were 51.4 percent versus 55.3 percent in the

11         prior quarter-primarily due to unfavorable overhead absorption based on reduced
        business levels during the quarter and a higher percentage of service revenue.

12         Operating expenses were $154 million, a decrease of $18 million from the June
        2001 quarter.

13

14        97.    On November 14, 2001, the Company filed its quarterly report on Form 10-Q for

15   the first quarter of 2002 with the SEC ("Q1FY02 Form 10-Q"), which was signed by Kispert.

16   The Q1FY02 Form 10-Q contained the following false and misleading statements: For the

17   three-month period ended September 30, 2001, the Company reported net income of

18   $86,465,000 ($0.44 per diluted share) and expenses of $398,539,000.

19        98.    On January 23, 2002, the Company issued a press release entitled "KLA-Tencor

20   Reports Second Quarter Operating Results for Fiscal 2002." The press release, which quotes

21   Schroeder, states in part:

22         KLA-Tencor Corp. (Nasdaq: KLAC) today announced its operating results for its
        second fiscal quarter ended December 31, 2001. Consistent with the company's

23         earlier guidance, KLA-Tencor reported after tax net income of $49 million or
        $0.25 per share on revenue of $404 million. Compared to the same period one

24         year ago, when the company reported net income of $78 million or $0.41 per
        share on revenue of $501 million, revenue and net income for the second quarter

25         ended December 31, 2001 were down 19 and 37 percent respectively. On a
        sequential quarter basis, revenue and net income declined 20 and 43 percent

26

27

28   [1] As explained more fully in ¶¶144-146 below, SFAS 123 required *pro forma* disclosures of net
  income and net income per share.

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT             34

1  respectively from the September 2001 quarter.

* * *

2  Gross margins for the current quarter were 50.1 percent versus 51.4 percent in the
3  prior quarter-primarily due to a higher percentage of service revenue and the
   larger percentage decrease in shipments versus manufacturing overhead expense.
4  Operating expenses were $146 million, $8 million lower than the September 2001
   quarter.

5      99.    On December 26, 2001, KLA filed a Form S-8 Registration Statement with the

6  SEC, which registered securities to be issued under the Company's Employee Benefit Plan. In

7  this Registration Statement, KLA incorporated by reference the following documents which

8  contained false and misleading statements (a) the 2001 Form 10-K; (b) the Q1FY02 Form 10-Q;

9  and (c) the 2001 Proxy Statement. This Registration Statement also stated that all documents

10  subsequently filed by the Registrant pursuant to Sections 13(a), 13(c), 14 and 15(d) of the

11  Exchange Act, prior to the filing of a post-effective amendment to this Registration Statement,

12  shall be deemed to be incorporated by reference in this Registration Statement from the date of

13  filing of such documents.

14      100.    On February 13, 2002, the Company filed its quarterly report on Form 10-Q for

15  the period ended December 31, 2001 with the SEC ("Q2FY02 Form 10-Q"), which was signed

16  by Kispert. The Q2FY02 Form 10-Q contained the following false and misleading statements:

17  For the three-month period ended December 31, 2001, the Company reported net income of

18  $49,048,000 ($0.25 per diluted share) and expenses of $347,868,000. For the six-month period

19  ended December 31, 2001, the Company reported net income of $135,513,000 ($0.70 per

20  diluted share) and expenses of $746,407,000.

21      101.    On April 18, 2002, the Company issued a press release entitled "KLA-Tencor

22  Reports Third Quarter Operating Results for Fiscal 2002." The press release, which quotes

23  Schroeder, states in part:

24      KLA-Tencor Corp. (Nasdaq: KLAC) today announced operating results for its
       third fiscal quarter ended March 31, 2002. KLA-Tencor reported after tax net
25      income of $34 million or $0.17 per fully diluted share on revenues of $357
       million. As expected, compared to the same period one year ago, the current
26      quarter's revenues and net income were down 42 and 75 percent respectively. On
       a quarter over quarter basis, revenues and net income declined 12 and 30 percent
27      respectively from the December 2001 quarter.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    35

# EXHIBIT 4
# Part 2 of 5

* * *

1    Gross margins for the current quarter were 49.0 percent versus 50.1 percent in the
prior quarter largely due to a higher percentage of service revenue versus system
2    revenue.  Operating expenses were $138 million, $8 million lower than the
December 2001 quarter.  Engineering expenses declined $2.6 million and sales,
3    marketing, and administration decreased $5.6 million versus the previous quarter.

4    102.    On May 13, 2002, the Company filed its quarterly report on Form 10-Q for the

5    period ended March 31, 2002 with the SEC ("Q3FY02 Form 10-Q"), which was signed by

6    Kispert.  The Q3FY02 Form 10-Q contained the following false and misleading statements: For

7    the three-month period ended March 31, 2002, the Company reported net income of

8    $34,149,000, ($0.17 per diluted share) and expenses of $320,011,000.  For the nine-month

9    period ended March 31, 2002, the Company reported net income of $169,662,000 ($0.86 per

10    diluted share) and expenses of $1,066,418,000.

11    103.    On July 30, 2002, the Company issued a press release entitled "KLA-Tencor

12    Reports Operating Results for Fiscal Year 2002."  The press release, which quotes Schroeder,

13    states in part:

14    KLA-Tencor Corporation (Nasdaq: KLAC) today announced its operating results
for its fourth quarter and 2002 fiscal year, which ended on June 30, 2002.  The
15    company reported $47 million in net income and earnings per share of $0.23 on
revenues of $373 million for the fourth quarter.  In the fourth quarter of fiscal
16    year 2001, by comparison, KLA-Tencor reported net income of $130 million and
earnings per share of $0.67 on revenues of $603 million.  In a quarter-over-
17    quarter comparison with the March 2002 fiscal third quarter, net income rose 36
percent from $34 million, earnings per share increased 35 percent from $0.17, and
18    revenue rose 4.5 percent from $357 million.  For the full fiscal year 2002, KLA-
Tencor reported net income of $216 million and earnings per share of $1.10 on
19    revenue of $1.64 billion.  This compares with net income of $373 million and
earnings per share of $1.93 (prior to the cumulative effect of the implementation
20    of SAB 101 accounting principles) on revenue of $2.1 billion for the 2001 fiscal
year.
21
* * *
22    Gross margins for the current quarter were 50.1 percent versus 49.0 percent in the
prior quarter.  Operating expenses were $140 million, or 37.5% of revenue.  Cash
23    and marketable securities were $1.33 billion, an increase of $117 million from the
previous quarter.
24

25    104.    On September 20, 2002, the Company filed its 2002 Form 10-K, which was

26    signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Tompkins and Urbanek.

27    The 2002 Form 10-K contained the following statements, which were false and misleading:

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                         36

(a)    For fiscal 2002, the Company reported net income of $216,166,000 ($1.10 per diluted share) and expenses of $1,392,389,000.

(b)    For the three-month period ended June 30, 2002, KLA reported net income of $47,223,000 ($0.23 per diluted share).

(c)    The same representation regarding the application of APB No. 25 as contained in the 2001 Form 10-K. The 2002 Form 10-K reported *pro forma* net income figure for fiscal 2002 of $92,364,000 ($0.47 per diluted share).

(d)    Certifications by Schroeder and Kispert stating that:

> I, [___], certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of KLA-Tencor Corporation on Form 10-K for the fiscal year ended June 30, 2002 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report on Form 10-K fairly presents in all material respects the financial condition and results of operations of KLA-Tencor Corporation.

105.    On September 27, 2002, KLA filed a Form S-8 Registration Statement, which registered securities to be issued under the Company's Employee Benefit Plan.    In this Registration Statement, KLA incorporated by reference the following documents which contained false and misleading statements: (a) 2002 Form 10-K; and (b) 2002 Proxy Statement. This Registration Statement also stated that all documents subsequently filed by the Registrant pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, prior to the filing of a post-effective amendment to this Registration Statement, shall be deemed to be incorporated by reference in this Registration Statement from the date of filing of such documents.

106.    On October 22, 2002, the Company issued a press release entitled "KLA-Tencor Posts $51 Million in Net Income for Its First Fiscal Quarter 2003." The press release, which quotes Schroeder, states in part:

> KLA-Tencor Corp. (Nasdaq: KLAC) today announced its operating results for its first quarter of fiscal 2003, ended September 30, 2002. The company posted net income of $51 million and earnings per share of $0.26 on revenues of $376 million. Revenue, net income and earnings per share were all up slightly from the prior fiscal quarter's results of $374 million, $47 million and $0.23 per share respectively-due in part to a one-time net pre-tax gain of $9 million related to the sale of technology offset by charges related to facilities consolidations.

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          37

Reflecting the current business environment, net income and revenue were down on a year-over-year basis from the levels of the first fiscal quarter of 2002 when the company posted net income of $86 million on revenues of $503 million.

107.    On November 13, 2002, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2002 with the SEC ("Q1FY03 Form 10-Q"), which was signed by Schroeder and Kispert. This Q1FY03 Form 10-Q contained the following false and misleading statements:

(a)    For the three-month period ended September 30, 2002, the Company reported net income of $51,265,000 ($0.26 per diluted share) and expenses of $318,236,000.

(b)    SOX certifications by Schroeder and Kispert stating that:

I, [  ] certify that:

1.    I have reviewed this quarterly report on Form 10-Q of KLA-Tencor Corporation;

2.    Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.    Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report[.]

(c)    Certifications by Schroeder and Kispert pursuant to 18 U.S.C. Section 1350 substantially identical to the one in the 2002 Form 10-K.

108.    On January 23, 2003, the Company issued a press release entitled "KLA-Tencor Posts Second Quarter Earnings of $29 million on Revenues of $335 Million." The press release, which quotes Schroeder, states in part:

KLA-Tencor Corp. (Nasdaq: KLAC) today announced its operating results for its second quarter of fiscal 2003, ended December 31, 2002. The company posted net income of $29 million and earnings per share of $0.15 on revenues of $335 million, as compared to $49 million on revenues of $404 million for the same period of the prior fiscal year. Revenue declined by 11 percent, as compared with the first quarter of fiscal 2003. Income was lower by 43 percent, as a result of the change in revenue, gains in the first quarter and restructuring-related expenses in the second quarter. For the three-month period the company continued to realize significant net income and strong cash flow.

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                            38

1        109.    On February 13, 2003, the Company filed its quarterly report on Form 10-Q for

2    the period ended December 31, 2002 with the SEC ("Q2FY03 Form 10-Q"), which was signed

3    by Schroeder and Kispert.  The Company's Q2FY03 Form 10-Q contained the following false

4    and misleading statements

5                (a)     For the three-month period ended December 31, 2002, the Company

6    reported net income of $29,228,000 ($0.15 per diluted share) and expenses of $308,162,000.

7    For the six-month period ended December 31, 2002, the Company reported net income of

8    $80,493,000 ($0.42 per diluted share) and expenses of $626,398,000.

9                (b)     **"Accounting for Stock-Based Compensation Plans** KLA-Tencor

10   accounts for its employee stock option and employee stock purchase plans under the recognition

11   and measurement principles of APB Opinion No. 25, Accounting for Stock Issued to

12   Employees, and related Interpretations.  No stock-based employee compensation is reflected in

13   net income, as all options granted under those plans had an exercise price equal to the market

14   value of the underlying common stock on the date of grant."

15               (c)     SOX certifications by Schroeder and Kispert substantially identical to

16   those in the Q1FY03 Form 10-Q.

17               (d)     Certifications by Schroeder and Kispert pursuant to 18 U.S.C. Section

18   1350 substantially identical to those in the 2002 Form 10-K.

19       110.    On April 23, 2003, the Company issued a press release entitled "KLA-Tencor

20   Posts $27 Million in Net Income for Third Quarter Fiscal 2003."  The press release, which

21   quotes Schroeder, states in part:

22           KLA-Tencor Corp. (Nasdaq: KLAC) today announced operating results for its
             third quarter of fiscal 2003, ended March 31, 2003.  For the three-month period,
23           the company posted net income of $27 million or $0.14 per share on revenue of
             $304 million versus $34 million or $0.17 per share on revenues of $357 million
24           for the same period last year.  When compared to the prior quarter, revenue
             decreased from $335 million while net income decreased 6% from $29 million.
25
             For the nine-month period, the company posted net income of $108 million or
26           $0.56 per share on revenues of $1.01 billion compared to earnings of $170 million
             or $0.86 per share and $1.26 billion in revenue in the first nine months of the
27           previous fiscal year.

28

1     111.    On May 14, 2003, the Company filed its quarterly report on Form 10-Q for the

2    period ended March 31, 2003 with the SEC ("Q3FY03 Form 10-Q"), which was signed by

3    Schroeder and Kispert. The Company's Q3FY03 Form 10-Q contained the following false and

4    misleading statements:

5     (a)    For the three-month period ended March 31, 2003, the Company reported

6    net income of $27,339,000 ($0.14 per diluted share) and expenses of $278,698,000. For the

7    nine-month period ended March 31, 2003, the Company reported net income of $107,832,000

8    ($0.56 per diluted share) and expenses of $905,096,000.

9     (b)    **"Accounting for Stock-Based Compensation Plans** KLA-Tencor

10    accounts for its employee stock option and employee stock purchase plans under the recognition

11    and measurement principles of **APB** Opinion No. 25, Accounting for Stock Issued to

12    Employees, and related Interpretations. No stock-based employee compensation is reflected in

13    net income, as all options granted under those plans had an exercise price equal to the market

14    value of the underlying common stock on the date of grant. In December 2002, FASB issued

15    Statement of Financial Accounting Standards No. 148 (SFAS 148), 'Accounting for Stock-

16    Based Compensation Transition and Disclosure'. This Statement amends SFAS 123, to provide

17    alternative methods of transition for an entity that voluntarily changes to the fair value based

18    method of accounting for stock-based employee compensation. It also amends the disclosure

19    provisions of that Statement to require prominent disclosure about the effects on reported net

20    income of an entity's accounting policy decisions with respect to stock-based employee

21    compensation. Finally, this Statement amends APB Opinion No. 28, 'Interim Financial

22    Reporting,' to require disclosure about those effects in interim financial information. Since

23    KLA-Tencor continues to account for stock-based compensation according to APB 25, its

24    adoption of SFAS No. 148 required the Company to provide prominent disclosures about the

25    effects of SFAS 123 on reported income and required the Company to disclose these affects in

26    the interim financial statements as well." The Q3FY03 reported *pro forma* results regarding the

27    effect of stock-based employee compensation as follows:

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT        40

1         (i)    For the three months ended March 31, 2002, the Company
2    reported total stock-based employee compensation expense, net of related tax effects, of
3    $24,813,000 and reported *pro forma* net income of $9,336,000 ($0.05 per diluted share).

4         (ii)    For the three months ended March 31, 2003, the Company
5    reported total stock-based employee compensation expense, net of related tax effects, of
6    $20,411,000 and reported *pro forma* net income of $6,928,000 ($0.04 per diluted share).

7         (iii)    For the nine months ended March 31, 2003 [sic], the Company
8    reported total stock-based employee compensation expense, net of related tax effects, of
9    $76,171,000 and reported *pro forma* net income of $93,491,000 ($0.48 per diluted share).

10         (iv)    For the nine months ended March 31, 2003, the Company
11    reported total stock-based employee compensation expense, net of related tax effects, of
12    $68,018,000 and reported *pro forma* net income of $39,814,000 ($0.21 per diluted share).

13        (c)    SOX certifications by Schroeder and Kispert substantially identical to
14    those in the Q1FY03 Form 10-Q.

15        (d)    Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section
16    1350, substantially identical to those in the 2002 Form 10-K.

17        112.    On July 24, 2003, the Company issued a press release entitled "KLA-Tencor
18    Reports $137 Million In Net Income on Revenue Of $1.32 Billion For Fiscal Year 2003." The
19    press release, which quotes Schroeder, states in part:

20        KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
      for its fourth quarter and 2003 fiscal year.  For the quarter ending June 30, 2003,
21    the company reported improvement on a quarter-over-quarter basis.  Net income
      of $29 million and earnings per share of $0.15 in the June 2003 fiscal quarter
22    were a 7 percent improvement over net income of $27 million and earnings per
      share of $0.14 posted in the March quarter.  Revenue of $308 million in the June
23    quarter was up slightly from revenue of $304 million in the March quarter.  The
      June 2003 quarter results compare to net income of $47 million and earnings per
24    share of $0.23 on revenues of $373 million for the same period last year.  For the
      full 2003 fiscal year, KLA-Tencor reported net income of $137 million and
25    earnings per share of $0.70 on revenue of $1.32 billion compared, to fiscal year
      2002 net income of $216 million and earnings per share of $1.10 on revenues of
26    $1.64 billion.
                                    * * *
27    Gross margins improved from 48.5 percent in the third quarter of fiscal year 2003
28    to 49.0 percent in the fourth quarter.    Cost reductions in service and

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          41

manufacturing expenses contributed to the improvement in gross margins. Operating expenses were unchanged at $122 million, a decrease in selling, general and administrative expense offset a $3 million increase in engineering expense.

113.    On September 16, 2003, the Company filed its annual report on Form 10-K for the period ended June 30, 2003 with the SEC. On September 29, 2003, the Company filed an amended Form 10-K. The original Form 10-K and the amended Form 10-K are collectively referred to hereinafter as the "2003 Form 10-K." The 2003 Form 10-K was signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Kaufman, Tompkins and Urbanek. The Company's 2003 Form 10-K contained the following statements, which were false and misleading:

(a)    For 2003, the Company reported net income of $137,191,000 ($0.70 per diluted share) and expenses of $1,184,327,000.

(b)    For the three-month period ended June 30, 2003, KLA reported net income of $29,359,000 ($0.15 per diluted share).

(c)    **"Accounting for Stock-Based Compensation Plans** KLA-Tencor accounts for its employee stock option and employee stock purchase plans under the recognition and measurement principles of APB Opinion No. 25, Accounting for Stock Issued to Employees, and related Interpretations. No stock-based employee compensation is reflected in net income, as all options granted under those plans had an exercise price equal to the market value of the underlying common stock on the date of grant. In December 2002, FASB issued Statement of Financial Accounting Standards No. 148 (SFAS 148), 'Accounting for Stock-Based Compensation Transition and Disclosure.' This Statement amends SFAS 123, to provide alternative methods of transition for an entity that voluntarily changes to the fair value based method of accounting for stock-based employee compensation. It also amends the disclosure provisions of that Statement to require prominent disclosure about the effects on reported net income of an entity's accounting policy decisions with respect to stock-based employee compensation. Finally, this Statement amends APB Opinion No. 28, Interim Financial Reporting, to require disclosure about those effects in interim financial information. Since

1   KLA-Tencor continues to account for stock-based compensation according to APB Opinion No.

2   25, its adoption of SFAS No. 148 required the Company to provide prominent disclosures about

3   the effects of SFAS 123 on reported income and required the Company to disclose these affects

4   in the financial statements as well." The 2003 Form 10-K reported total stock-based employee

5   compensation expense (net of related tax effects) of $90,880,000 and reported *pro forma* net

6   income of $46,311,000 ($0.24 per diluted share).

7             (d)      SOX certifications by Schroeder and Kispert substantially identical to

8   those in the Q1FY03 Form 10-Q.

9             (e)      Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

10  1350, substantially identical to those in the 2002 Form 10-K.

11        114.    On October 22, 2003, the Company issued a press release entitled "KLA-Tencor

12  Posts $37 Million In Net Income On Revenue of $318 Million for First Quarter of Fiscal Year

13  2004." The press release, which quotes Schroeder, states in part:

14        KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
          for its first quarter of fiscal 2004, ended September 30, 2003. The company
15        recorded net income of $37 million and earnings per share of $0.18 on revenue of
          $318 million in the September quarter, each of which reflect a sequential quarter-
16        to-quarter improvement over net income of $29 million, earnings per share of
          $0.15 and revenue of $308 million in the June quarter. For the first quarter of last
17        fiscal year, the company earned net income of $51 million and earnings per share
          of $0.26 on revenues of $376 million.
18
                                             * * *
19        Gross margins improved from 49.0 percent in the June quarter to 51.1 percent in
          the September quarter. Improvements in manufacturing and service costs
20        contributed to the increase in gross margins. Operating expenses increased
          slightly to $125 million.
21
22        115.    On November 7, 2003, the Company filed its quarterly report on Form 10-Q for

23  the period ended September 30, 2003 with the SEC ("Q1FY04 Form 10-Q"), which was signed

24  by Schroeder and Kispert.  This Q1FY04 Form 10-Q contained the following false and

25  misleading statements:

26             (a)      For the three-month period ended September 30, 2003, the Company

27  reported net income of $36,837,000 ($0.18 per diluted share) and expenses of $281,002,000.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              43

1          (b)     **"Accounting for Stock-Based Compensation Plans** KLA-Tencor

2  accounAts for its employee stock option and employee stock purchase plans under the

3  recognition and measurement principles of Accounting Principles Board Opinion No. 25,

4  Accounting for Stock Issued to Employees, and related Interpretations.   No stock-based

5  employee compensation is reflected in net income, as all options granted under those plans had

6  an exercise price equal to the market value of the underlying common stock on the date of

7  grant.  In December 2002, FASB issued Statement of Financial Accounting Standards No. 148

8  (SFAS 148), "Accounting for Stock-Based Compensation Transition and Disclosure."  This

9  Statement amends SFAS 123, to provide alternative methods of transition for an entity that

10  voluntarily changes to the fair value based method of accounting for stock-based employee

11  compensation.  It also amends the disclosure provisions of that Statement to require prominent

12  disclosure about the effects on reported net income of an entity's accounting policy decisions

13  with respect to stock-based employee compensation.   Finally, this Statement amends APB

14  Opinion No. 28, Interim Financial Reporting, to require disclosure about those effects in interim

15  financial information.  Since KLA-Tencor continues to account for stock-based compensation

16  according to APB 25, its adoption of SFAS 148 required the Company to provide prominent

17  disclosures about the effects of SFAS 123 on reported income and required the Company to

18  disclose these affects in the financial statements as well."  The Q1FY04 reported *pro forma*

19  results regarding the effect of stock-based employee compensation as follows:

20          (i)     For the three months ended September 30, 2002, the Company

21  reported total stock-based employee compensation expense, net of related tax effects, of

22  $24,976,000 and reported *pro forma* net income of $26,289,000 ($0.14 per diluted share).

23          (ii)    For the three months ended September 30, 2003, the Company

24  reported total stock-based employee compensation expense, net of related tax effects, of

25  $22,567,000 and reported *pro forma* net income of $14,270,000 ($0.07 per diluted share).

26          (c)     SOX certifications by Schroeder and Kispert substantially identical to

27  those in the Q1FY03 Form 10-Q.

28

1           (d)     Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

2   1350, substantially identical to those in the 2002 Form 10-K.

3          116.   On January 22, 2004, the Company issued a press release entitled "KLA-Tencor

4   Posts Earnings Of $45 Million on Revenues Of $339 Million For Second Quarter of Fiscal

5   2004." The press release, which quotes Schroeder, states in part:

6       KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
   for its second quarter of fiscal 2004, ended December 31, 2003. The company
7   reported net income of $45 million and diluted earnings per share of $0.22 on
   revenues of $339 million – an increase on both a year-over-year and sequential
8   basis. In comparison, the second quarter of fiscal 2003 resulted in net income of
   $29 million and diluted earnings per share of $0.15 on revenues of $335 million,
9   while in its first fiscal quarter of fiscal 2004 KLA-Tencor realized net income of
   $37 million and diluted earnings per share of $0.18 on revenues of $318 million.

10                               * * *

11   Gross margins improved three percent sequentially to 54 percent, which helped
   drive net income higher by 21 percent over the previous quarter. Improvements in
12   capacity absorption and manufacturing efficiencies contributed to the gain in
   gross margins.

13

14          117.   On February 6, 2004, the Company filed its quarterly report on Form 10-Q for

15   the period ended December 31, 2003 with the SEC ("Q2FY04 Form 10-Q"), which was signed

16   by Schroeder and Kispert.   This Q2FY04 Form 10-Q contained the following false and

17   misleading statements:

18           (a)     For the three-month period ended December 31, 2003, the Company

19   reported net income of $44,515,000 ($0.22 per diluted share) and expenses of $287,476,000.

20   For the six-month period ended December 31, 2003, the Company reported net income of

21   $81,352,000 ($0.40 per diluted share) and expenses of $568,478,000.

22           (b)     The identical representation regarding the application of APB No. 25 and

23   the fact that there is no stock-based employee compensation reflected in net income, "as all

24   options granted under those plans had an exercise price equal to the market value of the

25   underlying common stock on the date of grant," as contained in the Q1FY03 Form 10-Q. The

26   Q2FY04 reported *pro forma* results regarding the effect of stock-based employee compensation

27   as follows:

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT             45

1          (i)     For the three months ended December 31, 2002, the Company

2 reported total stock-based employee compensation expense, net of related tax effects, of

3 $24,976,000 and reported *pro forma* net income of $5,829,000 ($0.03 per diluted share).

4          (ii)    For the three months ended December 31, 2003, the Company

5 reported total stock-based employee compensation expense, net of related tax effects, of

6 $24,284,000 and reported *pro forma* net income of $20,231,000 ($0.10 per diluted share).

7          (iii)   For the six months ended December 31, 2002, the Company

8 reported total stock-based employee compensation expense, net of related tax effects, of

9 $48,375,000 and reported *pro forma* net income of $32,118,000 ($0.17 per diluted share).

10         (iv)   For the six months ended December 31, 2003, the Company

11 reported total stock-based employee compensation expense, net of related tax effects, of

12 $46,851,000 and reported *pro forma* net income of $34,501,000 ($0.17 per diluted share).

13        (c)    SOX certifications by Schroeder and Kispert substantially identical to

14 those in the Q1FY03 Form 10-Q.

15        (d)    Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

16 1350, substantially identical to those in the 2002 Form 10-K.

17    118.   On March 5, 2004, KLA filed a Form S-8 Registration Statement, which

18 registered securities to be issued under the Company's Employee Benefit Plan.    In this

19 Registration Statement, KLA incorporated by reference the following documents, which

20 contained false and misleading statements: (a) 2003 Form 10-K; (b) Q1FY04 and Q2FY04

21 Forms 10-Q; and (c) 2003 Proxy Statement.    This Registration Statement also stated that all

22 documents subsequently filed by the Registrant pursuant to Sections 13(a), 13(c), 14 and 15(d)

23 of the Exchange Act, prior to the filing of a post-effective amendment to this Registration

24 Statement, shall be deemed to be incorporated by reference in this Registration Statement from

25 the date of filing of such documents.

26    119.   On April 21, 2004, the Company issued a press release entitled "KLA-Tencor

27 Posts Third Quarter Fiscal Year 2004 Earnings Of $66 Million On Revenues Of $390 Million."

28

The press release, which quotes Schroeder, states in part:

> KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results for its third quarter of fiscal 2004, ended March 31, 2004. Revenues for the quarter were $390 million, up 15% from $339 million in the previous quarter, and up 28% from $304 million in the third quarter of fiscal 2003. The net income for the quarter was $66 million or $0.33 per diluted share, compared with net income of $45 million or $0.22 per diluted share in the prior quarter, and $27 million or $0.14 per diluted share in the third quarter of fiscal 2003.
>
> * * *
>
> Gross margins improved two percent sequentially to 56 percent in the March quarter from 54 percent in the December quarter, primarily driven by cost reduction initiatives along with improvements in capacity absorption.

120.    On May 5, 2004, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2004 with the SEC ("Q3FY04 Form 10-Q"), which was signed by Schroeder and Kispert. This Q3FY04 Form 10-Q contained the following false and misleading statements:

(a)    For the three-month period ended March 31, 2004, the Company reported net income of $66,182,000 ($0.33 per diluted share) and expenses of $302,019,000. For the nine-month period ended March 31, 2004, the Company reported net income of $147,534,000 ($0.73 per diluted share) and expenses of $870,497,000.

(b)    The identical representation as contained in the Q1FY04 Form 10-Q regarding the application of APB No. 25 and the fact that there is no stock-based employee compensation reflected in net income "as all options granted under those plans had an exercise price equal to the market value of the underlying common stock on the date of grant." The Q1FY04 reported *pro forma* results regarding the effect of stock-based employee compensation as follows:

(i)    For the three months ended March 31, 2003, the Company reported total stock-based employee compensation expense, net of related tax effects, of $20,740,000 and reported *pro forma* net income of $6,599,000 ($0.03 per diluted share).

(ii)    For the three months ended March 31, 2004, the Company reported total stock-based employee compensation expense, net of related tax effects, of

1   $21,718,000 and reported *pro forma* net income of $44,464,000 ($0.22 per diluted share).

2           (iii)    For the nine months ended March 31, 2003, the Company

3   reported total stock-based employee compensation expense, net of related tax effects, of

4   $69,115,E000 and reported *pro forma* net income of $38,717,000 ($0.20 per diluted share).

5           (iv)    For the nine months ended March 31, 2004, the Company

6   reported total stock-based employee compensation expense, net of related tax effects, of

7   $68,569,000 and reported *pro forma* net income of $78,965,000 ($0.39 per diluted share).

8           (c)    SOX certifications by Schroeder and Kispert substantially identical to

9   those in the Q1FY03 Form 10-Q.

10          (d)    Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

11  1350, substantially identical to those in the 2002 Form 10-K.

12      121.    On July 29, 2004, the Company issued a press release entitled "KLA-Tencor

13  Reports Earnings of $244 Million on Revenues of $1.5 Billion for Fiscal Year 2004." The press

14  release, which quotes Schroeder, states in part:

15      KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
    for its fourth quarter and 2004 fiscal year ended June 30, 2004. The company
16  reported strong gains for both the quarter and full fiscal year. For the quarter, the
    company reported net income of $96 million and earnings per diluted share of
17  $0.48 on revenues of $450 million, which represented an increase on both a
    sequential and year-over-year basis. Revenues rose 16 percent from $390 million
18  in the prior quarter and 46 percent from $308 million compared to the same
    period last year. Net income was also significantly higher, increasing from $66
19  million or $0.33 per diluted share in the prior quarter and $29 million or $0.15 per
    diluted share in the fourth quarter of fiscal 2003. For the full 2004 fiscal year,
20  KLA-Tencor reported net income of $244 million or $1.21 per diluted share on
    revenues of $1.5 billion versus net income of $137 million or $0.70 per diluted
21  share on revenues of $1.3 billion in its 2003 fiscal year.

22                      * * *
    Gross margins improved during the quarter, rising another two percent
23  sequentially to 58 percent compared to 56 percent in the third quarter. This
    improvement was primarily driven by cost reduction initiatives. Cash, cash
24  equivalents and marketable securities increased by $156 million to $1.88 billion.
    Accounts receivable increased $10 million to $373 million on higher product
25  shipments. Inventory increased by $27 million to $337 million, as the company
    continued to ramp production to meet customer demand.

26

27      122.    On August 30, 2004, the Company filed its 2004 Form 10-K, which was signed

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                 48

1  by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Kaufman, Marks, Tompkins and

2  Urbanek.   The 2004 Form 10-K contained the following statements, which were false and

3  misleading:

4          (a)     The Company reported net income of $243,701,000 ($1.21 per diluted

5  share) and expenses of $1,199,360,000.

6          (b)     For the three-month period ended June 30, 2004, KLA reported net

7  income of $96,167,000 ($0.48 per diluted share).

8          (c)     The identical representations as contained in the 2003 Form 10-K

9  regarding the application of APB No. 25 and  the fact that there is no stock-based employee

10 compensation reflected in net income "as all options granted under those plans had an exercise

11 price equal to the market value of the underlying common stock on the date of grant."  The

12 Company reported a total stock-based employee compensation expense (net of related tax

13 effects) of $82,446,000 and reported *pro forma* net income of $161,225,000 ($0.80 per diluted

14 share).

15         (d)     SOX certifications by Schroeder and Kispert substantially identical to

16 those in the Q1FY03 Form 10-Q.

17         (e)     Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

18 1350, substantially identical to those in the 2002 Form 10-K.

19     123.    On October 21, 2004, the Company issued a press release entitled "KLA-Tencor

20 Reports Earnings of $116 Million on Revenues of $519 Million for First Quarter of Fiscal Year

21 2005." The press release, which quotes Schroeder, states in part:

22     KLA-Tencor Corporation (Nasdaq:KLAC) today announced operating results for
       its first quarter of fiscal 2005, ended September 30, 2004.  Net income and
23     earnings per diluted share roles to $116 million and $0.58 on revenues of $519
       million, as the company reported sequential and year-over-year improvements in
24     operating results.  Revenues rose 15 percent from $450 million in the prior
       quarter and 63 percent from $318 million compared to the same period last year.
25     Net income was also significantly higher, increasing from $96 million or $0.48
       per diluted share in the prior quarter and $37 million or $0.18 per diluted share in
26     the first quarter of fiscal 2004.
                              * * *
27     Rising revenues and improved cost-structure resulted in record level gross
       margin, pretax, and operating margin percentages in the current quarter.
28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    49

1    Operating expenses increased from $141 million in the prior quarter to $146 million in the current quarter.

2    124.    On November 3, 2004, the Company filed its quarterly report on Form 10-Q for

3    the period ended September 30, 2004 with the SEC ("Q1FY05 Form 10-Q"), which was signed

4    by Schroeder and Kispert.  This Q1FY05 Form 10-Q contained the following false and

5    misleading statements:

6    (a)    For the three-month period ended September 30, 2004, the Company

7    reported net income of $116,405,000 ($0.58 for diluted share) and expenses of $361,806,000.

8    (b)    **"Accounting for Stock-Based Compensation Plans** KLA-Tencor

9    accounts for its employee stock option and employee stock purchase plans under the intrinsic

10   value recognition and measurement principles of Accounting Principles Board Opinion ('APB')

11   No. 25, 'Accounting for Stock Issued to Employees,' and related Interpretations, and has

12   adopted the disclosure-only provisions of Statement of Financial Accounting Standard ('SFAS')

13   No. 123, 'Accounting for Stock-Based Compensation,' as amended by SFAS No. 148,

14   'Accounting for Stock-Based Compensation – Transition and Disclosures.' No stock-based

15   employee compensation is reflected in net income, as all options granted under those plans had

16   an exercise price equal to the market value of the underlying common stock on the date of

17   grant."  The Q1FY05 reported *pro forma* results regarding the effect of stock-based employee

18   compensation as follows:

19   (i)    For the three months ended September 30, 2003, the Company

20   reported total stock-based employee compensation expense, net of related tax effects, of

21   $22,567,000 and reported *pro forma* net income of $14,270,000 ($0.07 per diluted share).

22   (ii)    For the three months ended September 30, 2004, the Company

23   reported total stock-based employee compensation expense, net of related tax effects, of

24   $20,453,000 and reported *pro forma* net income of $95,952,000 ($0.48 per diluted share).

25   (c)    SOX certifications by Schroeder and Kispert substantially identical to

26   those in the Q1FY03 Form 10-Q.

27   (d)    Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                      50

1  1350, substantially identical to those in the 2002 Form 10-K.

2      125.    On November 4, 2004, KLA filed a Form S-8 Registration Statement, which

3  registered securities to be issued under the Company's Employee Benefit Plan.    In this

4  Registration Statement, KLA incorporated by reference the following documents, which

5  contained false and misleading statements: (a) 2004 Form 10-K; (b) Q2FY05 Form 10-Q; and

6  (c) 2004 Proxy Statement.    This Registration Statement also stated that all documents

7  subsequently filed by the Registrant pursuant to Sections 13(a), 13(c), 14 and 15(d) of the

8  Exchange Act, prior to the filing of a post-effective amendment to this Registration Statement,

9  shall be deemed to be incorporated by reference in this Registration Statement from the date of

10  filing of such documents.

11      126.    On December 23, 2004, KLA filed a Form S-8 Registration Statement, which

12  registered securities to be issued under the Company's Employee Benefit Plan.    In this

13  Registration Statement, KLA incorporated by reference the following documents, which

14  contained false and misleading statements: (a) 2004 Form 10-K; (b) Q1FY05 Form 10-Q; and

15  (c) 2004 Proxy Statement.    This Registration Statement also stated that all documents

16  subsequently filed by the Registrant pursuant to Sections 13(a), 13(c), 14 and 15(d) of the

17  Exchange Act, prior to the filing of a post-effective amendment to this Registration Statement,

18  shall be deemed to be incorporated by reference in this Registration Statement from the date of

19  filing of such documents.

20      127.    On January 20, 2005, the Company issued a press release entitled "KLA-Tencor

21  Posts Second Quarter Fiscal Year 2005 Earnings of $122 Million on Revenues of $533

22  Million." The press release, which quotes Schroeder, states in part:

23      KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
       for its second quarter of fiscal 2005, ended December 31, 2004.  Revenues for the
24      quarter were $533 million, up 3% from $519 million in the previous quarter, and
       up 57% from $339 million in the second quarter of fiscal 2004.  The net income
25      for the quarter was $122 million or $0.61 per diluted share, compared with net
       income of $116 million or $0.58 per diluted share in the prior quarter, and $45
26      million or $0.22 per diluted share in the second quarter of fiscal 2004.

27      128.    On February 3, 2005, the Company filed its quarterly report on Form 10-Q for

28

1  the period ended December 31, 2004 with the SEC ("Q2FY05 Form 10-Q"), which was signed

2  by Schroeder and Kispert.  This Form 10-Q contained the following false and misleading

3  statements:

4          (a)  For the three-month period ended December 31, 2004, the Company

5  reported net income of $122,077,000 ($0.61 per diluted share) and expenses of $377,345,000.

6  For the six-month period ended December 31, 2004, the Company reported net income of

7  $238,482,000 ($1.19 per diluted share) and expenses of $739,151,000.

8          (b)  **"Accounting for Stock-Based Compensation Plans** KLA-Tencor

9  accounts for its employee stock option and employee stock purchase plans under the intrinsic

10  value recognition and measurement principles of Accounting Principles Board Opinion ('APB')

11  No. 25, 'Accounting for Stock Issued to Employees,' and related Interpretations, and has

12  adopted the disclosure-only provisions of Statement of Financial Accounting Standard ('SFAS')

13  No. 123, 'Accounting for Stock-Based Compensation,' as amended by SFAS No. 148,

14  'Accounting for Stock-Based Compensation - Transition and Disclosures.'"  The Q2FY05

15  reported *pro forma* results regarding the effect of stock-based employee compensation as

16  follows:

17          (i)  For the three months ended December 31, 2003, the Company

18  reported total stock-based compensation expense, net of related tax effects, of $24,284,000 and

19  reported *pro forma* net income of $20,231,000 ($0.10 per diluted share).

20          (ii)  For the three months ended December 31, 2004, the Company

21  reported total stock-based compensation expense, net of related tax effects, of $21,077,000 and

22  reported *pro forma* net income of $101,000,000 ($0.50 per diluted share).

23          (iii)  For the six months ended December 31, 2003, the Company

24  reported total stock-based compensation expense, net of related tax effects, of $46,851,000 and

25  reported *pro forma* net income of $34,501,000 ($0.17 per diluted share).

26          (iv)  For the six months ended December 31, 2004, the Company

27  reported total stock-based compensation expense, net of related tax effects, of $41,530,000 and

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                52

1    reported *pro forma* net income of $196,952,000 ($0.98 per diluted share).

2                    (c)        SOX certifications by Schroeder and Kispert substantially identical to

3    those in the Q1FY03 Form 10-Q.

4                    (d)        Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

5    1350, substantially identical to those in the 2002 Form 10-K.

6            129.    On April 28, 2005, the Company issued a press release entitled "KLA-Tencor

7    Posts Third Quarter Fiscal Year 2005 Earnings of $123 Million on Revenues of $542 Million."

8    The press release, which quotes Schroeder, states in part:

9            KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
             for its third quarter of fiscal 2005, ended March 31, 2005.  Revenues for the
10           quarter were $542 million, up 2% from $533 million in the previous quarter and
             up 39% from $390 million in the third quarter of fiscal 2004.  The net income for
11           the quarter was $123 million or $0.61 per diluted share, compared with net
             income of $122 million or $0.61 per diluted share in the prior quarter and $66
12           million or $0.33 per diluted share in the third quarter of fiscal 2004.

13                                              * * *

14           We continued to have strong gross margins as we benefit from cost reductions
             initiatives and high manufacturing utilization.  Operating expenses increased from
15           $160 million in the prior quarter to $165 million in the current quarter as a result
             of investment in research and development for new process control technology
16           solutions and systems to drive business efficiencies.

17           130.    On May 9, 2005, the Company filed its quarterly report on Form 10-Q for the

18   period ended March 31, 2005 with the SEC ("Q3FY05 Form 10-Q"), which was signed by

19   Schroeder and Kispert.  This Q3FY05 Form 10-Q contained the following false and misleading

20   statements:

21                   (a)        For the three-month period ended March 31, 2005, the Company reported

22   net income of $123,163,000 ($0.61 per diluted share) and expenses of $386,764,000.  For the

23   nine-month period ended March 31, 2005, the Company reported net income of $361,645,000

24   ($1.80 per diluted share) and expenses of $1,125,915,000.

25                   (b)        The identical representations regarding the application of APB No. 25 as

26   contained in the Q2FY05 Form 10-Q.  The Q3FY05 reported *pro forma* results regarding the

27   effect of stock-based employee compensation as follows:

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                53

1              (i)      For the three months ended March 31, 2004, the Company

2    reported total stock-based compensation expense, net of related tax effects, of $21,718,000 and

3    reported *pro forma* net income of $44,464,000 ($0.22 per diluted share).

4              (ii)     For the three months ended March 31, 2005, the Company

5    reported total stock-based compensation expense, net of related tax effects, of $24,575,000 and

6    reported *pro forma* net income of $98,588,000 ($0.49 per diluted share).

7              (iii)    For the nine months ended March 31, 2004, the Company

8    reported total stock-based compensation expense, net of related tax effects, of $68,569,000 and

9    reported pro forma net income of $78,965,000 ($0.39 per diluted share).

10             (iv)     For the nine months ended March 31, 2005, the Company

11   reported total stock-based compensation expense, net of related tax effects, of $66,105,000 and

12   reported *pro forma* net income of $295,540,000 ($1.47 per diluted share).

13             (c)      SOX certifications by Schroeder and Kispert substantially identical to

14   those in the Q1FY03 Form 10-Q.

15             (d)      Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section

16   1350, substantially identical to those in the 2002 Form 10-K.

17        131.    On July 28, 2005, the Company issued a press release entitled "KLA-Tencor

18   Reports Earnings of $467 Million on Revenues of $2.1 Billion for Fiscal Year 2005." The press

19   release, which quotes Schroeder, states in part:

20        KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
          for its fourth quarter and 2005 fiscal year ended June 30, 2005.  The company
21        realized strong gains for the full 2005 fiscal year, and reported net income of $467
          million or $2.32 per diluted share on revenues of $2.1 billion versus net income of
22        $244 million or $1.21 per diluted share on revenues of $1.5 billion in its 2004
          fiscal year.  For the quarter ended June 30, 2005, the company reported net
23        income of $105 million and earnings per diluted share of $0.52 on revenues of
          $492 million compared to net income of $96 million or $0.48 per diluted shares
24        on revenue of $450 million in the fourth quarter of fiscal 2004, and net income of
          $123 million or $0.61 per diluted shares on revenue of $542 million in the third
25        quarter of fiscal 2005.

26        132.    On September 2, 2005, the Company filed its 2005 Form 10-K, which was

27   signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Kaufman, Marks,

28

Tompkins and Urbanek. This 2005 Form 10-K contained the following statements, which were false and misleading:

(a)     The Company reported net income of $466,695,000 ($2.32 per diluted share) and expenses of $1,502,591,000.

(b)     For the three-month period ended June 30, 2005, KLA reported net income of $105,050,000 ($0.52 per diluted share).

(c)     The identical representations regarding the application of APB No. 25 as contained in the Q2FY05 Form 10-Q. The 2005 Form 10-K reported (i) total stock-based compensation expenses included in reported net income (net of tax) of $1,831,000; (ii) total stock-based employee compensation expense determined under the fair value based method (net of related tax effects) of $93,281,000; and (iii) *pro forma* net income of $375,245,000 ($1.87 per diluted share).

(d)     SOX certifications by Schroeder and Kispert substantially identical to those in the Q1FY03 Form 10-Q.

(e)     Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section 1350, substantially identical to those in the 2002 Form 10-K.

133.     On October 27, 2005, KLA issued a press release entitled "KLA-Tencor Reports First Quarter of 2006 Earnings Per Share of $0.38 ($0.50 Excluding Equity Based Compensation Of $0.12) on Revenue of $484 Million." The press release, which quotes Schroeder, states in part:

> KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results for its first quarter of fiscal 2006, ended September 30, 2005. The company reported net income of $77 million and earnings per diluted share of $0.38 on revenues of $484 million compared to net income of $105 million or $0.52 per diluted shares on revenue of $492 million in the fourth quarter of fiscal 2005, and net income of $116 million or $0.58 per diluted shares on revenue of $519 million in the first quarter of fiscal 2005. The results include the impact from adoption in the first quarter of fiscal 2006 of SFAS 123 (R). The company included equity based compensation expenses of $24 million or $0.12 per diluted share, after income tax expenses, in its costs and operating expenses during the first quarter of fiscal 2006. Excluding the $24 million of equity based compensation, net income would have been $101 million and earnings per diluted share would have been $0.50 for the first quarter of fiscal 2006.

134.     On November 8, 2005, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2005 with the SEC ("Q1FY06 Form 10-Q"), which was signed by Schroeder and Kispert.     This Q1FY06 Form 10-Q contained the following false and misleading statements:

(a)     For the three-month period ended September 30, 2005, the Company reported net income of $76,678,000 ($0.38 per diluted share) and expenses of $403,022,000.

(b)     For the three-month period ended September 30, 2005, the Company reported total stock-based compensation expense pursuant to SFAS No. 123(R), of $34,828,000 and $24,172,000 or $0.12 per diluted share, net of related tax effects.

(c)     "Effective July 1, 2005, KLA-Tencor adopted the provisions of SFAS No. 123(R), 'Share-Based Payment'.  SFAS No. 123(R) establishes accounting for stock-based awards exchanged for employee services.  Accordingly, stock-based compensation cost is measured at grant date, based on the fair value of the award, and is recognized as expense over the employee requisite service period.  The Company previously applied Accounting Principles Board (APB) Opinion No. 25, 'Accounting for Stock Issued to Employees,' and related Interpretations and provided the required pro forma disclosures of SFAS No. 123, 'Accounting for Stock-Based Compensation.'"     The Q1FY06 reported, for the three months ended September 30, 2004, total stock-based compensation expense, net of related tax effects, of $20,453,000 and *pro forma* net income of $95,952,000 ($0.48 per diluted share).

(d)     SOX certifications by Schroeder and Kispert substantially identical to those in the Q1FY03 Form 10-Q.

(e)     Certifications by Schroeder and Kispert, pursuant to 18 U.S.C. Section 1350, substantially identical to those in the 2002 Form 10-K.

135.     On November 21, 2005, KLA filed a Form S-8 Registration Statement, which registered securities to be issued under the Company's Employee Benefit Plan.     In this Registration Statement, KLA incorporated by reference the following documents which contained false and misleading statements: (a) 2005 Form 10-K; (b) Q1FY06 Form 10-Q; and

1  (c) 2005 Proxy Statement. This Registration Statement also stated that all documents

2  subsequently filed by the Registrant pursuant to Sections 13(a), 13(c), 14 and 15(d) of the

3  Exchange Act, prior to the filing of a post-effective amendment to this Registration Statement,

4  shall be deemed to be incorporated by reference in this Registration Statement from the date of

5  filing of such documents.

6       136.  On January 26, 2006, the Company issued a press release entitled "KLA-Tencor

7  Reports 2nd Quarter of Fiscal 2006 Earnings Per Share of $0.38 ($0.50 Excluding Equity Based

8  Compensation) on Revenue of $488 Million." The press release, which quotes Wallace, states

9  in part:

10        KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
        for its second quarter of fiscal 2006, ended December 31, 2005. The company
11       reported net income of $77 million and earnings per diluted share of $0.38 on
        revenues of $488 million compared to net income of $77 million or $0.38 per
12       diluted share on revenue of $484 million in the first quarter of fiscal 2006, and net
        income of $122 million or $0.61 per diluted share on revenue of $533 million in
13       the second quarter of fiscal 2005. The results for the fiscal 2006 quarters include
        the impact from adoption of SFAS 123 (R) "Stock Based Compensation". The
14       company recorded after-tax equity-based compensation expenses of $25 million
        during the second quarter of fiscal 2006 and $24 million during the first quarter of
15       fiscal 2006, in its costs and operating expenses. Excluding the impact of equity-
        based compensation, net income would have been $102 million or $0.50 per
16       diluted share in the second quarter of fiscal 2006 and $101 million or $0.50 per
        diluted share for the first quarter of fiscal 2006.
17

18       137.  On February 2, 2006, the Company filed its quarterly report on Form 10-Q for

19  the period ended December 31, 2005 with the SEC ("Q2FY06 Form 10-Q"), which was signed

20  by Wallace and Hall. This Q2FY06 Form 10-Q contained the following false and misleading

21  statements:

22       (a)  For the three-month period ended December 31, 2005, the Company

23  reported net income of $76,649,000 ($0.38 per diluted share) and expenses of $411,455,000.

24  For the six-month period ended December 31, 2005, the Company reported net income of

25  $153,327,000 ($0.76 per diluted share) and expenses of $814,477,000.

26       (b)  For the three-month period ended December 31, 2005, the Company

27  reported total stock-based compensation expense pursuant to SFAS No. 123(R) of $36,254,000

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                     57

1    ($25,812,000 or $0.13 per diluted share net of related tax effects).

2              (c)    For the three-month period ended December 31, 2004, the Company

3    reported total stock-based expense of $21,077,000 and net income of $101,800,000 ($0.50 per

4    diluted share).

5              (d)    For the six-month period ended December 31, 2005, the Company

6    reported total stock-based compensation expense pursuant to SFAS No. 123(R) of $71,082,000

7    ($49,984,000 or $0.25 per diluted share net of related tax effects).

8              (e)    For the six-month period ended December 31, 2004, the Company

9    reported total stock-based compensation expense of $41,530,000 and net income of

10    $196,952,000 ($0.98 per diluted share).

11              (f)    The identical statement regarding the adoption of SFAS No. 123(R), as

12    contained in the Q1FY06 Form 10-Q.

13              (g)    SOX certifications by Wallace and Hall substantially identical to those in

14    the Q1FY03 Form 10-Q.

15              (h)    Certifications by Wallace and Hall, pursuant to 18 U.S.C. Section 1350,

16    substantially identical to those in the 2002 Form 10-K.

17        138.    On April 27, 2006, the Company issued a press release entitled "KLA-Tencor

18    Reports Third Quarter of Fiscal 2006 Earnings Per Share of $0.48 ($0.63 Excluding Equity

19    Based Compensation) on Revenue of $518 Million." The press release, which quotes Wallace,

20    states in part:

21        KLA-Tencor Corporation (NASDAQ: KLAC) today announced operating results
          for its third quarter of fiscal 2006, ended March 31, 2006. The company reported
22        net income of $98 million and earnings per diluted share of $0.48 on revenues of
          $518 million compared to net income of $77 million or $0.38 per diluted share on
23        revenue of $488 million in the second quarter of fiscal 2006, and net income of
          $123 million or $0.61 per diluted share on revenue of $542 million in the third
24        quarter of fiscal 2005. The results for the fiscal 2006 quarters include the impact
          from adoption of SFAS 123 (R) "Stock Based Compensation". The company
25        recorded after tax equity based compensation expenses of $31 million during the
          third quarter of fiscal 2006 and $25 million during the second quarter of fiscal
26        2006, in its costs and operating expenses. Excluding the impact of equity based
          compensation, net income would have been $129 million or $0.63 per diluted
27        share for the third quarter of fiscal 2006 and $102 million or $0.50 per diluted
          share in the second quarter of fiscal 2006.
28

     [06-cv-04065-MJJ] CONSOLIDATED FEDERAL
     SECURITIES CLASS ACTION COMPLAINT                                                    58

"We had a quarter of strong financial results, as semiconductor manufacturers continue to make investments in our leading-edge process control solutions in order to reduce the time and costs associated with producing next-generation devices," stated Rick Wallace, chief executive officer of KLA-Tencor. "We remain focused on investing in the solutions our customers will need in order to remain competitive as next-generation applications enter production."

\* \* \*

KLA-Tencor's financial position remained strong with cash, cash equivalents and marketable securities of $2.3 billion and no long term debt. Inventory increased by $27 million compared to the prior quarter to $438 million as build plans ramp to meet increased customer demand. Accounts receivable increased by $84 million compared to the prior quarter to $456 million on higher shipments.

139. On May 4, 2006, the Company filed its quarterly report on Form 10-Q with the SEC ("Q3FY06 Form 10-Q"), which was signed by Wallace and Hall. This Q3FY06 Form 10-Q contained the following false and misleading statements:

(a) For the three-month period ended March 31, 2006, the Company reported net income of $98,143,000 ($0.48 per diluted share) and expenses of $430,911,000.

(b) For the nine-month period ended March 31, 2006, the Company reported net income of $251,470,000 ($1.23 per diluted share) and expenses of $1,245,388,000.

(c) For the three-month period ended March 31, 2006, the Company reported total stock-based compensation expense pursuant to SFAS No. 123(R) of $44,551,000 ($30,788,000 or $0.15 per diluted share net of related tax effects).

(d) For the nine-month period ended March 31, 2006, the Company reported total stock-based compensation expense pursuant to SFAS No. 123(R) of $115,633,000 ($80,772,000 or $0.40 per diluted share net of related tax effects).

(e) The identical statement regarding the adoption of SFAS No. 123(R), as contained in the Q1FY06 Form 10-Q.

(f) SOX certifications by Wallace and Hall substantially identical to those in the Q1FY03 Form 10-Q.

(g) Certifications by Wallace and Hall, pursuant to 18 U.S.C. Section 1350, substantially identical to those in the 2002 Form 10-K.

140. On May 18, 2006, KLA filed Proxy Statement/Prospectus on Form S-4A with

the SEC. This Proxy Statement/Prospectus incorporated by reference the following KLA filings which contained false and misleading statements: (a) 2005 Form 10-K; (b) Q1FY06, Q2FY06 and Q3FY06 Forms 10-Q; (c) reports on Form 8-K filed on July 28, 2005 (Item 5.02 and corresponding Exhibit 99.1 press release only) and November 8, 2005. This Registration Statement also stated that all documents subsequently filed by the Registrant pursuant to Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, prior to the filing of a post-effective amendment to this Registration Statement, shall be deemed to be incorporated by reference in this Registration Statement from the date of filing of such documents.

### (b)    The Reasons Why The Financial Statements Were False And Misleading

141.    As alleged more fully below, the statements contained in ¶¶92-140 (including the reported financial figures and representations regarding compliance with GAAP, SEC regulations and SOX) were materially false and misleading. The Company's financial and operating results reported during the Class Period were due, in material part, as the Company has admitted, to falsification of financial results.

142.    According to SEC regulations, public companies must prepare their financial statements in accordance with GAAP. GAAP are the principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. GAAP is also a term used to broadly describe the body of principles that governs the accounting for financial transactions underlying the preparation of a set of financial statements. GAAP are derived from a variety of sources, including promulgations of the Financial Accounting Standards Board and its predecessor, the APB, and AICPA. Other sources include the general body of accounting literature consisting of textbooks, articles, papers, etc. GAAP standards are the official standards accepted by the SEC. By failing to comply with GAAP, KLA's financial statements are presumptively in violation of

1    those regulations.[2]

2         143.   The statements contained in ¶¶92-140 violated GAAP with respect to the

3    Company's specific reporting of its compensation expenses, its net income figures and its tax

4    liabilities as well as with respect to the reporting of the Company's financial condition

5    generally.   Paragraphs 144-151 summarize how the compensation expenses were understated

6    and how the net income figures were overstated.   Paragraphs 152-155 summarize the improper

7    recording of tax liabilities.   Paragraphs 156-164 summarize how the Management Discussion

8    and Analysis of Financial Condition and Results of Operations ("MD&A") failed to disclose

9    that KLA was not in compliance with GAAP or the terms of its own option plans.

10              (i)     **Improper Accounting For Stock Options**

11        144.   Since 1995, the principal accounting guidance for stock options is contained in

12   SFAS 123.   However, for interim or annual periods beginning prior to June 15, 2005,

13   companies were permitted to account for stock options under the previous guidance known as

14   the "intrinsic value method" contained in APB No. 25, so long as they included added

15   disclosure requirements.[3]

16

17   [2] SEC Rule 4-01(a) of SEC regulation S-X states that "[f]inancial statements filed with the
     Commission which are not prepared in accordance with [GAAP] will be presumed to be
18   misleading or inaccurate, despite footnote or other disclosures, unless the Commission has
     otherwise provided." 17 C.F.R. §210.4-01(a)(1).  Regulation S-X requires that interim financial
19   statements must also comply with GAAP.  17 C.F.R. §210.10-01(a).  The SEC also regulates
     statements by registrants "that can reasonably be expected to reach investors and the trading
20   markets, whoever the intended primary audience."   Public Statements by Corporate
     Representatives, SEC Release Nos. 33-6504, 34-20560, 3 Fed. Sec. L. Rep. (CCH) ¶23,120B, at
21   17,096, 1984 SEC LEXIS 2559, at *2 (Jan. 13, 1984).

22   [3] SFAS 123, ¶11, stated in part:
             This Statement provides a choice of accounting methods for transactions with
23           employees that are within the scope of Opinion 25.   Paragraphs 16-44 of this
             Statement describe a method of accounting based on the fair value, rather than the
24           *intrinsic value,* of an employee stock option or a similar equity instrument.   The
             Board encourages entities to adopt the fair value based method of accounting,
25           which is preferable to the Opinion 25 method for purposes of justifying a change
             in accounting principle under APB Opinion No. 20, *Accounting Changes.*
26           However, an entity may continue to apply Opinion 25 in accounting for its stock-
             based employee compensation arrangements.   An entity that does so shall disclose
27           pro forma net income and, if presented, earnings per share, determined as if the
             fair value based method had been applied in measuring compensation cost
28           (paragraph 45).

1    145.   KLA represented that it had adopted APB No. 25 and purportedly applied this

2  rule through its fiscal year ended June 30, 2005. APB No. 25, ¶10 provides that:

3    Compensation for services that a corporation receives as consideration for stock
     issued through employee stock option, purchase, and award plans should be
4    measured by the quoted market price of the stock at the measurement date less the
     amount, if any, that the employee is required to pay.
5
                                       * * *
6    Thus a corporation recognizes compensation cost for stock issued through
     compensatory plans unless the employee pays an amount that is at least equal to
7    the quoted market price of the stock at the measurement date.

8    146.   Under the intrinsic value method, total compensation cost (stock option expense)

9  is computed as the excess of the market price of the stock over the option price on the date

10  when both the number of shares to which the employees are entitled and the option or purchase

11  price for those shares are known. This date is called the "measurement date." For many plans,

12  the measurement date is the grant date. In essence, APB No. 25 requires that companies

13  recognize compensation expense for options granted where the market price of the stock

14  exceeds the option's exercise price on the date of the grant. Total compensation is equal to the

15  total number of options granted multiplied by the difference between the exercise price and

16  market price of the stock on the date of grant. The intrinsic value or total compensation is then

17  recognized as an expense "over the period the employee performs related services" – that is, the

18  intrinsic value is amortized as compensation expense over the option's vesting period. If the

19  exercise price equals the prevailing market price, then this expense is zero. If the options are

20  priced below a stock's fair market value when they are awarded, there is an instant paper gain.

21  Under APB No. 25, that paper gain is the equivalent of additional compensation to the

22  executive that must be treated as a cost to the corporation. A company that fails to record or

23  amortize the intrinsic value of the in-the-money options understates compensation expense and

24  overstates net income on its income statement each year during the vesting period of an option.

25    147.   From prior to the start of the Class Period through June 30, 2006, KLA violated

26  APB No. 25 by ascribing little to no value to the total compensation expense. In fact, the

27

28  (Emphasis in original, footnote omitted.)

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                        62

1  Company should have reported hundreds of millions of dollars of added compensation cost
2  caused when option grants were backdated such that the amounts employees were required to
3  pay were less than the price of the options at grant date.  The Company has admitted to these
4  violations:

5        (a)    In its 2006 Form 10-K, the ***Company admitted that certain of its stock***
6  ***options had been retroactively priced*** such that the option exercise price was not the market
7  price of the option shares on the actual grant date of the option but rather was a lower market
8  price from a different date.

9        (b)    It has also admitted that "[t]he actual grant date – when the essential
10  actions necessary to grant the option were completed, including the final determination of the
11  number of shares to be granted to each employee and the exercise price – is the correct
12  measurement date to determine the market price of the option shares under the accounting rules
13  in effect at the time."

14        (c)    Yet, as the ***Company admitted, "the retroactively priced options were***
15  ***not accounted for correctly in our previously issued financial statements***."  (Emphasis added.)
16  Specifically, the Company explained in its 2006 Form 10-K that:

17       ***"[b]ecause each of our retroactively priced options had an exercise price below***
         ***the market price on the actual grant date, there should have been a charge for***
18       ***each of these options under APB Opinion No. 25 equal to the number of option***
         ***shares, multiplied by the difference between the exercise price and the market***
19       ***price on the actual grant date***.  That expense should have been amortized over
         the vesting period of the option." (Emphasis added)
20

21        (d)    As detailed in ¶150 below, the Company recorded additional pre-tax,
22  non-cash, stock-based compensation expense of $348 million for the periods July 1, 1994 to
23  June 30, 2005 under APB No. 25 in order to correct these past accounting misrepresentations.

24        148.    In December 2004, SFAS 123 was revised.  The new standard, SFAS 123(R),
25  required recognition of the cost of options (as per the fair value method) in the financial statements
26  and eliminated the use of APB No. 25:

27       10. An entity shall account for the compensation cost from share-based payment
         transactions with employees in accordance with the fair-value-based method set
28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          63

1    forth in paragraphs 11–63 of this Statement.

2    SFAS 123(R) became effective for interim or annual periods beginning after June 15, 2005.

3    149.    According to its public filings, KLA adopted SFAS No. 123(R) for its first

4    quarter of fiscal 2006.  Thus, as KLA explained in its 2006 Form 10-K, "for fiscal year 2006,

5    the additional stock-based compensation expense required to be recorded for each retroactively

6    priced option was equal to the incremental fair value of these options on the actual grant date

7    over the remaining vesting period of the option."

8    150.    KLA's financial results for Q1FY06, Q2FY06 and Q3FY06 violated SFAS No.

9    123(R) by failing to record certain stock-based compensation, as evidenced by the Company's

10   own admissions.  In its 2006 Form 10-K, *the Company admitted that it "did not record…stock-*

11   *based compensation expenses under…SFAS No. 123(R) related to our retroactively priced*

12   *options in our previously issued financial statements."* (Emphasis added.)

13   151.    Thus, as KLA admitted in its 2006 Form 10-K, because of the failure to properly

14   record stock-based compensation expenses under APB No. 25 and SFAS No. 123(R), it was

15   "restating them in this filing."  Specifically, *it stated that, "[t]o correct our past accounting for*

16   *stock options, we recorded additional pre-tax, non-cash, stock-based compensation expense*

17   *of (a) $348 million for the periods July 1, 1994 to June 30, 2005 under APB Opinion No. 25;*

18   *and (b) $22 million for the year ended June 30, 2006 under SFAS No. 123(R).  We expect to*

19   *amortize an additional $6 million of such pre-tax charges…in future periods …."* (Emphasis

20   added.)  On February 9, 2007, the Company issued its quarterly report on Form 10-Q for the

21   period ended December 31, 2006 ("Q2FY07 Form 10-Q") increasing the restatement to *$28*

22   *million for the period from July 1, 2005 through December 31, 2006 under SFAS No. 123(R).*

23   Attached hereto as Exhibit A is a chart identifying key restatement amounts.

(ii)    **Improper Tax Reporting For Stock Options**

24

25   152.    KLA's financial statements also violated GAAP and the SEC Regulations

26   because the Company understated its tax liabilities under IRC Section 162(m), 28 U.S.C.

27

28

§162(m).[4]

153.    Under IRC Section 162(m), a publicly held corporation's tax deduction for compensation paid to its chief executive officer and to its next four highest compensated officers is limited to $1 million per year, except for payments that qualify as commissions or as "performance-based" compensation. Option compensation that satisfies certain criteria may be considered "performance-based compensation" and, as such, would be excluded from the $1 million limit. Ordinarily, stock options with an exercise price that is no less than the fair market value of the stock on the date of grant qualify as "performance-based" compensation under §162(m). However, if a stock option has been backdated and, as a result, was granted with an exercise price that was less than the fair market value of the stock on the date of the actual grant, all of the income resulting from the exercise of the option must be included for purposes of calculating whether the executive's compensation exceeded the $1 million cap under Section 162(m).

154.    According to KLA's proxy statements, the following defendants were among the top five paid executives during the Class Period and, thus, potentially subject to the $1 million cap under IRC Section 162(m): Levy, Schroeder, Hall, Dickerson, Tompkins, Kispert and Wallace. Because these officers were granted "in-the-money" options as alleged herein, their compensation did not qualify for special treatment under IRC Section 162(m) and the Company should not have been allowed to deduct the compensation to these officers that exceeded $1 million for tax purposes.

155.    The Company has conceded that, because options were backdated, it improperly recorded additional deferred tax assets related to stock-based compensation on certain executive compensation. In its 2006 Form 10-K, the Company stated that *"it should not have taken a United States tax deduction in prior years for stock option related amounts pertaining to certain executives under [IRC] Section 162(m)."* (Emphasis added.) *The Company further*

---

[4] As discussed below, the Company also violated their withholding obligations under IRC Section 421(a).

1    *admitted that "excess deductions were taken on prior tax returns due to the finding that*

2    *retroactive pricing of certain stock options occurred.  As a result, the Company's tax*

3    *liabilities have increased by approximately $8 million."*  (Emphasis added.)

4                    **(iii)    The Misleading Statements In The Management Discussion**
                            **And Analysis Section Of The Financial Statements**
5

6        156.    The discussions also violated GAAP and the SEC regulations in that the MD&A

7    of Financial Condition and Results of Operations failed to disclose that KLA was not in

8    compliance with GAAP or the terms of its own option plans.

9        157.    The financial statements' Item 7 of Form 10-K and Item 2 of Form 10-Q,

10   MD&A of Financial Condition and Results of Operations, required the issuer to furnish

11   information required by Item 303 of Regulation S-K (17 C.F.R. §229.303).  On May 18, 1989,

12   the SEC issued an interpretive release, Securities Act release No. 6835, 54 Fed. Reg. 22427

13   (May 18, 1989), which stated in part:

14           The MD&A requirements are intended to provide, in one section of a filing,
             material historical and prospective textual disclosure enabling investors and other
15           users to assess the financial condition and results of operations of the registrant,
             with particular emphasis on the registrant's prospects for the future.  As the
16           Concept Release states:

17               The Commission has long recognized the need for a narrative
                 explanation of the financial statements, because a numerical
18               presentation and brief accompanying footnotes alone may be
                 insufficient for an investor to judge the quality of earnings and the
19               likelihood that past performance is indicative of future
                 performance.  MD&A is intended to give the investor an
20               opportunity to look at the company through the eyes of
                 management by providing both a short and long-term analysis of
21               the business of the company.  The Item asks management to
                 discuss the dynamics of the business and to analyze the financials.
22

23   (Footnotes omitted.)

24       158.    Securities Act Release No. 6349, 23 S.E.C Docket 962 (Sept. 28, 1981) provides

25   that:

26           It is the responsibility of management to identify and address those key variables
             and other qualitative and quantitative factors which are peculiar to and necessary
27           for an understanding and evaluation of the individual company.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                66

159.    Under SEC regulations, the management of a public company has a duty "to make full and prompt announcements of material facts regarding the company's financial condition."[5]    Defendants violated this regulation throughout the Class Period by deliberately and/or recklessly misrepresenting the specific terms and annual costs of the Company's employee and director stock option grants.

160.    Defendants failed to explain in the MD&A sections of their annual and quarterly SEC filings that they had caused KLA *to not be in compliance with GAAP or the terms of its own option plans*.    Moreover, defendants violated the basic precepts noted above by (a) concealing from the public a complete understanding of material facts relating to KLA's compensation expenses, specifically the costs the Company would have incurred if it had properly accounted for stock options that defendants improperly backdated; and (b) concealing from the public a complete understanding of material facts relating to defendants' practice of opportunistically granting options, specifically that: (i) while the options granted to executives, employees and directors of the Company appeared, based on the usual characteristics of such instruments, to be a form of "risk-based compensation," they were, instead, a disguised form of straight compensation, as defendants' practices substantially eliminated the risks faced by these option recipients; and (ii) by means of this subterfuge, defendants' compensation practices were performed in an improper manner.

161.    Due to all these accounting improprieties set forth above, KLA presented its financial results and statements in a manner which violated GAAP including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10).

(b)    The principle that financial reporting should provide information that is

---

[5] Timely Disclosure of Material Corporate Developments, Exchange Act Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) ¶23,120A, at 17,095, 17 C.F.R. §241.8995, 1970 WL 10576 (Oct. 15, 1970).

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

1   useful to present and potential investors, creditors and other users in making rational

2   investment, credit and similar decisions (FASB Statement of Financial Accounting Concepts

3   No. 1, ¶34).

4          (c)     The principle that financial reporting should provide information about

5   the economic resources of an enterprise, the claims to those resources and effects of

6   transactions, events and circumstances that change resources and claims to those resources

7   (FASB Statement of Financial Accounting Concepts No. 1, ¶48).

8          (d)     The principle that financial reporting should provide information about

9   how management of an enterprise has discharged its stewardship responsibility to owners

10   (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management

11   offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

12   accountability to prospective investors and to the public in general (FASB Statement of

13   Financial Accounting Concepts No. 1, ¶50).

14          (e)     The principle that financial reporting should provide information about

15   an enterprise's financial performance during a period.  Investors and creditors often use

16   information about the past to help in assessing the prospects of an enterprise.  Thus, although

17   investment and credit decisions reflect investors' expectations about future enterprise

18   performance, those expectations are commonly based at least partly on evaluations of past

19   enterprise performance (FASB Statement of Financial Accounting Concepts No. 1, ¶42).

20          (f)     The principle that financial reporting should be reliable in that it

21   represents what it purports to represent.  That information should be reliable as well as relevant

22   is a notion that is central to accounting (FASB Statement of Financial Accounting Concepts No.

23   2, ¶¶58-59).

24          (g)     The principle of completeness, which means that nothing is left out of the

25   information that may be necessary to insure that it validly represents underlying events and

26   conditions was violated (FASB Statement of Financial Accounting Concepts No. 2, ¶79).

27          (h)     The principle that conservatism be used as a prudent reaction to

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                68

1  uncertainty to try to ensure that uncertainties and risks inherent in business situations are

2  adequately considered. The best way to avoid injury to investors is to try to ensure that what is

3  reported represents what it purports to represent (FASB Statement of Financial Accounting

4  Concepts No. 2, ¶¶95, 97).

5      162.    Because of these GAAP violations, the Company restated its financial statements

6  for 1997 through 2005 in its 2006 Form 10-K and Q2FY07 Form 10-Q. Attached as Exhibit A

7  hereto is a chart summarizing the Restatement.

8      163.    The Company has further stated that it intends to later restate its previously filed

9  financial statements for the quarter ended March 31, 2006.

10     164.    Pursuant to GAAP, as set forth in APB Opinion No. 20,[6] restatements are

11  required to correct **material** accounting errors that existed at the time the financial statements

12  were issued and are permitted for the purpose of correcting improper accounting only when it

13  results in **material** misstatements. By restating KLA's financial statements, the Company is

14  admitting that each document publishing the original financial statements for the restated

15  periods contained untrue statements and/or omissions of material fact. Similarly, by

16  announcing the restatement, the Company is also conceding that each of the press releases

17  disseminated to the investing public and each of the annual and quarterly reports on Form 10-K

18  and Form 10-Q that were filed with the SEC during the Class Period contained untrue

19  statements of material fact and/or failed to disclose material facts.

20     **2.    The False and Misleading Statements Regarding the Option Grants**

21         **(a)    The Misleading Statements**

22     165.    In the section discussing "Stock Option and Incentive Plans," the Company's

23  2001 Form 10-K stated that "[u]nder KLA-Tencor's stock option plans, options generally have

24  vesting periods of four or five years, are exercisable for a period not to exceed ten years from

25

26  _____

27  [6] As of December 2005, APB Opinion No. 20 was superseded by SFAS No. 154, "Accounting
    Changes and Error Corrections a replacement of APB Opinion No. 20 and FASB Statement No.
    3," which carried forward without change the guidance contained in APB Opinion No. 20 for

28  reporting the correction of an error in previously issued financial statements.

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          69

1   the date of issuance and *are granted at prices not less than the fair market value of KLA-*

2   *Tencor's common stock at the grant date."* (Emphasis added.)  The Company's 2001 Form

3   10-K also incorporated by reference information contained in the 2001 Proxy Statement

4   regarding Executive Compensation.

5        166.   On September 28, 2001, the Company filed a definitive proxy statement with the

6   SEC ("2001 Proxy Statement").  Regarding the "Compensation of Directors," the 2001 Proxy

7   Statement stated that: (a) members of the Board of Directors who are not employees of the

8   Company receive benefits under the 1998 Outside Director Plan; (b) each Outside Director also

9   receives a nonstatutory option to purchase 20,000 shares of common stock as of the date on

10  which such director first becomes an Outside Director; (c) each Outside Director is also granted

11  a nonstatutory option to purchase an additional 10,000 shares of common stock on the date of

12  the subsequent annual meetings on which he or she remains an Outside Director; (d) the term of

13  options granted under the 1998 Outside Director Plan may not exceed ten years; and (e) the

14  1998 Outside Director Plan provides that *"the exercise price shall be equal to the fair market*

15  *value of the Common Stock on the date of grant of the option."*  (Emphasis added.)  Options

16  granted under the 1998 Director Plan become exercisable immediately upon the date of grant.

17       167.   The 2001 Proxy Statement also stated that the Company had granted under the

18  1982 Plan (a) 37,901, 75,800, 65,000 and 30,000 options with an exercise price of $44.69 to

19  Levy, Schroeder, Dickerson and Neil Richardson ("Richardson"), respectively, on August 11,

20  2000; (b) 18,951, 37,900, 32,500, 15,000 and 10,000 options with an exercise price of $26.25 to

21  Levy, Schroeder, Dickerson, Richardson and Tompkins, respectively, on November 10, 2000;

22  and (c) 18,951, 37,900, 32,500 and 45,000 options with an exercise price of $32.75 to Levy,

23  Schroeder, Dickerson and Richardson, respectively, on April 4, 2001.  Identified among the

24  *"material terms of the grants"* was the following: *"the exercise price of the options is the fair*

25  *market value of Common Stock as of the date of grant."*  (Emphasis added.)

26       168.   The 2001 Proxy Statement also identified the 2000 and 1999 Executive

27  Compensation for Levy, Schroeder, Dickerson, Richardson and Tompkins.  In 2000, Levy,

28

1    Schroeder, Dickerson, Richardson and Tompkins were granted (among other compensation)

2    90,000, 150,000, 100,000, 50,000 and 10,000 options, respectively. In 1999, Levy, Schroeder,

3    Dickerson, Richardson and Tompkins were granted (among other compensation) 102,136,

4    102,136, 62,882, 87,717 and 50,809 options, respectively.

5        169.    The 2001 Proxy Statement stated that *"[a]ctual gains, if any, on option*

6    *exercises are dependent on the future performance of the Company's Common Stock and*

7    *overall market conditions."* (Emphasis added.)

8        170.    The 2001 Proxy Statement also contained the Report of the Compensation

9    Committee on Executive Compensation. In pertinent part, the Report provided:

> *Compensation Philosophy:* The goals of the Company's compensation policy are to attract, retain and reward executive officers who contribute to the overall success of the Company by offering compensation that is competitive in the industry, to motivate executive officers to achieve the Company's business objectives *and to align the interests of executive officers with the long term interests of stockholders....*
>
> The compensation philosophy of the Compensation Committee is to provide a comprehensive compensation package for each executive officer that is well suited to support accomplishment of the Company's business strategies, objectives and initiatives. *For incentive-based compensation, the Compensation Committee considers the desirability of structuring such compensation arrangements so as to qualify for deductions available under Section 162(m) of the Internal Revenue Code, which disallows a tax deduction for any publicly-held corporation for individual compensation exceeding One Million dollars in any taxable year for any of the named executive officers, other than compensation that is "performance based."* The Compensation Committee applies this compensation philosophy in determining appropriate executive compensation levels and other compensation factors and the Compensation Committee reaches its decisions with a view towards the Company's overall financial performance.
>
> *Executive Officer Compensation:* The Committee's approach is based upon a belief that a substantial portion of aggregate annual *compensation for executive officers should be contingent upon the Company's performance* and an individual's contribution to the Company's success. In addition, the Committee strives to align the interests of the Company's executive officers with the long-term interests of stockholders through stock option grants that can result in ownership of the Company's Common Stock. The Committee endeavors to structure each executive officer's overall compensation package to be consistent with this approach and to enable the Company to attract, retain and reward personnel who contribute to the success of the Company.
>
> * * *
>
> *Long-term Incentives:* Longer term incentives are provided through the Stock Option Plan and the Excess Profit Stock Plan, each of which reward executive

**EXHIBIT 4**
**Part 3 of 5**

officers through the growth in value of the Company's Common Stock.... *Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price.*

(Emphasis added.)

171.    On September 20, 2002, the Company filed a definitive proxy statement and, on September 25, 2002, it filed a revised proxy statement with the SEC (collectively referred to herein as the "2002 Proxy Statement"). Regarding the "Compensation of Directors," the 2002 Proxy Statement stated that: (a) members of the Board of Directors who are not employees of the Company receive benefits under the 1998 Outside Director Plan; (b) each Outside Director received a nonstatutory stock option to purchase 20,000 shares of Common Stock as of the date on which such director first became on Outside Director. In fiscal year 2003, the Board approved a change in the amount of the First Option, reducing the size of that grant to 10,000 shares of Common stock to be effective when a new Outside Director first joins the Board; (c) each Outside Director is automatically granted a nonstatutory stock option to purchase an additional 10,000 shares of Common Stock on the date of the subsequent annual meetings on which he or she remains an Outside Director; (d) the terms of options granted under the 1998 Outside Director Plan may not exceed 10 years; and (e) the 1998 Outside Director Plan provides that *"the exercise price shall be equal to the fair market value of the Common Stock on the date of grant of the option."* (Emphasis added.) Options granted under the 1998 Director Plan become exercisable immediately upon the date of grant.

172.    The 2002 Proxy Statement also stated that, under the 1982 Stock Option Plan, the Company had granted 28,425, 341,100, 105,000, 60,000 and 45,000 options with an exercise price of $29.31 to Levy, Schroeder, Dickerson, Kispert and Dennis J. Fortino ("Fortino"), respectively, on October 2, 2001. The 2002 Proxy Statement specifically said that these *"[o]ptions were granted at an exercise price equal to the fair market value of the Company's Common Stock on October 2, 2001."* (Emphasis added.)

173.    The 2002 Proxy Statement also reiterated information from the 2001 Proxy Statement on Executive Compensation for Levy, Schroeder and Dickerson in 2001 and 2000,

1 including the options granted to them in those years. The Executive Compensation section

2 also revealed that (a) during 2001, Kispert and Fortino were granted 80,000 and 90,000

3 options, respectively; and (b) during 2000, Kispert and Fortino were granted 30,000 and

4 60,000 options, respectively.

5        174.    The 2002 Proxy Statement stated that *"[a]ctual gains, if any, on option*

6 *exercises are dependent on the future performance of the Company's Common Stock and*

7 *overall market conditions."* (Emphasis added.)

8        175.    The 2002 Proxy Statement also included the Report of the Compensation

9 Committee on Executive Compensation, which described its philosophy on Executive Officer

10 compensation and terms concerning Long-term Incentives in language substantially identical

11 to the language in the 2001 Proxy Statement.

12        176.    In the section discussing "Stock Options and Incentive Plans," the Company's

13 2002 Form 10-K provided that "KLA-Tencor's stock option program is a broad-based, long

14 term retention program that is intended to attract and retain qualified management and

15 technical employees...*and align stockholder and employee interests....*    Under KLA-

16 Tencor's stock option plans, options generally have vesting periods of four or five years, are

17 exercisable for a period not to exceed ten years from the date of issuance and *are granted at*

18 *prices not less than the fair market value of KLA-Tencor's common stock at the grant*

19 *date."* (Emphasis added.)  The Company's 2002 Form 10-K also incorporated by reference

20 information contained in the 2002 Proxy Statement regarding Executive Compensation.

21        177.    The Company's Q1FY03 Form 10-Q repeated the identical information

22 regarding the purpose of the stock option program and the exercise price of the option grants

23 set forth above from the Company's 2002 Form 10-K.

24        178.    The Company's Q2FY03 Form 10-Q repeated the identical information

25 regarding the purpose of the stock option program and the exercise price of the option grants

26 set forth above from the Company's 2002 Form 10-K.

27        179.    The Company's Q3FY03 Form 10-Q repeated the identical information

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    73

1    regarding the purpose of the stock option program and the exercise price of the option grants

2    set forth above from the Company's 2002 Form 10-K.

3        180.    On September 23, 2003, the Company filed a definitive proxy statement with

4    the SEC ("2003 Proxy Statement").   Regarding "Director Compensation," the 2003 Proxy

5    Statement provided information that was substantially identical to that provided in the 2002

6    Proxy Statement regarding option grants under the 1998 Outside Director Plan (except that the

7    Outside Directors now receive a nonstatutory stock option to purchase 10,000 shares of

8    common stock as of the date on which such director first becomes an Outside Director).

9        181.    The 2003 Proxy Statement also stated that the Company granted (a) 31,450,

10   25,000, 12,500, 12,500 and 12,500 options with an exercise price of $37.05 to Schroeder,

11   Dickerson, Kispert, Fortino and Wallace, respectively, on November 8, 2002; (b) 62,900,

12   50,000, 25,000, 25,000 and 25,000 options with an exercise price of $34.67 to Schroeder,

13   Dickerson, Kispert, Fortino and Wallace, respectively, on January 28, 2003; and (c) 1,000

14   options with an exercise price of $40.14 per share to Dickerson, Fortino and Wallace on May

15   22, 2003.   The 2003 Proxy Statement provided that *options were granted at an exercise price*

16   *equal to the fair market value of the Company's common stock.*

17       182.    The 2003 Proxy Statement also reiterated information from the 2002 Proxy

18   Statement on Executive Compensation for Schroeder, Dickerson, Kispert and Fortino in 2002

19   and 2001, including the options granted to them in those years.   The Executive Compensation

20   section also revealed that, during 2002 and 2001, Wallace was granted 45,000 and 70,000

21   options, respectively.

22       183.    The 2003 Proxy Statement stated that *"[a]ctual gains, if any, on option*

23   *exercises are dependent on the future performance of the Company's Common Stock and*

24   *overall market conditions."*   (Emphasis added.)

25       184.    The 2003 Proxy Statement also included the Report of the Compensation

26   Committee on Executive Compensation which described its philosophy on Executive Officer

27   compensation and terms concerning Long-term Incentives in language substantially similar to

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          74

1    the language in the 2001 Proxy Statement.

2        185.    The 2003 Proxy Statement also provided that, during the fiscal year ended June

3    30, 2002, Tompkins ceased to be an employee of KLA and pursuant to the terms of his options

4    granted under the 1982 Plan, had 30 days to exercise certain options.  However, "due to a

5    miscommunication," from KLA, Tompkins was misled as to the expiration date of certain of

6    these options and the independent members of the Board agreed to provide a "one-time cash

7    payment of $206,800 to him as a remedy for the miscommunication.  "The amount paid was

8    measured as 'in the money' value had Mr. Tompkins exercised such options on their

9    expiration date."

10        186.    The 2003 Form 10-K repeated the exact information regarding the purpose of

11    the stock option program and the exercise price of the option grants set forth above from the

12    Company's 2002 Form 10-K (except that it stated that options generally have a vestingperiod

13    of five years). The Company's 2003 Form 10-K also incorporated by reference information

14    contained in the 2003 Proxy Statement regarding Executive Compensation.

15        187.    The  Company's  Q1FY04  Form  10-Q  repeated  the  identical  information

16    regarding the purpose of the stock option program and the exercise price of the option grants

17    set  forth  above  from  the  Company's  2002  Form  10-K  (except  that  it  stated  that  options

18    generally have a vesting period of five years).

19        188.    The  Company's  Q2FY04  Form  10-Q  repeated  the  identical  information

20    regarding the purpose of the stock option program and the exercise price of the option grants

21    set  forth  above  from  the  Company's  2002  Form  10-K  (except  that  it  stated  that  options

22    generally have a vesting period of five years).

23        189.    The  Company's  Q3FY04  Form  10-Q  repeated  the  identical  information

24    regarding the purpose of the stock option program and the exercise price of the option grants

25    set  forth  above  from  the  Company's  2002  Form  10-K  (except  that  it  stated  that  options

26    generally have a vesting period of five years).

27        190.    The Company's 2004 Form 10-K repeated the identical information regarding

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    75

the purpose of the stock option program and the exercise price of the option grants set forth above from the Company's 2002 Form 10-K (except that it stated that options generally have a vesting period of five years).   The Company's 2004 10-K also incorporated by reference information contained in the 2004 Proxy Statement regarding Executive Compensation.

191.   On September 9, 2004, the Company filed a definitive proxy statement with the SEC ("2004 Proxy Statement").   Regarding "Director Compensation," the 2004 Proxy Statement provided information that was substantially identical to that provided in the 2003 Proxy Statement regarding option grants under the 1998 Outside Director Plan.

192.   The 2004 Proxy Statement stated that the Company granted (a) 31,450, 25,000, 12,500, 12,500 and 12,500 options with an exercise price of $51.23 to Schroeder, Dickerson, Kispert, Fortino and Wallace, respectively, on July 30, 2003; (b) 60,000, 50,000, 30,000, 30,000 and 30,000 options with an exercise price of $53.86 to Schroeder, Dickerson, Kispert, Fortino and Wallace, respectively, on October 27, 2003; (c) 30,000, 25,000, 15,000, 15,000 and 15,000 options with an exercise price of 58.10  to Schroeder, Dickerson, Kispert, Fortino and Wallace, respectively, on January 27, 2004; and (d) 37,500, 31,250, 18,750, 18,750 and 18,750 options with an exercise price of $45.16 to Schroeder, Dickerson, Kispert, Fortino and Wallace, respectively, on April 26, 2004.   The 2004 Proxy Statement further revealed that during fiscal year 2004, in order to provide Schroeder with an incentive to remain long-term, he received options covering 83,380 shares of common stock with delayed vesting.  The 2004 Proxy Statement also stated that options were granted at an exercise price equal to the fair market value of the Company's common stock.

193.   The 2004 Proxy Statement also reiterated information from the 2003 Proxy Statement on Executive Compensation for Schroeder, Dickerson, Kispert, Wallace and Fortino in 2003 and 2002, including the options granted to them in those years.

194.   The 2004 Proxy Statement stated that *"[a]ctual gains, if any, on option exercises are dependent on the future performance of the Company's Common Stock and overall market conditions."*  (Emphasis added.)

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                                76

195.    The 2004 Proxy Statement also included the Report of the Compensation Committee on Executive Compensation which described its philosophy on Executive Officer compensation and terms concerning Long-term Incentives in language substantially similar to the language in the 2001 Proxy Statement.

196.    The 2004 Proxy Statement also solicited shareholder votes for approval of the Company's 2004 Equity Incentive Plan, including approval of its material terms and performance goals for the purpose of helping awards under the 2004 Equity Incentive Plan qualify as "performance-based" compensation under IRC Section 162(m).

197.    In discussing the 2004 Equity Incentive Plan, the 2004 Proxy Statement provided that (a) its purposes were to "attract and retain the best available personnel for positions of substantial responsibility, provide additional incentive to our employees and consultants, and promote the success of our business"; (b) options and SARS may not be granted with an exercise price lower than 100% of the fair market value of the underlying shares; and (c) it "prohibits option or stock appreciation right repricing, including by way of an exchange for another award, unless stockholder approval is obtained."

198.    The 2004 Proxy Statement further stated that "[w]e have designed the 2004 Equity Incentive Plan so that it permits us to issue awards that qualify as performance-based under Section 162(m) of the Code."

199.    In discussing the "Terms and Conditions of Options," (regarding options granted under the 2004 Equity Incentive Plan), the 2004 Proxy Statement provided: *"[t]he exercise price of options may not be less than 100% of the fair market value of the common stock on the grant date the option [sic]. As our common stock is listed on the Nasdaq National Market, the fair market value is the closing sale price for the common stock (or the closing bid if no sales were reported) on the grant date."* (Emphasis added.)

200.    On October 1, 2004, the Company filed an amendment to its 2004 Proxy Statement ("Amended 2004 Proxy Statement"). Among other things, the Amended 2004 Proxy Statement represented that:

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                77

1
2
3
4
5
6
7
8

> In the history of the Company, equity compensation has been a critical component of our ability to attract and retain the talent needed in our industry…. ***KLA-Tencor has utilized stock options responsibly in the past and will continue to do so***…. While the new plan results in fewer options available for grant, it also gives the Company much greater flexibility in how we structure equity compensation. We believe this new plan will allow KLA-Tencor to continue attracting high-caliber employees. The 2004 Plan would allow us to grant restricted stock, stock appreciation rights, performance shares, performance units and deferred stock units which would give us a range of flexibility in designing competitive packages for our employees while aligning them with increasing shareholder value for you, the Stockholder. The members of our Board of Directors unanimously recommend a vote "FOR" approval of the 2004 Equity Incentive Plan.

9   (Emphasis added.)

10      201.   The Company's Q1FY05 Form 10-Q repeated substantially identical

11   information regarding the purpose of the stock option program and the exercise price of the

12   option grants set forth above from the Company's 2002 Form 10-K (except that it stated that

13   options generally have a vesting period of five years).

14      202.   The Company's Q2FY05 Form 10-Q provided that the "equity incentive

15   program is a broad-based, long-term retention program that is intended to attract and retain

16   qualified management and technical employees…and align stockholder and employee

17   interests…. Under our equity incentive program, stock options generally have a vesting period

18   of five years, are exercisable for a period not to exceed ten years from the date of issuance and

19   are generally ***granted at prices not less than the fair market value of our common stock at***

20   ***the grant date."*** (Emphasis added.)

21      203.   The Company's Q3FY05 Form 10-Q repeated the identical information

22   regarding the purpose of the stock option program and the exercise price of the option grants

23   set forth above from the Company's Q2FY05 Form 10-Q.

24      204.   The Company's 2005 Form 10-K repeated the identical information regarding

25   the purpose of the stock option program and the exercise price of the option grants set forth

26   above from the Company's Q2FY05 Form 10-Q. The Company's 2005 10-K also incorporated

27   by reference information contained in the 2005 Proxy Statement regarding Executive

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          78

1    Compensation.

2        205.    On October 13, 2005, the Company filed a definitive proxy statement ("2005

3    Proxy Statement") with the SEC.    Regarding "Director Compensation," the 2005 Proxy

4    Statement provided information regarding option grants under the 1998 Outside Director Plan,

5    which was substantially identical to that provided in the 2003 Proxy Statement.    However,

6    with respect to the subsequent grant (nonstatutory stock option to purchase an additional

7    aggregate 10,000 shares of common stock) the 2005 Proxy Statement stated that it would be

8    provided to each Outside Director in 2,500 share increments each quarter, approximately two

9    business days following the Company's earnings release for the prior fiscal quarter.    It further

10   provided that "the Chairman of the Audit Committee receives an additional nonstatutory stock

11   option grant to purchase an additional 2,500 shares of Common Stock on the date of each

12   subsequent annual meeting on which such Director remains the Chairman of the Audit

13   Committee."

14       206.    The 2005 Proxy Statement also stated that the Company had granted (a) 22,500,

15   11,250, 11,250, 6,000 and 3,750 options with an exercise price of $40.66 to Schroeder,

16   Kispert, Wallace, Avi Cohen ("Cohen") and Lance Glasser ("Glasser"), respectively, on

17   August 2, 2004; and (b) 325,800, 75,000, 75,000, 75,000 and 75,000 options with an exercise

18   price of $41.79 to Schroeder, Kispert, Wallace, Cohen and Glasser, respectively, on September

19   21, 2004.

20       207.    The 2005 Proxy Statement also reiterated information from the 2004 Proxy

21   Statement on Executive Compensation for Schroeder, Kispert and Wallace in 2004 and 2003,

22   including the options granted to them in those years.    The 2005 Proxy Statement also provided

23   the 2004 and 2003 Executive Compensation for Cohen and Lance.    In 2004, Cohen and

24   Glasser were granted (among other compensation) 40,250 and 25,750 options, respectively.    In

25   2003, Cohen and Glasser were granted (among other compensation) 18,750 and 13,500

26   options, respectively.

27       208.    The 2005 Proxy Statement stated that *"[a]ctual gains, if any, on option*

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    79

1    *exercises are dependent on the future performance of the Company's Common Stock and*

2    *overall market conditions."* (Emphasis added.)

3          209.    The 2005 Proxy Statement also included the Report of the Compensation

4    Committee on Executive Compensation.   With respect to "Compensation Philosophy," the

5    2005 Proxy Statement provided, among other things, that it is designed to "(i) attract, retain,

6    and reward Executives who contribute to the overall success of the Company; (ii) support

7    accomplishment of the Company's business strategies, objectives and initiatives; (iii) have a

8    substantial portion of annual compensation be contingent upon the Company's financial

9    performance and an individual's contribution to the Company's success; and (iv) align the

10   interests of Executives with the long term interests of stockholders."   With respect to "Long-

11   term Incentives," the Report provided that:

12          Long-term incentives are currently provided under the 2004 Equity Incentive Plan
            through grants of stock options and restricted stock units.  Such awards provide
13          value to Executives through the growth in value of the Company's Common
            Stock.  The Compensation Committee believes that employee equity ownership is
14          highly motivating, provides a major incentive for employees to build shareholder
            value and serves to align the interests of employees with those of stockholders....
15          *Stock options are granted at market price on the date of grant and will provide*
            *value to the Executive only when the price of the Company's Common Stock*
16          *increases over the exercise price.*

17   (Emphasis added.)

18          210.    In discussing the "Deductibility of Compensation under Internal Revenue Code

19   Section 162(m)," the Report of the Compensation Committee also provided that:

20          The Company's equity compensation programs, including the 2004 Equity
            Incentive Plan approved by stockholders at the last annual meeting, are structured
21          so that compensation from such programs is "performance based" when earned....
            Annual incentive compensation has historically not been structured to qualify
22          under Section 162(m).  Under Proposal 2 in this Proxy Statement [approving the
            162(m) Performance Bonus Plan], the Company's stockholders are being asked to
23          approve the KLA-Tencor Internal Revenue Code Section 162(m) Performance
            Bonus Plan which is structured to qualify incentive compensation as
24          "performance-based" for fiscal years beginning in 2006.

25          Compensation paid in fiscal 2005 subject to the Section 162(m) cap is expected to
            exceed $1 million for Mr. Schroeder and Mr. Kispert.  The Committee thus
26          believes that the Company will be subject to limitations on the deductibility of
            compensation paid to these named executive officers for fiscal year 2005.

27

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              80

211.    The Company's Q1FY06 Form 10-Q repeated the identical information regarding the purpose of the stock option program and the exercise price of the option grants set forth above from the Company's Q2FY05 Form 10-Q.

212.    The Company's Q2FY06 Form 10-Q repeated the identical information regarding the purpose of the stock option program and the exercise price of the option grants set forth above from the Company's Q2FY05 Form 10-Q.

213.    The Company's Q3FY06 Form 10-Q repeated the identical information regarding the purpose of the stock option program and the exercise price of the option grants set forth above from the Company's Q2FY05 Form 10-Q.

(b)    **The Reasons Why The Statements Were False And Misleading**

214.    The statements contained in ¶¶165-213 were false and misleading for the following reasons.

215.    First, the actual grants identified were false and misleading because the options were not granted on the dates identified but, rather, on dates chosen with hindsight for their lower stock prices, as detailed above.  Moreover, in recognition that certain of the defendants' option grants identified above were backdated, the Company has announced that it has canceled or repriced their outstanding retroactively priced stock options.

216.    Second, the statements that options were granted at prices not less than the fair market value of KLA's common stock price on the date of the grant pursuant to the Stock Option Plans were false and misleading because the options were not granted in accordance with such requirements but rather were backdated, as evidenced above.

217.    Third, the statements that actual gains, if any, on option exercises are dependent on the future performance of the Company's Common Stock and overall market conditions are false and misleading because the backdated options were "in-the-money" (*i.e.*, the exercise price was actually lower than the fair market value on the true date of the grant), as evidenced above.

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              81

218.  Fourth, the statements in KLA's Proxy Statements regarding the Company's philosophy in granting options were false and misleading in that the options were "in-the-money" on the date of the actual grant, as evidenced above.

219.  Fifth, the statements in KLA's Proxy Statement regarding the Company's compliance with IRC Section 162(m), 28 U.S.C. §162(m), were false and misleading because the Company did not comply with Section 162(m)), as discussed above.

220.  As a result of these false statements (a) KLA shareholders were misled regarding compensation of the Company's officers and directors, including the specific grants identified in the Proxy Statements; (b) KLA shareholders were misled regarding the integrity of management and the Board of Directors; (c) the election of directors was obtained pursuant to misleading Proxy Statements; (d) the approval of the 2004 Equity Incentive Plan was obtained through a misleading Proxy Statement; and (e) the Performance Bonus Plan was approved through a misleading Proxy Statement.

### 3.     The False and Misleading Statements Regarding Internal Controls

#### (a)     The Misleading Statements

221.  In their Q1FY03 Form 10-Q certification, Schroeder and Kispert each certified that:

> 4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:
>
> a)  designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly reports being prepared;
>
> b)  evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and
>
> c)  presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;
>
> 5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

82

1    committee of registrant's board of directors (or persons performing the
     equivalent function):

2        a)  all significant deficiencies in the design or operation of internal
3    controls which could adversely affect the registrant's ability to record,
     process, summarize and report financial data and have identified for the
4    registrant's auditors any material weaknesses in internal controls; and

5        b)  any fraud, whether or not material, that involves management or
     other employees who have a significant role in the registrant's internal
6    controls; and

7    6.    The registrant's other certifying officers and I have indicated in this
     quarterly report whether or not there were significant changes in internal
8    controls or in other factors that could significantly affect internal controls
     subsequent to the date of our most recent evaluation, including any
9    corrective actions with regard to significant deficiencies and material
     weaknesses.

10   (Emphasis added.)    Moreover, in Item 4, "Controls and Procedures," the Q1FY03 Form 10-Q

11   provided:

12       Evaluation of disclosure controls and procedures

13       Within 90 days prior to the date of this report (the Evaluation date), the
         Company's Chief Executive Officer (principal executive officer) and Executive
14       Vice President and Chief Financial Officer (Principal financial officer), carried
         out an evaluation of the effectiveness of the Company's "disclosure controls and
15       procedures" (as defined in the Securities Exchange Act of 1934 Rules 13a-14(c)
         and 15(d)-14(c)). *Based on that evaluation, these officers have concluded that*
16       *as of the Evaluation Date, the Company's disclosure controls and procedures*
         *were adequate and designed to ensure that material information relating to the*
17       *Company and the Company's consolidated subsidiaries would be made known*
         *to them by others within those entities.*  (Emphasis added.)

18

19       222.    In the Q2FY03 Form 10-Q, Schroeder and Kispert each signed certifications

20   identical to the Q1FY03 Form 10-Q certifications, as cited above.  Regarding "Controls and

21   Procedures," the Q2FY03 Form 10-Q repeated the language set forth in the Q1FY03 Form 10-Q

22   but added additional language as underlined:

23       Within 90 days prior to the date of this report (the Evaluation date), the
         Company's Chief Executive Officer (principal executive officer) and Executive
24       Vice President and Chief Financial Officer (Principal financial officer), carried
         out an evaluation of the effectiveness of the Company's "disclosure controls and
25       procedures" (as defined in the Securities and Exchange Act of 1934 Rules 13a-
         14(c) and 15(d)-14(c)). *Based on that evaluation, these officers have concluded*
26       *that as of the Evaluation Date, the Company's disclosure controls and*
         *procedures were adequate and designed to ensure that material information*
27       *relating to the Company and the Company's consolidated subsidiaries would be*
         *made known to them by others within those entities, and are effective to ensure*

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    83

1
2

> *that the information required to be disclosed by us in reports that we file or*
> *submit under the Securities Exchange Act of 1934 is recorded, processed and*
> *reported within the time periods specified in Securities and Exchange*
> *Commission rules and forms.* (Emphasis added.)

3    223.    In the Q3FY03 Form 10-Q, Schroeder and Kispert each signed certifications

4  substantially identical to the Q1FY03 certifications, as cited above. Regarding "Controls and

5  Procedures," the Q3FY03 Form 10-Q repeated the language set forth in the Q2FY03 Form 10-Q

6  but added additional language as underlined:

7
8
9
10
11
12
13
14

> Within 90 days prior to the date of this report (the Evaluation date), the
> Company's Chief Executive Officer (principal executive officer) and Executive
> Vice President and Chief Financial Officer (Principal financial officer) *with the*
> *participation of other members of management,* carried out an evaluation of the
> effectiveness of the Company's "disclosure controls and procedures" (as defined
> in the Securities and Exchange Act of 1934 Rules 13a-14(c) and 15(d)-14(c)).
> *Based on that evaluation, these officers have concluded that as of the*
> *Evaluation Date, the Company's disclosure controls and procedures were*
> *adequate and designed to ensure that material information relating to the*
> *Company and the Company's consolidated subsidiaries would be made known*
> *to them by others within those entities, and are effective to ensure that the*
> *information required to be disclosed by us in reports that we file or submit*
> *under the Securities Exchange Act of 1934 is recorded, processed and reported*
> *within the time periods specified in Securities and Exchange Commission rules*
> *and forms.* (Emphasis added.)

15    224.    In the 2003 Form 10-K, Schroeder and Kispert each signed certifications

16  substantially identical to the Q1FY03 certifications, as cited above.[7]   Regarding "Controls and

17  Procedures," the 2003 Form 10-K provided:

18
19
20
21
22

> Our management evaluated, with the participation of our Chief Executive Officer
> and our Chief Financial Officer, the effectiveness of our disclosure controls and
> procedures as of the end of the period covered by this Annual Report on Form 10-
> K. *Based on this evaluation, our Chief Executive Officer and our Chief*
> *Financial Officer have concluded that our disclosure controls and procedures*
> *are effective to ensure that information we are required to disclose in reports*
> *that we file or submit under the Securities Exchange Act of 1934 is recorded,*
> *processed, summarized and reported within the time periods specified in*
> *Securities and Exchange Commission rules and forms.* (Emphasis added.)

23    225.    In the Q1FY04 Form 10-Q, Schroeder and Kispert each signed certifications

24  substantially identical to the Q1FY03 certifications, as cited above. Regarding "Controls and

25  Procedures," the Q1FY04 Form 10-Q repeated the same information provided in the 2003 Form

26

27

28

---

[7] Beginning with the 2003 Form 10-K, the certifications referred to Exchange Act Rules 13a-15(e) and 15d-15(e), as opposed to Exchange Act Rules 13a-14 and 15d-14.

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    84

1  10-K, except that it represented the information as of the end of the period covered by this

2  Quarterly Report on Form 10-Q.

3      226.    In the Q2FY04 Form 10-Q, Kispert signed a certification substantially identical

4  to the Q1FY03 certifications, as cited above. Regarding "Controls and Procedures," the

5  Q2FY04 Form 10-Q repeated the same information provided in the 2003 Form 10-K, except

6  that it represented the information as of the end of the period covered by this Quarterly Report

7  on Form 10-Q.

8      227.    In the Q3FY04 Form 10-Q, Schroeder and Kispert each signed certifications

9  substantially identical to the Q1FY03 certifications, as cited above. Regarding "Controls and

10 Procedures," the Q3FY04 Form 10-Q repeated the same information provided in the 2003 Form

11 10-K, except that it represented the information as of the end of the period covered by this

12 Quarterly Report on Form 10-Q.

13     228.    In the 2004 Form 10-K, Schroeder and Kispert each signed certifications

14 substantially identical to the Q1FY03 certifications, as cited above. Regarding "Controls and

15 Procedures," the 2004 Form 10-K repeated the same information provided in the 2003 Form 10-

16 K, except that it represented the information as of the end of the period covered by this Annual

17 Report on Form 10-K.

18     229.    In the Q1FY05 Form 10-Q, Schroeder and Kispert each signed certifications

19 substantially identical to the Q1FY03 certifications, as cited above. Regarding "Controls and

20 Procedures," the Q1FY05 Form 10-Q repeated the same information provided in the 2003 Form

21 10-K, except that it represented the information as of the end of the period covered by this

22 Quarterly Report on Form 10-Q.

23     230.    In the Q2FY05 Form 10-Q, Kispert signed a certification substantially identical

24 to the Q1FY03 certifications, as cited above. Regarding "Controls and Procedures," the

25 Q2FY05 Form 10-Q stated:

26     **Evaluation of Disclosure Controls and Procedures and Related CEO and
       CFO Certifications**

27

28     We conducted an evaluation of the effectiveness of the design and operation of

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              85

our disclosure controls and procedures (Disclosure Controls) as of the end of the period covered by this Quarterly Report. The controls evaluation was conducted under the supervision and with the participation of management, including our Chief Executive Officer (CEO) and Chief Financial Officer (CFO). *Based on this evaluation, our CEO and our CFO have concluded that our disclosure controls and procedures are effective to ensure that information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms.*

Attached as exhibits to this Quarterly Report are certifications of the CEO and CFO, which are required in accordance with Rule 13a-14 of the Securities Exchange Act of 1934, as amended (Exchange Act). This Controls and Procedures section includes the information concerning the controls evaluation referred to in the certifications, and it should be read in conjunction with the certifications for a more complete understanding of the topics presented.

**Definition of Disclosure Controls**

Disclosure Controls are controls and procedures designed to reasonably assure that information required to be disclosed in our reports filed under the Exchange Act, such as this Quarterly Report, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. Disclosure Controls are also designed to reasonably assure that such information is accumulated and communicated to our management, including the CEO and CFO, as appropriate to allow timely decisions regarding required disclosure. Our Disclosure Controls include components of our internal control over financial reporting, which consists of control processes designed to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles in the U.S. To the extent that components of our internal control over financial reporting are included within our Disclosure Controls, they are included in the scope of our quarterly controls evaluation.

(Emphasis added).

231.  In the Q3FY05 Form 10-Q, Schroeder and Kispert each signed certifications substantially identical to the Q1FY03 certifications, as cited above. Regarding "Controls and Procedures," the Q3FY05 Form 10-Q repeated the same information provided in the Q2FY05 Form 10-Q, except that it represented the information as of the end of the period covered by this Quarterly Report on Form 10-Q.

232.  In their 2005 Form 10-K Certification, Schroeder and Kispert each certified that:

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

1

2

3
(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

4

5

6
(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

7

8

9
(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

10

11

12
(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

13

14
5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

15

16

17
(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

18

19
(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

20    Regarding "Controls and Procedures," the 2005 Form 10-K provided substantially similar

21    information provided in the Q2FY05 Form 10-Q regarding the Evaluation of Disclosure

22    Controls and Procedures and the Definition of Disclosure Controls, except that it referenced

23    Rules 13a-15(e) and 15d-15(e) under the Exchange Act when discussing Disclosure Controls

24    and represented the information as of the end of the period covered by this Annual Report on

25    Form 10-K.

26        233.    In the Q1FY06 Form 10-Q, Schroeder and Kispert each signed certifications

27    substantially identical to the 2005 Form 10-K certifications, as cited above. Regarding

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    87

1    "Controls and Procedures," the Q1FY06 Form 10-Q provided that:

2        **Evaluation of Disclosure Controls and Procedures and Related CEO and CFO Certifications**

3

4        We conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (Disclosure Controls) as of the end of the period covered by this Quarterly Report. The controls evaluation was conducted under the supervision and with the participation of management, including our Chief Executive Officer (CEO) and Chief Financial Officer (CFO). *Based on this evaluation, our CEO and our CFO have concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Quarterly Report to ensure that information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.*

5

6

7

8

9

10    (Emphasis added.)  In all other respects, the information provided was substantially similar to

11    that provided in the Q2FY05 Form 10-Q.

12        234.    In the Q2FY06 Form 10-Q, both Wallace and Hall each signed certifications

13    substantially identical to the 2005 Form 10-K certifications, as cited above.    Regarding

14    "Controls and Procedures," the Q2FY06 Form 10-Q provided substantially similar information

15    to that provided in the Q1FY05 Form 10-Q, except that it represented the information as of the

16    end of the period covered by this Quarterly Report on Form 10-Q.

17        235.    In the Q3FY06 Form 10-Q, both Wallace and Hall each signed certifications

18    substantially identical to the 2005 Form 10-K certifications, as cited above.    Regarding

19    "Controls and Procedures," the Q3FY06 Form 10-Q provided substantially similar information

20    to that provided in the Q1FY05 Form 10-Q, except that it represented the information as of the

21    end of the period covered by this Quarterly Report on Form 10-Q.

22            **(b)    The Reasons Why These Statements Were False and Misleading**

23

24        236.    The statements contained in ¶¶221-235 were false and misleading because (a)

25    the SEC filings did not identify deficiencies or material weaknesses in the internal controls

26    relating to option grants accounting and reporting; (b) the SEC filings did not disclose the

27    fraudulent scheme alleged herein; (c) no proper evaluation and report were ever conducted by

28

1   the certifying officers for the purpose of identifying and eliminating internal control problems;

2   and (d) defendants wholly failed to maintain effective internal controls over financial reporting

3   designed to provide reasonable assurance regarding the reliability of financial reporting and the

4   preparation of financial statements for external purposes in accordance with GAAP as required

5   by Public Company Accounting Oversight Board Auditing Standard No. 2, ¶7.

6          237.    The lack of sound internal controls and the existence of deficiencies and material

7   weaknesses are evidenced by the Company's own admissions.

8          238.    In its 2006 Form 10-K, the Company has admitted that:

9          *As a result of the Special Committee investigation, the Company identified
           certain material weaknesses in its internal control over financial reporting in
10         periods ending prior to June 30, 2006.* Before June 30, 2002, the Company did
           not have sufficient safeguards in place to monitor its control practices regarding
11         stock option pricing and related financial reporting and to foster an effective flow
           of information between those responsible for stock option pricing and those
12         responsible for financial reporting. Inadequate training, communication and
           coordination in and among the Company's human resources, stock administration,
13         legal and finance functions prevented the Company from assuring that stock
           options were priced and accounted for correctly, primarily from July 1, 1997 to
14         June 30, 2002.

15         In addition, the stock option pricing process during that time period was overly
           dependent on certain former executive officers of the Company, and was
16         administered by a stock option committee that was not always properly
           constituted and sometimes acted outside the scope of the authority delegated to it
17         by the Company's Board of Directors. *The individual who served as the
           Company's Chief Executive Officer during part of that time period and
18         continuing until midway through the last fiscal year, was involved in the past
           retroactive pricing of stock options. To that extent, the material weaknesses in
19         the Company's internal control over financial reporting continued until
           midway through the Company's fiscal year ended June 30, 2006.*

20

21   (Emphasis added.)

22         239.    The fact that the certifying officers did not conduct proper evaluations and failed

23   to report and remedy material weaknesses in control is also evidenced by the following facts.

24         240.    First, the pervasiveness of the backdating and internal control deficiencies

25   described by the Company creates a strong inference that, had a proper review been conducted,

26   the certifying officers would have uncovered that the Company lacked the proper internal

27   controls necessary to, among other things, prevent defendants from engaging in the fraudulent

28

backdating and ensure that the stock options were properly accounted for and reported in the Company's financial statements. Indeed, had a review been conducted, the problems would have been revealed as they were when the Special Committee conducted its internal investigation.

241.    Second, the fact that the certifying officers – in particular Schroeder and Kispert – abused the lack of the internal controls in order to effectuate and profit from the fraud evidences their failure to conduct a proper investigation of the internal controls.

**B.    DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD**

242.    The conduct alleged above also gives rise to liability under Rule 10b-5(a) and (c). Defendants are liable as participants in a scheme, plan and course of conduct to backdate options that began in the 1990s and continued throughout the Class Period. This backdating scheme operated as a fraud and deceit on Lead Plaintiffs and the other Class members by failing to disclose material facts and misleading them regarding (a) the Company's financial results; (b) officer and director compensation; (c) the Company's compliance with its own internal policies and stock option plans; (d) the Company's compliance with tax laws; and (e) the integrity of management.

243.    As detailed below, defendants each knowingly or with deliberate recklessness committed manipulative or deceptive acts in furtherance of the scheme including (a) causing and/or permitting the manipulation of stock option grants by, *inter alia*, the setting of retroactively selected exercise prices for option grants in order to understate compensation expenses and personally obtain larger than reported compensation; (b) exercising backdated options and selling the shares obtained therefrom; (c) preparing, approving and signing SEC filings that overstated the Company's results and understated its expenses and tax liabilities in its financial results; (d) preparing, approving and signing SEC filings that understated and misrepresented officer and director compensation; (e) failing to properly withhold taxes when employees exercised options; and/or (f) taking steps to ensure that the Company lacked sound internal controls and contained deficiencies and material weaknesses.

1.   **Defendants' Manipulation of Option Grants and KLA's Stock Purchase Plan**

244.   As noted above, the Company has conceded in its Restatement that options granted to officers, directors and employees were "retroactively" priced such that the "option exercise price was not the market price of the option shares on the actual grant date of the option, but instead was a lower market price on an earlier date."

245.   The Compensation Committee Defendants and the members of the Stock Option Committee (Schroeder, Nichols, Hall, Kispert, Urbanek, Marks, Dickerson, Barnholt, Bond, Tompkins and possibly other defendants) each backdated the option grants for the principal purpose of furthering the fraudulent scheme as evidenced by the following facts.

246.   First, in its 2006 Form 10-K, the Company concluded that "[t]he individual who served as the Company's Chief Executive Officer during part of that time period and continuing until midway through the last fiscal year, was involved in the past retroactive pricing of options." Based on the Company's reporting of officers, it is clear that this individual is Schroeder.

247.   Second, Schroeder, Nichols, Hall, Kispert, Dickerson and Tompkins were members of or attendees at meetings of the Stock Option Committee where decisions were made as to what grants should be approved and what the grant dates should be, as evidenced by the Company's own acts and admissions and statements by Confidential Witnesses who prepared agendas and reports for meetings of the Stock Option Committee.

   (a)   In its 2006 Form 10-K, *the Company admitted that Schroeder and Tompkins were members of the Company's Stock Option Committee* from 1994 through fall 2006 and from mid-1997 through mid-1999, respectively. According to its 2006 Form 10-K, the Company suspended this Stock Option Committee in fall 2006 as it conducted its investigation into the backdating. *The Company further stated that "the stock option pricing process during that time period…was administered by a stock option committee that was not always properly constituted and sometimes acted outside the scope of the authority delegated*

1   *to it by the Company's Board of Directors*." (Emphasis added.)

2         (b)    While CW #5 could not recall the identity of every executive who was a

3 member of the Stock Option Committee and attended its meetings ("Stock Option Committee

4 Meetings"), CW #5 stated that it definitely included the following persons: Schroeder, Nichols,

5 Hall, Kispert and the Company's senior corporate counsel, Kim Jackson.  CW #5 was aware of

6 this fact because he/she was involved in creating the agendas for some of the meetings.  While

7 he/she could not recall precisely how often the Stock Option Committee convened or what

8 topics were identified in the agendas, he/she believed it met quarterly.

9         (c)    CW #4 confirmed that the Stock Option Committee Meetings occurred

10 quarterly and that Schroeder and Dickerson attended these meetings.  CW #4 was aware of

11 these facts because, in his/her capacity as an employee in the human resources department,

12 he/she helped prepare quarterly spreadsheets identifying grants for executives and employees at

13 all levels of the Company and containing information such as the type of grant (*i.e.*, new hire,

14 employee promotion, annual (focal) performance review or retention), employee name,

15 employee hire date, employee title and number of shares being recommended, which were then

16 submitted to the Stock Option Committee ("Option Spreadsheets").

17         (d)    CW #4 explained that the Stock Option Committee made the decisions

18 regarding the option dates and price data.  Specifically, CW #4 stated that, while these Option

19 Spreadsheets were prepared under the direction of Nyberg (the director of compensation and

20 benefits), the *Compensation Department did not include share price data or grant dates on*

21 *these spread sheets prior to sending them to the Stock Option Committee.  Rather, the Stock*

22 *Option Committee returned the Option Spreadsheets to the Compensation Department with*

23 *the option grant dates and stock prices information completed after their meeting.*

24         (e)    CW #4 further stated that Option Spreadsheets were returned to the

25 Compensation Department with the signatures of either Schroeder or Dickerson.

26     248.    Third, as detailed in ¶¶34-37 above, the Compensation Committee Defendants

27 (Urbanek, Marks, Barnholt and Bond) participated in decisions regarding the options grants

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                         92

1    including the setting of option grant dates and exercise prices.

2        249.    The Director Defendants (Wallace, Schroeder, Urbanek, Marks, Barnholt, Bond,

3    Bingham, Elkus, Morton, Kaufman, Levy and Tompkins) each approved the backdating of

4    options grants.  As detailed in ¶¶34-35, 58, 72-89, each Director Defendant was ultimately

5    responsible for administering and deciding the terms of the option grants – including the grant

6    date – and for ensuring compliance with the Option Plans.  Indeed, CW #7 confirmed that,

7    while the Compensation Committee was charged with actually awarding the stock and date that

8    it was based on," "procedurally, the board had to meet and they had to approve [grants]."

9        250.    Defendants also engaged in a related scheme to defraud in connection with the

10    Company's Employees Stock Purchase Plan.  Although the Company does not provide any

11    details regarding this scheme, it does concede in its 2006 Form 10-K that the Company needed

12    to record "additional non-cash adjustments…relating primarily to the accounting for employee

13    stock purchase plans."  CW #8 provides an explanation of manipulation regarding the employee

14    stock purchase plan.

15        251.    The Second Amended and Restated 1981 Employee Stock Purchase Plan ("Stock

16    Purchase Plan") provides that employees can purchase KLA stock through payroll deductions

17    during six-month "Purchase Periods."  On the last day of each Purchase Period, employees are

18    entitled to buy KLA stock at 85% of the lower of (a) the closing stock price on the first day of

19    said six-month Purchase Period or (b) the closing stock price on the last day of said six-month

20    Purchase Period.  Under APB No. 25, the 15% discount (an IRS limit) was permitted and the

21    plan was considered "non-compensatory" and, thus, there was no compensation expense to

22    report.

23        252.    However, according to CW #8, the Company implemented an additional step to

24    the Stock Purchase Plan.  Specifically, the Company would assign each employee who

25    purchased stock on the last day of the Purchase Period a "term number."  This term number

26    enabled the employee to later change the purchase price for such shares.  The higher the term

27    number (1-5), the more time an employee had to change their share price.  Although he/she

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    93

1    could not recall with any certainty, CW #8 thought that the term number "5" granted an

2    employee a two-and-a-half-year window to change the price of their shares and the term

3    number "1" granted the employee a two-or-three-month window.    CW #8 provided the

4    following example of what occurred:  if an employee purchased their shares at $50 in January

5    2003 and the price dropped to $45 in March 2003, then the price of the shares purchased by the

6    employee in January would have been changed to $45, assuming that the employee's term

7    window was still open in March 2003.

8          **2.    Defendants' Manipulative And Deceptive Exercise Of Backdated
               Options**
9

10          253.    As detailed in ¶¶312-313 herein, during the Class Period, Wallace, Schroeder,

11    Kaufman, Levy, Tompkins, Dickerson, Hall, Kispert, Urbanek, Marks, Barnholt, Bond, Elkus,

12    Bingham, Morton and Nichols each knowingly and/or recklessly exercised options that were

13    backdated (either prior to or during the Class Period) and/or sold the resulting shares for the

14    primary purpose of furthering the fraudulent scheme.  These trades constitute manipulative and

15    deceptive acts in furtherance of the fraudulent scheme.

16          **3.    Defendants' Manipulative And Deceptive Understating of Expenses,
               Improper Tax Treatment of Options And Misrepresentation Of The
17               Company's Financial Results**

18          254.    As detailed above, defendants reported inflated net income figures for KLA by

19    failing to properly account for stock options made to KLA senior officers, directors and

20    employees.  Specifically, KLA's expenses were understated and income was overstated due to

21    the Company's failure to record the compensation expense from the backdated stock options

22    that were granted to officers, directors and employees and its improper tax treatment of the

23    options.

24          255.    Each of the defendants took manipulative and deceptive acts in connection with

25    the issuance of such misleading statements for the principal purpose of furthering this scheme

26    by preparing, approving or signing the SEC filings that understated and misrepresented officer

27    and director compensation:

28

1         (a)    Kispert, Hall and Boehlke held the position of CFO. Hall was also Vice

2  President of Finance and Accounting prior to becoming CFO. As such, they were responsible

3  for the preparation of the Company's financial statements and for ensuring that the periodic

4  reports filed with the SEC containing such financial statements complied fully with the

5  disclosure requirements of the federal securities laws.

6         (b)    Schroeder, Kispert, Wallace and Hall all signed certifications for various

7  quarterly or fiscal year-end financial statements pursuant to SOX. By signing the certifications

8  pursuant to SOX, Schroeder, Kispert, Wallace and Hall have certified that (i) the Company's

9  annual and quarterly reports fully complied with the requirements of the Exchange Act, as

10  amended; (ii) the information contained in the annual reports fairly presented, in all material

11  respects, KLA's financial condition and results; (iii) the quarterly and annual reports contained

12  no misstatements or omissions of material fact; (iv) they attested to the accuracy of the

13  Company's financial reports and sufficiency of the internal controls; and (v) they had disclosed

14  all instances of fraud involving management or other employees who had a significant role in

15  the Company's internal control over financial reporting.

16         (c)    Wallace, Schroeder, Hall, Kispert, Urbanek, Marks, Barnholt, Bond,

17  Bingham, Elkus, Morton, Kaufman, Levy and Tompkins all signed various quarterly or fiscal

18  year-end financial statements during the Class Period.

19         (d)    Each of the Officer Defendants (Wallace, Schroeder, Dickerson, Kispert,

20  Hall, Boehlke and Nichols) was responsible for ensuring the accuracy of the reporting of the

21  Company's financial results, as set forth in ¶¶28-29 above.

22         (e)    According to KLA's Audit Committee Charter, each Audit Committee

23  Defendant (Bingham, Bond, Elkus and Kaufman) oversaw the accounting and financial

24  reporting process of the Company and the audits of the financial statements of the Company and

25  assisted the Board with, among other things, the oversight and monitoring of the integrity of the

26  Company's financial statements and the Company's compliance with legal and regulatory

27  requirements.

28

1

2

      **4.**     **Defendants' Participation In The Understating And Misrepresentation Of Officer And Director Compensation**

3     256.   As discussed above, KLA's annual Proxy Statements for fiscal years 2001

4 through 2005 contained false statements about the compensation of KLA's officers and

5 directors because they stated, among other things, that the exercise price of the stock options is

6 equal to the price of the stock on date of the grant. Because of these false statements,

7 shareholders were misled when they were asked to approve the Company's 2004 Equity

8 Incentive Plan, approve a Performance Bonus Plan and vote for directors.

9     257.   Each of the defendants committed manipulative and deceptive acts in connection

10 with the issuance of these and other false and misleading statements regarding officer and

11 director compensation for the principal purpose of furthering this scheme. Indeed, as officers

12 and directors, the Individual Defendants had a duty to disseminate complete, accurate and

13 truthful information about KLA's executive and director compensation. The Individual

14 Defendants had a duty to promptly correct any public statements issued by KLA that had

15 become false and misleading. The Individual Defendants were involved in the drafting,

16 producing, reviewing and/or dissemination of the false and misleading statements alleged

17 herein. Moreover, as alleged in ¶¶34-37, 43-46 above, the Company's charters expressly state

18 that members of the Compensation Committee Defendants and the Audit Committee

19 Defendants had responsibilities for the proxy statements.

20

21

      **5.**     **Defendants' Manipulative And Deceptive Acts Regarding The Company's Tax Withholding Obligations**

22     258.   In addition to failing to properly report its tax liabilities, the Company also

23 violated tax laws by failing to properly withhold tax liabilities upon the exercise of options as

24 required by IRC §422.

25     259.   The September 6, 2006 testimony of Linda Thomsen, Director of the SEC's

26 Division of Enforcement, before the U.S. Senate Committee on Finance explained the

27 withholding obligations:

28

When an employee exercises a non-statutory option, the difference between the exercise price and the fair market value of the company's stock on the date of exercise is treated as ordinary compensation and the employee is generally taxed on the gain at his or her ordinary income tax rates. The company incurs employee withholding obligations on this gain, but also is entitled to an associated tax deduction on the gain. When companies backdate option grants to a lower exercise price, employees can obtain a larger taxable gain upon the exercise of an NSO and companies can obtain a correspondingly larger tax deduction and withholding obligation on that gain.

Unlike the exercise of NSOs, incentive stock options, or ISOs, afford employees favorable tax treatment because any gain at exercise is not taxed as ordinary income, although the gain may be subject to alternative minimum tax. Accordingly, a company does not obtain any corresponding tax deduction (or incur withholding obligations) at the time of exercise. In addition, if an employee holds the stock for the statutory holding period prior to sale - one year after exercise and two years after grant - then the sale is considered a "qualifying disposition" and the entire gain on sale is taxed at favorable capital gains rates. However, among the statutory requirements of ISOs is that they be granted at-the-money. An ISO that is granted in-the-money loses its favorable status and instead is treated under the tax code as a non-statutory option (NSO), including ordinary income recognition by the employee on any gain at exercise and a corresponding tax deduction by the company on that gain. Backdating allows an employee to treat what is in fact a non-qualified option as an incentive stock option, which can result in the employee underpaying taxes while causing the company to lose the tax deduction to which it otherwise would have been entitled.

260.    Specifically, for a stock option to qualify as an Incentive Stock Option ("ISO") (and thus receive the special tax treatment described above under IRC Section 421(a)), it must meet the requirements of IRC Section 422 when granted and at all times beginning from the grant until its exercise. Under IRC Section 422, the option price must equal or exceed the fair market value of the underlying stock at the time of the grant, *i.e.*, the option cannot be in-the-money when granted. A backdated stock option that has been granted at a discount, therefore, would violate one of the requirements that apply to ISOs and would not qualify as an ISO.

261.    If the requirements for an ISO have not been followed, the option will be treated under the tax rules as a non-qualified option. ISOs are subject to taxation only upon the sale of the stock. Non-qualified options, however, are subject to income tax and Federal Insurance Contributions Act ("FICA") withholding upon exercise. The backdated stock options granted to KLA officers, directors and employees did not qualify as ISOs because they were granted at a discount and, therefore, they should have been classified as non-qualified options.

262.    Because the backdated stock options constituted non-qualified options, KLA was liable for the income tax and payments under FICA that it failed to withhold upon the recipient's exercise of the discounted options.  Defendants, as well as others, exercised options during the Class Period that were granted between the mid-1990s and 2003 (¶312) – the period during which options were backdated.  Accordingly, KLA should have, but failed to, withhold monies when these backdated options were exercised.

263.    The Company's 2006 Form 10-K strongly supports an inference that KLA issued ISOs that were disqualified because of the backdated option prices, but failed to withhold monies:

Because virtually all holders of retroactively priced options issued by the Company were not involved in or aware of the retroactive pricing, *the Company has taken and intends to take certain actions to deal with the adverse tax consequences that may be incurred by the holders of retroactively priced options*. The adverse tax consequences are that retroactively priced stock options vesting after December 31, 2004 ("409A Affected Options") subject the option holder to a penalty tax under IRC Section 409A (and, as applicable, similar penalty taxes under California and other state tax laws).  One such action by the Company is to offer to amend the 409A Affected Options to increase the exercise price to the market price on the actual grant date or, if lower, the market price at the time of the amendment.   The amended options would not be subject to taxation under IRC.

* * *

Another action is to approve bonuses payable to holders of the amended options to compensate them for the resulting increase in their option exercise price. The amount of these bonuses would be effectively repaid to the Company if and when the options are exercised and the increased exercise price is paid (but there is no assurance that the options will be exercised).  *Finally, the Company intends to compensate certain option holders who have already exercised 409A Affected Options for the additional taxes they incur* under IRC Section 409A (and, as applicable, similar state tax laws).

Three of the Company's option holders were subject to the December 31, 2006 deadline described above. Accordingly, in December 2006, the Company offered to amend the 409A Affected Options held by Mr. Wallace, the Company's Chief Executive Officer, and two former executive officers to increase the exercise price so that these options will not subject the option holder to a penalty tax under IRC Section 409A. All three individuals accepted the Company's offer.   In addition, the Company agreed to pay each of the three individuals a cash bonus in January 2008 equal to the aggregate increase in the exercise prices for his amended options. For Mr. Wallace, the amount of this bonus is $0.4 million. The Company plans to take similar actions with respect to the outstanding 409A Affected Options granted to non-officers as soon as possible after the filing of this Report.  *The Company estimates that the total cash payments needed to deal with the adverse tax consequences of retroactively priced options granted to non-officers will be approximately $30 million.*

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

1    (Emphasis added.) *See also* Form 8-K filed on February 27, 2007, described in ¶295 below.

2            **6.**      **Defendants' Failure To Establish Sound Internal Controls And Allow Deficiencies And Material Weaknesses**

3

4       264.    As noted above, the Company has conceded in its Restatement that the

5 Company lacked sound internal controls and that its internal controls contained deficiencies

6 and material weaknesses.

7       265.    Each of the Individual Defendants was responsible for ensuring that the

8 Company had proper internal controls and took steps in furtherance of the fraudulent scheme

9 by ensuring that the Company's internal controls were deficient even while expressly

10 representing that such controls were adequate:

11          (a)      Schroeder, Kispert, Wallace and Hall all signed certifications for various

12 quarterly or fiscal year-end financial statements pursuant to SOX. By signing the certifications

13 pursuant to SOX, these defendants certified that they are responsible for establishing and

14 maintaining proper controls, have taken (with the participation of management) certain steps to

15 ensure that internal controls are sufficient and have reported all significant deficiencies.

16 Moreover, as set forth above, Schroeder, Kispert, Wallace and Hall have each certified that the

17 Company's internal controls were adequate, effective and designed to ensure that material

18 information relating to the Company and the Company's consolidated subsidiaries would have

19 been know to them by others within those entities.

20          (b)      The Officer Defendants were responsible under Section 110.03 of the

21 AICPA for adopting sound accounting policies and establishing and maintaining internal

22 controls consistent with management's assertions in the Company's financial statements, as set

23 forth in ¶28. The Company's own filings confirm that management was responsible for

24 establishing and maintaining a system for internal controls and the financial reporting process,

25 as set forth in ¶29.

26          (c)      According to the Audit Committee Charter, the Audit Committee

27 Defendants were responsible for overseeing the Company's accounting and financial reporting

28

1   processes, reviewing on a continuous basis the adequacy of the Company's systems of internal

2   controls, as set forth in ¶¶43-44.

3          (d)     According to the Nominating Committee Charter, the Nominating

4   Committee Defendants were responsible for developing and recommending to the Board of

5   Directors a set of corporate governance principles and for evaluating the governance of the

6   Board of Directors, as set forth in ¶¶54-55.

7          (e)     The Director Defendants were also ultimately responsible for the

8   Company's internal accounting and financial controls, as set forth in ¶¶34, 43-44, 54-55, 58.

9   **C.     THE TRUTH BEGINS TO EMERGE**

10         266.    On May 22, 2006, *The Wall Street Journal* carried a front-page story analyzing

11  the stock options that a few companies, including KLA, granted to its top executives.   The

12  article explained that, in 2001, KLA granted Levy and Schroeder two batches of stock options:

13  (a) the first dated at the share price's yearly first-half low and (b) the second at its yearly

14  second-half low.   In all, the article states that Levy had received ten grants from KLA and its

15  predecessor company between 1994 and 2001 – all preceding quick run-ups in the share price.

16  *The Wall Street Journal* further reported that "Mr. Levy has reaped at least $6 million from

17  cashing out options" while "Mr. Schroeder has pocketed at least $10 million."

18         267.    Merrill Lynch also issued a report on May 22, 2006 analyzing the options grant

19  timing for the semiconductor and semiconductor equipment companies in the Philadelphia

20  Semiconductor Index.   Covering the period from 1997 through 2002, Merrill Lynch's analysis

21  revealed that KLA's stock generated average annualized excess return of 800% for the 20 days

22  following options grants, ranking second out of the 16 companies studied.   Merrill Lynch

23  specifically identified that the following suspicious stock option grants were made to Levy,

24  Schroeder, Kispert and Wallace: (a) 4/30/1997 at $22.25 per option; (b) 7/31/1997 at $30.28 per

25  option; (c) 8/31/1998 at $10.63 per option; (d) 10/23/1998 at $16.97 per option; (e) 10/27/1999

26  at $16.88 per option; (f) 8/11/2000 at $44.69 per option; (g) 11/10/2000 at $26.25 per option; (h)

27  (h) 4/4/2001 at $32.75 per option; (i) 10/2/2001 at $29.31 per option; and (j) 11/8/2002 at

28

1   $37.05 per option.

2       268.    At a conference on May 22, 2006, CFO Hall announced that the DOJ had served

3   the Company with a subpoena requesting stock option grant data related to its stock option

4   grants and announced that the Company had formed an independent committee to investigate its

5   stock option grants over the past ten years.

6       269.    After the May 22, 2006 disclosures raising the possibility of an options

7   backdating scheme, *the common stock price fell 10.39% from $45.24 per share on May 19,*

8   *2006 to close at $40.54 per share on May 22, 2006 on heavy volume of 13,615,220 shares*

9   *traded, which was three times the average trading volume for the prior three months.*  On

10  May 23, 2006, KLA's stock fell again by 3.6% or $1.46 to close at $39.07 per share on heavy

11  volume of 11,193,220 shares traded.

12      270.    Analysts also reacted to these revelations by issuing reports expressing specific

13  concerns regarding the backdating issue:

14      (a)    Analyst D. Kaplan at Standard & Poor's downgraded the stock to a "sell"

15  from a "strong buy."

16      (b)    On May 22, 2006, analyst Robert Maire at Needham & Co. downgraded

17  KLA's stock to "hold" from a "buy," stating that the stock will likely be under significant

18  pressure for a period of time due to the stock option controversy.

19      (c)    A.G. Edwards Analyst Gavin Duffy downgraded KLA to "hold" from

20  "buy" on May 23, 2006, stating that "[w]ith the current environment where investors are skittish

21  about the possibility of any corporate scandal, we believe shares of KLA-Tencor will be range

22  bound at best until the current investigation is completed and the situation has closure in one

23  form or another."  Duffy continued: "We feel that investors are better advised to remain on the

24  sidelines in the near terms until we get a better sense of how this investigation will turn out."

25      271.    Over the next eight months, the Company started to make some admissions

26  about liability, which in some instances were also misleading, and attempted to limit the blame

27  to certain former executives, as discussed below.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                       101

1      272.    After the market closed on May 24, 2006, the Company filed a Form 8-K with

2    the SEC formally announcing the appointment of a Special Committee of independent directors

3    "to conduct an internal investigation relating to past stock option grants, the timing of such

4    grants and related accounting and documentation" with the assistance of outside legal counsel

5    and accounting experts.  The Company also reiterated that it had "received subpoenas from the

6    U.S. Attorney's Offices for the Eastern District of New York and the Northern District of

7    California requesting information relating to its past stock option grants."

8       273.    In the pre-market hours of May 30, 2006, the Company disclosed in a SEC Form

9    8-K that "it received notice from the [SEC] of an informal inquiry relating to past stock option

10    grants."

11      274.    The market reacted positively to misrepresentations by CEO Wallace on May 31,

12    2006, attempting to exonerate current management of any potential wrongdoing.  On May 31,

13    2006, *Bloomberg* published an article revealing that, during a Cowen & Co. Technology

14    Conference in New York, Wallace claimed that "[t]he current management team wasn't

15    involved in making decisions about stock options."  The stock price rose from $40.61 per share

16    on May 30, 2006 to $41.04 per share on May 31, 2006.  It continued to rise on June 1, 2006,

17    closing at $42.19 per share.

18      275.    On June 30, 2006, prior to the opening of the market, KLA issued a press release

19    providing an update on the investigation by the Special Committee into the Company's stock

20    option granting practices.  The press release states in part:

21              KLA-Tencor Corporation (NASDAQ: KLAC) today announced that *a Special*

22              *Committee of the Company's Board of Directors has reached a preliminary*
*conclusion that the actual measurement dates for financial accounting*

23              *purposes of certain stock option grants issued in prior years likely differ from*
*the recorded grant dates of such awards. . . .*

24                                                   * * *

25              Based on the Special Committee's investigation to date, the Company now
anticipates that it may record additional non-cash charges for stock-based

26              compensation expense.  The Company has not yet determined the amount of such
charges or the resulting tax impact of these actions.  In the event that the

27              Company determines that these items are material, KLA-Tencor may be required
to restate its financial statements for the relevant prior fiscal periods.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                            102

1   (Emphasis added.)  The stock price fell again in reaction to this June 30, 2006 announcement.

2   On June 30, 2006, the stock closed at $41.57 per share, a decline of 1% or $0.42 from the

3   previous trading day's closing price.

4       276.    The stock options controversy at KLA continued to impact the recommendations

5   of analysts in the following weeks:

6               (a)     On July 12, 2006, in his report on KLA, analyst Patrick J. Ho of Stiffel

7   Nicolaus ("Ho") maintained a "hold" rating for the Company based on a concern about the

8   stock options issue: "While the company's fundamental remains among the best of the industry

9   (market position, business model, order growth), we believe that some level of overhang

10  remains due to questions surrounding its past stock option grants to Chairman Kenneth Levy."

11  In the wake of this report, the stock fell from $42.56 per share on July 11, 2006 to $40.99 per

12  share on July 12, 2006, representing a $1.56 or 3.7% drop in the price of the stock.  The

13  Company's stock continued to fall on July 13, 2006, closing at $40.50 per share.

14              (b)     In a July 26, 2006 report, Ho maintained his "hold" rating due, in part, to

15  KLA's June 30, 2006 announcement: "Recently, the company announced that on a preliminary

16  basis, an appointed special committee did find some 'irregularities' in its past stock option grant

17  policy.  While this issue does not have any impact on near-term fundamentals, we believe there

18  is risk related to the credibility of the company and this issue could create a continuing

19  overhang on the stock until the matter is completely resolved."  Following the Company's

20  fourth quarter conference call on July 27, 2006, Ho maintained his "hold" rating, stating in his

21  July 28, 2006 report: "[T]here remains a cloud hanging over the company related to its past

22  stock options policy and the ongoing investigation by an independent committee."

23      277.    On July 24, 2006, after the close of the market, the Company issued a press

24  release announcing that it would delay releasing results for the fourth quarter and 2006 fiscal

25  year ended June 30, 2006 pending completion of the internal investigation into stock option

26  grants.  The press release also reiterated the Special Committee's preliminary results.  The next

27  day, the stock price fell another $0.03 to $39.80.

28

1    278.    After the market closed on July 27, 2006, the Company issued a press release

2    entitled "KLA-Tencor Reports Q4 2006 Revenue of $579 Million Fiscal Year 2006 Revenue

3    $2.1 Billion." In this release, KLA announced selected financial results for its fourth quarter

4    and reiterated that, "[a]s a result of the on-going investigation and the potential for restatement,

5    the Company is unable to provide detailed GAAP or non-GAAP financials for the quarter or

6    year ended June 30, 2006. In addition, the Company will not file its annual report on Form 10-

7    K until after the completion of the investigation. The Company does not expect the

8    investigation to be completed until after the date the Form 10-K is required to be filed."

9    279.    On September 13, 2006, after the close of the market, KLA filed Notification of

10   Late Filing with the SEC, disclosing that it would not timely file its Form 10-K due to its

11   ongoing stock options investigation. The stock price fell from $46.11 on September 13, 2006 to

12   $45.96 on September 14, 2006.

13   280.    On September 14, 2006, the Company issued a press release entitled "KLA-

14   Tencor Delays Filing Form 10-K And Receives Notice From NASDAQ." In this release, the

15   Company explained that it received a NASDAQ Staff Determination notice indicating that the

16   Company is not in compliance with the filing requirements for continued listing as set forth in

17   NASDAQ Marketplace Rule 4310(c)(14) and that its common stock is subject to delisting from

18   the NASDAQ Global Select Market. The Company also stated that it is focused on resolving

19   the backdating issues as quickly as possible and plans to file its Form 10-K as soon as

20   practicable following completion of the Special Committee's investigation. The stock price fell

21   again on September 15, 2006 from $45.96 to $45.44.

22   281.    On September 28, 2006, the Company issued a pre-market open press release

23   entitled "KLA-Tencor Will Restate Financial Statements Related to Stock Options." In the

24   press release, the Company revealed that *KLA's financial statements dating back to July 1,*

25   *1997 should no longer be relied upon and certain financial results will have to be restated*

26   *because incorrect measurement dates for certain stock option grants were used*:

27        KLA-Tencor Corporation (NASDAQ: KLAC) today announced that *it will restate*
          *previously issued financial statements to correct the Company's past*
28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    104

*accounting for stock options. Based on a report received from a Special Committee of the Board of Directors, the Board concluded that incorrect measurement dates for certain stock option grants were used for financial accounting purposes,* principally during the periods July 1, 1997 through June 30, 2002. *As a result, the Company will be required to record non-cash charges for compensation expenses relating to those past stock option grants.*

The Company has not determined the exact amount of such charges, the resulting tax and accounting impact, or which specific reporting periods may require restatement. Accordingly, the Company is filing a Form 8-K today stating that the financial statements and all earnings and press releases and similar communications issued by the Company relating to periods beginning on or after July 1, 1997, should no longer be relied upon. KLA-Tencor intends to file its restated financial results and Annual Report on Form 10-K as quickly as practicable.

(Emphasis added.)  In response to this announcement, the stock price fell $0.27 from $44.74 to $44.47 on September 29, 2006.

282.    Shortly before the close of the stock market on October 3, 2006, the Company filed a SEC Form 8-K providing additional details regarding the restatements and revealed, for the first time, that KLA believed that the restatement of previous financial statements would be "*material.*"  The stock fell $0.20 from $44.05 on October 2, 2006 to $43.85 on October 3, 2006.

283.    On October 5, 2006, Analysts Gary Hsueh and Srini Sundararajan of CIBC World Markets stated in their report that the stock options "overhang" on the KLA would continue: "In our view, pending restatement due to options is the bigger issue."  The report also drew attention to KLA's risk of NASDAQ de-listing because of the Company's likely failure to file its 2006 Form 10-K by the deadline imposed by the SEC as a results of to the Company's ongoing internal investigation and financial restatement: "Despite ongoing communication with NASDAQ in anticipation of this issue, such a risk on an $8B market cap stock could drive P/B and forward P/E multiples BELOW the prior, purely fundamental driven, trough in valuation."  The report further stated that the "more tangible risk of NASDAQ de-listing could drive shares to the low $30-range."

284.    After the close of the market on October 16, 2006, the Company issued a press release (expressly incorporated into its October 18, 2006 Form 8-K filed with the SEC) entitled "KLA-Tencor Announces Results of Special Committee Investigation of Historical Stock

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    105

1    Option Practices," *revealing that the restatements to correct accounting for stock-based*

2    *compensation would result in additional non-cash charges of up to $400 million.*

3    285.    On October 17, 2006, before the market opened, the Company issued a press

4    release entitled "KLA-Tencor Announces Retirement of Board Chairman Kenneth Levy"

5    (expressly incorporated into its October 18, 2006 Form 8-K filed with the SEC).  In this release

6    the Company also stated that, "[b]ased upon that investigation, the Company intends to re-price

7    all outstanding retroactively priced options held by Mr. Levy and certain other former and

8    current executives of the Company.  The exercise price of each re-priced option will be

9    increased to the fair market value on the corrected measurement date."  Following the October

10   16 and 17 news, the stock price fell $1.22 or 2.46% on October 17, 2006, closing at $48.32 per

11   share.  On October 18, 2006, the stock fell $1.91 or 3.96% to close at $46.29 per share.

12   286.    Analysts continued to comment on the materiality of the options backdating

13   scheme at KLA and reacted to the Company's misleading assertions that current management

14   had no responsibility for the fraud:

15   (a)    On October 16, 2006, Analysts Michael J. O'Brien, Michael D. Winters

16   and Andrew J. Liersch of Bears, Stearns & Co. Inc. issued a report citing KLA's disclosures

17   regarding the restatement of previous financial statements and the completion of the internal

18   investigation.  The report highlighted that (i) the total cash charge of the financial restatements

19   is expected to be $400 million; (ii) the current company management was not involved in the

20   improper stock option practices; (iii) the stock option grants to Kispert would be re-priced; (iv)

21   CEO Schroeder was terminated and all of his outstanding options would be cancelled; and (v)

22   Nichols had resigned and all of his outstanding options held by him would be re-priced.  The

23   report stated that: "In our view, this should help eliminate the overhang on the stock and it can

24   begin to trade on fundamental again."  Analysts at Citigroup and Edwards also issued reports on

25   October 16, 2006 which reiterated these disclosures made by the Company.

26   (b)    On October 17, 2006, Analyst Patrick J. Ho of Stiffle Nicolaus issued a

27   report relying upon the Company's announcement attributing all the wrongdoing to a few

28

1  defendants: "[t]he company announced that there was no involvement in these improper stock

2  option practices by any current members of the executive management team, including Rick

3  Wallace (CEO), John Kispert (President and COO, and former CFO) and Jeff Hall (CFO).

4  Based on this announcement, it appears that the stock options in question were tied to those of

5  Mr. Schroeder. We believe this announcement reduces a significant overhang on the stock, and

6  given that current management team (Mr. Wallace, Mr. Kispert and Mr. Hall) was not

7  implicated, we believe this also re-establishes the credibility among these key participants with

8  investors."

9        287.    On December 27, 2006, the Company announced the resignation of Tompkins

10  from the Board of Directors effective December 21, 2006. The stock fell $0.32 on December

11  28, 2006, closing at $49.89 per share.

12        288.    More surprising admissions by KLA were to come. In a Form 8-K filed with the

13  SEC before the market opened on January 5, 2007, KLA admitted that certain outstanding

14  options have exercise prices below the fair market value of the Company's common stock on

15  the actual date on which those particular options were granted and the exercise prices for those

16  options were set at the fair market value of the common stock on an earlier date when the fair

17  market value was lower. KLA further admitted that, to the extent the back-dated options were

18  not vested as of December 31, 2004, it had violated IRC Section 409A. In that same filing, the

19  Company announced specific steps to off-set the illicit benefit received by some of the

20  defendants. KLA re-priced the back-dated stock options of Wallace, Richardson and Fortino by

21  increasing the per share exercise price to the fair market value of the common stock on the

22  actual grant dates of the options. On this news, the stock price increased slightly on January 5,

23  2007, closing up $0.10 per share at $50.15 per share.

24        289.    On January 29, 2007, the Company issued its 2006 Form 10-K wherein it

25  restated previously filed financial results for fiscal years 2005, 2004, 2003 and 2002. KLA also

26  revealed even more damning facts regarding the fraud, including the fact that the backdating of

27  the option grants and corresponding public misrepresentations were not the result of inadvertent

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                               107

error but rather intentional misconduct and that documents were falsified in furtherance of this fraud. The key admissions regarding the nature of the fraudulent acts are as follows:

- *"[C]ertain of our stock options,* primarily those granted from July 1, 1997 to June 30, 2002, *had been retroactively priced for all employees who received these grants* .... This means that the option exercise price was not the market price of the option shares on the actual grant date of the option, but instead was a lower market price on an earlier date. The actual grant date – when the essential actions necessary to grant the option were completed, including the final determination of the number of shares to be granted to each employee and the exercise price – is the correct measurement date to determine the market price of the option shares under the accounting rules in effect at the time." (Emphasis added.)

- "[T]here was retroactive pricing of stock options granted to all employees who received options, primarily during the periods from July 1, 1997 to June 30, 2002 ...."

- *"[T]he retroactively priced options were not accounted for correctly in our previously issued financial statements ...."* (Emphasis added.)

- "to correct our past accounting for stock options, we recorded additional pre-tax, non-cash, stock-based compensation expense of *(a) $348 million for the periods July 1, 1994 to June 30, 2005 under APB Opinion No. 25 and (b) $22 million for the year ended June 22, 2006 under SFAS No. 123(R).* We expect to amortize an additional $6 million of such pre-tax charges...in future periods ...." (Emphasis added.)

- *"[T]he retroactive pricing of options involved the falsification of Company records, resulting in erroneous statements being made in financial and other reports previously filed with the SEC,* as well as in information previously provided to our independent registered public accounting firm ...." (Emphasis added.)

- "[I]n most instances, the retroactive pricing of options violated the terms of our stock option plans...."

- *"[W]e identified past material weaknesses in our internal controls and procedures* .... A material weakness is a control deficiency, or combination of them, that results in more than a remote likelihood that a material misstatement in our financial statements will not be prevented or detected." (Emphasis added.)

- "The discovery that we had retroactively priced stock options (primarily from July 1, 2007 to June 30, 2002) and had not accounted for them correctly has had, and may continue to have, a material adverse effect on our financial results."

- "The ongoing government inquiries relating to our historical stock option practices are time consuming and expensive and could result in injunctions, fines and penalties that

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                              108

may have a material adverse effect on our financial condition and results of operations."

- "The Special Committee investigation and restatement activities have required us to expend significant management time and incur significant accounting, legal, and other expenses. The resulting restatements have had a material adverse effect on our results of operations...."

- *"[T]he retroactive pricing of options was intentional, not inadvertent or through administrative error ...."* (Emphasis added.)

- "[T]he retroactive pricing of options involved the selection of fortuitously low exercise prices by certain former executive officers, and other former executives may have been aware of this conduct ...."

- *"The individual who served as the Company's Chief Executive Officer during part of that time period and continuing until midway through the last fiscal year, was involved in the past retroactive pricing of stock options."* (Emphasis added.) *Based on public filings, the individual who held these positions was Schroeder.*

- Under the "Findings and Remedial Actions" section of the Form 10-K, the Company stated that, "[a]s a result of the Special Committee investigation, on October 16, 2006, we terminated our employment relationship and agreement with Kenneth L. Schroeder, and we announced our intent to cancel all outstanding stock options held by Mr. Schroeder that were retroactively priced or otherwise improperly granted. Those options were canceled in December 2006.... Accordingly, in the second quarter of fiscal 2007 the Company will reverse approximately $20 million of the non-cash, stock-based compensation recorded in prior periods. ... "

- Under the "Findings and Remedial Actions" section of the Form 10-K, the Company reiterated that Nichols had resigned in fall 2006 and stated that the Company and Nichols had entered into a "Separation Agreement and General Release under which Mr. Nichols' outstanding retroactively priced stock options have been re-priced by increasing the exercise price to the market price of the option shares on the actual grant date. The exercise price of each re-priced option was increased to the market price on the actual grant date. Under SFAS No. 123(R), no incremental charge will be recognized in the financial statements for the quarter ended December 31, 2006."

- Under the "Findings and Remedial Actions" section of the Form 10-K, the Company reiterated that Levy had resigned in fall 2006 and stated that the Company and Levy had entered into a "Separation Agreement and General Release under which Mr. Levy's outstanding retroactively priced stock options have been re-priced by increasing the exercise price to the market price of the option shares on the actual grant date.... The exercise price of each re-priced option was increased to the market price on the actual grant date. Under SFAS No. 123(R), no incremental charge will be recognized in the financial statements for the quarter ended December 31, 2006."

- Under the "Findings and Remedial Actions" section of the Form 10-K, the Company announced that Tompkins had resigned on December 21, 2006 in fall 2006 and stated that the Company "agreed to modify the outstanding options held by Mr. Tompkins (all of which were fully vested) to extend the post-termination exercisability period to December 31, 2007, which is the last day of the calendar year in which those options would have terminated in the absence of such extension...."

- The U.S. Department of Labor is conducting an examination of KLA's 401(k) Savings Plan.

290.    Significantly, it appears that defendants' misconduct went beyond the stock option manipulation fraud. In the 2006 Form-10K, the Company also revealed that:

> "*[i]n addition to restating the consolidated financial statements in response to the Special Committee's findings, the Company is recording additional non-cash adjustments that were previously considered to be immaterial relating primarily to the accounting for employee stock purchase plans, corrections for the recognition of deferred tax assets, the release of tax reserves, the timing of revenue recognition, gains and losses on hedging contracts and the calculation of minority interest....*"

(Emphasis added.)

291.    On February 9, 2007, KLA filed its Q2FY07 Form 10-Q, which includes restatements for condensed consolidated financial statements for its quarter ended December 31, 2006 (and related disclosures). In its Q2FY07 Form 10-Q, KLA admitted that it "did not record the required stock-based compensation expenses under SFAS No. 123(R) related to our retroactively priced options in our previously issued financial statements for our quarter ended December 31, 2005, and that is why we are restating them in this filing." *KLA further stated that "[t]o correct our past accounting for stock options, in total we have recorded additional pre-tax, non-cash, stock-based compensation expense of (a) $348 million for the periods July 1, 1994 to June 30, 2005 under APB Opinion No. 25 and (b) $28 million for the period from July 1, 2005 through December 31, 2006 under SFAS No. 123(R)."* (Emphasis added.)  The Company also said that it "will later restate our previously filed financial statements for the quarter ended March 31, 2006 when included in our Quarterly Report on Form 10-Q for the quarter ended March 31, 2007."

292.    In its Q2FY07 Form 10-Q, the Company further clarified that "[m]anagement agrees with the Special Committee that there was retroactive pricing of stock options to all

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          110

1  option holders ...." KLA stated that, "[i]n addition to restating the consolidated financial

2  statements in response to the Special Committee's findings, the Company recorded additional

3  non-cash adjustments [for the quarter ended December 31, 2005] that were previously

4  considered to be immaterial relating primarily to the accounting for employee stock purchase

5  plans, corrections for the recognition of deferred tax assets, the release of tax reserves, the

6  timing of revenue recognition, gains and losses on hedging contracts and the calculation of

7  minority interest." The Company also revealed that, on February 2, 2007, it learned "that the

8  SEC has opened a formal investigation into these matters."

9      293.   In its Q2FY07 Form 10-Q, the Company further stated that:

- As a result of terminating Mr. Schroeder, "vesting of Mr. Schroeder's then outstanding stock options and restricted stock awards immediately ceased, and the 890,914 unvested option shares and 100,000 unvested restricted stock award shares held by Mr. Schroeder at the time of termination were canceled. Accordingly, in the second quarter of fiscal 2007 we reversed $20 million of the non-cash, stock-based compensation charges that had been recorded in prior periods .... In December 2006, we canceled 596,740 vested option shares held by Mr. Schroeder as of the time of termination, representing those shares that had been retroactively priced or otherwise improperly granted."

- "During the three months ended December 31, 2006 and 2005, we recorded stock-based compensation expense of $16.1 million (net of a $20 million reversal of stock-based compensation charges for our former Chief Executive Officer) and $38.8 million, respectively. During the six months ended December 31, 2006 and 2005, we recorded stock-based compensation expense of $53.1 million (net of a $20 million reversal of stock-based compensation charges for our former Chief Executive Officer) and $78.6 million."

19     294.   On February 27, 2007, KLA filed a definitive proxy statement with the SEC

20  ("2006 Proxy Statement"). In the section titled "About the Board of Directors and Its

21  Committees" under "The Board of Directors," the 2006 Proxy Statement states in part:

> In addition to the three standing Committees, in May 2006 the Board appointed a Special Committee, consisting of Mr. Bingham and Mr. Kaufman, to conduct an independent investigation of the Company's historical stock option practices, and in the fall of 2006, the Board of Directors appointed a Special Litigation Committee, consisting of Mr. Kaufman and Mr. Wang, to conduct an independent investigation of the claims asserted in the related stockholder derivative actions and to determine the Company's position with respect to those claims.

27  In the section titled "Report of the Compensation Committee on Executive Compensation"

under "Deductibility of Compensation Under Internal Revenue Code Section 162(m)" the

2006 Proxy Statement states in part:

> The Company's existing equity compensation plans, including the 2004
> Equity Incentive Plan, are structured so that the compensation deemed paid
> to an executive officer in connection with the exercise of stock options
> granted under those plans should qualify as performance-based
> compensation not subject to the $1 million limitation. However, the
> Company has determined that certain of its past stock options were
> retroactively priced and, therefore, have exercise prices below the fair
> market values of the underlying shares on the grant dates of the options.
> Because retroactively priced options do not qualify as performance-based
> compensation, the compensation deemed paid when those options are
> exercised is subject to the Section 162(m) limitation. *As a result, a
> substantial portion of the compensation realized by Mr. Kispert in
> connection with his option exercises during fiscal year 2006 is subject to
> the Section 162(m) limitation. In addition, other awards made under
> those plans may or may not qualify as performance-based compensation.*

(Emphasis added.) This section of the 2006 Proxy Statement further states:

> Until fiscal year 2006, the Company's annual cash incentive programs were
> not designed to provide bonus payments that would qualify as performance-
> based compensation under Section 162(m). However, at the 2005 annual
> meeting, the stockholders approved a new Performance Bonus Plan
> structured in a manner that will allow the Company to qualify all or part of
> the compensation earned under that plan as performance-based
> compensation not subject to the $1 million limit on deductibility under
> Section 162(m). As a result, a substantial portion of the incentive
> compensation earned by the executive officers under that plan for fiscal
> year 2006 should qualify as performance-based compensation not subject to
> the Section 162(m) limitation. However, a portion of the incentive
> compensation earned by certain executive officers for fiscal year 2006 is
> not expected to constitute performance-based compensation under Section
> 162(m), and that portion, when added to other non-performance based
> compensation earned for fiscal year 2006, is expected to exceed the $1
> million limit under Section 162(m) for Mr. Wallace, Mr. Kispert and
> possibly other executive officers."

295.    On February 27, 2007, the Company filed a Form 8-K announcing that:

> On February 27, 2007, KLA-Tencor Corporation (the "Company")
> commenced a formal tender offer to its employees that will allow them to
> tender for amendment or replacement certain outstanding options under the
> Company's Restated 1982 Stock Option Plan, 2000 Nonstatutory Stock
> Option Plan and 2004 Equity Incentive Plan. The options subject to the
> offer have been determined, as a result of a lengthy investigation of the
> Company's past option grant practices, to have exercise prices based on the
> fair market value per share of its common stock on a date earlier than the
> actual dates on which those options were granted. As a result, those options
> have exercise prices below the fair market value of the Company's common
> stock on the grant date.

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

112

Section 409A of the Internal Revenue Code provides that options granted with a below-market exercise price, to the extent unvested as of December 31, 2004, will be subject to adverse income taxation, unless certain remedial action is taken before those options are exercised. The offer is designed to allow employees the opportunity to avoid those tax consequences by offering to amend or replace each of their Section 409A-covered options. If such an option is tendered for amendment pursuant to the offer, then the exercise price of that option will, on the next business day following the expiration date of the offer, be adjusted to the lower of (i) the fair market value per share of the Company's common stock on the date on which that option was actually granted or (ii) the closing selling price per share of its common stock on the date on which the option is amended pursuant to the offer (the "Adjusted Exercise Price").

## D.    ADDITIONAL *SCIENTER* ALLEGATIONS

296.    As alleged herein, defendants acted with *scienter* in that they (a) had access to all internal data concerning the Company's stock option plans; (b) directed and/or participated in establishing the terms of the option grants, including the choice of grant dates and exercise price; (c) knew or with deliberate recklessness disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false, incomplete or misleading; (d) knew or with deliberate recklessness disregarded that such statements or documents would be issued or disseminated to the investing public; and (e) knowingly or with deliberate recklessness participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

297.    Additional facts provide actual and strong circumstantial evidence of defendants' *scienter* including: (a) the Company's concessions and admissions; (b) defendants' roles, responsibilities for granting and administering option grants, including their specific attendance at meetings where options were backdated; (c) defendants' desire to boost compensation when KLA lacked the funds to pay salaries or give pay raises; (d) defendants' desire to personally obtain greater compensation without public scrutiny; and (e) the pervasiveness and nature of the fraud.

1.    **The Company's Own Admissions And Recent Actions Establish Defendants' *Scienter***

298.    Most notably, the Company has made admissions and taken actions that establish, without resort to circumstantial evidence, the *scienter* of the Company and numerous Individual Defendants:

(a)    In the fall of 2006 and in its 2006 Form 10-K, the Company admitted that options were backdated. Indeed, in its 2006 Form 10-K, the Company explained that *"certain of our stock options, primarily those granted from July 1, 1997 to June 30, 2002, had been retroactively priced for all employees who received these grants* …. This means that the option exercise price was not the market price of the option shares on the actual grant date of the option, but instead was a lower market price on an earlier date." (Emphasis added.)

(b)    In its 2006 Form 10-K, the Company conceded that *"the retroactive pricing of options was intentional, not inadvertent or through administrative error."* (Emphasis added.)

(c)    The Company's statement that the backdating occurred "primarily" prior to 2002 is a tacit admission that some backdating occurred after 2002, which is after SOX changed the requirements for reporting option grants. After August 29, 2002, option grants had to be reported to the SEC within two days of the grant. The fact that the options misconduct occurred after this SOX provision was enacted suggests a knowing violation of securities laws or at least severe recklessness.

(d)    In its 2006 Form 10-K, the Company concluded that *"[t]he individual who served as the Company's Chief Executive Officer during part of that time period and continuing until midway through the last fiscal year, was involved in the past retroactive pricing of stock options."* (Emphasis added.) Based on the Company's reporting of officers, it is clear that this individual is Schroeder.

(e)    In its 2006 Form 10-K, the Company stated that, *"[a]s a result of the Special Committee investigation, on October 16, 2006, we terminated our employment*

1  *relationship and agreement with [defendant] Schroeder*, and we announced *our intent to*

2  *cancel all outstanding stock options held by Mr. Schroeder* that were retroactively priced or

3  otherwise improperly granted." According to KLA, these options were allegedly canceled in

4  December 2006.

5          (f)     After the Special Committee finished its investigation, the Company

6  announced resignations by Nichols, Levy and Tompkins and the re-pricing of all outstanding

7  retroactively priced stock options held by Nichols and Levy to the correct fair market value on

8  the corrected measurement date.

9          **2.**     **Defendants' Specific Participation In The Backdating Establish**

10                 **Their *Scienter***

11     299.    The Company also concluded that "the stock option pricing process during that

12 time period was overly dependent on certain former executive officers of the Company, and was

13 administered by a stock option committee that was not always properly constituted...." As

14 described above, Schroeder, Nichols, Hall, Kispert and Dickerson, and possibly other

15 defendants, were members of the Stock Option Committee and/or attended meetings at which

16 employee and executive stock option grants were approved and grant dates assigned during the

17 Class Period. Tompkins was also a member of this committee between mid-1997 and 1999,

18 during which time the backdating of option grants also occurred.

19     300.    As alleged above, the members of the Stock Option Committee and the

20 Compensation Committee Defendants (Schroeder, Nichols, Hall, Kispert, Urbanek, Marks,

21 Dickerson, Barnholt, Bond and Tompkins) each participated in the actual selection of backdated

22 grant dates for the principal purpose of furthering the fraud.

23     301.    From the beginning, the Company has attempted to minimize the fall-out from

24 the disclosure of its fraud by placing blame entirely on a couple of defendants and exonerating

25 the Company's current management. This effort has been effective as analysts expressed relief

26 over this fact. However, for the reasons alleged herein, the facts do not support this

27 exoneration.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT             115

**EXHIBIT 4**
**Part 4 of 5**

302. Most significantly, the Board of Directors has taken overt actions to prevent any independent investigation into the details of who was behind or who participated in this admitted fraud by obtaining a signed agreement from the one key employee who allegedly has intimate knowledge of the facts, prohibiting her from speaking with anyone about the options-related fraud. As described above, CW ##6 and 7 and others confirmed that Nyberg would be the one former employee other than defendants who had direct contact with senior executives and would have personal knowledge of the key issues relating to alleged backdating. According to CW #7, Nyberg would analyze stock options, make recommendations as to who got what, present to the Board regarding what the executives should get and present to the executives what the rank and file should get. In fact, CW #7 described Nyberg as the "woman who had the first ringside seat for a decade" and "is totally where all the coffins got buried." Yet, Nyberg, who is no longer employed by KLA, informed plaintiffs' counsels' representatives that she could not speak with them because the Company has instructed her not to speak with anyone and her husband clarified that Nyberg had executed a written agreement with the Board of Directors prohibiting her from speaking to anyone regarding KLA. Moreover, unlike other companies, KLA has not publicly disclosed the report issued by its Special Committee.

303. In addition, several Confidential Witnesses confirmed that defendants were very involved in all aspects of the Company. CW #7 described KLA as a company "that was run from the top down. Every division had to report personally to the CEO every quarter." CW #7 further stated that the Company was run as a "dictatorship" and that Schroeder and Levy, "the Kens" "ran this company with an iron fist." CW #2 also noted that Schroeder "ran everything" and that Dickerson also exercised power at the Company.

**3.    Defendants' Efforts To Recruit And Retain Executives And Employees Supports A Strong Inference Of *Scienter***

304. In the highly volatile market for technology companies, the granting of stock options is often a company's strongest means for obtaining skilled labor. Indeed, according to CW #6, the Company hired Iquantic to conduct an analysis of KLA's benefits program in 2001.

1  In connection with this analysis, Iquantic surveyed KLA's employees and learned that the
2  employees wanted to take home cash. Thus, the compensation department began to strategize
3  on how to provide employees with more cash without raising their salaries and the Company
4  executives, including defendants here, sought to "optimize" the benefits from stock options by
5  any means possible.

6      305.    A number of witnesses and documents evidence the fact that, as of at least 2000,
7  the Company lacked the ability to properly compensate employees with cash.

8          (a)    According to CW #6, KLA was not doing well financially in 2002 and
9  2003 so it implemented a pay freeze.

10         (b)    CW #8 confirmed that when he/she started at the Company in 2003,
11 he/she was informed that the Company had been having financial problems and had not given
12 employees raises during the prior few years.

13         (c)    CW #3 stated that in 2001 KLA was experiencing "money troubles" and
14 informed all employees that they would not be receiving raises. CW #3 further stated that, in
15 spring or summer 2001, all employees at the supervisory level and above were asked to take pay
16 cuts (although vice presidents received 10% raises for their annual merit increase in 2001).

17         (d)    CW #1 stated that KLA was "running its business based on options" and
18 that "instead of spending real money on salary and bonuses, they would give options."

19         (e)    A presentation slide titled "Q1 Focus" (page 28) from the "Human
20 Resources Executive Review dated June 26, 2001 – Tom Coffey" identifies one of the action
21 steps as "Decrease Management Salaries effective 7/1/01."

22         (f)    A presentation slide titled "Q1 Status Update Compensation" (page 18)
23 from the "Human Resources Executive Review dated September 19, 2001 – Tom Coffey" states
24 that the HR Department has "Processed Management Salary Decreases." The slide also
25 confirms that "All salary actions require Compensation approval."

26         (g)    A presentation slide titled "Q2 Status Update Compensation" (page 28)
27 from the "Human Resources Executive Review dated December 10, 2001 – Tom Coffey" states

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                    117

1   that "Salary increases for FY02 cancelled."

2          306.   Thus, the Company offered employees additional stock options during the pay

3   freeze or in exchange for pay cuts.

4                 (a)    CW #6 stated that the Company asked employees to accept stock options

5   in exchange for pay cuts.

6                 (b)    The presentation slide titled "Q4 Status Update" (page 26) from the

7   "Human Resources Executive Review dated June 26, 2001 – Tom Coffey" states that (i) "2nd

8   Supplemental [stock options] Approved for Officers, communicated and implemented into

9   stock system"; and (ii) "Recommended and received approval for 2nd Supplemental Focal

10  Stock Option."

11                (c)    The presentation slide titled "Q2 Status Update Compensation" (page 28)

12  from the "Human Resources Executive Review dated December 10, 2001 – Tom Coffey" also

13  states that (i) "Focal stock issued at 150%"; and (ii) "Developed, presented and received

14  approval for proposal to issue 100 share option to employees without Focal stock." The slide

15  further indicates that there was "[p]ositive feedback regarding stock" for both these action steps.

16         307.   Defendants' willingness to manipulate option grants as a means of boosting

17  compensation for themselves and employees is further evidenced by their practice of "re-

18  pricing" stock options that were "out-of the-money," that is, where the stock price fell below

19  the exercise price.

20         **4.     Defendants' Personal Enrichment Through Lucrative Stock Option**
                     **Grants And Insider Trading Further Supports A Finding Of**
21                   **Scienter**

22         308.   Defendants were motivated to commit the fraudulent scheme in order to reap

23  significant personal profits.    Defendants provided themselves with a direct form of

24  compensation, which amounted to undisclosed and unaccounted for compensation in a number

25  of ways.

26         309.   First, the Individual Defendants each personally obtained backdated options.

27  The following charts set forth the options granted to certain defendants prior to and during the

28

Class Period as reported in the Company's Proxy Statements and Form 4's filed with the SEC:

July 26, 1994 - Fiscal 1995

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Ken Levy | 7/26/94 | $9.31 | $9.12 | $9.06 | $11.24 | 240,000 |
| Ken Schroder | 7/26/94 | $9.31 | $9.12 | $9.06 | $11.24 | 240,000 |

April 18, 1995 - Fiscal 1995

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| John Kispert | 4/18/95 | $15.31 | $15.00 | $14.70 | $16.56 | 2,440 |

September 17, 1996 - Fiscal 1997

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| John Kispert | 9/17/96 | $10.94 | $10.72 | $8.70 | $12.19 | 3,000 |

October 8, 1996 - Fiscal 1997

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| John Kispert | 10/8/96 | $10.81 | $10.59 | $8.88 | $12.80 | 2,625 |
| Gary Dickerson | 10/8/96 | $10.81 | $10.59 | $8.88 | $12.80 | 12,750 |
| Ken Levy | 10/8/96 | $10.81 | $10.59 | $8.88 | $12.80 | 125,000 |

July 21, 1997 - Fiscal 1998

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Dean Morton | 7/21/1997 | $27.38 | $26.82 | $23.88 | $33.01 | 5,000 |
| Richard Elkus | 7/21/1997 | $27.38 | $26.82 | $23.88 | $33.01 | 5,000 |

June 15, 1998 - Fiscal 1998

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Dean Morton | 6/15/98 | $12.78 | $12.52 | $12.22 | $19.01 | 5,000 |

August 31, 1998 - Fiscal 1999

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Richard Wallace | 8/31/98 | $10.63 | $10.41 | $10.41 | $15.83 | 9,251 |
| John Kispert | 8/31/98 | $10.63 | $10.41 | $10.41 | $15.83 | 22,600 |
| Gary Dickerson | 8/31/98 | $10.63 | $10.41 | $10.41 | $15.83 | 41,921 |
| Ken Schroder | 8/31/98 | $10.63 | $10.41 | $10.41 | $15.83 | 125,000 |
| Ken Levy | 8/31/98 | $10.63 | $10.41 | $10.41 | $15.83 | 204,272 |
| Jon Tompkins | 8/31/98 | $10.63 | $10.41 | $10.41 | $15.83 | 60,595 |

October 23, 1998 - Fiscal 1999

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Gary Dickerson | 10/23/98 | $16.97 | $16.63 | $10.53 | $20.21 | 65,449 |
| Jon Kispert | 10/23/98 | $16.97 | $16.63 | $10.53 | $20.21 | 30,135 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                    120

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Ken Levy | 10/23/98 | $16.97 | $16.63 | $10.53 | $20.21 | 220,728 |
| Ken Schroder | 10/23/98 | $16.97 | $16.63 | $10.53 | $20.21 | 220,728 |
| Jon Tompkins | 10/23/98 | $16.97 | $16.63 | $10.53 | $20.21 | 87,016 |

November 17, 1998 - Fiscal 1999

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Dean Morton | 11/17/98 | $17.59 | $17.24 | $13.75 | $22.41 | 7,082 |

May 26, 1999 - Fiscal 1999

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Richard Wallace | 05/26/99 | $22.56 | $22.11 | $21.40 | $29.55 | 5,417 |

October 27, 1999 - Fiscal 1999

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Gary Dickerson | 10/27/99 | $33.75 | $33.07 | $31.84 | $47.40 | 100,000 |
| Ken Levy | 10/27/99 | $33.75 | $33.07 | $31.84 | $47.40 | 90,000 |
| John Kispert | 10/27/99 | $33.75 | $33.07 | $31.84 | $47.40 | 30,000 |
| Stuart Nichols | 10/27/99 | $33.75 | $33.07 | $31.84 | $47.40 | 35,000 |
| Ken Schroder | 10/27/99 | $33.75 | $33.07 | $31.84 | $47.40 | 150,000 |
| Richard Wallace | 10/27/99 | $33.75 | $33.07 | $31.84 | $47.40 | 36,250 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

121

August 11, 2000 - Fiscal 2001

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Gary E. Dickerson | 8/11/2000 | $44.687 | $44.69 | $42.38 | $66.81 | 41,585 |

August 13, 2000 - Fiscal 2001

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth Levy | 8/13/2000 | $44.69 | $44.69 | $42.38 | $66.81 | 37,901 |
| Kenneth L. Schroeder | 8/13/2000 | $44.69 | $44.69 | $42.38 | $66.81 | 75,800 |
| Gary E. Dickerson | 8/13/2000 | $44.69 | $44.69 | $42.38 | $66.81 | 65,000 |
| John H. Kispert | 8/13/2000 | $44.69 | $44.69 | $42.38 | $66.81 | 40,000 |
| Richard P. Wallace | 8/13/2000 | $44.69 | $44.69 | $42.38 | $66.81 | 21,878 |

August 15, 2000 - Fiscal 2001

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Raymond Bingham | 8/15/2000 | $59.44 | $52.75 | $42.38 | $66.81 | 20,000 |
| Robert Bond | 8/15/2000 | $59.44 | $52.75 | $42.38 | $66.81 | 20,000 |

November 10, 2000 - Fiscal 2001

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth Levy | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 18,951 |
| Kenneth L. Schroeder | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 37,900 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

122

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Gary E. Dickerson | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 32,500 |
| John H. Kispert | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 20,000 |
| Richard P. Wallace | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 12,250 |
| Richard J. Elkus | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 10,000 |
| Lida Urbanek | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 10,000 |
| Edward Barnholt | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 10,000 |
| Jon D. Tompkins | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 10,000 |
| Dean Morton | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 10,000 |
| Stuart Nichols | 11/10/2000 | $26.25 | $26.25 | $26.25 | $36.81 | 6,000 |

April 4, 2001 - Fiscal 2001

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth Levy | 4/4/2001 | $32.75 | $32.75 | $32.75 | $54.50 | 18,951 |
| Kenneth L. Schroeder | 4/4/2001 | $32.75 | $32.75 | $32.75 | $54.50 | 37,900 |
| Gary E. Dickerson | 4/4/2001 | $32.75 | $32.75 | $32.75 | $54.50 | 32,500 |
| John H. Kispert | 4/4/2001 | $32.75 | $32.75 | $32.75 | $54.50 | 20,000 |
| Richard P. Wallace | 4/4/2001 | $32.75 | $32.75 | $32.75 | $54.50 | 13,832 |
| Stuart Nichols | 4/4/2001 | $32.75 | $32.75 | $32.75 | $54.50 | 6,000 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                    123

October 2, 2001 -- Fiscal 2002

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 10/2/2001 | $29.31 | $29.31 | $28.86 | $51.46 | 341,100 |
| Gary E. Dickerson | 10/2/2001 | $29.31 | $29.31 | $28.86 | $51.46 | 105,000 |
| John H. Kispert | 10/2/2001 | $29.31 | $29.31 | $28.86 | $51.46 | 60,000 |
| Richard P. Wallace | 10/2/2001 | $29.31 | $29.31 | $28.86 | $51.46 | 45,000 |
| Kenneth Levy | 10/2/2001 | $29.31 | $29.31 | $28.86 | $51.46 | 28,425 |
| Jeffrey Hall | 10/2/2001 | $29.31 | $29.31 | $28.86 | $51.46 | 22,500 |
| Stuart Nichols | 10/2/2001 | $29.31 | $29.31 | $28.86 | $51.46 | 12,000 |

November 9, 2001 -- Fiscal 2002

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Raymond Bingham | 11/9/01 | $47.23 | $47.23 | $34.88 | $56.96 | 10,000 |
| Robert Bond | 11/9/01 | $47.23 | $47.23 | $34.88 | $56.96 | 10,000 |

November 8, 2002 -- Fiscal 2003

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 31,450 |
| Gary E. Dickerson | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 25,000 |
| John H. Kispert | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 12,500 |
| Richard P. Wallace | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 12,500 |
| Edward Barnholt | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 10,000 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Raymond Bingham | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 10,000 |
| Robert T. Bond | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 10,000 |
| Richard J. Elkus | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 10,000 |
| Stephen Kaufman | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 10,000 |
| Lida Urbanek | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 10,000 |
| Jon D. Tompkins | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 10,000 |
| Jeffrey Hall | 11/8/2002 | $37.05 | $37.05 | $28.34 | $45.09 | 3,250 |

January 28, 2003 – Fiscal 2003

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 1/28/2003 | $34.67 | $34.67 | $31.15 | $40.77 | 62,900 |
| Gary E. Dickerson | 1/28/2003 | $34.67 | $34.67 | $31.15 | $40.77 | 50,000 |
| John H. Kispert | 1/28/2003 | $34.67 | $34.67 | $31.15 | $40.77 | 25,000 |
| Richard P. Wallace | 1/28/2003 | $34.67 | $34.67 | $31.15 | $40.77 | 25,000 |

May 22, 2003 – Fiscal 2003

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Jeffrey Hall | 5/22/2003 | $40.14 | $40.14 | $38.34 | $48.60 | 5,500 |
| Gary E. Dickerson | 5/22/2003 | $40.14 | $40.14 | $38.34 | $48.60 | 1,000 |
| Richard P. Wallace | 5/22/2003 | $40.14 | $40.14 | $38.34 | $48.60 | 1,000 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                    125

July 30, 2003 – Fiscal 2004

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 7/30/2003 | $51.23 | $51.23 | $46.50 | $58.69 | 31,450 |
| Gary E. Dickerson | 7/30/2003 | $51.23 | $51.23 | $46.50 | $58.69 | 25,000 |
| John H. Kispert | 7/30/2003 | $51.23 | $51.23 | $46.50 | $58.69 | 12,500 |
| Richard P. Wallace | 7/30/2003 | $51.23 | $51.23 | $46.50 | $58.69 | 12,500 |
| Jeffrey Hall | 7/30/2003 | $51.23 | $51.23 | $46.50 | $58.69 | 3,250 |

October 27, 2003 – Fiscal 2004

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 10/27/2003 | $53.86 | $53.86 | $51.60 | $60.88 | 60,000 |
| Gary E. Dickerson | 10/27/2003 | $53.86 | $53.86 | $51.60 | $60.88 | 50,000 |
| John H. Kispert | 10/27/2003 | $53.86 | $53.86 | $51.60 | $60.88 | 30,000 |
| Richard P. Wallace | 10/27/2003 | $53.86 | $53.86 | $51.60 | $60.88 | 30,000 |
| Jeffrey Hall | 10/27/2003 | $53.86 | $53.86 | $51.60 | $60.88 | 5,200 |

November 5, 2003 – Fiscal 2004

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 11/05/03 | $59.44 | $59.44 | $52.29 | $59.65 | 10,000 |
| Michael Marks | 11/05/03 | $59.44 | $59.44 | $52.29 | $59.65 | 10,000 |
| Raymond Bingham | 11/05/03 | $59.44 | $59.44 | $52.29 | $59.65 | 10,000 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                    126

January 27, 2004 – Fiscal 2004

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 1/27/2004 | $58.10 | $58.10 | $53.64 | $62.52 | 30,000 |
| Gary E. Dickerson | 1/27/2004 | $58.10 | $58.10 | $53.64 | $62.52 | 25,000 |
| John H. Kispert | 1/27/2004 | $58.10 | $58.10 | $53.64 | $62.52 | 15,000 |
| Richard P. Wallace | 1/27/2004 | $58.10 | $58.10 | $53.64 | $62.52 | 15,000 |
| Jeffrey Hall | 1/27/2004 | $58.10 | $58.10 | $53.64 | $62.52 | 2,600 |

April 26, 2004 – Fiscal 2004

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 4/26/2004 | $45.16 | $45.16 | $41.70 | $53.88 | 37,500 |
| Gary E. Dickerson | 4/26/2004 | $45.16 | $45.16 | $41.70 | $53.88 | 31,250 |
| John H. Kispert | 4/26/2004 | $45.16 | $45.16 | $41.70 | $53.88 | 18,750 |
| Richard P. Wallace | 4/26/2004 | $45.16 | $45.16 | $41.70 | $53.88 | 18,750 |
| Jeffrey Hall | 4/26/2004 | $45.16 | $45.16 | $41.70 | $53.88 | 3,250 |

August 2, 2004 -- Fiscal 2005

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 8/2/2004 | $40.66 | $40.66 | $35.69 | $46.30 | 22,500 |
| John H. Kispert | 8/2/2004 | $40.66 | $40.66 | $35.69 | $46.30 | 11,250 |
| Richard P. Wallace | 8/2/2004 | $40.66 | $40.66 | $35.69 | $46.30 | 11,250 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

127

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Avi Cohen | 8/2/2004 | $40.66 | $40.66 | $35.69 | $46.30 | 6,000 |
| Lance Glasser | 8/2/2004 | $40.66 | $40.66 | $35.69 | $46.30 | 3,750 |
| Jeffrey Hall | 8/2/2004 | $40.66 | $40.66 | $35.69 | $46.30 | 1,950 |

September 21, 2004 – Fiscal 2005

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 9/21/2004 | $41.79 | $41.79 | $36.60 | $43.67 | 325,800 |
| John H. Kispert | 9/21/2004 | $41.79 | $41.79 | $36.60 | $43.67 | 75,000 |
| Richard P. Wallace | 9/21/2004 | $41.79 | $41.79 | $36.60 | $43.67 | 75,000 |
| Avi Cohen | 9/21/2004 | $41.79 | $41.79 | $36.60 | $43.67 | 75,000 |
| Lance Glasser | 9/21/2004 | $41.79 | $41.79 | $36.60 | $43.67 | 75,000 |
| Jeffrey Hall | 9/21/2004 | $41.79 | $41.79 | $36.60 | $43.67 | 20,000 |

October 18, 2004 – Fiscal 2005

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 10/18/2004 | $40.68 | $40.68 | $39.49 | $45.70 | 2,500 |
| Raymond Bingham | 10/18/2004 | $40.68 | $40.68 | $39.49 | $45.70 | 2,500 |

January 25, 2005 – Fiscal 2005

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 1/25/2005 | $44.76 | $44.76 | $42.25 | $50.50 | 2,500 |
| Raymond Bingham | 1/25/2005 | $44.76 | $44.76 | $42.25 | $50.50 | 5,000 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                    128

May 11, 2005 - Fiscal 2005

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 5/11/05 | $40.24 | $40.24 | $38.86 | $46.87 | 2,500 |
| Raymond Bingham | 5/11/05 | $40.24 | $40.24 | $38.86 | $46.87 | 2,500 |

August 2, 2005 -- Fiscal 2006

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 8/02/2005 | $51.35 | $51.35 | $44.37 | $51.70 | 2,500 |
| Michael Marks | 8/02/2005 | $51.35 | $51.35 | $44.37 | $51.70 | 2,500 |
| Raymond Bingham | 8/02/2005 | $51.35 | $51.35 | $44.37 | $51.70 | 2,500 |

November 4, 2005 -- Fiscal 2006

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 11/04/2005 | $49.99 | $49.99 | $45.52 | $54.09 | 1,250 |
| Michael Marks | 11/04/2005 | $49.99 | $49.99 | $45.52 | $54.09 | 1,250 |
| Raymond Bingham | 11/04/2005 | $49.99 | $49.99 | $45.52 | $54.09 | 3,750 |

September 26, 2005 - Fiscal 2006

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Richard P. Wallace | 9/26/2005 | $47.95 | $47.95 | $45.17 | $50.71 | 125,000 |
| John H. Kispert | 9/26/2005 | $47.95 | $47.95 | $45.17 | $50.71 | 75,000 |
| Jeffrey L. Hall | 9/26/2005 | $47.95 | $47.95 | $45.17 | $50.71 | 30,000 |
| Avi Cohen | 9/26/2005 | $47.95 | $47.95 | $45.17 | $50.71 | 75,000 |
| Kenneth Schroeder | 9/26/2005 | $47.95 | $47.95 | $45.17 | $50.71 | 325,800 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

129

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Lance Glasser | 9/26/2005 | $47.95 | $47.95 | $45.17 | $50.71 | 75,000 |

January 31, 2006 – Fiscal 2006

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 1/31/06 | $51.98 | $51.98 | $49.33 | $54.18 | 1,250 |
| Michael Marks | 1/31/06 | $51.98 | $51.98 | $49.33 | $54.18 | 1,250 |
| Raymond Bingham | 1/31/06 | $51.98 | $51.98 | $49.33 | $54.18 | 1,250 |

February 17, 2006 - Fiscal 2006

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Richard P. Wallace | 2/17/2006 | $52.53 | $52.53 | $48.67 | $54.18 | 50,000 |
| John H. Kispert | 2/17/2006 | $52.53 | $52.53 | $48.67 | $54.18 | 25,000 |
| Jeffrey L. Hall | 2/17/2006 | $52.53 | $52.53 | $48.67 | $54.18 | 15,000 |

May 2, 2006 - Fiscal 2006

| Name of Executive/ Director | Grant Date Reported | Strike Price | Closing Price on "Grant" Date | 40-Day Low Closing Price | 40-Day High Closing Price | Number of Securities Underlying Options |
|---|---|---|---|---|---|---|
| Stephen P. Kaufman | 5/02/06 | $47.86 | $47.86 | $39.07 | $50.39 | 1,250 |
| Raymond Bingham | 5/02/06 | $47.86 | $47.86 | $39.07 | $50.39 | 1,250 |
| Michael Marks | 5/02/06 | $47.86 | $47.86 | $39.07 | $50.39 | 1,250 |

310. Other options granted to defendants during the Class Period are identified in the charts below showing actual exercises of options and sales of stock.

311. While KLA has not identified precisely which options were backdated, it has

1   confirmed that options granted during this period had been retroactively priced for all
2   employees who received such grants. It has also admitted that Schroeder, Kispert, Nichols,
3   Levy and Wallace all received backdated options. Based on these admissions and the following
4   charts showing how all the alleged grant dates fell suspiciously at or close to low stock prices,
5   there is a strong inference that all of the options granted to all defendants during the Class
6   Period were backdated options:

7   **July 26, 1994**



1

**April 18, 1995**



2

3

4

5

6

7

8

9

10

11

12

13

**October 8, 1996**

14



15

16

17

18

19

20

21

22

23

24

25

26

27

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                    132

**July 21, 1997**



**June 15, 1998**

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                    133

**August 31, 1998**



**November 17, 1998**



1

**May 26, 1999**

2

3

4

5

6

7

8

9

10

11

12

13



14

**October 27, 1999**

15

16

17

18

19

20

21

22

23

24

25



26

27

28

1

2    **August 11, 2000**

3    

4

5

6

7

8

9

10

11

12

13    **November 10, 2000**

14    

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**April 4, 2001**



**October 2, 2001**

1

**November 8, 2002**

2

3



4

5

6

7

8

9

10

11

12

13

14

**January 28, 2003**

15

16

17



18

19

20

21

22

23

24

25

26

27

28

1   **May 22, 2003**

2

3

4   

5

6

7

8

9

10

11

12

13

14   **July 30, 2003**

15

16

17

18   

19

20

21

22

23

24

25

26

27

28

1  October 27, 2003



13  April 26, 2004



312.  Second, Wallace, Schroeder, Levy, Tompkins, Dickerson, Hall, Kispert, Urbanek, Marks, Barnholt, Bond, Elkus, Morton, Kaufman and Bingham actually exercised backdated options, thereby cashing in on their fraudulent scheme.  The following charts set

forth the proceeds realized by each defendant when they exercised their stock option grants:

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized on Transaction |
|------|------|------|------|------|------|------|------|
| Wallace, Richard P. | 10/27/99 | 12/03/03 | $33.75 | 5,041 | $59.5382 | 5,041 | $129,998.32 |
| | 08/13/00 | 12/03/03 | $44.6875 | 2,709 | $59.5382 | 2,709 | $40,230.55 |
| | 11/10/00 | 12/03/03 | $26.25 | 875 | $59.5382 | 875 | $29,127.18 |
| | 04/04/02 | 12/03/03 | $32.75 | 875 | $59.5382 | 875 | $23,439.68 |
| | 10/02/01 | 12/03/03 | $29.31 | 3,000 | $59.5382 | 3,000 | $90,684.60 |
| | 11/08/02 | 12/03/03 | $37.05 | 2,500 | $59.5382 | 2,500 | $146,382.55 |
| | 01/28/03 | 12/03/03 | $34.67 | 5,000 | $59.5382 | 5,000 | $124,341.00 |
| | 10/27/99 | 08/21/03 | $33.75 | 18,667 | $54.82 | 18,667 | $393,313.69 |
| | 11/10/00 | 08/21/03 | $26.25 | 292 | $54.82 | 292 | $8,342.44 |
| | 04/04/01 | 08/21/03 | $32.75 | 291 | $54.82 | 291 | $6,422.37 |
| | 10/02/01 | 08/21/03 | $29.31 | 750 | $54.82 | 750 | $19,132.50 |
| | 10/27/99 | 07/31/03 | $33.75 | 1,292 | $52.6275 | 1,292 | $24,389.73 |
| | 11/10/00 | 07/31/03 | $26.25 | 583 | $52.6275 | 583 | $15,378.086 |
| | 04/04/01 | 07/31/03 | $32.75 | 4,207 | $52.6275 | 4,207 | $83,624.64 |
| | 10/02/01 | 07/31/03 | $29.31 | 13,918 | $52.6275 | 13,918 | $324,532.97 |
| | 08/31/98 | 06/06/03 | $10.63 | 1,250 | $50.885 | 1,250 | $50,318.75 |
| | 08/31/98 | 06/06/03 | $10.63 | 834 | $50.885 | 834 | $33,572.67 |
| | 08/31/98 | 06/06/03 | $10.63 | 2,500 | $50.885 | 2,500 | $100,637.50 |
| | 08/31/98 | 06/06/03 | $10.63 | 2,500 | $50.885 | 2,500 | $100,637.50 |
| | 08/31/98 | 06/06/03 | $10.63 | 2,167 | $50.885 | 2,167 | $87,232.59 |
| | 05/26/99 | 06/06/03 | $22.56 | 5,417 | $50.885 | 5,417 | $153,436.53 |
| | 11/10/00 | 06/06/03 | $26.25 | 3,500 | $50.885 | 3,500 | $86,222.50 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

141

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized on Transaction |
|---|---|---|---|---|---|---|---|
| | 10/02/01 | 06/06/03 | $29.31 | 1,832 | $50.885 | 1,832 | $39,525.40 |
| **TOTAL** | | | | | | | $2,110,923.71 |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Schroeder, Kenneth | | 02/08/06 | $16.97 | 132,658 | $53.9155 | 132,658 | $4,901,116.14 |
| | | 02/08/06 | ???? | | | | |
| | 10/23/98 | 11/30/05 | $16.97 | 21,136 | $51.7382 | 21,136 | $734,860.68 |
| | 10/23/98 | 11/30/05 | $16.97 | 28,864 | $51.7382 | 28,864 | $1,003,549.33 |
| | 10/23/98 | 11/04/05 | $16.97 | 50,000 | $49.5026 | 50,000 | $1,626,630.00 |
| | 08/31/98 | 08/23/05 | $10.63 | 35,304 | $49.6331 | 35,304 | $1,376,965.44 |
| | 10/23/98 | 08/23/05 | $16.97 | 14,696 | $49.6331 | 14,696 | $488,933.94 |
| | 08/31/98 | 02/28/05 | $10.63 | 43,968 | $50.4927 | 43,968 | $1,752,683.19 |
| | 10/23/98 | 12/03/04 | $16.97 | 47,361 | $49.2846 | 47,361 | $1,530,451.77 |
| | 10/23/98 | 12/02/04 | $16.97 | 2,639 | $47.50 | 2,639 | $80,568.67 |
| | 08/31/98 | 01/28/04 | $10.63 | 25,000 | $58.5754 | 25,000 | $1,198,635.00 |
| | 08/31/98 | 01/28/04 | $10.63 | 25,000 | $58.5754 | 25,000 | $1,198,635.00 |
| | 08/31/98 | 08/22/03 | $10.63 | 50,000 | $57.8089 | 50,000 | $2,358,945.00 |
| | 08/31/98 | 08/19/03 | $10.81 | 25,000 | $54.4537 | 25,000 | $1,091,092.50 |
| | 10/08/96 | 08/19/03 | $10.63 | 25,000 | $54.4537 | 25,000 | $1,091,092.50 |
| | 10/08/96 | 08/15/03 | $10.81 | 25,000 | $52.0009 | 25,000 | $1,029,772.50 |
| | 10/08/96 | 08/14/03 | $10.81 | 25,000 | $52 | 25,000 | $1,029,750.00 |
| | 10/08/96 | 08/04/03 | $10.81 | 25,000 | $52.25 | 25,000 | $1,036,000.00 |
| | 07/26/94 | 07/31/03 | $9.31 | 24,100 | $52.753 | 24,100 | $1,046,976.30 |
| | 07/26/94 | 06/06/03 | $9.31 | 35,900 | $50.0917 | 35,900 | $1,464,063.03 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

142

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| **TOTAL** | | | | | | | **$26,040,720.99** |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized On Sale |
|---|---|---|---|---|---|---|---|
| Levy, Kenneth | 08/31/98 | 11/18/05 | $10.63 | 50,000 | $51.20 | 50,000 | $2,028,500.00 |
| | 10/08/96 | 08/02/05 | $10.81 | 75,000 | $51.2675 | 75,000 | $3,034,312.50 |
| | 10/08/96 | 12/15/04 | $10.81 | 25,000 | $46.9809 | 25,000 | $904,272.50 |
| | 10/08/96 | 11/01/04 | $10.81 | 25,000 | $45.2039 | 25,000 | $859,874.50 |
| | 07/26/94 | 05/26/04 | $9.31 | 25,000 | $46.281 | 25,000 | $924,275.00 |
| | 07/26/94 | 05/20/04 | $9.31 | 15,000 | $45.1833 | 15,000 | $538,099.50 |
| | 07/26/94 | 05/19/04 | $9.31 | 15,000 | $46.2133 | 15,000 | $553,549.50 |
| | 07/26/94 | 05/18/04 | $9.31 | 15,000 | $44.8197 | 15,000 | $532,645.50 |
| | 07/26/94 | 05/13/04 | $9.31 | 35,000 | $44.00 | 35,000 | $1,214,150.00 |
| | 07/26/94 | 10/30/03 | $9.31 | 55,000 | $57.3927 | 55,000 | $2,644,648.50 |
| | 07/26/04 | 09/16/03 | $9.31 | 30,000 | $57.0852 | 30,000 | $1,433,256.00 |
| | 07/26/94 | 08/22/03 | $9.31 | 50,000 | $57.6186 | 50,000 | $2,415,430.00 |
| **TOTAL** | | | | | | | **$17,082,914** |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized On Sale |
|---|---|---|---|---|---|---|---|
| Tompkins, Jon D. | 8/31/98 | 6/7/01 | $10.63 | 8,000 | $59.22 | 8,000 | $388,720.00 |
| | 8/31/98 | 6/7/01 | $10.63 | 12,000 | $59.22 | 12,000 | $583,080.00 |
| | 8/31/98 | 8/3/01 | $10.63 | 10,000 | $58.50 | 10,000 | $478,700.00 |
| | 8/31/98 | 8/3/01 | $10.63 | 10,000 | $58.50 | 10,000 | $478,700.00 |
| | 8/31/98 | 8/24/01 | $10.63 | 2,000 | $50.90 | 2,000 | $80,540.00 |
| | 8/31/98 | 8/24/01 | $10.63 | 6,000 | $50.90 | 6,000 | $241,620.00 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                    143

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized On Sale |
|------|------|------|------|------|------|------|------|
| | 10/23/98 | 8/24/01 | $16.97 | 10,000 | $51.00 | 10,000 | $340,300.00 |
| | 10/23/98 | 8/27/01 | $16.97 | 10,000 | $52.00 | 10,000 | $350,300.00 |
| | 10/23/98 | 11/16/01 | $16.97 | 20,000 | $50.00 | 20,000 | $660,600.00 |
| | 10/23/98 | 1/30/02 | $16.97 | 10,000 | $55.35 | 10,000 | $383,800.00 |
| | 10/23/98 | 2/4/02 | $16.97 | 5,000 | $58.10 | 5,000 | $205,650.00 |
| | 10/23/98 | 2/13/02 | $16.97 | 10,000 | $60.075 | 10,000 | $431,050.00 |
| | 10/23/08 | 3/1/02 | $16.97 | 3,000 | $60.90 | 3,000 | $131,790.00 |
| | 10/23/08 | 3/7/02 | $16.97 | 3,000 | $67.0683 | 3,000 | $150,294.90 |
| | 8/31/98 | 3/8/02 | $10.63 | 5,000 | $70.00 | 5,000 | $296,850.00 |
| | 8/31/98 | 5/14/02 | $10.63 | 5,100 | $60.35 | 5,100 | $253,572.00 |
| | 8/31/98 | 7/29/02 | $10.63 | 2,161 | N/A | N/A | N/A |
| | 8/31/98 | 7/29/02 | $10.63 | 334 | N/A | N/A | N/A |
| | 10/23/98 | 7/29/02 | $16.97 | 16,016 | N/A | N/A | N/A |
| | 11/08/02 | 08/29/05 | $37.05 | 5,000 | $49.75 | 5,000 | $63,500.00 |
| | 11/08/02 | 08/29/05 | $37.05 | 5,000 | $49.75 | 5,000 | $63,500.00 |
| | 10/18/04 | 08/29/05 | $40.68 | 2,500 | $49.75 | 2,500 | $22,675.00 |
| | 05/11/05 | 08/29/05 | $40.24 | 2,500 | $49.75 | 2,500 | $23,775.00 |
| TOTAL | | | | | | | $5,629,016.90 |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|------|------|------|------|------|------|------|------|
| Dickerson, Gary | 8/31/98 | 08/18/03 | $10.63 | 7,500 | $54.2781 | 7,500 | $327,360.75 |
| | 10/23/98 | 08/18/03 | $16.97 | 9,622 | $54.2781 | 9,622 | $358,978.54 |
| | 10/23/98 | 08/18/03 | $16.97 | 2,264 | $54.2781 | 2,264 | $84,465.54 |
| | 10/23/98 | 08/18/03 | $16.97 | 12,393 | $54.2781 | 12,393 | $462,359.28 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                        144

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| | 8/31/98 | 08/18/03 | $10.63 | 8,221 | $54.2781 | 8,221 | $358,831.03 |
| **TOTAL** | | | | | | | **$1,591,995.14** |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Hall, Jeffrey | 10/02/01 | 11/18/05 | $29.31 | 4,000 | $51.12 | 4,000 | $87,240.00 |
| | 10/02/01 | 08/19/05 | $29.31 | 3,000 | $49.3988 | 3,000 | $60,266.40 |
| | 10/02/01 | 05/26/05 | $29.31 | 2,300 | $45.80 | 2,300 | $37,927.00 |
| | 10/02/01 | 12/03/04 | $29.31 | 3,000 | $49.6833 | 3,000 | $61,119.90 |
| **TOTAL** | | | | | | | **$246,553** |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Kispert, John H. | 4/18/95 | 1/28/02 | $15.31 | 2,440 | $55.00 | 2,440 | $96,843.60 |
| | 9/17/96 | 1/28/02 | $10.94 | 3,000 | $55.00 | 3,000 | $132,180.00 |
| | 10/08/96 | 1/28/02 | $10.81 | 2,625 | $55.00 | 2,625 | $115,998.75 |
| | 8/31/98 | 1/28/02 | $10.63 | 6,000 | $55.00 | 6,000 | $266,220.00 |
| | 8/31/98 | 1/28/02 | $10.63 | 3,500 | $55.00 | 3,500 | $155,295.00 |
| | 8/31/98 | 1/28/02 | $10.63 | 7,600 | $55.00 | 7,600 | $337,212.00 |
| | 8/31/98 | 1/28/02 | $10.63 | 2,500 | $55.00 | 2,500 | $110,925.00 |
| | 8/31/98 | 1/28/02 | $10.63 | 3,000 | $55.00 | 3,000 | $133,110.00 |
| | 08/31/98 | 09/15/05 | $10.63 | 1,000 | $50.5089 | 1,000 | $39,878.90 |
| | 08/31/98 | 09/15/05 | $10.63 | 299 | $50.5089 | 299 | $11,923.79 |
| | 08/31/98 | 09/15/05 | $10.63 | 2,534 | $50.5089 | 2,534 | $101,053.13 |
| | 08/31/98 | 09/15/05 | $10.63 | 1,167 | $50.5089 | 1,167 | $46,538.68 |
| | 11/10/00 | 09/15/05 | $33.75 | 1,875 | $50.5089 | 1,875 | $31,422.94 |
| | 04/04/01 | 09/15/05 | $26.25 | 8,000 | $50.5089 | 8,000 | $19,4071.20 |
| | 04/04/01 | 09/15/05 | $32.75 | 8,000 | $50.5089 | 8,000 | $142,071.20 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                              145

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| | 10/02/01 | 09/15/05 | $29.31 | 24,000 | $50.5089 | 24,000 | $508,773.60 |
| | 11/08/02 | 09/15/05 | $37.05 | 6,875 | $50.5089 | 6,875 | $92,529.94 |
| | 01/28/03 | 09/15/05 | $34.67 | 13,750 | $50.5089 | 13,750 | $217,784.88 |
| | 08/31/98 | 08/21/03 | $10.63 | 535 | $56 | 535 | $24,272.95 |
| | 08/31/98 | 08/21/03 | $10.63 | 2,000 | $56 | 2,000 | $90,740.00 |
| | 10/27/99 | 08/21/03 | $33.75 | 18,790 | $56 | 18,790 | $418,077.50 |
| | 08/11/00 | 08/21/03 | $44.6875 | 5,370 | $56 | 5,370 | $60,748.13 |
| | 08/13/00 | 08/21/03 | $44.6875 | 25,972 | $56 | 25,972 | $293,808.25 |
| | 11/10/00 | 08/21/03 | $26.25 | 11,000 | $56 | 11,000 | $327,250.00 |
| | 04/04/01 | 08/21/03 | $32.75 | 9,333 | $56 | 9,333 | $216,992.25 |
| | 10/02/01 | 08/21/03 | $29.31 | 22,000 | $56 | 22,000 | $587,180.00 |
| **TOTAL** | | | | | | | **$4,752,901.68** |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Urbanek, Lida | 05/13/96 | 02/27/06 | $12.50 | 280 | $51.931 | 280 | $11,040.68 |
| | 05/13/96 | 12/14/04 | $12.50 | 5,000 | $47.1658 | 5,000 | $173,329.00 |
| **TOTAL** | | | | | | | **$184,369.68** |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Marks, Michael | 05/11/05 | 05/09/06 | $40.24 | 2,500 | $48.45 | 2,500 | $20,525.00 |
| | 10/18/04 | 05/09/06 | $40.68 | 2,500 | $48.68 | 2,500 | $20,000.00 |
| | 01/25/05 | 05/09/06 | $44.76 | 2,500 | $48.83 | 2,500 | $10,175.00 |
| **TOTAL** | | | | | | | **$50,700.00** |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                          146

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Barnholt, Edward | 10/25/96 | 11/18/05 | $10.63 | 2,500 | $51.04 | 2,500 | $101,025.00 |
| | 10/25/96 | 11/18/05 | $10.63 | 2,500 | $51.03 | 2,500 | $101,000.00 |
| | 10/25/96 | 11/18/05 | $10.63 | 5,000 | $51 | 5,000 | $201,850.00 |
| | 09/21/98 | 11/18/05 | $11.66 | 500 | $51 | 500 | $19,670.00 |
| | 09/21/98 | 11/18/05 | $11.66 | 2,500 | $50.96 | 2,500 | $98,250.00 |
| | 09/21/98 | 11/18/05 | $11.66 | 2,000 | $50.93 | 2,000 | $99,528.00 |
| | 09/19/97 | 11/18/05 | $34.94 | 4,000 | $50.96 | 4,000 | $64,080.00 |
| | 09/20/95 | 12/10/04 | $23.28 | 10,000 | $46.3877 | 10,000 | $231,077.00 |
| TOTAL | | | | | | | $916,480.00 |

| Name | Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Bond, Robert T. | 11/08/02 | 09/13/05 | $37.05 | 5,000 | $50.6136 | 5,000 | $67,818.00 |
| | 11/08/02 | 09/13/05 | $37.05 | 5,000 | $50.6136 | 5,000 | $67,818.00 |
| | 08/02/02 | 11/22/05 | $51.35 | 2,500 | $52.6097 | 2,500 | $3,149.25 |
| TOTAL | | | | | | | $138,785.25 |

| Name | Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Elkus, Richard | 08/02/02 | 11/22/05 | $51.35 | 2,500 | $52.6097 | 2,500 | $3,149.25 |
| | 10/18/04 | 08/09/05 | $40.68 | 2,500 | $49.36 | 2,500 | $21,700.00 |
| | 05/11/05 | 08/09/05 | $40.24 | 2,400 | $49.34 | 2,400 | $21,840.00 |
| | 05/11/05 | 08/09/05 | $40.24 | 100 | $49.36 | 100 | $912.00 |
| | 01/25/05 | 08/09/05 | $44.76 | 2,500 | $49.36 | 2,500 | $11,500.00 |
| | 11/09/01 | 12/01/03 | $47.23 | 5,000 | $59.1123 | 5,000 | $59,411.50 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

147

**EXHIBIT 4**
**Part 5 of 5**

| Name | Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| | 11/09/01 | 12/01/03 | $47.23 | 5,000 | $59.1123 | 5,000 | $59,411.50 |
| | 11/08/02 | 10/29/03 | $37.05 | 5,000 | $57.385 | 5,000 | $101,675.00 |
| | 11/08/02 | 10/27/03 | $37.05 | 5,000 | $53.47 | 5,000 | $82,100.00 |
| | 07/21/97 | 05/30/03 | $27.38 | 5,000 | $45.728 | 5,000 | $91,740.00 |
| | 04/30/98 | 05/15/03 | $20.16 | 209 | $41.6081 | 209 | $4,482.65 |
| | 11/10/00 | 05/15/03 | $26.25 | 2,291 | $41.6081 | 2,291 | $35,185.41 |
| | 11/10/00 | 05/15/03 | $26.25 | 5,000 | $41.6081 | 5,000 | $76,790.50 |
| TOTAL | | | | | | | $569,897.81 |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Bingham, Raymond | 11/08/02 | 11/22/05 | $37.05 | 5,000 | $52.6201 | 5,000 | $77,850.50 |
| | 11/08/02 | 11/22/05 | $37.05 | 5,000 | $52.6201 | 5,000 | $77,850.50 |
| TOTAL | | | | | | | $155,701.00 |

| Name | Reported Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Morton, Dean | 7/21/97 | 8/26/02 | $27.38 | 5,000 | | | |
| | 6/15/98 | 8/26/02 | $12.78 | 5,000 | | | |
| | 11/17/98 | 8/26/02 | $17.59 | 7,082 | | | |
| | 11/10/00 | 8/26/02 | $26.25 | 5,000 | | | |
| | 11/10/00 | 8/26/02 | $26.25 | 5,000 | | | |

| Name | Grant Date | Transaction Date | Exercise Price | Number of Shares Acquired on Exercise | Sale price | Number of Shares Sold | Proceeds Realized |
|---|---|---|---|---|---|---|---|
| Nichols, Stuart | 10/27/99 | 11/13/01 | $33.75 | 10,000 | $50.0855 | 10,000 | $163,055.00 |
| | 10/27/99 | 4/22/02 | $33.75 | 3,000 | $63.8347 | 3,000 | $90,254.10 |
| | 10/27/99 | 4/30/02 | $33.75 | 1,000 | $59.3785 | 1,000 | $25,628.50 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                    148

| | | | | | | | TOTAL | $278,937.60 |
|---|---|---|---|---|---|---|---|---|

313.    Third, Barnholt, Bingham, Bond, Dickerson, Elkus, Hall, Kaufman, Kispert, Levy, Schroeder, Tompkins, Urbanek, Wallace and Nichols also sold 1,666,971 shares of stock during the Class Period for proceeds of **$ 59,749,896.76 million**.    The bulk of the Class Period sales occurred as same day exercises of options and sales of the corresponding share, as set forth in the prior charts.  However, there were additional sales as follows:

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|---|---|---|---|---|
| Barnholt, Edward W. | 11/18/2005 | 2,500 | $51.0400 | $127,600.00 |
| | 11/18/2005 | 2,500 | $51.0300 | $127,575.00 |
| | 11/18/2005 | 5,000 | $51.0000 | $255,000.00 |
| | 11/18/2005 | 500 | $51.0000 | $25,500.00 |
| | 11/18/2005 | 2,500 | $50.9600 | $127,400.00 |
| | 11/18/2005 | 2,000 | $50.9300 | $101,860.00 |
| | 11/18/2005 | 4,000 | $50.9600 | $203,840.00 |
| | 12/10/2004 | 10,000 | $46.3877 | $463,877.00 |
| **TOTAL** | | **29,000** | | **$1,432,652.00** |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|---|---|---|---|---|
| Bingham, Raymond | 11/22/2005 | 5,000 | $52.6201 | $263,100.50 |
| | 11/22/2005 | 5,000 | $52.6201 | $263,100.50 |
| **TOTAL** | | **10,000** | | **$526,201.00** |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|---|---|---|---|---|
| Bond, Robert T. | 9/13/2005 | 5,000 | $50.6136 | $253,068.00 |
| | 9/13/2005 | 5,000 | $50.6136 | $253,068.00 |
| **TOTAL** | | **10,000** | | **$506,136.00** |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|---|---|---|---|---|
| Dickerson, Gary | 8/18/2003 | 7,500 | $54.2781 | $407,085.75 |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|-----------------------|------------|----------------|
| | 8/18/2003 | 9,622 | $54.2551 | $522,042.57 |
| | 8/18/2003 | 2,264 | $54.2638 | $122,853.24 |
| | 8/18/2003 | 12,393 | $54.2926 | $672,848.19 |
| | 8/18/2003 | 8,221 | $54.2553 | $446,032.82 |
| | 3/4/2002 | 1,370 | $64.7100 | $88,652.70 |
| | 3/4/2002 | 2,380 | $64.5895 | $153,723.01 |
| | 3/4/2002 | 1,250 | $64.7000 | $80,875.00 |
| | 3/8/2002 | 2,830 | $69.8400 | $197,647.20 |
| | 3/8/2002 | 727 | $69.8400 | $50,773.68 |
| | 2/13/2002 | 1,370 | $60.5200 | $82,912.40 |
| | 2/13/2002 | 2,380 | $60.4600 | $143,894.80 |
| | 2/13/2002 | 1,250 | $60.5100 | $75,637.50 |
| | 1/30/2002 | 10,960 | $55.0000 | $602,800.00 |
| | 1/30/2002 | 6,540 | $55.0000 | $359,700.00 |
| | 1/30/2002 | 2,500 | $55.0000 | $137,500.00 |
| | 1/30/2002 | 65 | $56.2500 | $3,656.25 |
| | 12/5/2001 | 7,500 | $56.3047 | $422,285.25 |
| | 11/13/2001 | 12,750 | $50.5000 | $643,875.00 |
| TOTAL | | 93,872 | | $5,214,795.37 |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|-----------------------|------------|----------------|
| Elkus, Richard J., Jr | 11/29/2005 | 5,000 | $51.9591 | $259,795.50 |
| | 11/22/2005 | 2,500 | $52.6097 | $131,524.25 |
| | 8/9/2005 | 2,500 | $49.3600 | $123,400.00 |
| | 8/9/2005 | 2,500 | $49.3600 | $123,400.00 |
| | 8/9/2005 | 2,400 | $49.3400 | $118,416.00 |
| | 8/9/2005 | 100 | $49.3600 | $4,936.00 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

150

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|-----------------------|------------|----------------|
| | 6/1/2005 | 5,000 | $45.7222 | $228,611.00 |
| | 3/10/2005 | 5,000 | $48.0800 | $240,400.00 |
| | 9/14/2004 | 10,000 | $40.3312 | $403,312.00 |
| | 6/15/2004 | 5,000 | $45.8954 | $229,477.00 |
| | 6/1/2001 | 5,000 | $47.4600 | $237,300.00 |
| | 12/1/2003 | 5,000 | $59.1123 | $295,561.50 |
| | 12/1/2003 | 5,000 | $59.1123 | $295,561.50 |
| | 11/12/2003 | 10,000 | $59.5100 | $595,100.00 |
| | 10/29/2003 | 5,000 | $57.3850 | $286,925.00 |
| | 10/27/2003 | 5,000 | $53.4700 | $267,350.00 |
| | 5/30/2003 | 5,000 | $45.7280 | $228,640.00 |
| | 5/15/2003 | 209 | $41.6081 | $8,696.09 |
| | 5/15/2003 | 2,291 | $41.6081 | $95,324.16 |
| | 5/15/2003 | 5,000 | $41.6081 | $208,040.50 |
| | 3/15/2002 | 1,709 | $64.5120 | $110,251.01 |
| | 3/15/2002 | 791 | $64.5120 | $51,028.99 |
| | 12/6/2001 | 1,000 | $55.5500 | $55,550.00 |
| **TOTAL** | | **96,000** | | **$4,492,021.51** |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|-----------------------|------------|----------------|
| Hall, Jeffrey | 11/18/2005 | 4,000 | $51.1200 | $204,480.00 |
| | 8/19/2005 | 3,000 | $49.3988 | $148,196.40 |
| | 5/26/2005 | 2,300 | $45.8000 | $105,340.00 |
| | 12/3/2004 | 3,000 | $49.6833 | $149,049.90 |
| **TOTAL** | | **12,300** | | **$607,066.30** |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|---|---|---|---|---|
| Kispert, John H. | 9/15/2005 | 1,000 | $50.5089 | $50,508.90 |
| | 9/15/2005 | 229 | $50.5089 | $11,566.54 |
| | 9/15/2005 | 2,534 | $50.5089 | $127,989.55 |
| | 9/15/2005 | 1,167 | $50.5089 | $58,943.89 |
| | 9/15/2005 | 1,875 | $50.5089 | $94,704.19 |
| | 9/15/2005 | 8,000 | $50.5089 | $404,071.20 |
| | 9/15/2005 | 8,000 | $50.5089 | $404,071.20 |
| | 9/15/2005 | 24,000 | $50.5089 | $1,212,213.60 |
| | 9/15/2005 | 6,875 | $50.5089 | $347,248.69 |
| | 9/15/2005 | 13,750 | $50.5089 | $694,497.36 |
| | 8/21/2003 | 535 | $56.0000 | $29,960.00 |
| | 8/21/2003 | 2,000 | $56.0000 | $112,000.00 |
| | 8/21/2003 | 18,790 | $56.0000 | $1,052,240.00 |
| | 8/21/2003 | 5,370 | $56.0000 | $300,720.00 |
| | 8/21/2003 | 25,972 | $56.0000 | $1,454,432.00 |
| | 8/21/2003 | 11,000 | $56.0000 | $616,000.00 |
| | 8/21/2003 | 9,333 | $56.0000 | $522,648.00 |
| | 8/21/2003 | 22,000 | $56.0000 | $1,232,000.00 |
| | 1/28/2002 | 9,335 | $55.0000 | $513,425.00 |
| | 1/28/2002 | 6,000 | $55.0000 | $330,000.00 |
| | 1/28/2002 | 3,500 | $55.0000 | $192,500.00 |
| | 1/28/2002 | 7,600 | $55.0000 | $418,000.00 |
| | 1/28/2002 | 2,500 | $55.0000 | $137,500.00 |
| **TOTAL** | | **191,365** | | **$10,317,240.13** |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------|------|------|------|
| Levy, Kenneth | 11/18/2005 | 50,000 | $51.2000 | $2,560,000.00 |
| | 8/2/2005 | 75,000 | $51.2675 | $3,845,062.50 |
| | 12/15/2004 | 25,000 | $46.9809 | $1,174,522.50 |
| | 11/1/2004 | 25,000 | $45.2039 | $1,130,097.50 |
| | 5/26/2004 | 25,000 | $46.2810 | $1,157,025.00 |
| | 5/20/2004 | 15,000 | $45.1833 | $677,749.50 |
| | 5/19/2004 | 15,000 | $46.2133 | $693,199.50 |
| | 5/18/2004 | 15,000 | $44.8197 | $672,295.50 |
| | 5/13/2004 | 25,000 | $44.0000 | $1,100,000.00 |
| | 10/30/2003 | 55,000 | $57.3927 | $3,156,598.50 |
| | 9/16/2003 | 30,000 | $57.0852 | $1,712,556.00 |
| | 8/22/2003 | 50,000 | $57.6186 | $2,880,930.00 |
| | 1/31/2002 | 107 | $56.2500 | $6,018.75 |
| **TOTAL for Levy** | | **405,107** | | **$20,766,055.25** |
| | | | | |
| KGMW, LP | 8/17/2005 | 40,000 | $49.2586 | $1,970,344.00 |
| | 3/1/2005 | 20,000 | $50.0012 | $1,000,024.00 |
| | 6/6/2003 | 80,000 | $50.6100 | $4,048,800.00 |
| | 5/28/2003 | 100,000 | $43.4308 | $4,343,080.00 |
| | 11/22/2002 | 50,000 | $42.1679 | $2,108,395.00 |
| | 2/6/2002 | 20,000 | $58.8500 | $1,177,000.00 |
| **TOTAL for KGMW** | | **310,000** | | **$14,647,643.00** |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

153

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|---|---|---|---|---|
| Levy Family Trust | 9/1/2005 | 30,000 | Gift of shares to Charity | |
| | 8/2/2005 | 75,000 | $51.2675 | $3,845,062.50 |
| | 9/14/2004 | 25,000 | Shares Gifted from Levy Family Trust | |
| | 9/13/2004 | 25,000 | $40.0542 | $1,001,355.00 |
| | 8/20/2003 | 2,500 | Gift of shares on form 5 | |
| | 8/22/2003 | 50,000 | $57.6411 | $2,882,055.00 |
| | 8/25/2003 | 50,000 | $57.6411 | $2,882,055.00 |
| | 11/22/2002 | 25,000 | $42.1679 | $1,054,197.50 |
| | 11/22/2002 | 25,000 | $43.0500 | $1,076,250.00 |
| | 2/6/2002 | 40,000 | $58.4500 | $2,338,000.00 |
| | 8/6/2001 | 20,000 | $58.4200 | $1,168,400.00 |
| TOTAL for Levy Fam. Trust | | 367,500 | $408.6918 | $16,247,375.00 |
| | | | | |
| Levy Family Foundation | N/A | N/A | N/A | N/A |
| TOTAL | | 1,082,607 | | $63,504,886.00 |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|---|---|---|---|---|
| Marks, Michael | 5/9/2006 | 2,500 | $48.4500 | $121,125.00 |
| | 5/9/2006 | 2,500 | $48.6800 | $121,700.00 |
| | 5/9/2006 | 2,500 | $48.8300 | $122,075.00 |
| TOTAL | | 7,500 | | $364,900.00 |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|------------------------|-----------|----------------|
| Nichols, Stuart | 4/22/2002 | 3,000 | $63.8347 | $191,504.10 |
| | 4/30/2002 | 1,700 | $59.3785 | $100,943.45 |
| | 4/30/2002 | 1,000 | $59.3785 | $59,378.50 |
| | 11/13/2001 | 10,000 | $50.0855 | $500,855.00 |
| | 11/13/2001 | 454 | $50.5400 | $22,945.16 |
| TOTAL | | 16,154 | | $875,626.21 |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|------------------------|-----------|----------------|
| Schroeder, Kenneth L. | 2/8/2006 | 56,032 | $53.9155 | $3,020,993.30 |
| | 2/8/2006 | 30,000 | $53.9155 | $1,617,465.00 |
| | 11/30/2005 | 21,136 | $51.7382 | $1,093,538.60 |
| | 11/30/2005 | 28,864 | $51.7382 | $1,493,371.40 |
| | 11/4/2005 | 50,000 | $49.5026 | $2,475,130.00 |
| | 8/23/2005 | 35,304 | $49.6331 | $1,752,246.96 |
| | 8/23/2005 | 14,696 | $49.6331 | $729,408.04 |
| | 2/28/2005 | 43,968 | $50.4927 | $2,220,063.03 |
| | 12/3/2004 | 47,361 | $49.2846 | $2,334,167.94 |
| | 12/2/2004 | 2,639 | $47.5000 | $125,352.50 |
| | 1/28/2004 | 25,000 | $58.5754 | $1,464,385.00 |
| | 1/28/2004 | 25,000 | $58.5754 | $1,464,385.00 |
| | 12/16/2003 | 50,000 | $55.0800 | $2,754,000.00 |
| | 8/22/2003 | 50,000 | $57.8089 | $2,890,445.00 |
| | 8/19/2003 | 25,000 | $54.4537 | $1,361,342.50 |
| | 8/19/2003 | 25,000 | $54.4537 | $1,361,342.50 |
| | 8/15/2003 | 25,000 | $52.0009 | $1,300,022.50 |
| | 8/14/2003 | 25,000 | $52.0000 | $1,300,000.00 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          155

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|----------------------|-----------|----------------|
| | 8/4/2003 | 50,000 | $52.2500 | $2,612,500.00 |
| | 7/31/2003 | 241,000 | $52.7530 | $12,713,473.00 |
| | 6/6/2003 | 35,900 | $50.0917 | $1,798,292.03 |
| | 5/14/2002 | 35,000 | $60.2900[8] | $2,110,150.00 |
| | 3/4/2002 | 900 | $66.7900 | $60,111.00 |
| | 3/4/2002 | 1,000 | $66.7700 | $66,770.00 |
| | 3/4/2002 | 600 | $66.6000 | $39,960.00 |
| | 3/4/2002 | 8,000 | $66.7000 | $533,600.00 |
| | 3/4/2002 | 8,000 | $66.5000 | $532,000.00 |
| | 2/13/2002 | 30,000 | $58.1200 | $1,743,600.00 |
| | 2/4/2002 | 30,000 | $58.9065 | $1,767,195.00 |
| | 12/12/2001 | 30,000 | $55.0200 | $1,650,600.00 |
| | 12/11/2001 | 9,090 | $56.1350 | $510,267.15 |
| | 12/6/2001 | 30,000 | $56.3000 | $1,689,000.00 |
| | 12/5/2001 | 30,000 | $55.0718 | $1,652,154.00 |
| **TOTAL** | | **1,119,490** | | **$60,237,331.45** |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|----------------------|-----------|----------------|
| Tompkins, Jon | 8/29/2005 | 5,000 | $49.7500 | $248,750.00 |
| | 8/29/2005 | 5,000 | $49.7500 | $248,750.00 |
| | 8/29/2005 | 2,500 | $49.7500 | $124,375.00 |
| | 8/29/2005 | 2,500 | $49.7500 | $124,375.00 |
| | 3/12/2004 | 7,500 | $53.0000 | $397,500.00 |
| | 8/27/2003 | 5,000 | $58.3800 | $291,900.00 |

---

[8] Price not reported on Form 4. Price stated is the closing price on the date of sale.

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

156

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|----------------------|------------|----------------|
|  | 8/22/2003 | 5,000 | $57.8000 | $289,000.00 |
|  | 5/14/2002 | 5,100 | $60.3500 | $307,785.00 |
|  | 3/1/2002 | 3,000 | $60.9000 | $182,700.00 |
|  | 3/7/2002 | 3,000 | $67.0683 | $201,204.90 |
|  | 3/8/2002 | 5,000 | $70.0000 | $350,000.00 |
|  | 2/13/2002 | 10,000 | $60.7500 | $607,500.00 |
|  | 2/4/2002 | 5,000 | $58.1000 | $290,500.00 |
|  | 1/30/2002 | 10,000 | $55.3500 | $553,500.00 |
|  | 12/14/2001 | 1,891 | $51.4000 | $97,197.40 |
|  | 11/13/2001 | 20,000 | $50.0000 | $1,000,000.00 |
|  | 8/3/2001 | 10,000 | $58.5000 | $585,000.00 |
|  | 8/3/2001 | 10,000 | $58.5000 | $585,000.00 |
|  | 8/3/2001 | 2,000 | $50.9000 | $101,800.00 |
|  | 8/3/2001 | 10,000 | $51.0000 | $510,000.00 |
|  | 8/3/2001 | 6,000 | $50.9000 | $305,400.00 |
| **TOTAL for Tompkins** |  | **133,491** |  | **$7,402,237.30** |
| Trust | 2/27/2004 | 8,819 | $53.0000 | $467,407.00 |
| **TOTAL** |  | **142,310** |  | **$7,869,644.30** |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------------------|----------------------|------------|----------------|
| Urbanek, Lida | 2/27/2006 | 280 | $51.9310 | $14,540.68 |
|  | 12/14/2004 | 5,000 | $47.1658 | $235,829.00 |
| **TOTAL for Urbanek** |  | **5,280** |  | **$250,369.68** |
| Family Foundation | 12/12/2003 | 1,369 | $57.0000 | $78,033.00 |
|  | 8/6/2003 | 700 | $50.7100 | $35,497.00 |
|  | 8/6/2003 | 300 | $50.6300 | $15,189.00 |
|  | 5/6/2003 | 1,000 | $43.1900 | $43,190.00 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------|------|------|------|
| | 12/14/2001 | 500 | $52.0500 | $26,025.00 |
| TOTAL for Foundation | | 3,869 | | $197,934.00 |
| TOTAL | | 9,149 | | $448,303.68 |

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|------|------|------|------|------|
| Wallace, Richard | 12/3/2003 | 5,041 | $59.5382 | $300,132.07 |
| | 12/3/2003 | 2,709 | $59.5832 | $161,410.89 |
| | 12/3/2003 | 875 | $59.5832 | $52,135.30 |
| | 12/3/2003 | 875 | $59.5832 | $52,135.30 |
| | 12/3/2003 | 3,000 | $59.5832 | $178,749.60 |
| | 12/3/2003 | 2,500 | $59.5832 | $148,958.00 |
| | 12/3/2003 | 5,000 | $59.5832 | $297,916.00 |
| | 8/21/2003 | 18,667 | $54.8200 | $1,023,324.94 |
| | 8/21/2003 | 292 | $54.8200 | $16,007.44 |
| | 8/21/2003 | 291 | $54.8200 | $15,952.62 |
| | 8/21/2003 | 750 | $54.8200 | $41,115.00 |
| | 7/31/2003 | 1,292 | $52.6275 | $67,994.73 |
| | 7/31/2003 | 583 | $52.6275 | $30,681.83 |
| | 7/31/2003 | 4,207 | $52.6275 | $221,403.89 |
| | 7/31/2003 | 13,918 | $52.6275 | $732,469.55 |
| | 6/6/2003 | 1,250 | $50.8850 | $63,606.25 |
| | 6/6/2003 | 834 | $50.8850 | $42,438.09 |
| | 6/6/2003 | 2,500 | $50.8850 | $127,212.50 |
| | 6/6/2003 | 2,500 | $50.8850 | $127,212.50 |
| | 6/6/2003 | 2,167 | $50.8850 | $110,267.80 |
| | 6/6/2003 | 5,417 | $50.8850 | $275,644.05 |
| | 6/6/2003 | 3,500 | $50.8850 | $178,097.50 |
| | 6/6/2003 | 1,832 | $50.8850 | $93,221.32 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

158

| | Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | 5/16/2002 | 24 | $59.8100 | $1,435.44 |
| 3 | | 5/16/2002 | 525 | $59.8400 | $31,416.00 |
| 4 | | 5/16/2002 | 416 | $59.7750 | $24,866.40 |
| 5 | | 5/16/2002 | 84 | $59.7750 | $5,021.10 |
| 6 | | 5/16/2002 | 275 | $59.8400 | $16,456.00 |
| 7 | | 3/1/2002 | 4,766 | $60.8400 | $289,963.44 |
| 8 | | 3/1/2002 | 1,253 | $60.8400 | $76,232.52 |
| 9 | | 3/1/2002 | 1,250 | $60.8400 | $76,050.00 |
| 10 | | 3/1/2002 | 417 | $60.8400 | $25,370.28 |
| 11 | | 3/1/2002 | 542 | $60.8400 | $32,975.28 |
| 12 | | 2/13/2002 | 750 | $61.1000 | $45,825.00 |
| 13 | | 2/13/2002 | 574 | $61.0900 | $35,065.66 |
| 14 | | 2/13/2002 | 719 | $61.0900 | $43,923.71 |
| 15 | | 2/13/2002 | 281 | $61.0900 | $17,166.29 |
| 16 | | 2/13/2002 | 2,000 | $61.1200 | $122,240.00 |
| 17 | | 1/31/2002 | 32 | $56.2500 | $1,800.00 |
| 18 | | 12/10/2001 | 2,000 | $55.0900 | $110,180.00 |
| 19 | | 12/10/2001 | 1,625 | $55.1200 | $89,570.00 |
| 20 | | 12/10/2001 | 1,062 | $55.1200 | $58,537.44 |
| 21 | | 12/10/2001 | 163 | $55.1200 | $8,984.56 |
| 22 | | 12/10/2001 | 100 | $55.1210 | $5,512.10 |
| 23 | | 11/27/2001 | 4,000 | $52.0400 | $208,160.00 |
| 24 | | 11/27/2001 | 145 | $52.0500 | $7,547.25 |
| 25 | | 11/27/2001 | 1,667 | $52.0500 | $86,767.35 |
| 26 | | 11/27/2001 | 1,625 | $52.0500 | $84,581.25 |
| 27 | | 11/27/2001 | 1,875 | $52.0500 | $97,593.75 |
| 28 | | 8/7/2001 | 1,500 | $54.7400 | $82,110.00 |
| | | 8/7/2001 | 324 | $54.6800 | $17,716.32 |

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT

| Name | Transaction Date | Number of Shares sold | Sale price | Profit (Gross) | |
|---|---|---|---|---|---|
| | 8/7/2001 | 34 | $54.7000 | $1,859.80 | |
| | 8/7/2001 | 267 | $54.7600 | $14,620.92 | |
| | 8/7/2001 | 416 | $54.7000 | $22,755.20 | |
| **TOTAL** | | **110,711** | | **$6,100,390.22** | |

| GRAND TOTAL FOR ALL LISTED RECIPENTS | | 2,930,458 | | $156,454,706.86 | |
|---|---|---|---|---|---|

314.    Since this fraudulent scheme had commenced by at least 1997, no meaningful comparison of prior trading patterns can be performed.  However, the Class Period trades were highly suspicious.  In particular, several of the defendants sold shares in May 2006, after some preliminary reports that companies were backdating options and just weeks before the first news that KLA was possibly among the list of companies engaging in such conduct.

315.    Defendants clearly had the opportunity to perpetrate the fraudulent scheme described herein by virtue of their positions at the Company and roles in the backdating scheme as alleged herein.

**5.    The Pervasiveness Of The Fraudulent Conduct And The Nature Of The Accounting Rules At Issue Further Support A Strong Inference Of *Scienter***

316.    The duration, magnitude and pervasiveness of the scheme support a strong inference of fraudulent conduct on the part of the Company and the Individual Defendants. KLA admits that the backdating occurred from 1997 forward and that the retroactive pricing of stock options affected all employees who received options.  Further, as a result of defendants' improper reporting of backdated options, *the financial results for fiscal years 2002 through 2006 have been restated*.  To date, in the Restatement, the Company recorded additional pre-tax, non-cash, stock-based compensation expense of (a) $348 million for the periods July 1, 1994 to June 30, 2005 under APB No. 25; and (b) $28 million for the period from July 1, 2005 through December 31, 2006 under SFAS No. 123(R).

317.  A strong inference of *scienter* is further supported by the nature of the accounting rules at issue.  As a preliminary matter, the accounting rules at issue – APB No. 25 and SFAS 123(R) – were simple and straightforward in application.

318.  Moreover, the issue of how to account for officer, director and employee stock option grants was a particularly highly charged and prominent issue for KLA during the Class Period.

(a)  After more than a decade of debate, FASB considered complete adoption of SFAS 123 in 2004.  In March 2004, FASB issued the March 2004 Exposure Draft ("March 2004 ED"), *Share-Based Payment*, which amended FAS 123 *Accounting for Stock-Based Compensation* and FAS 95 *Statement of Cash Flows*.  If adopted, these changes would require compensation costs for options granted to be recognized in financial statements using the fair value at the grant date.  After the release of the March 2004 ED, FASB accepted comments on the proposed standard through June 30, 2004.  In response, many companies, including KLA, entered the debate to vehemently oppose the proposed changes.

(b)  KLA was a very active participant in efforts to convince FASB not to change the rule on reporting employee stock option expenses.  Indeed, KLA sent letters to FASB during the comment period to voice the Company's opposition to the proposed rule changes.  In one letter, Maureen Lamb, KLA's Vice President of Finance at the time, not only expressed KLA's position with regard to the expensing of stock options but also misrepresented the Company's practices regarding option grants:

> Maureen Lamb, then a vice president, finance, wrote that while there were flaws in the accounting rules for stock-based compensation, "the politically charged belief that the blame lies with executives unwilling to give up their ill-begotten compensation is backward and unproductive."
>
> Ms. Lamb, who is no longer with the company, added that ***"KLA-Tencor does not currently have the ability to issue any equity-based compensation other than at-the-money stock options"***[9]

---

[9] "FASB Appears In a New Light On Stock Options: Some Companies That Opposed Expensing Rule Are Caught Up In U.S. Probe on 'Backdating,'" by David Reilly, *The Wall Street Journal*, August 14, 2006.

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                 161

1    (Emphasis added.)

2              (c)    In its public filings, the Company specifically acknowledged the

3    importance of the accounting rules relating to option grants. For example, in its 2005 Form 10-

4    K, the Company represented that the "adoption of SFAS No. 123(R) which would require us to

5    measure all employee stock-based compensation awards using a fair value method beginning in

6    fiscal year 2006 and record such expense in our consolidated financial statements will have a

7    material impact on our consolidated financial statements as reported under generally accepted

8    accounting principles in the United States." It also states that it will have a "material impact on

9    the Company's consolidated results of operations, financial position and statement of cash

10   flows."

11             319.   Significantly, defendants' knowledge and intent with respect to backdating of

12   stock options is further supported by the fact that such conduct occurred at other companies

13   with which they were involved:

14             (a)    Levy is currently on the Board of Directors of Juniper Networks, Inc.

15   According to Juniper Networks' 2006 Proxy Statement, filed on April 10, 2006, Levy has

16   served as a member of the Board of Directors since 2003. He is a member of Juniper Networks'

17   Compensation Committee and Nominating and Governance Committee. The DOJ has launched

18   an investigation into Juniper's option grants. Moreover, Juniper has admitted that "there were

19   numerous instances in which grant dates were chosen with the benefit of hindsight as to the

20   price of the company's stock, so as to give favorable prices," that prior financial results need to

21   be restated and that it anticipates recording additional non-cash stock-based compensation

22   expense of approximately $900 million.

23             (b)    Levy is also currently on the Board of Directors of Extreme Networks,

24   Inc. According to Extreme Networks' 2005 Proxy Statement, Levy has served as a director on

25   the Board of Directors since October 2001. He has served on Extreme Network's Audit

26   Committee, Compensation Committee and Nominating and Corporate Governance Committee.

27   The DOJ has launched an investigation into Extreme Network's option grants. Moreover,

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                    162

1  Extreme Networks has admitted that it would take charges on option restatements, therefore, its

2  financial reports relating to fiscal periods 2000 through 2005 and the first, second and third

3  quarters of 2006 should no longer be relied upon.  Extreme Network's special committee had

4  "reached a preliminary conclusion that the appropriate measurement dates for financial

5  accounting purposes of certain stock option grants differ from the recorded grant dates of those

6  awards" and "additional non-cash charges for stock-based compensation expense will be

7  required that will be material with respect to certain fiscal periods."

8          (c)     Barnholt is currently on the Board of Directors of Adobe Systems Inc.

9  According to Adobe Systems' 2006 Proxy Statement, filed on February 24, 2006, Barnholt has

10  served as a director on the Board of Directors since 2005.  Adobe has announced "certain

11  instances relating to grants made to employees where the list of employees and/or shares

12  allocated to them was not sufficiently definitive for the grant to be deemed final as of the

13  reported grant date" and that "adjustments were made to some employees grants after the grant

14  date without a corresponding change to the measurement date."  On January 4, 2007, Adobe

15  announced that it "has recently determined that certain stock options were granted, for

16  accounting purposes, with an exercise price that is less than the fair market value of the Adobe

17  common stock subject to such options on the applicable 'measurement date."

18          (d)     Morton is currently on the Board of Directors of BEA Systems

19  Incorporated.  According to BEA System's 2006 Proxy Statement, Morton has served as a

20  director of the BEA Systems since March 1996.  He has served on BEA Systems' Audit

21  Committee and Nominating and Governance Committee.  Morton has also served as Chair of

22  the Audit Committee of the company.  In December 2006, BEA Systems admitted in a Form 8-

23  K filed with the SEC that the actual measurement dates for certain stock options differed from

24  the recorded measurement dates for those options and that "the difference in these measurement

25  dates will result in material non-cash, stock-based compensation expenses."  On February 14,

26  2007, BEA Systems filed a Form 8-K with the SEC announcing that it "expects that it will

27  restate its financial statements from Fiscal 1998 through its first quarter of fiscal 2007 and that

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          163

1    it will record non-cash compensation expense, on a pre-tax basis, of between $340 and $390

2    million."

3                    (e)      Morton served on the Board of Directors of The Clorox Company.

4    Morton served as a director of that company from at least fiscal year 1997 to 2002.  He served

5    on The Clorox Company's Executive Committee, Finance Committee, Compensation

6    Committee and Board Administration and Public Policy Committee.  Morton also served as the

7    Chair of the Compensation Committee for the company.  On August 2, 2006, The Clorox

8    Company announced in a press release that it would take a $25 million pre-tax charge for stock-

9    based compensation expense for the fourth quarter ended June 30, 2006, following a review of

10    its historical stock option granting practices.

11          **E.      LOSS CAUSATION**

12          320.    Defendants' scheme operated as a fraud or deceit on Lead Plaintiffs and the

13    members of the Class because the false and misleading statements artificially inflated KLA's

14    securities prices.  Indeed, the false and misleading representations concerning KLA's financial

15    results and management compensation – plus the non-disclosures of material facts concerning

16    the Company's violation of Company and SEC policies and accounting regulations regarding

17    compensation expenses – caused and maintained the artificial inflation in KLA securities prices

18    throughout the Class Period and until the truth was slowly revealed to the market.

19          321.    When defendants' prior misrepresentations and fraudulent conduct began to be

20    disclosed and started to become apparent to the market, KLA's stock declined as the prior

21    artificial inflation came out of KLA's securities prices.

22          322.    These disclosures and public revelations about the stock option abuses at KLA

23    did not come to light all at once but came from a variety of sources over a period of time.  For

24    example, *The Wall Street Journal* published a front-page article in May 2006 exposing

25    fortuitously timed stock option grants to former KLA executives Levy and Schroeder.

26          323.    As investors and the market became aware of the true facts, which had been

27    concealed by defendants, the prior artificial inflation came out of KLA's securities prices.

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              164

1  From the very first announcement of potential backdating on May 22, 2006, the market has

2  reacted to the news and the stock price has fallen as the prior artificial inflation was slowly

3  removed from the value of KLA's securities. ***Significantly, the stock lost approximately $935***

4  ***million in market capitalization*** when KLA's common stock price plummeted from a closing

5  price of $45.24 per share on May 19, 2006 to a closing price of $40.54 ***after the May 22, 2006***

6  ***announcement on heavy volume of 13,615,220 shares traded - which was three times the***

7  ***average trading volume for the prior three months.*** These stock drops caused real economic

8  loss to investors who had purchased the securities during the Class Period.

9      324.    The totality of the circumstances around KLA's stock price drops combine to

10  negate any inference that the economic loss suffered by Lead Plaintiffs and the other members

11  of the Class was caused by changed market conditions, macroeconomic or industry factors or

12  KLA-specific facts unrelated to defendants' fraudulent conduct.    While there was some post-

13  Class Period rebound of KLA's stock price, these price increases were attributable to

14  defendants' statements downplaying the fraud, new market conditions, macroeconomic or other

15  factors and Company-specific facts unrelated to the fraudulent conduct alleged herein.

16      325.    As a result of their purchases of KLA securities during the Class Period, Lead

17  Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the

18  federal securities laws.    The economic loss was a direct result of the fraudulent scheme to

19  artificially inflate KLA's securities prices and the subsequent significant decline in the value of

20  KLA's securities when the truth was revealed.

21      326.    The resulting decline in KLA's stock price was foreseeable at the time of

22  defendants' misrepresentations.    Indeed, despite being aware of the consequences of their

23  fraudulent conduct, defendants nevertheless knowingly backdated options and engaged in the

24  other alleged misconduct, which, when the truth emerged, caused the stock price to decline.

25      327.    KLA's stock had been negatively affected by the growing stock option

26  backdating controversy. The declines in KLA's stock price at the end of the Class Period was a

27  direct result of defendants' fraudulent conduct alleged herein finally being revealed to KLA's

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                165

1  investors and the market.  A company's ultimate destiny is dependent on the integrity of

2  management.  In this particular case, the backdating of stock option grants to increase the

3  profitability of the options is a classic example of loss of confidence on the part of investors

4  since management is effectively taking from the Company in order to line their own pockets.

5  **F.    PRESUMPTION OF RELIANCE**

6  328.    At all relevant times, the market for KLA's publicly traded securities was an

7  efficient market for the following reasons, among others:

8  (a)    The Company's common stock met the requirements for public listing

9  and was listed and actively traded on the NASDAQ, a highly efficient market.

10  (b)    As a regulated issuer, the Company filed reports with the SEC.

11  (c)    The Company regularly issued press releases, which were carried by

12  national news wires.  Each of these releases was publicly available and entered the public

13  marketplace.

14  (d)    The Company's stock was followed by numerous analysts.

15  329.    As a result, the market for the Company's publicly traded securities promptly

16  digested current information with respect to KLA from all publicly available sources and

17  reflected such information in the price of the Company's securities.  Under these circumstances,

18  all purchasers of the Company's publicly traded securities during the Class Period suffered

19  similar injury through their purchase of KLA's publicly traded securities at artificially inflated

20  prices and a presumption of reliance applies.

21  **G.    NO SAFE HARBOR**

22  330.    The statutory safe harbor provided for forward-looking statements under certain

23  circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

24  None of the specific statements alleged herein are forward looking.  Many of the specific

25  statements alleged herein were not identified as "forward-looking statements" when made.  To

26  the extent there were any forward-looking statements, there were no meaningful cautionary

27  statements identifying important factors that could cause actual results to differ materially from

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                          166

1    those in the purportedly forward-looking statements.  Alternatively, to the extent that the

2    statutory safe harbor does apply to any forward-looking statement, these statements are

3    actionable because, at the time any forward-looking statement was made, the particular speaker

4    knew that the particular forward-looking statement was false and/or the forward-looking

5    statement was authorized and/or approved by an executive officer of KLA who knew that those

6    statements were false when made.

7                                    **Claims For Relief**

8                                       **COUNT I**

9    **(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
     Thereunder Against All Defendants)**

10

11         331.    Lead Plaintiffs repeat and restate each and every allegation contained in the

12   foregoing paragraphs as if fully set forth herein.

13         332.    The defendants named in this count include KLA, Wallace, Schroeder, Levy,

14   Dickerson, Kispert, Hall, Urbanek, Marks, Barnholt, Bond, Bingham, Elkus, Kaufman, Morton,

15   Tompkins, Nichols and Boehlke.

16         333.    During the Class Period, defendants carried out a plan, scheme and course of

17   conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing

18   public, including Lead Plaintiffs and the other members of the Class, as alleged herein; (b)

19   artificially inflate the market price of KLA's securities; and (c) cause Lead Plaintiffs and the

20   other members of the Class to purchase KLA's securities at artificially inflated prices.

21         334.    In furtherance of this unlawful scheme, plan and course of conduct, defendants,

22   individually and jointly, took the actions set forth herein.  Indeed, defendants: (a) employed

23   devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or

24   omitted to state material facts necessary to make the statements made not misleading; and (c)

25   engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the

26   purchasers of the Company's securities in an effort to create and maintain artificially high

27   market prices for KLA's securities in violation of Section 10(b) of the Exchange Act and Rule

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              167

1    10b-5 promulgated thereunder.  Each of the defendants was a direct, necessary and substantial

2    participant in the common course of conduct alleged herein.

3        335.    In addition to the duties of full disclosure imposed on defendants as a result of

4    their making affirmative statements and reports to the investing public, defendants had a duty to

5    promptly disseminate truthful information that would be material to investors in compliance

6    with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17

7    C.F.R. §210.1-01, *et seq.*) and Regulation S-K (17 C.F.R. §229.10, *et seq.*) and other SEC

8    regulations, including accurate and truthful information with respect to the Company's financial

9    condition, earnings and expenses, officer and director compensation and management integrity

10   so that the market price of the Company's securities would be based on truthful, complete and

11   accurate information.

12       336.    Defendants, directly and indirectly, by the use, means or instrumentalities of

13   interstate commerce and/or of the mails, engaged and participated in a continuous course of

14   conduct to misrepresent and to not disclose adverse material information about KLA's financial

15   condition, stock option grants, officer and director compensation and management integrity as

16   detailed herein.

17       337.    Defendants employed devices, schemes and artifices to defraud while in

18   possession of material adverse non-public information and engaged in acts, practices and a

19   course of conduct as alleged herein in an effort to deceive and/or mislead concerning KLA's

20   stock options, officer and director compensation, financial condition and management integrity.

21   Said schemes, devices, acts and artifices included: (a) the making of or participation in the

22   making of untrue statements; (b) the omitting of material facts necessary in order to make the

23   statements made, in light of the circumstances under which they were made, not misleading;

24   and (c) engaging in transactions, practices and a course of conduct which operated as a fraud

25   and deceit upon the purchasers of KLA's securities during the Class Period.  For example,

26   defendants (a) concealed the fact that defendants were allowing insiders to manipulate the

27   Company's stock option plans; (b) obtained and/or allowed KLA officers and directors to obtain

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                                            168

1    options using improper exercise prices in violation of its own policies and failed to properly

2    expense compensation derived therefrom; (c) engaged in insider trading and/or allowed KLA

3    officers and directors to trade securities based on material non-public information, which

4    trading was contemporaneous with purchases by members of the Class; and (d) allowed

5    themselves and others to retain executive and directorial positions at KLA and the profits,

6    power and prestige, which defendants enjoyed as a result of these positions.

7         338.   Defendants' material misrepresentations, omissions and acts in furtherance of the

8    fraud were done knowingly or with deliberate recklessness and for the purpose and effect of

9    misrepresenting KLA's financial condition, stock option grants, officer and director

10   compensation and management integrity to the investing public and thereby artificially inflating

11   the price of KLA's securities.

12        339.   As a result of the above alleged fraudulent scheme and dissemination of the

13   materially false and misleading information regarding KLA's financial results, officer and

14   director compensation and management integrity, the market price of KLA's securities was

15   artificially inflated prior to and during the Class Period.  In ignorance of the fact that market

16   prices of KLA's publicly traded securities were artificially inflated and relying, directly or

17   indirectly, on the false and misleading statements made by defendants or upon the integrity of

18   the market in which the securities traded and/or on the absence of material adverse information,

19   Lead Plaintiffs and the other members of the Class acquired KLA securities during the Class

20   Period at artificially high prices and were damaged thereby.

21        340.   By virtue of the foregoing, defendants have violated Section 10(b) of the

22   Exchange Act and Rule 10b-5 promulgated thereunder.

23        341.   At the time of said misrepresentations and omissions, Lead Plaintiffs and the

24   other members of the Class were ignorant of their falsity and believed them to be true.  Had

25   Lead Plaintiffs and the other members of the Class and the marketplace known of the true

26   financial condition of the Company and of its stock option fraud, officer and director

27   compensation and management integrity issues, Lead Plaintiffs and the other members of the

28

1    Class would not have purchased or otherwise acquired the KLA securities or, if they had

2    purchased and/or otherwise acquired such securities during the Class Period, they would not

3    have done so at the artificially inflated prices that they paid.

4        342.    As the truth about the extent and severity of KLA's stock option abuses, false

5    and misleading financials and harm to its reputation and credibility in the market started to be

6    released and become apparent to the market, KLA's common stock price plummeted as the

7    prior artificial inflation came out of the Company's stock price.  This price decline occurred as

8    the markets continued to digest the impact and meaning of defendants' stock option and other

9    schemes and its impact on KLA.  All or a significant portion of the decrease in KLA's stock

10   price was due to the disclosure, revelation and/or leakage of information inconsistent with

11   defendants' prior financial disclosures and other Company filings and releases.  This drop

12   removed the inflation from KLA's stock price, causing real economic loss and damage to

13   investors who had purchased the stock during the Class Period.

14       343.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs

15   and the other members of the Class suffered damages in connection with their respective

16   purchases and sales of the Company's securities during the Class Period.

17                                        **COUNT II**

18          **(Violations of Section 20(a) of the Exchange Act Against The Individual**
                                          **Defendants)**
19

20       344.    Lead Plaintiffs repeat and restate each and every allegation contained in the

21   foregoing paragraphs as if fully set forth herein.

22       345.    The defendants named in this count, including Wallace, Schroeder, Levy,

23   Dickerson, Hall, Kispert, Urbanek, Marks, Barnholt, Bond, Bingham, Elkus, Kaufman, Morton,

24   Tompkins, Nichols and Boehlke, acted as controlling persons of KLA within the meaning of

25   §20(a) of the Exchange Act.  By reason of their high-level positions with the Company, their

26   ownership of KLA stock, their participation in and/or awareness of the Company's operations

27   and/or intimate knowledge of the fraudulent scheme, the false financial statements and

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              170

misrepresentations regarding stock options and executive compensation filed with the SEC and disseminated to the investing public and their participation in the fraudulent acts and/or awareness of such acts, these defendants had the power and authority to control and cause KLA and its employees to engage in the wrongful conduct complained of herein.  By reason of such conduct, the defendants named herein are liable pursuant to §20(a) of the Exchange Act.

346.    As set forth above, KLA and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

347.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period, upon disclosure of the truth.

## COUNT III

### (Negligent Violations of Section 14(a)of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against All Defendants)

348.    Lead Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except allegations of fraud or intent which are not necessary to assert this Claim.  For purposes of this Claim only, Lead Plaintiffs assert negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

349.    Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 USCS §78l]."  Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no Proxy Statement shall

1   contain "any statement which, at the time and in the light of the circumstances under which it is

2   made, is false or misleading with respect to any material fact, or which omits to state any

3   material fact necessary in order to make the statements therein not false or misleading or

4   necessary to correct any statement in any earlier communication with respect to the solicitation

5   of a proxy for the same meeting or subject matter which has become false or misleading." 17

6   C.F.R. §240.14a-9(a).

7       350.    During the Class Period, Lead Plaintiffs and other KLA's shareholders were

8   solicited to vote to elect certain directors, among other proposals. In 2004, in addition to voting

9   on the election of directors, KLA shareholders were also solicited to approve the Company's

10  2004 Equity Incentive Plan, which included approval of its material terms and performance

11  goals for the purposes of IRC Section 162(m). In 2005, KLA shareholders were solicited to

12  "approve the Company's [IRC] Code Section 162(m) Performance Bonus Plan." A shareholder

13  vote was required to approve these proposals and elect these directors.

14      351.    The 2001-2005 Proxy Statements violated Section 14(a) and Rule 14a-9 because

15  they (a) contained false and misleading statements regarding the terms of KLA's grants of stock

16  options pursuant to KLA's Stock Option Plans; (b) misrepresented that the stock options

17  exercise prices would be the Company's stock price market price on the date of the grants

18  when, in fact, the options were backdated to a date when the Company's stock price was lower

19  than on the actual grant date; (c) contained false and misleading statements regarding the

20  directors' compensation; (d) misrepresented that the Company complied with IRC Section

21  162(m), 28 U.S.C. §162(m); (e) contained false and misleading statements regarding the stated

22  philosophy of KLA's Compensation Committee on executive compensation; and (f) contained

23  false and misleading statement regarding management's integrity.

24      352.    At the time of the materially false and misleading 2001 though 2005 Proxy

25  Statements, KLA shareholders were ignorant of the true facts. These facts would have been

26  material to a reasonable investor or shareholder in considering how to vote on the election of

27  directors, the approval of the 2004 Equity Incentive Plan or the approval of the Company's IRC

28

1   Section 162(m) Performance Bonus Plan.  Thus, the shareholders' corporate suffrage rights

2   were violated.

3       353.    Each of the Individual Defendants permitted the use of his or her name to solicit

4   the proxies.  In the exercise of reasonable care, defendants should have known that the Proxy

5   Statements were materially false and misleading.

6       354.    The misrepresentations in the Proxy Statements were material to KLA

7   shareholders in voting on each Proxy Statement.  The Proxy Statements were an essential link

8   in the accomplishment of the continuation of defendants' unlawful stock option backdating

9   scheme, as revelations of the truth would have immediately thwarted a continuation of

10  shareholders' endorsement of the directors' elections and positions as well as approval of the

11  2004 Equity Incentive Plan and the IRC Section 162(m) Performance Bonus Plan.

12      355.    Lead Plaintiffs and other members of the Class suffered injury as a result of the

13  material misrepresentations and omissions in the 2001-2005 Proxy Statements.

14                                    **COUNT IV**

15  **(Fraudulent Violations of Section 14(a)of the Exchange Act and Rule 14a-9 Promulgated
    Thereunder Against All Defendants)**

16

17      356.    Lead Plaintiffs allege a separate and distinct claim herein under Section 14(a) of

18  the Exchange Act for defendants' fraudulent conduct, as opposed to the prior count, which

19  alleges claims for negligent misrepresentations.  Lead Plaintiffs repeat and restate each and

20  every allegation contained in the foregoing paragraphs as if fully set forth herein.  For purposes

21  of this Claim, Lead Plaintiffs assert violations of Section 14(a) for conduct that was fraudulent

22  in nature.

23      357.    While Section 14(a) of the Exchange Act gives rise to liability for negligent

24  misrepresentation, plaintiffs also argue that defendants' intentional violation of Section 14(a)

25  gives rise to a claim under Section 14(a) as well.

26      358.    During the Class Period, Lead Plaintiffs and other KLA shareholders were

27  solicited to vote to elect certain directors, among other proposals.  In 2004, in addition to voting

28

[06-cv-04065-MJJ] CONSOLIDATED FEDERAL
SECURITIES CLASS ACTION COMPLAINT                                              173

1   on the election of directors, KLA shareholders were also solicited to approve the Company's

2   2004 Equity Incentive Plan, which included approval of its material terms and performance

3   goals for the purposes of IRC Section 162(m). In 2005, KLA shareholders were solicited to "to

4   approve the Company's [IRC] Section 162(m) Performance Bonus Plan." A shareholder vote

5   was required to approve these proposals and elect these directors.

6        359.    The 2001-2005 Proxy Statements violated Section 14(a) and Rule 14a-9 because

7   they (a) contained false and misleading statements regarding the terms of KLA's grants of stock

8   options pursuant to KLA's Stock Option Plans; (b) misrepresented that the stock options

9   exercise prices would be the Company's stock market price on the date of the grants when, in

10  fact, the options were backdated to a date when the Company's stock price was lower than on

11  the actual grant date; (c) contained false and misleading statements regarding the directors'

12  compensation; (d) misrepresented that the Company complied with IRC Section 162(m), 28

13  U.S.C. §162(m); (e) contained false and misleading statements regarding the stated philosophy

14  of KLA's Compensation Committee on executive compensation; and (f) contained false and

15  misleading statement regarding management's integrity.

16       360.    At the time of the materially false and misleading 2001-2005 Proxy Statements,

17  KLA shareholders were ignorant of the true facts. These facts would have been material to a

18  reasonable investor or shareholder in considering how to vote on the election of directors, the

19  approval of the 2004 Equity Incentive Plan or the approval the Company's IRC Section 162(m)

20  Performance Bonus Plan. Thus, the shareholders' corporate suffrage rights were violated.

21       361.    Each of the Individual Defendants permitted the use of his or her name to solicit

22  the proxies. As detailed above, Defendants knew and/or were deliberately reckless in not

23  knowing that the Proxy Statements were materially false and misleading.

24       362.    The misrepresentations in the Proxy Statements were material to KLA

25  shareholders in voting on each Proxy Statement. The Proxy Statements were an essential link

26  in the accomplishment of the continuation of defendants' unlawful stock option backdating

27  scheme, as revelations of the truth would have immediately thwarted a continuation of

28

1   shareholders' endorsement of the directors' elections and positions as well as approval of the

2   2004 Equity Incentive Plan and the IRC Section 162(m) Performance Bonus Plan.

3       363.   Lead Plaintiff and other members of the Class suffered injury as a result of the

4   material misrepresentations and omissions in the 2001-2005 Proxy Statements.

5   **COUNT V**

6   **(Violations of Section 20A of the Exchange Act Against KLA, Wallace, Levy, Schroeder,**

    **Dickerson, Kaufman, Kispert, Elkus, Hall, Barnholt, Urbanek, Tompkins,**

7   **Nichols, Marks, Bingham, Morton and Bond)**

8       364.   Lead Plaintiffs repeat and restate each and every allegation contained in the

9   foregoing paragraphs as if fully set forth herein.

10      365.   The defendants named in this Count are the defendants who: (a) granted or

11  received backdated options; (b) exercised the backdated options; and/or (c) otherwise sold KLA

12  stock during the Class Period and include KLA, Wallace, Levy, Schroeder, Dickerson,

13  Kaufman, Kispert, Elkus, Hall, Barnholt, Urbanek, Tompkins, Nichols, Marks, Bingham,

14  Morton and Bond.

15      366.   Lead Plaintiffs purchased at least one KLA stock contemporaneously with (a) the

16  grant of backdated options to defendants; (b) defendants' exercise of backdated options; and/or

17  (c) sales of KLA stock by defendants named in this Count.

18      367.   By virtue of their positions at KLA and the specific facts alleged herein, these

19  defendants were in possession of material, adverse, non-public information about KLA

20  contemporaneously with when backdated options were granted and/or exercised and/or

21  defendants sold their KLA stock to Lead Plaintiffs and members of the Class at artificially

22  inflated prices.   For example, defendants were in possession of the material, non-public

23  information regarding (a) the falsity of the Company's financial statements; and (b) the

24  misrepresentations regarding the value of options granted to officers and directors.

25      368.   As alleged above, each of the defendants violated Sections 10(b), 14(a) and/or

26  20(a) of the Exchange Act.

27      369.   These defendants violated Section 20A of the Exchange Act and applicable rules

28

1    and regulations thereto by granting and/or receiving backdated options, exercising backdated

2    options and/or selling KLA stock while in possession of material, non-public information about

3    the adverse information detailed herein.

4        370.    Lead Plaintiffs and other members of the Class who traded in KLA securities

5    contemporaneously with the grants, exercise of backdated options and/or sales of KLA stock by

6    defendants named in this Count have suffered substantial damages in that they paid artificially

7    inflated prices for KLA stock as a result of the violations of Sections 10(b), 14(a) and 20(a) and

8    Rule 10b-5 and Rule 14a-9 herein described.  Moreover, these Class members would not have

9    traded KLA securities at the prices they paid or received, or at all, if they had been aware that

10   the market prices had been artificially inflated by defendants' false and misleading statements

11   and scheme to defraud.

12       371.    The defendants named in this Count are required to account for all such stock

13   sales and to disgorge their profits or ill-gotten gains.

### Prayer For Relief

15   **WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

16       A.    Determining that this action is a proper class action, certifying Lead Plaintiffs as

17   class representatives under Rule 23 of the Federal Rules of Civil Procedure and appointing Lead

18   Plaintiffs' Counsel as Class Counsel;

19       B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other

20   members of the Class against defendants for all damages sustained as a result of defendants'

21   wrongdoing in an amount to be proven at trial, including pre-judgment and post-judgment

22   interest thereon;

23       C.    Awarding disgorgement of all insider trading profits in favor of Lead Plaintiffs

24   and the other members of the Class who purchased contemporaneously with defendants;

25       D.    Awarding preliminary and permanent injunctive relief in favor of Lead Plaintiffs

26   and the Class members against defendants, including relief in the form of an order (i) declaring

27   the proxies null and void; (ii) nullifying the corporate action taken as a result of the proxy vote;

28

1  (iii) rescinding the amendment to the stock option plan; (iv) declaring the backdated option

2  grants null and void; (v) granting an accounting for and imposition of a constructive trust and/or

3  an asset freeze on defendants' ill-gotten gains; (vi) increasing shareholder participation in

4  decisions regarding all executive compensation; and/or (vii) granting reforms that raise the

5  competency level of directors.

6       E.    Awarding Lead Plaintiffs and the other members of the Class their reasonable

7  costs and expenses incurred in this action, including counsel fees and expert fees; and

8       F.    Such other and further relief as the Court may deem just and proper.

9                   **Demand For Trial By Jury**

10      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiffs hereby

11  demand trial by jury of all issues that may be so tried.

12  DATED: March 6, 2007             **BERMAN DEVALERIO PEASE TABACCO**
                                    **BURT & PUCILLO**

13

14                      By:    /s/ NicoleLavallee
                            NICOLE LAVALLEE

15                      Joseph J. Tabacco, Jr.
                      Christopher T. Heffelfinger

16                      Lesley Hale
                      425 California Street, Suite 2100

17                      San Francisco, CA  94104-2205
                      Telephone: (415) 433-3200

18                      Facsimile:  (415) 433-6382

19                      **Member of Plaintiffs' Executive Committee and
                      Liaison Counsel**

20

21                      **KOHN, SWIFT & GRAF, P.C.**
                      Denis F. Sheils

22                      Joseph C. Kohn
                      William E. Hoese

23                      One South Broad Street, Suite 2100
                      Philadelphia, PA  19107

24                      Telephone:  (215) 238-1700
                      Facsimile:   (215) 238-1968

25                      Email: dsheils@kohnswift.com
                      Email: jkohn@kohnswift.com

26                      Email: whoese@kohnswift.com

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BERGER & MONTAGUE, P.C.**
Sherrie R. Savett
Douglas M. Risen
1622 Locust Street
Philadelphia, PA  19103
Telephone: (215) 875-3000
Facsimile:  (215) 875-4604
Email: ssavett@bm.net
Email: drisen@bm.net

**TRUJILLO RODRIGUEZ**
  **& RICHARDS LLC**
Kenneth I. Trujillo
Ira Neil Richards
Kathryn C. Harr
1717 Arch Street, Suite 3838
Philadelphia, PA  19103
Telephone: (215) 731-9004
Facsimile:  (215) 731-9044
Email: KTrujillo@trrlaw.com
Email: IRichards@trrlaw.com
Email: Kharr@trrlaw.com

**Members of Plaintiffs' Executive Committee**

# Exhibit A

### KLA-Tencor, Inc.
### Analysis of Stock Option Restatement Impact

Quarterly Data (from previous 10-K filings):
All data in 000s, except per share data

| | Originally Reported | | | | Restatement Charges | | As Restated | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Operating Income | Net Income (Loss) | EPS | Avg Shares | Operating Income | Net Income (Loss) | Operating Income | % Change | Net Income (Loss) | EPS | % Change |
| FY 1995 Annual | $ 156,609 | $ 104,811 | $ 1.34 | 78,427 | $ (2,904) | $ (1,866) | $ 153,705 | (2%) | $ 102,945 | $ 1.31 | (2%) |
| FY 1996 Annual | $ 296,266 | $ 196,634 | $ 2.34 | 84,195 | $ (2,747) | $ (1,764) | $ 293,519 | (1%) | $ 194,870 | $ 2.31 | (1%) |
| FY 1997 Annual | $ 145,832 | $ 105,396 | $ 1.24 | 85,203 | $ (2,852) | $ (1,816) | $ 142,980 | (2%) | $ 103,580 | $ 1.22 | (2%) |
| FY 1998 Annual | $ 164,631 | $ 134,096 | $ 1.52 | 88,522 | $ (5,219) | $ (3,358) | $ 159,412 | (3%) | $ 130,738 | $ 1.48 | (3%) |
| FY 1999 Annual | $ (10,334) | $ 39,212 | $ 0.21 | 183,344 | $ (17,630) | $ (11,576) | $ (27,964) | (171%) | $ 27,636 | $ 0.15 | (30%) |
| FY 2000 Annual | $ 311,541 | $ 253,798 | $ 1.32 | 192,564 | $ (23,296) | $ (16,098) | $ 288,245 | (7%) | $ 237,700 | $ 1.23 | (6%) |
| FY 2001 Annual | $ 458,468 | $ 66,683 | $ 0.34 | 193,435 | $ (59,261) | $ (41,999) | $ 399,207 | (13%) | $ 24,684 | $ 0.13 | (63%) |
| FY 2002 Annual | $ 244,893 | $ 216,166 | $ 1.10 | 196,594 | $ (76,582) | $ (50,482) | $ 168,311 | (31%) | $ 165,684 | $ 0.84 | (23%) |
| FY 2003 Annual | $ 138,722 | $ 137,191 | $ 0.70 | 194,785 | $ (70,032) | $ (43,196) | $ 68,690 | (50%) | $ 93,995 | $ 0.48 | (31%) |
| FY 2004 Annual | $ 297,358 | $ 243,701 | $ 1.21 | 201,799 | $ (53,728) | $ (31,225) | $ 243,630 | (18%) | $ 212,476 | $ 1.05 | (13%) |
| FY 2005 Q1 | $ 156,967 | $ 116,405 | $ 0.58 | 199,969 | $ (10,407) | $ (6,133) | $ 146,560 | (7%) | $ 110,272 | $ 0.55 | (5%) |
| Q2 | $ 155,508 | $ 122,077 | $ 0.61 | 200,946 | $ (7,175) | $ (55) | $ 148,333 | (5%) | $ 122,022 | $ 0.61 | (0%) |
| Q3 | $ 154,847 | $ 123,163 | $ 0.61 | 202,329 | $ (11,212) | $ (6,276) | $ 143,635 | (7%) | $ 116,887 | $ 0.58 | (5%) |
| Q4 | $ 115,240 | $ 105,050 | $ 0.52 | 201,014 | $ (8,648) | $ (9,182) | $ 106,592 | (8%) | $ 95,868 | $ 0.48 | (9%) |
| Annual | $ 582,562 | $ 466,695 | $ 2.32 | 201,014 | $ (37,442) | $ (21,646) | $ 545,120 | (6%) | $ 445,049 | $ 2.21 | (5%) |
| FY 2006 Q1 | $ 80,838 | $ 76,678 | $ 0.38 | 202,715 | $ (5,848) | $ (1,191) | $ 74,990 | (7%) | $ 75,487 | $ 0.37 | (2%) |
| Q2 | $ 76,515 | $ 76,649 | $ 0.38 | 203,345 | $ (1,521) | $ (44) | $ 74,994 | (2%) | $ 76,605 | $ 0.38 | (0%) |
| Q3 | $ 87,345 | $ 98,143 | $ 0.48 | 204,318 | $ (2,418) | $ (1,459) | $ 84,927 | (3%) | $ 96,684 | $ 0.47 | (1%) |
| Q4 | | Q4 not restated, because not previously reported ⟶ | | | | | $ 74,880 | N/M | $ 131,676 | 0.65 | N/M |
| Annual | $ 309,791 | $ 380,452 | | | | | | N/M | | 1.86 | N/M |

# EXHIBIT 5

1

PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934 (Amendment No.)

Filed by the Registrant (X)

Filed by a Party other than the Registrant ( )

Check the appropriate box:

[ ]  Preliminary Proxy Statement

[ ]  Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))

[X]  Definitive Proxy Statement

( )  Definitive Additional Materials

( )  Soliciting Material Pursuant to Section 240.14a-11(c) or Section 240.14a-12

KLA-TENCOR CORPORATION

-----------------------------------------------------------------
(Name of Registrant as Specified In Its Charter)

-----------------------------------------------------------------
(Name of Person(s) Filing Proxy Statement if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X] No fee required.

( ) Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11.

1) Title of each class of securities to which transaction applies:

-----------------------------------------------------------------

2) Aggregate number of securities to which transaction applies:

-----------------------------------------------------------------

3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

-----------------------------------------------------------------

4) Proposed maximum aggregate value of transaction:

-----------------------------------------------------------------

5) Total fee paid:

-----------------------------------------------------------------

( ) Fee previously paid.

( ) Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

1)  Amount Previously Paid:

-----------------------------------------------------------------

2)  Form, Schedule or Registration Statement No.:

-----------------------------------------------------------------

3)  Filing Party:

-----------------------------------------------------------------

4)  Date Filed:

-----------------------------------------------------------------

2

KLA-TENCOR CORPORATION
NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
NOVEMBER 17, 1998

To the Stockholders:

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders of KLA-Tencor Corporation (the "Company"), a Delaware corporation, will be held on Tuesday, November 17, 1998 at 11:00 a.m., local time, at the Company's offices located at One Technology Drive, Milpitas, California 95035, for the following purposes:

   1. To elect four Class III directors to serve for a three year term and until their successors are elected.

   2. To approve amendments to the 1997 Employee Stock Purchase Plan (the "1997 Purchase Plan") to increase the number of shares of Common Stock of the Company (the "Common Stock") reserved for issuance thereunder by 1,000,000 shares.

   3. To approve amendments to the 1997 Purchase Plan to increase the number of shares of Common Stock reserved for issuance thereunder on the first day of each subsequent fiscal year by the lesser of (a) 2,000,000 shares or (b) the number of shares which the Company estimates (based on the previous 12-month period) it will be required to issue under the 1997 Purchase Plan during the forthcoming fiscal year.

   4. To approve the 1998 Outside Director Option Plan and to reserve for issuance thereunder 1,000,000 shares of the Common Stock.

   5. To ratify the appointment of PricewaterhouseCoopers LLP as independent accountants of the Company for the fiscal year ending June 30, 1999.

   6. To transact such other business as may properly come before the meeting and any adjournments thereof.

The foregoing items of business are more fully described in the Proxy Statement accompanying this Notice.

Only stockholders of record at the close of business on September 18, 1998 are entitled to notice of and to vote at the meeting.

                    Sincerely,

                    Larry W. Sonsini
                    Secretary

San Jose, California
September 30, 1998

YOUR VOTE IS IMPORTANT

ALL STOCKHOLDERS ARE CORDIALLY INVITED TO ATTEND THE MEETING IN PERSON, HOWEVER, TO ASSURE YOUR REPRESENTATION AT THE MEETING, YOU ARE REQUESTED TO COMPLETE, SIGN AND DATE THE ENCLOSED PROXY CARD AS PROMPTLY AS POSSIBLE AND RETURN IT IN THE ENCLOSED ENVELOPE. ANY STOCKHOLDER ATTENDING THE MEETING MAY VOTE IN PERSON EVEN IF HE OR SHE RETURNED A PROXY.

3

KLA-TENCOR CORPORATION
------------------------

PROXY STATEMENT

INFORMATION CONCERNING SOLICITATION AND VOTING

GENERAL

The enclosed Proxy is solicited on behalf of KLA-Tencor Corporation (the "Company") for use at the Annual Meeting of Stockholders to be held on Tuesday, November 17, 1998 at 11:00 a.m., local time, or at any adjournment(s) thereof (the "Annual Meeting"), for the purposes set forth herein and in the accompanying Notice of Annual Meeting of Stockholders. The Annual Meeting will be held at the Company's offices at One Technology Drive, Milpitas, California 95035. The Company's principal executive offices are located at 160 Rio Robles, San Jose, California 95134 and its telephone number is (408) 875-4200.

These proxy solicitation materials were mailed on or about September 30, 1998 to all stockholders entitled to vote.

RECORD DATE

Stockholders of record at the close of business on September 18, 1998 are entitled to notice of and to vote at the Annual Meeting. As of the record date 87,321,556 shares of the Company's Common Stock, $0.001 par value, were issued and outstanding.

REVOCABILITY OF PROXIES

Any Proxy given pursuant to this solicitation may be revoked by the person giving it at any time before its use by delivering to the Company a written notice of revocation or a duly executed proxy bearing a later date or by attending the meeting and voting in person.

QUORUM; ABSTENTIONS; BROKER NON-VOTES

The required quorum for the transaction of business at the Annual Meeting is a majority of the votes eligible to be cast by holders of shares of Common Stock issued and outstanding on the record date. Shares that are voted "FOR," "AGAINST," "ABSTAIN" or "WITHHELD FROM" a matter are treated as being present at the Annual Meeting for purposes of establishing a quorum and are also treated as shares entitled to vote at the Annual Meeting (the "Votes Cast") with respect to such matter.

Abstentions will be counted for purposes of determining both (i) the presence or absence of a quorum for the transaction of business and (ii) the total number of Votes Cast with respect to a proposal (other than the election of directors). Accordingly, abstentions will have the same effect as a vote against the proposal.

Broker non-votes will be counted for purposes of determining the presence or absence of a quorum for the transaction of business, but will not be counted for purposes of determining the number of Votes Cast with respect to the particular proposal on which the broker has expressly not voted. Accordingly, broker non-votes will not affect the outcome of the voting on a proposal that requires a majority of the Votes Cast (such as the approval of a plan).

VOTING AND SOLICITATION

On all matters other than the election of directors, each share has one vote. See "PROPOSAL ONE -- REQUIRED VOTE."

The cost of soliciting proxies will be borne by the Company. The Company has retained the services of Skinner & Co. to aid in the solicitation of proxies from brokers, bank nominees and other institutional owners. The Company estimates that it will pay Skinner & Co. a fee not to exceed $5,000 for its services and will reimburse it for certain out of pocket expenses estimated to be $45,000. In addition, the Company may

4

reimburse brokerage firms and other persons representing beneficial owners of shares for their expenses in forwarding solicitation material to such beneficial owners. Proxies may be solicited by certain of the Company's directors, officers and regular employees, without additional compensation, personally or by telephone or telegram.

DEADLINE FOR RECEIPT OF STOCKHOLDER PROPOSALS

Proposals of stockholders of the Company which are intended to be presented by such stockholders at the Company's annual meeting in 1999 must be received by the Company no later than June 2, 1999 and otherwise be in compliance with applicable laws and regulations in order for such proposals to be considered for possible inclusion may be included in the Company's proxy statement and form of proxy relating to that meeting.

The attached proxy card grants the proxy holders discretionary authority to vote on any matter raised at the Annual Meeting. If a stockholder intends to submit a proposal at the Company's annual meeting in 1999, which proposal is not intended to be included in the Company's proxy statement and form of proxy relating to that meeting, the stockholder should give appropriate notice no later than August 16, 1999. If such a stockholder fails to submit the proposal by such date the Company will not be required to provide any information about the nature of the proposal in its proxy statement and the proxy holders will be allowed to use their discretionary voting authority if the proposal is raised at the Company's annual meeting in 1999.

SECURITY OWNERSHIP

PRINCIPAL STOCKHOLDERS

As of June 30, 1998, the following persons were known to the Company to be beneficial owners of more than 5% of the Company's Common Stock:

| NAME AND ADDRESS | NUMBER OF SHARES OWNED | PERCENTAGE TOTAL(1) |
|---|---|---|
| Capital Guardian Trust Co.(2)........................ 333 South Hope Street Los Angeles, CA 90071 | 7,726,700 | 8.8% |
| Jennison Associates Capital Corp.(3)................ 466 Lexington Ave New York, NY 10017 | 5,485,500 | 6.3% |
| FMR Corp.(4)........................................ 82 Devonshire Street Boston, MA 02109 | 6,347,503 | 7.3% |
| Neuberger & Berman, LLC; Neuberger & Berman Management Incorporated(5)....... 605 Third Ave., New York, NY 10158-3698 | 6,411,113 | 7.3% |
| The Prudential Insurance Company of America(6)...... Prudential Plaza Newark, NJ 07102 | 5,685,552 | 6.5% |

---------------

(1) Based on 87,443,592 outstanding shares of Common Stock as of June 30, 1998.

(2) Based on information provided pursuant to Schedule 13G filed with the Securities and Exchange Commission (the "SEC") on July 9, 1998. This share amount includes 1,037,100 shares held by Capital International Limited; 805,400 shares held by Capital International S.A. and 112,100 shares held by Capital International, Inc., affiliated entities of Capital Guardian Trust Co. (the "Reporting Entity"). Previously, The Capital Group Companies, Inc., the parent holding company of the Reporting Entity and its listed affiliated entities, reported the beneficial ownership of all of such shares. On July 9, 1998 it filed a Schedule 13G indicating that it retained no beneficial ownership of shares held by its independent investment management affiliates.

2

5

(3) Based on information provided pursuant to Schedule 13G/A filed with the SEC on February 12, 1998. Jennison Associates Capital Corp. ("Jennison") is an institutional investor and is considered the beneficial owner only as a result of its position as manager of the funds which own the shares of Common Stock of the Company. Jennison is an autonomous, wholly-owned subsidiary of The Prudential Insurance Company of America ("Prudential"). As such, the shares of Common Stock reported by Jennison are also included in the shares of Common Stock reported by Prudential in its reporting obligations with the SEC. (See Note 6 below.)

(4) Based on information provided pursuant to Schedule 13G filed with the SEC on February 10, 1998. FMR Corp. is a parent holding company and includes shares held by Fidelity Management & Research Company, Fidelity Management Trust Company and Fidelity International Limited.

(5) Based on information provided pursuant to Schedule 13G filed with the SEC on February 12, 1998. This number includes 4,373,850 shares held by Neuberger & Berman's various mutual funds, for which Neuberger & Berman LLC and Neuberger & Berman Management Inc. serve as sub-advisor and investment manager, respectively.

(6) Based on information provided pursuant to Schedule 13G/A filed with the SEC on February 9, 1998. Prudential presently holds 22,400 shares of Common Stock of the Company for the benefit of its general account. In addition, Prudential may have direct or indirect voting and/or investment discretion over 5,663,152 shares, including 5,485,500 shares held by Jennison, a wholly-owned subsidiary of Prudential (see Note 3 above).

SECURITY OWNERSHIP OF MANAGEMENT

    The following table sets forth the beneficial ownership of Common Stock of the Company as of September 18, 1998 (the most recent practicable date) by all directors and nominees (naming them), each of the named executive officers set forth in the Summary Compensation Table and by all directors and current executive officers as a group:

| NAME | AMOUNT OWNED | APPROXIMATE PERCENTAGE OWNED* |
| --- | --- | --- |
| Kenneth Levy(1) | 1,874,170 | 2.15% |
| Jon D. Tompkins(2) | 160,869 | ** |
| Kenneth L. Schroeder(3) | 449,729 | ** |
| James W. Bagley(4) | 20,051 | ** |
| Edward W. Barnholt(5) | 5,213 | ** |
| Leo J. Chamberlain(6) | 27,067 | ** |
| Richard J. Elkus, Jr.(7) | 75,937 | ** |
| Dean O. Morton(8) | 15,051 | ** |
| Yoshio Nishi(9) | 32,956 | ** |
| Samuel Rubinovitz(10) | 13,623 | ** |
| Dag Tellefsen(11) | 14,206 | ** |
| Lida Urbanek(12) | 818,679 | ** |
| Robert J. Boehlke(13) | 102,526 | ** |
| Gary E. Dickerson(14) | 95,190 | ** |
| Graham J. Siddall(15) | 204,384 | ** |
| All directors and executive officers as a group (22 persons)(16) | 4,354,172 | 4.99% |

---------------

    * Based on 87,321,556 outstanding shares of the Common Stock of the Company as of September 18, 1998.

    ** Less than 1%

3

6

(1) Includes 353,093 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998 and 231,000 shares which are held in trust for the benefit of Mr. Levy's children.

(2) Includes 145,072 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(3) Includes 325,093 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(4) Includes 20,051 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(5) Includes 5,213 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(6) Includes 5,070 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(7) Includes 937 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(8) Includes 10,051 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(9) Includes 32,956 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(10) Includes 9,623 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(11) Includes 13,107 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(12) Includes 3,560 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998 and 151,500 shares which are held by Mrs. Urbanek's children.

(13) Includes 98,829 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(14) Includes 92,688 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(15) Includes 173,966 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(16) Includes 1,715,860 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

PROPOSAL ONE

TO ELECT FOUR CLASS III DIRECTORS TO SERVE FOR A
THREE YEAR TERM AND UNTIL THEIR SUCCESSORS ARE ELECTED.

NOMINEES

The Company has a classified board of twelve directors consisting of four Class I directors (Kenneth Levy, Samuel Rubinovitz, Jon D. Tompkins and Lida Urbanek), three Class II directors (Leo J. Chamberlain, Richard J. Elkus, Jr. and Dag Tellefsen) and five Class III directors (James W. Bagley, Edward W. Barnholt, Dean O. Morton, Yoshio Nishi and Kenneth L. Schroeder). The Class I directors and the Class II directors will serve until the annual meetings of stockholders to be held in 1999 and 2000 respectively, or until their respective successors are duly elected and qualified. At each annual meeting of stockholders, directors are elected for a full term of three years to succeed those directors whose terms expire at the annual meeting.

4

7

The terms of the Class III directors will expire on the date of the Annual Meeting. Yoshio Nishi has declined to stand for re-election. Accordingly, four of the five Class III directors of the Board of Directors are to be elected at the Annual Meeting. The nominees for election by the stockholders to these four positions are James W. Bagley, Edward W. Barnholt, Dean O. Morton and Kenneth L. Schroeder. If elected, the nominees will serve as directors until the Company's annual meeting of stockholders in 2001, or until their successors are elected and qualified. If any of the nominees declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election, the proxies may be voted for such substitute nominees as management may designate. The proxy holders also have been advised that, in the event any of the nominees shall not be available for election, a circumstance that is not currently expected, they may vote for the election of substitute nominees in accordance with their judgment. If additional persons are nominated for election as directors, the proxy holders intend to vote all proxies received by them in such a manner in accordance with cumulative voting (if invoked) as will assure the election of as many of the nominees as possible and, in such event, the specific nominees to be voted for will be determined by the proxy holders.

If a quorum is present and voting, the four nominees for Class III directors receiving the highest number of votes will be elected as Class III directors. Abstentions and shares held by brokers that are not present, but not voted because the brokers were prohibited from exercising discretionary authority, i.e., "broker non-votes," will be counted as present in determining if a quorum is present.

The following table sets forth certain information with respect to the Company's Board of Directors.

| NAME OF DIRECTOR | AGE | POSITION | DIRECTOR SINCE |
|---|---|---|---|
| Jon D. Tompkins | 58 | Chairman of the Board | 1997 |
| Kenneth Levy | 55 | Chief Executive Officer | 1975 |
| Kenneth L. Schroeder | 52 | President and Chief Operating Officer | 1991 |
| James W. Bagley | 59 | Director | 1997 |
| Edward W. Barnholt | 55 | Director | 1995 |
| Leo J. Chamberlain | 68 | Director | 1982 |
| Richard J. Elkus, Jr. | 63 | Director | 1997 |
| Dean O. Morton | 66 | Director | 1997 |
| Yoshio Nishi | 58 | Director | 1989 |
| Samuel Rubinovitz | 68 | Director | 1990 |
| Dag Tellefsen | 56 | Director | 1978 |
| Lida Urbanek | 55 | Director | 1997 |

There are no family relationships between or among any directors or executive officers of the Company.

JON D. TOMPKINS has been Chairman of the Board since July 1, 1998. From April 30, 1997 until July 1, 1998 he was Chief Executive Officer and a Director of the Company. From 1991 until April 30, 1997 he was President and Chief Executive Officer of Tencor Instruments, a manufacturer of wafer inspection, film measurement and metrology systems for the semiconductor industry ("Tencor") prior to its merger with the Company. He was a director of Tencor from 1991 until April 1997 and was appointed chairman of the board of directors of Tencor in November 1993. He currently serves on the boards of directors of Varian Corporation and ESI Incorporated as well as chairman of the board of SEMI/SEMATECH, a private research and development consortium of U.S. semiconductor equipment and materials companies.

KENNETH LEVY is a founder of the Company and since July 1, 1998 has been Chief Executive Officer and a Director. From 1975 until April 30, 1997 he was Chairman of the Board and Chief Executive Officer. From April 30, 1997 until June 30, 1998 he was Chairman of the Board. He currently serves on the boards of directors of Ultratech Stepper, Inc. and Integrated Process Equipment Corporation.

KENNETH L. SCHROEDER has been President, Chief Operating Officer and Director of the Company since November 1991. He currently serves on the board of directors of GaSonics International.

5

8

JAMES W. BAGLEY has been a Director of the Company since April 30, 1997. He was a director of Tencor from June 1993 until April 30, 1997. He has been chief executive officer and a director of Lam Research Corporation, a manufacturer of semiconductor processing equipment, since August 1997. From May 1996 until August 1997 he was chairman of the board and chief executive officer of OnTrak Systems, Inc. until its merger with Lam Research Corporation in August 1997. From December 1987 until December 1993, Mr. Bagley was president and chief operating officer for Applied Materials, Inc., a manufacturer of wafer fabrication systems to the semiconductor industry. From January 1994 until October 1995 he was vice chairman and chief operating officer of Applied Materials, Inc., and vice chairman from November 1995 until May 1996. Mr. Bagley currently serves on the boards of directors of Teradyne, Inc., Kulicke & Soffa Industries, Inc., Micron Technology, Inc., and SEMI/SEMATECH.

EDWARD W. BARNHOLT has been a Director of the Company since 1995. Mr. Barnholt joined Hewlett-Packard Company, a manufacturer of electronic and computer equipment in December 1966. From 1988 to 1990 he was general manager of the Electronics Instruments Group of Hewlett-Packard Company. In July 1988, he was elected vice president and in November 1993 he was elected senior vice president of Hewlett-Packard Company. Mr. Barnholt is currently executive vice president and general manager of the Test and Measurement Organization of Hewlett Packard Company.

LEO J. CHAMBERLAIN has been a Director of the Company since 1982. He is a private investor.

RICHARD J. ELKUS, JR. has been a Director of the Company since April 30, 1997. He was executive vice president and vice chairman of the board of directors of Tencor from February 1994 until April 30, 1997. Previously, he was with Prometrix Corporation from September 1983 until February 1994 where he held the positions of chairman and chief executive officer until its merger with Tencor in February 1994. He currently serves on the boards of directors of Voyan Technology and Lam Research Corporation.

DEAN O. MORTON has been a Director of the Company since April 30, 1997. From June 1993 until April 30, 1997 he was a director of Tencor. In October 1992 Mr. Morton retired as executive vice president, chief operating officer and a director of Hewlett-Packard Company, where he held various positions from 1960 until his retirement. Mr. Morton currently serves as chairman of the board of Centigram Communications Corporation and as a director of ALZA Corporation, The Clorox Company, BEA Systems Inc. and Raychem Corporation. Mr. Morton is also a trustee of the Metropolitan Series Fund and State Street Research Funds Group and Portfolios Inc.

YOSHIO NISHI has been a Director of the Company since 1989. Since May 1995 he has been director of research and development and senior vice president of the Semiconductor Group of Texas Instruments Incorporated, a manufacturer of integrated circuits and electronic equipment. From January 1986 to April 1995 he was director of the Silicon Process Laboratory for Hewlett-Packard Laboratories, a semiconductor technology research facility affiliated with Hewlett-Packard Company.

SAMUEL RUBINOVITZ has been a Director of the Company since 1990. He previously served as a Director of the Company from October 1979 to January 1989. From April 1989 to January 1994 he was executive vice president of EG&G, Inc., a diversified manufacturer of scientific instruments and electronic, optical and mechanical equipment. He currently serves on the boards of directors of Richardson Electronics, Inc., LTX Corporation and Kronos, Inc.

DAG TELLEFSEN has been a Director of the Company since 1978. He is the general partner of the Investment Manager of Glenwood Ventures I and II, venture capital funds. He currently serves on the boards of directors of Iwerks Entertainment Corporation, Aptix, Metorex International and Aeneid.

LIDA URBANEK has been a Director of the Company since April 30, 1997. She is a private investor. She was a director of Tencor from August 1991 until April 30, 1997.

6

9

## BOARD MEETINGS AND COMMITTEES

The Board of Directors of the Company held a total of five meetings during the fiscal year ended June 30, 1998. The Board of Directors has an Audit Committee, a Compensation Committee and a Nominating Committee.

The Audit Committee, which consists of Mr. Morton, Mr. Rubinovitz and Mr. Tellefsen, held three meetings during the last fiscal year. The Audit Committee recommends engagement of the Company's independent accountants, and is primarily responsible for approving the services performed by the Company's independent accountants and for reviewing and evaluating the Company's accounting principles and its system of internal accounting controls. The Compensation Committee, which consists of Mr. Bagley, Mr. Chamberlain and Mrs. Urbanek, held three meetings during the last fiscal year. The Compensation Committee reviews and approves the Company's executive compensation policy and makes recommendations concerning the Company's employee benefit plans. The Nominating Committee, which consists of Mr. Barnholt, Mr. Levy and Mr. Tompkins did not hold a meeting during the last fiscal year. A unanimous group of the disinterested members of the board of directors nominated the four Class III directors for election, with Mr. Nishi declining to stand for reelection. The Nominating Committee is primarily responsible for identifying and evaluating the qualifications of all candidates for election to the Board of Directors. The Nominating Committee will consider nominations recommended by stockholders. Stockholders wishing to submit nominations must notify the Company of their intent to do so and provide the Company with certain information set forth in the Company's bylaws on or before the date on which stockholder proposals to be included in the proxy statement for the stockholder meeting must be received by the Company.

During the fiscal year ended June 30, 1998, all incumbent Directors attended at least 75% of the aggregate number of meetings of the Board of Directors and meetings of the committees of the Board on which they served.

## COMPENSATION OF DIRECTORS

Members of the Board of Directors who are not employees of the Company receive an annual fee of $15,000 and $1,000 for each meeting they attend ($500 if participation is by telephone), plus expenses. Committee members receive $500 per committee meeting they attend ($250 if participation is by telephone). The Company's Outside Directors Stock Option Plan (the "Director Plan") as adopted by the Board of Directors and approved by the stockholders, provides for the grant of an option to purchase 2,500 shares of Common Stock of the Company to each of the Company's non-employee directors on the date on which such person is elected a director. Thereafter, each non-employee director is automatically granted an option to purchase 2,500 shares of Common Stock of the Company on the anniversary of such date. The Director Plan provides that the exercise price shall be equal to the fair market value of the Common Stock on the date of grant of the option. Options granted pursuant to the Director Plan have a term of ten years with 25% vesting after 12 months and the remainder vesting monthly over the following 36 months, but only while the optionee is a director of the Company, within six months after death or within 30 days after the optionee ceases to serve as a director of the Company. The Company plans to terminate the Director Plan if the stockholders approve Proposal Four hereunder.

If the stockholders approve Proposal Four hereunder, the non-employee Directors shall receive benefits under the 1998 Outside Director Plan ("1998 Director Plan") and no additional options will be granted under the Director Plan and it will be terminated. Under the 1998 Director Plan, each non-employee Director ("Outside Director") shall receive a nonstatutory option to purchase 10,000 shares of Common Stock as of the date on which such director first becomes an Outside Director (the "First Option"). Accordingly, none of the existing directors will be granted a First Option. In addition, each Outside Director shall automatically be granted a nonstatutory option to purchase an additional 5,000 shares of Common Stock on the date of the subsequent annual meetings on which he or she remains an Outside Director (the "Subsequent Option"). The term of options granted under the 1998 Director Plan may not exceed 10 years. The 1998 Director Plan provides that the exercise price shall be equal to the fair market value of the Common Stock on the date of

7

10

grant of the option. Options granted under the 1998 Director Plan shall become exercisable immediately upon the date of grant.

REQUIRED VOTE

Directors shall be elected by a plurality of the votes of the shares of the Company's Common Stock entitled to vote and represented in person or by proxy at the Annual Meeting. Votes against, votes withheld and broker non-votes have no legal effect on the election of directors due to the fact that such elections are by a plurality. Every stockholder voting for the election of directors may cumulate such stockholder's votes and give one candidate a number of votes equal to the number of directors to be elected multiplied by the number of votes to which the stockholder's shares are entitled, or may distribute the stockholder's votes on the same principle among as many candidates as the stockholder thinks fit, provided that votes cannot be cast for more than the number of directors to be elected. However, no stockholder shall be entitled to cumulate votes unless the candidate's name has been placed in nomination prior to the voting and the stockholder, or any other stockholder, has given notice at the Annual Meeting prior to the voting of the intention to cumulate the stockholder's votes. The proxy holders will exercise discretionary authority to cumulate votes in the event that additional persons are nominated at the Annual Meeting for election of directors.

MANAGEMENT RECOMMENDS A VOTE FOR EACH OF THE CLASS III
NOMINEES LISTED ABOVE.

PROPOSAL TWO

APPROVAL OF AMENDMENT TO THE 1997 EMPLOYEE STOCK PURCHASE PLAN TO INCREASE THE NUMBER OF SHARES OF COMMON STOCK RESERVED FOR ISSUANCE THEREUNDER BY 1,000,000 SHARES.

GENERAL

As of the date hereof 200,000 shares of the Company's Common Stock have been reserved for issuance under the Company's 1997 Employee Stock Purchase Plan (the "1997 Purchase Plan"). In August 1998, the Board of Directors adopted an amendment to the 1997 Purchase Plan, subject to stockholder approval, to increase the number of shares reserved for issuance thereunder by 1,000,000 shares in fiscal 1999, to a total of 1,200,000 reserved shares. As of June 30, 1998, 195,598 shares of Common Stock had been issued under the 1997 Purchase Plan at an average price of $23.5344 per share and 4,402 shares remained available for purchase.

The 1997 Purchase Plan was adopted in 1997 and stockholder approval was obtained at the 1997 annual meeting of stockholders with the intention of phasing out the Company's 1981 Employee Stock Purchase Plan (the "1981 Purchase Plan") over the two year period ending June 30, 1999. The Company estimates that it will utilize the remaining available shares under the 1997 Purchase Plan leaving an insufficient number of shares for issuance in the exercise periods throughout the phase out of the 1981 Purchase Plan in fiscal 1999.

The Board of Directors believes that it is in the best interests of the Company to provide employees with an opportunity to purchase Common Stock of the Company through payroll deductions. In addition, the Board of Directors believes that the shares remaining available for issuance pursuant to the 1997 Purchase Plan are insufficient for such purpose. Accordingly, at the Annual Meeting, the stockholders are being requested to consider and to approve an amendment of the 1997 Purchase Plan to increase the number of shares reserved for issuance thereunder by 1,000,000 shares which the Company believes is a sufficient number of shares to allow the Company to continue to phase out the 1981 Purchase Plan through the next fiscal year.

11

The description of the 1997 Purchase Plan that follows Proposal Three is incorporated herein by this reference.

THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR APPROVAL OF THE AMENDMENT TO THE 1997 EMPLOYEE STOCK PURCHASE PLAN TO INCREASE THE NUMBER OF SHARES RESERVED FOR ISSUANCE THEREUNDER BY 1,000,000 SHARES.

PROPOSAL THREE

APPROVAL OF AMENDMENTS TO THE 1997 PURCHASE PLAN TO PROVIDE FOR AN AUTOMATIC INCREASE TO THE SHARES FOR ISSUANCE THEREUNDER ON THE FIRST DAY OF EACH NEW FISCAL YEAR

GENERAL

As of the date hereof 200,000 shares of the Company's Common Stock have been reserved for issuance under the 1997 Purchase Plan. In August 1998, in addition to the amendment described in Proposal Two above, the Board of Directors adopted an amendment to the 1997 Purchase Plan, subject to stockholder approval, to increase the number of shares reserved for issuance thereunder on the first day of each subsequent fiscal year (beginning on July 1, 1999) by the lesser of (a) 2,000,000 shares or (b) the number of shares which the Company estimates (based on the previous 12-month period) it will be required to issue under the 1997 Purchase Plan during the forthcoming fiscal year. As of June 30, 1998, 195,598 shares of Common Stock had been issued under the 1997 Purchase Plan at an average price of $23.5344 per share and 4,402 shares remained available for purchase.

The Company sought stockholder approval of the 1997 Purchase Plan at the 1997 annual meeting of stockholders with the intention of phasing out the Company's 1981 Purchase Plan over the two year period ending June 30, 1999. Following the phase out of the 1981 Purchase Plan, the 1997 Purchase Plan will need additional shares to replace the shares issued thereunder.

As described in Proposal Two above, the Company will have phased out the 1982 Purchase Plan by June 30, 1999. Thereafter, the 1997 Purchase Plan will be the Company's sole employee stock purchase plan. The Board of Directors believes that it is in the best interests to provide employees with an opportunity to purchase Common Stock of the Company through payroll deductions. The Board believes that the 1,000,000 shares of Common Stock being added to the 1997 Purchase Plan pursuant to Proposal Two will be sufficient to cover the requirements of this plan through June 30, 1999. To simplify the administration of the 1997 Purchase Plan thereafter, the Board has approved the proposed amendment which provides for automatic periodic additions of a specified number of shares of Common Stock to the plan without the need for additional stockholder approval. This amendment is intended to ensure that the 1997 Purchase Plan will continue to have a reasonable number of shares available to meet its requirements for the remainder of its term.

The description of the 1997 Purchase Plan that follows Proposal Three is incorporated herein by this reference.

REQUIRED VOTE -- PROPOSALS TWO AND THREE

The affirmative vote of a majority of the Votes Cast will be required to approve the amendments to the 1997 Purchase Plan.

THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR APPROVAL OF THE AMENDMENTS TO THE 1997 PURCHASE PLAN TO PROVIDE FOR AN AUTOMATIC INCREASE TO THE SHARES RESERVED FOR ISSUANCE THEREUNDER ON THE FIRST DAY OF EACH NEW FISCAL YEAR.

9

12

SUMMARY OF THE 1997 PURCHASE PLAN, AS AMENDED

The essential features of the 1997 Purchase Plan, as amended, are outlined below; provided however, that the following summary is qualified in its entirety by the specific language of the 1997 Purchase Plan, as amended, a copy of which is available at no charge to any stockholder upon request.

Purpose

The purpose of the 1997 Purchase Plan is to provide employees of the Company and its foreign subsidiaries designated by the Board of Directors of the Company with an opportunity to purchase Common Stock of the Company through payroll deductions.

Administration

The 1997 Purchase Plan is administered by the Board of Directors or a committee appointed by the Board of Directors. The Board of Directors has the discretion to delegate routine matters to management. All questions of interpretation or application of the 1997 Purchase Plan are determined in the sole discretion of the Board of Directors, and its decisions are final and binding upon all participants. The Board of Directors may determine, in its sole discretion, the requirements and conditions of participation, if any, by employees of foreign subsidiaries. In the event that the Board of Directors determines that the ongoing operation of the 1997 Purchase Plan may result in unfavorable financial accounting consequences, the Board of Directors may in any manner it determines, in its sole discretion, and, to the extent necessary or desirable, modify or amend the 1997 Purchase Plan, including, but not limited to altering the purchase price for any offering period including an offering period underway at the time of the change in purchase price. Such modifications or amendments shall not require stockholder approval or the consent of any participants in the 1997 Purchase Plan. Members of the Board of Directors who are eligible employees of the Company are permitted to participate in the 1997 Purchase Plan. Members of the Board of Directors will receive no additional compensation for their services in connection with the administration of the 1997 Purchase Plan. All payroll deductions received or held by the Company may be used by the Company for any corporate purpose.

Eligibility

Any person who is employed by the Company or its subsidiaries for at least 20 hours per week and more than five months in a calendar year is eligible to participate in the 1997 Purchase Plan.

Employees of foreign subsidiaries may be subject to additional requirements and restrictions depending upon applicable local law. As of June 30, 1998, approximately 3,300 employees were participating in the 1997 Purchase Plan.

Offering Dates

The 1997 Purchase Plan is implemented by 24-month offering periods (each an "Offering Period"), commencing on January 1 and July 1 of each year. Each Offering Period is composed of four consecutive six-month purchase periods (each a "Purchase Period"). The Board of Directors has the power to alter the duration of the Offering Periods without stockholder approval.

Eligible employees become participants in the 1997 Purchase Plan by delivering to the Company a subscription agreement authorizing payroll deductions. An eligible employee may participate in an Offering Period only if, as of the enrollment date of such Offering Period, such employee is not participating in the 1981 Purchase Plan or in any prior Offering Period under the 1997 Purchase Plan which is continuing at the time of such proposed enrollment. An employee who becomes eligible to participate in the 1997 Purchase Plan after the commencement of an Offering Period may not participate until the commencement of the next Offering Period.

13

Purchase Price

The purchase price per share at which shares are sold under the 1997 Purchase Plan shall be 85% of the lesser of (a) the fair market value of the shares of Common Stock on the first day of such Offering Period, and (b) the fair market value of the shares of Common Stock at the time of exercise of a participant's purchase option. The fair market value of the Common Stock on a given date shall be determined by the Board of Directors based on the closing price of the Company's Common Stock on such date as reported on the Nasdaq National Market.

Payment of Purchase Price; Payroll Deductions

The purchase price for the shares is accumulated by payroll deductions during the Offering Period. The deductions may not exceed 10% of a participant's eligible compensation. A participant may institute decreases in the rate of payroll deductions at any time and such decreases are immediately effective. Increases in the rate of payroll deductions are effective as of the commencement of the next Offering Period.

All payroll deductions are credited to the participant's account under the 1997 Purchase Plan; no interest accrues on the payroll deductions. All payroll deductions received or held by the Company may be used by the Company for any corporate purpose and such payroll deductions need not be segregated.

Purchase of Stock; Exercise of Option

At the beginning of each Offering Period, by executing a subscription agreement to participate in the 1997 Purchase Plan, each employee is in effect granted an option to purchase shares of Common Stock. The maximum number of shares placed under option to a participant in an Offering Period is determined by dividing $20,000 by 85% of the fair market value of the Common Stock at the beginning of the Offering Period. Notwithstanding the foregoing, no employee may make aggregate purchases of stock of the Company and its subsidiaries under the 1997 Purchase Plan and any other employee stock purchase plans qualified as such under Section 423(b) of the Internal Revenue Code of 1986, as amended (the "Code") in excess of $25,000 (determined using the fair market value of the shares at the time the option is granted) during any calendar year.

Withdrawal

While each employee in the 1997 Purchase Plan is required to sign a subscription agreement authorizing payroll deductions to participate, a participant may terminate his or her participation in the 1997 Purchase Plan at any time by signing and delivering to the Company a notice of withdrawal from the 1997 Purchase Plan. All of the participant's accumulated payroll deductions will be paid to the participant promptly after receipt of his or her notice of withdrawal and his or her participation in the current Offering Period will be automatically terminated, and no further payroll deductions for the purchase of shares will be made during the Offering Period. No resumption of payroll deductions will occur on behalf of such participant unless such participant re-enrolls in the 1997 Purchase Plan by delivering a new subscription agreement to the Company during the applicable open enrollment period preceding the commencement of a subsequent Offering Period. A participant's withdrawal from the 1997 Purchase Plan during an Offering Period does not have any effect upon such participant's eligibility to participate in subsequent Offering Periods under the 1997 Purchase Plan.

Termination of Employment

Termination of a participant's employment for any reason, including retirement or death, cancels his or her participation in the 1997 Purchase Plan immediately. In such event, the payroll deductions credited to the participant's account will be returned to such participant or, in the case of death, to the participant's legal representative.

14

Capital Changes

If any change is made in the capitalization of the Company, such as stock splits or stock dividends, which results in an increase or decrease in the number of shares of Common Stock outstanding or in the event of any merger, sale or other reorganization, appropriate adjustments shall be made by the Company in the 1997 Purchase Plan's reserve and the number and class of shares subject to outstanding purchase options and in the purchase price per share. Notwithstanding such adjustment, if in a transaction the stockholders of the Company no longer retain at least a majority of the beneficial interest in the voting stock of the Company following such transaction ("Transfer of Control"), the Board of Directors may, in its sole discretion (a) provide that the purchase options become fully exercisable prior to the date of the Transfer of Control, (b) provide that such successor entity assume the Company's obligations under the 1997 Purchase Plan, or (c) terminate the 1997 Purchase Plan. The Board of Directors may also make provisions for adjusting the number of shares subject to the 1997 Purchase Plan and the purchase price per share if the Company effects one or more reorganizations, recapitalizations, rights offerings or other increases or decreases in the number of shares of the Company's outstanding Common Stock.

Amendment and Termination of the 1997 Purchase Plan

The Board of Directors may at any time amend or terminate the 1997 Purchase Plan; provided, however, amendments that would increase the number of shares reserved for purchase or would otherwise require stockholder approval in order to comply with other regulatory requirements, require stockholder approval.

CERTAIN UNITED STATES FEDERAL INCOME TAX INFORMATION

The 1997 Purchase Plan is intended to qualify under the provisions of Sections 421 and 423 of the Code with respect to participants who are citizens of the United States ("U.S. Participants"). Under these provisions, no income will be taxable to a U.S. Participant at the time of grant of the option or purchase of shares. Upon disposition of the shares, the U.S. Participant will generally be subject to tax, the amount of which will depend upon the holding period. If the shares have been held by the U.S. Participant for more than two years after the offering date and more than one year after the exercise date, the lesser of: (a) the excess of the fair market value of the shares at the time of such disposition over the option price, or (b) the excess of the fair market value of the shares at the time the option was granted over the option price (which option price will be computed as of the grant date) will be treated as ordinary income, and any further gain will be treated as long-term capital gain. If the shares are disposed of before the expiration of these holding periods, the excess of the fair market value of the shares on the exercise date over the option price will be treated as ordinary income, and any further gain or any loss on such disposition will be long-term or short-term capital gain or loss, depending on the holding period. Special rules may apply with respect to U.S. Participants subject to Section 16(b) of the Securities Exchange Act of 1934, as amended. The Company is not entitled to a deduction for amounts taxed as ordinary income or capital gain to a U.S. Participant except to the extent of ordinary income reported by U.S. Participants upon disposition of shares prior to the expiration of the two holding periods described above. The consequences to non-U.S. Participants are governed by foreign laws, which typically do not offer the same tax advantages as U.S. laws.

The foregoing is only a summary of the effect of federal income taxation upon the participant and the Company with respect to the grant and exercise of options under the 1997 Purchase Plan, does not purport to be complete, and does not discuss the income tax laws of any municipality, state or foreign country in which a participant may reside. It is advisable that a participant contact his or her own tax advisor concerning the application of all of these tax laws.

STOCK PRICE

The closing price of a share of the Company's Common Stock on the Nasdaq National Market on September 18, 1998 was $22.375.

12

15

PLAN BENEFITS

The Company cannot now determine the number of shares to be purchased in the future by the named executive officers, all current executive officers as a group or all employees (excluding executive officers) as a group. In the fiscal year ended June 30, 1998, however, the following shares of Common Stock were purchased by such persons pursuant to the 1997 Purchase Plan and the 1981 Purchase Plan:

| NAME OR GROUP | NUMBER OF SHARES |
|---|---|
| Kenneth Levy......................................... | 1,122 |
| Jon D. Tompkins..................................... | 617 |
| Kenneth L. Schroeder................................ | 937 |
| Robert J. Boehlke................................... | 760 |
| Gary E. Dickerson................................... | 1,173 |
| Graham J. Siddall.................................... | 617 |
| All current executive officers (13 persons-as a group)........................................ | 12,254 |
| All employees (including current officers who are not executive officers)............................... | 802,737 |

PROPOSAL FOUR

APPROVAL OF THE 1998 OUTSIDE DIRECTOR OPTION PLAN AND RESERVATION OF 1,000,000 SHARES OF COMMON STOCK OF THE COMPANY FOR ISSUANCE THEREUNDER.

GENERAL

The Company's 1998 Outside Director Option Plan (the "1998 Director Plan") was adopted by the Board of Directors in August 1998 and is intended to allow the Company to attract and retain the best available individuals for service as non-employee members of the Board of Directors ("Outside Directors") and to encourage their continued service on the Board. The Company has initially reserved 1,000,000 shares of Common Stock for issuance under the 1998 Director Plan. At the Annual Meeting, the stockholders are being asked to approve the 1998 Director Plan and to approve the reservation of 1,000,000 shares for issuance thereunder. Upon approval by the stockholders of the Company, the Company will no longer grant any options under the current Outside Directors Stock Option Plan and will terminate that plan.

SUMMARY OF THE 1998 DIRECTOR PLAN

The essential features of the 1998 Director Plan are outlined below; provided however, that the following summary is qualified in its entirety by the specific language of the 1998 Director Plan, a copy of which is available at no charge to any stockholder upon request.

Purpose

The 1998 Director Plan provides for the grant of nonstatutory stock options to Outside Directors to allow the Company to attract and retain the best available individuals for service as Outside Directors.

Administration

The 1998 Director Plan may be administered by the Board of Directors or a committee of the Board (as applicable, the "Administrator"). The Administrator has the power to determine the terms of the options granted, including the exercise price of the option, the number of shares subject to each option, the exercisability thereof, and the form of consideration payable upon such exercise. In addition, the Administra-

13

16

tor has the authority to amend, suspend or terminate the 1998 Director Plan, provided that no such action may affect any share of Common Stock previously issued and sold or any option previously granted under the 1998 Director Plan.

Eligibility

Options under the 1998 Director Plan may be granted only to Outside Directors. No person has any discretion to select which Outside Directors shall be granted options. In addition to discretionary grants by the Board of Directors, the Director Plan provides for automatic grants of options to be made in the following ways: (a) each Outside Director as of the date on which such director first becomes an Outside Director receives a nonstatutory option to purchase 10,000 shares of Common Stock (the "First Option"); and (b) each Outside Director shall automatically be granted a nonstatutory option to purchase an additional 5,000 shares of Common Stock on the date of the subsequent annual meetings on which he or she remains an Outside Director (the "Subsequent Option").

Terms of Options

Options granted under the 1998 Director Plan are generally not transferable by the optionee, and each option is exercisable during the lifetime of the optionee only by such optionee. Options granted under the 1998 Director Plan must generally be exercised within 30 days after the end of optionee's status as an Outside Director of the Company, or within twelve months after such optionee's termination by death or disability, but in no event later than the expiration of the option's term.

The exercise price of nonstatutory stock options granted under the 1998 Director Plan shall be at least equal to the fair market value of the Common Stock on the date of grant. The term of all options granted under the 1998 Director Plan may not exceed ten years. Both the First Option and the Subsequent Option shall become 100% exercisable on their respective dates of grant.

Amendment or Termination

The Administrator may amend or terminate the 1998 Director Plan at any time. However, no amendment or termination may adversely affect any stock options then outstanding under the 1998 Director Plan without the optionee's consent.

The 1998 Director Plan provides that in the event of a merger of the Company with or into another corporation, or a sale of substantially all of the Company's assets, each option shall be assumed or an equivalent option substituted for by the successor corporation. If the outstanding options are not assumed or substituted for by the successor corporation, the Administrator shall provide for the optionee to have the right to exercise the option as to all of the optioned stock, including shares as to which it would not otherwise be exercisable. If the Administrator makes an option exercisable in full in the event of a merger or sale of substantially all of the Company's assets, the Administrator shall notify the optionee that the option shall be fully exercisable for a period of fifteen (15) days from the date of such notice, and the option will terminate upon the expiration of such period.

CERTAIN UNITED STATES FEDERAL INCOME TAX INFORMATION

The following is only a summary of the effect of federal income taxation upon the Outside Director and the Company with respect to the grant and exercise of options under the 1998 Director Option Plan. This summary does not purport to be complete and does not discuss the income tax laws of any municipality, state or foreign country in which an Outside Director may reside.

Options granted under the 1998 Director Plan are nonstatutory options ("NSO"). An Outside Director will not recognize any taxable income at the time he or she is granted an NSO. However, upon the exercise of an NSO, the optionee will recognize ordinary income measured by the excess of the then fair market value of the shares over the option price. Upon resale of such shares by the Outside Director, any difference between the sale price and the exercise price, to the extent not recognized as ordinary income as provided above, will be

14

17

treated as long-term or short-term capital gain or loss, depending on the holding period. The Company will be entitled to a tax deduction in the same amount as the ordinary income recognized by the Outside Director with respect to shares acquired upon exercise of an NSO.

PLAN BENEFITS

If the 1998 Director Plan is approved at the Annual Meeting, each Outside Director serving on the Board of Directors shall be entitled to each receive a Subsequent Option. If Proposals One and Four are approved by the stockholders, there will be eight Outside Directors on the Board of Directors immediately following the Annual Meeting and options to purchase an aggregate of 40,000 shares of Common Stock will therefore be outstanding under the 1998 Director Plan immediately following the Annual Meeting.

REQUIRED VOTE

The affirmative vote of a majority of the Votes Cast will be required to approve the adoption of the 1998 Director Plan and for the reservation of 1,000,000 shares of Common Stock of the Company for issuance thereunder.

THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE ADOPTION OF THE 1998 DIRECTOR PLAN AND FOR THE RESERVATION OF 1,000,000 SHARES OF COMMON STOCK OF THE COMPANY FOR ISSUANCE THEREUNDER.

PROPOSAL FIVE

TO RATIFY THE APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE INDEPENDENT ACCOUNTANTS OF THE COMPANY FOR THE FISCAL YEAR ENDING JUNE 30, 1999.

The Board of Directors has selected PricewaterhouseCoopers LLP, independent accountants, to audit the consolidated financial statements of the Company for its 1999 fiscal year and recommends that the stockholders vote for ratification of such appointment. If there is a negative vote on such ratification, the Board of Directors will reconsider its selection. Representatives of PricewaterhouseCoopers LLP are expected to be present at the Annual Meeting with the opportunity to make a statement if they desire to do so, and are expected to be available to respond to appropriate questions.

THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE RATIFICATION OF THE APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE INDEPENDENT ACCOUNTANTS OF THE COMPANY FOR THE FISCAL YEAR ENDING JUNE 30, 1999.

15

18

EXECUTIVE COMPENSATION

The following table shows, as to the person who served as Chief Executive Officer during the fiscal year ended June 30, 1998 and each of the five other most highly compensated executive officers whose salary plus bonus exceeded $100,000, information concerning all reportable compensation awarded to, earned by or paid to each for services to the Company in all capacities during the fiscal year ended June 30, 1998, as well as such compensation for each such individual for the Company's previous two fiscal years.

SUMMARY COMPENSATION TABLE

| NAME AND PRINCIPAL POSITION | ANNUAL COMPENSATION | | | LONG TERM COMPENSATION | | | |
| | | | | AWARDS | | PAYOUTS | |
| | YEAR | SALARY ($) | BONUS | OTHER ANNUAL COMPEN-SATION ($)(1) | RESTRICTED STOCK AWARD(S) ($)(2) | SECURITIES UNDERLYING OPTIONS/ SARS($)(1) | LTIP PAYOUTS ($)(4) | ALL OTHER COMPENSATION ($)(5) |
|---|---|---|---|---|---|---|---|---|
| Kenneth Levy(6)................. Chief Executive Officer | 1998 | $467,769 | $262,114 | $N/A | -0- | 62,500 | -0- | $ 44,410 |
| | 1997 | $402,122 | $114,277 | $N/A | -0- | 162,500 | -0- | $ 71,158 |
| Chairman of the Board | 1996 | $150,289 | $413,070 | $N/A | -0- | -0- | -0- | $111,021 |
| Jon D. Tompkins(7)............. | 1998 | $467,769 | $262,114 | $N/A | -0- | -0- | -0- | $ 44,410 |
| Chairman of the Board | 1997 | $149,569 | $396,462 | $N/A | -0- | 100,000 | -0- | $ 1,500 |
| Chief Executive Officer | 1996(8) | $152,067 | $381,562 | $N/A | -0- | 71,999 | -0- | $ 12,291 |
| Kenneth L. Schroeder.......... | 1998 | $435,992 | $256,757 | $N/A | -0- | 62,500 | -0- | $ 43,545 |
| President and Chief Operating Officer | 1997 | $184,231 | $112,809 | $N/A | -0- | 162,500 | -0- | $ 71,452 |
| | 1996 | $110,777 | $196,095 | $N/A | -0- | -0- | -0- | $106,810 |
| Robert J. Boehlke.............. | 1998 | $297,135 | $116,708 | $N/A | -0- | 11,500 | -0- | $ 28,604 |
| Executive Vice President | 1997 | $257,908 | $141,587 | $N/A | -0- | 71,500 | -0- | $ 49,911 |
| and Chief Financial Officer | 1996 | $248,185 | $186,008 | $N/A | -0- | -0- | -0- | $ 79,526 |
| Gary R. Dickerson.............. | 1998 | $112,135 | $261,164 | $N/A | -0- | 42,500 | -0- | $ 29,984 |
| Executive Vice President, | 1997 | $260,611 | $129,441 | $N/A | -0- | 82,500 | -0- | $ 50,197 |
| Yield Management Solutions | 1996 | $221,146 | $172,500 | $N/A | -0- | 20,000 | -0- | $ 71,104 |
| Graham J. Siddall(8).......... | 1998 | $112,115 | $ 64,717 | $N/A | -0- | -0- | -0- | $ 29,984 |
| Executive Vice President, | 1997 | $261,062 | $217,661 | $N/A | -0- | 40,000 | -0- | $ 1,500 |
| Wafer Inspection Group | 1996(8) | $242,062 | $214,112 | $N/A | -0- | 87,999 | -0- | $ 1,500 |

---------------

(1) The amounts paid during the fiscal year to the named executive officers were less than the lesser of (a) $50,000 or (b) 10% of the executive officers total reported salary and bonus.

(2) The Company has not granted any restricted stock rights.

(3) The Company has not granted any stock appreciation rights.

(4) The Company does not have any Long Term Incentive Plans as that term is defined in the regulations.

(5) "All Other Compensation" is itemized as follows:

- In 1998, Mr. Levy received $25,496 in cash profit sharing; $9,246 in profit sharing was contributed by the Company to the 401(k) Plan; $8,688 was contributed to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

- In 1998, Mr. Tompkins received $25,496 in cash profit sharing; $9,246 in profit sharing was contributed by the Company to the 401(k) Plan; $8,688 was contributed to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

- In 1998, Mr. Schroeder received $25,001 in cash profit sharing; $9,230 in profit sharing was contributed by the Company to the 401(k) Plan; $8,314 was contributed to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

- In 1998, Mr. Boehlke received $16,205 in cash profit sharing; $8,681 in profit sharing was contributed by the Company to the 401(k) Plan; $2,718 was contributed to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

- In 1998, Mr. Dickerson received $17,016 in cash profit sharing; $9,032 in profit sharing was contributed by the Company to the 401(k) Plan; $2,936 was contributed to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

19

- In 1998, Mr. Siddall received $17,016 in cash profit sharing; $9,032 in profit sharing was contributed by the Company to the 401(k) Plan; $2,936 was contributed by the Company to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

(6) Mr. Levy was named Chief Executive Officer effective July 1, 1998. During fiscal 1997, Mr. Levy was Chief Executive Officer until April 30, 1997 when, as a result of the merger of Tencor Instruments ("Tencor") into a wholly-owned subsidiary of the Company (the "Merger"), he became Chairman of the Board of Directors and remained in that position until July 1, 1998.

(7) Mr. Tompkins was named Chairman of the Board effective July 1, 1998. He was previously President and Chief Executive Officer of Tencor until April 1997. As a result of the Merger he became Chief Executive Officer of the Company effective April 30, 1997 and remained in that position until July 1, 1998. The compensation described in this Summary Compensation Table reflects certain amounts which were paid during the period prior to the Merger when Tencor was an independent, publicly traded company. Tencor reported its results on a calendar year basis, while the Company reports its results based on a June 30 year end.

(8) The amounts reported for 1996 for Mr. Tompkins and Mr. Siddall are those amounts reported by Tencor in its proxy statements filed with the Securities and Exchange Commission for the year ended December 31, 1996.

STOCK OPTION GRANTS AND EXERCISES

    The following tables set forth the stock options granted to the named executive officers under the Company's stock option plans and the options exercised by such named executive officers during the fiscal year ended June 30, 1998.

    The Option/SAR Grant Table sets forth hypothetical gains or "option spreads" for the options at the end of their respective ten-year terms, as calculated in accordance with the rules of the Securities and Exchange Commission. Each gain is based on an arbitrarily assumed annualized rate of compound appreciation of the market price at the date of grant of 5% and 10% from the date the option was granted to the end of the option term. Actual gains, if any, on option exercises are dependent on the future performance of the Company's Common Stock and overall market conditions.

OPTION/SAR(1) GRANTS IN LAST FISCAL YEAR

KLA-TENCOR CORPORATION 1982 STOCK OPTION PLAN(2)

| | INDIVIDUAL GRANTS | | | | POTENTIAL REALIZABLE VALUE ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM | |
| NAME | OPTIONS/SARS GRANTED (#) | PERCENT OF TOTAL OPTIONS/ SARS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE OR BASE PRICE ($/SHARE) | EXPIRATION DATE | 5% | 10% |
|------|------|------|------|------|------|------|
| Kenneth Levy............. | 62,500 | 1.73% | $60.5625 | 07/31/07 | $2,380,464 | $6,032,564 |
| Jon D. Tompkins......... | -0- | -0- | -0- | N/A | -0- | -0- |
| Kenneth L. Schroeder.... | 62,500 | 1.73% | $60.5625 | 07/31/07 | $2,380,464 | $6,032,564 |
| Rupert J. Boehlke...... | 13,500 | .93% | $60.5625 | 07/31/07 | $1,275,929 | $3,213,454 |
| Gary E. Dickerson....... | 42,500 | 1.18% | $60.5625 | 07/31/07 | $1,618,716 | $4,102,144 |
| Graham J. Siddall....... | -0- | -0- | -0- | N/A | -0- | -0- |

----------------

(1) The Company has not granted any stock appreciation rights.

(2) The material terms of the grants (other than those set forth in the table) are: (a) The exercise price of the options is the fair market value of Common Stock as of the date of grant; (b) The options vest on a four year schedule with 25% after one year and the remaining option shares vesting 1/36th per month for the remainder of the vesting term; (c) To the extent unexercised, the options lapse after ten years; (d) The options are non-transferrable and are only exercisable during the period of employment of the

17

20

optionee and for 30 days following termination of employment, subject to limited exceptions in the cases of certain terminations, death or permanent disability of the optionee.

AGGREGATED OPTION/SAR EXERCISES IN LAST FISCAL YEAR AND YEAR-END VALUE(1)

KLA-TENCOR CORPORATION 1982 STOCK OPTION PLAN

| NAME | NUMBER OF SHARES ACQUIRED ON EXERCISE | VALUE REALIZED | TOTAL NUMBER OF UNEXERCISED OPTIONS HELD AT FISCAL YEAR END | | TOTAL VALUE(2) OF UNEXERCISED, IN-THE-MONEY OPTIONS HELD AT FISCAL YEAR END | |
|---|---|---|---|---|---|---|
| | | | EXERCISABLE | UNEXERCISABLE | EXERCISABLE | UNEXERCISABLE |
| Kenneth Levy............... | -0- | -0- | 326,901 | 226,099 | $5,673,025 | $800,006 |
| Jon D. Tompkins........... | -0- | -0- | 15,000 | 85,000 | -0- | -0- |
| Kenneth L. Schroeder...... | 20,000 | $1,283,750 | 298,901 | 226,099 | $4,958,276 | $800,006 |
| Robert J. Boehlke......... | 35,000 | $1,965,880 | 80,604 | 104,208 | $ 524,526 | $495,548 |
| Gary E. Dickerson......... | 26,500 | $1,379,228 | 71,815 | 128,885 | $ 316,089 | $446,517 |
| Graham J. Siddall(3)...... | -0- | -0- | 18,437 | 21,563 | -0- | -0- |

---------------

(1) The Company has not granted any stock appreciation rights.

(2) Total value of vested options based on fair market value of Company's Common Stock of $27.6875 per share as of June 30, 1998.

AGGREGATED OPTION/SAR EXERCISES IN LAST FISCAL YEAR AND YEAR-END VALUE(1)

TENCOR INSTRUMENTS 1993 EQUITY INCENTIVE PLAN

| NAME | NUMBER OF SHARES ACQUIRED ON EXERCISE | VALUE REALIZED | TOTAL NUMBER OF UNEXERCISED OPTIONS HELD AT FISCAL YEAR END | | TOTAL VALUE(2) OF UNEXERCISED, IN-THE-MONEY OPTIONS HELD AT FISCAL YEAR END | |
|---|---|---|---|---|---|---|
| | | | EXERCISABLE | UNEXERCISABLE | EXERCISABLE | UNEXERCISABLE |
| Kenneth Levy(3)........ | -0- | -0- | -0- | -0- | -0- | -0- |
| Jon D. Tompkins........ | 103,172 | $5,753,834 | 70,947 | 61,003 | $ 870,737 | $721,660 |
| Kenneth L. Schroeder(3)......... | -0- | -0- | -0- | -0- | -0- | -0- |
| Robert J. Boehlke(3)... | -0- | -0- | -0- | -0- | -0- | -0- |
| Gary E. Dickerson(3)... | -0- | -0- | -0- | -0- | -0- | -0- |
| Graham J. Siddall...... | 17,050 | $ 922,255 | 105,447 | 49,625 | $1,619,674 | $523,601 |

---------------

(1) The Company has not granted any stock appreciation rights.

(2) Total value of vested options based on fair market value of Company's Common Stock of $27.6875 per share as of June 30, 1998.

(3) Messrs. Levy, Schroeder, Boehlke and Dickerson have been executive officers of the Company and accordingly have never received options under the Tencor Instruments 1993 Equity Incentive Plan. Accordingly, the information under this table is inapplicable to them.

18

21

REPORT OF THE COMPENSATION COMMITTEE ON EXECUTIVE COMPENSATION

Compensation Committee

The Committee is comprised of three of the independent, non-employee members of the Board of Directors, none of whom have interlocking relationships as defined by the Securities and Exchange Commission. The Committee is responsible for setting and administering the policies governing annual compensation of executive officers, considers their performance and makes recommendations regarding their cash compensation and stock options to the full Board of Directors. The Committee periodically reviews its approach to executive compensation and makes changes as appropriate.

Compensation Philosophy

The Committee of the Board of Directors establishes the overall executive compensation strategies of the Company and approves compensation elements for the chairman of the board, the chief executive officer and other executive officers. The goals of the Company's compensation policy are to attract, retain and reward executive officers who contribute to the overall success of the Company by offering compensation that is competitive in the industry, to motivate executive officers to achieve the Company's business objectives and to align the interests of executive officers with the long term interests of stockholders. The Company currently uses salary, a management incentive plan and stock options to meet these goals.

The compensation philosophy of the Committee is to provide a comprehensive compensation package for each executive officer that is well suited to support accomplishment of the Company's business strategies, objectives and initiatives. For incentive-based compensation, the Committee considers the desirability of structuring such compensation arrangements so as to qualify for deductibility under Section 162(m) of the Internal Revenue Code. As the Committee applies this compensation philosophy in determining appropriate executive compensation levels and other compensation factors, the Committee reaches its decisions with a view towards the Company's overall financial performance.

Executive Officer Compensation

The Committee's approach is based upon a belief that a substantial portion of aggregate annual compensation for executive officers should be contingent upon the Company's performance and an individual's contribution to the Company's success. In addition, the Committee strives to align the interests of the Company's executive officers with the long-term interests of stockholders through stock option grants that can result in ownership of the Company's Common Stock. The Committee endeavors to structure each executive officer's overall compensation package to be consistent with this approach and to enable the Company to attract, retain and reward personnel who contribute to the success of the Company.

The Company provides its executive officers with a compensation package consisting of base salary, variable incentive pay and participation in benefit plans generally available to other employees. The Committee considers market information from published survey data provided to the Committee by the Company's human resources staff. The market data consists primarily of base salary and total cash compensation rates, as well as incentive bonus and stock programs of other companies considered by the Committee to be peers in the Company's industry.

For the Company's previous fiscal year, the Committee reviewed and recommended a compensation structure which had as an important component, the successful integration of KLA Instruments Corporation and Tencor Instruments. The merger was completed April 30, 1997 with the Company's fiscal 1998 year focused on integrating the two companies as well as substantial economic and business challenges in the semiconductor and semiconductor capital equipment industries worldwide.

Base Salary. Salaries for executive officers are set with reference to salaries for comparable positions among other companies in the Company's industry or in industries that employ individuals of similar education and background to the executive officer based on data provided by the Company's human resources staff.

22

Management Incentive Plan. Each year since fiscal 1979, the Company has adopted a management incentive plan (the "Incentive Plan") which provides for payments to officers and key employees based on the financial performance of the Company or the relevant business unit, and on the achievement of the person's individual performance objectives. The Incentive Plan is approved by the Committee and submitted to the Board of Directors for ratification. For fiscal 1999 the Incentive Plan sets goals for profitability, achievement of measurable objectives aimed at strategic corporate goals and achievement of objectives relating to managing the ratio of assets to sales.

Outstanding Corporate Performance Executive Bonus Plan. The Company adopted an additional incentive plan (the "Outstanding Corporate Performance Plan") which allows for an additional bonus in years when the Company achieves certain levels of profitability and growth. For those executive officers that do not have operating divisions reporting to them, the matrix is based on the Company's pre-tax margin and the growth of the Company compared to a peer group. The target percentage for the Outstanding Corporate Performance Plan is the same target percentage as utilized in determining the Incentive Plan bonus. For those executive officers who do have operating divisions reporting to them, the matrix is based on certain specified growth objectives for that division and the Company's net operating margin. The target percentage for the Outstanding Corporate Performance Plan is also the same as that utilized in determining the Incentive Plan bonus. Any amounts to be paid under the Outstanding Corporate Performance Plan will be in the form of a contribution by the Company to the Executive Deferred Savings Plan (the "EDSP") and will vest over a one year period. At the end of such one year period, the executive officer will have the choice of taking a cash payment or leaving it in the EDSP. If the executive officer should leave during that one year period, the contribution by the Company shall be forfeited. The executive officer will be eligible to participate in the Company's profit sharing plan while eligible for Company contributions under the Outstanding Corporate Performance Plan but any amounts contributed by the Company pursuant to the Outstanding Corporate Performance Plan will be offset by profit sharing paid during the year.

Long-term incentives. Longer term incentives are provided through the Stock Option Plan and the Excess Profit Stock Plan, each of which reward executive officers through the growth in value of the Company's Common Stock. The Committee believes that employee equity ownership is highly motivating, provides a major incentive for employees to build stockholder value and serves to align the interests of employees with those of stockholders.

Grants of stock options to executive officers are based upon each executive officer's relative position, responsibilities, historical and expected contributions to the Company, and the executive officer's existing stock ownership and previous option grants, with primary weight given to the executive officer's relative rank and responsibilities. Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price.

Approval of Fiscal Year 1999 Bonus Plan and Outstanding Corporate Performance Plan

The Committee approved the fiscal year 1999 bonus plan incentive formula which is based on two components of equal weight. The first is performance against certain financial objectives and the second is achievement of certain non-financial strategic objectives. The bonuses for the Chairman of the Board, the Chief Executive Officer, the President/Chief Operating Officer and the Chief Financial Officer are based on an average of the performance of those managers reporting to the executive officers utilizing a combination of the weighted average contribution made by each manager and a simple average of those contributions. The Committee also approved the fiscal year Outstanding Corporate Performance Plan which is based on a matrix of the Company's net operating margin and certain growth objectives. The Outstanding Corporate Performance Plan does not require any contributions by the Company until the Company achieves a Pre-Tax Margin Factor of 14%. The Pre-Tax Margin Factor is calculated by taking the pre-tax, pre-profit sharing income, excluding non-recurring charges, and dividing it by total revenue.

20

23

Chief Executive Officer Compensation

For fiscal year 1998, Jon D. Tompkins served as Chief Executive Officer and Kenneth Levy served as Chairman of the Board. Effective July 1, 1998 Mr. Tompkins assumed the role of Chairman of the Board and Mr. Levy assumed the role of Chief Executive Officer. Base salary for Mr. Tompkins for fiscal 1999 has been set at $245,440, and the base salary for Mr. Levy has been set at $490,880 based on the recommendations provided by the Company's Human Resources Compensation staff. Options to purchase 50,809 shares of the Common Stock of the Company were granted to Mr. Tompkins and options to purchase 102,136 shares of the Common Stock of the Company were granted to Mr. Levy, each with standard four year vesting terms. For fiscal 1998 a bonus of $262,314 was paid to Mr. Levy and a bonus of $262,314 was paid to Mr. Tompkins. These payments were based on the formula approved by the Compensation Committee and the Board of Directors last year. In a year in which the Company faced many challenges, including the integration of two companies and severe economic downturn in the semiconductor and semiconductor capital equipment industries worldwide, the Company successfully integrated two companies and continued its profitability with revenues of $1.2 billion and earnings per share of $1.76.

MEMBERS OF THE COMPENSATION COMMITTEE

James W. Bagley
Leo J. Chamberlain
Lida Urbanek

21

24

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

The members of the Compensation Committee are set forth in the preceding section. There are no members of the Compensation Committee who were officers or employees of the Company or any of its subsidiaries during the fiscal year, formerly officers of the Company, or had any relationship otherwise requiring disclosure hereunder.

## PERFORMANCE GRAPH

The stock price performance shown on the graph following is not necessarily indicative of future price performance.

COMPARISON OF FIVE YEAR CUMULATIVE TOTAL RETURN AMONG KLA-TENCOR
CORPORATION, THE NASDAQ -- US INDEX AND THE HAMBRECHT & QUIST
TECHNOLOGY INDEX*

|         | KLA-TENCOR CORPORATION | NASDAQ - US INDEX | HAMBRECHT & QUIST TECHNOLOGY INDEX |
|---------|------------------------|-------------------|------------------------------------|
| 6/30/93 | 100.00                 | 100.00            | 100.00                             |
| 6/30/94 | 217.39                 | 100.96            | 102.21                             |
| 6/30/95 | 447.83                 | 134.77            | 180.82                             |
| 6/30/96 | 269.57                 | 173.03            | 211.32                             |
| 6/30/97 | 565.22                 | 210.38            | 275.98                             |
| 6/30/98 | 321.01                 | 277.69            | 349.59                             |

---------------

* Assumes $100 invested on June 30, 1993. The Company's fiscal year end is June 30.

22

25

## CERTAIN TRANSACTIONS

In connection with the merger between KLA Instruments Corporation and Tencor Instruments (effective April 30, 1997) the Company entered into identical employment arrangements, subsequently amended, with Kenneth Levy, Jon D. Tompkins and Kenneth L. Schroeder, all executive officers of the Company. The arrangements, as amended, provide that certain benefits would be paid if certain events took place after April 30, 1997. The purpose of these arrangements is to retain the services of Messrs. Levy, Tompkins and Schroeder to ensure the continued smooth transition associated with the Merger. The terms of those arrangements provide that if an individual were to leave the Company after April 30, 1998, subject to releasing the Company from all claims, and in connection with working part-time for 36 months, he will receive (i) his base salary for the first 24 months of part-time employment, (ii) a mutually agreeable level of compensation per month for the final 12 months of part-time employment, (iii) an annual bonus (based on an achievement of 100% of bonus objectives) in the fiscal year of his transition to part-time employment, (iv) a bonus paid in the fiscal year following the payment of the annual bonus above, (based on achievement of 100% of his individual bonus objectives) and (v) a pro-rated bonus for the fiscal year in which part-time employment ended. During the periods of part-time employment, all options to exercise stock of the Company which were granted more than 12 months prior to the termination of full-time employment will continue to vest. The same benefits shall be payable in the event the Company terminates his employment without cause. If he is terminated for cause (defined as (i) gross negligence or willful misconduct in connection with the performance of duties, (ii) conviction of or plea of nolo contendere to any felony, or (iii) the embezzlement or misappropriation of Company property) then he will receive a lump-sum payment equal to 25% of his base salary.

## COMPLIANCE WITH SECTION 16(a) OF THE SECURITIES EXCHANGE ACT OF 1934

Section 16(a) of the Exchange Act requires the Company's executive officers, directors, and persons who own more than ten percent of a registered class of the Company's equity securities to file reports of ownership and changes in ownership with the SEC. Executive officers, directors and greater than ten percent stockholders are required by SEC regulations to furnish the Company with copies of all Section 16(a) forms they file. Kenneth Levy, an executive officer and director of the Company filed an amendment to his Form 4 for the month ending August 30, 1997 in order to reflect transactions by a family member and a family trust, which had inadvertently been left off of the original Form 4. Mr. Levy filed the amendment when he discovered the error. Jon D. Tompkins, an executive officer and director of the Company filed an amendment to his Form 4 for the month ending July 31, 1997 to reflect ownership of an additional 1,500 shares of the Company's Common Stock owned by Mr. Tompkins. These shares were inadvertently not reported on the original Form 4 because they were held by Mr. Tompkins under the Tencor Instruments employee stock purchase plan prior to the Merger. Mr. Tompkins filed an amendment when he discovered the error. Dean O. Morton, a director of the Company, filed an amended Form 4 for the month ending August 30, 1997 to reflect an exercise of a stock option inadvertently not reported on the original Form 4. Mr. Morton filed an amendment when he discovered the error. Graham J. Siddall, an executive officer of the Company filed an amendment to his Form 4 for the month ending August 30, 1997 in order to reflect exercises of stock options which had inadvertently been left off the original Form 4. Mr. Siddall filed the amendment when he discovered the error.

## OTHER MATTERS

The Company knows of no other matters to be submitted to the stockholders at the Annual Meeting. If any other matters properly come before the Annual Meeting, it is the intention of the persons named in the enclosed form of Proxy to vote the shares they represent as the Board of Directors may recommend.

THE BOARD OF DIRECTORS

September 30, 1998

26

## KLA-TENCOR CORPORATION

### 1998 OUTSIDE DIRECTOR OPTION PLAN

1. **Purposes of the Plan.** The purposes of this 1998 Outside Director Option Plan are to attract and retain the best available personnel for service as Outside Directors (as defined herein) of the Company, to provide additional incentive to the Outside Directors of the Company to serve as Directors, and to encourage their continued service on the Board.

All options granted hereunder shall be nonstatutory stock options.

2. **Definitions.** As used herein, the following definitions shall apply:

(a) "Board" means the Board of Directors of the Company.

(b) "Code" means the Internal Revenue Code of 1986, as amended.

(c) "Common Stock" means the common stock of the Company.

(d) "Company" means KLA-Tencor Corporation.

(e) "Director" means a member of the Board.

(f) "Disability" means total and permanent disability as defined in section 22(e)(3) of the Code.

(g) "Employee" means any person, including officers and Directors, employed by the Company or any Parent or Subsidiary of the Company. The payment of a Director's fee by the Company shall not be sufficient in and of itself to constitute "employment" by the Company.

(h) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(i) "Fair Market Value" means, as of any date, the value of Common Stock determined as follows:

(i) If the Common Stock is listed on any established stock exchange or a national market system, including without limitation the Nasdaq National Market or The Nasdaq SmallCap Market of The Nasdaq Stock Market, its Fair Market Value shall be the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such exchange or system on the date of determination as reported in The Wall Street Journal or such other source as the Administrator deems reliable;

27

          (ii) If the Common Stock is regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value of a Share of Common Stock shall be the mean between the high bid and low asked prices for the Common Stock on the date of determination, as reported in The Wall Street Journal or such other source as the Board deems reliable; or

          (iii) In the absence of an established market for the Common Stock, the Fair Market Value thereof shall be determined in good faith by the Board.

          (j) "Inside Director" means a Director who is an Employee.

          (k) "Option" means a stock option granted pursuant to the Plan.

          (l) "Optioned Stock" means the Common Stock subject to an Option.

          (m) "Optionee" means a Director who holds an Option.

          (n) "Outside Director" means a Director who is not an Employee.

          (o) "Parent" means a "parent corporation," whether now or hereafter existing, as defined in Section 424(e) of the Code.

          (p) "Plan" means this 1998 Director Option Plan.

          (q) "Share" means a share of the Common Stock, as adjusted in accordance with Section 10 of the Plan.

          (r) "Subsidiary" means a "subsidiary corporation," whether now or hereafter existing, as defined in Section 424(f) of the Code.

          3. Stock Subject to the Plan. Subject to the provisions of Section 10 of the Plan, the maximum aggregate number of Shares which may be optioned and sold under the Plan is one million Shares (the "Pool"). The Shares may be authorized, but unissued, or reacquired Common Stock.

          If an Option expires or becomes unexercisable without having been exercised in full, the unpurchased Shares which were subject thereto shall become available for future grant or sale under the Plan (unless the Plan has terminated). Shares that have actually been issued under the Plan shall not be returned to the Plan and shall not become available for future distribution under the Plan.

2

28

4. Administration and Grants of Options under the Plan.

(a) Discretionary Grants. The Board (or its committee) shall have the authority, in its discretion, to make discretionary grants of Options hereunder to Outside Directors and to specify the terms and conditions of such discretionary Option grants.

(b) Automatic Grants. Outside Directors under this Plan shall receive automatic Option grants as follows:

(i) Each Outside Director shall be automatically granted an Option to purchase ten thousand (10,000) Shares (the "First Option") on the date on which such person first becomes an Outside Director, whether through election by the shareholders of the Company or appointment by the Board to fill a vacancy; provided, however, that an Inside Director who ceases to be an Inside Director but who remains a Director shall not receive a First Option.

(ii) Each Outside Director shall be automatically granted an Option to purchase five thousand (5,000) Shares (a "Subsequent Option") on the day of the Company's annual meeting of shareholders of each year provided he or she is then an Outside Director, and if as of such date, he or she shall have served on the Board for at least the preceding six (6) months.

(iii) The terms of a First Option granted hereunder shall be as follows:

(A) the term of the First Option shall be ten (10) years.

(B) the First Option shall be exercisable only while the Outside Director remains a Director of the Company, except as set forth in Sections 8 and 10 hereof.

(C) the exercise price per Share shall be 100% of the Fair Market Value per Share on the date of grant of the First Option.

(D) subject to Section 10 hereof, the First Option shall become exercisable as to twenty-five percent of the Shares subject to the First Option on the first anniversary of its date of grant and as to 1/48th of the Shares initially subject to the First Option each month thereafter, so as to be 100% vested on the fourth anniversary of the date of grant, provided that the Optionee continues to serve as a Director on such dates.

(iv) The terms of a Subsequent Option granted hereunder shall be as follows:

(A) the term of the Subsequent Option shall be ten (10) years.

(B) the Subsequent Option shall be exercisable only while the Outside Director remains a Director of the Company, except as set forth in Sections 8 and 10 hereof.

3

29

                (C) the exercise price per Share shall be 100% of the Fair Market Value per Share on the date of grant of the Subsequent Option.

                (D) subject to Section 10 hereof, the Subsequent Option shall become exercisable as to 100% percent of the Shares subject to the Subsequent Option on the fourth anniversary of its date of grant, provided that the Optionee continues to serve as a Director on such date.

            (c) Powers of the Board. Subject to the provisions of the Plan and, in the case of a committee, the specific duties delegated by the Board to such committee, and subject to the approval of any relevant authorities, the Board (or its committee) shall have the authority, in its discretion:

                (i) to modify or amend each Option, including the discretionary authority to change prospectively the vesting schedules of options, to extend the post-termination exercisability period of outstanding Options longer than is otherwise provided for and/or to accelerate the vesting of any outstanding Option;

                (ii) to construe and interpret the terms of the Plan and awards granted pursuant to the Plan.

            (d) Share Shortfalls. In the event that any Option granted under the Plan would cause the number of Shares subject to outstanding Options plus the number of Shares previously purchased under Options to exceed the Pool, then the remaining Shares available for Option grant shall be granted under Options to the Outside Directors on a pro rata basis. No further grants shall be made until such time, if any, as additional Shares become available for grant under the Plan through action of the Board or the shareholders to increase the number of Shares which may be issued under the Plan or through cancellation or expiration of Options previously granted hereunder.

        5. Eligibility. Options may be granted only to Outside Directors. The Plan shall not confer upon any Optionee any right with respect to continuation of service as a Director or nomination to serve as a Director, nor shall it interfere in any way with any rights which the Director or the Company may have to terminate the Director's relationship with the Company at any time.

        6. Term of Plan. The Plan shall become effective upon the date upon which it is approved by the Company's stockholders. It shall continue in effect until it is terminated under Section 11 of the Plan.

        7. Form of Consideration. The consideration to be paid for the Shares to be issued upon exercise of an Option, including the method of payment, shall consist of (i) cash, (ii) check, (iii) other shares which (x) in the case of Shares acquired upon exercise of an option, have been owned by the Optionee for more than six (6) months on the date of surrender, and (y) have a Fair

30

Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which said Option shall be exercised, (iv) consideration received by the Company under a cashless exercise program implemented by the Company in connection with the Plan, or (v) any combination of the foregoing methods of payment.

8. Exercise of Option.

(a) Procedure for Exercise; Rights as a Shareholder. Any Option granted hereunder shall be exercisable at such times as are set forth in Section 4 hereof.

An Option may not be exercised for a fraction of a Share.

An Option shall be deemed to be exercised when written notice of such exercise has been given to the Company in accordance with the terms of the Option by the person entitled to exercise the Option and full payment for the Shares with respect to which the Option is exercised has been received by the Company. Full payment may consist of any consideration and method of payment allowable under Section 7 of the Plan. Until the issuance (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company) of the stock certificate evidencing such Shares, no right to vote or receive dividends or any other rights as a shareholder shall exist with respect to the Optioned Stock, notwithstanding the exercise of the Option. A share certificate for the number of Shares so acquired shall be issued to the Optionee as soon as practicable after exercise of the Option. No adjustment shall be made for a dividend or other right for which the record date is prior to the date the stock certificate is issued, except as provided in Section 10 of the Plan.

Exercise of an Option in any manner shall result in a decrease in the number of Shares which thereafter may be available, both for purposes of the Plan and for sale under the Option, by the number of Shares as to which the Option is exercised.

(b) Termination of Continuous Status as a Director. Subject to Section 10 hereof, in the event an Optionee's status as a Director terminates (other than upon the Optionee's death or Disability), the Optionee may exercise his or her Option, but only within thirty days (30) following the date of such termination, and only to the extent that the Optionee was entitled to exercise it on the date of such termination (but in no event later than the expiration of its ten (10) year term). To the extent that the Optionee was not entitled to exercise an Option on the date of such termination, and to the extent that the Optionee does not exercise such Option (to the extent otherwise so entitled) within the time specified herein, the Option shall terminate.

(c) Disability of Optionee. In the event Optionee's status as a Director terminates as a result of Disability, the Optionee may exercise his or her Option, but only within twelve (12) months following the date of such termination, and only to the extent that the Optionee was entitled to exercise it on the date of such termination (but in no event later than the expiration of its ten (10) year term). To the extent that the Optionee was not entitled to exercise an Option on the date of termination, or if he or she does not exercise such Option (to the extent otherwise so entitled) within the time specified herein, the Option shall terminate.

5

31

(d) Death of Optionee. In the event of an Optionee's death, the Optionee's estate or a person who acquired the right to exercise the Option by bequest or inheritance may exercise the Option, but only within twelve (12) months following the date of death, and only to the extent that the Optionee was entitled to exercise it on the date of death (but in no event later than the expiration of its ten (10) year term). To the extent that the Optionee was not entitled to exercise an Option on the date of death, and to the extent that the Optionee's estate or a person who acquired the right to exercise such Option does not exercise such Option (to the extent otherwise so entitled) within the time specified herein, the Option shall terminate.

9. Non-Transferability of Options. The Option may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent or distribution and may be exercised, during the lifetime of the Optionee, only by the Optionee.

10. Adjustments Upon Changes in Capitalization, Dissolution, Merger or Asset Sale.

(a) Changes in Capitalization. Subject to any required action by the shareholders of the Company, the number of Shares covered by each outstanding Option, the number of Shares which have been authorized for issuance under the Plan but as to which no Options have yet been granted or which have been returned to the Plan upon cancellation or expiration of an Option, as well as the price per Share covered by each such outstanding Option, (but not the number of Shares issuable pursuant to the automatic grant provisions of Section 4 hereof) shall be proportionally adjusted for any increase or decrease in the number of issued Shares resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the Common Stock, or any other increase or decrease in the number of issued Shares effected without receipt of consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of Shares subject to an Option.

(b) Dissolution or Liquidation. In the event of the proposed dissolution or liquidation of the Company, to the extent that an Option has not been previously exercised, it shall terminate immediately prior to the consummation of such proposed action.

(c) Merger or Asset Sale. In the event of a merger of the Company with or into another corporation or the sale of substantially all of the assets of the Company, outstanding Options may be assumed or equivalent options may be substituted by the successor corporation or a Parent or Subsidiary thereof (the "Successor Corporation"). If an Option is assumed or substituted for, the Option or equivalent option shall continue to be exercisable as provided in Section 4 hereof for so long as the Optionee serves as a Director or a director of the Successor Corporation. Following such assumption or substitution, if the Optionee's status as a Director or director of the Successor Corporation, as applicable, is terminated other than upon a voluntary

6

32

resignation by the Optionee, the Option or option shall become fully exercisable, including as to Shares for which it would not otherwise be exercisable. Thereafter, the Option or option shall remain exercisable in accordance with Sections 8(b) through (d) above.

If the Successor Corporation does not assume an outstanding Option or substitute for it an equivalent option, the Option shall become fully vested and exercisable, including as to Shares for which it would not otherwise be exercisable. In such event the Board shall notify the Optionee that the Option shall be fully exercisable for a period of thirty (30) days from the date of such notice, and upon the expiration of such period the Option shall terminate.

For the purposes of this Section 10(c), an Option shall be considered assumed if, following the merger or sale of assets, the Option confers the right to purchase or receive, for each Share of Optioned Stock subject to the Option immediately prior to the merger or sale of assets, the consideration (whether stock, cash, or other securities or property) received in the merger or sale of assets by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares). If such consideration received in the merger or sale of assets is not solely common stock of the successor corporation or its Parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of the Option, for each Share of Optioned Stock subject to the Option, to be solely common stock of the successor corporation or its Parent equal in fair market value to the per share consideration received by holders of Common Stock in the merger or sale of assets.

11. Amendment and Termination of the Plan.

(a) Amendment and Termination. The Board may at any time amend, alter, suspend, or discontinue the Plan, but no amendment, alteration, suspension, or discontinuation shall be made which would impair the rights of any Optionee under any grant theretofore made, without his or her consent. In addition, to the extent necessary and desirable to comply with any applicable law, regulation or stock exchange rule, the Company shall obtain shareholder approval of any Plan amendment in such a manner and to such a degree as required.

(b) Effect of Amendment or Termination. Any such amendment or termination of the Plan shall not affect Options already granted and such Options shall remain in full force and effect as if this Plan had not been amended or terminated.

12. Time of Granting Options. The date of grant of an Option shall, for all purposes, be the date determined in accordance with Section 4 hereof.

13. Conditions Upon Issuance of Shares. Shares shall not be issued pursuant to the exercise of an Option unless the exercise of such Option and the issuance and delivery of such Shares pursuant thereto shall comply with all relevant provisions of law, including, without limitation, the Securities Act of 1933, as amended, the Exchange Act, the rules and regulations promulgated thereunder, state securities laws, and the requirements of any stock exchange upon

33

which the Shares may then be listed, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

As a condition to the exercise of an Option, the Company may require the person exercising such Option to represent and warrant at the time of any such exercise that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares, if, in the opinion of counsel for the Company, such a representation is required by any of the aforementioned relevant provisions of law.

Inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained.

14. Reservation of Shares. The Company, during the term of this Plan, will at all times reserve and keep available such number of Shares as shall be sufficient to satisfy the requirements of the Plan.

15. Option Agreement. Options shall be evidenced by written option agreements in such form as the Board shall approve.

16. Shareholder Approval. The Plan shall be subject to approval by the shareholders of the Company within twelve (12) months after the date the Plan is adopted. Such shareholder approval shall be obtained in the degree and manner required under applicable state and federal law and any stock exchange rules.

8

34

## KLA-TENCOR CORPORATION

### Proxy for 1998 Annual Meeting of Stockholders

#### THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

The undersigned, revoking all prior proxies, hereby appoints Kenneth Levy and Lisa C. Berry, and each of them, as Proxies with full power of substitution, to represent and vote as designated in this proxy any and all shares of the common stock of KLA-Tencor Corporation (the "Company"), held or owned by or standing in the name of the undersigned on the Company's books on September 18, 1998, at the Annual Meeting of Stockholders of the Company to be held at the Company's offices at One Technology Drive, Milpitas, California 95035, at 11:00 a.m. local time on Tuesday, November 17, 1998 and any continuation or adjournment thereof, with all powers the undersigned would possess if personally present at the meeting.

The undersigned hereby directs and authorizes said Proxies and each of them, or their substitute or substitutes, to vote as specified with respect to the proposals listed on the reverse side or, if no specification is made, to vote in favor thereof.

The undersigned hereby further confers upon said Proxies, and each of them, or their substitute or substitutes, discretionary authority to vote with respect to all other matters that may properly come before the meeting or any continuation or adjournment thereof.

The undersigned hereby acknowledges receipt of: (a) Notice of Annual Meeting of Stockholders of the Company, (b) accompanying Proxy Statement, and (c) Annual Report to Stockholders for the year ending June 30, 1998.

CONTINUED AND TO BE SIGNED ON REVERSE SIDE

SEE REVERSE SIDE

35

/ X /  Please mark votes as in this example.

THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS OF THE COMPANY. THE
BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE NOMINEES FOR DIRECTOR AND FOR
PROPOSALS 2, 3, 4 AND 5.

1.    To elect Class III directors to serve for a three year term and until their
successors are elected. Nominees: James W. Bagley, Edward W. Barnholt, Dean O.
Morton and Kenneth L. Schroeder.

             FOR                    WITHHELD
             / /                      / /

        / /
             ---------------------------------------------------
             For all nominees, except as noted above.

2.    To approve amendments to the 1997 Employee Stock Purchase Plan to increase
the number of shares of Common Stock of the Company reserved for issuance
thereunder by 1,000,000 shares.

             FOR              AGAINST            ABSTAIN
             / /                / /                / /

3.    To approve amendments to the 1997 Employee Stock Purchase Plan to increase
the number of shares of Common Stock of the Company reserved for issuance
thereunder on the first day of each subsequent fiscal year by the lesser of (a)
2,000,000 shares or (b) the number of shares which the Company estimates (based
on the previous 12-month period) it will be required to issue under the 1997
Employee Stock Purchase Plan during the forthcoming fiscal year.

             FOR              AGAINST            ABSTAIN
             / /                / /                / /

4.    To approve the 1998 Outside Director Option Plan and to reserve for
issuance thereunder 1,000,000 shares of the Common Stock of the Company.

             FOR              AGAINST            ABSTAIN
             / /                / /                / /

5.    To ratify the appointment of PricewaterhouseCoopers LLP as independent
accountants of the Company for the fiscal year ending June 30, 1999.

             FOR              AGAINST            ABSTAIN
             / /                / /                / /


In their discretion, the proxy holders are authorized to vote on all such other
matters as may properly come before the meeting or any adjournment thereof.

/ /    Mark here if you plan to attend the meeting

/ /    Mark here for address change and note below

Please sign exactly as your name appears on your stock certificate(s), date and
return this Proxy promptly in the reply envelope provided. Please correct your
address before returning this Proxy. Persons signing in a fiduciary capacity
should so indicate. If shares are held by joint tenants or as community
property, both should sign.


Signature:                                        Date:
           -------------------------------------        -----------------
Signature:                                        Date:
           -------------------------------------        -----------------

                              [DETACH HERE]

# EXHIBIT 6

**SCHEDULE 14A INFORMATION**
**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934**

Filed by the Registrant  ☒
Filed by a Party other than the Registrant  ☐
Check the appropriate box:
☐     Preliminary Proxy Statement
☐     Confidential, for Use of the Commission Only (as permitted by Rule 14a–6(e)(2))
☒     Definitive Proxy Statement
☐     Definitive Additional Materials
☐     Soliciting Material Pursuant to §240.14a–12

# KLA – TENCOR CORPORATION

(Name of Registrant as Specified in its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):
☒     No fee required.
☐     Fee computed on table below per Exchange Act Rules 14a–6(i)(1) and 0–11.
    (1)     Title of each class of securities to which transaction applies:

    (2)     Aggregate number of securities to which transaction applies:

    (3)     Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0–11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)     Proposed maximum aggregate value of transaction:

    (5)     Total fee paid:

☐     Fee paid previously with preliminary materials.
☐     Check box if any part of the fee is offset as provided by Exchange Act Rule 0–11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
    (1)     Amount Previously Paid:

    (2)     Form, Schedule or Registration Statement No.:

    (3)     Filing Party:

    (4)     Date Filed:



### NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
October 18, 2004

To the Stockholders:

### YOUR VOTE IS IMPORTANT

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders of KLA–Tencor Corporation (the "Company"), a Delaware corporation, will be held on Monday, October 18, 2004 at 1:00 p.m., local time, at the Company's offices located at Three Technology Drive, Milpitas, California 95035, for the following purposes:

1.  To elect three Class III directors to each serve for a three–year term and until their successors are duly elected.

2.  To approve the Company's 2004 Equity Incentive Plan, including approval of its material terms and performance goals for purposes of Internal Revenue Code Section 162(m).

3.  To ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2005.

4.  To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

The foregoing items of business are more fully described in the Proxy Statement accompanying this Notice.

Only stockholders of record at the close of business on August 23, 2004 are entitled to notice of, and to vote at, the Annual Meeting and any adjournment or postponement thereof.

Sincerely,

Stuart J. Nichols
Assistant Secretary
San Jose, California

September 9, 2004

All stockholders are cordially invited to attend the Annual Meeting in person; however, to assure your representation at the Annual Meeting, you are requested to complete, sign and date the enclosed proxy card and return it in the enclosed envelope or follow the instructions on the enclosed proxy card to vote by telephone or via the Internet. Any stockholder attending the Annual Meeting may vote in person even if he or she returned a proxy card.

81

**2004 ANNUAL MEETING OF STOCKHOLDERS**
**OF**
**KLA-TENCOR CORPORATION**

To be held on October 18, 2004

## PROXY STATEMENT

### QUESTIONS AND ANSWERS REGARDING SOLICITATION AND VOTING

**Why am I receiving these materials?**

The Board of Directors of KLA-Tencor Corporation ("KLA-Tencor," the "Company" or "we") is providing these proxy materials for you in connection with KLA-Tencor's Annual Meeting of Stockholders to be held on Monday, October 18, 2004 at 1:00 p.m. local time. As a stockholder of record, you are invited to attend the Annual Meeting, which will be held at our offices at Three Technology Drive, Milpitas, California 95035. The purposes of the Annual Meeting are set forth in the accompanying Notice of Annual Meeting of Stockholders and this Proxy Statement.

These proxy solicitation materials and the enclosed Annual Report on Form 10-K for the fiscal year ended June 30, 2004, including financial statements, were first mailed on or about September 9, 2004 to all stockholders entitled to vote at the Annual Meeting. KLA-Tencor's principal executive offices are located at 160 Rio Robles, San Jose, California 95134, and our telephone number is (408) 875-3000.

**How may I obtain KLA-Tencor's Annual Report?**

A copy of our Annual Report on Form 10-K was delivered with this Proxy Statement. It is also available free of charge on the Internet from the Securities and Exchange Commission's website at www.sec.gov, as well as on our website at www.kla-tencor.com.

### QUESTIONS AND ANSWERS ABOUT THE ANNUAL MEETING

**Who may vote at the Annual Meeting?**

You may vote if our records showed that you owned shares of KLA-Tencor Common Stock as of August 23, 2004 (the "Record Date"). At the close of business on that date, we had a total of 196,247,543 shares of Common Stock issued and outstanding, which were held of record by approximately 971 stockholders. As of the Record Date, we had no shares of Preferred Stock outstanding. You are entitled to one vote for each share that you own.

**What proposals are being voted on at the Annual Meeting?**

In addition to such other business as may properly come before the Annual Meeting or any adjournment thereof, the following three proposals will be presented at the Annual Meeting:

1. Electing three Class III directors to each serve for a three-year term and until their successors are duly elected;

2. Approving the Company's 2004 Equity Incentive Plan, including approval of its material terms and performance goals for purposes of Internal Revenue Code Section 162(m); and

3. Ratifying the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2005.

82

| **How can I vote if I own shares directly?** | If your shares are registered directly in your name with our transfer agent, you are considered, with respect to those shares, the stockholder of record, and these proxy materials are being sent directly to you. You may vote in accordance with the instruction described below. If you hold your shares in your own name as a holder of record, you may instruct the proxy holders how to vote your common stock in the following ways: |

1.  **By Telephone:** Use the toll free telephone number provided on the proxy card (specific instructions for using the telephone voting system are on the proxy card);

2.  **Internet:** Use the Internet voting site listed on the proxy card (specific instructions for using the Internet voting system are on the proxy card);

3.  **By Mail:** Complete, sign, date and mail the proxy card in the postage paid envelope that we have provided; or

4.  **In Person:** Attend the Annual Meeting and vote your shares in person.

Whichever of these methods you select to transmit your instructions, the proxy holders will vote your shares in accordance with those instructions.

If you sign and return a proxy card without giving specific voting instructions, your shares will be voted as recommended by our Board of Directors.

| **How may I vote if my shares are held in a stock brokerage account, by a bank or other nominee?** | If your shares are held in a stock brokerage account or by a bank or other nominee, you are considered the beneficial owner of shares held in street name, and these proxy materials are being forwarded to you by your broker or nominee who is considered, with respect to those shares, the stockholder of record. As the beneficial owner, you have the right to direct your broker on how to vote and you are also invited to attend the Annual Meeting. However, since you are not the stockholder of record, you may not vote these shares in person at the Annual Meeting. Your broker or nominee has forwarded instructions for you to use in directing the broker or nominee regarding how to vote your shares. |

If a broker, bank or other nominee holds your shares, you will receive instructions from them that you must follow in order to have your shares voted.

| **Can I change my vote?** | You may change your vote at any time prior to the vote at the Annual Meeting. To change your proxy instructions if you are a holder of record, you must: |

1.  Advise our Assistant Secretary in writing at our principal executive office before the proxy holders vote your shares that you wish to revoke your proxy instructions; or

2.  Deliver proxy instructions dated after your earlier proxy instructions as follows:

    (a)  **By Telephone:** Use the toll free telephone number provided on the proxy card to vote again prior to 11:59 P.M. EST on October 17, 2004 (specific instructions for using the telephone voting system are on the proxy card);

    (b)  **By Internet:** Use the Internet voting site listed on the proxy card to vote again prior to 11:59 P.M EST on October 17, 2004 (specific instructions for using the Internet voting system are on the proxy card);

    (c)  **By Mail:** Complete, sign, date and mail another proxy card bearing a later date and deliver such proxy card prior to 11:59 P.M. EST on October 17, 2004; or

    (d)  **In Person:** Attend the Annual Meeting and vote your shares in person.

**How are votes counted?**

The Annual Meeting will be held if a majority of the outstanding Common Stock entitled to vote is represented at the Annual Meeting. If you have returned valid proxy instructions or attend the Annual Meeting in person, your Common Stock will be counted for the purpose of determining whether there is a quorum, even if you wish to abstain from voting on some or all matters at the Annual Meeting.

**Who will bear the cost of this proxy solicitation?**

We will pay the cost of this proxy solicitation. KLA–Tencor has retained the services of Automatic Data Processing ("ADP") and D.F. King to aid in the solicitation of proxies from brokers, bank nominees and other institutional owners. We estimate that we will pay ADP fees of approximately $100,000 for this solicitation activity and for forwarding solicitation material to beneficial and registered stockholders and processing the results. We estimate that we will pay D.F. King approximately $10,000 for this solicitation activity. Certain of our directors, officers and regular employees, without additional compensation, may solicit proxies personally or by telephone.

**Can my broker vote my shares if I do not instruct him or her how I would like my shares voted?**

Yes, except with respect to the proposal to approve the Company's 2004 Equity Incentive Plan. If you do not give your broker voting instructions with respect to Proposal Two, approval of the 2004 Equity Incentive Plan, the broker will be prevented from voting shares held in your brokerage account (a "broker non–vote"). The New York Stock Exchange ("NYSE") has issued regulations which prohibit bankers, brokers or other nominees that are NYSE member organizations from voting in favor of proposals related to equity compensation plans unless they receive specific instructions from the beneficial owner of the shares to vote in that manner. In addition, brokers who are members of the National Association of Securities Dealers ("NASD") are also prohibited from voting on such proposals without specific instructions from beneficial holders. Thus, all shares that you hold through a broker or other nominee who is a NYSE or NASD member organization will only be voted on Proposal Two if you have provided specific voting instructions to your broker or other nominee with respect to Proposal Two.

**Are abstentions and broker non–votes counted?**

Shares that are voted "FOR," "AGAINST," "WITHHELD" or "ABSTAIN" are treated as being present for purposes of determining the presence of a quorum and are also treated as shares entitled to vote at the Annual Meeting ("Votes Cast").

Since abstentions will be counted for purposes of determining both (i) the presence or absence of a quorum for the transaction of business and (ii) the total number of Votes Cast with respect to a proposal (other than the election of directors), abstentions will have the same effect as a vote against the proposal (other than election of directors).

Shares that are subject to a broker non–vote are counted for purposes of determining whether a quorum exists but not for purposes of determining whether a proposal has passed. Accordingly, broker non–votes will not affect the outcome of the voting on a proposal that requires a majority of the Votes Cast.

84

| | |
|---|---|
| **How does the Board of Directors recommend that I vote?** | The Board of Directors recommends that stockholders vote as follows:<br>"FOR" the election of the Class III Directors—Edward W. Barnholt, Stephen P. Kaufman and Kenneth L. Schroeder to the Board of Directors;<br>"FOR" approval of the Company's 2004 Equity Incentive Plan, including approval of its material terms and performance goals for purposes of Internal Revenue Code Section 162(m); and<br>"FOR" ratification of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2005.<br><br>When proxies are properly dated, executed and returned, the shares represented by such proxies will be voted at the Annual Meeting in accordance with the instructions of the stockholder. However, if no specific instructions are given, the shares will be voted in accordance with the recommendations of our Board of Directors and as the proxy holders may determine in their discretion with respect to any other matters that properly come before the meeting. |
| **Will any other business be transacted at the Annual Meeting?** | We are not aware of any matters to be presented other than those described in this Proxy Statement. If any matters not described in the Proxy Statement are properly presented at the Annual Meeting, the proxy holders will use their own judgment to determine how to vote your shares. If the Annual Meeting is adjourned or postponed, the proxy holders can vote your shares on the new meeting date as well, unless you have revoked your proxy instructions. |
| **Can I present other business to be transacted at the Annual Meeting?** | Any stockholder may present a matter from the floor for consideration at a meeting of stockholders so long as certain procedures are followed. Under our bylaws, as amended, a stockholder notice must be delivered to, or mailed and received by, KLA−Tencor (attention: Assistant Secretary) at least 120 days prior to the annual meeting of stockholders (under the assumption that the next annual meeting of stockholders will occur on the anniversary of the same calendar day as the day of the most recent annual meeting of stockholders). |
| **What is required in a stockholder's notice to present other business to be transacted?** | The stockholder's notice must set forth, as to each proposed matter, the following:<br>1.    A brief description of the proposed matter and reasons for conducting such business at the meeting;<br><br>2.    Name and address, as they appear on KLA−Tencor's books, of the stockholder;<br><br>3.    The class and number of shares of KLA−Tencor that are beneficially owned by the stockholder;<br><br>4.    Any material interest of the stockholder in such business; and<br><br>5.    Any other information that is required to be provided by such stockholder pursuant to Regulation 14A under the Securities Exchange Act of 1934. |
| **Can I still present other business to be transacted if my notice is deficient?** | If the stockholder notice is not in compliance with the requirements set forth in our bylaws, the presiding officer of the meeting may refuse to acknowledge the matter. |

85

| | |
|---|---|
| **What is the deadline for stockholder proposals in connection with the 2005 Annual Meeting?** | Stockholders may present proposals for action at a future meeting only if they comply with the requirements of the proxy rules established by the Securities and Exchange Commission ("SEC") and the provisions of our bylaws. We must receive stockholder proposals that are intended to be presented by such stockholders at our 2005 Annual Meeting of Stockholders no later than May 12, 2005 to be considered for inclusion in the Proxy Statement and form of Proxy relating to that meeting.<br><br>Stockholder proposals that are not intended to be included in our proxy materials for such meeting, but that are to be presented by the stockholder from the floor are subject to the advance notice provisions set forth above under **"Can I present other business to be transacted at the Annual Meeting?"** and other requirements set forth in our bylaws. |
| **How may I obtain a copy of KLA–Tencor's Bylaws?** | For a free copy of KLA–Tencor's bylaws, please contact our Investor Relations department at (408) 875–3600 or visit our website at www.kla-tencor.com/investors/contactinfo.html and fill out a request form. |
| **What should I do if I receive more than one set of voting materials?** | You may request delivery of a single copy of our future proxy statements and annual reports by writing to the address below or calling our Investor Relations department at the telephone number below. Stockholders may also request electronic delivery of our annual report and proxy statement by writing to the address below, calling our Investor Relations department at the telephone number below or via our website at www.icsdelivery.com/klatencor/index.html. |
| **May I get additional copies of these materials and the exhibits to the Annual Report?** | Certain stockholders who share an address are being delivered only one copy of this Proxy Statement and our 2004 Annual Report on Form 10–K. You may receive additional copies of this Proxy Statement and our Annual Report on Form 10–K for the fiscal year ended June 30, 2004 without charge or a copy of the exhibits to such Form 10–K for a reasonable fee (which shall be limited to our reasonable expenses in furnishing such exhibits) by sending a written request to KLA–Tencor Corporation, Attention: Investor Relations, 160 Rio Robles, San Jose, CA 95134. Requests may also be made by calling Investor Relations at KLA–Tencor at (408) 875–3600. |

**PROPOSAL ONE:**
**ELECTION OF DIRECTORS**

The Company has a classified Board of Directors currently comprised of three incumbent Class I directors (Kenneth Levy, Jon D. Tompkins and Lida Urbanek), four incumbent Class II directors (H. Raymond Bingham, Robert T. Bond, Richard J. Elkus, Jr. and Michael E. Marks) and three incumbent Class III directors (Edward W. Barnholt, Stephen P. Kaufman and Kenneth L. Schroeder). The Class I directors and the Class II directors will serve until the annual meetings of stockholders to be held in 2005 and 2006, respectively, or until their respective successors are duly elected and qualified. At each annual meeting, directors are elected for a full term of three years to succeed those directors whose terms expire at the annual meeting.

**Nominees**

The term of the three current Class III directors will expire on the date of the Annual Meeting. Three Class III directors of the Board of Directors are to be elected at the Annual Meeting. The Nominating and Governance Committee, consisting solely of independent directors as determined under the rules of the Nasdaq National Market, recommended the nominees set forth in this Proposal One, each of whom is an incumbent director. Based on that recommendation, the members of the Board of Directors unanimously resolved to nominate such individuals for election. The nominees for election by the stockholders to these three positions are:

- Edward W. Barnholt;
- Stephen P. Kaufman; and
- Kenneth L. Schroeder.

If elected, the nominees will serve as directors until the Company's annual meeting of stockholders in 2007, or until their successors are duly elected and qualified. If any of the nominees declines to serve or becomes unavailable for any reason, or a vacancy occurs before the election, the proxies may be voted for such substitute nominees as the Board of Directors may designate. As of the date of this proxy statement, the Board is not aware of any nominee who is unable or will decline to serve as a director.

**Vote Required and**
**Recommendation**

If a quorum is present and voting, the three nominees for Class III directors receiving the highest number of affirmative votes will be elected as Class III directors. Votes withheld from any director and broker non-votes are counted for purposes of determining the presence or absence of a quorum but have no other legal effect on the selection of nominees for directors.

**THE MEMBERS OF THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMEND A VOTE "FOR" EACH OF THE CLASS III NOMINEES LISTED ABOVE.**

## INFORMATION ABOUT THE DIRECTORS AND THE NOMINEES

The following table sets forth certain information with respect to the Company's Board of Directors as of the date of this proxy statement:

**Nominees for Election as Class III Directors**

| | Principal Occupation of Board Members During the Past Five Years | Age | Director Since |
|---|---|---|---|
| Edward W. Barnholt | Edward W. Barnholt has been a Director of KLA–Tencor since 1995. Since May 1999, Mr. Barnholt has been President and Chief Executive Officer of Agilent Technologies, Inc. ("Agilent") and became Chairman of the Board of Agilent in November 2002. Before being named Agilent's Chief Executive Officer, Mr. Barnholt served as Executive Vice President and General Manager of Hewlett–Packard Company's Measurement Organization from 1998 to 1999. From 1990 to 1998, he served as General Manager of Hewlett–Packard Company's Test and Measurement Organization. He was elected a Senior Vice President of Hewlett–Packard Company in 1993 and an Executive Vice President in 1996. Mr. Barnholt also serves on the boards of directors of the Tech Museum of Innovation and Silicon Valley Manufacturing Group. | 61 | 1995 |
| Stephen P. Kaufman | Stephen P. Kaufman has been a Director of KLA–Tencor since November 2002. He has been a Senior Lecturer at the Harvard Business School since January 2001. He was a member of the board of directors of Arrow Electronics, Inc. ("Arrow") from 1994 to May 2003. From 1986 to June 2000, he was Chief Executive Officer of Arrow. From 1985 to June 1999, he was also Arrow's President. From 1994 to June 2002, he was Chairman of the Board of Arrow. Mr. Kaufman also serves on the boards of directors of Harris Corporation and Viacore, Inc. | 62 | 2002 |
| Kenneth L. Schroeder | Kenneth L. Schroeder joined KLA Instruments in 1979 and left in 1987 to pursue personal and other business interests. He returned to KLA Instruments in 1991. Mr. Schroeder has been Chief Executive Officer and a member of the Board of Directors of KLA–Tencor since July 1, 1999, as well as President since May 2004. He also held the position of President from November 1991 to July 2002. | 59 | 1991 |

88

**Class II Directors**

| | Principal Occupation of Board Members During the Past Five Years | Age | Director Since |
|---|---|---|---|
| **H. Raymond Bingham** | H. Raymond Bingham has been a Director of KLA−Tencor since October 1999. He served as President and Chief Executive Officer of Cadence Design Systems, Inc. ("Cadence") from May 1999 to April 2004. Mr. Bingham has been Chairman of the Board of Cadence since May 2004 and has been a director of Cadence since November 1997. From 1993 to April 1999, Mr. Bingham served as Executive Vice President and Chief Financial Officer of Cadence. Prior to joining Cadence, Mr. Bingham was Executive Vice President and Chief Financial Officer of Red Lion Hotels, Inc. for eight years. Mr. Bingham also serves on the boards of directors of Freescale Semiconductor, Inc., Onyx Software Corporation and Oracle Corporation. | 58 | 1999 |
| **Robert T. Bond** | Robert T. Bond has been a Director of KLA−Tencor since August 2000. From April 1996 to January 1998, Mr. Bond served as Chief Operating Officer of Rational Software Corporation. Prior to that, he held various executive positions at Rational Software Corporation. Mr. Bond was employed by Hewlett−Packard Company from 1967 to 1983 and held various management positions during his tenure there. Mr. Bond also serves on the boards of directors of Portal Software, MontaVista Software, Clarus Systems and DecisionPoint Applications, Inc. | 61 | 2000 |
| **Richard J. Elkus, Jr.** | Richard J. Elkus, Jr. has been a Director of KLA−Tencor since April 1997. He was Executive Vice President and Vice Chairman of the board of directors of Tencor Instruments from February 1994 until April 1997. In addition to KLA− Tencor he currently serves on the boards of directors of Sopra SA, Lam Research Corporation, Virage Logic Corporation, the Palo Alto Medical Foundation, the National Medal of Technology Foundation, and the Board of Trustees of the Scripps Research Institute. | 69 | 1997 |
| **Michael E. Marks** | Michael E. Marks has been a Director of KLA−Tencor since November 2003. He has been the Chief Executive Officer of Flextronics International Ltd. ("Flextronics") since January 1994 and also serves on its board of directors. Mr. Marks was Chairman of the Board of Flextronics from July 1993 to January 2003. Prior to joining Flextronics, he was President and Chief Executive Officer of Metcal, Inc., a precision heating instrument company. | 53 | 2003 |

89

**Class I Directors**

| | Principal Occupation of Board Members During the Past Five Years | Age | Director Since |
|---|---|---|---|
| **Kenneth Levy** | Kenneth Levy is a founder of KLA Instruments Corporation and since July 1, 1999 has been Chairman of the Board and a Director of KLA−Tencor. From July 1998 until June 30, 1999, he was Chief Executive Officer and a Director. From 1975 until April 30, 1997 he was Chief Executive Officer of KLA Instruments Corporation. He currently serves on the boards of directors of the following publicly traded companies: Juniper Networks, Inc., Extreme Networks, Inc., and PowerDsine, Inc. In addition, he is a Director Emeritus of SEMI, an industry trade association. | 61 | 1975 |
| **Jon D. Tompkins** | Jon D. Tompkins has been a Director of KLA−Tencor since April 1997. He was Chairman of the Board from July 1998 to June 1999, when he retired from such position. From May 1997 until July 1998, he was Chief Executive Officer. From April 1991 until April 1997, Mr. Tompkins was President and Chief Executive Officer of Tencor Instruments prior to its merger with KLA Instruments Corporation. He was a director of Tencor Instruments from 1991 until April 1997 and was appointed Chairman of the Board of Directors of Tencor Instruments in November 1993. Mr. Tompkins currently serves on the boards of directors of Cymer, Inc., Electro Scientific Industries, Inc. and Credence Systems Corporation. | 64 | 1997 |
| **Lida Urbanek** | Lida Urbanek has been a Director of KLA−Tencor since April 30, 1997. She is a private investor. She was a director of Tencor Instruments from August 1991 until April 30, 1997. | 61 | 1997 |

90

**PROPOSAL TWO:**
**APPROVAL OF THE COMPANY'S 2004 EQUITY INCENTIVE PLAN, INCLUDING APPROVAL OF ITS MATERIAL TERMS AND PERFORMANCE GOALS FOR PURPOSES OF INTERNAL REVENUE CODE SECTION 162(m)**

Approval of the 2004
Equity Incentive Plan

The Board of Directors is asking our stockholders to approve our 2004 Equity Incentive Plan, which will:

- Reserve 11,000,000 new shares of our Common Stock for issuance under the2004 Equity Incentive Plan;

- Transfer up to an additional 1,500,000 shares subject to outstanding options under our 1982 Stock Option Plan and 2000 Nonstatutory Stock Option Plan if they expire or are forfeited without being exercised and terminate the 1982 Stock Option Plan (including its "evergreen" automatic replenishment feature) and 2000 Nonstatutory Stock Option Plan for any new grants; and

- Include the ability to grant restricted stock, stock appreciation rights, performance shares, performance units and deferred stock units.

The Company's stockholders are also being asked to approve the material terms of the 2004 Equity Incentive Plan and the performance goals thereunder for the purpose of helping awards under the 2004 Equity Incentive Plan qualify as "performance– based" compensation under Internal Revenue Code Section 162(m).

Any 2004 Equity Incentive Plan awards of restricted stock, performance shares, performance units or deferred stock units with a per share or unit purchase price lower than 100% of fair market value on the grant date shall be counted against the total number of shares issuable under the plan as 1.8 shares for every one share subject thereto.

As of June 30, 2004, options to purchase a total of 29,432,566 shares were

outstanding under our active stock option plans as follows:

| | |
|---|---|
| 1982 Stock Option Plan | 20,343,266 |
| 2000 Nonstatutory Stock Option Plan | 8,816,802 |
| 1998 Outside Director Option Plan | 272,498 |

As of June 30, 2004, our 1982 Stock Option Plan had 12,647,812 shares remaining available for issuance and was scheduled to expire in 2006. Moreover, our 1982 Stock Option Plan has an "evergreen" automatic annual share replenishment feature whereby on the first day of each of our fiscal years, an amount of shares equal to 3% of our outstanding shares of common stock on the last day of each fiscal year plus the number of common stock shares that we repurchase on the open market for reissuance under the Plan can be added to the Plan. Pursuant to this "evergreen" annual share replenishment feature, on July 1, 2004 an additional 5,903,603 shares as of June 30, 2004 were added to the 1982 Stock Option Plan. As of June 30, 2004, our 2000 Nonstatutory Stock Option Plan had 3,098,870 shares remaining available for issuance and was scheduled to expire in 2010. If our stockholders approve this proposal, both the 1982 Stock Option Plan (including its "evergreen" feature) and the 2000 Nonstatutory Stock Option Plan shall be terminated for any new grants.

Proposed new accounting regulations are expected to require companies to record a charge to earnings for employee and director stock option grants, including options granted under plans similar to the proposed 2004 Equity Incentive Plan. The extent to which we will make grants of awards under the 2004 Equity

91

Incentive Plan will depend on the developments in these accounting regulations as well as several other factors, including our assessment of the impact of the final rules on our earnings, actions by other companies (particularly those with whom we compete for employees and directors) with respect to the design and operation of equity incentive plans, and the attitude of financial analysts and investors towards these potentially significant non–cash charges. The 2004 Equity Incentive Plan will allow us to grant a wider range of awards than is permitted under our current stock option plans, including restricted stock, stock appreciation rights, performance shares, performance units and deferred stock units, which will help us achieve our goal of attracting, retaining and motivating our talented personnel. We believe that the 2004 Equity Incentive Plan will be an essential element of a competitive compensation package.

Our 2004 Equity Incentive Plan has been developed to replace our 1982 Stock Option Plan and 2000 Nonstatutory Stock Option Plan and to supplement our 1998 Outside Director Option Plan. Currently, our 1982 Stock Option Plan authorizes our Board of Directors to grant stock options to our eligible employees and consultants. Our 2000 Nonstatutory Stock Option Plan authorizes our Board of Directors to grant stock options to our eligible employees and consultants who are not officers or members of the Board of Directors. Our 1998 Outside Director Option Plan provides for automatic formula option grants as well as discretionary option grants to members of our Board of Directors. Our Board of Directors approved the 2004 Equity Incentive Plan in July 2004 to replace the 1982 Stock Option Plan and 2000 Nonstatutory Stock Option Plan, subject to stockholder approval at the 2004 Annual Meeting.

As of June 30, 2004, the closing price of our common stock was $49.38 per share. The 2004 Equity Incentive Plan provides for the grant of options to purchase shares of our Common Stock, stock appreciation rights ("SARs"), restricted stock, performance shares, performance units, and deferred stock units to our employees, consultants and members of our Board of Directors. As of June 30, 2004, there were approximately 5,200 employees (including officers) and members of our Board of Directors eligible to participate in the 2004 Equity Incentive Plan. Please see the summary of the 2004 Equity Incentive Plan below.

**Vote Required and Recommendation**

If a quorum is present and voting, the affirmative vote of a majority of the votes cast will be required to approve the adoption of the 2004 Equity Incentive Plan. Our executive officers and members of our Board of Directors have an interest in this proposal as they may receive awards under the 2004 Equity Incentive Plan.

**THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" APPROVAL OF THE COMPANY'S 2004 EQUITY INCENTIVE PLAN, INCLUDING APPROVAL OF ITS MATERIAL TERMS AND PERFORMANCE GOALS FOR PURPOSES OF INTERNAL REVENUE CODE SECTION 162(M).**

**SUMMARY OF THE 2004 EQUITY INCENTIVE PLAN**

The essential features of the 2004 Equity Incentive Plan are summarized below. This summary does not purport to be complete and is subject to, and qualified in its entirety by, the provisions of the 2004 Equity Incentive Plan, which is attached as Appendix A. Capitalized terms used herein and not defined shall have the meanings set forth in the 2004 Equity Incentive Plan.

| | |
|---|---|
| **General** | The purposes of the 2004 Equity Incentive Plan are to attract and retain the best available personnel for positions of substantial responsibility, provide additional incentive to our employees and consultants, and promote the success of our business. |
| **Administration** | The 2004 Equity Incentive Plan may be administered by our Board of Directors or a committee, which our Board of Directors may appoint from among its members (the "Administrator"). Subject to the provisions of the 2004 Equity Incentive Plan, the Administrator has the authority to: (i) interpret the plan and apply its provisions; (ii) prescribe, amend or rescind rules and regulations relating to the 2004 Equity Incentive Plan; (iii) select the persons to whom awards are to be granted; (iv) subject to individual fiscal year limits applicable to each type of award, determine the number of shares or equivalent units to be made subject to each award; (v) determine whether and to what extent awards are to be granted; (vi) determine the terms and conditions applicable to awards generally and of each individual award (including the provisions of the award agreement to be entered into between the Company and the participant); (vii) amend any outstanding award subject to applicable legal restrictions (except repricing an option or SAR, unless stockholder approval is obtained); (viii) authorize any person to execute, on our behalf, any instrument required to effect the grant of an award; (ix) approve forms of agreement for use under the Plan; (x) allow participants to satisfy withholding tax obligations by electing to have the Company withhold from the shares or cash to be issued upon exercise, vesting of an award (or distribution of a deferred stock unit) that number of shares or cash having a fair market value equal to the minimum amount required to be withheld; and (xi) subject to certain limitations, take any other actions deemed necessary or advisable for the administration of the 2004 Equity Incentive Plan. All decisions, interpretations and other actions of the Administrator shall be final and binding on all holders of options or rights and on all persons deriving their rights therefrom. |
| **Discount Award Limitations** | Options and SARs may not be granted with an exercise price lower than 100% of the fair market value of the underlying shares. |
| **Shares Counted Against the Plan** | Any 2004 Equity Incentive Plan awards of restricted stock, performance shares, performance units or deferred stock units with a per share or unit purchase price lower than 100% of fair market value on the grant date shall be counted against the total number of shares issuable under the plan as 1.8 shares for every one share subject thereto. |
| **No Repricing** | The 2004 Equity Incentive Plan prohibits option or stock appreciation right repricing, including by way of an exchange for another award, unless stockholder approval is obtained. |
| **Eligibility** | The 2004 Equity Incentive Plan provides that awards may be granted to our employees, consultants and members of our Board of Directors. Incentive stock options may only be granted to employees. Any optionee who owns more than 10% of the combined voting power of all classes of outstanding stock of the Company (a "10% Stockholder") is not eligible for the grant of an incentive stock option unless the exercise price of the option is at least 110% of the fair market value of the common stock on the date of grant. |

Code Section 162(m)
Performance Goals

We have designed the 2004 Equity Incentive Plan so that it permits us to issue awards that qualify as performance-based under Section 162(m) of the Code. Thus, the Administrator may make performance goals applicable to a participant with respect to an award. At the Administrator's discretion, one or more of the following performance goals may apply: annual revenue, cash position, earnings per share, net income, operating cash flow, operating income, return on assets, return on equity, return on sales, and total stockholder return, all as determined in accordance with accounting principles generally accepted in the United States. Except for cash position, return on equity and total stockholder return, a performance goal may apply either to the Company or to one of its business units.

Terms and Conditions of
Options

Each option granted under the 2004 Equity Incentive Plan is evidenced by a written stock option agreement between the optionee and us and is subject to the following terms and conditions:

(a) *Exercise Price.* The exercise price of options may not be less than 100% of the fair market value of the common stock on the grant date the option. As our common stock is listed on the Nasdaq National Market, the fair market value is the closing sale price for the common stock (or the closing bid if no sales were reported) on the grant date.

(b) *Form of Consideration.* The means of payment for shares issued upon exercise of an option is specified in each option agreement and generally may be made by cash, check, other shares of our common stock owned by the optionee, delivery of an exercise notice together with irrevocable instructions to a broker to deliver to us the exercise price from sale proceeds, or by a combination thereof.

(c) *Exercise of the Option.* Each stock option agreement will specify the term of the option and the date when the option is to become exercisable. However, in no event shall an option granted under the 2004 Equity Incentive Plan be exercised more than 10 years after the date of grant. Moreover, in the case of an incentive stock option granted to a 10% stockholder, the term of the option shall be for no more than five years from the date of grant.

(d) *Termination of Employment.* If an optionee's employment terminates for any reason (other than death or permanent disability), all options held by such optionee under the 2004 Equity Incentive Plan expire upon the earlier of (i) such period of time as is set forth in his or her option agreement or (ii) the expiration date of the option. The optionee may exercise all or part of his or her option at any time before such expiration to the extent that such option was exercisable at the time of termination of employment.

(e) *Permanent Disability.* If an optionee is unable to continue employment with us as a result of permanent and total disability (as defined in the Code), all options held by such optionee under the 2004 Equity Incentive Plan shall expire upon the earlier of (i) 12 months after the date of termination of the optionee's employment or (ii) the expiration date of the option. The optionee may exercise all or part of his or her option at any time before such expiration to the extent that such option was exercisable at the time of termination of employment.

(f) *Death.* If an optionee dies while employed by us, his or her options shall expire upon the earlier of (i) 12 months after the optionee's death or

94

(ii) the expiration date of the options. The executor or other legal representative of the optionee may exercise all or part of the optionee's option at any time before such expiration with respect to all shares subject to such option.

(g) *ISO Limitation.* If the aggregate fair market value of all shares of common stock subject to an optionee's incentive stock option that are exercisable for the first time during any calendar year exceeds $100,000, the excess options shall be treated as nonstatutory options.

(h) *Other Provisions.* The stock option agreement may contain terms, provisions and conditions that are inconsistent with the 2004 Equity Incentive Plan as determined by the Administrator.

| | |
|---|---|
| **Option and SAR 162(m) Share Limit** | No participant may be granted stock options and stock appreciation rights to purchase more than 400,000 shares of common stock in any fiscal year, except that up to 1,200,000 shares may be granted in the participant's first fiscal year of service. |
| **Exercise Price and Other Terms of Stock Appreciation Rights** | The exercise price of SARs may not be less than 100% of the fair market value of the common stock on the grant date of the option. The Administrator, subject to the provisions of the 2004 Equity Incentive Plan (including the 162(m) share limit referred to above and the exercise price restrictions), shall have complete discretion to determine the terms and conditions of SARs granted under the 2004 Equity Incentive Plan. |
| **Payment of Stock Appreciation Right Amount** | Upon exercise of a SAR, the holder of the SAR shall be entitled to receive payment in an amount equal to the product of (X) the difference between the fair market value of a share on the date of exercise and the exercise price and (Y) the number of shares for which the SAR is exercised. |
| **Payment upon Exercise of Stock Appreciation Right** | At the discretion of the Administrator, payment to the holder of a SAR may be in cash, shares of our common stock or a combination thereof. To the extent that a SAR is settled in cash, the shares available for issuance under the 2004 Equity Incentive Plan shall not be diminished as a result of the settlement. |
| **Stock Appreciation Right Agreement** | Each SAR grant shall be evidenced by an agreement that shall specify the exercise price, the term of the SAR, the conditions of exercise, and such other terms and conditions as the committee, in its sole discretion, shall determine. |
| **Expiration of Stock Appreciation Rights** | SARs granted under the 2004 Equity Incentive Plan expire as determined by the Administrator, but in no event later than ten (10) years from date of grant. No SAR may be exercised by any person after its expiration. |
| **Restricted Stock and Performance Share 162(m) Share Limit** | No participant shall be granted restricted stock or performance share awards covering, in the aggregate, more than 300,000 shares in any of our fiscal years, except that up to 750,000 shares may be granted in the participant's first fiscal year of service. |
| **Grant of Restricted Stock** | Subject to the terms and conditions of the 2004 Equity Incentive Plan, restricted stock may be granted to our employees, consultants and members of our Board of Directors at any time and from time to time at the discretion of the Administrator. Subject to the 162(m) share limit set forth above, the Administrator shall have complete discretion to determine (i) the number of shares subject to a |

95

restricted stock award granted to any participant and (ii) the conditions for grant or for vesting that must be satisfied, which typically will be based principally or solely on continued provision of services but may include a performance−based component. Until the shares are issued, no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the underlying shares.

**Restricted Stock Award Agreement**

Each restricted stock grant shall be evidenced by an agreement that shall specify the purchase price (if any) and such other terms and conditions as the Administrator shall determine; *provided, however,* that if the restricted stock grant has a purchase price, the purchase price must be paid no more than ten (10) years following the date of grant.

**Grant of Performance Shares**

Subject to the terms and conditions of the 2004 Equity Incentive Plan, performance shares may be granted to our employees and consultants at any time and from time to time as shall be determined at the discretion of the Administrator. Subject to the 162(m) share limit set forth above, the Administrator shall have complete discretion to determine (i) the number of shares of our common stock subject to a performance share award granted to any service provider and (ii) the conditions that must be satisfied for grant or for vesting, which typically will be based principally or solely on achievement of performance milestones but may include a service−based component.

**Performance Share Award Agreement**

Each performance share grant shall be evidenced by an agreement that shall specify such other terms and conditions as the Administrator, in its sole discretion, shall determine.

**Grant of Performance Units**

Performance units are similar to performance shares, except that they shall be settled in cash equivalent to the fair market value of the underlying shares of our common stock, determined as of the vesting date. The shares available for issuance under the 2004 Equity Incentive Plan shall not be diminished as a result of the settlement of a performance unit.

**Performance Unit Award Agreement**

Each performance unit grant shall be evidenced by an agreement that shall specify such terms and conditions as shall be determined at the discretion of the Administrator. However, no participant shall be granted a performance unit award covering more than one million dollars in any of our fiscal years, except that an award covering up to three million dollars may be granted in the participant's first fiscal year of service.

**Deferred Stock Units**

Deferred stock units shall consist of a restricted stock, performance share or performance unit award that the Administrator, in its sole discretion, permits to be paid out in installments or on a deferred basis, in accordance with rules and procedures established by the Administrator. Deferred stock units are subject to the individual annual limits that apply to each type of award.

**Non−Transferability of Awards**

Unless determined otherwise by the Administrator, an award granted under the 2004 Equity Incentive Plan may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent or distribution and may be exercised, during the lifetime of the recipient, only by the recipient. If the Administrator makes an award granted under the 2004 Equity Incentive Plan transferable, such award shall contain such additional terms and conditions as the Administrator deems appropriate.

96

**Leave of Absence**

In the event that a participant goes on a leave of absence, award vesting will cease until he or she returns to work, except as required by law or as otherwise determined by the Administrator.

**Part-Time Service**

Unless the Administrator provides otherwise or except as otherwise required by law, any service-based vesting of awards granted under the 2004 Equity Incentive Plan shall be extended on a proportionate basis in the event an employee transitions from a full-time to a part-time work schedule, or if not on a full-time work schedule, to a schedule requiring fewer hours of service. Such vesting shall be proportionately re-adjusted prospectively in the event that the employee subsequently becomes regularly scheduled to work additional hours of service.

**Adjustment Upon Changes in Capitalization**

In the event that our capital stock is changed by reason of any stock split, reverse stock split, stock dividend, combination or reclassification of our common stock or any other increase or decrease in the number of issued shares of common stock effected without receipt of consideration by us, appropriate proportional adjustments shall be made in the number and class of shares of stock subject to the 2004 Equity Incentive Plan, the individual fiscal year limits applicable to restricted stock, performance share awards, SARS and options, the number and class of shares of stock subject to any award outstanding under the 2004 Equity Incentive Plan, and the exercise price of any such outstanding option or SAR or other award. Any such adjustment shall be made by the Compensation Committee of our Board of Directors, whose determination shall be conclusive.

**Change of Control**

In the event of a change of control, the successor corporation (or its parent or subsidiary) will assume or substitute each outstanding award. If the successor corporation refuses to assume the awards or to substitute equivalent awards, such awards shall become 100% vested. In such event, the Administrator shall notify the participant that each award subject to exercise is fully exercisable for fifteen (15) days from the date of such notice and that the award terminates upon expiration of such period.

**Amendment, Suspensions and Termination of the 2004 Equity Incentive Plan**

Our Board of Directors may amend, suspend or terminate the 2004 Equity Incentive Plan at any time; *provided, however*, that stockholder approval is required for any amendment to the extent necessary to comply with Rule 16b-3 promulgated under the Securities Exchange Act of 1934 ("Rule-16b-3") or Section 422 of the Code, or any similar rule or statute. If Proposal Two is approved, the 2004 Equity Incentive Plan will terminate in June 2014.

## FEDERAL TAX INFORMATION

**Options**

Options granted under the 2004 Equity Incentive Plan may be either "incentive stock options," as defined in Section 422 of the Code, or nonstatutory options.

An optionee who is granted an incentive stock option will not recognize taxable income either at the time the option is granted or upon its exercise, although the exercise may subject the optionee to alternative minimum tax.

Upon the sale or exchange of the shares more than two years after grant of the option and one year after exercising the option, any gain or loss will be treated as long-term capital gain or loss. If these holding periods are not satisfied, the optionee will recognize ordinary income at the time of sale or exchange equal to the difference between the exercise price and the lower of (i) the fair market value

97

of the shares at the date of the option exercise or (ii) the sales price of the shares. A different rule for measuring ordinary income upon such a premature disposition may apply if the optionee is also an officer, director, or 10% Stockholder. Any gain or loss recognized on such a premature disposition of the shares in excess of the amount treated as ordinary income will be characterized as long–term or short–term capital gain or loss, depending on the holding period.

All options that do not qualify as incentive stock options are referred to as nonstatutory options. An optionee will not recognize any taxable income at the time the optionee is granted a nonstatutory option. However, upon its exercise, the optionee will recognize taxable income generally measured as the excess of the then fair market value of the shares purchased over the purchase price. Any taxable income recognized in connection with an option exercise by an optionee who is also our employee will be subject to tax withholding by us. Upon resale of such shares by the optionee, any difference between the sale price and the optionee's purchase price, to the extent not recognized as taxable income as described above, will be treated as long–term or short–term capital gain or loss, depending on the holding period.

| | |
|---|---|
| **Stock Appreciation Rights** | No taxable income is reportable when a stock appreciation right is granted to a participant. Upon exercise, the participant will recognize ordinary income in an amount equal to the amount of cash received and the fair market value of any shares of our common stock received less the purchase price. Any additional gain or loss recognized upon any later disposition of the shares of our common stock would be capital gain or loss. |
| **Restricted Stock, Performance Units and Performance Shares** | A participant will not have taxable income upon grant (unless, with respect to restricted stock, he or she elects to be taxed at that time). Instead, he or she will recognize ordinary income at the time of vesting equal to the fair market value (on the vesting date) of the vested shares or cash received minus any amount paid for the shares of our vested common stock. |
| **Deferred Stock Units** | A participant will generally recognize employment tax (e.g., Social Security taxes) on the vesting date of a deferred stock award equal to the value of the vested shares received minus any amount paid for the shares. A participant will generally recognize income tax upon receipt of the deferred stock award shares in an amount equal to the value of the shares minus any amount paid for the shares. |
| **Tax Effect for Us** | We generally will be entitled to a tax deduction in connection with an award under the 2004 Equity Incentive Plan in an amount equal to the ordinary income realized by a participant and at the time the participant recognizes such income (for example, the exercise of a nonqualified stock option). Special rules limit the deductibility of compensation paid to our Chief Executive Officer and to each of our four most highly compensated executive officers. Under Section 162(m) of the Code, the annual compensation paid to any of these specified executives will be deductible only to the extent that it does not exceed $1,000,000. However, we can preserve the deductibility of certain compensation in excess of $1,000,000 if the conditions of Section 162(m) are met with respect to awards. These conditions include stockholder approval of the 2004 Equity Incentive Plan and performance goals under the 2004 Equity Incentive Plan, setting individual annual limits on each type of award, and certain other requirements. The 2004 Equity Incentive Plan has been designed to permit the committee to grant awards that qualify as performance–based for purposes of satisfying the conditions of Section 162(m), |

98

thereby permitting us to continue to receive a federal income tax deduction in connection with such awards.

**The foregoing is only a summary of the current effect of federal income taxation upon us and upon the participant, does not purport to be complete, and does not discuss the tax consequences of the participant's death or the income tax laws of any municipality, state or foreign country in which a participant may reside.**

## ACCOUNTING TREATMENT

Currently, employee awards and awards to members of our Board of Directors with purchase prices at or above fair market value on the grant date typically do not result in any direct charge to our reported earnings. However, the fair market value of these awards is required to be disclosed in the notes to our financial statements. We must also disclose, in the notes to our financial statements, the pro forma impact these awards would have on our reported earnings and earnings per share if the fair value of the awards at the time of grant was treated as a compensation expense.

Currently, employee awards and awards to members of our Board of Directors with purchase prices below fair market value on the grant date result in a direct compensation expense that is typically equal to the "spread", i.e. the difference between the purchase price and the fair market value on the grant date. Typically, this expense is amortized over our earnings over the award's vesting period.

The Financial Accounting Standards Board intends to require mandatory expensing for equity awards for fiscal years commencing after December 15, 2004 (although such implementation may be delayed). In such event, we expect that all 2004 Equity Incentive Plan awards will result in direct charges to our reported earnings.

**New Plan Benefits**

We are unable to determine the benefits or amounts under the 2004 Equity Incentive Plan that will be received by or allocated to our executive officers named in the Summary Compensation Table, other employees or members of our Board of Directors.

99

**PROPOSAL THREE:**
**RATIFICATION OF APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR THE FISCAL YEAR ENDING JUNE 30, 2005.**

| | |
|---|---|
| Audit Committee Recommendation | The Audit Committee has the sole authority to retain or dismiss our independent auditors. The Audit Committee has selected PricewaterhouseCoopers LLP, an independent registered public accounting firm, to audit the consolidated financial statements of the Company for its 2005 fiscal year. Before making its determination, the Audit Committee carefully considered that firm's qualifications as independent auditors. |
| | The Board of Directors, following the Audit Committee's recommendation, unanimously recommends that the stockholders vote for ratification of such appointment. |
| | Although ratification by stockholders is not required by law, the Board of Directors has determined that it is desirable to request approval of this selection by the stockholders. If the stockholders do not ratify the appointment of PricewaterhouseCoopers LLP, the Audit Committee may reconsider its selection. |
| Attendance at the Annual Meeting | Representatives of PricewaterhouseCoopers LLP are expected to be present at the Annual Meeting with the opportunity to make a statement if they desire to do so, and are expected to be available to respond to appropriate questions. |
| Fees | The aggregate fees billed by PricewaterhouseCoopers LLP, KLA–Tencor's independent auditors, in fiscal years 2004 and 2003 were as follows: |

| Services Rendered/Fees | | 2004 | | 2003 |
|---|---|---|---|---|
| Audit fees [1] | $ | 1,193,000 | $ | 998,000 |
| Audit–Related Fees [2] | $ | 109,000 | $ | 0 |
| Total Audit and Audit–Related Fees | $ | 1,302,000 | $ | 998,000 |
| Tax Compliance | $ | 1,051,000 | $ | 1,129,000 |
| Tax Planning and Consulting | $ | 571,000 | $ | 528,000 |
| Total Tax Fees [3] | $ | 1,622,000 | $ | 1,657,000 |
| All Other Fees [4] | $ | 171,000 | $ | 174,000 |

[1]  For professional services rendered for the audits of annual financial statements set forth in KLA–Tencor's Annual Report on Form 10–K for fiscal years 2004 and 2003, the review of quarterly financial statements included in KLA–Tencor's Form 10–Qs for fiscal years 2004 and 2003 and fees for services related to statutory and regulatory filings or engagements.

[2]  For fiscal year ended 2004, assurance and related services related to accounting consultations, audits in connection with acquisitions and preparatory work related to the Sarbanes–Oxley Act of 2002.

[3]  For fiscal years ended 2004 and 2003, tax services for U.S, foreign tax and expatriate compliance and tax planning and consulting.

[4]  For fiscal years ended 2004 and 2003, fees for services other that those described above, including, but not limited to, publications, consulting services on expatriate and other special projects.

100

| | |
|---|---|
| Pre–approval Policies and Procedures | The Audit Committee has adopted a policy regarding non–audit services provided by PricewaterhouseCoopers LLP, our independent auditors. First, the policy ensures the independence of our auditors by expressly naming all services that the auditors may not perform and reinforcing the principle of independence regardless of the type of service. Second, certain non–audit services such as tax–related services and acquisition advisory are permitted but limited in proportion to the audit fees paid. Third, the chair of the Audit Committee pre–approves non–audit services not specifically permitted under this policy and the Audit Committee reviews the annual plan and any subsequent engagements. Thus, all of the services described above under audit–related fees, tax fees and all other fees were approved by the Audit Committee pursuant to its pre–approval policies and procedures. On a quarterly basis, management provides written updates to the Audit Committee providing an update of audit and non–audit services, the amount of audit and non–audit service fees incurred to date, and the estimated cost to complete such services. |
| Independence Assessment by Audit Committee | The Company's Audit Committee considered and determined that the provision of the services provided by PricewaterhouseCoopers LLP as set forth herein are compatible with maintaining PricewaterhouseCoopers LLP's independence and approved all non–audit related fees and services. |
| Vote Required Recommendation | If a quorum is present and voting, the affirmative vote of the Votes Cast is needed to ratify the appointment of PricewaterhouseCoopers LLP as KLA–Tencor's independent registered public accounting firm, to audit the consolidated financial statements of the Company for its 2005 fiscal year. |

**THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" THE RATIFACTION OF THE APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR THE FISCAL YEAR ENDING JUNE 30, 2005.**

101

## OUR CORPORATE GOVERNANCE PRACTICES

At KLA–Tencor we have always believed in strong and effective corporate governance procedures and practices. In that spirit, we have summarized several of our corporate governance practices below.

**Adopting Governance Guidelines**

The Board has adopted a set of corporate governance guidelines to establish a framework within which the Board will conduct its business and to guide management in its running of your Company. The governance guidelines can be found on our website at http://ir.kla–tencor.com/disclaimer1.cfm and are summarized below.

**Monitoring Board Effectiveness**

It is important that our Board and its committees are performing effectively and in the best interest of the Company and its stockholders. The Board and each committee are responsible for annually assessing their effectiveness in fulfilling their obligations. In addition, our Nominating and Governance Committee is charged with annually reviewing the Board and its membership.

**Board Committee Responsibilities**

The Board has three standing committees: the Audit Committee; the Compensation Committee; and the Nominating and Governance Committee. The Board has determined that each of the members of each of the committees of the Board has no material relationship with the Company (including any relationship that, in the opinion of the Board, would interfere with the exercise of independent judgment as a director) and is independent within the meaning of the Nasdaq National Market director independence standards, including in the case of the Audit Committee, the heightened "independence" standard required for such committee members.

Each Committee meets regularly and has a written charter approved by the Board, all of which were attached as appendices to the Proxy Statement related to our 2003 Annual Meeting, which was filed with the Securities and Exchange Commission on September 23, 2003 and are available via our website at www.kla–tencor.com. In addition, at each regularly scheduled Board meeting, a member of each Committee reports on any significant matters addressed by the Committee. In 2002, after reviewing the Sarbanes–Oxley Act of 2002 and the proposed rules of the SEC and the Nasdaq Stock Market, the Board revised all of its Committee charters to implement voluntarily the proposed standards and to expand the responsibilities of each Committee as well as establish independence and self–assessment requirements. The Board and each Committee regularly reviews the Committee charters.

**Conducting Formal Independent Sessions**

At the conclusion of each regularly scheduled Board meeting, the independent directors meet without KLA–Tencor management and the non–independent directors.

**Hiring Outside Advisors**

The Board and each of its Committees may retain outside advisors and consultants of their choosing at the Company's expense, without management's consent.

**Avoiding Conflicts of Interest**

KLA–Tencor expects its directors, executives and employees to conduct themselves with the highest degree of integrity, ethics and honesty. KLA–Tencor's credibility and reputation depend upon the good judgment, ethical standards and personal integrity of each director, executive and employee. In order to provide assurances to KLA–Tencor and its stockholders, KLA–Tencor has updated its Standards of Business Conduct to provide clear conflict of interest guidelines to its employees, as well as an explanation of reporting and investigatory procedures.

102

| | |
|---|---|
| **Providing Transparency** | KLA−Tencor believes it is important that stockholders understand our governance practices. In order to help ensure transparency of our practices we have posted information regarding our corporate governance procedures on our website at http://ir.kla−tencor.com/disclaimer1.cfm. |
| **Communications with the Board of Directors** | Although KLA−Tencor does not have a formal policy regarding communications with the Board, stockholders may communicate with the Board by writing to the Company at KLA−Tencor Corporation, Attention: Investor Relations, 160 Rio Robles, San Jose, CA 95134. Stockholders who would like their submission directed to a member of the Board may so specify, and the communication will be forwarded, as appropriate. |
| **Standards of Business Conduct** | The Board has adopted Standards of Business Conduct for all of the Company's employees and directors, including the Company's principal executive and senior financial officers. You can obtain a copy of our Standards of Business Conduct via our website at http://ir.kla−tencor.com/disclaimer1.cfm, or by making a written request to the Company at KLA−Tencor Corporation, Attention: Investor Relations, 160 Rio Robles, San Jose, CA 95134. We will disclose any amendments to the Standards of Business Conduct or waiver of a provision therefrom, on our website at the same address. |
| **Ensuring Auditor Independence** | KLA−Tencor has taken a number of steps to ensure the continued independence of our outside auditors. Our independent auditors report directly to the Audit Committee, which also has the ability to pre−approve or reject any non−audit services proposed to be conducted by our outside auditors. |
| **Stockholder Nominations to the Board** | Please see **"ABOUT THE BOARD OF DIRECTORS AND ITS COMMITTEES"**. |

## ABOUT THE BOARD OF DIRECTORS AND ITS COMMITTEES

| | |
|---|---|
| **The Board of Directors** | The Board of Directors of the Company held a total of five meetings during the fiscal year ended June 30, 2004. The Board of Directors has an Audit Committee, a Compensation Committee and a Nominating and Governance Committee. |
| | All directors other than Messrs. Levy, Schroeder and Tompkins meet the definition of independence within the meaning of the Nasdaq National Market director independence standards. None of the Company's directors fall outside of the SEC's 10% ownership safe harbor. |
| | During the fiscal year ended June 30, 2004, all incumbent directors attended at least 85% of the total number of meetings of the Board of Directors and each director attended 100% of the aggregate of the total number of meetings held by all committees of the Board on which each such director served (during the periods that each such director served). |
| | Although we do not have a formal policy regarding attendance by members of the Board at our annual meetings of stockholders, directors are encouraged to attend annual meetings of KLA−Tencor stockholders. Six directors attended the 2003 Annual Meeting of stockholders. |

| | |
|---|---|
| **Audit Committee** | The Audit Committee consists of Mr. Bingham, Mr. Bond, Mr. Elkus and Mr. Kaufman. During fiscal year 2004, Mr. Bingham was the chairman of the Audit Committee. The Audit Committee is responsible for appointing, compensating and overseeing the work of the Company's independent auditors, approving the services performed by the Company's independent auditors and for reviewing and evaluating the Company's accounting principles and its system of internal accounting controls. The Audit Committee held ten meetings during the last fiscal year. |
| **Compensation Committee** | The Compensation Committee consists of Mr. Barnholt, Mr. Bond, Mr. Marks and Ms. Urbanek. During fiscal year 2004, Mr. Bond was the chairman of the Compensation Committee. The Compensation Committee reviews and approves the Company's executive compensation policy and administers the Company's employee equity benefit plans. The Compensation Committee held three meetings during the last fiscal year. |
| **Nominating and Governance Committee** | The Nominating and Governance Committee consists of Mr. Barnholt and Mr. Elkus. Mr. Barnholt served as the chairman of the Nominating and Governance Committee during fiscal year 2004. The Nominating and Governance Committee nominated the three Class III directors for election at the Annual Meeting. The Nominating and Governance Committee is primarily responsible for identifying and evaluating the qualifications of all candidates for election to the Board of Directors, as well as reviewing corporate governance policies and procedures. The Nominating and Governance Committee held three meetings during the last fiscal year. |

It is the Nominating and Governance Committee's policy to consider candidates recommended by stockholders who have owned at least 1% of the Company's outstanding shares for at least one year and who have evidenced intent to continue as a substantial stockholder for the long term. Stockholders wishing to submit recommendations must notify the Company (attention: Assistant Secretary) of their intent to do so and provide the Company with certain information set forth in Section 11 of our bylaws and all other information regarding nominees that is required to be provided pursuant to Regulation 14A of the Securities Exchange Act of 1934, or as otherwise requested by the Nominating and Governance Committee. In addition, stockholders may nominate candidates for the Board of Directors pursuant to the provisions of Section 11 of our bylaws and in conformance with the requirements of Regulation 14A of the Securities Exchange Act of 1934.

In considering candidates for director nomination, including evaluating any recommendations from stockholders as set forth above, the Nominating and Governance Committee only considers candidates who have demonstrated executive experience, have experience in an applicable industry, or significant high level experience in accounting, legal or a technical field applicable to the Company. In addition, in evaluating director candidates, the Nominating and Governance Committee considers all factors it considers appropriate, which may include strength of character, mature judgment, career specialization, relevant technical skills, diversity and the extent to which the candidate would fill a present need on the Board.

104

The Nominating and Governance Committee regularly assesses the appropriate size and composition of the Board, and whether any vacancies on the Board are expected. In the event that vacancies are anticipated, or otherwise arise, the Nominating and Governance Committee considers potential candidates that may come to its attention through current members of the Board, professional search firms, stockholders who have owned at least 1% of the Company's outstanding shares for at least one year and who have evidenced intent to continue as a substantial stockholder for the long term, or other persons. In evaluating properly submitted stockholder recommendations, the Nominating and Governance Committee uses the evaluation standards discussed above and seeks to achieve a balance of knowledge, experience and capability on the Board.

## DIRECTOR COMPENSATION

**Employee Directors**

Members of the Board of Directors who are employees do not receive any additional compensation for their services as directors.

**1998 Outside Director Plan**

Members of the Board who are not employees of the Company ("Outside Directors") receive benefits under the 1998 Outside Director Plan ("1998 Director Plan"), which was approved by the stockholders at the 1998 annual meeting of stockholders. Each Outside Director receives a nonstatutory stock option to purchase 10,000 shares of Common Stock as of the date on which such director first becomes an Outside Director (the "First Option"). If the new Outside Director does not join the Board at the beginning of the Company's fiscal year, the First Option will be pro rated to reflect the quarter in which such new Outside Director joins the Board. In addition, each Outside Director is automatically granted a nonstatutory stock option to purchase an additional 10,000 shares of Common Stock on the date of each subsequent annual meeting on which he or she remains an Outside Director.

The term of options granted under the 1998 Director Plan may not exceed 10 years. The 1998 Director Plan provides that the exercise price shall be equal to the fair market value of the Common Stock on the date of grant of the option. Options granted under the 1998 Director Plan become exercisable immediately upon the date of grant.

**Cash Compensation**

Each Outside Director receives an annual fee of $20,000 and $1,000 for each Board meeting they attend ($500 if participation is by telephone), plus reasonable expenses in attending such meeting. Audit Committee members receive $1,000 per committee meeting they attend ($500 if participation is by telephone). The Audit Committee chair receives an annual retainer of $10,000. Members of the Compensation Committee and the Nominating and Governance Committee receive $500 per committee meeting they attend ($250 if participation is by telephone).

## INFORMATION ABOUT EXECUTIVE OFFICERS

Set forth below are the names, ages and positions of the executive officers of KLA–Tencor September 9, 2004.

| Name and Position | Principal Occupation of the Executive Officers During the Past Five Years | Age |
|---|---|---|
| Kenneth Levy<br>Chairman of the Board | Kenneth Levy is a founder of KLA Instruments Corporation and since July 1, 1999 has been Chairman of the Board and a Director of KLA–Tencor. From July 1998 until June 30, 1999, he was Chief Executive Officer and a Director. From 1975 until April 30, 1997 he was Chief Executive Officer of KLA Instruments Corporation. He currently serves on the boards of directors of the following publicly traded companies: Juniper Networks, Inc., Extreme Networks, Inc., and PowerDsine, Inc. In addition, he is a Director Emeritus of SEMI, an industry trade association. | 61 |
| Kenneth L. Schroeder<br>President & Chief Executive Officer | Kenneth L. Schroeder joined KLA Instruments in 1979 and left in1987 to pursue personal and other business interests. He returned to KLA Instruments in 1991. Mr. Schroeder has been Chief Executive Officer and a member of the Board of Directors of KLA–Tencor since July 1, 1999, as well as President since May 2004. He also held the position of President from November 1991 to July 2002. | 59 |
| John H. Kispert<br>Executive Vice President & Chief Financial Officer | John H. Kispert has been Chief Financial Officer and Executive Vice President since July 2000. From July 1999 to July 2000, Mr. Kispert was Vice President of Finance and Accounting. From February 1998 to July 1999, he was Vice President of Operations for the Wafer Inspection Group. Mr. Kispert joined KLA–Tencor in February 1995 and has held a series of other management positions within the Company. He currently serves on the board of directors of North American SEMI, an industry trade association. | 40 |
| Richard P. Wallace<br>Executive Vice President, Customer Group | Richard P. Wallace has been Executive Vice President of the Customer Group since May 2004. He was Executive Vice President of the Wafer Inspection, Review & Analysis Group since July 2000. From July 1999 to June 2000, he was the Group Vice President for Lithography and Films. From April 1998 to June 1999, he was Vice President and General Manager of the Mirage Group. From 1995 to March 1998, he was Vice President and General Manager of the Wisard division. Mr. Wallace joined KLA–Tencor in 1988 and has held a series of other management positions. | 44 |
| Dennis J. Fortino<br>Executive Vice President, Corporate Operations | Dennis J. Fortino has been Executive Vice President of Corporate Operations since May 2004. He was Executive Vice President of the Lithography & Parametric Solutions Group from July 1999 to May2004. From August 1997 to June 1999, he served as Vice President and General Manager of the Surfscan Division and from November1995 to July 1997, he served as the Vice President and General Manager of the Surface Metrology Division. Mr. Fortino served as Vice President and General Manager for Spectra–Physics Lasers from July 1991 to October 1995. | 58 |

106

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

**Principal Stockholders**

As of August 23, 2004, based on our review of filings made with the SEC, we are aware of the following entities being the beneficial owner of more than 5% of the Company's Common Stock:

| Name and Address | Number of Shares Beneficially Owned | Percent of Shares Beneficially Owned (1) |
|---|---|---|
| FMR Corp. (2)(3)<br>82 Devonshire Street<br>Boston, MA 02109 | 21,671,609 | 11.04% |
| Capital Guardian Trust Co. (2)<br>333 South Hope Street<br>Los Angeles, CA 90071 | 22,676,067 | 11.55% |
| Capital Research & Management Co. (2)<br>333 South Hope Street<br>Los Angeles, CA 90071 | 12,225,000 | 6.23% |
| Wellington Management Co. LLP (2)<br>75 State Street<br>Boston, Massachusetts 02109 | 10,838,451 | 5.52% |

(1)   Based on 196,247,543 outstanding shares of Common Stock as of August 23, 2004.

(2)   Based on information provided pursuant to Schedule 13F filed with the Securities and Exchange Commission.

(3)   FMR Corp. is a parent holding company and includes shares held by Fidelity Management Research and Fidelity International Limited.

**Management**

The following table sets forth the beneficial ownership of Common Stock of the Company as of August 23, 2004 by all directors, each of the named executive officers set forth in the Summary Compensation Table, and by all directors and current executive officers as a group:

| Name and Address | Number of Shares Beneficially Owned | Percent of Shares Beneficially Owned (1) |
|---|---|---|
| Kenneth Levy (2) | 2,903,259 | 1.47% |
| Kenneth L. Schroeder (3) | 876,821 | * |
| Edward W. Barnholt (4) | 85,832 | * |
| H. Raymond Bingham (5) | 50,000 | * |
| Robert T. Bond (6) | 52,000 | * |
| Richard J. Elkus, Jr. (7) | 100,000 | * |
| Stephen P. Kaufman (8) | 21,000 | * |
| Michael E. Marks (9) | 10,000 | * |
| Jon D. Tompkins (10) | 24,200 | * |
| Lida Urbanek (11) | 1,374,861 | * |
| John H. Kispert (12) | 65,039 | * |
| Richard P. Wallace (13) | 48,654 | * |
| Dennis J. Fortino (14) | 105,787 | * |
| Gary E. Dickerson (15) | 294,523 | * |
| All directors and executive officers as a group (17 persons) (16) | 6,278,976 | 3.16% |

\*   Less than 1%

(1) Based on 196,247,543 outstanding shares of the Common Stock of the Company as of August 23, 2004.

(2) Includes 735,122 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004, 1,769,375 shares which are held in trust for the benefit of Mr. Levy's family, 40,000 shares which are held by the Levy Family Foundation, and 358,000 shares which are held by the KGMW, L.P.

(3) Includes 714,883 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(4) Includes 85,832 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(5) Includes 50,000 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(6) Includes 50,000 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(7) Includes 10,000 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(8) Includes 20,000 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(9) Includes 10,000 shares subject to options which are presently exercisable or will become exercisable, within 60 days of August 23, 2004.

(10) Includes 20,000 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(11) Includes 73,892 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004, 1,271,414 shares which are held in trust for the benefit of Ms. Urbanek's family, and 29,555 shares which are held by the Urbanek Family Foundation.

(12) Includes 58,031 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(13) Includes 45,751 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(14) Includes 99,916 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(15) Includes 287,905 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(16) Includes 2,522,764 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

108

## EXECUTIVE COMPENSATION AND OTHER MATTERS

Executive Compensation

The following table sets forth, as to the person who served as Chief Executive Officer during the fiscal year ended June 30, 2004 and each of the four other most highly compensated executive officers whose salary plus bonus exceeded $100,000, information concerning all reportable compensation awarded to, earned by or paid to each for services to the Company in all capacities during the fiscal year ended June 30, 2004, as well as such compensation for each such individual for the Company's previous two fiscal years.

| Name and Principal Position | | Annual Compensation | | | | Long Term Compensation (1) | |
| | Year | Salary | Bonus (3) | Other Annual Compensation ($) | Securities Underlying Options/SARs (#) | All Other Compensation (2) | |
|---|---|---|---|---|---|---|---|
| Kenneth L. Schroeder | 2004 | $ 581,195 | $ 1,183,023 | N/A | 158,950 | $ | 0 |
| President & Chief | 2003 | $ 577,940 | $ 199,209 | N/A | 94,350 | $ | 9,231 |
| Executive Officer | 2002 | $ 492,649 | $ 218,040 | N/A | 341,100 | $ | 1,000 |
| John H. Kispert | 2004 | $ 396,393 | $ 658,700 | N/A | 76,250 | $ | 1,000 |
| Executive Vice | 2003 | $ 324,357 | $ 167,133 | N/A | 37,500 | $ | 5,767 |
| President & Chief Financial Officer | 2002 | $ 238,350 | $ 166,843 | N/A | 60,000 | $ | 1,000 |
| Richard P. Wallace | 2004 | $ 336,501 | $ 443,730 | N/A | 76,250 | $ | 1,000 |
| Executive Vice | 2003 | $ 324,674 | $ 75,545 | N/A | 38,500 | $ | 5,766 |
| President, Customer Group | 2002 | $ 240,096 | $ 66,328 | N/A | 45,000 | $ | 1,000 |
| Dennis J. Fortino | 2004 | $ 332,618 | $ 489,589 | N/A | 76,250 | $ | 1,000 |
| Executive Vice | 2003 | $ 324,674 | $ 76,670 | N/A | 38,500 | $ | 5,766 |
| President, Corporate Operations | 2002 | $ 230,048 | $ 86,209 | N/A | 45,000 | $ | 1,000 |
| Gary E. Dickerson | 2004 | $ 501,593 | $ 969,942 | N/A | 131,250 | $ | 1,000 |
| Former President & | 2003 | $ 488,451 | $ 156,657 | N/A | 76,000 | $ | 8,104 |
| Chief Operating Officer | 2002 | $ 378,269 | $ 159,046 | N/A | 105,000 | $ | 1,000 |

---

(1)  The Company has not granted any restricted stock rights or stock appreciation rights and the Company does not have any Long Term Incentive Plans as that term is defined in the regulations.

(2)  In FY 2004 Mr. Kispert received $1,000 contributed by the Company as a matching contribution to the 401(k) Plan; Mr. Wallace received $1,000 contributed by the Company as a matching contribution to the 401(k) Plan; Mr. Fortino received $1,000 contributed by the Company as a matching contribution to the 401(k) Plan; and Mr. Dickerson received $1,000 contributed by the Company as a matching contribution to the 401(k) Plan.

(3)  In addition to other bonus payments, this amount includes payments made pursuant to the Company's Outstanding Corporate Performance Executive Bonus Plan ("OCBP"). Of the OCBP payment earned in fiscal year 2004, 34% is payable currently. The remaining 66% of the OCBP payment earned in fiscal year 2004 is automatically deferred into the Company's Executive Deferred Savings Plan ("EDSP") as a Company contribution. Executives whose employment terminates before the end of the vesting period will receive a pro rata distribution of such deferred bonus funds. The OCBP amounts for fiscal year 2004 represent 47% of the aggregate fiscal year 2004 bonus amounts for Messrs. Schroeder and Dickerson, 41% for Mr. Kispert, 51% for Mr. Wallace and 46% for Mr. Fortino.

109

**OPTION/SAR GRANTS IN LAST FISCAL YEAR**

Stock Option Grants and Exercises

The following tables set forth the number of securities underlying stock options granted to the named executive officers under the Company's stock option plans and the options exercised by such named executive officers during the fiscal year ended June 30, 2004.

The Option/SAR Grant Table sets forth hypothetical gains or "option spreads" for the options at the end of their respective ten-year terms, as calculated in accordance with the rules of the Securities and Exchange Commission. Each gain is based on an arbitrarily assumed annualized rate of compound appreciation of the market price at the date of grant of 5% and 10% from the date the option was granted to the end of the option term. Actual gains, if any, on option exercises are dependent on the future performance of the Company's Common Stock and overall market conditions.

| | Number of Securities Underlying Options (1) | Percent of Total Options Granted to Employees in Fiscal Year (2) | Exercise or Base Price ($/share)(3) | Expiration Date | Potential Realizable Value At Assumed Annual Rates of Stock Price Appreciation for Option Term ($) | |
|---|---|---|---|---|---|---|
| | | | | | 5% | 10% |
| Kenneth L.(4) Schroeder | 31,450 | .50% | $ 51.23 | 7/30/2013 | $ 1,012,245 | $ 2,567,761 |
| | 60,000 | .95% | $ 53.86 | 10/27/2013 | $ 2,032,336 | $ 5,150,338 |
| | 30,000 | .48% | $ 58.10 | 1/27/2014 | $ 1,097,163 | $ 2,777,893 |
| | 37,500 | .60% | $ 45.16 | 4/26/2014 | $ 1,065,033 | $ 2,699,003 |
| Total | 158,950 | 2.53% | N/A | N/A | $ 5,206,777 | $ 13,194,996 |
| John H. Kispert | 12,500 | .20% | $ 51.23 | 7/30/2013 | $ 402,721 | $ 1,020,573 |
| | 30,000 | .48% | $ 53.86 | 10/27/2013 | $ 1,016,168 | $ 2,575,169 |
| | 15,000 | .24% | $ 58.10 | 1/27/2014 | $ 548,082 | $ 1,388,947 |
| | 18,750 | .30% | $ 45.16 | 4/26/2014 | $ 532,517 | $ 1,349,501 |
| Total | 76,250 | 1.21% | N/A | N/A | $ 2,499,487 | $ 6,334,190 |
| Richard P. Wallace | 12,500 | .20% | $ 51.23 | 7/30/2013 | $ 402,721 | $ 1,020,573 |
| | 30,000 | .48% | $ 53.86 | 10/27/2013 | $ 1,016,168 | $ 2,575,169 |
| | 15,000 | .24% | $ 58.10 | 1/27/2014 | $ 548,082 | $ 1,388,947 |
| | 18,750 | .30% | $ 45.16 | 4/26/2014 | $ 532,517 | $ 1,349,501 |
| Total | 76,250 | 1.21% | N/A | N/A | $ 2,499,487 | $ 6,334,190 |
| Dennis J. Fortino | 12,500 | .20% | $ 51.23 | 7/30/2013 | $ 402,721 | $ 1,020,573 |
| | 30,000 | .48% | $ 53.86 | 10/27/2013 | $ 1,016,168 | $ 2,575,169 |
| | 15,000 | .24% | $ 58.10 | 1/27/2014 | $ 548,082 | $ 1,388,947 |
| | 18,750 | .30% | $ 45.16 | 4/26/2014 | $ 532,517 | $ 1,349,501 |
| Total | 76,250 | 1.21% | N/A | N/A | $ 2,499,487 | $ 6,334,190 |
| Gary E. Dickerson | 25,000 | .40% | $ 51.23 | 7/30/2013 | $ 805,441 | $ 2,041,146 |
| | 50,000 | .79% | $ 53.86 | 10/27/2013 | $ 1,693,613 | $ 4,291,948 |
| | 25,000 | .40% | $ 58.10 | 1/27/2014 | $ 913,469 | $ 2,314,911 |
| | 31,250 | .50% | $ 45.16 | 4/26/2014 | $ 887,528 | $ 2,249,169 |
| Total | 131,250 | 2.08% | N/A | N/A | $ 4,300,051 | $ 10,897,174 |

(1)   The Company has not granted any stock appreciation rights.

(2)   Based on a total of 6,298,343 options granted to employees in fiscal year 2004.

(3)   Options were granted at an exercise price equal to the fair market value of the Company's Common Stock. The material terms of the grants are: (a) options granted in years 2004 and 2003, the options vest on a five year schedule with 20% vesting after one year and the remaining option shares vesting 1/48 per month for the remainder of the vesting term; (b) options granted prior to fiscal year 2002 vest on a four year schedule with 25% vesting after one year and the remaining option shares vesting 1/36 per month for the remainder of the vesting term; (c) to the extent unexercised, the options lapse after ten years; and (d) the options are non-transferable and are only exercisable during the period of employment of the optionee for 30 days following the

110

termination of employment, subject to limited exceptions in the cases of certain terminations, death or permanent disability of the optionee.

(4) During FY 2004, in order to incentivize Mr. Schroeder to remain with the Company over the long-term, Mr. Schroeder received options covering 83,380 shares of Common Stock with delayed vesting. Specifically, 20% of 18,950 option shares vest 11/8/2007 with the remaining 80% to vest monthly over the following 48 months and 20% of 64,430 option shares vest 10/27/2006 with the remaining 80% to vest monthly over the following 48 months.

## AGGREGATED OPTION/SAR EXERCISES IN LAST FISCAL YEAR AND FISCAL YEAR-END OPTION VALUES

1982 Stock Option Plan

The following table sets forth information with respect to the persons named in the Summary Compensation Table concerning exercised and unexercised options held as of June 30, 2004.

| | Number of Shares Acquired on Exercise | Value Realized | Number of Securities Underlying Unexercised Options at 6/30/2004 | | Value of Unexercised In-the-Money Options at 6/30/2004 (1) | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Vested | Unvested | Exercisable | Unexercisable |
| Kenneth L. Schroeder | 274,100 | $ 12,121,399 | 676,519 | 519,481 | $ 15,832,316 | $ 6,917,528 |
| John H. Kispert | 95,000 | $ 2,019,069 | 46,588 | 140,362 | $ 755,379 | $ 1,257,527 |
| Richard P. Wallace | 60,000 | $ 1,369,178 | 35,849 | 131,529 | $ 325,749 | $ 1,084,435 |
| Dennis J. Fortino | 83,541 | $ 1,967,462 | 88,931 | 135,195 | $ 874,852 | $ 1,149,627 |
| Gary E. Dickerson | 90,000 | $ 2,868,441 | 268,171 | 246,444 | $ 3,593,603 | $ 2,247,863 |

(1) The Company has not granted any stock appreciation rights. Total value of vested options based on fair market value of Company's Common Stock of $49.38 per share as of June 30, 2004.

## EQUITY COMPENSATION PLANS

Equity Compensation Plan Information

The following table summarizes our equity compensation plans as of June 30, 2004.

| | Number of securities to be issued upon exercise of outstanding options | Weighted-average exercise price of outstanding options | Number of securities remaining available for future issuance under stock option plans and ESPP plans |
| --- | --- | --- | --- |
| Equity compensation plans approved by stockholders (1) | 20,879,143 | $ 34.00 | 14,252,016 |
| Equity compensation plans not approved by stockholders (2) | 8,816,802 | 37.95 | 3,098,870 |
| Total | 29,695,945 | $ 35.11 | 17,350,886 |

(1) In July 2004, the Company reserved an additional 5,903,603 shares of its Common Stock in accordance with the provisions of the 1982 Stock Option Plan.

(2) On November 10, 2000 the Board approved the 2000 Nonstatutory Stock Option Plan (the "2000 Plan") and amended it on November 6, 2002. The goals for the 2000 Plan are for the issuance of nonstatutory stock options to employees and consultants of the Company or any parent or subsidiary corporation; however, officers and directors of the Company are not eligible to receive options under the 2000 Plan. Options granted under the 2000 Plan have an exercise price and a term that is determined by the plan administrator and generally vest in accordance with a schedule determined by the plan administrator at the time of grant. Upon cessation of service to the Company, the optionee will have a limited period of time, generally 90 days, in which to exercise his or her outstanding options that are vested at that time; usually this period of time is longer in the event of an optionee's death or disability. Options granted under the 2000 Plan generally are not transferable during the lifetime of an optionee; however, the plan administrator

111

may permit the optionee to transfer all or a portion of an option to a member of the optionee's immediate family, or to a limited liability corporation, trust or partnership for the benefit of an immediate family member. In the event that the Company is acquired by merger or asset sale, the vesting of each outstanding option under the 2000 Plan which is not to be assumed by the successor corporation will automatically accelerate in full, and all unvested shares will immediately vest and become exercisable for a period of 15 days after the optionee has been sent a notice of the acceleration. At the end of the 15−day period, unexercised options will terminate. The Board generally is authorized to amend, alter, suspend or terminate the 2000 Plan at any time, but no amendment, alteration, suspension or termination of the 2000 Plan may adversely affect any option previously granted under the plan without the written consent of the optionee. Unless sooner terminated by the Board, the 2000 Plan will terminate in 2010.

## REPORT OF THE COMPENSATION COMMITTEE ON EXECUTIVE COMPENSATION

**Compensation Committee**

The Compensation Committee of the Board of Directors is comprised of four independent, non−employee members of the Board of Directors, none of who have interlocking relationships as defined by the Securities and Exchange Commission and all of whom meet the definition of "independent director" as currently promulgated by the Nasdaq National Market. The Compensation Committee is responsible for setting and administering the policies governing annual compensation of executive officers, considering their performance and making recommendations regarding their cash compensation and stock options to the full Board of Directors. The Compensation Committee periodically reviews its approach to executive compensation and makes changes as appropriate. The Compensation Committee may retain, and has retained in the past, consultants when necessary, as determined by the members of the Compensation Committee.

**Compensation Philosophy**

The compensation philosophy of the Compensation Committee is to provide a comprehensive compensation package for each executive officer that is well suited to support accomplishment of the Company's business strategies, objectives and initiatives. The Compensation Committee applies this compensation philosophy in determining appropriate executive compensation levels and other compensation factors, and the Compensation Committee reaches its decisions with a view towards the Company's overall financial performance. The goals of the Company's compensation policy are to:

- attract, retain and reward executive officers who contribute to the overall success of the Company by offering compensation that is competitive in the industry;

- motivate executive officers to achieve the Company's business objectives; and

- align the interests of executive officers with the long term interests of stockholders.

The Company currently uses a compensation package, which includes a salary, executive incentive plans and stock option grants to meet these goals.

For incentive−based compensation, the Compensation Committee considers the desirability of structuring such compensation arrangements so as to qualify for deductions available under Section 162(m) of the Internal Revenue Code, which disallows a tax deduction for any publicly−held corporation for individual compensation exceeding one million U.S. Dollars in any taxable year for any of the named executive officers, other than compensation that is "performance based". The 2004 Equity Incentive Plan, which is the subject of Proposal Two of this Proxy Statement, permits a range of equity compensation devices to qualify as performance based compensation under Section 162(m) of the Internal Revenue Code.

112

| | |
|---|---|
| **Chief Executive Officer Compensation** | For fiscal year 2004, Kenneth L. Schroeder served as Chief Executive Officer. In setting Mr. Schroeder's compensation for fiscal year 2004, the Compensation Committee considered the Company's revenue and profit in the prior fiscal year, the Company's market capitalization and data from comparable companies supplied by the Compensation Committee's compensation consultants, in addition to Mr. Schroeder's performance and continuing contributions to the Company. For fiscal year 2004, a bonus of $1,183,023 was payable to Mr. Schroeder, based on the Company's performance as measured against a formula, which is based on meeting financial and strategic objectives as well as the Company's revenue growth objectives as compared to a peer group. This bonus formula was approved by the Compensation Committee and the independent members of the Board of Directors last fiscal year. |
| **Executive Officer Compensation** | The Compensation Committee's executive compensation philosophy is based upon a belief that a substantial portion of aggregate annual compensation for executive officers should be contingent upon the Company's performance and an individual's contribution to the Company's success. In addition, the Compensation Committee strives to align the interests of the Company's executive officers with the long-term interests of stockholders through stock option grants that can result in ownership of the Company's Common Stock. The Compensation Committee endeavors to structure each executive officer's overall compensation package to be consistent with this approach and to enable the Company to attract, retain and reward personnel who contribute to the success of the Company. |
| | In addition to stock option grants, the Company provides its executive officers with a compensation package consisting of base salary, variable incentive pay and participation in benefit plans generally available to other employees. The Committee considers market information from published survey data provided to the Committee by the Company's human resources staff. The market data consists primarily of base salary and total cash compensation rates, as well as incentive bonus and stock programs of other companies considered by the Committee to be peers in the Company's industry. |
| | For the Company's previous fiscal year, the Committee reviewed and recommended a compensation structure, after considering a number of factors, including, the substantial economic and business challenges in the semiconductor and semiconductor capital equipment industries worldwide. |
| | *Base Salary.* Salaries for executive officers are set with reference to salaries for comparable positions among other companies in the Company's industry or in industries that employ individuals of similar education and background to the executive officer based on data provided by the Compensation Committee's compensation consultants, as well as each person's job responsibilities, level of experience, individual performance and contribution to the Company's business. In making base salary decisions, the Compensation Committee exercised its discretion and judgment based upon these factors. No specific formula was applied to determine the weight of each factor. |
| | *Management Incentive Plan.* Each year since fiscal 1979, the Company has adopted a management incentive plan (the "Incentive Plan") which provides for payments to officers and key employees based on the financial performance of the Company or the relevant business unit, and on the achievement of key strategic objectives which are set by senior management and approved by the Board of Directors. The Incentive Plan solely as to Messrs. Levy, Schroeder, Kispert and Dickerson is approved by the Compensation Committee and submitted to the |

113

Board of Directors for ratification. For fiscal year 2004, the Incentive Plan set goals for profitability, achievement of measurable objectives aimed at strategic corporate goals and achievement of objectives relating to managing the ratio of assets to sales. The target goals for fiscal year 2004 were exceeded on financial objectives but underachieved on strategic objectives. As a result, approximately 107.3% of the eligible incentive plan amounts for Messrs. Levy, Schroeder, Kispert and Dickerson were paid.

*Outstanding Corporate Performance Executive Bonus Plan.* The Company continues to utilize its incentive plan for an additional bonus to executives in years when the Company achieves certain levels of profitability and growth (the "Outstanding Corporate Performance Plan"). The performance measurements are based on the Company's pretax margin and growth of the Company's aggregate revenues over the prior twelve months against a target group of public U.S. Companies over the same period. The target percentage for the Outstanding Corporate Performance Plan bonus is the same target percentage as utilized in determining the Incentive Plan bonus. For fiscal year 2004, bonuses were paid pursuant to the Outstanding Corporate Performance Plan at a rate of 96.3% of target.

In years that the performance goals are met, one−third of each annual amount under the Outstanding Corporate Performance Plan is payable at the end of the fiscal year; an additional one−third of each annual amount payable under the plan is payable at the end of the next fiscal year, and the final one−third of each annual amount payable under the plan is payable at the end of the next fiscal year. If the executive officer leaves during that one−year period, he receives a pro rata distribution of any deferred bonus funds.

*Long−term Incentives.* Long−term incentives are currently provided through the Stock Option Plan, which rewards executive officers through the growth in value of the Company's Common Stock. The Compensation Committee believes that employee equity ownership is highly motivating, provides a major incentive for employees to build stockholder value and serves to align the interests of employees with those of stockholders.

Grants of stock options to executive officers are based upon each executive officer's relative position, responsibilities, historical and expected contributions to the Company, and the executive officer's existing stock ownership and previous option grants. Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price. If Proposal Two is adopted, the Compensation Committee will consider granting different types of awards to executive officers under the 2004 Equity Incentive Plan.

**Stock Ownership Guidelines**

The Company adopted a program, approved by the Board of Directors, pursuant to which certain Company executives with the title Vice President or above and all directors are required to own a prescribed number of shares of Common Stock of the Company. These ownership requirements for eligible executives are phased in over time. Each executive submitted a five−year plan on how they plan to comply with the guidelines. As of June 30, 2004, all executives covered by these guidelines are on track to reach full compliance by 2009.

114

**MEMBERS OF THE COMPENSATION COMMITTEE**

Robert T. Bond, Chairman
Edward W. Barnholt
Michael E. Marks
Lida Urbanek

**Compensation Committee Interlocks**

The members of the Compensation Committee are set forth in the preceding section. There are no members of the Compensation Committee who were officers or employees of the Company or any of its subsidiaries during the fiscal year, formerly officers of the Company, or had any relationship otherwise requiring disclosure hereunder.

## REPORT OF THE AUDIT COMMITTEE

**Audit Committee**

The Company's Audit Committee is composed of four non-employee directors, each of whom meet the standards of independence and financial experience requirements of the Nasdaq National Market, as currently in effect. The Board has determined that H. Raymond Bingham is an "audit committee financial expert" within the meaning of the rules promulgated by the Securities and Exchange Commission. For fiscal year 2004, H. Raymond Bingham, Robert T. Bond, Richard J. Elkus, Jr. and Stephen P. Kaufman served as members on the Audit Committee. Mr. Bingham served as the Chairman of the Audit Committee for fiscal year 2004. The Board of Directors has adopted a written charter for the Audit Committee that details the responsibilities of the Audit Committee and was attached as Exhibit A to the Proxy Statement related to the 2003 Annual Meeting. This report relates to the activities undertaken by the Audit Committee in fulfilling such responsibilities. The charter is reviewed annually for changes, as appropriate, and is posted on the Company's website at http://ir.kla-tencor.com/, in the Investor Presentations and Corporate Governance section.

KLA–Tencor's management is responsible for establishing and maintaining a system for internal controls and the financial reporting process. The Audit Committee is responsible for overseeing KLA–Tencor's auditing, accounting and financial reporting processes, its system of internal controls, and legal and ethical compliance. This report relates to the activities undertaken by theAudit Committee in fulfilling such responsibilities. During fiscal year 2004, the Audit Committee reviewed and discussed with the Company's management team KLA–Tencor's audited consolidated financial statements contained in KLA–Tencor's Annual Report on Form 10–K for the fiscal year ended June 30, 2004. The Audit Committee also met routinely with the independent auditors, with and without members of the KLA–Tencor management team present, to discuss their evaluation of the Company's internal controls and the overall quality of the Company's financial reporting. The Audit Committee also met with the Company's Chief Executive Officer to discuss accounting issues and risks facing the Company.

The Audit Committee also discussed with the Company's independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61, (Communication With Audit Committees).

The Audit Committee received from the independent auditors the written disclosures and the letter from the auditors required by Independence Standards Board Standard No. 1, (Independence Discussions With Audit Committees) and has discussed with the independent auditors their independence from management and KLA–Tencor. The Audit Committee also considered whether the provision of

115

services covered by fees paid to its independent auditors was compatible with maintaining their independence.

Based on the reviews and discussions referred to above, the Audit Committee recommended to the Board of Directors, and the Board of Directors approved, the inclusion of the audited financial statements in the Company's Annual Report on Form 10−K for the fiscal year ended June 30, 2004, filed with the Securities and Exchange Commission.

**MEMBERS OF THE AUDIT COMMITTEE**

H. Raymond Bingham, Chairman
Robert T. Bond
Richard J. Elkus, Jr.
Stephen P. Kaufman

116

**PERFORMANCE GRAPH**

The stock price performance shown on the following graph is not necessarily indicative of future stock price performance.

Comparison of Five Year Cumulative Total Return Among KLA–Tencor
Corporation, The NASDAQ — US Index and The Philadelphia SOXX Index [1]



| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| KLA–Tencor Corporation | 100 | 180.538 | 180.252 | 135.613 | 143.227 | 152.229 |
| The NASDAQ–US Index | 100 | 147.831 | 80.271 | 54.681 | 60.713 | 76.526 |
| Philadelphia SOXX Index | 100 | 235.428 | 128.824 | 80.004 | 74.247 | 100.132 |

[1]  Assumes $100 invested on June 30, 1999. The Company's fiscal year end is June 30.

117

**CERTAIN TRANSACTIONS AND OTHER MATTERS**

Transactions with
Directors, Executive
Officers and 5%
Stockholders

In fiscal year 2001, the Company entered into a Bonus Agreement with Mr. Kispert, whereby Mr. Kispert will receive payments of $93,900 a year, for the following four years.

Change of Control
Agreements

In connection with the merger between KLA Instruments Corporation and Tencor Instruments (effective April 30, 1997) the Company entered into identical employment arrangements, subsequently amended, (the "Retention and Non–Competition Agreement") with Messrs. Levy and Schroeder. The arrangements, as amended, provide that certain benefits would be paid if certain events took place after April 30, 1997. The purpose of these arrangements was to retain the services of Messrs. Levy and Schroeder to ensure the continued smooth transition associated with the merger. The terms of those arrangements provide that if an individual were to leave the Company after April 30, 1998, subject to releasing the Company from all claims, and in connection with working part–time for 36 months, he will receive (i) his base salary for the first 24 months of part–time employment, (ii) a mutually agreeable level of compensation per month for the final 12 months of part–time employment, (iii) an annual bonus (based on an achievement of 100% of bonus objectives) in the fiscal year of his transition to part–time employment, (iv) a bonus paid in the fiscal year following the payment of the annual bonus above, (based on achievement of 100% of his individual bonus objectives) and (v) a pro–rated bonus for the fiscal year in which part–time employment ended. During the periods of part–time employment, all options to exercise stock of the Company, which were granted more than 12 months prior to the termination of full–time employment, will continue to vest. The same benefits shall be payable in the event the Company terminates his employment without cause. If he is terminated for cause (defined as (i) gross negligence or willful misconduct in connection with the performance of duties, (ii) conviction of or plea of nolo contendere to any felony, or (iii) the embezzlement or misappropriation of Company property) then he will receive a lump–sum payment equal to 25% of his base salary.

In fiscal year 2002, the Board of Directors approved individual "change–in–control" agreements for Messrs. Schroeder, Dickerson and Kispert (each, an "Executive"). As of April 30, 2004, Mr. Dickerson's agreement terminated. The change–in–control provisions of these agreements take effect if the Executive's employment is terminated involuntarily or constructively within two years after a change in control of the Company. If the provisions become effective, Mr. Schroeder would receive salary and bonus under the terms of his Retention and Non–Competition Agreement and the unvested portions of his then outstanding option grants would fully accelerate. In the case of Mr. Kispert, he would become eligible to receive: (i) an amount equal to two times his annual compensation; (ii) an amount equal to two times his bonus amount; (iii) continuation of health benefits for two years; and (iv) full acceleration of vesting for all options held. For the purpose of these agreements, a change in control occurs upon merger of the Company with or into another corporation, or a change in more than half of the total voting power of the Company, or upon the sale of substantially all of the assets of the Company.

118

**Mr. Dickerson**

Mr. Dickerson, the Company's President and Chief Operating Officer resigned both positions effective as of April 30, 2004. Effective May 1, 2004 until the termination of his Severance Agreement and General Release (the "Severance Agreement"), Mr. Dickerson's job title will be "Senior Vice President, New Business Operations" and he will continue to report to the Company's Chief Executive Officer. During the term of his Severance Agreement, Mr. Dickerson will receive one–half of his base salary (effective as of April 30, 2004) plus a bonus for fiscal year 2004. Mr. Dickerson's outstanding stock options which had been granted by the Company prior to April 30, 2004, will continue to vest in accordance with the terms and conditions of the applicable original option agreements relating to such options through the earlier termination of his Agreement or March 31, 2006. In addition, during the pendency of the Severance Agreement, Mr. Dickerson will continue to receive all medical, dental, life, accident, and disability insurance and benefits that he was receiving from the Company as of April 30, 2004.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") requires the Company's executive officers, directors, and persons who own more than ten percent of a registered Class of the Company's equity securities to file reports of ownership and changes in ownership with the SEC. Executive officers, directors and greater than ten percent stockholders are required by SEC regulations to furnish the Company with copies of all Section 16(a) forms they file. With one exception and based solely on its review of the copies of such forms received by it, the Company believes that during fiscal year 2004 all executive officers, directors and greater than ten percent stockholders of the Company complied with all applicable filing requirements. Due to an administrative error, Ken Levy filed an amendment to a Form 4 which was filed on January 27, 2004 to update the aggregate share ownership set forth therein.

119

APPENDIX A

**KLA–TENCOR CORPORATION**
**2004 EQUITY INCENTIVE PLAN**

1. <u>Purposes of the Plan</u>. The purposes of this Equity Incentive Plan are:

- to attract and retain the best available personnel for positions of substantial responsibility,

- to provide additional incentive to Service Providers, and

- to promote the success of the Company's business.

Awards granted under the Plan may be Incentive Stock Options, Nonstatutory Stock Options, Restricted Stock, Stock Appreciation Rights, Performance Shares, Performance Units or Deferred Stock Units, as determined by the Administrator at the time of grant.

2. <u>Definitions</u>. As used herein, the following definitions shall apply:

(a) "<u>Administrator</u>" means the Board or any of its Committees that shall be administering the Plan, in accordance with Section 4 of the Plan.

(b) "<u>Annual Revenue</u>" means the Company's or a business unit's net sales for the Fiscal Year, determined in accordance with generally accepted accounting principles.

(c) "<u>Applicable Laws</u>" means the requirements relating to the administration of equity compensation plans under U.S. state corporate laws, U.S. federal and state securities laws, the Code, any stock exchange or quotation system on which the Shares are listed or quoted and the applicable laws of any other country or jurisdiction where Awards are granted under the Plan.

(d) "<u>Award</u>" means, individually or collectively, a grant under the Plan of Options, Restricted Stock, Stock Appreciation Rights, Performance Shares, Performance Units or Deferred Stock Units.

(e) "<u>Award Agreement</u>" means the written or electronic agreement setting forth the terms and provisions applicable to each Award granted under the Plan. The Award Agreement is subject to the terms and conditions of the Plan.

(f) "<u>Awarded Stock</u>" means the Common Stock subject to an Award.

(g) "<u>Board</u>" means the Board of Directors of the Company.

(h) "<u>Cash Position</u>" means the Company's level of cash and cash equivalents.

(i) "<u>Change of Control</u>" means the occurrence of any of the following events, in one or a series of related transactions:

(i) any "person," as such term is used in Sections 13(d) and 14(d) of the Exchange Act, other than the Company, a subsidiary of the Company or a Company employee benefit plan, including any trustee of such plan acting as trustee, is or becomes the "beneficial owner" (as defined in Rule 13d–3 under the Exchange Act), directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the combined voting power of the Company's then outstanding securities entitled to vote generally in the election of directors; or

(ii) a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least fifty percent (50%) of the total voting power represented by the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; or

(iii) the sale or disposition by the Company of all or substantially all the Company's assets; or

120

(iv) a change in the composition of the Board, as a result of which fewer than a majority of the directors are Incumbent Directors. "Incumbent Directors" shall mean directors who either (A) are Directors as of the date this Plan is approved by the Board, or (B) are elected, or nominated for election, to the Board with the affirmative votes of at least a majority of the Incumbent Directors and whose election or nomination was not in connection with any transaction described in (i) or (ii) above or in connection with an actual or threatened proxy contest relating to the election of directors of the Company.

(j)  "Code" means the Internal Revenue Code of 1986, as amended.

(k)  "Committee" means a Committee appointed by the Board in accordance with Section 4 of the Plan.

(l)  "Common Stock" means the Common Stock of the Company.

(m)  "Company" means KLA-Tencor Corporation.

(n)  "Consultant" means any person, including an advisor, engaged by the Company or a Parent or Subsidiary to render services and who is compensated for such services.

(o)  "Deferred Stock Unit" means a deferred stock unit Award granted to a Participant pursuant to Section 14.

(p)  "Director" means a member of the Board.

(q)  "Disability" means total and permanent disability as defined in Section 22(e)(3) of the Code.

(r)  "Earnings Per Share" means as to any Fiscal Year, the Company's or a business unit's Net Income, divided by a weighted average number of common shares outstanding and dilutive common equivalent shares deemed outstanding, determined in accordance with generally accepted accounting principles.

(s)  "Employee" means any person, including Officers and Directors, employed by the Company or any Parent or Subsidiary of the Company. A Service Provider shall not cease to be an Employee in the case of (i) any leave of absence approved by the Company or (ii) transfers between locations of the Company or between the Company, its Parent, any Subsidiary, or any successor. For purposes of Incentive Stock Options, no such leave may exceed ninety days, unless reemployment upon expiration of such leave is guaranteed by statute or contract. If reemployment upon expiration of a leave of absence approved by the Company is not so guaranteed, then three (3) months following the 91st day of such leave any Incentive Stock Option held by the Participant shall cease to be treated as an Incentive Stock Option and shall be treated for tax purposes as a Nonstatutory Stock Option.

(t)  "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(u)  "Fair Market Value" means, as of any date, the value of Common Stock determined as follows:

(i) If the Common Stock is listed on any established stock exchange or a national market system, including without limitation the Nasdaq National Market of the National Association of Securities Dealers, Inc. Automated Quotation ("Nasdaq") System, the Fair Market Value of a Share of Common Stock shall be the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such system or exchange (or the exchange with the greatest volume of trading in Common Stock) on the day of determination, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable;

(ii) If the Common Stock is quoted on the Nasdaq System (but not on the Nasdaq National Market thereof) or is regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value of a Share of Common Stock shall be the mean between the high bid and low asked prices for the Common Stock on the last market trading day prior to the day of determination, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable; or

(iii) In the absence of an established market for the Common Stock, the Fair Market Value shall be determined in good faith by the Administrator.

(v)  "Fiscal Year" means a fiscal year of the Company.

(w)    "Incentive Stock Option" means an Option intended to qualify as an incentive stock option within the meaning of Section 422 of the Code and the regulations promulgated thereunder.

(x)    "Net Income" means as to any Fiscal Year, the income after taxes of the Company for the Fiscal Year determined in accordance with generally accepted accounting principles.

(y)    "Nonstatutory Stock Option" means an Option not intended to qualify as an Incentive Stock Option.

(z)    "Notice of Grant" means a written or electronic notice evidencing certain terms and conditions of an individual Award. The Notice of Grant is part of the Option Agreement.

(aa)    "Officer" means a person who is an officer of the Company within the meaning of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

(bb)    "Operating Cash Flow" means the Company's or a business unit's sum of Net Income plus depreciation and amortization less capital expenditures plus changes in working capital comprised of accounts receivable, inventories, other current assets, trade accounts payable, accrued expenses, product warranty, advance payments from customers and long–term accrued expenses, determined in accordance with generally acceptable accounting principles.

(cc)    "Operating Income" means the Company's or a business unit's income from operations but excluding any unusual items, determined in accordance with generally accepted accounting principles.

(dd)    "Option" means a stock option granted pursuant to the Plan.

(ee)    "Option Agreement" means a written or electronic agreement between the Company and a Participant evidencing the terms and conditions of an individual Option grant. The Option Agreement is subject to the terms and conditions of the Plan.

(ff)    "Parent" means a "parent corporation", whether now or hereafter existing, as defined in Section 424(e) of the Code.

(gg)    "Participant" means the holder of an outstanding Award granted under the Plan.

(hh)    "Performance Goals" means the goal(s) (or combined goal(s)) determined by the Administrator (in its discretion) to be applicable to a Participant with respect to an Award. As determined by the Administrator, the Performance Goals applicable to an Award may provide for a targeted level or levels of achievement using one or more of the following measures: (a) Annual Revenue, (b) Cash Position, (c) Earnings Per Share, (d) Net Income, (e) Operating Cash Flow, (f) Operating Income, (g) Return on Assets, (h) Return on Equity, (i) Return on Sales, and (j) Total Stockholder Return. The Performance Goals may differ from Participant to Participant and from Award to Award.

(ii)    "Performance Share" means a performance share Award granted to a Participant pursuant to Section 12.

(jj)    "Performance Unit" means a performance unit Award granted to a Participant pursuant to Section 13.

(kk)    "Plan" means this 2004 Equity Incentive Plan.

(ll)    "Restricted Stock" means Shares granted pursuant to Section 11 of the Plan.

(mm) "Return on Assets" means the percentage equal to the Company's or a business unit's Operating Income before incentive compensation, divided by average net Company or business unit, as applicable, assets, determined in accordance with generally accepted accounting principles.

(nn)    "Return on Equity" means the percentage equal to the Company's Net Income divided by average stockholder's equity, determined in accordance with generally accepted accounting principles.

(oo)    "Return on Sales" means the percentage equal to the Company's or a business unit's Operating Income before incentive compensation, divided by the Company's or the business unit's, as applicable, revenue, determined in accordance with generally accepted accounting principles.

122

(pp)  "Rule 16b−3" means Rule 16b−3 of the Exchange Act or any successor to Rule 16b−3, as in effect when discretion is being exercised with respect to the Plan.

(qq)  "Section 16(b)" means Section 16(b) of the Securities Exchange Act of 1934, as amended.

(rr)  "Service Provider" means an Employee, Consultant or Director.

(ss)  "Share" means a share of the Common Stock, as adjusted in accordance with Section 18 of the Plan.

(tt)  "Stock Appreciation Right" or "SAR" means an Award granted pursuant to Section 10 hereof.

(uu)  "Subsidiary" means a "subsidiary corporation", whether now or hereafter existing, as defined in Section 424(f) of the Code.

(vv)  "Total Stockholder Return" means the total return (change in share price plus reinvestment of any dividends) of a Share.

3.  Stock Subject to the Plan. Subject to the provisions of Section 18 of the Plan, the maximum aggregate number of Shares which may be issued under the Plan is 11,000,000 Shares plus any shares subject to any outstanding options under the Company's 1982 Stock Option Plan and the Company's 2000 Nonstatutory Stock Option Plan that subsequently expire unexercised, up to a maximum of an additional 1,500,000 Shares.

Any Shares subject to Options or SARs shall be counted against the numerical limits of this Section 3 as one share for every share subject thereto. Any Shares or units subject to Restricted Stock, Performance Shares, Performance Units or Deferred Stock Unit Awards with a per share or unit purchase price lower than 100% of Fair Market Value on the date of grant shall be counted against the numerical limits of this Section 3 as 1.8 shares for every one share subject thereto.

The Shares may be authorized, but unissued, or reacquired Common Stock.

If an Award expires or becomes unexercisable without having been exercised in full, or, with respect to Restricted Stock, Performance Shares, Performance Units or Deferred Stock Units, is forfeited to or repurchased by the Company, the unpurchased Shares (or for Awards other than Options and SARs, the forfeited or repurchased shares) which were subject thereto shall become available for future grant or sale under the Plan (unless the Plan has terminated). With respect to SARs, only shares actually issued pursuant to an SAR shall cease to be available under the Plan; all remaining shares under SARs shall remain available for future grant or sale under the Plan (unless the Plan has terminated). However, Shares that have actually been issued under the Plan under any Award shall not be returned to the Plan and shall not become available for future distribution under the Plan; provided, however, that if Shares of Restricted Stock, Performance Shares, Performance Units or Deferred Stock Units are repurchased by the Company at their original purchase price or are forfeited to the Company, such Shares shall become available for future grant under the Plan. Shares used to pay the exercise price of an Option or Stock Purchase Right shall become available for future grant or sale under the Plan. To the extent an Award under the Plan is paid out in cash rather than stock, such cash payment shall not result in reducing the number of Shares available for issuance under the Plan.

4.  Administration of the Plan.

(a)  Procedure.

(i)  Multiple Administrative Bodies. The Plan may be administered by different Committees with respect to different groups of Service Providers.

(ii)  Section 162(m). To the extent that the Administrator determines it to be desirable to qualify Options granted hereunder as "performance−based compensation" within the meaning of Section 162(m) of the Code, the Plan shall be administered by a Committee of two or more "outside directors" within the meaning of Section 162(m) of the Code.

(iii)  Rule 16b−3. To the extent desirable to qualify transactions hereunder as exempt under Rule 16b−3, the transactions contemplated hereunder shall be structured to satisfy the requirements for exemption under Rule 16b−3.

123

(iv) Other Administration. Other than as provided above, the Plan shall be administered by (A) the Board or (B) a Committee, which committee shall be constituted to satisfy Applicable Laws.

(b) Powers of the Administrator. Subject to the provisions of the Plan, and in the case of a Committee, subject to the specific duties delegated by the Board to such Committee, the Administrator shall have the authority, in its discretion:

(i) to determine the Fair Market Value of the Common Stock, in accordance with Section 2(u) of the Plan;

(ii) to select the Service Providers to whom Awards may be granted hereunder;

(iii) to determine whether and to what extent Awards or any combination thereof, are granted hereunder;

(iv) to determine the number of shares of Common Stock or equivalent units to be covered by each Award granted hereunder;

(v) to approve forms of agreement for use under the Plan;

(vi) to determine the terms and conditions, not inconsistent with the terms of the Plan, of any award granted hereunder. Such terms and conditions include, but are not limited to, the exercise price, the time or times when Options or SARs may be exercised or other Awards vest (which may be based on performance criteria), any vesting acceleration or waiver of forfeiture restrictions, and any restriction or limitation regarding any Award or the shares of Common Stock relating thereto, based in each case on such factors as the Administrator, in its sole discretion, shall determine;

(vii) to construe and interpret the terms of the Plan and Awards;

(viii) to prescribe, amend and rescind rules and regulations relating to the Plan, including rules and regulations relating to sub-plans established for the purpose of qualifying for preferred tax treatment under foreign tax laws;

(ix) to modify or amend each Award (subject to Section 20(c) of the Plan), including the discretionary authority to extend the post-termination exercisability period of Options and SARs longer than is otherwise provided for in the Plan;

(x) to authorize any person to execute on behalf of the Company any instrument required to effect the grant of an Award previously granted by the Administrator;

(xi) to allow Participants to satisfy withholding tax obligations by electing to have the Company withhold from the Shares or cash to be issued upon exercise or vesting of an Award (or distribution of a Deferred Stock Unit) that number of Shares or cash having a Fair Market Value equal to the minimum amount required to be withheld (but no more). The Fair Market Value of any Shares to be withheld shall be determined on the date that the amount of tax to be withheld is to be determined. All elections by a Participant to have Shares or cash withheld for this purpose shall be made in such form and under such conditions as the Administrator may deem necessary or advisable;

(xii) to determine the terms and restrictions applicable to Awards; and

(xiii) to make all other determinations deemed necessary or advisable for administering the Plan.

(c) Effect of Administrator's Decision. The Administrator's decisions, determinations and interpretations shall be final and binding on all Participants and any other holders of Awards.

5. Eligibility. Restricted Stock, Performance Shares, Performance Units, Stock Appreciation Rights, Deferred Stock Units and Nonstatutory Stock Options may be granted to Service Providers. Incentive Stock Options may be granted only to Employees.

6. No Employment Rights. Neither the Plan nor any Award shall confer upon a Participant any right with respect to continuing the Participant's employment with the Company or its Subsidiaries, nor shall they interfere

124

in any way with the Participant's right or the Company's or Subsidiary's right, as the case may be, to terminate such employment at any time, with or without cause or notice.

7. Code Section 162(m) Provisions.

(a) Option and SAR Annual Share Limit. No Participant shall be granted, in any Fiscal Year, Options and Stock Appreciation Rights to purchase more than 400,000 Shares; provided, however, that such limit shall be 1,200,000 Shares in the Participant's first Fiscal Year of Company service.

(b) Restricted Stock and Performance Share Annual Limit. No Participant shall be granted, in any Fiscal Year, more than 200,000 Shares of Restricted Stock or Performance Shares; provided, however, that such limit shall be 600,000 Shares in the Participant's first Fiscal Year of Company service.

(c) Performance Units Annual Limit. No Participant shall receive Performance Units, in any Fiscal Year, having an initial value greater than $1,000,000, provided, however, that such limit shall be $3,000,000 in the Participant's first Fiscal Year of Company service.

(d) Section 162(m) Performance Restrictions. For purposes of qualifying grants of Restricted Stock, Performance Shares or Performance Units as "performance–based compensation" under Section 162(m) of the Code, the Administrator, in its discretion, may set restrictions based upon the achievement of Performance Goals. The Performance Goals shall be set by the Administrator on or before the latest date permissible to enable the Restricted Stock, Performance Shares or Performance Units to qualify as "performance–based compensation" under Section 162(m) of the Code. In granting Restricted Stock, Performance Shares or Performance Units which are intended to qualify under Section 162(m) of the Code, the Administrator shall follow any procedures determined by it from time to time to be necessary or appropriate to ensure qualification of the Award under Section 162(m) of the Code (e.g., in determining the Performance Goals).

(e) Changes in Capitalization. The numerical limitations in Sections 7(a) and (b) shall be adjusted proportionately in connection with any change in the Company's capitalization as described in Section 18(a).

8. Term of Plan. The Plan shall continue in effect for a term of ten (10) years following the date upon which the Board approved the Plan in 2004.

9. Stock Options.

(a) Term. The term of each Option shall be stated in the Notice of Grant; provided, however, that the term shall be ten (10) years from the date of grant or such shorter term as may be provided in the Notice of Grant. Moreover, in the case of an Incentive Stock Option granted to a Participant who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the term of the Incentive Stock Option shall be five (5) years from the date of grant or such shorter term as may be provided in the Notice of Grant.

(b) Option Exercise Price. The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be determined by the Administrator and shall be no less than 100% of the Fair Market Value per share on the date of grant; provided, however, that in the case of an Incentive Stock Option granted to an Employee who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the per Share exercise price shall be no less than 110% of the Fair Market Value per Share on the date of grant.

(c) No Repricing. The exercise price for an Option may not be reduced without the consent of the Company's stockholders. This shall include, without limitation, a repricing of the Option as well as an Option exchange program whereby the Participant agrees to cancel an existing Option in exchange for an Option, SAR or other Award.

(d) Waiting Period and Exercise Dates. At the time an Option is granted, the Administrator shall fix the period within which the Option may be exercised and shall determine any conditions which must be satisfied before the Option may be exercised. In so doing, the Administrator may specify that an Option may not be exercised until the completion of a service period or until performance milestones are satisfied.

125

(e) <u>Form of Consideration</u>. The Administrator shall determine the acceptable form of consideration for exercising an Option, including the method of payment. In the case of an Incentive Stock Option, the Administrator shall determine the acceptable form of consideration at the time of grant. Subject to Applicable Laws, such consideration may consist entirely of:

(i) cash;

(ii) check;

(iii) other Shares which (A) in the case of Shares acquired upon exercise of an option, have been owned by the Participant for more than six months on the date of surrender, and (B) have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which said Option shall be exercised;

(iv) delivery of a properly executed exercise notice together with such other documentation as the Administrator and the broker, if applicable, shall require to effect an exercise of the Option and delivery to the Company of the sale proceeds required to pay the exercise price;

(v) any combination of the foregoing methods of payment; or

(vi) such other consideration and method of payment for the issuance of Shares to the extent permitted by Applicable Laws.

(f) <u>Exercise of Option; Rights as a Stockholder</u>. Any Option granted hereunder shall be exercisable according to the terms of the Plan and at such times and under such conditions as determined by the Administrator and set forth in the Option Agreement. An Option may not be exercised for a fraction of a Share.

An Option shall be deemed exercised when the Company receives: (i) written or electronic notice of exercise (in accordance with the Option Agreement) from the person entitled to exercise the Option, and (ii) full payment for the Shares with respect to which the Option is exercised. Full payment may consist of any consideration and method of payment authorized by the Administrator and permitted by the Option Agreement and the Plan. Shares issued upon exercise of an Option shall be issued in the name of the Participant. Until the stock certificate evidencing such Shares is issued (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the optioned stock, notwithstanding the exercise of the Option. The Company shall issue (or cause to be issued) such stock certificate promptly after the Option is exercised. No adjustment will be made for a dividend or other right for which the record date is prior to the date the stock certificate is issued, except as provided in Section 18 of the Plan.

Exercising an Option in any manner shall decrease the number of Shares thereafter available for sale under the Option, by the number of Shares as to which the Option is exercised.

(g) <u>Termination of Relationship as a Service Provider</u>. If a Participant ceases to be a Service Provider, other than upon the Participant's death or Disability, the Participant may exercise his or her Option within such period of time as is specified in the Option Agreement to the extent that the Option is vested on the date of termination (but in no event later than the expiration of the term of such Option as set forth in the Option Agreement). In the absence of a specified time in the Option Agreement, the Option shall remain exercisable for three months following the Participant's termination. If, on the date of termination, the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option shall revert to the Plan. If, after termination, the Participant does not exercise his or her Option within the time specified by the Administrator, the Option shall terminate, and the Shares covered by such Option shall revert to the Plan.

(h) <u>Disability</u>. If a Participant ceases to be a Service Provider as a result of the Participant's Disability, the Participant may exercise his or her Option within such period of time as is specified in the Option Agreement to the extent the Option is vested on the date of termination (but in no event later than the expiration of the term of such Option as set forth in the Option Agreement). In the absence of a specified time in the Option Agreement, the Option shall remain exercisable for twelve (12) months following the Participant's termination. If, on the date of termination, the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option shall revert to the Plan. If, after termination, the Participant does not exercise his or her Option within the time specified herein, the Option shall terminate, and the Shares covered by such Option shall revert to the Plan.

126

(i) Death of Participant. If a Participant dies while a Service Provider, the Option may be exercised following the Participant's death within such period of time as is specified in the Option Agreement (but in no event may the option be exercised later than the expiration of the term of such Option as set forth in the Option Agreement), by the Participant's designated beneficiary, provided such beneficiary has been designated prior to Participant's death in a form acceptable to the Administrator. If no such beneficiary has been designated by the Participant, then such Option may be exercised by the personal representative of the Participant's estate or by the person(s) to whom the Option is transferred pursuant to the Participant's will or in accordance with the laws of descent and distribution. In the absence of a specified time in the Option Agreement, the Option shall remain exercisable for twelve (12) months following Participant's death. If the Option is not so exercised within the time specified herein, the Option shall terminate, and the Shares covered by such Option shall revert to the Plan.

(j) ISO $100,000 Rule. Each Option shall be designated in the Notice of Grant as either an Incentive Stock Option or a Nonstatutory Stock Option. However, notwithstanding such designations, to the extent that the aggregate Fair Market Value:

(i) of Shares subject to a Participant's Incentive Stock Options granted by the Company, any Parent or Subsidiary, which

(ii) become exercisable for the first time during any calendar year (under all plans of the Company or any Parent or Subsidiary) exceeds $100,000, such excess Options shall be treated as Nonstatutory Stock Options. For purposes of this Section 9(j), Incentive Stock Options shall be taken into account in the order in which they were granted, and the Fair Market Value of the Shares shall be determined as of the time of grant.

10. Stock Appreciation Rights.

(a) Grant of SARs. Subject to the terms and conditions of the Plan, SARs may be granted to Participants at any time and from time to time as shall be determined by the Administrator, in its sole discretion. The Administrator shall have complete discretion to determine the number of SARs granted to any Participant.

(b) Exercise Price and other Terms. Subject to Section 7(a) of the Plan, the Administrator, subject to the provisions of the Plan, shall have complete discretion to determine the terms and conditions of SARs granted under the Plan; provided, however, that no SAR may have a term of more than ten (10) years from the date of grant. The exercise price for the Shares or cash to be issued pursuant to an already granted SAR may not be changed without the consent of the Company's stockholders. This shall include, without limitation, a repricing of the SAR as well as an SAR exchange program whereby the Participant agrees to cancel an existing SAR in exchange for an Option, SAR or other Award.

(c) Payment of SAR Amount. Upon exercise of a SAR, a Participant shall be entitled to receive payment from the Company in an amount determined by multiplying:

(i) The difference between the Fair Market Value of a Share on the date of exercise over the exercise price; times

(ii) the number of Shares with respect to which the SAR is exercised.

(d) Payment upon Exercise of SAR. At the discretion of the Administrator, payment for a SAR may be in cash, Shares or a combination thereof.

(e) SAR Agreement. Each SAR grant shall be evidenced by an Award Agreement that shall specify the exercise price, the term of the SAR, the conditions of exercise, and such other terms and conditions as the Administrator, in its sole discretion, shall determine.

(f) Expiration of SARs. A SAR granted under the Plan shall expire upon the date determined by the Administrator, in its sole discretion, and set forth in the Award Agreement.

(g) Termination of Relationship as a Service Provider. If a Participant ceases to be a Service Provider, other than upon the Participant's death or Disability termination, the Participant may exercise his or her SAR within such period of time as is specified in the SAR Agreement to the extent that the SAR is vested on the date of termination (but in no event later than the expiration of the term of such SAR as set forth in the SAR Agreement).

127

In the absence of a specified time in the SAR Agreement, the SAR shall remain exercisable for three months following the Participant's termination. If, on the date of termination, the Participant is not vested as to his or her entire SAR, the Shares covered by the unvested portion of the SAR shall revert to the Plan. If, after termination, the Participant does not exercise his or her SAR within the time specified by the Administrator, the SAR shall terminate, and the Shares covered by such SAR shall revert to the Plan.

(h) Disability. If a Participant ceases to be a Service Provider as a result of the Participant's Disability, the Participant may exercise his or her SAR within such period of time as is specified in the SAR Agreement to the extent the SAR is vested on the date of termination (but in no event later than the expiration of the term of such SAR as set forth in the SAR Agreement). In the absence of a specified time in the SAR Agreement, the SAR shall remain exercisable for twelve (12) months following the Participant's termination. If, on the date of termination, the Participant is not vested as to his or her entire SAR, the Shares covered by the unvested portion of the SAR shall revert to the Plan. If, after termination, the Participant does not exercise his or her SAR within the time specified herein, the SAR shall terminate, and the Shares covered by such SAR shall revert to the Plan.

(i) Death of Participant. If a Participant dies while a Service Provider, the SAR may be exercised following the Participant's death within such period of time as is specified in the SAR Agreement (but in no event may the SAR be exercised later than the expiration of the term of such SAR as set forth in the SAR Agreement), by the Participant's designated beneficiary, provided such beneficiary has been designated prior to Participant's death in a form acceptable to the Administrator. If no such beneficiary has been designated by the Participant, then such SAR may be exercised by the personal representative of the Participant's estate or by the person(s) to whom the SAR is transferred pursuant to the Participant's will or in accordance with the laws of descent and distribution. In the absence of a specified time in the SAR Agreement, the SAR shall remain exercisable for twelve (12) months following Participant's death. If the SAR is not so exercised within the time specified herein, the SAR shall terminate, and the Shares covered by such SAR shall revert to the Plan.

11. Restricted Stock.

(a) Grant of Restricted Stock. Subject to the terms and conditions of the Plan, Restricted Stock may be granted to Participants at any time as shall be determined by the Administrator, in its sole discretion. Subject to Section 7(b) hereof, the Administrator shall have complete discretion to determine (i) the number of Shares subject to a Restricted Stock award granted to any Participant, and (ii) the conditions that must be satisfied, which typically will be based principally or solely on continued provision of services but may include a performance−based component, upon which is conditioned the grant, vesting or issuance of Restricted Stock. Restricted Stock shall be granted in the form of units to acquire Shares. Each such unit shall be the equivalent of one Share for purposes of determining the number of Shares subject to an Award. Restricted Stock may be granted in the form of restricted stock units that are not issued until the vesting conditions are satisfied. Until the Shares are issued, no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the units to acquire Shares.

(b) Other Terms. The Administrator, subject to the provisions of the Plan, shall have complete discretion to determine the terms and conditions of Restricted Stock granted under the Plan. Restricted Stock grants shall be subject to the terms, conditions, and restrictions determined by the Administrator at the time the stock or the restricted stock unit is awarded. The Administrator may require the recipient to sign a Restricted Stock Award agreement as a condition of the award. Any certificates representing the Shares of stock awarded shall bear such legends as shall be determined by the Administrator.

(c) Restricted Stock Award Agreement. Each Restricted Stock grant shall be evidenced by an agreement that shall specify the purchase price (if any) and such other terms and conditions as the Administrator, in its sole discretion, shall determine; provided; however, that if the Restricted Stock grant has a purchase price, such purchase price must be paid no more than ten (10) years following the date of grant.

12. Performance Shares.

(a) Grant of Performance Shares. Subject to the terms and conditions of the Plan, Performance Shares may be granted to Participants at any time as shall be determined by the Administrator, in its sole discretion. Subject to Section 7(b) hereof, the Administrator shall have complete discretion to determine (i) the number of Shares subject to a Performance Share award granted to any Participant, and (ii) the conditions that must be satisfied, which

128

typically will be based principally or solely on achievement of performance milestones but may include a service–based component, upon which is conditioned the grant or vesting of Performance Shares. Performance Shares shall be granted in the form of units to acquire Shares. Each such unit shall be the equivalent of one Share for purposes of determining the number of Shares subject to an Award. Until the Shares are issued, no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the units to acquire Shares.

(b) Other Terms. The Administrator, subject to the provisions of the Plan, shall have complete discretion to determine the terms and conditions of Performance Shares granted under the Plan. Performance Share grants shall be subject to the terms, conditions, and restrictions determined by the Administrator at the time the stock is awarded, which may include such performance–based milestones as are determined appropriate by the Administrator. The Administrator may require the recipient to sign a Performance Shares agreement as a condition of the award. Any certificates representing the Shares of stock awarded shall bear such legends as shall be determined by the Administrator.

(c) Performance Share Award Agreement. Each Performance Share grant shall be evidenced by an agreement that shall specify such other terms and conditions as the Administrator, in its sole discretion, shall determine.

13. Performance Units.

(a) Grant of Performance Units. Performance Units are similar to Performance Shares, except that they shall be settled in a cash equivalent to the Fair Market Value of the underlying Shares, determined as of the vesting date. Subject to the terms and conditions of the Plan, Performance Units may be granted to Participants at any time and from time to time as shall be determined by the Administrator, in its sole discretion. The Administrator shall have complete discretion to determine the conditions that must be satisfied, which typically will be based principally or solely on achievement of performance milestones but may include a service–based component, upon which is conditioned the grant or vesting of Performance Units. Performance Units shall be granted in the form of units to acquire Shares. Each such unit shall be the cash equivalent of one Share of Common Stock. No right to vote or receive dividends or any other rights as a stockholder shall exist with respect to Performance Units or the cash payable thereunder.

(b) Number of Performance Units. Subject to Section 7(c) hereof, the Administrator will have complete discretion in determining the number of Performance Units granted to any Participant.

(c) Other Terms. The Administrator, subject to the provisions of the Plan, shall have complete discretion to determine the terms and conditions of Performance Units granted under the Plan. Performance Unit grants shall be subject to the terms, conditions, and restrictions determined by the Administrator at the time the grant is awarded, which may include such performance–based milestones as are determined appropriate by the Administrator. The Administrator may require the recipient to sign a Performance Unit agreement as a condition of the award. Any certificates representing the units awarded shall bear such legends as shall be determined by the Administrator.

(d) Performance Unit Award Agreement. Each Performance Unit grant shall be evidenced by an agreement that shall specify such terms and conditions as the Administrator, in its sole discretion, shall determine.

14. Deferred Stock Units.

(a) Description. Deferred Stock Units shall consist of a Restricted Stock, Performance Share or Performance Unit Award that the Administrator, in its sole discretion permits to be paid out in installments or on a deferred basis, in accordance with rules and procedures established by the Administrator. Deferred Stock Units shall remain subject to the claims of the Company's general creditors until distributed to the Participant.

(b) 162(m) Limits. Deferred Stock Units shall be subject to the annual 162(m) limits applicable to the underlying Restricted Stock, Performance Share or Performance Unit Award as set forth in Section 7 hereof.

15. Leaves of Absence. Unless the Administrator provides otherwise or except as otherwise required by Applicable Laws, vesting of Awards granted hereunder shall cease commencing on the first day of any unpaid leave of absence and shall only recommence upon return to active service.

16. Part–Time Service. Unless the Administrator provides otherwise or except as otherwise required by Applicable Laws, any service–based vesting of Awards granted hereunder shall be extended on a proportionate basis

129

in the event an Employee transitions to a work schedule under which they are customarily scheduled to work on less than a full-time basis, or if not on a full-time work schedule, to a schedule requiring fewer hours of service. Such vesting shall be proportionately re-adjusted prospectively in the event that the Employee subsequently becomes regularly scheduled to work additional hours of service.

17. <u>Non-Transferability of Awards</u>. Unless determined otherwise by the Administrator, an Award may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent or distribution and may be exercised, during the lifetime of the recipient, only by the recipient. If the Administrator makes an Award transferable, such Award shall contain such additional terms and conditions as the Administrator deems appropriate.

18. <u>Adjustments Upon Changes in Capitalization, Dissolution or Liquidation or Change of Control</u>.

(a) <u>Changes in Capitalization</u>. Subject to any required action by the stockholders of the Company, the number of shares of Common Stock covered by each outstanding Award, the number of shares of Common Stock which have been authorized for issuance under the Plan but as to which no Awards have yet been granted or which have been returned to the Plan upon cancellation or expiration of an Award, as well as the price per share of Common Stock covered by each such outstanding Award and the 162(m) fiscal year share issuance limits under Sections 7(a) and (b) hereof shall be proportionately adjusted for any increase or decrease in the number of issued shares of Common Stock resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the Common Stock, or any other increase or decrease in the number of issued shares of Common Stock effected without receipt of consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." Such adjustment shall be made by the Compensation Committee, whose determination in that respect shall be final, binding and conclusive. Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares of Common Stock subject to an Award.

(b) <u>Dissolution or Liquidation</u>. In the event of the proposed dissolution or liquidation of the Company, the Administrator shall notify each Participant as soon as practicable prior to the effective date of such proposed transaction. The Administrator in its discretion may provide for a Participant to have the right to exercise his or her Option or SAR until ten (10) days prior to such transaction as to all of the Awarded Stock covered thereby, including Shares as to which the Award would not otherwise be exercisable. In addition, the Administrator may provide that any Company repurchase option or forfeiture rights applicable to any Award shall lapse 100%, and that any Award vesting shall accelerate 100%, provided the proposed dissolution or liquidation takes place at the time and in the manner contemplated. To the extent it has not been previously exercised (with respect to Options and SARs) or vested (with respect to other Awards), an Award will terminate immediately prior to the consummation of such proposed action.

(c) <u>Change of Control</u>.

(i) <u>Stock Options and SARs</u>. In the event of a Change of Control, each outstanding Option and SAR shall be assumed or an equivalent option or SAR substituted by the successor corporation or a Parent or Subsidiary of the successor corporation. In the event that the successor corporation refuses to assume or substitute for the Option or SAR, the Participant shall fully vest in and have the right to exercise the Option or SAR as to all of the Awarded Stock, including Shares as to which it would not otherwise be vested or exercisable. If an Option or SAR becomes fully vested and exercisable in lieu of assumption or substitution in the event of a Change of Control, the Administrator shall notify the Participant in writing or electronically that the Option or SAR shall be fully vested and exercisable for a period of fifteen (15) days from the date of such notice, and the Option or SAR shall terminate upon the expiration of such period. For the purposes of this paragraph, the Option or SAR shall be considered assumed if, following the Change of Control, the option or stock appreciation right confers the right to purchase or receive, for each Share of Awarded Stock subject to the Option or SAR immediately prior to the Change of Control, the consideration (whether stock, cash, or other securities or property) received in the Change of Control by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the Change of Control is not solely

130

common stock of the successor corporation or its Parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of the Option or SAR, for each Share of Awarded Stock subject to the Option or SAR, to be solely common stock of the successor corporation or its Parent equal in fair market value to the per share consideration received by holders of Common Stock in the Change of Control.

(ii) <u>Restricted Stock, Performance Shares, Performance Units and Deferred Stock Units</u>. In the event of a Change of Control, each outstanding Restricted Stock, Performance Share, Performance Unit and Deferred Stock Unit award shall be assumed or an equivalent Restricted Stock, Performance Share, Performance Unit and Deferred Stock Unit award substituted by the successor corporation or a Parent or Subsidiary of the successor corporation. In the event that the successor corporation refuses to assume or substitute for the Restricted Stock, Performance Share, Performance Unit or Deferred Stock Unit award, the Participant shall fully vest in the Restricted Stock, Performance Share, Performance Unit or Deferred Stock Unit including as to Shares (or with respect to Performance Units, the cash equivalent thereof) which would not otherwise be vested. For the purposes of this paragraph, a Restricted Stock, Performance Share, Performance Unit and Deferred Stock Unit award shall be considered assumed if, following the Change of Control, the award confers the right to purchase or receive, for each Share (or with respect to Performance Units, the cash equivalent thereof) subject to the Award immediately prior to the Change of Control, the consideration (whether stock, cash, or other securities or property) received in the Change of Control by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the Change of Control is not solely common stock of the successor corporation or its Parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received, for each Share and each unit/right to acquire a Share subject to the Award, to be solely common stock of the successor corporation or its Parent equal in fair market value to the per share consideration received by holders of Common Stock in the Change of Control.

19. <u>Date of Grant</u>. The date of grant of an Award shall be, for all purposes, the date on which the Administrator makes the determination granting such Award, or such other later date as is determined by the Administrator. Notice of the determination shall be provided to each Participant within a reasonable time after the date of such grant.

20. <u>Amendment and Termination of the Plan</u>.

(a) <u>Amendment and Termination</u>. The Board may at any time amend, alter, suspend or terminate the Plan; provided, however, that the Board may not materially amend the Stock Plan without obtaining stockholder approval.

(b) <u>Stockholder Approval</u>. The Company shall obtain stockholder approval of any Plan amendment to the extent necessary and desirable to comply Section 422 of the Code (or any successor rule or statute or other applicable law, rule or regulation, including the requirements of any exchange or quotation system on which the Common Stock is listed or quoted). Such stockholder approval, if required, shall be obtained in such a manner and to such a degree as is required by the applicable law, rule or regulation.

(c) <u>Effect of Amendment or Termination</u>. No amendment, alteration, suspension or termination of the Plan shall impair the rights of any Participant, unless mutually agreed otherwise between the Participant and the Administrator, which agreement must be in writing (or electronic format) and signed by the Participant and the Company.

21. <u>Conditions Upon Issuance of Shares</u>.

(a) <u>Legal Compliance</u>. Shares shall not be issued pursuant to the exercise of an Award unless the exercise of the Award or the issuance and delivery of such Shares (or with respect to Performance Units, the cash equivalent thereof) shall comply with Applicable Laws and shall be further subject to the approval of counsel for the Company with respect to such compliance.

(b) <u>Investment Representations</u>. As a condition to the exercise or receipt of an Award, the Company may require the person exercising or receiving such Award to represent and warrant at the time of any such exercise or receipt that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is required.

131

22. <u>Liability of Company</u>.

(a) <u>Inability to Obtain Authority</u>. The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained.

(b) <u>Grants Exceeding Allotted Shares</u>. If the Awarded Stock covered by an Award exceeds, as of the date of grant, the number of Shares which may be issued under the Plan without additional stockholder approval, such Award shall be void with respect to such excess Awarded Stock, unless stockholder approval of an amendment sufficiently increasing the number of Shares subject to the Plan is timely obtained in accordance with Section 20(b) of the Plan.

23. <u>Reservation of Shares</u>. The Company, during the term of this Plan, will at all times reserve and keep available such number of Shares as shall be sufficient to satisfy the requirements of the Plan.

132



**KLA–TENCOR CORPORATION**
*C/O EQUISERVE*
*150 ROYALL STREET*
*CANTON, MA 02021*
*MS 45–02–62*

**VOTE BY INTERNET** – www.proxyvote.com
Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 P.M. Eastern Time on October 17, 2004. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**VOTE BY PHONE – 1–800–690–6903**
Use any touch–tone telephone to transmit your voting instructions up until 11:59 P.M. Eastern Time on October 17, 2004. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign, and date your proxy card and return it in the postage–paid envelope we have provided or return it to KLA–Tencor Corporation, c/o ADP, 51 Mercedes Way, Edgewood, NY 11717.

Your telephone or Internet vote authorizes the named proxies to vote your shares in the same manner as if you marked, signed and returned your proxy card.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:          KLATNt          KEEP THIS PORTION FOR YOUR RECORDS

---

DETACH AND RETURN THIS PORTION ONLY
**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

## KLA–TENCOR CORPORATION (the "Company")

**The Board Recommends a Vote "FOR" all Nominees for Director, "FOR" Proposal 2 and "FOR" Proposal 3.**

**Vote On Directors**

| | For All | Withhold All | For All Except | |
|---|---|---|---|---|
| 1. To elect three Class III directors to each serve for a three year term and until their successors are duly elected. | | | | To withhold authority to vote, mark "For All Except" and clearly write the nominee's letter on the line below. |
| a. Edward W. Barnholt | ☐ | ☐ | ☐ | _____ |
| b. Stephen P. Kaufman | | | | |
| c. Kenneth L. Schroeder | | | | |

**Vote on Proposals**

| | For | Against | Abstain |
|---|---|---|---|
| 2. To approve the Company's 2004 Equity Incentive Plan, including approval of its material terms and performance goals for purposes of Internal Revenue Code Section 162(m). | ☐ | ☐ | ☐ |
| 3. To ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2005. | ☐ | ☐ | ☐ |

To transact such other business as may properly come before the meeting or any adjournment thereof.

In their discretion, the proxy holders are authorized to vote on all such other matters as may properly come before the meeting or any adjournment or postponement thereof.

Please sign exactly as your name appears on your stock certificate(s), date and return this Proxy promptly in the postage–paid envelope provided or vote by Internet or by telephone. Please correct your address before returning this Proxy. Persons signing in a fiduciary capacity should so indicate. If shares are held by joint tenants or as community property, both should sign.

|  | Yes | No |
|---|---|---|
| **HOUSEHOLDING ELECTION** – Please indicate if you consent to receive certain future investor communications in a single package per household | ☐ | ☐ |

| Signature [PLEASE SIGN WITHIN BOX] | Date | Signature (Joint Owners) | Date |
|---|---|---|---|

THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

**KLA-TENCOR CORPORATION**
Notice of Annual Meeting of Stockholders
October 18, 2004

To the Stockholders:

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders of KLA-Tencor Corporation (the "Company"), a Delaware corporation, will be held on Monday, October 18, 2004 at 1:00 P.M., local time, at the Company's offices located at Three Technology Drive, Milpitas, California 95035, for the purposes stated on the reverse side.

The undersigned hereby appoints John H. Kispert and Stuart J. Nichols, or either of them, as proxies, each with the power to appoint his substitute, and hereby authorizes them to represent and to vote, as designated on the reverse side, all of the shares of Common Stock of KLA-Tencor Corporation that the undersigned is entitled to vote at the Annual Meeting of Stockholders, and any adjournment or postponement thereof.

**THIS PROXY, WHEN PROPERLY EXECUTED, WILL BE VOTED AS DIRECTED BY THE UNDERSIGNED STOCKHOLDER. IF NO SUCH DIRECTIONS ARE MADE, THIS PROXY WILL BE VOTED FOR THE ELECTION OF THE NOMINEES LISTED ON THE REVERSE SIDE FOR THE BOARD OF DIRECTORS AND FOR PROPOSALS 2 AND 3.**

**PLEASE MARK, SIGN, DATE AND RETURN THIS PROXY CARD PROMPTLY USING THE ENCLOSED POSTAGE-PAID ENVELOPE.**

SEE REVERSE SIDE          CONTINUED AND TO BE SIGNED ON REVERSE SIDE          SEE REVERSE SIDE