1  Patrice L. Bishop (182256)
   service@ssbla.com
2  STULL, STULL & BRODY
   10940 Wilshire Boulevard
3  Suite 2300
   Los Angeles, CA  90024
4  Tel:    (310) 209-2468
   Fax:    (310) 209-2087
5
   Jules Brody
6  Aaron L. Brody
   SSBNY@aol.com
7  STULL, STULL & BRODY
   6 East 45th Street
8  New York,  NY 10017
   Tel:    (212) 687-7230
9  Fax:    (212) 490-2022

10 Counsel for Plaintiff

11

12                  UNITED STATES DISTRICT COURT

13                NORTHERN DISTRICT OF CALIFORNIA

14

15 CHRIS CRIMI, on Behalf of Himself and All    )    CASE NO. C 08-2249 CRB
   Others Similarly Situated,                   )
16                                              )    **CLASS ACTION**
                         Plaintiff,             )
17                                              )    **DECLARATION OF PATRICE L.**
            v.                                  )    **BISHOP IN SUPPORT OF**
18                                              )    **OPPOSITION TO MOTION TO**
   EDWARD W. BARNHOLT, H. RAYMOND               )    **DISMISS; MOTION TO STRIKE**
19 BINGHAM, ROBERT T. BOND, RICHARD             )    **PAGES IN EXCESS OF COURT'S**
   J. ELKUS, JR., STEPHEN P. KAUFMAN,           )    **STANDING ORDER NO. 5; MOTION**
20 KENNETH LEVY, MICHAEL E. MARKS,              )    **FOR LEAVE TO AMEND;**
   DEAN O. MORTON, KENNETH L.                   )    **MEMORANDUM OF POINTS AND**
21 SCHROEDER, JON D. TOMPKINS,                  )    **AUTHORITIES IN SUPPORT**
   RICHARD P. WALLACE, KLA-TENCOR               )    **THEREOF**
22 CORPORATION, and DOES 1 through 25,          )
                                                )    **DATE:       July 18, 2008**
23                       Defendants.            )    **TIME:       10:00 a.m.**
   _____        )    **CTRM:       8, 19th Floor**
24                                                   **JUDGE:      Hon. Charles R. Breyer**

25

26

27

28

---

**BISHOP DECL. IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS; MOTION TO STRIKE
PAGES IN EXCESS OF STANDING ORDER; MOTION FOR LEAVE; MPA       CASE NO. C 08-2249 CRB**
C:\WordPerfect\KLA2\PLD\DismissDecl.wpd

1    I, Patrice L. Bishop, declare as follows:

2    1.    I am an attorney with the law firm of Stull, Stull & Brody, counsel of record for

3    plaintiff Chris Crimi.  I make this declaration in support of plaintiff's Opposition to Motion to

4    Dismiss; Motion to Strike Pages in Excess of Court's Standing Order No. 5; Motion for Leave to

5    Amend; Memorandum of Points and Authorities in Support Thereof.  I have personal knowledge of

6    the matters stated herein, and if called as a witness, I could and would competently testify thereto.

7    2.    Attached hereto as Exhibit 1 is a true and correct copy of plaintiffs' [Proposed]

8    Second Amended Class Action Complaint for Breaches of Fiduciary Duties.

9    I declare under penalty of perjury under the laws of the United States of America and the

10    State of California that the foregoing is true and correct.

11    Executed this 12th day of June, 2008, at Los Angeles, California

12

13    _____
     /s/

14    Patrice L. Bishop

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

1   Patrice L. Bishop (182256)
    service@ssbla.com
2   STULL, STULL & BRODY
    10940 Wilshire Boulevard
3   Suite 2300
    Los Angeles, CA  90024
4   Tel:    (310) 209-2468
    Fax:    (310) 209-2087
5
    Jules Brody
6   Aaron L. Brody
    SSBNY@aol.com
7   STULL, STULL & BRODY
    6 East 45th Street
8   New York,  NY 10017
    Tel:    (212) 687-7230
9   Fax:    (212) 490-2022

10  Counsel for Plaintiff

11

12                      UNITED STATES DISTRICT COURT

13                    NORTHERN DISTRICT OF CALIFORNIA

14

15  CHRIS CRIMI, on Behalf of Himself and All   )   CASE NO. C 08-2249 CRB
    Others Similarly Situated,                  )
16                                              )   **CLASS ACTION**
                        Plaintiff,              )
17                                              )   **[Proposed] SECOND AMENDED**
            v.                                  )   **COMPLAINT FOR BREACHES OF**
18  EDWARD W. BARNHOLT, H. RAYMOND              )   **FIDUCIARY DUTIES**
    BINGHAM, ROBERT T. BOND, RICHARD            )
19  J. ELKUS, JR., STEPHEN P. KAUFMAN,          )
    KENNETH LEVY, MICHAEL E. MARKS,             )
20  DEAN O. MORTON, KENNETH L.                  )
    SCHROEDER, JON D. TOMPKINS,                 )
21  RICHARD P. WALLACE, KLA-TENCOR              )
    CORPORATION, and DOES 1 through 25,         )
22                                              )
                        Defendants.             )
23  _____    )

24

25

26

27

28

1        Plaintiff, through his attorneys, brings this Second Amended Complaint pursuant to Fed. R.

2  Civ. P. 15, against defendant KLA-Tencor Corporation ("KLA-Tencor" or the "Company") and

3  certain directors of the Company, alleges on personal knowledge as to his self and his activities, and

4  on information and belief as to all other matters, based on investigation and discovery conducted by

5  counsel:

6                                   **SUMMARY**

7        1.      This is a shareholders' action on behalf of all individuals who owned KLA-Tencor

8  common stock between September 20, 2002 and September 27, 2006, except those who are part of

9  the class of settling shareholders who purchased KLA-Tencor stock between February 13, 2003 and

10  May 22, 2006, (the "Class").  Plaintiff, on behalf of himself and those similarly situated, alleges that

11  certain current and former officers and members of its Board of Directors (the "Board") breached

12  their fiduciary duties when they failed to inform plaintiff and the Class that they had issued backdated

13  KLA-Tencor stock options to certain senior executives.  Indeed, defendants, as outlined *infra*, have

14  admitted that they issued backdated stock options to all employees who received grants between

15  from July 1, 1997 and June 30, 2002.

16        2.      KLA-Tencor, a publicly traded company whose common stock is traded on Nasdaq

17  under the ticker symbol "KLAC," was formed in May 1997 pursuant to merger of KLA Instruments

18  and Tencor Instruments.  The Company supplies management solutions for the semiconductor and

19  related microelectronics industries.

20                                **JURISDICTION**

21        3.      Defendant KLA-Tencor removed this action pursuant to Securities Litigation

22  Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb(f).  Plaintiff has filed a Motion to Remand

23  this action to the State Court pursuant to 28 U.S.C. § 1447 because it meets the requirements of an

24  exception of the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. §

25  78bb(f)(3)(A)(ii).

26

27

28

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
C:\WordPerfect\KLA2\PLD\DirectComplaint.003.wpd

4.      Plaintiff alleges that the Superior Court of California has jurisdiction over the subject matter of this action pursuant to the California Constitution Article VI, Section 10, because the case is an action not given by statute to other trial courts.

5.      Plaintiff also contends that venue is proper in Santa Clara County under Section 395(a) of the California code of Civil Procedure in that some or all of the Individual Defendants reside in this County.

**PARTIES**

6.      Plaintiff Chris Crimi owned shares of KLA-Tencor common stock between September 20, 2002 and September 27, 2006.

7.      Edward W. Barnholt ("Barnholt") has served as a member of the Board of Directors since 1995 and  its Compensation Committee and Nominating and Governance Committee since 2000.  Defendant Barnholt was the Chairman of the Nominating and Governance Committee for the 2004, 2005 and 2006 fiscal years, and was named as Chairman of the Board in October of 2006, and became its Chairman in October 2006.  Upon information and belief, Barnholt resides in California.

8.      H. Raymond Bingham ("Bingham") has served as a member of the Board of Directors since October 1999, its Audit Committee since 2000, and its Nominating and Governance Committee since 2006.  Defendant Bingham became Chairman of the Audit Committee in 2003.  and as Chairman.  Upon information and belief, Bingham resides in California.

9.      Robert T. Bond ("Bond") has served as a member of the Board of Directors and its Compensation Committee since August 2000 and Audit Committee since 2002.  He became Chairman of the Compensation Committee in 2004.  Upon information and belief, Bond resides in California.

10.     Richard J. Elkus, Jr. ("Elkus") was a member of the Board of Directors during times relevant herein, and a member of its Audit Committee from 1999 until November 4, 2005 and its Nominating and Governance Committee from fiscal 2003 to November 4, 2005.  Upon information and belief, Elkus resides in California.

11.     Stephen P. Kaufman ("Kaufman") has served as a member of the Board of Directors since November 2002 and its since November 2002 and its Nominating and Governance Committee

2

1    since fiscal year 2005.  Upon information and belief, Kaufman resides in California.

2         12.    Kenneth Levy ("Levy") was a member of Board of Directors during times relevant

3    herein, holding the position of Chairman of the Board from July 1999 through October 2006.  Levy

4    was also a member of the Board's Nominating and Governance Committee and served as the

5    Company's CEO from July 1998 to June 1999.  Upon information and belief, Levy resides in

6    California.

7         13.    Michael E. Marks ("Marks") was a member of the Board of Directors during times

8    relevant herein, and a member of its Compensation Committee from November 2003 until May 2006.

9    Upon information and believe, Marks resides in California.

10        14.    Dean O. Morton ("Morton") was a member of the Board of Directors during times

11   relevant herein, and a member of its Audit Committee and the Nominating and

12   Governance Committee during fiscal year 2001.  Upon information and belief, Morton resides in

13   California.

14        15.    Defendant Kenneth L. Schroeder ("Schroeder") was a member of the Board of

15   Directors during times relevant herein and served on its Nominating and Governance Committee

16   during the 2001 and 2002 fiscal years.  Schroeder also served on the Company's Stock Option

17   Committee from 1994 until December 31, 2005.  Defendant Schroeder was a Senior Advisor to the

18   Company from January 1, 2006 through October 16, 2006, its CEO from July 1999 until January 1,

19   2006, President from November 1991 to July 2002 and from May 2004 to July 2005, and COO from

20   November 1991 until June 1999.  Upon information and belief, defendant Schroeder resides in

21   California.

22        16.    Jon D. Tompkins ("Tompkins"), one of the founders of the Company,  was a member

23   of the Board during times relevant herein, having served as Chairman of the Board from July 1998 to

24   June 1999 and CEO from May 1997 to July 1998.  Tompkins also served as a member of the Stock

25   Option Committee from 1997 until 1999.  Upon information and belief, Tompkins resides in

26   California.

27        17.    Defendant Richard P. Wallace ("Wallace") has been a member of the Company's

28   Board of Directors since January 2006.  Defendant Wallace also serves as the Company's Chief

3

1  Executive Officer ("CEO"), a position he has held since January 1, 2006.  He also served as

2  President and Chief Operating Officer ("COO") from July 2005 through December 2005, Executive

3  Vice President of the Customer Group from May 2004 to July 2005, and Executive Vice President

4  of the Wafer Inspection, Review & Analysis Group from July 2000 to May 2004.  Upon information

5  and belief, defendant Wallace resides in California.

6         18.    Defendant KLA-Tencor is a Delaware corporation with its executive offices and

7  principal place of business located at 160 Rio Robles, San Jose, California 95134.

8         19.    Defendants Barnholt, Bingham, Bond, Elkus, Kaufman, Levy, Marks, Morton,

9  Schroeder, Tompkins, and Wallace are collectively referred to herein as the "Individual Defendants."

10        20.    The true names and capacities of defendants sued herein under California Code of

11 Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiff, who

12 therefore sue these defendants by such fictitious names.  Plaintiff will seek to amend this Complaint

13 and include these Doe defendants' true names and capacities when they are ascertained.  Each of the

14 fictitiously named defendants is responsible in some manner for the conduct alleged herein and for

15 the injuries suffered by the Company.

16              **DUTIES OF THE INDIVIDUAL DEFENDANTS**

17        21.    Each Individual Defendant owed KLA-Tencor and its public shareholders the duty to

18 exercise due care, loyalty and good faith in the management and administration of the affairs of the

19 Company, as well as in the use and preservation of its property and assets.  The conduct of the

20 Individual Defendants complained of herein involves a knowing, reckless or grossly negligent and

21 culpable violation of their obligations as directors and/or officers of KLA-Tencor, the absence of

22 good faith on their part and a reckless disregard for their duties to the Company and its shareholders,

23 all of which the Individual Defendants were aware or should have been aware, presented a risk of,

24 and in fact did cause, serious injury to the Company.

25        22.    By reason of their positions as officers, directors, and fiduciaries of KLA-Tencor and

26 its shareholders and because of their ability to control the business and corporate affairs of KLA-

27 Tencor, the Individual Defendants owed KLA-Tencor and its shareholders fiduciary obligations of

28 trust, good faith, loyalty, and due care, and were and are required to use their utmost ability to

4

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
C:\WordPerfect\KLA2\PLD\DirectComplaint.003.wpd

1   control and manage KLA-Tencor in a fair, just, honest, and equitable manner.  The Individual

2   Defendants were and are required to act in furtherance of the best interests of KLA-Tencor and its

3   shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests

4   or benefit.

5         23.    The Individual Defendants, because of their positions of control and authority as

6   directors and/or officers of KLA-Tencor, were able to and did, directly and/or indirectly, exercise

7   control over the wrongful acts complained of herein.

8         24.    At all times relevant hereto, each of the Individual Defendants was the agent of each

9   of the other Individual Defendants and of KLA-Tencor, and was at all times acting within the course

10  and scope of such agency.

11        25.    To discharge the aforesaid duties, the Individual Defendants were required to exercise

12  reasonable and prudent supervision over the management, policies, practices, controls, and financial

13  affairs of KLA-Tencor.  The Individual Defendants were required, among other things, to: in good

14  faith manage, conduct, supervise and direct the business and affairs of KLA-Tencor carefully and

15  prudently and in accordance with all applicable laws, rules and regulations; neither violate nor

16  knowingly permit any officer, director, employee or agent of KLA-Tencor to violate applicable

17  federal and state laws, rules and regulations or any rule or regulation of KLA-Tencor; exercise

18  reasonable control and supervision over the officers and employees and agents of KLA-Tencor;

19  remain informed as to the status of KLA-Tencor's operations, and upon receipt of notice or

20  information of imprudent or unsound practices, to make a reasonable inquiry in connection

21  therewith, and to take steps to correct such conditions or practices and make such disclosures as are

22  necessary to comply with federal and state securities laws, supervise the preparation, filing and/or

23  dissemination of any SEC filings, press releases, audits, reports or other information required by law,

24  and examine and evaluate any reports or examinations, audits, or other financial information

25  concerning the financial condition of KLA-Tencor; maintain and implement an adequate system of

26  internal financial, accounting and management information systems and controls; and ensure that

27  KLA-Tencor's financial statements were prepared in accordance with Generally Accepted

28  Accounting Principles ("GAAP").

5

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
C:\WordPerfect\KLA2\PLD\DirectComplaint.003.wpd

1    26.    Because of their Board membership and/or executive and managerial positions with

2    KLA-Tencor and their access to internal corporate documents (including the Company's operating

3    plans, budgets and forecasts and reports of actual operations compared thereto), conversations and

4    connections with other corporate officers and employees, attendance at management and Board of

5    Directors meetings and committees thereof, and their receipt of reports and other information

6    provided to them in connection therewith, each of the Individual Defendants had access to

7    undisclosed information about KLA-Tencor's business prospects, financial condition, performance,

8    accounting and revenue recognition practices, as alleged herein.

9                              **CLASS ACTION ALLEGATIONS**

10    27.    Plaintiff brings this action pursuant to §382 of the California Code of Civil Procedure

11    on his own behalf and as a class action on behalf of all holders of KLA-Tencor common stock, who

12    are being and will be harmed by defendants' actions described below (the "Class").  While plaintiff

13    contends this action was properly filed in the Superior Court for the County of Santa Clara, asserts

14    that this action also satisfies the requirements of Fed. R. Civ. P. 23.  Excluded from the Class are

15    defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with

16    any defendants.

17    28.    This action is properly maintainable as a class action because:

18          a.    The class is so numerous that joinder of all members is impracticable.  There

19    are millions of KLA-Tencor stock issued and outstanding.  The shares trade on the Nasdaq National

20    Market under the ticker symbol "KLAC", and thousands of KLA-Tencor stockholders of record are

21    located throughout the United States;

22          b.    There are questions of law and fact which are common to the Class, including

23    whether the defendants have engaged or are continuing to act in a manner calculated to benefit

24    themselves at the expense of KLA-Tencor's minority stockholders and whether plaintiff and other

25    members of the Class would be irreparably damaged if the defendants are not enjoined in the manner

26    described below;

27          c.    The defendants have acted or refused to act on grounds generally applicable

28    to the Class thereby making appropriate final injunctive relief with respect to the Class as a whole;

6

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB

1           d.      Plaintiff is committed to prosecuting this action and has retained competent

2    counsel experienced in litigation of this nature.  The claims of plaintiff are typical of the claims of the

3    other members of the class and plaintiff has the same interest as the other members of the Class.

4    Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect

5    the interests of the Class; and

6           e.      Plaintiff anticipates that there will be no difficulty in the management of this

7    litigation as a class action.

8          29.     For the reasons stated herein, a class action is superior to other available methods for

9    the fair and efficient adjudication of this controversy.

10    <u>**SUBSTANTIVE ALLEGATIONS**</u>

11    <u>**Background**</u>

12          30.     Stock options give employees of a publically traded company the right to purchase

13    company stock at a fixed price in the future.  The general policy behind a grant of stock options is to

14    link employees' compensation to the value of the company's shares and, therefore, to the wealth of

15    the company's shareholders.  Typically, the options' fixed price is aligned with the price of the stock

16    on the day of the grant.  If the stock price rises from the fixed grant price the employee profits by

17    exercising the options and selling the shares.  In contrast, backdated stock options allow the

18    employees of a publically traded company, such as KLA-Tencor, to maximize their wealth at the

19    expense of its shareholders.

20          31.     According to the Definitive Proxy filed with the Securities and Exchange Commission

21    on October 6, 1997 (the "1997 Proxy"), options were granted to eligible employees through the

22    1982 Stock Option Plan and to directors through the Director Plan.  According to the 1997 Proxy,

23    the "exercise price of the options is the fair market value of Common Stock as of the date of grant."

24          32.     The 1982 Stock Option Plan was initially adopted by KLA Instruments Corporation

25    in 1981, restated on November 18, 1996 (the date of the annual meeting pursuant to the 1996

26    Definitive Proxy filed with the SEC on October 11, 1996), and operative through October 18, 2004.

27    Pursuant to the terms of the 1982 Stock Option Plan, as restated, the "Plan shall be administered by

28    the Board, including any duly appointed Committee of the Board."  In its power as administrator of

7

the plan, "the Board shall have the full and final power and authority, in its sole discretion . . . to determine the persons to whom, and the time or times at which, Options shall be granted and the number of shares of Stock to be subject to each Option . . . [and] . . . to determine the Fair Market Value of shares of Stock or other property". Moreover, the "exercise price for each Option shall be established in the sole discretion of the Board; provided, however, that [] no Option shall have an exercise price per share less than the Fair Market Value of a share of Stock on the effective date of grant of the Option."

33.    The 1982 Stock Option Plan also had an "evergreen" automatic annual share replenishment feature which provided for, on the first day of the next fiscal year, the addition to the Plan an amount of shares equal to 3% of KLA-Tencor's outstanding shares of common stock on the last day of each fiscal year (the "Evergreen Provision").

34.    According to the Definitive Proxy filed with the SEC on September 28, 1998 (the "1998 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and to directors through the Director Plan. According to the 1998 Proxy, the "exercise price of the options is the fair market value of Common Stock as of the date of grant."

35.    The 1998 Proxy also requested shareholders approve the 1998 Outside Director Option Plan (the "1998 Director Plan") and to reserve for issuance 1,000,000 shares of the KLA-Tencor common stock for distribution to the directors under that plan.

36.    According to the Definitive Proxy filed with the SEC on October 15, 1999 (the "1999 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and to directors through the 1998 Director Plan. According to the 1999 Proxy, the "exercise price of the options is the fair market value of Common Stock as of the date of grant."

37.    According to the Definitive Proxy filed with the SEC on October 6, 2000 (the "2000 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and to directors through the 1998 Director Plan. According to the 2000 Proxy, the "exercise price of the options is the fair market value of Common Stock as of the date of grant."

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
C:\WordPerfect\KLA2\PLD\DirectComplaint.003.wpd

1      38.     On November 10, 2000, the Board approved the 2000 Nonstatutory Stock Option

2   Plan which provides for the issuance of stock options to employees and consultants, other than

3   officers and directors, of the Company or any parent or subsidiary corporation .

4      39.     According to the Definitive Proxy filed with the SEC on September 28, 2001 (the

5   2001 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and

6   to directors through the 1998 Director Plan.  According to the 2001 Proxy, the "exercise price of the

7   options is the fair market value of Common Stock as of the date of grant."

8      40.     According to the Definitive Proxy filed with the SEC on September 20, 2002 the

9   "2002 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and

10  to directors through the 1998 Director Plan.  According to the 2002 Proxy, all "Options were

11  granted at an exercise price equal to the fair market value of the Company's Common Stock on" the

12  date of the grant.

13     41.     On November 6, 2002, the Board amended the Nonstatutory Stock Option Plan.

14     42.     According to the Definitive Proxy filed with the SEC on September 23, 2003 (the

15  2003 Proxy"),options were granted to eligible employees through the 1982 Stock Option Plan and to

16  directors through the 1998 Director Plan.  According to the 2003 Proxy, all "Options were granted

17  at an exercise price equal to the fair market value of the Company's Common Stock."

18     43.     Pursuant to Evergreen Provision, on July 1, 2004, 5,903,603 shares of KLA-Tencor

19  stock were added into the 1982 Stock Option Plan.

20     44.     According to the Definitive Proxy filed with the SEC on September 9, 2004 (the

21  "2004 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan to

22  and to directors through the 1998 Director Plan.  According to the 2004 Proxy, all "Options were

23  granted at an exercise price equal to the fair market value of the Company's Common Stock."

24     45.     The 2004 Proxy requested shareholders vote in favor of the director approved 2004

25  Equity Incentive Plan.  The "2004 Equity Incentive Plan [was] developed to replace [the] 1982

26  Stock Option Plan and 2000 Nonstatutory Stock Option Plan and to supplement [the] 1998 Outside

27  Director Option Plan."   Under the terms of the 2004 Equity Incentive Plan, shareholders were

28  requested to reserve 11,000,000 shares of KLA-Tencor common stock for issuance under the terms

9

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
C:\WordPerfect\KLA2\PLD\DirectComplaint.003.wpd

1  of the 2004 Equity Incentive Plan.  In addition, pursuant to the terms of the 2004 Equity Incentive

2  Plan, up to an additional 1,500,000 shares remaining for grant under the 1982 Stock Option Plan and

3  2000 Nonstatutory Stock Option Plan would be transferred into the 2004 Equity Incentive Plan.

4        46.    The 2004 Equity Incentive Plan was to "be administered by our Board of Directors or

5  a committee, which our Board of Directors may appoint from among its members (the

6  'Administrator')."  The "Administrator has the authority to . . . select the persons to whom awards

7  are to be granted."  Options granted under the Plan "may not be granted with an exercise price lower

8  than 100% of the fair market value of the underlying shares."

9        47.    According to the Definitive Proxy filed with the SEC on October 13,  2005 (the

10  "2005 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan to

11  and to directors through the 1998 Director Plan.  According to the 2005 Proxy, all "Options were

12  granted at an exercise price equal to the fair market value of the Company's Common Stock." .

13  **Defendants Begin to Reveal the Truth**

14        48.    On May 22, 2006, *The Wall Street Journal* published an article entitled "Five More

15  Companies Show Questionable Options Patterns."  The first company addressed by the article was

16  KLA-Tencor and, in fact, this was the first time the public had any idea that KLA-Tencor was

17  allegedly backdating stock options to top executives. The article stated, in relevant part:

18          In 2001,  KLA-Tencor Corp., a leading semiconductor-equipment
           maker, granted its top executives, including Chairman Ken Levy, two
19          batches of stock options. They arrived on unusually fortunate days for
           the executives: The first dated at the share price's first-half low; the
20          second at its second-half low.

21          In all, Mr. Levy received 10 grants from KLA-Tencor and its
           predecessor company between 1994 and 2001 -- all preceding quick
22          runups in the share price; an analysis by The Wall Street Journal found
           the probability that that pattern occurred merely by chance is tiny --
23          around one in 20 million.

24          Mr. Levy and company executives didn't return repeated phone and
           email messages.

25
                                          * * *
26

27          KLA-Tencor was formed from the merger of two major suppliers of
           semiconductor equipment. It is a powerhouse in the specialized and
           expensive gear used by the world's largest chipmakers to test the
28          quality of their complex production systems. It has a market value of

                                          10
[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
C:\WordPerfect\KLA2\PLD\DirectComplaint.003.wpd

about $9 billion. Based in San Jose, Calif., KLA-Tencor has generated a fortune for Mr. Levy, the founder of one of its predecessors.

The company has assured shareholders -- whose holdings in the company get diluted each time an option is exercised -- that its option grants serve an important incentive purpose. "Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price," KLA-Tencor's compensation committee members wrote in a report filed with the company's 2002 proxy statement.

KLA-Tencor's 2001 stock chart looks a bit like a "W," with sharp drops in April and October. Mr. Levy and other top executives were granted options dated at the very bottom of each dip. One grant carried an exercise price of $29.31; the other, $32.75. KLA-Tencor shares now trade around $45, which means the options could be yielding millions in gains.

But had either 2001 grant come a bit more than a month later, it would have carried an exercise price closer to $50, yielding zero potential profit today.

It wasn't the only time that KLA executives, including Mr. Levy, former CEO Kenneth Schroeder and current chief Rick Wallace, received propitious grants. Grants to Messrs. Levy and Schroeder in 1998 and 2000 also were dated at that year's lowest closing price.

The 1998 grant proved lucrative for the executives. Mr. Levy has reaped at least $6 million from cashing out options issued then, while Mr. Schroeder has pocketed at least $10 million. Mr. Levy didn't return phone or email messages. Neither the company's chief financial officer nor a company spokeswoman returned several messages seeking comment. Mr. Schroeder couldn't be reached to comment.

49.  On May 24, 2006, the Company filed an 8-K with the SEC which stated:

KLA-Tencor Corporation announced today that its Board of Directors has appointed a Special Committee of independent directors to conduct an internal investigation relating to past stock option grants, the timing of such grants and related accounting and documentation. The Special Committee will be assisted by outside legal counsel and accounting experts. KLA-Tencor also said that it has received subpoenas from the U.S. Attorney's Offices for the Eastern District of New York and Northern District of California requesting information relating to its past stock option grants. KLA-Tencor said that it will cooperate fully with any government or regulatory investigation into these matters. KLA-Tencor further disclosed that on May 22, 2006, it was served with a complaint relating to a lawsuit filed in the United States District Court for the Northern District of California filed by the Theodore R. Kornreich Revocable Trust, derivatively on behalf of KLA-Tencor.

11

1    50.    On May 20, 2006, KLA-Tencor filed another 8-K which stated that "KLA-Tencor

2    Corporation announced today that it received notice from the Securities and Exchange Commission

3    of an informal inquiry relating to past stock option grants.  KLA-Tencor will cooperate fully with

4    this investigation."

5    51.    On June 30, 2006, the Company filed a 8-K attaching a press release issued that same

6    day entitled "KLA-Tencor Provides Update on Special Committee Investigation."  The press release

7    announcing:

8            [T]hat a Special Committee of the Company's Board of Directors has
             reached a preliminary conclusion that the actual measurement dates for
9            financial accounting purposes of certain stock option grants issued in
             prior years likely differ from the recorded grant dates of such awards.
10           The Special Committee has not completed its investigation and is
             continuing its review of these matters. The Special Committee has not
11           yet determined whether any resulting compensation charges are
             material or whether the Company ultimately will restate previously
12           issued financial statements.

13           The Company previously announced that its Board of Directors has
             appointed a Special Committee of independent directors to conduct an
14           internal investigation relating to stock options granted to members of
             senior management and the employees of the Company. The Special
15           Committee, assisted by independent legal counsel and accounting
             experts, is investigating the timing of such grants, as well as their
16           related accounting treatment.

17           Based on the Special Committee's investigation to date, the Company
             now anticipates that it may record additional non-cash charges for
18           stock-based compensation expense. The Company has not yet
             determined the amount of such charges or the resulting tax impact of
19           these actions. In the event that the Company determines that these
             items are material, KLA-Tencor may be required to restate its financial
20           statements for the relevant prior fiscal periods.

21    52.    On July 26, 2006, the Company filed another 8-K attaching a press release issued on

22    July 21, 2006, which stated, in relevant part:

23           As previously announced, the Company's Board of Directors has
             appointed a Special Committee of independent directors to conduct an
24           internal investigation relating to stock options granted to the
             employees of the Company. As disclosed on June 30, the Special
25           Committee has reached a preliminary conclusion that the actual
             measurement dates for financial accounting purposes of certain stock
26           option grants issued in prior years likely differ from the recorded grant
             dates of such awards. The Special Committee has not yet determined
27           whether any resulting compensation charges or tax implications are
             material or whether the Company ultimately will restate previously
28           issued financial statements.

12

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
C:\WordPerfect\KLA2\PLD\DirectComplaint.003.wpd

1
2
3
4
5

As a result of the on-going investigation and the potential for restatement, the Company is unable to provide detailed GAAP or non-GAAP financials for items other than revenue and bookings for the quarter or year ended June 30, 2006. In addition, the Company will not file its annual report on form 10-K until after the completion of the investigation. The Company does not expect the investigation to be completed until after the date the Form 10-K is required to be filed.

6    53.    On September 14, 2006, the Company acknowledged that it could not meet its

7    financial obligations when it filed a Form 12b-25, Notice of Inability to Timely File 10-Q, with the

8    SEC.  The Form stated, in relevant part that:

9
10
11

[A] Special Committee of independent directors, appointed by the Board of Directors of KLA-Tencor Corporation (the "Company"), is conducting an internal investigation relating to stock options granted to the employees of the Company, the timing of such grants and their related accounting and tax treatment.

12
13
14
15
16

On June 30, 2006, the Company disclosed that the Special Committee reached a preliminary conclusion that the actual measurement dates for financial accounting purposes of certain stock option grants issued in prior years likely differ from the recorded grant dates of such awards. Neither the Special Committee nor the Board of Directors of the Company has yet determined whether any resulting compensation or tax charges are material or whether the Company ultimately will restate previously issued financial statements.

17
18
19
20

As a result of the ongoing investigation, the Company was unable to file its annual report on Form 10-K for the year ended June 30, 2006 by the required filing date of September 13, 2006 without unreasonable effort or expense. The Company does not anticipate that it will be able to file its Form 10-K on or before the fifteenth calendar day following the prescribed due date, in accordance with Rule 12b-25.

21
22

The Company is focused on resolving these issues as quickly as possible and plans to file its Form 10-K as soon as practicable following the completion of the Special Committee's investigation.

23    54.    On September 15, 2006, the Company filed an 8-K with the SEC attaching a

24    September 14, 2006 press release which announced that:

25
26
27
28

[T]he Special Committee appointed by the Board of Directors of the Company is continuing its internal investigation relating to stock options granted to employees of the Company. As anticipated in the Company's news release dated July 24, 2006, the Company will not file its Annual Report on Form 10-K until the internal investigation is complete. Thus, the Company did not file its Form 10-K on September

13

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
C:\WordPerfect\KLA2\PLD\DirectComplaint.003.wpd

13, 2006 as required, and has filed Form 12b-25 (Notification of Late Filing) also as required.

As a result of the delayed filing of the Company's Form 10-K, the Company today received a NASDAQ Staff Determination notice indicating that the Company is not in compliance with the filing requirements for continued listing as set forth in NASDAQ Marketplace Rule 4310(c)(14) and that its common stock is subject to delisting from the NASDAQ Global Select Market. The notice, which the Company expected, was issued in accordance with standard NASDAQ procedures. The Company will appeal this determination and request a hearing before the NASDAQ Listing Qualifications Panel. The Company's appeal and hearing request will automatically stay the delisting of the Company's common stock. Pending the Panel's decision, the Company's shares will continue to be listed on the NASDAQ Global Select Market.

As previously announced, the Special Committee reached a preliminary conclusion that the actual measurement dates for financial accounting purposes of certain stock option grants issued in prior years likely differ from the recorded grant dates of such awards. Neither the Special Committee nor the Board of Directors of the Company has yet determined whether any resulting compensation or tax charges are material or whether the Company ultimately will restate previously issued financial statements. The Company is focused on resolving these issues as quickly as possible and plans to file its Form 10-K as soon as practicable following completion of the Special Committee's investigation.

55.    On September 27, 2007, the Company filed an 8-K with the SEC admitting that stock options had been granted to KLA-Tencor executives at backdated prices. The press release announced, in relevant part, that:

A Special Committee of the Board of Directors of KLA-Tencor Corporation (the "Company") has delivered a report to the Board of Directors, which concluded that incorrect measurement dates were used for certain stock option grants made principally during the period from July 1, 1997 through July 30, 2002. The Board of Directors of the Company has not concluded its evaluation of the factors that led to the use of incorrect measurement dates of stock options. The Board of Directors has concluded that the Company will need to restate certain of its historical financial statements to record non-cash charges for compensation expenses relating to past stock option grants. The Company has not determined the amount of such charges, the resulting tax and accounting impacts, the impact on internal control over financial reporting, or which specific periods may require restatement. However, the effects on previously reported financial statements are expected to be material. The Special Committee and the Board of Directors will continue to be actively involved in reviewing information and determining the appropriate actions to be taken by the Company with respect to this matter.

14

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES CASE NO. C 08-2249 CRB

Accordingly, on September 27, 2006, the Board of Directors concluded that financial statements and all earnings and press releases and similar communications issued by the Company relating to periods beginning on or after July 1, 1997, should no longer be relied upon, including the Company's financial statements for fiscal years 1998 through 2005, the interim periods contained therein, and the fiscal quarters ended September 30, 2005, December 31, 2005 and March 31, 2006. The Company's management and the Special Committee have discussed this matter with PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm.

* * *

On September 27, 2006, KLA-Tencor Corporation (the "Company") determined that its historical financial statements for one or more prior fiscal years will have to be restated as a result of improper accounting for option grants made to officers and employees. The specific fiscal years which will need to be restated has yet been determined. However, the Company has decided to suspend temporarily employee participation in several equity incentive programs because the S-8 registration statements covering the shares of common stock issuable under those programs incorporate one or more financial statements that will likely have to be restated. As part of such suspension, participants in the Company's 401(k) Plan (the "401(k) Plan") will be subject to a blackout period during which they will be precluded from acquiring shares of the Company's common stock under that plan. . . .

**Ongoing Aftermath**

56.     On October 3, 2007, KLA-Tencor filed an 8-K announcing that the Company would need restate its financials for dates between July 1, 1997 through March 31, 2006.  The 8-K more specifically stated, in relevant part, that:

A Special Committee of the Board of Directors of KLA-Tencor Corporation (the "Company") has delivered a report to the Board of Directors, which concluded that incorrect measurement dates were used for certain stock option grants made principally during the period from July 1, 1997 through July 30, 2002. The Board of Directors of the Company has not concluded its evaluation of the factors that led to the use of incorrect measurement dates of stock options. The Board of Directors has concluded that the Company will need to restate certain of its historical financial statements to record non-cash charges for compensation expenses relating to past stock option grants. The Company has not determined the amount of such charges, the resulting tax and accounting impacts, the impact on internal control over financial reporting, or which specific periods may require restatement. However, the effects on previously reported financial statements are expected to be material. The Special Committee and the Board of Directors will continue to be actively involved in reviewing information and determining the appropriate actions to be taken by the Company with respect to this matter.

15

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
C:\WordPerfect\KLA2\PLD\DirectComplaint.003.wpd

Accordingly, on September 27, 2006, the Board of Directors concluded that financial statements and all earnings and press releases and similar communications issued by the Company relating to periods beginning on or after July 1, 1997, should no longer be relied upon, including the Company's financial statements for fiscal years 1998 through 2005, the interim periods contained therein, and the fiscal quarters ended September 30, 2005, December 31, 2005 and March 31, 2006. The Company's management and the Special Committee have discussed this matter with PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm.

57.    On October 16, 2006, the Company announced, in an 8-K filed with the SEC, in relevant part, that:

[A]s a result of the Special Committee investigation [] of the historical stock option practices of KLA-Tencor Corporation [] , the Company terminated, effective immediately, all aspects of its employment relationship with Kenneth L. Schroeder and any and all employment and/or service agreements between Mr. Schroeder and the Company. The Company intends to cancel all outstanding stock options held by Mr. Schroeder that were retroactively priced or otherwise improperly granted. Mr. Schroeder was President and Chief Operating Officer of the Company from 1991 to 1999 and Chief Executive Officer and a member of the Board of Directors of the Company from 1999 to 2005.

Also on October 16, 2006, the Company's General Counsel, Stuart J. Nichols, resigned, effective immediately. Mr. Nichols had been Vice President and General Counsel of the Company since 2000. The Company intends to re-price all outstanding retroactively priced stock options held by Mr. Nichols; the exercise price of each re-priced option will be increased to the fair market value on the corrected measurement date.

* * *

Later on October 16, 2006, Kenneth Levy, Founder and Chairman of the Board of Directors of the Company, retired as a Director and employee, effective immediately, and was named Chairman Emeritus by the Board of Directors. As of that date, by mutual agreement, Mr. Levy's employment with the Company immediately ceased, and any and all employment or service contracts between Mr. Levy and the Company immediately terminated, with each party having no further monetary or other obligations thereunder. The Company intends to re-price all outstanding retroactively priced stock options held by Mr. Levy; the exercise price of each re-priced option will be increased to the fair market value on the corrected measurement date. Mr. Levy was a member of the Board of Directors of the Company since 1975, Chairman of the Board since 1999, and Chief Executive Officer from 1975 to 1997 and from mid 1998 to mid 1999.

Edward W. Barnholt was appointed to succeed Mr. Levy as Chairman of the Board of Directors of the Company and will serve in a non-executive capacity. Mr. Barnholt is the former President and Chief

16

1

Executive Officer of Agilent Technologies, and joined the Company's
Board of Directors in 1995.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

1    58.    A press release issued by the Company on October 16, 2007 also announced, in

2    relevant part, that:

3            [T]he Company's Board of Directors concluded that incorrect
             measurement dates for certain stock option grants were used for
4            financial accounting purposes, principally during the period July 1,
             1997 through June 30, 2002, and as a result, the Company will restate
5            its financial statements to correct the accounting for retroactively
             priced stock options. The Company now anticipates that the total
6            additional non-cash charges for stock-based compensation expenses
             will not exceed $400 million.

7

8    59.    On November 15, 2006, the Company filed with the SEC another Form 12b-25,

9    Notice of Inability to Timely File 10-Q.

10   60.    On November 15, 2006, the Company also filed an 8-K with the SEC announcing

11   that it continued to face delisting as the result of its inability to meet its financial reporting

12   requirements.

13   61.    On December 27, 2006, the Company filed an 8-K announcing that defendant

14   Tompkins had resigned from the KLA-Tencor Board of Directors on December 21, 2006.

15   62.    On January 5, 2007, the Company filed and 8-K attaching its "Stock Option

16   Amendment and Special Bonus Agreement." The text of the 8-K stated, *inter alia*, the amendment

17   would increase the price of defendant Wallace's outstanding stock options by $368,618.36.

18   63.    On January 29, 2007, the KLA-Tencor filed its fiscal 2006 Form 10-K and restated

19   previously filed financial results for fiscal years 2005, 2004, 2003 and 2002. In its filing, the

20   Company, admitted, *inter alia*, that:

21           This Annual Report on Form 10-K for our fiscal year ended June 30,
             2006 includes restatements of the following previously filed financial
22           statements and data (and related disclosures): (1) our consolidated
             financial statements as of and for our fiscal years ended June 30, 2005
23           and 2004; (2) our selected consolidated financial data as of and for our
             fiscal years ended June 30, 2005, 2004, 2003 and 2002, and (3) our
24           unaudited quarterly financial data for the first three quarters in our
             fiscal year ended June 30, 2006 and for all quarters in our fiscal year
25           ended June 30, 2005. See Note 2, "Restatement of Consolidated
             Financial Statements," to Consolidated Financial Statements and
26           Exhibit 99.1 for a detailed discussion of the effect of the restatements.

27           As a result of an investigation of our historical stock option practices
             by a Special Committee of our Board of Directors (see Item 3—Legal
28           Proceedings), **we discovered that certain of our stock options,**

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**primarily those granted from July 1, 1997 to June 30, 2002, had been retroactively priced for all employees who received these grants** (less than 15% of these options were granted to executive officers). This means that the option exercise price was not the market price of the option shares on the actual grant date of the option, but instead was a lower market price on an earlier date. The actual grant date—when the essential actions necessary to grant the option were completed, including the final determination of the number of shares to be granted to each employee and the exercise price—is the correct measurement date to determine the market price of the option shares under the accounting rules in effect at the time. More than 95% of the total in-the-money value (market price on the actual grant date minus exercise price) of all of our retroactively priced options was attributable to those granted from July 1, 1997 to June 30, 2002.

\* \* \*

. . . To correct our past accounting for stock options, we recorded additional pre-tax, non-cash, stock-based compensation expense of (a) $348 million for the periods July 1, 1994 to June 30, 2005 under APB Opinion No. 25 and (b) $22 million for the year ended June 30, 2006 under SFAS No. 123®. We expect to amortize an additional $6 million of such pre-tax charges under SFAS No. 123® in future periods to properly account for past retroactively priced option grants.

By October 16, 2006, the Special Committee had substantially completed its investigation. The Special Committee concluded that (1) there was retroactive pricing of stock options granted to all employees who received options, primarily during the periods from July 1, 1997 to June 30, 2002 (less than 15% of these options were granted to executive officers), (2) **the retroactively priced options were not accounted for correctly in our previously issued financial statements**, (3) **the <u>retroactive pricing of options was intentional, not inadvertent or through administrative error</u>**, (4) **the retroactive pricing of options involved the selection of fortuitously low exercise prices by certain former executive officers, and other former executives may have been aware of this conduct**, (5) **the <u>retroactive pricing of options involved the falsification of Company records</u>, resulting in erroneous statements being made in financial and other reports previously filed with the SEC, as well as in information previously provided to our independent registered public accounting firm**, and (6) in most instances, **the retroactive pricing of options violated the terms of our stock option plans**. Because virtually all holders of retroactively priced options issued by the Company were not involved in or aware of the retroactive pricing, the Board of Directors decided that we should continue to honor the options that violated the terms of our stock option plans, except in certain individual cases as described below.

[emphasis added.]

64.    According to an 8-K filed by KLA-Tencor on July 25, 2007, the Company reached a

settlement with the United States Securities and Exchange Commission ("SEC") "by consenting to

19

1  the entry of a permanent injunction against future violations of the reporting, books and records, and

2  internal controls provisions of the federal securities laws."

3      65.     On that same day the SEC announced that it had filed charges against defendant

4  Schroeder concerning Schroeder's backdating of stock options during his employment with KLA-

5  Tencor.

6      66.     The Defendants disseminated false and misleading financial statements in, *inter alia*,

7  the following "Form 10-K" filings:

8          a.     Form 10-K for fiscal year ended June 30, 1998, and filed with the SEC on
   September 28, 1998;
9
          b.     Form 10-K/A for fiscal year ended June 30, 1998, and filed with the SEC on
10  September 29, 1998;

11         c.     Form 10-K for fiscal year ended June 30, 1999, and filed with the SEC on
   September 28, 1999;
12
          d.     Form 10-K for fiscal year ended June 30, 2000, and filed with the SEC on
13  September 28, 2000;

14         e.     Form 10-K for fiscal year ended June 30, 2001, and filed with the SEC on
   September 21, 2001;
15
          f.     Form 10-K for fiscal year ended June 30, 2002, and filed with the SEC on
16  September 20, 2002;

17         g.     Form 10-K for fiscal year ended June 30, 2003, and filed with the SEC on
   September 16, 2003;
18
          h.     Form 10-K/A for fiscal year ended June 30, 2003, and filed with the SEC on
19  September 29, 2003;

20         i.     Form 10-K for fiscal year ended June 30, 2004, and filed with the SEC on
   August 30, 2004; and
21
          j.     Form 10-K for fiscal year ended June 30, 2005, and filed with the SEC on
22  September 2, 2005.

23     67.     The Company's 1998, 1999, 2000, 2001, 2002, 2003, 2004 and 2005 Form 10-Ks

24  were issued in violation of GAAP, and in particular Accounting Principles Board ("APB") Opinion

25  No. 25 ("APB 25"),  "Accounting for Stock Issued to Employees."  Pursuant to APB 25, if the

26  market price on the date of grant exceeds the exercise price of the options, the company must

27  recognize the difference as an expense.  Defendants' backdating practice resulted in understated

28

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
C:\WordPerfect\KLA2\PLD\DirectComplaint.003.wpd

1   expenses on each Form 10-K because the difference between the market price and option exercise

2   price was not expensed by the Company.

3        68.    The Individual Defendants also caused and/or participated in issuing, filing and

4   disseminating the false and misleading information regarding Company issued options on the Form(s)

5   DEF 14A (the "Definitive Proxies") filed with the SEC on:

6              a.     October 6, 1997;

7              b.     September 28, 1998;

8              c.     October 15, 1999;

9              d.     October 6, 2000;

10             e.     September 28, 2001;

11             f.     September 20, 2002;

12             g.     September 23, 2003;

13             h.     September 9, 2004;

14             i.     October 13,  2005; and

15             j.     February 27, 2007.

16       69.    The Definitive Proxies were each false and misleading because they failed to correct

17  prior information regarding the issuance of backdated stock options and caused the Class to approve

18  the Individual Defendants' request to be appointed as directors of the Company based on that false

19  and misleading information.

20       70.    Defendants' backdating of options grants also violated provisions of the Internal

21  Revenue Code relating to deduction of option payments and thereby rendered the Company's

22  financial statements in Form 10-K filings for the years 1998, 1999, 2000 and 2001, as well as interim

23  Form 10-Qs, materially false and misleading.

24                    **TOLLING OF THE STATUTE OF LIMITATIONS**

25       71.    The Defendants concealed their violations of law until at least June 30, 2006, the date

26  the Company issued its press release entitled "KLA-Tencor Provides Update on Special Committee

27  Investigation." Further, it was not until September 14, 2006, that the investing public was informed

28  that the Defendants would be unable to meet their financial reporting requirements as a result of

21

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
C:\WordPerfect\KLA2\PLD\DirectComplaint.003.wpd

1   backdating schemes.  Indeed, while the Defendants partially admitted to their violations of law in

2   their September 27, 2006, 8-K filing with the SEC, outlined *infra*, when they admitted that they

3   would be required to restate the earnings for certain accounting periods relevant to plaintiff's

4   allegations herein, the full extent of their violations is not yet known.  It was not until October 16,

5   2007, that KLA-Tencor shareholders and the investing public were advised that the Company

6   anticipated that "the total additional non-cash charges for stock-based compensation expenses will

7   not exceed $400 million."

8       72.     As a result, the Individual Defendants have systematically and wrongfully concealed

9   their manipulation of Company stock option plans, falsely asserting that the grants were being

10  administered by a committee of independent directors, while in fact, as outlined herein, the

11  Compensation Committee Defendants were colluding with other Individual Defendants to violate

12  GAAP and Section 162(m).  Moreover, the Compensation Committee Defendants were colluding

13  with the other Individual Defendants to make, *inter alia*, false and misleading filings with the SEC.

14      73.     Similarly, the Audit Committee Defendants were systematically and wrongfully

15  concealing wrongdoings of each of the Individual Defendants by disseminating to KLA-Tencor

16  shareholders and the market false financial statements that improperly recorded and accounted for

17  backdated options grants in violation of GAAP and Section 162(m).

18      74.     At no time prior to June 30, 2006, did KLA-Tencor shareholders or any other

19  member of the investing public have reason to know of Defendants' breaches of their fiduciary duties

20  and violations of the Corporations Code.  Therefore, the Individual Defendants cannot rely on a

21  statute of limitations defense as they have withheld from KLA-Tencor shareholders and the investing

22  public the facts that give rise to the claims asserted herein.

23

24

25

26  ///

27  ///

28  ///

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
C:\WordPerfect\KLA2\PLD\DirectComplaint.003.wpd

# COUNT I

(Against All Defendants)
Claim for Breach of Fiduciary Duty of Due Care and Loyalty

75.     Plaintiff hereby realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

76.     Defendants have violated fiduciary duties owed to the shareholders of KLA-Tencor under Delaware and California law as they have acted unreasonably and/or put their personal interests ahead of the interests of plaintiff and other members of the Class.

77.     Rather than make proper disclosures concerning the true financial condition of KLA-Tencor, defendants either breached their duties, and/or aided and abetted such breach, to take the following actions:

    a.     to act in the interests of all KLA-Tencor equity owners, including at the time of agreeing to a settlement;

    b.     to maximize shareholder value;

    c.     to act in accordance with their fundamental duties of due care and loyalty and not to place their individual interests or other shareholders interests over the interests of plaintiff and the Class, nor to aid and abet such abject dereliction of duties.

78.     By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, failed to disclose KLA-Tencor's true financial condition or prospects to plaintiff or the Class and unfairly deprived plaintiff and other members of the Class of the ability to make an informed decision concerning whether they should: (i) continue holding their shares of KLA-Tencor stock during times relevant herein; (ii) allow the Evergreen Provision to go forward, adding to the restated 1982 Stock Option Plan, on July 1, 2003 and July 1, 2004, an amount of shares equal to 3% of KLA-Tencor's shares of common stock outstanding on June 30, 2002 and June 30, 2001, respectively; (iii) adopt of 2004 Equity Incentive Plan.

79.     By reason of the foregoing acts, practices and course of conduct, the defendants failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other Class members.

23

80.    As a result of the actions of defendants, plaintiff and the Class were damaged.

**COUNT II**

(Against All Defendants)
Claim for Breach of Duty of Candor and Full Disclosure

81.    Plaintiff repeats and realleges each allegation set forth herein.

82.    As fiduciaries of the KLA-Tencor shareholders, defendants owed all KLA-Tencor shareholders the highest duty known to the law, a duty of complete candor, requiring them to fully disclose all material facts concerning the grant of stock options and related transactions which were voted upon by plaintiff and the Class shareholders.

83.    Defendants breached their duty of candor and full disclosure by failing to disclose material facts and misrepresenting matters as set forth above.  As a result of these misrepresentations and failures to disclose, plaintiff and the Class were deprived of the opportunity to cast their vote in an informed manner.

84.    As a result of defendants' breach of the duty of candor and full disclosure, KLA-Tencor's shareholders were damaged.

85.    By reason of the foregoing, plaintiff and each member of the Class is suffering irreparable injury and damages.

86.    By reason of the foregoing, the Individual Defendants have violated the fiduciary duties which each of them owes to plaintiff and the class.

87.    Plaintiff and other members of the class have no adequate remedy at law.

88.    Each of the defendants has colluded in and rendered substantial assistance in the accomplishment of the wrongdoing complained of herein.  In taking the actions, as particularized herein, to aid and abet and substantially assist the wrongs complained of, all defendants acted with an awareness of the primary wrongdoing and realized that their conduct would substantially assist the accomplishment of that wrongdoing and were aware of their overall contribution to the conspiracy, common scheme and course of wrongful conduct.

89.    Unless enjoined by this Court, defendants will continue to breach their fiduciary duties owed to plaintiff and the Class.

24

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
C:\WordPerfect\KLA2\PLD\DirectComplaint.003.wpd

1    90.    Plaintiff and the other Class members are immediately threatened by the acts and

2  transactions complained of herein, and lack an adequate remedy at law.

3                                    **<u>PRAYER FOR RELIEF</u>**

4        WHEREFORE, plaintiff prays for judgment and relief as follows:

5        1.    Ordering that this action may be maintained as a class action and certifying plaintiff as

6              the Class representative;

7        2.    Declaring that defendants have breached and/or are aiding and abetting breaches of

8              fiduciary and other duties to plaintiff and the other members of the Class;

9        3.    Awarding compensatory damages against defendants, jointly and severally, in an

10             amount to be determined at trial, together with pre-judgment interest at the maximum

11             rate allowable by law;

12       4.    Rescinding: (i) all stock added to the 1982 Stock Option Plan on July 1, 2003 and

13             July 1, 2004, pursuant to the Evergreen Provision, and (ii) the 2004 Equity Incentive

14             Plan, and cancelling the millions of shares added to the stock option plans.

15       5.    Preliminarily and permanently enjoining the defendants from granting any stock

16             options and from allowing the exercise of any of the currently outstanding options

17             granted under the stock option plans during the Class Period outlined herein;

18       6.    Awarding costs and disbursements, including plaintiff's counsel's fees and experts'

19             fees; and

20       7.    Granting such other and further relief as the Court may deem just and proper.

21

22

23

24

25

26  ///

27  ///

28  ///

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
C:\WordPerfect\KLA2\PLD\DirectComplaint.003.wpd

1

**JURY DEMAND**

2          Plaintiff demands a trial by jury.

3

4    Dated: June 12, 2008                    Patrice L. Bishop
                                            STULL, STULL & BRODY
5

6
                                   By:        /s/
7                                           Patrice L. Bishop
                                            10940 Wilshire Boulevard
8                                           Suite 2300
                                            Los Angeles, CA  90024
9                                           Tel:    (310) 209-2468
                                            Fax:    (310) 209-2087
10

11                                          Jules Brody
                                            Aaron L. Brody
                                            STULL, STULL & BRODY
12                                          6 East 45th Street
                                            New York,  NY 10017
13                                          Tel:    (212) 687-7230
                                            Fax:    (212) 490-2022
14
                                            Counsel for Plaintiff
15

16

17

18

19

20

21

22

23

24

25

26

27

28

[Proposed] SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
C:\WordPerfect\KLA2\PLD\DirectComplaint.003.wpd