Patrice L. Bishop (182256)
service@ssbla.com
STULL, STULL & BRODY
10940 Wilshire Boulevard
Suite 2300
Los Angeles, CA  90024
Tel:    (310) 209-2468
Fax:    (310) 209-2087

Jules Brody
Aaron L. Brody
SSBNY@aol.com
STULL, STULL & BRODY
6 East 45th Street
New York,  NY 10017
Tel:    (212) 687-7230
Fax:    (212) 490-2022

Counsel for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRIS CRIMI, on Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EDWARD W. BARNHOLT, H. RAYMOND BINGHAM, ROBERT T. BOND, RICHARD J. ELKUS, JR., STEPHEN P. KAUFMAN, KENNETH LEVY, MICHAEL E. MARKS, DEAN O. MORTON, KENNETH L. SCHROEDER, JON D. TOMPKINS, RICHARD P. WALLACE, KLA-TENCOR CORPORATION, and DOES 1 through 25, <br><br> Defendants. | CASE NO. C 08-2249 CRB <br><br> **CLASS ACTION** <br><br> **SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES** <br><br> **DEMAND FOR JURY TRIAL** |

1    Plaintiff, through his attorneys, brings this Second Amended Complaint, against defendant

2    KLA-Tencor Corporation ("KLA-Tencor" or the "Company") and certain directors of the

3    Company, alleges on personal knowledge as to his self and his activities, and on information and

4    belief as to all other matters, based on investigation and discovery conducted by counsel:

5    **SUMMARY**

6    1.    This is a shareholders' action on behalf of all individuals who owned KLA-Tencor

7    common stock between September 20, 2002 and September 27, 2006, except those who are part of

8    the class of settling shareholders who purchased KLA-Tencor stock between February 13, 2003 and

9    May 22, 2006, (the "Class"). Plaintiff, on behalf of himself and those similarly situated, alleges that

10   certain current and former officers and members of its Board of Directors (the "Board") breached

11   their fiduciary duties when they failed to inform plaintiff and the Class that they had issued

12   backdated KLA-Tencor stock options to certain senior executives. Indeed, defendants, as outlined

13   *infra*, have admitted that they issued backdated stock options to all employees who received grants

14   between from July 1, 1997 and June 30, 2002.

15   2.    KLA-Tencor, a publicly traded company whose common stock is traded on Nasdaq

16   under the ticker symbol "KLAC," was formed in May 1997 pursuant to merger of KLA Instruments

17   and Tencor Instruments. The Company supplies management solutions for the semiconductor and

18   related microelectronics industries.

19   **JURISDICTION**

20   3.    Defendant KLA-Tencor removed this action pursuant to Securities Litigation

21   Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb(f). Plaintiff intends to file a Motion to

22   Remand on this action to the State Court pursuant to 28 U.S.C. § 1447 because it meets the

23   requirements of an exception of the Securities Litigation Uniform Standards Act ("SLUSA"), 15

24   U.S.C. § 78bb(f)(3)(A)(ii).

25   4.    Plaintiff alleges that the Superior Court of California has jurisdiction over the subject

26   matter of this action pursuant to the California Constitution Article VI, Section 10, because the case

27   is an action not given by statute to other trial courts.

28

1

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES**
**CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

1    5.    Plaintiff also contends that venue is proper in Santa Clara County under Section

2    395(a) of the California code of Civil Procedure in that some or all of the Individual Defendants

3    reside in this County.

4    **PARTIES**

5    6.    Plaintiff Chris Crimi owned shares of KLA-Tencor common stock between

6    September 20, 2002 and September 27, 2006.

7    7.    Edward W. Barnholt ("Barnholt") has served as a member of the Board of Directors

8    since 1995 and  its Compensation Committee and Nominating and Governance Committee since

9    2000.  Defendant Barnholt was the Chairman of the Nominating and Governance Committee for the

10   2004, 2005 and 2006 fiscal years, and was named as Chairman of the Board in October of 2006, and

11   became its Chairman in October 2006.  Upon information and belief, Barnholt resides in California.

12   8.    H. Raymond Bingham ("Bingham") has served as a member of the Board of

13   Directors from October 1999 until May 2008.  He was also a member of its Audit Committee since

14   2000 and its Nominating and Governance Committee since 2006.  Defendant Bingham became

15   Chairman of the Audit Committee in 2003.  Defendant Bingham resigned from the board effective

16   on May 7, 2008. Upon information and belief, Bingham resides in California.

17   9.    Robert T. Bond ("Bond") has served as a member of the Board of Directors and its

18   Compensation Committee since August 2000 and Audit Committee since 2002.  He became

19   Chairman of the Compensation Committee in 2004.  Upon information and belief, Bond resides in

20   California.

21   10.    Richard J. Elkus, Jr. ("Elkus") was a member of the Board of Directors during times

22   relevant herein, and a member of its Audit Committee from 1999 until November 4, 2005 and its

23   Nominating and Governance Committee from fiscal 2003 to November 4, 2005.  Upon information

24   and belief, Elkus resides in California.

25   11.    Stephen P. Kaufman ("Kaufman") has served as a member of the Board of Directors

26   since November 2002 and its since November 2002 and its Nominating and Governance Committee

27   since fiscal year 2005.  Upon information and belief, Kaufman resides in California.

28

2

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES**
**CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

12.     Kenneth Levy ("Levy") was a member of Board of Directors during times relevant herein, holding the position of Chairman of the Board from July 1999 through October 2006.  Levy was also a member of the Board's Nominating and Governance Committee and served as the Company's CEO from July 1998 to June 1999.  Upon information and belief, Levy resides in California.

13.     Michael E. Marks ("Marks") was a member of the Board of Directors during times relevant herein, and a member of its Compensation Committee from November 2003 until May 2006.  Upon information and believe, Marks resides in California.

14.     Dean O. Morton ("Morton") was a member of the Board of Directors during times relevant herein, and a member of its Audit Committee and the Nominating and Governance Committee during fiscal year 2001.  Upon information and belief, Morton resides in California.

15.     Defendant Kenneth L. Schroeder ("Schroeder") was a member of the Board of Directors during times relevant herein and served on its Nominating and Governance Committee during the 2001 and 2002 fiscal years.  Schroeder also served on the Company's Stock Option Committee from 1994 until December 31, 2005.  Defendant Schroeder was a Senior Advisor to the Company from January 1, 2006 through October 16, 2006, its CEO from July 1999 until January 1, 2006, President from November 1991 to July 2002 and from May 2004 to July 2005, and COO from November 1991 until June 1999.  Upon information and belief, defendant Schroeder resides in California.

16.     Jon D. Tompkins ("Tompkins"), one of the founders of the Company,  was a member of the Board during times relevant herein, having served as Chairman of the Board from July 1998 to June 1999 and CEO from May 1997 to July 1998.  Tompkins also served as a member of the Stock Option Committee from 1997 until 1999.  Upon information and belief, Tompkins resides in California.

17.     Defendant Richard P. Wallace ("Wallace") has been a member of the Company's Board of Directors since January 2006.  Defendant Wallace also serves as the Company's Chief Executive Officer ("CEO"), a position he has held since January 1, 2006.  He also served as President and Chief Operating Officer ("COO") from July 2005 through December 2005, Executive

3

1    Vice President of the Customer Group from May 2004 to July 2005, and Executive Vice President

2    of the Wafer Inspection, Review & Analysis Group from July 2000 to May 2004.  Upon

3    information and belief, defendant Wallace resides in California.

4         18.    Defendant KLA-Tencor is a Delaware corporation with its executive offices and

5    principal place of business located at 160 Rio Robles, San Jose, California 95134.

6         19.    Defendants Barnholt, Bingham, Bond, Elkus, Kaufman, Levy, Marks, Morton,

7    Schroeder, Tompkins, and Wallace are collectively referred to herein as the "Individual

8    Defendants."

9         20.    The true names and capacities of defendants sued herein under California Code of

10   Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiff, who

11   therefore sue these defendants by such fictitious names.  Plaintiff will seek to amend this Complaint

12   and include these Doe defendants' true names and capacities when they are ascertained.  Each of the

13   fictitiously named defendants is responsible in some manner for the conduct alleged herein and for

14   the injuries suffered by the Company.

15                        **DUTIES OF THE INDIVIDUAL DEFENDANTS**

16        21.    Each Individual Defendant owed KLA-Tencor and its public shareholders the duty to

17   exercise due care, loyalty and good faith in the management and administration of the affairs of the

18   Company, as well as in the use and preservation of its property and assets.  The conduct of the

19   Individual Defendants complained of herein involves a knowing, reckless or grossly negligent and

20   culpable violation of their obligations as directors and/or officers of KLA-Tencor, the absence of

21   good faith on their part and a reckless disregard for their duties to the Company and its

22   shareholders, all of which the Individual Defendants were aware or should have been aware,

23   presented a risk of, and in fact did cause, serious injury to the Company.

24        22.    By reason of their positions as officers, directors, and fiduciaries of KLA-Tencor and

25   its shareholders and because of their ability to control the business and corporate affairs of KLA-

26   Tencor, the Individual Defendants owed KLA-Tencor and its shareholders fiduciary obligations of

27   trust, good faith, loyalty, and due care, and were and are required to use their utmost ability to

28   control and manage KLA-Tencor in a fair, just, honest, and equitable manner.  The Individual

4

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES**
**CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

1   Defendants were and are required to act in furtherance of the best interests of KLA-Tencor and its

2   shareholders so as to benefit all shareholders equally and not in furtherance of their personal

3   interests or benefit.

4        23.    The Individual Defendants, because of their positions of control and authority as

5   directors and/or officers of KLA-Tencor, were able to and did, directly and/or indirectly, exercise

6   control over the wrongful acts complained of herein.

7        24.    At all times relevant hereto, each of the Individual Defendants was the agent of each

8   of the other Individual Defendants and of KLA-Tencor, and was at all times acting within the

9   course and scope of such agency.

10       25.    To discharge the aforesaid duties, the Individual Defendants were required to

11  exercise reasonable and prudent supervision over the management, policies, practices, controls, and

12  financial affairs of KLA-Tencor.  The Individual Defendants were required, among other things, to:

13  in good faith manage, conduct, supervise and direct the business and affairs of KLA-Tencor

14  carefully and prudently and in accordance with all applicable laws, rules and regulations; neither

15  violate nor knowingly permit any officer, director, employee or agent of KLA-Tencor to violate

16  applicable federal and state laws, rules and regulations or any rule or regulation of KLA-Tencor;

17  exercise reasonable control and supervision over the officers and employees and agents of KLA-

18  Tencor; remain informed as to the status of KLA-Tencor's operations, and upon receipt of notice or

19  information of imprudent or unsound practices, to make a reasonable inquiry in connection

20  therewith, and to take steps to correct such conditions or practices and make such disclosures as are

21  necessary to comply with federal and state securities laws, supervise the preparation, filing and/or

22  dissemination of any SEC filings, press releases, audits, reports or other information required by

23  law, and examine and evaluate any reports or examinations, audits, or other financial information

24  concerning the financial condition of KLA-Tencor; maintain and implement an adequate system of

25  internal financial, accounting and management information systems and controls; and ensure that

26  KLA-Tencor's financial statements were prepared in accordance with Generally Accepted

27  Accounting Principles ("GAAP").

28

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

1    26.    Because of their Board membership and/or executive and managerial positions with

2  KLA-Tencor and their access to internal corporate documents (including the Company's operating

3  plans, budgets and forecasts and reports of actual operations compared thereto), conversations and

4  connections with other corporate officers and employees, attendance at management and Board of

5  Directors meetings and committees thereof, and their receipt of reports and other information

6  provided to them in connection therewith, each of the Individual Defendants had access to

7  undisclosed information about KLA-Tencor's business prospects, financial condition, performance,

8  accounting and revenue recognition practices, as alleged herein.

9                              **CLASS ACTION ALLEGATIONS**

10    27.    Plaintiff brings this action pursuant to §382 of the California Code of Civil

11  Procedure on his own behalf and as a class action on behalf of all holders of KLA-Tencor common

12  stock, who are being and will be harmed by defendants' actions described below (the "Class").

13  While plaintiff contends this action was properly filed in the Superior Court for the County of Santa

14  Clara, plaintiff also asserts that this action also satisfies the requirements of Fed. R. Civ. P. 23.

15  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other

16  entity related to or affiliated with any defendants.

17    28.    This action is properly maintainable as a class action because:

18          a.    The class is so numerous that joinder of all members is impracticable.  There

19  are millions of KLA-Tencor stock issued and outstanding.  The shares trade on the Nasdaq National

20  Market under the ticker symbol "KLAC", and thousands of KLA-Tencor stockholders of record are

21  located throughout the United States;

22          b.    There are questions of law and fact which are common to the Class, including

23  whether the defendants have engaged or are continuing to act in a manner calculated to benefit

24  themselves at the expense of KLA-Tencor's minority stockholders and whether plaintiff and other

25  members of the Class would be irreparably damaged if the defendants are not enjoined in the

26  manner described below;

27          c.    The defendants have acted or refused to act on grounds generally applicable

28  to the Class thereby making appropriate final injunctive relief with respect to the Class as a whole;

6

1    d.    Plaintiff is committed to prosecuting this action and has retained competent

2 counsel experienced in litigation of this nature.  The claims of plaintiff are typical of the claims of

3 the other members of the class and plaintiff has the same interest as the other members of the Class.

4 Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately

5 protect the interests of the Class; and

6    e.    Plaintiff anticipates that there will be no difficulty in the management of this

7 litigation as a class action.

8    29.    For the reasons stated herein, a class action is superior to other available methods for

9 the fair and efficient adjudication of this controversy.

10                    **SUBSTANTIVE ALLEGATIONS**

11    30.    Stock options give employees of a publically traded company the right to purchase

12 company stock at a fixed price in the future.  The general policy behind a grant of stock options is

13 to link employees' compensation to the value of the company's shares and, therefore, to the wealth

14 of the company's shareholders.  Typically, the options' fixed price is aligned with the price of the

15 stock on the day of the grant.  If the stock price rises from the fixed grant price the employee profits

16 by exercising the options and selling the shares.  In contrast, backdated stock options allow the

17 employees of a publically traded company, such as KLA-Tencor, to maximize their wealth at the

18 expense of its shareholders.

19 **KLA-Tencor Stock Option Plans**

20    31.    According to the Definitive Proxy filed with the Securities and Exchange

21 Commission on October 6, 1997 (the "1997 Proxy"), options were granted to eligible employees

22 through the 1982 Stock Option Plan and to directors through the Director Plan.  According to the

23 1997 Proxy, the "exercise price of the options is the fair market value of Common Stock as of the

24 date of grant."

25    32.    The 1982 Stock Option Plan was initially adopted by KLA Instruments Corporation

26 in 1981, restated on November 18, 1996 (the date of the annual meeting pursuant to the 1996

27 Definitive Proxy filed with the SEC on October 11, 1996), and operative through October 18, 2004.

28 Pursuant to the terms of the 1982 Stock Option Plan, as restated, the "Plan shall be administered by

7

the Board, including any duly appointed Committee of the Board."  In its power as administrator of

the plan, "the Board shall have the full and final power and authority, in its sole discretion . . . to

determine the persons to whom, and the time or times at which, Options shall be granted and the

number of shares of Stock to be subject to each Option . . . [and] . . . to determine the Fair Market

Value of shares of Stock or other property".  Moreover, the "exercise price for each Option shall be

established in the sole discretion of the Board; provided, however, that [] no Option shall have an

exercise price per share less than the Fair Market Value of a share of Stock on the effective date of

grant of the Option."

33.    The 1982 Stock Option Plan also had an "evergreen" automatic annual share

replenishment feature which provided for, on the first day of the next fiscal year, the addition to the

Plan an amount of shares equal to 3% of KLA-Tencor's outstanding shares of common stock on the

last day of each fiscal year (the "Evergreen Provision").

34.    According to the Definitive Proxy filed with the SEC on September 28, 1998 (the

1998 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and

to directors through the Director Plan.  According to the 1998 Proxy, the "exercise price of the

options is the fair market value of Common Stock as of the date of grant."

35.    The 1998 Proxy also requested shareholders approve the 1998 Outside Director

Option Plan (the "1998 Director Plan") and to reserve for issuance 1,000,000 shares of the KLA-

Tencor common stock for distribution to the directors under that plan.

36.    According to the Definitive Proxy filed with the SEC on October 15, 1999 (the

"1999 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and

to directors through the 1998 Director Plan.  According to the 1999 Proxy, the "exercise price of the

options is the fair market value of Common Stock as of the date of grant."

37.    According to the Definitive Proxy filed with the SEC on October 6, 2000 (the "2000

Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and to

directors through the 1998 Director Plan.  According to the 2000 Proxy, the "exercise price of the

options is the fair market value of Common Stock as of the date of grant."

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES**
**CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

38.    On November 10, 2000, the Board approved the 2000 Nonstatutory Stock Option Plan which provides for the issuance of stock options to employees and consultants, other than officers and directors, of the Company or any parent or subsidiary corporation .

39.    According to the Definitive Proxy filed with the SEC on September 28, 2001 (the 2001 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and to directors through the 1998 Director Plan.  According to the 2001 Proxy, the "exercise price of the options is the fair market value of Common Stock as of the date of grant."

40.    According to the Definitive Proxy filed with the SEC on September 20, 2002 the "2002 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan and to directors through the 1998 Director Plan.  According to the 2002 Proxy, all "Options were granted at an exercise price equal to the fair market value of the Company's Common Stock on" the date of the grant.

41.    On November 6, 2002, the Board amended the Nonstatutory Stock Option Plan.

42.    According to the Definitive Proxy filed with the SEC on September 23, 2003 (the 2003 Proxy"),options were granted to eligible employees through the 1982 Stock Option Plan and to directors through the 1998 Director Plan.  According to the 2003 Proxy, all "Options were granted at an exercise price equal to the fair market value of the Company's Common Stock."

43.    Pursuant to Evergreen Provision, on July 1, 2004, 5,903,603 shares of KLA-Tencor stock were added into the 1982 Stock Option Plan.

44.    According to the Definitive Proxy filed with the SEC on September 9, 2004 (the "2004 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan to and to directors through the 1998 Director Plan.  According to the 2004 Proxy, all "Options were granted at an exercise price equal to the fair market value of the Company's Common Stock."

45.    The 2004 Proxy requested shareholders vote in favor of the director approved 2004 Equity Incentive Plan.  The "2004 Equity Incentive Plan [was] developed to replace [the] 1982 Stock Option Plan and 2000 Nonstatutory Stock Option Plan and to supplement [the] 1998 Outside Director Option Plan."   Under the terms of the 2004 Equity Incentive Plan, shareholders were requested to reserve 11,000,000 shares of KLA-Tencor common stock for issuance under the terms

9

1    of the 2004 Equity Incentive Plan.  In addition, pursuant to the terms of the 2004 Equity Incentive

2    Plan, up to an additional 1,500,000 shares remaining for grant under the 1982 Stock Option Plan

3    and 2000 Nonstatutory Stock Option Plan would be transferred into the 2004 Equity Incentive Plan.

4          46.    The 2004 Equity Incentive Plan was to "be administered by our Board of Directors

5    or a committee, which our Board of Directors may appoint from among its members (the

6    'Administrator')."  The "Administrator has the authority to . . . select the persons to whom awards

7    are to be granted."  Options granted under the Plan "may not be granted with an exercise price

8    lower than 100% of the fair market value of the underlying shares."

9          47.    According to the Definitive Proxy filed with the SEC on October 13,  2005 (the

10   "2005 Proxy"), options were granted to eligible employees through the 1982 Stock Option Plan to

11   and to directors through the 1998 Director Plan.  According to the 2005 Proxy, all "Options were

12   granted at an exercise price equal to the fair market value of the Company's Common Stock." .

13   **Wall Street Journal Article**

14         48.    On May 22, 2006, *The Wall Street Journal* published an article entitled "Five More

15   Companies Show Questionable Options Patterns."  The first company addressed by the article was

16   KLA-Tencor and, in fact, this was the first time the public had any idea that KLA-Tencor was

17   allegedly backdating stock options to top executives. The article stated, in relevant part:

18   In 2001,  KLA-Tencor Corp., a leading semiconductor-equipment
19   maker, granted its top executives, including Chairman Ken Levy, two
     batches of stock options. They arrived on unusually fortunate days for
20   the executives: The first dated at the share price's first-half low; the
     second at its second-half low.

21   In all, Mr. Levy received 10 grants from KLA-Tencor and its
22   predecessor company between 1994 and 2001 -- all preceding quick
     runups in the share price; an analysis by The Wall Street Journal
     found the probability that that pattern occurred merely by chance is
23   tiny -- around one in 20 million.

24   Mr. Levy and company executives didn't return repeated phone and
     email messages.
25
                                    * * *
26
     KLA-Tencor was formed from the merger of two major suppliers of
27   semiconductor equipment. It is a powerhouse in the specialized and
     expensive gear used by the world's largest chipmakers to test the
28   quality of their complex production systems. It has a market value of

10

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES**
**CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

1   about $9 billion. Based in San Jose, Calif., KLA-Tencor has
    generated a fortune for Mr. Levy, the founder of one of its
2   predecessors.

3   The company has assured shareholders -- whose holdings in the
    company get diluted each time an option is exercised -- that its option
4   grants serve an important incentive purpose. "Stock options are
    granted at market price on the date of grant and will provide value to
5   the executive officers only when the price of the Company's Common
    Stock increases over the exercise price," KLA-Tencor's compensation
6   committee members wrote in a report filed with the company's 2002
    proxy statement.

7
    KLA-Tencor's 2001 stock chart looks a bit like a "W," with sharp
8   drops in April and October. Mr. Levy and other top executives were
    granted options dated at the very bottom of each dip. One grant
9   carried an exercise price of $29.31; the other, $32.75. KLA-Tencor
    shares now trade around $45, which means the options could be
10  yielding millions in gains.

11  But had either 2001 grant come a bit more than a month later, it
    would have carried an exercise price closer to $50, yielding zero
12  potential profit today.

13  It wasn't the only time that KLA executives, including Mr. Levy,
    former CEO Kenneth Schroeder and current chief Rick Wallace,
14  received propitious grants. Grants to Messrs. Levy and Schroeder
    in 1998 and 2000 also were dated at that year's lowest closing price.
15
    The 1998 grant proved lucrative for the executives. Mr. Levy has
16  reaped at least $6 million from cashing out options issued then, while
    Mr. Schroeder has pocketed at least $10 million. Mr. Levy didn't
17  return phone or email messages. Neither the company's chief financial
    officer nor a company spokeswoman returned several messages
18  seeking comment. Mr. Schroeder couldn't be reached to comment.

19      49.    The Company's stock, which had closed on May 19, 2006, fell to a close of $40.54

20  on May 22, 2006.

21  **Backdated Options**

22      50.    Prior to the start of the Class Period, defendants repeated issued themselves

23  backdated stock options, including but not limited to:

24          a.    On July 21, 1997, defendants issued the following number of backdated

25  options at a per share strike price of $27.38 (which was not even the closing price on that purported

26  grant date):

27              i.    Morton: 5,000 shares;

28              ii.    Elkus: 5,000 shares;

11

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES**
**CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

b.      On August 31, 1998, defendants issued the following number of backdated options at a per share strike price of $10.63 (which was not even the closing price on that purported grant date):

        i.      Levy: 204,272 shares;

        ii.     Schroeder: 125,000 shares;

        iii.    Tompkins: 60,595 shares;

        iv.     Wallace: 9,251 shares;

c.      On October 23, 1998, defendants issued the following number of backdated options at a per share strike price of $16.97 (which was not even the closing price on that purported grant date):

        i.      Levy: 220,728 shares;

        ii.     Schroeder: 220,728 shares;

        iii.    Tompkins: 87,016 shares;

d.      On November 17, 1998, defendants issued 7,082 backdated options to defendant Morton at a per share strike price of $17.59 (which was not even the closing price on that purported grant date):

e.      On May 26, 1999, defendants issued 5,417 backdated options to defendant Wallace at a per share strike price of $22.56 (which was not even the closing price on that purported grant date):

f.      On October 27, 1999, defendants issued the following number of backdated options at a per share strike price of $33.75 (which was not even the closing price on that purported grant date):

        i.      Levy: 90,000 shares;

        ii.     Schroeder: 150,000 shares;

        iii.    Wallace: 36,250 shares;

g.      On August 13, 2000, defendants issued the following number of backdated options at a per share strike price of $44.69:

        i.      Levy: 37,901 shares;

12

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES**
**CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

1              ii.      Schroder: 75,800 shares;

2              iii.     Wallace: 21,878 shares;

3         h.    On August 15, 2000, defendants issued the following number of backdated

4    options at a per share strike price of $59.44:

5              i.      Bingham: 20,000 shares;

6              ii.      Bond: 20,000 shares;

7         i.    On November 10, 2000, defendants issued the following number of

8    backdated options at a per share strike price of $26.25:

9              i.      Barnholt: 10,000 shares

10             ii.      Elkus: 10,000 shares;

11             iii.     Levy: 18,951 shares;

12             iv.      Morton: 10,000 shares

13             v.      Schroeder: 37,900 shares;

14             vi.      Tompkins:10,000 shares;

15             vii.     Wallace: 12,250 shares;

16        j.    On April 4, 2001, defendants issued the following number of backdated

17   options at a per share strike price of $32.75:

18             i.      Levy: 18,951 shares;

19             ii.      Schroeder: 37,900 shares;

20             iii.     Wallace: 13,832 shares;

21        k.    On October 2, 2001, defendants issued the following number of backdated

22   options at a per share strike price of 29.31:

23             i.      Levy: 28,425 shares;

24             ii.      Schroeder: 341,100 shares;

25             iii.     Wallace: 45,000 shares;

26        l.    On November 9, 2001, defendants issued the following number of backdated

27   options at a per share strike price of $47.23:

28             i.      Bingham: 10,000 shares;

13

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES**
**CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

1       ii.      Bond: 10,000 shares;

2       51.     As outlined *infra*, defendants admitted that these stock options were backdated in a

3   10-K filed with SEC on January 29, 2007.

4   **First KLA-Tencor Announcment Regarding the Alleged Backdating**

5       52.     On May 24, 2006, the Company filed an 8-K with the SEC which stated:

6               KLA-Tencor Corporation announced today that its Board of Directors
                has appointed a Special Committee of independent directors to
7               conduct an internal investigation relating to past stock option grants,
                the timing of such grants and related accounting and documentation.
8               The Special Committee will be assisted by outside legal counsel and
                accounting experts. KLA-Tencor also said that it has received
9               subpoenas from the U.S. Attorney's Offices for the Eastern District of
                New York and Northern District of California requesting information
10              relating to its past stock option grants. KLA-Tencor said that it will
                cooperate fully with any government or regulatory investigation into
11              these matters. KLA-Tencor further disclosed that on May 22, 2006, it
                was served with a complaint relating to a lawsuit filed in the United
12              States District Court for the Northern District of California filed by
                the Theodore R. Kornreich Revocable Trust, derivatively on behalf of
13              KLA-Tencor.

14      53.     On May 30, 2006, KLA-Tencor filed another 8-K which stated that "KLA-Tencor

15  Corporation announced today that it received notice from the Securities and Exchange Commission

16  of an informal inquiry relating to past stock option grants.  KLA-Tencor will cooperate fully with

17  this investigation."

18      54.     On June 30, 2006, the Company filed a 8-K attaching a press release issued that

19  same day entitled "KLA-Tencor Provides Update on Special Committee Investigation."  The press

20  release announcing:

21              [T]hat a Special Committee of the Company's Board of Directors has
                reached a preliminary conclusion that the actual measurement dates
22              for financial accounting purposes of certain stock option grants issued
                in prior years likely differ from the recorded grant dates of such
23              awards. The Special Committee has not completed its investigation
                and is continuing its review of these matters. The Special Committee
24              has not yet determined whether any resulting compensation charges
                are material or whether the Company ultimately will restate
25              previously issued financial statements.

26              The Company previously announced that its Board of Directors has
                appointed a Special Committee of independent directors to conduct an
27              internal investigation relating to stock options granted to members of
                senior management and the employees of the Company. The Special
28              Committee, assisted by independent legal counsel and accounting

14
**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

experts, is investigating the timing of such grants, as well as their related accounting treatment.

Based on the Special Committee's investigation to date, the Company now anticipates that it may record additional non-cash charges for stock-based compensation expense. The Company has not yet determined the amount of such charges or the resulting tax impact of these actions. In the event that the Company determines that these items are material, KLA-Tencor may be required to restate its financial statements for the relevant prior fiscal periods.

55.    On July 26, 2006, the Company filed another 8-K attaching a press release issued on July 21, 2006, which stated, in relevant part:

As previously announced, the Company's Board of Directors has appointed a Special Committee of independent directors to conduct an internal investigation relating to stock options granted to the employees of the Company. As disclosed on June 30, the Special Committee has reached a preliminary conclusion that the actual measurement dates for financial accounting purposes of certain stock option grants issued in prior years likely differ from the recorded grant dates of such awards. The Special Committee has not yet determined whether any resulting compensation charges or tax implications are material or whether the Company ultimately will restate previously issued financial statements.

As a result of the on-going investigation and the potential for restatement, the Company is unable to provide detailed GAAP or non-GAAP financials for items other than revenue and bookings for the quarter or year ended June 30, 2006. In addition, the Company will not file its annual report on form 10-K until after the completion of the investigation. The Company does not expect the investigation to be completed until after the date the Form 10-K is required to be filed.

56.    On September 14, 2006, the Company acknowledged that it could not meet its financial obligations when it filed a Form 12b-25, Notice of Inability to Timely File 10-Q, with the SEC.  The Form stated, in relevant part that:

[A] Special Committee of independent directors, appointed by the Board of Directors of KLA-Tencor Corporation (the "Company"), is conducting an internal investigation relating to stock options granted to the employees of the Company, the timing of such grants and their related accounting and tax treatment.

On June 30, 2006, the Company disclosed that the Special Committee reached a preliminary conclusion that the actual measurement dates for financial accounting purposes of certain stock option grants issued in prior years likely differ from the recorded grant dates of such awards. Neither the Special Committee nor the Board of Directors of

15

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES**
**CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

1

2

> the Company has yet determined whether any resulting compensation or tax charges are material or whether the Company ultimately will restate previously issued financial statements.

3

4

5

6

> As a result of the ongoing investigation, the Company was unable to file its annual report on Form 10-K for the year ended June 30, 2006 by the required filing date of September 13, 2006 without unreasonable effort or expense. The Company does not anticipate that it will be able to file its Form 10-K on or before the fifteenth calendar day following the prescribed due date, in accordance with Rule 12b-25.

7

8

> The Company is focused on resolving these issues as quickly as possible and plans to file its Form 10-K as soon as practicable following the completion of the Special Committee's investigation.

9

10

     57.    On September 15, 2006, the Company filed an 8-K with the SEC attaching a

September 14, 2006 press release which announced that:

11

12

13

14

15

> [T]he Special Committee appointed by the Board of Directors of the Company is continuing its internal investigation relating to stock options granted to employees of the Company. As anticipated in the Company's news release dated July 24, 2006, the Company will not file its Annual Report on Form 10-K until the internal investigation is complete. Thus, the Company did not file its Form 10-K on September 13, 2006 as required, and has filed Form 12b-25 (Notification of Late Filing) also as required.

16

17

18

19

20

21

22

> As a result of the delayed filing of the Company's Form 10-K, the Company today received a NASDAQ Staff Determination notice indicating that the Company is not in compliance with the filing requirements for continued listing as set forth in NASDAQ Marketplace Rule 4310(c)(14) and that its common stock is subject to delisting from the NASDAQ Global Select Market. The notice, which the Company expected, was issued in accordance with standard NASDAQ procedures. The Company will appeal this determination and request a hearing before the NASDAQ Listing Qualifications Panel. The Company's appeal and hearing request will automatically stay the delisting of the Company's common stock. Pending the Panel's decision, the Company's shares will continue to be listed on the NASDAQ Global Select Market.

23

24

25

26

27

28

> As previously announced, the Special Committee reached a preliminary conclusion that the actual measurement dates for financial accounting purposes of certain stock option grants issued in prior years likely differ from the recorded grant dates of such awards. Neither the Special Committee nor the Board of Directors of the Company has yet determined whether any resulting compensation or tax charges are material or whether the Company ultimately will restate previously issued financial statements. The Company is focused on resolving these issues as quickly as possible and plans to file its Form 10-K as soon as practicable following completion of the Special Committee's investigation.

16

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

1    **Special Committee Report**

2         58.      On September 27, 2006, the Company filed an 8-K with the SEC admitting that

3    stock options had been granted to KLA-Tencor executives at backdated prices.  The press release

4    announced, in relevant part, that:

5              A Special Committee of the Board of Directors of KLA-Tencor
               Corporation (the "Company") has delivered a report to the Board of
6              Directors, which concluded that incorrect measurement dates were
               used for certain stock option grants made principally during the
7              period from July 1, 1997 through July 30, 2002. The Board of
               Directors of the Company has not concluded its evaluation of the
8              factors that led to the use of incorrect measurement dates of stock
               options. The Board of Directors has concluded that the Company will
9              need to restate certain of its historical financial statements to record
               non-cash charges for compensation expenses relating to past stock
10             option grants. The Company has not determined the amount of such
               charges, the resulting tax and accounting impacts, the impact on
11             internal control over financial reporting, or which specific periods
               may require restatement. However, the effects on previously reported
12             financial statements are expected to be material. The Special
               Committee and the Board of Directors will continue to be actively
13             involved in reviewing information and determining the appropriate
               actions to be taken by the Company with respect to this matter.
14
               Accordingly, on September 27, 2006, the Board of Directors
15             concluded that financial statements and all earnings and press releases
               and similar communications issued by the Company relating to
16             periods beginning on or after July 1, 1997, should no longer be relied
               upon, including the Company's financial statements for fiscal years
17             1998 through 2005, the interim periods contained therein, and the
               fiscal quarters ended September 30, 2005, December 31, 2005 and
18             March 31, 2006. The Company's management and the Special
               Committee have discussed this matter with PricewaterhouseCoopers
19             LLP, the Company's independent registered public accounting firm.

20                                     * * *

21             On September 27, 2006, KLA-Tencor Corporation (the "Company")
               determined that its historical financial statements for one or more
22             prior fiscal years will have to be restated as a result of improper
               accounting for option grants made to officers and employees. The
23             specific fiscal years which will need to be restated has yet been
               determined. However, the Company has decided to suspend
24             temporarily employee participation in several equity incentive
               programs because the S-8 registration statements covering the shares
25             of common stock issuable under those programs incorporate one or
               more financial statements that will likely have to be restated. As part
26             of such suspension, participants in the Company's 401(k) Plan (the
               "401(k) Plan") will be subject to a blackout period during which they
27             will be precluded from acquiring shares of the Company's common
               stock under that plan. . . .

28

                                        17
**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES**
**CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

**Restatement**

59.     On October 3, 2006, KLA-Tencor filed an 8-K announcing that the Company would

need restate its financials for dates between July 1, 1997 through March 31, 2006.  The 8-K more

specifically stated, in relevant part, that:

> A Special Committee of the Board of Directors of KLA-Tencor
> Corporation (the "Company") has delivered a report to the Board of
> Directors, which concluded that incorrect measurement dates were
> used for certain stock option grants made principally during the
> period from July 1, 1997 through July 30, 2002. The Board of
> Directors of the Company has not concluded its evaluation of the
> factors that led to the use of incorrect measurement dates of stock
> options. The Board of Directors has concluded that the Company will
> need to restate certain of its historical financial statements to record
> non-cash charges for compensation expenses relating to past stock
> option grants. The Company has not determined the amount of such
> charges, the resulting tax and accounting impacts, the impact on
> internal control over financial reporting, or which specific periods
> may require restatement. However, the effects on previously reported
> financial statements are expected to be material. The Special
> Committee and the Board of Directors will continue to be actively
> involved in reviewing information and determining the appropriate
> actions to be taken by the Company with respect to this matter.
>
> Accordingly, on September 27, 2006, the Board of Directors
> concluded that financial statements and all earnings and press releases
> and similar communications issued by the Company relating to
> periods beginning on or after July 1, 1997, should no longer be relied
> upon, including the Company's financial statements for fiscal years
> 1998 through 2005, the interim periods contained therein, and the
> fiscal quarters ended September 30, 2005, December 31, 2005 and
> March 31, 2006. The Company's management and the Special
> Committee have discussed this matter with PricewaterhouseCoopers
> LLP, the Company's independent registered public accounting firm.

60.     On October 18, 2006, the Company announced, in an 8-K filed with the SEC, in

relevant part, that:

> [A]s a result of  the Special Committee investigation [] of the
> historical stock option practices of KLA-Tencor Corporation [] , the
> Company terminated, effective immediately, all aspects of its
> employment relationship with Kenneth L. Schroeder and any and all
> employment and/or service agreements between Mr. Schroeder and
> the Company. The Company intends to cancel all outstanding stock
> options held by Mr. Schroeder that were retroactively priced or
> otherwise improperly granted. Mr. Schroeder was President and Chief
> Operating Officer of the Company from 1991 to 1999 and Chief
> Executive Officer and a member of the Board of Directors of the
> Company from 1999 to 2005.

18

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES**
**CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

1    Also on October 16, 2006, the Company's General Counsel, Stuart J.
     Nichols, resigned, effective immediately. Mr. Nichols had been Vice
2    President and General Counsel of the Company since 2000. The
     Company intends to re-price all outstanding retroactively priced stock
3    options held by Mr. Nichols; the exercise price of each re-priced
     option will be increased to the fair market value on the corrected
4    measurement date.

5                                   * * *

6    Later on October 16, 2006, Kenneth Levy, Founder and Chairman of
     the Board of Directors of the Company, retired as a Director and
7    employee, effective immediately, and was named Chairman Emeritus
     by the Board of Directors. As of that date, by mutual agreement, Mr.
8    Levy's employment with the Company immediately ceased, and any
     and all employment or service contracts between Mr. Levy and the
9    Company immediately terminated, with each party having no further
     monetary or other obligations thereunder. The Company intends to re-
10   price all outstanding retroactively priced stock options held by Mr.
     Levy; the exercise price of each re-priced option will be increased to
11   the fair market value on the corrected measurement date. Mr. Levy
     was a member of the Board of Directors of the Company since 1975,
12   Chairman of the Board since 1999, and Chief Executive Officer from
     1975 to 1997 and from mid 1998 to mid 1999.
13
     Edward W. Barnholt was appointed to succeed Mr. Levy as Chairman
14   of the Board of Directors of the Company and will serve in a non-
     executive capacity. Mr. Barnholt is the former President and Chief
15   Executive Officer of Agilent Technologies, and joined the Company's
     Board of Directors in 1995.
16

17        61.    A press release issued by the Company on October 16, 2006, ant attached to the 8-K

18   filed on October 18, 2006,  also announced, in relevant part, that:

19                [T]he Company's Board of Directors concluded that incorrect
                  measurement dates for certain stock option grants were used for
20                financial accounting purposes, principally during the period July 1,
                  1997 through June 30, 2002, and as a result, the Company will restate
21                its financial statements to correct the accounting for retroactively
                  priced stock options. The Company now anticipates that the total
22                additional non-cash charges for stock-based compensation expenses
                  will not exceed $400 million.
23

24        62.    On November 15, 2006, the Company filed with the SEC another Form 12b-25,

25   Notice of Inability to Timely File 10-Q.

26        63.    On November 15, 2006, the Company also filed an 8-K with the SEC announcing

27   that it continued to face delisting as the result of its inability to meet its financial reporting

28   requirements.

                                          19

1      64.    On December 27, 2006, the Company filed an 8-K announcing that defendant

2  Tompkins had resigned from the KLA-Tencor Board of Directors on December 21, 2006.

3      65.    On January 5, 2007, the Company filed and 8-K attaching its "Stock Option

4  Amendment and Special Bonus Agreement."  The text of the 8-K stated, *inter alia*, the amendment

5  would increase the price of defendant Wallace's outstanding stock options by $368,618.36.

6      66.    On January 29, 2007, the KLA-Tencor filed its fiscal 2006 Form 10-K and restated

7  previously filed financial results for fiscal years 2005, 2004, 2003 and 2002.  In its filing, the

8  Company, admitted, *inter alia*, that:

> This Annual Report on Form 10-K for our fiscal year ended June 30, 2006 includes restatements of the following previously filed financial statements and data (and related disclosures): (1) our consolidated financial statements as of and for our fiscal years ended June 30, 2005 and 2004; (2) our selected consolidated financial data as of and for our fiscal years ended June 30, 2005, 2004, 2003 and 2002, and (3) our unaudited quarterly financial data for the first three quarters in our fiscal year ended June 30, 2006 and for all quarters in our fiscal year ended June 30, 2005. See Note 2, "Restatement of Consolidated Financial Statements," to Consolidated Financial Statements and Exhibit 99.1 for a detailed discussion of the effect of the restatements.

> As a result of an investigation of our historical stock option practices by a Special Committee of our Board of Directors (see Item 3—Legal Proceedings), **we discovered that certain of our stock options, primarily those granted from July 1, 1997 to June 30, 2002, had been retroactively priced for all employees who received these grants** (less than 15% of these options were granted to executive officers). This means that the option exercise price was not the market price of the option shares on the actual grant date of the option, but instead was a lower market price on an earlier date. The actual grant date—when the essential actions necessary to grant the option were completed, including the final determination of the number of shares to be granted to each employee and the exercise price—is the correct measurement date to determine the market price of the option shares under the accounting rules in effect at the time. More than 95% of the total in-the-money value (market price on the actual grant date minus exercise price) of all of our retroactively priced options was attributable to those granted from July 1, 1997 to June 30, 2002.

>                             * * *

> . . . To correct our past accounting for stock options, we recorded additional pre-tax, non-cash, stock-based compensation expense of (a) $348 million for the periods July 1, 1994 to June 30, 2005 under APB Opinion No. 25 and (b) $22 million for the year ended June 30, 2006 under SFAS No. 123(r). We expect to amortize an additional $6 million of such pre-tax charges under SFAS No. 123(r) in future periods to properly account for past retroactively priced option grants.

20

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES**
**CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

By October 16, 2006, the Special Committee had substantially completed its investigation. The Special Committee concluded that (1) there was retroactive pricing of stock options granted to all employees who received options, primarily during the periods from July 1, 1997 to June 30, 2002 (less than 15% of these options were granted to executive officers), (2) **the retroactively priced options were not accounted for correctly in our previously issued financial statements**, (3) the **retroactive pricing of options was intentional, not inadvertent or through administrative error**, (4) **the retroactive pricing of options involved the selection of fortuitously low exercise prices by certain former executive officers, and other former executives may have been aware of this conduct**, (5) the **retroactive pricing of options involved the falsification of Company records, resulting in erroneous statements being made in financial and other reports previously filed with the SEC, as well as in information previously provided to our independent registered public accounting firm**, and (6) in most instances, **the retroactive pricing of options violated the terms of our stock option plans**. Because virtually all holders of retroactively priced options issued by the Company were not involved in or aware of the retroactive pricing, the Board of Directors decided that we should continue to honor the options that violated the terms of our stock option plans, except in certain individual cases as described below.

[emphasis added.]

67.     According to an 8-K filed by KLA-Tencor on July 25, 2007, the Company reached a settlement with the United States Securities and Exchange Commission ("SEC") "by consenting to the entry of a permanent injunction against future violations of the reporting, books and records, and internal controls provisions of the federal securities laws."

68.     On that same day the SEC announced that it had filed charges against defendant Schroeder concerning Schroeder's backdating of stock options during his employment with KLA-Tencor.

**False and Misleading SEC Filings**

69.     The Defendants disseminated false and misleading financial statements in, *inter alia*, the following "Form 10-K" filings:

a.     Form 10-K for fiscal year ended June 30, 1998, and filed with the SEC on September 28, 1998;

b.     Form 10-K/A for fiscal year ended June 30, 1998, and filed with the SEC on September 29, 1998;

21

1          c.       Form 10-K for fiscal year ended June 30, 1999, and filed with the SEC on

2    September 28, 1999;

3          d.       Form 10-K for fiscal year ended June 30, 2000, and filed with the SEC on

4    September 28, 2000;

5          e.       Form 10-K for fiscal year ended June 30, 2001, and filed with the SEC on

6    September 21, 2001;

7          f.       Form 10-K for fiscal year ended June 30, 2002, and filed with the SEC on

8    September 20, 2002;

9          g.       Form 10-K for fiscal year ended June 30, 2003, and filed with the SEC on

10    September 16, 2003;

11          h.       Form 10-K/A for fiscal year ended June 30, 2003, and filed with the SEC on

12    September 29, 2003;

13          i.       Form 10-K for fiscal year ended June 30, 2004, and filed with the SEC on

14    August 30, 2004; and

15          j.       Form 10-K for fiscal year ended June 30, 2005, and filed with the SEC on

16    September 2, 2005.

17          70.     The Company's 1998, 1999, 2000, 2001, 2002, 2003, 2004 and 2005 Form 10-Ks

18    were issued in violation of GAAP, and in particular Accounting Principles Board ("APB") Opinion

19    No. 25 ("APB 25"),  "Accounting for Stock Issued to Employees."  Pursuant to APB 25, if the

20    market price on the date of grant exceeds the exercise price of the options, the company must

21    recognize the difference as an expense.  Defendants' backdating practice resulted in understated

22    expenses on each Form 10-K because the difference between the market price and option exercise

23    price was not expensed by the Company.

24          71.     The Individual Defendants also caused and/or participated in issuing, filing and

25    disseminating the false and misleading information regarding Company issued options on the

26    Form(s) DEF 14A (the "Definitive Proxies") filed with the SEC on:

27          a.       October 6, 1997;

28          b.       September 28, 1998;

22

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES**
**CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

1          c.      October 15, 1999;

2          d.      October 6, 2000;

3          e.      September 28, 2001;

4          f.      September 20, 2002;

5          g.      September 23, 2003;

6          h.      September 9, 2004;

7          i.      October 13,  2005; and

8          j.      February 27, 2007.

9      72.    The Definitive Proxies were each false and misleading because they failed to correct prior information regarding the issuance of backdated stock options and caused the Class to approve the Individual Defendants' request to be appointed as directors of the Company based on that false and misleading information.

73.    Defendants' backdating of options grants also violated provisions of the Internal Revenue Code relating to deduction of option payments and thereby rendered the Company's financial statements in Form 10-K filings for the years 1998, 1999, 2000 and 2001, as well as interim Form 10-Qs, materially false and misleading.

## TOLLING OF THE STATUTE OF LIMITATIONS

74.    The Defendants concealed their violations of law until at least June 30, 2006, the date the Company issued its press release entitled "KLA-Tencor Provides Update on Special Committee Investigation." Further, it was not until September 14, 2006, that the investing public was informed that the Defendants would be unable to meet their financial reporting requirements as a result of backdating schemes.  Indeed, while the Defendants partially admitted to their violations of law in their September 27, 2006, 8-K filing with the SEC, outlined *infra*, when they admitted that they would be required to restate the earnings for certain accounting periods relevant to plaintiff's allegations herein, the full extent of their violations is not yet known.  It was not until October 16, 2007, that KLA-Tencor shareholders and the investing public were advised that the Company anticipated that "the total additional non-cash charges for stock-based compensation expenses will not exceed $400 million."

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES**
**CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

75.    As a result, the Individual Defendants have systematically and wrongfully concealed their manipulation of Company stock option plans, falsely asserting that the grants were being administered by a committee of independent directors, while in fact, as outlined herein, the Compensation Committee Defendants were colluding with other Individual Defendants to violate GAAP and Section 162(m).  Moreover, the Compensation Committee Defendants were colluding with the other Individual Defendants to make, *inter alia*, false and misleading filings with the SEC.

76.    Similarly, the Audit Committee Defendants were systematically and wrongfully concealing wrongdoings of each of the Individual Defendants by disseminating to KLA-Tencor shareholders and the market false financial statements that improperly recorded and accounted for backdated options grants in violation of GAAP and Section 162(m).

77.    At no time prior to June 30, 2006, did KLA-Tencor shareholders or any other member of the investing public have reason to know of Defendants' breaches of their fiduciary duties and violations of the Corporations Code.  Therefore, the Individual Defendants cannot rely on a statute of limitations defense as they have withheld from KLA-Tencor shareholders and the investing public the facts that give rise to the claims asserted herein.

## COUNT I

**(Against All Defendants)**
**Claim for Breach of Fiduciary Duty of Due Care and Loyalty**

78.    Plaintiff hereby realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

79.    Defendants have violated fiduciary duties owed to the shareholders of KLA-Tencor under Delaware and California law as they have acted unreasonably and/or put their personal interests ahead of the interests of plaintiff and other members of the Class.

80.    Rather than make proper disclosures concerning the true financial condition of KLA-Tencor, defendants either breached their duties, and/or aided and abetted such breach, to take the following actions:

a.    to act in the interests of all KLA-Tencor equity owners, including at the time of agreeing to a settlement;

24

SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES
CASE NO. C 08-2249 CRB
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

b.    to maximize shareholder value;

c.    to act in accordance with their fundamental duties of due care and loyalty and not to place their individual interests or other shareholders interests over the interests of plaintiff and the Class, nor to aid and abet such abject dereliction of duties.

81.    By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, failed to disclose KLA-Tencor's true financial condition or prospects to plaintiff or the Class and unfairly deprived plaintiff and other members of the Class of the ability to make an informed decision concerning whether they should: (i) continue holding their shares of KLA-Tencor stock during times relevant herein; (ii) allow the Evergreen Provision to go forward, adding to the restated 1982 Stock Option Plan, on July 1, 2003 and July 1, 2004, an amount of shares equal to 3% of KLA-Tencor's shares of common stock outstanding on June 30, 2002 and June 30, 2001, respectively; (iii) adopt of 2004 Equity Incentive Plan.

82.    By reason of the foregoing acts, practices and course of conduct, the defendants failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other Class members.

83.    As a result of the actions of defendants, plaintiff and the Class were damaged.

<u>**COUNT II**</u>

**(Against All Defendants)**
<u>**Claim for Breach of Duty of Candor and Full Disclosure**</u>

84.    Plaintiff repeats and realleges each allegation set forth herein.

85.    As fiduciaries of the KLA-Tencor shareholders, defendants owed all  KLA-Tencor shareholders the highest duty known to the law, a duty of complete candor, requiring them to fully disclose all material facts concerning the grant of stock options and related transactions which were voted upon by plaintiff and the Class shareholders.

86.    Defendants breached their duty of candor and full disclosure by failing to disclose material facts and misrepresenting matters as set forth above.  As a result of these misrepresentations and failures to disclose, plaintiff and the Class were deprived of the opportunity to cast their vote in an informed manner.

25

87.    As a result of defendants' breach of the duty of candor and full disclosure, KLA-Tencor's shareholders were damaged.

88.    By reason of the foregoing, plaintiff and each member of the Class is suffering irreparable injury and damages.

89.    By reason of the foregoing, the Individual Defendants have violated the fiduciary duties which each of them owes to plaintiff and the class.

90.    Plaintiff and other members of the class have no adequate remedy at law.

91.    Each of the defendants has colluded in and rendered substantial assistance in the accomplishment of the wrongdoing complained of herein.  In taking the actions, as particularized herein, to aid and abet and substantially assist the wrongs complained of, all defendants acted with an awareness of the primary wrongdoing and realized that their conduct would substantially assist the accomplishment of that wrongdoing and were aware of their overall contribution to the conspiracy, common scheme and course of wrongful conduct.

92.    Unless enjoined by this Court, defendants will continue to breach their fiduciary duties owed to plaintiff and the Class.

93.    Plaintiff and the other Class members are immediately threatened by the acts and transactions complained of herein, and lack an adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment and relief as follows:

1.    Ordering that this action may be maintained as a class action and certifying plaintiff as the Class representative;

2.    Declaring that defendants have breached and/or are aiding and abetting breaches of fiduciary and other duties to plaintiff and the other members of the Class;

3.    Awarding compensatory damages against defendants, jointly and severally, in an amount to be determined at trial, together with pre-judgment interest at the maximum rate allowable by law;

**SECOND AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES**
**CASE NO. C 08-2249 CRB**
Z:\STULL\KLA2\PLD\Second_Amended_Complaint.wpd

4.  Rescinding: (i) all stock added to the 1982 Stock Option Plan on July 1, 2003 and July 1, 2004, pursuant to the Evergreen Provision, and (ii) the 2004 Equity Incentive Plan, and cancelling the millions of shares added to the stock option plans.

5.  Preliminarily and permanently enjoining the defendants from granting any stock options and from allowing the exercise of any of the currently outstanding options granted under the stock option plans during the Class Period outlined herein;

6.  Awarding costs and disbursements, including plaintiff's counsel's fees and experts' fees; and

7.  Granting such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.


Dated: July 11, 2008

Patrice L. Bishop
STULL, STULL & BRODY


By:      /s/
Patrice L. Bishop
10940 Wilshire Boulevard
Suite 2300
Los Angeles, CA 90024
Tel:    (310) 209-2468
Fax:    (310) 209-2087

Jules Brody
Aaron L. Brody
STULL, STULL & BRODY
6 East 45th Street
New York, NY 10017
Tel:    (212) 687-7230
Fax:    (212) 490-2022

Counsel for Plaintiff

27