1  JOHN H. HEMANN (SBN: 165823)
   JOSEPH E. FLOREN (SBN 168292)
2  THOMAS R. GREEN (SBN: 203480))
   MATTHEW S. WEILER (SBN 236052)
3  MORGAN, LEWIS & BOCKIUS LLP
   One Market, Spear Street Tower
4  San Francisco, CA  94105-1126
   Tel:  415.442.1000
5  Fax:  415.442.1001
   E-mail:  jhemann@morganlewis.com
6          jfloren@morganlewis.com
           tgreen@morganlewis.com
7          mweiler@morganlewis.com

8

9  Attorneys for KLA-Tencor Corporation

10              UNITED STATES DISTRICT COURT

11           NORTHERN DISTRICT OF CALIFORNIA

12  CHRIS CRIMI, on Behalf of Himself and All      Case No. CV-08-2249 CRB
    Others Similarly Situated,
13                                                 **REQUEST FOR JUDICIAL**
                 Plaintiff,                        **NOTICE IN SUPPORT OF**
14                                                 **DEFENDANT KLA-TENCOR'S**
           vs.                                     **MOTION TO DISMISS;**
15                                                 **DECLARATION OF MATTHEW S.**
    EDWARD W. BARNHOLT, H. RAYMOND                 **WEILER**
16  BINGHAM, ROBERT T. BOND, RICHARD J.
    ELKUS, JR., STEPHEN P. KAUFMAN,                DATE:  September 13, 2008
17  KENNETH LEVY, MICHAEL E. MARKS,                TIME: 10 A.M.
    DEAN O. MORTON, KENNETH L.                     DEP'T: Courtroom 8
18  SCHROEDER, JON D. TOMPKINS,
    RICHARD P. WALLACE, KLA-TENCOR                 Hon. Charles R. Breyer
19  CORPORATION, and DOES 1 through 25,

20                 Defendants.

21

22

23

24

25

26

27

28

1-SF/7701082.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**REQUEST FOR JUDICIAL NOTICE**

In accordance with Federal Rule of Evidence 201, defendant KLA-Tencor Corporation ("KLA") respectfully request that this Court take judicial notice of each of the following exhibits accompanying this Request for Judicial Notice.

Federal Rule of Evidence 201 allows a court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Public filings, such as filings made with the U.S. Securities and Exchange Commission (the "SEC"), are the proper subject of judicial notice. *See, e.g., In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003) (court may take judicial notice of documents filed with the SEC); *Yuen v. U.S. Stock Transfer Co.*, 966 F. Supp. 944, 945 n.1 (C.D. Cal. 1997) (court may take judicial notice of the contents of SEC filings). Accordingly, the contents of Forms 10-K and Forms 14A Definitive Proxy Statements, cited in Plaintiff's FAC, are thereby incorporated by reference, and can be considered for purposes of this motion to dismiss. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) ("[C]onsideration [of other portions of a document referenced in a complaint] is appropriate in the context of a motion to dismiss, and does not cover the motion into one for summary judgment"); *In re Computer Sciences Corp. Derivative Litig.*, 244 F.R.D. 580, 587 n.8 (C.D. Cal. 2007) ("The Court therefore takes judicial notice of [Forms 14-A Definitie Proxy Statements] under Federal Rule of Evidence 201, as they are: 1) public records filed with the SEC; 2) documents whose contents are alleged in Plaintiffs' Complaint; or 3) documents that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."). Thus, the Court can take judicial notice of the 1998 and 2004 Definitive Proxy Statements attached hereto.

1    DATED:  August 8, 2008                      MORGAN LEWIS & BOCKIUS, LLP

2

3                                                By:_____/s/_____

4                                                        Matthew S. Weiler

5
                                                 *Attorneys for Defendant KLA-Tencor Corporation*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-SF/7701082.1                                   3

REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF MATTHEW S. WEILER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF MATTHEW S. WEILER

I, Matthew S. Weiler, declare as follows:

1.    I am an attorney at law, licensed to practice before the courts of the State of California and before this Court.  I am an associate of the law firm Morgan, Lewis & Bockius LLP, attorneys of record for defendant KLA-Tencor Corporation.  I am making this declaration in support of Defendant KLA-Tencor Corporation's Motion to Dismiss.  I know the following to be true of my own personal knowledge and if called as a witness could and would testify competently thereto.

6.    Attached hereto as **Exhibit 1** is a true and correct copy of a Definitive Proxy Statement filed on behalf of KLA with the SEC on or about September 28, 1998.

7.    Attached hereto as **Exhibit 2** is a true and correct copy of a Definitive Proxy Statement filed on behalf of KLA with the SEC on or about September 9, 2004.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on August 8, 2008, in San Francisco, California.

By    _____/s/_____
                    Matthew S. Weiler

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7701082.1

4

REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF MATTHEW S. WEILER

1

## PROOF OF SERVICE BY ELECTRONIC TRANSMISSION

2

### *Chris Crimi, et al. v. Edward W. Barnholt, et al.*
### Northern District of California Case No. 08-2249 CRB

3

4

   I, the undersigned, declare:  that I am, and was at the time of service of the documents

5

herein referred to, over the age of 18 years, and not a party to the action; and I am employed in
the County of San Francisco, California.  My business address is One Market, Spear Street

6

Tower, San Francisco, California 94105.

7

   On the date executed below, I electronically served the document(s) via the Santa Clara
Superior Court's electronic filing system described as:

8

9

   **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT KLA-
   TENCOR'S MOTION TO DISMISS; DECLARATION OF MATTHEW S. WEILER**

10

on the recipients designated on the Transaction Receipt located on the Santa Clara County

11

Superior Court's electronic filing website.  I declare under penalty of perjury pursuant to the laws
of the State of California that the foregoing is true and correct and was executed August 8, 2008.

12

13

14
/s/
_____
Laura Walker

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW SAN
FRANCISCO

1-SF/7701082.1                                    5

REQUEST FOR JUDICIAL NOTICE AND DECLARATION OF MATTHEW S. WEILER

# EXHIBIT 1

1

PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE SECURITIES EXCHANGE ACT
OF 1934 (Amendment No.)

Filed by the Registrant (X)

Filed by a Party other than the Registrant ( )

Check the appropriate box:

[ ]  Preliminary Proxy Statement

[ ]  Confidential, for Use of the Commission Only (as permitted by
     Rule 14a-6(e)(2))

[X[  Definitive Proxy Statement

( )  Definitive Additional Materials

( )  Soliciting Material Pursuant to Section 240.14a-11(c) or Section 240.14a-12

                        KLA-TENCOR CORPORATION

        --------------------------------------------------------
                 (Name of Registrant as Specified In Its Charter)

        --------------------------------------------------------
        (Name of Person(s) Filing Proxy Statement if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

[X] No fee required.

( ) Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11.

    1) Title of each class of securities to which transaction applies:

       ----------------------------------------------------------------
    2) Aggregate number of securities to which transaction applies:

       ----------------------------------------------------------------
    3) Per unit price or other underlying value of transaction computed
    pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee
    is calculated and state how it was determined):

       ----------------------------------------------------------------
    4) Proposed maximum aggregate value of transaction:

       ----------------------------------------------------------------
    5) Total fee paid:

       ----------------------------------------------------------------

( [ Fee previously paid.

( ) Check box if any part of the fee is offset as provided by Exchange Act
    Rule 0-11(a)(2) and identify the filing for which the offsetting fee was
    paid previously. Identify the previous filing by registration statement
    number, or the Form or Schedule and the date of its filing.

    1)  Amount Previously Paid:

        ---------------------------------------------------------------
    2)  Form, Schedule or Registration Statement No.:

        ---------------------------------------------------------------
    3)  Filing Party:

        ---------------------------------------------------------------
    4)  Date Filed:

        ---------------------------------------------------------------

2

KLA-TENCOR CORPORATION
NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
NOVEMBER 17, 1998

To the Stockholders:

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders of
KLA-Tencor Corporation (the "Company"), a Delaware corporation, will be held on
Tuesday, November 17, 1998 at 11:00 a.m., local time, at the Company's offices
located at One Technology Drive, Milpitas, California 95035, for the following
purposes:

1. To elect four Class III directors to serve for a three year term
and until their successors are elected.

2. To approve amendments to the 1997 Employee Stock Purchase Plan (the
"1997 Purchase Plan") to increase the number of shares of Common Stock of
the Company (the "Common Stock") reserved for issuance thereunder by
1,000,000 shares.

3. To approve amendments to the 1997 Purchase Plan to increase the
number of shares of Common Stock reserved for issuance thereunder on the
first day of each subsequent fiscal year by the lesser of (a) 2,000,000
shares or (b) the number of shares which the Company estimates (based on
the previous 12-month period) it will be required to issue under the 1997
Purchase Plan during the forthcoming fiscal year.

4. To approve the 1998 Outside Director Option Plan and to reserve for
issuance thereunder 1,000,000 shares of the Common Stock.

5. To ratify the appointment of PricewaterhouseCoopers LLP as
independent accountants of the Company for the fiscal year ending June 30,
1999.

6. To transact such other business as may properly come before the
meeting and any adjournments thereof.

The foregoing items of business are more fully described in the Proxy
Statement accompanying this Notice.

Only stockholders of record at the close of business on September 18, 1998
are entitled to notice of and to vote at the meeting.

Sincerely,

Larry W. Sonsini
Secretary

San Jose, California
September 30, 1998

YOUR VOTE IS IMPORTANT

ALL STOCKHOLDERS ARE CORDIALLY INVITED TO ATTEND THE MEETING IN PERSON,
HOWEVER, TO ASSURE YOUR REPRESENTATION AT THE MEETING, YOU ARE REQUESTED TO
COMPLETE, SIGN AND DATE THE ENCLOSED PROXY CARD AS PROMPTLY AS POSSIBLE AND
RETURN IT IN THE ENCLOSED ENVELOPE. ANY STOCKHOLDER ATTENDING THE MEETING MAY
VOTE IN PERSON EVEN IF HE OR SHE RETURNED A PROXY.

3

## KLA-TENCOR CORPORATION
--------------------------

### PROXY STATEMENT

### INFORMATION CONCERNING SOLICITATION AND VOTING

**GENERAL**

The enclosed Proxy is solicited on behalf of KLA-Tencor Corporation (the "Company") for use at the Annual Meeting of Stockholders to be held on Tuesday, November 17, 1998 at 11:00 a.m., local time, or at any adjournment(s) thereof (the "Annual Meeting"), for the purposes set forth herein and in the accompanying Notice of Annual Meeting of Stockholders. The Annual Meeting will be held at the Company's offices at One Technology Drive, Milpitas, California 95035. The Company's principal executive offices are located at 160 Rio Robles, San Jose, California 95134 and its telephone number is (408) 875-4200.

These proxy solicitation materials were mailed on or about September 30, 1998 to all stockholders entitled to vote.

**RECORD DATE**

Stockholders of record at the close of business on September 18, 1998 are entitled to notice of and to vote at the Annual Meeting. As of the record date 87,321,556 shares of the Company's Common Stock, $0.001 par value, were issued and outstanding.

**REVOCABILITY OF PROXIES**

Any Proxy given pursuant to this solicitation may be revoked by the person giving it at any time before its use by delivering to the Company a written notice of revocation or a duly executed proxy bearing a later date or by attending the meeting and voting in person.

**QUORUM; ABSTENTIONS; BROKER NON-VOTES**

The required quorum for the transaction of business at the Annual Meeting is a majority of the votes eligible to be cast by holders of shares of Common Stock issued and outstanding on the record date. Shares that are voted "FOR," "AGAINST," "ABSTAIN" or "WITHHELD FROM" a matter are treated as being present at the Annual Meeting for purposes of establishing a quorum and are also treated as shares entitled to vote at the Annual Meeting (the "Votes Cast") with respect to such matter.

Abstentions will be counted for purposes of determining both (i) the presence or absence of a quorum for the transaction of business and (ii) the total number of Votes Cast with respect to a proposal (other than the election of directors). Accordingly, abstentions will have the same effect as a vote against the proposal.

Broker non-votes will be counted for purposes of determining the presence or absence of a quorum for the transaction of business, but will not be counted for purposes of determining the number of Votes Cast with respect to the particular proposal on which the broker has expressly not voted. Accordingly, broker non-votes will not affect the outcome of the voting on a proposal that requires a majority of the Votes Cast (such as the approval of a plan).

**VOTING AND SOLICITATION**

On all matters other than the election of directors, each share has one vote. See "PROPOSAL ONE -- REQUIRED VOTE."

The cost of soliciting proxies will be borne by the Company. The Company has retained the services of Skinner & Co. to aid in the solicitation of proxies from brokers, bank nominees and other institutional owners. The Company estimates that it will pay Skinner & Co. a fee not to exceed $5,000 for its services and will reimburse it for certain out of pocket expenses estimated to be $45,000. In addition, the Company may

4

reimburse brokerage firms and other persons representing beneficial owners of shares for their expenses in forwarding solicitation material to such beneficial owners. Proxies may be solicited by certain of the Company's directors, officers and regular employees, without additional compensation, personally or by telephone or telegram.

DEADLINE FOR RECEIPT OF STOCKHOLDER PROPOSALS

Proposals of stockholders of the Company which are intended to be presented by such stockholders at the Company's annual meeting in 1999 must be received by the Company no later than June 2, 1999 and otherwise be in compliance with applicable laws and regulations in order for such proposals to be considered for possible inclusion may be included in the Company's proxy statement and form of proxy relating to that meeting.

The attached proxy card grants the proxy holders discretionary authority to vote on any matter raised at the Annual Meeting. If a stockholder intends to submit a proposal at the Company's annual meeting in 1999, which proposal is not intended to be included in the Company's proxy statement and form of proxy relating to that meeting, the stockholder should give appropriate notice no later than August 16, 1999. If such a stockholder fails to submit the proposal by such date the Company will not be required to provide any information about the nature of the proposal in its proxy statement and the proxy holders will be allowed to use their discretionary voting authority if the proposal is raised at the Company's annual meeting in 1999.

SECURITY OWNERSHIP

PRINCIPAL STOCKHOLDERS

As of June 30, 1998, the following persons were known to the Company to be beneficial owners of more than 5% of the Company's Common Stock:

| NAME AND ADDRESS | NUMBER OF SHARES OWNED | PERCENTAGE TOTAL(1) |
|---|---|---|
| Capital Guardian Trust Co.(2)....................... 333 South Hope Street Los Angeles, CA 90071 | 7,726,700 | 8.8% |
| Jennison Associates Capital Corp.(3)............... 466 Lexington Ave New York, NY 10017 | 5,485,500 | 6.3% |
| FMR Corp.(4)........................................... 82 Devonshire Street Boston, MA 02109 Neuberger & Berman, LLC; | 6,347,503 | 7.3% |
| Neuberger & Berman Management Incorporated(5)....... 605 Third Ave., New York, NY 10158-3698 | 6,411,113 | 7.3% |
| The Prudential Insurance Company of America(6)...... Prudential Plaza Newark, NJ 07102 | 5,685,552 | 6.5% |

----------------

(1) Based on 87,443,592 outstanding shares of Common Stock as of June 30, 1998.

(2) Based on information provided pursuant to Schedule 13G filed with the Securities and Exchange Commission (the "SEC") on July 9, 1998. This share amount includes 1,037,100 shares held by Capital International Limited; 805,400 shares held by Capital International S.A. and 112,100 shares held by Capital International, Inc., affiliated entities of Capital Guardian Trust Co. (the "Reporting Entity"). Previously, The Capital Group Companies, Inc., the parent holding company of the Reporting Entity and its listed affiliated entities, reported the beneficial ownership of all of such shares. On July 9, 1998 it filed a Schedule 13G indicating that it retained no beneficial ownership of shares held by its independent investment management affiliates.

2

5

(3) Based on information provided pursuant to Schedule 13G/A filed with the SEC on February 12, 1998. Jennison Associates Capital Corp. ("Jennison") is an institutional investor and is considered the beneficial owner only as a result of its position as manager of the funds which own the shares of Common Stock of the Company. Jennison is an autonomous, wholly-owned subsidiary of The Prudential Insurance Company of America ("Prudential"). As such, the shares of Common Stock reported by Jennison are also included in the shares of Common Stock reported by Prudential in its reporting obligations with the SEC. (See Note 6 below.)

(4) Based on information provided pursuant to Schedule 13G filed with the SEC on February 10, 1998. FMR Corp. is a parent holding company and includes shares held by Fidelity Management & Research Company, Fidelity Management Trust Company and Fidelity International Limited.

(5) Based on information provided pursuant to Schedule 13G filed with the SEC on February 12, 1998. This number includes 4,373,850 shares held by Neuberger & Berman's various mutual funds, for which Neuberger & Berman LLC and Neuberger & Berman Management Inc. serve as sub-advisor and investment manager, respectively.

(6) Based on information provided pursuant to Schedule 13G/A filed with the SEC on February 9, 1998. Prudential presently holds 22,400 shares of Common Stock of the Company for the benefit of its general account. In addition, Prudential may have direct or indirect voting and/or investment discretion over 5,663,152 shares, including 5,485,500 shares held by Jennison, a wholly-owned subsidiary of Prudential (see Note 3 above).

SECURITY OWNERSHIP OF MANAGEMENT

The following table sets forth the beneficial ownership of Common Stock of the Company as of September 18, 1998 (the most recent practicable date) by all directors and nominees (naming them), each of the named executive officers set forth in the Summary Compensation Table and by all directors and current executive officers as a group:

| NAME | AMOUNT OWNED | APPROXIMATE PERCENTAGE OWNED* |
|------|--------------|------------------------------|
| Kenneth Levy(1) | 1,874,170 | 2.15% |
| Jon D. Tompkins(2) | 160,869 | ** |
| Kenneth L. Schroeder(3) | 449,729 | ** |
| James W. Bagley(4) | 20,051 | ** |
| Edward W. Barnholt(5) | 5,213 | ** |
| Leo J. Chamberlain(6) | 27,067 | ** |
| Richard J. Elkus, Jr.(7) | 75,937 | ** |
| Dean O. Morton(8) | 15,051 | ** |
| Yoshio Nishi(9) | 32,956 | ** |
| Samuel Rubinovitz(10) | 13,623 | ** |
| Dag Tellefsen(11) | 14,206 | ** |
| Lida Urbanek(12) | 818,679 | ** |
| Robert J. Boehlke(13) | 102,526 | ** |
| Gary E. Dickerson(14) | 95,190 | ** |
| Graham J. Siddall(15) | 204,384 | ** |
| All directors and executive officers as a group (22 persons)(16) | 4,354,172 | 4.99% |

---------------

* Based on 87,321,556 outstanding shares of the Common Stock of the Company as of September 18, 1998.

** Less than 1%

3

6

(1) Includes 353,093 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998 and 231,000 shares which are held in trust for the benefit of Mr. Levy's children.

(2) Includes 145,072 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(3) Includes 325,093 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(4) Includes 20,051 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(5) Includes 5,213 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(6) Includes 5,070 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(7) Includes 937 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(8) Includes 10,051 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(9) Includes 32,956 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(10) Includes 9,623 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(11) Includes 13,107 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(12) Includes 3,560 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998 and 151,500 shares which are held by Mrs. Urbanek's children.

(11) Includes 98,829 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(14) Includes 92,688 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(15) Includes 173,966 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

(16) Includes 1,715,860 shares, options for which are presently exercisable or will become exercisable within 60 days of September 18, 1998.

PROPOSAL ONE

TO ELECT FOUR CLASS III DIRECTORS TO SERVE FOR A
THREE YEAR TERM AND UNTIL THEIR SUCCESSORS ARE ELECTED.

NOMINEES

The Company has a classified board of twelve directors consisting of four Class I directors (Kenneth Levy, Samuel Rubinovitz, Jon D. Tompkins and Lida Urbanek), three Class II directors (Leo J. Chamberlain, Richard J. Elkus, Jr. and Dag Tellefsen) and five Class III directors (James W. Bagley, Edward W. Barnholt, Dean O. Morton, Yoshio Nishi and Kenneth L. Schroeder). The Class I directors and the Class II directors will serve until the annual meetings of stockholders to be held in 1999 and 2000 respectively, or until their respective successors are duly elected and qualified. At each annual meeting of stockholders, directors are elected for a full term of three years to succeed those directors whose terms expire at the annual meeting.

4

7

The terms of the Class III directors will expire on the date of the Annual Meeting. Yoshio Nishi has declined to stand for re-election. Accordingly, four of the five Class III directors of the Board of Directors are to be elected at the Annual Meeting. The nominees for election by the stockholders to these four positions are James W. Bagley, Edward W. Barnholt, Dean O. Morton and Kenneth L. Schroeder. If elected, the nominees will serve as directors until the Company's annual meeting of stockholders in 2001, or until their successors are elected and qualified. If any of the nominees declines to serve or becomes unavailable for any reason, or if a vacancy occurs before the election, the proxies may be voted for such substitute nominees as management may designate. The proxy holders also have been advised that, in the event any of the nominees shall not be available for election, a circumstance that is not currently expected, they may vote for the election of substitute nominees in accordance with their judgment. If additional persons are nominated for election as directors, the proxy holders intend to vote all proxies received by them in such a manner in accordance with cumulative voting (if invoked) as will assure the election of as many of the nominees as possible and, in such event, the specific nominees to be voted for will be determined by the proxy holders.

If a quorum is present and voting, the four nominees for Class III directors receiving the highest number of votes will be elected as Class III directors. Abstentions and shares held by brokers that are not present, but not voted because the brokers were prohibited from exercising discretionary authority, i.e., "broker non-votes," will be counted as present in determining if a quorum is present.

The following table sets forth certain information with respect to the Company's Board of Directors.

| NAME OF DIRECTOR | AGE | POSITION | DIRECTOR SINCE |
| --- | --- | --- | --- |
| Jon D. Tompkins | 58 | Chairman of the Board | 1997 |
| Kenneth Levy | 55 | Chief Executive Officer | 1975 |
| Kenneth L. Schroeder | 52 | President and Chief Operating Officer | 1991 |
| James W. Bagley | 59 | Director | 1997 |
| Edward W. Barnholt | 55 | Director | 1995 |
| Leo J. Chamberlain | 68 | Director | 1982 |
| Richard J. Elkus, Jr. | 63 | Director | 1997 |
| Dean O. Morton | 66 | Director | 1997 |
| Yoshio Nishi | 58 | Director | 1989 |
| Samuel Rubinovitz | 68 | Director | 1990 |
| Gag Tellefsen | 56 | Director | 1978 |
| Lida Urbanek | 55 | Director | 1997 |

There are no family relationships between or among any directors or executive officers of the Company.

JON D. TOMPKINS has been Chairman of the Board since July 1, 1998. From April 30, 1997 until July 1, 1998 he was Chief Executive Officer and a Director of the Company. From 1991 until April 30, 1997 he was President and Chief Executive Officer of Tencor Instruments, a manufacturer of wafer inspection, film measurement and metrology systems for the semiconductor industry ("Tencor") prior to its merger with the Company. He was a director of Tencor from 1991 until April 1997 and was appointed chairman of the board of directors of Tencor in November 1993. He currently serves on the boards of directors of Varian Corporation and ESI Incorporated as well as chairman of the board of SEMI/SEMATECH, a private research and development consortium of U.S. semiconductor equipment and materials companies.

KENNETH LEVY is a founder of the Company and since July 1, 1998 has been Chief Executive Officer and a Director. From 1975 until April 30, 1997 he was Chairman of the Board and Chief Executive Officer. From April 30, 1997 until June 30, 1998 he was Chairman of the Board. He currently serves on the boards of directors of Ultratech Stepper, Inc. and Integrated Process Equipment Corporation.

KENNETH L. SCHROEDER has been President, Chief Operating Officer and Director of the Company since November 1991. He currently serves on the board of directors of GaSonics International.

5

8

JAMES W. BAGLEY has been a Director of the Company since April 30, 1997. He was a director of Tencor from June 1993 until April 30, 1997. He has been chief executive officer and a director of Lam Research Corporation, a manufacturer of semiconductor processing equipment, since August 1997. From May 1996 until August 1997 he was chairman of the board and chief executive officer of OnTrak Systems, Inc. until its merger with Lam Research Corporation in August 1997. From December 1987 until December 1993, Mr. Bagley was president and chief operating officer for Applied Materials, Inc., a manufacturer of wafer fabrication systems to the semiconductor industry. From January 1994 until October 1995 he was vice chairman and chief operating officer of Applied Materials, Inc., and vice chairman from November 1995 until May 1996. Mr. Bagley currently serves on the boards of directors of Teradyne, Inc., Kulicke & Soffa Industries, Inc., Micron Technology, Inc., and SEMI/SEMATECH.

EDWARD W. BARNHOLT has been a Director of the Company since 1995. Mr. Barnholt joined Hewlett-Packard Company, a manufacturer of electronic and computer equipment in December 1966. From 1988 to 1990 he was general manager of the Electronics Instruments Group of Hewlett-Packard Company. In July 1988, he was elected vice president and in November 1993 he was elected senior vice president of Hewlett-Packard Company. Mr. Barnholt is currently executive vice president and general manager of the Test and Measurement Organization of Hewlett Packard Company.

LEO J. CHAMBERLAIN has been a Director of the Company since 1982. He is a private investor.

RICHARD J. ELKUS, JR. has been a Director of the Company since April 30, 1997. He was executive vice president and vice chairman of the board of directors of Tencor from February 1994 until April 30, 1997. Previously, he was with Prometrix Corporation from September 1983 until February 1994 where he held the positions of chairman and chief executive officer until its merger with Tencor in February 1994. He currently serves on the boards of directors of Voyan Technology and Lam Research Corporation.

DEAN O. MORTON has been a Director of the Company since April 30, 1997. From June 1993 until April 30, 1997 he was a director of Tencor. In October 1992 Mr. Morton retired as executive vice president, chief operating officer and a director of Hewlett-Packard Company, where he held various positions from 1960 until his retirement. Mr. Morton currently serves as chairman of the board of Centigram Communications Corporation and as a director of ALZA Corporation, The Clorox Company, BEA Systems Inc. and Raychem Corporation. Mr. Morton is also a trustee of the Metropolitan Series Fund and State Street Research Funds Group and Portfolios Inc.

YOSHIO NISHI has been a Director of the Company since 1989. Since May 1995 he has been director of research and development and senior vice president of the Semiconductor Group of Texas Instruments Incorporated, a manufacturer of integrated circuits and electronic equipment. From January 1986 to April 1995 he was director of the Silicon Process Laboratory for Hewlett-Packard Laboratories, a semiconductor technology research facility affiliated with Hewlett-Packard Company.

SAMUEL RUBINOVITZ has been a Director of the Company since 1990. He previously served as a Director of the Company from October 1979 to January 1989. From April 1989 to January 1994 he was executive vice president of EG&G, Inc., a diversified manufacturer of scientific instruments and electronic, optical and mechanical equipment. He currently serves on the boards of directors of Richardson Electronics, Inc., LTK Corporation and Kronos, Inc.

DAG TELLEFSEN has been a Director of the Company since 1978. He is the general partner of the Investment Manager of Glenwood Ventures I and II, venture capital funds. He currently serves on the boards of directors of Iwerks Entertainment Corporation, Aptix, Metorex International and Aeneid.

LIDA URBANEK has been a Director of the Company since April 30, 1997. She is a private investor. She was a director of Tencor from August 1991 until April 30, 1997.

6

9

BOARD MEETINGS AND COMMITTEES

The Board of Directors of the Company held a total of five meetings during the fiscal year ended June 30, 1998. The Board of Directors has an Audit Committee, a Compensation Committee and a Nominating Committee.

The Audit Committee, which consists of Mr. Morton, Mr. Rubinovitz and Mr. Tellefsen, held three meetings during the last fiscal year. The Audit Committee recommends engagement of the Company's independent accountants, and is primarily responsible for approving the services performed by the Company's independent accountants and for reviewing and evaluating the Company's accounting principles and its system of internal accounting controls. The Compensation Committee, which consists of Mr. Bagley, Mr. Chamberlain and Mrs. Urbanek, held three meetings during the last fiscal year. The Compensation Committee reviews and approves the Company's executive compensation policy and makes recommendations concerning the Company's employee benefit plans. The Nominating Committee, which consists of Mr. Barnholt, Mr. Levy and Mr. Tompkins did not hold a meeting during the last fiscal year. A unanimous group of the disinterested members of the board of directors nominated the four Class III directors for election, with Mr. Nishi declining to stand for reelection. The Nominating Committee is primarily responsible for identifying and evaluating the qualifications of all candidates for election to the Board of Directors. The Nominating Committee will consider nominations recommended by stockholders. Stockholders wishing to submit nominations must notify the Company of their intent to do so and provide the Company with certain information set forth in the Company's bylaws on or before the date on which stockholder proposals to be included in the proxy statement for the stockholder meeting must be received by the Company.

During the fiscal year ended June 30, 1998, all incumbent Directors attended at least 75% of the aggregate number of meetings of the Board of Directors and meetings of the committees of the Board on which they served.

COMPENSATION OF DIRECTORS

Members of the Board of Directors who are not employees of the Company receive an annual fee of $15,000 and $1,000 for each meeting they attend ($500 if participation is by telephone), plus expenses. Committee members receive $500 per committee meeting they attend ($250 if participation is by telephone). The Company's Outside Directors Stock Option Plan (the "Director Plan") as adopted by the Board of Directors and approved by the stockholders, provides for the grant of an option to purchase 2,500 shares of Common Stock of the Company to each of the Company's non-employee directors on the date on which such person is elected a director. Thereafter, each non-employee director is automatically granted an option to purchase 2,500 shares of Common Stock of the Company on the anniversary of such date. The Director Plan provides that the exercise price shall be equal to the fair market value of the Common Stock on the date of grant of the option. Options granted pursuant to the Director Plan have a term of ten years with 25% vesting after 12 months and the remainder vesting monthly over the following 36 months, but only while the optionee is a director of the Company, within six months after death or within 30 days after the optionee ceases to serve as a director of the Company. The Company plans to terminate the Director Plan if the stockholders approve Proposal Four hereunder.

If the stockholders approve Proposal Four hereunder, the non-employee Directors shall receive benefits under the 1998 Outside Director Plan ("1998 Director Plan") and no additional options will be granted under the Director Plan and it will be terminated. Under the 1998 Director Plan, each non-employee Director ("Outside Director") shall receive a nonstatutory option to purchase 10,000 shares of Common Stock as of the date on which such director first becomes an Outside Director (the "First Option"). Accordingly, none of the existing directors will be granted a First Option. In addition, each Outside Director shall automatically be granted a nonstatutory option to purchase an additional 5,000 shares of Common Stock on the date of the subsequent annual meetings on which he or she remains an Outside Director (the "Subsequent Option"). The term of options granted under the 1998 Director Plan may not exceed 10 years. The 1998 Director Plan provides that the exercise price shall be equal to the fair market value of the Common Stock on the date of

7

10

grant of the option. Options granted under the 1998 Director Plan shall become exercisable immediately upon the date of grant.

REQUIRED VOTE

Directors shall be elected by a plurality of the votes of the shares of the Company's Common Stock entitled to vote and represented in person or by proxy at the Annual Meeting. Votes against, votes withheld and broker non-votes have no legal effect on the election of directors due to the fact that such elections are by a plurality. Every stockholder voting for the election of directors may cumulate such stockholder's votes and give one candidate a number of votes equal to the number of directors to be elected multiplied by the number of votes to which the stockholder's shares are entitled, or may distribute the stockholder's votes on the same principle among as many candidates as the stockholder thinks fit, provided that votes cannot be cast for more than the number of directors to be elected. However, no stockholder shall be entitled to cumulate votes unless the candidate's name has been placed in nomination prior to the voting and the stockholder, or any other stockholder, has given notice at the Annual Meeting prior to the voting of the intention to cumulate the stockholder's votes. The proxy holders will exercise discretionary authority to cumulate votes in the event that additional persons are nominated at the Annual Meeting for election of directors.

MANAGEMENT RECOMMENDS A VOTE FOR EACH OF THE CLASS III
NOMINEES LISTED ABOVE.

PROPOSAL TWO

APPROVAL OF AMENDMENT TO THE 1997 EMPLOYEE STOCK PURCHASE PLAN TO INCREASE THE NUMBER OF SHARES OF COMMON STOCK RESERVED FOR ISSUANCE THEREUNDER BY 1,000,000 SHARES.

GENERAL

As of the date hereof 200,000 shares of the Company's Common Stock have been reserved for issuance under the Company's 1997 Employee Stock Purchase Plan (the "1997 Purchase Plan"). In August 1998, the Board of Directors adopted an amendment to the 1997 Purchase Plan, subject to stockholder approval, to increase the number of shares reserved for issuance thereunder by 1,000,000 shares in fiscal 1999, to a total of 1,200,000 reserved shares. As of June 30, 1998, 195,598 shares of Common Stock had been issued under the 1997 Purchase Plan at an average price of $23.5344 per share and 4,402 shares remained available for purchase.

The 1997 Purchase Plan was adopted in 1997 and stockholder approval was obtained at the 1997 annual meeting of stockholders with the intention of phasing out the Company's 1981 Employee Stock Purchase Plan (the "1981 Purchase Plan") over the two year period ending June 30, 1999. The Company estimates that it will utilize the remaining available shares under the 1997 Purchase Plan leaving an insufficient number of shares for issuance in the exercise periods throughout the phase out of the 1981 Purchase Plan in fiscal 1999.

The Board of Directors believes that it is in the best interests of the Company to provide employees with an opportunity to purchase Common Stock of the Company through payroll deductions. In addition, the Board of Directors believes that the shares remaining available for issuance pursuant to the 1997 Purchase Plan are insufficient for such purpose. Accordingly, at the Annual Meeting, the stockholders are being requested to consider and to approve an amendment of the 1997 Purchase Plan to increase the number of shares reserved for issuance thereunder by 1,000,000 shares which the Company believes is a sufficient number of shares to allow the Company to continue to phase out the 1981 Purchase Plan through the next fiscal year.

11

The description of the 1997 Purchase Plan that follows Proposal Three is incorporated herein by this reference.

THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR APPROVAL OF THE AMENDMENT TO THE 1997 EMPLOYEE STOCK PURCHASE PLAN TO INCREASE THE NUMBER OF SHARES RESERVED FOR ISSUANCE THEREUNDER BY 1,000,000 SHARES.

PROPOSAL THREE

APPROVAL OF AMENDMENTS TO THE 1997 PURCHASE PLAN TO PROVIDE FOR AN AUTOMATIC INCREASE TO THE SHARES FOR ISSUANCE THEREUNDER ON THE FIRST DAY OF EACH NEW FISCAL YEAR

GENERAL

As of the date hereof 200,000 shares of the Company's Common Stock have been reserved for issuance under the 1997 Purchase Plan. In August 1998, in addition to the amendment described in Proposal Two above, the Board of Directors adopted an amendment to the 1997 Purchase Plan, subject to stockholder approval, to increase the number of shares reserved for issuance thereunder on the first day of each subsequent fiscal year (beginning on July 1, 1999) by the lesser of (a) 2,000,000 shares or (b) the number of shares which the Company estimates (based on the previous 12-month period) it will be required to issue under the 1997 Purchase Plan during the forthcoming fiscal year. As of June 30, 1998, 195,598 shares of Common Stock had been issued under the 1997 Purchase Plan at an average price of $23.5344 per share and 4,402 shares remained available for purchase.

The Company sought stockholder approval of the 1997 Purchase Plan at the 1997 annual meeting of stockholders with the intention of phasing out the Company's 1981 Purchase Plan over the two year period ending June 30, 1999. Following the phase out of the 1981 Purchase Plan, the 1997 Purchase Plan will need additional shares to replace the shares issued thereunder.

As described in Proposal Two above, the Company will have phased out the 1982 Purchase Plan by June 30, 1999. Thereafter, the 1997 Purchase Plan will be the Company's sole employee stock purchase plan. The Board of Directors believes that it is in the best interests to provide employees with an opportunity to purchase Common Stock of the Company through payroll deductions. The Board believes that the 1,000,000 shares of Common Stock being added to the 1997 Purchase Plan pursuant to Proposal Two will be sufficient to cover the requirements of this plan through June 30, 1999. To simplify the administration of the 1997 Purchase Plan thereafter, the Board has approved the proposed amendment which provides for automatic periodic additions of a specified number of shares of Common Stock to the plan without the need for additional stockholder approval. This amendment is intended to ensure that the 1997 Purchase Plan will continue to have a reasonable number of shares available to meet its requirements for the remainder of its term.

The description of the 1997 Purchase Plan that follows Proposal Three is incorporated herein by this reference.

REQUIRED VOTE -- PROPOSALS TWO AND THREE

The affirmative vote of a majority of the Votes Cast will be required to approve the amendments to the 1997 Purchase Plan.

THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR APPROVAL OF THE AMENDMENTS TO THE 1997 PURCHASE PLAN TO PROVIDE FOR AN AUTOMATIC INCREASE TO THE SHARES RESERVED FOR ISSUANCE THEREUNDER ON THE FIRST DAY OF EACH NEW FISCAL YEAR.

9

12

SUMMARY OF THE 1997 PURCHASE PLAN, AS AMENDED

The essential features of the 1997 Purchase Plan, as amended, are outlined below; provided however, that the following summary is qualified in its entirety by the specific language of the 1997 Purchase Plan, as amended, a copy of which is available at no charge to any stockholder upon request.

Purpose

The purpose of the 1997 Purchase Plan is to provide employees of the Company and its foreign subsidiaries designated by the Board of Directors of the Company with an opportunity to purchase Common Stock of the Company through payroll deductions.

Administration

The 1997 Purchase Plan is administered by the Board of Directors or a committee appointed by the Board of Directors. The Board of Directors has the discretion to delegate routine matters to management. All questions of interpretation or application of the 1997 Purchase Plan are determined in the sole discretion of the Board of Directors, and its decisions are final and binding upon all participants. The Board of Directors may determine, in its sole discretion, the requirements and conditions of participation, if any, by employees of foreign subsidiaries. In the event that the Board of Directors determines that the ongoing operation of the 1997 Purchase Plan may result in unfavorable financial accounting consequences, the Board of Directors may in any manner it determines, in its sole discretion, and, to the extent necessary or desirable, modify or amend the 1997 Purchase Plan, including, but not limited to altering the purchase price for any offering period including an offering period underway at the time of the change in purchase price. Such modifications or amendments shall not require stockholder approval or the consent of any participants in the 1997 Purchase Plan. Members of the Board of Directors who are eligible employees of the Company are permitted to participate in the 1997 Purchase Plan. Members of the Board of Directors will receive no additional compensation for their services in connection with the administration of the 1997 Purchase Plan. All payroll deductions received or held by the Company may be used by the Company for any corporate purpose.

Eligibility

Any person who is employed by the Company or its subsidiaries for at least 20 hours per week and more than five months in a calendar year is eligible to participate in the 1997 Purchase Plan.

Employees of foreign subsidiaries may be subject to additional requirements and restrictions depending upon applicable local law. As of June 30, 1998, approximately 3,300 employees were participating in the 1997 Purchase Plan.

Offering Dates

The 1997 Purchase Plan is implemented by 24-month offering periods (each an "Offering Period"), commencing on January 1 and July 1 of each year. Each Offering Period is composed of four consecutive six-month purchase periods (each a "Purchase Period"). The Board of Directors has the power to alter the duration of the Offering Periods without stockholder approval.

Eligible employees become participants in the 1997 Purchase Plan by delivering to the Company a subscription agreement authorizing payroll deductions. An eligible employee may participate in an Offering Period only if, as of the enrollment date of such Offering Period, such employee is not participating in the 1981 Purchase Plan or in any prior Offering Period under the 1997 Purchase Plan which is continuing at the time of such proposed enrollment. An employee who becomes eligible to participate in the 1997 Purchase Plan after the commencement of an Offering Period may not participate until the commencement of the next Offering Period.

13

Purchase Price

The purchase price per share at which shares are sold under the 1997 Purchase Plan shall be 85% of the lesser of (a) the fair market value of the shares of Common Stock on the first day of such Offering Period, and (b) the fair market value of the shares of Common Stock at the time of exercise of a participant's purchase option. The fair market value of the Common Stock on a given date shall be determined by the Board of Directors based on the closing price of the Company's Common Stock on such date as reported on the Nasdaq National Market.

Payment of Purchase Price; Payroll Deductions

The purchase price for the shares is accumulated by payroll deductions during the Offering Period. The deductions may not exceed 10% of a participant's eligible compensation. A participant may institute decreases in the rate of payroll deductions at any time and such decreases are immediately effective. Increases in the rate of payroll deductions are effective as of the commencement of the next Offering Period.

All payroll deductions are credited to the participant's account under the 1997 Purchase Plan; no interest accrues on the payroll deductions. All payroll deductions received or held by the Company may be used by the Company for any corporate purpose and such payroll deductions need not be segregated.

Purchase of Stock; Exercise of Option

At the beginning of each Offering Period, by executing a subscription agreement to participate in the 1997 Purchase Plan, each employee is in effect granted an option to purchase shares of Common Stock. The maximum number of shares placed under option to a participant in an Offering Period is determined by dividing $20,000 by 85% of the fair market value of the Common Stock at the beginning of the Offering Period. Notwithstanding the foregoing, no employee may make aggregate purchases of stock of the Company and its subsidiaries under the 1997 Purchase Plan and any other employee stock purchase plans qualified as such under Section 423(b) of the Internal Revenue Code of 1986, as amended (the "Code") in excess of $25,000 (determined using the fair market value of the shares at the time the option is granted) during any calendar year.

Withdrawal

While each employee in the 1997 Purchase Plan is required to sign a subscription agreement authorizing payroll deductions to participate, a participant may terminate his or her participation in the 1997 Purchase Plan at any time by signing and delivering to the Company a notice of withdrawal from the 1997 Purchase Plan. All of the participant's accumulated payroll deductions will be paid to the participant promptly after receipt of his or her notice of withdrawal and his or her participation in the current Offering Period will be automatically terminated, and no further payroll deductions for the purchase of shares will be made during the Offering Period. No resumption of payroll deductions will occur on behalf of such participant unless such participant re-enrolls in the 1997 Purchase Plan by delivering a new subscription agreement to the Company during the applicable open enrollment period preceding the commencement of a subsequent Offering Period. A participant's withdrawal from the 1997 Purchase Plan during an Offering Period does not have any effect upon such participant's eligibility to participate in subsequent Offering Periods under the 1997 Purchase Plan.

Termination of Employment

Termination of a participant's employment for any reason, including retirement or death, cancels his or her participation in the 1997 Purchase Plan immediately. In such event, the payroll deductions credited to the participant's account will be returned to such participant or, in the case of death, to the participant's legal representative.

11

14

## Capital Changes

If any change is made in the capitalization of the Company, such as stock splits or stock dividends, which results in an increase or decrease in the number of shares of Common Stock outstanding or in the event of any merger, sale or other reorganization, appropriate adjustments shall be made by the Company in the 1997 Purchase Plan's reserve and the number and class of shares subject to outstanding purchase options and in the purchase price per share. Notwithstanding such adjustment, if in a transaction the stockholders of the Company no longer retain at least a majority of the beneficial interest in the voting stock of the Company following such transaction ("Transfer of Control"), the Board of Directors may, in its sole discretion (a) provide that the purchase options become fully exercisable prior to the date of the Transfer of Control, (b) provide that such successor entity assume the Company's obligations under the 1997 Purchase Plan, or (c) terminate the 1997 Purchase Plan. The Board of Directors may also make provisions for adjusting the number of shares subject to the 1997 Purchase Plan and the purchase price per share if the Company effects one or more reorganizations, recapitalizations, rights offerings or other increases or decreases in the number of shares of the Company's outstanding Common Stock.

## Amendment and Termination of the 1997 Purchase Plan

The Board of Directors may at any time amend or terminate the 1997 Purchase Plan; provided, however, amendments that would increase the number of shares reserved for purchase or would otherwise require stockholder approval in order to comply with other regulatory requirements, require stockholder approval.

## CERTAIN UNITED STATES FEDERAL INCOME TAX INFORMATION

The 1997 Purchase Plan is intended to qualify under the provisions of Sections 421 and 423 of the Code with respect to participants who are citizens of the United States ("U.S. Participants"). Under these provisions, no income will be taxable to a U.S. Participant at the time of grant of the option or purchase of shares. Upon disposition of the shares, the U.S. Participant will generally be subject to tax, the amount of which will depend upon the holding period. If the shares have been held by the U.S. Participant for more than two years after the offering date and more than one year after the exercise date, the lesser of: (a) the excess of the fair market value of the shares at the time of such disposition over the option price, or (b) the excess of the fair market value of the shares at the time the option was granted over the option price (which option price will be computed as of the grant date) will be treated as ordinary income, and any further gain will be treated as long-term capital gain. If the shares are disposed of before the expiration of these holding periods, the excess of the fair market value of the shares on the exercise date over the option price will be treated as ordinary income, and any further gain or any loss on such disposition will be long-term or short-term capital gain or loss, depending on the holding period. Special rules may apply with respect to U.S. Participants subject to Section 16(b) of the Securities Exchange Act of 1934, as amended. The Company is not entitled to a deduction for amounts taxed as ordinary income or capital gain to a U.S. Participant except to the extent of ordinary income reported by U.S. Participants upon disposition of shares prior to the expiration of the two holding periods described above. The consequences to non-U.S. Participants are governed by foreign laws, which typically do not offer the same tax advantages as U.S. laws.

The foregoing is only a summary of the effect of federal income taxation upon the participant and the Company with respect to the grant and exercise of options under the 1997 Purchase Plan, does not purport to be complete, and does not discuss the income tax laws of any municipality, state or foreign country in which a participant may reside. It is advisable that a participant contact his or her own tax advisor concerning the application of all of these tax laws.

## STOCK PRICE

The closing price of a share of the Company's Common Stock on the Nasdaq National Market on September 18, 1998 was $22.375.

12

15

PLAN BENEFITS

The Company cannot now determine the number of shares to be purchased in the future by the named executive officers, all current executive officers as a group or all employees (excluding executive officers) as a group. In the fiscal year ended June 30, 1998, however, the following shares of Common Stock were purchased by such persons pursuant to the 1997 Purchase Plan and the 1981 Purchase Plan:

| NAME OR GROUP | NUMBER OF SHARES |
|---|---|
| Kenneth Levy | 1,122 |
| Jon D. Tompkins | 617 |
| Kenneth L. Schroeder | 937 |
| Robert J. Boehlke | 760 |
| Gary E. Dickerson | 1,173 |
| Graham J. Siddall | 617 |
| All current executive officers (13 persons-as a group) | 12,254 |
| All employees (including current officers who are not executive officers) | 802,737 |

PROPOSAL FOUR

APPROVAL OF THE 1998 OUTSIDE DIRECTOR OPTION PLAN AND RESERVATION OF 1,000,000 SHARES OF COMMON STOCK OF THE COMPANY FOR ISSUANCE THEREUNDER.

GENERAL

The Company's 1998 Outside Director Option Plan (the "1998 Director Plan") was adopted by the Board of Directors in August 1998 and is intended to allow the Company to attract and retain the best available individuals for service as non-employee members of the Board of Directors ("Outside Directors") and to encourage their continued service on the Board. The Company has initially reserved 1,000,000 shares of Common Stock for issuance under the 1998 Director Plan. At the Annual Meeting, the stockholders are being asked to approve the 1998 Director Plan and to approve the reservation of 1,000,000 shares for issuance thereunder. Upon approval by the stockholders of the Company, the Company will no longer grant any options under the current Outside Directors Stock Option Plan and will terminate that plan.

SUMMARY OF THE 1998 DIRECTOR PLAN

The essential features of the 1998 Director Plan are outlined below; provided however, that the following summary is qualified in its entirety by the specific language of the 1998 Director Plan, a copy of which is available at no charge to any stockholder upon request.

Purpose

The 1998 Director Plan provides for the grant of nonstatutory stock options to Outside Directors to allow the Company to attract and retain the best available individuals for service as Outside Directors.

Administration

The 1998 Director Plan may be administered by the Board of Directors or a committee of the Board (as applicable, the "Administrator"). The Administrator has the power to determine the terms of the options granted, including the exercise price of the option, the number of shares subject to each option, the exercisability thereof, and the form of consideration payable upon such exercise. In addition, the Administra-

13

16

tor has the authority to amend, suspend or terminate the 1998 Director Plan, provided that no such action may affect any share of Common Stock previously issued and sold or any option previously granted under the 1998 Director Plan.

### Eligibility

Options under the 1998 Director Plan may be granted only to Outside Directors. No person has any discretion to select which Outside Directors shall be granted options. In addition to discretionary grants by the Board of Directors, the Director Plan provides for automatic grants of options to be made in the following ways: (a) each Outside Director as of the date on which such director first becomes an Outside Director receives a nonstatutory option to purchase 10,000 shares of Common Stock (the "First Option"); and (b) each Outside Director shall automatically be granted a nonstatutory option to purchase an additional 5,000 shares of Common Stock on the date of the subsequent annual meetings on which he or she remains an Outside Director (the "Subsequent Option").

### Terms of Options

Options granted under the 1998 Director Plan are generally not transferable by the optionee, and each option is exercisable during the lifetime of the optionee only by such optionee. Options granted under the 1998 Director Plan must generally be exercised within 30 days after the end of optionee's status as an Outside Director of the Company, or within twelve months after such optionee's termination by death or disability, but in no event later than the expiration of the option's term.

The exercise price of nonstatutory stock options granted under the 1998 Director Plan shall be at least equal to the fair market value of the Common Stock on the date of grant. The term of all options granted under the 1998 Director Plan may not exceed ten years. Both the First Option and the Subsequent Option shall become 100% exercisable on their respective dates of grant.

### Amendment or Termination

The Administrator may amend or terminate the 1998 Director Plan at any time. However, no amendment or termination may adversely affect any stock options then outstanding under the 1998 Director Plan without the optionee's consent.

The 1998 Director Plan provides that in the event of a merger of the Company with or into another corporation, or a sale of substantially all of the Company's assets, each option shall be assumed or an equivalent option substituted for by the successor corporation. If the outstanding options are not assumed or substituted for by the successor corporation, the Administrator shall provide for the optionee to have the right to exercise the option as to all of the optioned stock, including shares as to which it would not otherwise be exercisable. If the Administrator makes an option exercisable in full in the event of a merger or sale of substantially all of the Company's assets, the Administrator shall notify the optionee that the option shall be fully exercisable for a period of fifteen (15) days from the date of such notice, and the option will terminate upon the expiration of such period.

CERTAIN UNITED STATES FEDERAL INCOME TAX INFORMATION

The following is only a summary of the effect of federal income taxation upon the Outside Director and the Company with respect to the grant and exercise of options under the 1998 Director Option Plan. This summary does not purport to be complete and does not discuss the income tax laws of any municipality, state or foreign country in which an Outside Director may reside.

Options granted under the 1998 Director Plan are nonstatutory options ("NSO"). An Outside Director will not recognize any taxable income at the time he or she is granted an NSO. However, upon the exercise of an NSO, the optionee will recognize ordinary income measured by the excess of the then fair market value of the shares over the option price. Upon resale of such shares by the Outside Director, any difference between the sale price and the exercise price, to the extent not recognized as ordinary income as provided above, will be

14

17

treated as long-term or short-term capital gain or loss, depending on the holding period. The Company will be entitled to a tax deduction in the same amount as the ordinary income recognized by the Outside Director with respect to shares acquired upon exercise of an NSO.

PLAN BENEFITS

If the 1998 Director Plan is approved at the Annual Meeting, each Outside Director serving on the Board of Directors shall be entitled to each receive a Subsequent Option. If Proposals One and Four are approved by the stockholders, there will be eight Outside Directors on the Board of Directors immediately following the Annual Meeting and options to purchase an aggregate of 40,000 shares of Common Stock will therefore be outstanding under the 1998 Director Plan immediately following the Annual Meeting.

REQUIRED VOTE

The affirmative vote of a majority of the Votes Cast will be required to approve the adoption of the 1998 Director Plan and for the reservation of 1,000,000 shares of Common Stock of the Company for issuance thereunder.

THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE ADOPTION OF THE 1998 DIRECTOR PLAN AND FOR THE RESERVATION OF 1,000,000 SHARES OF COMMON STOCK OF THE COMPANY FOR ISSUANCE THEREUNDER.

## PROPOSAL FIVE

TO RATIFY THE APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE INDEPENDENT ACCOUNTANTS OF THE COMPANY FOR THE FISCAL YEAR ENDING JUNE 30, 1999.

The Board of Directors has selected PricewaterhouseCoopers LLP, independent accountants, to audit the consolidated financial statements of the Company for its 1999 fiscal year and recommends that the stockholders vote for ratification of such appointment. If there is a negative vote on such ratification, the Board of Directors will reconsider its selection. Representatives of PricewaterhouseCoopers LLP are expected to be present at the Annual Meeting with the opportunity to make a statement if they desire to do so, and are expected to be available to respond to appropriate questions.

THE BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE RATIFICATION OF THE APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE INDEPENDENT ACCOUNTANTS OF THE COMPANY FOR THE FISCAL YEAR ENDING JUNE 30, 1999.

15

18

EXECUTIVE COMPENSATION

The following table shows, as to the person who served as Chief Executive Officer during the fiscal year ended June 30, 1998 and each of the five other most highly compensated executive officers whose salary plus bonus exceeded $100,000, information concerning all reportable compensation awarded to, earned by or paid to each for services to the Company in all capacities during the fiscal year ended June 30, 1998, as well as such compensation for each such individual for the Company's previous two fiscal years.

## SUMMARY COMPENSATION TABLE

| | | ANNUAL COMPENSATION | | | LONG TERM COMPENSATION | | | |
| | | | | OTHER | AWARDS | | PAYOUTS | |
| NAME AND PRINCIPAL POSITION | YEAR | SALARY ($) | BONUS ($) | ANNUAL COMPEN-SATION ($)(1) | RESTRICTED STOCK AWARDS($) (S)(12) | SECURITIES UNDERLYING OPTIONS/ SARS($)(S)(3) | LTIP PAYOUTS ($)(4) | ALL OTHER COMPENSATION ($)(5) |
|---|---|---|---|---|---|---|---|---|
| Kenneth Levy(6)............... | 1993 | $467,769 | $263,114 | N/A | -0- | 62,500 | -0- | $ 44,410 |
| Chief Executive Officer | 1993 | $401,122 | $134,137 | N/A | -0- | 162,500 | -0- | $ 73,146 |
| Chairman of the Board | 1996 | $350,299 | $413,070 | N/A | -0- | -0- | -0- | $111,021 |
| Jon D. Tompkins(7)........... | 1996 | $467,769 | $262,114 | N/A | -0- | -0- | -0- | $ 44,410 |
| Chairman of the Board | 1997 | $199,569 | $194,442 | N/A | -0- | 106,000 | -0- | $ 3,800 |
| Chief Executive Officer | 3694(3)(8) | $157,067 | $181,562 | N/A | -0- | 71,999 | -0- | $ 12,291 |
| Kenneth L. Schroeder........ | 1998 | $455,992 | $264,757 | N/A | -0- | 61,500 | -0- | $ 42,544 |
| President and Chief Operating Officer | 1997 | $184,211 | $112,800 | N/A | -0- | 141,500 | -0- | $ 71,472 |
| | 1996 | $110,377 | $198,095 | N/A | -0- | -0- | -0- | $106,810 |
| Robert J. Boehlke............ | 1998 | $297,115 | $116,708 | N/A | -0- | 11,500 | -0- | $ 26,404 |
| Executive Vice President | 1997 | $257,909 | $141,567 | N/A | -0- | 71,500 | -0- | $ 49,911 |
| and Chief Financial Officer | 1996 | $246,193 | $146,008 | N/A | -0- | -0- | -0- | $ 79,326 |
| Gary K. Dickerson........... | 1999 | $152,115 | $141,164 | N/A | -0- | 42,500 | -0- | $ 29,984 |
| Executive Vice President, | 1997 | $160,614 | $129,441 | N/A | -0- | 82,500 | -0- | $ 50,397 |
| Yield Management Solutions | 1996 | $221,144 | $172,500 | N/A | -0- | 20,000 | -0- | $ 71,104 |
| Gerben J. Blom(1)(1)......... | 1996 | $112,115 | $ 64,717 | N/A | -0- | -0- | -0- | $ 39,364 |
| Executive Vice President, | 1997 | $261,062 | $217,441 | N/A | -0- | 40,000 | -0- | $ 1,500 |
| Wafer Inspection Group | 1996(6) | $242,062 | $214,112 | N/A | -0- | 87,999 | -0- | $ 1,500 |

--------------

(1) The amounts paid during the fiscal year to the named executive officers were less than the lesser of (a) $50,000 or (b) 10% of the executive officers total reported salary and bonus.

(2) The Company has not granted any restricted stock rights.

(3) The Company has not granted any stock appreciation rights.

(4) The Company does not have any Long Term Incentive Plans as that term is defined in the regulations.

(5) "All Other Compensation" is itemized as follows:

- In 1998, Mr. Levy received $25,496 in cash profit sharing; $9,246 in profit sharing was contributed by the Company to the 401(k) Plan; $8,688 was contributed by the Company to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

- In 1998, Mr. Tompkins received $25,496 in cash profit sharing; $9,246 in profit sharing was contributed by the Company to the 401(k) Plan; $8,688 was contributed by the Company to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

- In 1998, Mr. Schroeder received $25,001 in cash profit sharing; $9,230 in profit sharing was contributed by the Company to the 401(k) Plan; $8,314 was contributed by the Company to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

- In 1998, Mr. Boehlke received $16,205 in cash profit sharing; $8,681 in profit sharing was contributed by the Company to the 401(k) Plan; $2,718 was contributed by the Company to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

- In 1998, Mr. Dickerson received $17,016 in cash profit sharing; $9,032 in profit sharing was contributed by the Company to the 401(k) Plan; $2,936 was contributed by the Company to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

16

19

- In 1998, Mr. Siddall received $17,016 in cash profit sharing; $9,032 in profit sharing was contributed by the Company to the 401(k) Plan; $2,936 was contributed by the Company to the Excess Profit Stock Plan; $1,000 was contributed by the Company as a matching contribution to the 401(k) Plan.

(6) Mr. Levy was named Chief Executive Officer effective July 1, 1998. During fiscal 1997, Mr. Levy was Chief Executive Officer until April 30, 1997 when, as a result of the merger of Tencor Instruments ("Tencor") into a wholly-owned subsidiary of the Company (the "Merger"), he became Chairman of the Board of Directors and remained in that position until July 1, 1998.

(7) Mr. Tompkins was named Chairman of the Board effective July 1, 1998. He was previously President and Chief Executive Officer of Tencor until April 1997. As a result of the Merger he became Chief Executive Officer of the Company effective April 30, 1997 and remained in that position until July 1, 1998. The compensation described in this Summary Compensation Table reflects certain amounts which were paid during the period prior to the Merger when Tencor was an independent, publicly traded company. Tencor reported its results on a calendar year basis, while the Company reports its results based on a June 30 year end.

(8) The amounts reported for 1996 for Mr. Tompkins and Mr. Siddall are those amounts reported by Tencor in its proxy statements filed with the Securities and Exchange Commission for the year ended December 31, 1996.

STOCK OPTION GRANTS AND EXERCISES

The following tables set forth the stock options granted to the named executive officers under the Company's stock option plans and the options exercised by such named executive officers during the fiscal year ended June 30, 1998.

The Option/SAR Grant Table sets forth hypothetical gains or "option spreads" for the options at the end of their respective ten-year terms, as calculated in accordance with the rules of the Securities and Exchange Commission. Each gain is based on an arbitrarily assumed annualized rate of compound appreciation of the market price at the date of grant of 5% and 10% from the date the option was granted to the end of the option term. Actual gains, if any, on option exercises are dependent on the future performance of the Company's Common Stock and overall market conditions.

OPTION/SAR(1) GRANTS IN LAST FISCAL YEAR

KLA-TENCOR CORPORATION 1982 STOCK OPTION PLAN(2)

| | INDIVIDUAL GRANTS | | | | POTENTIAL REALIZABLE VALUE ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM | |
| NAME | OPTIONS/SARS GRANTED (#) | PERCENT OF TOTAL OPTIONS/ SARS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE OR BASE PRICE ($/SHARE) | EXPIRATION DATE | 5% | 10% |
| --- | --- | --- | --- | --- | --- | --- |
| Kenneth Levy............ | 63,500 | 1.31% | $60.5625 | 03/31/07 | $7,380,464 | $6,033,366 |
| Jon D. Tompkins........ | -0- | -0- | -0- | N/A | -0- | -0- |
| Kenneth L. Schroeder.... | 62,500 | 1.73% | $60.5625 | 03/31/07 | $3,180,464 | $6,033,568 |
| Rupert J. Koehler...... | 19,500 | .93% | $60.6625 | 07/31/07 | $1,279,929 | $1,333,436 |
| Gary H. Dickerson...... | 42,500 | 1.18% | $46.3625 | 07/31/01 | $1,119,316 | $4,182,144 |
| Graham J. Siddall...... | -0- | -0- | -0- | N/A | -0- | -0- |

----------------

(1) The Company has not granted any stock appreciation rights.

(2) The material terms of the grants (other than those set forth in the table) are: (a) The exercise price of the options is the fair market value of Common Stock as of the date of grant; (b) The options vest on a four year schedule with 25% after one year and the remaining option shares vesting 1/36th per month for the remainder of the vesting term; (c) To the extent unexercised, the options lapse after ten years; (d) The options are non-transferrable and are only exercisable during the period of employment of the

17

20

optionee and for 30 days following termination of employment, subject to limited exceptions in the cases of certain terminations, death or permanent disability of the optionee.

### AGGREGATED OPTION/SAR EXERCISES IN LAST FISCAL YEAR AND YEAR-END VALUE(1)

### KLA-TENCOR CORPORATION 1982 STOCK OPTION PLAN

| NAME | NUMBER OF SHARES ACQUIRED ON EXERCISE | VALUE REALIZED | TOTAL NUMBER OF UNEXERCISED OPTIONS HELD AT FISCAL YEAR END | | TOTAL VALUE(2) OF UNEXERCISED, IN-THE-MONEY OPTIONS HELD AT FISCAL YEAR END | |
|---|---|---|---|---|---|---|
| | | | EXERCISABLE | UNEXERCISABLE | EXERCISABLE | UNEXERCISABLE |
| Kenneth Levy.............. | -0- | -0- | 326,901 | 226,099 | $5,673,025 | $800,006 |
| Jon D. Tompkins........... | -0- | -0- | 15,000 | 85,000 | -0- | -0- |
| Kenneth L. Schroeder...... | 20,000 | $1,283,750 | 298,901 | 226,099 | $4,958,276 | $800,006 |
| Robert J. Boehlke......... | 35,000 | $1,965,880 | 80,604 | 104,208 | $ 524,526 | $495,548 |
| Gary E. Dickerson......... | 26,500 | $1,379,228 | 71,815 | 128,865 | $ 316,089 | $446,517 |
| Graham J. Siddall(3)...... | -0- | -0- | 18,437 | 21,563 | -0- | -0- |

---------------
(1) The Company has not granted any stock appreciation rights.

(2) Total value of vested options based on fair market value of Company's Common Stock of $27.6875 per share as of June 30, 1998.

### AGGREGATED OPTION/SAR EXERCISES IN LAST FISCAL YEAR AND YEAR-END VALUE(1)

### TENCOR INSTRUMENTS 1993 EQUITY INCENTIVE PLAN

| NAME | NUMBER OF SHARES ACQUIRED ON EXERCISE | VALUE REALIZED | TOTAL NUMBER OF UNEXERCISED OPTIONS HELD AT FISCAL YEAR END | | TOTAL VALUE(2) OF UNEXERCISED, IN-THE-MONEY OPTIONS HELD AT FISCAL YEAR END | |
|---|---|---|---|---|---|---|
| | | | EXERCISABLE | UNEXERCISABLE | EXERCISABLE | UNEXERCISABLE |
| Kenneth Levy(3)......... | -0- | -0- | -0- | -0- | -0- | -0- |
| Jon D. Tompkins........ | 103,172 | $5,753,834 | 70,947 | 61,003 | $ 870,737 | $721,660 |
| Kenneth L. Schroeder(3)......... | -0- | -0- | -0- | -0- | -0- | -0- |
| Robert J. Boehlke(3)... | -0- | -0- | -0- | -0- | -0- | -0- |
| Gary E. Dickerson(3)... | -0- | -0- | -0- | -0- | -0- | -0- |
| Graham J. Siddall...... | 17,050 | $ 922,255 | 105,447 | 49,625 | $1,619,674 | $523,601 |

---------------
(1) The Company has not granted any stock appreciation rights.

(2) Total value of vested options based on fair market value of Company's Common Stock of $27.6875 per share as of June 30, 1998.

(3) Messrs. Levy, Schroeder, Boehlke and Dickerson have been executive officers of the Company and accordingly have never received options under the Tencor Instruments 1993 Equity Incentive Plan. Accordingly, the information under this table is inapplicable to them.

18

21

REPORT OF THE COMPENSATION COMMITTEE ON EXECUTIVE COMPENSATION

Compensation Committee

The Committee is comprised of three of the independent, non-employee members of the Board of Directors, none of whom have interlocking relationships as defined by the Securities and Exchange Commission. The Committee is responsible for setting and administering the policies governing annual compensation of executive officers, considers their performance and makes recommendations regarding their cash compensation and stock options to the full Board of Directors. The Committee periodically reviews its approach to executive compensation and makes changes as appropriate.

Compensation Philosophy

The Committee of the Board of Directors establishes the overall executive compensation strategies of the Company and approves compensation elements for the chairman of the board, the chief executive officer and other executive officers. The goals of the Company's compensation policy are to attract, retain and reward executive officers who contribute to the overall success of the Company by offering compensation that is competitive in the industry, to motivate executive officers to achieve the Company's business objectives and to align the interests of executive officers with the long term interests of stockholders. The Company currently uses salary, a management incentive plan and stock options to meet these goals.

The compensation philosophy of the Committee is to provide a comprehensive compensation package for each executive officer that is well suited to support accomplishment of the Company's business strategies, objectives and initiatives. For incentive-based compensation, the Committee considers the desirability of structuring such compensation arrangements so as to qualify for deductibility under Section 162(m) of the Internal Revenue Code. As the Committee applies this compensation philosophy in determining appropriate executive compensation levels and other compensation factors, the Committee reaches its decisions with a view towards the Company's overall financial performance.

Executive Officer Compensation

The Committee's approach is based upon a belief that a substantial portion of aggregate annual compensation for executive officers should be contingent upon the Company's performance and an individual's contribution to the Company's success. In addition, the Committee strives to align the interests of the Company's executive officers with the long-term interests of stockholders through stock option grants that can result in ownership of the Company's Common Stock. The Committee endeavors to structure each executive officer's overall compensation package to be consistent with this approach and to enable the Company to attract, retain and reward personnel who contribute to the success of the Company.

The Company provides its executive officers with a compensation package consisting of base salary, variable incentive pay and participation in benefit plans generally available to other employees. The Committee considers market information from published survey data provided to the Committee by the Company's human resources staff. The market data consists primarily of base salary and total cash compensation rates, as well as incentive bonus and stock programs of other companies considered by the Committee to be peers in the Company's industry.

For the Company's previous fiscal year, the Committee reviewed and recommended a compensation structure which had as an important component, the successful integration of KLA Instruments Corporation and Tencor Instruments. The merger was completed April 30, 1997 with the Company's fiscal 1998 year focused on integrating the two companies as well as substantial economic and business challenges in the semiconductor and semiconductor capital equipment industries worldwide.

Base Salary. Salaries for executive officers are set with reference to salaries for comparable positions among other companies in the Company's industry or in industries that employ individuals of similar education and background to the executive officer based on data provided by the Company's human resources staff.

19

22

Management Incentive Plan. Each year since fiscal 1979, the Company has adopted a management incentive plan (the "Incentive Plan") which provides for payments to officers and key employees based on the financial performance of the Company or the relevant business unit, and on the achievement of the person's individual performance objectives. The Incentive Plan is approved by the Committee and submitted to the Board of Directors for ratification. For fiscal 1999 the Incentive Plan sets goals for profitability, achievement of measurable objectives aimed at strategic corporate goals and achievement of objectives relating to managing the ratio of assets to sales.

Outstanding Corporate Performance Executive Bonus Plan. The Company adopted an additional incentive plan (the "Outstanding Corporate Performance Plan") which allows for an additional bonus in years when the Company achieves certain levels of profitability and growth. For those executive officers that do not have operating divisions reporting to them, the matrix is based on the Company's pre-tax margin and the growth of the Company compared to a peer group. The target percentage for the Outstanding Corporate Performance Plan is the same target percentage as utilized in determining the Incentive Plan bonus. For those executive officers who do have operating divisions reporting to them, the matrix is based on certain specified growth objectives for that division and the Company's net operating margin. The target percentage for the Outstanding Corporate Performance Plan is also the same as that utilized in determining the Incentive Plan bonus. Any amounts to be paid under the Outstanding Corporate Performance Plan will be in the form of a contribution by the Company to the Executive Deferred Savings Plan (the "EDSP") and will vest over a one year period. At the end of such one year period, the executive officer will have the choice of taking a cash payment or leaving it in the EDSP. If the executive officer should leave during that one year period, the contribution by the Company shall be forfeited. The executive officer will be eligible to participate in the Company's profit sharing plan while eligible for Company contributions under the Outstanding Corporate Performance Plan but any amounts contributed by the Company pursuant to the Outstanding Corporate Performance Plan will be offset by profit sharing paid during the year.

Long-term Incentives. Longer term incentives are provided through the Stock Option Plan and the Excess Profit Stock Plan, each of which reward executive officers through the growth in value of the Company's Common Stock. The Committee believes that employee equity ownership is highly motivating, provides a major incentive for employees to build stockholder value and serves to align the interests of employees with those of stockholders.

Grants of stock options to executive officers are based upon each executive officer's relative position, responsibilities, historical and expected contributions to the Company, and the executive officer's existing stock ownership and previous option grants, with primary weight given to the executive officer's relative rank and responsibilities. Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price.

Approval of Fiscal Year 1999 Bonus Plan and Outstanding Corporate Performance Plan

The Committee approved the fiscal year 1999 bonus plan incentive formula which is based on two components of equal weight. The first is performance against certain financial objectives and the second is achievement of certain non-financial strategic objectives. The bonuses for the Chairman of the Board, the Chief Executive Officer, the President/Chief Operating Officer and the Chief Financial Officer are based on an average of the performance of those managers reporting to the executive officers utilizing a combination of the weighted average contribution made by each manager and a simple average of those contributions. The Committee also approved the fiscal year Outstanding Corporate Performance Plan which is based on a matrix of the Company's net operating margin and certain growth objectives. The Outstanding Corporate Performance Plan does not require any contributions by the Company until the Company achieves a Pre-Tax Margin Factor of 14%. The Pre-Tax Margin Factor is calculated by taking the pre-tax, pre-profit sharing income, excluding non-recurring charges, and dividing it by total revenue.

20

23

Chief Executive Officer Compensation

For fiscal year 1998, Jon D. Tompkins served as Chief Executive Officer and Kenneth Levy served as Chairman of the Board. Effective July 1, 1998 Mr. Tompkins assumed the role of Chairman of the Board and Mr. Levy assumed the role of Chief Executive Officer. Base salary for Mr. Tompkins for fiscal 1999 has been set at $245,440, and the base salary for Mr. Levy has been set at $490,880 based on the recommendations provided by the Company's Human Resources Compensation staff. Options to purchase 50,809 shares of the Common Stock of the Company were granted to Mr. Tompkins and options to purchase 102,136 shares of the Common Stock of the Company were granted to Mr. Levy, each with standard four year vesting terms. For fiscal 1998 a bonus of $262,314 was paid to Mr. Levy and a bonus of $262,314 was paid to Mr. Tompkins. These payments were based on the formula approved by the Compensation Committee and the Board of Directors last year. In a year in which the Company faced many challenges, including the integration of two companies and severe economic downturn in the semiconductor and semiconductor capital equipment industries worldwide, the Company successfully integrated two companies and continued its profitability with revenues of $1.2 billion and earnings per share of $1.76.

MEMBERS OF THE COMPENSATION COMMITTEE

James W. Bagley
Leo J. Chamberlain
Lida Urbanek

21

24

COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

The members of the Compensation Committee are set forth in the preceding section. There are no members of the Compensation Committee who were officers or employees of the Company or any of its subsidiaries during the fiscal year, formerly officers of the Company, or had any relationship otherwise requiring disclosure hereunder.

PERFORMANCE GRAPH

The stock price performance shown on the graph following is not necessarily indicative of future price performance.

COMPARISON OF FIVE YEAR CUMULATIVE TOTAL RETURN AMONG KLA-TENCOR CORPORATION, THE NASDAQ -- US INDEX AND THE HAMBRECHT & QUIST TECHNOLOGY INDEX*

|         | KLA-TENCOR CORPORATION | NASDAQ - US INDEX | HAMBRECHT & QUIST TECHNOLOGY INDEX |
|---------|------------------------|-------------------|------------------------------------|
| 6/30/93 | 100.00                 | 100.00            | 100.00                             |
| 6/30/94 | 217.39                 | 100.96            | 102.21                             |
| 6/30/95 | 447.83                 | 134.77            | 180.82                             |
| 6/30/96 | 269.57                 | 173.03            | 211.32                             |
| 6/30/97 | 565.22                 | 210.38            | 275.98                             |
| 6/30/98 | 321.01                 | 277.69            | 349.59                             |

---------------

* Assumes $100 invested on June 30, 1993. The Company's fiscal year end is June 30.

22

25

## CERTAIN TRANSACTIONS

In connection with the merger between KLA Instruments Corporation and Tencor Instruments (effective April 30, 1997) the Company entered into identical employment arrangements, subsequently amended, with Kenneth Levy, Jon D. Tompkins and Kenneth L. Schroeder, all executive officers of the Company. The arrangements, as amended, provide that certain benefits would be paid if certain events took place after April 30, 1997. The purpose of these arrangements is to retain the services of Messrs. Levy, Tompkins and Schroeder to ensure the continued smooth transition associated with the Merger. The terms of those arrangements provide that if an individual were to leave the Company after April 30, 1998, subject to releasing the Company from all claims, and in connection with working part-time for 36 months, he will receive (i) his base salary for the first 24 months of part-time employment, (ii) a mutually agreeable level of compensation per month for the final 12 months of part-time employment, (iii) an annual bonus (based on an achievement of 100% of bonus objectives) in the fiscal year of his transition to part-time employment, (iv) a bonus paid in the fiscal year following the payment of the annual bonus above, (based on achievement of 100% of his individual bonus objectives) and (v) a pro-rated bonus for the fiscal year in which part-time employment ended. During the periods of part-time employment, all options to exercise stock of the Company which were granted more than 12 months prior to the termination of full-time employment will continue to vest. The same benefits shall be payable in the event the Company terminates his employment without cause. If he is terminated for cause (defined as (i) gross negligence or willful misconduct in connection with the performance of duties, (ii) conviction of or plea of nolo contendere to any felony, or (iii) the embezzlement or misappropriation of Company property) then he will receive a lump-sum payment equal to 25% of his base salary.

## COMPLIANCE WITH SECTION 16(a) OF THE SECURITIES EXCHANGE ACT OF 1934

Section 16(a) of the Exchange Act requires the Company's executive officers, directors, and persons who own more than ten percent of a registered class of the Company's equity securities to file reports of ownership and changes in ownership with the SEC. Executive officers, directors and greater than ten percent stockholders are required by SEC regulations to furnish the Company with copies of all Section 16(a) forms they file. Kenneth Levy, an executive officer and director of the Company filed an amendment to his Form 4 for the month ending August 30, 1997 in order to reflect transactions by a family member and a family trust, which had inadvertently been left off of the original Form 4. Mr. Levy filed the amendment when he discovered the error. Jon D. Tompkins, an executive officer and director of the Company filed an amendment to his Form 4 for the month ending July 31, 1997 to reflect ownership of an additional 1,500 shares of the Company's Common Stock owned by Mr. Tompkins. These shares were inadvertently not reported on the original Form 4 because they were held by Mr. Tompkins under the Tencor Instruments employee stock purchase plan prior to the Merger. Mr. Tompkins filed an amendment when he discovered the error. Dean O. Morton, a director of the Company, filed an amended Form 4 for the month ending August 30, 1997 to reflect an exercise of a stock option inadvertently not reported on the original Form 4. Mr. Morton filed an amendment when he discovered the error. Graham J. Siddall, an executive officer of the Company filed an amendment to his Form 4 for the month ending August 30, 1997 in order to reflect exercises of stock options which had inadvertently been left off the original Form 4. Mr. Siddall filed the amendment when he discovered the error.

## OTHER MATTERS

The Company knows of no other matters to be submitted to the stockholders at the Annual Meeting. If any other matters properly come before the Annual Meeting, it is the intention of the persons named in the enclosed form of Proxy to vote the shares they represent as the Board of Directors may recommend.

THE BOARD OF DIRECTORS

September 30, 1998

23

26

KLA-TENCOR CORPORATION

1998 OUTSIDE DIRECTOR OPTION PLAN

1. Purposes of the Plan. The purposes of this 1998 Outside Director Option Plan are to attract and retain the best available personnel for service as Outside Directors (as defined herein) of the Company, to provide additional incentive to the Outside Directors of the Company to serve as Directors, and to encourage their continued service on the Board.

All options granted hereunder shall be nonstatutory stock options.

2. Definitions. As used herein, the following definitions shall apply:

(a) "Board" means the Board of Directors of the Company.

(b) "Code" means the Internal Revenue Code of 1986, as amended.

(c) "Common Stock" means the common stock of the Company.

(d) "Company" means KLA-Tencor Corporation.

(e) "Director" means a member of the Board.

(f) "Disability" means total and permanent disability as defined in section 22(e)(3) of the Code.

(g) "Employee" means any person, including officers and Directors, employed by the Company or any Parent or Subsidiary of the Company. The payment of a Director's fee by the Company shall not be sufficient in and of itself to constitute "employment" by the Company.

(h) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(i) "Fair Market Value" means, as of any date, the value of Common Stock determined as follows:

(i) If the Common Stock is listed on any established stock exchange or a national market system, including without limitation the Nasdaq National Market or The Nasdaq SmallCap Market of The Nasdaq Stock Market, its Fair Market Value shall be the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such exchange or system on the date of determination as reported in The Wall Street Journal or such other source as the Administrator deems reliable;

27

(ii) If the Common Stock is regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value of a Share of Common Stock shall be the mean between the high bid and low asked prices for the Common Stock on the date of determination, as reported in The Wall Street Journal or such other source as the Board deems reliable; or

(iii) In the absence of an established market for the Common Stock, the Fair Market Value thereof shall be determined in good faith by the Board.

(j) "Inside Director" means a Director who is an Employee.

(k) "Option" means a stock option granted pursuant to the Plan.

(l) "Optioned Stock" means the Common Stock subject to an Option.

(m) "Optionee" means a Director who holds an Option.

(n) "Outside Director" means a Director who is not an Employee.

(o) "Parent" means a "parent corporation," whether now or hereafter existing, as defined in Section 424(e) of the Code.

(p) "Plan" means this 1998 Director Option Plan.

(q) "Share" means a share of the Common Stock, as adjusted in accordance with Section 10 of the Plan.

(r) "Subsidiary" means a "subsidiary corporation," whether now or hereafter existing, as defined in Section 424(f) of the Code.

3. Stock Subject to the Plan. Subject to the provisions of Section 10 of the Plan, the maximum aggregate number of Shares which may be optioned and sold under the Plan is one million Shares (the "Pool"). The Shares may be authorized, but unissued, or reacquired Common Stock.

If an Option expires or becomes unexercisable without having been exercised in full, the unpurchased Shares which were subject thereto shall become available for future grant or sale under the Plan (unless the Plan has terminated). Shares that have actually been issued under the Plan shall not be returned to the Plan and shall not become available for future distribution under the Plan.

2

28

4. Administration and Grants of Options under the Plan.

(a) Discretionary Grants. The Board (or its committee) shall have the authority, in its discretion, to make discretionary grants of Options hereunder to Outside Directors and to specify the terms and conditions of such discretionary Option grants.

(b) Automatic Grants. Outside Directors under this Plan shall receive automatic Option grants as follows:

(i) Each Outside Director shall be automatically granted an Option to purchase ten thousand (10,000) Shares (the "First Option") on the date on which such person first becomes an Outside Director, whether through election by the shareholders of the Company or appointment by the Board to fill a vacancy; provided, however, that an Inside Director who ceases to be an Inside Director but who remains a Director shall not receive a First Option.

(ii) Each Outside Director shall be automatically granted an Option to purchase five thousand (5,000) Shares (a "Subsequent Option") on the day of the Company's annual meeting of shareholders of each year provided he or she is then an Outside Director, and if as of such date, he or she shall have served on the Board for at least the preceding six (6) months.

(iii) The terms of a First Option granted hereunder shall be as follows:

(A) the term of the First Option shall be ten (10) years.

(B) the First Option shall be exercisable only while the Outside Director remains a Director of the Company, except as set forth in Sections 8 and 10 hereof.

(C) the exercise price per Share shall be 100% of the Fair Market Value per Share on the date of grant of the First Option.

(D) subject to Section 10 hereof, the First Option shall become exercisable as to twenty-five percent of the Shares subject to the First Option on the first anniversary of its date of grant and as to 1/48th of the Shares initially subject to the First Option each month thereafter, so as to be 100% vested on the fourth anniversary of the date of grant, provided that the Optionee continues to serve as a Director on such dates.

(iv) The terms of a Subsequent Option granted hereunder shall be as follows:

(A) the term of the Subsequent Option shall be ten (10) years.

(B) the Subsequent Option shall be exercisable only while the Outside Director remains a Director of the Company, except as set forth in Sections 8 and 10 hereof.

3

29

      (C) the exercise price per Share shall be 100% of the Fair Market Value per Share on the date of grant of the Subsequent Option.

      (D) subject to Section 10 hereof, the Subsequent Option shall become exercisable as to 100% percent of the Shares subject to the Subsequent Option on the fourth anniversary of its date of grant, provided that the Optionee continues to serve as a Director on such date.

      (c) Powers of the Board. Subject to the provisions of the Plan and, in the case of a committee, the specific duties delegated by the Board to such committee, and subject to the approval of any relevant authorities, the Board (or its committee) shall have the authority, in its discretion:

      (i) to modify or amend each Option, including the discretionary authority to change prospectively the vesting schedules of options, to extend the post-termination exercisability period of outstanding Options longer than is otherwise provided for and/or to accelerate the vesting of any outstanding Option;

      (ii) to construe and interpret the terms of the Plan and awards granted pursuant to the Plan.

      (d) Share Shortfalls. In the event that any Option granted under the Plan would cause the number of Shares subject to outstanding Options plus the number of Shares previously purchased under Options to exceed the Pool, then the remaining Shares available for Option grant shall be granted under Options to the Outside Directors on a pro rata basis. No further grants shall be made until such time, if any, as additional Shares become available for grant under the Plan through action of the Board or the shareholders to increase the number of Shares which may be issued under the Plan or through cancellation or expiration of Options previously granted hereunder.

      5. Eligibility. Options may be granted only to Outside Directors. The Plan shall not confer upon any Optionee any right with respect to continuation of service as a Director or nomination to serve as a Director, nor shall it interfere in any way with any rights which the Director or the Company may have to terminate the Director's relationship with the Company at any time.

      6. Term of Plan. The Plan shall become effective upon the date upon which it is approved by the Company's stockholders. It shall continue in effect until it is terminated under Section 11 of the Plan.

      7. Form of Consideration. The consideration to be paid for the Shares to be issued upon exercise of an Option, including the method of payment, shall consist of (i) cash, (ii) check, (iii) other shares which (x) in the case of Shares acquired upon exercise of an option, have been owned by the Optionee for more than six (6) months on the date of surrender, and (y) have a Fair

4

30

Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which said Option shall be exercised, (iv) consideration received by the Company under a cashless exercise program implemented by the Company in connection with the Plan, or (v) any combination of the foregoing methods of payment.

8. Exercise of Option.

(a) Procedure for Exercise; Rights as a Shareholder. Any Option granted hereunder shall be exercisable at such times as are set forth in Section 4 hereof.

An Option may not be exercised for a fraction of a Share.

An Option shall be deemed to be exercised when written notice of such exercise has been given to the Company in accordance with the terms of the Option by the person entitled to exercise the Option and full payment for the Shares with respect to which the Option is exercised has been received by the Company. Full payment may consist of any consideration and method of payment allowable under Section 7 of the Plan. Until the issuance (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company) of the stock certificate evidencing such Shares, no right to vote or receive dividends or any other rights as a shareholder shall exist with respect to the Optioned Stock, notwithstanding the exercise of the Option. A share certificate for the number of Shares so acquired shall be issued to the Optionee as soon as practicable after exercise of the Option. No adjustment shall be made for a dividend or other right for which the record date is prior to the date the stock certificate is issued, except as provided in Section 10 of the Plan.

Exercise of an Option in any manner shall result in a decrease in the number of Shares which thereafter may be available, both for purposes of the Plan and for sale under the Option, by the number of Shares as to which the Option is exercised.

(b) Termination of Continuous Status as a Director. Subject to Section 10 hereof, in the event an Optionee's status as a Director terminates (other than upon the Optionee's death or Disability), the Optionee may exercise his or her Option, but only within thirty days (30) following the date of such termination, and only to the extent that the Optionee was entitled to exercise it on the date of such termination (but in no event later than the expiration of its ten (10) year term). To the extent that the Optionee was not entitled to exercise an Option on the date of such termination, and to the extent that the Optionee does not exercise such Option (to the extent otherwise so entitled) within the time specified herein, the Option shall terminate.

(c) Disability of Optionee. In the event Optionee's status as a Director terminates as a result of Disability, the Optionee may exercise his or her Option, but only within twelve (12) months following the date of such termination, and only to the extent that the Optionee was entitled to exercise it on the date of such termination (but in no event later than the expiration of its ten (10) year term). To the extent that the Optionee was not entitled to exercise an Option on the date of termination, or if he or she does not exercise such Option (to the extent otherwise so entitled) within the time specified herein, the Option shall terminate.

5

31

(d) Death of Optionee. In the event of an Optionee's death, the Optionee's estate or a person who acquired the right to exercise the Option by bequest or inheritance may exercise the Option, but only within twelve (12) months following the date of death, and only to the extent that the Optionee was entitled to exercise it on the date of death (but in no event later than the expiration of its ten (10) year term). To the extent that the Optionee was not entitled to exercise an Option on the date of death, and to the extent that the Optionee's estate or a person who acquired the right to exercise such Option does not exercise such Option (to the extent otherwise so entitled) within the time specified herein, the Option shall terminate.

9. Non-Transferability of Options. The Option may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent or distribution and may be exercised, during the lifetime of the Optionee, only by the Optionee.

10. Adjustments Upon Changes in Capitalization, Dissolution, Merger or Asset Sale.

(a) Changes in Capitalization. Subject to any required action by the shareholders of the Company, the number of Shares covered by each outstanding Option, the number of Shares which have been authorized for issuance under the Plan but as to which no Options have yet been granted or which have been returned to the Plan upon cancellation or expiration of an Option, as well as the price per Share covered by each such outstanding Option, (but not the number of Shares issuable pursuant to the automatic grant provisions of Section 4 hereof) shall be proportionately adjusted for any increase or decrease in the number of issued Shares resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the Common Stock, or any other increase or decrease in the number of issued Shares effected without receipt of consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of Shares subject to an Option.

(b) Dissolution or Liquidation. In the event of the proposed dissolution or liquidation of the Company, to the extent that an Option has not been previously exercised, it shall terminate immediately prior to the consummation of such proposed action.

(c) Merger or Asset Sale. In the event of a merger of the Company with or into another corporation or the sale of substantially all of the assets of the Company, outstanding Options may be assumed or equivalent options may be substituted by the successor corporation or a Parent or Subsidiary thereof (the "Successor Corporation"). If an Option is assumed or substituted for, the Option or equivalent option shall continue to be exercisable as provided in Section 4 hereof for so long as the Optionee serves as a Director or a director of the Successor Corporation. Following such assumption or substitution, if the Optionee's status as a Director or director of the Successor Corporation, as applicable, is terminated other than upon a voluntary

6

32

resignation by the Optionee, the Option or option shall become fully exercisable, including as to Shares for which it would not otherwise be exercisable. Thereafter, the Option or option shall remain exercisable in accordance with Sections 8(b) through (d) above.

If the Successor Corporation does not assume an outstanding Option or substitute for it an equivalent option, the Option shall become fully vested and exercisable, including as to Shares for which it would not otherwise be exercisable. In such event the Board shall notify the Optionee that the Option shall be fully exercisable for a period of thirty (30) days from the date of such notice, and upon the expiration of such period the Option shall terminate.

For the purposes of this Section 10(c), an Option shall be considered assumed if, following the merger or sale of assets, the Option confers the right to purchase or receive, for each Share of Optioned Stock subject to the Option immediately prior to the merger or sale of assets, the consideration (whether stock, cash, or other securities or property) received in the merger or sale of assets by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares). If such consideration received in the merger or sale of assets is not solely common stock of the successor corporation or its Parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of the Option, for each Share of Optioned Stock subject to the Option, to be solely common stock of the successor corporation or its Parent equal in fair market value to the per share consideration received by holders of Common Stock in the merger or sale of assets.

11. Amendment and Termination of the Plan.

(a) Amendment and Termination. The Board may at any time amend, alter, suspend, or discontinue the Plan, but no amendment, alteration, suspension, or discontinuation shall be made which would impair the rights of any Optionee under any grant theretofore made, without his or her consent. In addition, to the extent necessary and desirable to comply with any applicable law, regulation or stock exchange rule, the Company shall obtain shareholder approval of any Plan amendment in such a manner and to such a degree as required.

(b) Effect of Amendment or Termination. Any such amendment or termination of the Plan shall not affect Options already granted and such Options shall remain in full force and effect as if this Plan had not been amended or terminated.

12. Time of Granting Options. The date of grant of an Option shall, for all purposes, be the date determined in accordance with Section 4 hereof.

13. Conditions Upon Issuance of Shares. Shares shall not be issued pursuant to the exercise of an Option unless the exercise of such Option and the issuance and delivery of such Shares pursuant thereto shall comply with all relevant provisions of law, including, without limitation, the Securities Act of 1933, as amended, the Exchange Act, the rules and regulations promulgated thereunder, state securities laws, and the requirements of any stock exchange upon

33

which the Shares may then be listed, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

As a condition to the exercise of an Option, the Company may require the person exercising such Option to represent and warrant at the time of any such exercise that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares, if, in the opinion of counsel for the Company, such a representation is required by any of the aforementioned relevant provisions of law.

Inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained.

14. Reservation of Shares. The Company, during the term of this Plan, will at all times reserve and keep available such number of Shares as shall be sufficient to satisfy the requirements of the Plan.

15. Option Agreement. Options shall be evidenced by written option agreements in such form as the Board shall approve.

16. Shareholder Approval. The Plan shall be subject to approval by the shareholders of the Company within twelve (12) months after the date the Plan is adopted. Such shareholder approval shall be obtained in the degree and manner required under applicable state and federal law and any stock exchange rules.

8

34

## KLA-TENCOR CORPORATION

Proxy for 1998 Annual Meeting of Stockholders

### THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

The undersigned, revoking all prior proxies, hereby appoints Kenneth Levy and Lisa C. Berry, and each of them, as Proxies with full power of substitution, to represent and vote as designated in this proxy any and all shares of the common stock of KLA-Tencor Corporation (the "Company"), held or owned by or standing in the name of the undersigned on the Company's books on September 18, 1998, at the Annual Meeting of Stockholders of the Company to be held at the Company's offices at One Technology Drive, Milpitas, California 95035, at 11:00 a.m. local time on Tuesday, November 17, 1998 and any continuation or adjournment thereof, with all powers the undersigned would possess if personally present at the meeting.

The undersigned hereby directs and authorizes said Proxies and each of them, or their substitute or substitutes, to vote as specified with respect to the proposals listed on the reverse side or, if no specification is made, to vote in favor thereof.

The undersigned hereby further confers upon said Proxies, and each of them, or their substitute or substitutes, discretionary authority to vote with respect to all other matters that may properly come before the meeting or any continuation or adjournment thereof.

The undersigned hereby acknowledges receipt of: (a) Notice of Annual Meeting of Stockholders of the Company, (b) accompanying Proxy Statement, and (c) Annual Report to Stockholders for the year ending June 30, 1998.

CONTINUED AND TO BE SIGNED ON REVERSE SIDE

SEE REVERSE SIDE

35

/ X /  Please mark votes as in this example.

THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS OF THE COMPANY. THE
BOARD OF DIRECTORS RECOMMENDS A VOTE FOR THE NOMINEES FOR DIRECTOR AND FOR
PROPOSALS 2, 3, 4 AND 5.

1.   To elect Class III directors to serve for a three year term and until their
successors are elected. Nominees: James W. Bagley, Edward W. Barnholt, Dean O.
Morton and Kenneth L. Schroeder.

```
            FOR                    WITHHELD
            / /                      / /

      / /
          -------------------------------------------------
            For all nominees, except as noted above.
```

2.   To approve amendments to the 1997 Employee Stock Purchase Plan to increase
the number of shares of Common Stock of the Company reserved for issuance
thereunder by 1,000,000 shares.

```
            FOR            AGAINST            ABSTAIN
            / /              / /                / /
```

3.   To approve amendments to the 1997 Employee Stock Purchase Plan to increase
the number of shares of Common Stock of the Company reserved for issuance
thereunder on the first day of each subsequent fiscal year by the lesser of (a)
2,000,000 shares or (b) the number of shares which the Company estimates (based
on the previous 12-month period) it will be required to issue under the 1997
Employee Stock Purchase Plan during the forthcoming fiscal year.

```
            FOR            AGAINST            ABSTAIN
            / /              / /                / /
```

4.   To approve the 1998 Outside Director Option Plan and to reserve for
issuance thereunder 1,000,000 shares of the Common Stock of the Company.

```
            FOR            AGAINST            ABSTAIN
            / /              / /                / /
```

5.   To ratify the appointment of PricewaterhouseCoopers LLP as independent
accountants of the Company for the fiscal year ending June 30, 1999.

```
            FOR            AGAINST            ABSTAIN
            / /              / /                / /
```

In their discretion, the proxy holders are authorized to vote on all such other
matters as may properly come before the meeting or any adjournment thereof.

/ /    Mark here if you plan to attend the meeting

/ /    Mark here for address change and note below

Please sign exactly as your name appears on your stock certificate(s), date and
return this Proxy promptly in the reply envelope provided. Please correct your
address before returning this Proxy. Persons signing in a fiduciary capacity
should so indicate. If shares are held by joint tenants or as community
property, both should sign.

```
Signature:                                       Date:
           --------------------------------            -----------------
Signature:                                       Date:
           --------------------------------            -----------------
```

[DETACH HERE]

# EXHIBIT 2

**SCHEDULE 14A INFORMATION**

**Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934**

Filed by the Registrant ☒
Filed by a Party other than the Registrant ☐
Check the appropriate box:
☐   Preliminary Proxy Statement
☐   Confidential, for Use of the Commission Only (as permitted by Rule 14a–6(e)(2))
☒   Definitive Proxy Statement
☐   Definitive Additional Materials
☐   Soliciting Material Pursuant to §240.14a–12

# KLA – TENCOR CORPORATION

---

(Name of Registrant as Specified in its Charter)

---

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):
☒   No fee required.
☐   Fee computed on table below per Exchange Act Rules 14a–6(i)(1) and 0–11.

   (1)   Title of each class of securities to which transaction applies:

   (2)   Aggregate number of securities to which transaction applies:

   (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0–11 (set forth the amount on which the filing fee is calculated and state how it was determined):

   (4)   Proposed maximum aggregate value of transaction:

   (5)   Total fee paid:

☐   Fee paid previously with preliminary materials.
☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0–11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

   (1)   Amount Previously Paid:

   (2)   Form, Schedule or Registration Statement No.:

   (3)   Filing Party:

   (4)   Date Filed:



## NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
October 18, 2004

To the Stockholders:

### YOUR VOTE IS IMPORTANT

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders of KLA–Tencor Corporation (the "Company"), a Delaware corporation, will be held on Monday, October 18, 2004 at 1:00 p.m., local time, at the Company's offices located at Three Technology Drive, Milpitas, California 95035, for the following purposes:

1.  To elect three Class III directors to each serve for a three–year term and until their successors are duly elected.

2.  To approve the Company's 2004 Equity Incentive Plan, including approval of its material terms and performance goals for purposes of Internal Revenue Code Section 162(m).

3.  To ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2005.

4.  To transact such other business as may properly come before the Annual Meeting or any adjournment thereof.

The foregoing items of business are more fully described in the Proxy Statement accompanying this Notice.

Only stockholders of record at the close of business on August 23, 2004 are entitled to notice of, and to vote at, the Annual Meeting and any adjournment or postponement thereof.

Sincerely,

Stuart J. Nichols
Assistant Secretary
San Jose, California

September 9, 2004

All stockholders are cordially invited to attend the Annual Meeting in person; however, to assure your representation at the Annual Meeting, you are requested to complete, sign and date the enclosed proxy card and return it in the enclosed envelope or follow the instructions on the enclosed proxy card to vote by telephone or via the Internet. Any stockholder attending the Annual Meeting may vote in person even if he or she returned a proxy card.

81

## 2004 ANNUAL MEETING OF STOCKHOLDERS
### OF
### KLA-TENCOR CORPORATION

To be held on October 18, 2004

### PROXY STATEMENT

### QUESTIONS AND ANSWERS REGARDING SOLICITATION AND VOTING

**Why am I receiving these materials?**

The Board of Directors of KLA-Tencor Corporation ("KLA-Tencor," the "Company" or "we") is providing these proxy materials for you in connection with KLA-Tencor's Annual Meeting of Stockholders to be held on Monday, October 18, 2004 at 1:00 p.m. local time. As a stockholder of record, you are invited to attend the Annual Meeting, which will be held at our offices at Three Technology Drive, Milpitas, California 95035. The purposes of the Annual Meeting are set forth in the accompanying Notice of Annual Meeting of Stockholders and this Proxy Statement.

These proxy solicitation materials and the enclosed Annual Report on Form 10-K for the fiscal year ended June 30, 2004, including financial statements, were first mailed on or about September 9, 2004 to all stockholders entitled to vote at the Annual Meeting. KLA-Tencor's principal executive offices are located at 160 Rio Robles, San Jose, California 95134, and our telephone number is (408) 875-3000.

**How may I obtain KLA-Tencor's Annual Report?**

A copy of our Annual Report on Form 10-K was delivered with this Proxy Statement. It is also available free of charge on the Internet from the Securities and Exchange Commission's website at www.sec.gov, as well as on our website at www.kla-tencor.com.

### QUESTIONS AND ANSWERS ABOUT THE ANNUAL MEETING

**Who may vote at the Annual Meeting?**

You may vote if our records showed that you owned shares of KLA-Tencor Common Stock as of August 23, 2004 (the "Record Date"). At the close of business on that date, we had a total of 196,247,543 shares of Common Stock issued and outstanding, which were held of record by approximately 971 stockholders. As of the Record Date, we had no shares of Preferred Stock outstanding. You are entitled to one vote for each share that you own.

**What proposals are being voted on at the Annual Meeting?**

In addition to such other business as may properly come before the Annual Meeting or any adjournment thereof, the following three proposals will be presented at the Annual Meeting:

1. Electing three Class III directors to each serve for a three-year term and until their successors are duly elected;

2. Approving the Company's 2004 Equity Incentive Plan, including approval of its material terms and performance goals for purposes of Internal Revenue Code Section 162(m); and

3. Ratifying the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2005.

82

| How can I vote if I own shares directly? | If your shares are registered directly in your name with our transfer agent, you are considered, with respect to those shares, the stockholder of record, and these proxy materials are being sent directly to you. You may vote in accordance with the instruction described below. If you hold your shares in your own name as a holder of record, you may instruct the proxy holders how to vote your common stock in the following ways: |

1.  **By Telephone:** Use the toll free telephone number provided on the proxy card(specific instructions for using the telephone voting system are on the proxy card);

2.  **Internet:** Use the Internet voting site listed on the proxy card (specific instructions for using the Internet voting system are on the proxy card);

3.  **By Mail:** Complete, sign, date and mail the proxy card in the postage paid envelope that we have provided; or

4.  **In Person:** Attend the Annual Meeting and vote your shares in person.

Whichever of these methods you select to transmit your instructions, the proxy holders will vote your shares in accordance with those instructions.

If you sign and return a proxy card without giving specific voting instructions, your shares will be voted as recommended by our Board of Directors.

| How may I vote if my shares are held in a stock brokerage account, by a bank or other nominee? | If your shares are held in a stock brokerage account or by a bank or other nominee, you are considered the beneficial owner of shares held in street name, and these proxy materials are being forwarded to you by your broker or nominee who is considered, with respect to those shares, the stockholder of record. As the beneficial owner, you have the right to direct your broker on how to vote and you are also invited to attend the Annual Meeting. However, since you are not the stockholder of record, you may not vote these shares in person at the Annual Meeting. Your broker or nominee has forwarded instructions for you to use in directing the broker or nominee regarding how to vote your shares. |

If a broker, bank or other nominee holds your shares, you will receive instructions from them that you must follow in order to have your shares voted.

| Can I change my vote? | You may change your vote at any time prior to the vote at the Annual Meeting. To change your proxy instructions if you are a holder of record, you must: |

1.  Advise our Assistant Secretary in writing at our principal executive office before the proxy holders vote your shares that you wish to revoke your proxy instructions; or

2.  Deliver proxy instructions dated after your earlier proxy instructions as follows:

    (a)  **By Telephone:** Use the toll free telephone number provided on the proxy card to vote again prior to 11:59 P.M. EST on October 17, 2004 (specific instructions for using the telephone voting system are on the proxy card);

    (b)  **By Internet:** Use the Internet voting site listed on the proxy card to vote again prior to 11:59 P.M EST on October 17, 2004 (specific instructions for using the Internet voting system are on the proxy card);

    (c)  **By Mail:** Complete, sign, date and mail another proxy card bearing a later date and deliver such proxy card prior to 11:59 P.M. EST on October 17, 2004; or

    (d)  **In Person:** Attend the Annual Meeting and vote your shares in person.

| | |
|---|---|
| How are votes counted? | The Annual Meeting will be held if a majority of the outstanding Common Stock entitled to vote is represented at the Annual Meeting. If you have returned valid proxy instructions or attend the Annual Meeting in person, your Common Stock will be counted for the purpose of determining whether there is a quorum, even if you wish to abstain from voting on some or all matters at the Annual Meeting. |
| Who will bear the cost of this proxy solicitation? | We will pay the cost of this proxy solicitation. KLA-Tencor has retained the services of Automatic Data Processing ("ADP") and D.F. King to aid in the solicitation of proxies from brokers, bank nominees and other institutional owners. We estimate that we will pay ADP fees of approximately $100,000 for this solicitation activity and for forwarding solicitation material to beneficial and registered stockholders and processing the results. We estimate that we will pay D.F. King approximately $10,000 for this solicitation activity. Certain of our directors, officers and regular employees, without additional compensation, may solicit proxies personally or by telephone. |
| Can my broker vote my shares if I do not instruct him or her how I would like my shares voted? | Yes, except with respect to the proposal to approve the Company's 2004 Equity Incentive Plan. If you do not give your broker voting instructions with respect to Proposal Two, approval of the 2004 Equity Incentive Plan, the broker will be prevented from voting shares held in your brokerage account (a "broker non-vote"). The New York Stock Exchange ("NYSE") has issued regulations which prohibit bankers, brokers or other nominees that are NYSE member organizations from voting in favor of proposals related to equity compensation plans unless they receive specific instructions from the beneficial owner of the shares to vote in that manner. In addition, brokers who are members of the National Association of Securities Dealers ("NASD") are also prohibited from voting on such proposals without specific instructions from beneficial holders. Thus, all shares that you hold through a broker or other nominee who is a NYSE or NASD member organization will only be voted on Proposal Two if you have provided specific voting instructions to your broker or other nominee with respect to Proposal Two. |
| Are abstentions and broker non-votes counted? | Shares that are voted "FOR," "AGAINST," "WITHHELD" or "ABSTAIN" are treated as being present for purposes of determining the presence of a quorum and are also treated as shares entitled to vote at the Annual Meeting ("Votes Cast").

Since abstentions will be counted for purposes of determining both (i) the presence or absence of a quorum for the transaction of business and (ii) the total number of Votes Cast with respect to a proposal (other than the election of directors), abstentions will have the same effect as a vote against the proposal (other than election of directors).

Shares that are subject to a broker non-vote are counted for purposes of determining whether a quorum exists but not for purposes of determining whether a proposal has passed. Accordingly, broker non-votes will not affect the outcome of the voting on a proposal that requires a majority of the Votes Cast. |

84

| | |
|---|---|
| How does the Board of Directors recommend that I vote? | The Board of Directors recommends that stockholders vote as follows:<br>    "FOR" the election of the Class III Directors—Edward W. Barnholt, Stephen P. Kaufman and Kenneth L. Schroeder to the Board of Directors;<br>    "FOR" approval of the Company's 2004 Equity Incentive Plan, including approval of its material terms and performance goals for purposes of Internal Revenue Code Section 162(m); and<br>    "FOR" ratification of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2005.<br><br>When proxies are properly dated, executed and returned, the shares represented by such proxies will be voted at the Annual Meeting in accordance with the instructions of the stockholder. However, if no specific instructions are given, the shares will be voted in accordance with the recommendations of our Board of Directors and as the proxy holders may determine in their discretion with respect to any other matters that properly come before the meeting. |
| Will any other business be transacted at the Annual Meeting? | We are not aware of any matters to be presented other than those described in this Proxy Statement. If any matters not described in the Proxy Statement are properly presented at the Annual Meeting, the proxy holders will use their own judgment to determine how to vote your shares. If the Annual Meeting is adjourned or postponed, the proxy holders can vote your shares on the new meeting date as well, unless you have revoked your proxy instructions. |
| Can I present other business to be transacted at the Annual Meeting? | Any stockholder may present a matter from the floor for consideration at a meeting of stockholders so long as certain procedures are followed. Under our bylaws, as amended, a stockholder notice must be delivered to, or mailed and received by, KLA-Tencor (attention: Assistant Secretary) at least 120 days prior to the annual meeting of stockholders (under the assumption that the next annual meeting of stockholders will occur on the anniversary of the same calendar day as the day of the most recent annual meeting of stockholders). |
| What is required in a stockholder's notice to present other business to be transacted? | The stockholder's notice must set forth, as to each proposed matter, the following:<br>1.    A brief description of the proposed matter and reasons for conducting such business at the meeting;<br>2.    Name and address, as they appear on KLA-Tencor's books, of the stockholder;<br>3.    The class and number of shares of KLA-Tencor that are beneficially owned by the stockholder;<br>4.    Any material interest of the stockholder in such business; and<br>5.    Any other information that is required to be provided by such stockholder pursuant to Regulation 14A under the Securities Exchange Act of 1934. |
| Can I still present other business to be transacted if my notice is deficient? | If the stockholder notice is not in compliance with the requirements set forth in our bylaws, the presiding officer of the meeting may refuse to acknowledge the matter. |

| | |
|---|---|
| **What is the deadline for stockholder proposals in connection with the 2005 Annual Meeting?** | Stockholders may present proposals for action at a future meeting only if they comply with the requirements of the proxy rules established by the Securities and Exchange Commission ("SEC") and the provisions of our bylaws. We must receive stockholder proposals that are intended to be presented by such stockholders at our 2005 Annual Meeting of Stockholders no later than May 12, 2005 to be considered for inclusion in the Proxy Statement and form of Proxy relating to that meeting. |
| | Stockholder proposals that are not intended to be included in our proxy materials for such meeting, but that are to be presented by the stockholder from the floor are subject to the advance notice provisions set forth above under "Can I present other business to be transacted at the Annual Meeting?" and other requirements set forth in our bylaws. |
| **How may I obtain a copy of KLA-Tencor's Bylaws?** | For a free copy of KLA-Tencor's bylaws, please contact our Investor Relations department at (408) 875-3600 or visit our website at www.kla-tencor.com/investors/contactinfo.html and fill out a request form. |
| **What should I do if I receive more than one set of voting materials?** | You may request delivery of a single copy of our future proxy statements and annual reports by writing to the address below or calling our Investor Relations department at the telephone number below. Stockholders may also request electronic delivery of our annual report and proxy statement by writing to the address below, calling our Investor Relations department at the telephone number below or via our website at www.icsdelivery.com/klatencor/index.html. |
| **May I get additional copies of these materials and the exhibits to the Annual Report?** | Certain stockholders who share an address are being delivered only one copy of this Proxy Statement and our 2004 Annual Report on Form 10-K. You may receive additional copies of this Proxy Statement and our Annual Report on Form 10-K for the fiscal year ended June 30, 2004 without charge or a copy of the exhibits to such Form 10-K for a reasonable fee (which shall be limited to our reasonable expenses in furnishing such exhibits) by sending a written request to KLA-Tencor Corporation, Attention: Investor Relations, 160 Rio Robles, San Jose, CA 95134. Requests may also be made by calling Investor Relations at KLA-Tencor at (408) 875-3600. |

**PROPOSAL ONE:**
**ELECTION OF DIRECTORS**

The Company has a classified Board of Directors currently comprised of three incumbent Class I directors (Kenneth Levy, Jon D. Tompkins and Lida Urbanek), four incumbent Class II directors (H. Raymond Bingham, Robert T. Bond, Richard J. Elkus, Jr. and Michael E. Marks) and three incumbent Class III directors (Edward W. Barnholt, Stephen P. Kaufman and Kenneth L. Schroeder). The Class I directors and the Class II directors will serve until the annual meetings of stockholders to be held in 2005 and 2006, respectively, or until their respective successors are duly elected and qualified. At each annual meeting, directors are elected for a full term of three years to succeed those directors whose terms expire at the annual meeting.

Nominees

The term of the three current Class III directors will expire on the date of the Annual Meeting. Three Class III directors of the Board of Directors are to be elected at the Annual Meeting. The Nominating and Governance Committee, consisting solely of independent directors as determined under the rules of the Nasdaq National Market, recommended the nominees set forth in this Proposal One, each of whom is an incumbent director. Based on that recommendation, the members of the Board of Directors unanimously resolved to nominate such individuals for election. The nominees for election by the stockholders to these three positions are:

- Edward W. Barnholt;
- Stephen P. Kaufman; and
- Kenneth L. Schroeder.

If elected, the nominees will serve as directors until the Company's annual meeting of stockholders in 2007, or until their successors are duly elected and qualified. If any of the nominees declines to serve or becomes unavailable for any reason, or a vacancy occurs before the election, the proxies may be voted for such substitute nominees as the Board of Directors may designate. As of the date of this proxy statement, the Board is not aware of any nominee who is unable or will decline to serve as a director.

Vote Required and
Recommendation

If a quorum is present and voting, the three nominees for Class III directors receiving the highest number of affirmative votes will be elected as Class III directors. Votes withheld from any director and broker non–votes are counted for purposes of determining the presence or absence of a quorum but have no other legal effect on the selection of nominees for directors.

**THE MEMBERS OF THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMEND A VOTE "FOR" EACH OF THE CLASS III NOMINEES LISTED ABOVE.**

## INFORMATION ABOUT THE DIRECTORS AND THE NOMINEES

The following table sets forth certain information with respect to the Company's Board of Directors as of the date of this proxy statement:

Nominees for Election as Class III Directors

| | Principal Occupation of Board Members During the Past Five Years | Age | Director Since |
|---|---|---|---|
| Edward W. Barnholt | Edward W. Barnholt has been a Director of KLA–Tencor since 1995. Since May 1999, Mr. Barnholt has been President and Chief Executive Officer of Agilent Technologies, Inc. ("Agilent") and became Chairman of the Board of Agilent in November 2002. Before being named Agilent's Chief Executive Officer, Mr. Barnholt served as Executive Vice President and General Manager of Hewlett–Packard Company's Measurement Organization from 1998 to 1999. From 1990 to 1998, he served as General Manager of Hewlett–Packard Company's Test and Measurement Organization. He was elected a Senior Vice President of Hewlett–Packard Company in 1993 and an Executive Vice President in 1996. Mr. Barnholt also serves on the boards of directors of the Tech Museum of Innovation and Silicon Valley Manufacturing Group. | 61 | 1995 |
| Stephen P. Kaufman | Stephen P. Kaufman has been a Director of KLA–Tencor since November 2002. He has been a Senior Lecturer at the Harvard Business School since January 2001. He was a member of the board of directors of Arrow Electronics, Inc. ("Arrow") from 1994 to May 2003. From 1986 to June 2000, he was Chief Executive Officer of Arrow. From 1985 to June 1999, he was also Arrow's President. From 1994 to June 2002, he was Chairman of the Board of Arrow. Mr. Kaufman also serves on the boards of directors of Harris Corporation and Viacore, Inc. | 62 | 2002 |
| Kenneth L. Schroeder | Kenneth L. Schroeder joined KLA Instruments in 1979 and left in 1987 to pursue personal and other business interests. He returned to KLA Instruments in 1991. Mr. Schroeder has been Chief Executive Officer and a member of the Board of Directors of KLA–Tencor since July 1, 1999, as well as President since May 2004. He also held the position of President from November 1991 to July 2002. | 59 | 1991 |

88

Class II Directors

| | Principal Occupation of Board Members During the Past Five Years | Age | Director Since |
|---|---|---|---|
| H. Raymond Bingham | H. Raymond Bingham has been a Director of KLA–Tencor since October 1999. He served as President and Chief Executive Officer of Cadence Design Systems, Inc. ("Cadence") from May 1999 to April 2004. Mr. Bingham has been Chairman of the Board of Cadence since May 2004 and has been a director of Cadence since November 1997. From 1993 to April 1999, Mr. Bingham served as Executive Vice President and Chief Financial Officer of Cadence. Prior to joining Cadence, Mr. Bingham was Executive Vice President and Chief Financial Officer of Red Lion Hotels, Inc. for eight years. Mr. Bingham also serves on the boards of directors of Freescale Semiconductor, Inc., Onyx Software Corporation and Oracle Corporation. | 58 | 1999 |
| Robert T. Bond | Robert T. Bond has been a Director of KLA–Tencor since August 2000. From April 1996 to January 1998, Mr. Bond served as Chief Operating Officer of Rational Software Corporation. Prior to that, he held various executive positions at Rational Software Corporation. Mr. Bond was employed by Hewlett–Packard Company from 1967 to 1983 and held various management positions during his tenure there. Mr. Bond also serves on the boards of directors of Portal Software, MontaVista Software, Clarus Systems and DecisionPoint Applications, Inc. | 61 | 2000 |
| Richard J. Elkus, Jr. | Richard J. Elkus, Jr. has been a Director of KLA–Tencor since April 1997. He was Executive Vice President and Vice Chairman of the board of directors of Tencor Instruments from February 1994 until April 1997. In addition to KLA– Tencor he currently serves on the boards of directors of Sopra SA, Lam Research Corporation, Virage Logic Corporation, the Palo Alto Medical Foundation, the National Medal of Technology Foundation, and the Board of Trustees of the Scripps Research Institute. | 69 | 1997 |
| Michael E. Marks | Michael E. Marks has been a Director of KLA–Tencor since November 2003. He has been the Chief Executive Officer of Flextronics International Ltd. ("Flextronics") since January 1994 and also serves on its board of directors. Mr. Marks was Chairman of the Board of Flextronics from July 1993 to January 2003. Prior to joining Flextronics, he was President and Chief Executive Officer of Metcal, Inc., a precision heating instrument company. | 53 | 2003 |

89

Class I Directors

| | Principal Occupation of Board Members During the Past Five Years | Age | Director Since |
|---|---|---|---|
| Kenneth Levy | Kenneth Levy is a founder of KLA Instruments Corporation and since July 1, 1999 has been Chairman of the Board and a Director of KLA–Tencor. From July 1998 until June 30, 1999, he was Chief Executive Officer and a Director. From 1975 until April 30, 1997 he was Chief Executive Officer of KLA Instruments Corporation. He currently serves on the boards of directors of the following publicly traded companies: Juniper Networks, Inc., Extreme Networks, Inc., and PowerDsine, Inc. In addition, he is a Director Emeritus of SEMI, an industry trade association. | 61 | 1975 |
| Jon D. Tompkins | Jon D. Tompkins has been a Director of KLA–Tencor since April 1997. He was Chairman of the Board from July 1998 to June 1999, when he retired from such position. From May 1997 until July 1998, he was Chief Executive Officer. From April 1991 until April 1997, Mr. Tompkins was President and Chief Executive Officer of Tencor Instruments prior to its merger with KLA Instruments Corporation. He was a director of Tencor Instruments from 1991 until April 1997 and was appointed Chairman of the Board of Directors of Tencor Instruments in November 1993. Mr. Tompkins currently serves on the boards of directors of Cymer, Inc., Electro Scientific Industries, Inc. and Credence Systems Corporation. | 64 | 1997 |
| Lida Urbanck | Lida Urbanck has been a Director of KLA–Tencor since April 30, 1997. She is a private investor. She was a director of Tencor Instruments from August 1991 until April 30, 1997. | 61 | 1997 |

90

**PROPOSAL TWO:**
**APPROVAL OF THE COMPANY'S 2004 EQUITY INCENTIVE PLAN, INCLUDING APPROVAL OF ITS MATERIAL TERMS AND PERFORMANCE GOALS FOR PURPOSES OF INTERNAL REVENUE CODE SECTION 162(m)**

Approval of the 2004
Equity Incentive Plan

The Board of Directors is asking our stockholders to approve our 2004 Equity Incentive Plan, which will:

- Reserve 11,000,000 new shares of our Common Stock for issuance under the 2004 Equity Incentive Plan;

- Transfer up to an additional 1,500,000 shares subject to outstanding options under our 1982 Stock Option Plan and 2000 Nonstatutory Stock Option Plan if they expire or are forfeited without being exercised and terminate the 1982 Stock Option Plan (including its "evergreen" automatic replenishment feature) and 2000 Nonstatutory Stock Option Plan for any new grants; and

- Include the ability to grant restricted stock, stock appreciation rights, performance shares, performance units and deferred stock units.

The Company's stockholders are also being asked to approve the material terms of the 2004 Equity Incentive Plan and the performance goals thereunder for the purpose of helping awards under the 2004 Equity Incentive Plan qualify as "performance–based" compensation under Internal Revenue Code Section 162(m).

Any 2004 Equity Incentive Plan awards of restricted stock, performance shares, performance units or deferred stock units with a per share or unit purchase price lower than 100% of fair market value on the grant date shall be counted against the total number of shares issuable under the plan as 1.8 shares for every one share subject thereto.

As of June 30, 2004, options to purchase a total of 29,432,566 shares were

outstanding under our active stock option plans as follows:

| | |
|---|---:|
| 1982 Stock Option Plan | 20,343,266 |
| 2000 Nonstatutory Stock Option Plan | 8,816,802 |
| 1998 Outside Director Option Plan | 272,498 |

As of June 30, 2004, our 1982 Stock Option Plan had 12,647,812 shares remaining available for issuance and was scheduled to expire in 2006. Moreover, our 1982 Stock Option Plan has an "evergreen" automatic annual share replenishment feature whereby on the first day of each of our fiscal years, an amount of shares equal to 3% of our outstanding shares of common stock on the last day of each fiscal year plus the number of common stock shares that we repurchase on the open market for reissuance under the Plan can be added to the Plan. Pursuant to this "evergreen" annual share replenishment feature, on July 1, 2004 an additional 5,903,603 shares as of June 30, 2004 were added to the 1982 Stock Option Plan. As of June 30, 2004, our 2000 Nonstatutory Stock Option Plan had 3,098,870 shares remaining available for issuance and was scheduled to expire in 2010. If our stockholders approve this proposal, both the 1982 Stock Option Plan (including its "evergreen" feature) and the 2000 Nonstatutory Stock Option Plan shall be terminated for any new grants.

Proposed new accounting regulations are expected to require companies to record a charge to earnings for employee and director stock option grants, including options granted under plans similar to the proposed 2004 Equity Incentive Plan. The extent to which we will make grants of awards under the 2004 Equity

91

Incentive Plan will depend on the developments in these accounting regulations as well as several other factors, including our assessment of the impact of the final rules on our earnings, actions by other companies (particularly those with whom we compete for employees and directors) with respect to the design and operation of equity incentive plans, and the attitude of financial analysts and investors towards these potentially significant non-cash charges. The 2004 Equity Incentive Plan will allow us to grant a wider range of awards than is permitted under our current stock option plans, including restricted stock, stock appreciation rights, performance shares, performance units and deferred stock units, which will help us achieve our goal of attracting, retaining and motivating our talented personnel. We believe that the 2004 Equity Incentive Plan will be an essential element of a competitive compensation package.

Our 2004 Equity Incentive Plan has been developed to replace our 1982 Stock Option Plan and 2000 Nonstatutory Stock Option Plan and to supplement our 1998 Outside Director Option Plan. Currently, our 1982 Stock Option Plan authorizes our Board of Directors to grant stock options to our eligible employees and consultants. Our 2000 Nonstatutory Stock Option Plan authorizes our Board of Directors to grant stock options to our eligible employees and consultants who are not officers or members of the Board of Directors. Our 1998 Outside Director Option Plan provides for automatic formula option grants as well as discretionary option grants to members of our Board of Directors. Our Board of Directors approved the 2004 Equity Incentive Plan in July 2004 to replace the 1982 Stock Option Plan and 2000 Nonstatutory Stock Option Plan, subject to stockholder approval at the 2004 Annual Meeting.

As of June 30, 2004, the closing price of our common stock was $49.38 per share. The 2004 Equity Incentive Plan provides for the grant of options to purchase shares of our Common Stock, stock appreciation rights ("SARs"), restricted stock, performance shares, performance units, and deferred stock units to our employees, consultants and members of our Board of Directors. As of June 30, 2004, there were approximately 5,200 employees (including officers) and members of our Board of Directors eligible to participate in the 2004 Equity Incentive Plan. Please see the summary of the 2004 Equity Incentive Plan below.

**Vote Required and Recommendation**

If a quorum is present and voting, the affirmative vote of a majority of the votes cast will be required to approve the adoption of the 2004 Equity Incentive Plan. Our executive officers and members of our Board of Directors have an interest in this proposal as they may receive awards under the 2004 Equity Incentive Plan.

**THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" APPROVAL OF THE COMPANY'S 2004 EQUITY INCENTIVE PLAN, INCLUDING APPROVAL OF ITS MATERIAL TERMS AND PERFORMANCE GOALS FOR PURPOSES OF INTERNAL REVENUE CODE SECTION 162(M).**

**SUMMARY OF THE 2004 EQUITY INCENTIVE PLAN**

The essential features of the 2004 Equity Incentive Plan are summarized below. This summary does not purport to be complete and is subject to, and qualified in its entirety by, the provisions of the 2004 Equity Incentive Plan, which is attached as Appendix A. Capitalized terms used herein and not defined shall have the meanings set forth in the 2004 Equity Incentive Plan.

92

| | |
|---|---|
| General | The purposes of the 2004 Equity Incentive Plan are to attract and retain the best available personnel for positions of substantial responsibility, provide additional incentive to our employees and consultants, and promote the success of our business. |
| Administration | The 2004 Equity Incentive Plan may be administered by our Board of Directors or a committee, which our Board of Directors may appoint from among its members (the "Administrator"). Subject to the provisions of the 2004 Equity Incentive Plan, the Administrator has the authority to: (i) interpret the plan and apply its provisions; (ii) prescribe, amend or rescind rules and regulations relating to the 2004 Equity Incentive Plan; (iii) select the persons to whom awards are to be granted; (iv) subject to individual fiscal year limits applicable to each type of award, determine the number of shares or equivalent units to be made subject to each award; (v) determine whether and to what extent awards are to be granted; (vi) determine the terms and conditions applicable to awards generally and of each individual award (including the provisions of the award agreement to be entered into between the Company and the participant); (vii) amend any outstanding award subject to applicable legal restrictions (except repricing an option or SAR, unless stockholder approval is obtained); (viii) authorize any person to execute, on our behalf, any instrument required to effect the grant of an award; (ix) approve forms of agreement for use under the Plan; (x) allow participants to satisfy withholding tax obligations by electing to have the Company withhold from the shares or cash to be issued upon exercise, vesting of an award (or distribution of a deferred stock unit) that number of shares or cash having a fair market value equal to the minimum amount required to be withheld; and (xi) subject to certain limitations, take any other actions deemed necessary or advisable for the administration of the 2004 Equity Incentive Plan. All decisions, interpretations and other actions of the Administrator shall be final and binding on all holders of options or rights and on all persons deriving their rights therefrom. |
| Discount Award Limitations | Options and SARs may not be granted with an exercise price lower than 100% of the fair market value of the underlying shares. |
| Shares Counted Against the Plan | Any 2004 Equity Incentive Plan awards of restricted stock, performance shares, performance units or deferred stock units with a per share or unit purchase price lower than 100% of fair market value on the grant date shall be counted against the total number of shares issuable under the plan as 1.8 shares for every one share subject thereto. |
| No Repricing | The 2004 Equity Incentive Plan prohibits option or stock appreciation right repricing, including by way of an exchange for another award, unless stockholder approval is obtained. |
| Eligibility | The 2004 Equity Incentive Plan provides that awards may be granted to our employees, consultants and members of our Board of Directors. Incentive stock options may only be granted to employees. Any optionee who owns more than 10% of the combined voting power of all classes of outstanding stock of the Company (a "10% Stockholder") is not eligible for the grant of an incentive stock option unless the exercise price of the option is at least 110% of the fair market value of the common stock on the date of grant. |

93

Code Section 162(m)
Performance Goals

We have designed the 2004 Equity Incentive Plan so that it permits us to issue awards that qualify as performance-based under Section 162(m) of the Code. Thus, the Administrator may make performance goals applicable to a participant with respect to an award. At the Administrator's discretion, one or more of the following performance goals may apply: annual revenue, cash position, earnings per share, net income, operating cash flow, operating income, return on assets, return on equity, return on sales, and total stockholder return, all as determined in accordance with accounting principles generally accepted in the United States. Except for cash position, return on equity and total stockholder return, a performance goal may apply either to the Company or to one of its business units.

Terms and Conditions of
Options

Each option granted under the 2004 Equity Incentive Plan is evidenced by a written stock option agreement between the optionee and us and is subject to the following terms and conditions:

    (a) *Exercise Price.* The exercise price of options may not be less than 100% of the fair market value of the common stock on the grant date the option. As our common stock is listed on the Nasdaq National Market, the fair market value is the closing sale price for the common stock (or the closing bid if no sales were reported) on the grant date.

    (b) *Form of Consideration.* The means of payment for shares issued upon exercise of an option is specified in each option agreement and generally may be made by cash, check, other shares of our common stock owned by the optionee, delivery of an exercise notice together with irrevocable instructions to a broker to deliver to us the exercise price from sale proceeds, or by a combination thereof.

    (c) *Exercise of the Option.* Each stock option agreement will specify the term of the option and the date when the option is to become exercisable. However, in no event shall an option granted under the 2004 Equity Incentive Plan be exercised more than 10 years after the date of grant. Moreover, in the case of an incentive stock option granted to a 10% stockholder, the term of the option shall be for no more than five years from the date of grant.

    (d) *Termination of Employment.* If an optionee's employment terminates for any reason (other than death or permanent disability), all options held by such optionee under the 2004 Equity Incentive Plan expire upon the earlier of (i) such period of time as is set forth in his or her option agreement or (ii) the expiration date of the option. The optionee may exercise all or part of his or her option at any time before such expiration to the extent that such option was exercisable at the time of termination of employment.

    (e) *Permanent Disability.* If an optionee is unable to continue employment with us as a result of permanent and total disability (as defined in the Code), all options held by such optionee under the 2004 Equity Incentive Plan shall expire upon the earlier of (i) 12 months after the date of termination of the optionee's employment or (ii) the expiration date of the option. The optionee may exercise all or part of his or her option at any time before such expiration to the extent that such option was exercisable at the time of termination of employment.

    (f) *Death.* If an optionee dies while employed by us, his or her options shall expire upon the earlier of (i) 12 months after the optionee's death or

94

(ii) the expiration date of the options. The executor or other legal representative of the optionee may exercise all or part of the optionee's option at any time before such expiration with respect to all shares subject to such option.

(g) *ISO Limitation.* If the aggregate fair market value of all shares of common stock subject to an optionee's incentive stock option that are exercisable for the first time during any calendar year exceeds $100,000, the excess options shall be treated as nonstatutory options.

(h) *Other Provisions.* The stock option agreement may contain terms, provisions and conditions that are inconsistent with the 2004 Equity Incentive Plan as determined by the Administrator.

| | |
|---|---|
| Option and SAR 162(m) Share Limit | No participant may be granted stock options and stock appreciation rights to purchase more than 400,000 shares of common stock in any fiscal year, except that up to 1,200,000 shares may be granted in the participant's first fiscal year of service. |
| Exercise Price and Other Terms of Stock Appreciation Rights | The exercise price of SARs may not be less than 100% of the fair market value of the common stock on the grant date of the option. The Administrator, subject to the provisions of the 2004 Equity Incentive Plan (including the 162(m) share limit referred to above and the exercise price restrictions), shall have complete discretion to determine the terms and conditions of SARs granted under the 2004 Equity Incentive Plan. |
| Payment of Stock Appreciation Right Amount | Upon exercise of a SAR, the holder of the SAR shall be entitled to receive payment in an amount equal to the product of (X) the difference between the fair market value of a share on the date of exercise and the exercise price and (Y) the number of shares for which the SAR is exercised. |
| Payment upon Exercise of Stock Appreciation Right | At the discretion of the Administrator, payment to the holder of a SAR may be in cash, shares of our common stock or a combination thereof. To the extent that a SAR is settled in cash, the shares available for issuance under the 2004 Equity Incentive Plan shall not be diminished as a result of the settlement. |
| Stock Appreciation Right Agreement | Each SAR grant shall be evidenced by an agreement that shall specify the exercise price, the term of the SAR, the conditions of exercise, and such other terms and conditions as the committee, in its sole discretion, shall determine. |
| Expiration of Stock Appreciation Rights | SARs granted under the 2004 Equity Incentive Plan expire as determined by the Administrator, but in no event later than ten (10) years from date of grant. No SAR may be exercised by any person after its expiration. |
| Restricted Stock and Performance Share 162(m) Share Limit | No participant shall be granted restricted stock or performance share awards covering, in the aggregate, more than 300,000 shares in any of our fiscal years, except that up to 750,000 shares may be granted in the participant's first fiscal year of service. |
| Grant of Restricted Stock | Subject to the terms and conditions of the 2004 Equity Incentive Plan, restricted stock may be granted to our employees, consultants and members of our Board of Directors at any time and from time to time at the discretion of the Administrator. Subject to the 162(m) share limit set forth above, the Administrator shall have complete discretion to determine (i) the number of shares subject to a |

95

restricted stock award granted to any participant and (ii) the conditions for grant or for vesting that must be satisfied, which typically will be based principally or solely on continued provision of services but may include a performance–based component. Until the shares are issued, no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the underlying shares.

**Restricted Stock Award Agreement**

Each restricted stock grant shall be evidenced by an agreement that shall specify the purchase price (if any) and such other terms and conditions as the Administrator shall determine; *provided, however,* that if the restricted stock grant has a purchase price, the purchase price must be paid no more than ten (10) years following the date of grant.

**Grant of Performance Shares**

Subject to the terms and conditions of the 2004 Equity Incentive Plan, performance shares may be granted to our employees and consultants at any time and from time to time as shall be determined at the discretion of the Administrator. Subject to the 162(m) share limit set forth above, the Administrator shall have complete discretion to determine (i) the number of shares of our common stock subject to a performance share award granted to any service provider and (ii) the conditions that must be satisfied for grant or for vesting, which typically will be based principally or solely on achievement of performance milestones but may include a service–based component.

**Performance Share Award Agreement**

Each performance share grant shall be evidenced by an agreement that shall specify such other terms and conditions as the Administrator, in its sole discretion, shall determine.

**Grant of Performance Units**

Performance units are similar to performance shares, except that they shall be settled in cash equivalent to the fair market value of the underlying shares of our common stock, determined as of the vesting date. The shares available for issuance under the 2004 Equity Incentive Plan shall not be diminished as a result of the settlement of a performance unit.

**Performance Unit Award Agreement**

Each performance unit grant shall be evidenced by an agreement that shall specify such terms and conditions as shall be determined at the discretion of the Administrator. However, no participant shall be granted a performance unit award covering more than one million dollars in any of our fiscal years, except that an award covering up to three million dollars may be granted in the participant's first fiscal year of service.

**Deferred Stock Units**

Deferred stock units shall consist of a restricted stock, performance share or performance unit award that the Administrator, in its sole discretion, permits to be paid out in installments or on a deferred basis, in accordance with rules and procedures established by the Administrator. Deferred stock units are subject to the individual annual limits that apply to each type of award.

**Non–Transferability of Awards**

Unless determined otherwise by the Administrator, an award granted under the 2004 Equity Incentive Plan may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent or distribution and may be exercised, during the lifetime of the recipient, only by the recipient. If the Administrator makes an award granted under the 2004 Equity Incentive Plan transferable, such award shall contain such additional terms and conditions as the Administrator deems appropriate.

96

| | |
|---|---|
| Leave of Absence | In the event that a participant goes on a leave of absence, award vesting will cease until he or she returns to work, except as required by law or as otherwise determined by the Administrator. |
| Part-Time Service | Unless the Administrator provides otherwise or except as otherwise required by law, any service-based vesting of awards granted under the 2004 Equity Incentive Plan shall be extended on a proportionate basis in the event an employee transitions from a full-time to a part-time work schedule, or if not on a full-time work schedule, to a schedule requiring fewer hours of service. Such vesting shall be proportionately re-adjusted prospectively in the event that the employee subsequently becomes regularly scheduled to work additional hours of service. |
| Adjustment Upon Changes in Capitalization | In the event that our capital stock is changed by reason of any stock split, reverse stock split, stock dividend, combination or reclassification of our common stock or any other increase or decrease in the number of issued shares of common stock effected without receipt of consideration by us, appropriate proportional adjustments shall be made in the number and class of shares of stock subject to the 2004 Equity Incentive Plan, the individual fiscal year limits applicable to restricted stock, performance share awards, SARS and options, the number and class of shares of stock subject to any award outstanding under the 2004 Equity Incentive Plan, and the exercise price of any such outstanding option or SAR or other award. Any such adjustment shall be made by the Compensation Committee of our Board of Directors, whose determination shall be conclusive. |
| Change of Control | In the event of a change of control, the successor corporation (or its parent or subsidiary) will assume or substitute each outstanding award. If the successor corporation refuses to assume the awards or to substitute equivalent awards, such awards shall become 100% vested. In such event, the Administrator shall notify the participant that each award subject to exercise is fully exercisable for fifteen (15) days from the date of such notice and that the award terminates upon expiration of such period. |
| Amendment, Suspensions and Termination of the 2004 Equity Incentive Plan | Our Board of Directors may amend, suspend or terminate the 2004 Equity Incentive Plan at any time; *provided, however,* that stockholder approval is required for any amendment to the extent necessary to comply with Rule 16b-3 promulgated under the Securities Exchange Act of 1934 ("Rule-16b-3") or Section 422 of the Code, or any similar rule or statute. If Proposal Two is approved, the 2004 Equity Incentive Plan will terminate in June 2014. |

### FEDERAL TAX INFORMATION

| | |
|---|---|
| Options | Options granted under the 2004 Equity Incentive Plan may be either "incentive stock options," as defined in Section 422 of the Code, or nonstatutory options. |
| | An optionee who is granted an incentive stock option will not recognize taxable income either at the time the option is granted or upon its exercise, although the exercise may subject the optionee to alternative minimum tax. |
| | Upon the sale or exchange of the shares more than two years after grant of the option and one year after exercising the option, any gain or loss will be treated as long-term capital gain or loss. If these holding periods are not satisfied, the optionee will recognize ordinary income at the time of sale or exchange equal to the difference between the exercise price and the lower of (i) the fair market value |

97

of the shares at the date of the option exercise or (ii) the sales price of the shares. A different rule for measuring ordinary income upon such a premature disposition may apply if the optionee is also an officer, director, or 10% Stockholder. Any gain or loss recognized on such a premature disposition of the shares in excess of the amount treated as ordinary income will be characterized as long–term or short–term capital gain or loss, depending on the holding period.

All options that do not qualify as incentive stock options are referred to as nonstatutory options. An optionee will not recognize any taxable income at the time the optionee is granted a nonstatutory option. However, upon its exercise, the optionee will recognize taxable income generally measured as the excess of the then fair market value of the shares purchased over the purchase price. Any taxable income recognized in connection with an option exercise by an optionee who is also our employee will be subject to tax withholding by us. Upon resale of such shares by the optionee, any difference between the sale price and the optionee's purchase price, to the extent not recognized as taxable income as described above, will be treated as long–term or short–term capital gain or loss, depending on the holding period.

| | |
|---|---|
| Stock Appreciation Rights | No taxable income is reportable when a stock appreciation right is granted to a participant. Upon exercise, the participant will recognize ordinary income in an amount equal to the amount of cash received and the fair market value of any shares of our common stock received less the purchase price. Any additional gain or loss recognized upon any later disposition of the shares of our common stock would be capital gain or loss. |
| Restricted Stock, Performance Units and Performance Shares | A participant will not have taxable income upon grant (unless, with respect to restricted stock, he or she elects to be taxed at that time). Instead, he or she will recognize ordinary income at the time of vesting equal to the fair market value (on the vesting date) of the vested shares or cash received minus any amount paid for the shares of our vested common stock. |
| Deferred Stock Units | A participant will generally recognize employment tax (e.g., Social Security taxes) on the vesting date of a deferred stock award equal to the value of the vested shares received minus any amount paid for the shares. A participant will generally recognize income tax upon receipt of the deferred stock award shares in an amount equal to the value of the shares minus any amount paid for the shares. |
| Tax Effect for Us | We generally will be entitled to a tax deduction in connection with an award under the 2004 Equity Incentive Plan in an amount equal to the ordinary income realized by a participant and at the time the participant recognizes such income (for example, the exercise of a nonqualified stock option). Special rules limit the deductibility of compensation paid to our Chief Executive Officer and to each of our four most highly compensated executive officers. Under Section 162(m) of the Code, the annual compensation paid to any of these specified executives will be deductible only to the extent that it does not exceed $1,000,000. However, we can preserve the deductibility of certain compensation in excess of $1,000,000 if the conditions of Section 162(m) are met with respect to awards. These conditions include stockholder approval of the 2004 Equity Incentive Plan and performance goals under the 2004 Equity Incentive Plan, setting individual annual limits on each type of award, and certain other requirements. The 2004 Equity Incentive Plan has been designed to permit the committee to grant awards that qualify as performance–based for purposes of satisfying the conditions of Section 162(m), |

thereby permitting us to continue to receive a federal income tax deduction in connection with such awards.

The foregoing is only a summary of the current effect of federal income taxation upon us and upon the participant, does not purport to be complete, and does not discuss the tax consequences of the participant's death or the income tax laws of any municipality, state or foreign country in which a participant may reside.

## ACCOUNTING TREATMENT

Currently, employee awards and awards to members of our Board of Directors with purchase prices at or above fair market value on the grant date typically do not result in any direct charge to our reported earnings. However, the fair market value of these awards is required to be disclosed in the notes to our financial statements. We must also disclose, in the notes to our financial statements, the pro forma impact these awards would have on our reported earnings and earnings per share if the fair value of the awards at the time of grant was treated as a compensation expense.

Currently, employee awards and awards to members of our Board of Directors with purchase prices below fair market value on the grant date result in a direct compensation expense that is typically equal to the "spread", i.e. the difference between the purchase price and the fair market value on the grant date. Typically, this expense is amortized over our earnings over the award's vesting period.

The Financial Accounting Standards Board intends to require mandatory expensing for equity awards for fiscal years commencing after December 15, 2004 (although such implementation may be delayed). In such event, we expect that all 2004 Equity Incentive Plan awards will result in direct charges to our reported earnings.

New Plan Benefits

We are unable to determine the benefits or amounts under the 2004 Equity Incentive Plan that will be received by or allocated to our executive officers named in the Summary Compensation Table, other employees or members of our Board of Directors.

99

**PROPOSAL THREE:**
**RATIFICATION OF APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR THE FISCAL YEAR ENDING JUNE 30, 2005.**

| | |
|---|---|
| Audit Committee Recommendation | The Audit Committee has the sole authority to retain or dismiss our independent auditors. The Audit Committee has selected PricewaterhouseCoopers LLP, an independent registered public accounting firm, to audit the consolidated financial statements of the Company for its 2005 fiscal year. Before making its determination, the Audit Committee carefully considered that firm's qualifications as independent auditors. |
| | The Board of Directors, following the Audit Committee's recommendation, unanimously recommends that the stockholders vote for ratification of such appointment. |
| | Although ratification by stockholders is not required by law, the Board of Directors has determined that it is desirable to request approval of this selection by the stockholders. If the stockholders do not ratify the appointment of PricewaterhouseCoopers LLP, the Audit Committee may reconsider its selection. |
| Attendance at the Annual Meeting | Representatives of PricewaterhouseCoopers LLP are expected to be present at the Annual Meeting with the opportunity to make a statement if they desire to do so, and are expected to be available to respond to appropriate questions. |
| Fees | The aggregate fees billed by PricewaterhouseCoopers LLP, KLA-Tencor's independent auditors, in fiscal years 2004 and 2003 were as follows: |

| Services Rendered/Fees | 2004 | 2003 |
|---|---|---|
| Audit fees [1] | $ 1,193,000 | $ 998,000 |
| Audit-Related Fees [2] | $ 109,000 | $ 0 |
| Total Audit and Audit-Related Fees | $ 1,302,000 | $ 998,000 |
| Tax Compliance | $ 1,051,000 | $ 1,129,000 |
| Tax Planning and Consulting | $ 571,000 | $ 528,000 |
| Total Tax Fees [3] | $ 1,622,000 | $ 1,657,000 |
| All Other Fees [4] | $ 171,000 | $ 174,000 |

[1] For professional services rendered for the audits of annual financial statements set forth in KLA-Tencor's Annual Report on Form 10-K for fiscal years 2004 and 2003, the review of quarterly financial statements included in KLA-Tencor's Form 10-Qs for fiscal years 2004 and 2003 and fees for services related to statutory and regulatory filings or engagements.

[2] For fiscal year ended 2004, assurance and related services related to accounting consultations, audits in connection with acquisitions and preparatory work related to the Sarbanes-Oxley Act of 2002.

[3] For fiscal years ended 2004 and 2003, tax services for U.S, foreign tax and expatriate compliance and tax planning and consulting.

[4] For fiscal years ended 2004 and 2003, fees for services other that those described above, including, but not limited to, publications, consulting services on expatriate and other special projects.

| Pre-approval Policies and Procedures | The Audit Committee has adopted a policy regarding non-audit services provided by PricewaterhouseCoopers LLP, our independent auditors. First, the policy ensures the independence of our auditors by expressly naming all services that the auditors may not perform and reinforcing the principle of independence regardless of the type of service. Second, certain non-audit services such as tax-related services and acquisition advisory are permitted but limited in proportion to the audit fees paid. Third, the chair of the Audit Committee pre-approves non-audit services not specifically permitted under this policy and the Audit Committee reviews the annual plan and any subsequent engagements. Thus, all of the services described above under audit-related fees, tax fees and all other fees were approved by the Audit Committee pursuant to its pre-approval policies and procedures. On a quarterly basis, management provides written updates to the Audit Committee providing an update of audit and non-audit services, the amount of audit and non-audit service fees incurred to date, and the estimated cost to complete such services. |
| --- | --- |
| Independence Assessment by Audit Committee | The Company's Audit Committee considered and determined that the provision of the services provided by PricewaterhouseCoopers LLP as set forth herein are compatible with maintaining PricewaterhouseCoopers LLP's independence and approved all non-audit related fees and services. |
| Vote Required Recommendation | If a quorum is present and voting, the affirmative vote of the Votes Cast is needed to ratify the appointment of PricewaterhouseCoopers LLP as KLA-Tencor's independent registered public accounting firm, to audit the consolidated financial statements of the Company for its 2005 fiscal year.<br><br>**THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE "FOR" THE RATIFACTION OF THE APPOINTMENT OF PRICEWATERHOUSECOOPERS LLP AS THE COMPANY'S INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR THE FISCAL YEAR ENDING JUNE 30, 2005.** |

101

## OUR CORPORATE GOVERNANCE PRACTICES

At KLA–Tencor we have always believed in strong and effective corporate governance procedures and practices. In that spirit, we have summarized several of our corporate governance practices below.

**Adopting Governance Guidelines**

The Board has adopted a set of corporate governance guidelines to establish a framework within which the Board will conduct its business and to guide management in its running of your Company. The governance guidelines can be found on our website at http://ir.kla–tencor.com/disclaimer1.cfm and are summarized below.

**Monitoring Board Effectiveness**

It is important that our Board and its committees are performing effectively and in the best interest of the Company and its stockholders. The Board and each committee are responsible for annually assessing their effectiveness in fulfilling their obligations. In addition, our Nominating and Governance Committee is charged with annually reviewing the Board and its membership.

**Board Committee Responsibilities**

The Board has three standing committees: the Audit Committee; the Compensation Committee; and the Nominating and Governance Committee. The Board has determined that each of the members of each of the committees of the Board has no material relationship with the Company (including any relationship that, in the opinion of the Board, would interfere with the exercise of independent judgment as a director) and is independent within the meaning of the Nasdaq National Market director independence standards, including in the case of the Audit Committee, the heightened "independence" standard required for such committee members.

Each Committee meets regularly and has a written charter approved by the Board, all of which were attached as appendices to the Proxy Statement related to our 2003 Annual Meeting, which was filed with the Securities and Exchange Commission on September 23, 2003 and are available via our website at www.kla–tencor.com. In addition, at each regularly scheduled Board meeting, a member of each Committee reports on any significant matters addressed by the Committee. In 2002, after reviewing the Sarbanes–Oxley Act of 2002 and the proposed rules of the SEC and the Nasdaq Stock Market, the Board revised all of its Committee charters to implement voluntarily the proposed standards and to expand the responsibilities of each Committee as well as establish independence and self– assessment requirements. The Board and each Committee regularly reviews the Committee charters.

**Conducting Formal Independent Sessions**

At the conclusion of each regularly scheduled Board meeting, the independent directors meet without KLA–Tencor management and the non–independent directors.

**Hiring Outside Advisors**

The Board and each of its Committees may retain outside advisors and consultants of their choosing at the Company's expense, without management's consent.

**Avoiding Conflicts of Interest**

KLA–Tencor expects its directors, executives and employees to conduct themselves with the highest degree of integrity, ethics and honesty. KLA–Tencor's credibility and reputation depend upon the good judgment, ethical standards and personal integrity of each director, executive and employee. In order to provide assurances to KLA–Tencor and its stockholders, KLA–Tencor has updated its Standards of Business Conduct to provide clear conflict of interest guidelines to its employees, as well as an explanation of reporting and investigatory procedures.

102

| | |
|---|---|
| Providing Transparency | KLA–Tencor believes it is important that stockholders understand our governance practices. In order to help ensure transparency of our practices we have posted information regarding our corporate governance procedures on our website at http://ir.kla–tencor.com/disclaimer1.cfm. |
| Communications with the Board of Directors | Although KLA–Tencor does not have a formal policy regarding communications with the Board, stockholders may communicate with the Board by writing to the Company at KLA–Tencor Corporation, Attention: Investor Relations, 160 Rio Robles, San Jose, CA 95134. Stockholders who would like their submission directed to a member of the Board may so specify, and the communication will be forwarded, as appropriate. |
| Standards of Business Conduct | The Board has adopted Standards of Business Conduct for all of the Company's employees and directors, including the Company's principal executive and senior financial officers. You can obtain a copy of our Standards of Business Conduct via our website at http://ir.kla–tencor.com/disclaimer1.cfm, or by making a written request to the Company at KLA–Tencor Corporation, Attention: Investor Relations, 160 Rio Robles, San Jose, CA 95134. We will disclose any amendments to the Standards of Business Conduct or waiver of a provision therefrom, on our website at the same address. |
| Ensuring Auditor Independence | KLA–Tencor has taken a number of steps to ensure the continued independence of our outside auditors. Our independent auditors report directly to the Audit Committee, which also has the ability to pre–approve or reject any non–audit services proposed to be conducted by our outside auditors. |
| Stockholder Nominations to the Board | Please see "ABOUT THE BOARD OF DIRECTORS AND ITS COMMITTEES". |

## ABOUT THE BOARD OF DIRECTORS AND ITS COMMITTEES

| | |
|---|---|
| The Board of Directors | The Board of Directors of the Company held a total of five meetings during the fiscal year ended June 30, 2004. The Board of Directors has an Audit Committee, a Compensation Committee and a Nominating and Governance Committee. |
| | All directors other than Messrs. Levy, Schroeder and Tompkins meet the definition of independence within the meaning of the Nasdaq National Market director independence standards. None of the Company's directors fall outside of the SEC's 10% ownership safe harbor. |
| | During the fiscal year ended June 30, 2004, all incumbent directors attended at least 85% of the total number of meetings of the Board of Directors and each director attended 100% of the aggregate of the total number of meetings held by all committees of the Board on which each such director served (during the periods that each such director served). |
| | Although we do not have a formal policy regarding attendance by members of the Board at our annual meetings of stockholders, directors are encouraged to attend annual meetings of KLA–Tencor stockholders. Six directors attended the 2003 Annual Meeting of stockholders. |

103

| Audit Committee | The Audit Committee consists of Mr. Bingham, Mr. Bond, Mr. Elkus and Mr. Kaufman. During fiscal year 2004, Mr. Bingham was the chairman of the Audit Committee. The Audit Committee is responsible for appointing, compensating and overseeing the work of the Company's independent auditors, approving the services performed by the Company's independent auditors and for reviewing and evaluating the Company's accounting principles and its system of internal accounting controls. The Audit Committee held ten meetings during the last fiscal year. |
|---|---|
| Compensation Committee | The Compensation Committee consists of Mr. Barnholt, Mr. Bond, Mr. Marks and Ms. Urbanek. During fiscal year 2004, Mr. Bond was the chairman of the Compensation Committee. The Compensation Committee reviews and approves the Company's executive compensation policy and administers the Company's employee equity benefit plans. The Compensation Committee held three meetings during the last fiscal year. |
| Nominating and Governance Committee | The Nominating and Governance Committee consists of Mr. Barnholt and Mr. Elkus. Mr. Barnholt served as the chairman of the Nominating and Governance Committee during fiscal year 2004. The Nominating and Governance Committee nominated the three Class III directors for election at the Annual Meeting. The Nominating and Governance Committee is primarily responsible for identifying and evaluating the qualifications of all candidates for election to the Board of Directors, as well as reviewing corporate governance policies and procedures. The Nominating and Governance Committee held three meetings during the last fiscal year. |

It is the Nominating and Governance Committee's policy to consider candidates recommended by stockholders who have owned at least 1% of the Company's outstanding shares for at least one year and who have evidenced intent to continue as a substantial stockholder for the long term. Stockholders wishing to submit recommendations must notify the Company (attention: Assistant Secretary) of their intent to do so and provide the Company with certain information set forth in Section 11 of our bylaws and all other information regarding nominees that is required to be provided pursuant to Regulation 14A of the Securities Exchange Act of 1934, or as otherwise requested by the Nominating and Governance Committee. In addition, stockholders may nominate candidates for the Board of Directors pursuant to the provisions of Section 11 of our bylaws and in conformance with the requirements of Regulation 14A of the Securities Exchange Act of 1934.

In considering candidates for director nomination, including evaluating any recommendations from stockholders as set forth above, the Nominating and Governance Committee only considers candidates who have demonstrated executive experience, have experience in an applicable industry, or significant high level experience in accounting, legal or a technical field applicable to the Company. In addition, in evaluating director candidates, the Nominating and Governance Committee considers all factors it considers appropriate, which may include strength of character, mature judgment, career specialization, relevant technical skills, diversity and the extent to which the candidate would fill a present need on the Board.

104

The Nominating and Governance Committee regularly assesses the appropriate size and composition of the Board, and whether any vacancies on the Board are expected. In the event that vacancies are anticipated, or otherwise arise, the Nominating and Governance Committee considers potential candidates that may come to its attention through current members of the Board, professional search firms, stockholders who have owned at least 1% of the Company's outstanding shares for at least one year and who have evidenced intent to continue as a substantial stockholder for the long term, or other persons. In evaluating properly submitted stockholder recommendations, the Nominating and Governance Committee uses the evaluation standards discussed above and seeks to achieve a balance of knowledge, experience and capability on the Board.

## DIRECTOR COMPENSATION

**Employee Directors**

Members of the Board of Directors who are employees do not receive any additional compensation for their services as directors.

**1998 Outside Director Plan**

Members of the Board who are not employees of the Company ("Outside Directors") receive benefits under the 1998 Outside Director Plan ("1998 Director Plan"), which was approved by the stockholders at the 1998 annual meeting of stockholders. Each Outside Director receives a nonstatutory stock option to purchase 10,000 shares of Common Stock as of the date on which such director first becomes an Outside Director (the "First Option"). If the new Outside Director does not join the Board at the beginning of the Company's fiscal year, the First Option will be pro rated to reflect the quarter in which such new Outside Director joins the Board. In addition, each Outside Director is automatically granted a nonstatutory stock option to purchase an additional 10,000 shares of Common Stock on the date of each subsequent annual meeting on which he or she remains an Outside Director.

The term of options granted under the 1998 Director Plan may not exceed 10 years. The 1998 Director Plan provides that the exercise price shall be equal to the fair market value of the Common Stock on the date of grant of the option. Options granted under the 1998 Director Plan become exercisable immediately upon the date of grant.

**Cash Compensation**

Each Outside Director receives an annual fee of $20,000 and $1,000 for each Board meeting they attend ($500 if participation is by telephone), plus reasonable expenses in attending such meeting. Audit Committee members receive $1,000 per committee meeting they attend ($500 if participation is by telephone). The Audit Committee chair receives an annual retainer of $10,000. Members of the Compensation Committee and the Nominating and Governance Committee receive $500 per committee meeting they attend ($250 if participation is by telephone).

105

## INFORMATION ABOUT EXECUTIVE OFFICERS

Set forth below are the names, ages and positions of the executive officers of KLA–Tencor September 9, 2004.

| Name and Position | Principal Occupation of the Executive Officers During the Past Five Years | Age |
|---|---|---|
| Kenneth Levy Chairman of the Board | Kenneth Levy is a founder of KLA Instruments Corporation and since July 1, 1999 has been Chairman of the Board and a Director of KLA–Tencor. From July 1998 until June 30, 1999, he was Chief Executive Officer and a Director. From 1975 until April 30, 1997 he was Chief Executive Officer of KLA Instruments Corporation. He currently serves on the boards of directors of the following publicly traded companies: Juniper Networks, Inc., Extreme Networks, Inc., and PowerDsine, Inc. In addition, he is a Director Emeritus of SEMI, an industry trade association. | 61 |
| Kenneth L. Schroeder President & Chief Executive Officer | Kenneth L. Schroeder joined KLA Instruments in 1979 and left in1987 to pursue personal and other business interests. He returned to KLA Instruments in 1991. Mr. Schroeder has been Chief Executive Officer and a member of the Board of Directors of KLA–Tencor since July 1, 1999, as well as President since May 2004. He also held the position of President from November 1991 to July 2002. | 59 |
| John H. Kispert Executive Vice President & Chief Financial Officer | John H. Kispert has been Chief Financial Officer and Executive Vice President since July 2000. From July 1999 to July 2000, Mr. Kispert was Vice President of Finance and Accounting. From February 1998 to July 1999, he was Vice President of Operations for the Wafer Inspection Group. Mr. Kispert joined KLA–Tencor in February 1995 and has held a series of other management positions within the Company. He currently serves on the board of directors of North American SEMI, an industry trade association. | 40 |
| Richard P. Wallace Executive Vice President, Customer Group | Richard P. Wallace has been Executive Vice President of the Customer Group since May 2004. He was Executive Vice President of the Wafer Inspection, Review & Analysis Group since July 2000. From July 1999 to June 2000, he was the Group Vice President for Lithography and Films. From April 1998 to June 1999, he was Vice President and General Manager of the Mirage Group. From 1995 to March 1998, he was Vice President and General Manager of the Wisard division. Mr. Wallace joined KLA–Tencor in 1988 and has held a series of other management positions. | 44 |
| Dennis J. Fortino Executive Vice President, Corporate Operations | Dennis J. Fortino has been Executive Vice President of Corporate Operations since May 2004. He was Executive Vice President of the Lithography & Parametric Solutions Group from July 1999 to May2004. From August 1997 to June 1999, he served as Vice President and General Manager of the Surfscan Division and from November1995 to July 1997, he served as the Vice President and General Manager of the Surface Metrology Division. Mr. Fortino served as Vice President and General Manager for Spectra–Physics Lasers from July 1991 to October 1995. | 58 |

106

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

**Principal Stockholders**

As of August 23, 2004, based on our review of filings made with the SEC, we are aware of the following entities being the beneficial owner of more than 5% of the Company's Common Stock:

| Name and Address | Number of Shares Beneficially Owned | Percent of Shares Beneficially Owned [1] |
|---|---|---|
| FMR Corp. [2][3] 82 Devonshire Street Boston, MA 02109 | 21,671,609 | 11.04% |
| Capital Guardian Trust Co. [2] 333 South Hope Street Los Angeles, CA 90071 | 22,676,067 | 11.55% |
| Capital Research & Management Co. [2] 333 South Hope Street Los Angeles, CA 90071 | 12,225,000 | 6.23% |
| Wellington Management Co. LLP [2] 75 State Street Boston, Massachusetts 02109 | 10,838,451 | 5.52% |

(1)     Based on 196,247,543 outstanding shares of Common Stock as of August 23, 2004.

(2)     Based on information provided pursuant to Schedule 13F filed with the Securities and Exchange Commission.

(3)     FMR Corp. is a parent holding company and includes shares held by Fidelity Management Research and Fidelity International Limited.

**Management**

The following table sets forth the beneficial ownership of Common Stock of the Company as of August 23, 2004 by all directors, each of the named executive officers set forth in the Summary Compensation Table, and by all directors and current executive officers as a group:

| Name and Address | Number of Shares Beneficially Owned | Percent of Shares Beneficially Owned [1] |
|---|---|---|
| Kenneth Levy [2] | 2,903,259 | 1.47% |
| Kenneth L. Schroeder [3] | 876,821 | * |
| Edward W. Barnholt [4] | 85,832 | * |
| H. Raymond Bingham [5] | 50,000 | * |
| Robert T. Bond [6] | 52,000 | * |
| Richard J. Elkus, Jr. [7] | 100,000 | * |
| Stephen P. Kaufman [8] | 21,000 | * |
| Michael E. Marks [9] | 10,000 | * |
| Jon D. Tompkins [10] | 24,200 | * |
| Lida Urbanek [11] | 1,374,861 | * |
| John H. Kispert [12] | 65,039 | * |
| Richard P. Wallace [13] | 48,654 | * |
| Dennis J. Fortino [14] | 105,787 | * |
| Gary E. Dickerson [15] | 294,523 | * |
| All directors and executive officers as a group (17 persons) [16] | 6,278,976 | 3.16% |

*     Less than 1%

107

(1)    Based on 196,247,543 outstanding shares of the Common Stock of the Company as of August 23, 2004.

(2)    Includes 735,122 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004, 1,769,375 shares which are held in trust for the benefit of Mr. Levy's family, 40,000 shares which are held by the Levy Family Foundation, and 358,000 shares which are held by the KGMW, L.P.

(3)    Includes 714,883 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(4)    Includes 85,832 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(5)    Includes 50,000 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(6)    Includes 50,000 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(7)    Includes 10,000 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(8)    Includes 20,000 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(9)    Includes 10,000 shares subject to options which are presently exercisable or will become exercisable, within 60 days of August 23, 2004.

(10)    Includes 20,000 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(11)    Includes 73,892 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004, 1,271,414 shares which are held in trust for the benefit of Ms. Urbanck's family, and 29,555 shares which are held by the Urbanek Family Foundation.

(12)    Includes 58,031 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(13)    Includes 45,751 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(14)    Includes 99,916 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(15)    Includes 287,905 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

(16)    Includes 2,522,764 shares subject to options which are presently exercisable or will become exercisable within 60 days of August 23, 2004.

## EXECUTIVE COMPENSATION AND OTHER MATTERS

Executive Compensation

The following table sets forth, as to the person who served as Chief Executive Officer during the fiscal year ended June 30, 2004 and each of the four other most highly compensated executive officers whose salary plus bonus exceeded $100,000, information concerning all reportable compensation awarded to, earned by or paid to each for services to the Company in all capacities during the fiscal year ended June 30, 2004, as well as such compensation for each such individual for the Company's previous two fiscal years.

| Name and Principal Position | | Annual Compensation | | | | Long Term Compensation (1) | |
|---|---|---|---|---|---|---|---|
| | Year | Salary | Bonus (3) | Other Annual Compensation (5) | Securities Underlying Options/SARs (#) | All Other Compensation (2) | |
| Kenneth L. Schroeder | 2004 | $ 581,195 | $ 1,183,023 | N/A | 158,950 | $ | 0 |
| President & Chief | 2003 | $ 577,940 | $ 199,209 | N/A | 94,350 | $ | 9,231 |
| Executive Officer | 2002 | $ 492,649 | $ 218,040 | N/A | 341,100 | $ | 1,000 |
| John H. Kispert | 2004 | $ 396,393 | $ 658,700 | N/A | 76,250 | $ | 1,000 |
| Executive Vice | 2003 | $ 324,357 | $ 167,133 | N/A | 37,500 | $ | 5,767 |
| President & Chief Financial Officer | 2002 | $ 238,350 | $ 166,843 | N/A | 60,000 | $ | 1,000 |
| Richard P. Wallace | 2004 | $ 336,501 | $ 443,730 | N/A | 76,250 | $ | 1,000 |
| Executive Vice | 2003 | $ 324,674 | $ 75,545 | N/A | 38,500 | $ | 5,766 |
| President, Customer Group | 2002 | $ 240,096 | $ 66,328 | N/A | 45,000 | $ | 1,000 |
| Dennis J. Fortino | 2004 | $ 332,618 | $ 489,589 | N/A | 76,250 | $ | 1,000 |
| Executive Vice | 2003 | $ 324,674 | $ 76,670 | N/A | 38,500 | $ | 5,766 |
| President, Corporate Operations | 2002 | $ 230,048 | $ 86,209 | N/A | 45,000 | $ | 1,000 |
| Gary E. Dickerson | 2004 | $ 501,593 | $ 969,942 | N/A | 131,250 | $ | 1,000 |
| Former President & | 2003 | $ 488,451 | $ 156,657 | N/A | 76,000 | $ | 8,104 |
| Chief Operating Officer | 2002 | $ 378,269 | $ 159,046 | N/A | 105,000 | $ | 1,000 |

(1)　The Company has not granted any restricted stock rights or stock appreciation rights and the Company does not have any Long Term Incentive Plans as that term is defined in the regulations.

(2)　In FY 2004 Mr. Kispert received $1,000 contributed by the Company as a matching contribution to the 401(k) Plan; Mr. Wallace received $1,000 contributed by the Company as a matching contribution to the 401(k) Plan; Mr. Fortino received $1,000 contributed by the Company as a matching contribution to the 401(k) Plan; and Mr. Dickerson received $1,000 contributed by the Company as a matching contribution to the 401(k) Plan.

(3)　In addition to other bonus payments, this amount includes payments made pursuant to the Company's Outstanding Corporate Performance Executive Bonus Plan ("OCBP"). Of the OCBP payment earned in fiscal year 2004, 34% is payable currently. The remaining 66% of the OCBP payment earned in fiscal year 2004 is automatically deferred into the Company's Executive Deferred Savings Plan ("EDSP") as a Company contribution. Executives whose employment terminates before the end of the vesting period will receive a pro rata distribution of such deferred bonus funds. The OCBP amounts for fiscal year 2004 represent 47% of the aggregate fiscal year 2004 bonus amounts for Messrs. Schroeder and Dickerson, 41% for Mr. Kispert, 51% for Mr. Wallace and 46% for Mr. Fortino.

## OPTION/SAR GRANTS IN LAST FISCAL YEAR

Stock Option Grants and Exercises

The following tables set forth the number of securities underlying stock options granted to the named executive officers under the Company's stock option plans and the options exercised by such named executive officers during the fiscal year ended June 30, 2004.

The Option/SAR Grant Table sets forth hypothetical gains or "option spreads" for the options at the end of their respective ten-year terms, as calculated in accordance with the rules of the Securities and Exchange Commission. Each gain is based on an arbitrarily assumed annualized rate of compound appreciation of the market price at the date of grant of 5% and 10% from the date the option was granted to the end of the option term. Actual gains, if any, on option exercises are dependent on the future performance of the Company's Common Stock and overall market conditions.

| | Number of Securities Underlying Options (1) | Percent of Total Options Granted to Employees in Fiscal Year (2) | Exercise or Base Price ($/share)(3) | Expiration Date | Potential Realizable Value At Assumed Annual Rates of Stock Price Appreciation for Option Term ($) | |
|---|---|---|---|---|---|---|
| | | | | | 5% | 10% |
| Kenneth L.(4) Schroeder | 31,450 | .50% | $ 51.23 | 7/30/2013 | $ 1,012,245 | $ 2,567,761 |
| | 60,000 | .95% | $ 53.86 | 10/27/2013 | $ 2,032,336 | $ 5,150,338 |
| | 30,000 | .48% | $ 58.10 | 1/27/2014 | $ 1,097,163 | $ 2,777,893 |
| | 37,500 | .60% | $ 45.16 | 4/26/2014 | $ 1,065,033 | $ 2,699,003 |
| Total | 158,950 | 2.53% | N/A | N/A | $ 5,206,777 | $ 13,194,996 |
| John H. Kispert | 12,500 | .20% | $ 51.23 | 7/30/2013 | $ 402,721 | $ 1,020,573 |
| | 30,000 | .48% | $ 53.86 | 10/27/2013 | $ 1,016,168 | $ 2,575,169 |
| | 15,000 | .24% | $ 58.10 | 1/27/2014 | $ 548,082 | $ 1,388,947 |
| | 18,750 | .30% | $ 45.16 | 4/26/2014 | $ 532,517 | $ 1,349,501 |
| Total | 76,250 | 1.21% | N/A | N/A | $ 2,499,487 | $ 6,334,190 |
| Richard P. Wallace | 12,500 | .20% | $ 51.23 | 7/30/2013 | $ 402,721 | $ 1,020,573 |
| | 30,000 | .48% | $ 53.86 | 10/27/2013 | $ 1,016,168 | $ 2,575,169 |
| | 15,000 | .24% | $ 58.10 | 1/27/2014 | $ 548,082 | $ 1,388,947 |
| | 18,750 | .30% | $ 45.16 | 4/26/2014 | $ 532,517 | $ 1,349,501 |
| Total | 76,250 | 1.21% | N/A | N/A | $ 2,499,487 | $ 6,334,190 |
| Dennis J. Fortino | 12,500 | .20% | $ 51.23 | 7/30/2013 | $ 402,721 | $ 1,020,573 |
| | 30,000 | .48% | $ 53.86 | 10/27/2013 | $ 1,016,168 | $ 2,575,169 |
| | 15,000 | .24% | $ 58.10 | 1/27/2014 | $ 548,082 | $ 1,388,947 |
| | 18,750 | .30% | $ 45.16 | 4/26/2014 | $ 532,517 | $ 1,349,501 |
| Total | 76,250 | 1.21% | N/A | N/A | $ 2,499,487 | $ 6,334,190 |
| Gary E. Dickerson | 25,000 | .40% | $ 51.23 | 7/30/2013 | $ 805,441 | $ 2,041,146 |
| | 50,000 | .79% | $ 53.86 | 10/27/2013 | $ 1,693,613 | $ 4,291,948 |
| | 25,000 | .40% | $ 58.10 | 1/27/2014 | $ 913,469 | $ 2,314,911 |
| | 31,250 | .50% | $ 45.16 | 4/26/2014 | $ 887,528 | $ 2,249,169 |
| Total | 131,250 | 2.08% | N/A | N/A | $ 4,300,051 | $ 10,897,174 |

(1)    The Company has not granted any stock appreciation rights.

(2)    Based on a total of 6,298,343 options granted to employees in fiscal year 2004.

(3)    Options were granted at an exercise price equal to the fair market value of the Company's Common Stock. The material terms of the grants are: (a) options granted in years 2004 and 2003, the options vest on a five year schedule with 20% vesting after one year and the remaining option shares vesting 1/48 per month for the remainder of the vesting term; (b) options granted prior to fiscal year 2002 vest on a four year schedule with 25% vesting after one year and the remaining option shares vesting 1/36 per month for the remainder of the vesting term; (c) to the extent unexercised, the options lapse after ten years; and (d) the options are non-transferable and are only exercisable during the period of employment of the optionee for 30 days following the

110

termination of employment, subject to limited exceptions in the cases of certain terminations, death or permanent disability of the optionee.

(4) During FY 2004, in order to incentivize Mr. Schroeder to remain with the Company over the long–term, Mr. Schroeder received options covering 83,380 shares of Common Stock with delayed vesting. Specifically, 20% of 18,950 option shares vest 11/8/2007 with the remaining 80% to vest monthly over the following 48 months and 20% of 64,430 option shares vest 10/27/2006 with the remaining 80% to vest monthly over the following 48 months.

## AGGREGATED OPTION/SAR EXERCISES IN LAST FISCAL YEAR AND FISCAL YEAR–END OPTION VALUES

1982 Stock Option Plan

The following table sets forth information with respect to the persons named in the Summary Compensation Table concerning exercised and unexercised options held as of June 30, 2004.

| | Number of Shares Acquired on Exercise | Value Realized | Number of Securities Underlying Unexercised Options at 6/30/2004 | | Value of Unexercised In–the–Money Options at 6/30/2004 (1) | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Vested | Unvested | Exercisable | Unexercisable |
| Kenneth L. Schroeder | 274,100 | $ 12,121,399 | 676,519 | 519,481 | $ 15,832,316 | $ 6,917,528 |
| John H. Kispert | 95,000 | $ 2,019,069 | 46,588 | 140,362 | $ 755,379 | $ 1,257,527 |
| Richard P. Wallace | 60,000 | $ 1,369,178 | 35,849 | 131,529 | $ 325,749 | $ 1,084,435 |
| Dennis J. Fortino | 83,541 | $ 1,967,462 | 88,931 | 135,195 | $ 874,852 | $ 1,149,627 |
| Gary E. Dickerson | 90,000 | $ 2,868,441 | 268,171 | 246,444 | $ 3,593,603 | $ 2,247,863 |

(1) The Company has not granted any stock appreciation rights. Total value of vested options based on fair market value of Company's Common Stock of $49.38 per share as of June 30, 2004.

## EQUITY COMPENSATION PLANS

Equity Compensation Plan Information

The following table summarizes our equity compensation plans as of June 30, 2004.

| | Number of securities to be issued upon exercise of outstanding options | Weighted–average exercise price of outstanding options | Number of securities remaining available for future issuance under stock option plans and ESPP plans |
| --- | --- | --- | --- |
| Equity compensation plans approved by stockholders (1) | 20,879,143 | $ 34.00 | 14,252,016 |
| Equity compensation plans not approved by stockholders (2) | 8,816,802 | 37.95 | 3,098,870 |
| Total | 29,695,945 | $ 35.11 | 17,350,886 |

(1) In July 2004, the Company reserved an additional 5,903,603 shares of its Common Stock in accordance with the provisions of the 1982 Stock Option Plan.

(2) On November 10, 2000 the Board approved the 2000 Nonstatutory Stock Option Plan (the "2000 Plan") and amended it on November 6, 2002. The goals for the 2000 Plan are for the issuance of nonstatutory stock options to employees and consultants of the Company or any parent or subsidiary corporation; however, officers and directors of the Company are not eligible to receive options under the 2000 Plan. Options granted under the 2000 Plan have an exercise price and a term that is determined by the plan administrator and generally vest in accordance with a schedule determined by the plan administrator at the time of grant. Upon cessation of service to the Company, the optionee will have a limited period of time, generally 90 days, in which to exercise his or her outstanding options that are vested at that time; usually this period of time is longer in the event of an optionee's death or disability. Options granted under the 2000 Plan generally are not transferable during the lifetime of an optionee; however, the plan administrator

111

may permit the optionee to transfer all or a portion of an option to a member of the optionee's immediate family, or to a limited liability corporation, trust or partnership for the benefit of an immediate family member. In the event that the Company is acquired by merger or asset sale, the vesting of each outstanding option under the 2000 Plan which is not to be assumed by the successor corporation will automatically accelerate in full, and all unvested shares will immediately vest and become exercisable for a period of 15 days after the optionee has been sent a notice of the acceleration. At the end of the 15–day period, unexercised options will terminate. The Board generally is authorized to amend, alter, suspend or terminate the 2000 Plan at any time, but no amendment, alteration, suspension or termination of the 2000 Plan may adversely affect any option previously granted under the plan without the written consent of the optionee. Unless sooner terminated by the Board, the 2000 Plan will terminate in 2010.

## REPORT OF THE COMPENSATION COMMITTEE ON EXECUTIVE COMPENSATION

**Compensation Committee**

The Compensation Committee of the Board of Directors is comprised of four independent, non–employee members of the Board of Directors, none of who have interlocking relationships as defined by the Securities and Exchange Commission and all of whom meet the definition of "independent director" as currently promulgated by the Nasdaq National Market. The Compensation Committee is responsible for setting and administering the policies governing annual compensation of executive officers, considering their performance and making recommendations regarding their cash compensation and stock options to the full Board of Directors. The Compensation Committee periodically reviews its approach to executive compensation and makes changes as appropriate. The Compensation Committee may retain, and has retained in the past, consultants when necessary, as determined by the members of the Compensation Committee.

**Compensation Philosophy**

The compensation philosophy of the Compensation Committee is to provide a comprehensive compensation package for each executive officer that is well suited to support accomplishment of the Company's business strategies, objectives and initiatives. The Compensation Committee applies this compensation philosophy in determining appropriate executive compensation levels and other compensation factors, and the Compensation Committee reaches its decisions with a view towards the Company's overall financial performance. The goals of the Company's compensation policy are to:

- attract, retain and reward executive officers who contribute to the overall success of the Company by offering compensation that is competitive in the industry;

- motivate executive officers to achieve the Company's business objectives; and

- align the interests of executive officers with the long term interests of stockholders.

The Company currently uses a compensation package, which includes a salary, executive incentive plans and stock option grants to meet these goals.

For incentive–based compensation, the Compensation Committee considers the desirability of structuring such compensation arrangements so as to qualify for deductions available under Section 162(m) of the Internal Revenue Code, which disallows a tax deduction for any publicly–held corporation for individual compensation exceeding one million U.S. Dollars in any taxable year for any of the named executive officers, other than compensation that is "performance based". The 2004 Equity Incentive Plan, which is the subject of Proposal Two of this Proxy Statement, permits a range of equity compensation devices to qualify as performance based compensation under Section 162(m) of the Internal Revenue Code.

**Chief Executive Officer Compensation**

For fiscal year 2004, Kenneth L. Schroeder served as Chief Executive Officer. In setting Mr. Schroeder's compensation for fiscal year 2004, the Compensation Committee considered the Company's revenue and profit in the prior fiscal year, the Company's market capitalization and data from comparable companies supplied by the Compensation Committee's compensation consultants, in addition to Mr. Schroeder's performance and continuing contributions to the Company. For fiscal year 2004, a bonus of $1,183,023 was payable to Mr. Schroeder, based on the Company's performance as measured against a formula, which is based on meeting financial and strategic objectives as well as the Company's revenue growth objectives as compared to a peer group. This bonus formula was approved by the Compensation Committee and the independent members of the Board of Directors last fiscal year.

**Executive Officer Compensation**

The Compensation Committee's executive compensation philosophy is based upon a belief that a substantial portion of aggregate annual compensation for executive officers should be contingent upon the Company's performance and an individual's contribution to the Company's success. In addition, the Compensation Committee strives to align the interests of the Company's executive officers with the long-term interests of stockholders through stock option grants that can result in ownership of the Company's Common Stock. The Compensation Committee endeavors to structure each executive officer's overall compensation package to be consistent with this approach and to enable the Company to attract, retain and reward personnel who contribute to the success of the Company.

In addition to stock option grants, the Company provides its executive officers with a compensation package consisting of base salary, variable incentive pay and participation in benefit plans generally available to other employees. The Committee considers market information from published survey data provided to the Committee by the Company's human resources staff. The market data consists primarily of base salary and total cash compensation rates, as well as incentive bonus and stock programs of other companies considered by the Committee to be peers in the Company's industry.

For the Company's previous fiscal year, the Committee reviewed and recommended a compensation structure, after considering a number of factors, including, the substantial economic and business challenges in the semiconductor and semiconductor capital equipment industries worldwide.

*Base Salary.* Salaries for executive officers are set with reference to salaries for comparable positions among other companies in the Company's industry or in industries that employ individuals of similar education and background to the executive officer based on data provided by the Compensation Committee's compensation consultants, as well as each person's job responsibilities, level of experience, individual performance and contribution to the Company's business. In making base salary decisions, the Compensation Committee exercised its discretion and judgment based upon these factors. No specific formula was applied to determine the weight of each factor.

*Management Incentive Plan.* Each year since fiscal 1979, the Company has adopted a management incentive plan (the "Incentive Plan") which provides for payments to officers and key employees based on the financial performance of the Company or the relevant business unit, and on the achievement of key strategic objectives which are set by senior management and approved by the Board of Directors. The Incentive Plan solely as to Messrs. Levy, Schroeder, Kispert and Dickerson is approved by the Compensation Committee and submitted to the

113

Board of Directors for ratification. For fiscal year 2004, the Incentive Plan set goals for profitability, achievement of measurable objectives aimed at strategic corporate goals and achievement of objectives relating to managing the ratio of assets to sales. The target goals for fiscal year 2004 were exceeded on financial objectives but underachieved on strategic objectives. As a result, approximately 107.3% of the eligible incentive plan amounts for Messrs. Levy, Schroeder, Kispert and Dickerson were paid.

*Outstanding Corporate Performance Executive Bonus Plan.* The Company continues to utilize its incentive plan for an additional bonus to executives in years when the Company achieves certain levels of profitability and growth (the "Outstanding Corporate Performance Plan"). The performance measurements are based on the Company's pretax margin and growth of the Company's aggregate revenues over the prior twelve months against a target group of public U.S. Companies over the same period. The target percentage for the Outstanding Corporate Performance Plan bonus is the same target percentage as utilized in determining the Incentive Plan bonus. For fiscal year 2004, bonuses were paid pursuant to the Outstanding Corporate Performance Plan at a rate of 96.3% of target.

In years that the performance goals are met, one–third of each annual amount under the Outstanding Corporate Performance Plan is payable at the end of the fiscal year; an additional one–third of each annual amount payable under the plan is payable at the end of the next fiscal year, and the final one–third of each annual amount payable under the plan is payable at the end of the next fiscal year. If the executive officer leaves during that one–year period, he receives a pro rata distribution of any deferred bonus funds.

*Long–term Incentives.* Long–term incentives are currently provided through the Stock Option Plan, which rewards executive officers through the growth in value of the Company's Common Stock. The Compensation Committee believes that employee equity ownership is highly motivating, provides a major incentive for employees to build stockholder value and serves to align the interests of employees with those of stockholders.

Grants of stock options to executive officers are based upon each executive officer's relative position, responsibilities, historical and expected contributions to the Company, and the executive officer's existing stock ownership and previous option grants. Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price. If Proposal Two is adopted, the Compensation Committee will consider granting different types of awards to executive officers under the 2004 Equity Incentive Plan.

Stock Ownership Guidelines

The Company adopted a program, approved by the Board of Directors, pursuant to which certain Company executives with the title Vice President or above and all directors are required to own a prescribed number of shares of Common Stock of the Company. These ownership requirements for eligible executives are phased in over time. Each executive submitted a five–year plan on how they plan to comply with the guidelines. As of June 30, 2004, all executives covered by these guidelines are on track to reach full compliance by 2009.

114

## MEMBERS OF THE COMPENSATION COMMITTEE

Robert T. Bond, Chairman
Edward W. Barnholt
Michael E. Marks
Lida Urbanek

Compensation Committee
Interlocks

The members of the Compensation Committee are set forth in the preceding section. There are no members of the Compensation Committee who were officers or employees of the Company or any of its subsidiaries during the fiscal year, formerly officers of the Company, or had any relationship otherwise requiring disclosure hereunder.

## REPORT OF THE AUDIT COMMITTEE

Audit Committee

The Company's Audit Committee is composed of four non–employee directors, each of whom meet the standards of independence and financial experience requirements of the Nasdaq National Market, as currently in effect. The Board has determined that H. Raymond Bingham is an "audit committee financial expert" within the meaning of the rules promulgated by the Securities and Exchange Commission. For fiscal year 2004, H. Raymond Bingham, Robert T. Bond, Richard J. Elkus, Jr. and Stephen P. Kaufman served as members on the Audit Committee. Mr. Bingham served as the Chairman of the Audit Committee for fiscal year 2004. The Board of Directors has adopted a written charter for the Audit Committee that details the responsibilities of the Audit Committee and was attached as Exhibit A to the Proxy Statement related to the 2003 Annual Meeting. This report relates to the activities undertaken by the Audit Committee in fulfilling such responsibilities. The charter is reviewed annually for changes, as appropriate, and is posted on the Company's website at http://ir.kla–tencor.com/, in the Investor Presentations and Corporate Governance section.

KLA–Tencor's management is responsible for establishing and maintaining a system for internal controls and the financial reporting process. The Audit Committee is responsible for overseeing KLA–Tencor's auditing, accounting and financial reporting processes, its system of internal controls, and legal and ethical compliance. This report relates to the activities undertaken by the Audit Committee in fulfilling such responsibilities. During fiscal year 2004, the Audit Committee reviewed and discussed with the Company's management team KLA–Tencor's audited consolidated financial statements contained in KLA–Tencor's Annual Report on Form 10–K for the fiscal year ended June 30, 2004. The Audit Committee also met routinely with the independent auditors, with and without members of the KLA–Tencor management team present, to discuss their evaluation of the Company's internal controls and the overall quality of the Company's financial reporting. The Audit Committee also met with the Company's Chief Executive Officer to discuss accounting issues and risks facing the Company.

The Audit Committee also discussed with the Company's independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61, (Communication With Audit Committees).

The Audit Committee received from the independent auditors the written disclosures and the letter from the auditors required by Independence Standards Board Standard No. 1, (Independence Discussions With Audit Committees) and has discussed with the independent auditors their independence from management and KLA–Tencor. The Audit Committee also considered whether the provision of

115

services covered by fees paid to its independent auditors was compatible with maintaining their independence.

Based on the reviews and discussions referred to above, the Audit Committee recommended to the Board of Directors, and the Board of Directors approved, the inclusion of the audited financial statements in the Company's Annual Report on Form 10−K for the fiscal year ended June 30, 2004, filed with the Securities and Exchange Commission.

**MEMBERS OF THE AUDIT COMMITTEE**

H. Raymond Bingham, Chairman
Robert T. Bond
Richard J. Elkus, Jr.
Stephen P. Kaufman

116

**PERFORMANCE GRAPH**

The stock price performance shown on the following graph is not necessarily indicative of future stock price performance.

Comparison of Five Year Cumulative Total Return Among KLA-Tencor
Corporation, The NASDAQ — US Index and The Philadelphia SOXX Index [1]



| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| KLA-Tencor Corporation | 100 | 180.538 | 180.252 | 135.613 | 143.227 | 152.229 |
| The NASDAQ-US Index | 100 | 147.831 | 80.271 | 54.681 | 60.713 | 76.526 |
| Philadelphia SOXX Index | 100 | 235.428 | 128.824 | 80.004 | 74.247 | 100.132 |

[1]  Assumes $100 invested on June 30, 1999. The Company's fiscal year end is June 30.

117

## CERTAIN TRANSACTIONS AND OTHER MATTERS

Transactions with
Directors, Executive
Officers and 5%
Stockholders

Change of Control
Agreements

In fiscal year 2001, the Company entered into a Bonus Agreement with Mr. Kispert, whereby Mr. Kispert will receive payments of $93,900 a year, for the following four years.

In connection with the merger between KLA Instruments Corporation and Tencor Instruments (effective April 30, 1997) the Company entered into identical employment arrangements, subsequently amended, (the "Retention and Non–Competition Agreement") with Messrs. Levy and Schroeder. The arrangements, as amended, provide that certain benefits would be paid if certain events took place after April 30, 1997. The purpose of these arrangements was to retain the services of Messrs. Levy and Schroeder to ensure the continued smooth transition associated with the merger. The terms of those arrangements provide that if an individual were to leave the Company after April 30, 1998, subject to releasing the Company from all claims, and in connection with working part-time for 36 months, he will receive (i) his base salary for the first 24 months of part–time employment, (ii) a mutually agreeable level of compensation per month for the final 12 months of part–time employment, (iii) an annual bonus (based on an achievement of 100% of bonus objectives) in the fiscal year of his transition to part–time employment, (iv) a bonus paid in the fiscal year following the payment of the annual bonus above, (based on achievement of 100% of his individual bonus objectives) and (v) a pro–rated bonus for the fiscal year in which part–time employment ended. During the periods of part–time employment, all options to exercise stock of the Company, which were granted more than 12 months prior to the termination of full–time employment, will continue to vest. The same benefits shall be payable in the event the Company terminates his employment without cause. If he is terminated for cause (defined as (i) gross negligence or willful misconduct in connection with the performance of duties, (ii) conviction of or plea of nolo contendere to any felony, or (iii) the embezzlement or misappropriation of Company property) then he will receive a lump–sum payment equal to 25% of his base salary.

In fiscal year 2002, the Board of Directors approved individual "change–in–control" agreements for Messrs. Schroeder, Dickerson and Kispert (each, an "Executive"). As of April 30, 2004, Mr. Dickerson's agreement terminated. The change–in–control provisions of these agreements take effect if the Executive's employment is terminated involuntarily or constructively within two years after a change in control of the Company. If the provisions become effective, Mr. Schroeder would receive salary and bonus under the terms of his Retention and Non–Competition Agreement and the unvested portions of his then outstanding option grants would fully accelerate. In the case of Mr. Kispert, he would become eligible to receive: (i) an amount equal to two times his annual compensation; (ii) an amount equal to two times his bonus amount; (iii) continuation of health benefits for two years; and (iv) full acceleration of vesting for all options held. For the purpose of these agreements, a change in control occurs upon merger of the Company with or into another corporation, or a change in more than half of the total voting power of the Company, or upon the sale of substantially all of the assets of the Company.

118

| | |
|---|---|
| Mr. Dickerson | Mr. Dickerson, the Company's President and Chief Operating Officer resigned both positions effective as of April 30, 2004. Effective May 1, 2004 until the termination of his Severance Agreement and General Release (the "Severance Agreement"), Mr. Dickerson's job title will be "Senior Vice President, New Business Operations" and he will continue to report to the Company's Chief Executive Officer. During the term of his Severance Agreement, Mr. Dickerson will receive one–half of his base salary (effective as of April 30, 2004) plus a bonus for fiscal year 2004. Mr. Dickerson's outstanding stock options which had been granted by the Company prior to April 30, 2004, will continue to vest in accordance with the terms and conditions of the applicable original option agreements relating to such options through the earlier termination of his Agreement or March 31, 2006. In addition, during the pendency of the Severance Agreement, Mr. Dickerson will continue to receive all medical, dental, life, accident, and disability insurance and benefits that he was receiving from the Company as of April 30, 2004. |
| Section 16(a) Beneficial Ownership Reporting Compliance | Section 16(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") requires the Company's executive officers, directors, and persons who own more than ten percent of a registered Class of the Company's equity securities to file reports of ownership and changes in ownership with the SEC. Executive officers, directors and greater than ten percent stockholders are required by SEC regulations to furnish the Company with copies of all Section 16(a) forms they file. With one exception and based solely on its review of the copies of such forms received by it, the Company believes that during fiscal year 2004 all executive officers, directors and greater than ten percent stockholders of the Company complied with all applicable filing requirements. Due to an administrative error, Ken Levy filed an amendment to a Form 4 which was filed on January 27, 2004 to update the aggregate share ownership set forth therein. |

APPENDIX A

**KLA-TENCOR CORPORATION**
**2004 EQUITY INCENTIVE PLAN**

1. <u>Purposes of the Plan</u>. The purposes of this Equity Incentive Plan are:

- to attract and retain the best available personnel for positions of substantial responsibility,

- to provide additional incentive to Service Providers, and

- to promote the success of the Company's business.

Awards granted under the Plan may be Incentive Stock Options, Nonstatutory Stock Options, Restricted Stock, Stock Appreciation Rights, Performance Shares, Performance Units or Deferred Stock Units, as determined by the Administrator at the time of grant.

2. <u>Definitions</u>. As used herein, the following definitions shall apply:

(a)   "<u>Administrator</u>" means the Board or any of its Committees that shall be administering the Plan, in accordance with Section 4 of the Plan.

(b)   "<u>Annual Revenue</u>" means the Company's or a business unit's net sales for the Fiscal Year, determined in accordance with generally accepted accounting principles.

(c)   "<u>Applicable Laws</u>" means the requirements relating to the administration of equity compensation plans under U.S. state corporate laws, U.S. federal and state securities laws, the Code, any stock exchange or quotation system on which the Shares are listed or quoted and the applicable laws of any other country or jurisdiction where Awards are granted under the Plan.

(d)   "<u>Award</u>" means, individually or collectively, a grant under the Plan of Options, Restricted Stock, Stock Appreciation Rights, Performance Shares, Performance Units or Deferred Stock Units.

(e)   "<u>Award Agreement</u>" means the written or electronic agreement setting forth the terms and provisions applicable to each Award granted under the Plan. The Award Agreement is subject to the terms and conditions of the Plan.

(f)   "<u>Awarded Stock</u>" means the Common Stock subject to an Award.

(g)   "<u>Board</u>" means the Board of Directors of the Company.

(h)   "<u>Cash Position</u>" means the Company's level of cash and cash equivalents.

(i)   "<u>Change of Control</u>" means the occurrence of any of the following events, in one or a series of related transactions:

(i)   any "person," as such term is used in Sections 13(d) and 14(d) of the Exchange Act, other than the Company, a subsidiary of the Company or a Company employee benefit plan, including any trustee of such plan acting as trustee, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the combined voting power of the Company's then outstanding securities entitled to vote generally in the election of directors; or

(ii)   a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least fifty percent (50%) of the total voting power represented by the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; or

(iii)   the sale or disposition by the Company of all or substantially all the Company's assets; or

120

(iv) a change in the composition of the Board, as a result of which fewer than a majority of the directors are Incumbent Directors. "Incumbent Directors" shall mean directors who either (A) are Directors as of the date this Plan is approved by the Board, or (B) are elected, or nominated for election, to the Board with the affirmative votes of at least a majority of the Incumbent Directors and whose election or nomination was not in connection with any transaction described in (i) or (ii) above or in connection with an actual or threatened proxy contest relating to the election of directors of the Company.

(j)    "Code" means the Internal Revenue Code of 1986, as amended.

(k)    "Committee" means a Committee appointed by the Board in accordance with Section 4 of the Plan.

(l)    "Common Stock" means the Common Stock of the Company.

(m)    "Company" means KLA-Tencor Corporation.

(n)    "Consultant" means any person, including an advisor, engaged by the Company or a Parent or Subsidiary to render services and who is compensated for such services.

(o)    "Deferred Stock Unit" means a deferred stock unit Award granted to a Participant pursuant to Section 14.

(p)    "Director" means a member of the Board.

(q)    "Disability" means total and permanent disability as defined in Section 22(e)(3) of the Code.

(r)    "Earnings Per Share" means as to any Fiscal Year, the Company's or a business unit's Net Income, divided by a weighted average number of common shares outstanding and dilutive common equivalent shares deemed outstanding, determined in accordance with generally accepted accounting principles.

(s)    "Employee" means any person, including Officers and Directors, employed by the Company or any Parent or Subsidiary of the Company. A Service Provider shall not cease to be an Employee in the case of (i) any leave of absence approved by the Company or (ii) transfers between locations of the Company or between the Company, its Parent, any Subsidiary, or any successor. For purposes of Incentive Stock Options, no such leave may exceed ninety days, unless reemployment upon expiration of such leave is guaranteed by statute or contract. If reemployment upon expiration of a leave of absence approved by the Company is not so guaranteed, then three (3) months following the 91st day of such leave any Incentive Stock Option held by the Participant shall cease to be treated as an Incentive Stock Option and shall be treated for tax purposes as a Nonstatutory Stock Option.

(t)    "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(u)    "Fair Market Value" means, as of any date, the value of Common Stock determined as follows:

(i) If the Common Stock is listed on any established stock exchange or a national market system, including without limitation the Nasdaq National Market of the National Association of Securities Dealers, Inc. Automated Quotation ("Nasdaq") System, the Fair Market Value of a Share of Common Stock shall be the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such system or exchange (or the exchange with the greatest volume of trading in Common Stock) on the day of determination, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable;

(ii) If the Common Stock is quoted on the Nasdaq System (but not on the Nasdaq National Market thereof) or is regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value of a Share of Common Stock shall be the mean between the high bid and low asked prices for the Common Stock on the last market trading day prior to the day of determination, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable; or

(iii) In the absence of an established market for the Common Stock, the Fair Market Value shall be determined in good faith by the Administrator.

(v)    "Fiscal Year" means a fiscal year of the Company.

121

(w) "Incentive Stock Option" means an Option intended to qualify as an incentive stock option within the meaning of Section 422 of the Code and the regulations promulgated thereunder.

(x) "Net Income" means as to any Fiscal Year, the income after taxes of the Company for the Fiscal Year determined in accordance with generally accepted accounting principles.

(y) "Nonstatutory Stock Option" means an Option not intended to qualify as an Incentive Stock Option.

(z) "Notice of Grant" means a written or electronic notice evidencing certain terms and conditions of an individual Award. The Notice of Grant is part of the Option Agreement.

(aa) "Officer" means a person who is an officer of the Company within the meaning of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

(bb) "Operating Cash Flow" means the Company's or a business unit's sum of Net Income plus depreciation and amortization less capital expenditures plus changes in working capital comprised of accounts receivable, inventories, other current assets, trade accounts payable, accrued expenses, product warranty, advance payments from customers and long-term accrued expenses, determined in accordance with generally acceptable accounting principles.

(cc) "Operating Income" means the Company's or a business unit's income from operations but excluding any unusual items, determined in accordance with generally accepted accounting principles.

(dd) "Option" means a stock option granted pursuant to the Plan.

(ee) "Option Agreement" means a written or electronic agreement between the Company and a Participant evidencing the terms and conditions of an individual Option grant. The Option Agreement is subject to the terms and conditions of the Plan.

(ff) "Parent" means a "parent corporation", whether now or hereafter existing, as defined in Section 424(e) of the Code.

(gg) "Participant" means the holder of an outstanding Award granted under the Plan.

(hh) "Performance Goals" means the goal(s) (or combined goal(s)) determined by the Administrator (in its discretion) to be applicable to a Participant with respect to an Award. As determined by the Administrator, the Performance Goals applicable to an Award may provide for a targeted level or levels of achievement using one or more of the following measures: (a) Annual Revenue, (b) Cash Position, (c) Earnings Per Share, (d) Net Income, (e) Operating Cash Flow, (f) Operating Income, (g) Return on Assets, (h) Return on Equity, (i) Return on Sales, and (j) Total Stockholder Return. The Performance Goals may differ from Participant to Participant and from Award to Award.

(ii) "Performance Share" means a performance share Award granted to a Participant pursuant to Section 12.

(jj) "Performance Unit" means a performance unit Award granted to a Participant pursuant to Section 13.

(kk) "Plan" means this 2004 Equity Incentive Plan.

(ll) "Restricted Stock" means Shares granted pursuant to Section 11 of the Plan.

(mm) "Return on Assets" means the percentage equal to the Company's or a business unit's Operating Income before incentive compensation, divided by average net Company or business unit, as applicable, assets, determined in accordance with generally accepted accounting principles.

(nn) "Return on Equity" means the percentage equal to the Company's Net Income divided by average stockholder's equity, determined in accordance with generally accepted accounting principles.

(oo) "Return on Sales" means the percentage equal to the Company's or a business unit's Operating Income before incentive compensation, divided by the Company's or the business unit's, as applicable, revenue, determined in accordance with generally accepted accounting principles.

122

(pp) "Rule 16b-3" means Rule 16b-3 of the Exchange Act or any successor to Rule 16b-3, as in effect when discretion is being exercised with respect to the Plan.

(qq) "Section 16(b)" means Section 16(b) of the Securities Exchange Act of 1934, as amended.

(rr) "Service Provider" means an Employee, Consultant or Director.

(ss) "Share" means a share of the Common Stock, as adjusted in accordance with Section 18 of the Plan.

(tt) "Stock Appreciation Right" or "SAR" means an Award granted pursuant to Section 10 hereof.

(uu) "Subsidiary" means a "subsidiary corporation", whether now or hereafter existing, as defined in Section 424(f) of the Code.

(vv) "Total Stockholder Return" means the total return (change in share price plus reinvestment of any dividends) of a Share.

3. Stock Subject to the Plan. Subject to the provisions of Section 18 of the Plan, the maximum aggregate number of Shares which may be issued under the Plan is 11,000,000 Shares plus any shares subject to any outstanding options under the Company's 1982 Stock Option Plan and the Company's 2000 Nonstatutory Stock Option Plan that subsequently expire unexercised, up to a maximum of an additional 1,500,000 Shares.

Any Shares subject to Options or SARs shall be counted against the numerical limits of this Section 3 as one share for every share subject thereto. Any Shares or units subject to Restricted Stock, Performance Shares, Performance Units or Deferred Stock Unit Awards with a per share or unit purchase price lower than 100% of Fair Market Value on the date of grant shall be counted against the numerical limits of this Section 3 as 1.8 shares for every one share subject thereto.

The Shares may be authorized, but unissued, or reacquired Common Stock.

If an Award expires or becomes unexercisable without having been exercised in full, or, with respect to Restricted Stock, Performance Shares, Performance Units or Deferred Stock Units, is forfeited to or repurchased by the Company, the unpurchased Shares (or for Awards other than Options and SARs, the forfeited or repurchased shares) which were subject thereto shall become available for future grant or sale under the Plan (unless the Plan has terminated). With respect to SARs, only shares actually issued pursuant to an SAR shall cease to be available under the Plan; all remaining shares under SARs shall remain available for future grant or sale under the Plan (unless the Plan has terminated). However, Shares that have actually been issued under the Plan under any Award shall not be returned to the Plan and shall not become available for future distribution under the Plan; provided, however, that if Shares of Restricted Stock, Performance Shares, Performance Units or Deferred Stock Units are repurchased by the Company at their original purchase price or are forfeited to the Company, such Shares shall become available for future grant under the Plan. Shares used to pay the exercise price of an Option or Stock Purchase Right shall become available for future grant or sale under the Plan. To the extent an Award under the Plan is paid out in cash rather than stock, such cash payment shall not result in reducing the number of Shares available for issuance under the Plan.

4. Administration of the Plan.

(a) Procedure.

(i) Multiple Administrative Bodies. The Plan may be administered by different Committees with respect to different groups of Service Providers.

(ii) Section 162(m). To the extent that the Administrator determines it to be desirable to qualify Options granted hereunder as "performance-based compensation" within the meaning of Section 162(m) of the Code, the Plan shall be administered by a Committee of two or more "outside directors" within the meaning of Section 162(m) of the Code.

(iii) Rule 16b-3. To the extent desirable to qualify transactions hereunder as exempt under Rule 16b-3, the transactions contemplated hereunder shall be structured to satisfy the requirements for exemption under Rule 16b-3.

123

(iv) <u>Other Administration</u>. Other than as provided above, the Plan shall be administered by (A) the Board or (B) a Committee, which committee shall be constituted to satisfy Applicable Laws.

(b) <u>Powers of the Administrator</u>. Subject to the provisions of the Plan, and in the case of a Committee, subject to the specific duties delegated by the Board to such Committee, the Administrator shall have the authority, in its discretion:

(i)   to determine the Fair Market Value of the Common Stock, in accordance with Section 2(u) of the Plan;

(ii)  to select the Service Providers to whom Awards may be granted hereunder;

(iii) to determine whether and to what extent Awards or any combination thereof, are granted hereunder;

(iv)  to determine the number of shares of Common Stock or equivalent units to be covered by each Award granted hereunder;

(v)   to approve forms of agreement for use under the Plan;

(vi)  to determine the terms and conditions, not inconsistent with the terms of the Plan, of any award granted hereunder. Such terms and conditions include, but are not limited to, the exercise price, the time or times when Options or SARs may be exercised or other Awards vest (which may be based on performance criteria), any vesting acceleration or waiver of forfeiture restrictions, and any restriction or limitation regarding any Award or the shares of Common Stock relating thereto, based in each case on such factors as the Administrator, in its sole discretion, shall determine;

(vii) to construe and interpret the terms of the Plan and Awards;

(viii) to prescribe, amend and rescind rules and regulations relating to the Plan, including rules and regulations relating to sub-plans established for the purpose of qualifying for preferred tax treatment under foreign tax laws;

(ix)  to modify or amend each Award (subject to Section 20(c) of the Plan), including the discretionary authority to extend the post-termination exercisability period of Options and SARs longer than is otherwise provided for in the Plan;

(x)   to authorize any person to execute on behalf of the Company any instrument required to effect the grant of an Award previously granted by the Administrator;

(xi)  to allow Participants to satisfy withholding tax obligations by electing to have the Company withhold from the Shares or cash to be issued upon exercise or vesting of an Award (or distribution of a Deferred Stock Unit) that number of Shares or cash having a Fair Market Value equal to the minimum amount required to be withheld (but no more). The Fair Market Value of any Shares to be withheld shall be determined on the date that the amount of tax to be withheld is to be determined. All elections by a Participant to have Shares or cash withheld for this purpose shall be made in such form and under such conditions as the Administrator may deem necessary or advisable;

(xii) to determine the terms and restrictions applicable to Awards; and

(xiii) to make all other determinations deemed necessary or advisable for administering the Plan.

(c) <u>Effect of Administrator's Decision</u>. The Administrator's decisions, determinations and interpretations shall be final and binding on all Participants and any other holders of Awards.

5. <u>Eligibility</u>. Restricted Stock, Performance Shares, Performance Units, Stock Appreciation Rights, Deferred Stock Units and Nonstatutory Stock Options may be granted to Service Providers. Incentive Stock Options may be granted only to Employees.

6. <u>No Employment Rights</u>. Neither the Plan nor any Award shall confer upon a Participant any right with respect to continuing the Participant's employment with the Company or its Subsidiaries, nor shall they interfere

124

in any way with the Participant's right or the Company's or Subsidiary's right, as the case may be, to terminate such employment at any time, with or without cause or notice.

    7. Code Section 162(m) Provisions.

    (a) Option and SAR Annual Share Limit. No Participant shall be granted, in any Fiscal Year, Options and Stock Appreciation Rights to purchase more than 400,000 Shares; provided, however, that such limit shall be 1,200,000 Shares in the Participant's first Fiscal Year of Company service.

    (b) Restricted Stock and Performance Share Annual Limit. No Participant shall be granted, in any Fiscal Year, more than 200,000 Shares of Restricted Stock or Performance Shares; provided, however, that such limit shall be 600,000 Shares in the Participant's first Fiscal Year of Company service.

    (c) Performance Units Annual Limit. No Participant shall receive Performance Units, in any Fiscal Year, having an initial value greater than $1,000,000, provided, however, that such limit shall be $3,000,000 in the Participant's first Fiscal Year of Company service.

    (d) Section 162(m) Performance Restrictions. For purposes of qualifying grants of Restricted Stock, Performance Shares or Performance Units as "performance−based compensation" under Section 162(m) of the Code, the Administrator, in its discretion, may set restrictions based upon the achievement of Performance Goals. The Performance Goals shall be set by the Administrator on or before the latest date permissible to enable the Restricted Stock, Performance Shares or Performance Units to qualify as "performance−based compensation" under Section 162(m) of the Code. In granting Restricted Stock, Performance Shares or Performance Units which are intended to qualify under Section 162(m) of the Code, the Administrator shall follow any procedures determined by it from time to time to be necessary or appropriate to ensure qualification of the Award under Section 162(m) of the Code (e.g., in determining the Performance Goals).

    (e) Changes in Capitalization. The numerical limitations in Sections 7(a) and (b) shall be adjusted proportionately in connection with any change in the Company's capitalization as described in Section 18(a).

    8. Term of Plan. The Plan shall continue in effect for a term of ten (10) years following the date upon which the Board approved the Plan in 2004.

    9. Stock Options.

    (a) Term. The term of each Option shall be stated in the Notice of Grant; provided, however, that the term shall be ten (10) years from the date of grant or such shorter term as may be provided in the Notice of Grant. Moreover, in the case of an Incentive Stock Option granted to a Participant who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the term of the Incentive Stock Option shall be five (5) years from the date of grant or such shorter term as may be provided in the Notice of Grant.

    (b) Option Exercise Price. The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be determined by the Administrator and shall be no less than 100% of the Fair Market Value per share on the date of grant; provided, however, that in the case of an Incentive Stock Option granted to an Employee who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the per Share exercise price shall be no less than 110% of the Fair Market Value per Share on the date of grant.

    (c) No Repricing. The exercise price for an Option may not be reduced without the consent of the Company's stockholders. This shall include, without limitation, a repricing of the Option as well as an Option exchange program whereby the Participant agrees to cancel an existing Option in exchange for an Option, SAR or other Award.

    (d) Waiting Period and Exercise Dates. At the time an Option is granted, the Administrator shall fix the period within which the Option may be exercised and shall determine any conditions which must be satisfied before the Option may be exercised. In so doing, the Administrator may specify that an Option may not be exercised until the completion of a service period or until performance milestones are satisfied.

(e) Form of Consideration. The Administrator shall determine the acceptable form of consideration for exercising an Option, including the method of payment. In the case of an Incentive Stock Option, the Administrator shall determine the acceptable form of consideration at the time of grant. Subject to Applicable Laws, such consideration may consist entirely of:

(i) cash;

(ii) check;

(iii) other Shares which (A) in the case of Shares acquired upon exercise of an option, have been owned by the Participant for more than six months on the date of surrender, and (B) have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which said Option shall be exercised;

(iv) delivery of a properly executed exercise notice together with such other documentation as the Administrator and the broker, if applicable, shall require to effect an exercise of the Option and delivery to the Company of the sale proceeds required to pay the exercise price;

(v) any combination of the foregoing methods of payment; or

(vi) such other consideration and method of payment for the issuance of Shares to the extent permitted by Applicable Laws.

(f) Exercise of Option; Rights as a Stockholder. Any Option granted hereunder shall be exercisable according to the terms of the Plan and at such times and under such conditions as determined by the Administrator and set forth in the Option Agreement. An Option may not be exercised for a fraction of a Share.

An Option shall be deemed exercised when the Company receives: (i) written or electronic notice of exercise (in accordance with the Option Agreement) from the person entitled to exercise the Option, and (ii) full payment for the Shares with respect to which the Option is exercised. Full payment may consist of any consideration and method of payment authorized by the Administrator and permitted by the Option Agreement and the Plan. Shares issued upon exercise of an Option shall be issued in the name of the Participant. Until the stock certificate evidencing such Shares is issued (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the optioned stock, notwithstanding the exercise of the Option. The Company shall issue (or cause to be issued) such stock certificate promptly after the Option is exercised. No adjustment will be made for a dividend or other right for which the record date is prior to the date the stock certificate is issued, except as provided in Section 18 of the Plan.

Exercising an Option in any manner shall decrease the number of Shares thereafter available for sale under the Option, by the number of Shares as to which the Option is exercised.

(g) Termination of Relationship as a Service Provider. If a Participant ceases to be a Service Provider, other than upon the Participant's death or Disability, the Participant may exercise his or her Option within such period of time as is specified in the Option Agreement to the extent that the Option is vested on the date of termination (but in no event later than the expiration of the term of such Option as set forth in the Option Agreement). In the absence of a specified time in the Option Agreement, the Option shall remain exercisable for three months following the Participant's termination. If, on the date of termination, the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option shall revert to the Plan. If, after termination, the Participant does not exercise his or her Option within the time specified by the Administrator, the Option shall terminate, and the Shares covered by such Option shall revert to the Plan.

(h) Disability. If a Participant ceases to be a Service Provider as a result of the Participant's Disability, the Participant may exercise his or her Option within such period of time as is specified in the Option Agreement to the extent the Option is vested on the date of termination (but in no event later than the expiration of the term of such Option as set forth in the Option Agreement). In the absence of a specified time in the Option Agreement, the Option shall remain exercisable for twelve (12) months following the Participant's termination. If, on the date of termination, the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option shall revert to the Plan. If, after termination, the Participant does not exercise his or her Option within the time specified herein, the Option shall terminate, and the Shares covered by such Option shall revert to the Plan.

126

(i) <u>Death of Participant</u>. If a Participant dies while a Service Provider, the Option may be exercised following the Participant's death within such period of time as is specified in the Option Agreement (but in no event may the option be exercised later than the expiration of the term of such Option as set forth in the Option Agreement), by the Participant's designated beneficiary, provided such beneficiary has been designated prior to Participant's death in a form acceptable to the Administrator. If no such beneficiary has been designated by the Participant, then such Option may be exercised by the personal representative of the Participant's estate or by the person(s) to whom the Option is transferred pursuant to the Participant's will or in accordance with the laws of descent and distribution. In the absence of a specified time in the Option Agreement, the Option shall remain exercisable for twelve (12) months following Participant's death. If the Option is not so exercised within the time specified herein, the Option shall terminate, and the Shares covered by such Option shall revert to the Plan.

(j) <u>ISO $100,000 Rule</u>. Each Option shall be designated in the Notice of Grant as either an Incentive Stock Option or a Nonstatutory Stock Option. However, notwithstanding such designations, to the extent that the aggregate Fair Market Value:

(i) of Shares subject to a Participant's Incentive Stock Options granted by the Company, any Parent or Subsidiary, which

(ii) become exercisable for the first time during any calendar year (under all plans of the Company or any Parent or Subsidiary) exceeds $100,000, such excess Options shall be treated as Nonstatutory Stock Options. For purposes of this Section 9(j), Incentive Stock Options shall be taken into account in the order in which they were granted, and the Fair Market Value of the Shares shall be determined as of the time of grant.

10. <u>Stock Appreciation Rights</u>.

(a) <u>Grant of SARs</u>. Subject to the terms and conditions of the Plan, SARs may be granted to Participants at any time and from time to time as shall be determined by the Administrator, in its sole discretion. The Administrator shall have complete discretion to determine the number of SARs granted to any Participant.

(b) <u>Exercise Price and other Terms</u>. Subject to Section 7(a) of the Plan, the Administrator, subject to the provisions of the Plan, shall have complete discretion to determine the terms and conditions of SARs granted under the Plan; provided, however, that no SAR may have a term of more than ten (10) years from the date of grant. The exercise price for the Shares or cash to be issued pursuant to an already granted SAR may not be changed without the consent of the Company's stockholders. This shall include, without limitation, a repricing of the SAR as well as an SAR exchange program whereby the Participant agrees to cancel an existing SAR in exchange for an Option, SAR or other Award.

(c) <u>Payment of SAR Amount</u>. Upon exercise of a SAR, a Participant shall be entitled to receive payment from the Company in an amount determined by multiplying:

(i) The difference between the Fair Market Value of a Share on the date of exercise over the exercise price; times

(ii) the number of Shares with respect to which the SAR is exercised.

(d) <u>Payment upon Exercise of SAR</u>. At the discretion of the Administrator, payment for a SAR may be in cash, Shares or a combination thereof.

(e) <u>SAR Agreement</u>. Each SAR grant shall be evidenced by an Award Agreement that shall specify the exercise price, the term of the SAR, the conditions of exercise, and such other terms and conditions as the Administrator, in its sole discretion, shall determine.

(f) <u>Expiration of SARs</u>. A SAR granted under the Plan shall expire upon the date determined by the Administrator, in its sole discretion, and set forth in the Award Agreement.

(g) <u>Termination of Relationship as a Service Provider</u>. If a Participant ceases to be a Service Provider, other than upon the Participant's death or Disability termination, the Participant may exercise his or her SAR within such period of time as is specified in the SAR Agreement to the extent that the SAR is vested on the date of termination (but in no event later than the expiration of the term of such SAR as set forth in the SAR Agreement).

127

In the absence of a specified time in the SAR Agreement, the SAR shall remain exercisable for three months following the Participant's termination. If, on the date of termination, the Participant is not vested as to his or her entire SAR, the Shares covered by the unvested portion of the SAR shall revert to the Plan. If, after termination, the Participant does not exercise his or her SAR within the time specified by the Administrator, the SAR shall terminate, and the Shares covered by such SAR shall revert to the Plan.

(h) Disability. If a Participant ceases to be a Service Provider as a result of the Participant's Disability, the Participant may exercise his or her SAR within such period of time as is specified in the SAR Agreement to the extent the SAR is vested on the date of termination (but in no event later than the expiration of the term of such SAR as set forth in the SAR Agreement). In the absence of a specified time in the SAR Agreement, the SAR shall remain exercisable for twelve (12) months following the Participant's termination. If, on the date of termination, the Participant is not vested as to his or her entire SAR, the Shares covered by the unvested portion of the SAR shall revert to the Plan. If, after termination, the Participant does not exercise his or her SAR within the time specified herein, the SAR shall terminate, and the Shares covered by such SAR shall revert to the Plan.

(i) Death of Participant. If a Participant dies while a Service Provider, the SAR may be exercised following the Participant's death within such period of time as is specified in the SAR Agreement (but in no event may the SAR be exercised later than the expiration of the term of such SAR as set forth in the SAR Agreement), by the Participant's designated beneficiary, provided such beneficiary has been designated prior to Participant's death in a form acceptable to the Administrator. If no such beneficiary has been designated by the Participant, then such SAR may be exercised by the personal representative of the Participant's estate or by the person(s) to whom the SAR is transferred pursuant to the Participant's will or in accordance with the laws of descent and distribution. In the absence of a specified time in the SAR Agreement, the SAR shall remain exercisable for twelve (12) months following Participant's death. If the SAR is not so exercised within the time specified herein, the SAR shall terminate, and the Shares covered by such SAR shall revert to the Plan.

11. Restricted Stock.

(a) Grant of Restricted Stock. Subject to the terms and conditions of the Plan, Restricted Stock may be granted to Participants at any time as shall be determined by the Administrator, in its sole discretion. Subject to Section 7(b) hereof, the Administrator shall have complete discretion to determine (i) the number of Shares subject to a Restricted Stock award granted to any Participant, and (ii) the conditions that must be satisfied, which typically will be based principally or solely on continued provision of services but may include a performance−based component, upon which is conditioned the grant, vesting or issuance of Restricted Stock. Restricted Stock shall be granted in the form of units to acquire Shares. Each such unit shall be the equivalent of one Share for purposes of determining the number of Shares subject to an Award. Restricted Stock may be granted in the form of restricted stock units that are not issued until the vesting conditions are satisfied. Until the Shares are issued, no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the units to acquire Shares.

(b) Other Terms. The Administrator, subject to the provisions of the Plan, shall have complete discretion to determine the terms and conditions of Restricted Stock granted under the Plan. Restricted Stock grants shall be subject to the terms, conditions, and restrictions determined by the Administrator at the time the stock or the restricted stock unit is awarded. The Administrator may require the recipient to sign a Restricted Stock Award agreement as a condition of the award. Any certificates representing the Shares of stock awarded shall bear such legends as shall be determined by the Administrator.

(c) Restricted Stock Award Agreement. Each Restricted Stock grant shall be evidenced by an agreement that shall specify the purchase price (if any) and such other terms and conditions as the Administrator, in its sole discretion, shall determine; provided; however, that if the Restricted Stock grant has a purchase price, such purchase price must be paid no more than ten (10) years following the date of grant.

12. Performance Shares.

(a) Grant of Performance Shares. Subject to the terms and conditions of the Plan, Performance Shares may be granted to Participants at any time as shall be determined by the Administrator, in its sole discretion. Subject to Section 7(b) hereof, the Administrator shall have complete discretion to determine (i) the number of Shares subject to a Performance Share award granted to any Participant, and (ii) the conditions that must be satisfied, which

128

typically will be based principally or solely on achievement of performance milestones but may include a service-based component, upon which is conditioned the grant or vesting of Performance Shares. Performance Shares shall be granted in the form of units to acquire Shares. Each such unit shall be the equivalent of one Share for purposes of determining the number of Shares subject to an Award. Until the Shares are issued, no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the units to acquire Shares.

(b) Other Terms. The Administrator, subject to the provisions of the Plan, shall have complete discretion to determine the terms and conditions of Performance Shares granted under the Plan. Performance Share grants shall be subject to the terms, conditions, and restrictions determined by the Administrator at the time the stock is awarded, which may include such performance-based milestones as are determined appropriate by the Administrator. The Administrator may require the recipient to sign a Performance Shares agreement as a condition of the award. Any certificates representing the Shares of stock awarded shall bear such legends as shall be determined by the Administrator.

(c) Performance Share Award Agreement. Each Performance Share grant shall be evidenced by an agreement that shall specify such other terms and conditions as the Administrator, in its sole discretion, shall determine.

13. Performance Units.

(a) Grant of Performance Units. Performance Units are similar to Performance Shares, except that they shall be settled in a cash equivalent to the Fair Market Value of the underlying Shares, determined as of the vesting date. Subject to the terms and conditions of the Plan, Performance Units may be granted to Participants at any time and from time to time as shall be determined by the Administrator, in its sole discretion. The Administrator shall have complete discretion to determine the conditions that must be satisfied, which typically will be based principally or solely on achievement of performance milestones but may include a service-based component, upon which is conditioned the grant or vesting of Performance Units. Performance Units shall be granted in the form of units to acquire Shares. Each such unit shall be the cash equivalent of one Share of Common Stock. No right to vote or receive dividends or any other rights as a stockholder shall exist with respect to Performance Units or the cash payable thereunder.

(b) Number of Performance Units. Subject to Section 7(c) hereof, the Administrator will have complete discretion in determining the number of Performance Units granted to any Participant.

(c) Other Terms. The Administrator, subject to the provisions of the Plan, shall have complete discretion to determine the terms and conditions of Performance Units granted under the Plan. Performance Unit grants shall be subject to the terms, conditions, and restrictions determined by the Administrator at the time the grant is awarded, which may include such performance-based milestones as are determined appropriate by the Administrator. The Administrator may require the recipient to sign a Performance Unit agreement as a condition of the award. Any certificates representing the units awarded shall bear such legends as shall be determined by the Administrator.

(d) Performance Unit Award Agreement. Each Performance Unit grant shall be evidenced by an agreement that shall specify such terms and conditions as the Administrator, in its sole discretion, shall determine.

14. Deferred Stock Units.

(a) Description. Deferred Stock Units shall consist of a Restricted Stock, Performance Share or Performance Unit Award that the Administrator, in its sole discretion permits to be paid out in installments or on a deferred basis, in accordance with rules and procedures established by the Administrator. Deferred Stock Units shall remain subject to the claims of the Company's general creditors until distributed to the Participant.

(b) 162(m) Limits. Deferred Stock Units shall be subject to the annual 162(m) limits applicable to the underlying Restricted Stock, Performance Share or Performance Unit Award as set forth in Section 7 hereof.

15. Leaves of Absence. Unless the Administrator provides otherwise or except as otherwise required by Applicable Laws, vesting of Awards granted hereunder shall cease commencing on the first day of any unpaid leave of absence and shall only recommence upon return to active service.

16. Part-Time Service. Unless the Administrator provides otherwise or except as otherwise required by Applicable Laws, any service-based vesting of Awards granted hereunder shall be extended on a proportionate basis

129

in the event an Employee transitions to a work schedule under which they are customarily scheduled to work on less than a full-time basis, or if not on a full-time work schedule, to a schedule requiring fewer hours of service. Such vesting shall be proportionately re-adjusted prospectively in the event that the Employee subsequently becomes regularly scheduled to work additional hours of service.

17. Non-Transferability of Awards. Unless determined otherwise by the Administrator, an Award may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent or distribution and may be exercised, during the lifetime of the recipient, only by the recipient. If the Administrator makes an Award transferable, such Award shall contain such additional terms and conditions as the Administrator deems appropriate.

18. Adjustments Upon Changes in Capitalization, Dissolution or Liquidation or Change of Control.

(a) Changes in Capitalization. Subject to any required action by the stockholders of the Company, the number of shares of Common Stock covered by each outstanding Award, the number of shares of Common Stock which have been authorized for issuance under the Plan but as to which no Awards have yet been granted or which have been returned to the Plan upon cancellation or expiration of an Award, as well as the price per share of Common Stock covered by each such outstanding Award and the 162(m) fiscal year share issuance limits under Sections 7(a) and (b) hereof shall be proportionately adjusted for any increase or decrease in the number of issued shares of Common Stock resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the Common Stock, or any other increase or decrease in the number of issued shares of Common Stock effected without receipt of consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." Such adjustment shall be made by the Compensation Committee, whose determination in that respect shall be final, binding and conclusive. Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares of Common Stock subject to an Award.

(b) Dissolution or Liquidation. In the event of the proposed dissolution or liquidation of the Company, the Administrator shall notify each Participant as soon as practicable prior to the effective date of such proposed transaction. The Administrator in its discretion may provide for a Participant to have the right to exercise his or her Option or SAR until ten (10) days prior to such transaction as to all of the Awarded Stock covered thereby, including Shares as to which the Award would not otherwise be exercisable. In addition, the Administrator may provide that any Company repurchase option or forfeiture rights applicable to any Award shall lapse 100%, and that any Award vesting shall accelerate 100%, provided the proposed dissolution or liquidation takes place at the time and in the manner contemplated. To the extent it has not been previously exercised (with respect to Options and SARs) or vested (with respect to other Awards), an Award will terminate immediately prior to the consummation of such proposed action.

(c) Change of Control.

(i) Stock Options and SARs. In the event of a Change of Control, each outstanding Option and SAR shall be assumed or an equivalent option or SAR substituted by the successor corporation or a Parent or Subsidiary of the successor corporation. In the event that the successor corporation refuses to assume or substitute for the Option or SAR, the Participant shall fully vest in and have the right to exercise the Option or SAR as to all of the Awarded Stock, including Shares as to which it would not otherwise be vested or exercisable. If an Option or SAR becomes fully vested and exercisable in lieu of assumption or substitution in the event of a Change of Control, the Administrator shall notify the Participant in writing or electronically that the Option or SAR shall be fully vested and exercisable for a period of fifteen (15) days from the date of such notice, and the Option or SAR shall terminate upon the expiration of such period. For the purposes of this paragraph, the Option or SAR shall be considered assumed if, following the Change of Control, the option or stock appreciation right confers the right to purchase or receive, for each Share of Awarded Stock subject to the Option or SAR immediately prior to the Change of Control, the consideration (whether stock, cash, or other securities or property) received in the Change of Control by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the Change of Control is not solely

130

common stock of the successor corporation or its Parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of the Option or SAR, for each Share of Awarded Stock subject to the Option or SAR, to be solely common stock of the successor corporation or its Parent equal in fair market value to the per share consideration received by holders of Common Stock in the Change of Control.

(ii) Restricted Stock, Performance Shares, Performance Units and Deferred Stock Units. In the event of a Change of Control, each outstanding Restricted Stock, Performance Share, Performance Unit and Deferred Stock Unit award shall be assumed or an equivalent Restricted Stock, Performance Share, Performance Unit and Deferred Stock Unit award substituted by the successor corporation or a Parent or Subsidiary of the successor corporation. In the event that the successor corporation refuses to assume or substitute for the Restricted Stock, Performance Share, Performance Unit or Deferred Stock Unit award, the Participant shall fully vest in the Restricted Stock, Performance Share, Performance Unit or Deferred Stock Unit including as to Shares (or with respect to Performance Units, the cash equivalent thereof) which would not otherwise be vested. For the purposes of this paragraph, a Restricted Stock, Performance Share, Performance Unit and Deferred Stock Unit award shall be considered assumed if, following the Change of Control, the award confers the right to purchase or receive, for each Share (or with respect to Performance Units, the cash equivalent thereof) subject to the Award immediately prior to the Change of Control, the consideration (whether stock, cash, or other securities or property) received in the Change of Control by holders of Common Stock for each Share held on the effective date of the transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the Change of Control is not solely common stock of the successor corporation or its Parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received, for each Share and each unit/right to acquire a Share subject to the Award, to be solely common stock of the successor corporation or its Parent equal in fair market value to the per share consideration received by holders of Common Stock in the Change of Control.

19. Date of Grant. The date of grant of an Award shall be, for all purposes, the date on which the Administrator makes the determination granting such Award, or such other later date as is determined by the Administrator. Notice of the determination shall be provided to each Participant within a reasonable time after the date of such grant.

20. Amendment and Termination of the Plan.

(a) Amendment and Termination. The Board may at any time amend, alter, suspend or terminate the Plan; provided, however, that the Board may not materially amend the Stock Plan without obtaining stockholder approval.

(b) Stockholder Approval. The Company shall obtain stockholder approval of any Plan amendment to the extent necessary and desirable to comply Section 422 of the Code (or any successor rule or statute or other applicable law, rule or regulation, including the requirements of any exchange or quotation system on which the Common Stock is listed or quoted). Such stockholder approval, if required, shall be obtained in such a manner and to such a degree as is required by the applicable law, rule or regulation.

(c) Effect of Amendment or Termination. No amendment, alteration, suspension or termination of the Plan shall impair the rights of any Participant, unless mutually agreed otherwise between the Participant and the Administrator, which agreement must be in writing (or electronic format) and signed by the Participant and the Company.

21. Conditions Upon Issuance of Shares.

(a) Legal Compliance. Shares shall not be issued pursuant to the exercise of an Award unless the exercise of the Award or the issuance and delivery of such Shares (or with respect to Performance Units, the cash equivalent thereof) shall comply with Applicable Laws and shall be further subject to the approval of counsel for the Company with respect to such compliance.

(b) Investment Representations. As a condition to the exercise or receipt of an Award, the Company may require the person exercising or receiving such Award to represent and warrant at the time of any such exercise or receipt that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is required.

131

22. Liability of Company.

(a) Inability to Obtain Authority. The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained.

(b) Grants Exceeding Allotted Shares. If the Awarded Stock covered by an Award exceeds, as of the date of grant, the number of Shares which may be issued under the Plan without additional stockholder approval, such Award shall be void with respect to such excess Awarded Stock, unless stockholder approval of an amendment sufficiently increasing the number of Shares subject to the Plan is timely obtained in accordance with Section 20(b) of the Plan.

23. Reservation of Shares. The Company, during the term of this Plan, will at all times reserve and keep available such number of Shares as shall be sufficient to satisfy the requirements of the Plan.

132

**KLA Tencor**

KLA-TENCOR CORPORATION
C/O EQUISERVE
150 ROYALL STREET
CANTON, MA 02021
MS 45-02-62

**VOTE BY INTERNET** – www.proxyvote.com
Use the Internet to transmit your voting instructions and for electronic delivery of information up until 11:59 P.M. Eastern Time on October 17, 2004. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

**VOTE BY PHONE** – 1–800–690–6903
Use any touch–tone telephone to transmit your voting instructions up until 11:59 P.M. Eastern Time on October 17, 2004. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign, and date your proxy card and return it in the postage–paid envelope we have provided or return it to KLA–Tencor Corporation, c/o ADP, 51 Mercedes Way, Edgewood, NY 11717.

Your telephone or Internet vote authorizes the named proxies to vote your shares in the same manner as if you marked, signed and returned your proxy card.

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:     KLATN1     KEEP THIS PORTION FOR YOUR RECORDS

DETACH AND RETURN THIS PORTION ONLY

**THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.**

KLA–TENCOR CORPORATION (the "Company")

The Board Recommends a Vote "FOR" all Nominees for Director, "FOR" Proposal 2 and "FOR" Proposal 3.

Vote On Directors

|  | For All | Withhold All | For All Except |  |
|---|---|---|---|---|
| 1. To elect three Class III directors to each serve for a three year term and until their successors are duly elected. | ☐ | ☐ | ☐ | To withhold authority to vote, mark "For All Except" and clearly write the nominee's letter on the line below. _____ |
| a. Edward W. Barnholt | | | | |
| b. Stephen P. Kaufman | | | | |
| c. Kenneth L. Schroeder | | | | |

Vote on Proposals

|  | For | Against | Abstain |
|---|---|---|---|
| 2. To approve the Company's 2004 Equity Incentive Plan, including approval of its material terms and performance goals for purposes of Internal Revenue Code Section 162(m). | ☐ | ☐ | ☐ |
| 3. To ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2005. | ☐ | ☐ | ☐ |

To transact such other business as may properly come before the meeting or any adjournment thereof.

In their discretion, the proxy holders are authorized to vote on all such other matters as may properly come before the meeting or any adjournment or postponement thereof.

Please sign exactly as your name appears on your stock certificate(s), date and return this Proxy promptly in the postage–paid envelope provided or vote by Internet or by telephone. Please correct your address before returning this Proxy. Persons signing in a fiduciary capacity should so indicate. If shares are held by joint tenants or as community property, both should sign.

|  | Yes | No |
|---|---|---|
| **HOUSEHOLDING ELECTION** – Please indicate if you consent to receive certain future investor communications in a single package per household | ☐ | ☐ |

_____   _____
Signature [PLEASE SIGN WITHIN BOX]     Date

_____   _____
Signature (Joint Owners)     Date

THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

**KLA-TENCOR CORPORATION**
Notice of Annual Meeting of Stockholders
October 18, 2004

To the Stockholders:

NOTICE IS HEREBY GIVEN that the Annual Meeting of Stockholders of KLA-Tencor Corporation (the "Company"), a Delaware corporation, will be held on Monday, October 18, 2004 at 1:00 P.M., local time, at the Company's offices located at Three Technology Drive, Milpitas, California 95035, for the purposes stated on the reverse side.

The undersigned hereby appoints John H. Kispert and Stuart J. Nichols, or either of them, as proxies, each with the power to appoint his substitute, and hereby authorizes them to represent and to vote, as designated on the reverse side, all of the shares of Common Stock of KLA-Tencor Corporation that the undersigned is entitled to vote at the Annual Meeting of Stockholders, and any adjournment or postponement thereof.

THIS PROXY, WHEN PROPERLY EXECUTED, WILL BE VOTED AS DIRECTED BY THE UNDERSIGNED STOCKHOLDER. IF NO SUCH DIRECTIONS ARE MADE, THIS PROXY WILL BE VOTED FOR THE ELECTION OF THE NOMINEES LISTED ON THE REVERSE SIDE FOR THE BOARD OF DIRECTORS AND FOR PROPOSALS 2 AND 3.

PLEASE MARK, SIGN, DATE AND RETURN THIS PROXY CARD PROMPTLY USING THE ENCLOSED POSTAGE-PAID ENVELOPE.

| SEE REVERSE SIDE | CONTINUED AND TO BE SIGNED ON REVERSE SIDE | SEE REVERSE SIDE |
|---|---|---|